NO FEE PURSUANT TO GOVERNMENT CODE SECTION 6103

ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General
CHRISTINA MCCALL
SABRINA T. MCGRAW
EDWARD P. WOLFE
Deputy Attorneys General
State Bar No. 247835
 600 W Broadway, STE 1800
 San Diego, CA 92101-3375
 Telephone: (619) 321-5426
 Fax: (916) 731-2124
 E-mail: Edward.Wolfe@doj.ca.gov
*Attorneys for Defendants,
State of California and Robert Bonta, in his official
capacity as head of the California Department of
Justice*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA and ROBERT BONTA, in his official capacity as head of the California Department of Justice,** | Case No. 8:26-cv-1697-AH-MBK<br><br>**DECLARATION OF SABRINA T. MCGRAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER (ECF 3)**<br><br>Date: Not Set<br>Time: Not Set<br>Courtroom: Los Angeles Courtroom 9C<br>Judge: Hon. Anne Hwang<br>Trial Date: Not Set<br>Action Filed: July 1, 2026 |

1

I, Sabrina T. McGraw, hereby declare and state as follows:

1.     I am an attorney licensed to practice law in the State of California, admitted to the bar of this Court, and a Deputy Attorney General in the Office of the Attorney General, California Department of Justice. The Attorney General is counsel to Defendants State of California and Rob Bonta in his official capacity (collectively, Defendants) in this action. I make this declaration in support of Defendants' Opposition to Plaintiff's *Ex Parte* Application for Temporary Restraining Order.

2.     Attached as **Exhibit 1** is a true and correct copy of the advisory, entitled "Assembly Bill (AB) 1127 – Semiautomatic Pistols Currently on the Roster of Handguns Certified for Sale that Would Qualify as a 'Machinegun-Convertible Pistol,'" that was electronically sent by the California Department of Justice, Bureau of Firearms to all licensed California firearm dealers on December 26, 2025.

3.     Attached as **Exhibit 2** is a true and correct copy of Glock, Inc. and Glock Ges.m.b.H.'s Limited Opposition to Minnesota's Motion for Leave to Supplement Complaint in *State by Ellison v. Glock, Inc.*, No. 27-CV-24-18827 (Minn. Dist. Ct. Mar. 10, 2026).

4.     Attached as **Exhibit 3** is a true and correct copy of the letter sent by Harmeet K. Dhillon, Assistant Attorney General of the U.S. Department of Justice to California Governor Gavin Newsom and California Attorney General Rob Bonta on June 24, 2026.

5.     Attached as **Exhibit 4** is a true and correct copy of the District of Columbia's Motion to Dismiss filed in *United States v. District of Columbia*, No. 1:25-cv-04458-APM (D.D.C. filed June 25, 2026).

6.     Attached as **Exhibit 5** is a true and correct copy of Colorado's Motion to Dismiss filed in *United States v. Colorado*, No. 1:26-cv-01950-SKC-TPO (D. Colo. filed June 30, 2026).

2

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 2nd day of July, 2026, in San Francisco, California.

Sabrina T. McGraw

3

# Exhibit 1



**California Department of Justice**
**Bureau of Firearms**
**Firearms Dealer/Ammunition Vendor Information**
**Advisory Number: 173**
**Issue Date: December 26, 2025**

**SUBJECT: Assembly Bill (AB) 1127 – Semiautomatic Pistols Currently on the Roster of Handguns Certified for Sale that Would Qualify as a "Machinegun-Convertible Pistol"**

The purpose of this notice is to inform all California Firearm Dealers which semiautomatic pistols that are currently on the Roster of Handguns Certified for Sale (Handgun Roster) would qualify as a "machinegun-convertible pistol" under the new Penal Code section 27595 added by Assembly Bill (AB) 1127 (stats. 2025, ch. 572).

**Brief Overview of the Statutory Requirements Under AB 1127:**

Commencing July 1, 2026, AB 1127 prohibits a California firearms dealer from selling, offering for sale, exchanging, giving, transferring, or delivering a "machinegun-convertible pistol," except as specified under the new Penal Code section 27595. The penalties for violating this prohibition are outlined in the new Penal Code section 27595, subdivision (b).

AB 1127 defines a "machinegun-convertible pistol" under the new Penal Code section 16885, subdivisions (a) and (b) as:

*[A]ny semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with common household tools, as defined in Section 4082 of Title 11 of the California Code of Regulations, into a machinegun by the installation or attachment of a pistol converter as a replacement for the slide's backplate without any additional engineering, machining, or modification of the pistol's trigger mechanism.*

*A machinegun-convertible pistol does not include a hammer-fired semiautomatic pistol or striker-fired semiautomatic pistol lacking a cruciform trigger bar, which instead has a trigger bar that is shielded from interference by a pistol converter.*

AB 1127 additionally adds to the definition of a "machinegun" at Penal Code section 16880 "any machinegun-convertible pistol equipped with a pistol converter, as defined in [Penal Code] Section 17015."

The full text of AB 1127 is attached to this advisory and is available at this hyperlink: https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202520260AB1127.

**List of Semiautomatic Pistols Currently on the Roster of Handguns Certified for Sale that Would Qualify as a "Machinegun-Convertible Pistol"**

Under Penal Code section 32015, the California Department of Justice (Department) maintains the Handgun Roster, which is available at this hyperlink: https://oag.ca.gov/firearms/certified-handguns/search. Commencing July 1, 2026, AB 1127 will prohibit a firearms dealer from selling a semiautomatic pistol that falls within the definition of a "machinegun-convertible pistol," unless an exception at the new Penal Code section 27595 applies, even if that semiautomatic pistol is listed on the Handgun Roster.

To assist dealers in identifying such semiautomatic pistols, below is a list of semiautomatic pistols that are currently (as of the date of this advisory) on the Handgun Roster that qualify as a "machinegun-convertible pistol" under AB 1127. Please note that the models below have not necessarily been renewed for listing on the Handgun Roster in 2026 pursuant to Penal Code section 32015, subdivision (b) and California Code of Regulations, title 11, section 4072. The list also includes models that a manufacturer has stated will be discontinued (for more information, see this hyperlink: https://us.glock.com/en/discontinued-models).

McGraw Decl. Exs. Page 002



**California Department of Justice**
**Bureau of Firearms**
**Firearms Dealer/Ammunition Vendor Information**
**Advisory Number: 173**
**Issue Date: December 26, 2025**

| Manufacturer | Model/Materials | Barrel Length | Caliber |
|---|---|---|---|
| Derya | DY9*/Steel Alloy: Polymer | 3.86" | 9mm |
| Glock | 17 (Black) / Steel, Polymer | 4.49" | 9mm |
| Glock | 17 OD / Steel, Polymer | 4.49" | 9mm |
| Glock | 17C / Steel, Polymer | 4.49" | 9mm |
| Glock | 17RTF2 (Black) / Steel, Polymer | 4.49" | 9mm |
| Glock | 19 / Steel, Polymer | 4.02" | 9mm |
| Glock | 19 OD / Steel, Polymer | 4.02" | 9mm |
| Glock | 19C / Steel, Polymer | 4.02" | 9mm |
| Glock | 20 / Steel, Polymer | 4.60" | 10mm |
| Glock | 20 OD / Steel, Polymer | 4.60" | 10mm |
| Glock | 20C / Steel, Polymer | 4.60" | 10mm |
| Glock | 20SF (Black) / Steel, Polymer | 4.60" | 10mm |
| Glock | 21 / Steel, Polymer | 4.60" | .45 ACP |
| Glock | 21 OD / Steel, Polymer | 4.60" | .45 ACP |
| Glock | 21C / Steel, Polymer | 4.60" | .45 ACP |
| Glock | 21SF-STD / Steel, Polymer | 4.61" | .45 ACP |
| Glock | 22 / Steel, Polymer | 4.49" | .40 S&W |
| Glock | 22 - California Department of Corrections / Steel; Polymer | 4.49" | .40 S&W |
| Glock | 22 - FBI 100 Yr. Commemorative (Blk) / Steel, Polymer | 4.49" | .40 S&W |
| Glock | 22 C / Steel, Polymer | 4.49" | .40 S&W |
| Glock | 22 OD / Steel, Polymer | 4.49" | .40 S&W |
| Glock | 22RTF2 (Black) / Steel, Polymer | 4.49" | .40 S&W |
| Glock | 23 / Steel, Polymer | 4.02" | .40 S&W |
| Glock | 23 OD / Steel, Polymer | 4.02" | .40 S&W |
| Glock | 23C / Steel, Polymer | 4.02" | .40 S&W |
| Glock | 26 / Steel, Polymer | 3.46" | 9mm |
| Glock | 26 OD / Steel, Polymer | 3.46" | 9mm |
| Glock | 27 / Steel, Polymer | 3.46" | .40 S&W |
| Glock | 27 OD / Steel, Polymer | 3.46" | .40 S&W |
| Glock | 29 / Steel, Polymer | 3.78" | 10mm |
| Glock | 29 OD / Steel, Polymer | 3.78" | 10mm |
| Glock | 29SF (Black) / Steel, Polymer | 3.78" | 10mm |
| Glock | 30 / Steel, Polymer | 3.78" | .45 ACP |
| Glock | 30 OD / Steel, Polymer | 3.78" | .45 ACP |
| Glock | 30SF / Steel, Polymer | 3.78" | .45 ACP |
| Glock | 31 / Steel, Polymer | 4.49" | .357 SIG |
| Glock | 31 OD / Steel, Polymer | 4.49" | .357 SIG |
| Glock | 31C / Steel, Polymer | 4.49" | .357 SIG |
| Glock | 32 / Steel, Polymer | 4.02" | .357 SIG |
| Glock | 32 OD / Steel, Polymer | 4.02" | .357 SIG |
| Glock | 32C / Steel, Polymer | 4.02" | .357 SIG |
| Glock | 33 / Steel, Polymer | 3.46" | .357 SIG |
| Glock | 33 OD / Steel, Polymer | 3.46" | .357 SIG |

McGraw Decl. Exs. Page  003



**California Department of Justice**
**Bureau of Firearms**
**Firearms Dealer/Ammunition Vendor Information**
**Advisory Number: 173**
**Issue Date: December 26, 2025**

| Manufacturer | Model/Materials | Barrel Length | Caliber |
|---|---|---|---|
| Glock | 34 / Steel, Polymer | 5.32" | 9mm |
| Glock | 34 OD / Steel, Polymer | 5.32" | 9mm |
| Glock | 35 / Steel, Polymer | 5.32" | .40 S&W |
| Glock | 35 OD / Steel, Polymer | 5.32" | .40 S&W |
| Glock | 36 / Steel, Polymer | 3.78" | .45 ACP |
| Glock | 36 OD / Steel, Polymer | 3.78" | .45 ACP |
| Glock | 38 / Steel, Polymer | 4.02" | .45 GAP |
| Glock | 38 OD / Steel, Polymer | 4.02" | .45 GAP |
| Glock | 39 / Steel, Polymer | 3.46" | .45 GAP |
| Glock | 39 OD / Steel, Polymer | 3.46" | .45 GAP |
| Glock | G-37 / Steel, Polymer | 4.49" | .45 GAP |
| Glock | G-37 OD / Steel, Polymer | 4.49" | .45 GAP |
| Shadow Systems | DR920P SS-2239-CA* / Stainless Steel; Polymer; Aluminum | 4.5" | 9mm |
| Shadow Systems | DR920P SS-2240-CA* / Stainless Steel; Polymer; Aluminum | 4.5" | 9mm |
| Shadow Systems | MR920 SS-1039-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |
| Shadow Systems | MR920 SS-1040-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |
| Shadow Systems | MR920 SS-1052-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |
| Shadow Systems | XR920 SS-3039-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |
| Shadow Systems | XR920 SS-3040-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |
| Shadow Systems | XR920 SS-3052-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |

**Support and Contact Information:**

Should you have any questions, please contact the Bureau of Firearms, Customer Support Center:

- Phone: 855-365-3767
- Email: bofdes@doj.ca.gov

Thank you for your attention to this important matter.

**Attachment(s):**

- Assembly Bill No. 1127

Page 3 of 3

McGraw Decl. Exs. Page  004

STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

### Assembly Bill No. 1127

### CHAPTER 572

An act to amend Section 3273.50 of the Civil Code, and to amend Section 16880 of, and to add Sections 16885, 17015, 27595, 27595.1, and 32103 to, the Penal Code, relating to firearms.

[Approved by Governor October 10, 2025. Filed with Secretary
of State October 10, 2025.]

LEGISLATIVE COUNSEL'S DIGEST

AB 1127, Gabriel. Firearms: converter pistols.

Existing law prohibits any person from selling, leasing, or transferring any firearm unless the person is licensed as a firearms dealer, as specified. Existing law prescribes certain requirements and prohibitions for licensed firearms dealers. A violation of any of these requirements or prohibitions is grounds for forfeiture of a firearms dealer's license. For purposes of these provisions, existing law defines "machinegun" to mean, among other definitions, any weapon that shoots or is designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

This bill would, on and after July 1, 2026, prohibit a licensed firearms dealer to sell, offer for sale, exchange, give, transfer, or deliver any semiautomatic machinegun-convertible pistol, except as specified. For these purposes, the bill would define "machinegun-convertible pistol" as any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with common household tools into a machinegun by the installation or attachment of a pistol converter, as specified, and "pistol converter" as any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, replaces the backplate and interferes with the trigger mechanism and thereby enables the pistol to shoot automatically more than one shot by a single function of the trigger. The bill would make a violation of these provisions punishable by a fine, a 2nd violation punishable by a fine that may result in a suspension or revocation of the dealer's license and removal from certain centralized lists maintained by the Department of Justice, and a 3rd violation punishable as a misdemeanor that shall result in the revocation of the dealer's license and removal from certain centralized lists.

Existing law prohibits the manufacture, sale, possession, or transportation of a machinegun, except as authorized. A violation of these prohibitions is punishable as a felony.

This bill would expand the above definition of "machinegun" to include any machinegun-convertible pistol equipped with a pistol converter and,

91

thus, prohibit the manufacture, sale, possession, or transportation of a machinegun-convertible pistol equipped with a pistol converter.

Existing law, subject to certain exceptions, generally makes it an offense to manufacture or sell an unsafe handgun, as defined, and requires the Department of Justice to compile a roster listing all of the handguns that have been tested and determined not to be unsafe handguns. Existing law establishes criteria for determining if a handgun is an unsafe handgun, including, for firearms manufactured after a certain date and not already listed on the roster, the lack of a chamber load indicator and a magazine disconnect mechanism.

For any pistol listed on the roster on January 1, 2026, that was not subject to the above-described requirements to be on the list because it was submitted for testing before specified dates, that is thereafter only modified to change the design features that brought the pistol within the definition of a machinegun-convertible pistol, and that is submitted to an independent certified laboratory for testing pursuant to the above-described testing provisions before January 1, 2027, this bill would authorize that pistol to be submitted for testing and added to the roster without meeting those requirements.

This bill would make these provisions severable.

This bill would incorporate additional changes to Section 3273.50 of the Civil Code proposed by AB 1263 to be operative only if this bill and AB 1263 are enacted and this bill is enacted last.

By creating a new crime and expanding the application of an existing crime, this bill would create a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.   Section 3273.50 of the Civil Code is amended to read:

3273.50.   As used in this title, the following definitions apply:

(a)  "Ammunition" has the same meaning as provided in subdivision (b) of Section 16150 of the Penal Code.

(b)  "Firearm" has the same meaning as provided in subdivisions (a) and (b) of Section 16520 of the Penal Code.

(c)  "Firearm accessory" means an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with a firearm that is designed, intended, or functions to alter or enhance the firing capabilities of a firearm, the lethality of the firearm, or a shooter's ability to hold and use a firearm.

91

**Ch. 572**

(d) "Firearm-related product" means a firearm, ammunition, a firearm precursor part, a firearm component, firearm manufacturing machine, and a firearm accessory that meets any of the following conditions:

(1) The item is sold, made, or distributed in California.

(2) The item is intended to be sold or distributed in California.

(3) The item is or was possessed in California and it was reasonably foreseeable that the item would be possessed in California.

(e) "Firearm precursor part" has the same meaning as provided in Section 16531 of the Penal Code.

(f) "Firearm industry member" shall mean a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale sale, or retail sale of firearm-related products.

(g) "Firearm manufacturing machine" means a three-dimensional printer, as defined in Section 29185 of the Penal Code, or CNC milling machine that, as described in that section, is marketed or sold as, or reasonably designed or intended to be used to manufacture or produce a firearm.

(h) "Reasonable controls" means reasonable procedures, acts, or practices that are designed, implemented, and enforced to do the following:

(1) Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully.

(2) Prevent the loss or theft of a firearm-related product from the firearm industry member.

(3) Ensure that the firearm industry member complies with all provisions of California and federal law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product.

(4) Prevent the installation and use of a pistol converter, as defined in Section 17015 of the Penal Code, with a firearm.

SEC. 1.5.  Section 3273.50 of the Civil Code is amended to read:

3273.50.  As used in this title, the following definitions apply:

(a) "Ammunition" has the same meaning as provided in subdivision (b) of Section 16150 of the Penal Code.

(b) "Firearm" has the same meaning as provided in subdivisions (a) and (b) of Section 16520 of the Penal Code.

(c) "Firearm accessory" means an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with a firearm that is designed, intended, or functions to increase a firearm's rate of fire or to increase the speed at which a person may reload a firearm or replace the magazine, or any other attachment or device described in subdivision (a) of Section 30515 of the Penal Code that may render a firearm an assault weapon when inserted into, affixed onto, or used in conjunction with a firearm. The term firearm accessory also includes any other device,

91

McGraw Decl. Exs. Page  007

tool, kit, part, or parts set that is clearly designed and intended for use in manufacturing firearms.

(d) "Firearm-related product" means a firearm, ammunition, a firearm precursor part, a firearm component, firearm manufacturing machine, and a firearm accessory that meets any of the following conditions:

(1) The item is sold, made, or distributed in California.

(2) The item is intended to be sold or distributed in California.

(3) The item is or was possessed in California and it was reasonably foreseeable that the item would be possessed in California.

(e) "Firearm precursor part" has the same meaning as provided in Section 16531 of the Penal Code.

(f) "Firearm industry member" shall mean a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale sale, or retail sale of firearm-related products.

(g) "Firearm manufacturing machine" means a three-dimensional printer, as defined in Section 29185 of the Penal Code, a computer numerical control (CNC) milling machine, or a similar machine, that is marketed or sold as or is reasonably designed or intended to be used to manufacture or produce firearms, firearm components, or firearm accessories.

(h) "Reasonable controls" means reasonable procedures, acts, or practices that are designed, implemented, and enforced to do the following:

(1) Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully.

(2) Prevent the loss or theft of a firearm-related product from the firearm industry member.

(3) Ensure that the firearm industry member complies with all provisions of California and federal law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product.

(4) Prevent the installation and use of a pistol converter, as defined in Section 17015 of the Penal Code, with a firearm.

SEC. 2.   Section 16880 of the Penal Code is amended to read:

16880.   (a) As used in this part, "machinegun" means any weapon that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

(b) The term "machinegun" also includes the frame or receiver of any weapon described in subdivision (a), any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if those parts are in the possession or under the control of a person.

91

McGraw Decl. Exs. Page  008

—5—                                    Ch. 572

(c) The term "machinegun" also includes any weapon deemed by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives as readily convertible to a machinegun under Chapter 53 (commencing with Section 5801) of Title 26 of the United States Code.

(d) The term "machinegun" also includes any machinegun-convertible pistol equipped with a pistol converter, as defined in Section 17015.

SEC. 3.   Section 16885 is added to the Penal Code, to read:

16885.   (a)  As used in this part, "machinegun-convertible pistol" means any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with common household tools, as defined in Section 4082 of Title 11 of the California Code of Regulations, into a machinegun by the installation or attachment of a pistol converter as a replacement for the slide's backplate without any additional engineering, machining, or modification of the pistol's trigger mechanism.

(b) A machinegun-convertible pistol does not include a hammer-fired semiautomatic pistol or striker-fired semiautomatic pistol lacking a cruciform trigger bar, which instead has a trigger bar that is shielded from interference by a pistol converter.

(c) A polymer notch or other piece of polymer molded into the rear of the pistol frame does not prevent ready conversion into a machinegun and will not prevent a pistol from qualifying under this definition.

SEC. 4.   Section 17015 is added to the Penal Code, to read:

17015.   "Pistol converter" means any device or instrument that when installed in or attached to the rear of the slide of a semiautomatic pistol, replaces the backplate, and interferes with the trigger mechanism and thereby enables the pistol to shoot automatically more than one shot by a single function of the trigger. A pistol converter includes, but is not limited to, a pistol converter manufactured using a three-dimensional printer, as defined in Section 29185.

SEC. 5.   Section 27595 is added to the Penal Code, to read:

27595.   (a)  Except as provided in subdivision (c), commencing on July 1, 2026, a firearms dealer licensed pursuant to Sections 26700 to 26920, shall not sell, offer for sale, exchange, give, transfer, or deliver any semiautomatic machinegun-convertible pistol, as defined in Section 16885.

(b) (1)  A violation of subdivision (a) shall be punishable by a fine of not more than one thousand dollars ($1,000).

(2)  A second violation of subdivision (a) shall be punishable by a fine of not more than five thousand dollars ($5,000) and may result in the suspension or revocation of the dealer's license issued under Sections 26700 to 26920, inclusive, and removal of the firearms dealer from any centralized list maintained by the Department of Justice pursuant to Sections 26715, 28450, and 29060.

(3)  A third violation of subdivision (a) is a misdemeanor and shall result in the revocation of the dealer's license issued under Sections 26700 to 26920, inclusive, and removal of the firearms dealer from any centralized list maintained by the Department pursuant to Sections 26715, 28450, and 29060.

91

McGraw Decl. Exs. Page  009

(c)  This section shall not apply to any of the following:

(1)  A machinegun-convertible pistol delivered to a firearms dealer prior to January 1, 2026.

(2)  The sale of a machinegun-convertible pistol to any of the following entities for lawful use in the discharge of their official duties:

(A)  A police department, sheriff's office, probation department, marshal's office, district attorney's office, the California Highway Patrol, the Department of Justice, the Department of Corrections and Rehabilitation.

(B)  Any state agency listed in paragraph (6) or paragraph (7) of subdivision (b) of Section 32000.

(C)  The military or naval forces of this state or of the United States.

(3)  A private party to private party transaction conducted through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).

(4)  A transfer of a machinegun-convertible pistol to a gunsmith or other qualified entity for service or repair.

(5)  The sale or transfer of a machinegun-convertible pistol to a firearms dealer licensed pursuant to Sections 26700 to 26920, inclusive, or to federally licensed firearms manufacturers or dealers outside California.

(6)  A transfer of a machinegun-convertible pistol back to a private party after temporary safekeeping storage pursuant to Section 26892.

(7)  A transfer of a machinegun-convertible pistol back to a private party after a period of temporary prohibition pursuant to Section 29830.

(8)  A transfer of a machinegun-convertible pistol to any forensic laboratory or forensic laboratory employee, while on duty and acting within the scope and course of employment.

(9)  The sale of a machinegun-convertible pistol to an individual who is an active peace officer described in Section 830.1 or a reserve peace officer described in Section 830.6 who is employed or appointed by a law enforcement agency described in Section 830.1 and is authorized to carry a firearm on duty.

SEC. 6.  Section 27595.1 is added to the Penal Code, to read:

27595.1.  The Department of Justice is authorized to adopt regulations to implement Section 27595.

SEC. 7.  Section 32103 is added to the Penal Code, to read:

32103.  (a) A pistol may be submitted for testing described in Section 32010 and added to the roster described in subdivision (a) of Section 32015 without being subject to the requirements of subparagraph (D) or (E) of paragraph (2) of subdivision (a) of Section 31910, or the requirements of subdivision (d) of Section 32010, if all of the following conditions are met:

(1)  The pistol was listed on the roster, described in subdivision (a) of Section 32015, on January 1, 2026.

(2)  The pistol was not subject to the requirements of subparagraph (D) or (E) of paragraph (2) of subdivision (a) of Section 31910 because it was submitted for testing before the dates identified in subdivision (d) of Section 32010.

91

**Ch. 572**

(3) The pistol was thereafter only modified to change design features which brought the pistol within the definition of machinegun-convertible pistol in Section 16885.

(4) The modified pistol is submitted to an independent certified laboratory for testing pursuant to Article 5 (commencing with Section 32000) of Chapter 4 before January 1, 2027.

(b) Any firearm meeting the requirements of this section shall be removed from the roster according to subdivision (b) of Section 31910 on the same timeline as the pistol that appeared on the roster prior to being modified pursuant to this section.

SEC. 8. If any section, subsection, sentence, or clause of this act is for any reason declared unconstitutional, invalid, or unenforceable by any court of competent jurisdiction, such decision shall not affect the constitutionality, validity, or enforceability of the remaining portions of this act or any part thereof. The Legislature hereby declares that it would have adopted this act notwithstanding the unconstitutionality, invalidity, or unenforceability of any one or more of its sections, subsections, sentences, or clauses.

SEC. 9. Section 1.5 of this bill incorporates amendments to Section 3273.50 of the Civil Code proposed by both this bill and Assembly Bill 1263. That section of this bill shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2026, (2) each bill amends Section 3273.50 of the Civil Code, and (3) this bill is enacted after Assembly Bill 1263, in which case Section 1 of this bill shall not become operative.

SEC. 10. No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

McGraw Decl. Exs. Page 011

# Exhibit 2

McGraw Decl. Exs. Page 012

Filed in District Court
State of Minnesota
3/10/2026 9:27 PM

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT
Case Type:   Other Civil

---

State of Minnesota by its Attorney
General, Keith Ellison,

Plaintiff,

v.

Glock, Inc. and Glock Ges.m.b.H.,

Defendants.

Court File No.:   27-CV-24-18827

**DEFENDANTS' LIMITED OPPOSITION TO THE STATE'S MOTION FOR LEAVE TO SUPPLEMENT COMPLAINT**

---

## INTRODUCTION

The Complaint in this matter contains allegations that the Minnesota Attorney General's Office ("AGO") now knows to be false. While Defendants have asked the AGO to correct these allegations, Defendants' efforts have failed. The draft supplemental complaint does not address these false or misleading allegations. For example, the AGO continues to allege that Defendants "ha[ve] failed to stop companies producing these illegal products from using Glock trademarks" (Compl. ¶¶ 126-128, 139), even though the AGO is now aware that Defendants have made substantial efforts to enforce their intellectual property rights to stop the criminal proliferation of MCDs. The draft supplemental complaint continues to refer to Defendants' purported "prior refusal to change the design" of GLOCK pistols (*Id.* ¶ 186), even though the AGO is now aware that Defendants have made substantial efforts to modify the design of GLOCK pistols to prevent their conversion to MCDs.

Plaintiff now moves this Court to supplement its Complaint with new allegations regarding the supposed illegal conversion of Defendants' GLOCK V series and Gen6 handguns into fully

1

239887216

McGraw Decl. Exs. Page 013

27-CV-24-18827

Case 8:26-cv-01697-AH-MBK    Document 19-1    Filed 07/02/26    Page 17 of 113    Page
ID #:138

Filed in District Court
State of Minnesota
3/10/2026 9:27 PM

automatic weapons. A majority of the AGO's proposed supplemental allegations assert that the GLOCK V Series and Gen6 pistols contain "easily defeatable features" and are "easily convertible" with machinegun conversion devices ("MCDs"). (Proposed Amended Complaint ("PAC"), attached as Exhibit 2 to the Declaration of Katherine Moerke, dated February 20, 2026 ("Moerke Decl."), ¶¶ 4, 5, 12, 14-17, 110-118, 141, 253, 294, 305, 309, 310.) But Plaintiff's new allegations are based entirely on anonymous, speculative, and unreliable internet and social media content. Defendants do not oppose an amendment to the Complaint to the extent that appropriate corrections are made. But Defendants do not consent to a supplemental complaint that asserts allegations known to be false or which are predicated entirely upon internet speculation and a social media post.

## BACKGROUND

On December 12, 2024, the AGO filed its Complaint. During the pendency of this action, Defendants provided the AGO with documents and information contradicting significant and material factual allegations in the Complaint. On December 18, 2025, Defendants sent the AGO a letter (the "Letter") (Moerke Decl., Exhibit 3), requesting that the AGO rectify false statements in a court filing by amending the Complaint and withdrawing certain false allegations. The Letter asserted that false statements in a court filing violate various duties and obligations, including Minnesota Rule of Civil Procedure 11.02, Minn. Stat. § 549.211 and Minnesota Rules of Professional Conduct 3.1 and 3.3. Rule 11.02(c) and § 549.211(2)(c), which require that "allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." *See also Johnson ex rel. Johnson v. Johnson*, 726 N.W.2d 516, 519 (Minn. Ct. App. 2007).

239887216

2

27-CV-24-18827

Case 8:26-cv-01697-AH-MBK    Document 19-1    Filed 07/02/26    Page 18 of 113    Page
ID #:139

Filed in District Court
State of Minnesota
3/10/2026 9:27 PM

On January 2, 2026, the AGO responded to Defendants' Letter (the "AGO Letter") (Moerke Decl., Exhibit 4), asserting it would not amend and withdraw the allegations now known to be false. Instead, the AGO stated: "[G]iven Glock's new design and launch of the Model V and Gen6 handguns—along with the fact that the new design was quickly shown not to prevent the *quick and easy* conversion of Glock handguns into machine guns with switches—the State intends to supplement the allegations in its complaint." (AGO Letter, at 1 (emphasis added).) Thus, the AGO seeks to maintain allegations Defendants identified as incorrect, and to supplement with new allegations that lack any verifiable evidentiary support.

## ARGUMENT

### A.    The AGO's Allegations Concerning Defendants' Enforcement Of Intellectual Property Rights Are Materially Misleading

Glock, Inc. and Glock Ges.m.b.H. have separately and together engaged in MCD enforcement efforts for many years by using their intellectual property rights in an effort to stop the criminal proliferation and use of MCDs in the United States and globally. The AGO has been provided with multiple examples of Defendants' substantial intellectual property enforcement actions and collaboration with law enforcement. Yet the AGO continues to take the position that it does not have to revise any allegations concerning Defendants' purported lack of trademark enforcement because MCDs infringing GLOCK trademarks remain published online. (Moerke Decl., Exhibit 5; *see also* PAC ¶ 38 (alleging that "[d]espite the proliferation of Glock switches bearing Glock's logo, Glock has failed to stop companies producing these illegal products from using Glock trademarks").)

As disclosed to the AGO, Glock, Inc. has partnered with the Department of Homeland Security ("DHS") and supported DHS applications to the Office of Foreign Assets Control ("OFAC") for sanctions against MCD websites and sellers, and has engaged in various training

3

239887216

McGraw Decl. Exs. Page 015

27-CV-24-18827

Case 8:26-cv-01697-AH-MBK    Document 19-1    Filed 07/02/26    Page 19 of 113    Page

ID #:140

Filed in District Court
State of Minnesota
3/10/2026 9:27 PM

initiatives in the United States concerning MCDs. For example, the AGO was provided with communications involving DHS personnel and presentations Glock, Inc. made to U.S. Customs and Border Protection addressing unauthorized and infringing MCDs. These documents are in addition to other documents that Defendants provided to the AGO in person, including: (i) the affidavit of HSI Agent Adam Rayho explaining that Glock, Inc. acquired 344 infringing domains through Uniform Domain-Name Dispute-Resolution Policy ("UDRP") proceedings, sent cease-and-desist letters to the registrants and paid the annual registration fees in order to maintain ownership of the domains and keep them inactive; (ii) an exemplar cease-and-desist letter, one of many, from Glock, Inc.'s counsel to an infringer; and (iii) other safety and publicity materials warning against the dangers and illegality of MCDs. Collectively, these materials demonstrate that many of the AGO's factual allegations are inaccurate, unsupported, and contradicted by documentary evidence already in its possession. If the AGO is permitted to supplement the Complaint, it should be required to correct these inaccuracies.

**B.    The AGO's Scant Support For Its Allegations That GLOCK V Series and Gen6 Pistols Are "Easily" Convertible To Fully Automatic Is Inadequate**

The AGO seeks to amend the Complaint to add specious allegations that have no verifiable evidentiary support, which relate in large part to Glock, Inc.'s announcement and release of the new GLOCK V series and Gen6 pistols, and their purported "easy" conversion to fire fully automatic. For example the PAC alleges that "[w]ithin a few days of Glock's release of the V Model handgun [in] November 2025, multiple social media posts demonstrated that the V Model was easily convertible into a machine gun." (PAC ¶ 6); (*see also id.* ¶¶ 7, 11, 112, 113 and 117). The PAC, in paragraph 117, also alleges that "[c]omments and social media posts related to the Gen6 predict that the Gen6 will also be able to be converted into a machine gun."

239887216

4

The fact is that *any* semi-automatic pistol can be converted to fire fully automatic with the requisite capability, know-how, and tools. However, as disclosed to the AGO, Glock Ges.m.b.H. has made extensive efforts to redesign GLOCK pistols to prevent the use of known MCDs. Specifically, the AGO is now in possession of documentation confirming the affirmative engineering measures that prevent the use of known MCDs with GLOCK V series and Gen6 pistols. This is in addition to official testing reports from the ATF's Firearms Technology Industry Services Branch (FTISB) for the latest GLOCK pistol models which concluded that the Model V series and Gen6 pistols prevented the installation of known MCDs.

The PAC's new allegations, based entirely on citations to speculation and cherry-picked online comments, lack any verifiable good faith basis.[1]  (*See id.* ¶¶ 111-113, 117 fn. 57-60 and 63); *see also Goerdt v. Goerdt*, No. A24-1973, 2025 WL 2691207, at *3 (Minn. Ct. App. Sept. 22, 2025) (noting that the trial court rejected a motion to amend the complaint where amendment was futile); *Amann v. Allianz Income Mgmt. Servs., Inc.*, No. A09-1891, 2010 WL 3220061, at *4 (Minn. Ct. App. Aug. 17, 2010) (affirming trial court's denial of motion to amend complaint as futile); *State by Peters Sunset Beach, Inc. v. Pope Cnty.*, No. A24-0804, 2024 WL 5036669, at *8 (Minn. Ct. App. Dec. 9, 2024) (same).[2]

---

[1] By way of example, PAC paragraph 111 states that "[w]hen Glock's V Model was announced, people immediately started speculating that switches for the new design would soon be available." In this allegation, "speculation" is the key word. Relying on footnote 57 as its basis, this footnote includes a comment made to a YouTube video in which a user called @HoboCoastie states: "I can't wait until a switch shows up in like 5 minutes." This comment is pure speculation without any factual basis and the AGO's reliance on anonymous speculation is improper.

[2] On February 11, 2026, the AGO sent Defendants what it represented as the draft supplemental complaint showing "[a]ll changes from the original complaint" in tracked changes. This document is different from the document attached as Exhibit 1 to the Moerke Declaration, which itself purports to have "all changes from the original complaint shown in tracked changes." However, that is not the case. For example, paragraphs 6 and 7 in Exhibit 1 are not in the original Complaint at all, but are also not reflected as tracked changes in the exhibit filed with the Court.

239887216

McGraw Decl. Exs. Page 017

## CONCLUSION

Defendants do not oppose an amendment to the Complaint to the extent that appropriate corrections are made. However, Defendants cannot consent to a supplemental complaint that asserts allegations that are demonstrably false or which are predicated entirely upon internet speculation and social media posts. Accordingly, for all the reasons stated above, this Court should deny the AGO's Motion for Leave to Supplement Complaint.

Dated:  March 10, 2026                        Respectfully submitted,

                                             /s/ Andrew W. Davis
                                             Todd A. Noteboom (#0240047)
                                             Andrew W. Davis (#0386634)
                                             Andrew P. Leiendecker (#0399107)
                                             **STINSON LLP**
                                             50 South Sixth Street, Suite 2600
                                             Minneapolis, Minnesota 55402
                                             Telephone:  612.335.1500
                                             todd.noteboom@stinson.com
                                             andrew.davis@stinson.com
                                             andrew.leiendecker@stinson.com

                                             -and-

---

(*See* Moerke Decl., Exhibit 1 at 3.) The AGO should provide an accurate copy of the draft supplemental complaint showing all of its proposed changes from the existing Complaint.

6

239887216

John F. Renzulli (*pro hac vice*)
Christopher Renzulli (*pro hac vice*)
Peter V. Malfa (*pro hac vice*)
Scott C. Allan (*pro hac vice*)
**RENZULLI LAW FIRM, LLP**
One North Broadway, Suite 1005
White Plains, New York 10601
Telephone:  (914) 285-0700
jrenzulli@renzullilaw.com
crenzulli@renzullilaw.com
pmalfa@renzullilaw.com
sallan@renzullilaw.com

*Attorneys for Defendants Glock, Inc.
and Glock Ges.m.b.H.*

## ACKNOWLEDGMENT

Pursuant to Minn. Stat. § 549.211, subd. 1, the undersigned acknowledges that non-monetary sanctions and monetary sanctions, such as costs, disbursements, and reasonable attorney and witness fees, may be imposed under Minn. Stat. § 549.211, subd. 3.

Dated: March 10, 2026                         */s/ Andrew W. Davis*
                                                      Andrew W. Davis

7

239887216

# Exhibit 3

McGraw Decl. Exs. Page 020

U.S. Department of Justice

Civil Rights Division

*Assistant Attorney General*
*950 Pennsylvania Ave, NW - RFK*
*Washington, DC  20530*

June 24, 2026

**<u>Via Electronic and Certified Mail</u>**

The Honorable Gavin Newsom
Governor of California
1021 O Street, Suite 9000
Sacramento, CA 95814

The Honorable Robert Bonta
Attorney General of California
California Department of Justice
1300 I Street
Sacramento, CA 95814

Re:    <u>Notice of Suit:</u> *United States v. State of California and California Department of Justice*

Dear Governor Newsom and General Bonta:

The Second Amendment guarantees the right of law-abiding citizens to keep and bear arms for self-defense. *D.C. v. Heller*, 554 U.S. 570, 625 (2008). Because handguns are the most popular weapon chosen by Americans for self-defense, a prohibition of their use is invalid. *Id.* at 629.

As you know, pursuant to Cal. Penal Code § 27595(a), as of July 1, 2026, it will be illegal for California firearms dealers to sell certain semiautomatic pistols. This statute is commonly known as the "Glock Ban," because it will ban the sale of virtually all Glock and Glock-style pistols. California's ban on the sale of the most popular handgun in America violates the Second Amendment.

Moreover, to be sold at retail in California, a handgun must be listed on the State's official "Handgun Roster." To be listed on the Handgun Roster, certain handguns must have a chamber-load indicator, a magazine-disconnect mechanism, and, until recently, the ability to transfer microscopic characters representing the handgun's make, model, and serial number onto shell casings fired by the gun (commonly referred to as microstamping capability). As a result of these requirements, no new handguns were added to the Handgun Roster between 2013 and 2023, leading the court in *Boland v. Bonta*, 662 F. Supp. 3d 1077, 1092 (C.D. Cal. 2023), to hold as follows:

> Californians have the constitutional right to acquire and use state-of-the-art handguns to protect themselves. They should not be forced to settle for decade-old models of handguns to ensure that they remain safe inside or outside

the home.  But unfortunately, the [statute's] requirements do exactly that. . . . [T]hose requirements are unconstitutional and their enforcement must be preliminarily enjoined.

The injunction entered in *Boland* is stayed pending appeal, and the State's legislature recently deferred the microstamping requirement until January 1, 2028.  Nevertheless, for the reasons stated by the district court, these provisions of the Handgun Roster statute violate the Second Amendment.

This letter is to inform you that as the Assistant Attorney General for the Civil Rights Division, I have authorized the filing of a complaint in federal district court against the State. The complaint will allege that the Glock Ban and the Handgun Roster statute violate the State's citizens' Second amendment rights by making it a crime to acquire constitutionally protected arms from firearms dealers, and that state law enforcement agencies' implementation of the prohibition and threat of criminal enforcement constitute a pattern or practice of law enforcement misconduct.  The United States is authorized to bring such an action by 34 U.S.C. § 12601.

The Department will consider deferring the filing of the lawsuit for a short period if the State is willing to enter pre-suit negotiations in an effort to resolve this matter.  Although the specific provisions are open to discussion, a resolution must at a minimum require that the State: (1) immediately cease enforcement of the laws identified above; (2) acknowledge the unconstitutionality of these laws; and (3) agree to enter into a court-enforceable consent decree permanently enjoining the State from violating its citizens' constitutional rights through these or any similar laws.

This letter also serves as a document-retention notice.  Please ensure that State officials, employees, and contractors preserve in their current form any and all records, including documents, photos, videos, files, tapes, emails and computer files, that may be relevant to this matter.

We hope that the State shares our interest in achieving a voluntary resolution of this matter.  We ask that you inform us no later than June 30, 2026, whether the State is interested in entering into pre-suit settlement negotiations.  If we do not hear from you by 5:00 p.m. ET, June 30, 2026, the United States may file its complaint without further notice.  If the State wishes to enter into pre-suit negotiations, please contact Barry Arrington, Acting Chief of the Division's Second Amendment Section at barry.arrington@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

2

McGraw Decl. Exs. Page 022

# Exhibit 4

McGraw Decl. Exs. Page 023

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | |
| v. | No. 1:25-cv-04458-APM |
| DISTRICT OF COLUMBIA, *et al.*, | |
| **Defendants.** | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Defendants (collectively, "the District") move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Complaint [28] for failure to state a claim. A memorandum of points and authorities as well as a proposed order are attached. Because this motion is dispositive, the District did not seek Plaintiff's consent. *See* LCvR 7(m).

Date: June 25, 2026.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
Civil Litigation Division

McGraw Decl. Exs. Page 024

400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendants*

McGraw Decl. Exs. Page 025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 1:25-cv-04458-APM |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

McGraw Decl. Exs. Page 026

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 1

    I.     The Challenged Firearms Laws ................................................................... 1

    II.    34 U.S.C. § 12601 ...................................................................................... 2

        A.    Text and Enactment History ............................................................ 2

        B.    Past Practice .................................................................................... 5

    III.   This Case ..................................................................................................... 7

LEGAL STANDARD ....................................................................................................... 9

ARGUMENT .................................................................................................................... 9

    I.     The United States' Challenge to the District's Proscription of AR-15s and Silencers Is Not Cognizable Under Section 12601. ................................. 9

        A.    Section 12601 Does Not Authorize the United States to Challenge Substantive Criminal Prohibitions. ............................................. 10

            1.    The Text of Section 12601 Does Not Authorize Challenges to State and Local Criminal Statutes. ........................................... 10

            2.    History and Context Make Clear That Section 12601 Should Not Be Construed to Authorize Challenges to Substantive Criminal Statutes. ...................................................... 15

                a.    Congress Enacted Section 12601 Against the Backdrop of Other Pattern-or-Practice Laws, Which Do Not Contain Similar Constraints. ............................... 16

                b.    Legislative History Also Evidences Section 12601's Narrow Focus on Eliminating Police Misconduct. ........... 18

                c.    Since Its Enactment 30 Years Ago, Section 12601 Has Never Been Used to Challenge a Substantive Criminal Prohibition. ...................................................... 21

McGraw Decl. Exs. Page 027

3. Construing Section 12601 to Authorize Challenges to Criminal Prohibitions Is Contrary to Federalism and Common Sense. .......................................................................... 23

B. The Amended Complaint Brings a Facial Challenge to Substantive Criminal Laws That Section 12601 Does Not Permit. ............................ 28

II. The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement That Deprives Persons of Constitutional Rights. ................................................................................................................ 30

A. The Amended Complaint Fails to Plausibly Allege a Deprivation of Constitutional Rights. ........................................................................ 31

1. The United States Must Plausibly Allege That Silencers and AR-15s Are Protected by the Second Amendment. ............... 31

2. The Amended Complaint Fails to Plausibly Allege That Silencers Are Protected by the Second Amendment. ................... 35

3. The Amended Complaint Fails to Plausibly Allege That AR-15s Are Protected by the Second Amendment. ...................... 39

B. The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement Officers. ................................ 43

CONCLUSION ....................................................................................................................... 45

McGraw Decl. Exs. Page 028

## INTRODUCTION

This lawsuit is the first of its kind—and it should be the last. The United States brings a facial challenge to District laws criminalizing the possession of AR-15 rifles and firearm silencers. It does so under the guise of 34 U.S.C. § 12601, which allows the United States to sue state and local governments to eliminate "a pattern or practice of conduct by law enforcement officers" that "deprives persons of [federal] rights." But, historically, Section 12601 has not been used to facially challenge criminal laws democratically enacted by the legislature.

This Court should reject the United States' novel claim for either of two reasons. First, Section 12601 does not authorize a facial challenge to state or local criminal prohibitions. It creates a targeted cause of action to seek injunctive or declaratory relief to eliminate "a pattern or practice of conduct by law enforcement officers." But substantive criminal prohibitions, like the laws challenged here, are not directed at "conduct by" law enforcement officers. To the contrary, they proscribe private conduct. The United States' efforts to shoehorn its challenge into Section 12601 violate the statute's plain text, ignore telling pre- and post-enactment history, and run afoul of basic canons of construction. Second, even if the United States' claim is cognizable under Section 12601, the Amended Complaint fails to plausibly allege facts showing that the District's laws are unconstitutional or that police officers have a pattern or practice of enforcing those laws in ways that deprive constitutional rights. For either of these reasons, the Court should dismiss the Amended Complaint for failure to state a claim.

## BACKGROUND

### I.     The Challenged Firearms Laws

Both the D.C. Council and Congress can legislate firearms laws for the District. *See Heller v. District of Columbia*, 670 F.3d 1244, 1250 (D.C. Cir. 2011). This case concerns two District firearms laws, one passed by the Council and the other by Congress.

McGraw Decl. Exs. Page 029

Almost two decades ago, the D.C. Council passed, the Mayor signed, and Congress passively approved statutory provisions that together prohibit possession of AR-15s in the District. *See* Firearms Control Amendment Act of 2008, D.C. Law 17-372, 56 D.C. Reg. 1365 (Feb. 13, 2009) (eff. Mar. 31, 2009). District law generally provides that no person in the District may "possess or control" a firearm without a "valid registration certificate." D.C. Code § 7-2502.01(a). But "assault weapon[s]" cannot be registered. *Id.* § 7-2502.02(a)(6). Included in the category of assault weapons are AR-15s. *See id.* § 7-2501.01(3A)(A)(i)(I)(ee). Possession of an AR-15 (*i.e.*, an unregistered firearm) is a misdemeanor. *See id.* § 7-2507.06(a).

Almost a century ago, Congress passed and the President signed a District law prohibiting "any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms." Act of July 8, 1932, ch. 465, Pub. L. No. 72-275, § 14, 47 Stat. 650, 654 (codified at D.C. Code § 22-4514(a)).[1] These devices are commonly known as "silencers." *United States v. Woodfolk*, 656 A.2d 1145, 1147 n.3 (D.C. 1995). Possession of a silencer is a misdemeanor. D.C. Code § 22-4515.

## II.    34 U.S.C. § 12601

### A.    Text and Enactment History

This case arises under 34 U.S.C. § 12601. Section 12601, originally codified at 42 U.S.C. § 14141, is part of Title XXI, § 210401, 108 Stat. 2071, of the Violent Crime Control and Law Enforcement Act of 1994 (the 1994 Crime Bill). It reads as follows:

> (a) Unlawful conduct
>
> It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement

---

[1]    The Amended Complaint mistakenly alleges that the District—not Congress—enacted what is now D.C. Code § 22-4514(a). *See* Am. Compl. ¶¶ 2, 32.

2

officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

(b) Civil action by Attorney General

Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1)[2] has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

Section 12601 was a direct response to the 1991 beating of Rodney King by Los Angeles Police Department officers. *See* Defs.' Ex. 1, Civ. Rts. Div., U.S. Dep't of Just., *Roundtable on State and Local Law Enforcement Police Pattern or Practice Program 42 USC § 14141* at 1–2 (June 3, 2010) (*Roundtable* Rep.) (summarizing history).[3] Following that tragedy and national outrage, the Police Accountability Act of 1991—the precursor to Section 12601—was introduced in Congress and incorporated into H.R. 3371, the Omnibus Crime Control Act of 1991 (the 1991 Crime Bill). H.R. Rep. No. 102-1085, at 63, 65 (1992); H.R. Rep. No. 102-242, at 135–39 (1991). The Police Accountability Act was passed by the House of Representatives, but the Senate "failed to achieve cloture on the Conference Report." H.R. Rep. No. 102-1085, at 65, 67, 189–90. A modified version was, however, incorporated into the 1994 Crime Bill. *See* Pub. L. No. 103-322, tit. XXI, 108 Stat. 2071 (1994); *Roundtable* Rep. at 1–2. This modified version, which became law, was identical in substance to its predecessor, except that it omitted a

---

[2]     The reference to "paragraph (1)" is a scrivener's error, which should be read as "paragraph (a)." *United States v. Lauderdale Cnty.*, 914 F.3d 960, 962 n.2 (5th Cir. 2019).

[3]     With this motion, the District provides as exhibits relevant materials from the Justice Department regarding Section 12601. As publicly available government documents, they are properly considered at this stage, especially because they provide background and are sources relevant to interpreting Section 12601. *See Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (on a motion to dismiss, a court may consider "public records subject to judicial notice").

3

private cause of action and expanded the scope of the provision so that it referenced "conduct" not only by "law enforcement officers," but also by "officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles." *Compare* 34 U.S.C. § 12601, *with* H.R. Rep. No. 102-242, at 24.

Because Section 12601 has no direct legislative history, courts and the Justice Department look to the legislative history of the Police Accountability Act. *See, e.g.*, *United States v. City of Columbus*, No. 99-cv-1097, 2000 WL 1133166, at *3 (S.D. Ohio Aug. 3, 2000). The committee report makes clear that the Act was designed to address a specific problem: "the problem of excessive force," which "is a serious one." H.R. Rep. No. 102-242, at 136. The report detailed the brutalization of King and found that it was "not an aberration," but rather part of a "culture" of "excessive force" by police that is "a significant problem in this country." *Id.* at 135. The report described examples of "police brutality" and "police misconduct," including "unconstitutional, harassing stops and searches of minority individuals," arrests of bystanders who "complain about police actions," a special unit using a racial slur in its name, and officers' use of "an illegal kung-fu device . . . to inflict pain on passive demonstrators." *Id.* at 136.

The committee found that the Justice Department "lack[ed] the authority to address systemic patterns or practices of police misconduct." *Id.* at 137. Specifically, the committee noted that "the Federal Government's criminal authority to prosecute police brutality is not adequate to address patterns or practices such as the lack of training or the routine use of deadly techniques like chokeholds, or the absence of a monitoring and disciplinary system." *Id.* at 138. And the committee further explained that two cases—*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), and *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980)—only underscored the need for congressional intervention. After *Lyons*, individual litigants could not

seek injunctive relief to address police abuses "absent a showing of likely future harm," and

*Philadelphia* made clear that the Attorney General did not have "implied statutory or

constitutional authority to sue a local government or its officials to enjoin violations of citizens'

constitutional rights by police officers." *Id.* at 137. This created a "gap in the law" where

neither individual litigants "nor anyone else" could eliminate systemic constitutional violations

caused by "police brutality." *Id.* at 137–38.

Congress sought to "close this gap in the law, [by] authorizing the Attorney

General . . . to sue for injunctive relief against abusive police practices." *Id.* at 138. The

committee report cited two cases as illustrative of "the need for this authority and how it will

work"; both involved excessive force. *Id.* at 138–39 (detailing how residents in Washington

State were "beaten by police officers following traffic stops" and a "young black man" in North

Carolina was "strangled to death by city police officers"). Nonetheless, the report stressed that

"[t]he Act does not increase the responsibilities of police departments or impose any new

standards of conduct on police officers" because "[t]he standards of conduct under the Act are

the same as those under the Constitution." *Id.* at 138; *see id.* at 136 (stating that "[p]olice

brutality is a violation of the U.S. Constitution").

### B.    Past Practice

Since Section 12601's enactment, the Justice Department has developed standard

practices for Section 12601 cases. Defs.' Ex. 2, Civ. Rts. Div., U.S. Dep't of Just., *The Civil

Rights Division's Pattern and Practice Police Reform Work: 1994-Present* at 1–2 (2017) (2017

Rep.). Until very recently, Section 12601 cases had been handled by the Special Litigation

Section in the Civil Rights Division, which "consists of career professional attorneys with many

decades of collective experience working on police reform cases." *Id.* at 3. A Section 12601

case begins with a preliminary, internal inquiry of whether to open an investigation into a police

5

department's conduct. *Id.* at 5. If the Division decides to open an investigation, it notifies the jurisdiction and makes the investigation public. *Id.* at 8.

Investigations of police conduct often take over a year and include extensive evidence and observation. *Id.* at 9–10, 14. "[T]he Division emphasizes outreach to all levels of a law enforcement agency." *Id.* at 10–12. The Division meets with law enforcement leadership and "engages officers . . . at roll-calls [and] during ride-alongs" as well as "in face-to-face meetings." *Id.* at 10, 12. The Division also engages the community through "community or town hall meetings." *Id.* at 13. These efforts are necessary because "the thoroughness of the Division's investigations underpins the credibility and effectiveness of its reform efforts." *Id.* at 15. At the end of an investigation, if the Division determines that there is reasonable cause to believe that a Section 12601 violation exists, the Division notifies the jurisdiction of the Division's determination and meets with police and community stakeholders. *Id.* at 15–16.

The focus then shifts to cooperatively finding solutions to eliminate the pattern or practice. *Id.* at 17. "The Division's goal in every case is to avoid contentious litigation and begin the process of reform as quickly as possible." *Id.* at 18. The Division engages the police department in negotiations to reach a reform agreement and consent decree, with input from stakeholders. *Id.* at 17–18, 20. Reform agreements and consent decrees provide for termination once their terms have been implemented. *Id.* at 35. Only if a reform agreement cannot be reached does the Division bring a lawsuit. *Id.* at 2, 18. At the time of the Division's 2017 report, only six out of dozens of cases had required litigation. *Id.* at 18.

The Division's Section 12601 cases have "focus[ed] on systemic police misconduct." *Id.* at 1. Accordingly, "[m]any of the Division's investigations focus on core issues in police reform common to many law enforcement agencies—such as patterns of unlawful use of force; unlawful

6

stops, searches and arrests; and racial discrimination." *Id.* at 6. Indeed, "[a]ddressing systemic excessive force is one of the core functions of the Division's pattern-or-practice cases." *Id.* at 27. Accordingly, the Justice Department had never used a Section 12601 case to bring a facial challenge to a state or local criminal statute—until this case. *See id.* at 41–48 (summarizing past Section 12601 cases); *Roundtable* Rep. at 8–9 (cataloguing past Section 12601 cases).

In fact, between 2017 and 2021, the Justice Department brought only one Section 12601 investigation and even declined to open an investigation into the Minneapolis Police Department following the murder of George Floyd. Christy E. Lopez, *DOJ Police Pattern-or-Practice Investigations*, 37-SPG Crim. Just. 34, 35–36 (2022). The lack of investigations was consistent with that administration's pronouncement that it "is not the responsibility of the federal government to manage non-federal law enforcement agencies." Defs.' Ex. 3, Memo. From Jefferson B. Sessions III, Atty. Gen., to Heads of Dep't Components & U.S. Attys. at 1 (Mar. 31, 2017). Indeed, the federal government curtailed the use of consent decrees because, in its view, "federal court decrees that impose wide-ranging and long-term obligations on, or require ongoing judicial supervision o[f], state or local governments are extraordinary remedies that raise sensitive federalism concerns." Defs.' Ex. 4, Memo. From Jefferson B. Sessions III, Atty. Gen., to Heads of Civ. Litigating Components & U.S. Attys. at 2 (Nov. 7, 2018) (citation modified). In the United States' view at the time, "[t]his supervision can deprive the elected representatives of the people of the affected jurisdiction of control of their government." *Id.*

### III.    **This Case**

This case breaks from Section 12601's history and the Justice Department's prior practices. There was no public investigation or engagement with the District's Metropolitan Police Department (MPD). Instead, this case began with a Complaint [1] filed in December 2025 by the Justice Department's "newly established Second Amendment Section." Press

7

Release, Off. of Pub. Affs., U.S. Dep't of Just., *Justice Department Sues the District of Columbia for the Unconstitutional Ban of Semi-Automatic Firearms* (Dec. 22, 2025), tinyurl.com/yu82pzdn. That Complaint brought a single claim under Section 12601, alleging that MPD's enforcement of the District's assault weapons laws was a pattern or practice of law enforcement conduct that violated the Second Amendment. Compl. [5-1] ¶¶ 39–42.[4]

The District moved to dismiss the Complaint for failure to state a claim, explaining that challenges to state and local criminal laws were not cognizable under Section 12601, and even if they were, the Complaint failed to plausibly allege that the assault weapons laws are unconstitutional or that MPD is engaged in an unlawful pattern or practice. Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss Pl.'s Compl. (Defs.' MTD Compl.) [16] at 1. In support, former Civil Rights Division officials, the Brady Center to Prevent Gun Violence, and the Giffords Law Center to Prevent Gun Violence filed an amicus brief explaining how the United States' claim breaks starkly from the Justice Department's understanding of the statute. Amicus Br. [25]. The United States filed an opposition [23], and the District filed a reply [26].

Two days after the District filed its reply, the United States asked the District for consent to amend its Complaint. The District consented, and the United States filed an Amended Complaint that makes three main changes: (1) it abandons the challenge to the District's assault weapons laws and instead only challenges the ban on AR-15s; (2) it adds a handful of allegations about AR-15s; and (3) it adds a challenge to the District's silencer ban. *Compare* Compl., *with* Am. Compl. The Amended Complaint seeks declaratory and injunctive relief to prevent Defendants from enforcing the AR-15 and silencer bans. Am. Compl. at 14.

---

[4] The United States designated this case as "related" to another case before this Court challenging the District's assault weapons laws and brought by private plaintiffs under 42 U.S.C. § 1983, *Yzaguirre v. District of Columbia*, No. 1:24-cv-01828. Not. of Related Case [2].

8

**LEGAL STANDARD**

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court need not accept as true conclusory "assertions devoid of further factual enhancement," *id.* (citation modified), or "legal conclusions," *Pueschel v. Chao*, 955 F.3d 163, 166 (D.C. Cir. 2020).

**ARGUMENT**

I.     <u>The United States' Challenge to the District's Proscription of AR-15s and Silencers Is Not Cognizable Under Section 12601.</u>

Following the beating of Rodney King and reports of police misconduct across the country, Congress enacted Section 12601 to authorize the Attorney General to bring civil suits to eliminate systemic constitutional and statutory violations caused by law enforcement officers. In so doing, Congress did not fundamentally reorder the federal government's relationship with states and localities. Instead, Congress crafted a powerful but targeted cause of action and remedial scheme with important limitations. The statute's text, history, and context, plus basic canons of construction, make clear that the United States may only invoke Section 12601 to challenge a "pattern or practice of conduct by law enforcement officers" that "deprives" individuals of protected rights. That reading respects states' and localities' historic police powers while accomplishing Congress's stated goal of empowering the Attorney General to redress a particular category of harm—systemic police misconduct—which is not easily redressed by individual litigants. Since its enactment 30 years ago, this is precisely how the United States has interpreted Section 12601.

9

Today, however, the United States asks the Court to adopt a reading of Section 12601 that is atextual and out of step with history, congressional intent, past practice, and basic principles of prudence. The United States seeks to use Section 12601 to bring a facial challenge to the District's AR-15 and silencer laws. But Section 12601's text does not support such a reading because substantive criminal prohibitions, like the challenged laws, proscribe *individual* conduct; they are not directed at "conduct by" law enforcement officers. And allegedly unconstitutional criminal prohibitions are far afield from the types of harms that Congress sought to remedy when it enacted Section 12601, *i.e.*, harms caused by police misconduct. The United States' novel interpretation also dramatically expands the federal government's ability to superintend state and local affairs at the expense of state and local sovereignty. For these and the reasons that follow, this Court should dismiss the Amended Complaint with prejudice because the United States' suit based on its newly minted interpretation of Section 12601 is not cognizable. *See Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015) ("Dismissal with prejudice is warranted when the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." (citation modified)).

A. **Section 12601 Does Not Authorize the United States to Challenge Substantive Criminal Prohibitions.**

Section 12601's text, especially when interpreted in light of its context, its history, and canons of interpretation, reveals that the statute does not authorize facial constitutional challenges to state and local criminal laws.

1. **The Text of Section 12601 Does Not Authorize Challenges to State and Local Criminal Statutes.**

To resolve a question of statutory interpretation, the Court "begin[s] with the text," which "must be read in the context of the entire statute." *Noble v. Nat'l Ass'n of Letter Carriers*, 103 F.4th 45, 50 (D.C. Cir. 2024). In construing statutory text, the Court generally interprets words

based on their ordinary meaning when Congress enacted the statute. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019). Here, the text of Section 12601 makes three limiting principles clear: the statute provides a cause of action (1) targeted at specific actors (as relevant here, "law enforcement officers") (2) when "a pattern or practice of conduct by" those actors (*i.e.*, the way in which they perform their duties) (3) causes the deprivation of constitutional rights. The import of these limitations is that Section 12601 does not authorize the United States to challenge substantive criminal prohibitions, such as the District's proscription of AR-15s and silencers.

First, Section 12601 provides an avenue for redressing harms caused by specific actors: "law enforcement officers" and "officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles." 34 U.S.C. § 12601(a). The statute's focus on specific actors is evidenced not only by the text itself, but also by the title and subtitle heading under which Congress enacted Section 12601, "State and Local Law Enforcement" and "Police Pattern or Practice," respectively. *See* Pub. L. No. 103-322, 108 Stat. 2061, 2071 (1994). "[T]he title of a statute and the heading of a section" can help determine a statute's "meaning." *Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)). Here, the statute's title and heading "point to a narrow[ ] reading" that is "centered around" police officers. *Id.* at 120; *Lauderdale Cnty.*, 914 F.3d at 966 (referring to title and subtitle in interpreting Section 12601).

Second, Section 12601's phrase "engage in a pattern or practice of conduct by" law enforcement officers shows that the statute concerns *how* officers perform their duties. As used here, "engage in" means "[t]o involve oneself or become occupied" or to "participate." *Engage*, The American Heritage College Dictionary (3d ed. 1993). "Pattern" means "[a] characteristic

11

form, style, or method." *Pattern*, The American Heritage College Dictionary (3d ed. 1993); *see Pattern*, Webster's New World Dictionary (3d ed. 1988) ("a regular, mainly unvarying way of acting or doing"). "Practice" means "[a] habitual or customary action or way of doing something." *Practice*, The American Heritage College Dictionary (3d ed. 1993); *see Practice*, Webster's New World Dictionary (3d ed. 1988) ("a frequent or usual action; habit; usage . . . a usual method or custom"). "Conduct" means "the way that one acts; behavior; deportment." *Conduct*, Webster's New World Dictionary (3d ed. 1988); *see Conduct*, Black's Law Dictionary (6th ed. 1990) ("[p]ersonal behavior; deportment; mode of action"); *Conduct*, The Compact Oxford English Dictionary (2d ed. 1989) ("Manner of conducting oneself or one's life; behaviour; usually with more or less reference to its moral quality (good or bad)"). "Conduct" is distinct from an "act," for example, which means simply "a thing done," stripped of any normative gloss as to how that act is performed. *Act*, Webster's New World Dictionary (3d ed. 1988). And "[c]onduct" is coupled in Section 12601 with "by," which indicates agency and means "[t]hrough the means, act, agency or instrumentality of." *By*, Black's Law Dictionary (6th ed. 1990); *see By*, Webster's II New Riverside University Dictionary (1984) ("[t]hrough the agency or action of"). "By" is used to "[i]ntroduc[e] the principal agent." *By*, The Compact Oxford English Dictionary (2d ed. 1989); *see Bank of Am. Corp. v. United States*, 148 F.4th 171, 177–78 (4th Cir. 2025) (relying on the definition of "by" to interpret "interest is payable . . . on equivalent underpayments and overpayments by the same taxpayer" to mean the "taxpayer *made* the 'equivalent underpayments and overpayments'").

Putting these terms together along with "law enforcement officers," "engage in a pattern or practice of conduct by law enforcement officers" refers to repeated or habitual modes of action by law enforcement officers. The statutory language is focused on officers' own conduct,

McGraw Decl. Exs. Page 040

not the conduct of others. "Engage in" reinforces that this provision is focused on something law enforcement officers are actually doing. And, critically, the statute's references to "pattern," "practice," and "conduct" are limited to *how* officers act, as evidenced by past actions targeting police misconduct. "By" indicates that the law enforcement officer is responsible for the pattern or practice of relevant "conduct." Accordingly, the phrase "conduct by" limits Section 12601's scope so that it creates a cause of action to remedy abuses of authority by law enforcement officers. It does not grant the United States a roving license to seek redress for *any* alleged harm with a connection to law enforcement officers.

Third, the "pattern or practice of conduct by" law enforcement officers must cause the alleged deprivation of rights. The clause "that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States" is a restrictive relative clause that limits the preceding text and meaning of "pattern or practice of conduct by law enforcement officers" such that this pattern or practice of conduct must be the source of the deprivation. *See* H.W. Fowler, *The New Fowler's Modern English Usage* 672 (R.W. Burchfield rev. 3d ed. 1996) (explaining how restrictive relative clauses limit phrases); *United States v. Nishiie*, 996 F.3d 1013, 1021–22 (9th Cir. 2021) (explaining that "[r]estrictive relative clauses are usually introduced by *that* . . . and are never set off by commas from the rest of the sentence" and "provide[ ] information that is essential to understanding the intended meaning of the rest of the sentence" (citation omitted)). If something else causes the alleged deprivation—for instance, an underlying statute that restricts conduct by private individuals—then there is no police "pattern or practice" that falls within the scope of Section 12601.

Altogether, these text-based limitations mean that Section 12601 cannot be used to challenge substantive criminal prohibitions. A criminal statute enacted by the legislature and

McGraw Decl. Exs. Page 041

signed by the executive is not "conduct by" law enforcement officers. Rather, criminal prohibitions are legislative acts. Law enforcement officers have no control over what criminal laws proscribe. Nor do substantive criminal prohibitions establish or regulate a "pattern or practice of conduct by law enforcement." To the contrary, they impose restrictions and concomitant penalties on private individuals. As such, criminal prohibitions do not speak to the way in which "law enforcement officers" conduct their duties. This means that challenges to criminal prohibitions are, in essence, facial challenges to legislative acts—not challenges to harms allegedly caused by a pattern or practice of police conduct. And, when a criminal statute is challenged as unconstitutional, it is the legislature's proscription of individual conduct that causes any alleged deprivation of rights. Even if law enforcement officers make arrests for allegedly unconstitutional criminal laws, the "principal agent" behind any constitutional harm from the arrest is the legislature that wrote the law. *See By*, The Compact Oxford English Dictionary (2d ed. 1989). At bottom, Section 12601 is an avenue for the correction of systemic police misconduct, *i.e.*, repeated abuses of authority by officers. It does not give the federal government carte blanche to challenge any state or local law that it opposes.

Section 12601's remedial scheme confirms that the statute cannot be used to challenge substantive criminal prohibitions. *See City & Cnty. of S.F. v. EPA*, 604 U.S. 334, 347 (2025) ("[O]ur interpretation of the meaning of the term 'limitation' in § 1311(b)(1)(C) must take into account the way in which the term is used in the two preceding statutory subsections."); *United States v. Wilson*, 290 F.3d 347, 355 (D.C. Cir. 2002) ("It is the 'classic judicial task' of construing related statutory provisions 'to make sense in combination.'" (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988))). While subsection (a) of Section 12601 proscribes "a pattern or practice of law enforcement conduct" that deprives individuals of constitutional rights,

subsection (b) authorizes a limited remedy, and the two must be construed together. Subsection (b) provides that courts may grant only "appropriate equitable and declaratory relief to eliminate the pattern or practice," *i.e.*, the "pattern or practice of conduct by law enforcement officers . . . that deprives persons" of rights guaranteed by federal law. In the case of a challenge to police conduct, that equitable and declaratory relief would "eliminate" the constitutional harm because the abusive police conduct could be declared unlawful or enjoined. For example, a police department could enter into a consent decree to stop using a particular method of force and thus "eliminate" the constitutional harm of excessive force.

But when the United States challenges a substantive criminal prohibition, the only relief the statute allows—equitable and declaratory relief to eliminate the "pattern or practice of conduct by" law enforcement officers—would not eliminate the source of the alleged harms. At most, a court could enjoin the police from enforcing a criminal prohibition, but that would not redress the alleged constitutional violation caused by the prohibition itself. The offending law would remain on the books, and individuals would remain subject to enforcement in any other way and prosecution and punishment for violating it. Accordingly, any redress granted by this Court would not remedy the harms alleged by the United States. That is a nonsensical outcome when Congress designed Section 12601 to "*eliminate*" constitutional harms.

      2.      **History and Context Make Clear That Section 12601 Should Not Be Construed to Authorize Challenges to Substantive Criminal Statutes.**

In addition to the statute's plain text, its context and history (both pre- and post-enactment) indicate that the United States can only use Section 12601 to target "conduct by" law enforcement officers, not to bring facial challenges to substantive criminal statutes.

15

### a. Congress Enacted Section 12601 Against the Backdrop of Other Pattern-or-Practice Laws, Which Do Not Contain Similar Constraints.

Comparing Section 12601 to Congress's other "pattern or practice" laws further evinces that Congress crafted a narrow statute here. Before Section 12601 was enacted, "pattern or practice" laws existed in a range of areas, including employment, housing, and public accommodations. Differences between Section 12601 and these predecessor laws are meaningful because "Congress legislates against the backdrop of existing law." *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013); *see Orton Motor, Inc. v. HHS*, 884 F.3d 1205, 1214 (D.C. Cir. 2018). "Congress's choice to depart from the model of a closely related statute is a choice neither [the Court] nor the agency may disregard." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018). In this Court's words, "[o]ther statutes may bear on Congress's intent." *Merck & Co. v. HHS*, 385 F. Supp. 3d 81, 95 (D.D.C. 2019) (Mehta, J.), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020).

Other "pattern or practice" laws allow for the vindication of only a specific subset of rights in a particular field. *See, e.g.*, 42 U.S.C § 2000a-5(a) (public accommodations "rights secured by this subchapter"); *id.* § 2000e-6(a) (employment "rights secured by this subchapter"); *id.* § 3614(a) (housing "rights granted by this title"). By contrast, Section 12601 has no express subject-matter constraint. It allows for the vindication of "rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 34 U.S.C. § 12601(a). That breadth, however, is counterbalanced by clear actor-based constraints. Section 12601 allows for the vindication of only those harms caused by "law enforcement officers" and other specified actors not relevant here. *Id.* Conversely, other "pattern or practice" laws allow the Attorney General to sue "any person or group of persons" "engaged in a pattern or practice of resistance" to protected rights, *e.g.*, 42 U.S.C §§ 2000a-5(a), 2000e-6(a), 3614(a), or any "State

government or unit of local government" that "has engaged in or is engaging in a pattern or practice in violation" of specified rights, 34 U.S.C. § 10228(c)(3), without actor constraints.

Congress's decision to exclude subject-matter constraints and instead include actor constraints in Section 12601 is a marked and deliberate choice that must be respected. It underscores Congress's laser focus on only one type of harm: harm caused by "conduct by" law enforcement officers. This is especially true because the 1994 Crime Bill, within which Section 12601 was enacted, contained another "pattern or practice" law that again was limited by subject matter but not by actor. *See* 31 U.S.C. § 6715 (authorizing the Attorney General to sue "a unit of general local government that the Attorney General has reason to believe has engaged or is engaging in a pattern or practice in violation of section 6711 (a) or (b)").[5] "[B]ecause Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another," the presence of actor-based constraints in Section 12601 but not in 31 U.S.C. § 6715 carries particular weight. *DHS v. Maclean*, 574 U.S. 383, 391 (2015); *see Orton Motor*, 884 F.3d at 1214 (similar); A. Scalia & B. Garner, *Reading Law* 170 (2012) ("[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.").

It makes no sense to conclude that regardless of Section 12601's clear actor-based constraints, Congress nonetheless sought to authorize broader challenges to substantive criminal prohibitions. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[The

---

[5] Section 6711(a) states that "[n]o person in the United States shall be excluded from participating in, be denied the benefits of, or be subject to discrimination under, a program or activity of a unit of general local government because of race, color, national origin, or sex if the government receives a payment under this chapter." And Section 6711(b) applies further prohibitions to governments that "receive[ ] a payment under this chapter," *i.e.*, age-based discrimination, "discrimination against an otherwise qualified handicapped individual," and "discrimination because of religion."

McGraw Decl. Exs. Page 045

Court] must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."). Congress knows how to authorize or refer to challenges to statutes. *See, e.g.*, 42 U.S.C. § 1983 (providing a cause of action against "[e]very person who, under color of any *statute*, *ordinance*, *regulation*, custom, or usage, of any State or Territory or the District of Columbia" deprives a plaintiff of constitutional or statutory rights (emphases added)); 28 U.S.C. § 2284(a) ("A district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."). In Section 12601, however, Congress did not refer to state or local "criminal statutes" or "actions challenging the constitutionality" thereof. Instead, Congress used "pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights." The United States thus asks this Court to endorse "the doubtful proposition that Congress sought to accomplish in a surpassingly strange manner what it could have accomplished in a much more straightforward way." *Azar v. Allina Health Servs.*, 587 U.S. 566, 577 (2019) (citation modified). At base, Section 12601 is a targeted tool, aimed at remedying a particular kind of harm caused by specific actors. To avoid warping the statutory text, Section 12601's textual constraints should be respected by limiting Section 12601 to suits alleging misconduct by law enforcement, not allegedly unconstitutional lawmaking.

> **b.** **Legislative History Also Evidences Section 12601's Narrow Focus on Eliminating Police Misconduct.**

Legislative history confirms and reinforces what the text shows. *See Sec'y of Labor v. KC Transport, Inc.*, 173 F.4th 294, 314 n.10 (D.C. Cir. 2026) ("Though legislative history is not the law, it can be helpful in confirming or reinforcing what the text shows." (citation modified)); *Inst. S'holder Servs. Inc. v. SEC*, 718 F. Supp. 3d 7, 27 (D.D.C. 2024) (Mehta, J.) (consulting

McGraw Decl. Exs. Page 046

legislative history, after the text, to decide which party's interpretation "better reflects the purposes and history" of the statute), *aff'd*, 142 F.4th 757 (D.C. Cir. 2025). As explained, Section 12601 was designed to address a specific problem: police misconduct. Background § II.A, *supra*. The committee report for the Police Accountability Act makes clear that the Act was a direct reaction to the brutalization of Rodney King and police misconduct across the country. The harm to be remedied was expressly and repeatedly identified as "pattern[s] of abuse," *i.e.*, patterns of "[p]olice brutality," "police misconduct," and "abuse[s]" of "the authority granted" to officers. H.R. Rep. No. 102-242, at 136, 138. And Congress called out specific examples of these unacceptable "abusive police practices," including "the lack of training or the routine use of deadly techniques like chokeholds, or the absence of a monitoring and disciplinary system." *Id.* at 138.

Not once in the thorough committee report did Congress express any concern with state and local criminal laws. To the contrary, Congress indicated that the problem it sought to correct was not flawed legislative acts, but rather police departments "ignor[ing]" state statutes that mandated proper "police training standards," *id.* at 139, among other troubling instances of police misconduct, *id.* at 138. Facial challenges to substantive criminal prohibitions are fundamentally different from the sorts of suits that Congress plainly had in mind. Authorizing such challenges would be a major and consequential undertaking. If Congress had sought to authorize them, surely Congress would have at least mentioned that somewhere in the legislative history. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 380 (1988) (Scalia, J.) ("[I]t is most improbable that [a major change] would have been made without even any mention in the legislative history.").

McGraw Decl. Exs. Page 047

Indeed, Congress was clear that it did *not* intend to greatly upset the federal and state balance.  Congress evidenced a clear intent to "create[ ] an enforceable right to be free of patterns of police brutality" by empowering the Attorney General to hold police "department[s] . . . responsible" by "su[ing] for injunctive relief against abusive police practices."  H.R. Rep. No. 102-242, at 138.  But in so doing, Congress also acknowledged competing federalism concerns and reiterated that it did not intend to upset the balance of power between the federal government and states and localities.  Specifically, Congress acknowledged, when considering the 1991 Crime Bill that incorporated the Police Accountability Act, that, "[h]istorically, day-to-day responsibility for operation of the Nation's criminal justice system has rested with those units of government that are closest to the people."  *Id.* at 88.  In Congress's own words, the 1991 Crime Bill "reflects that historical relationship while giving impetus to certain initiatives and policy decisions that must start at the Federal level i[f] the fight against crime is to be waged efficiently and vigorously."  *Id.*

Further, Section 12601 was enacted against the backdrop of two cases (*Lyons*, 461 U.S. 95, and *Philadelphia*, 644 F.2d 187) and existing limits on the United States' authority to criminally prosecute police misconduct.  *See* H.R. Rep. No. 102-242, at 137–39.  *Lyons* limited private litigants' ability to seek systemic fixes for police misconduct.  Afterwards, but prior to Section 12601's passage, Congress expressed concern that "courts were powerless to correct" systemic police abuses and "had no authority to order remedies for the glaring deficiencies" described in reports of police abuse across the nation.  *Id.* at 139.  Section 12601 was meant to fix that shortfall.  Yet, that sort of remedial gap simply does not exist when it comes to substantive criminal prohibitions.  Criminal defendants can always challenge laws via a motion

20

to dismiss the indictment, among other mechanisms; and individual litigants can bring affirmative facial challenges to state and local laws under 42 U.S.C. § 1983.

Further, in *Philadelphia*, the Third Circuit held that the Attorney General had no "implied statutory or constitutional authority" to sue localities "to enjoin violations of citizens' constitutional rights." *See* H.R. Rep. No. 102-242, at 137. Notably, the injunction sought in *Philadelphia* was not a facial challenge to a substantive criminal prohibition. Instead, the United States sought to enjoin a widespread practice by "police officers" of "violating the rights of persons . . . on the streets" and police misconduct designed to "discourage victims of abuse from complaining" and "suppress evidence," among other alleged abuses of power. 644 F.2d at 190. In Congress's view, the Attorney General's inability to "change the policy of a police department that tolerates officers beating citizens on the street" "represent[ed] a serious and outdated gap in the federal scheme for protecting constitutional rights." H.R. Rep. No. 102-242, at 137. Section 12601 was designed to remedy that "gap." Nothing in the relevant legislative history suggests that Congress drafted Section 12601 to authorize challenges to state or local criminal statutes and make Section 12601 the Justice Department's own Section 1983.

> **c.** **Since Its Enactment 30 Years Ago, Section 12601 Has Never Been Used to Challenge a Substantive Criminal Prohibition.**

This suit is entirely anomalous and out of step with past practice. When, as here, the federal executive has never interpreted a statute to confer a power, that past practice is "significant in determining whether such power was actually conferred." *Refugee & Immigrant Ctr. Educ & Legal Servs. v. Mullin*, 174 F.4th 81, 101 (D.C. Cir. 2026) (quoting *West Virginia v. EPA*, 597 U.S. 697, 725 (2022)) (looking to the Executive Branch's "past practice," including that of the first Trump Administration); *see also, e.g.*, *FTC v. Bunte Bros, Inc.*, 312 U.S. 349, 352 (1941). After all, "the longstanding practice of the government . . . can inform a court's

21

determination of what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (citation modified)).

The United States's recent invocation of Section 12601 to challenge substantive criminal prohibitions on individual conduct—in the Assistant Attorney General's own words—has "never been done before" and is "revolutionary." The Arena America First Legal (@TheArenaFL), X at 28:48–29:10, 32:15–32:26 (Jun. 1, 2026), perma.cc/FZM3-ZVDQ, perma.cc/WF3P-LQHM (contending that the United States's Section 12601 suits against the District and other jurisdictions are unprecedented in "the history of the United States"). Amici, including former leaders of the Justice Department's Civil Rights Division, as well as career supervisors from the Division's Special Litigation Division, know Section 12601 better than anyone and confirm that this suit is "the first of its kind" and a "stark[ ] depart[ure]" from past practice. Amicus Br. [25] at 2, 3.

Historically, the United States has used Section 12601 only to target law enforcement officer conduct deviating from the law. *See* 2017 Rep. at 41–48 (summarizing the United States' pattern-of-practice cases through 2017). Examples of past suits include challenges to patterns or practices of "unlawful stops, searches and arrests," "discriminatory policing," "excessive force, including deadly force," "theft by officers," "unlawful retaliation against people who make complaints or criticize [the police department]," and "violations of the First Amendment right to observe and record police activity." *Id.* Those suits are different in kind from facial challenges to substantive criminal prohibitions.

Further, when the United States has previously sought to challenge state or local laws, it has not, to the District's knowledge, done so by invoking Section 12601. Rather, it has either attempted to proceed directly under the Supremacy Clause (and established standing to do so),

McGraw Decl. Exs. Page 050

*see, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012) (challenging Arizona's law as preempted by federal immigration law); *United States v. California*, 921 F.3d 865 (9th Cir. 2019) (challenging California immigration laws); *United States v. Texas*, 586 F. Supp. 3d 574 (W.D. Tex. 2022) (challenging an executive order issued by state governor), or else relied on different statutory authority, *see, e.g.*, *United States v. Skrmetti*, 605 U.S. 495 (2025) (invoking 42 U.S.C. § 2000h-2 to intervene in a suit challenging Tennessee law). If Section 12601 did grant the United States broad authority and standing to challenge state and local laws that it opposes, presumably the United States would have invoked it for that purpose previously, rather than invoking other causes of action and bases for standing.

### 3. Construing Section 12601 to Authorize Challenges to Criminal Prohibitions Is Contrary to Federalism and Common Sense.

Endorsing an interpretation of Section 12601 that allows for challenges to substantive criminal prohibitions would be a sweeping—and unjustifiable—grant of authority to the United States. After all, police officers can lawfully arrest individuals for the infraction of "even a very minor criminal offense," *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001), and officers enforce not only criminal laws, but also a range of civil laws by, for example, citing individuals for traffic infractions or noise violations, *see, e.g.*, *United States v. Rodenhauser*, No. 94-5709, 1996 WL 331157, at *2 n.2 (4th Cir. June 18, 1996) (noting that the duties of county police officers included the enforcement of the municipal code and "all other laws and ordinances" (quoting Prince George's Cnty., Md., Code § 18-135(a) (1991))). If the mere enforcement of state and local laws were enough to ground a Section 12601 suit, the United States could bring constitutional challenges to any number of laws that the administration in power opposes. Basic canons of federalism and common sense weigh against such a seismic shift in police power.

McGraw Decl. Exs. Page 051

For starters, it is a "well-established principle that it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014) (citation modified); *see also Vt. Agency of Nat. Res. v. United States*, 529 U.S. 765, 787 (2000) ("[I]f Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intentions to do so unmistakably clear in the language of the statute." (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989))). In the balance of federal and state power, "[f]oremost among" the states' powers is "the power to create and enforce a criminal code." *Heath v. Alabama*, 474 U.S. 82, 93 (1985). In a similar vein, states and localities are responsible for local law enforcement, and the Supreme Court has thus long recognized that the "proper balance between state and federal authority counsels restraint" when federal courts are called upon to enjoin local law enforcement. *Lyons*, 461 U.S. at 112. More broadly, federal courts have long "disfavored" facial challenges to state and local laws because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

Authorizing federal-court, facial challenges by the federal executive to state and local criminal laws and enjoining police officers from enforcing them would upset this balance. And these would not be just any constitutional challenges, but challenges brought by "the world's largest law firm," the Justice Department, with all its resources and powers that far outmatch those of municipalities' and states' law departments. *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 471 (1983) (Burger, J., dissenting). Yet, nothing in Section 12601's text or history indicates—let alone *clearly* indicates—that this was Congress's desired outcome.

McGraw Decl. Exs. Page 052

Even if that were not apparent from a plain-text review, it is underscored by Congress's express acknowledgment that the lion's share of police powers has historically rested with "those units of government that are closest to the people." H.R. Rep. No. 102-242, at 88. In defining the contours of Section 12601's predecessor, Congress emphasized that it was crafted to "reflect[ ] that historical relationship." *Id.* That statement only reinforces the commonsense intuition that had Congress desired to dramatically expand the United States' ability to superintend state and local affairs, it would have made its intention clear. Indeed, Congress legislated against the backdrop of decades of case law that cautioned that "[w]here . . . the exercise of authority by states officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (citation modified). Had Congress desired to cast these longstanding federalism concerns aside and grant the United States a newly minted license to challenge state and local law as unconstitutional, it would have said so explicitly rather than use "pattern or practice of conduct by law enforcement officers."

Further, even prototypical Section 12601-type suits raise federalism concerns—making it all the more important that the Attorney General toe the line of the cause of action created by Congress. Prior to Section 12601's enactment, the Third Circuit in *Philadelphia*, 644 F.2d 187, rejected an attempt by the United States to bring a pattern-or-practice suit against a police department for police misconduct absent clear congressional authorization. *Philadelphia* cogently and powerfully detailed the "important principles of federalism and separation of powers" at stake. *Id.* at 200–01. It explained that permitting the "Justice Department to bring a civil suit against any state or local administrative body merely because the Attorney General and his subordinates" opine that their practices are unconstitutional "would be to vest an excessive

25

and dangerous degree of power in the hands of the Attorney General." *Id.* at 200 (citation modified).  The court went on to explain that "[t]he conceivable variations" on this type of "lawsuit are practically infinite" and would "compel drastic and far-reaching changes in local governments" fundamentally "inconsistent with a proper division of power in a federal system." *Id.* at 201.  A broad reading of the Attorney General's powers would allow him to "sweep across the nation, thrusting himself into the policy-making machinery at every level of government from the village hall to the governor's mansion." *Id.* at 198.  Undoubtedly, Congress drafted Section 12601 to provide the statutory authority found lacking in *Philadelphia*.  *See* H.R. Rep. No. 102-242, at 137–38.  But that authorization of authority goes only so far as the statute's plain text.  When the United States seeks judicial sanction of an atextual reading of the statute—as it does here—all the federalism concerns described by *Philadelphia* reemerge with full force.

Worse still, the United States' interpretation of Section 12601 does not just upset the balance of power between the federal government and states—it also upsets the balance of power *within* the federal government by setting the Justice Department on a collision course with Congress.  Many District criminal laws were passed by Congress and signed by the President— including the silencer ban challenged here.  *See Palmore v. United States*, 411 U.S. 389, 398 (1973) ("Congress has from time to time enacted laws that compose the District of Columbia Code.").  It defies common sense to think that Congress wanted the Justice Department to undo Congress's own enactments, and "[t]he court must steer clear of outcomes that are . . . 'contrary to common sense,'" *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 16 (D.D.C. 2024) (Mehta, J.) (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998)), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025).  Instead, the Court should "interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S.

497, 502 (2018). After all, the Attorney General has a "duty to defend" Acts of Congress, and "if executive officers were to adopt a policy of ignoring or attacking Acts of Congress whenever they believed them to be in conflict with the provisions of the Constitution, their conduct in office could jeopardize the equilibrium established within our constitutional system." The Att'y Gen.'s Duty to Def. & Enforce Constitutionally Objectionable Legis., 4A Op. O.L.C. 55, 55–56 (1980); *see United States v. Windsor*, 570 U.S. 744, 762 (2013) ("[I]t poses grave challenges to the separation of powers for the Executive . . . to be able to nullify Congress' enactment solely on its own initiative."). Yet that is precisely what the United States asks this Court to condone: "government by injunction in which the courts and the Executive Branch can 'make law' without regard to the action of Congress." *Phila.*, 644 F.2d at 203 (quoting *N.Y. Times Co. v. United States*, 403 U.S. 713, 742–43 (1971)).

In addition, the United States' reading of Section 12601 violates the baseline principle that "[r]epeals by implication are not favored" and when two statutes are "capable of co-existence" courts must "regard each as effective" absent clear "congressional intent to the contrary." *P&Z Co. v. District of Columbia*, 408 A.2d 1249, 1251 (D.C. 1979); *Me. Cmty. Health Options v. United States*, 590 U.S. 296 (2020). Similarly, "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Strawberry v. Albright*, 111 F.3d 943, 947 (D.C. Cir. 1997). After enacting the District's silencer law, it is unlikely that Congress would have declared that prior statute "unlawful" and authorized the Attorney General to seek to enjoin it through the passage of Section 12601 without a clear and manifest statement. Because the United States' interpretation strains both the separation of powers and common sense, the Court should reject it.

McGraw Decl. Exs. Page 055

Besides a clash with Congress, the United States' reading of Section 12601 risks fractures within the Justice Department. Congress gave the United States Attorney for the District of Columbia (USAO) the duty to prosecute District-law felonies and, in certain instances, District-law misdemeanors—including the laws challenged here. *See* District of Columbia Court Reform and Procedure Act of 1970, § 210(a), Pub. L. No. 91-358, 84 Stat. 473, 605 (codified at D.C. Code § 23-101(c)–(d)). It strains common sense to think that Congress intended one component of the Justice Department to have the power to challenge the very laws that another component prosecutes. *See U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 999 (D.C. Cir. 2024) ("[W]e should not lightly read the statutory text to require EPA to act in a manner that is 'self-defeating.'" (quoting *Quarles v. United States*, 587 U.S. 645, 654 (2019))). In all, the United States' interpretation of Section 12601 threatens the demarcation of authority between Congress and the Justice Department, and risks instability within the Department itself. Those are, to say the least, "anomalous result[s]" that should be "avoid[ed]." *Validus Reins., Ltd. v. United States*, 786 F.3d 1039, 1045–46 (D.C. Cir. 2015) (citation modified).

### B. The Amended Complaint Brings a Facial Challenge to Substantive Criminal Laws That Section 12601 Does Not Permit.

Applying the correct understanding of Section 12601 outlined above, the Complaint fails to state a claim because it is an effort to facially invalidate substantive criminal prohibitions, and such a suit is not cognizable under Section 12601. The source of the alleged constitutional harms are "unconstitutional law[s]" that proscribe the possession of AR-15s and silencers. Am. Compl. ¶ 5. Specifically, the Complaint challenges, at its core, the D.C. Council's inclusion of AR-15s in the substantive definition of "assault weapon," *see, e.g.*, *id.* ¶¶ 14–17, and Congress's ban on the possession of silencers in the District, *id.* ¶ 32. By the United States' telling, these "*laws* violate the Second Amendment." *Id.* ¶ 41 (emphasis added). But these laws are

28

prohibitions on private conduct passed by the D.C. Council, signed by the Mayor, and approved by Congress (in the case of the AR-15 ban) and passed by Congress and signed by the President (in the case of the silencer ban), which both subject individuals to criminal penalties.  MPD does not determine the substance of these laws, and the United States only sues MPD because officers are "required" to enforce the challenged laws.  *Id.* ¶ 8.  That is quite different from a situation where law enforcement makes an independent judgment about the amount of force to use in executing a law or making an arrest, for example, where the harm flows from "conduct by" law enforcement officers rather from the substantive criminal law itself.

In addition, the United States seeks broad relief, including "injunctive relief . . . enjoining Defendants from enforcing the provisions of the District's laws that make it a crime to possess AR-15 style rifles or [silencers]."  *Id.* at 14.  That request is striking.  In effect, the United States asks this Court to enlist MPD in nullifying laws enacted by the people's representatives.  At base, the incongruence between the source of the harm alleged (legislative enactments) and the relief available under Section 12601 (proscription of law enforcement conduct) evidences the fundamental problem with the Complaint:  It is not directed at the type of harm that Section 12601 is designed to redress, and accordingly, it does not state a claim that is cognizable under Section 12601.

Nonetheless, the Amended Complaint tries to shoehorn its facial challenge into Section 12601 by alleging two ways that MPD enforces the challenged laws: (1) MPD "serves as the registration and licensing office for all applicants for firearms-related licenses in the District," and (2) MPD has the authority to make arrests when individuals violate the laws.  *Id.* ¶ 8. Neither role suffices to state a viable Section 12601 claim.

McGraw Decl. Exs. Page 057

For starters, these roles are nothing more than the ordinary ways that police enforce criminal prohibitions across the country. If these roles were sufficient to allow the United States to bring a facial challenge to state or local law under Section 12601, the United States could use this statute to challenge any criminal law it opposed, along with a slew of civil laws. For all the reasons stated above, Section 12601 does not grant the United States such sweeping authority.

Moreover, neither of MPD's roles triggers Section 12601 because they do not *cause* the alleged "depriv[ation]" of constitutional rights. As explained, Section 12601 proscribes only patterns or practices of "conduct by" law enforcement officers "that deprives persons" of constitutional or statutory rights. That is simply not the case here. Rather, the alleged deprivation the United States challenges is caused by the underlying criminal laws written by the D.C. Council and Congress. It is the challenged laws that limit individual rights that the United States alleges are protected by the Second Amendment—for instance, by proscribing the possession of "all AR-15 platform rifles." *Id.* ¶ 14. MPD is simply not responsible for the constitutional harm alleged and should not be subject to liability for it under Section 12601. After all, "[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality," and "[s]ociety would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979).

## II. The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement That Deprives Persons of Constitutional Rights.

Even if the United States' claim is cognizable, the Amended Complaint fails to plausibly allege (1) that the challenged laws deprive persons of constitutional rights or (2) that MPD officers are engaging in a pattern or practice of enforcing the laws in a manner that effects any such deprivation.

A. **The Amended Complaint Fails to Plausibly Allege a Deprivation of Constitutional Rights.**

If the United States can use Section 12601 to challenge the District's criminal laws, then the United States must allege facts plausibly showing that those laws "deprive[ ] persons of [constitutional] rights." 34 U.S.C. § 12601(a); *see* Am. Compl. ¶ 37. The United States alleges that the District's bans on silencers and AR-15s are unconstitutional, Am. Compl. ¶¶ 2–5, so the United States must allege facts plausibly showing that silencers and AR-15s are protected by the Second Amendment. The Amended Complaint fails to do so.

1. **The United States Must Plausibly Allege That Silencers and AR-15s Are Protected by the Second Amendment.**

"[T]o determine what the plaintiff must plausibly allege at the outset of a lawsuit, we usually ask what the plaintiff must prove in the trial at its end." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 332 (2020). The court "take[s] note of the elements" of a plaintiff's claim and "then determines whether the plaintiff has pleaded those elements with adequate factual support to state a claim to relief that is plausible on its face." *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (citation modified). To decide whether the Amended Complaint's facts rise to the level of plausibility, the Court "peer[s] down the road towards [the United States'] eventual evidentiary burden to deduce whether [it] plausibly alleged the types of facts that can, if proven, satisfy that burden." *Couch v. Verizon Commc'ns Inc.*, 105 F.4th 425, 432 (D.C. Cir. 2024).

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court articulated a two-step test for Second Amendment challenges. At the first step, the plaintiff bears the burden to show that the challenged law infringes conduct that falls within "the Second Amendment's plain text," as originally understood and interpreted by precedent. *Hanson v. District of Columbia*, 120 F.4th

McGraw Decl. Exs. Page 059

223, 231–32 (D.C. Cir. 2024) (per curiam) (quoting *Bruen*, 597 U.S. at 17), *cert. denied*, 145 S. Ct. 2778 (2025).  If so, the Court proceeds to the second step, and the law must be upheld if it "is consistent with the principles that underpin our regulatory tradition."  *Rahimi*, 602 U.S. at 692.

In a challenge to a regulation of an alleged "Arm," *Bruen*'s step one "encompasses two more precise questions": (1) is the regulated device a "bearable arm[ ]," and if so, (2) is the device "in common use for a lawful purpose, such as self-defense?"  *Hanson*, 120 F.4th at 232 (citation modified).

Starting with the first question, the term "arm" in the Second Amendment is "fixed according to its historical understanding."  *Bruen*, 597 U.S. at 28.  That is, to fall within the Second Amendment's protection, a device must fit within the Founding-Era understanding of an "arm," although the device need not have existed at the Founding.  *See Hanson*, 120 F.4th at 232; *Heller*, 554 U.S. at 582.  Relying on Founding-Era dictionaries, *Heller* explained that "arms" were defined as "weapons of offence, or armour of defence" or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  554 U.S. at 581 (citation modified).  Thus, the "most natural reading" of the Second Amendment's right to "keep and bear Arms" is the right to "have *weapons*."  *Id.* at 582 (emphasis added). Although the Second Amendment's text only refers to "arms," *Hanson* noted that "[c]onstitutional rights . . . implicitly protect those closely related acts necessary to their exercise."  120 F.4th at 232 (quoting *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring)).  Accordingly, the court found that a magazine was likely protected by the Second Amendment because it "is necessary to make meaningful an individual's right to carry a handgun for self-defense."  *Id.*

McGraw Decl. Exs. Page 060

Even if a regulated device qualifies as an "arm" or is otherwise necessary to the exercise of Second Amendment rights, it only receives Second Amendment protection if it is "in common use for a lawful purpose, such as self-defense." *Id.*; *see Heller*, 554 U.S. at 622 (not every "*type of weapon*" is "eligible for Second Amendment protection"). And of course, self-defense is the core of the Second Amendment right, as the Supreme Court's decisions emphasize. *See, e.g.*, *Bruen*, 597 U.S. at 29 ("[I]ndividual self-defense is the *central component* of the Second Amendment right." (citation modified)); *Rahimi*, 602 U.S. at 690 (the Second Amendment "secures for Americans a means of self-defense"); Am. Compl. ¶ 29 ("[T]he Second Amendment's plain text covers the conduct of those law-abiding the District's citizens who desire to keep and bear arms in common use for self-defense.").

As the plain meaning of the phrase "in common *use* for self-defense" suggests, both the Supreme Court and the D.C. Circuit have looked to the suitability of the weapon for self-defense and whether it is actually used for self-defense. Start with *Heller*, which held that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever." 554 U.S. at 626. Rather, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. In determining that handguns were the "quintessential self-defense weapon" and thus protected, the Court examined the handgun's distinguishing functionality—the practical "*reasons* that a citizen may prefer [one] for home defense," including that handguns are easier to access in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand "while the other hand dials the police." *Id.* at 629 (emphasis added). The Supreme Court then noted, quoting from a D.C. Circuit decision, that handguns are, in fact, "the most preferred firearm in

33

the nation to 'keep' *and use* for protection of one's home and family." *Id.* at 628–29 (emphasis added) (quoting *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)).

Building on *Heller*, *Hanson* assessed common use for self-defense in a challenge to the District's prohibition on extra-large-capacity magazines (ELCMs), that is, ammunition magazines containing 12 to 17 bullets. 120 F.4th at 230; *see id.* at 231 n.2. The D.C. Circuit explained that the "answer" to the question of whether an arm is in common use for self-defense "is not to be found solely by looking to the number of a certain weapon in private hands." *Id.* at 232–33.[6] The court approvingly cited the en banc Fourth Circuit's observation that "the [Supreme Court's] choice of the phrase common *use* instead of common *possession* suggests that only instances of 'active employment' of the weapons should count." 120 F.4th at 233 (quoting *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) (en banc), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025)). The court identified a key factual dispute "about the role of ELCMs for self-defense" because the District argued that ELCMs are "rarely used to fire more than a couple rounds in self-defense," while the plaintiffs argued that "one need not fire every bullet in an ELCM in order to use it." *Id.* Rather than resolve that dispute, the court "presume[d]" that ELCMs "can be used for self-defense" and proceeded to uphold the District's law at *Bruen*'s step two. *Id.* Thus, *Hanson*'s focus on "the role of ELCMs for self-defense" and its identification of the key factual dispute reflect that "common use for self-defense" at *Bruen*'s step one turns on an arm's suitability and actual use for self-defense. That understanding is in

---

[6] The *Hanson* Court "assume[d], without deciding," that the "common-use" issue belongs at step one, reasoning that "the *Bruen* Court determined that handguns are in common use before conducting its historical analysis." 120 F.4th at 232 n.3. Unless and until the D.C. Circuit revisits the placement of the common-use issue, this Court should follow *Hanson*. *Cf. Ellis v. District of Columbia*, 84 F.3d 1413, 1418 (D.C. Cir. 1996) (a district court follows an "on point" case until the appellate court "instructs . . . otherwise").

34

step with the Supreme Court's emphasis elsewhere that "[d]ictionaries consistently define the noun 'use' to mean the 'act of employing' something." *Voisine v. United States*, 579 U.S. 686, 692 (2016) (citation omitted).

> **2. The Amended Complaint Fails to Plausibly Allege That Silencers Are Protected by the Second Amendment.**

The Amended Complaint fails to allege facts plausibly showing that silencers are either "arms," necessary to exercise the Second Amendment right, or in common use for self-defense. To start, a silencer does not fit the Founding-Era definition of an "arm." It is not a weapon. It cannot otherwise be "useth in wrath to cast at or strike another," *Heller*, 554 U.S. at 581—unless it is thrown, but the Second Amendment does not protect any potential projectile. It is useless without being attached to a firearm. It is, at most, an optional accessory; but the Second Amendment protects "arms," not accessories.

Nor does the Amended Complaint contain any facts plausibly alleging that silencers are "necessary to make meaningful an individual's right to carry a handgun for self-defense." *Hanson*, 120 F.4th at 232. To the contrary, a firearm can still be fired without a silencer. Accordingly, courts—including three federal courts of appeals—have overwhelmingly held that silencers are not protected by the Second Amendment.[7]

---

[7] *E.g.*, *United States v. DeBorba*, --- F.4th ----, ----, No. 24-3304, 2026 WL 1587553, at *4 (9th Cir. June 3, 2026); *Duncan v. Bonta*, 133 F.4th 852, 868 (9th Cir. 2025) (en banc), *pet. for cert. docketed*, No. 25-198 (U.S. Aug. 19, 2025); *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *United States v. Saleem*, No. 23-4693, 2024 WL 5084523, at *2 (4th Cir. Dec. 12, 2024) (per curiam); *United States v. Speed*, 175 F.4th 272, 287–88 (4th Cir. 2026) (Wilkinson, J., concurring); *United States v. Bradley*, 766 F. Supp. 3d 769, 781 (S.D. Ohio 2025); *United States v. Berger*, 715 F. Supp. 3d 676, 702 (E.D. Pa. 2024); *People v. Hardy*, 343 Cal. Rptr. 3d 475, 479–80 (Ct. App. 2026); *see United States v. Ritsema*, 31 F.3d 559, 562 (7th Cir. 1994) (concluding that silencers "are not actual weapons").

McGraw Decl. Exs. Page 063

The United States nonetheless alleges that silencers are constitutionally protected because they "facilitate armed self-defense." Am. Compl. ¶ 34 (quoting *Bruen*, 577 U.S. at 28). No part of the test articulated in *Hanson* offers protection for a device that merely facilitates self-defense. *See Hanson*, 120 F.4th at 232. Nor did *Bruen* create a "facilitates self-defense" test; the Supreme Court explained that the petitioners' proposed conduct was protected by the Second Amendment because, among other reasons, they sought to carry handguns, which were "weapons 'in common use' today for self-defense." 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627); *see Speed*, 175 F.4th at 288–89 (Wilkinson, J., concurring) (rejecting the United States' argument). Such a test would be hopelessly indeterminable and expansive as an array of devices could in theory "facilitate self-defense." *See Speed*, 175 F.4th at 289 (Wilkinson, J., concurring). But even if "facilitates self-defense" were the test for Second Amendment protection, none of the few factual allegations in the Amended Complaint plausibly show that silencers facilitate self-defense.[8]

Even assuming that silencers could be considered "arms," necessary to the exercise of Second Amendment rights, or facilitative of self-defense, the Amended Complaint fails to allege facts plausibly showing that silencers are *in common use for* self-defense. The Amended Complaint contains no facts "about the role of [silencers] for self-defense." *Hanson*, 120 F.4th at 233. For example, there are no facts showing that silencers have features that make them useful for self-defense or that silencers have been used in self-defense scenarios. Rather, it is "common sense," *Iqbal*, 556 U.S. at 679, that silencers are well suited for criminal uses because by

---

[8]     For those reasons, the United States can find no help in the Fifth Circuit's outlier conclusion that silencers are "arms" because they facilitate self-defense. *United States v. Comeaux*, --- F.4th ----, ----, No. 24-30307, 2026 WL 1758170, at *3–4 (5th Cir. June 18, 2026). Anyway, that conclusion was dicta because the panel resolved the case based on circuit precedent holding that, even assuming silencers are "arms," a silencer-registration scheme is presumptively constitutional. *Id.* at *2, 4.

36

silencing or muffling gunfire, they allow criminals to shoot guns undetected.  And so, courts have long associated silencers with criminal uses.  *See, e.g.*, *United States v. Brooks*, 330 A.2d 245, 247 (D.C. 1974) (observing that the items prohibited by what is now D.C. Code § 22-4514(a) "are so highly suspect and devoid of lawful use that their mere possession is forbidden"); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) ("Silencers . . . are not typically possessed by law-abiding citizens for lawful purposes . . . ." (citation modified)).  Because silencers are suited for criminal uses, they are not protected by the Second Amendment.  *See United States v. Speaks*, No. 25-cv-217, 2025 WL 3701958, at *5 (D.D.C. Dec. 19, 2025) (holding that a gun without a serial number is not protected by the Second Amendment because its "primary advantage . . . is its utility in illicit activity").

Further, silencers are subject to what the United States characterizes as an "arduous process" of registration and taxation under the National Firearms Act (NFA), ch. 757, Pub. L. No. 73-747, 48 Stat. 1236 (1934).  Am. Compl. ¶ 31.  Logically, the "arduous" registration process makes it more difficult to obtain a silencer and thus makes silencers less common.  *See Bianchi*, 111 F.4th at 470 (explaining that the NFA "severely curtailed the civilian possession and general circulation of . . . silencers").  So "it is implausible" that silencers are even commonly possessed, let alone commonly used in self-defense.  *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1050 (D.C. Cir. 2012).

The United States should agree with all this.  Elsewhere, the United States has recently taken the position that "[s]uppressors . . . are susceptible to criminal misuse because they make it harder for law enforcement to identify or detect the source and direction of gunfire, such as in drive-by or mass shootings or assassination attempts."  Supp. Br. for the U.S. at 7–8, *Speed*, 175 F.4th 272 (No. 23-4308), 2025 WL 3159454.  Likewise, the United States previously took the

position—before the Supreme Court no less—that "the Second Amendment does not protect silencers" because they are not "arms," and the Second Amendment right would not be "meaningless" without them. Br. of the U.S. in Opp'n at 10–12, *Kettler v. United States*, No. 18-936 (U.S. May 6, 2019), 2019 WL 2006238. That position had been consistent. *E.g.*, Br. of the U.S. at 29–37, *United States v. Saleem*, No. 23-4693 (4th Cir. May 10, 2024), 2024 WL 2186414.

Despite all the above, the Amended Complaint makes only three factual allegations about silencers that could speak to the common-use inquiry, but they do not suffice to state a claim.

First, the Amended Complaint alleges that "[a]ccording to the American Suppressor Association, as if [*sic*] April 2026, there are approximately six million registered suppressors in the United States." Am. Compl. ¶ 33.[9] But common use "is not to be found solely by looking to the number of a certain weapon in private hands." *Hanson*, 120 F.4th at 232–33.

Second, the Amended Complaint alleges that "according to acting former [Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)] Deputy Director Ronald B. Turk, [silencers] are rarely used in criminal shootings and should not be viewed as a threat to public safety." Am. Compl. ¶ 33. The allegation cites a white paper, which the Court may consider. *See Simmons v. Rubio*, 170 F.4th 905, 910 (D.C. Cir. 2026) (on a motion to dismiss, a court may consider documents incorporated by the complaint). That white paper states that it "merely" expresses "the ideas and opinions of this writer" that "cannot be taken as . . . quotable specifics" and that are "not intended to be public." Ronald B. Turk, *White Paper: Options to Reduce or Modify*

---

[9]    The United States bizarrely relies on an advocacy organization's estimates even though the United States itself publishes a count of registered silencers, and the last published count was about 3.5 million—around half of what the Amended Complaint alleges. Bureau of Alcohol, Tobacco, Firearms & Explosives, *Firearms Commerce in the United States: Statistical Update 2024* at 12, tinyurl.com/4v8k65yk.

*Firearms Regulations* at 11 (Jan. 20, 2017), perma.cc/JXF5-CULT.  The author states—without citation—that "silencers are very rarely used in criminal shootings."  *Id.* at 6.  This statement is conclusory, devoid of factual enhancement, and merely the opinion of the author, so the Court disregards it.  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015) (ignoring, on a motion to dismiss, "the opinions and conclusions" of a report referred to in a complaint).

Third, the Amended Complaint alleges, seemingly based on Turk's report, that "in 2017, the ATF reported that it had recommended prosecutions in only *44* suppressor related cases on average per year."  Am. Compl. ¶ 33.  Without any factual enhancement, it is impossible to understand this allegation or how it shows that silencers are in common use for self-defense.  ATF's prosecution recommendations could depend on any number of factors that have nothing to do with the common-use inquiry, such as resource constraints.

### 3. The Amended Complaint Fails to Plausibly Allege That AR-15s Are Protected by the Second Amendment.

The Amended Complaint fails to allege facts plausibly showing that AR-15 rifles are "in common use," let alone for self-defense.  For example, there are no allegations about the AR-15's suitability for self-defense or incidents in which the AR-15 was used in self-defense.  Instead, the Amended Complaint adds a handful of allegations relying on ownership statistics, judicial opinions, two surveys, and 2019 data about homicides.  Am. Compl. ¶¶ 19–26.  These allegations do not show that AR-15s are suitable for or actually used in self-defense.

First, the Amended Complaint includes statistics alleging the number of AR-15s owned or in circulation.  *Id.* ¶¶ 20–22.  But, again, the D.C. Circuit has expressly disavowed possession alone as the measure of "common use."  *Hanson*, 120 F.4th at 232–33.  In doing so, it joined a growing consensus among the federal courts.  *See, e.g., Bevis v. City of Naperville*, 85 F.4th

McGraw Decl. Exs. Page 067

1175, 1198–99 (7th Cir. 2023) (declining to base its analysis "on numbers alone" because "the idea of 'common use' cannot be severed from the historical scope of the common-law right that the Second Amendment was designed to protect"), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024); *Or. Firearms Federation v. Kotek*, 682 F. Supp. 3d 874, 912–18 (D. Or. 2023) (similar), *stayed*, No. 23-35478 (9th Cir. Dec. 19, 2023); *Bianchi*, 111 F.4th at 460 (rejecting challengers' attempt to equate "common use" with "common possession" as a "trivial counting exercise" that leads to "absurd consequences").

Second, the Amended Complaint parrots conclusions expressed in judicial opinions, mostly by individual jurists and mostly dissenting. Am. Compl. ¶¶ 2–3, 24. A complaint cannot survive a motion to dismiss by relying on facts contained in a judicial opinion. *See Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (on a motion to dismiss, courts cannot rely on court records "for the truth of the matter asserted" therein); *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86, 92 n.9 (D.D.C. 2017) (courts cannot take judicial notice of facts contained in a judicial opinion). That makes sense because facts alleged in a pleading must "have evidentiary support." Fed. R. Civ. P. 11(b)(3). Relying on judicial opinions means the pleader is relying on someone else's opinions about facts, instead of reviewing the evidence himself. Thus, the Court should ignore all the allegations relying on judicial opinions. Even if the Court nonetheless considers those allegations, the Amended Complaint cites judicial opinions only for their legal conclusions or statements about the ownership of "[s]emiautomatic rifles like the AR-15." Am. Compl. ¶ 24. Legal conclusions do not state a claim, *Pueschel*, 955 F.3d at 166, and allegations about ownership do not show common use for lawful purposes, *see Hanson*, 120 F.4th at 232–33. And allegations that are not attuned to the AR-15, but "[s]emiautomatic rifles like the AR-15," Am. Compl. ¶ 24, do not show that AR-15s specifically are commonly owned.

Third, the Amended Complaint relies on two surveys that purported to ask participants why they owned "AR-style rifles."  *Id.* ¶ 23 (first citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 33 (May 13, 2022), perma.cc/9L8W-Y3HT; then citing Emily Guskin *et al.*, *Why Do Americans Own AR-15s?*, Wash. Post (Mar. 27, 2023), tinyurl.com/436xdvku).  At the outset, these studies are outdated by several years and rely in part on what Americans "have owned" in the past.  *Id.* ¶ 22.  Furthermore, many of the reasons for owning AR-15s—like "competitive sports shooting"—do not speak to the core of the Second Amendment right, which is self-defense.  As the Seventh Circuit has concluded, although there may be "other lawful purposes for weapons," including "sporting uses, collections, and competitions," "the constitutional protection exists to protect the individual right to self-defense."  *Bevis*, 85 F.4th at 1192; *see also, e.g.*, *Bianchi*, 111 F.4th at 460–61; *United States v. Charles*, 159 F.4th 545, 547 (8th Cir. 2025) (emphasizing the "'common use for self-defense' rationale for the private right to bear arms").  And *Bruen* itself, in analyzing step one, asked specifically whether handguns were "'in common use' today *for self-defense*."  *Bruen*, 597 U.S. at 32 (emphasis added) (quoting *Heller*, 554 U.S. at 627).

But more fundamentally, the subjective reasons for purchasing a firearm do not show anything about whether the firearm is in fact in use or has features that *objectively* make it well suited for a particular use.  *See Heller*, 554 U.S. at 629.  It would be absurd if the scope of the Second Amendment right were determined by subjective feelings—let alone survey results—because some survey respondents may feel that grenades, machine guns, or other extremely dangerous weapons could help them better defend themselves.  In other words, a machine gun should not be "in common use for self-defense" simply because survey respondents subjectively wish to use them for home defense.  Nor is an AR-15—"[b]uilt to generate maximum wound

effect," and resulting in "multiple organs shattered, bones exploded, and soft tissue absolutely destroyed"—any better suited for hunting on account of an individual's subject desire to use it for that purpose. *Bianchi*, 111 F.4th at 455 (citation modified). Accordingly, the D.C. Circuit in *Hanson* made no mention of subjective reasons as relevant to the common-use inquiry. Likewise, courts have found that facts about subjective reasons for owning a firearm—and the English survey in particular—are insufficient to show common use for self-defense.[10]

Fourth, the Amended Complaint alleges that "AR-15 type rifles are not commonly used by criminals" because data from the Federal Bureau of Investigation (FBI) on homicides in 2019 allegedly shows that "364 homicides were known to have been committed with *rifles of any type*, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects." Am. Compl. ¶ 25 (citing FBI, *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019*, bit.ly/3HdolNd). For starters, the FBI data indicates that an additional 3,281 homicides were committed by "[f]irearms" where the firearm type was simply "not stated." So the data cannot be used to draw any concrete conclusions about the use of AR-15s by criminals. Further, proportional use of rifles in homicides says nothing about whether AR-15s are useful for or used in self-defense. Finally, the single citation about homicides from seven years ago does not support the sweeping conclusion that AR-15s are not commonly used by criminals generally.

---

[10] *See Rupp v. Bonta*, 723 F. Supp. 3d 837, 858 n.17 (C.D. Cal. 2024), *stayed*, No. 24-2583 (9th Cir. June 7, 2024); *Or. Firearms Fed'n*, 682 F. Supp. 3d at 918; *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 87, 97 (D. Conn. 2023), *aff'd*, 153 F.4th 213 (2d Cir. 2025), *pet. for cert. docketed*, No. 25-421 (U.S. Oct. 7, 2025); *Banta v. Ferguson*, No. 23-cv-112, 2024 WL 4314788, at *9 (E.D. Wash. Sept. 26, 2024), *stayed*, No. 24-6537 (9th Cir. Jan. 8, 2025); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 190–91 (D. Vt. 2024), *argued*, No. 24-2026 (2d Cir. Apr. 28, 2026); *State v. Gator's Custom Guns, Inc.*, 568 P.3d 278, 283–84 (Wash. 2025) (en banc), *pet. for cert. docketed*, No. 25-153 (U.S. Aug. 8, 2025).

McGraw Decl. Exs. Page 070

All said, none of the few factual allegations about AR-15s speak to common use, let alone for self-defense. The Amended Complaint's challenge to the District's AR-15 ban is thus legally insufficient because none of its factual allegations are aimed at the correct legal test. *See Sanchez*, 45 F.4th at 395 (a complaint must provide "adequate factual support" for the elements of a claim); *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344 (D.C. Cir. 2018) ("A Rule 12(b)(6) motion tests the legal sufficiency of a claim or complaint.").

B.     **The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement Officers.**

As explained in Argument § I, *supra*, the Amended Complaint fails to identify a pattern or practice that is cognizable under Section 12601. Even if the Court disagrees, the Amended Complaint does not allege facts plausibly showing that the supposed pattern or practice is actually occurring and depriving individuals of their Second Amendment rights. The Amended Complaint's theory is that when MPD officers "enforce" the AR-15 and silencer proscriptions, "they are engaging in a pattern or practice" under Section 12601. Am. Compl. ¶ 40. But in support of this theory, the Amended Complaint makes just two allegations that could be considered "factual," and neither suffices to state a claim.

First, the Amended Complaint alleges that "[t]he District routinely enforces" the laws "as evidenced by the fact that hundreds of people have been convicted for violating them." *Id.* ¶ 35. This allegation is conclusory and "devoid of further factual enhancement" necessary to make the United States' claim plausible. *Iqbal*, 556 U.S. at 678 (citation modified). The allegation does not say, for example, when these "hundreds of people" were convicted; and if the convictions are outdated, then this allegation does not show that MPD is currently enforcing the proscriptions. The allegation also does not say that these convictions arose from MPD arrests. After all, federal law enforcement agencies have a large presence in the District, may recover unlawful firearms or

43

devices, and may refer the possessors for prosecution. Further still, the allegation does not say anything about the circumstances of these convictions, such as whether these defendants had committed other crimes, used AR-15s or silencers in crimes of violence, or were ineligible to possess firearms. Yet, the Amended Complaint alleges that only a subset of conduct prohibited by the statutes is constitutionally protected: possession of AR-15s and silencers by *otherwise law-abiding individuals*. *See, e.g.*, Am. Compl. ¶¶ 29, 50. If, for example, the individuals referenced in this allegation were possessing AR-15s and silencers while ineligible to possess any gun (say, due to a felony conviction, *see* D.C. Code § 22-4503(a)(1)), then this allegation does not support the United States' claim. And it is neither intuitive nor obvious that MPD or prosecutors would focus their limited enforcement resources on regularly arresting and prosecuting otherwise law-abiding individuals.

Second, the Amended Complaint alleges that, "[o]n information and belief," MPD officers "are fulfilling (and will continue to fulfill) their statutory duty to enforce" the challenged laws. Am. Compl. ¶ 40. Pleading "on information and belief" is only permitted "when the necessary information lies within defendants' control," and the allegations are "accompanied by a statement of the facts upon which [they] are based." *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (citation modified). If either requirement is not met, the Court does not accept the allegation as true. *Mahoney v. U.S. Capitol Police Bd.*, 566 F. Supp. 3d 22, 28 (D.D.C. 2022). The allegation here is not accompanied by any additional facts. Yet, information about MPD's arrests is available to the United States because the United States shares responsibility for prosecutions arising from MPD's arrests. *See* D.C. Code § 23-101(c)–(d). Thus, the Court should disregard this allegation.

Regardless, the Court cannot reasonably infer a pattern or practice merely from the existence of the underlying substantive criminal prohibition that MPD has authority to enforce. That would mean that every police force in every jurisdiction engages in an actionable pattern or practice any time a criminal law is enforced. Such an inference is furthermore contrary to ordinary principles of prosecutorial discretion. The decision of whether to arrest individuals for violating a criminal statute involves more considerations than just whether the officer has probable cause to believe a crime was committed. *See United States v. Texas*, 599 U.S. 670, 680 (2023) ("the Executive Branch must balance many factors when devising arrest and prosecution policies"). Indeed, federal law criminalizes marijuana possession, but police do not usually arrest for simple possession of marijuana.

* * *

For all those reasons, the Amended Complaint fails to plausibly allege a pattern or practice of conduct by law enforcement officers that deprives individuals of their Second Amendment rights, even assuming the United States' challenge is cognizable. Worse, the District raised essentially the same pleading deficiencies before, yet the United States does not correct them. *See* Defs.' MTD Compl. at 31–40. It is no pleading misstep, then, that the United States cannot muster facts to support its claim. "[T]his basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the [C]ourt," and so this case should be dismissed. *Twombly*, 550 U.S. at 558 (citation modified).

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Amended Complaint.

Date: June 25, 2026

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

45

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendants*

46

# Exhibit 5

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-134  Filed 07/02/26    Page 79 of 113   Page
ID #:200

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 26-cv-01950-SKC-TPO

UNITED STATES OF AMERICA,

     Plaintiff,

v.

STATE OF COLORADO,
COLORADO DEPARTMENT OF PUBLIC SAFETY

     Defendants.

---

## MOTION TO DISMISS

---

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-134    Filed 07/02/26    Page 80 of 113   Page
ID #:201

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

I.      Colorado's reasonable restrictions on large-capacity magazines. .................... 2

II.     The Department of Justice's tailored authority to address "pattern or
        practice" police misconduct. .................................................................................. 4

        A.      Text and history of 34 U.S.C. § 12601. ................................................... 4

        B.      The United States' past practice. ........................................................... 7

III.    Summary of the Complaint. ................................................................................... 9

LEGAL STANDARDS ........................................................................................... 10

ARGUMENT ........................................................................................................... 11

I.      The United States' facial challenge to Colorado's restrictions on large-
        capacity magazines is not cognizable under Section 12601. .......................... 11

        A.      Section 12601 does not authorize facial challenges to legislative
                enactments ............................................................................................... 12

                1.      The plain text of Section 12601 does not authorize facial
                        challenges. ...................................................................................... 12

                2.      The history and context confirm Section 12601's narrow focus on
                        redressing systemic police misconduct. ..................................... 16

                3.      For more than 30 years, the United States did not use Section
                        12601 to launch facial challenges. ............................................. 19

        B.      The Complaint brings a facial challenge that Section 12601 does not
                permit ........................................................................................................ 20

II.     The Complaint fails to allege a pattern or practice by law enforcement
        officers. ..................................................................................................................... 22

III.    The alleged constitutional violation cannot be redressed by this suit ........... 23

        A.      The United States' claim is not redressable because it will not prevent
                enforcement of the statute. ..................................................................... 25

        B.      The United States will never be able to establish redressability
                because Section 12601 does not afford relief against prosecutors for
                their independent prosecutorial decisions. ........................................... 28

IV.     The United States cannot cure the Complaint's deficiencies and the Court
        should dismiss without leave to amend. ............................................................ 30

CONCLUSION ......................................................................................................... 30

McGraw Decl. Exs. Page 077

## INTRODUCTION

In the wake of multiple horrific mass shootings, the Colorado General Assembly enacted commonsense limitations on large-capacity magazines. Those limitations, which have been in place for more than a decade, have saved countless lives. Over the past 13 years, state and federal courts have repeatedly rejected challenges to this statute in part because this reasonable limitation leaves ample room for citizens to bear arms consistent with the Second Amendment.

Notwithstanding this history, the Department of Justice ("DOJ") now seeks to bring a late facial challenge to Colorado's longstanding large-capacity magazine restriction. But DOJ lacks authority to bring that claim. So instead, DOJ attempts to shoehorn its facial challenge through its limited authority to redress "pattern or practice" law enforcement misconduct. Having abdicated its responsibility to redress true police misconduct and brutality, DOJ now claims that through this limited authority Congress actually authorized a sweeping new cause of action by which DOJ can challenge any law enacted by a state's legislature. The whole of DOJ's logic is: "the Magazine Ban violates the Second Amendment. Accordingly, there is a pattern or practice of conduct by the CO Law Enforcement Officers that deprives persons of rights, privileges, or immunities secured or protected by the Constitution." ECF No. 1 ("Compl.") ¶ 58.

Under DOJ's theory, this congressional authorization has hidden in plain sight for more than 30 years, left untouched by Attorneys General of both parties,

1

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 49-134    Filed 07/02/26    Page 82 of 113    Page
ID #:203

and all ideologies. Of course, there is a reason DOJ has never asserted this authority—because it does not exist. The plain text, history, context, and past practice all confirm the obvious: the authority to redress "a pattern or practice of conduct by law enforcement officers," 34 U.S.C. § 12601(a), does not encompass authority to challenge legislative enactments. Relatedly, because the relief afforded by the statute is directly tailored to redressing specific law enforcement misconduct, the alleged injury is not redressable because any relief would be limited to two random law enforcement agencies. It will have no impact on enforcement because every prosecutor within the State can continue to exercise their discretion to prosecute violations of the law. The Court should dismiss the Complaint under Rule 12(b)(1) and 12(b)(6) for failure to state a claim and lack of jurisdiction.

## BACKGROUND

### I.    Colorado's reasonable restrictions on large-capacity magazines.

Colorado suffered "two of the nation's most notorious mass shootings: Columbine High School in 1999 and the Aurora movie theater in 2012." *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 317 (Colo. 2020). Collectively, the shooters in those tragedies killed over two dozen people and wounded scores more using firearms equipped with large-capacity magazines. *Id.* In response, the General Assembly passed a reasonable limitation on the availability of the types of large-capacity magazines the shooters employed to such deadly effect. *See id.*

2

Colorado Revised Statute Section 18-12-302(1)(a) includes a narrow restriction on the sale, transfer, or possession of a "large-capacity magazine," which include magazines of more than fifteen rounds of ammunition, *id.* § 18-12-301(2)(a)(I). The General Assembly limited the restriction to large-capacity magazines acquired after July 1, 2013. *Id.* § 18-12-302(2)(a). Furthermore, the statute exempts employees who bear firearms in the course of their duties, including members of the armed forces, *id.* § 18-12-302(3)(b)(I), and those employed by the United States government, *id.* § 18-12-302(3)(b)(II).

In the 13 years since the General Assembly placed these reasonable limitations on the sale, transfer, or possession of large-capacity magazines, federal and state courts have repeatedly rejected challenges brought under both the U.S. Constitution and the Colorado Constitution. *See, e.g., Colo. Outfitter Ass'n v. Hickenlooper*, 823 F.3d 537, 549–551 (10th Cir. 2016) (rejecting facial challenge on standing grounds); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d at 329–331 (Colo. 2020) (rejecting facial challenge under the Colorado Constitution because the legislature reasonably exercised its police power and the statute does not interfere with Coloradans' right to bear arms in self-defense, leaving "ample weapons" for that purpose); *People v. Sgaggio*, Case No. 2023CV296 (El Paso Cnty. Dist. Ct. Nov. 12, 2024) (rejecting constitutional challenge after concluding the large-capacity magazine restriction falls squarely within the nation's historical tradition of firearms regulation), *cert. denied*, No. 24SC805, 2025 WL 764629 (Colo. 2025); *see*

Case No. 1:26-cv-01950-SKC-TPO   Document 30   filed 06/30/26   USDC Colorado
Case 8:26-cv-01697-AH-MBK   Document 19-134 Filed 07/02/26   Page 84 of 113   Page
ID #:205

*also Gates v. Polis*, Case No. 22-cv-01866-GPG (D. Colo.) (plaintiffs stipulated to

dismiss their facial challenge with prejudice after two years of litigation). In short,

despite numerous challenges in state and federal court, no court has held that the

General Assembly exceeded its authority by placing commonsense, reasonable

limitations on the type of large-capacity magazines that were historically used to

kill dozens of innocent Coloradans.

## II.   The Department of Justice's tailored authority to address "pattern or practice" police misconduct.

### A.   Text and history of 34 U.S.C. § 12601.

The United States brings its challenge to the large-capacity magazine

restriction pursuant to 34 U.S.C. § 12601. Section 12601 authorizes a cause of

action to redress "a pattern or practice of conduct by law enforcement officers" that

deprives persons of constitutional or federal rights. 34 U.S.C. § 12601. Congress

enacted Section 12601 in response to the 1991 beating of Rodney King by officers

from the Los Angeles Police Department ("LAPD").[1] *See* Civ. Rts. Div., U.S. Dep't of

Just., *Taking Stock: Report from the 2010 Roundtable on State and Local Law

Enforcement Police Pattern or Practice Program (42 USC § 14141)* 1–2 (June 3,

2010) ("*Roundtable* Rep."), https://www.ojp.gov/pdffiles1/nij/234458.pdf (summarizing

history). The statute was designed to address a specific problem: "the problem of

---

[1] This provision was originally codified at 42 U.S.C. § 14141 and was enacted as
Title XXI, § 210401, of the Violent Crime Control and Law Enforcement Act of 1994
(the "1994 Crime Bill"). Pub. Law 103-322, 108 Stat. 1796, 2071 (Sept. 13, 1994).

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1    Filed 07/02/26    Page 85 of 113    Page
ID #:206

excessive force" by law enforcement officers.[2] H.R. Rep. No. 102-242, at 24, 136 (1991). A House committee report detailed the brutalization of King by the LAPD and noted that it was "not an aberration," but rather part of a "culture" of "excessive force" in the LAPD. *Id.* at 135. The committee found it "apparent" that the "problem is not limited to Los Angeles"—"[p]olice use of excessive force is a significant problem in this country." *Id.* The report described other examples of "police brutality" and "police misconduct" in police departments, many of which evidenced "pattern[s] of misconduct," including "unconstitutional, harassing stops and searches of minority individuals," and arrests of bystanders who "complain about police actions." *Id.* at 136.

The committee found that DOJ "lack[ed] the authority to address systemic patterns or practices of police misconduct." *Id.* at 137. Specifically, the committee noted "the Federal Government's criminal authority to prosecute police brutality is not adequate to address patterns or practices." *Id.* at 138. The committee further considered a Third Circuit decision holding that the United States "does not have implied statutory or constitutional authority to sue a local government or its officials to enjoin violations of citizens' constitutional rights by police officers." *Id.* at 137 (citing *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980)). And

---

[2] Section 12601 was derived from the Police Accountability Act of 1991, which did not become law. Because Section 12601 has no direct legislative history, courts and the Justice Department have looked to the history of the Police Accountability Act, its closely related predecessor. *See, e.g., United States v. City of Columbus*, No. 99-cv-1097, 2000 WL 1133166, at *3 (S.D. Ohio Aug. 3, 2000).

5

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-134 Filed 07/02/26    Page 86 of 113    Page
ID #:207

the committee reasoned that after the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), individual litigants could not seek injunctive relief to address police abuses "absent a showing of likely future harm." *Id.* at 137.

Taken together, the committee identified a specific "gap in the law," where neither individual litigants "nor anyone else" could eliminate systemic constitutional violations caused by "police brutality." *Id.* at 137–38. Congress sought to "close this gap in the law, [by] authorizing the Attorney General . . . to sue for injunctive relief against abusive police practices." *Id.* at 138. The committee report cited two cases as illustrative of "the need for this authority and how it will work"; both involved excessive force. *Id.* at 138–39.

Congress therefore created a tailored cause of action to address that problem. It specifically targeted "a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 34 U.S.C. § 12601(a). Congress authorized DOJ to "obtain appropriate equitable and declaratory relief to eliminate the pattern or practice." *Id.* § 12601(b). Congress's tailored approach thus specifically targeted pattern and practice misconduct by law enforcement. It did not permit other types of constitutional challenges, such as challenges to legislative enactments.

McGraw Decl. Exs. Page 083

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-134    Filed 07/02/26    Page 87 of 113    Page
ID #:208

### B.    The United States' past practice.

Following Section 12601's enactment, the Justice Department developed standard procedures for Section 12601 cases. Ex. A, Civ. Rts. Div., U.S. Dep't of Just., *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present* 1–2 (Jan. 2017) ("2017 Rep.").[3] Section 12601 cases have historically been handled by the Special Litigation Section in the Civil Rights Division, which "consists of career professional attorneys with many decades of collective experience working on police reform cases." *Id.* at 3. Section 12601 cases begin with a preliminary, internal inquiry of whether to open an investigation into a police department's conduct. *Id.* at 5. After that preliminary inquiry, if the Special Litigation Section recommends opening an investigation and the Assistant Attorney General agrees, the Civil Rights Division notifies the jurisdiction's chief executive officer and chief legal officer. *Id.* at 8. The Division then "makes the existence of the open investigation public." *Id.*

Investigations of police conduct are comprehensive and include extensive review of evidence, data, and documents along with direct observation of police officers. *Id.* at 9–10, 14. In addition to meeting with law enforcement leadership at the start of an investigation, "[t]he Division engages officers . . . at roll-calls [and] during ride-alongs," as well as "in face-to-face meetings." *Id.* at 10, 12. The Division

---

[3] The Court may take judicial notice of government records. *High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 & n.1 (10th Cir. 2019); Fed. R. Evid. 201(b)(2).

McGraw Decl. Exs. Page 084

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1 34 Filed 07/02/26    Page 88 of 113    Page
ID #:209

also engages the community and "almost always conducts a series of community or town hall meetings." *Id.* at 13. Such detailed investigation is necessary because "the thoroughness of the Division's investigations underpins the credibility and effectiveness of its reform efforts." *Id.* at 15. At the end of an investigation, if the Division determines there is insufficient evidence of a "pattern or practice of conduct by law enforcement officers" that violates constitutional or statutory rights, it notifies the jurisdiction of the finding and closes the investigation. *Id.* at 15. If, however, the Division determines that there is reasonable cause to believe that such a Section 12601 pattern or practice exists, the Division sends a letter or report notifying the jurisdiction of the Division's determination. *Id.*

The focus then shifts to finding solutions to eliminate the unlawful pattern or practice. *Id.* at 17. "The Division's goal in every case is to avoid contentious litigation and begin the process of reform as quickly as possible." *Id.* at 18. Only if a reform agreement cannot be reached does the Division bring a lawsuit. *Id.* at 2, 18. At the time of the Division's 2017 report on the history of Section 12601, "of the many dozens of cases in which the Division has found a pattern or practice of police misconduct, all but six have resulted in a reform agreement without the need for civil litigation." *Id.* at 18.

Consistent with the statute, Section 12601 cases have "focus[ed] on systemic police misconduct." *Id.* at 1. Accordingly, "[m]any of the Division's investigations focus on core issues in police reform common to many law enforcement agencies—

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1 34 Filed 07/02/26    Page 89 of 113    Page
ID #:210

such as patterns of unlawful use of force; unlawful stops, searches and arrests; and racial discrimination." *Id.* at 6. Indeed, "[a]ddressing systemic excessive force is one of the core functions of the Division's pattern-or-practice cases." *Id.* at 27.

Until recently, the Justice Department had never, to Defendants' knowledge, used a Section 12601 case to bring a facial challenge to a state or local statute duly enacted by the legislature, let alone to the legislature's regulation of individual criminal conduct. *See id.* at 41–48 (summarizing past Section 12601 cases); *Roundtable* Rep. at 8–9 (cataloguing Section 12601 cases and tagging the allegation type). In fact, the prior Trump administration pronounced that it "is not the responsibility of the federal government to manage non-federal law enforcement agencies." Ex. B, Memorandum from Jefferson B. Sessions III, Att'y Gen., to Heads of Dep't Components & U.S. Att'ys 1 (Mar. 31, 2017). In the United States' view at that time, "[t]his supervision can deprive the elected representatives of the people of the affected jurisdiction of control of their government." Ex. C, Memorandum from Jefferson B. Sessions III, Att'y Gen., to Heads of Civ. Litigating Components & U.S. Att'ys 2 (Nov. 7, 2018) (citing *Horne v. Flores*, 557 U.S. 433, 448 (2009)).

## III.    Summary of the Complaint.

This case began with a letter announcing DOJ's intent to file the present suit, unless Defendants agreed to "negotiations" that would ultimately "require" Colorado to cease enforcement of the large-capacity magazine restriction, declare it unconstitutional, and enter into an agreement to "permanently enjoin" its

9

Case No. 1:26-cv-01950-SKC-TPO   Document 30   filed 06/30/26   USDC Colorado
Case 8:26-cv-01697-AH-MBK   Document 29-1 34 Filed 07/02/26   Page 90 of 113   Page
ID #:211

enforcement. *See* Ex. D, Letter from Harmeet K. Dhillon, Asst. Att'y Gen., to Gov. Jared Polis and Att'y Gen. Phil Weiser 2 (Apr. 28, 2026). Departing from normal procedures for Section 12601 cases, DOJ did not publicly investigate Colorado's enforcement of the large-capacity magazine restriction, release the results of any investigation, or otherwise engage with Defendants before filing this lawsuit.

The Complaint brings a single claim pursuant to Section 12601. Rather than alleging any police misconduct, the Complaint instead facially attacks Colorado's large-capacity magazine restriction, Colo. Rev. Stat. § 18-12-301(2), claiming that this statute "violates the Second Amendment." Compl. ¶¶ 1–6, 42, 58. The Complaint then alleges that this purportedly unlawful statute is the basis for the "pattern or practice of conduct" claim. *Id.* ¶ 58 ("As set forth above, the Magazine Ban violates the Second Amendment. Accordingly, there is a pattern or practice of conduct by the CO Law Enforcement Officers that deprives persons of rights, privileges, or immunities secured or protected by the Constitution."). The Complaint seeks declaratory and injunctive relief to prevent two Colorado law enforcement agencies, Colorado State Patrol ("CSP") and Colorado Bureau of Investigation ("CBI"), from enforcing the statute.

## LEGAL STANDARDS

Rule 12(b)(6) permits dismissal of a complaint that fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

Case No. 1:26-cv-01950-SKC-TPO   Document 30   filed 06/30/26   USDC Colorado
Case 8:26-cv-01697-AH-MBK   Document 19-1   Filed 07/02/26   Page 91 of 113   Page
ID #:212

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).
A court disregards labels, conclusory allegations, naked assertions, or formulaic
recitations of the elements. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281
(10th Cir. 2021).

A complaint may also be dismissed for lack of subject-matter jurisdiction
under Rule 12(b)(1). "When resolving a facial attack on the allegations of subject
matter jurisdiction, a court must accept the allegations in the complaint as true."
*Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 507 (10th Cir. 2023). "When the
moving party attacks the factual basis for subject matter jurisdiction, on the other
hand, a court 'may not presume the truthfulness of the factual allegations in the
complaint, but may consider evidence to resolve disputed jurisdictional facts.'" *Id.*

## ARGUMENT

**I.    The United States' facial challenge to Colorado's restrictions on large-capacity magazines is not cognizable under Section 12601.**

In Section 12601, Congress established a limited cause of action to address
systemic misconduct by law enforcement officers that existing law did not
adequately remedy. This new cause of action did not grant the federal government
broad authority to challenge any state or local law with which it disagreed. Instead,
a review of Section 12601's plain text, history, and context demonstrate that the
United States cannot use it to launch a facial challenge to a law.

Despite over 30 years of enforcement in line with this plain meaning, DOJ's
newly created Second Amendment Unit now seeks to challenge a statute enacted by

11

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1 34 Filed 07/02/26    Page 92 of 113   Page
ID #:213

the General Assembly in 2013. The United States' claim relies on an atextual

reading of Section 12601 that is also not supported by history, past practice, or

common sense. Section 12601 does not permit facial challenges to duly enacted

laws; criminal statutes proscribe private conduct by individuals, and such

legislative acts simply do not constitute "conduct by law enforcement." For the

reasons below, the Court should reject the United States' unprecedented

interpretation and find that this suit is not cognizable.

A.    **Section 12601 does not authorize facial challenges to legislative enactments.**

Section 12601's text, especially when interpreted in light of its context,

history, and canons of interpretation, reveals that the statute does not permit facial

attacks.

1.    **The plain text of Section 12601 does not authorize facial challenges.**

"'The goal of statutory interpretation is to ascertain the congressional intent

and give effect to the legislative will.'" *Kan. Nat. Res. Coal. v. United States Dept of*

*Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020) (quoting *In Re Taylor*, 899 F.3d 1126,

1129 (10th Cir. 2018)). A reviewing court's "'proper starting point lies in a careful

examination of the ordinary meaning and structure of the law itself.'" *Frontier*

*Airlines, Inc. v. DHS*, 173 F.4th 1158, 1166 (10th Cir. 2026) (quoting *Food Mktg.*

*Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019)). And in interpreting a

statute's plain language, a court "'give[s] undefined terms their ordinary meanings,

considering both the specific context in which the word is used and the broader context of the statute as a whole.'" *Id.* (quoting *Hooper v. City of Tulsa*, 71 F.4th 1270, 1282 (10th Cir. 2023)). Here, these principles all confirm that Section 12601 does not authorize facial challenges to states' substantive laws. Instead, the statute provides a narrower cause of action focused on specific actors ("law enforcement officers") when the way they perform their duties ("a pattern or practice by") causes a deprivation of rights.

To begin, the plain text of Section 12601 provides the United States with a cause of action targeting harms stemming from specific actors—"law enforcement officers" and "officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles." 34 U.S.C. § 12601(a). The statute's focus on specific actors "is bolstered by the title Congress gave this section"—in this instance, the titling and subtitling the section "State and Local Law Enforcement" and "Police Pattern or Practice," respectively. *See SEC v. Scoville*, 913 F.3d 1204, 1218 (10th Cir. 2019) (citing *Almendaraz-Torres v. United States*, 523 U.S. 224, 234 (1998)). This focus on law enforcement officers is further illustrated by the other provision in that subtitle directing the Attorney General to "acquire data about the use of excessive force by law enforcement officers," and to "publish an annual summary of the data." Pub. L. No. 103-322, § 210402, 108 Stat. at 2071 (now codified as 34 U.S.C. § 12602). Congress' decision to pair the pattern or practice provision with one directing the Attorney General to acquire this data

McGraw Decl. Exs. Page 090

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1    Filed 07/02/26    Page 94 of 113    Page
ID #:215

underscores its specific focus on law enforcement officers and the way they perform

their duties. *See Adoptive Couple v. Baby Girl*, 570 U.S. 637, 652 (2013)

("[P]rovisions [that] appear adjacent to each other . . . should be read in harmony").

Next, the language "engage in a pattern or practice of conduct by law

enforcement officers" demonstrates that Section 12601 addresses *how* officers

perform their duties. In the context of Section 12601, to "engage" means "[t]o

employ or involve oneself" or "to take part in." *Engage, Black's Law Dictionary* (12th

ed. 2024). A "pattern" is "[a] mode of behavior or series of acts that are recognizably

consistent," *Pattern, Black's Law Dictionary* (12th ed. 2024), while "practice"

similarly denotes "[a]n established custom or prescribed usage." *Practice, Black's

Law Dictionary* (12th ed. 2024). "Conduct" refers to "[p]ersonal behavior, whether

by action or inaction" or "the manner in which a person behaves; collectively, a

person's deeds." *Conduct, Black's Law Dictionary* (12th ed. 2024). These definitions

underscore the commonsense understanding that "engage in a pattern or practice of

conduct by law enforcement offers" refers to repeated, prescribed, or habitual

courses of action by law enforcement. Congress chose to establish a cause of action

to address law enforcement officers' own conduct, not the conduct of others, let alone

legislative enactments by another branch of government.

Finally, the "pattern or practice of conduct by" law enforcement officers must

cause the alleged deprivation of rights. The clause "that deprives persons of rights,

privileges, or immunities secured or protected by the Constitution or laws of the

14

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 17-1    Filed 07/02/26    Page 95 of 113    Page
ID #:216

United States" is a restrictive relative clause that limits the preceding text and meaning of "pattern or practice of conduct by law enforcement officers" such that this pattern of conduct must be the source of the deprivation. *See United States v. Nishiie,* 996 F.3d 1013, 1021–22 (9th Cir. 2021) (noting that "[r]estrictive relative clauses are usually introduced by *that* . . . and are never set off by commas from the rest of the sentence" and that such clauses provide "information that is essential to understanding the intended meaning of the rest of the sentence" (citation omitted)); *see also Fla. Agency for Health Care Admin. v. Adm'r for Ctrs. for Medicare & Medicaid Servs.,* 161 F.4th 765, 782 (11th Cir. 2025) (illustrating how a restrictive relative clause modifies the preceding clause of a statutory sentence under "the ordinary rules of syntax"). Thus, where a different act causes the alleged deprivation—as here, where the legislature enacted the underlying law proscribing individuals' private conduct—then there is no "pattern or practice" by law enforcement officers that falls within the scope of Section 12601.

Nothing in Section 12601's plain text creates a cause of action to challenge substantive criminal prohibitions. Instead, it squarely addresses "conduct by law enforcement officers," which does not include the large-capacity magazine restriction enacted by the General Assembly. At bottom, "[i]f Congress had intended" to authorize DOJ to facially challenge state or local laws, "it easily could have drafted language to that effect." *Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 429 (2022). Congress would not have created such a circuitous path if it

15
McGraw Decl. Exs. Page 092

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1 34 Filed 07/02/26    Page 96 of 113    Page
ID #:217

wanted to authorize DOJ to facially challenge state or local laws. *Cf. City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 879 (9th Cir. 2009) (distinguishing between a "facial challenge to the statute itself" and a "pattern and practice" claim).

### 2. The history and context confirm Section 12601's narrow focus on redressing systemic police misconduct.

In addition to Section 12601's plain text, its context and history further demonstrate that Section 12601 provides a remedy to address "conduct by law enforcement officers" and does not permit facial challenges to substantive criminal statutes as Plaintiffs seek to bring here. As explained *supra* in Background Section II.A, Section 12601 was designed to address the specific problem of systemic police misconduct. The Committee Report for the Police Accountability Act, Section 12601's precursor, *see supra* at 5–7, clearly emphasized that the Act sought to remedy harm expressly identified multiple times as "pattern[s] of abuse," *i.e.*, patterns of "[p]olice brutality," "police misconduct," and "abuse[s]" of "the authority granted" to officers. H.R. Rep. No. 102-242, at 136, 138. Further, Congress highlighted examples of the "abusive police practices" the Act intended to target, such as "the lack of training or the routine use of deadly techniques like chokeholds, or the absence of a monitoring and disciplinary system." *Id.* at 138.

Congress sought to close what it perceived as a "gap in the law" created by the general lack of authority to criminally prosecute police misconduct and the decision in *Lyons*, 461 U.S. 95, which limited private litigants' ability to seek systemic fixes for police misconduct. *Id.* at 137–39. Congress expressed concern that

16

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1 34 Filed 07/02/26    Page 97 of 113    Page
ID #:218

prior to Section 12601's passage, "courts were powerless to correct" systemic police abuses and "had no authority to order remedies for the glaring deficiencies" described in reports of police abuse across the nation. *Id.* at 139.

Section 12601 was meant to fix that shortfall. "It makes sense to read" Section 12601 "in light of the history of the provision." *Fischer v. United States*, 603 U.S. 480, 491 (2024). *Fischer* is instructive here. There, the Supreme Court reviewed the history of disputed provision of the Sarbanes-Oxley Act and noted that it was enacted "to plug [a] loophole" revealed by the Enron scandal. *Id.* at 492. Examining this text in light of this history, the Court rejected the United States' more expansive reading because "[i]t would be peculiar to conclude that in closing the Enron gap, Congress actually hid away . . . a catchall provision that reaches far beyond the [scandal] that prompted the legislation in the first place." *Id.*

The same analysis applies here, where Congress likewise drafted Section 12601 to close an identified gap in the law that left systemic police misconduct unaddressed, the text should be read as tailored to solving that problem, not as authorizing roving facial challenges to legislative enactments. And in any case, that sort of remedial gap simply does not exist when it comes to substantive criminal prohibitions. Criminal defendants can and do challenge those laws via a motion to dismiss the indictment, among other mechanisms. *See* Motion to Dismiss Under the Second Amendment, *People v. Salas*, 25M2118 (Denver Cnty. Ct. May 11, 2026); Order on Appeal, *People v. Sgaggio*, 23CV296 (El Paso Dist. Ct. Nov. 12, 2024)

17

(affirming denial of motion to dismiss large capacity magazine prosecution under Second Amendment). And individual litigants can bring (and have brought) affirmative facial challenges to these laws under 42 U.S.C. § 1983 and other statutes.

Additionally, noticeably absent from the committee report was any expression of congressional concern about state criminal laws. To the contrary, Congress indicated a concern not about flawed legislative acts, but rather law enforcement "ignor[ing]" state statutes that mandated proper "police training standards," H.R. Rep. No. 102-242, at 139, along with troubling instances of police misconduct, *id.* at 138. Authorizing DOJ to facially challenge state and local laws would represent a significant change in the carefully constructed federalism balance; if Congress had intended to do so, surely it would have mentioned that somewhere in the legislative history, if not the text. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 380 (1988) ("[I]t is most improbable that [a major change] would have been made without even any mention in the legislative history."); *cf. Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear." (citation modified)).

McGraw Decl. Exs. Page 095

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1 34 Filed 07/02/26    Page 99 of 113   Page
ID #:220

In sum, nothing in the relevant history suggests that Congress designed Section 12601 to authorize challenges to state or local criminal statutes and make Section 12601 the Justice Department's own Section 1983.

### 3.    For more than 30 years, the United States did not use Section 12601 to launch facial challenges.

Further, the present suit is completely unprecedented and out of step with past practice. "A longstanding 'want of assertion of power by those who presumably would be alert to exercise it' may provide some clue that the power was never conferred." *Biden v. Nebraska*, 600 U.S. 477, 519 (2023) (Barret, J., concurring) (quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941)); *see also Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 643 (2026) ("The fact that no President has ever found such power in [the statute] is strong evidence that it does not exist."); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("The longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is." (citation modified)).

Section 12601 has historically been used only to remedy unlawful conduct by law enforcement. A review of suits brought under Section 12601 confirm this; for example, previous suits included challenges to patterns or practices of "unlawful stops, searches and arrests," "discriminatory policing," "excessive force, including deadly force," "theft by officers," "unlawful retaliation against people who make complaints or criticize [the police department]," and "violations of the First

Amendment right to observe and record police activity." *See* 2017 Rep. at 41–48 (summarizing the United States' pattern or practice cases through 2017).

Only in the last few months under the newly created Second Amendment Section has the United States initiated Section 12601 claims to challenge laws. If Section 12601 did grant the United States broad authority to challenge state and local laws that it opposes, presumably the United States would have invoked it for that purpose previously. That the United States did not believe it had such power for the past three decades is strong evidence that this unheralded power does not exist. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power . . . we typically greet its announcement with a measure of skepticism.").

### B.    The Complaint brings a facial challenge that Section 12601 does not permit.

The United States upends its long-held application of Section 12601, however, and its Complaint fails to state a claim because it attempts to facially challenge criminal laws enacted by the General Assembly. Section 12601 does not provide such a cause of action. Plaintiff's true target is not law enforcement conduct, but rather "a criminal law of the State" prohibiting the sale, transfer, or possession of "a large-capacity magazine." Compl. ¶¶ 14, 50 (citing Colo. Rev. Stat. § 18-12-302(1)(a)). It is this criminal statute—enacted by the General Assembly, not Defendants—which the Complaint alleges "violates the Second Amendment." *Id.* ¶ 42; *see also id.* ¶¶ 50, 6.

20

The Complaint attempts to cast its facial challenge as a valid Section 12601 claim by broadly alleging that Colorado law enforcement officers make arrests when individuals violate criminal laws, including the large-capacity magazine restriction. And because Plaintiff believes that the large-capacity magazine restriction is unconstitutional (despite it being repeatedly upheld, see *supra* at pp. 3–4), *id.* ¶ 42, it reasons that any enforcement of the law is "a pattern or practice of conduct" in violation of Section 12601. *Id.* ¶ 58. This does not suffice to state a viable claim.

The United States' allegation amounts to nothing more than the assertion that Defendants enforce criminal prohibitions. They "have the power to make arrests for violation of *any* criminal law of the State," and are instructed "to make arrests when a valid warrant for arrest issues." *Id.* ¶ 45. Absent from the Complaint, however, are any allegations about *how* Defendants enforce the law or otherwise specifying the conduct that violates Section 12601. If basic policing duties to enforce criminal laws were sufficient to enable a facial challenge to a state or local law under Section 12601, the United States could use the statute to challenge any law it opposes. Section 12601 does not grant such roving authority.

More fundamentally, the Complaint cannot avoid the reality that Defendants' general duties to enforce criminal laws does not create the "depriv[ation]" of constitutional rights alleged. *Id.* ¶ 58. Again, Section 12601 only prohibits patterns or practices of "conduct by" law enforcement officers "that deprives persons of constitutional or statutory rights." But there is no such conduct alleged here.

21

Case No. 1:26-cv-01950-SKC-TPO   Document 30   filed 06/30/26   USDC Colorado
Case 8:26-cv-01697-AH-MBK   Document 19-1   Filed 07/02/26   Page 102 of 113   Page
ID #:223

Instead, the alleged deprivation Plaintiff challenges stems from a substantive criminal law enacted by Colorado's General Assembly. It is that law, not Defendants' conduct, that limits an individual's right to "sell[], transfer[], or possess[] a large-capacity magazine," which Plaintiff alleges violates the Second Amendment. *Id.* ¶¶ 42, 63. The Complaint itself recognizes that Colorado law enforcement officers "are under a duty to enforce the criminal laws of the State," which are promulgated by the General Assembly. *Id.* ¶ 49. Simply put, Defendants' conduct is not responsible for the alleged constitutional harm.

Finally, the United States' requested relief underscores that the Complaint is a facial challenge to a criminal law not cognizable under Section 12601. It seeks a permanent injunction "enjoining Defendants and their agents from enforcing the Magazine Ban." Compl., Prayer ¶ B. This is not a request to proscribe specific patterns or practice of conduct by law enforcement officers, but rather an ask to partially nullify a statute by barring its enforcement by Defendants. Section 12601 was not designed to offer such striking relief and does not permit the type of facial challenges the United States attempts to smuggle in here.

## II.   The Complaint fails to allege a pattern or practice by law enforcement officers.

Even if the United States' claim were cognizable under Section 12601, the Complaint fails to allege sufficient facts to support that the CSP and CBI are in fact engaging in a pattern or practice of conduct. The Complaint cites portions of Colorado law and concludes that officers of the two agencies "are under a duty to

McGraw Decl. Exs. Page 099

enforce the criminal laws of the State." Compl. ¶¶ 49–51. The Complaint then offers a conclusory assertion, with no factual support, that officers of the two agencies "routinely enforced [Colorado's large-capacity magazine restriction] from 2013 to the present . . . and will continue to do so in the future unless enjoined." *Id.* ¶ 52.

The Court cannot reasonably infer a "pattern or practice of conduct" from the mere existence of a criminal statute. *See, e.g.*, Compl. ¶ 58. That the United States rushed to file this lawsuit without first conducting an investigation might explain the absence of any factual allegations. But that explanation is not an excuse—and does not relieve the United States of its obligation to plead plausible facts from which this Court could find a pattern and practice of conduct by law enforcement officers. Because the Complaint fails to do so, the Court must dismiss it.

## III.   The alleged constitutional violation cannot be redressed by this suit.

The United States' claim also fails because its alleged injury is not redressable by this suit. This jurisdictional flaw is directly tied to DOJ's misuse of its pattern and practice authority and independently merits dismissal under Rule 12(b)(1). DOJ seeks to bring a facial challenge to Colorado's large-capacity magazine restriction to enjoin any enforcement or prosecution of the challenge statute. Because DOJ lacks authority to do so, it has sued two random law enforcement agencies for "pattern or practice" conduct. But an injunction against these two random agencies would provide no real-world relief because it will not limit any enforcement or prosecution of this Colorado law. Regardless of the outcome,

McGraw Decl. Exs. Page 100

Colorado district attorneys will continue to be permitted to prosecute every single violation of this statute with the assistance of all local law enforcement. Thus, not only is the Section 12601 claim not cognizable, there is no relief that can be provided that would redress the alleged injury. Accordingly, for this additional reason, the Court should dismiss the Complaint for lack of jurisdiction.

Federal courts are courts of limited jurisdiction. A federal district court is not a roving beacon of justice, free to opine on each question any party presents, no matter how consequential. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378–82 (2024). The Constitution confines the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. To satisfy Article III's justiciability requirements, a plaintiff must have standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff "bears the burden of establishing standing as of the time [they] brought the lawsuit and maintaining it thereafter." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation modified).

To establish standing, a plaintiff must prove: (1) they "ha[ve] suffered or likely will suffer an injury in fact," (2) "the injury likely was caused or will be caused by the defendant," and (3) "the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at 380. To satisfy its burden as to redressability a plaintiff must "demonstrate a substantial likelihood that the relief requested will redress its injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005). "A showing that the relief requested *might*

McGraw Decl. Exs. Page 101

redress the plaintiff's injuries is generally insufficient" to satisfy the redressability requirement. *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012). "It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023); *see also Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring) ("Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power."). To determine whether an injury is redressable, courts consider "the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (quotation omitted).

## A. The United States' claim is not redressable because it will not prevent enforcement of the statute.

To determine if the United States alleges a redressable injury, this Court must consider "the relationship between the judicial relief requested and the injury suffered." *California*, 593 U.S. at 671. Here, the United States asserts that Coloradans are injured through enforcement of the large-capacity magazine restriction, Compl. ¶¶ 6, 62–63, and that "the United States brings this action to vindicate the rights of Colorado citizens," *Id.* at ¶ 6. Yet the requested relief will not redress the injury the United States alleges. Should the court provide the United States the complete relief it seeks, it will only apply to two random law enforcement agencies (CSP and CBI). It will not stop any enforcement of this criminal statute,

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1 of 34 Filed 07/02/26    Page 106 of 113    Page
ID #:227

which is enforced like all criminal laws by prosecutors bringing criminal charges in court against offenders.

Granting the United States' requested relief would do absolutely nothing to impact prosecutions of the large-capacity magazine restriction. The responsibility to prosecute falls squarely to Colorado's district attorneys, locally elected officials under article VI, section 13 of the Colorado Constitution. *See also People v. Dist. Ct.*, 632 P.2d 1022, 1024 (Colo. 1981) (recognizing that district attorneys have the power "to determine who shall be prosecuted and what crimes shall be charged"). Any relief against CSP and CBI would have no impact against Colorado's district attorneys, elected officials who could continue to prosecute every violation of the law. *Haaland*, 599 U.S. at 293 (recognizing an injury is not redressable where it would not give "legally enforceable protection" from other officials who enforce and are "not parties to the suit" and would not be "obliged to honor" any legal determination). Rather than "vindicating the rights of Coloradans," the relief requested by the United States would leave intact Colorado's large-capacity magazine restriction, permitting continued enforcement and prosecution. *Cf. We the Patriots, Inc. v. Grisham*, 119 F.4th 1253, 1259 (10th Cir. 2024) (holding that plaintiffs lacked standing on redressability grounds to challenge a state statute when there were independent city and county regulations that were not challenged).

Likewise, the myriad of local law enforcement agencies, such as police departments and sheriff's offices throughout Colorado, would remain free to

McGraw Decl. Exs. Page 103

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1    Filed 07/02/26    Page 107 of 113    Page
ID #:228

continue investigating and assisting the district attorneys with enforcing the statute. Again, far from "vindicating the rights of Colorado citizens," any relief would be limited to two random law enforcement agencies, which would not prevent the enforcement of the challenged law.

For identical reasons, a declaratory judgment would have no real-world impact because it would not bind any district attorneys or local law enforcement agencies and would thus not prevent any prosecution or enforcement of the challenge statute. Instead, it would serve only as an advisory opinion, providing little more than persuasive authority regarding the constitutionality of the statute. But such authority cannot solve the United States' redressability problem. *Haaland*, 599 U.S. at 294; *see also People v. Barber,* 799 P.2d 936, 939–40 (Colo. 1990) (holding that decisions of lower federal courts "are not conclusive on state courts, even on questions of federal law"). That is not enough for the United States to meet its burden to establish a redressable injury and standing, and this Court should dismiss this lawsuit under Rule 12(b)(1).

Nor is this outcome surprising given the limited authority granted to DOJ under Section 12601. To the contrary, it is entirely the byproduct of DOJ lacking authority to bring facial challenge against state laws. Instead, its authority is directly tailored towards correcting law enforcement pattern or practice misconduct. That is why DOJ has been forced here to direct its claim against two random law enforcement agencies, notwithstanding that its actual objection is with a statute

27

McGraw Decl. Exs. Page 104

Case No. 1:26-cv-01950-SKC-TPO   Document 30   filed 06/30/26   USDC Colorado
Case 8:26-cv-01697-AH-MBK   Document 30-1   Filed 07/02/26   Page 108 of 113   Page
ID #:229

enacted by the General Assembly. But because of the limited available relief,

tailored to correct specific pattern or practice conduct by law enforcement officers,

Section 12601 does not allow relief that would remedy the injury alleged.

**B.    The United States will never be able to establish
redressability because Section 12601 does not afford relief
against prosecutors for their independent prosecutorial
decisions.**

While hypothetically the United States might bring untold other Section

12601 lawsuits against Colorado's 64 counties and their sheriffs, or perhaps seek to

join to this suit the approximately 240 distinct law enforcement agencies within the

State, the United States cannot use Section 12601 litigation to compel Colorado's

district attorneys because Section 12601 does not and cannot reach their

independent prosecutorial decisions. So long as those district attorneys may—and

will—continue to prosecute violators of the law, the purported harm to Coloradans

cannot be redressed by this spurious Section 12601 lawsuit.

As set forth above, Section 12601 targets harm stemming from specific actors,

and excludes any reference to prosecutors or other courtroom practitioners. "If

Congress had intended" for Section 12601 to cover prosecutorial decisions by

prosecutors, "it easily could have drafted language to that effect." *Marstiller*, 596

U.S. at 429 (citation omitted). Instead, the statute is limited to "law enforcement

officers," a term commonly understood as synonymous with police. While Section

12601 does not define "law enforcement officer," a separate provision of Title 34

defines "State or local law enforcement officer," and prosecutors would not qualify

because they do not "make arrests or apprehensions," nor are they ordinarily authorized "to carry firearms." 34 U.S.C. § 50301(11). Nothing in the text of Section 12601, also codified within Title 34, would warrant a more expansive meaning here. Indeed, Congress codified this provision under the title "Police Pattern or Practice," providing further evidence of its limited scope. *See Scoville*, 913 F.3d at 1218. Likewise, the Committee Report for the Police Accountability Act shows that Congress intended to create a cause of action to allow DOJ to address "patterns or practices of *police* misconduct," H.R. Rep. No. 102-242 at 137 (emphasis added), and the report contains no mention of prosecutors, further revealing that Congress did not extend Section 12601 beyond the common understanding of "law enforcement." *See United Sav. Ass'n of Tex.*, 484 U.S. at 380.

Notably, the Fifth Circuit rejected DOJ's prior attempt to extend Section 12601 to courtroom practitioners. There, the court looked to the plain text of § 12601 and the context of the 1994 Crime Bill to reject the government's argument that Section 12601 extended to Youth Court judges. *United States v. Lauderdale Cnty.*, 914 F.3d 960, 964–966 (5th Cir. 2019).[4]

In sum, the text of Section 12601, combined with precedent, practice, and commonsense, lead to an inexorable conclusion: the United States cannot use the statute to obtain injunctive relief against prosecutors for their independent

---

[4] Defendants understand that DOJ has twice before asserted that Section 12601 could apply to prosecutors, but that no court has sanctioned that interpretation.

McGraw Decl. Exs. Page 106

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 39-1    Filed 07/02/26    Page 110 of 113    Page
ID #:231

prosecutorial decisions. As a result, the United States will never be able to establish redressability because it cannot obtain relief to enjoin prosecutors from charging violations of the law.

## IV. The United States cannot cure the Complaint's deficiencies and the Court should dismiss without leave to amend.

Generally, leave to amend should be freely granted when justice requires, but amendment may be denied when futile. *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999). Here, the United States raises a single claim under Section 12601. For the reasons outlined herein, the Court should dismiss that claim because Section 12601 cannot be used to launch a facial challenge to Colorado's laws and the harm the United States alleges cannot be redressed in this lawsuit. The United States cannot expand the limited authority Congress provided it through amendment to the pleadings in this case. For that reason, any amendment would be futile. The Court should dismiss the Complaint without leave to amend.

### CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

McGraw Decl. Exs. Page 107

Case No. 1:26-cv-01950-SKC-TPO    Document 30    filed 06/30/26    USDC Colorado
Case 8:26-cv-01697-AH-MBK    Document 19-1    Filed 07/02/26    Page 111 of 113    Page
ID #:232

Dated: June 30, 2026                    Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
*Deputy Solicitor General*
Peter Baumann, *Senior Assistant Attorney General*
Gabe Podesta, *Senior Assistant Attorney General*
Sam Wolter, *Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado and the
Department of Public Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ David Moskowitz

David Moskowitz
*Deputy Solicitor General*

# CERTIFICATE OF SERVICE

| | | |
|---|---|---|
| Case Name: | **United States of America v. State of California, et al. (Handgun Roster/AB 1127)** | Case No. **8:26-cv-1697** |

I hereby certify that on <u>July 2, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DECLARATION OF SABRINA T. MCGRAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER (ECF 3)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>July 2, 2026</u>, at Los Angeles, California.

| | |
|---|---|
| J. Sissov | /s/ *J. Sissov* |
| Declarant | Signature |

SA2026303422