HARMEET K. DHILLON
Assistant Attorney General
JESUS A. OSETE
Principal Deputy Assistant Attorney General
    Civil Rights Division
    United States Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, D.C.  20530
    Telephone: (202) 304-8447
    barry.arrington@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA
*Additional counsel listed on following page*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>         v.<br><br>STATE OF CALIFORNIA and ROBERT BONTA, in his official capacity as head of the California Department of Justice,<br><br>                 Defendants. | Case No. 8:2026-cv-1697-MRA-ADS<br><br>**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing:          September 1, 2026<br>Hearing Time:   10:00 a.m.<br>Courtroom:      9B<br><br>Hon. Mónica Ramírez Almadani<br>United States District Judge |

R. JONAS GEISSLER
Deputy Assistant Attorney General

BARRY K. ARRINGTON (TX No. 24129555)
Acting Chief, Second Amendment Section

PATRICK TODD (TX No. 24106513)
TRISTAN SILVA II (DC No. 90037513)
    Trial Attorneys
    Second Amendment Section
    United States Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, D.C.  20530
    Telephone: (202) 304-8447

TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (Cal. Bar No. 272742)
Assistant United States Attorney
    United States Attorney's Office
    300 North Los Angeles Street, Suite 7516
    Los Angeles, California 90012
    Telephone: (213) 894-2464
    Julie.hamill@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    ARGUMENT .................................................................................................... 2

    **A.**   Standard for Injunctive Relief under Fed. R. Civ. P. 65. .................... 2

    B.    The United States Is Likely to Prevail on the Merits. ........................ 2

        1.    THE GLOCK BAN IS A TOTAL PROHIBITION UNDER THREAT OF CRIMINAL AND ADMINISTRATIVE PENALTY. .................................................................................... 2

        2.    *GLOCK HANDGUNS ARE THE MOST POPULAR HANDGUNS IN AMERICA AND THEREFORE PROTECTED UNDER THE SECOND AMENDMENT.* ................................. 3

        3.    THE BRUEN SECOND AMENDMENT STANDARD APPLIES. ................................................................................... 4

        4.    THE GLOCK BAN IS PRESUMPTIVELY UNCONSTITUTIONAL. .................................................... 4

        5.    DEFENDANTS CANNOT REBUT THE PRESUMPTION OF THE GLOCK BAN'S UNCONSTITUTIONALITY. ....... 6

        6.    THIS COURT HAS ALREADY HELD THAT THE HANDGUN ROSTER IS UNCONSTITUTIONAL. ............... 6

        7.    THE UNITED STATES IS ENTITLED TO SEEK INJUNCTIONS AGAINST SECOND AMENDMENT VIOLATIONS. .................................................................. 10

    **C.**   Absent a Preliminary Injunction, the United States—and Law-Abiding Californians—Will Suffer Irreparable Harm. ..................... 15

    **D.**   The United States Prevails on the Final Two *Winter* Factors. .......... 16

III.   CONCLUSION ............................................................................................. 16

i

## <u>ABLE OF AUTHORITIES</u>

**Federal Cases**                                                                                  **Page(s)**

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*,
 2026 WL 2075513 (3d Cir. July 17, 2026) ...................................................... 5

*Baird v. Bonta*,
 81 F.4th 1036 (9th Cir. 2023) ...................................................................... 16

*Barnhart v. Sigmon Coal Co.*,
 534 U.S. 438 (2002) ................................................................................... 11

*Boland v. Bonta*,
 662 F. Supp. 3d 1077 (C.D. Cal. 2023) ................................................. 1, 7, 8, 9

*Congress." FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*,
 146 S. Ct. 1546–59 (2026) ......................................................................... 12

*Connecticut Nat. Bank v. Germain*,
 503 U.S. 249 (1992) ................................................................................... 11

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ............................................................................ *passim*

*Duncan v. Bonta*,
 133 F.4th 852 (9th Cir. 2025) ...................................................................... 5

*E. Bay Sanctuary Covenant v. Garland*,
 994 F.3d 962 (9th Cir. 2020) ...................................................................... 2

*Food Mktg. Inst. v. Argus Leader Media*,
 588 U.S. 427 (2019) ................................................................................... 11

*Hernandez v. Sessions*,
 872 F.3d 976 (9th Cir. 2017) ...................................................................... 15

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
 436 U.S. 658 (1978) ................................................................................... 13

*NetChoice, LLC v. Bonta*,
 152 F.4th 1002 (9th Cir. 2025) .................................................................... 2

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 597 U.S. 1 (2022) ...................................................................................... 4

*Ortega v. Grisham*,
 148 F.4th 1134 (10th Cir. 2025) .................................................................. 5

*Pasadena City Bd. of Educ. v. Spangler*,
 427 U.S. 424 (1976) ................................................................................... 11

*Pont de Nemours & Co.*,
 353 U.S. 586 (1957) ................................................................................... 14

*Preminger v. Principi*,
 422 F.3d 815 (9th Cir. 2005) ...................................................................... 16

*Riley's Am. Heritage Farms v. Elsasser*,
32 F.4th 707 (9th Cir. 2022) ............................................................ 16

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) ........................................................................ 11

*Staples v. United States*,
511 U.S. 600 (1994) .......................................................................... 6

*Trump v. CASA, Inc.*,
606 U.S. 831 856 (2025) ................................................................. 10

*United States v. Bd, of Educ. for Sch. Dist. of Phila.*,
911 F.2d 882 (3d Cir. 1990) ........................................................... 13

*United States v. City of Columbus*,
2000 WL 1133166 (S.D. Ohio Aug. 3, 2000) ................................. 12

*United States v. City of Philadelphia*,
644 F.2d 187 (3d Cir. 1980) ........................................................... 12

*United States v. Cnty. of Maricopa*,
889 F.3d 648 (9th Cir. 2018) ..................................................... 12, 13

*United States v. Jordan*,
509 F.3d 191 (4th Cir. 2007) .......................................................... 15

*United States v. Town of Colorado City*,
935 F.3d 804 (9th Cir. 2019) .......................................................... 15

*Vasquez Perdomo v. Noem*,
148 F.4th 656 (9th Cir. 2025) ......................................................... 15

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) ........................................................................ 11

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .............................................................................. 2

*Wolford v. Lopez*,
146 S.Ct. 2032 (2026) ................................................................... 4, 5

*Zepeda v. INS*,
753 F.2d 719 (9th Cir. 1983) .......................................................... 16

**Federal Statutes**

34 U.S.C. § 12601 ................................................................... *passim*

34 U.S.C. § 12601(a) ................................................................ 10, 14

34 U.S.C. § 12601(b) ....................................................................... 11

42 U.S.C. § 1983.  Section 12601 ................................................... 11

**State Cases**

*Steen v. App. Div. of Superior Ct.*,

331 P.3d 136 (Cal. 2014) ...................................................................................... 15

**State Statutes**

Cal. Penal Code § 16885 ......................................................................................... 2

Cal. Penal Code § 16885(a) .................................................................................... 2

Cal. Penal Code § 27533 ......................................................................................... 8

Cal. Penal Code § 27595(c) ..................................................................................... 3

Cal. Penal Code § 31910 ......................................................................................... 6

Cal. Penal Code § 31910(a)(2)(D), (E) .................................................................. 7

Cal. Penal Code § 31910(b) .................................................................................... 7

Cal. Penal Code § 32015 ......................................................................................... 7

Cal. Penal Code § 32110 ......................................................................................... 8

Cal. Penal Code §§ 16380, 31910(a)(2)(D) ........................................................... 7

Cal. Penal Code §§ 16900, 31910(a)(2)(E) ........................................................... 7

Cal. Penal Code §§ 31910, 32000 .......................................................................... 6

Cal. Penal Code §§ 32000(b)(4) ............................................................................. 8

California Penal Code § 27595(a) ................................................................... 1, 2, 3

California Penal Code § 27595(b)(1)–(3) ............................................................... 2

Penal Code § 830.1(b) ........................................................................................... 15

Section 1983 ..................................................................................... 12, 10, 11, 12, 13

Section 12601—not ............................................................................................... 11

**Federal Rules**

Fed. R. Civ. P. 65 ............................................................................................... i, 2

Rule 7-3 ...................................................................................................................... i

Rule 7.3 ...................................................................................................................... i

iv

# NOTICE OF MOTION
# AND MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that on September 1, 2026, at 10:00 a.m., or as soon thereafter as it may be heard, the United States will, and hereby does, move this Court for an order entering a preliminary injunction pursuant to Fed. R. Civ. P. 65.  This motion will be made in the Ronald Reagan Federal Building and United States Courthouse before the Honorable Mónica Ramírez Almadani, United States District Judge, located at 411 West 4th Street, Santa Ana, California 92701.

The United States brings this motion on the grounds stated in the attached Memorandum of Points and Authorities, and all pleadings, records, and other documents on file with the Court in this action, and upon such oral argument as may be presented at the hearing of this motion.

**Statement of Compliance with Local Rule 7-3**.  This motion is not subject to Local Rule 7.3.  Nevertheless, the undersigned met and conferred with counsel for Defendants on July 21, 2026.  Defendants oppose this motion.

Dated:  July 28, 2026

/s/ Barry K. Arrington
Barry Arrington
Acting Chief
Second Amendment Section

i

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

When law enforcement places unconstitutional restrictions on the exercise of Americans' protected rights, they engage in misconduct redressable through the United States' authority to seek injunctive relief.  34 U.S.C. § 12601 (Section 12601).  Here, by design of State statutes, Defendants systematically implemented a practice of unlawful law enforcement misconduct which, if not enjoined, will continue to violate individuals' constitutional right to keep and bear lawful arms for legal purposes such as self-defense.  Indeed, handguns are "*overwhelmingly chosen by American society*" for self-defense.  *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008) (emphasis added).  Therefore, a "prohibition of their use is invalid." *Id*. at 629.  Glock handguns are the most popular handguns in America.  *See, e.g.*, *How Glock became America's gun*, CBS NEWS   (Sep. 15, 2013), https://perma.cc/J5E8-42UA.  Yet California Penal Code § 27595(a) (Glock Ban) bans California citizens from acquiring those handguns—and all similar cruciform-trigger-bar handguns—from licensed dealers.  The Glock Ban is a flagrant violation of the Second Amendment and merits immediate enjoinder.  The United States also seeks injunctive relief against the handgun "Roster" that this Court has already found to be likely unconstitutional.  *See Boland v. Bonta*, 662 F. Supp. 3d 1077, 1091 (C.D. Cal. 2023).   Thus, California law enforcement's continued implementation of these statutes is a practice of misconduct that this Court should enjoin under Section 12601 just as any other law enforcement misconduct.

1

## II.   ARGUMENT

**A.   Standard for Injunctive Relief under Fed. R. Civ. P. 65.**

A party seeking a preliminary injunction must show that [1] it is likely to succeed on the merits, [2] it is likely to suffer irreparable harm, and an injunction is both [3] equitable and [4] in the public interest. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1012 (9th Cir. 2025) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)).   When the government is the defendant, the third and fourth preliminary injunction factors merge. *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 975 (9th Cir. 2020) (citation and quotation marks omitted).

**B.   The United States Is Likely to Prevail on the Merits.**

**1.   The Glock Ban Is a Total Prohibition under Threat of Criminal and Administrative Penalty.**

On July 1, 2026, it became illegal for a California licensed firearms dealer "to sell, offer for sale, exchange, give, transfer, or deliver any semiautomatic machinegun-convertible pistol." Cal. Penal Code § 27595(a).   Violations of the Glock Ban may be punished by fine and the suspension or revocation of the offending dealer's license. *See id*. § 27595(b)(1)–(3).

Cal. Penal Code § 16885(a) defines a "semiautomatic machine-gun convertible pistol" as:

> [A]ny semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with common household tools . . . into a machinegun by the installation or attachment of a pistol converter as a replacement for the slide's backplate without any additional engineering, machining, or modification of the pistol's trigger mechanism.

All factory-stock models of Glock pistols currently on the market have a cruciform trigger bar. Declaration of Earl Griffith ¶ 9.   This includes Glock's "Gen 6" and "V series" pistols, which were introduced into the U.S. market in late 2025. *Id*.   Therefore, based on the definition set forth in Cal. Penal Code § 16885, as of July 1, 2026, Cal. Penal Code § 27595(a) prohibits licensed firearms dealers from

selling, offering for sale, exchanging, giving, transferring, or delivering any Glock handgun to their customers.  Declaration of Earl Griffith ¶ 10.  Thus, Cal. Penal Code § 27595(a) operates as a total ban on the purchase of Glock handguns from licensed firearms dealers in California.  *Id.*[1]

    **2.**    ***Glock Handguns Are the Most Popular Handguns in America and Therefore Protected under the Second Amendment.***

Glock handguns are the most popular handguns in America.  Declaration of Earl Griffith ¶ 11; *see also How Glock became America's gun*, CBS News (Sep. 15, 2013), https://perma.cc/J5E8-42UA.  Analysts estimate that, as of 2020, Glock held nearly 65% of the U.S. market for handguns.  *Gaston Glock & family*, Forbes (Apr. 5, 2021), https://perma.cc/6HWX-6FFP.  According to one source, three Glock handgun models made the top 25 for new guns sold in 2024, placing fourth, seventh, and twenty-second.  *See* Logan Metesh, *Top Selling New Guns of 2024*, Guns & Ammo (Jan. 14, 2025), https://perma.cc/8A5Z-5VQN.  ATF has observed that Glocks are "popular for civilian use."  *See Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022).  Glock pistols consistently rank among the top-selling firearms in the U.S. civilian market.  *See, e.g.*, *Best-Selling Guns*, Guns.com (May 5, 2026), https://perma.cc/9JGJ-ZXXN (listing two Glock models in the top-five-selling handguns).  Government data confirms the popularity of these types of handguns.  *See* ECF 3-1 p. 5.  In sum, Glock handguns are unquestionably in common use and are therefore protected under the Second Amendment.

---

[1] This does not apply to the limited exceptions set forth in Cal. Penal Code § 27595(c).  Declaration of Earl Griffith ¶ 10.  However, those limited exceptions do not cure Defendants' law enforcement misconduct in implementing the unconstitutional Glock Ban.

3

### 3.    The Bruen Second Amendment Standard Applies.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Court set forth the following test for evaluating Second Amendment claims:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

597 U.S. at 24.

Under step one of the *Bruen* test, when a "challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional." *Wolford v. Lopez*, 146 S.Ct. 2032, 2044 (2026).  At step two, the government (i.e., Defendants here) has an opportunity to rebut any presumption of unconstitutionality that arose under step one by demonstrating that its regulation is consistent with the Nation's historical tradition of firearm regulation.  *Id*.

### 4.    The Glock Ban Is Presumptively Unconstitutional.

Just last month, the Supreme Court stated the following regarding the Second Amendment's protection of handguns:  "The phrase 'to keep and bear Arms,' . . . signifies what its terms mean in ordinary usage—that is, to 'have' and 'carry Arms.' [citing *District of Columbia v. Heller*, 554 U.S. 570, 583-585 (2008)].  And 'Arms,' . . . refers to implements used for offense or defense. *Id*., at 581. . . . *[H]andguns, which are 'overwhelmingly chosen by American society' for self-defense, fall squarely into this category. Id*., at 628." *Wolford* at 2041 (emphasis added).

The Glock Ban prevents law-abiding citizens from acquiring Glock handguns from licensed firearms dealers.  "Common sense dictates that the right to bear arms requires a right to acquire arms, just as the right to free press necessarily includes

4

the right to acquire a printing press, or the right to freely practice religion necessarily rests on a right to acquire a sacred text." *Ortega v. Grisham*, 148 F.4th 1134, 1143 (10th Cir. 2025). In *Jackson v. City & Cnty. of San Francisco*, the court held that the right to possess firearms implies a corresponding acquisition right. 746 F.3d 953, 967 (9th Cir. 2014) (Second Amendment protects right to acquire ammunition, and *Heller* did not differentiate between regulations governing ammunition and regulations governing firearms themselves). Thus, the Second Amendment protects the right to acquire handguns.

The Glock Ban's constitutional woes remain even if it leaves a few narrow avenues for Californians to acquire Glock handguns. Just like a law that bans *some* protected speech would violate the First Amendment even if did not ban *all* protected speech, a Second Amendment violation remains even if the government could have committed further violations. *See Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed.").

Defendants may argue that in *Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025), the court held that a plaintiff is required to make a number of difficult empirical demonstrations to show that his conduct is covered by the "plain text" of the Second Amendment. But, last month, in *Wolford v. Lopez*, 146 S.Ct. 2032 (2026), the Supreme Court abrogated *Duncan* when it stated that a plaintiff meets his plain-text burden simply by demonstrating that he desires to keep and bear "*any form of 'Arms*,'" i.e., any weapon customarily used for offensive or defensive purposes." *Id*. at 2044 (emphasis added). Importantly for purposes of this case, the Court held that handguns like those subject to the Glock Ban "fall squarely into this category." *Id*. at 2041. As the Third Circuit stated a few days ago, "[c]ommon use has no bearing" on the step one formulation clarified in *Wolford*. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 2026 WL 2075513, at *12 (3d Cir. July 17, 2026).

5

In summary, the Second Amendment's plain text covers the conduct of those law-abiding Californians who desire to acquire Glock handguns from licensed dealers. The Glock Ban prohibits that conduct. Therefore, under *Bruen* step one, the Glock Ban is presumptively unconstitutional.

**5.** **Defendants Cannot Rebut the Presumption of the Glock Ban's Unconstitutionality.**

Defendants cannot rebut the presumption that the Glock Ban is unconstitutional. Glock handguns are in common use. Indeed, as set forth above, they are the most popular handgun in America. There is no historical tradition analogous to a ban of a weapon in common use. *See Heller*, 554 U.S. at 629. It follows that there is no historical tradition of banning the commercial acquisition of a weapon in common use.

California apparently believes that it can outlaw perfectly legal, safe, and constitutionally protected firearms if those firearms can be converted into illegal firearms. That is wrong. A legal shotgun can be turned into an illegal sawed-off shotgun in a matter of seconds with a common hacksaw. Surely, this does not mean that a state can outlaw shotguns. A semiautomatic rifle can be converted into a machinegun, but unmodified semiautomatic rifles are "widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994). The Glock Ban cannot be reconciled with *Staples*.

**6.** **This Court Has Already Held That the Handgun Roster Is Unconstitutional.**

Under California's so-called Unsafe Handgun Act ("UHA"), a handgun may not lawfully be manufactured or sold on the primary market if it is "unsafe." Cal. Penal Code §§ 31910, 32000. The State defined an "unsafe handgun" as "any pistol, revolver, or other firearm capable of being concealed upon the person" that does not meet firing reliability requirements, satisfy drop safety requirements, or have certain safety features. *Id.* § 31910. All handgun models that have been tested by

6

a certified testing laboratory and have been determined not to be "unsafe handguns" are added to an official list known as the "Roster." Cal. Penal Code § 32015. Admission to the Roster is valid for one year and must be renewed annually with a fee. Cal. Code Regs. tit 11, §§ 4070(a)-(b) & 4072(b).

Over time, the California legislature has changed what features a handgun must have to be considered not "unsafe." When it does so, handguns previously on the Roster that do not have the newly required features are not removed from the Roster, but rather are "grandfathered" and are still permitted to be sold even though they now would be considered "unsafe." *See* Cal. Penal Code § 31910(a)(2)(D), (E); *Boland*, 662 F. Supp. 3d at 1081. However, for each semiautomatic pistol newly added to the Roster, the Department is required to remove from the Roster three pistols lacking either a chamber-load indicator (CLI) and a magazine-disconnect mechanism (MDM). *See* Cal. Penal Code § 31910(b).

Since 2007, to be eligible for primary market sale in California, new-to-market semiautomatic pistols must have two safety features designed to limit accidental discharges that occur when someone mistakenly believes no round is in the chamber. First, a new-to-market centerfire semiautomatic pistol must have a CLI, which is a device that indicates that a cartridge is in the firing chamber. Cal. Penal Code §§ 16380, 31910(a)(2)(D). Second, a new-to-market centerfire or rimfire semiautomatic pistol must have an MDM, which is a mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the pistol. *Id*. §§ 16900, 31910(a)(2)(E).

Handguns on the Roster before 2007 that lack a CLI or MDM are "grandfathered" and may still be sold. *See* Cal. Penal Code §§ 31910(a)(2)(D), (E) (defining as "unsafe handguns" only those without the required features "not already listed on the roster").

7

Beginning in 2013, new-to-market semiautomatic pistols were also required to include a feature called microstamping.  This requirement mandated that each pistol imprint microscopic arrays of characters that identify the make, model, and serial number of the pistol onto the cartridge or shell casing of each fired round. *See Boland*, 662 F. Supp. 3d at 1082.  The microstamping requirement prevented any new handgun models from being added to the Roster in the ten years from 2013 to 2023.  *Id*.  Indeed, a decade after the requirement took effect, no firearm manufacturer in the world made a firearm with this capability.  *Id*.  California recently postponed further implementation of the microstamping requirement to January 1, 2028.  *See* Cal. Penal Code § 27533.  The CMI and MDM requirements remain applicable.

As a result of these regulations, as of 2023, none of the handguns listed on the Roster met the then-current definition of a handgun that is not "unsafe."  *See Boland*, 662 F. Supp. 3d at 1082.  Not one of the handguns being sold in California had a CLI, MDM, and microstamping ability.  *Id*.  Thus, every single handgun on the Roster was a grandfathered handgun—and was a handgun that the California legislature deemed "unsafe."

The UHA's prohibition on sales of "unsafe" handguns is subject to exceptions.  It does not apply to sales to law enforcement personnel, personnel from agencies including the Department, a police department, a sheriff's official, a marshal's office, Department of Corrections and Rehabilitation, the California Highway Patrol, and the district attorney's office, or any member of the military. *See* Cal. Penal Code §§ 32000(b)(4).

The UHA does not prohibit possessing Off-Roster handguns lawfully acquired on the secondary market or lawfully transferred into California.  See *id*. § 32110.  The result is that "unsafe" Off-Roster handguns may be purchased by ordinary people on the secondary market from law enforcement officials and others, often at a high markup.  *Boland*, 662 F. Supp. 3d at 1082.  Again, it is "no answer"

that the statute is not as unconstitutional as it could be. *See Heller*, 554 U.S. at 629. The State has not cut off every avenue for acquisition of these constitutionally protected firearms—just the avenue that is, by far, the most important one for law-abiding Californians who desire to acquire state-of-the-art firearms. The fact that Californians can still acquire them at exorbitant prices from exempted persons (if they can find one) does not make the statute constitutional, nor inoculate the Defendants from Section 12601 liability for their law enforcement misconduct in enforcing the statute.

The United States has carried its burden at *Bruen* step one. The challenged UHA provisions unquestionably infringe on the right to keep and bear arms because the UHA prevents California citizens from acquiring state-of-the-art handguns for self-defense. *Boland*, 662 F. Supp. 3d at 1084. Therefore, the Constitution presumptively protects that conduct, and the challenged provisions of the UHA are presumptively unconstitutional. *Id*. at 1086.

The State has failed to proffer any historical regulation analogous to the UHA's CLI and MDM requirements. *Id*. at 1089. Accordingly, those requirements are unconstitutional. *Id*. And, Defendant's implementation of those requirements constitutes an unconstitutional practice of law enforcement misconduct. In *Boland*, this Court preliminarily enjoined these provisions of the Roster. The Court stated:

> Californians have the constitutional right to acquire and use state-of-the-art handguns to protect themselves. They should not be forced to settle for decade-old models of handguns to ensure that they remain safe inside or outside the home. But unfortunately, the [statutes'] requirements do exactly that. . . . [T]hose requirements are unconstitutional and their enforcement must be preliminarily enjoined.

662 F. Supp. 3d at 1092

The State touts the fact that since the *Boland* injunction was entered, 138 semiautomatic pistol models with one or both of these required features have been added to the Roster. Declaration of Earl Griffith ¶ 15. This statistic is both

9

misleading and constitutionally irrelevant.  It is misleading because the Roster counts a pistol with cosmetic changes from the base model as a completely different pistol.  Declaration of Earl Griffith ¶ 15.  Thus, if a manufacturer offers a base model and nine cosmetically different variants, the Roster misleadingly counts that as ten models.

The State's claim is irrelevant to the conclusion this Court reached in *Bonta*, because the important number is not the tiny number of pistol models that have made the Roster in the last couple of years but the many thousands of pistol models that did not.  Even with the few additions, the Roster still makes the vast majority of pistols sold in the country unavailable for purchase from a dealer in California.  Declaration of Earl Griffith ¶ 16.  Thus, the fundamental constitutional infirmity of the Roster identified in *Boland*, 662 F. Supp. 3d at 1092, remains unchanged.

The *Boland* injunction is stayed pending appeal.  Nevertheless, for the reasons previously stated by this Court, the Roster statute violates the Second Amendment.  The United States seeks injunctive relief against implementation of the Roster in addition to the injunction entered in *Boland*, because the *Boland* injunction binds the State only with respect the parties in that case.  *See Trump v. CASA, Inc.*, 606 U.S. 831 856 (2025) (injunction may provide relief only to party to case).  The United States brought this action to vindicate the Second Amendment rights of the people of California pursuant to the authority conferred on it by Section 12601.  Section 12601's purpose is to authorize the United States to obtain broad equitable relief against police misconduct that is not available to a Section 1983 plaintiff.  Accordingly, any injunction entered against the State will be broader than the injunction entered in *Boland*.

**7.     The United States Is Entitled to Seek Injunctions against Second Amendment Violations.**

Under 34 U.S.C. § 12601(a), it is unlawful (1) for a "governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority;"

(2) to "engage in a pattern or practice of conduct by law enforcement officers;" (3) that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.[2]

The plain text authorizes the United States to obtain injunctive relief against violations of § 12601(a).  34 U.S.C. § 12601(b).  This includes the Glock Ban and the UHA.  The "cardinal canon" of statutory interpretation is that a "legislature says in a statute what it means and means in a statute what it says there" regardless of whether "*legislative history points to a different result.*"  *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992) (emphasis added).  Accordingly, when the words of a statute are unambiguous, this first canon is also the last and the "judicial inquiry is complete."  *Id.* at 254 (citations and internal quotation marks omitted); *see also Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) (internal citations omitted) (a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself, and where that examination yields a clear answer, judges must stop); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)) (when interpreting a statute, the first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case and, if so, the inquiry ceases).  The text of Section 12601—not the circumstances that sparked its enactment—determine its scope.

Section 1983 illustrates this point.  *See* 42 U.S.C. § 1983.  Section 12601 is a sister statute of Section 1983 in that both create a broad cause of action to redress violations of all federally protected civil rights.  Section 12601 applies in actions that the United States brings and Section 1983 applies in actions that private

---

[2] The United States also has standing to vindicate its own sovereignty.  *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 430-431 (1976).  But the United States brought this cause of action pursuant to its Section 12601 authority.

litigants bring.  *See United States v. Cnty. of Maricopa*, 889 F.3d 648, 653 (9th Cir. 2018) (applying Section 1983 caselaw in a Section 12601 case because "Section 12601 shares important similarities with § 1983").

Congress passed Section 1983 as part of the Ku Klux Klan Act of 1871, ch. 22, 17 Stat. 13 (Klan Act).  As the Klan Act's name implies, the members of the 42nd Congress who voted to enact Section 1983 had a very specific problem in mind (vindicating the constitutional rights of the freedmen), and despite the statute's broad remedial language, it languished in obscurity for nearly a century.[3] Nevertheless, Section 1983 ultimately emerged as a powerful engine for vindicating deprivations of constitutional rights by government actors.  The scope of Section 12601 is no more limited to addressing the problem the members of the 103rd Congress contemplated when they enacted the Crime Act than the scope of Section 1983 is limited by what the members of the 42nd Congress contemplated when they passed the Klan Act.  In both instances, the plain text of the statute controls.[4]  The

[3] "Despite its noble beginnings, § 1983 remained in disuse for nearly a century." Rodney A. Smolla, *The history of § 1983—The Civil Rights Act of 1871*, 2 Federal Civil Rights Acts § 14:2 (3d ed. 2026) (citations omitted).  Of course, this disuse did not impact the statute's validity.

[4] "[S]tatutory interpretation must focus on the text . . . rather than psychoanalysis of Congress."  *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*, 146 S. Ct. 1546, 1558–59 (2026) (citation omitted).  Indeed, even if legislative history were properly within consideration, that, too, supports Section 12601's application to protection of Second Amendment rights.  Section 12601 was a reaction against constraints on the United States' authority to seek injunctive relief against myriad constitutional violations.  Congress did not hold hearings on the provision of the Crime Act that became Section 12601.  Thus, the statute does not have its own legislative history.  Section 12601, however, is similar to a provision of H.R. 3371, a failed bill that would have enacted a statute called the Omnibus Crime Control Act of 1991 (the "1991 Bill").  *United States v. City of Columbus*, 2000 WL 1133166, at *3 (S.D. Ohio Aug. 3, 2000).  "The standards of conduct under the Act [the 1991 Bill] are the same as those under the Constitution, presently enforced in damage actions under section 1983."  H.R. Rep. No. 102–242, 102nd Cong., 1st

[Footnote continued on next page]

plain text of Section 12601 mandates that any time law enforcement officers engage in a pattern or practice of conduct that deprives citizens of their constitutional rights, the United States is authorized to bring an action to redress the violation.  As with Section 1983, the specific context in which the statute was enacted and the history of the statute's enforcement in no way limit the scope of the United States' enforcement authority.

The plain text authorizes the United States to seek an injunction against "a governmental authority whose own official policy causes it to engage in a pattern or practice of conduct by law enforcement officers that deprives persons of federally protected rights."  *See Cnty. of Maricopa*, 889 F.3d at 653; *see also United States v. Bd, of Educ. for Sch. Dist. of Phila.*, 911 F.2d 882 (3d Cir. 1990)  (providing that where a governmental defendant announces a discriminatory policy, then the policy constitutes a "pattern or practice").  Enforcing an unconstitutional law by definition deprives persons of their constitutional rights.  And acts of the legislative body of a state represent the "official policy" of that state.  *Id.* at 652.  Therefore, Section 12601 authorizes the United States to seek to enjoin such conduct.

Here, too, Section 1983 caselaw confirms this logical conclusion.  A local ordinance is among the "official polic[ies]" that can be the basis for liability under Section 1983.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).  "Indeed, the language of § 12601 goes even further than § 1983,"—which only imposes liability on local governments—"making it unlawful for 'any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority' to engage in the prohibited conduct."  *Cnty. of Maricopa*,

---

Sess. at 138.  Congress intended the 1991 Bill to fill a gap created by *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980), to give the United States "authority to sue a local government or its officials to enjoin violations of citizens' constitutional rights by police officers."  Committee Report, 137-138.

889 F.3d at 653 (quoting 34 U.S.C. § 12601(a)).  It thus follows that a state is liable for violations of § 12601 "stemming from" its state laws.  *See id.*

There is nothing novel about the Department using Section 12601 to remedy law enforcement officers' enforcement of unconstitutional laws.  For example, in the U.S. Dept. of Justice Civil Rights Division Report of Investigation of the Ferguson Police Department, March 4, 2015 (available at http://bit.ly/4vWiJ2j), the Department reported on a Section 12601 enforcement action against Ferguson, Missouri.  The Department reported that law enforcement officers' enforcement of Ferguson's unconstitutional Failure to Comply municipal ordinance one of the patterns or practices of conduct that gave rise to constitutional violations.  *Id*. at 16, 19.[5]  Likewise, here, Defendant's enforcement of an unconstitutional restraint on a protected right is precisely "conduct" within Section 12601's plain meaning.  The text of the statute proscribes law enforcement officers from engaging in "a pattern or practice of conduct" that deprives persons of their constitutional rights.  The most common sense of the word "conduct" is "personal behavior."  The Random House Dictionary of the English Language, 2nd ed., unabridged (New York: Random House, 1987);  Conduct, Black's Law Dictionary (12th ed. 2024) ("[p]ersonal behavior . . ..").  Thus, "Conduct" means "personal behavior, whether by action or

---

[5] Indeed, past administrations have exercised their prosecutorial discretion to use Section 12601 to investigate and bring enforcement actions to remedy: enforcement of local ordinances that are facially unconstitutional; First, Fourth, Sixth, Eighth, and Fourteenth Amendment violations; Title VI violations; and to challenge the conduct of law enforcement exercised through court clerks, prosecutors, non-sworn staff, and sworn officers and deputies.  *See, e.g.*, Special Litigation Section Cases and Matters – Law Enforcement Agencies, available at *https://www.justice.gov/crt/special-litigation-section-cases-and-matters#police*. But even if that were not the case, past agency practice cannot confine the United States' authority under Section 12601.  *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 590 (1957).

inaction and is a term that transcends the legal context." *United States v. Jordan*, 509 F.3d 191, 196 (4th Cir. 2007) (citation and quotation marks omitted).

In this case, the California Attorney General is the chief law enforcement officer of the State, and it is his duty to see that the laws of the State are uniformly and adequately enforced. *Steen v. App. Div. of Superior Ct.*, 331 P.3d 136, 141 (Cal. 2014); Cal. Const. art. V, § 13. The California Bureau of Firearms is one of the bureaus of the Department's Division of Law Enforcement. Special Agents (sworn peace officers under Penal Code § 830.1(b)) of the California Bureau of Firearms enforce the State's firearms laws, including the Glock Ban and the UHA. Accordingly, the State's enactment of the Glock Ban and UHA and its threat of or actual enforcement through state law enforcement officials constitutes law enforcement misconduct within the meaning of § 12601. *See, e.g.*, *United States v. Town of Colorado City*, 935 F.3d 804, 811 (9th Cir. 2019). It follows that California is liable under § 12601 for violations of Second Amendment rights stemming from the Glock Ban.

**C.      Absent a Preliminary Injunction, the United States—and Law-Abiding Californians—Will Suffer Irreparable Harm.**

It is "well established" that the deprivation of constitutional rights "unquestionably" constitutes irreparable injury. *Vasquez Perdomo v. Noem*, 148 F.4th 656, 679 (9th Cir. 2025) (internal citation and quotation marks omitted). It "follows inexorably" that if a government's policy is likely unconstitutional, a plaintiff has also carried its burden as to irreparable harm. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). Accordingly, "[w]hen an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 1998). Because the United States

has established that it will likely succeed on the merits, which concern the deprivation of constitutional rights, the irreparable harm factor is satisfied.[6]

## D.    The United States Prevails on the Final Two *Winter* Factors.

Likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in a plaintiff's favor. Public interest concerns are implicated when a constitutional right has been violated, and all citizens have a stake in upholding the Constitution. *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). Thus "it is always in the public interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (citation and quotation marks omitted). The government also "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983).

These principles are equally applicable in cases in which the plaintiff has established a likely violation of the Second Amendment. *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). Thus, Plaintiff has demonstrated that it will prevail on all four *Winter* factors.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully moves the Court to enter a preliminary injunction against the Glock Ban and the UHA. A proposed order is attached.

---

[6] Because a constitutional violation remains even if the Glock Ban or UHA leave open ways for Californians to acquire the handguns, irreparable harm remains. *See supra* Section II.B.4. Indeed, California Attorney General Bonta assured in writing that his law enforcement agents would continue to implement the unconstitutional Glock Ban and UHA. *See* ECF 20-2.

16

Respectfully submitted this 28th day of July 2026.

/s/ Barry K. Arrington
Barry Arrington
Acting Chief
Second Amendment Section

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the United States, certifies that this brief contains 5,063 words, which complies with the word limit of L.R. 11-6.1.

Dated: July 28, 2026                    Respectfully submitted,

*/s/ Barry K. Arrington*
Barry Arrington
Acting Chief
Second Amendment Section

1