ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General
VIVIANA M. HANLEY
CHRISTINA MCCALL
SABRINA T. MCGRAW
EDWARD P. WOLFE (SBN 247835)
Deputy Attorneys General
  600 W Broadway, STE 1800
  San Diego, CA 92101-3375
  Telephone: (619) 321-5426
  Fax: (916) 731-2124
  E-mail: Edward.Wolfe@doj.ca.gov
*Attorneys for Defendants,
State of California and Robert Bonta, in his official
capacity as head of the California Department of
Justice*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA and ROBERT BONTA, in his official capacity as the head of the California Department of Justice,**<br><br>Defendants. | 8:26-cv-01697-MRA-ADSx<br><br>**DEFENDANTS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COMPLAINT**<br><br>Date: September 1, 2026<br>Time: 10:00 a.m.<br>Courtroom: 9B<br>Judge: Hon. Mónica Ramírez Almadani<br>Trial Date: Not set<br>Action Filed: July 1, 2026 |

**PLEASE TAKE NOTICE** that on September 1, 2026, at 10:00 a.m., or as soon thereafter as the matter may be heard before the honorable Mónica Ramírez Almadani in Courtroom 9B of the above-entitled Court, located at the Ronald

Reagan Federal Building and U.S. Courthouse, 411 West 4th Street, Santa Ana, CA 92701, the Court will hear a motion to dismiss the complaint brought by Defendants State of California and Rob Bonta, in his official capacity as the head of the California Department of Justice.

Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) on the grounds that the Complaint does not allege sufficient facts to state a claim because Plaintiff's claims do not allege a pattern or practice of conduct by law enforcement officers that deprives persons of rights, privileges, or immunities secured by federal law pursuant to 34 U.S.C. § 12601.

This motion is based on this notice, the accompanying Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, all pleadings and papers on file, and such additional argument as may be presented at the hearing.

This motion is made following a conference of counsel pursuant to Local Rule 7-3, which took place on July 21, 2026. During that conference, counsel for Plaintiff stated that it opposes this motion.

Dated: July 28, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General

***/s/ Edward P. Wolfe***

VIVIANA M. HANLEY
CHRISTINA MCCALL
SABRINA T. MCGRAW
EDWARD P. WOLFE
Deputy Attorneys General
*Attorneys for Defendants*
*State of California and Robert Bonta,*
*in his official capacity as head of the*
*California Department of Justice*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

    I.    Relevant Constitutional Principles.................................................2

    II.   34 U.S.C. Section 12601 ...............................................................3

    III.  The Unsafe Handgun Act................................................................6

    IV.  Assembly Bill 1127.......................................................................8

    V.   This Lawsuit..................................................................................10

LEGAL STANDARD ........................................................................................11

ARGUMENT.......................................................................................................12

    I.    Section 12601 Does Not Authorize Facial Challenges To State Laws .........................................................................................12

        A.   The Text of Section 12601 Does Not Authorize the United States's Facial Challenge to California Laws ...............12

        B.   The History of Section 12601 Refutes the United States's Broad Interpretation .........................................................15

        C.   The United States' Newly-Minted Interpretation of Section 12601 Is Out of Step with Its Past Enforcement Practice ........................................................................17

        D.   Principles of Federalism Counsel Against the United States' Sweeping Interpretation of Section 12601....................19

    II.   The United States Cannot Cure The Defects With Its Complaint, And The Court Should Not Grant Leave To Amend ..........................20

CONCLUSION ...................................................................................................21

CERTIFICATE OF COMPLIANCE..................................................................22

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Adoptive Couple v. Baby Girl*
  570 U.S. 637 (2013) ...................................................................................14

*Almendarez-Torres v. United States*
  523 U.S. 224 (1998) ...................................................................................14

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ...................................................................................11

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007) ...................................................................................11

*Boland v. Bonta*
  662 F. Supp. 3d 1077 (C.D. Cal. 2023)........................................................7

*Bond v. United States*
  572 U.S. 844 (2014) ............................................................................15, 19

*City of Los Angeles v. Lyons*
  461 U.S. 95 (1983) .....................................................................................16

*City of Rialto v. W. Coast Loading Corp.*
  581 F.3d 865 (9th Cir. 2009)......................................................................13

*Daniels-Hall v. Nat'l Educ. Ass'n*
  629 F.3d 992 (9th Cir. 2010)........................................................................5

*DeSoto v. Yellow Freight Systems, Inc.*
  957 F.2d 655 (9th Cir. 1992)......................................................................19

*Election Integrity Project Cal., Inc. v. Weber*
  113 F.4th 1072 (9th Cir. 2024)...................................................................11

*Fiscal v. City & County of San Francisco*
  158 Cal. App. 4th 895 (Cal. Ct. App. 2008).................................................6

*Fischer v. United States*
  603 U.S. 480 (2024) ............................................................................15, 16

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Gallardo ex rel. Vassallo v. Marstiller*
    596 U.S. 420 (2022) ................................................................................14

*Godecke ex rel. United States v. Kinetic Concepts, Inc.*
    937 F.3d 1201 (9th Cir. 2019) ................................................................11

*Jaymes v. Bonta*
    No. 3:25-cv-02711 (S.D. Cal. filed Oct. 13, 2025) ..................................9

*Learning Res., Inc. v. Trump*
    607 U.S. 229 (2026) ................................................................................17

*Loper Bright Enters. v. Raimondo*
    603 U.S. 369 (2024) ................................................................................17

*Manzarek v. St. Paul Fire & Marine Ins. Co.*
    519 F.3d 1025 (9th Cir. 2008) ................................................................11

*McDonald v. City of Chicago*
    561 U.S. 742 (2010) ................................................................................20

*Nken v. Holder*
    556 U.S. 418 (2009) ..................................................................................7

*Pena v. Lindley*
    898 F.3d 969 (9th Cir. 2018) ................................................................6, 7

*Renna v. Bonta*
    667 F. Supp. 3d 1048 (S.D. Cal. 2023) ....................................................7

*Salisbury v. City of Monica*
    998 F.3d 852 (9th Cir. 2021) ..................................................................12

*Satterfield v. Simon & Schuster, Inc.*
    569 F.3d 946 (9th Cir. 2009) ..................................................................12

*Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*
    708 F.3d 1109 (9th Cir. 2013) ..................................................................3

*United States v. 144,774 pounds of Blue King Crab*
    410 F.3d 1131 (9th Cir. 2005) ................................................................12

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States v. City of Columbus*
No. 99-cv-1097, 2000 WL 1133166 (S.D. Ohio Aug. 3, 2000) ..........................5

*United States v. City of Philadelphia*
644 F.2d 187 (3d Cir. 1980) ..............................................2, 3, 15, 19

*United States v. County of Maricopa*
889 F.3d 648 (9th Cir. 2018) ............................................................18

*United States v. Mattson*
600 F.2d 1295 (9th Cir. 1979) ..............................................................3

*United States v. Nishiie*
996 F.3d 1013 (9th Cir. 2021) ...........................................................13

*United States v. Town of Colorado City*
935 F.3d 804 (9th Cir. 2019) .............................................................18

*Utility Air Reg. Grp. v. EPA*
573 U.S. 302 (2014) ..........................................................................17

*Vt. Agency of Nat. Res. v. United States*
529 U.S. 765 (2000) ..........................................................................19

**FEDERAL STATUTES AND BILLS**

United States Code, Title 34
§ 12601 ...............................................................................*passim*
§ 12602 ...........................................................................................14

United States Code, Title 42
§ 1983 .................................................................................*passim*
§ 2000a-5 ...........................................................................................3
§ 14141 ...............................................................................................4

Omnibus Crime Control Act of 1991 ......................................................4

Police Accountability Act of 1991 .......................................................4, 5

Public Law No. 103-322, Tile XXI
Subtitle D § 210401, 108 Stat. 1796 (1994)......................................4

# TABLE OF AUTHORITIES
## (continued)

**Page**

Violent Crime Control and Law Enforcement Act of 1994 ......................................4

**CALIFORNIA STATUTES AND BILLS**

California Penal Code
  § 16885 ...............................................................................................8
  § 27531-27534.2......................................................................................7
  § 27595 .........................................................................................8, 10, 12
  § 31900 ...............................................................................................6
  § 31905 ...............................................................................................6
  § 31910 ............................................................................................6, 7
  § 32000 ...............................................................................................6
  § 32010 ...............................................................................................7

California Assembly Bill No. 1127 ......................................................*passim*

California Senate Bill No. 452 ....................................................................7

**CONSTITUTIONAL PROVISIONS**

United States Constitution
  Second Amendment ...............................................................................*passim*
  Fourteenth Amendment Section 5 ......................................................2, 15, 19

**COURT RULES**

Federal Rule of Civil Procedure
  §12(b)(6).............................................................................................11
  § 15(a)...............................................................................................19

**LEGISLATIVE HISTORY**

House Reports
  H.R. Rep. No. 102-1085 (1992) .......................................................3, 4
  H.R. Rep. No. 102-242, pt. I (1991)..........................................3, 4, 15, 16

Cal. Legis. Counsel's Dig., Assem. Bill No. 1127 .......................................8

Cal. Assembly Floor Analysis, AB 1127 (as amended Sept. 9, 2025)......................9

**TABLE OF AUTHORITIES**
(continued)

**Page**

OTHER AUTHORITIES

ATF, *National Firearms Commerce and Trafficking Assessment: NFCTA Updates, New Analysis, and Policy Recommendations* ..........................9

Cal. Att'y Gen., Handguns Certified for Sale.........................................................6, 8

Merriam-Webster's Collegiate Dictionary (10th ed. 1994)....................................13

U.S. Dep't of Justice, Civil Rights Div., *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present* (Jan. 2017).................................................................................................................5, 16, 17

U.S. Dep't of Justice, Taking Stock: Report from the 2010 Roundtable on the State and Local Law Enforcement Police Pattern or Practice Program *(42 USC § 14141)* (Sept. 2011) .......................................................5, 17

## INTRODUCTION

The United States's Complaint asserts that two California firearm safety statutes are facially invalid because they violate the Second Amendment of the U.S. Constitution. That claim is meritless, and California is prepared to defend the constitutionality of those commonsense firearm safety regulations if this case proceeds. But the United States's suit falters at an earlier, threshold step: the United States lacks a cause of action to bring its facial challenge.

As the United States implicitly recognizes, the federal Executive Branch does not have a freestanding right to bring a suit in equity against a state to enforce private citizens' constitutional rights. For that reason, the United States asserts the power to sue based on a novel and far-reaching interpretation of 34 U.S.C. § 12601, a federal statute that authorizes the U.S. Attorney General to sue to eliminate a "pattern or practice of conduct by law enforcement officers" that deprives individuals of federal rights. That statute was enacted in response to the 1991 beating of Rodney King by Los Angeles Police Department officers, in order to afford the U.S. Attorney General, the power to combat systemic police misconduct. Now, for the first time more than thirty years after Section 12601's enactment, this Administration claims that the statute grants it the remarkable power to bring facial challenges to virtually any state law, on the theory that officers enforcing allegedly unconstitutional laws are engaged in a "pattern or practice" of rights deprivation. *See* Compl. ¶¶ 58–59, ECF No. 1. In effect, the United States claims that Congress enacted an oddly phrased version of 42 U.S.C. § 1983 for the U.S. Attorney General that has been hiding in plain sight for over three decades.

That capacious interpretation of Section 12601 is divorced from the statute's text, its history, the U.S. Department of Justice (DOJ)'s past enforcement practice, and federalism. Section 12601 permits the United States to target a "pattern or practice of conduct by law enforcement officers"—that is, the particular manner in

1

which officers carry out their duties. It does not authorize the United States to target a state statute enacted by the state legislature. The history of Section 12601 confirms that plain reading of the text. Congress enacted the statute to solve a particular problem exposed by the Rodney King beating: the inability of either the U.S. Attorney General or private parties to sue to enjoin systemic police misconduct and abuse. It is implausible that Congress granted the U.S. Attorney General the sweeping authority to facially challenge any state law in addressing that particularized problem. Perhaps that is why no one—including U.S. DOJ in its history of enforcing Section 12601—has previously suggested that Congress did so.

Indeed, this Court has already recognized that the United States's theory is, "at the very least, a novel approach that deviates from the way [Section 12601] has historically been enforced." Order Denying TRO Application (Order) at 5, ECF No. 26. Had Congress intended to alter the federal-state balance in such an historic manner, it would have used much clearer language—like simply amending Section 1983 to allow for enforcement by the Attorney General.

The United States's novel theory of Section 12601 reflects a brazen power grab that threatens to grant the U.S. Attorney General unprecedented authority to seek injunctions against a broad spectrum of state laws. The Court should reject that baseless theory and dismiss the Complaint without leave to amend.

**BACKGROUND**

**I.     RELEVANT CONSTITUTIONAL PRINCIPLES**

Under our constitutional scheme, "the United States may not sue to enjoin violations of individuals' [F]ourteenth [A]mendment rights without specific statutory authority." *United States v. City of Philadelphia*, 644 F.2d 187, 201 (3d Cir. 1980). That is because "Section 5 of the [F]ourteenth [A]mendment confers on Congress, not on the Executive or the Judiciary, the 'power to enforce, by appropriate legislation, the provisions of this article.'" *Id.* at 200. Consistent with Section 5, Congress enacted 42 U.S.C. § 1983, which provides a cause of action for

2

*private parties* to sue to enjoin state officers from enforcing unconstitutional state laws. And Congress, on occasion, has authorized the U.S. Attorney General to sue to enjoin *particular* civil rights violations by states under *specified* circumstances. *See, e.g.*, 42 U.S.C § 2000a-5 (authorizing U.S. Attorney General to sue state entities for discriminating in providing access to public facilities, subject to several preconditions on suit). But Congress has never enacted a general cause of action akin to Section 1983 for the Executive Branch to sue states or state officers to enforce individuals' constitutional or other federal rights. *See United States v. Mattson*, 600 F.2d 1295, 1299–1300 (9th Cir. 1979) (noting "the overall congressional policy denying the federal government broad authority to initiate an action whenever a civil rights violation is alleged"). Various proposals to extend this authority have been rejected by Congress on the ground that they would grant a "truly shocking" and "vast, far-reaching power" to the U.S. Attorney General that could not "be reconciled with a due regard for sound Federal-State relations." *City of Philadelphia*, 644 F.2d at 195–97; *accord Mattson*, 600 F.2d at 1300 (noting that proposed amendment failed because "the proposal injects Federal executive authority into some areas which are not its legitimate concern and vests the Attorney General with broad discretion in matters of great political and social concern").

## II.    34 U.S.C. SECTION 12601

Congress enacted Section 12601 to give the federal government a tool to address systemic patterns or practices of police misconduct. In the wake of the 1991 beating of Rodney King by officers of the Los Angeles Police Department (LAPD), the U.S. House Subcommittee on Civil and Constitutional Rights held hearings on police use of excessive force. H.R. Rep. No. 102-242, pt. I, at 135 (1991), attached as Ex. A to Req. Judicial Notice; H.R. Rep. No. 102-1085, at 63 (1992), attached as

///

///

3

Ex. B to Req. Judicial Notice.[1] The Subcommittee then drafted the Police Accountability Act of 1991 to "strengthen[] the Federal response to police misconduct." H.R. Rep. No. 102-1085, at 63. The Police Accountability Act was advanced to the House Judiciary Committee and incorporated into the Omnibus Crime Control Act of 1991. *Id.*

The Judiciary Committee prepared a report recommending passage of the Omnibus Crime Control Act of 1991. H.R. Rep. No. 102-242, pt. I, at 1. The committee found that "[p]olice excessive force is a significant problem in this country," but that the federal government "lack[ed] the authority to address systemic patterns or practices of police misconduct." *Id.* at 137. The Police Accountability Act would have authorized both the U.S. Attorney General and private parties injured by police misconduct "to sue for injunctive relief against abusive police practices."[2] *Id.* at 138. The Committee characterized the Act as "creat[ing] an enforceable right to be free of patterns of police brutality." *Id.*

The Police Accountability Act of 1991 never became law. H.R. Rep. No. 102-1085, at 63, 65. However, Congress incorporated its language into the Violent Crime Control and Law Enforcement Act of 1994, which contained the pattern or practice provision first codified as 42 U.S.C. § 14141 and later recodified as Section 12601. Pub. L. No. 103-322, Tile XXI, Subtitle D, § 210401, 108 Stat. 1796 (1994). The only difference between the pattern or practice cause of action in the Police Accountability Act of 1991 and Section 12601 is that the former included a private right of action, whereas the latter provides a right of action only

_____

[1] Legislative history is judicially noticeable, and the Court may consider it for a motion to dismiss. *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1120 n.8 (9th Cir. 2013).

[2] The Police Accountability Act of 1991 provided in part:

(1) UNLAWFUL CONDUCT - It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers that deprives persons of rights, privileges, or immunities, secured or protected by the Constitution or laws of the United States

H.R. Rep. 102-242, pt. I, at 24.

4

to the Attorney General and expands its scope to include conduct by certain government employees involved in the juvenile justice system. *Compare* 34 U.S.C. § 12601 *with* H.R. Rep. No. 102-242, pt. I, at 24. Section 12601 has no legislative history of its own, so courts and U.S. DOJ itself have relied on the legislative history of the Police Accountability Act of 1991 to inform their interpretation of Section 12601. *See, e.g., United States v. City of Columbus*, No. 99-cv-1097, 2000 WL 1133166, at *3 (S.D. Ohio Aug. 3, 2000).

The U.S. DOJ has published two reports that explore its history and practices in employing Section 12601. *See* U.S. Dep't of Justice, *Taking Stock: Report from the 2010 Roundtable on the State and Local Law Enforcement Police Pattern or Practice Program (42 USC § 14141)* (Sept. 2011), attached as Ex. C to Req. Judicial Notice (*Roundtable Rep.*); U.S. Dep't of Justice, Civil Rights Div., *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present* (Jan. 2017), attached as Ex. D to Req. Judicial Notice (*CRD Rep.*).[3] These reports list U.S. DOJ's prior Section 12601 settlements, investigations, and reform agreements—all of which involved police or prosecutorial misconduct. *See CRD Rep.* at 1–2, 10; *Roundtable Rep.* at 19–20.

In the 2017 Report, U.S. DOJ also described its process for conducting Section 12601 cases as a "police reform strategy." *Id.* at 6. U.S. DOJ historically began its Section 12601 cases with an investigation to determine not only if there is a "pattern or practice of police misconduct," but "*why* such a pattern or practice exists." *Id.* at 9. In doing so, it would "comprehensively evaluate[] the law enforcement agency's relevant written policies and actual practices," including its "systems for holding officers accountable for misconduct" and "the degree of accountability to community voices and democratic government." *Id.* If, after this investigation, U.S. DOJ determined that the law enforcement agency was in

_____

[3] The Court may take judicial notice of government publications. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

5

violation of Section 12601, it would notify the agency and shift its focus to finding solutions. *Id.* at 17. "The Division's goal in every case is to avoid contentious litigation and begin the process of reform as quickly as possible." *Id.* at 18. The Division would bring a lawsuit only if efforts at reform failed. *Id.* As of 2017, only in six cases had the Division been unable to resolve the violation without litigation. *Id.*

## III.   THE UNSAFE HANDGUN ACT

The UHA imposes public safety and quality assurance requirements that pistols and revolvers must meet before they can be commercially sold or manufactured in California. The law was first enacted in 1999, "in response to the proliferation of local ordinances banning low cost, cheaply made handguns known as 'Saturday Night Specials.'" *See Fiscal v. City & County of San Francisco*, 158 Cal. App. 4th 895, 912 (Cal. Ct. App. 2008). The UHA generally prohibits the manufacture or retail sale of any "unsafe handgun" in California. Cal. Penal Code § 32000(a). The UHA does not prohibit the possession of any handgun or other firearm, nor does it prohibit the acquisition of any handgun through private party transfers. *See id.* §§ 31900, *et seq*.

The UHA identifies approved handguns for retail sale through a Roster of Certified Handguns (the "Handgun Roster"), which the California DOJ maintains. *Id.* § 32015(a). As of the date of this filing, there are 961 handgun models listed on the Handgun Roster. Cal. Att'y Gen., Handguns Certified for Sale, https://oag.ca.gov/firearms/certified-handguns/search (last visited July 28, 2026).

To qualify for addition to the Handgun Roster, a handgun—whether a revolver or pistol—must have a "safety device" and pass a firing test (which assesses whether the handgun malfunctions or cracks while firing 600 rounds of ammunition), and a drop-safety test (which evaluates whether the handgun fires when dropped in six different ways) in an independent laboratory. *See* Cal. Penal Code §§ 31900, 31905, 31910. Since 2007, new models of semiautomatic pistols, a

6

subset of handguns, generally cannot be added to the Handgun Roster unless they have two "safety features designed to limit accidental discharges that occur when someone mistakenly believes no round is in the chamber." *Pena v. Lindley*, 898 F.3d 969, 974 (9th Cir. 2018); Cal. Penal Code § 32010. These two safety features are: (1) a chamber load indicator, which is "a device that plainly indicates that a cartridge is in the firing chamber" using readily visible text or graphics," Cal. Penal Code § 16380; and (2) a magazine disconnect mechanism, which "prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol," *id.* § 16900.[4] Under the UHA, semiautomatic pistol models that were already on the Handgun Roster when these requirements took effect could generally remain on the Handgun Roster. Cal. Penal Code § 31910(a)(2)(D), (E); *Pena*, 898 F.3d at 983.

The UHA has already been the subject of litigation. Two groups of plaintiffs separately obtained preliminary injunctions of the UHA's requirements that new semiautomatic pistol models must have a chamber load indicator and magazine disconnect mechanism to be eligible for addition to the Handgun Roster. *See Boland v. Bonta*, 662 F. Supp. 3d 1077, 1081 (C.D. Cal. 2023); *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1058, 1072 (S.D. Cal. 2023).[5] However, the injunction of these two requirements never took effect because the Ninth Circuit stayed the injunction of these two requirements pending appeal, citing *Nken v. Holder*, 556

///

---

[4] Unlike the magazine disconnect mechanism requirement, the chamber load indicator requirement applies only to centerfire, but not rimfire, semiautomatic pistol models. Cal. Penal Code § 31910(a)(2)(D), (E).

[5] These preliminary injunctions also enjoined a requirement that new semiautomatic pistol models have microstamping capability, formerly at Penal Code section 31910, subdivision (b)(6). Effective January 1, 2024, Senate Bill 452 removed the requirement from the UHA and imposed a substantially different—and delayed—microstamping requirement, codified in California Penal Code sections 27531 through 27534.2. The Complaint acknowledges as much. Compl. ¶ 6.

U.S. 418, 434 (2009).[6] *See Boland*, No. 23-55276, Dkt. No. 7 (9th Cir. Mar. 31, 2023). The district court in *Renna* also stayed its injunction pending appeal. *See Renna*, 667 F. Supp. 3d at 1072. *Boland* and *Renna* have been fully briefed and argued before the Ninth Circuit, and decisions in each case remain pending.

While these appeals have been pending, over 100 models of semiautomatic pistols with a chamber load indicator and/or a magazine disconnect mechanism have become, and remain, available for retail sale in California. *Handguns Certified for Sale*, https://oag.ca.gov/firearms/certified-handguns/search.[7]

## IV.  ASSEMBLY BILL 1127

The California Legislature enacted AB 1127 on October 10, 2025. Legis. Counsel's Dig., Assem. Bill No. 1127 at 91, attached as Ex. E to Req. Judicial Notice.[8] That bill added Section 27595 to the California Penal Code, providing that, beginning on July 1, 2026, licensed firearms dealers "shall not sell, offer for sale, exchange, give, transfer, or deliver any semiautomatic machinegun-convertible pistol." *Id.* § 5, 27595(a). AB 1127 also amended or added other California statutes to implement and define the terms in Section 27595. *Id.* §§ 2–4, 6–7. Under the new Penal Code Section 16885(a), a "machinegun-convertible pistol" is defined as "any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with common household tools … into a machinegun by the installation or attachment of a pistol converter as a replacement for the slide's backplate without any additional engineering, machining, or modification of the pistol's trigger mechanism." *Id.*

///

[6] The preliminary injunction of the former UHA microstamping requirement remained in place.

[7] By typing an asterisk ("*") in the search bar at this webpage, one can see the models with one or both features that have become available for retail sale.

[8] The United States calls Section 27595/AB 1127 a "Glock Ban." Compl. ¶ 20. However, the restriction pertains to a design feature, not to a particular manufacturer. It would not restrict Glock handguns without that feature, and it applies to handguns with that feature produced by other manufacturers.

8

AB 1127 does not prohibit the possession of semiautomatic machinegun-convertible pistols, and includes exemptions to the general retail sales restriction, including permitting firearms dealers to sell out any remaining inventory of machinegun-convertible pistols delivered to the dealer before January 1, 2026, and permits private individuals to transfer and acquire such pistols through private-party transactions so long as the transaction is conducted through a licensed firearms dealer. *Id.* § 27595(a), (c)(1), (3).

AB 1127 was enacted in response to deadly mass shootings committed with firearms that had been converted from their original semiautomatic design into fully automatic machineguns using "small, concealed devices that transform a semi-automatic firearm into an illegal machinegun in seconds." *See* ATF, *National Firearms Commerce and Trafficking Assessment: NFCTA Updates, New Analysis, and Policy Recommendations*, Vol. IV, Director's Foreword at 1, attached as Exhibit F to Req. Judicial Notice; Assembly Floor Analysis, AB 1127, (as amended Sept. 9, 2025) ("Assembly Floor Analysis") at 3, attached as Ex. G to Req. Judicial Notice. Due to a "design flaw" in certain pistol models with unique design features, such conversion could be accomplished "at home" simply by "attaching a tiny piece of plastic" to the rear of the pistol's slide. Assembly Floor Analysis at 3. The number of these machine gun conversion devices recovered in crimes skyrocketed 784% between 2019 (658) and 2023 (5,816), and California was in the top ten states where these devices were recovered. *See* ATF, *National Firearms Commerce and Trafficking Assessment: NFCTA Updates, New Analysis, and Policy Recommendations*, Vol. IV, Part V at 7–8, attached as Ex. H to Req. Judicial Notice. The California Legislature passed AB 1127 to address this "growing threat to public safety" and encouraged manufacturers to remedy this dangerous design defect to prevent affected pistol models from being readily converted into machine guns by hand or with common household tools. Assembly Floor Analysis at 3.

///

In October 2025, three days after AB 1127 was signed into law, a group of plaintiffs sued to enjoin enforcement of AB 1127 via 42 U.S.C. § 1983, claiming such enforcement would violate the Second Amendment. *See Jaymes v. Bonta*, No. 3:25-cv-02711, Compl., ECF No. 1 (S.D. Cal.). Six months later, the case was voluntarily dismissed. *Jaymes*, No. 3:25-cv-02711, Order Granting Joint Mot. to Dismiss, ECF No. 31 (S.D. Cal. Apr. 13, 2026).

## V.    THIS LAWSUIT

On the day Section 27595 took effect, the United States sued the State of California and California Attorney General Rob Bonta (together, "the State" or "California"). *See* Compl. (ECF No. 1). The United States seeks to enjoin California from enforcing Section 27595 and the UHA's chamber load indicator and magazine disconnect mechanism provisions and requests a declaration that such enforcement would constitute a pattern or practice of conduct by law enforcement officers that violates Second Amendment rights. *Id.* Prayer for Relief. The United States brings a single claim, under Section 12601. *Id.* ¶¶ 62–64. Although the United States filed its Complaint on the first day that Section 27595 took effect, it alleges that Section 27595 and the challenged UHA requirements "have been enforced in a manner that violates the Second Amendment," and that this enforcement constitutes "a pattern or practice of conduct by [law enforcement officers]" that deprives Californians of their constitutional rights. *Id.* ¶¶ 58–59.[9]

Simultaneously with the filing of its Complaint, the United States applied *ex parte* for a Temporary Restraining Order (TRO) to enjoin enforcement of Section 27595. *See* ECF No. 3. This Court denied that request "given the uncertain viability of the United States' claim pursuant to Section 12601." ECF No. 26 at 6. The Court explained that Section 12601 "has historically been used to" combat excessive force and discriminatory policing by law enforcement officers. *Id.* The Court noted there

_____
[9] As noted previously by Defendants, this is one of at least seven similar lawsuits where the United States is attempting to use Section 12601 in this novel manner. ECF No. 19 at 14–15, n.2 (collecting cases).

was no "previous instance" nor "historical precedent" for "utilizing Section 12601 to argue that law enforcement officers engaged in a pattern or practice of unlawful conduct by enforcing a state firearms law." *Id.* And, the Court questioned whether "Section 12601 grants the United States the authority to challenge AB 1127 because AB 1127 is not a law enforcement policy but rather a [California] law." *Id.* at 6. The Court concluded that the United States had not established a likelihood of success with this novel use of Section 12601. *Id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes a motion to dismiss for "failure to state a claim upon which relief can be granted." A complaint may be dismissed under Rule 12(b)(6) for either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Godecke ex rel. United States v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (internal quote omitted). Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "[c]onclusory statements, unreasonable inferences, and legal conclusions couched as factual allegations" will "not be credited." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1081 (9th Cir. 2024) (cleaned up).

///

///

///

///

11

## ARGUMENT

**I.     SECTION 12601 DOES NOT AUTHORIZE FACIAL CHALLENGES TO STATE LAWS**

Lacking an equitable cause of action to sue to enjoin state laws that allegedly violate individuals' constitutional rights, the United States attempts to contort 34 U.S.C. § 12601 to provide statutory authorization for this suit. But the statute's text, history, U.S. DOJ's past enforcement practices, and basic federalism principles all confirm the provision provides a limited cause of action to redress systemic law enforcement misconduct—not a roving authority to facially challenge any state or local law that the U.S. Attorney General believes violates individuals' rights under federal law.

**A.     The Text of Section 12601 Does Not Authorize the United States's Facial Challenge to California Laws**

Statutory interpretation starts with the plain text. *Salisbury v. City of Monica*, 998 F.3d 852, 858 (9th Cir. 2021). "Unless defined in the statute, a statutory term receives its 'ordinary, contemporary, common meaning.'" *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953 (9th Cir. 2009) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Courts often look at dictionary definitions to assess that common meaning. *E.g.*, *Salisbury*, 998 F.3d at 858. Additionally, courts "giv[e] effect to each word," avoiding interpretations that "make other provisions meaningless or superfluous." *United States v. 144,774 pounds of Blue King Crab*, 410 F.3d 1131, 1134–35 (9th Cir. 2005).

The plain text of Section 12601 authorizes only challenges to "a pattern or practice of conduct by law enforcement officers," not facial challenges to state statutes enacted by a state legislature. As relevant here, the provision makes it "unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers … that deprives persons of rights, privileges,

12

or immunities secured or protected by the Constitution or laws of the United States." 34 U.S.C. § 12601(a). The provision authorizes the United States to bring a civil action for "equitable and declaratory relief to eliminate the pattern or practice." *Id.* § 12601(b). In other words, the United States may sue to eliminate "a pattern or practice of conduct by law enforcement officers" that violates individuals' rights.

But the United States's Complaint here is that Section 27595 and the challenged provisions of the UHA *on their face* violate individuals' Second Amendment rights. *See* Compl. ¶¶ 24, 50 (describing the laws as "presumptively unconstitutional"; *id.* Prayer for Relief (seeking to enjoin the challenged laws entirely). Even if that were true (it is not), the violations would arise from the laws enacted by the State Legislature, not from any particular "pattern or practice of conduct" by police officers. *See City of Rialto v. W. Coast Loading Corp.,* 581 F.3d 865, 879 (9th Cir. 2009) ("a challenge to statutory requirements is a facial challenge to the statute itself, not a 'pattern and practice' claim.").

Contemporary dictionary definitions of the terms Congress used confirms this common sense understanding of the statute. A "pattern" is "a reliable sample of traits, acts, tendencies, or other observable characteristics of a person, group, or institution," and a "practice" is "a repeated or customary action" or "the usual way of doing something." *Pattern*, Merriam-Webster's Collegiate Dictionary (10th ed. 1994) ("Merriam-Webster's") at 853; *Practice*, Merriam-Webster's at 914. Conduct is "act, manner, or process of carrying on." *Conduct*, , Merriam-Webster's at 240; *see also Conduct*, Black's Law Dictionary (6th ed. 1990) ("[p]ersonal behavior; deportment; mode of action"). And "by" means "through the agency … or instrumentality of." *By*, Merriam-Webster's at 157. Taken together, these terms require a Section 12601 challenge to be addressed to a police officer's *own* tendencies, actions, agency, and behavior—*i.e.*, the manner in which the officer performs her enforcement duties—not the facial validity of the statutes she is

13

enforcing.

Moreover, the statute requires the officer's conduct itself to be the thing that allegedly deprives persons of federal rights. Section 12601 concerns a "pattern or practice of conduct by law enforcement officers … *that* deprives persons" of constitutional or other federal rights (emphasis added). "That" is used here as a relative pronoun; it is "used as a function word to introduce a restrictive relative clause." *That*, Merriam-Webster's at 1221. *United States v. Nishiie*, 996 F.3d 1013, 1021–22 (9th Cir. 2021) (explaining that restrictive relative clauses "provide[ ] information that is essential to understanding the intended meaning of the rest of the sentence" (citation omitted)). Therefore, the alleged deprivation of rights must arise from the police officer's own pattern or practice of conduct, not from the text of an underlying statute. And where the allegation is that law enforcement officers are enforcing the letter of the law and there are no allegations that there is something unlawful about *how* the officers are conducting that enforcement, then the Complaint is directed to the statute itself and not to any pattern, practice, or conduct by particular law enforcement officers. *Cf.* Compl. ¶ 58 (alleging only that "California Law Enforcement Officers … "are fulfilling (and will continue to fulfill unless enjoined) their statutory duty to enforce the State's laws").

Section 12601's location within the U.S. Code confirms that it does not authorize facial challenges to state laws. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (looking to "the title of a statute and the heading of a section" as interpretive aids (internal quotation marks omitted)). Section 12601 appears in Title 34 "Crime Control and Law Enforcement," Chapter 121 "Violent Crime Control and Law Enforcement," Subchapter VIII "State and Local Law Enforcement," Part B "Police Pattern or Practice." Those headings indicate that the focus is on law enforcement conduct, not state laws. The only other section in Part B directs the Attorney General to "acquire data about the use of excessive force by law enforcement officers," an activity conducive to monitoring police misconduct

14

but irrelevant to challenging legislative enactments. 34 U.S.C. § 12602; *see Adoptive Couple v. Baby Girl*, 570 U.S. 637, 652 (2013) ("[P]rovisions [that] appear adjacent to each other … should be read in harmony"). Section 12602 requires the U.S. DOJ to monitor police excessive force; Section 12601 should be read as directed toward the same goal of combating systemic law enforcement misconduct.

At bottom, "[i]f Congress had intended" to authorize the U.S. Attorney General to facially challenge state laws that violate constitutional or other federal rights, "it easily could have drafted language to that effect." *Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 429 (2022). Indeed, Congress plainly knows how to draft such language, as 42 U.S.C. § 1983 provides that authority to private individuals—but notably not to the Attorney General. Instead, Congress drafted a distinct and narrower statute authorizing challenges to patterns or practices of conduct by law enforcement officers.

**B.     The History of Section 12601 Refutes the United States's Broad Interpretation**

The history of Section 12601 supports this more modest interpretation of the cause of action created by Congress. In interpreting statutory text, it is appropriate to consult "the history of the provision." *Fischer v. United States*, 603 U.S. 480, 491 (2024) (interpreting statutory provision narrowly in light of a "loophole" revealed by the "Enron accounting scandal" that the statute was enacted to "plug"); *see also Bond v. United States*, 572 U.S. 844, 860 (2014) (interpreting statute narrowly "in light of the context from which the statute arose").

///

///

///

///

15

Congress created Section 12601 in response to the 1991 beating of Rodney King by Los Angeles Police Department officers and the broader "problem of excessive force in American policing." H.R. Rep. 102-242, pt. I, at 135-136; *see also, e.g.*, *Roundtable Rep*, *supra*, at 1–2. Despite this widespread problem, the key committee report discussing the pattern-or-practice cause of action noted that "[t]he Justice Department currently lacks the authority to address systemic patterns or practices of police misconduct," pointing to the Third Circuit's decision in *United States v. City of Philadelphia*. H.R. Rep. 102-242, at 137. That case had held that the United States did not have implied statutory or constitutional authority to challenge a "pattern or practice" by the City of Philadelphia and its Police Department "of depriving persons of rights protected by the due process clause of the fourteenth amendment," including performing stops, searches, and arrests without probable cause and using excessive force. *City of Philadelphia*, 644 F.2d at 190. The committee considered this lack of pattern-or-practice authority to be "a serious and outdated gap in the federal scheme for protecting constitutional rights." H.R. Rep. 102-242, pt. I, at 137. Moreover, the committee noted that private citizens could not fill this gap because, under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), individuals cannot sue for injunctive relief against officer misconduct unless they can meet a high bar of showing that they are likely to be subject to such misconduct again. H.R. Rep. 102-242, pt. I, at 138. The committee explained that the proposed provision "would close this gap in the law, authorizing the Attorney General … to sue for injunctive relief against abusive police practices." *Id.* at 138.

This history demonstrates that Section 12601 was enacted to "close" a specific "gap" exposed by the Rodney King beating, *Fischer*, 603 U.S. at 492: the inability of either the federal government or private parties to seek injunctive relief against patterns or practices of police "misconduct," "brutality," "excessive force," and other "abusive" practices. H.R. Rep. 102-242, pt. I, at 135-138. The United States

16

would have the Court believe that, to address this particularized problem, Congress granted the Attorney General an expansive power to challenge the facial validity of state and local laws that violate any federal right—that Congress, in other words, granted the Attorney General his own version of Section 1983. But it would be "peculiar" to conclude that Congress authorized such a sweeping cause of action that "reaches far beyond the … scenarios that prompted the legislation in the first place." *Fischer*, 603 U.S. at 492.

## C.     The United States' Newly-Minted Interpretation of Section 12601 Is Out of Step with Its Past Enforcement Practice

Consistent with the statute's text and historical context, the United States has interpreted Section 12601 for decades as authorizing it to "obtain a court order requiring state or local law enforcement agencies to address institutional failures that cause *systemic police misconduct*." *CRD Rep.*, *supra*, at 3 (emphasis added). In line with that interpretation, U.S. DOJ's pattern-or-practice suits have "focus[ed] on core issues in police reform . . . such as patterns of unlawful use of force; unlawful stops, searches and arrests; and racial discrimination." *Id.* at 6.

For example, in the 2010 *Roundtable Report*, U.S. DOJ listed all 19 settlements and all 32 investigations under Section 12601 in the statute's first 15 years. *Roundtable Rep.* at 19–20. All those settlements and investigations involved either police or sheriff's departments. *Id.* And all involved allegations of police misconduct: detention, discriminatory policing, false arrest, holding cells, search and seizure, and/or use of force. *Id.* Seven years later, in its 2017 Report, U.S. DOJ provided summaries of all 40 reform agreements under Section 12601. *CRD Rep.* at 41–48. All the reform agreements involved police or prosecutorial misconduct. *Id.* Although U.S. DOJ utilized Section 12601 to address a range of misconduct, the cases were all focused on conduct by police or prosecutors. *See id.* at 7 ("Although many people may be familiar with the [Civil Rights] Division's police reform agreements addressing use of force or discriminatory policing on the basis of race

17

or national origin, the Division's agreements have addressed a wide range of issues *in policing*" (emphasis added)).

This "longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). Here, it confirms what the text indicates: that Section 12601 provides a limited authorization for the U.S. Attorney General to sue to address patterns and practices of law enforcement misconduct. Not until this Administration did the United States claim that Section 12601 grants it the remarkable authority to bring facial challenges to state laws. "[T]he fact that no President has ever found such power" in Section 12601 in the three decades since it was enacted "is strong evidence that it does not exist." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 250 (2026); *see also Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power … we typically greet its announcement with a measure of skepticism.").

Consistent with the historical use of Section 12601, both Ninth Circuit cases analyzing its scope arose from heartland applications of the statute. In *United States v. County of Maricopa*, the Ninth Circuit held that a county could be held liable under Section 12601 for racially discriminatory traffic stops conducted by local law enforcement officers. 889 F.3d 648, 649, 651–53 (9th Cir. 2018). And in *United States v. Town of Colorado City*, the court held that a pair of towns could be held liable under Section 12601, pursuant to *respondeat superior*, for the discriminatory use of police department resources by local law enforcement to advance the interests of the religious majority. 935 F.3d 804, 806–11 (9th Cir. 2019). In reaching the latter holding, the Ninth Circuit acknowledged that Section 1983 does not support *respondeat superior* liability. *Id.* at 808. But, observing that the language of Section 1983 that supports this limitation is absent in Section 12601, it concluded that Section 12601 extends "further than § 1983" with respect to the

18

degree to which it imposes liability on "local governments … when their agents engage in a pattern or practice of conduct that deprives persons of their constitutional rights." *Id.* at 810–11 (quoting *Cnty. of Maricopa*, 889 F.3d at 653). Together, *Colorado City* and *County of Maricopa* illustrate conventional fact-patterns in which Section 12601 suits arise. Although the United States has suggested these cases support its novel invocation of Section 12601 here, *see* ECF No. 20 (TRO Reply Br.) at 7, 14, neither involved the attempted use of Section 12601 to attack the facial validity of a state law—or the weighty federalism implications of this attempt.

### D. Principles of Federalism Counsel Against the United States' Sweeping Interpretation of Section 12601

Principles of federalism also counsel against reading Section 12601 to convey the broad power asserted by the United States. "[I]f Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the statute's language." *Vt. Agency of Nat. Res. v. United States*, 529 U.S. 765, 787 (2000); *see also Bond v. United States*, 572 U.S. 844, 857 (2014) (rejecting interpretation that would "dramatically intrude[ ] upon traditional state criminal jurisdiction" because courts must "avoid reading statutes to have such reach in the absence of a clear indication that they do").

Here, if Congress had enacted a statute that granted the Attorney General freewheeling authority to challenge state and local laws as facially violative of individual citizens' federal rights, that would undoubtedly alter the usual constitutional balance. As discussed, *supra* pp. 2–3, Congress—not the Executive Branch—is entitled to enforce the rights incorporated against the States by the Fourteenth Amendment, via appropriate legislation. *City of Philadelphia*, 644 F.2d at 200–01. While Congress in turn has authorized suits by private individuals to protect their civil rights under Section 1983, it has never provided comparable

19

general authorization to the federal government. Indeed, prior congressional attempts in the 1950s and 1960s "to give the Attorney General broad power to seek injunctions against violations of citizens' constitutional rights" each failed in the face of criticism that they would grant a "truly shocking" and "vast, far-reaching power" to the Attorney General that could not "be reconciled with a due regard for sound Federal-State relations." *Id.*, 644 F.2d at 195–97. The text of Section 12601—focused on patterns and practices of conduct by law enforcement officers—is a far cry from a "clear" statement that Congress intended to confer such power.

## II. THE UNITED STATES CANNOT CURE THE DEFECTS WITH ITS COMPLAINT, AND THE COURT SHOULD NOT GRANT LEAVE TO AMEND

A court may dismiss a complaint without leave to amend when it appears with certainty that the plaintiff cannot state a claim and amendment would be futile. Fed. R. Civ. P. 15(a); *DeSoto v. Yellow Freight Systems, Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). The United States's only claim is under a section that does not authorize the United States to do what it wants: to facially challenge a state law. The Complaint is defective because the United States simply lacks statutory authority to bring this lawsuit. Section 12601 is not a viable vehicle for the United States to mount a facial Second Amendment challenge to state firearms laws. *Cf. McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (noting that even with the Second Amendment being fully binding on States, "state and local experimentation with reasonable firearms regulations will continue under the Second Amendment" (internal quotation marks omitted)). Any amendment would therefore be futile, and this Court should dismiss without leave to amend.

///

///

///

///

20

**CONCLUSION**

Section 12601 does not authorize the United States to mount a facial challenge to California firearm safety laws. This Court should dismiss the Complaint without leave to amend.

Dated: July 28, 2026                              Respectfully submitted,

                                                  ROB BONTA
                                                  Attorney General of California
                                                  CHARLES J. SAROSY
                                                  Supervising Deputy Attorney General

                                                  */s/ Edward P. Wolfe*

                                                  VIVIANA M. HANLEY
                                                  CHRISTINA MCCALL
                                                  SABRINA T. MCGRAW
                                                  EDWARD P. WOLFE
                                                  Deputy Attorneys General
                                                  *Attorneys for Defendants*

21

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants State of California and Robert Bonta in his official capacity as head of the California Department of Justice, certifies that this brief contains 6,572 words, which:

_X_ complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated [date].


Dated: July 28, 2026                          Respectfully submitted,

                                              ROB BONTA
                                              Attorney General of California
                                              CHARLES J. SAROSY
                                              Supervising Deputy Attorney General

                                              */s/ Edward P. Wolfe*

                                              VIVIANA M. HANLEY
                                              CHRISTINA MCCALL
                                              SABRINA T. MCGRAW
                                              EDWARD P. WOLFE
                                              Deputy Attorneys General
                                              *Attorneys for Defendants*

22