# EXHIBIT "A"

H.R. REP. 102-242(I), H.R. REP. 102-242, H.R. Rep. No. 242(I),
102ND Cong., 1ST Sess. 1991, 1991 WL 206794 (Leg.Hist.)
**\*1** OMNIBUS CRIME CONTROL ACT OF 1991

HOUSE REPORT NO. 102–242(I)

October 7, 1991
[To accompany H.R. 3371]

The Committee on the Judiciary, to whom was referred the bill (H .R. 3371) to control and prevent crime, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE AND TABLE OF CONTENTS.

(a) Short Title.–This Act may be cited as the "Omnibus Crime Control Act of 1991".

(b) Table of Contents.–The following is the table of contents for this Act:

TITLE I–COMMUNITY POLICING; COP ON THE BEAT

TITLE II–DRUG TREATMENT IN FEDERAL PRISONS

TITLE III–SUBSTANCE ABUSE TREATMENT IN STATE PRISONS

TITLE IV–SAFE SCHOOLS

TITLE V–VICTIMS OF CRIME

Subtitle A–Crime Victims Fund

Subtitle B–Restitution

Subtitle C–HIV Testing

TITLE VI–CERTAINTY OF PUNISHMENT FOR YOUNG OFFENDERS

TITLE VII–DRUG TESTING OF ARRESTED INDIVIDUALS

TITLE VIII–DRUG EMERGENCY AREAS ACT OF 1991

TITLE IX–COERCED CONFESSIONS

TITLE X–DNA IDENTIFICATION

TITLE XI–HABEAS CORPUS

TITLE XII–PROVISIONS RELATING TO POLICE OFFICERS

Subtitle A–Police Accountability

Subtitle B–Retired Public Safety Officer Death Benefit

Subtitle C–Study on Poli ce Officers' Rights

Subtitle D–Law Enforcement Scholarships

Subtitle E–Law Enforcement Family Support

TITLE XIII–FRAUD

TITLE XIV–PROTECTION OF YOUTH

Subtitle A–Crimes Against Children

Subtitle B–Parental Kidnapping

Subtitle C–Sexual Abuse Amendments

Subtitle D–Reporting of Crimes Against Children

TITLE XV–MISCELLANEOUS DRUG CONTROL

TITLE XVI–FAIRNESS IN DEATH SENTENCING ACT OF 1991

TITLE XVII–MISCELLANEOUS CRIME CONTROL

Subtitle A–General

Subtitle B–Motor Vehicle Theft Prevention

Subtitle C–Terrorism: Civil Remedy

Subtitle D–Commission on Crime and Violence

TITLE XVIII–MISCELLANEOUS FUNDING PROVISIONS

Subtitle A–General

Subtitle B–Midnight Basketball

TITLE XIX–MISCELLANEOUS CRIMINAL PROCEDURE AND CORRECTIONS

Subtitle A–Revocation of Probation and Supervised Release

Subtitle B–List of Veniremen

Subtitle C–Immunity

Subtitle D–Clarification of 18 U.S.C. 5032's Requirement That Any Prior Record
of a Juvenile Be Produced Before the Commencement of Juvenile Proceedings

Subtitle E–Petty Offenses

Subtitle F–Optional Venue for Espionage and Related Offenses

Subtitle G–General

TITLE XX–FIREARMS AND RELATED AMENDMENTS

Subtitle A–Firearms and Related Amendments

Subtitle B–Assault Weapons

Subtitle C–Large Capacity Ammunition Feeding Devices

TITLE XXI–SPORTS GAMBLING

TITLE XXII–TECHNICAL CORRECTIONS

TITLE XXIII–DEATH PENALTY PROCEDURES

TITLE XXIV–DEATH PENALTY

**\*3**  TITLE I–COMMUNITY POLICING; COP ON THE BEAT

SEC. 101. SHORT TITLE.

This title may be cited as "The Community Policing; Cop on the Beat Act of 1991".

SEC. 102. COMMUNITY POLICING; COP ON THE BEAT.

(a) In General.–Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.) is amended–

(1) by redesignating part P as part Q;

(2) by redesignating section 1601 as section 1701; and

(3) by inserting after part O the following:

"PART P–COMMUNITY POLICING; COP ON THE BEAT GRANTS

"SEC. 1601. GRANT AUTHORIZATION.

"(a) Grant Projects.–The Director of the Bureau of Justice Assistance may make grants to units of general local government and to community groups to establish or expand cooperative efforts between police and a community for the purposes of increasing police presence in the community, including–

"(1) developing innovative neighborhood-oriented policing programs;

"(2) providing new technologies to reduce the amount of time officers spend processing cases instead of patrolling the community;

"An appeal may not be taken to the court of appeals from the final order in a habeas corpus proceeding where the detention complained of arises out of process issued by a State court, unless the justice or judge who rendered the order or a circuit justice or judge issues a certificate of probable cause. However, an applicant under sentence of death shall have a right of appeal without a certification of probable cause, except after denial of a second or successive application.".

## TITLE XII–PROVISIONS RELATING TO POLICE OFFICERS

### Subtitle A–Police Accountability

### SEC. 1201. SHORT TITLE.

This subtitle may be cited as the "Police Accountability Act of 1991".

### SEC. 1202. PATTERN OR PRACTICE CASES.

(a) Cause of Action.–

(1) Unlawful conduct.–It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers that deprives persons of rights, privileges, or immunities, secured or protected by the Constitution or laws of the United States.

(2) Civil action by attorney general.–Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1) has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

(3) Civil action by injured person.–Any person injured by a violation of paragraph (1) may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice. In any civil action under this paragraph, the court may allow the prevailing plaintiff reasonable attorneys' fees and other litigation fees and costs (including expert's fees). A governmental body shall be liable for such fees and costs to the same extent as a private individual.

(b) Definition.–As used in this section, the term "law enforcement officer" means an official empowered by law to conduct investigations of, to make arrests for, or to detain individuals suspected or convicted of, criminal offenses.

### SEC. 1203. DATA ON USE OF EXCESSIVE FORCE.

(a) Attorney General to Collect.–The Attorney General shall, through the victimization surveys conducted by the Bureau of Justice Statistics, acquire data about the use of excessive force by law enforcement officers.

(b) Limitation on Use of Data.–Data acquired under this section shall be used only for research or statistical purposes and may not contain any information that may reveal the identity of the victim or any law enforcement officer.

(c) Annual Summary.–The Attorney General shall publish an annual summary of the data acquired under this section.

### Subtitle B–Retired Public Safety Officer Death Benefit

### SEC. 1211. RETIRED PUBLIC SAFETY OFFICER DEATH BENEFIT.

(a) Payments.–Section 1201 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended–

(1) in subsection (a) by inserting after "line of duty" the following "or a retired public safety officer has died as the direct and proximate result of a personal injury sustained while responding to a fire, rescue, or police emergency";

(2) in subsection (b) by inserting after "line of duty" the following "or a retired public safety officer has become permanently and totally disabled as the **\*25** direct result of a catastrophic injury sustained while responding to a fire, rescue, or police emergency"; and

(3) in subsections (c), (i), and (j) by inserting after "public safety officer" every place it occurs the following "or a retired public safety officer".

(b) Limitations.–Section 1202 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended–

(1) in paragraph (1) by striking "the public safety officer or by such officer's intention" and inserting "the public safety officer or the retired public safety officer who had the intention";

(2) in paragraph (2) by striking "the public safety officer" and inserting "the public safety officer or the retired public safety officer"; and

(3) in paragraph (3) by striking "the public safety officer" and inserting "the public safety officer or the retired public safety officer".

(c) National Program.–Section 1203 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended by inserting before the period "or retired public safety officers who have died while responding to a fire, rescue, or police emergency".

(d) Definitions.–Section 1204 of the Omnibus Crime Control and Safe Streets Act of 1968 is amended–

(1) by striking "and" after paragraph (6);

(2) by inserting "; and" at the end of paragraph (7); and

(3) by adding at the end the following:

"(8) 'retired public safety officer' means a former public safety officer, as defined in paragraph (7), who has served a sufficient period of time in such capacity to become vested in the retirement system of a public agency with which the officer was employed and who retired from such agency in good standing.".

(e) Effective Date.–The amendments made by this section shall apply with respect to death or injuries occurring after the date of the enactment of this section.


Subtitle C–Study on Police Officers' Rights

SEC. 1221. STUDY ON POLICE OFFICERS' RIGHTS.

The Attorney General, through the National Institute of Justice, shall conduct a study of the procedures followed in internal, noncriminal investigations of State and local law enforcement officers to determine if such investigations are conducted fairly and effectively. The study shall examine the adequacy of the rights available to law enforcement officers and members of the public in cases involving the performance of a law enforcement officer, including–

This section, in virtually any situation, bars multiple petitions from the same prisoner under a sentence of death. It tracks the relevant Powell Committee proposal, adding only the recommendation of the full Judicial Conference that claims going to the validity of a death sentence, as well as claims going to guilt or innocence, should be permitted, [60] provided that the prisoner meets other stringent requirements as well. See discussion infra.

**\*134**  Justice Anthony Kennedy's opinion for the Supreme Court in McCleskey v. Zant [61] has already narrowed the law governing successive petitions by incorporating the rules previously developed for cases on procedural default in State court. Under McCleskey, a prisoner cannot file a second Federal petition without showing 1) "cause" for failing to raise his or her claim in a prior application and "prejudice" flowing from the violation that went uncorrected because the claim was not raised the first time, or 2) that a "miscarriage of justice" would result from the Federal court's failure to entertain the claim in a successive petition. According to Justice Kennedy, a miscarriage of justice would occur if the violation "caused the conviction of an innocent person." [62]

This section is more stringent than McCleskey. Subparagraph (A) codifies some, but not all, of the ways the Court has held that "cause" can be established. Further, under subsection (B), the prisoner must assert a claim going to guilt or to the validity of his or her death sentence and, in addition, must show what amounts to "cause."

Section 1107 (Certificates of Probable Cause)

This section adopts the recommendation of the Powell Committee that prisoners under sentence of death should not be required to obtain a certificate of probable cause in order to appeal from the denial of relief at the district court level, except in successive petition cases. Since certificates are issued routinely in death penalty cases, the certification process now wastes valuable judicial resources.

## CONCLUSION

As ABA President John Curtin testified:

A system that would take life must first give justice. The paramount requirement of a civilized system of justice is that a sentence of death not be carried out until it has been subjected to full, fair, and deliberate scrutiny. Unique among all legal decisions, the decision to execute the defendant cannot be corrected after it has been carried out. [63]

In a manner consistent with justice, the Act will expedite death penalty proceedings and ensure that every petitioner will have one, and only one, fair opportunity to present his or her claims to a Federal court. The Act thus return the focus of capital litigation to the States courts, where it belongs.

**\*135**  TITLE XII–PROVISIONS RELATING TO POLICE OFFICERS

SUBTITLE A–POLICE ACCOUNTABILITY

PURPOSE

Subtitle A is the Police Accountability Act of 1991. It grants standing to the United States Attorney General and, in certain circumstances, to private parties to obtain civil injunctive relief against governmental authorities that engage in patterns or practices of unconstitutional or unlawful conduct by law enforcement officers. It also requires the Attorney General, through the surveys of the Bureau of Justice Statistics, to collect data about the incidence of police use of excessive force.

BACKGROUND

On March 3, 1991 motorist Rodney King was apprehended by members of the Los Angeles Police Department (LAPD) after a high speed chase. While twenty-one other officers stood by, three LAPD officers and a sergeant administered 56 baton blows, six kicks to the head and body, and two shocks from a Taser electric stun gun. The incident was captured on videotape by a citizen. President Bush rightly called the beating "sickening."

Unfortunately, the Rodney King incident is not an aberration. The Independent Commission on the Los Angeles Police Department, created to examine the incident and headed by former Deputy Attorney General and Deputy Secretary of State Warren Christopher, concluded in its July 1991 report that "there is a significant number of officers in the LAPD who repetitively use excessive force against the public." Moreover, as the Commission found, the conduct of these officers was well known to police department management, who condoned the behavior through a pattern of lax supervision and inadequate investigation of complaints.

As Professor James Fyfe, a 16-year veteran of the New York City Police Department and one of the nation's leading experts on police use of force, testified before the Subcommittee on Civil and Constitutional Rights, the King incident "was no aberration. ... [T]here exists in LAPD a culture in which officers who choose to be brutal and abusive are left to do so without fear of interference."

It is apparent, moreover, that the problem is not limited to Los Angeles. Police chiefs from 10 major cities convened soon after the King incident and emphasized that "the problem of excessive force in American policing is real." The same point was stressed by Hubert Williams, President of the Police Foundation and former Chief of Police for Newark, New Jersey: "Police use of excessive force is a significant problem in this country, particularly in our inner cities" District of Columbia police officer Ronald Hampton, director of national affairs for the National Black Police Association, testified before the Subcommittee that his organization has complained for years that minority residents "were disrespected, disregarded, [and] physically and verbally abused" by police. The Flint, Michigan ombudsman, who reported that citizen complaints about police conduct to his office were up 10 percent in 1990, after **\*136** a 25 percent increase in 1989, wrote to the Subcommittee that the experience of his office led him to believe that the Los Angeles beating "was not an isolated incident."

The Subcommittee on Civil and Constitutional Rights held two days of hearings on police brutality after the King incident and received written submissions regarding alleged police misconduct from across the country. Many of the complaints involved individual incidents. Many, however, also presented systemic issues–particular policies or practices that were reflected in a pattern of misconduct. Among the matters brought to the Subcommittee's attention:

The Civil Rights Division of the Massachusetts Attorney General's office found that in 1989–90 Boston police officers routinely conducted unconstitutional, harassing stops and searches of minority individuals, including requiring youths to submit to strip searches in public.

In New York City, bystanders who complain about police actions are arrested and "run through the system," according to affidavits compiled by the New York Civil Liberties Union. The Police Department admitted that a 1977 order prohibiting such arrests was "mistakenly" revoked in 1980.

A lawsuit against the town of Reynoldsburg, Ohio discovered that a special unit within the police department called itself the S.N.A.T. squad, for "Special Nigger Arrest Team."

The Los Angeles Police Department directed officers to use an illegal king-fu device known as the nun-chuk to inflict pain on passive demonstrators in an effort to force them to comply with police orders.

Policing is difficult, dangerous work. Most police officers do not abuse the authority granted them. To the contrary, the majority of police officers in America are dedicated men and women who strive to uphold the ideals of the Constitution. Under growing stresses, they make an enormous contribution to public safety and deserve the nation's gratitude. Incidents of restraint in the face of provocation certainly outnumber incidents of brutality. Faced, however, with evidence that the problem of excessive force is a serious one, police departments, local authorities and the Federal Government have a responsibility to strengthen their responses.

Current Federal legal authority and Justice Department policy

Police brutality is a violation of the U.S. Constitution, and under sections 241 and 242 of title 18 it is a federal crime. However, the Federal response to police misconduct has been limited. The Assistant Attorney General in charge of the Civil Rights Division testified that the U.S. Justice Department follows a "back-stop" policy, deferring to local authorities. Statistics provided to the Subcommittee on Civil and Constitutional Rights by the Justice Department show that the Justice Department prosecutes on average 50 police officers a year. This represents a fraction of the 3,000 criminal civil rights cases, most of them involving law enforcement officers, that the Justice Department investigates yearly.

Moreover, the cases investigated by the Department represent only a fraction of the allegations of police misconduct reported to local authorities, most of which are never reported to Federal officials. The Justice Department provided to the Subcommittee statistics **137** showing that the FBI had investigated 720 criminal civil rights matters in the Central District of California, which encompasses Los Angeles, between 1982 and March 1991. Of those 720 cases investigated in a nine year period, 72 involved the Los Angeles Police Department and 186 involved the Los Angeles County Sheriff's Office. Yet, the Los Angeles Police Misconduct Referral Service received 652 complaints against the LAPD in 1988 alone and 616 in 1990. Of the 720 Federal investigations, only four resulted in indictments against police officers. Yet, during just a 3 year period, 1987–1990, the LA County Sheriff's Office lost or settled 56 civil lawsuits involving the use of excessive force, paying out $8.5 million in damages, and the LAPD paid out $18.8 million in damages for police brutality cases.

Pattern or practice authority

The Justice Department currently lacks the authority to address systemic patterns or practices of police misconduct. The Justice Department can only prosecute individual police officers, whom juries are often reluctant to convict. If an officer was poorly trained, or was acting pursuant to an official policy, it is difficult to obtain a conviction, and Justice has no authority to sue the police department itself to correct the underlying policy.

In 1980, the Third Circuit Court of Appeals held in United States v. City of Philadelphia, 644 F. 2d 187 (3d Cir. 1980), that the United States does not have implied statutory or cnstitutional authority to sue a local government or its officials to enjoin violations of citizens' constitutional rights by police officers.

This represents a serious and outdated gap in the federal scheme for protecting constitutional rights. The Attorney General has pattern or practice authority under eight civil rights statutes, including those governing voting, housing, employment, education, public accommodations and access to public facilities. The Justice Department can sue a city or county over its voter registration practices or its educational policies. It can sue private and public employers, including police departments, over patterns of employment discrimination. The Justice Department can seek injunctive relief under the Civil Rights of Institutionalized Persons Act against a jail or prison that tolerates guards beating inmates. But it cannot sue to change the policy of a police department that tolerates officers beating citizens on the street.

While a private citizen injured by police misconduct can sue for money damages, he or she cannot sue for injunctive relief, absent a showing of likely future harm, under the Supreme Court decision in Los Angeles v. Lyons, 461 U.S. 95 (1983). The case involved a resident of Los Angeles who had been choked unconscious by a police officer following a routine traffic stop. Unlike other cities, Los Angeles did not limit the use of chokeholds to situations where the officer's life was in danger. From

1975 to 1982, 15 people died as a result of LAPD chokeholds. The Supreme Court ruled that the plaintiff had no standing to seek an injunction restricting the use of chokeholds because he could not demonstrate that he himself was likely to be choked again. If choked again, the Court allowed, he could sue for damages again. But neither he nor anyone else could sue to bring the LAPD's policy on use of the chokehold in line with practices accepted in most other cities.

 **\*138**  The Police Accountability Act would close this gap in the law, authorizing the Attorney General and private parties to sue for injunctive relief against abusive police practices. The Committee expects that the Department of Justice will be diligent in exercising its new authority. But the Committee believes that private standing is necessary, especially in situations where the Department of Justice does not act. To ensure that the issues being litigated are not hypothetical, and to provide a court with the benefit of a factual context, the Act requires that a private citizen seeking injunctive relief have been injured by the challenged practice.

The Act creates an enforceable right to be free of patterns of police brutality. In adopting the provision granting individuals the standing to sue, Congress is exercising its authority to create legal rights, the invasion of which creates standing even where the plaintiff would not have had standing in the absence of the statute. Warth v. Seldin, 422 U.S. 490 (1975).

The Act does not increase the responsibilities of police departments or impose any new standards of conduct on police officers. The standards of conduct under the Act are the same as those under the Constitution, presently enforced in damage actions under section 1983. The Act merely provides another tool for a court to use, after a police department is held responsible for a pattern or practice of misconduct that violates the Constitution or laws of the United States.

Because the Act imposes no new standard of conduct on law enforcement agencies, it should not increase the amount of litigation against police departments. Individuals aggrieved by the use of excessive force already can and do sue under 42 U.S.C. 1983 for monetary damages. With adoption of this section, such persons will be able to seek injunctive relief as well, if their injury is the product of a pattern or practice of misconduct.

This provision may in fact decrease the number of lawsuits against police departments. Currently, changes in a police department's policy are prompted by successive criminal cases or damage actions; the cumulative weight of convictions or adverse monetary judgments may lead the police leadership to conclude that change is necessary. This is an inefficient way to enforce the Constitution and is not always effective. Some police departments have shown they are willing to absorb millions of dollars of damage payments per year without changing their policies. If there is a pattern of abuse, this section can bring it to an end with a single legal action.

Pattern or practice authority is needed because the Federal Government's criminal authority to prosecute police brutality is not adequate to address patterns or practices such as the lack of training or the routine use of deadly techniques like chokeholds, or the absence of a monitoring and disciplinary system. Two cases illustrate both the need for this authority and how it will work.

In Mason County, Washington, in the nine month period between June 1985 and March 1986, citizens in four separate incidents were beaten by police officers following traffic stops. A federal jury returned civil verdicts against all of the deputy sheriffs involved in the incidents and against the county, awarding a total of $853,000 in damages and costs. The Ninth Circuit affirmed, tracing the incidents to the lack of training provided by the sheriff's department,  **\*139**  which it described as "woefully inadequate, if it can be said to have existed at all." Davis v. Mason County, 927 F.2d 1473, 1482 (9th Cir. 1991). Yet while the lack of training was established and was found to rise to the level of a constitutional violation, the courts were powerless to correct it. In formulating a remedy, the courts would have had to look no further than the Washington State statute on police training standards, which Mason County has ignored.

Another federal case, against the Goldsboro, North Carolina police department, resulted in a $220,000 payment to the father of a young black man who was strangled to death by city police officers. The officers involved in the incident had been involved in several prior incidents involving use of excessive force, yet there had been disciplinary action taken against them. One expert

Case 8:26-cv-01697-MRA-ADS   Document 29-3   Filed 07/28/26   Page 11 of 11   Page ID #:367

witness, the former chief of police for Boston and St. Louis County, testified that the City of Goldsboro had an "official policy of not investigating incidents [involving deadly force]." Again, the court had no authority to order remedies for the glaring deficiencies the case has highlighted. Swann v. Goldsboro, No. 90–59–CIV–5–D (E.D.N.C.).

The Police Accountability Act as originally introduced and reported out of the Subcommittee on Civil and Constitutional Rights contained a section on criminal liability against police officers. That section was stricken by an amendment during full Committee consideration.

## SECTION-BY-SECTION ANALYSIS

Section 1201 is the short title: Police Accountability Act of 1991.

Section 1202 creates a cause of action and standing for pattern or practice cases.

Subsection 1202(a)(1) provides that it shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers that deprives persons of rights, privileges or immunities secured or protected by the Constitution or laws of the United States.

Subsection 1202(a)(2) provides that the Attorney General may in a civil action obtain appropriate equitable and declaratory relief to eliminate a pattern or practice that violates subsection 1202(a)(1).

Subsection 1202(a)(3) provides that a person injured by a pattern or practice that violates subseciton 1202(a)(1) may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

Section 1202(b) defines law enforcement officers. The term includes state, local and Federal officials.

Section 1203 requires the Attorney General to collect data about the use of excessive force by law enforcement officers. The data will not identify individuals. It will be published annually in statistical form.

## *140   SUBTITLE B–RETIRED PUBLIC SAFETY OFFICER DEATH BENEFIT

### PURPOSE AND BACKGROUND

This subtitle extends the Public Safety Officers Benefits Act to inlcude the families of retired officers who are killed or permanently disabled while responding to fire, rescue or police emergencies. The Public Safety Officers Death Benefits program, first enacted in the 94th Congress, recognized a Federal responsibility for public safety offices killed in the line of duty. It was amended in the 101st Congress to include the families of officers permanently disabled in the line of duty. This subtitle would make the families of retired officers so killed or disabled eligible for the $100,000 lump sum benefit provided by the act. Because of their specialized training and experience, it is important to encourage retired public safety officers to respond to emergencies they witness. If they are killed or disabled as a result of rendering aid or assistance to crime victims or other people in need, their families shuld be provided with the same benefits they would have received if the officer had been killed while still on active duty. This is happily an infrequent, but not unheard of occurence. In New York City as of the date of markup, more retired police officers were killed rendering aid than were active officers.

### SECTION-BY-SECTION ANALYSIS