ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General
GABRIELLE D. BOUTIN
VIVIANA M. HANLEY
CHRISTINA MCCALL
SABRINA T. MCGRAW
EDWARD P. WOLFE (SBN 247835)
Deputy Attorneys General
600 W Broadway, STE 1800
San Diego, CA 92101-3375
Telephone: (619) 321-5426
Fax: (916) 731-2124
E-mail: Edward.Wolfe@doj.ca.gov
*Attorneys for Defendants State of California and Attorney General Rob Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>**v.**<br><br>**STATE OF CALIFORNIA and ROBERT BONTA, in his official capacity as the head of the California Department of Justice,**<br><br>Defendants. | 8:26-cv-01697-MRA-ADS<br><br>**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (ECF 28)**<br><br>Date: Sept. 11, 2026<br>Time: 1:30 p.m.<br>Courtroom: 9B<br>Judge: The Honorable Mónica Ramírez Almadani<br>Trial Date: None set<br>Action Filed: July 1, 2026 |

## TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1
BACKGROUND ..... 2
I. California's Unsafe Handgun Act ..... 2
II. Assembly Bill 1127 ..... 3
III. This Litigation ..... 4
LEGAL STANDARD ..... 5
ARGUMENT ..... 5
I. The United States Remains Unlikely to Succeed on the Merits ..... 5
A. The United States Cannot Use Section 12601 to Facially Challenge California Laws ..... 5
B. There is No Likelihood of Success on the Merits of the Second Amendment Challenge ..... 8
1. The United States Fails to Establish That the Second Amendment's Plain Text Is Implicated ..... 8
2. The Challenged Laws Are Consistent with Historical Tradition ..... 11
a. The UHA's CLI and MDM Requirements ..... 12
b. AB 1127 ..... 15
II. The Equities Disfavor Granting A Preliminary Injunction ..... 19
CONCLUSION ..... 22

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Al Otro Lado v. Wolf*
952 F.3d 999 (9th Cir. 2020) ....................20

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*
178 F.4th 456 (9th Cir. 2026) ....................5

*B&L Prods., Inc. v. Newsom*
104 F.4th 108 (9th Cir. 2024) ....................9, 10

*Baird v. Bonta*
81 F.4th 1036 (9th Cir. 2023) ....................21

*Barnett v. Raoul*
180 F.4th 1035 (7th Cir. 2026) ....................16

*Benisek v. Lamone*
585 U.S. 155 (2018) ....................21

*Boland. Trump v. Boyle*
145 S.Ct. 2653 (2025) ....................21

*Boland v. Bonta*
662 F. Supp. 3d 1077 (C.D. Cal. 2023) ....................3, 10, 21

*Boland v. Bonta*
No. 23-55276, ECF No. 7 (9th Cir. Mar. 31, 2023) ....................3, 10

*Defense Distributed v. Blanche*
No. 22-cv-00691 (N.D. Tex. May 22, 2026) ....................13

*Doe v. Bonta*
101 F.4th 633 (9th Cir. 2024) ....................8

*Duncan v. Bonta*
133 F.4th 852 (9th Cir. 2025) ....................*passim*

*Earth Island Inst. v. Carlton*
626 F.3d 462 (9th Cir. 2010) ....................5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Garcia v. Google, Inc.*
786 F.3d 733 (9th Cir. 2015) .......... 20

*Granata v. Campbell*
No. 1:21-cv-10960-DJC (D. Mass. Feb. 20, 2025) .......... 13

*DC v. Heller*
554 U.S. 570 (2008) .......... 9

*United States v. Hemani*
146 S.Ct. 1684 (2026) .......... 9

*Knife Rights v. Bonta*
165 F.4th 1330 (9th Cir. 2026) .......... 8

*Knife Rights v. Bonta*
182 F.4th 797 (9th Cir. 2026) (en banc) .......... 8

*Maryland v. King*
567 U.S. 1301 (2012) .......... 20

*Mazurek v. Armstrong*
520 U.S. 968 (1997) .......... 5

*Nguyen v. Bonta*
140 F.4th 1237 (9th Cir. 2025) .......... 6

*Nken v. Holder*
556 U.S. 418 (2009) .......... 21

*NYSRPA v. Bruen*
597 U.S. 1 (2022) .......... *passim*

*Pena v. Lindley*
898 F.3d 969 (9th Cir. 2018) .......... 3

*Renna v. Bonta*
667 F. Supp. 3d 1048 (S.D. Cal. 2023) .......... 3

*Roe v. Critchfield*
137 F.4th 912 (9th Cir. 2025) .......... 5, 20

## TABLE OF AUTHORITIES
## (continued)

**Page**

*Rupp v. Bonta*
No. 8:17-cv-00746 (C.D. Cal. May 26, 2023)....................................................16

*Thakur v. Trump*
163 F.4th 1198 (9th Cir. 2025)....................................................................21

*United States v. City of Ferguson*
No. 4:16-cv-00180 (E.D. Mo. Feb. 10, 2016)....................................................7

*United States v. County of Maricopa*
889 F.3d 648 (9th Cir. 2018)....................................................................6, 7

*United States v. Kittson*
161 F.4th 619 (9th Cir. 2025)....................................................................19

*United States v. Martinez*
169 F.4th 1147 (9th Cir. 2026)....................................................................6

*United States v. Rahimi*
602 U.S. 680 (2024)....................................................................*passim*

*United States v. Vlha*
142 F.4th 1194 (9th Cir. 2025)....................................................................8, 9, 11

*Vasquez Perdomo v. Noem*
148 F.4th 656 (9th Cir. 2025)....................................................................20

*Winter v. NRDC*
555 U.S. 7 (2008)....................................................................5, 20, 21

*Wolford v. Lopez*
146 S.Ct. 2032 (2026)....................................................................8, 9, 11, 12

**STATUTES**

United States Code, Title 34
§ 12601....................................................................*passim*

United States Code, Title 42
§ 1983....................................................................6, 7

## TABLE OF AUTHORITIES
## (continued)


**Page**

California's Unsafe Handgun Act ........ *passim*

California Penal Code
§ 16380 ........ 3
§ 16885 ........ 4
§ 16900 ........ 3
§ 17015 ........ 4
§ 27545 ........ 3
§ 27595 ........ 3, 4, 19
§ 27850 ........ 3
§ 28050 ........ 3
§ 31900 ........ 2
§ 31910 ........ 3
§ 32010 ........ 3
§ 32015 ........ 2
§ 32103 ........ 4
§ 32110 ........ 3

Maine
2 Laws State of Maine (1821) ........ 13, 14

Massachusetts
1808 Mass. Acts 444, ch. 52 ........ 14

New Hampshire
1820 N.H. Laws 274, ch. 25 ........ 14

New Jersey
"Act for the Inspection of Gunpowder"
1776–1777, N.J. Laws 6, ch.6. ........ 13, 14

Pennsylvania
1795 Pa. Stats., ch. 1858 ........ 14

Rhode Island
1776 R.I. Pub. Laws 25 (Oct. Sess.) ........ 14

**CONSTITUTIONAL PROVISIONS**

Second Amendment ........ *passim*

## TABLE OF AUTHORITIES (continued)

Page

Fourteenth Amendment ........ 11

**OTHER AUTHORITIES**

Assembly Bill
1127 ........ 1, 3

Senate Bill
489 ........ 21

Resolution of the Pennsylvania Committee on Safety
Oct. 27, 1775, Col. Rec. Penn. 10:383 ........ 13

8 Documents and Records Relating to the State of New Hampshire During the Period of the American Revolution from 1776–1783 (Nathaniel Bouton ed. 1874), Jan. 12, 1775 ........ 13

## INTRODUCTION

The United States seeks to enjoin California handgun safety requirements that it claims facially violate the Second Amendment. Just as the United States failed to demonstrate that it is entitled to the extraordinary remedy of a temporary restraining order, it fails to show that it is entitled to a preliminary injunction. None of the relevant factors weigh in its favor.

*First*, the United States cannot succeed on the merits because its sole cause of action, 34 U.S.C. §12601 (Section 12601), does not authorize the United States to facially challenge state laws. As discussed fully in the pending Motion to Dismiss the Complaint (ECF No. 29) (MTD), this threshold deficiency is fatal to the United States's effort to obtain a preliminary injunction.

*Second*, even if the United States had a valid cause of action, its claim that the challenged requirements violate the Second Amendment on their face—"the most difficult challenge to mount successfully"—is unlikely to succeed. *United States v. Rahimi*, 602 U.S. 680, 693 (2024). The United States challenges provisions of California's Unsafe Handgun Act (UHA) and Assembly Bill 1127 (AB 1127). The two challenged UHA provisions protect against accidental shootings by requiring that any semiautomatic, centerfire pistol model newly certified for commercial sale have (1) a chamber load indicator (CLI), which indicates when a pistol is loaded, and (2) (if it has a detachable magazine) a magazine disconnect mechanism (MDM), which prevents a pistol from firing when no magazine is inserted. For its part, AB 1127 protects Californians from semiautomatic pistols that can be easily converted into machineguns by restricting the commercial sale of models with design features that make such conversion simple, quick, and inexpensive.

These statutes do not implicate the Second Amendment's plain text because they are commercial sales restrictions that neither prohibit the possession or carriage of any handgun, nor meaningfully impair anyone's ability to purchase

handguns suitable for self-defense. Indeed, Californians are free to purchase nearly one thousand Roster-listed handgun models for self-defense. And there's no reason to think the UHA or AB 1127 prevents manufacturers from adding even more models to this list. Nearly 200 Roster-listed models already have a CLI, MDM, or both, and manufacturers have announced efforts to redesign pistols impacted by AB 1127 so that they can be sold in California.

Even if the challenged statutes implicated the Second Amendment, they survive constitutional scrutiny because they are consistent with this Nation's tradition. The CLI and MDM requirements fit within a longstanding tradition of regulations protecting the public from poorly manufactured firearms and improperly stored ammunition, and AB 1127 continues an equally enduring tradition of restricting especially dangerous uses of weapons.

*Third*, the equities disfavor enjoining these important handgun safety regulations. The Legislature enacted these statutes to reduce the risk of accidental shootings and to prevent the easy conversion of semiautomatic pistols into devastatingly lethal machineguns. Enjoining these democratically enacted laws would undermine the public interest by upsetting California's consumer and public safety regime for a subset of handguns, without meaningfully improving Californians' access to firearms suitable for self-defense.

## BACKGROUND

### I. CALIFORNIA'S UNSAFE HANDGUN ACT

The UHA requires handguns to meet safety and quality assurance standards before they can be commercially sold or manufactured in California.[1] *See* Cal. Penal Code §31900, *et seq*. It directs the California Department of Justice to maintain a roster of handguns certified for commercial sale in California (the Roster). *Id.* §32015(a). The UHA does not prohibit the possession of any firearm or

[1] For more information on the history and requirements of the UHA, see MTD 6–8.

the acquisition of any firearm transferred between private parties. *Id.* §32110(a).[2]

Since 2007, new models of semiautomatic pistols generally cannot be added to the Roster unless they have two "safety features designed to limit accidental discharges that occur when someone mistakenly believes no round is in the chamber." *Pena v. Lindley*, 898 F.3d 969, 974 (9th Cir. 2018); *see* Cal. Penal Code §32010(d)(2). These two safety features are: (1) a CLI, Cal. Penal Code §16380, and (2) an MDM, *id.* §16900. Newly added pistol models must have an MDM if they have a detachable magazine. *Id.* §31910(a)(2)(E). Only those newly added pistols that are centerfire models must have a CLI. *Id.* §31910(a)(2)(D); *see* Gonzalez Decl. ¶14.

These requirements have already been the subject of litigation. Two groups of private plaintiffs separately obtained preliminary injunctions of the CLI and MDM requirements in 2023. *See Boland v. Bonta*, 662 F. Supp. 3d 1077, 1081 (C.D. Cal. 2023); *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1058, 1072 (S.D. Cal. 2023). The *Boland* injunction never took effect because the Ninth Circuit stayed it pending appeal. *See Boland v. Bonta*, No. 23-55276, ECF No. 7 (9th Cir. Mar. 31, 2023) (*Boland* Stay). The district court in *Renna* also stayed its injunction pending appeal. *See Renna*, 667 F. Supp. 3d at 1072. *Boland* and *Renna* have been fully briefed and argued before the Ninth Circuit. Decisions in each case remain pending.

## II. ASSEMBLY BILL 1127

Under AB 1127, since July 1, 2026, licensed firearms dealers generally cannot sell any "semiautomatic machinegun-convertible pistol." Cal. Penal Code §27595(a).[3] A "machinegun-convertible pistol" is "any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with common household tools … into a machinegun by the installation or attachment of a pistol

---

[2] In California, the transfer of a firearm between private parties generally must be conducted through a licensed firearms dealer. *See* Cal. Penal Code §§27545, 27850, 28050.

[3] For more background on AB 1127, *see* MTD 8–10.

converter[4] as a replacement for the slide's backplate without any additional … modification of the pistol's trigger mechanism." *Id.* §16885(a). AB 1127 includes exceptions to its sales restriction, including for transactions between private parties conducted through a licensed dealer. *Id.* §27595(c)(1)–(3), (5), (9). AB 1127 does not prohibit possession, acquisition, or carry of semiautomatic machinegun-convertible pistols.

Currently, 25 models on the Roster made by three firearms manufacturers—Derya, Glock, and Shadow Systems—fall within AB 1127's definition of a machinegun-convertible pistol. Gonzalez Decl. ¶33. Derya and Glock have announced plans to modify their semiautomatic pistol models so that they no longer qualify as machinegun-convertible pistols. *Id.* ¶34. And AB 1127 provides a pathway for these manufacturers to make such a pistol model available for retail. Cal. Penal Code §32103.

There are currently 140 Roster-listed semiautomatic pistol models available for retail sale in California that do not fall within AB 1127's definition of a machinegun-convertible pistol, and have a CLI, MDM, or both. *Id.* ¶25. In total, there are currently 961 models listed on the Roster, including 570 semiautomatic pistol models, each suitable for self-defense. Gonzalez Decl. ¶¶24, 26.

## III. THIS LITIGATION

The day AB 1127 took effect, the United States sued, claiming that AB 1127 and the UHA's CLI and MDM requirements facially violate the Second Amendment. It lodged a single count under Section 12601. Without describing any instance of enforcement, the Complaint characterizes the existence of these

---

[4] A pistol converter is a small device that "when installed or attached to the rear of the slide of a semiautomatic pistol, replaces the backplate, and interferes with the trigger mechanism and thereby enables the pistol to shoot automatically more than one shot by a single function of the trigger." Cal. Penal Code §17015; Gonzalez Decl. ¶27.

provisions as establishing a rights-depriving "pattern or practice of conduct by [law enforcement officers]" under Section 12601. Compl. ¶¶58–59, 62–64.

The United States applied for a temporary restraining order (TRO) of AB 1127, ECF No. 3, which the Court denied "given the uncertain viability" of the United States' "novel" use of Section 12601. ECF No. 26 at 5–6. The United States now moves to preliminarily enjoin both AB 1127 and the UHA's CLI and MDM requirements. ECF No. 28; ECF No. 28-2 at 9.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* (*AFGE*), 178 F.4th 456, 465 (9th Cir. 2026) (quoting *Winter v. NRDC*, 555 U.S. 7, 24 (2008)). To secure this extraordinary relief, a plaintiff bears a "heavy burden." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). It must put forth "substantial proof" constituting a "*clear showing*" that preliminary restraints are warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). This requires establishing four *Winter* factors: "[1] a likelihood of success on the merits, [2] irreparable harm …, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." *AFGE*, 178 F.4th at 465. Where the government is the opposing party, the last two factors merge. *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025).

## ARGUMENT

### I. THE UNITED STATES REMAINS UNLIKELY TO SUCCEED ON THE MERITS

#### A. The United States Cannot Use Section 12601 to Facially Challenge California Laws

This lawsuit is unlikely to succeed because Section 12601 does not authorize facial challenges to state laws. By its terms, Section 12601 permits the United States to challenge the lawfulness of systemic, rights-depriving "conduct by law enforcement officers," not the facial constitutionality of state laws. The United States's contrary interpretation, *see* Pl.'s Mot. for Prelim. Inj. (ECF No. 28) (MPI)

11–12, cannot be squared with Section 12601's text, history, enforcement practice, or separation of powers and federalism principles. *See* MTD. Nothing in the United States's motion moves the needle.

The United States's maximalist reading of Section 12601 boils down to an uncompelling syllogism: because law enforcement officers enforce state laws, any challenge to a state law is a challenge to law enforcement conduct. *See* MPI 13, 15. But interpreting Section 12601 to authorize facial challenges to state laws fails to make sense of the words Congress chose. Section 12601 authorizes suit over rights-depriving "conduct by law enforcement officers," yet officer conduct is irrelevant in a facial challenge. In resolving facial challenges, courts consider "only the text of the statute," *Nguyen v. Bonta*, 140 F.4th 1237, 1240 (9th Cir. 2025), and to succeed, the plaintiff must show that the law is "unconstitutional in all its applications." *United States v. Martinez*, 169 F.4th 1147, 1153 (9th Cir. 2026). Actual enforcement practices make no difference. Congress would not have drafted a statute authorizing suits over rights-depriving "pattern[s] or practice[s] of conduct by law enforcement officers" to authorize suits in which law enforcement practices are irrelevant.

Moreover, the federalism implications would be astonishing. The United States suggests that 42 U.S.C. §1983 and Section 12601 differ only in whom Congress authorized to bring the action. MPI 11–12. But authorizing the U.S. Attorney General to sue States for all violations of individuals' federal rights would be a sweeping grant of authority that would disrupt the constitutional federal-state relationship. Section 12601 is a far cry from the clear statement Congress would use to convey such expansive power. *See* MTD 2–3, 19–20.

Nor does *United States v. County of Maricopa,* 889 F.3d 648 (9th Cir. 2018), support the United States's interpretation. *See* MTD 18–19; *Contra* MPI 12–14. There, the Ninth Circuit held that a county could be held directly liable under Section 12601 for the "racially discriminatory traffic-stop policies" of its sheriff.

889 F.3d at 653. The Ninth Circuit's remark that Section 12601 "goes even further" than Section 1983 addressed only the fact that Section 12601 explicitly imposes liability on "any governmental authority," whereas the plain text of Section 1983 imposes liability only on "person[s]" (a word the Supreme Court had interpreted to encompass localities). *Id.* at 652–53. That remark, and these phrases, concern the actors upon whom these statutes impose liability. That language is not relevant here where the question is not who may be sued but what they may be sued for.

The language relevant for answering that question is broader in Section 1983 than in Section 12601. Whereas Section 1983 protects against actions taken "under color of any statute, ordinance, regulation, custom, or usage," Section 12601 protects only against "pattern[s] or practice[s] of conduct by law enforcement officers." Indeed, in *County of Maricopa*, the Ninth Circuit acknowledged that, while Section 1983 and Section 12601 are both civil rights remedies, Section 12601 was enacted as a remedy "specifically for violations that are systematically perpetrated by local police departments." *Id.* at 653. If Congress had intended Section 12601 to be a vehicle for facial challenges to state laws, Section 1983 provided a roadmap to do so. Yet Congress chose narrower language.

Finally, the unprecedented nature of this administration's use of Section 12601 confirms the implausibility of the United States's expansive reading. *See* MTD.17–19; Proposed Amicus Br. (ECF No. 36-2). The United States's lawsuit against the Ferguson Police Department forms no counterpoint. *Contra* MPI 14. There, the Section 12601 count was based on prototypical police misconduct such as unreasonable searches and seizures, excessive force, and discrimination. *See* Compl., *United States v. City of Ferguson*, No. 4:16-cv-00180 (E.D. Mo. Feb. 10, 2016), ECF No. 1 ¶¶181–88. To the extent the complaint mentions misconduct tied to ordinances, it is to explain how officers abused them to make unwarranted arrests. *Id.* at ¶¶45–46, 51. The United States remains unable to show any prior administration's similar use of Section 12601.

### B. There is No Likelihood of Success on the Merits of the Second Amendment Challenge

Even if Section 12601 were an appropriate vehicle, the United States still would be unlikely to succeed because its Second Amendment challenge lacks merit.

To succeed with a Second Amendment challenge, the plaintiff must establish that the "Second Amendment's plain text" is implicated. *NYSRPA v. Bruen*, 597 U.S. 1, 24 (2022). If the plaintiff meets this "step one" burden, *see Doe v. Bonta*, 101 F.4th 633, 639–40 (9th Cir. 2024), then the challenged law survives scrutiny at "step two" if the government demonstrates that its law is consistent with the Nation's regulatory tradition. *See Bruen*, 597 U.S. at 24; *Wolford v. Lopez*, 146 S.Ct. 2032, 2043–44 (2026). Here, the United States fails to carry its step-one burden because these challenged laws do not implicate the Second Amendment's text. Regardless, the challenged laws survive at step-two because they are consistent with historical tradition.[5]

#### 1. The United States Fails to Establish That the Second Amendment's Plain Text Is Implicated

The United States cannot carry its step-one burden because the challenged statutes neither directly regulate nor meaningfully constrain anyone's "right … to keep and bear Arms" for self-defense. U.S. Const. amend II.

In the Ninth Circuit, a plaintiff may carry its step-one burden in two ways. First, it may demonstrate that the challenged regulation "direct[ly] … implicate[s]" an "individual['s] … possessory right to 'keep and bear Arms.'" *United States v. Vlha*, 142 F.4th 1194, 1198 (9th Cir. 2025). A challenged law does so if it directly regulates (1) "the 'keeping' (*i.e.*, possession) or the 'bearing' (*i.e.*, carrying)" (2) of "Arms" (3) by "the people." *Wolford*, 146 S.Ct. at 2043 (cleaned up). Every statute

[5] At both steps, the United States also fails to meet the "exceptional burden" of "prov[ing] that the statute[s] violate[] the Second Amendment in all of [their] applications." *Knife Rights v. Bonta*, 165 F.4th 1330, 1335 (9th Cir. 2026); *Knife Rights v. Bonta*, 182 F.4th 797 (9th Cir. 2026) (en banc) (Wardlaw, J., concurring in denial); *see also Rahimi*, 602 U.S. at 693.

that the Supreme Court has found to implicate the Second Amendment's plain text since *Bruen* has directly regulated protected conduct in this way. *See id.* at 2046–47 (ban on carrying in certain locations); *United States v. Hemani*, 146 S.Ct. 1677, 1684 (2026) (ban on possession by certain people); *Rahimi*, 602 U.S. at 684–86 (same); *Bruen*, 597 U.S. at 12–13 (ban on public carry absent extraordinary need).

Absent such direct regulation, a plaintiff may carry its step-one burden by demonstrating that the challenged law "meaningfully constrain[s]" an "ancillary activit[y]," *Vlha*, 142 F.4th at 1198, that is, an activity without which "the right to keep and bear firearms would be meaningless," *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024). Acquiring firearms qualifies as such an ancillary activity. *Id.* Thus, a plaintiff may establish that the plain text is implicated by a law that regulates firearms acquisition only if it "meaningfully constrains the right to keep and bear arms for the purpose of self-defense." *Id.* at 119 (cleaned up); *Vlha*, 142 F.4th at 1198. After all, laws that merely "impos[e] conditions and qualifications on the commercial sale of arms" are "presumptively *lawful*." *DC v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008) (emphasis added). By and large then, such regulations "must not implicate the plain text of the Second Amendment." *B&L Prods.*, 104 F.4th at 119.[6] They do so only in the "limited" circumstances when such commercial regulations amount to "meaningful constraints." *Vlha*, 142 F.4th at 1198; *B&L Prods.*, 104 F.4th at 119.

The United States fails to establish that the UHA or AB 1127 implicate the Second Amendment's plain text in either manner.

*First*, the challenged provisions do not directly regulate "the 'keeping' … or the 'bearing'" of firearms. *Wolford*, 146 S.Ct. at 2043. Instead, these provisions

[6] Any suggestion that *Wolford* requires this Court to depart from Ninth Circuit authority detailing "how a plaintiff meets his plain-text burden" must fail. MPI 5. In the language the United States quotes, *Wolford* was simply "overview[ing]" the Supreme Court's existing "Second Amendment decisions," 146 S.Ct. at 2041. Such a summary cannot be construed to have silently "abrogated" any Ninth Circuit case decided after those summarized decisions.

govern which models are available for retail sale, without prohibiting anyone from possessing or carrying any handgun. *See supra* at 2–4.

*Second*, the challenged statutes do not "meaningfully constrain[] the right to keep and bear arms for the purpose of self-defense." *B&L Prods.*, 104 F.4th at 119. As to the UHA, the United States asserts without explanation that its requirements prevent "California citizens from acquiring state-of-the-art handguns" (whatever that refers to). But manufacturers have been incorporating CLI and MDM features into semiautomatic pistol models since 2008, and they recently have done so in biometric smart guns. Gonzalez Decl. ¶25.[7]

As to AB 1127, the United States contends that it is a "total ban" on acquiring Glock handguns "and all similar cruciform-trigger-bar handguns." MPI 1–3. But there are currently 961 models listed on the Roster, including 570 semiautomatic pistol models, each suitable for self-defense. Gonzalez Decl. ¶¶24, 26. Given this plethora of options, the fact that retailers cannot sell a subset of handguns that feature a dangerous design flaw does not "meaningfully constrain" the right to keep and bear firearms. Moreover, impacted manufacturers, including Glock, can—and are—modifying their designs to prevent their pistols from being readily convertible into machineguns. Gonzalez Decl. ¶34. And 183 models already listed on the Roster are not readily-convertible and have a CLI, MDM, or both. *Id.* ¶41. Thus, complying with these safety design requirements is feasible for manufacturers, underscoring that these modern safety regulations do not impede meaningful access to firearms for self-defense.

The United States also asserts that "Glock handguns are the most popular handguns in America" and are "in common use" across the Nation. MPI 3. But it

[7] The United States's reliance on *Boland* is misplaced. MPI 9. *Boland* was decided on a different record; its step one analysis largely addressed the impact of the UHA's prior microstamping requirement, which is not at issue here; it was decided before the Ninth Circuit confirmed that the meaningful constraints analysis continues to govern post-*Bruen*, *see B&L*, 104 F.4th 118–19, and the Ninth Circuit stayed the injunction pending appeal, *see Boland v. Bonta*, No. 23-55276, ECF No. 7 (9th Cir. Mar. 31, 2023).

does not matter whether semiautomatic pistol models unavailable for retail sale in California are in common use elsewhere. The Ninth Circuit has already declined to adopt that kind of "simplistic ownership-statistics" approach to Second Amendment jurisprudence. *Duncan v. Bonta*, 133 F.4th 852, 883 (9th Cir. 2025).[8]

Finally, the United States' position that barring the retail sale of *any* arm presents a *prima facie* Second Amendment violation, MPI 5, cannot be squared with *Heller*'s assurance that laws regulating "the commercial sale of arms" are "presumptively lawful" and that the Second Amendment right is "not a right to keep and carry any weapon whatsoever." *Id.* at 626–27 & n.26. Nor is this reconcilable with the Ninth Circuit's characterization of Second Amendment protections for ancillary activities, including the retail acquisition of firearms, as "limited." *Vlha*, 142 F.4th at 1198.

### 2. The Challenged Laws Are Consistent with Historical Tradition

Even if the United States could meet its burden at step one, Defendants meet theirs at step two.

At step two, the government must show that "the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. "A variety of sources, including scholarship, may aid this inquiry…[b]ut often, the best evidence may be what *Bruen* called historical analogues." *Wolford*, 146 S.Ct. at 2044. Particularly relevant historical laws are those passed around the time the Bill of Rights was adopted (1791) or the Fourteenth Amendment was ratified (1868), thereby making the Second Amendment applicable to the States. *Bruen*, 597 U.S. at 37. "A party defending against a Second Amendment claim may rely on a single analogue or a group of

[8] For both AB 1127 and the UHA, the United States essentially argues that because standard models produced by some manufacturers do not comply with these design requirements, California cannot require these safety features. That is no different from asserting a "constitutional right to factory settings," which is untenable under *Duncan*. 133 F.4th at 883 n.12.

analogues," which should be "relevantly similar" to the challenged law. *Wolford*, 146 S.Ct. at 2044. "Why and how the regulation burdens the [Second Amendment] right are central to this inquiry." *Rahimi*, 602 U.S. at 692. Courts consider whether the regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 597 U.S. at 29. "[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," that is, a "more difficult exercise of judgment" when comparing historical to modern laws. *Id.* at 27; *Wolford*, 146 S.Ct. at 2045.

While the result here is the same whether or not the nuanced approach applies, this approach is warranted for both the UHA and AB 1127. As to the UHA, the chambering of ammunition in a modern semiautomatic firearm—obscuring whether the firearm is loaded—represents a dramatic technological change from the "single-shot, muzzle-loading firearms common at the Founding" and the "[r]epeating Henry and Winchester rifles" popular after the Civil War. *See Duncan*, 133 F.4th at 874. Indeed, semiautomatic weapons themselves were not developed until the late 1800s, and did not become common until the early twentieth century. DeLay Decl. ¶¶60, 64–65.[9] And AB 1127 addresses "dramatic technological changes" from the development of automatic weapons, pistol converters, and 3-D printing, as well as "unprecedented societal concerns" regarding mass shootings. *Bruen*, 597 U.S. at 27; *see* Roth Decl. ¶¶48, 51–65 (modern developments in mass murder); Spitzer Decl. ¶78 (development of automatic and semi-automatic firearms); Gonzalez Decl. ¶37 (recent increase in pistol converters recovered in crimes).

**a. The UHA's CLI and MDM Requirements**

The UHA's CLI and MDM requirements follow a long history of firearm regulations enacted to protect against defective or poorly manufactured firearms

[9] If helpful to the Court, Defendants can prepare a compendium of historical statutes cited by their experts.

and ammunition. These analogues fall generally into three categories: firearm and gunpowder inspection laws, gunpowder storage laws, and toy pistol laws.

First, since even before the Founding, there has been a broad tradition of firearm and ammunition inspection (or "proving") laws. Rivas Decl. ¶15.[10]

In 1775 and 1776, resolutions were adopted in Pennsylvania, New Jersey, and New Hampshire, which required that firearms meet manufacturing and inspection specifications prior to purchase. *See* 8 Documents and Records Relating to the State of New Hampshire During the Period of the American Revolution from 1776–1783 at 15–16 (Nathaniel Bouton ed. 1874), Jan. 12, 1775; Resolution of the Pennsylvania Committee on Safety, Oct. 27, 1775, Col. Rec. Penn. 10:383; "Act for the Inspection of Gunpowder", 1776–1777, N.J. Laws 6, ch.6.[11]

In the late 1700s and early 1800s, several states adopted firearm and/or ammunition inspection laws. Massachusetts—the leading small arms producer in America on the eve of the War of 1812—adopted both types of inspection laws, while Maine adopted one for firearms, and Rhode Island, New Jersey, New Hampshire, and Pennsylvania adopted laws concerning gunpowder. Rivas Decl. ¶¶18, 20; Spitzer Decl. ¶116-19.

The Massachusetts law, enacted in 1805, required that all firearm barrels be tested and inspected before sale to the public. Spitzer Decl., Ex. J at 3–4. The law was enacted because, absent such legislation, "many [Firearms] may be introduced into use which are unsafe and thereby the lives of the Citizens be exposed." *Id.* A firearm could be sold only if it passed inspection and bore the inspector's stamp. *Id.*; Regele Decl. ¶55. Maine adopted a similar inspection law in 1821. 2 Laws State

---

[10] The United States has relied on this tradition, as well as on the tradition of gunpowder regulations discussed below, *see infra* at 14–15, in defending its own firearm regulations. *See, e.g.*, Dfs.' Summ. J. Br., *Defense Distributed v. Blanche*, No. 22-cv-00691 (N.D. Tex. May 22, 2026), ECF No. 319, at 24–26.

[11] Text available at ECF No. 88-1 at 23–24, *Granata v. Campbell*, No. 1:21-cv-10960-DJC (D. Mass. Feb. 20, 2025), and https://firearmslaw.duke.edu/laws/1776-1777-n-j-laws-6-an-act-for-the-inspection-of-gunpowder-ch-6-c2a7-1.

of Maine (1821), at 685–86; Rivas Decl. ¶18.

The ammunition inspection laws adopted by Massachusetts, Rhode Island, New Jersey, New Hampshire, and Pennsylvania generally required government inspection to ensure gunpowder met quality standards before it could be sold to the public. Rivas Decl. ¶20; 1808 Mass. Acts 444, ch. 52; 1776 R.I. Pub. Laws 25 (Oct. Sess.); 1776–1777 N.J. Laws 6-7, ch. 6; 1820 N.H. Laws 274, ch. 25; 1795 Pa. Stats., ch. 1858.

These proving laws existed against a backdrop in which most "firearms from the late 1790s until the Civil War were produced at two federal armories ... and the factories of government contractors," and all such firearms were required by the federal government to undergo regular inspecting and testing. Regele Decl. ¶14. Manufacturers expected the frequent inspection of weapons, and adjusted designs of models that repeatedly failed such inspections. *Id.* ¶¶32–37, 43–47 ("In response to government feedback, Colt improved the safety and practicality of his firearms.").

Second, a longstanding tradition of regulating gunpowder stretches back to even before the Founding. Spitzer Decl. ¶41; Rivas Decl. ¶20. "[A]t least seven gun powder laws were enacted in the colonies in the 1600s, thirty gunpowder laws were passed in the 1700s, 175 laws in the 1800s, and seventy-six laws in the 1900s up until 1934 ... yielding a grand total of over 300 laws in forty-nine states." Spitzer Decl. ¶41. Many of these laws regulated storage of gunpowder to reduce the risks of explosions, fires, and accidental discharges. *Id.* ¶43. These laws "required gunpowder to be stored safely, even though the rules made it more difficult for people to load their guns quickly." *Id.* ¶42. These laws applied to both private individuals and gunpowder dealers and restricted both the location and amount of gunpowder that individuals could keep. *Id.* ¶44.

Third, after the Civil War, the increase in toy pistols (real, miniature firearms) "elicited a strong, condemnatory response from the general public" because they

could fire like typical pistols, risking accidental injuries and deaths, especially for children. Rivas Decl. ¶¶27–28. Sales restrictions of toy pistols were adopted by 15 states and territories from 1882 to 1885. *Id.* ¶29.

The challenged UHA provisions and these historical laws are "comparably justified" because they are intended to prevent death and injury from accidental ignition. *Bruen*, 597 U.S. at 29. The proving, gunpowder storage, and toy pistol laws tried to reduce dangers arising from firearms and ammunition that did not function properly or caused accidental injuries. Spitzer Decl. ¶¶42–43; Rivas Decl. ¶¶28–29. Similarly, the CLI and MDM requirements work together to prevent a semiautomatic pistol from firing when the user does not intend it to. Gonzalez Decl. ¶¶16–22. Indeed, the Ninth Circuit has already extracted from these gunpowder storage laws "an early tradition of laws seeking to protect innocent persons from infrequent but devastating harm by regulating a component necessary to the firing of a firearm." *Duncan*, 133 F.4th at 876. The UHA's CLI and MDM requirements fall within this tradition.

The challenged UHA provisions also impose a "comparable," but smaller, burden on "the right of armed self-defense." The firearm and ammunition inspection laws required an inspection for *every* firearm and *every* cask of gunpowder, impacting the speed with which each went to market. Spitzer Decl. ¶¶116–19. The gunpowder storage laws limited individuals' ability to immediately use firearms for self-defense. *Id.* ¶42. The toy pistol laws often completely prohibited the sale of those items. Rivas Decl. ¶29. In contrast, the UHA permits approval of handguns as safe for use on a model-by-model basis. And within that scheme, California consumers currently may choose among hundreds of models that they can purchase and use quickly and conveniently. Gonzalez Decl. ¶24.

**b. AB 1127**

AB 1127 is consistent with our nation's longstanding tradition of restricting "especially dangerous use[s] of [] weapons" as they are developed and then used by

civilians. *Duncan*, 133 F.4th at 876; *see Barnett v. Raoul*, 180 F.4th 1035, 1047 (7th Cir. 2026) (discussing well-recognized tradition of "restrictions on weapons whose danger and lethality stand out"); Spitzer Decl. ¶¶123–24; Rivas Decl. ¶23; Roth Decl. ¶¶18–19, 68; Vorenberg Decl. ¶16. This tradition stretches back to pre-founding England, where the Crown prohibited possession of weapons such as launcegays, crossboys, handguns, hagbutts, and demy hakes.[12]

During the colonial period and the early Republic, several jurisdictions enacted restrictions on weapons deemed to pose unreasonable dangers to public safety. In the late 1600s and 1700s, Massachusetts and New Jersey both passed laws prohibiting the setting of "trap guns," devices rigged to fire when the operator was not present, because they "endangered [] people who might unsuspectingly trip the device." Rivas Decl. ¶¶30–32; Spitzer Decl. ¶¶31–33; DeLay Decl. ¶27. The focus of such regulations was on "what had proved to be an especially dangerous use of firearms." *Duncan*, 133 F.4th at 875.

From the antebellum period through the end of the nineteenth century, a growing number of states heavily restricted weapons "after their use by criminals exposed an especially dangerous use of the weapon." *Duncan*, 133 F.4th at 875; Rivas Decl. ¶¶23–34; Spitzer Decl. ¶20; DeLay Decl. ¶45; Roth Decl. ¶¶23, 25–27, 34–38. Sixteen additional trap gun restrictions were enacted in the 1800s. Spitzer Decl. ¶40. Numerous states and territories outlawed the carry, use, and manufacture of slung shots (a weighted ball attached by a cord to a handle). Rivas Decl. ¶¶25–26. As discussed, *supra* at 15, states outlawed the sale or possession of toy pistols. Rivas Decl. ¶¶28–29. Numerous states banned the possession, sale, or carry of bowie knives (long fighting knives with clipped blades) because they were used in an "alarming proportion of the era's murders and serious assaults." Roth Decl. ¶23;

[12] Compendium of Historical Laws Vol. 1, *Rupp v. Bonta*, No. 8:17-cv-00746 (C.D. Cal. May 26, 2023), ECF No. 152, at 2, (items 1–4), 32–38; *see also Duncan*, 133 F.4th at 875.

*see* DeLay Decl. ¶¶54–55, 108–09; Spitzer Decl. ¶12. Some laws prohibitively taxed the sales of unusually dangerous weapons. Rivas Decl. ¶¶23, 40; DeLay Decl. ¶¶54, 109; Spitzer Decl. ¶¶25, 73.

During this time, firearms were not exempted from laws restricting dangerous weapons. For example, four States banned the sale of certain handguns and, when two such laws were constitutionally challenged, both were upheld. Rivas Decl. ¶44. Numerous States also heavily restricted the carry of certain weapons thought to be dangerous by virtue of their concealability. Spitzer Decl. ¶109; Roth Decl. ¶¶23, 25–27, 34–38.

There were also regulations at the local level, including by "town ordinance or at the discretion of local officers" to restrict the kinds of weapons, including firearms, civilians could possess. Vorenberg Decl. ¶8. And dangerous firearms were also regulated through "the policies and practices of the U.S. army and its auxiliary or allied units." *Id.* ¶9; *see also id.* ¶77 (confiscation of Winchester rifles by South Carolina governor); *id.* ¶87 (disarming Louisiana civilians of high-capacity, rapid-firing arms); *id.* ¶101 (restrictions on use of Winchester rifles imposed by Louisiana official).

In the post-World War I era, when multi-shot "semi-automatic and fully automatic long guns first began to circulate appreciably in society and came to be associated with criminal use," they newly "became a [] public policy concern." Spitzer Decl. ¶109; *see also* DeLay Decl. ¶¶70–78; Roth Decl. ¶¶51–55.[13] In

[13] Prior to this period, such weapons had not yet been designed, and any arguably analogous weapons were not in widespread circulation. Accordingly, the absence of Founding and Reconstruction Era regulations addressing dangerous rapid-fire arms is unsurprising and does not foreclose modern regulation of these arms. *Rahimi*, 602 U.S. at 691–92 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791."). For example, repeating firearms "were vanishingly rare in colonial and founding-era America" and were "too rare and too irrelevant to public safety to attract regulatory attention in 1791." DeLay Decl. ¶39; *see id.* ¶40. And during the Reconstruction period, "high-capacity, rapid-firing firearms did not circulate widely among the civilian population; thus, there was no need for legislative efforts to regulate them among civilians." Vorenberg Decl. ¶11; *see also id.* ¶10.

response to news of the crimes committed with the first fully automatic firearm widely available to civilians, the "Tommy gun," Spitzer Decl. ¶60, over half of the states in the nation passed laws regulating fully automatic firearms between 1925 and 1935. DeLay Decl. ¶72. At least eighteen of these states passed total bans on possession of fully automatic weapons. DeLay Decl. ¶72; Spitzer Decl. ¶69. Congress enacted laws restricting ownership of automatic weapons in the 1930s. Roth Decl. ¶55. Minnesota passed a law in 1933 regulating machine guns that, like AB 1127, accounted for "semi-automatic firearms that had been 'changed, altered, or modified' to fire 'continuously by continuous trigger pressure." DeLay Decl. ¶90.[14]

AB 1127 and these historical laws "share the same justification: to protect innocent persons from harm from especially dangerous uses of weapons." *Duncan*, 133 F.4th at 879. Historical laws restricting weapons used in especially dangerous ways were enacted in response to dangers at the time, such as the criminal use of machine guns in the early 20th century and the use of trap guns and bowie knives in assaults in the 19th century. As those weapons circulated more widely among civilians and were used more frequently in crime, governments restricted them, while permitting access to other weapons for self-defense. *See Duncan*, 133 F.4th at 875–76. AB 1127 is similarly justified because the firearms it restricts are designed in a manner that facilitates dangerous use by criminals who take advantage of technological advances. These pistols can be "readily converted" into machineguns by nearly anyone with a simple pistol converter. *See supra* at 3–4. Pistols converted into machineguns with pistol converters have been used in mass shootings, and the number of pistol converters recovered in crimes recently has skyrocketed, particularly in California. Gonzalez Decl. ¶37.

[14] This tradition of barring the conversion of semiautomatic weapons into automatic weapons has continued over several decades. DeLay Decl. ¶¶92–96.

There is no doubt that a ban on machineguns is consistent with the Second Amendment. *Duncan*, 133 F.4th at 882–83 (noting that the Supreme Court observed it would be "startling" to read the Second Amendment as prohibiting a ban machineguns); *see United States v. Kittson*, 161 F.4th 619, 631 (9th Cir. 2025) (confirming, post-*Bruen*, that machineguns are dangerous and unusual weapons that fall outside the scope of the Second Amendment). Now that criminals are relying on new technology to exploit design flaws in certain semiautomatic pistol models to convert them into machineguns, the Legislature has reacted to address this dangerous use in the same way that legislatures historically have. Throughout our Nation's history, "[w]hen criminals took advantage of technological advances in weapons, legislatures acted to restrict an especially dangerous use of those weapons." *Duncan*, 133 F.4th at 876.

AB 1127 also imposes a "comparable," if not lesser, burden on "the right of armed self-defense." The historical laws described above (such as the bans on machineguns) often restricted entire classes of weapons, including by banning their sale or possession. AB 1127 allows the sale of numerous alternative handgun models, with AB 1127-compliant handgun models from Glock and Derya apparently on their way. Gonzalez Decl. ¶34. AB 1127 does not ban the possession of non-compliant pistols, nor does it prohibit sale or acquisition between private individuals. Cal. Penal Code §27595(a), (c). And as with the historical laws, AB 1127 allows people to keep and bear numerous comparable alternatives for armed self-defense. *See Duncan*, 133 F.4th at 880 ("Each of those laws [the trap gun, Bowie knife, and slungshot laws], like California's law, burdened the right to armed self-defense by prohibiting a specific, particularly dangerous use of a weapon.").

## II. THE EQUITIES DISFAVOR GRANTING A PRELIMINARY INJUNCTION

Even if the United States had demonstrated a likelihood of success on the merits, the balance of the equities and public interest—merged in this context, *see*

*Roe*, 137 at 922—would still counsel against preliminary relief. *See Winter*, 555 U.S. at 23–24.

Here, the balance of equities does not support the extraordinary relief of a preliminary injunction. The harms that California and the public would suffer if these handgun safety regulations are enjoined are weighty. The California Legislature enacted these regulations to avoid accidental shootings and thwart easy access to machineguns, *see supra* at 2, 19, and the evidence supports that they do so, *see* Gonzalez Decl. ¶¶16, 18–22; *id.* Exs. B–D (studies establishing that CLIs and MDMs prevent accidental shooting deaths and injuries); Gonzalez Decl. ¶¶37, 40 (explaining how redesigning firearms such that they are not readily convertible into machineguns can avoid such criminal conversion, and that according to ATF data, California was in the top ten states where pistol converters were recovered). Enjoining them would frustrate the Legislature's determination, as the elected representative of the people, that these statutes safeguard the public interest—irreparably harming California and the public alike. After all, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see Al Otro Lado v. Wolf*, 952 F.3d 999, 1015 (9th Cir. 2020).

On its side of the balance, the United States places little on the scale. It offers no *evidence* of harm, resting its case entirely on its legal argument that the challenged regulations violate the Second Amendment. *Compare* MPI 15–16, *with Vasquez Perdomo v. Noem*, 148 F.4th 656, 665 (9th Cir. 2025) (plaintiffs submitted "21 sworn declarations" describing harms they suffered from suspicionless seizures by immigration enforcement officers). That merits position is mistaken, *see supra* at 8–19, which alone is sufficient ground to deny this preliminary injunction motion, *see Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). But even if

the United States were right on the merits, a preliminary injunction still would be inappropriate given the relative balance of harms.

"As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam). Contrary to the United States assertion, MPI 15–16, that is true even where the plaintiff alleges "constitutional offense[s]," *id.* at 157. While a preliminary injunction may not be denied where constitutional injury is alleged without even analyzing a plaintiff's likelihood of success on the merits, *see Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023), it would be equally inappropriate to grant a preliminary injunction without determining that the balance of equities supports such relief, *see Benisek*, 585 U.S. at 158; *Winter*, 555 U.S. at 23–24. Here, they do not. In contrast to the public safety benefits that flow from enforcing these handgun safety laws, the United States offers no argument, let alone concrete evidence, that these statutes meaningfully impair Californians' ability to exercise armed self-defense.

As discussed above, they have no such effect. *See supra* at 10–11. Indeed, as to AB 1127, this Court recognized as much in denying a TRO. *See* ECF No. 26 at 7 (United States failed to establish sufficient harm). And as to the UHA's CLI and MDM requirements, the Ninth Circuit's stay of the preliminary injunction of those requirements in *Boland* reflects that Court's determination that the equitable balance does not favor enjoining those requirements. *See Boland* Stay (granting stay pursuant to *Nken v. Holder*, 556 U.S. 418, 434 (2009)). That determination properly "inform[s] how [this] court should exercise its equitable discretion" here, given the similarities between the challenge to the UHA in this case and that in *Boland*. *Trump v. Boyle*, 145 S.Ct. 2653, 2654 (2025); *see, e.g.*, *Thakur v. Trump*, 163 F.4th 1198, 1208 (9th Cir. 2025).[15]

---

[15] That these UHA requirements have been in effect for over 19 years also weighs against enjoining them. *See* Cal. Senate Bill 489 (2003); *Benisek*, 585 U.S.
(continued…)

**CONCLUSION**

This Court should deny the United States's motion for preliminary injunction.

Dated: August 25, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General

/s/ *Edward P. Wolfe*

GABRIELLE D. BOUTIN
VIVIANA M. HANLEY
CHRISTINA MCCALL
SABRINA T. MCGRAW
EDWARD P. WOLFE
Deputy Attorneys General
*Attorneys for Defendants*

---

at 160. ("In considering the balance of equities … plaintiffs' unnecessary, years-long delay … weigh[s] against their request.").

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 25, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General

/s/ *Edward P. Wolfe*

GABRIELLE D. BOUTIN
VIVIANA M. HANLEY
CHRISTINA MCCALL
SABRINA T. MCGRAW
EDWARD P. WOLFE
Deputy Attorneys General
*Attorneys for Defendants*