ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General
EDWARD P. WOLFE
GABRIELLE D. BOUTIN
VIVIANA M. HANLEY
SABRINA T. MCGRAW
CHRISTINA MCCALL
Deputy Attorneys General
State Bar No. 234139
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-7890
Fax: (916) 324-8835
E-mail: Christina.McCall@doj.ca.gov
*Attorneys for Defendants State of California and Robert Bonta, in his official capacity as head of the California Department of Justice*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>**v.**<br><br>**STATE OF CALIFORNIA and ROBERT BONTA, in his official capacity as the head of the California Department of Justice,**<br><br>Defendants. | 8:26-cv-01697-MRA-ADSx<br><br>**DECLARATION OF BRENNAN RIVAS**<br><br>Date: September 11, 2026<br>Time: 1:30 p.m.<br>Courtroom: 9B<br>Judge: The Honorable Monica Ramirez Almadani<br>Trial Date: None set<br>Action Filed: 7/01/2026 |

# Table of Contents

Expert Report of Brennan Rivas ........ 3
Background & Qualifications ........ 3
Methodology ........ 4
Summary of Opinions ........ 4
Historical Regulations of Weapons & Related Materials for Public Safety ........ 7
I. Inherent and Essential Danger ........ 7
A. Proof of Firearms ........ 7
B. Gunpowder & Explosive Materials ........ 10
II. Unusually Dangerous ........ 14
A. Slung Shots ........ 15
B. Toy Pistols ........ 17
C. Trap Guns or Spring Guns ........ 21
D. Bowie Knives & Bladed Weapons ........ 24
III. Handgun Sales Restrictions ........ 28
Historical Process & Methods Applied to History & Tradition of Gun Regulation ........ 31
I. The Challenge of Identifying Historical Analogues ........ 31
II. Analyzing Analogues as a Historian ........ 33
Consumer Protection as Public Safety ........ 35
Conclusion ........ 41

## EXPERT REPORT OF BRENNAN RIVAS

## BACKGROUND & QUALIFICATIONS

1. I am a historian and currently work as the Assistant Director of the Clements Center for Southwest Studies at Southern Methodist University. Prior to becoming the Assistant Director of the Clements Center, I worked as a Senior Postdoctoral Researcher and Associate Director at the Center for the Study of Guns and Society at Wesleyan University in Middletown, Connecticut. Before that, I was the Lloyd Lewis Fellow in American History at The Newberry Library (2021-2022), a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University (2020-2021) and a Lecturer in American History at Texas Christian University (2019-2020). My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

2. My expertise includes historical weapon regulations in the United States. I have authored multiple publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, “Enforcement of Public Carry Restrictions: Texas as a Case Study” (June 2022), was published in the *UC Davis Law Review*. I am currently completing a book manuscript based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period. This manuscript has undergone the first round of peer-review and is currently under contract with an academic press. I have yet more articles forthcoming with the *Colorado Law Review* and within an edited collection entitled *American Violence: Histories, Structures, and Legacies* (peer-reviewed, with Evan Turiano).

3. I have provided expert witness declarations or reports in numerous cases, all involving firearm or weapon regulations. A complete list is attached as Exhibit B.

4. I am being compensated by the California Attorney General's Office at a rate of $250/hour for document review and consultation, $300/hour for research, writing and editing materials, and $400/hour for deposition, testimony, and related activities.

5. My curriculum vitae is attached hereto as Exhibit A.

**METHODOLOGY**

6. This declaration is a work of historical scholarship, informed by analysis of primary and secondary sources. Having studied the subject of historical gun regulations for many years now, I have drawn upon knowledge gained from reading numerous, peer-reviewed scholarly books and articles, in addition to law review articles and media such as blogs and news articles. I have supplemented that with additional research into the development of firearms, cartridges, and magazine technologies during the late nineteenth and early twentieth centuries. I have read or consulted many books about the development of firearms and other weapons from the early modern period to the mid-twentieth century. At its core, my research relies upon primary sources like historical laws, court opinions, digests, and newspaper reports. In addition to online repositories like Westlaw, Hein Online, Hathi Trust, Chronicling America, and the Duke Repository of Historical Gun Laws, I have made use of digital collections housing government documents and rare newspapers.

**SUMMARY OF OPINIONS**

7. This report is divided into three parts but its general purpose is to provide important historical information relative to two challenged California statutory schemes—the Unsafe Handgun Act and Assembly Bill 1127. AB 1127 identifies a feature of some semiautomatic handguns as posing a unique risk to public safety by enabling easy conversion of the firearm into a "machinegun." AB 1127 prohibits the retail sale (with some exceptions) of semiautomatic handguns with a "cruciform trigger bar" that allows this easy conversion.[1] The Unsafe Handgun Act creates a roster of handguns that have been tested and approved to meet state-mandated safety requirements, including a chamber-load indicator and a magazine disconnect mechanism. Plaintiffs argue that there are no historical regulations "analogous to the

[1] California Penal Code Sections 16685, 27595.

UHA's chamber-load indicator, magazine-disconnect mechanism, and microstamping requirements," and that therefore "those requirements are unconstitutional."[2]They further argue that AB 1127 is effectively a ban upon a handgun in common use and assert that "[t]here is no historical tradition analogous to a ban of a weapon in common use."[3]

8. There are relevant historical analogues from the eighteenth and nineteenth centuries that speak to the "how" and "why" of the challenged statutory schemes. The first section of this declaration, "Historical Regulations of Weapons & Related Materials for Public Safety," presents these analogues in three subsections. The first subsection addresses historical firearm proving laws and gunpowder regulations. Beginning in the early 1800s, Massachusetts and Maine required that all firearm barrels be tested and "proved" for safety before lawful sale. This state-mandated proving process was designed to protect the public by ensuring that firearms sold would not maim or kill their users. Other regulations in the North American colonies and United States placed restrictions upon the sale, possession, and/or manufacture of explosive substances (like gunpowder or fulminates) on the basis of their inherent danger. These included laws requiring that gunpowder be inspected and approved before lawful sale, and which established strict rules for its storage within populated areas.

9. The second subsection presents a larger set of analogues, drawn especially from the nineteenth century—when American homicide rates were on the rise and the widespread carrying of concealable weapons became a cause of serious concern. State and local governments identified certain weapons as especially dangerous to the public, and consequently imposed restrictions upon their sale, manufacture, or possession. The declaration discusses the problems posed by and regulations imposed upon four of these weapons: slung shots, toy pistols, bowie knives (along with other fighting knives), and trap guns (also known as spring guns).

10. The third subsection reviews a series of sales restrictions from the nineteenth century, prohibiting or restricting the sale of concealable handguns. These analogues are particularly insightful in regard to Plaintiff's characterization of AB 1127 as a "ban" on a

[2] Complaint, ECF No. 1 at 12-13.
[3] ECF No. 28 at 13.

common-use handgun for which "[t]here is no historical tradition."[4] Indeed the laws in this subsection applied themselves to pistols and other weapons that were popular and which were circulating among the general public in ever higher numbers. While exact figures for the production, sale, and circulation of pistols in the nineteenth century is unknowable, we can conclude from the weight of the evidence within primary sources (historical laws, newspapers, appellate cases, and the like) that the very concealable handguns and deadly weapons barred from retail sale in these statutes were models which would-be weapon-carriers and handgun buyers likely wanted.

11. Moving on from historical analogues, the second part of this report focuses on historical process, methods, and ethics. The analogous historical laws called for by the U.S. Supreme Court's *Bruen* framework are not readily available to researchers, and many historical laws remain undiscovered. Though many are contained within the Duke Repository of Historical Gun Laws, far more are locked behind the paywalls of keyword-searchable databases like Hein Online. Often scattered and buried within different kinds of legislation, weapon-related laws can be hard to find even for the researcher who knows exactly what she is looking for. To make matters more complicated, some pertinent regulations were enforced by private entities, municipal records are often not digitized, and countless pieces of evidence from the historical record remain undigitized or have not been preserved at all. These primary sources should be interpreted in accordance with the academic and ethical standards of the historical profession, which equips its practitioners to weigh evidence (or the absence of it) in a way that does justice to the past. Taking account of the historical method is important in this case, in particular, because Plaintiffs suggest that the search for historical analogues must uncover laws from the Founding and Reconstruction Eras that featured restrictions directly comparable to requirements about chamber-load indicators, magazine disconnect mechanisms, and microstamping[5]—all impossible if not inconceivable technologies at those points in time.

---

[4] ECF No. 28 at 13.
[5] ECF No. 1 at 12-13.

12. The third and final part of this report discusses nineteenth-century notions of the police power, showing that strict regulations in the name of public health and public safety affected the use, sale, transportation, and manufacture of firearms and/or ammunition. Thus, the historical record shows that—even though identical laws did not exist in the nineteenth century—laws with similar policy contours did. Importantly, laws designed to protect the public safety, promote public health, and protect marketplace consumers filled historical statute books, and some of those applied to firearms.

## HISTORICAL REGULATIONS OF WEAPONS & RELATED MATERIALS FOR PUBLIC SAFETY

13. This first part of the report describes a series of historical laws that are similar in one way or another to the challenged statutory schemes. The first subsection presents laws that regulated the manufacture of firearms as well as the storage, sale, manufacture, and/or transport of gunpowder on the basis that they were inherently dangerous by their very nature. The second presents four types of weapons that were subject to restriction because they had features or functions that made them especially dangerous or deadly: slung shots, toy pistols, bowie knives (and other fighting knives), and trap guns (also known as spring guns). These are merely examples and do not comprise an exhaustive list. Finally, a section about pistol sales restrictions demonstrates that nineteenth-century lawmakers had the authority to distinguish between those handguns that were safe and appropriate to be sold to the public versus those that were not.

### I. INHERENT AND ESSENTIAL DANGER

14. The following historical regulations targeted specific items or products on the basis of their inherent danger to life and wellbeing. They include proof laws for firearm barrel production, and laws surrounding the manufacture, storage, sale, and transportation of gunpowder and explosive material.

#### A. Proof of Firearms

15. The historical laws most closely analogous to the challenged laws are so-called "proving" laws that set state-required standards upon the manufacture of firearm barrels. The process is as old as the gun manufacturing trade itself, and in early modern England rules were in

place for testing the strength of barrels before placing them in the hands of soldiers or militiamen.[6] The English were by no means the only power to put their firearms through a proof process. The French government did as well by proving barrels in addition to gunlocks.[7] Moreover, during the French Revolution, gun inspectors' authority expanded to include not only privately made firearms destined for French military service, but gun barrels made for civilian markets as well (including the thousands of pistols produced there annually).[8] During the American Revolution and Founding Era, laws and regulations of this nature applied to the nascent gun manufacturing industry within the colonies and early United States.[9]

16. Proving barrels essentially involved firing excess loads from a gun—deliberately causing force and heat beyond what a regular load would create. Proving was crucial to gunsmithing to ensure the safety of the gun user and others nearby. Because the discharge of a firearm begins with an explosive reaction (in historical guns, black powder and a spark), the barrels become hot when in use. A barrel that is tempered incorrectly cannot withstand heavy use and may explode. Barrels could also explode if the hole had not been bored correctly. Gun users fire from near the face, neck, and chest—so explosions were often lethal. For soldiers, the tight formations of early modern warfare meant that one defective barrel could remove multiple men from the field.[10]

---

[6] Priya Satia, Empire of Guns: The Violent Making of the Industrial Revolution (New York: Penguin Press, 2018), 28-31, 38; J. N. George, English Guns and Rifles: Being an Account of the Development, Design and Usage of English Sporting Rifles and Shotguns (Harrisburg: The Stackpole Company, 1947), 35-36, 66.

[7] A gunlock is "The firing mechanism on a small arm," consisting of such smaller parts as the tumbler, sear, and spring. It is fitted within a lockplate present on the side of a firearm. See *Firearms: An Illustrated History* (New York: DK Publishing, 2014), 310 (glossary, including terms "gunlock" and "lockplate.").

[8] On French traditions of gun inspection, barrel proofing, and lock testing, see Ken Alder, *Engineering the Revolution: Arms and Enlightenment in France, 1763-1815* (Princeton: Princeton University Press, 1997), 169-175 ("The central authorities justified state involvement in civilian gun production by pointing to the need to control the possession of an artifact so disruptive to the public safety and public order."). On the proof process in Europe and the United States generally, see Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 473-477.

[9] Graham Ambrose, "Gun Making at the Founding," *Stanford Law Review* 77 (2025), 271-278.

[10] For an approachable, informative look at why proofing remains important in gunmaking, see Jim Carmichael, "Why Most Guns Don't Blow Up," *Outdoor Life* (February 12, 2025), https://www.outdoorlife.com/guns/why-most-guns-dont-explode-proofing/ (accessed June

(continued…)

17. Key historical analogues to the Unsafe Handgun Act are the firearm inspection laws adopted by Massachusetts and Maine in the early nineteenth century. The kind of expertise required to bore barrels and custom-fit other componentry of guns was not common across the United States.[11] In fact, expert gunsmithing at that time preponderated in the Connecticut River Valley of New England.[12] It is therefore not surprising that Massachusetts, home to Springfield Armory on the banks of the Connecticut River and a key site in early American gun manufacturing, would see a need to regulate the trade. Maine separated from Massachusetts to become a state in 1820 and understandably maintained some similarities to Massachusetts.[13]

18. In Massachusetts, laws from 1805 and 1814 delineated a process for appointing barrel provers, charging them with responsibility for evaluating the safety of the barrels, and stamping them to signal whether they had passed proof.[14] Provers were appointed by the governor and had to test each barrel manufactured in the state. The process was laid out in detail, requiring provers to test twice with different loads of gunpowder.[15] Notably, these laws applied to firearms manufactured for civilian sale, and left those produced on behalf of the War Department to the appropriate oversight of military and ordnance authorities (who had their own standards and

---

4, 2026). See also "Chapter XI: The Proof of Guns," in W. Greener, *The Gun and Its Development* 9th ed. (London: Cassell and Company, 1910), 288-309 (describing the "definitive" proof process in England).

[11] On the significant distinctions between gunsmithing as the forging of original parts versus gunsmithing as the assembly of premade parts, versus gunsmithing as carrying out routine repairs and maintenance, see Brian DeLay, "The Myth of Continuity in American Gun Culture," 113 Cal. L. Rev. 101.

[12] Felicia Johnson Deyrup, *Arms Making in the Connecticut Valley: A Regional Study of the Economic Development of the Small Arms Industry* (York, PA: George Shumway, 1970), 4-5 ("…this region [the Connecticut River Valley of New England] is both the area in which the bulk of American small arms manufacture has normally been located, and, more significantly, the center from which most of the achievements of the industry have spring."). This book was originally published as *Arms Makers of the Connecticut River Valley* by Smith College Studies in History, Vol. XXXIII (1948).

[13] In this particular instance, Maine lawmakers adopted regulations quite similar to those of Massachusetts in 1821—about a year after statehood. Gunsmithing was also a significant industry in "southern Maine." Sey Deyrup, *Arms Making*, 15-16.

[14] 1805 Mass. ch. 35, "An act to provide for the proof of fire arms manufactured within this Commonwealth"; 1814 Mass. ch. 192, "An Act in addition to an act, entitled 'An act to provide for the proof of Fire Arms, manufactured within this Commonwealth'."

[15] 1805 Mass. ch. 35, "An act to provide for the proof of fire arms manufactured within this Commonwealth," §1.

procedures for proving).[16] Maine enacted a similar law in 1821.[17] The governor appointed "provers of the barrels of all new, or unused firearms," who stamped the barrels and completed a certificate of proof.[18]

19. In Massachusetts and elsewhere, firearm factories and powder mills were subject to police regulations that ultimately excluded them from residential areas to protect local populations against exposure to noxious odors, incessant noise, and potential fires or explosions.[19] In Burlington, Iowa, for instance, an ordinance gave local government the authority to designate where "shooting batteries" (likely test firing facilities or gun ranges) could be located within town limits, and reserved the right to erect them to authorized gunsmiths only.[20]

**B. Gunpowder & Explosive Materials**

20. While these state-backed proving laws preponderated in New England, where advanced gunsmithing and barrel production had deep roots, gunpowder regulations stretched across the country. In fact, so many laws and regulations applied themselves to gunpowder that it is beyond the scope of this report to recount or cite them all.[21] Suffice it to say that gunpowder (and fulminating powders) were subject to regulation on multiple fronts. During the Revolution, New Jersey and Rhode Island adopted laws requiring that gunpowder be inspected before sale. Much like with the barrel proving laws discussed previously, inspectors had to assess the quality

[16] On the exceptions within the Massachusetts proving laws for firearms made at Springfield Armory, or made as part of a government contract, see Billy Clark, "'Proven' Safety Regulations: Massachusetts 1805 Proving Law as Historical Analogue for Modern Gun Safety Laws," 108 Minn. L. Rev. Headnotes 327 at 342-345.

[17] Maine, *Laws of the State of Maine* (Hallowell: Glazier, Master & Co., 1830), 546, ch. 462, "An Act to provide for the proof of Firearms," approved 1821.

[18] Ibid., §1.

[19] See below section titled "Consumer Protection as Public Safety."

[20] Charles Ben Darwin, *Ordinances of the City of Burlington, with Head Notes and an Analytic Index* (1856), 149-150 (repeating an 1841 ordinance), available at the Duke Repository of Historical Gun Laws: https://firearmslaw.duke.edu/laws/chas-ben-darwin-ordinances-of-the-city-of-burlington-with-head-notes-and-an-analytic-index-page-149-150-image-149-150-1856-available-at-the-making-of-modern-law-primary-sources, accessed August 14, 2024.

[21] Laws pertaining to gunpowder are some of the most common in historical statute books, session laws, and municipal codes. See the "Manufacturing, Inspection and Sale of Gunpowder and Firearms" category within the Duke Repository for Historical Gun Law, which identifies 140 relevant laws enacted by colonial, state, or municipal governments. https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search, accessed August 18, 2026. On gunpowder regulation, see also Saul Cornell and Nathan DeNino, "A Well-Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73 (November 2004), 510-512.

of the gunpowder and place a special mark or stamp upon each cask.[22] The New Jersey regulation was adopted in response to problems posed by the "vending of damaged or bad Gun-Powder" and specified that gunpowder should be inspected and assessed on the basis of its "Quickness in Firing, Strength, Dryness, and other Qualities."[23] A 1794 Pennsylvania law laid out rules for storing and testing the strength of gunpowder—all to protect "the purchaser and consumer…against fraud and imposition" of "inferior" gunpowder.[24] And in New Hampshire, a law from 1820 heavily regulated not only the sale of gunpowder but its manufacture as well. Inspectors of gunpowder were required to "prove" the powder in accordance with detailed testing procedures laid out within the text of the law.[25]

21. Local sanitation and hygiene ordinances kept powder mills and stockpiles on the outskirts of settled areas, far from populated cities. New York City's 1872 health code provided that no "establishment or place of business…for carrying on any offensive or noisome trade or business, shall hereafter be opened, started, or established…without a permit… ."[26] Citing *Kent's Commentaries*, the document elsewhere provided as a "remedy for nuisances" that "Unwholesome trades…the deposit of powder…the building of combustible materials…may all be interdicted by law, in the midst of dense masses of population, on the general and rational principle, that every person ought so to use his property as not to injure his neighbors, and that private interests must be made subservient to the general interests of the community."[27] The notable absence of gunpowder in American cities even served as a rhetorical tool for Roger Taney in his argument before John Marshall in the case *Brown v. Maryland*. He posited that the overturning of a commercial regulation would pave the way for the indiscriminate and reckless

---

[22] 1776 New Jersey ch. 6, 6-8, "An Act for the Inspection of Gun-Powder;"; 1776 Rhode Island 25, "An Act for the Inspection of Gunpowder, Manufactured within this State."

[23] 1776 New Jersey ch. 6, §2. The preamble stated: "Whereas the vending of damaged or bad Gun-Powder within this State, especially in the Time of War, may be of the most dangerous Consequence."

[24] 1794 Pennsylvania ch. 337, "An Act providing for the Inspection of Gun-powder."

[25] 1820 New Hampshire ch. 25, 274-276, "An Act to Provide for the Appointment of Inspectors and Regulating the Manufactory of Gunpowder."

[26] New York City, Manual of the Board of Health, of the Health Department of the City of New York (New York: D. Appleton & Company, 1872), 61, § 74. Hereinafter referred to as New York Board of Health Manual.

[27] *New York Board of Health Manual*, 170-171 (citing 2 Kent's Com., 420).

sale of "large quantities of gunpowder in the heart of a city and thus endanger the lives of the citizens."[28] Marshall's opinion did overturn the challenged law, but in doing so defended states' exacting regulations on gunpowder, finding the enterprise well within the police powers that protected public safety.[29]

22. In addition to restrictions upon the location of powder mills and storage facilities, the sale and transportation of gunpowder was also subject to strict regulation, at times spelled out in tremendous detail. The states who, as John Marshall explained, wielded the police power to "direct the removal of gunpowder" were also authorized to delegate the policing of gunpowder and explosive materials to municipal governments better situated to create and administer policies that worked for a particular community. For this reason, city charters often included recognition that city officials could regulate the sale, storage, and transportation of gunpowder—often by requiring licenses for dealers or manufacturers.[30] Nebraska's legislature gave all cities of the first class (with class designations being predicated upon a population threshold) "power to license…all venders of gun powder…and in granting such license may exact and receive such sum or sums of money as the Council shall think fit and expedient."[31] America's largest cities, though, prescribed detailed rules and regulations for the storage, sale, and even transportation of gunpowder. Chicago's 1851 ordinance contained seven sections laying out the process of applying for a gunpowder permit, how and when such permits must be renewed, how gunpowder and guncotton[32] could be transported, and specifying penalties for violators. Importantly, the

[28] *Brown v. Maryland* 25 U.S. 419 (1827); see also William J. Novak, *The People's Welfare: Law & Regulation in Nineteenth-Century America* (Chapel Hill: University of North Carolina Press, 1996), 53-54.

[29] Idem.

[30] For examples, see 1845 Iowa ch. 122, § 12 ("That the said city council…shall have power to regulate by ordinance the keeping and sale of gun-powder within the city."); 1847 Indiana ch. 55, § 8.4 ("The common council…shall have power for and within the city…To regulate and license…the keepers of gun powder and other explosive compounds, and in all these cases to charge and receive for such license such sum as the common council may ordain."); 1849 Ohio 406, § 4 ("That the said town council of Ripley shall have power to ordain and establish laws…to regulate the sale of gunpowder therein… ."). These are merely examples, they do not form an exhaustive list.

[31] 1869 Nebraska 53, § 47.

[32] Guncotton is a form of treated cotton that is highly explosive. It was developed in the mid-1800s by Austrian scientists and is now known as nitrocellulose. Innovations in the use of guncotton in gunpowder production ultimately led to the development of smokeless powder. See

(continued…)

ordinance forbade not only the sale of such products "in any quantity," but also the possession of it and the giving of it to others.[33] New York City similarly levied special rules upon anyone who would "manufacture, have, keep, sell, or give away any gunpowder, blasting powder, gun-cotton, nitro-glycerin, dualin, or any explosive oils or compounds…except…upon the conditions herein provided… ." Permitted dealers could keep on hand no more than fourteen pounds of gunpowder at any one time.[34] City officials further held the right to enter "all buildings, dwelling-houses, livery and other stables, hay-boats, or vessels, and places where any merchandise, gunpowder…or other combustible materials may be lodged… ."[35] This New York City ordinance built upon a longstanding tradition within the city, which regulated the storage of gunpowder during the Founding Era as well. An ordinance printed in 1793 specified that gunpowder must be kept within the city's magazine, in the custody of an overseer who ensured that the powder was turned regularly and transported in accordance with safety requirements.[36] And another from 1788 prohibited the storage of large deposits of gunpowder within a mile of city hall.[37] It, too,

---

"Gun Cotton," *Journal of the Society of Arts* 19 (London), November 18, 1870, 724-726; Jonathan Law and Richard Rennie, eds., "Cellulose Nitrate," *A Dictionary of Chemistry* (New York: Oxford University Press, 2020), 252; "Nitrocellulose," *Encyclopedia Britannica* https://www.britannica.com/science/nitrocellulose#ref241771 (accessed August 19, 2026). Another informative resource on guncotton is Yoel Bergman, "Union and Confederate Views on Guncotton," *Vulcan* 3 (2015), 93-109, see esp. 93-96.

[33] "Regulating the Keeping and Conveying Gun Powder and Gun Cotton," *Ordinances of the City of Chicago*, available at Duke Repository of Historical Gun Laws. See esp § 1, "That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing… ."

[34] The ordinance did not specify how much could be had or kept by persons not engaged in the business of selling gunpowder. Nor did it stipulate that commissioners needed warrants or other authorization prior to "enter[ing] into and examin[ing] all buildings…vessels, and places" where gunpowder, explosives, and combustible materials might be. See Mark Ash, *The New York City Consolidation Act, as in Force in 1891* (Albany: Weed, Parsons and Company, 1891), 209-210. An 1821 Maine law also authorized local officials (in this case town selectmen) to enter premises upon suspicion of violation of gunpowder storage laws and the issuance of a warrant. See 1821 Maine ch. 25, 98-100 at 99, §5.

[35] Ibid., 214.

[36] "A Law to Regulate the Keeping of Gun-Powder in the City of New-York," in Richard Varick, comp., *Laws and Ordinances, Ordained and Established by the Mayor, Aldermen and Commonalty of the City of New York, in Common Council Convened* (New York: Hugh Gaine, 1793), 25-28. The date of this ordinance's enactment is unclear.

[37] "An Act to Prevent the Storing of Gun-Powder, within Certain Parts of the City of New York," in Varick, comp., *Laws and Ordinances* (1793), 62-64. The law specified that no more than 28 pounds of gunpowder could be kept within any building inside the one-mile demarcation line, and such 28 pounds had to be divided into at least 4 separate "Stone Jugs or Tin Canisters." See Ibid., 62, §1. Note that between approximately 1793 and 1872, the maximum amount of gunpowder that could be lawfully stored within the city dropped from 28 pounds to 14 pounds.

authorized city officials to enter private premises on suspicion of a violation.[38] Regulating the manufacture, storage, and transportation of gunpowder and other explosive (and even combustible) materials is a longstanding feature of American history, rooted deeply in the state's interest in protecting the public from harm.[39]

## II. Unusually Dangerous

23. The essential, inherent danger of firearms and gunpowder justified state and municipal regulation of their manufacture, sale, and storage. But firearms and gunpowder were also recognized as necessary devices for communal defense, militia preparedness, hunting, and other purposes. There were, however, some devices and weapons deemed especially dangerous without providing the kinds of social benefits bestowed by firearms-access on the part of the public. These unusually dangerous weapons were, therefore, subject to the unmitigated policing of government in the name of public safety. In other words, they could be taxed at prohibitive rates and even banned altogether. This tradition of rigorous regulation dated back to medieval English history and carried over into the North American colonies. The Crown was responsible for keeping the peace within the realm, and that authority endowed the monarch with substantial regulatory powers—including those related to the possession and carrying of firearms and other weapons. At various points in English history, the Crown and Parliament restricted the possession of firearms among the poorer classes, prohibited concealable firearms called *dags*, and heavily regulated access to other deadly weapons.[40] English laws also restricted the carrying of weapons and prohibited travelers from carrying firearms into taverns.[41]

---

[38] Ibid., 64, §4. Upon suspicion, officials could issue warrants to enter buildings.

[39] The preambles to some of these regulations explicitly state as much, such as New York City's 1788 ordinance, which reads: "Whereas the Practice of storing Gun-Powder within certainParts of the City of New-York, is dangerous to the Safety of the said City: Therefore, … ." See Ibid. (fn 32-33).

[40] On early English gun and weapon regulations, see Lois G. Schwoerer, *Gun Culture in Early Modern England* (Charlottesville: University of Virginia Press, 2016), 46-64; Lois G. Schwoerer, "English and American Gun Rights," in Jennifer Tucker et al, eds. *A Right to Bear Arms: The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Scholarly Press, 2019), 139-141.

[41] On English regulations regarding the carrying of weapons, see Statute of Northampton 2 Edw. 3, c. 3 (1328); Patrick J. Charles, "The Many Faces of the Second Amendment Outside the Home: History versus Ahistorical Standards of Review," *Cleveland State Law Review* 60 (1) (2012): 1–55, 13–25; Mark Anthony Frassetto, "To the Terror of the People: Public Disorder

(continued…)

24. This report addresses four unusually dangerous weapons from the nineteenth century: slung shots, toy pistols, bowie knives (along with other fighting knives), and trap guns (also known as spring guns). There are numerous other such weapons that became subject to strict regulation during the eighteenth and/or nineteenth centuries, such as metal knuckles, and sword canes.[42] This section of the report, therefore, is not exhaustive in its presentation of historical laws that regulated certain unusually dangerous weapons.

**A. Slung Shots**

25. A slung shot was a makeshift weapon associated with organized crime and street gangs. Unlike a sling shot that we might think of today, a slung shot was a weapon in which a weighted ball could be swung from a cord or handle in a striking motion. The Oxford English Dictionary defines it as "[a] shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon," and attributes it to the United States.[43] The phrase could describe various kinds of homemade weapons and did not have a single, nationwide definition. A commenter from the South during the 1870s described a slung shot as being "made by putting stones in woolen stockings."[44] Around the same time, a Native American "war-club" was also referred to as a type of slung-shot with "the stone ball hanging loosely from the handle in a bag of buckskin."[45] Testimony in a Texas trial (1908) offered an explanation of the slung shot's use and deadliness. "The only slung shot I ever saw was by having a ball of shot or metal covered with leather, and a band of elastic or leather, attached to such a ball, and made so that the same could be attached to the wrist or arm of a person[.] . . . [A]nd, when a person using them would strike with his fist, the ball or weight would extend beyond his fist and strike a person, and, by being covered, would cause no sound."[46]

---

Crimes and the Original Public Understanding of the Second Amendment." *Southern Illinois University Law Journal* 43 (2018): 61–90.

[42] For an overview of some of these additional weapons and their regulation, including trap guns, see Robert Spitzer, "Understanding Gun Law History after *Bruen*: Moving Forward by Looking Back," *Fordham Urban Law Journal* 51, no. 1 (2023), 57-115.

[43] "Slung-shot," Oxford English Dictionary.

[44] Quoted in Richard Hopwood Thornton, An American Glossary: Being an Attempt to Illustrate Certain Americanisms Upon Historical Principles, 2 vols. (London: Francis & Company, 1912), II: 815.

[45] Otis T. Mason, "American Indian Weapons," *Nature* (June 10, 1875), 107-108, Fig. 2.

[46] *Geary v. State*, 53 Tex. Crim. 38 (1908).

26. Unlike firearms and knives, which required specialized knowledge and equipment to manufacture, a slung shot could be made by just about anyone. The weapon may have derived from a similarly named device commonly used by sailors—spare rope could be tied into a heavy "monkey's fist" knot, which could then be thrown (or *slung*) across some distance to pass a rope or line from one sailor or vessel to another.[47] Slung shots and other club-like instruments also had no military function, unlike rifles and muskets conducive to militia service, or the large "horse pistols" used by cavalry. Beginning in the 1830s and 1840s, accounts of these devices used in the commission of crimes or carried by riotous crowds appeared in newspapers.[48] By the close of the 1840s, laws prohibiting the carry, use, and manufacture of slung shots began to appear in numerous states. In 1849, Vermont's legislature passed a law saying, "Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose or keep for sale or gift, or part with any instrument or weapon of the kind usually known as slung shot, or of any similar kinds, shall be deemed guilty of a misdemeanor."[49] The law went on to punish carrying, using, attempting to use, and being "found in the possession of" a slung shot as a felony.[50] Similar laws went into effect in New York (1849), Massachusetts (1850), Florida

[47] David S.T. Blackmore, *The Seafaring Dictionary: Terms, Idioms and Legends of the Past and Present* (Jefferson, NC: McFarland & Company, 2009), 207, ("Monkey's fist: A heavy knot at the end of a heaving line, making it easier to throw. Often tied around a lump of lead wrapped in a rag."). Early references to "slung shot" within American newspapers used the term in connection to sailors. For example, see "U.S. Circuit Court," *New York Daily Express* (New York, New York), August 4, 1840 (Describing the trial of a man charged with assault "with a dangerous weapon, called in sea phrase 'slung shot,' being about ¼ lb. lead used either for fishing or the sounding line.").

[48] For an early example, see "Riot and Outrage," *Republican Herald* (Providence, Rhode Island), August 19, 1835 ("In the afternoon of yesterday, eight Portuguese, each with a club in the right hand, and a stone or shot slung in a little canvas bag in the left, strolled over to the west side of the goal, where they fell in [fought] with two or three sailors, and a drunken woman, whom they beat and bruised most unmercifully."). See also "Outrage Last Night," *New York Commercial Advertiser* (New York, New York), September 27, 1844 (After an attack upon a Whig political procession, the reporter said: "We have seen a deadly implement that was wrested from one of the assailants; and one better adapted for striking a fatal blow it would not be easy to devise. The technical name of it is a 'slung-shot'; and it consists of a lump of lead, weighing nearly a pound, firmly attached to one end of a cord, perhaps two feet long, which has at the other hand a loop for the rasp of the wielder. The one we have seen is quite new, and was probably made or bought for this especial occasion.").

[49] 1849 Vermont ch. 36, 26 § 1.

[50] 1849 Vermont ch. 36, 26 § 2.

(1868), Dakota Territory (1883), Minnesota (1885), and Oklahoma Territory (1890) among others.[51]

**B. Toy Pistols**

27. Another item which came under heavy regulation during the nineteenth century was the toy pistol. Deceptively named, this device was exceptionally deadly even though it was ostensibly designed for childhood amusement and play. The label "toy pistol" embraced a number of different devices, some of which were essentially miniaturized guns. But the kind that elicited the strongest public condemnation was made of cast iron, measuring about four inches in length with a two-inch barrel. The breech-loading device could break open via a spring mechanism, or it could feature a rotating barrel (like a revolver). In the post-Civil War period, numerous patents for toy pistols were filed, and many thousands of them were produced and sold within American communities over the ensuing decades.[52] An estimate from 1883 was that 50,000 toy pistols were

---

[51] 1849 N.Y. ch. 278 § 1 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, or expose, or keep for sale or gift, or part with any instrument or weapon the kind usually known as slung shot, or of any similar kinds,"); 1850 Mass. ch. 194 § 2 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose for sale, any instrument or weapon of the kind usually known as slung shot,"); *Laws of Florida – First Session* (1868), Ch. VII, § 11 ("Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles,"); *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative Assembly* (1883), ch. 38, § 455 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor." Repeated during statehood, *see Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1899), ch. 40, "Crimes against the Public Health and Safety," 1461 § 7311); *Penal Code of the State of Minnesota to Take Effect January 1, A.D. 1886* (St. Paul: Pioneer Press Co., 1885), § 333 ("A person who manufactures or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles,"); *Oklahoma, 1st Regular Session*, (1890), ch. 25, 475–76 § 18 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor."). This is not an exhaustive list.

[52] The index for U.S. patents (1790-1873) lists dozens under headings like toy-gun, toy-pistol, toy cannon, toy breech-loading fire-arm. Most of these are dated to the 1860s and early 1870s, showing that they were new phenomena at that time. See *Subject-Matter Index of Patents for Inventions issued by the United States Patent Office from 1790 to 1873, Inclusive*, 3 vols. (Washington: Government Printing Office, 1874), III: 1559-1560. A report from 1883 states that "it is claimed that nearly 50,000 of these toy pistols were sold to toy dealers for the last Fourth of July."

sold to toy dealers over the preceding Fourth of July.[53] The style, manufacture, and design of toy pistols were quite similar to real pistols, so their emergence in the 1860s and later may have been a way for gun-makers to turn a profit once the US Army and Navy slowed their orders following the end of the Civil War.[54] Most toy pistols appear to have been made as a 22-caliber firearm designed to shoot blank 22-caliber short rounds, though live rounds could easily be substituted for the blanks.[55]

28. Toy pistols elicited a strong, condemnatory response from the general public for two reasons. First, they were capable of shooting projectiles and thereby becoming a deadly weapon as opposed to simply a toy.[56] And second, because they were likely to cause tetanus infections and deaths as a result of lockjaw. When fired, the blank cartridges caused bits of wadding, cartridge casing, and fulminating powder to penetrate the skin, carrying tetanus bacillus deep enough to cause infection. Furthermore, the design of some (possibly most) toy pistols called for a breech-loading process that encouraged users to hold the barrel in their left hand against pressure from a spring. At times the opening snapped closed unexpectedly, causing an inadvertent discharge of the blank cartridge on or next to the user's left hand. Doctors who treated

---

[53] Arthur Hazlewood, "Remarks on Toy Pistols," Proceedings and Addresses at a Sanitary Convention Held at Pontiac, Michigan, April 26 and 27, 1883, Under the Direction of a Committee of the State Board of Health and a Committee of Citizens of Pontiac (Supplement to the Report of the Michigan State Board of Health for the Year 1883 No. 198 (Lansing: W. S. George & Co., 1883), 90.

[54] Catie Carberry, "The Origin of Toy Guns in America," *Second Thoughts Blog*, Duke Center for Firearms Law, Duke University (July 18, 2019), https://firearmslaw.duke.edu/2019/07/the-origin-of-toy-guns-in-america/ (citing *CNN* and *Collector's Weekly* that "modern toy guns were produced in an effort by gun factories to stay in business after demand dropped at the conclusion of the Civil War," and that "the modern history begins with the cap gun, invented by shotgun manufacturers who retrofitted their factories in the settling smoke of the Civil War.").

[55] On the caliber of toy pistols, see Paul A. McIlhenny, "The Deadly Toy Pistol and Its Relationship to Tetanus," *Society Proceedings – Orleans Parish Medical Society, Meeting of April 11, 1903* reproduced in *New Orleans Medical and Surgical Journal, July 1902 to June 1903* (New Orleans: The L. Graham Co., Ltd., 1903), 744. A useful description of the toy pistol and its potential dangers can be found in "A Warning to Parents. The Toy Pistol," *Hartford Daily Courant* (Hartford, Connecticut) July 21, 1881, 1, reprinted from *New York Sun*.

[56] See Pennsylvania's restriction against the sale of certain firearms and toy imitations of them, which described the prohibited toys as capable of "being exploded, fired off and discharged, and thereby become a dangerous and deadly weapon." Cap guns, by contrast, had an unbored barrel and were incapable of shooting projectiles. The wafer of fulminating powder and wadding therefore did not shoot at high velocity into objects such as hands, appendages, etc. 1881 Pennsylvania, 111, No. 124.

patients and studied the outbreak of toy-pistol-induced tetanus infections noted that most injuries were to the hand. They often appeared so slight that children and their parents opted out of seeking medical attention only to find out too late that lockjaw had set in and death was imminent. This posed a serious threat to public health, and therefore public safety, which justified state and local action at the time.[57]

29. The response to toy pistols was widespread outrage along with sales restrictions. The fact that these lethal devices afflicted primarily children with incurable, fatal illness was (understandably) upsetting to people at the time.[58] One of the first jurisdictions to take action was Baltimore, Maryland. An 1881 ordinance made it unlawful "to sell, give away, or dispose of in any manner, what is known as 'the toy cartridge pistol' within the limits of the city."[59] Pennsylvania restricted their sale that same year, followed by Maryland, Wisconsin, New Jersey, and Vermont in 1882.[60] Vermont's law, for example, penalized any person "who has in his

---

[57] Hazlewood, "Remarks on Toy Pistols," 92. See also C. H. Claudy and Clarence Maris, "The Deadly Toy Pistol," *The Technical World Magazine* XI, No. 1 (March 1909), 476-482.

[58] "Sweet Little Jessie," *Boston Daily Globe* (Boston, Massachusetts), September 21, 1886, 4 (an emotional recounting of the death of a young girl from a toy pistol shot to the face); "A Symposium of Murderous Rivals," *Puck* 40, no. 285 (New York, New York), August 23, 1885, 395 (a full page of poems and illustrations about common killers of children, with special emphasis on the toy pistol: "…If of these rivals, / Variously harmful, / I am not surely / Past peradventure / Leader and chieftain— / Deadliest and direst?"; illustrations especially condemn dealers in toy pistols, who sell them to boys with full knowledge of their fatal effects.). See also "The Murderous Toy Pistol," *Hartford Daily Courant* (Hartford, Connecticut), July 19, 1882, 3 (listing sixteen recent deaths by way of toy pistols, only one of which involved an adult; most decedents were aged 11-14).

[59] "An Ordinance to Prohibit the sale and use of the Toy Cartridge Pistol with the limits of the City of Baltimore," No. 120, *Ordinances of Baltimore* (1881), available at the Duke Repository of Historical Gun Laws, https://firearmslaw.duke.edu/laws/the-ordinances-and-resolutions-of-the-mayor-and-city-council-of-baltimore-passed-at-the-annual-session-of-1880-and-1881-page-162-image-162-vol-11-1881-available-at-the-making-of-modern-law-prim/.

[60] 1881 Penn. Ch. 124 (prohibiting sale of cannons, revolvers, pistols, or imitations or toys of such "constructed or arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls, and being exploded, fired off and discharged, and thereby become a dangerous or deadly weapon," as well as "any cartridge, gunpowder or other dangerous and explosive substance," to minors under age sixteen); 1882 Wisconsin Ch. 116 (prohibiting the sale, use, and having in one's possession "for the purpose of exposing for sale or use, any toy pistol, toy revolver, or other toy firearm," and providing criminal penalty); 1882 N.J. Ch. 4 (prohibiting the sale, barter, exchange, or exhibition for such, and the hiring or loaning of any "gun, pistol, toy pistol, or other firearms in this state" to persons under fifteen years, and prohibiting persons under fifteen years from purchasing, bartering, exchanging, carrying, firing, or using "any gun, pistol, toy pistol or other firearms in this state," and assessing criminal penalties); 1882 Vermont ch. 82 (prohibiting the sale or possession with intent to sell of any toy pistol, and assessing criminal penalties and civil liability).

possession a toy pistol for the explosion of percussion caps or blank cartridges with intent to sell the same, or sells, or offers to sell or give away the same," and declared violators "liable for all damages resulting from such selling or giving away, to be recovered in an action on the case."[61] The statewide law in Maryland declared that "it shall be unlawful for any person or persons within the State of Maryland to manufacture or to sell, barter or give away the cartridge toy pistol to any one whomsoever."[62] Regulations limiting or prohibiting the sale of toy pistols, or prohibiting their manufacture, took effect in Ohio, Kansas, New Hampshire, Washington Territory, and Maine (1883), and in Iowa, Utah Territory, Michigan, and Mississippi (1884), and in Indiana (1885).[63] Yet more states enacted similar restrictions in later decades.[64]

---

[61] 1882 Vermont ch. 82.

[62] 1882 Maryland Ch. 424, § 1 (subsequent section prohibited "any person, be he or she licensed dealer or not" from the selling, bartering or giving away of "any firearm whatsoever or other deadly weapons, except shot gun, fowling pieces and rifles" to minors under twenty-one years, and assessing criminal penalties).

[63] 1883 Ohio ch. 336, 222 (penalizing the sale of toy pistols to minors under fourteen, and assessing criminal penalties and civil liability); 1883 Kans. Ch. 105 (penalizing the sale or furnishing of deadly weapons, including toy pistols, to minors or persons of "notoriously unsound mind," and penalizing minors having deadly weapons, including toy pistols, in their possession); 1883 N.H. Ch. 10 (penalizing possession of toy pistols or other firearms with intent to sell the same, and assessing criminal penalties and civil liability); 1883 Wash. Terr. 67 (prohibiting the sale or offering for sale of toy pistols, as well as furnishing "any pistol, toy pistol or other pocket weapon, in which explosives may be used" to persons under sixteen years); 1883 Maine Ch. 216 (prohibiting having in one's possession "a toy pistol for the explosion of percussion caps or blank cartridges, with intent to sell the same," or selling, offering for sale, or giving away of such, and assessing criminal penalties and civil liability); 1884 Iowa Ch. 78 (prohibiting the sale, presentation, or gift of "any pistol, revolver or toy pistol to any minor" and assessing criminal penalties); 1884 Utah Terr. Ch. 1 (prohibiting the sale or gift of a toy pistol "to any person in this Territory" under criminal penalty); 1884 Michigan, Ch. 138, 144 (prohibiting selling, giving, or furnishing to children under thirteen years, "any cartridge of any form or material, or any pistol, gun, or other mechanical contrivance, specially arranged or designated for the explosion of the same," and providing criminal penalties); 1884 Mississippi Ch. 74 (prohibiting "any person company or corporation" from selling or offering for sale "any toy pistol, cartridges, caps or other contrivance by which said pistols are fired, within the limits of the State of Mississippi" and assessing criminal penalties); 1885 Ind. Ch. 74 (prohibiting the manufacture, sale, exposure for sale, giving away "as a prize or reward, any to pistol, or other device for the purpose of exploding caps or wafers, containing fulminates or other explosive compounds" and assessing criminal penalties).

[64] Louisiana (1893): John Q. Flynn, *Flynn's Digest of the City Ordinances…of the City of New Orleans* (1896), 545, quoted in Duke Repository of Historical Gun Laws, https://firearmslaw.duke.edu/laws/john-q-flynn-flynns-digest-of-the-city-ordinances-together-with-the-constitutional-provisions-acts-of-the-general-assembly-and-decisions-of-the-courts-relative-to-the-government-of-the-ci/ (prohibiting the sale, lease for giving of any "pistol, dirk, bowieknife, toy pistol for which cartridges are used, or any other dangerous weapons which may be carried concealed" to persons under eighteen years, and providing criminal penalties); 1900 N.Y. Ch. 222 (prohibiting the selling or giving away of "any instrument or weapon commonly known as a toy (continued…)

**C. Trap Guns or Spring Guns**

30. Another weapon subject to regulation during the nineteenth century was the trap gun or spring gun.[65] These deadly devices were essentially booby trapped guns loaded and ready to fire when an unsuspecting person tripped a wire that pulled the trigger.[66] They were different from "trap-guns" used in "trap-shooting," which was "The sport of shooting pigeons, glass balls, etc., released from a spring trap."[67] These booby trapped guns were also not to be confused with spring guns in which a "missile is discharged by the release of a spring."[68] Though the term "spring gun" appears to have come into use during the eighteenth century, the practice itself is older. For instance, records from seventeenth-century Plymouth Colony restricted the "setting of guns" as a result of "several persons [having] been greatly endangered" by it.[69] A century later,

---

pistol, in or upon which any loaded or blank cartridges are used or may be used" to persons under sixteen years); 1902 Virginia Ch. 186 (prohibiting "any person, firm, corporation, or association" from selling, bartering, exchanging, furnishing, or disposing of by gift etc. "any toy gun, pistol, rifle, or other toy firearm, if the same shall, by means of powder or other explosives discharge blank or ball charges" to persons under twelve years, and prohibiting the purchase, acceptance, or acquisition "in any manner" of said articles on behalf of a person under twelve years, and assessing criminal penalties); 1903 S.C. Ch. 79, 123 (prohibiting "any person, firm or corporation, in this State," from selling, keeping or offering for sale, or giving away "any toy pistol, in which caps or cartridges are used, or any caps or cartridges for such toy pistol" and assessing criminal penalties); 1909 Arkansas 810 (prohibiting "any person, firm or corporation" from giving away, selling or offering for sale, "or to make or manufacture any toy pistol, firecracker—commonly known as cannon crackers—or gun that shoots a blank cartridge," and prohibiting the receiving, owning, carrying , or shooting of "any such toy pistol, gun or cannon cracker within this State" and assessing criminal penalties).

[65] On trap guns and their regulation in American history, see Robert J. Spitzer, "Understanding Gun Law History after *Bruen*: Moving forward by Looking Back," *Fordham Urban Law Journal*, 51, no. 1 (2023), 57-115 at 100-102 (Describing and explaining "historical restrictions on trap guns.").

[66] "Spring Gun," *Oxford English Dictionary* (Definition 1: "A booby trap consisting of a gun equipped with a triggering device, such as a trip wire, designed to cause it to fire when a person or animal passes through an area or interacts with a particular object, typically used to protect property or land.").

[67] "Trap-shooting," *Oxford English Dictionary*. See also "Trap-gun," *Oxford English Dictionary* ("a shotgun used in trap-shooting.").

[68] "Spring Gun," *Oxford English Dictionary* (Definition 2: "A toy gun in which the missile is discharged by the release of a spring.").

[69] *Records of the Colony of New Plymouth in New England*, 12 vols. (Boston: William White, 1861), 11: 230. ("Whereas seuerall psons haue bine greatly Indangered by seting of Guns It is enacted by the Court and the authoritie thereof that none shall sett any Guns except in Inclosures and that the gun be sufficiently enclosed soe as it be Cecure from hurting man or beast and that hee that seteth the gun doe giue warning or notice thereof to all the Naighbours on the penaltie of paying a fine of fiue pounds to the vse of the Collonie for euery default;"). The law appears to have been passed in 1670. https://archive.org/details/recordscolonyne02courgoog/page/n249/mode/1up?view=theater All 12 vols available here: https://www.sec.state.ma.us/divisions/archives/collections/plymouth-records.htm

colonial lawmakers in New Jersey similarly penalized "a most dangerous Method of setting Guns" in which "the [Gun] shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance."[70]

31. Restrictions upon the use of trap or spring guns often appeared in relation to hunting regulations. In some cases, historical laws explicitly state that the purpose was to prevent inappropriate hunting practices, like luring game into a trap.[71]

32. But spring and trap gun laws were not *just* about humane hunting practices—they were also about public safety. As the colonial Plymouth and New Jersey laws showed, the setting of guns in a trap endangered innocent people who might unsuspectingly trip the device. In fact, trap guns shot people (as opposed to animals) often enough that states addressed it in their corpus of law for both homicide and trespass. In Minnesota, for instance, "the setting of a so-called trap or spring gun, pistol, rifle or other deadly weapon" violated the law, and the penalty scaled upward depending upon whether a person was injured or killed as a result.[72] Law in Washington took a similar approach.[73] In Michigan, laws about trap guns and exploding devices prohibited

[70] 1771 New Jersey ch. 540, "An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns," § 10 ("An whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it enacted by the authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun un such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for six Months.").

[71] For example, 1877 New York ch. 411, § 1 (excerpted from "An Act to further amend chapter seven hundred and twenty-one of the laws of eighteen hundred and seventy-one, entitled 'An act to amend and consolidate the several acts relating to the preservation of moose, wild deer, birds and fish'."); 1880 Wisconsin ch. 170, § 4 ("…or who shall kill, destroy or wound any wild duck, brant or goose, by the use of any pivot or swivel gun, or any fire-arm other than a gun habitually used at arm's length and fired or discharged from the shoulder, or when raised and held by the hand, or by any float, sneak boat, sail or steam boat, or floating box or similar device, or from any fixed or artificial blind or ambush located in open water outside or beyond the natural cover of reeds, canes, flag or wild rice, of any lake river, bay or inlet, or attempt so to do…"; 1915 Tennessee ch. 152, §§ 37, 45..

[72] 1869 Minnesota ch. 309, "An Act to prohibit the setting of traps or spring guns, rifle, or other deadly weapons." In the case of no injuries, penalties were a) county jail 6 months or longer; 2) fine up to $500; or c) both. In the case of a non-fatal injury, the penalty was prison no longer than five years. In the case of death, the penalty was prison 10-15 years.

[73] Frank Pierce, comp., *Pierce's Code, State of Washington, Cyclopedic Arrangement including Laws 1919* (Seattle: National Law Book Co., 1919), 2566, "Firearms and Weapons," § 8836, "Setting Spring Gun."

"[leaving] or [permitting] the same to be left, except in the immediate presence of some competent person," and if death were to ensue, it would be manslaughter.[74]

33. When property owners set up trap guns in the face of trespassers, they ran into longstanding common law practices about whether lethal force could be employed to protect property outside one's dwelling. In Iowa, for instance, a property owner set up a trap gun to protect his vineyard from plunder by trespassers and ended up shooting a man. The shooting victim survived but was wounded, and he won a suit against the property owner. The court stated that a property owner "cannot prevent a trespass by using means dangerous to life."[75] A trap gun set up near a well ended up killing an innocent woman, and the gun-setter—a man trying to ward off thieves upon his property—was arrested in connection with the homicide.[76] An Alabama case from 1877 asserted that the unlawfulness of setting spring guns to prevent trespass was a nationwide consensus—and this in a state without a specific spring gun statute.[77] The court summed up the problem with trap guns quite well by saying that their danger to the public

---

[74] Andrew Howell, comp., *General Statutes of the State of Michigan* (Chicago: Callaghan & Co., 1882-1890), 2212, § 9114, "Setting Spring Guns and Other Dangerous Devices," ("That if any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.").

[75] *Hooker v. Miller*, 37 Iowa 613 (1873). The court went on to say: "The act of defendant, we conclude, upon the authority cited and upon principle, in preparing the means whereby plaintiff's life was endangered and from which he sustained great bodily injury, was unlawful. It follows, in the application of familiar doctrines, which do not demand the support of authority to secure their recognition, that he is liable for the injury inflicted upon plaintiff."

[76] "Killed by a Spring Gun," *Chicago Tribune* (Chicago, Illinois), April 29, 1884, 7 ("The owner of the well said he placed the gun there [near a well] to protect himself against thieves. He was lodged in jail."). The killing occurred in Texas.

[77] *Simpson v. State*, 59 Ala. 1 (1877). "The preservation of human life, and of limb and member from grievous harm, is of more importance to society than the protection of property. Compensation may be made for injuries to, or the destruction of property; but for the deprivation of life there is no recompense; and for grievous bodily harm, at most, but a poor equivalent. It is an inflexible principle of the criminal law of this State, and we believe of all the States, as it is of the common law, that for the prevention of a bare trespass upon property, not the dwelling-house, human life can not be taken, nor grievous bodily harm inflicted. If in the defence of property, not the dwelling-house, life is taken with a deadly weapon, it is murder, though the killing may be actually necessary to prevent the trespass." Also, counsel for appellant argued "There is no statute on the subject [of setting a spring-gun] in Alabama," and "not a case can be found in the reports of England or America, where any one has been prosecuted for shooting another with a spring-gun." The court disagreed with this argument notwithstanding the lack of a pertinent statute in Alabama.

outweighed a person's interest in protecting their property. "The preservation of human life, and of limb and member from grievous harm, is of more importance to society than the protection of property. Compensation may be made for injuries to, or the destruction of property; but for the deprivation of life there is no recompense; and for grievous bodily harm, at most, but a poor equivalent."[78]

34. In some instances, the use of trap guns could only be tolerated as a mode of protecting a dwelling or place of business from burglary.[79] Some shop owners and home owners certainly resorted to trap guns or spring guns to defend their premises and succeeded in wounding or killing their would-be burglars.[80] But even then, if the trap gun harmed or killed an innocent person, the gun-setter could be held civilly or criminally liable.[81] Sadly, trap guns also had the unfortunate effect of wounding or killing the person who set them.[82]

**D. Bowie Knives & Bladed Weapons**

35. An especially dangerous deadly weapon during the nineteenth century was the bowie knife. Named for James Bowie, who used the blade to great effect in a duel-turned-melee in 1827, the style became the most widely known, used, and discussed by Americans in the

---

[78] *Simpson v. State*, 59 Ala. 1 (1877).

[79] See *Scheuermann v. Scharfenberg*, 163 Ala. 337 (1909). Case applied the protections to dwelling to a man's place of business—a store with valuable goods protected at night by a spring gun. See also "The Burglar Trap Gun," *Cincinnati Daily Enquirer* (Cincinnati, Ohio), November 7, 1870 ("That the accused would have been justified in killing Tweedle under the circumstances of attempting burglary, had the former surprised him in such an attempt, no one can doubt, and at the best the deceased died from the misdirection of his own felonious act.").

[80] Many newspaper reports about trap guns described their effectiveness against burglars without validating or criticizing their use. For example, see "Post Office Robber Shot," *Washington Post* (Washington, D.C.), August 24, 1891, 1; "Burglar Shot," *Detroit Free Press* (Detroit, Michigan), February 17, 1870), 1; "Notorious Crook Killed," *St. Louis Post-Dispatch* (St. Louis, Missouri), October 23, 1897, 1; "Penny's Trap Gun at Work," *Atlanta Constitution* (Atlanta, Georgia), December 20, 1898, 7. It is unclear whether these shop and homeowners faced charges for their setting of trap guns.

[81] See "Illinois: Suit to Recover Damages for Injuries Received from the Accidental Discharge of a Trap Gun," *Chicago Tribune* (Chicago, Illinois), December 22, 1870, 4 (In which the family of an innocent woman wounded by trap gun sue shop owner who set the same); "Killed His Wife's Mother," *San Francisco Chronicle* (San Francisco, California), September 20, 1895, 4 (In which a man whose trap gun at his cabin killed his mother-in-law pleaded guilty to manslaughter charge); "Did Burke Set a Trap Gun?" *New York Tribune* (New York, New York), August 21, 1894, 5 (In which the inquest into the shooting of a man by his father-in-law within the home investigated whether it was accomplished purposefully by way of a trap gun).

[82] "Set His Own Death-Trap," *St. Louis Post-Dispatch* (St. Louis, Missouri), October 21, 1897, 4; "His Trap Gun," *Cincinnati Enquirer* (Cincinnati, Ohio), December 25, 1896, 1.

nineteenth century. In justifying a sentence enhancement for homicides committed with bowie knives, a Texas judge described them as inherently more dangerous than most other weapons: "It is an exceedingly destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie knife differs from these in its device and design; it is the instrument of almost certain death. He who carries such a weapon, for lawful defence, as he may, makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon."[83]

36. In his description of the bowie knife as a fearsome weapon, a commentator from the 1860s said, "Among the many means invented for man's destruction, this of Colonel Bowie is the most effectual in execution, the most fearful to the sight and imagination;… ."[84]

37. Despite its entry into mainstream conversations during the nineteenth century, we cannot be sure what the original bowie knife actually looked like because it disappeared after Bowie's death at the Alamo in 1836.[85] What we do know, however, is that "bowie knife" as a term came to describe a large knife with clipped blade—one with a sharpened swedge[86] that made it more lethal. Bowie knives had long blades, often measuring 8 to 12 inches, and the point of the knife was generally aligned with the handle to make it a more effective weapon.[87] Americans

[83] *Cockrum v. State*, 24 Tex. 394 (1859). This case is more frequently cited for the sentence preceding this passage, that "The right to carry a bowie-knife for lawful defence is secured, and must be admitted." That was the law in Texas at the time, but state policy changed in 1871 to prohibit the open or concealed carrying of deadly weapons (including bowie knives). That law's constitutionality was affirmed by a state supreme court of pro-Union appointees as well as a Redeemer-Era court of Democrats headed by none other than this judge himself, Oran M. Roberts. See 1871 Texas ch. 34; *English v. State* 35 Tex. 473 (1872); *State v. Duke* 42 Tex. 455 (1875).

[84] P. R., "Bowie Knife," *Army and Navy Journal* 4, no. 36 (April 27, 1867), 570.

[85] For more information on the mysterious origins of the bowie knife, see Harold Leslie Peterson, *American Knives: The First History and Collectors' Guide* (New York: Scribner, 1958), 26-27; Sid Latham, *Knives and Knifemakers* (New York: Winchester Press, 1973), 104-112.

[86] A swedge is a secondary edge on a knife blade, which—when sharpened—allows the knife to penetrate flesh more effectively. On swedges, see Norman Strung, *An Encyclopedia of Knives* (Philadelphia: J. B. Lippincott Company, 1976), 59-61.

[87] On bowie knives having tips aligned with their handles, see Strung, *An Encyclopedia of*

(continued…)

often discussed or made reference to bowie knives, but there were numerous styles of fighting knives in circulation during the nineteenth century. At times, the term "Arkansas toothpick" also referred to a bowie knife, though it eventually referred to a knife that was generally similar to a bowie but double-edged and tapered.[88] In fact, there were so many styles and names of knives that Americans sometimes struggled to distinguish them from one another. To make matters even more complicated, labels and definitions might vary geographically, change over time, and were not set in stone during the nineteenth century.[89] A case arising in Tennessee during the 1840s revolved around what particular style of knife a defendant had carried (the jury settled on Mexican pirate knife) and whether he had been indicted for carrying a bowie knife, or a knife *resembling* a bowie knife. The abundance of knife names and styles inspired lawmakers to insert catchall language into weapon regulations such that they regulated not only the carrying of specifically enumerated bladed weapons, like a dirk, dagger, bowie knife, but also "any other knife of the like kind," or more sweepingly "any other deadly weapon."[90]

38. After the death of Jim Bowie in 1836, criticism of bowie knives mounted.[91] A particularly gruesome incident occurred in Arkansas, when one member of the state legislature murdered a fellow member on the floor of the House of Representatives with a bowie knife.[92] Americans' response to this horror of bloodshed was regulation.

39. As especially dangerous weapons, bowie knives and similar knives could be regulated by state and local governments much more stringently than could militia weapons (like muskets and rifles). Nineteenth-century laws generally included these knives in lists of so-called

---

*Knives*, 96. See also "Bowie Knife," (1867) (describing the bowie as having a twelve-inch blade with an edge "keen, smooth;" and "The point is curved and hollowed at the back, cutting both ways like a two-edged sword. It is two inches broad at the heel, and of proportional thickness. Its weight alone is sufficient to give effect to a descending blow; and a child, thus armed, might well intimidate a man of strength and courage.").

[88] On the interchangeable use of "bowie knife" and "Arkansas toothpick" during the nineteenth century, see Peterson, *American Knives*, 59. For an explanation of these knife styles as understood by modern collectors, see Strung, *An Encyclopedia of Knives*, 95-97.

[89] Worthen, *Arkansas Made*, I:267–268.

[90] For example, see 1839 Alabama 67, § 1 ("That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansaw[sic] tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon…").

[91] For example, see "Murder with a Bowie Knife," *The New Yorker* (October 14, 1837).

[92] See "Another Awful Tragedy—Legislating with Bowie Knives," *The Sun* (Baltimore, Maryland), December 27, 1837.

"deadly weapons" or "concealed weapons" that were associated with interpersonal violence and could easily be concealed on the person. Men carried bowie knives hidden inside the front of their coats and at times down their backs (attached to a string).[93] Because bowie knives—like other deadly weapons—had no customary militia purpose, public carry laws tended to restrict their presence in public especially when concealed.[94]

40. Beyond public carry laws, some policies specifically targeted bowie knives for further restriction. In 1837, Alabama lawmakers taxed the sale or gift of bowie knives and the like at $100 per instance (equivalent to approximately $3,195.27 today).[95] That same year, a Georgia law prohibited the sale of bowie knives and other fighting knives.[96] An 1838 law from Tennessee prohibited "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or knives, or Arkansas tooth pick."[97] Meanwhile, in Florida

---

[93] For a useful description of the many modes of concealing weapons, including bowie knives, see J.D. Brothwick, *Three Years in California, 1851-1854* (London: W. Blackwood and Sons, 1857), 78.

[94] The regulations referred to are public carry laws that restricted the carrying of deadly weapons, especially when concealed. Tenn. 1801 ch. 22 § 6 (prohibiting "privately" carrying "any dirk, large knife, pistol or any other dangerous weapon."). Similar laws existed in numerous states during the antebellum nineteenth century, including: Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife . . . ." *See also* 1838 Vir., ch. 101 ("any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . ."; 1840 Ala., ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun . . ."; 1819 Ind., ch. 23 ("any dirk pistol, sword in cane, or any other unlawful weapon . . ."); 1821 Miss., ch. 49 ("any pistols, dirk or other such offensive weapons . . ."); 1812 Ken., ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane . . ."; 1813 La., ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon,"; Revised Statutes, Wisconsin, 1849, Title XXXI, Ch. 142, "Of Proceedings to Prevent the Commission of Crime," Sec. 18 ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon . . ."); Revised Statutes, Michigan, 1846, Title XXXI, Ch. 162, "Of Proceedings to Prevent the Commission of Crime," Sec. 16 ("a dirk, dagger, sword, pistol, or other offensive and dangerous weapon . . ."). This is not an exhaustive list.

[95] 1837 Ala. 11, § 2 ("That for every such weapon [knife or weapon, known as Bowie Knives or Arkansaw[sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie Knife or Arkansaw[sic] Tooth-pick], sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury[.]").

[96] 1837 Georgia 90. See below section "Handgun Sales Restrictions" for additional information.

[97] Tenn. 1838 ch. 137. This law was temporarily suspended during part of the Civil War. *See* Tenn. 1862 ch. 23.

Territory, an 1835 concealed-carry law proved so ineffectual that the territorial legislature followed it up with an 1838 enactment levying a tax of $200 upon anyone who chose "to vend dirks, pocket-pistols, sword-canes, or bowie-knives."[98] In 2023 dollars, the annual occupation tax would amount to approximately $6,300.[99] For a sparsely populated, rural environment like territorial Florida, this was clearly a prohibitively high tax designed to discourage trade in deadly weapons—including bowie knives.

## III. Handgun Sales Restrictions

41. A final form of relevant historical regulation is a body of nineteenth-century laws prohibiting the sale of certain kinds of handguns. Lawmakers at the time associated smaller, more readily concealable pistols with interpersonal violence as opposed to militia duty, and therefore restricted their sale.

42. An early sales restriction originated in Georgia in 1837 and proscribed not only the carrying of certain deadly weapons, but their sale as well. The law held that "it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere" certain weapons.[100] Those included "Bowie or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes spears, &c. … save such pistols as are known and used, as horseman's pistols, &c."[101] A well-known case, *State v. Nunn*, invalidated some of the rules pertaining to the carrying of deadly weapons, but it did not address the accompanying sales restriction.[102]

43. In 1856, Kentucky lawmakers prohibited "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung shot, or any imitation or substitute therefor."[103] At the time this law was passed, Colt revolvers were finally beginning to penetrate

---

[98] 1838 Fla., ch. 24.

[99] The amount of the occupation tax is approximately $6,382.73. *See*: https://www.in2013dollars.com/us/inflation/1838?amount=200.

[100] 1837 Georgia 90, § 1. The reference to "horseman's pistols" excluded from regulation those kinds of pistols customarily used in a military capacity by cavalry or mounted soldiers known as dragoons.

[101] Idem.

[102] *Nunn v. State*, 1 Ga. 243 (1846).

[103] Kentucky 1855 ch. 636, 96 § 1.

the American civilian market, which explains why lawmakers chose that word as opposed to the more general term "pistol." Lawmakers' decision there also suggests that the sale of other kinds of pistols, like single-shot derringers, remained legal, and that only the sale of Colt products violated the law. This leaves open the intriguing possibility that the Kentucky law would have prohibited the sale of Colt revolving rifles, understood at the time as having a serious and dangerous design flaw. The early models of Colt revolvers at times suffered from a "chain fire" problem, in which the ignition of one chamber within the cylinder could cause an unintentional chain reaction across the remaining un-fired chambers. This chain reaction, with a larger load and closer proximity to the user's head and face posed a serious danger to the user, and was more often associated with Colt's revolving rifles than with the pistols (though it remained a nettlesome problem among the antebellum models).[104]

44. In the post-Civil War period, more states restricted the sale of certain kinds of handguns, and the distinction between legal versus illegal hinged upon whether the weapon could be understood as a militia arm. In Tennessee, a postbellum public carry law prohibited open as well as concealed carrying of deadly weapons, holding that "it shall not be lawful for any person to publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, or revolver."[105] A challenge on Second Amendment (and state analogue) grounds found a prohibition against all "revolvers" unconstitutional because the United States Army and Navy issued certain types of revolvers to some of its servicemen, making these "army/navy" models military—and therefore militia—arms protected by the state constitution.[106] The following year (1871), the legislature enacted a replacement statute which carved out a novel exception for

[104] On chain fire in Colt revolvers, see Rasenberger, *Revolver*, 130-131, 155; Flayderman, *Flayderman's Guide*, 567.

[105] *Andrews v. State*, 50 Tenn. 165 (1871). It is also worth noting that the Tennessee court in Andrews took "revolver" to also mean "repeater." The court limited itself to insisting that a repeating pistol was "a soldier's weapon—skill in the use of which will add to the efficiency of the soldier." But the wording itself could have been interpreted even more broadly to include revolving rifles and muskets as well as carbines typically referred to as "repeaters."

[106] Tenn. Const. 1870, Article I, §26 ("That the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime.").

"army pistol[s], or such as are commonly carried and used in the United States Army… ."[107] This schema passed constitutional muster when challenged in the state court system.[108] A few years later, Tennessee lawmakers added a new vector to their gun regulation program by making it a misdemeanor to "sell, or offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistols."[109] Army/Navy models were, in recognition of the high court's previous words about militia arms, exempted. Dealers had a limited window of time to divest themselves of their current stock, and any sales after the expiration risked prosecution.[110] An almost identical chain of events took place in Arkansas, with a sweeping public carry law being overturned, a replacement law featuring an army/navy exception, and a sales restriction put in place.[111] In both states, protections for "militia" firearms resulted in people carrying them in ways that disturbed the peace—prompting lawmakers to restrict the carrying of protected pistols to in-hand only, and ultimately to sales restrictions.[112]

45. In both states, the sales restriction faced constitutional challenge, marking a sharp departure from previous decades when sales bans and prohibitive taxes had prompted no entries on the appellate record. But in both instances, the courts upheld the sales restrictions.[113] Arkansas and Tennessee provide insightful examples of nineteenth-century state governments distinguishing between handguns suitable for sale to the public versus those unsuitable. The metric they used was constitutional protection—allowing the sale (and limited carrying) of those pistols which served a military purpose; but their intent was to promote public safety by removing especially dangerous deadly weapons (like pocket pistols) from public spaces. Weapon sales

---

[107] 1871 Tenn. 90, pp.81-82. This law further held that even the exempted army pistols could only be carried "openly in his hands."

[108] *State v. Wilburn*, 66 Tenn. 57 (1872).

[109] 1879 Tenn. 96 pp.135-136.

[110] 1879 Tenn. 96 pp.135-136.

[111] 1875 Arkansas 156; *Wilson v. State*, 33 Ark. 557 (1878); 1881 Arkansas ch. 96 § 3.

[112] James F. Willis, "Arkansas's Gun Regulations," *Arkansas Historical Quarterly* 81, no. 2 (Summer 2022), 103-126, at 109 (Describing Arkansas lawmakers' and reformers' response to widespread carrying of large, protected military revolvers including their replication of the carry-in-hand policy from Tennessee). Quoting an article from *Arkansas Democrat* (Little Rock, Arkansas), December 16, 1880. Within the time constraints for the preparation of this declaration, I have not been able to locate a digital copy of this issue of the newspaper in question.

[113] *State v. Burgoyne*, 75 Tenn. 173 (1881); *Dabbs v. State*, 39 Ark. 353 (1882).

restrictions did not disappear at the turn of the century, and continued to coexist with indirect forms of regulation like licensing laws and tax requirements. For example, a 1911 Michigan law prohibited the sale of "any dirk, dagger, stiletto, metallic-knuckles, sand-bag or skull cracker" and made specific exception for "the selling or keeping for sale of hunting and fishing knives."[114]

## HISTORICAL PROCESS & METHODS APPLIED TO HISTORY & TRADITION OF GUN REGULATION

46. This second part of the report switches gears to address what is called "the historian's craft" of studying and analyzing the past. It begins with a description of how historians and Second Amendment scholars go about finding historical gun and weapon laws, emphasizing that we do not have a complete list or comprehensive database of such laws. Since the field of Second Amendment and gun regulatory jurisprudence is one that calls especially for historical analysis, practitioners should adhere to the standards of the historical profession—which requires its adherents to conform to ethical and methodological standards, and whose mission is to seek truth about the past.

### I. THE CHALLENGE OF IDENTIFYING HISTORICAL ANALOGUES

47. Identifying historical gun and weapon laws is a time-consuming process that takes special training as well as access to a number of paywall-protected research databases. This may seem like an odd assertion in our digital age of AI and instantaneous online search results, but it is nevertheless true. Researchers do not have a comprehensive list or database of such laws, and it is unlikely that they ever will. Regulations were put in place not only at the state level, but also at the municipal level—meaning that potentially thousands of historical laws were recorded in local newspapers or council meeting minutes without being preserved in accessible archival collections. Moreover, the deep interdependency between public and private enterprise in the eighteenth and nineteenth century means that a host of private entities chartered for public

[114] 1911 Michigan ch. 274, § 2. This law also laid out terms and conditions for obtaining a license to carry pistols.

purposes (especially transportation companies) established rules for customers that may not have been preserved or are challenging to locate and consult.[115]

48. A first step in locating historical gun and weapon laws is the Duke Repository of Historical Gun Laws, maintained by the Center for Firearms Law at Duke University. This collection of historical laws is indexed and searchable by location, date, and regulatory type. It is a foundationally important resource for scholars working in this field. However, the Repository is far from a complete database of historical laws. It has collected a variety of state-level policies specifically pertaining to weapons (especially firearms), but it sometimes misses weapon-related policies that are part-and-parcel of other kinds of laws (like taxation of weapons within revenue bills, for instance).

49. Searching beyond the Duke Repository is most effectively accomplished (based on my experience) through the legal database Hein Online and its constituent collections of state session laws and historical state statutes. This is not the most user-friendly database. Beyond that, analogous laws can be found in other digitized materials accessible through sites like Google Books, The Internet Archive, and Hathi Trust. At times, historical municipal codes are accessible through these tools, but at others they are only available in hard copy at a law or research library. Municipal laws were sometimes printed in newspapers, which means that researchers can consult digitized newspaper databases like Chronicling America for historical analogues. But many newspaper collections are stored in paywall-protected databases, like America's Historical Newspapers, ProQuest Newspapers, and Newspapers.com. So, deep research into this subject is all but impossible without the kinds of resources that come with academic libraries, and even then different universities and law libraries provide uneven access to the sources. And of course, only a portion of historical documents (especially municipal records) have been digitized at all—so

[115] On the relationship between public and private enterprise, see William J. Novak, "Public-Private Governance: A Historical Introduction," *in Government by Contract: Outsourcing and American Democracy*, Jody Freeman and Martha Minnow, eds., (Cambridge: Harvard University Press, 2009), 23-40. This problem manifests itself in transit-related Second Amendment cases, where ridership rules for streetcar services and railway companies—challenging sources to find—can serve as historical analogues. See Josh Hochman, "The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation," *Yale Law Journal* 133.

number-crunching based on hits found in digital repositories only takes into account a portion of the relevant sources.

50. In addition to the challenges of finding historical gun and weapon laws, there is the problem of interpretation. Laws in and of themselves tell us something about the past, but the picture they paint is incomplete. Even though laws reflect the challenges and beliefs of the societies that enacted them, they are easily misinterpreted without their proper context. Legal historians have moved away from legal formalism to embrace a "law and society" approach that seeks to embed atomized laws within the societies, classes, and associations that produced, contested, enforced, and defied them rather than simply looking to the existence, or absence, of particular types of laws. Words in lawbook cannot shed light on that. Instead, historians turn to other primary sources, like newspapers, letters, pamphlets, material objects, etc., to better understand what the law meant to historical Americans and the context in which it was enacted and enforced. This is an especially important element of research when it comes to guns—devices imbued with deep meaning and tremendous cultural weight in the past as well as in the present. To undertake this additional level of *indispensable* historical research takes yet more time.

## II. Analyzing Analogues as a Historian

51. The many historical gun and weapon regulations that researchers have found (and will continue to uncover) should be interpreted in accordance with the standard practices of historical inquiry and scholarship. Professional historians operating within academe do not hold a monopoly on the study, writing, and exposition of history, but they are separated from amateurs by "their self-conscious identification with a community of historians who are collectively engaged in investigating and interpreting the past as a matter of disciplined learned practice."[116] This "disciplined learned practice" entails specialized training and charges *professional* historians to adhere purposefully and strictly to the ethical and methodological standards of their profession.

52. Even though historians cannot *know* with certainty everything about the past, we are ultimately seekers of truth. The historian's present reality indelibly shapes the process of

[116] American Historical Association, "Statement on Standards of Professional Conduct," revised January 2023, https://www.historians.org/resource/statement-on-standards-of-professional-conduct/, accessed August 14, 2024.

researching and analyzing historical events, but "even when interpretations grow too stale to use, basic factual findings endure."[117] Thus, despite the mutability of history as a field of study, its practitioners recognize that some facts can be known and established with some certainty.[118] It is the interpretation and analysis of these facts that create the historian's craft, calling for methodological approaches and ethical practices that conform to professional standards. By adhering to professional standards, the ethical historian takes steps to avoid amateurish pitfalls. One of these is mythologizing the past, or replacing a nuanced and complex history with a convenient or useful myth.[119] Another is embracing mono-causation—which consists of "[identifying] a single factor and [seizing] on it as the *only* factor causing an event."[120] Historians are "people with special skills, who translate to others the meaning of the lives and struggles of their ancestors, so that they may see meaning in their own lives."[121] In this endeavor the professional historian seeks to do justice not only to the present audience, but also to the dead who can no longer speak for themselves.[122] Any scholarly endeavor that presents itself as rooted in the study of history must ultimately call for historical judgments—which should be determined on the basis of historians' professional standards.

53. Historical gun and weapon regulations from the eighteenth and nineteenth centuries were products of political, social, and cultural environments unlike our own today. Accounting for and appreciating these differences is crucial to properly understanding the laws themselves, what they tell us about the communities that adopted them, and how they may be "analogous" to current laws. For the purposes of this case—in which a consumer safety law is being challenged—it is useful to explore the history of consumer protection and ascertain whether pre-1900 governments took regulatory action on that front.

---

[117] Zachary M. Schrag, *The Princeton Guide to Historical Research* (Princeton: Princeton University Press, 2021), 22.

[118] Idem.

[119] On truth versus myth in history, see Schrag, *Princeton Guide*, 33-35.

[120] Schrag, *Princeton Guide*, 223.

[121] Gerda Lerner, "The Necessity of History and the Professional Historian," *Journal of American History* 69, no. 1 (June 1982), 19.

[122] Jonathan Gorman, "Historians and Their Duties," *History and Theory* 43, no. 4 (December 2004), 103-117, at 111 ("This seems right: historians *as historians* owe historical truth to everyone who chooses to be part of their audience."). See also Idem at 115 ("Importantly, historians owe historical truth not only to the living but to the dead.").

**CONSUMER PROTECTION AS PUBLIC SAFETY**

46. This third part of the report provides some historical context for consumer protection in the United States. Drawing on scholarship about police power and modes of regulation during the nineteenth century, this part of the report demonstrates that consumer protection regulations (like the challenged statute) are part of a long, deep, and powerful tradition of protecting public health and safety in the United States.

47. Consumer protection is generally associated with John F. Kennedy's 1962 speech about consumer rights, which resulted in the Consumer Bill of Rights as well as landmark federal legislation on the subject. The consumer protection movement was particularly effective in advancing automobile safety by pioneering scientific studies showing the efficacy of seatbelts, airbags, and other innovations that are now standard on American cars. Historians see the origins of the movement in an earlier period, though. In the traditional historical narrative, mass production of consumer goods in the early twentieth century, and a growing reliance upon domestic consumption of such goods, ultimately led to the redefinition of American civic obligation in the New Deal Era to include patriotic consumption.[123] Even before that, advocacy organizations had formed, like Consumers Research, established in 1929 "to educate and protect consumers from harmful products."[124] As one might expect, though, the Progressives who never saw an American endeavor *not* in need of comprehensive reform were also concerned about the dangers posed by new consumer products.

48. This view of the history of consumer protection legislation is not inaccurate, but some of its implicit assumptions hide the longer history of consumer protection regulation. First, this account couches its understanding of "consumer protection" within twentieth-century movement politics. Scholars seek out grassroots action, widespread public opinion among everyday Americans, and activity along the lines of other socio-political movements, like civil

[123] Alan Brinkly, The End of Reform: New Deal Liberalism in Recession and War (New York: Knopf, 1995), 72; Lizbeth Cohen, A Consumer's Republic: The Politics of Mass Consumption in Postwar America (New York: Knopf, 2003).

[124] Consumers Research, "History," https://consumersresearch.org/history/, accessed August 14, 2024.

rights, women's rights, LGBTQ rights, etc.[125] Second, this view of consumer protection history is focused upon nationwide, federal regulation. Scholars working in the twentieth and twenty-first centuries have at times teleologically looked back to the past seeking the origins of the administrative, bureaucratic state and in finding them near the turn of the twentieth century, have inferred that the preceding era offered no viable regulatory heritage or was so weak in the face of emerging big business as to be "stateless."[126] In fact, though, consumer safety regulations made their way onto American statute books long before the twentieth-century rights-based movements, and state and local governments exercised tremendous authority over the manufacture and sale of goods.

49. Consumer protection is part and parcel of the unique form of governance prevalent across the United States during the nineteenth-century. Dubbed the "well-regulated society" by historian and law scholar William J. Novak, this governmental tradition was deeply rooted in the English common law and prioritized the polity's protection of public safety above all other concerns—above individual rights, above property rights, and before constitutional guarantees. In the century following the Founding, jurists adapted common-law precepts to a growing, thriving, modernizing United States, and sought to integrate new statutory laws and ordinances within a preexisting common-law framework. This system was necessarily local as opposed to national, and provides an all-important bridge between the premodern, patriarchal state of the colonial period and the modern, bureaucratized American state we experience today. Locally enforced rules stipulated how the commonly used goods of the society would be transported, stored, and at times even manufactured.[127]

---

[125] Narrative histories of economic regulation also tend to emphasize the "movement" origins of legislation like the Interstate Commerce Commission, Federal Trade Commission, federal antitrust laws, etc.

[126] Myth of American statelessness is predicated upon the idea that the United States is exceptional, and exceptionally individualistic at that. Though its roots reach deep into the American past, the concept solidified within historical writing during the 1950s and remained unshakably attached to histories of American government and state-building even after the Cold War period. For a concise and insightful recounting of that process, see William J. Novak, "The Myth of the 'Weak' American State," *American Historical Review* 113, no. 3 (June 2008), 755-758.

[127] Novak, *The People's Welfare*, 19-50 (describing the "well-regulated society" and its origins in common law). The extent and intent of the police power was illustratively explained by Massachusetts judge Lemuel Shaw in the case *Commonwealth v. Alger*, 61 Mass. 53 (1851).

50. The "well-regulated society" and its practice of "localized law" has been overlooked by scholars of law and history not because it lies outside of American history and tradition (in fact it is foundational), but because inquiries into the history of "the state" have identified that concept with the national government and federal action rather than state or local governance. Changing conceptions of citizenship, constitutional law, and individual rights—all resulting from the passage and interpretation of the Reconstruction Amendments—slowly displaced this common-law-based system of regulatory governance.[128]

51. Despite its being forgotten, though, the well-regulated society formed a critically important pillar of the American legal tradition. Its common law conception of public good (*salus populi*) placed tremendous power in the hands of governing officials (elected and appointed) to protect the public from harm. This power could reach as far as destroying personal property to prevent the spread of fire and disinterring bodies buried in urban cemeteries. The flip-side of this protection of the public was a mandate to promote the health and wealth of the community through necessary regulation of commercial activity and private property. All manner of regulations ensured fair exchange at marketplaces, segregated noisome and noxious trades away from residential neighborhoods, and implemented sanitation procedures for the community. In other words, the police power was exercised in the name of public safety first and foremost, with other attendant goals like the protection of public health and economy growing out of it.[129]

52. The umbrella of nineteenth-century regulations is wide enough to provide an analogical cover for an unknown number of current laws pertaining to weapons. Some are particularly well-matched for consumer safety laws about firearms, like the challenged laws in this case. Of those, several have already been addressed in this report: laws related to gunpowder, proof of firearms, and the manufacture and/or sale of especially dangerous weapons like bowie knives, slung shots, toy pistols, etc. We have also seen nineteenth-century state governments discriminate between firearms that are lawful to sell versus those that are not. In the cases of

[128] On the "well-regulated society," see Novak, The People's Welfare, 19-50; on "localized law," see Laura F. Edwards, The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South (Chapel Hill: University of North Carolina Press, 2009), 3-10.

[129] Novak, The People's Welfare, 19-50.

Arkansas and Tennessee, that distinction applied specifically to styles of handguns, allowing so-called "army/navy" pistols to be legally sold while prohibiting the same for pocket pistols. There are yet more historical regulatory policies that, while less directly analogous to the challenged law, demonstrate the presence of a broader public-health regulatory tradition that reached into the manufacture and use of firearms and related materials.

53. A dynamic field of regulation in the eighteenth and nineteenth century involved sanitation, health, and hygiene. Maritime trade exposed residents of port cities to contagion transported on merchant vessels, and unsuitably prepared foodstuffs threatened to cause disease outbreaks. Cities like New York and Boston established health boards in the 1700s, and by the early 1800s the Massachusetts legislature had authorized all towns to form their own local boards of health.[130] These organizations were vested with state police power to create and enforce regulations that promoted the public health and prevented unnecessary threats to life and wellbeing. Rules and policies pertained to mandatory quarantines, environmental hazards like stagnant water or dumping of waste, the keeping of animals, and the carrying on of so-called "noxious trades" that endangered people residing in the vicinity.[131] Health or sanitary rules were woven into state code books, as were the responsibilities and powers of health officers and inspectors.[132]

54. In its pioneering study of the state's public health, the Massachusetts Sanitary Commission compiled a number of resources, including existing laws pertaining to public health,

---

[130] Howard D. Kramer, "Early Municipal and State Boards of Health," *Bulletin of the History of Medicine* 24, no. 6 (1950), 503-529; for a Massachusetts example, see 1810 Mass. Laws ch. 62, "An Act to empower the inhabitants of the town of Plymouth to choose a Board of Health, and for removing and preventing nuisances in said town." Of note is § 7, apparently restating from a previous enactment, "That each town and district in this commonwealth may, at their meeting held in March or April annually…choose and appoint a Health Committee… ."

[131] Kramer, "Early Boards of Health," 505, 514-15; on the Massachusetts State Board of Health specifically, see 517-529; Novak, *The People's Welfare*, 191-233.

[132] For example, see Charles Allen, et al, eds., *The Public Statutes of the Commonwealth of Massachusetts* (Boston: Rand, Avery, & Company, 1882), in which public health regulations and duties of health officers (members of boards of health) are scattered across numerous parts, titles, and sections. In New York, sanitary officers had so many rules to enforce that the health board delegated its canine-related responsibilities to the ASPCA for many decades. See Jessica Wang, "Dogs and the Making of the American State: Voluntary Association, State Power, and the Politics of Animal Control in New York City, 1850-1920," *Journal of American History* 98, no. 4 (March 2012), 998-1024.

proposed new provisions on the subject, extracts from relevant medical publications, and even notes from international conferences on hygiene and sanitation.[133] The longstanding law prohibiting the discharge of firearms in cities was listed alongside quarantine policies as health-related legislation.[134] Members of the commission described numerous noxious trades and activities—from the use of "locomotive steam carriages, steamboats, or other vehicles," to allowing "horses, cattle, swine, or other animals" on the streets and "the manufacture, storage, and use of gunpowder and fireworks" in populated areas—the document's authors explained "These and all other nuisances of a sanitary character, which often occasion direct accidental injury or death, should be so regulated as not to become dangerous to health and life."[135]

55. Gunpowder regulations certainly aimed at fire prevention, but they were even more fundamentally about protecting people's health and safety. In proposing why public health officers were needed in Massachusetts and what their duties would be, the commission quoted an expert who described their overarching purpose by saying: "It is the right of the people at large to enjoy the elementary conditions of a natural existence. The officer of health will be authorized to act, and be recognized as the public protector of that right."[136] The commission's vision of public health law was rooted in preventive regulation, and reached into commercial activity as well as personal property.

---

[133] Massachusetts Sanitary Commission, Report of a General Plan for the Promotion of Public and Personal Health, Devised, Prepared and Recommended by the Commissioners Appointed under a Resolve of the Legislature of Massachusetts, Relating to a Sanitary Survey of the State (Boston: Dutton & Wentworth, 1850). Hereinafter referred to as Massachusetts Sanitary Survey.

[134] *Massachusetts Sanitary Survey*, 339. In New York City, longstanding regulations about the "firing of any fire-arms, the firing or setting off any squibs, gunpowder, rockets, or fire-works" were also incorporated into the health code. See George W. Morton, comp., *Laws and Ordinances Relative to the Preservation of the Public Health in the City of New York* (New York: Edmund Jones & Co., 1860), 72, § 20. Originally passed in 1833.

[135] *Massachusetts Sanitary Survey*, 183. See also p. 19, in reference to "Council of Health in Paris" mention of reports about "the condensation of the gas and vapors resulting from the refining of metals; the fabrication, preservation, and sale of fulminating and lucifer matches; the precautions to be taken in the construction of fulminating powder-mills, and the manipulation of the substances employed there."

[136] *Massachusetts Sanitary Survey*, 374; This passage is the Commission's extraction of an article published in *Journal of Public Health*. The author notes that "public bodies, especially public companies seeking after gain, are found quite as ready to sacrifice the public health for their private benefit, when such a course can be adopted in a quiet manner, as they are prompt to manifest regard for the public welfare in striking and readily observable works or operations which they expect to return large profits."

56. In a similar vein, the city of New York published reports and codes pertinent to public health and safety concerns. Its 1872 manual included a section prohibiting the setting off of "any fireworks, fire-crackers, or other substance, whereby, or by reason of which, any human life may be put in danger."[137] Subsequent sections prohibited the encouragement of fights and the firing of guns without authorization.[138] Finally, New York City's sanitary code included a significant weapon restriction: "That no person shall sell, loan, or give to, or allow to be taken by any other person, any fire-arm, or other deadly or dangerous weapon, when there shall be any reason for such first-named person to think or believe that any danger to life may illegally result from the giving, loaning, selling for from the use of such arm or weapon."[139] On its face, this law prohibits the provision of weapons to irresponsible or dangerous people; but it can also be read to support the challenged laws—that firearms which do not meet requisite safety standards should not be sold by licensed dealers to prevent "danger to life."

57. Some may find public health law easy to discount as an appropriate analogue for current firearm restrictions, and indeed constitutional scholars have tended to downplay the power and significance of public health concerns in their analyses of constitutional history.[140] This tendency has erased from our current constitutional discourse our American heritage of promoting public safety and the common good by way of public health regulation; it has also "de-constitutionalized" public health efforts and therefore robbed the concept of its force.[141] But if we are to analogize current firearm laws to those of the pre-1900 or pre-1868 period, we should bear in mind that public health was a necessary appendage of public safety at that time, and was supported by the full force of the police power as exercised by state and local authorities. Their

[137] New York Board of Health Manual, 88, § 157.

[138] New York Board of Health Manual, 88-89, §158-159.

[139] New York Board of Health Manual, 89, § 160.

[140] Wendy E. Parmet, "Health Care and the Constitution: Public Health and the Role of the State in the Framing Era," 20 Hastings Const. L.Q. 267 at 269 ("Despite the prevalence and prominence of health care issues in constitutional discourse, the unique role those issues have played is usually ignored by constitutional scholars. Health law scholars, meanwhile, often do not ask what light these cases shed on the nature of constitutional rights.").

[141] Wendy E. Parmet, "From *Slaughter-House* to *Lochner*: The Rise and Fall of the Constitutionalization of Public Health," *Journal of American Legal History* 40, no. 4 (October 1996), 477 ("I suggest that since the New Deal, public health has been both enlarged and enfeebled. Today the health of the public means everything and nothing at all.").

primary concerns reflected the realities of their day—from epidemic diseases to toxic manufacturing waste, stray dogs, storage or sale of combustible products, and (as we saw in examples from Massachusetts and New York City above) the use or transferring of weapons.

58. Recalling the prior force of public health as a vehicle for protecting life and promoting safety helps us better situate historical regulations that may be considered analogical to the challenged statute in approach or intent. We should also bear in mind the dramatic differences in "scientific context" between the present and the periods from which analogues are drawn. Equipped with a far greater knowledge of biomedical and behavioral sciences, as well as sophisticated data analytics, our modern sense of what counts as a "public health" concern and how to address it understandably differs from that of nineteenth-century and Founding-Era Americans. This reminds us that any assessment of historically analogous laws must take into consideration what was scientifically knowable or administratively feasible in 1791 or 1868.[142]

**CONCLUSION**

59. This declaration has presented historical evidence about eighteenth- and nineteenth-century gun and weapon policies that point to an American tradition of firearms regulation relevant and applicable to the case at hand. In three separate sections, this declaration has: (1) Presented numerous historical analogues that heavily regulated gun manufacture, gunpowder manufacture and storage, the sale, carrying, and/or possession of unusually dangerous weapons, and sales restrictions upon popular nineteenth-century weapons, including handguns; (2) Reviewed the methods and standards employed by trained historians, who aim to interpret primary sources on their own terms and as part of an American past that is in many ways foreign to our present; and (3) Delineates the ways in which modern consumer protection and public health measures are rooted in notions of the police power and its fundamental mission of public safety.

60. In sum, this declaration presents the following:

[142] Eric Ruben, "Scientific Context, Suicide Prevention, and the Second Amendment after *Bruen*," 108 Minn. L. Qu. 3121.

61. The first subsection of "Historical Regulations of Weapons & Related Materials for Public Safety" presents laws from Massachusetts and Maine that required a proving process for gun barrels. It also presents a substantial number of gunpowder regulations—from mandatory inspection requirements to storage and transportation regulations. The laws and ordinances presented in this subsection, which pertained to guns, gunpowder, and other explosive materials, targeted the objects they did because they were by nature inherently dangerous. Vested with the responsibility of protecting the public and empowered with the authority to accomplish that mission, state and local governments actively tried to minimize the risk of injuries, fires, and explosions caused by guns and gunpowder.

62. The second subsection presents a series of laws that placed special restrictions upon weapons and devices that were considered especially dangerous. Though this report is not exhaustive on the subject, it presents and explains the purpose behind laws that restricted the use, sale, or manufacture of slung shots, toy pistols, bowie knives, and trap guns. Again, public safety was a driving concern—protecting the public from the dangers posed by the circulation of unusually dangerous weapons. Toy pistols, as a result of their causing lockjaw and death in numerous children, present a particularly apt example of firearm-related regulation undertaken in the name of public health to address an unintentional and fatal consequence of poorly manufactured weapons.

63. The third subsection describes several historical analogues that restricted or outlawed the sale of certain kinds of knives and handguns. Nineteenth century Americans understood their governments to possess the necessary power to prohibit the sale of certain kinds of problematic firearms. Antebellum appellate court records do not show laws restricting, taxing, or prohibiting the sale of deadly weapons being challenged on constitutional grounds. Those that were during the postbellum period were upheld by appellate courts in Arkansas and Tennessee, which prohibited the sale of pocket pistols while permitting the sale of revolvers conducive to militia service and similar to those issued to some classes of soldiers by the United States Army and Navy.

64. The second part of this declaration, "Historical Processes & Methods Applied to History & Tradition of Gun Regulation" pivots to historical processes and methods—the practices historians learn to *do* more so than to *explain*. That being said, the report provides a high-level explanation of how researchers in the field of gun and Second Amendment studies go about finding historical analogues, showing that the process is a time-consuming one reliant upon access to the institutional resources of academic and law libraries. Though any number of interested researchers, amateurs, and students can embark on this path of study, the "disciplined learned practice" of history requires specialized training and adherence to historians' professional ethics. An endeavor seeking to understand the *history* of a thing should comport as much as possible with the standards of professional practice that historians exercise in their disciplinary field. In other words, the historical context of the laws and regulatory policies presented here is crucial to understanding the intentions behind them as well as why they took the form they did or why none existed at the time.

65. In the third and final section, "Consumer Protection as Public Safety," this declaration demonstrates that the form of government in place within the United States during the nineteenth century championed regulations that would promote the common good and protect the public from harm. Historical regulations undertaken in the name of public health provided a powerful tool for state and local officials, enabling them to set rules for the marketplace, require quality standards for essential items, and dictate where certain trades or industries could be practiced. Importantly, examples from New York and Massachusetts show that weapon-related laws (like firing prohibitions and even a sale/transfer restriction) channeled state authority over firearms through the vehicle of public health. Understanding the force of the police power over public safety and public health in the nineteenth century shows us that American governments have a long tradition of enacting regulations in service of these fundamental goals.

66. Where Plaintiffs have suggested that AB 1127 is effectively a ban upon a handgun in common use and assert that ""[t]here is no historical tradition analogous to a ban of a weapon in common use," this declaration presents a series of historical analogues that did just that. Laws

from Arkansas, Kentucky, and Tennessee restricted the sale of revolvers which were common in the mid- and late nineteenth century.

67. Where Plaintiffs have suggested that the State must provide laws from the Founding and Reconstruction Eras that featured restrictions directly comparable to modern requirements about chamber-load indicators, magazine disconnect mechanisms, and microstamping (impossible or inconceivable at those points in time), this declaration presents a brief distillation of the historical method and lays a foundation for recognizing the illogic of expecting the historical record to contain such direct analogues.

68. And where Plaintiffs have suggested that the lack of direct analogues to chamber-load indicators, magazine disconnect mechanisms, and microstamping renders these portions of the Unsafe Handgun Act unconstitutional, this declaration presents historical regulations related to the manufacture of firearm barrels as well as the storage, production, and transportation of gunpowder—which, taken together, imposed regulations upon manufacturers and retail dealers of firearms and related substances in the name of public safety. This declaration has also endeavored to trace the connection between consumer safety regulation to the fundamental importance of the police power and its protection of the public within American local governance.

69. There is indeed a relevant historical record applicable to this case, and there are historical analogues that restricted retail sales of certain weapons (including handguns) and imposed safety-focused manufacturing requirements upon firearms intended for sale to the public.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

August 24, 2026

Brennan Rivas

Brennan Rivas

# EXHIBIT A

# Brennan Gardner Rivas

Curriculum Vitae · Aug 2026

*brennan.rivas.phd@gmail.com*
*Professional Website*

## CURRENT POSITION

Assistant Director, Clements Center for Southwest Studies, Southern Methodist University (TX), 2026-present.

Senior administrator for humanities center that promotes research, publishing, teaching, and public programming related to Texas, the American Southwest, and the U.S.-Mexico borderlands.

## EDUCATION

Ph.D., History, Texas Christian University, 2019
Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in the Lone Star State, 1836-1930"
Advisor: Gregg Cantrell

M.A., History, Texas Christian University, 2013
Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"

B.A. with Honors, History, Oklahoma State University, 2010

## AWARDS, HONORS, AND FELLOWSHIPS

Harvard Injury Control Research Center and the Robert Wood Johnson Foundation, 2023-2025 (historical research related to race and the history of firearms).

Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022 (book manuscript research project in American History and Western Americana).

Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist University, Clements Center for Southwest Studies, 2020-2021 (book manuscript research project in Southwestern America).

The Benjamin W. Schmidt Memorial Scholarship, Texas Christian University, 2018-2019 (dissertation award for TCU Department of History PhD candidate showing exceptional professional promise; highest departmental prize for TCU history graduate students).

The Shinko and Thomas McDonald Research Prize in Texas History, Texas Christian University, 2019, 2017 (research award for the year's best graduate student on antebellum Texas history).

**PREVIOUS EMPLOYMENT**

**Public History**

*Associate Director & Senior Postdoctoral Researcher*, Center for the Study of Guns & Society, Wesleyan University (CT), 2024-2026.

Lead researcher for a grant-funded project assembling histories of gun culture, use, and regulation; supervisory, networking, and mentorship responsibilities.

*Expert Witness and Consultant*, self-employed, 2022-present.

Provide expert consulting services to government attorneys defending firearm regulations from legal challenge; written reports and declarations, depositions, and in-person trial testimony.

Clients include: States of New York, Rhode Island, New Jersey, Delaware, Massachusetts, Maryland, Illinois, Colorado, California, Oregon, Washington, Hawaii; Washington, D.C.; City of Columbus, Ohio.

*Senior Title Agent*, Norfleet Land Services, LLC, 2022-2024

Conduct surface title research on subject properties in advance of utility construction projects; prepare legal documents for execution and filing; review easements and contracts for acquired assets; deed-plotting metes and bounds descriptions of subject properties in GIS; review and correct title reports prepared by colleagues.

**Teaching**

*Lecturer in American History*, Instructor of Record, Department of History, Texas Christian University, 2019-2020.

*Graduate Student Instructor*, Teaching Assistant, Department of History, Texas Christian University, 2017-2018

**PUBLICATIONS**

**Monograph**

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas* (New Haven: Yale University Press, under contract).

**Refereed Journal Articles**

"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

[with Evan Turiano] "English Tradition, American Violence: The Origins of American Gun Regulation," in *American Violence: Histories, Structures, and Legacies*, eds. Scott Gac and Caroline E. Light (Routledge, forthcoming).

**Law Articles**

"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship" in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (New York: Oxford University Press, 2023), 149-165.

"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review* (May 2022): 2603-2624.

"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022).

**Other Contributions**

"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU Press, 2019.

Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

**Works In Progress**

"A Fashionable Crime: Gender, Fashion, and Carrying Deadly Weapons in the Nineteenth Century" (under review, *Colorado Law Review*).

**PUBLIC HISTORY**

**Public Scholarship**

"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the Journal of the Early Republic* (Oct 2023).

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022).

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021).

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)

**Digital Humanities**

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka, Nov 2021. (Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law").

**Workshops and Seminars**

"Historical Criminal Records and Quantitative Methods," History+ Summer Program, Duke University, June 2025. (Research presentation for Duke undergraduate history majors engaged in data-driven, experiential learning projects.)

"The Deadly Weapon Laws of Texas," *Preserving Our Past:* Community History Workshop, Center for Texas Studies at TCU, Nov 2020. (Public lecture featuring special insights for genealogical researchers).

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University, Sept 2020. (Research presentation on accessing and interpreting historical county criminal records).

## TEACHING

**Areas of Interest**

American History, Local History and Research Methods, Guns in American Law and Culture, Legal and Constitutional History, Public History, Texas and the Southwestern Borderlands, Civil War Era, American West, Gilded Age and Progressive Era, Women's History, Visual and Material Studies.

**Courses Taught (Texas Christian University, 2017-2020):**

"American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603, 2019-2020)

"American History since 1877: The Quest for Equality" (HIST 10613, 2019-2020)

"History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

American History to 1877 (HIST 10603, 2017-2018)

American History since 1877 (HIST 10613, 2017-2018)

**Student Mentorship (Wesleyan University, 2024-present)**

Recruit, hire, and supervise graduate and undergraduate students in law and history, 2024-present; training in research methods, law and society scholarship, organization and interpretation of primary sources, and general professionalism

Reader for MPhil Social Sciences thesis, focusing on politics, racial violence, and armed resistance in Reconstruction-Era Mississippi; advise on subject matter questions as well as with historiographical position of scholarship

**CONFERENCE PRESENTATIONS AND INVITED TALKS**

"Military Disarmament Orders: The U.S. Army's Forgotten Contribution to Gun Control Measures in Texas," Government in Action: Controlling Popular and Racial Violence in the Post–Civil War United States, OAH Conference on American History, Philadelphia, Pennsylvania, April 2026.

Panelist, Protests and Public Carry: The Intersection of the First and Second Amendments, Modern Weapons, Historical Tradition, and the Second Amendment, University of Colorado Law School Symposium, Boulder, Colorado, April 2026.

Panelist, A Right to Bear Arms? A Roundtable on the Contested Role of History and Historians in the Current Second Amendment Debate, American Historical Association Annual Meeting, Chicago, Illinois, January 2026

Presenter, Research Update: Modeling the Application of Historical Methods for Law and Policy in the *Bruen* Era, Center for the Study of Guns and Society Annual Conference, Wesleyan University, Middletown, Connecticut, October 2025

Panelist, Hired Guns: Historians Investigate the Place of Firearms in Eighteenth-Century America for Current Second-Amendment Court Cases, American Society for Eighteenth Century Studies, Virtual Meeting, March 2025

Panelist, How Did We Get Here? America's Gun Problem, Guns in America: Criminalization, Consequences, and Innovative Responses, Vera Institute of Justice and John Jay College of Criminal Justice, Virtual Symposium, December 2024

"The Revolver Must Go," Nineteenth-Century Studies of Guns and Culture, Historical and Contemporary Perspectives on Guns and Society, Wesleyan University, Middletown, Connecticut, October 2024

Panelist, Historian Roundtable: "Regulatory Tradition" after *Rahimi*, Paths Forward from the Age of Gun Violence: Industry Accountability and the Modern Second Amendment, SUNY University at Buffalo Law School Symposium, Buffalo, New York, September 2024

Panelist, Roundtable on Reconstruction Historians in the Courtroom: A Roundtable about History, Gun Laws, and the Constitution in the Wake of the *Bruen* Decision, Society of Civil War Historians Biennial Conference, Raleigh, North Carolina, June 2024

Panelist, Roundtable on the Business of Firearms in American History, Business History Conference, Providence, Rhode Island, March 2024

Panelist, Ethical Use of History in Second Amendment Cases, Litigating the Second Amendment: Gun Safety Advocacy in the Wake of *Heller* and *Bruen*, University of Illinois College of Law, Chicago, Illinois, November 2023

Panelist, Race and the Disparate Impact of Gun Law Enforcement, Historically and Today, Aiming for Answers: Balancing Rights, Safety, and Justice in a Post-*Bruen* America, University of Minnesota Law School Symposium, Minneapolis, Minnesota, October 2023

Panelist, "Use and Abuse of History in Second Amendment Litigation," and "Going Armed: Nineteenth Century Views on Open Carry," Current Perspectives on the History of Guns and Society, Wesleyan University, Middletown, Connecticut, October 2023

"Masculinity, Honor-Violence, and Gun Reform in the Early U.S.," Race, Gender, and Firearms in the Early Republic, Society for Historians of the Early American Republic Annual Meeting, Philadelphia, Pennsylvania, July 2023

"Second Amendment Panel—Issues in Cases Post-*Bruen*," Strategic Litigation Convening: Anti-Democracy Efforts and Political Violence Post-*Bruen*, Institute for Constitutional Advocacy and Protection, Georgetown Law, Washington, D. C., June 2023

"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia, Pennsylvania, January 2023

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*," Current Perspectives on the History of Guns and Society Symposium, Wesleyan University, Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, UC-Davis Law School Symposium, Davis, California, October 2021

"Race & Guns," Newberry Library Fellows' Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

**PROFESSIONAL MEMBERSHIPS**

American Historical Association
Western Historical Association
Alliance for Texas History

**EXPERT WITNESS & CONSULTING**

See Exhibit B, List of Cases

**EXHIBIT B**

# Brennan Gardner Rivas

List of Cases · Aug 2026

Written testimony submitted for the following cases. Deposition and trial testimony in cases so marked.

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.
*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.
*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.
*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.
*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.
*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.
*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.
*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.
*Siegel v. Platkin*, New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.
*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.
*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore. (deposition; in-person trial testimony).
*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.
*Chavez v. Bonta*, California, No. 3:19-cv-01226-L-AHG, S.D. Cal. (f/k/a *Jones v. Bonta*)
*Nguyen v. Bonta*, California, No. 3:20-cv-02470-WQH-BGS, S.D. Cal.
*Baird v. Bonta*, California, No. 2:19-cv-00617-KJM-AC, E.D. Cal.
*Nichols v. Bonta*, California, No. 3:11-cv-09916-SJO-SS, C.D. Cal.
*Wiese v. Bonta*, California, No. 2:17-cv-00903-WBS-KJN, E.D. Cal.
*Rocky Mountain Gun Owners v. Polis*, Colorado, No. 23-cv-01077-JLK, D. Col.
*Wolford v. Lopez*, Hawaii, No. 1:23-cv-00265-LEK-WRP, D. Haw.
*Novotny v. Moore*, Maryland, No. 1:23-cv-01295-GRL, D. Mary.
*Kipke v. Moore*, Maryland, No. 1:23-cv-01293-GRL, D. Mary.
*State of Ohio v. City of Columbus*, Columbus, Ohio, No. 2022-cv-00657, Ct. Com. Pleas, Fairfield Cty, Ohio
*Schoenthal v. Raoul*, Illinois, No. 3:22-cv-50326, N.D. Ill.
*May v. Bonta*, California, No. 8:23-cv-01696 CJC and No. I:23-cv-01798 CJC, C.D. Cal.
*State of Washington v. Gator's Custom Guns, Inc.*, Washington, No. 23-2-00897-08, Sup. Ct., Cowlitz Cty, Wash.
*Knife Rights, Inc. v. Bonta*, California, No. 3:23-cv-00474-JES-DDL, S.D. Cal. (deposition).
*Hartford v. Ferguson*, Washington, No. 3:23-cv-05364-RJB, W.D. Wash.
*California Rifle & Pistol Assoc. v. Bonta*, California, No. 2:23-cv-10169, C.D., Cal.
*Lane v. James*, No. 22 Civ. 10989 (KMK), S.D. N.Y.
*City of Columbus v. State of Ohio*, Columbus, Ohio, No. 23-cv-3555, Com. Pleas, Franklin Cty, Ohio.
*O'Neil v. Neronha*, Rhode Island, No. 23-cv-00070 D. R.I. (deposition).
*Granata v. Campbell*, Massachusetts, No. 21-cv-10960 D. Mass.
*Dotson v. District of Columbia*, Washington, D.C., No. 24-cv-01864 D.D.C.

*Russell v. District of Columbia*, Washington, D.C., No. 1:24-cv-01820, D.D.C.
*State of New Jersey v. Robert Fox*, New Jersey, Nos. FO-14-123-20, FO-14-14121, Sup. Ct. New Jersey, Chancery Division: Family Part, County of Morris, N. J.
*State of New Jersey v. Michael J. Ricciardi*, New Jersey, Nos. FO-14-54-21, FO-14-149-22, Sup. Ct. New Jersey, Chancery Division: Family Part, County of Morris, N. J.
*Hoffman v. Bonta*, California, No. 3:24-cv-00664-CAB-MMP, S.D. Cal.
*We the Patriots v. Doyle*, Connecticut, No. 3:24-CV-01054JCH, D. Conn.
*Succow v. Bondi*, Connecticut, No. 3:25-cv-00250-SVN, D. Conn. (virtual testimony).
*NYSRPA v. James*, New York, No. 1:22-cv-00907 (MAD/PJE), N.D. N.Y. (deposition).
*Del Toro et al v. Polis*, Colorado, No. 1:25-cv-02725-WJM-MDB, D. Col.