ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General
EDWARD P. WOLFE
GABRIELLE D. BOUTIN
VIVIANA M. HANLEY
SABRINA T. MCGRAW
CHRISTINA MCCALL
Deputy Attorneys General
State Bar No. 234139
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-7890
Fax: (916) 324-8835
E-mail: Christina.McCall@doj.ca.gov
*Attorneys for Defendants State of California and Robert Bonta, in his official capacity as head of the California Department of Justice*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br>**v.**<br>**STATE OF CALIFORNIA and ROBERT BONTA, in his official capacity as the head of the California Department of Justice,**<br>Defendants. | 8:26-cv-01697-MRA-ADSx<br>**DECLARATION OF BRIAN DELAY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br>Date: September 11, 2026<br>Time: 1:30 p.m.<br>Courtroom: 9B<br>Judge: The Honorable Monica Ramirez Almadani<br>Trial Date: None set<br>Action Filed: July 1, 2026 |

# TABLE OF CONTENTS

Background and Qualifications....................1
Summary of Opinions....................3
Opinions....................5
I. The Early American Regulatory Tradition....................5
A. Gun Culture Then and Now: The Early American Context for Weapon Regulation....................5
B. Early American Regulation of Specific Weapons....................14
II. Weapons Regulation in the 19th Century....................23
A. Technological Change and the Advent of Modern Weapons Regulation....................23
B. Bowie Knives: An Important Regulatory Precedent....................27
III. The Invention of Machine Guns and the National Firearms Act....................35
A. Long-Arms Before the Advent of Automatic Fire....................35
B. Automatic Fire: A Dramatic Technological Change....................36
C. Machine Guns: New Societal Concerns and the Regulatory Response....................42
IV. The State/Civilian Divide in the American Tradition of Arms Regulation....................48
V. AB 1127 and the Iterative Effort To Prevent Machinegun Crime....................53
VI. The Why and How of Regulation: Shotguns & Bowie Knives as Analogies for Machinegun-Convertible Pistols....................61
Conclusion....................64

## REPORT AND DECLARATION OF BRIAN DELAY

I, Brian DeLay, declare under penalty of perjury that the following is true and correct:

## BACKGROUND AND QUALIFICATIONS

1. I am Professor of History and the Preston Hotchkis Chair in the History of the United States at the University of California, Berkeley. I received my B.A. from the University of Colorado, Boulder (1994), and my M.A. (1998) and Ph.D. (2004) from Harvard University. My first book, War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War (Yale University Press, 2008), won best book prizes from several scholarly organizations. Since 2010, I have been working on three interrelated projects about the historic arms trade: a monograph about the arms trade in the era of American Revolutions (under contract with W.W. Norton and scheduled to be published in 2025); a second monograph about guns, freedom, and domination in the Americas from 1800–1945 (also under contract with W.W. Norton); and a database tracking the global trade in arms and ammunition between the end of the Napoleonic Wars and the start of World War I. These projects are grounded in primary-source research in archives in the United States, England, Spain, and Mexico. "The Arms Trade and American Revolutions," a 20,000-word, peer-reviewed scholarly article previewing some of this research, appeared in the September 2023 issue of the American Historical Review, the flagship journal of the history discipline. In 2024, that article won the Vandervort Prize for outstanding article in military history from the Society for Military History. In February 2025, the California Law Review published my 36,000-word article "The Myth of Continuity in American Gun Culture."

2. I have delivered more than three dozen presentations on firearms history at universities in the U.S. and abroad, including Harvard University, the University of Chicago, Stanford University, Oxford University, Cambridge University, Columbia University, the University of Melbourne, Doshisha

University in Kyoto, Japan, the University of Poitiers, France, the University of Saskatchewan, and the Zentrum für Interdisziplinäre Forschung (ZIF), in Bielefeld, Germany. My research on the history of firearms has been supported by grants from the American Philosophical Society, the British Academy, the American Council of Learned Societies, the Stanford Humanities Center, and Harvard's Radcliffe Institution for Advanced Study, among other organizations. In 2019, I was awarded a Guggenheim fellowship.

3. I have been retained by the Office of the Attorney General of California to provide expert testimony in litigation challenging various aspects of the state's recently enacted legislation regulating the sale of machinegun-convertible pistols (hereafter AB 1127) as well as aspects of the Unsafe Handgun Act. My expertise focuses on history primarily relevant for AB 1127. I have reviewed the provisions of this legislation being challenged in this case as well as the complaint, the temporary restraining order briefing, and the preliminary injunction motion. I am being compensated at a rate of $250/hour for research, writing, and consultation and $400 for deposition and testimony.

4. In addition to my work on this case, I've served as an expert witness in *Hartford, et al. v. Ferguson, et al.*, No. 3:23-cv-05364-RJB (W.D. Wash.); *Banta, et al. v. Ferguson and Batiste*, No. 2:23-cv-00112-MKD (E.D. Wash); *Guardian Arms, et al., v. State of Washington, et al.*, No. 23-2-01761-34 (Wash., and County of Thurston); *Hanson v. District of Columbia*, 22-cv-02256 (D.D.C.); *Arnold v. Kotek, et al.*, No. 22CV41008 (Harney Cnty. Cir. Ct.); *Oregon Firearms Federation, et al., v. Kotek, et. al.*, 22-cv-01815 (D. Or.)[1]; *Wiese, et al., v. Bonta, et al.*, 2:17-cv-00903 (E.D. Cal); *Sullivan, et al., v. Ferguson, et al.*, 3:22-cv-05403 (W.D. Wash.); *Brumback, et al., v. Bob Ferguson, et al.*, 1:22-cv-03093-MKD

[1] *Oregon Firearms Federation, et al., v. Tina Kotek, et. al.*, has been consolidated with three other actions: *Fitz v. Rosenblum et al.*, 3:22-cv-01859 (D. Or.), *Eyre v. Rosenblum, et al.*, 3:22-cv-01862 (D. Or.), and *Azzopardi v. Rosenblum, et al.*, 3:22-cv-01869 (D. Or.).

(E.D. Wash.); *Rocky Mountain Gun Owners et al., v. The Town of Superior, et al.*, 22-cv-2680 (D. Col.); *Association of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Platkin, et al.*, 3:18-cv-10507 (D.N.J.); *Cheeseman, et al. v. Platkin, et al.*, 1:22-cv-04360 (D.N.J.); *Ellman, et al. v. Platkin, et al.*, 3:22-cv-04397 (D.N.J.); *Rigby et al. v. Jennings, et al.*, 1:21-cv-01523-MN (D. Del.); *National Association of Gun Rights, et al., v. Polis*, 24-cv-00001-GPG-STV (D. Colo.); *J. Mark Lane, et al., v. Steven G. James, et al.* (S.D.N.Y), 22-cv-10989; *Palmer, et al., v. Sisolak, et al.*, 3:21-cv-00268-MMD-CSD (D. Nev.); *Stefano Granata et al., v. Andrea Joy Campbell et al.* (D. Mass.), 1:21-cv-10960-DJC; *Harrel v. Raoul*, 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Bevis v. Naperville*, No. 22-cv-4775 (N.D. Ill.); *Kenneally v. Raoul, et al.*, 23-cv-50039 (N.D. Ill.*); Joseph Santolla et. al., v. Colonel Jeffrey S. Katz, et. al.* (Circuit Court, County of Washington, VA), CL26001139-00; *John Crump, et. al., v. Colonel Jeffrey S. Katz, et. al.* (Circuit Court, County of Lancaster, VA), CL26001201-00; *Eric Black, et. al., v. Scott C. Hook and Commonwealth of Virginia* (Circuit Court, County of Fauquier, VA), CL26000241-00, June 2026; and *Dustin Curtis, et. al., v. Colonel Jeffery S. Katz, et. al.* (Circuit Court for the County of Spotsylvania, VA), CL26002454-00, June 2026.

5. The only cases in the last four years in which I testified are *Oregon Firearms Federation, supra*, *Arnold v. Kotek*, *supra*, and *National Association of Gun Rights v. Polis, supra*. A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

## SUMMARY OF OPINIONS

6. Is AB 1127 consistent with the American tradition of weapons regulation? I believe it is. To explain why, I've organized this declaration into six sections. Part I explores early American weapons regulation in context, from the seventeenth century through the founding era. It argues that any comparison of laws

between their times and ours has to acknowledge the profound differences in gun culture then and now. It next discusses early American regulatory preoccupations in context. Part II explains how technological developments and their resulting social consequences gave rise to a modern regime of weapons regulation starting in the early nineteenth century. It offers laws concerning fighting knives, particularly the famous Bowie knife, as an example of extent of perceived regulatory authority in the mid-nineteenth century. Several states implemented de-facto prohibitions on these knives, despite the fact that they were in broad circulation for legal as well as illegal purposes.

7. Part III examines the late-nineteenth and early twentieth century advent of automatic and semi-automatic weapons, a dramatic technological change that soon provoked novel societal concerns. Lawmakers in more than half the states in the country responded to these concerns with new regulations. Evidence from period newspapers helps explain the public anxieties that put California at the forefront of this regulatory effort prior to the National Firearms Act of 1934 ("NFA"). Like many weapons laws, AB 1127 makes exceptions for military and law enforcement. Part IV argues that such exceptions have been a routine feature of our regulatory tradition for nearly two centuries. Part V offers a partial reconstruction of the iterative regulatory response to the danger of machine guns, from the 1930s through today. It explains how state and federal law has responded to the rising problem of semiautomatic conversions in the decades after the NFA. These responses included prohibitions on the sale of new, easily convertible semiautomatic handguns, starting in the early 1980s. Finally, Part VI critiques the complaint's central analogy: that prohibiting the sale of new machinegun convertible semiautomatic pistols is akin to prohibiting the sale of shotguns. That analogy both overstates *how* AB 1127 limits Californians' right to armed self-defense and obscures *why* regulators have taken this step. The part concludes by offering a different analogy that better illuminates the how and why of regulation

that the Supreme Court has made central to the evaluation of historical analogies in Second Amendment litigation.

## OPINIONS

### I. THE EARLY AMERICAN REGULATORY TRADITION

#### A. Gun Culture Then and Now: The Early American Context for Weapon Regulation

8. Given *Bruen*'s[2] emphasis on history, text, and tradition, and *Rahimi*'s[3] injunction to prioritize "the principles that underpin our regulatory tradition" over a narrow text-by-text comparison of contemporary and historic laws, it is useful to begin with the general context for early American weapons regulations. Any attempt to evaluate laws that early Americans did—or didn't—promulgate must start with the contexts in which firearms regulation took place.

9. Such regulation emerged out of a very different gun culture than the one that prevails today. Then as now, America had higher rates of firearms ownership than most other places around the world. Careful samples of probate inventories from 1774 suggest that on average about half of all White households possessed a firearm.[4] All told, the thirteen colonies might have had as many as 150,000 to 200,000 firearms on hand by the eve of the Revolution, which, at the upper end, was enough to arm around a third of adult White men. But once we begin to inquire into why early America was so well-armed, three basic differences in gun culture emerge. Whereas our present-day gun culture is consumerist, government-phobic, and individualist, gun culture in seventeenth and eighteenth century British North America and in the early United States was utilitarian, government-led, and collective.

10. Consider some of the features of contemporary gun culture in the

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

[3] *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

[4] James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 WM. & MARY L. REV. 1777, 1780–81 (2002).

United States. One of the most prominent is the gun's association with rural America and hunting. Here, continuity with the eighteenth century seems strong. In an era where rural farming families comprised nearly 95 percent of the colonial population, firearms were useful and sometimes indispensable tools for everyday life.[5] They were required for fowling or hunting big game, and handy for keeping pests from crops and homes. Guns are obviously put to similar uses in the United States today, but only by a small proportion of the population (14 percent now live in rural areas,[6] and a mere 4 percent hunt).[7]

11. Another conspicuous feature of our contemporary gun culture is the degree to which firearms are prized and heavily marketed consumer goods.[8] For a small minority of wealthy colonial buyers, finely made arms could be valued and pleasing material possessions—objects to take care of and even pass down to heirs.[9] But the extreme rarity in the eighteenth century of large firearm collections, which are so important to the flourishing of today's industry, is another metric of discontinuity. A landmark 2015 survey from researchers at Harvard and Northeastern Universities found that today's so-called "super-owners," the 3 percent of Americans who—for reasons of collecting or prepping or both—own the most guns, possess roughly half of all privately held firearms in the country.[10]

---

[5] For a comparison of rural and urban population data from the 1790 census, see U.S. BUREAU OF THE CENSUS, HISTORICAL STATISTICS OF THE UNITED STATES: COLONIAL TIMES TO 1957, at 14 (1960).

[6] Elizabeth A. Dobis et al., USDA Econ. Rsch. Serv., RURAL AMERICA AT A GLANCE: 2021 EDITION 2 (Nov. 2021).

[7] Andrew Moore, *Decline in Hunting Threatens Conservation Funding*, N.C. STATE COLL. OF NAT. RES. NEWS (Jan. 27, 2021), https://cnr.ncsu.edu/news/2021/01/decline-in-hunting-threatens-conservation-funding/.

[8] For recent accounts of the business of marketing and selling firearms in the United States, see generally RYAN BUSSE, GUNFIGHT: MY BATTLE AGAINST THE INDUSTRY THAT RADICALIZED AMERICA (2021); JENNIFER CARLSON, MERCHANTS OF THE RIGHT: GUN SELLERS AND THE CRISIS OF AMERICAN DEMOCRACY (2023).

[9] *See* MICHAEL LENZ, "ARMS ARE NECESSARY": GUN CULTURE IN EIGHTEENTH-CENTURY AMERICAN POLITICS AND SOCIETY 138–40 (2010).

[10] Lois Beckett, *The Gun Numbers: Just 3% of American Adults Own a Collective 133m*

(continued…)

12. Contrast that with the colonial era. Historian Kevin Sweeney's painstaking work in probate records from British North America has revealed that only 4.5 percent of male probate inventories contained more than three firearms and that only 1.4 percent contained more than five.[11] Rather than aficionados or preppers, most of the tiny number of early American "super-owners" maintained private arsenals connected with the exploitative nature of their business. More than two-thirds of those in Sweeney's sample, who owned six or more guns, were Southern slaveholders.[12] All ten of the probate inventories containing ten guns or more belonged to South Carolinian planters who ran vast slave labor enterprises, averaging ninety-five enslaved laborers each.[13] It was not possible to terrorize and exploit people on that scale without a significant weapons gap. Americans of the late eighteenth century would have found today's hyper-commercialized and ideologically charged culture of consuming guns deeply alien.

13. Over the past generation, self-defense has become central to contemporary gun culture, a shift that the firearms industry has skillfully encouraged through its advertising campaigns.[14] This increasing focus on self-defense is also at the heart of recent Second Amendment jurisprudence as defined in *Heller*, *McDonald*, and *Bruen*. But crime and self-defense, in the sense of attacks

---

*Firearms*, GUARDIAN (Nov. 15, 2017), https://www.theguardian.com/us-news/2017/nov/15/the-gun-numbers-just-3-of-american-adults-own-a-collective-133m-firearms. For the original study, see Lisa Hepburn et al., *The US Gun Stock: Results from the 2004 National Firearms Survey*. 13 INJURY PREVENTION: JOURNAL OF THE INTERNATIONAL SOCIETY FOR CHILD AND ADOLESCENT INJURY PREVENTION 15–19 (2007), https://doi.org/10.1136/ip.2006.013607.

[11] Kevin M. Sweeney, *An Eighteenth-Century Gun Culture Shaped by Constraints,* DUKE CTR. FOR FIREARMS L.: SECOND THOUGHTS BLOG (Sept. 6, 2023), https://firearmslaw.duke.edu/2023/09/an-eighteenth-century-gun-culture-shaped-by-constraints.

[12] *See* Expert Report and Declaration of Kevin M. Sweeney at 12, *Nguyen v. Bonta*, 675 F. Supp. 3d 1065 (S.D. Cal. 2023) (No. 3:20-cv-02470-WQH-BGS).

[13] *Id.*

[14] The sociologist David Yamane has done important work documenting this shift in U.S. gun culture. *See, e.g.*, David Yamane, Paul Yamane, & Sebastian L. Ivory, *Targeted Advertising: Documenting the Emergence of Gun Culture 2.0 in Guns Magazine: 1955–2019*, 6 PALGRAVE COMMC'NS 1 (2020).

on or protection against other members of one's own society, are weak explanations for colonial gun ownership. Prior to the widespread availability of breechloading weapons and metallic cartridges in the mid-nineteenth century, firearms were awkward tools either for perpetrating or resisting crimes of passion. They were notoriously inaccurate at range, liable to misfire, and had to be muzzle-loaded with gunpowder and ball before every shot, either by pouring ammunition directly into the barrel or packing in a pre-made paper cartridge loaded with powder and ball.[15] That took time and focus. Moreover, such guns were seldom kept loaded and at the ready for any extended period because black powder corroded iron barrels so quickly.[16]

14. Partly for these reasons, firearms usually played a relatively small role in murders between White people in early America. Randolph Roth, the nation's foremost scholar of the history of homicide in North America, argues that rates of gun violence rose and fell in step with political instability and shifts in faith in government, justice, and social hierarchy.[17] When the overall homicide rate was low, guns were used in only 10 to 15 percent of homicides.[18] (During the period of political instability before the Civil War, firearms would be used in as many as 30 to 40 percent of all homicides.[19]) In 2020, in contrast, nearly 80 percent of all homicides in the United States involved a firearm.[20] In sum, neither consumerism

---

[15] Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship Between Guns and Homicide in American History*, in A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 135, 139–40, 143 (Jennifer Tucker, Barton C. Hacker, & Margaret Vining eds., 2019).

[16] *Id.* at 140.

[17] *Id.* at 138.

[18] *Id.* at 139.

[19] *Id.*

[20] For homicide and arms technology, see generally *id.* Roth's chapter draws upon his magisterial book American Homicide. RANDOLPH ROTH, AMERICAN HOMICIDE (2009). For 2020 homicide data, see John Gramlich, *What the Data Says About Gun Deaths in the U.S.*, PEW RSCH. CTR. (Feb. 3, 2022), https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/.

nor fear of crime are adequate explanations for British North America's unusually high rates of firearm ownership.

15. Given this, what *are* compelling explanations? Freedom from restrictive laws provides a partial answer. Gun ownership among wealthy colonists seems to have been twice as common as it was among their peers in mid-eighteenth-century England, while the poorest White colonists were more than eighteen times more likely to own a gun than their English counterparts.[21] Whereas England criminalized hunting and gun ownership for all but the relatively wealthy,[22] colonists in British North America faced no such barriers.[23] Even so, that fact cannot explain the great variability in gun ownership across time and space in early America. To explain that we need to center slavery, Indigenous dispossession, and inter-imperial warfare.

16. In the first instance, firearms were necessary for the two systematic forms of violent predation that preoccupied generations of European colonists: enslaving people of African descent, who comprised nearly a fifth of the thirteen colonies' total population in 1775,[24] and dispossessing Native people of their land. As those ten rich South Carolinian planters understood very well, neither project could have been sustained without a weapons gap. "Self-defense" is an imprecise term for the violence that sustained these projects. It is true that colonists terrorizing and exploiting enslaved people and settlers violently encroaching on Native land, often in defiance of British law, had reason to fear their victims, and, therefore,

---

[21] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America*, *in* A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 72–73 (Jennifer Tucker, Barton C. Hacker, & Margaret Vining eds., 2019).

[22] *See* LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 46–73, 156–70 (2016).

[23] Sweeney, *supra* note 21, at 72–73.

[24] ALAN TAYLOR, AMERICAN REVOLUTIONS: A CONTINENTAL HISTORY, 1750–1804, at 3 (2016).

reason to be armed.[25] But such colonists needed more guns than their counterparts in quieter corners of the colonies or in England, not so much for self-defense as for collective-*offense*. In addition to the practical uses of firearms on farms, many Americans needed guns so that they and their neighbors could safely take what they wanted from Black and Indigenous people. Limitations on White American gun ownership, of the type common in England at the time, would have been incompatible with these projects.[26]

17. Moreover, many colonists needed to be well-armed on account of imperial rivals. Warfare between western Europe's great powers provoked warfare in the Americas repeatedly during the colonial era. Given the vastness of imperial claims, the vulnerability of scattered frontier settlements, and the relatively small size of imperial armies, colonists inevitably found themselves recruited into formal or informal military service in ways that very few Americans today can relate to.[27] Conflict between Spain, France, and Britain also magnified the risks of slavery and settler colonialism, as European powers sought advantage by arming and otherwise empowering their enemies' enemies.[28] That happened during King William's War (1689–1697), Queen Anne's War (1702–1713), King George's War (1744–1748), and, especially, the Seven Years' War (1754–1763). More than one hundred thousand men from the British colonies served alongside British regular forces in

[25] For an overview of settler encroachment on Native land in the decade before the Revolution, see TAYLOR, *supra* note 24, at 55–90.

[26] For limitations, see generally Priya Satia, *Who Had Guns in Eighteenth-Century Britain?*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 47 (Jennifer Tucker, Barton C. Hacker, & Margaret Vining eds., 2019); Sweeney, *supra* note 21.

[27] Among the white, able-bodied males between the ages of sixteen and sixty in colonial Massachusetts, for example, only ministers, civil magistrates, and students and faculty of Harvard were exempt from militia service. *See* FRED ANDERSON, A PEOPLE'S ARMY: MASSACHUSETTS SOLDIERS AND SOCIETY IN THE SEVEN YEARS' WAR 26 (1984). In contrast, as of 2018, 7 percent of the adult population in the United States were veterans. *See* JONATHAN VESPA, U.S. CENSUS BUREAU, THOSE WHO SERVED: AMERICA'S VETERANS FROM WORLD WAR II TO THE WAR ON TERROR 1 (2020), https://www.census.gov/library/publications/2020/demo/acs-43.html.

[28] For a case study of this phenomenon, see generally Alan Taylor, THE INTERNAL ENEMY: SLAVERY AND WAR IN VIRGINIA, 1772–1832 (2013).

North America in these conflicts, which required periodic weapons shipments from the metropole.[29]

18. The imperatives of war – against enslaved people, against Indigenous nations, and against imperial rivals – meant that early American gun culture was government-led. Governments shaped gun culture most extensively through laws governing militias: the formal, compulsory, selective, state-sanctioned organizations through which colonists undertook most martial activities.[30] Colonial authorities passed hundreds of militia laws before the Revolution, laws which mandated how the armed bodies were to be constituted, mobilized, equipped, led, and disciplined.[31] This body of legislation fostered an uneven geography of gun ownership in British North America. That unevenness can help us understand *why* colonists had guns, in addition to *who* had them and *where*.

19. Evidence in probate records makes it clear that colonial governments exerted powerful influence on the geography of gun ownership in the British colonies, and that they did so primarily through the mechanism of militia laws. Gun ownership was highest in colonies where governments energetically encouraged and supported militia service. These were places where slavery, settler colonialism, and nearby imperial rivals provoked security concerns. In such places, colonial authorities mandated gun ownership and, in times of heightened anxiety, took steps

---

[29] *See* George D. Moller, AMERICAN MILITARY SHOULDER ARMS, VOLUME I: COLONIAL AND REVOLUTIONARY WAR ARMS 9–12 (2011). Appendix I provides the tally of 107,000 colonists serving in these years. *See id.* at 471.

[30] For a critique of how the majority in Heller mischaracterized these bodies as unorganized "citizens' militias" whose primary purpose was to be a "safeguard against tyranny," see Kevin M. Sweeney, Firearms, Militias, and the Second Amendment, in THE SECOND AMENDMENT ON TRIAL: CRITICAL ESSAYS ON DISTRICT OF COLUMBIA V. HELLER 310, 311 (Saul Cornell & Nathan Kozuskanich eds., 2013).

[31] Several hundred of these laws were anthologized by the Selective Service System in the mid-twentieth century. *See generally* MILITARY OBLIGATION: THE AMERICAN TRADITION; A COMPILATION OF THE ENACTMENTS OF COMPULSION FROM THE EARLIEST SETTLEMENTS OF THE ORIGINAL THIRTEEN COLONIES IN 1607 THROUGH THE ARTICLES OF CONFEDERATION 1789 (Arthur Vollmer ed., 1947) (outlining these laws).

to equip militiamen who lacked their own arms.[32]

20. In mid-seventeenth-century New England, for example, which had a violently expanding settler frontier and robust militia tradition, nearly 70 percent of male probate inventories included a firearm.[33] Ownership was nearly as high further south, in the Chesapeake. In late-seventeenth-century Virginia and Maryland, where anxious authorities restricted militia service to property owners but took an active role in arming them, firearms likewise appeared in 70 percent of male probate inventories.[34] South Carolina, which not only had an enslaved majority but also shared vulnerable frontiers with the mighty Creek and Cherokee Nations to the West, was even better armed by the mid-eighteenth century.[35] There, colonial and imperial officials cooperated to ensure white colonists possessed firearms, and they even armed enslaved men for militia service in wartime.[36]

21. In contrast, mid-Atlantic colonies with weak or nonexistent militia traditions usually had far lower rates of gun ownership. Dutch and English New Yorkers, accustomed to relying on professional military and Native allies, owned fewer firearms than their counterparts in the North or South. There, firearms appeared in just over half of late seventeenth-century inventories and in barely more than a third by the mid-eighteenth century.[37] In Pennsylvania, New Jersey, and Delaware, where there were few enslaved laborers, no nearby imperial rivals,

---

[32] The association between militia organization and changes in firearm possession over time and place is a dominant theme in Sweeney's work. *See generally* Sweeney, *supra* note 21; Kevin M. Sweeney, *Firearms, Militias, and the Second Amendment, in* THE SECOND AMENDMENT ON TRIAL: CRITICAL ESSAYS ON *DISTRICT OF COLUMBIA V. HELLER* 310, 311 (Saul Cornell & Nathan Kozuskanich eds., 2013).

[33] *See* Sweeney, *supra* note 21, at 75 (Table 3.5).

[34] *Id.*

[35] *Id.*

[36] For the arming of South Carolina, see De Witt Bailey, SMALL ARMS OF THE BRITISH FORCES IN AMERICA: 1664–1815, at 110–12 (2009). And for the arming of South Carolina's enslaved, see John W. Shy, *A New Look at Colonial Militia*, 20 WM. & MARY Q. 175, 181 (1963); Maria Alessandra Bollettino, *Slavery, War, and Britain's Atlantic Empire: Black Soldiers, Sailors, and Rebels in the Seven Years' War* 41–50 (2009) (Ph.D. dissertation, Univ. of Tex. at Austin).

[37] *See* Sweeney, *supra* note 21, at 75 (Table 3.5).

and, until the mid-eighteenth century, relatively peaceful relations with Indigenous neighbors, the pacifist Quaker proprietors repressed militias during most of the colonial era.[38] As a result, like New York, around only a third of Pennsylvania's probate inventories contained firearms before independence.[39]

22. When the imperatives and dangers associated with opportunities and threats relaxed in the colonies, gun ownership declined. Massachusetts militiamen were well-armed in the decades before Metacom's (King Philip's) War devastated southern New England's Indigenous polities in the late 1670s. By the 1740s, however, the colony's militias struggled to arm themselves for the crisis of King George's War.[40] Relying on Indigenous allies and armed enslaved men from South Carolina, North Carolina defeated the formidable Tuscarora between 1711 and 1715, which relieved the colony of the most proximate threat to its settler colonial program.[41] Militia service declined in North Carolina over the following decades, to the point that, by the mid-eighteenth century, it was described as "not near half-armed" while the arms they had were characterized as "very bad."[42]

23. The state played an enormous role in these shifting patterns of gun ownership, not only through militia regimes specific to individual colonies but through the primary fount of firepower, the imperial metropole. To a greater degree than in previous inter-imperial conflicts, the Seven Years' War came to turn on events in North America. British war planners needed to recruit tens of thousands of colonists but found that most of them were either unwilling or unable to muster into service with an appropriate firearm. Consequently, Britain shipped more than

[38] Sweeney, *supra* note 32, at 322–25.

[39] *Id.* at 321–23.

[40] *Id.* at 328–29.

[41] *See* Wayne E. Lee, *Fortify, Fight, or Flee: Tuscarora and Cherokee Defensive Warfare and Military Culture Adaptation*, 68 J. MIL. HIST. 731, 731–44 (2004).

[42] Sweeney, *supra* note 32, at 334–35.

sixty-six thousand guns to the colonies between 1756 and 1763.[43] That sudden infusion of firepower might have represented a 50 percent increase in the number of guns available in British North America. While thousands of those arms remained in colonial storehouses or crown arsenals after 1763, the majority apparently stayed with the colonists who mustered out of service.[44]

24. Colonial British North America had a robust gun culture, in summary, but it was very different from the one that prevails today. Encouraged and assisted by the metropole and by colonial assemblies, British North Americans armed themselves for the purpose of responding to shared threats and opportunities. The result, evident in the shifting geography of firearm ownership, was a gun culture that was utilitarian, rather than consumerist; collective, rather than individualist; and government-led, rather than government-phobic.

### B. Early American Regulation of Specific Weapons

25. Our understanding of America's tradition of arms regulation needs to be situated not just in the context of period gun culture, but also in light of the current state of historical research into legal history. Electronically searchable compendia of historic laws have only captured part of our legal tradition. These compendia are particularly lacking when it comes to common law tradition and to local ordinances, where (as today) most regulation and enforcement originated.[45] The Supreme Court acknowledged the relevance of common law in *Rahimi* when it relied on its "prohibitions on going armed and affrays" as part of the relevant

---

[43] De Witt Bailey, the main expert on the topic, found that the British Ordnance Department sent colonial authorities in British North America ten thousand muskets in 1756 and another twelve thousand in 1758. During the war, merchants operating under government license shipped another 7,610 firearms to colonial governments and 36,592 "for the planters"—that is, for private buyers. Presumably, most of these buyers were likewise motivated by the war. Bailey's figures exclude weapons shipped for the Indian trade. *See* BAILEY, *supra* note 36, at 119–24, 236–38.

[44] *Id.*

[45] Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99, 158 (2023).

historical tradition.[46]

26. Still, even the incomplete record reveals a rich early American regulatory tradition in pursuit of public safety – safety as authorities at the time defined it. Authorities in British North America and in the early United States passed hundreds of laws that directly or indirectly regulated firearms prior to 1791 and the ratification of the Second Amendment. Nearly all of them were motivated by concerns for public safety. Sometimes they anticipated laws in our own era. For example, colonies and states passed laws regulating the carrying[47] or brandishing[48] of particular weapons; forbidding discharge in sensitive times[49] and places;[50] and sentence enhancements for crimes committed with arms.[51] Regulations of all these types were enacted in the decade before the ratification of the Second Amendment, and they reflect public safety concerns familiar to twenty-first century Americans.

27. America's first weapon-specific laws were part of this broader regulatory tradition. Like some laws today, they sought to manage access to particular kinds of weapons in the name of public safety. Here again, some

---

[46] *Rahimi*, 602 U.S. at 682.

[47] *See, e.g.*, An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (1786), available at https://firearmslaw.duke.edu/laws/1786-va-laws-33-ch-21-an-act-forbidding-and-punishing-affrays/.

[48] *See, e.g.*, An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, 1786 Mass. Sess. Laws (1786), available at https://firearmslaw.duke.edu/laws/1786-mass-sess-laws-an-act-to-prevent-routs-riots-and-tumultuous-assemblies-and-the-evil-consequences-thereof/.

[49] *See, e.g.*, An Act to Prevent Firing of Guns and Other Firearms within this State, on Certain Days Therein Mentioned, ch. 81, 1784–1785 N.Y. Laws 152 (1785), available at https://firearmslaw.duke.edu/laws/1784-1785-n-y-laws-152-an-act-to-prevent-firing-of-guns-and-other-firearms-within-this-state-on-certain-days-therein-mentioned-ch-81/.

[50] *See, e.g.*, the 1788 Ohio Law 42, "An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4, 1788–1801 Ohio Laws 42 (1788), available at https://firearmslaw.duke.edu/laws/1788-1801-ohio-laws-42-an-act-for-suppressing-and-prohibiting-every-species-of-gaming-for-money-or-other-property-and-for-making-void-all-contracts-and-payments-made-in-furtherance-thereof-ch-13/.

[51] *See, e.g.*, the 1788 Ohio Laws 20, A Law Respecting Crimes and Punishments…, ch. 6, 1788_1801 Ohio Laws 20 (1788), available at https://firearmslaw.duke.edu/laws/1788-1801-ohio-laws-20-a-law-respecting-crimes-and-punishments-ch-6/.

regulations of this subtype are easily analogized to laws in our own times. Laws against "trap-guns," for example, sought to outlaw modifications that rendered common firearms excessively dangerous. The term refers to everyday firearms staged (usually with a string or wire attached to the trigger) so that they could fire without action from a shooter. The obvious problem here was that trap-guns were indiscriminately dangerous: they could and did injure or kill anyone unlucky enough to set them off. During the outbreak of the Revolutionary crisis in 1775, for example, the royal governor of Virginia ordered the keeper of the colony's arsenal to set a trap-shotgun near the window so that anyone attempting to illicitly enter this storehouse of war material would be shot. Two unwitting local boys from Williamsburg soon attempted to enter through the window and triggered the trap gun. One of them lost two fingers, making the governor even less popular in Virginia than he had been.[52] Colonists and their representatives had long recognized the danger of trap guns. Finding that "seuerall psons haue bine greatly Indangered by seting of Guns," for example, Massachusetts set strict limits on the practice in 1670. The law prohibited trap guns outside of enclosures (that is, fenced properties); mandated that the gun "be sufficiently enclosed soe as it be Cecure from hurting man or beast;" and obliged owners who set trap guns to give warning to all neighbors (a penalty of £5 for each infraction).[53] New Jersey took more vigorous steps. In 1751, lawmakers there outlawed the setting of trap guns (or the planting of sharp stakes) in order to kill deer or other animals, "on his own, or the Lands of any other Person whatsoever." Violators forfeited £5 for each infraction; £10 if said offense injured a person.[54] Still grappling with the problem twenty years

[52] Letter from Lord Dunmore to the Earl of Dartmouth (June 25, 1775), in 9 DOCUMENTS OF THE AMERICAN REVOLUTION 200–07 (K. G. Davies, ed.,1972–1981); Ivor Noël Hume, 1775: ANOTHER PART OF THE FIELD 212 (1966).

[53] Act of June, 1670, in 11 RECORDS OF THE COLONY OF NEW PLYMOUTH IN NEW ENGLAND: LAWS, 1623–1682, at 230 (David Pulsifer, ed.,1861).

[54] 1751 NJ Laws, at 19, https://firearmslaw.duke.edu/assets/1751,-nj,-a-supplementary-act-to-the-act-entitled,-an-act-to-prevent-the-killing-of-deer-out-of-season,-and-against-carrying-of-guns,-and-hunting-by-persons-not-qualifyed,-1751-n.j.-laws-15,-1520-(w.-bradford).pdf.

later, New Jersey leveled a blanket fine of six pounds (a significant sum) or six months jailtime on any who presumed to indulge in this "most dangerous Method of setting guns."[55] Colonies and states would continue to pass anti trap-gun laws through the early twentieth century.[56]

28. Other weapons-specific laws followed directly from the cultural context explained above. They seem more alien to regulations in our own times. Among these are colonial-era weapons laws that sought to deprive particular groups of specific weapons that British authorities regarded as particularly dangerous (in the wrong hands). For example, informed observers insisted that rifles helped Indigenous enemies inflict more damage at greater distance using less gunpowder than the more common smoothbore trade-guns. Such observations led to regulation. The British Empire attempted to prevent the sale of rifles to Native People after the Seven Years' War.[57]

29. Another, even more common type of colonial-era weapon-specific law encouraged or mandated that militia members equip themselves not just with firearms but with military style muskets. Like their inverse, regulations seeking to deprive adversaries of rifles, these regulations were products of a wartime society. In the eighteenth century, most European militaries equipped soldiers with relatively heavy, large-caliber, smoothbore long-arms designed to accept a bayonet. For instance, the standard service arm for most of Britain's eighteenth-century army, the Long Land Pattern Musket (the "Brown Bess"), weighed around eleven pounds, and had a forty-six inch, .760 -.780 caliber barrel. This clunky but formidable weapon was built to withstand the rigors of campaigning, to deliver

---

[55] Act of Dec. 21, 1771, §§ 1, 3, & 10, in LAWS OF THE STATE OF NEW JERSEY 25–26 (1821).

[56] Robert J. Spitzer notes that "16 colonies and states enacted such laws in the 1700s to 1800s, and 15 in the early 1900s." Robert J. Spitzer, GUN LAW HISTORY: HOW THREE HUNDRED YEARS OF WEAPONS LAWS BUILT THE NATION 91 (Forthcoming, 2026).

[57] For the rifle prohibition, see Regulations to be Observed in Carrying on the Trade with the Indians in the Southern District (1767), CO 5/68/144, The National Archives (UK).

significant stopping power, and to accept a socket bayonet so that musketeers could double as pikemen in battle.[58]

30. Most civilians during the colonial and early national period had other priorities. They needed firearms that were less expensive, easier to handle, had milder recoil, weighed less than a Brown Bess (often just over half as much), and had smaller calibers and therefore generally consumed less powder and lead per shot. Such "fowlers," "fusils," "squirrel guns," and "trade guns" also cost less than "muskets," a term informed observers of the day usually reserved for military long-arms.[59] Settlers in western Pennsylvania and Virginia often had rifles, too. Skilled gunsmiths in these regions were producing distinctive, high-quality rifles by the eighteenth century, often with imported locks. Rifles had greater range and accuracy but took around three times as long to reload as smooth-bore weapons.[60] That trade-off made sense if the goal was hunting deer. But painfully slow reloading times could be deadly in combat unless the shooter had reliable cover.

31. Given their needs, civilians were far more likely to own the less expensive, lighter long-arms than they were to own muskets. But colonial and early national leaders trying to organize forces against regular armies had different priorities. They complained bitterly about the inferiority of most civilian arms. And they usually failed in their goal of seeing militiamen equipped with military muskets. During the Seven Years' War, for example, one despairing official reported that the arms "which belong to private persons are mostly poor and undersized and unfit for an expedition."[61] A little more than a decade later, when he was first trying to forge a revolutionary army out of New England's militiamen, General Washington complained that "of Arms those brought in by the Soldiers are

[58] For an authoritative discussion of the evolution and variations, see Bailey, *supra* note 36, at 13–23.

[59] Sweeney, *supra* note 30, at 330–31.

[60] *Id.* at 342.

[61] *Id.* at 331.

So very indifferent that I Cannot place Confidence in them."[62]

32. State authorities had long tried to correct this. In 1738, for example, Virginia mandated that militia infantry "be furnished with a firelock, musket, or fuzee, well fixed, a bayonet fitted to the same."[63] Finding years later that the 1738 law "hath proved very ineffectual," the colony passed a similar law in 1755.[64] It tried again in 1757.[65] These repeated efforts reflect the difficulty of convincing people to acquire military muskets. In 1755, at the start of the Seven Years' War (often referred to in North America as the French and Indian War), the crown ordered a census taken of militiamen and arms in every colony. Virginia's return revealed that only 62.2% of white men older than 16 were enrolled in the militia. "Not above one-half" of them were armed, and the arms the half possessed had "different Bores." The variety of bores reflects a stubborn preference among Virginia's colonists for lighter, smaller caliber "trade guns," "fowlers," or "squirrel guns" more suited to civilian life.[66] These spare facts allow a rough estimate that less than 3% of Virginians were equipped with military style firearms in the mid-eighteenth century.[67]

---

[62] Letter from George Washington to Maj. Gen. Richard Montgomery (Jan. 12, 1776), FOUNDERS ONLINE, Nat'l Archives, https://founders.archives.gov/documents/Washington/03-03-02-0051

[63] *See* An Act, for the better Regulation of the Militia (Nov. 1738), in 5 WILLIAM WALLER HENING, THE STATUTES AT LARGE 17 (1819).

[64] 6 Henning, *supra* note 63, at 530.

[65] 7 Henning, *supra* note 63, at 94.

[66] Sweeney, *supra* note 30, at 332 tbl.6.

[67] White people accounted for 63% of Virginia's population east of the mountains in 1745: see Peter H. Wood, *The Changing Population of the Colonial South: An Overview by Race and Region, 1685–1790*, in POWHATAN'S MANTLE: INDIANS IN THE COLONIAL SOUTHEAST [57], 60–61, tbl.1 (Gregory A. Waselkov, Peter H. Wood, and M. Thomas Hatley eds., rev. ed. 2006). I assume White males accounted for roughly 31.5 % of the total population; and that roughly a third of that figure would have been too young or too old to serve in the militia. That would leave 21% of the total population. According to the crown census taken a decade later, only half, 10.5%, were enrolled in the militia. Only half of these, 5.25% were armed. The comment about "different bores" offered no proportions, but it seems extremely unlikely that half had military-style muskets. Even if we accept such an unlikely proportion, that meant that 2.75% of Virginia's population had military-style firearms in the mid-eighteenth century.

33. Regulatory battles over military muskets reveal yet another important difference about weapons regulation in early America and our own times. Founding-era law did more to protect certain relatively uncommon weapons than it did to protect weapons in common use. In the generation after independence, Virginia and twelve other states crafted laws shielding militia arms (military muskets) from being seized as part of tax arrears proceedings or debt litigation. Only two states (Connecticut and Maryland) extended those protections to the lighter, personal firearms most in common use.[68]

34. If a wartime gun-culture helps explain why eighteenth-century lawmakers would craft weapons-specific regulations to arm white men and disarm their adversaries, the relatively narrow technological differences between period firearms help explain the absence of weapon-specific regulation aimed at reducing violence *within* white society. Nearly every firearm in circulation at the time was a single-shot, flintlock, muzzle-loaded weapon. Rifles were more accurate than smoothbore long-arms, but they took three times as long to load. Smoothbore flintlock pistols were easier to conceal and carry, but they had significantly less stopping power and range. Variations in size, weight, caliber, and bore had advantages and disadvantages depending on context, but these differences were relatively minor compared to the wide range of firearms available today.

35. While the vast majority of firearms in early America were single-shot muzzle-loaders, there were other kinds of guns in existence at the time. In recent court challenges to state regulation of assault weapons and high-capacity magazines, plaintiffs have argued (a) that eighteenth-century Americans were familiar with repeat-fire weapons and (b) that their failure to regulate these weapons reflects a founding-era conviction that regulation would be illegitimate.[69]

[68] Saul Cornell, *The Early American Tradition of Arms Regulation: Common Law, Common Weapons, and Common Use*, 75 DUKE L.J. ONLINE 109, 126–27 (2026).

[69] *See, e.g.*, Memorandum of Points and Authorities in Support of Plaintiffs' Motion for (continued…)

Though such claims do not figure into the complaint against AB 1127, a brief interrogation of them can help further illuminate the context for early-American weapons regulation.

36. Inventive gunsmiths began trying to design dependable, effective firearms capable of shooting multiple rounds without reloading in the sixteenth century, if not earlier. The evidence for their efforts can be found in personal and public archives, in patent records, and occasionally in actual weapons still preserved in museums and private collections today.[70] Safe and reliable increased rates of fire would have had transformational implications for early modern militaries, so incentives were significant.

37. Inventors experimented with a few basic designs. The first solution achieved repeat fire with a revolving breech; one innovative design along these lines emerged in Germany in the early sixteenth century. The second approach employed multiple barrels, each pre-loaded with ball and powder. A seventeenth-century Scot built a gun with a single, fixed breech and fifty barrels arrayed around an axis, for instance. A third design incorporated an internal magazine housing enough powder and (sometimes) balls for multiple shots. Most such arms employed a rotating breechblock to cycle a single powder charge and (sometimes) a single ball into the chamber, before sealing the chamber for firing. The fourth and final major approach, the so-called superposed load or stacked charge method, fired multiple rounds loaded into a single barrel – usually one after another in a single concentrated sequence.[71]

38. But such weapons were flawed, experimental curiosities. They were

Summary Judgment at 15, *Wiese v. Bonta*, No. 2:17-cv-00903 (E.D. Cal. Mar. 31, 2023); Complaint for Declaratory and Injunctive Relief and Damages at 20, *Hanson v. District of Columbia*, No. 2:17-cv-00903-WBS-KJN (D.D.C. Aug. 1, 2022); Complaint for Declaratory and Injunctive Relief at 4, *Harrel v. Raoul*, No. 23-cv-141-SPM (S.D. Ill. Jan. 17, 2023), *sub. nom. Barnett v. Raoul*, 671 F. Supp. 3d 928 (S.D. Ill. 2023), *vacated*, *Bevis v. Naperville*, 85 F.4th 1175 (7th Cir. 2023).

[70] W. W. GREENER, THE GUN AND ITS DEVELOPMENT 76–86 (9th ed. 1910).

[71] For a fuller discussion, see Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 CALIF. L. REV 1, at 21–26.

both dangerous (to the shooter, as well as to the target) and highly unusual. Most of these gunpowder weapons never advanced beyond proof of concept. Only a small minority of repeating firearm inventions ever moved past the design or prototype stage, and none achieved commercial significance or military relevance prior to 1791.[72] To be durable, reliable, affordable, and safe enough to achieve popularity, the experimental designs required metallurgical techniques and a level of machine precision unknown until well into the nineteenth century. Not until the advent of these and other breakthroughs discussed below in section II could repeating firearms become practical weapons of mass production, widespread military adoption, and commercial viability.[73]

39. As explained above, early America had a diverse and extensive tradition of regulating firearms in the name of public safety. Why, then, do we find no period laws regulating repeating firearms or restricting the size of firearm magazines? Put simply, the founding generation did not regulate technologies before they had any impact on society. Generally unsafe and unreliable, repeating firearms of all kinds were also overwhelmingly produced in Europe and stayed in Europe. They were vanishingly rare in colonial and founding-era America. Like their counterparts today, lawmakers from early America preoccupied themselves with actual social phenomena – not the possible implications of experimental technologies. They didn't spend their time scouring European publications for news about the cutting edge of firearms technology or hold lengthy debates about the potential social implications of weapons that few of them had ever seen, and that were not known to have ever been militarily or commercially consequential anywhere in the world. <u>The simplest and most accurate explanation for the absence of regulation, therefore, is that repeating firearms were much too rare and too</u>

[72] *Id.*

[73] For a summary of the basic technological hurdles and how they were finally overcome in the nineteenth century, see JOSEPH BRADLEY, GUNS FOR THE TSAR: AMERICAN TECHNOLOGY AND THE SMALL ARMS INDUSTRY IN NINETEENTH CENTURY RUSSIA, 12–19 (1990).

irrelevant to public safety to attract regulatory attention in 1791.

40. An appropriate modern-day analogy might be personal jetpacks. Much as repeating firearms did during the eighteenth century, personal jetpacks have held appeal both for militaries and private consumers for more than a hundred years. That appeal has generated competition in research and development. But jetpacks remain an expensive and experimental curiosity to this day, because of stubborn technological, safety, and practical challenges, including cost. A future historian (or jurist) discovering evidence that a patent was taken out on a jetpack design as early as 1919 (it was); that militaries remained intrigued by the technology throughout the century (indeed, they still are); and that the jetpack commanded enduring popular interest, could conclude that the absence of public regulation reflected an ideological disposition against regulating jetpacks. But the simpler and most accurate explanation would be that jetpacks remained too rare to attract regulatory attention in 2026.[74]

## II. WEAPONS REGULATION IN THE 19TH CENTURY

### A. Technological Change and the Advent of Modern Weapons Regulation

41. Weapons technology underwent huge changes after 1791. Advances in metallurgy, machine tooling, and mass-production associated with the Industrial Revolution enabled gifted firearms innovators and engineers to finally overcome design challenges that had frustrated gunmakers for centuries. New innovations built on one another, such that the period from the 1820s through the 1860s became one of the most productive and dynamic ever in the history of firearms technology.

42. Percussion caps, introduced early in the century, were one of the first transformative innovations. Simple to use and cheap to mass produce, percussion caps replaced the relatively cumbersome flint ignition systems that had dominated

[74] Anthony Quinn, *The Fall and Rise of Jetpacks* (Aug. 16, 2022), ROYAL AERONAUTICAL SOCIETY WEBSITE, https://www.aerosociety.com/news/the-fall-and-rise-of-jetpacks/#:~:text=The%20concept%20of%20a%20jetpack,never%20built%20or%20even%20prototyped.

firearms design since the seventeenth century. Meanwhile, other breakthroughs transformed gun production itself. In decades prior, arms manufacturing faced obstacles to large-scale production because it was so difficult to make precision component parts by hand. But by the 1830s, the federal armory in Springfield, Massachusetts (the Springfield Armory) and some of its biggest contractors had become world-leaders in the use of automatic milling machines to produce parts so uniformly as to be interchangeable. This "American system of manufacture," as the rest of the world would soon call it, combined with other advances in metallurgy and machine tooling made it possible both to build complex arms from nearly identical component parts, and to manufacture them at greater speed and less cost than ever before. These changes first became visible in the firearms market with the advent of affordable, reliable, mass-produced single-shot percussion-cap pistols.[75]

43. But the combination of percussion ignition and the advances in manufacturing also opened the way, finally, for the mass production of reliable repeating pistols. By the 1830s, two types of repeating pistols were entering the market alongside these simpler firearms. The first type, skillfully refined and aggressively patented by the inventor Samuel Colt, featured a single barrel with a multi-chambered, rotating breech. Percussion caps were affixed to the rear of each chamber in the breech. The chamber rotated mechanically so that the cap affixed to successive chambers would assume position to receive the hammer's blow and ignite the powder inside each chamber. The second type, most associated with Ethan Allen, featured three or more barrels that rotated around an axis (either manually or mechanically), the charge for each barrel ignited by a separate percussion cap. Also referred to as "revolvers" early on, these arms eventually came to be known as "pepperboxes." Pepperboxes enjoyed more commercial

[75] WILLIAM H. MCNEILL, THE PURSUIT OF POWER: TECHNOLOGY, ARMED FORCE, AND SOCIETY SINCE A.D. 1000 233–34 (1982); MERRITT ROE SMITH, HARPERS FERRY ARMORY AND THE NEW TECHNOLOGY: THE CHALLENGE OF CHANGE 219–51 (1977).

success than revolvers prior to the Civil War.[76]

44. In an era of emergent industrialization, dramatic population increases, and explosive urbanization, the rapid proliferation of mass-produced weapons – bladed weapons as well as single-shot and repeating pistols – unsurprisingly led to increases in armed crime. Responding to rising public safety concerns over the increase in gun violence and the proliferation of concealable weapons, lawmakers across the country passed a wave of new weapons regulations. Anti-brandishing laws were passed in three-fourths of all states during the nineteenth century, for example.[77] Many other laws sought to regulate concealed carry. At least twenty states and territories enacted such laws around the country between the ratifications of the Second and Fourteenth Amendments.[78] Sometimes the laws amounted to categorical bans. For instance, in 1855 Kentucky criminalized the "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung-shots, or any imitation or substitute therefore."[79] (Note that "colt," in this context, almost certainly referred to a slung-shot-type weapons, not the revolver).[80]

45. After the Civil War, state and municipal lawmakers continued to regulate dangerous weapons in the name of public safety, as they had since the colonial era. At least twenty-eight states and territories passed new concealed carry laws between 1865 and 1900, for example.[81] By the turn of the century, the

[76] For pepperboxes and revolvers, see Louis A. Garavaglia and Charles G. Worman, FIREARMS OF THE AMERICAN WEST, 1803–1865, at 95–104, 139–52, 203–20 (1998).

[77] Spitzer, *supra* note 55, at 43.

[78] For the relevant laws, see Mark Anthony Frassetto, *Firearms and Weapons Legislation up to the Early 20th Century* 20–24 (2013) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991.

[79] An Act to Prevent the Selling and Using of Certain Weapons, ch. 636, §§ 1–4, 1855 Ky. Acts 96, 96–97 (A.G. Hodges 1856)., available at https://firearmslaw.duke.edu/laws/an-act-to-prevent-the-selling-and-using-of-certain-weapons-ch-636-1-4-1855-ky-acts-96-96-97-a-g-hodges-1856.

[80] According to the Oxford English Dictionary's Historical Thesaurus, "Colt" was a nautical reference referring to "a piece of rope used as an instrument of chastisement." https://www.oed.com/thesaurus/?classId=172658.

[81] Frassetto, *supra* note 78, at 24–34.

majority living in the nation's most populous urban areas—millions of Americans—were subject to one restrictive carry regime or another.[82] Hundreds more carry regulations were promulgated at the municipal level in this period and in the early twentieth century.[83] Again, sometimes these laws amounted to categorical bans. In 1903, for example, South Carolina effectively outlawed the vast majority of handguns. It criminalized the manufacture, sale, lease, rent, barter, exchange, transport for sale, or carry (concealed or open) of "any pistol less than twenty inches long and three pounds in weight."[84] Alabama passed a similar law regulating pistol sales in 1907. It excluded a weight limit but expanded the minimum legal length of pistols to 24 inches – outlawing nearly all commercially available pistols.[85]

46. Nineteenth and early twentieth century regulators devoted much of their attention to weapons perceived as especially dangerous – because of lethality, association with crime, or both. Slungshots (a weighted object or "shot" attached to a length of rope or strip of cloth), metal knuckles, sandbags, and knife canes were among the targeted weapons.[86] None were considered especially lethal. The frequency of regulation indicates that they weren't especially unusual, either. All, however, had a strong association with crime. Legal restrictions often grouped two or more of these weapons together. Sometimes regulations were highly

---

[82] *See* Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328–1928*, 55 U.C. DAVIS L. REV. 2545, 2591–96 (2022).

[83] A search of Duke's Repository of Historical Gun Laws returns 495 hits for municipal conceal carry regulations passed between 1869–1934. Search completed July 22, 2026. *See* Repository of Historical Gun Laws, Duke Ctr. for Firearms L., https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search.

[84] 1903 S.C. Acts 127, available at https://firearmslaw.duke.edu/laws/1903-s-c-acts-127.

[85] Convictions resulted in fines between $100 and $1000, and violators could "also be sentenced to hard labor for not less than one nor more than three months." *See* 1907 Ala. Laws 80, available at https://firearmslaw.duke.edu/laws/1907-ala-laws-80.

[86] For examples and discussion of such laws, see Mark Anthony Frassetto & Kellen Heniford, *Weapons Most Useful in Crime: Slungshots, Silencers, and Ghost Guns under the Second Amendment*, 98 COLO. L. REV. (Forthcoming 2027), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6718620.

burdensome. Slungshots, for example, came under effective prohibition in New York (1849),[87] Vermont (1849),[88] Massachusetts (1850),[89] Kentucky (1860);[90] Dakota Territory (1865);[91] Florida (1868);[92] Illinois (1881);[93] Arkansas (1881);[94] Minnesota (1888);[95] and Oklahoma (1890).[96]

### B. Bowie Knives: An Important Regulatory Precedent

47. Bowie knives and other similar large "fighting knives" generated tremendous attention and concern in the nineteenth and early twentieth centuries. In the 1830s, "Bowie knife" quickly gained cultural currency as a standard term for a large fighting knife. Sizes and features varied. The Texas Penal Code captured the flexibility of the term in 1856: "A 'bowie knife' or 'dagger,' as the terms are here and elsewhere used, means any knife intended to be worn on the person, which is capable of inflicting death, and not commonly known as a pocket knife."[97] Given that Bowie knives were both common and frequently regulated, they are worth examining in more detail. A few points are particularly relevant to understanding the national tradition of arms regulation.

48. First, unlike brass knuckles or slungshots, Bowie knives and their

---

[87] 1849 N.Y. Sess. Laws 403; 1893 N.Y. Sess. Laws. 1288 (re-enacting).

[88] 1849 Vermont Acts 26, No. 36.

[89] 1850 Mass. Acts & Resolves 401, ch. 194.

[90] 1860 Kent. Pub. Acts 96, 636.

[91] General and Private Laws and Memorials and Resolutions of the Territory of Dakota 128 (1864–65).

[92] 1868 Fla. Laws 95, ch. 7, § 11.

[93] 1881 Ill. Sess. Laws 71.

[94] 1881 Ark. Acts 191–92.

[95] The Penal Code of the State of Minnesota, To Take Effect January 1, A.D. 1886, at 127 (1885).

[96] 1890 Okla. Sess. Laws 475–76, §§ 18–19. For slungshot regulation in context, see Mark Frassetto & Kellen Heniford, *Weapons Most Useful in Crime: Slungshots, Silencers, and Ghost Guns under the Second Amendment*, 98 COLO. L. REV.__(2027) (Forthcoming), at 13-16, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6718620.

[97] Art. 611, Texas Penal Code (1856), in A DIGEST OF THE GENERAL STATUTE OF THE STATE OF TEXAS (1859), at 534.

analogues were used not only among a criminal underclass, but by law-abiding citizens across the nation. A popular overland guide from 1849 advised every man contemplating emigration to carry a Bowie knife in his belt.[98] One emigrant party that followed this advice and left Ohio that same year was an unusually "respectable company": including the son of the U.S. secretary of the Interior, a state attorney, a constable, a lawyer, a merchant, and a druggist among its number. Stopping in Cincinnati to equip their journey: "each man [obtained] a good rifle, a pair of revolvers, [and] a bowie knife."[99] Stephen J. Field, who served in the California State Assembly, the California Supreme Court, and, eventually as a U.S. Supreme Court justice, recalled carrying a Bowie-knife for self-protection during his early career as a lawyer in California.[100]

49. Though nineteenth century sources occasionally claimed that the Bowie knife was "only worn by hunters and desperados in the wilder and more unsettled parts of the Union,"[101] the weapons were not confined to frontier areas. According to Norm Flayderman, author of the most comprehensive study of Bowie knives, the weapon was "not purely regional; their manufacture, sale and use was indigenous to just about every part of America. They served everyone equally, upstanding citizens and villains."[102] The wealthy Kentucky planter and abolitionist Cassius Marcellus Clay (after whom Muhammod Ali's father and, by extension, the great boxer himself was named) routinely armed himself with a Bowie knife for self-protection. Interviews he gave later in life were reprinted across the country. He recalled how the scabbard of his knife once saved him from an assassin's bullet,

[98] J. ELY SHERWOOD, THE POCKET GUIDE TO CALIFORNIA; A SEA AND LAND ROUTE BOOK 52 (1849).

[99] MCNEIL'S TRAVELS IN 1849, TO, THROUGH, AND FROM THE GOLD REGIONS, IN CALIFORNIA 4 (1850).

[100] *See* STEPHEN J. FIELD, PERSONAL REMINISCENCES OF EARLY DAYS IN CALIFORNIA 57–58 (1880), https://tile.loc.gov/storage-services/service/gdc/calbk/114.pdf.

[101] AMERICANISMS OLD & NEW 82 (John S. Farmer, ed., 1889).

[102] NORM FLAYDERMAN, THE BOWIE KNIFE: UNSHEATHING AN AMERICAN LEGEND, at 20 (2004).

and how, on another occasion, he wielded his Bowie knife against an enraged pro-slavery mob.[103] Representative John Fox Potter, Republican from Wisconsin, earned national fame as "Bowie-Knife Potter" after he agreed to duel with a southern congressman but insisted that they fight with the famous knives, rather than pistols.[104] Lincoln's partner and bodyguard armed himself with a Bowie knife while protecting the newly elected president when he first arrived in Washington D.C in 1861.[105]

50. A second, related fact about Bowie knives is that they were commonly used for lawful purposes. As the examples above indicate, self-defense was the most common of these lawful purposes. Asked whether it would be safer to rely on a pistol or a Bowie-knife in a fight, Clay answered "the Bowie Knife by all means." He explained that "the best of revolvers often misses fire and you may get so close to your enemy as to be unable to use it. Your Bowie knife never misses and scientifically used it will cut to the death every time."[106] Nineteenth century newspapers publicized accounts of the weapons being used in legitimate self-defense. Consider two examples from northern cities in the 1850s. A sickly twenty-two-year-old named John Walker came to Cincinnati for medical treatment in 1850. He brought with him a bowie-knife that his brother-in-law had given him, advising he "carry it if he should ever go out at night." While attending a circus one evening, he was assaulted by two off-duty constables. Walker stabbed both, and one later died of his wounds. At trial, Walker's lawyer argued that the young man had used

---

[103] For an early iteration, see *Kentucky Spunk*, SALT LAKE HERALD, Oct. 11, 1891, at 13. This article was still being reprinted years later. See *e.g.* L.A. HERALD, Nov. 17, 1895, at 28.

[104] *See* N.Y. TIMES, May 21, 1899, at 16 (obituary of John Fox Potter), https://www.nytimes.com/1899/05/21/archives/john-fox-potters-death-recalls-bowieknife-incident-in-thirtysixth.html.

[105] Frederick S. Calhoun, LAWMEN: UNITED STATES MARSHALLS AND THEIR DEPUTIES, 1789–1989 at 97 (1989).

[106] PITTSBURG DISPATCH, Nov. 15, 1891, at 16.

his Bowie knife in self-defense. The jury agreed and acquitted him of murder.[107] On April 5, 1857, a police officer named Byron Potter employed by the Michigan Southern Railroad in Chicago, was assaulted by several assailants near a freight depot. Potter "drew a large heavy bowie knife and stabbed the three men who were nearest him—inflicting frightful wounds." One of the men, Patrick Brown, died soon after. Describing Potter as possessing "a countenance denoting great determination and moral as well as physical courage," the *Chicago Tribune* noted that a jury of inquest examined a number of witnesses and "rendered a verdict entirely exonerating Mr. Potter from any blame in the matter, and declaring that he killed Brown wholly in self-defense."[108]

51. Self-defense was the most common of all lawful uses for Bowie knives, but not the only one. Rezin Bowie (James' older brother) is considered by most to have been the originator of the first "Bowie Knife." Nineteenth century accounts claimed he initially designed the knife for hunting wild cattle.[109] Another account from 1837 claims the knife was "originally intended to answer the double purpose of blazing trees, and of a hunting knife."[110] Sometimes hunting and self-defense went together. In 1877, for instance, the *California Mountain Messenger* reported that one Mr. Walpole, of Lassen County, had been hunting deer when he was charged by an enormous grizzly bear. A rifle shot barely wounded the animal, but Walpole buried his Bowie knife in the animal's breast and lived to tell the

---

[107] *State v. Walker* (Ohio Ct. Com. Pl. July Term 1850), *reprinted in* REPORTS OF CASES ARGUED AND DETERMINED, IN OHIO COURTS OF RECORD AS PUBLISHED IN THE WESTERN LAW JOURNAL 353–58 (1896), https://books.google.com/books?id=A5kKAAAAYAAJ&pg=PA1&dq=Reports+of+cases+argued+and+determined+in+Ohio+courts+of+record,+Volume+1&hl=en&ei=bItiTYfLPMX0gAex-5WAAg&sa=X&oi=book_result&ct=result&resnum=1&ved=0CCcQ6AEwAA#v=snippet&q=Dalzell&f=false.

[108] *Bloody Affray*, CHI. TRIB., Aug. 7, 1857, at 1.

[109] *The Bowie Knife*, DALLES DAILY CHRONICLE (Or.), Jan. 16, 1891, at 4. For a different origin story, see PASCOAG HERALD (R.I.), Nov. 27, 1903.

[110] ARK. ADV. (Little Rock), Feb. 2, 1837, at 1.

tale.[111] *Chambers's Encyclopedia*, from 1892, defined the Bowie knife as "an American hunting dagger."[112] While most Bowie knives were inexpensive (as the Texas Supreme Court put it in 1859, they were "ordinary weapon[s], one of the cheapest character, accessible even to the poorest citizen"[113]), some Americans purchased the knives as showpieces. An artisan in San Francisco by the name of M. Price began making high-end Bowie knives for wealthy clients in 1858 (often incorporating some of the gold then pouring into the city). Reputedly, these prized weapons were as famous on the West Coast "as Toledo blades were in Spain." Price's first customers, however, were U.S. surveyors who wanted the large blades "as substitutes for axes in cutting trails through the brush."[114]

52. Given the Bowie knife's utility as a weapon of self-defense and for other lawful purposes, it enjoyed a degree of legitimacy denied to metal knuckles, slungshots, and other weapons that were heavily regulated in this era. The nineteenth century United States was a large, diverse, territorially expansive, demographically explosive, and violent society. While many condemned Bowie knives (as I explain below), figures of prominence invoked the weapon as a useful and even iconic tool of self-defense. Consider this quote from a 1858 essay from Harvard Professor Oliver Wendell Holmes Sr. (father of the celebrated Supreme Court Justice): "We are the Romans of the modern world,--the great assimilating people. Conflicts and conquests are of course necessary accidents with us, as with our prototypes. And so we come to their style of weapon. Our army sword is the short, stiff, pointed gladius of the Romans; and the American bowie-knife is the same tool, modified to meet the daily wants of civil society."[115]

---

[111] KENOSHA TELEGRAPH (Wi.), Apr. 5, 1877, at 3.

[112] 2 CHAMBERS'S ENCYCLOPEDIA: A DICTIONARY OF UNIVERSAL KNOWLEDGE 337 (1892).

[113] 24 Tex. 394, John Cockrum v. The State, Supreme Court of Texas, 1859.

[114] MANNING TIMES (S.C.), Jan. 23, 1889, at 1. Christie's auctioned one of Price's Bowie Knives in 1999. *See* Lot 1515826, CHRISTIE'S, https://www.christies.com/en/lot/lot-1515826.

[115] Oliver Wendell Holmes, THE AUTOCRAT OF THE BREAKFAST-TABLE 21 (1858).

53. Of course, in addition to their use for self-defense and other lawful purposes, Bowie knives were frequently used for unlawful purposes. That same Texas Supreme Court also called the Bowie knife one of "the most deadly of all weapons in common use."[116] While in common use across society for lawful purposes, Bowie knives and their clones also became notorious across the nation as weapons of crime, violence, and intimidation. As early as 1838, the *Arkansas Gazette* was lamenting "the frequent Bowie knife murders in the west."[117] Searching only publications between 1834 and 1899, the phrase "Bowie knife" appears 13,109 times in the Library of Congress's newspaper repository, *Chronicling America* ("brass knuckles," in comparison, has 3,577 hits in the same period).[118] A significant proportion of those instances involved stories about the weapon's misuse or associated it with unsavory characters.[119]

54. Given widespread societal concerns, Bowie knives and their variants were routinely included in the nineteenth century wave of weapons legislation noted above, either on their own or alongside other dangerous weapons.[120] Here again, conceal carry restrictions were the most common form of regulation. But several states embraced more severe forms of regulation. Some states and territories

---

[116] 24 Tex. 394, John Cockrum v. The State, Supreme Court of Texas, 1859.

[117] ARK. GAZETTE (Little Rock), March 14, 1838, at 2.

[118] CHRONICLING AMERICA, Libr. Of Cong., https://www.loc.gov/collections/chronicling-america/?dl=page&end_date=1899-12-31&ops=PHRASE&qs=Bowie+knife&searchType=advanced&start_date=1834-01-01 (search for "Bowie knife," Jan. 1, 1834 to Dec. 31, 1899).

[119] Such articles are numerous. *See, e.g.*, GENIUS OF LIBERTY, (Il.), June 5, 1841, https://www.loc.gov/resource/sn92053389/1841-06-05/ed-1/?sp=1&q=Bowie+knife&r=-0.489,0.357,1.653,1.321,0; DAVENPORT GAZETTE (Iowa), June 22, 1848, at 3, https://www.loc.gov/resource/sn82014073/1848-06-22/ed-1/?sp=3&q=Bowie+knife&r=0.012,0.062,0.852,0.681,0; DANBURY TIMES (Conn.), June 26, 1856, at 2, https://www.loc.gov/resource/sn84022465/1856-06-26/ed-1/?sp=2&q=Bowie+knife&r=-0.207,0.061,1.16,0.927,0; DAILY BUTTE (Cal.), July 23, 1858, https://www.loc.gov/resource/sn86058107/1858-07-23/ed-1/?sp=2&q=Bowie+knife&r=0.18,-0.081,0.743,0.593,0.

[120] According to Robert J. Spitzer, Bowie knives or their analogues were regulated in every state in the country at some point between the 1830s and the early twentieth century. *See* Spitzer, *supra* note 55, at 25.

(Georgia in 1837,[121] Texas in 1871,[122] Arkansas in 1881,[123] Arizona in 1889[124]) banned carry altogether, with only narrow exceptions. Other states and territories went so far as to prohibit sale or possession outright: Georgia in 1837,[125] Tennessee

[121] In addition to Bowie and similar knives, the carry ban included pistols (excepting only very large pistols known as horseman's pistols), dirks, sword canes, and spears. Fines for conviction were between $100–$500 for the first violation; $500–$1000 for every violation thereafter. "An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons," §§ 1–4, https://firearmslaw.duke.edu/laws/an-act-to-guard-and-protect-the-citizens-of-this-state-against-the-unwarrantable-and-too-prevalent-use-of-deadly-weapons-1-5-1837-ga-laws-90-90-91-p-l-robinson-1838.

[122] Exceptions for militiamen, law enforcement, and civil officers (except for members of the state legislature, interestingly); those able to demonstrate "immediate and pressing danger" not of his own making; "persons traveling in the state"; and persons residing in what the governor designates to be frontier counties. Fines for first offence between $25–$100 and forfeiture of weapon. Subsequent offenses carry same penalties plus possible imprisonment up to sixty days. See Tex. Code., Arts 6512–6515 (W.H. & O. H. Morrison 1874) [law passed 1871], https://firearmslaw.duke.edu/laws/george-washington-paschal-a-digest-of-the-laws-of-texas-containing-laws-in-force-and-the-repealed-laws-on-which-rights-rest-carefully-annotated-page-1322-1324-image-292-294-vol-2-1873-availa.

[123] Along with Bowie knives, prohibited the carry, "in any manner whatever," dirks, swords, cane spears, brass or metal knuckles, razors, and all pistols except as used in the U.S. Army and Navy. Exceptions for persons on a journey or on their own premises, and officers of the state. Violations punished with fines between $50–$200. 1881 Ark. Acts 192, "An Act to Preserve the Public Peace and Prevent Crime," no. 96, §§1–4, https://firearmslaw.duke.edu/laws/an-act-to-preserve-the-public-peace-no-96-1881-ark-acts-191-191-92-mitchell-bettis.

[124] Applied to any settlement, town, village, or city within Arizona Territory. Exceptions for official officers, and militiamen; persons in their own premises or place of business; persons reasonably fearing an attack so imminent as to prevent the arrest of the assailant; and travelers, provided they carry the prohibited weapons for no more than one half hour after arriving or preparing to leave a town or settlement. Violators may be arrested without warrant and fined between $25–$100, in addition to forfeiting the weapon in question. See Act of Mar. 18, 1889, no. 13, §§ 1–9, Ariz. Sess. Laws 30, 30–31, https://firearmslaw.duke.edu/laws/act-of-mar-18-1889-1889-ariz-sess-laws-16-17.

[125] Fines for conviction were between $100–$500 for the first violation. 1837 Ga. Acts 90, "An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons," §§ 1–4, https://firearmslaw.duke.edu/laws/an-act-to-guard-and-protect-the-citizens-of-this-state-against-the-unwarrantable-and-too-prevalent-use-of-deadly-weapons-1-5-1837-ga-laws-90-90-91-p-l-robinson-1838.

in 1838,[126] Arkansas in 1881,[127] and Indian Territory in 1899.[128] Still other states and territories imposed such high fees or taxes as to amount to a prohibition, including Alabama in 1837[129] and Florida in 1838.[130]

55. Even in an era of proliferating weapons laws, the nineteenth century Bowie knife regulations stand out. They reflect the willingness of lawmakers across the country to heavily regulate even weapons in common use for lawful purposes -- once evidence existed that their frequent misuse had imperiled public safety. The Georgia Supreme Court famously struck down that state's 1837 carry ban in Nunn v. State 1 Ga. (1 Kel.) 243 (1846). Crucially, though, the Nunn decision left the sale

---

[126] Upon conviction violators to be fined between $100–$500 and imprisoned between one and six months. "An Act to Suppress the Sale and Use of Knives and Arkansas Took Picks in this State," ch. 137, §§ 1–5, 1838 Tenn. Pub. Acts 200, 200–01 (S. Nye & Co.), https://firearmslaw.duke.edu/laws/an-act-to-suppress-the-sale-and-use-of-bowie-knives-and-arkansas-tooth-picks-in-this-state-ch-137-1-5-1838-tenn-pub-acts-200-200-01-s-nye-co.

[127] Along with Bowie knives, sale ban included dirks, swords, cane spears, brass or metal knuckles, all pistols except as used in the U.S. Army or Navy, and "any kind of cartridge, for any pistol." Misdemeanor offence. 1881 Ark. Acts 192, "An Act to Preserve the Public Peace and Prevent Crime, no. 96, §3," https://firearmslaw.duke.edu/laws/an-act-to-preserve-the-public-peace-no-96-1881-ark-acts-191-191-92-mitchell-bettis.

[128] Banned carrying Bowie knives (along with dirks, swords, cane spears, brass or metal knuckles, razors, and all pistols save Army and Navy pistols (which had to be openly carried). Also outlawed the sale, barter, or exchange of the above weapons, along with all pistol cartridges. Misdemeanor. Dorset Carter, Annotated Statutes of the Indian Territory (55th Cong., 2nd Sess.), 243–44, https://firearmslaw.duke.edu/laws/dorset--carter-annotated-statutes-of-the-indian-territory-embracing-all-laws-of-a-general-and-permanent-character-in-force-at-the-close-of-the-second-session-of-the-fifty-fifth-congress-page-243-244.

[129] $100 tax on anyone selling, giving, or disposing. "Pains and penalties of perjury" for violators. The law also included sentence enhancements for homicides committed with Bowie knives and their clones. "An Act to Suppress the Use of Bowie Knives, no. 11, §§ 1–2, 1837 Ala. Laws 7,7 (Ferguson & Eaton), https://firearmslaw.duke.edu/laws/an-act-to-suppress-the-use-of-bowie-knives-no-11-1-2-1837-ala-laws-7-7-ferguson-eaton.

[130] $200/year tax on vendors and $10/year tax on anyone carrying Bowie knives openly. Convicted violators fined between $200–$500. "No. 24. AN ACT in addition to An Act, (approved January 30th, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly," available at https://firearmslaw.duke.edu/laws/no-24-an-act-in-addition-to-an-act-approved-january-30th-1835-entitled-an-act-to-prevent-any-person-in-this-territory-from-carrying-arms-secretly-c2a71-10-feb-1838. Note that earlier Florida legislation prohibited the concealed-carry of any weapons save a common pocket knife. "An Act to Prevent Any Person in this Territory from Carrying Arms Secretly, ch. 860, 1835 Fla. Terr. Laws 318, 318 (William Wilson), https://firearmslaw.duke.edu/laws/1835-fl-acts-of-the-governor-and-legislative-council-of-the-territory-of-florida-passed-at-the-thirteenth-session-ch-860-no-38.

prohibition intact.[131] To my knowledge, none of the other Bowie knife restrictions cited above were overturned on state or national constitutional grounds.

## III. THE INVENTION OF MACHINE GUNS AND THE NATIONAL FIREARMS ACT

### A. Long-Arms Before the Advent of Automatic Fire

56. The manufacturing and technological revolution that transformed concealable weapons like fighting knives and pistols also came for long-arms by the mid-19th century. Flawed but clever designs began to appear that combined breach-loading, attached or internal magazines, metallic cartridges, and mechanisms for the chambering of cartridges and ejection of spent cases. This line of innovation culminated in 1860 when Oliver Winchester's New Haven Arms Company released the world's first reliable firearm with a greater-than-ten-shot capacity. Named after Winchester's brilliant gunmaker, Benjamin Tyler Henry, it was an ingenious breech-loading, lever-action rifle that could fire sixteen rounds without reloading (one in the chamber and fifteen from an attached, tubular magazine). Soon, refinements to the Henry resulted in an even better gun: the Winchester Model 1866. The growing popularity of these firearms over the coming decades spawned numerous competitors.[132]

57. The late nineteenth century was an era of slow-load firearms. Winchester lever-action rifles and their competitors in the last third of the nineteenth century had fixed magazines. Once a fixed magazine was empty, the shooter had to reload each round, one by one. As with pepperboxes or Colt revolvers, this round-by-round loading process put a ceiling on the damage a single shooter could inflict on a group of people.[133] Notwithstanding the success of lever-

[131] *Nunn v. State*, 1 Ga. 243 (1846).

[132] Herbert G. Houze, WINCHESTER REPEATING ARMS COMPANY: ITS HISTORY & DEVELOPMENT FROM 1865 TO 1981, at 42–46 (1994). The Spencer Repeating Rifle, also introduced in 1860, was a seven-shot, lever-action rifle.

[133] Colt transitioned away from the laborious cap-and-ball system to faster-loading metallic cartridges in the early 1870s, more than a decade after its competitor Smith & Wesson had done so. *See* JOHN WALTER, THE HAND GUN STORY: A COMPLETE ILLUSTRATED HISTORY 52–55

(continued…)

action firearms, that ceiling had not gotten dramatically higher since the 1830s. The magazines of most of the new rifles held somewhere between ten to fifteen rounds. A person armed with a pair of seven-shot revolvers could fire fourteen rounds without reloading. A shooter from the time with a typical repeating rifle had roughly the same capabilities as a shooter with two revolvers in his hands. There were trade-offs, of course. The repeating rifle often had somewhat more power and always had more range and accuracy. Pistols were concealable and easier to use in some circumstances. Still, neither arm had the power, range, or accuracy of bolt-action, single-shot rifles that the United States and the strongest European militaries continued to favor.[134]

58. In other words, the advent of Winchester repeaters and their imitators did not provoke fundamentally different social problems than those that had been accelerating in the United States since the proliferation of revolvers and pepperboxes earlier in the century. The changes were of degree, rather than kind. Automatic fire was different.

### B. Automatic Fire: A Dramatic Technological Change

59. Lever-action or pump-action rifles require energy transferred from human muscle through an internal mechanism to eject a spent casing and chamber a new round. The same is true of single-action revolvers, which require the shooter to pull back the hammer to rotate the chamber and position a new round for firing. Double-action revolvers transfer all this work to the trigger, which, when squeezed, both rotates the chamber and releases the hammer.

60. Automatic and semi-automatic firearms do not rely on human muscle. Instead, their great innovation is to enlist some of the energy released by the first round to eject the spent casing and chamber the next round. Automatic firearms

---

(2008).

[134] For a discussion of the rifles the United States military preferred, see DAVID F. BUTLER, UNITED STATES FIREARMS: THE FIRST CENTURY, 1776–1875, at 152–93 (1971).

(which continue to fire so long as the trigger is depressed and ammunition lasts) and semi-automatic firearms (which fire a round with each squeeze of the trigger) first started coming on the market in the 1890s. In addition to advances in machine production, materials science, and precision parts, these revolutionary weapons incorporated three specific innovations.

61. The first was the invention of a reliable mechanism using springs and levers to capture the recoil energy of a fired round to chamber the next round. That discovery belongs to Hiram Maxim, creator of the famous Maxim machine gun in 1884.[135] Maxim aimed to improve upon the French mitrailleuse (1851), the U.S. Gatling gun (1862), and the Swiss Nordenfeldt (1873). These heavy, multi-barreled military weapons sat atop tripods or carriages and achieved rapid fire through hand-cranked ammunition feeding devices. The bulky Maxim gun generally required at least two people to carry and position. But unlike its competitors' mechanical feeding systems, the Maxim's method of using recoil to chamber each new round was scalable and, therefore, would soon have huge consequences for smaller, handheld firearms.[136]

62. Smokeless powder was the second innovation. When fired, black powder leaves residue behind that fouls barrels. Fouling was a manageable annoyance in the era before guns could fire several times a second. With the astonishing rates of fire made possible through Maxim's invention—up to 600 rounds a minute[137]—fouling could be so rapid as to render an automatic fire weapon inoperable. Serendipity intervened to solve this problem. In the mid-1880s, right when Maxim was making his breakthrough in harnessing recoil energy, researchers in France perfected a new chemical propellant. Based on nitrocellulose,

[135] *See* W. Y. CARMAN, A HISTORY OF FIREARMS: FROM EARLIEST TIMES TO 1914, at 82–88 (1955).

[136] *See id.*

[137] JULIA KELLER, MR. GATLING'S TERRIBLE MARVEL: THE GUN THAT CHANGED EVERYTHING AND THE MISUNDERSTOOD GENIUS WHO INVENTED IT 222 (2008).

it was three times as powerful as black powder, gave off very little smoke, and left behind almost no residue in the barrel.[138] Smokeless powder meant that automatic fire would be a practical technology.

63. Third and finally, automatic and semi-automatic firearms required a method of feeding cartridges into the weapon. Maxim's machine gun used belts of bullets stored in crates or boxes. For most handheld firearms, it would be more practical to have a magazine. One option was to have a fixed magazine incorporated into the weapon itself, as with the tubular magazines of most lever-action rifles. Some of the earliest semi-automatic handguns would be designed around fixed box magazines, such as the Mauser C-96, a flawed but innovative German arm introduced in 1896.[139]

64. Once gunmakers began turning their attention to small arms in earnest, however, they had another, more appealing option: detachable magazines. Like self-loading mechanisms and smokeless powder, detachable magazines achieved their initial practical use in military arms during the 1880s. The first successful firearm with a detachable magazine was developed by James Paris Lee, to be used with military bolt-action rifles.[140] What made detachable magazines so advantageous is that they dramatically accelerated loading. Rather than reloading a weapon bullet by bullet, as with lever-action rifles or revolvers, the shooter simply ejected the spent magazine, inserted a full magazine, and resumed firing.[141]

65. By the early 1890s, then, gunmakers had at their disposal a trio of

---

[138] For the development of smokeless powder, see René Amiable, Scientific Reasoning and the Empirical Approach at the Time of the European Invention of Smokeless Powder, in GUNPOWDER, EXPLOSIVES, AND THE STATE: A TECHNOLOGICAL HISTORY 343–54 (Brenda J. Buchanan ed., 2006).

[139] Walter, *supra* note 133, at 196–98.

[140] ALEXANDER ROSE, AMERICAN RIFLE: A BIOGRAPHY 224–25 (2008).

[141] The great late nineteenth and early twentieth century authority W.W. Greener compared the standard service arms of nineteen countries in 1910. Only four (Turkey, Switzerland, Great Britain, and Belgium) employed arms with detachable magazines. W. W. GREENER, THE GUN AND ITS DEVELOPMENT 736–37 (9th ed. 1910).

potent new design features that would become characteristic of most modern automatic and semi-automatic firearms—self-loading mechanisms, smokeless powder ammunition, and detachable magazines. The first pistol to successfully combine all three elements was the Borchardt C-93. Made in Germany in 1893, the Borchardt C-93 had a detachable, eight-round magazine.[142] Competitors were quick to enter the market. In 1900, Belgium's Fabrique Nationale ("FN") produced a semi-automatic pistol with a seven-round detachable magazine designed by John Moses Browning, arguably the most inventive and important of all U.S. gunmakers. FN would go on to sell more than 700,000 of them over the next decade, mostly to foreign militaries.[143] Colt soon partnered with Browning on semi-automatic pistols, marketing better and better versions of his popular firearms starting in 1900. These efforts culminated in the M1911, a handgun with a seven-round detachable magazine. The most copied and influential of all modern handguns, several million M1911s have been sold in the past century. Variations of the gun are still in production today.[144]

66. American firms also helped lead the way in the production of semi-automatic rifles. Winchester and Remington both had models out early in the 20th century. As with the early semi-automatic handguns, some designs had fixed magazines and others had detachable magazines. Light, fully automatic guns migrated from the battlefield to the U.S. civilian market in the 1920s. The most notorious was the Thompson "submachine" gun (so called to distinguish it from the far heavier and less maneuverable machine guns that had played a prominent role in WWI).

67. Colloquially known as the "Tommy Gun," the weapon went into

---

[142] Walter, *supra* note 133, at 127–44.

[143] *Id.* at 220–28.

[144] NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 118 (9th ed. 2007).

production in 1921. It had box magazines ranging from twenty to thirty rounds, and drum magazines as large as one hundred rounds.[145] It was a select-fire weapon, meaning it could be set either to semi-automatic or automatic fire. In semi-automatic mode, the weapon could empty a 100-round drum magazine in around a minute. In automatic mode, it only took around four seconds to fire 100 rounds.[146] Just who would benefit from such a weapon was an open question. Auto-Ordnance, its producer, initially concentrated on foreign and domestic military contracts. These contracts proved elusive, though. High price was one factor. Initially offered at $225 ($4,197 in 2026 dollars), the gun barely sold even when Auto-Ordnance reduced it to $175 ($3264 today). Desperate marketing campaigns aimed at rural Americans (see below) didn't solve the company's problem.[147]

---

[145] William Helmer, THE GUN THAT MADE THE TWENTIES ROAR 49–52 (1969).

[146] Brief for Patrick J. Charles as Amicus Curiae Supporting Petitioners at 6, *Garland v. Cargill*, 602 U.S. 406 (2024) (No. 22-976).

[147] Helmer, *supra* note 145, at 70–74.




68. Law enforcement proved as disappointing to the firm as military procurement offices and ranch-owners. By 1925, Auto Ordnance had only sold around 3000 of the guns, total. Sales were actually declining. While several police departments acquired a few Tommy Guns, the weapon was simply too indiscriminate to be of help to most police business. A prominent arms expert thought that Tommy Guns simply weren't useful. "Here, one would say, is an arm that is useless for sport, cumbrous for self-defense and could not serve any honest purpose, but which in the hands of political fanatics might provoke disaster."[148]

69. But there was one very enthusiastic constituency. Because their detachable magazines enabled users to load and reload all at once, rather than round by round, the new fast-load firearms empowered individual shooters to inflict far more damage on more people than had been possible with earlier technologies – so long as they didn't object to incidental casualties. The Tommy gun made its debut

[148] *Id.* at 74–79.

in Chicago's gangland warfare on September 25, 1925. Impressed by the new firepower his rivals had acquired, Al Capone ordered three from a local hardware store a few months later. By 1926 the Thompson had migrated to New York's underworld, and by 1927 they made it to Philadelphia.[149]

### C. Machine Guns: New Societal Concerns and the Regulatory Response

70. Stories of gangland shootouts became more and more prominent in the press, culminating with the "St. Valentine's Day Massacre" on February 14, 1929. Under Capone's orders, his lieutenants lured six members of a rival gang (and one unlucky hanger-on) into a trap where men disguised as police ordered them up against a wall and then two other men sprayed them with Tommy guns.[150] News of crimes committed with the Thompson continued to fill the nation's newspapers, with civilians sometimes caught in the crossfire. "Child is Killed; Four Others Shot in Gang Warfare," read a frontpage headline from July 1931, "Tots Playing on Sidewalk in Harlem's 'Little Italy' are struck by bullets intended for Gangster."[151] With the gangland wars burning themselves out by the early 1930s (Capone, having eliminated most of his rivals in Chicago, pled guilty to tax evasion in 1931), the Tommy gun became associated with newly audacious forms of depression-era armed robbery in the heartland. Clyde Barrow and Bonnie Parker in Texas, Pretty Boy Floyd in Oklahoma, George "Machine Gun" Kelly in Indiana; and John Dillinger across the upper Midwest: these figures fascinated the public and cemented the association of Tommy guns with violent crime.[152]

71. Public discussion about regulating these dangerous weapons emerged as soon as reports of their misuse began appearing in newspaper articles. The

---

[149] *Id.* at 152.

[150] ARIZ. DAILY STAR, Feb. 15, 1929, https://tucson.com/feb-15-1929-front-page-st-valentines-day-massacre/article_15fd04c4-4d18-11ea-b0c8-73d594f334a4.html.

[151] BRUNSWICK NEWS (Ga.), July 29, 1931, at 1, https://gahistoricnewspapers.galileo.usg.edu/lccn/sn90052143/1931-07-29/ed-1/seq-1/.

[152] Helmer, *supra* note 145, at 102–28.

popular national magazine *Collier's*, for example, sent a crime reporter to gun stores around New York City to see whether he encountered any difficulty purchasing machineguns. In New Jersey, thieves armed with a Tommy gun had recently ambushed a mail truck, killed its driver, wounded his assistant, and escaped with a small fortune. *Collier's* reporter went to three different gun stores and asked about purchasing a Thompson submachine gun. He discovered that it was easier to legally purchase a Tommy gun than a pistol. "*The police authorities are powerless to interfere with the sale and distribution of the highest powdered instrument of destruction that has yet been placed at the convenience of the criminal element in this country* [emphasis in original]." A police officer the reporter interviewed explained that a criminal armed with this weapon "is going to cut down on a whole street, clear up an avenue of escape and make a get-away. But can the police, in pursuit of him, do anything like that? Certainly not. We can't turn loose an endless stream of bullets down a crowded thoroughfare. We won't do it." Concluding that the Tommy gun was "the paramount example of peace-time barbarism" and "the diabolical acme" of man's effort to devise a mechanical contrivance with which to murder his neighbor," the reporter concluded that "its manufacture or, at any rate, its sale in the United States should be absolutely prohibited."[153]

72. As they had with the industrial revolution's proliferation of deadly weapons in the nineteenth century, lawmakers responded to the novel threat to public safety with legislation. States took the lead. Between 1925 (when automatic weapons were just beginning to amplify crime) and 1935, over half of the states in the nation passed laws regulating fully automatic firearms. At least eighteen passed total bans on possession (as did the Territory of Hawaii and Washington D.C.). At least six states banned possession with unlawful or aggressive purpose. At least

[153] Owen P. White, *Machine Guns for Sale*, COLLIER'S, Dec. 4, 1926, at 11–12.

seven states subjected automatic weapons to strict licensing regimes.[154]

73. California's experience is instructive. The state's residents began learning about the criminal use of machine guns via early reports from other states. In early 1927, for example, the San Pedro News Pilot noted such crimes in New Jersey and Illinois. "Here is one of the deadliest of weapons which murderers seem to have no difficulty whatever in obtaining," it noted. "Inquiries show that it is easy to buy a machine gun even in states which regulate the sale of revolvers."[155] The Los Angeles Times also lamented the trade in machine guns. "Except on the battlefield, the machine gun has no legitimate place. To let criminals purchase these weapons and make battlefields of our streets is a disgrace to civilization."[156] Moving proactively to protect Californians from machine gun crime, the Legislative Committee of the California Peace Officers' Association urged Sacramento to act. Concerning the proposed legislation, the *Oakland Tribune* reported that "Repetition of such crime orgies" as had become notorious in Chicago "will be made impossible if possession of machine guns s made a serious offence, the officers

---

[154] To my knowledge this list includes twenty-three different states, one territory, and Washington, D.C. The statutes fall into three groups, sometimes overlapping. (all laws available at the https://firearmslaw.duke.edu/repository-of-historical-gun-laws):

1) Total bans on possession (see 1927 Cal. Stat. 938, §§ 1–2; 1927 Ind. Acts 469, § 1; 1927 Iowa Acts 201, §§ 1–2; 1927 Mich. Pub. Acts 888–89 § 3; 1927 (January Session) R.I. Pub. Laws 256 §§ 1, 4–6 (exceptions under permit for banks and transportation firms); 1929 Mo. Laws 170, §§ 1–2; 1928–1929 Wis. Sess. Laws 157 § 1; 1931 Ark. Laws 705, 705-06, §§ 2–3; 1931 Del. Laws. 813, § 1; 1931 Ill. Laws 452-53, §§ 1–2; 47 Stat. 650 §§ 1, 14 [D.C. 1932]; 1933 Haw. Sess. Laws 38, § 7; 1932 La. Acts 337–38, §§ 1–2; 1933 Kan. Sess. Laws 76, §§ 1–3; 1933 Minn. Laws 231–33, §§ 1–3; 1933 N.Y. Laws 1639, §§ 1, 3; 1933 Or. Laws 489, §§ 3–4); 1933 Tex. Gen. Laws 219–20, 1st Called Sess., §§ 1–4, 6; 1933 Wash. Sess. Laws 335–36, §§ 1–5; 1931–1933 Wis. Sess. Laws 778, § 1); 1933 N.C. Sess. Laws 387, §§ 1–4.

2) Bans on possession with an unlawful or aggressive purpose (see 1929 Neb. Laws 673; 1931 N.Y. Laws 1033, § 1; 1933 S.D. Sess. Laws 245–47, §§ 1–8); 1934 Va. Acts 137, §§ 1–7; 1935 Ark. Laws 171, §§ 2–5; 1935 Mont. Laws 57-60, §§ 3–5.

3) Licensing regimes (see 1925 W. Va. Acts 30–31 (Extraordinary Sess.); 1927 Mass. Acts 413, §§ 1–2 (amending §§ 121, 123); 1927 N.J. Laws 180–81, §§ 1–2; 1931 N.D. Laws 305–06; 1933 Cal. Stat. 1169; 1933 Ohio Laws 189–90, § 1 (Reg. Sess.).

[155] *Private War*, SAN PEDRO NEWS PILOT, Jan. 20, 1927, at 4, https://cdnc.ucr.edu/?a=d&d=SPNP19270120.2.56&srpos=49&e=02-01-1920-01-02-1935-192-en--20--41-byDA-txt-txIN-%22machine+gun%22----1927---.

[156] L.A. TIMES, Jan. 27, 1927, part II, at 4, https://latimes.newspapers.com/image/380446001/.

agree."[157]

74. Sacramento approved. The state instituted a sweeping ban on machine guns in mid-1927, applicable to "every person, firm or corporation, within the state of California." It defined "machine gun" as "capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such a gun from or by means of clips, disks, drums, belts or other separable mechanical device." Upon conviction, violations were to be imprisoned up to three years, fined up to $5,000, or both.[158]

75. California newspapers continued to run stories about machine gun violence, whether in civil wars and revolutions abroad, or in eastern cities grappling with gangland warfare. Complaining that "the possessor of a pair of brass knuckles is more of a crime than possession of a machine gun," State Representative William G. Bonelli from Los Angeles proposed strengthening the 1927 law.[159] His colleagues obliged. Whereas the original legislation had only focused on possession, the 1931 law expanded regulation to cover "the sale, offering for sale, possession or transportation" of machine guns. The 1927 legislation had offered exceptions to no one but military and law enforcement in discharge of their duties, meaning that banks and armored delivery firms, for example, had no legal access to the weapons. The amended language allowed broader exceptions. It expanded the sphere of official use to include "city, city and county, county, state or federal" officers. It introduced a strict permitting regime whereby the superintendent of the division of criminal identification and investigation of the department of penology

---

[157] OAKLAND TRIBUNE, Jan. 20, 1927, at 2, https://cdnc.ucr.edu/?a=d&d=OT19270120.1.2&srpos=54&e=02-01-1920-01-02-1935-192-en--20--41-byDA-txt-txIN-%22machine+gun%22----1927---.

[158] *See* "An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns, ch. 552, §§1–2, 1927, Cal. Stat. 938, 938, available at https://firearmslaw.duke.edu/laws/1927-cal-stat-938.

[159] *Legislators Probe Machine Gun Problem*, PETALUMA ARGUS COURIER, Jan. 20, 1931, https://cdnc.ucr.edu/?a=d&d=PAC19310120.1.3&srpos=92&e=01-01-1931-01-01-1932--en--20--81-byDA-txt-txIN-%22machine+gun%22-------.

could issue permits to those convincing him "that good cause exists for the issuance thereof." Permits could be revoked at any time "when it shall appear that the need for such firearms has ceased" or when they are used for non-permitted purposes.[160]

76. Machine guns remained in the California news. In early 1933, for example, The *Santa Cruz Sentinel* ran the front-page headline "Los Angeles Machine Gun Gang Try to Slay Wealthy Retired Man."[161] Commentary in the *Los Angeles Times* had a particular edge in 1933. Its "Pen Points" section of light reflections on the news often turned to machine guns and the people profiting from them. "Americanism: Restricting the sale of poison to prevent crime; permitting the sale of machine guns that are used only for murder."[162] "What is an accessory to a crime? And does the seller of a machine gun think it will be used in Sunday school?"[163] "There's one way to disarm gangsters. Let the wife of a machine-gun victim win a $50,000 suit against the firm that provided the gun."[164]

77. The Los Angeles Bar Association's Committee on Criminal Law and Procedure urged the state to tighten the law even further by extending the maximum prison time for violation.[165] Again, legislators responded. Amendments to the law in 1933 clarified that machine gun permits would not be issued to anyone under twenty-one years of age; increased the maximum prison time for violation to five

---

[160] *See* An Act to Amend the Title and Section 1 of and to add sections 3, 4, 5, 6, and 7 to an act entitled "An Act to Prohibit the Possession of Machine Rifles…," ch. 1050, §§ 1–7, 1931, pp. 2203–05, https://clerk.assembly.ca.gov/sites/clerk.assembly.ca.gov/files/archive/Statutes/1931/31vol1_Chapters.pdf.

[161] SANTA CRUZ SENTINEL, Jan. 11, 1933, at 1, https://cdnc.ucr.edu/?a=d&d=SCS19330111.1.1.

[162] L.A. TIMES, Apr. 21, 1913, at 20, https://latimes.newspapers.com/article/the-los-angeles-times-la-times-pen-po/203762411/.

[163] L.A. TIMES, Oct. 14, 1933, https://latimes.newspapers.com/image/380463592/?clipping_id=203762554.

[164] L. A. TIMES, Apr. 25, 1933, https://latimes.newspapers.com/image/380600815/?search-id=e747d834-39a8-4596-8c68-9c6821f6b6bb&search-rank=4&clipping_id=203762718.

[165] DAILY NEWS (L.A.), March 17, 1933, at 2, https://cdnc.ucr.edu/?a=d&d=DNLA19330317.1.2.

years; added failure to exercise "great care in retaining custody of any weapons possessed under the permit" to the list of justifications for revoking a permit; clarified the terms under which licensed gun dealers may be permitted to sell machine guns to permit-holders.[166] Importantly, the 1933 law also elaborated on the definition of "machine gun," now also including "all firearms which are automatically fed after each discharge from or by means of clips, disks, drums, belts or other separable mechanical device having a capacity greater than ten cartridges."[167]

78. In 1934, Congress passed the first significant federal firearm law in the nation's history, regulating fully automatic firearms along with several other kinds of weapons.[168] (Interestingly, prominent Californians believed that they had led the way. Future Supreme Court Chief Justice Earl Warren, then attorney general of Alameda County, told the Bay Counties' Peace Officer Association that the new federal regulation of machine guns had "been originally suggested by the California Peace Officers' Association.[169]). While the National Rifle Association opposed other elements of the proposed legislation, it supported action to "completely outlaw machine guns."[170] According to an important study of the era's firearms legislation (a study that finds most other regulatory actions during the 1920s and 1930s to have been ineffective), "the public market in submachine guns appears to

---

[166] *See* An Act to Amend sections 1, 2, 3, 6, and 7 of an act entitled "An Act regulating the sale, offering for sale, possession or transportation of machine rifles, machine guns, and sub-machine guns…," ch. 450, §§ 1–7, 1933, pp. 1169–71, available at https://firearmslaw.duke.edu/assets/1933,-ca,-act-of-may-20,-ch.-450,--15,-1933,-cal.-stat.,-1169,-116971-(harry-hammond).pdf.

[167] *Id.*, §3.

[168] ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL 139 (6th ed. 2015).

[169] S.F. POLICE & PEACE OFFICERS' J. OF THE STATE OF CAL., Sept. 1934, at 7–8, https://archive.org/details/policepeaceoffic19331934sanf/page/302/mode/2up?q=%22machine+gun%22. Warren also claimed, incorrectly, that California had been the only state in the country to ban machine guns.

[170] Press release, Nat. Firearms Ass'n (Apr. 14, 1934 and May 1, 1934), *reprinted in To Regulate Commerce in Firearms: Hearings on S. 885 and S. 2258 Before a Subcomm. of the S. Comm. on Commerce*, 73d CONG. 70 (1934).

have largely dried up soon after the act's passage."[171]

## IV. THE STATE/CIVILIAN DIVIDE IN THE AMERICAN TRADITION OF ARMS REGULATION

79. Section 13 of the National Firearms Act emphasized that its terms "shall not apply to the transfer of firearms (1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia; (2) to any peace officer or any Federal officer designation by regulations of the Commissioner."[172] By 1934, it had become routine in the American tradition of arms regulation to make formal distinctions between weapons available to government and weapons available to the public. It is worth understanding the roots of that important distinction.

80. As explained above, early Americans distinguished between military and civilian arms. Numerous militia laws attempted to encourage or compel colonists to purchase military-style muskets, because authorities relied on colonists to project military force. That meant that the practical boundary between military and civilian arms remained highly porous through the eighteenth century.

81. That boundary continued to be porous in the nineteenth century, even as firearms technology underwent dramatic change. The War Department (today's Department of Defense) periodically auctioned off decommissioned firearms from federal stores. Many were scooped up by wholesalers who then exported them abroad. But many others (nearly all of them single-shot muskets or rifles) also wound up in civilian hands.[173] Some important innovations (percussion ignition, breech loading, and metallic cartridges, for example) found their way into civilian

---

[171] Carol Skalnik Leff and Mark H. Leff, *The Politics of Ineffectiveness: Federal Firearms Legislation, 1919–38*, 455 ANNALS AM. ACAD. POL. & SOC. SCI. 48, 56 (1981).

[172] *See* National Firearms Act, ch. 757, 48 Stat. 1236 (1934), https://govtrackus.s3.amazonaws.com/legislink/pdf/stat/48/STATUTE-48-Pg1236.pdf.

[173] Such auctions even predate the Constitution. *See, e.g.*, 27 JOURNALS OF THE CONTINENTAL CONGRESS for Friday, at 613 (July 30, 1784).

and military arms alike. Occasionally innovations held far more appeal for one sector than the other – not because they were superior in any general sense, but because they were better suited to particular purposes. Pepperbox pistols, for example, appealed to some civilians because they conferred concealable repeat fire capabilities and were effective in close quarters. But most pepperboxes lacked the range or power that would make them remotely as appealing to soldiers or cavalry as the more expensive Colt revolvers. Lever-action rifles became popular consumer items in the last third of the 19th century and were esteemed by cavalry in numerous countries. But they did not have the same appeal for the world's top infantries, who prized the greater range and power delivered by the best bolt-action rifles.[174]

82. While the nineteenth-century boundary between civilian and military arms remained permeable in some ways, legislators nonetheless hardened the boundary by inscribing meaningful and more rigid distinctions into law when necessary. As explained above, state and local authorities around the nation enacted numerous laws throughout the century aimed at addressing the mounting social problems caused by firearms and other deadly weapons. Sometimes state lawmakers included explicit language in these laws exempting officers of the state from their provisions. Georgia's 1837 "Act to guard and protect the citizens of this state against the unwarrantable and too prevalent use of deadly weapons,"[175] for example, outlawed the sale, keeping, or carrying of bowie knives, pistols, dirks, sword canes, and other weapons. The act stipulated that its provisions "shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise."[176]

---

[174] *See* Greener, *supra* note 141, at 727–44.

[175] As discussed below, Georgia's Supreme Court declared the 1837 law unconstitutional in 1846, *Nunn v. State*, 1 Ga. 243 (1846), though not because law enforcement was exempt.

[176] ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA, PASSED IN NOVEMBER AND DECEMBER, at 90–91 (1837).

83. Municipal authorities incorporated similar exemptions into law. In 1856, New Orleans forbade dangerous weapons (concealed or otherwise) in "any theater, public hall, tavern, pic-nic ground, place for shows or exhibitions, house or other place of public entertainment or amusement." Military personnel were explicitly exempt.[177] In 1857, Washington D.C. prohibited the carry of various dangerous weapons, including pistols and Colt revolvers, but exempted "police officers, the members of the auxiliary guard, and the military" from its provisions.[178] Memphis passed a similar ordinance that same year, but required police officers to obtain permission from a commanding officer to carry any of the prohibited weapons.[179] In 1859, the city of Georgetown (in what is now the District of Columbia) forbade concealed "deadly or dangerous weapons," but provided that "the police officers and military, when on duty, shall be exempt from such fines and forfeitures."[180] In 1861, authorities in Saint Louis, Missouri, passed a conceal-carry prohibition and stipulated that "nothing in this ordinance shall be so construed as to prohibit any United States, State, county or city officer from carrying and wearing such weapons as may be necessary in the proper discharge of his duties."[181]

84. State lawmakers in the early republic and antebellum eras didn't usually make such exemptions explicit. Presumably this is because they thought such exemptions too obvious to be necessary.[182] We can find evidence for that attitude in one of the most important arms-rights cases from the era. In 1846, in

---

[177] JEWELL'S DIGEST OF THE CITY ORDINANCES 1–2 (1882).

[178] Washington, D.C. City Ordinance (Nov. 4, 1857), *reprinted in* THE AMERICAN (Washington, D.C.), Nov. 11, 1857.

[179] SMITH P. BANKHEAD, DIGEST OF CHARTERS AND ORDINANCES OF THE CITY OF MEMPHIS 286 (1860).

[180] ORDINANCES OF THE CORPORATION OF GEORGETOWN, FROM JANUARY 1859, TO JANUARY 1860, at 22–23 (1860).

[181] REVISED ORDINANCES OF THE CITY OF SAINT LOUIS 513 (1861).

[182] Prosecutions of officers of the law and/or military personnel for violating such prohibitions in the course of their official duties could call this hypothesis into question, but I am unaware of any such cases.

*Nunn v. State*, 1 Ga. (1 Kel.) 243, the Georgia Supreme Court declared the 1837 law unconstitutional, finding that while a ban on concealed carry was permissible, a ban on open carry was not. The opinion criticized the way that the law had worded the law-enforcement exception, complaining that its vague language meant "that it might be insisted, and with much plausibility, that even sheriffs, and other officers therein enumerated, might be convicted for keeping, as well as carrying, any of the forbidden weapons, while not in the actual discharge of their respective duties." The court warned that such a reading could lead to the absurd premise that law officers would be obliged to throw their arms away at the end of every shift and acquire new ones before resuming duties. In sum, even this pioneering decision on the right to bear arms implicitly affirmed the constitutionality of exceptions for law enforcement. Indeed, these justices urged legislators to make more explicit distinctions between civilians and law enforcement when crafting firearms regulations.

85. Explicit distinctions in law became much more common in state and territorial law after the Civil War massively increased the prevalence of firearms in American life. For instance, an 1870 Texas law made it a misdemeanor offence to go to any public assembly with "a bowie knife, dirk, or butcher knife, or fire-arms, whether known as six shooter, gun, or pistol or any kind," but stipulated that "nothing contained in this section shall apply to locations subject to Indian depredations: and provided further, That this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law."[183] Three years later, Iowa's law prohibiting concealed weapons stipulated that it "shall not apply to police officers and other persons whose duty it

[183] Repository of Historical Gun Laws, DUKE CTR. FOR FIREARMS L., https://firearmslaw.duke.edu/laws/george-washington-paschal-reporter-a-digest-of-the-laws-of-texas-containing-laws-in-force-and-the-repealed-laws-on-which-rights-rest-carefully-annotated-3rd-ed-vol-2-page-1322-image-292-washi..

is to execute process or warrants, or make arrests."[184] Washington State's conceal-carry prohibition from 1881 used nearly identical language.[185]

86. All told, between 1864 and 1892, at least eighteen states[186] and three territories[187] incorporated explicit exemptions for law enforcement and/or military personnel into laws regulating firearms.

87. Municipalities continued to do the same. In 1869, for example, authorities in Memphis, Tennessee passed an ordinance punishing the carrying of concealed weapons with a fifty dollar fine, but exempted "sworn officers of the law."[188] Other examples known to me include Jersey City (1868)[189];Washington,

---

[184] 2 THE CODE: CONTAINING ALL THE STATUTES OF THE STATE OF IOWA 603 (1873).

[185] Wash. Terr. Code § 929 (1881): "If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days: Provided, that this section shall not apply to police officers and other persons whose duty it is to execute process or warrants, or make arrests."

[186] In addition to the Texas, Iowa, and Washington laws above, these include New York, 1866 (see STATUTES AT LARGE OF THE STATE OF NEW YORK 810–11 (1869); Nevada, 1867 (STATUTES OF THE STATE OF NEVADA PASSED AT THE THIRD SESSION OF THE LEGISLATURE, 1867 66 (1867); Georgia, 1870 (THE CODE OF GEORGIA 1181–82 (1882); Missouri, 1875 (LAWS OF MISSOURI 50–51 (1875); Tennessee, 1870 (A COMPILATION OF THE STATUTE LAWS OF THE STATE OF TENNESSEE 88–92 (1872); Texas, 1871 (*Brief of Thirty-Four Professional Historians and Legal Historians as Amici Curiae in Support of Respondents*, McDonald v. City of Chicago, S. Ct. No. 08-1521, Jan. 6, 2010 27a-28a); North Carolina, 1877 (LAWS AND RESOLUTIONS OF THE STATE OF NORTH CAROLINA, PASSED BY THE GENERAL ASSEMBLY AT ITS SESSION 1876–77 162–63 (1877); Kentucky, 1880 (*Brief of Thirty-Four Professional Historians* 12a–13a); South Carolina, 1880 (*id.*, 21a); Mississippi, 1880 (THE REVISED CODE OF THE STATUTE LAWS OF THE STATE OF MISSISSIPPI 776 (1880); Arkansas, 1881 (*Brief of Thirty-Four Professional Historians* 3a–4a); Colorado, 1883 (THE GENERAL STATUTES OF THE STATE OF COLORADO, 1883 339 (1883); Illinois, 1887 (THE REVISED STATUTES OF THE STATE OF ILLINOIS 441–42 (1887); Minnesota, 1888 (GENERAL STATUTES OF THE STATE OF MINNESOTA 1006–07 (1888); Michigan, 1889 (LAWS OF THE STATE OF MICHIGAN RELATING TO PUBLIC HEALTH 145 (1889); and Oregon, 1892 (*Brief of Thirty-Four Professional Historians* 20a). The Georgia, Missouri, and Texas laws concerned sensitive places and all the other laws concerned concealed carry.

[187] Idaho Territory, 1864 (LAWS OF THE TERRITORY OF IDAHO (Lewiston: 1864), p. 442; New Mexico Territory, 1869 (LAWS OF THE TERRITORY OF NEW MEXICO (Santa Fe, 1869), p. 72–76); Arizona, 1889 (ACTS, RESOLUTIONS, AND MEMORIALS OF THE FIFTEENTH LEGISLATIVE ASSEMBLY OF THE TERRITORY OF ARIZONA (Prescott, 1889), p. 11–12. Idaho's law concerned brandishing. New Mexico and Arizona's law regulated the carry of weapons (concealed or open).

[188] PUB. LEDGER (Memphis), Oct. 21, 1869.

[189] REVISED ORDINANCES OF JERSEY CITY 121 (1899).

D.C. (1871)[190]; Omaha, Nebraska (1872)[191]; Fayetteville, Tennessee (1876)[192]; Mexico, Missouri (1877)[193]; Provo City, Utah (1877)[194]; Kansas City, Missouri (1880)[195]; Albany, New York (1887)[196]; Milwaukee, Wisconsin (1888).[197] I am confident that further research would unearth more nineteenth-century examples of firearms legislation making distinctions between civilians and the police or military.

88. The tradition of inscribing that distinction into law became even more pronounced in the early twentieth century, when the dramatic technological change of automatic and semi-automatic weapons brought about unprecedented societal concerns. As I explain above, dozens of states passed laws regulating automatic and semi-automatic firearms during the 1920s and 1930s. Most of these laws made exceptions for law enforcement and none applied to the U.S. military. The NFA's exemptions for state authorities, the military, and law enforcement therefore reflect a conviction that had informed arms regulation for generations. Citizens may be lawfully subject to arms regulations that government authorities, in pursuit of their duties, are exempt from.

## V. AB 1127 AND THE ITERATIVE EFFORT TO PREVENT MACHINEGUN CRIME

89. To use the language of *Bruen*'s framework, the United States has witnessed multiple "dramatic technological changes" in firearms—changes that have generated "unprecedented societal concerns" and led to waves of regulatory

---

[190] LAWS OF THE DISTRICT OF COLUMBIA, 1871–1872, 33 (1872).

[191] REVISED ORDINANCES OF THE CITY OF OMAHA 86–87 (1872).

[192] Ordinance, FAYETTEVILLE OBSERVER, Aug. 31, 1876.

[193] *Ordinances of the City of Mexico, reprinted in* MEXICO WEEKLY LEDGER, Jan. 25, 1877.

[194] REVISED ORDINANCES OF PROVO CITY 106–07 (1877).

[195] AN ORDINANCE IN REVISION OF THE ORDINANCES GOVERNING THE CITY OF KANSAS 264–65 (Gardiner Lathrop & James Gibson, comps., 1880).

[196] CHARTER AND GENERAL ORDINANCES OF THE CITY OF ALBANY 110 (1887).

[197] GENERAL ORDINANCES OF THE CITY OF MILWAUKEE 227–28 (1888).

responses.[198] Technological changes provoking societal concerns that lead to public safety legislation. That is the nation's tradition of arms regulation. That tradition is evident in the nation's iterative regulatory response to the problem of machinegun crime.

90. The mechanical similarities between automatic and semi-automatic firearms raised the possibility that semiautomatic firearms could be modified for continuous fire. Even in the 1930s, some regulators attempted to account for that possibility in law. Minnesota's 1933 law regulating machine guns, for example, included semi-automatic firearms that had been "changed, altered, or modified" to fire "continuously by continuous trigger pressure."[199] That was prescient. Conversion and conversion devices would present a growing challenge to public safety over the coming generations. Regulators have responded to that challenge by iterating on the landmark machine gun legislation of the 1920s and 1930s.

91. By the late 1960s, machine guns had been regulated for decades and, consequently, had become expensive and seldom used in domestic crime. However, conversion of semiautomatic firearms had risen in importance. For example, in 1966 an undercover F.B.I. agent who had infiltrated a Florida rally of the United Klans of America, Inc., overheard the organization's robed leader (occupying the office of the "Exalted Cyclops") discussing a gunsmith in Fort Lauderdale who converted guns to fully automatic fire.[200] Not all conversions required a gunsmith. In April 1968, in a long article about federal firearms regulation, the *New Yorker* discussed a gun-dealer from Yonkers, New York, named Ed Agramonte: "Although the sale of fully automatic rifles is illegal under existing federal law," the article observed, "most semi-automatic rifles can be easily converted to fully automatic

---

[198] *Bruen*, 597 U.S. at 18.

[199] Brief for Patrick J. Charles, *supra* note 146, at 13–14.

[200] Federal Bureau of Investigation, Bureau File Number 15-7-9-25, at 40, in https://archive.org/details/COINTELPRODisruptionOfWhiteHateGroupsMiami1571114/page/n709/mode/2up?q=gunsmith.

operation, and Agramonte advertised a 'conversion kit,' for $18.50."[201]

92. Congress responded in 1968 with Title II of the Gun Control Act, which elaborated on the NFA's definition of 'machine gun.' In explaining the additional language, Congress observed that "so-called conversion-kits are now made and sold for the purpose of converting certain rifles so that they will fire automatically or semi-automatically more than one shot, without manual reloading, by a single function of the trigger."[202] Thus, to the original definition, the GCA added that "the term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."[203] For more than half a century, as a consequence of the GCA, federal law has regarded combinations of conversion parts as machine guns.

93. In addition to short-barreled shotguns, machine guns, and silencers, the GCA regulated the importation and sale of short-barreled rifles as well as a large swath of weapons under the umbrella of "destructive devices," including bombs, grenades, mines, and rockets or missiles that exceed certain thresholds for propellant/explosive charge, as well as explosive, incendiary, or poison gas. The GCA also regulates large-caliber weapons, which includes most rocket-launchers, mortars, and cannons.[204] Like the NFA, the 1968 GCA made explicit exceptions for

---

[201] Richard Harris, *If You Love Your Guns*, THE NEW YORKER (April 16, 1968), https://www.newyorker.com/magazine/1968/04/20/if-you-love-your-guns.

[202] 114 Cong. Rec. 10,862 (Apr. 29, 1968).

[203] *See* Gun Control Act of 1968, Pub. L. 90-618, § 5845(b), 82 Stat. 1213, 1231, https://www.govinfo.gov/content/pkg/STATUTE-82/pdf/STATUTE-82-Pg1213-2.pdf.

[204] *See* Gun Control Act of 1968, Pub. L. No. 90-618, tit. II, 82 Stat. 1213, 1229–36 (amending I. R.C. § 5845 (1954)), https://www.gpo.gov/fdsys/pkg/STATUTE-82/pdf/STATUTE-82-Pg1213-2.pdf. Most shotguns are exempt from the large-caliber regulation. For that and for more on the weapons that fall under this regulation, see Bureau of Alcohol, Tobacco, Firearms, & Explosives, National Firearms Act Handbook ch. 2 (2009), https://www.atf.gov/files/publications/download/p/atf-p-5320-8/atf-p-5320-8-chapter-2.pdf.

military and law enforcement.[205]

94. Still, innovations in semiautomatic conversion continued to challenge the existing regulatory framework and to prompt iterative solutions. By the late 1970s and early 1980s, law enforcement was encountering the "drop-in auto sear," a small part that could convert some AR-15 pattern rifles to fully automatic fire. The ATF responded administratively in 1981 with Rule 84-1, determining that the device itself was a machinegun under § 5845(b).[206]

95. In 1986, the Firearm Owners' Protection Act (which was otherwise deregulatory) fortified the national commitment to protecting Americans from machinegun crime. First, the act criminalized the sale or purchase of new machine guns as of May 19, 1986 – effectively freezing the legal market and ensuring that dwindling supplies and ever higher prices. Second, it created a new categorical possession-and-transfer offense punishable by five years in prison (increased to ten years by Congress in 1988[207]). Third, the act introduced yet another refinement to the federal statutory definition of machine guns to include "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun."[208] Meanwhile, iterative regulation continued at the state level. On January 1, 1990, for example, California criminalized "the knowing manufacture of a machinegun, as well as the intentional conversion of a firearm into a machinegun."[209]

96. Notwithstanding these responses, innovations in semiautomatic

---

[205] *See* Pub. L. No. 90-618, tit. I § 102 (amending 18 U.S.C. § 925(a); tit. II § 201 (amending § 5853(a) of the Internal Revenue Code of 1954).

[206] *See* ATF Rul. 81-4, https://www.atf.gov/media/24261/download.

[207] *See* Public Law 100-690, § 6482, Nov. 18, 1988, available at https://www.congress.gov/100/statute/STATUTE-102/STATUTE-102-Pg4181.pdf.

[208] *See* Public Law 99-308 (1986), Section 109.a, Available at https://www.govinfo.gov/content/pkg/STATUTE-100/pdf/STATUTE-100-Pg449.pdf.

[209] *See* "New Statutes Affecting the Criminal Law: 1990 General and Extraordinary Sessions of the California State Legislature," at 115, https://www.ojp.gov/pdffiles1/Digitization/131307NCJRS.pdf.

conversion have again continued to challenge the existing regulatory framework since 1986. In 1987, 22-year-old Venezuelan Jorge Leon invented the simple device that converts Glock semiautomatic pistols (and other pistols with a cruciform trigger-bar) into machineguns. Leon (who now says he regrets his invention[210]) secured a U.S. patent for his invention in 1998. That patent expired in 2016. These conversion devices have become increasingly problematic in the years since. By 2019, law enforcement was recovering thousands of pistol conversion devices illegally imported from China. The advent of consumer 3D printing technology has made the devices relatively easy to manufacture domestically and affordable on the black market.[211] These devices have been implicated in mass shootings and other prominent crimes, including here in California.[212] In 2019, assailants used a converted Glock to kill four people and wound six others at a family event in Fresno. In 2022, a Glock 19 handgun fitted with a pistol conversion device was used in a mass shooting in downtown Sacramento that left six dead and twelve injured.[213]

97. National recovery of machine-gun conversion devices increased several-fold from 2019 to 2023.[214] The trend line does not seem to be turning. In

---

[210] Bill Hutchinson, *"I feel Terrified": Inventor of 'Glock switch' technology says he regrets creation*, ABC News (June 24, 2024), https://abcnews.com/US/feel-terrified-inventor-glock-switch-technology-regrets-creation/story?id=111271476.

[211] Scott Glover and Curt Devine, *A device that can turn a semi-automatic weapon into a machinegun in moments is wreaking havoc on American streets*, CNN (Aug. 20, 1022), https://web.archive.org/web/20230416034511/https://www.cnn.com/2022/08/30/us/automatic-machine-gun-fire-invs/index.html.

[212] *Glock Switches and Auto Sears: A Closer look at the machine gun conversion devices showing up at crime scenes across the U.S.*, SMOKING GUN, https://smokinggun.org/glock-switches-auto-sears/.

[213] Alain Stephens and Keegan Hamilton, *A Machine Gun Was Likely Used in Sacramento's Chaotic Mass Shooting*, The Trace, Apr. 4, 2022, available at https://www.vice.com/en/article/sacramento-mass-shooting-machine-gun/.

[214] Bureau of Alcohol, Tobacco, Firearms and Explosives, NATIONAL FIREARMS COMMERCE AND TRAFFICKING ASSESSMENT: vol. 4, part VIII, at 15 (2024), https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-firearms-trafficking-investigations-volume-four.

January 2026, federal authorities in Boston seized cryptocurrency accounts and internet domains allegedly used to facilitate the smuggling of Chinese-made machinegun conversion devices into the United States. The investigators seized more than 3,000 of the devices in the course of the operation.[215]

98. Conversion devices have existed for more than a generation. But only in the past decade has this technological change become a nationwide public security concern. Responding to the mounting societal concerns prompted by the diffusion of conversion devices, twenty-eight states and the District of Columbia have now instituted bans that complement the longstanding federal prohibition (either by integrating the devices into statutory machinegun definition or by regulating them separately).[216]

99. Given the mounting availability and affordability of pistol conversion devices, though, states are increasingly looking to regulate machinegun convertible pistols themselves. California's AB 1127 was the first such law. Maryland,[217] New York,[218] and Connecticut[219] have passed similar legislation. These laws represent the latest move in a century-long effort to protect the public against machine gun crime. That regulatory effort began almost immediately after machineguns began threatening public safety in the United States. It has necessarily been iterative. Only by responding flexibly and creatively have state and national authorities been able to keep pace with market, technological, and manufacturing developments that

---

[215] Press Release, *U.S. Att'y's Off., D. Mass., Federal Authorities Seize Two Website Domains used to Import Illegal Machine Gun Conversion Devices* (Jan. 13, 2026), https://www.justice.gov/usao-ma/pr/federal-authorities-seize-two-website-domains-used-import-illegal-machine-gun-conversion.

[216] For list of states and laws, see *Hardware & Ammunition: Auto Sears*, GIFFORDS L. CTR., https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/auto-sears/#footnote_10_88849.

[217] Maryland Senate Bill 334, https://mgaleg.maryland.gov/2026RS/bills/sb/sb0334T.pdf.

[218] 2026 N.Y. Laws ch. 55, pt. C, subpt. A, enacted through S 9005-C / A. 10005-C, https://www.nychiefs.org/news/regulation-convertible-pistols-and-pistol-converters-glock-ban-chapter-55-laws-2026.

[219] Conn. Pub. Act No. 26-41 (2026), https://www.cga.ct.gov/2026/act/Pa/pdf/2026PA-00041-R00HB-05043-PA.PDF.

threaten to return us to the 1920s and 1930s, when machineguns were a terrifying feature of public life. Legislation restricting the new sale of machinegun-convertible pistols fits into this iterative, century-long regulatory tradition.

100. Moreover, this legislative trend is not the first instance of regulation moving beyond conversion devices to machinegun-convertible firearms themselves. In the 1970s the SM10 Pistol, manufactured by RPB Industries, became coveted by criminals because of its easy convertibility to automatic fire. With a steel file, users could modify a small internal component and convert the SM10 into a machinegun.[220] In response to the dangers that this weapon posed to public safety, in 1982 the ATF reclassified the SM10 and three other easily convertible semiautomatic handguns as machineguns as defined by the NFA, making their sale or possession felony acts. The agency invoked the language in the NFA's definition of machine guns: "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically one shot, without manual reloading, by a single function of the trigger." Explaining the rule changes, the ATF observed that "the 'designed' definition includes those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts."[221]

101. The context for new rules illuminates the fluid nature of the machinegun problem and the need for regulation to be iterative. Shortly after implementation of the new ATF rules, Congress considered the machinegun problem during a House subcommittee meeting (convened on May 24, 1984). ATF Director Stephen E. Higgins testified that of the 152 machinegun criminal cases his agency completed in 1983, 43 were cases "where a semiautomatic weapon had been

[220] *See* ATF Rul. 81-4; ATF Rul. 82-2; ATF Rul. 82-8, https://www.atf.gov/media/25096/download.

, [221] The other three firearms were the KG-9, the SM11A1, and the YAC STEN MK II. *See id.*, at 142–44.

converted to a machinegun."[222] Edward M. Owen, ATF chief of the Firearms Technology Branch, used an RBB Industries SM11A1 (one of the firearms classified as a machinegun the year before) as a demonstration. Worried that the hearings would offer televised instructions for the conversion of semiautomatic firearms, the committee chairman asked that cameras be turned off for this portion of the testimony. "It can be converted in any number of ways," Owen began, holding up the SM11A1 for committee members to see. Most commonly, "modifications are made to its internal components, to a small shoulder right here, which is clipped with a pair of pliers. If that is clipped, the weapon will fire automatically – this long component right here, where I hold the screwdriver, hit it with a hammer, break this out, the weapon will fire fully automatically."[223] Owen next demonstrated an AR15 drop-in automatic sear. "By installing these components, which would take about a minute, and this piece – we have created a machinegun." He testified that though such auto-sears were classified as machineguns and therefore illegal under the NFA, "we still encounter these that are being homemade."[224]

102. Regulators in the 1980s understood that the problem of conversion devices could not be solved without cooperation from firearms manufacturers. In written responses to the subcommittee's questions, Higgins acknowledged that "virtually any semiautomatic weapon can be modified to permit full automatic fire." But, he explained, "most semiautomatic weapons are designed and manufactured in such a manner that conversion is fairly complex and requires considerable knowledge and skill. However, certain semiautomatic rifles and pistols have been produced which can be modified to permit full automatic fire in a matter of seconds or minutes. These modifications are simple, require little skill and entail

---

[222] Armor Piercing Ammunition and the Criminal Misuse and Availability of Machineguns and Silencers: Hearings on H.R. 641 & Related Bills before the Subcomm. on Crime of the H. Comm. on the Judiciary, 98th Cong., 116 (1984).

[223] *Id.*, at 132–33.

[224] *Id.*, at 134.

only minor modification to or elimination of a part." Kits made conversion even simpler. "This problem of conversion of semiautomatic firearms to machineguns is difficult to combat," Higgins concluded, "because ATF does not have the authority to require manufacturers to submit new weapon designs for approval prior to commercial marketing."[225]

## VI. THE WHY AND HOW OF REGULATION: SHOTGUNS & BOWIE KNIVES AS ANALOGIES FOR MACHINEGUN-CONVERTIBLE PISTOLS

103. With the foregoing in mind, I now want to address the striking analogy at the heart of the complaint: comparing AB 1127 to outlawing shotguns: "A legal shotgun can be turned into an illegal sawed-off shotgun in a matter of seconds with a common hacksaw. Surely, this does not mean that the State can outlaw shotguns" (Complaint at 22). Leaving aside the question of how many hundreds of seconds it would take the average person to saw through a steel shotgun barrel, this is a misleading analogy. Explaining why it is misleading can help clarify the relevant "how" and "why" questions that the Supreme Court has centered in the evaluation of historical analogies.[226]

104. The complaint's shotgun analogy is misleading in three ways.

105. The first is a category error that misrepresents how the regulation burdens the right of armed self-defense. The analogy likens a ban on the sale of new semiautomatic pistols with a particular trigger mechanism architecture to outlawing an entire category of firearms. In the shotgun scenario raised in the complaint, California consumers would be forbidden from purchasing one of the three basic mechanically defined categories of firearms recognized in most firearm law (shotguns, rifles, and handguns). AB 1127 is far narrower. It eliminates one popular design choice within one class (semi-automatic) within one category (handguns). California consumers may still legally purchase a variety of new, non-

---

[225] *Id.*, at 206–07.
[226] *Wolford v. Lopez*, 609 U.S. ___, 146 S. Ct. 2032, 2044 (2026).

machinegun convertible semiautomatic pistols. Moreover, under AB 1127, California consumers would still be able to legally purchase the semiautomatic handguns currently subject to AB 1127 once the required design adjustment is made.

106. Second, the sawed-off shotgun analogy masks the increase in lethality that AB 1127 aims to address. Reducing the length of a shotgun barrel makes the weapon easier to conceal and to operate in close quarters. It does not increase its lethality. Adding a pistol converter to a machinegun-convertible pistol dramatically increases lethality by transforming a semi-automatic handgun into a machinegun. Given that dangerousness is a key consideration in the American tradition of arms regulation, this increase in lethality is central to the 'why' of regulation.

107. Third, the complaint's analogy obscures the regulatory challenges AB 1127 responds to—another dimension of the 'why' question. Shortening a shotgun barrel is a permanent alteration that leaves behind unmistakable visual evidence on the firearm itself of a felony act. Thus, heavy penalties for those who shorten shotgun barrels seems to have been an effective form of regulation (sawed-off shotguns account for a small percentage of gun crime today). As explained above, pistol conversion devices have been outlawed for generations. Yet these devices are increasingly found at crime scenes. According to the ATF's National Firearms Commerce and Trafficking Assessment, the ATF's recovery of Machine-Gun Conversion Parts (pistol conversion devices as well as drop-in auto sears used to convert semi-automatic rifles into machine guns) increased 570% in the period 2017-2021 compared to the period 2012-2016.[227] Recoveries increased 784% from 2019 to 2023.[228]

108. In contrast to sawing off a shotgun barrel, installing a pistol conversion device into a machinegun-convertible pistol is an act that can be quickly reversed

[227] *See* table FER-01 in ATF, *supra*, *note* 214, at pt. VIII, p.15.

[228] *Id.*, pt. V, at 7.

without leaving behind obvious visual evidence. Rapid reversibility makes it easier to evade detection. This presumably helps explain why decades-old federal and state regulations targeting pistol conversion parts themselves have not prevented their recent proliferation. AB 1127 is a response to that regulatory challenge. It addresses a complex, novel problem: the capacity of individuals with no skills or special tools to quickly and affordably convert certain semi-automatic pistols into machine guns, and to do so in a way that is rapidly reversable.

109. Bowie knives offer a more clarifying analogy for assessing AB 1127 than shotguns. In the nineteenth century, as discussed above in Part II, several states and territories took steps to eliminate Bowie knives and other fighting knives from public life. Some banned any form of carry; others imposed prohibitive taxes on sale and/or purchase; and still others prohibited sale and possession outright. AB 1127 is far less severe than any of these measures. The prohibitory fighting knife measures of the 19th century deprived law-abiding Americans of a basic tool of self-defense. Fighting knives were popular because they were deadly in close quarters, immune from mechanical malfunction, and, not requiring ammunition or priming caps, inexhaustibly effective. In the states that prohibited them, law-abiding residents had no recourse to another weapon with this bundle of qualities. AB 1127 imposes a significantly lighter burden. It prohibits the new sale of machinegun-convertible handguns. But Californians are still able to legally purchase a wide variety of new semiautomatic handguns that cannot be easily converted into machineguns, including handguns from the same manufacturers that are impacted by AB 1127 so long as those manufacturers make the necessary design modifications to those handguns.

110. To apply the Bowie knife analogy here, we'd have to imagine a much narrower rule. Imagine, for argument's sake, that the most popular size fighting knife in nineteenth century America had a 10" blade. Imagine then that state regulators prohibited the sale of all new 10" fighting knives. That would have

inconvenienced law-abiding Americans who wished to equip themselves with the most popular fighting knife in the country. But they'd still have access to the less popular but perfectly serviceable knives with 7", 8", 9", 11", or 12" blades. This imaginary law would be a reasonable analogue for AB 1127 in terms of *how* it burdens the right to armed self-defense.

111. Of course, my fanciful analogy fails as an analogue for *why* AB 1127 burdens the right of armed self-defense. 10-inch Bowie knives posed no fundamentally different risk to public safety than 11- or 13- inch Bowie knives. But machinegun convertible pistols pose a dramatically greater risk to public safety than the many non-machinegun convertible alternatives that are still legally available for new purchase in California.

## CONCLUSION

112. Is it consistent with the American tradition of arms regulation to prohibit new sales of a popular type of semiautomatic handgun in order to prevent its criminal conversion into machineguns? Contrary to assertions in the complaint, I believe it is. For nearly two centuries, America has regulated weapons considered unusually dangerous and/or particularly suited to criminal activity. Many such regulations were passed by states, territories, and municipalities during the nineteenth century. As explained in the section on Bowie knives, sometimes these regulations amounted to effective bans on popular weapons in wide use for lawful purposes.

113. Automatic and semi-automatic firearms were invented at the end of the nineteenth century and became consequential consumer items in the early twentieth century. They represented a dramatic technological change that produced unprecedented societal concerns. Consistent with the American tradition of weapons regulation, authorities responded to mounting public safety concerns with legislation. For the past century, state and federal law have iterated on the regulations of the 1920s and 1930s in an ongoing effort to protect Americans from

the criminal use of machineguns. By the 1960s, attention had shifted to devices that can convert semiautomatic weapons to machineguns. By the 1980s, regulators began targeting specific firearms designed for easy conversion into machineguns. At the time, such models represented a small proportion of the semiautomatic firearms market. As the ATF director put it in 1982, "most semiautomatic weapons are designed and manufactured in such a manner that conversion is fairly complex and requires considerable knowledge and skill."[229]

114. Though conversion devices have been a regulatory problem for nearly half a century, the recent proliferation of conversion devices compatible with very popular semiautomatic firearms represents a novel challenge. Easy convertibility of popular semiautomatic firearms threatens to return the United States to the public safety crisis of the early 1930s, when machine guns were a deadly and notorious feature of urban crime.[230] As former ATF Director Steve Dettlebach put it in early 2025, today's prevalence of machinegun conversion devices "is a grave public safety threat and a threat to the lives of law enforcement."[231] Now as in the 1920s and 1930s, the 1960s, and the 1980s, state regulators have responded to societal concerns generated by dramatic technological change by taking practical steps to protect the public from machinegun violence. AB 1127, California's response to this novel threat to public safety, is consistent with our national tradition of weapons regulation.

---

[229] *Supra* note 222 at 206–07.

[230] For an (outdated, but still) instructive report, see Alain Stephens, *Watch: Machine Gun Conversion Kits are 'Everywhere,' Feds Warn*, THE TRACE (Mar. 24, 2022), https://www.youtube.com/watch?v=UHk2_SGRFQU.

[231] Quoted in his foreword to ATF, *supra*, note 214, https://www.atf.gov/media/18611/download.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 20, 2026 at Albany, California.

Brian DeLay

Brian DeLay

# EXHIBIT A

# Brian DeLay

University of California
3229 Dwinelle Hall
Berkeley, CA 94720-2550
https://history.berkeley.edu/brian-delay
delay@berkeley.edu

## ACADEMIC POSITIONS

- Preston Hotchkis Chair in the History of the United States, UC Berkeley: 2016-Present
- Professor of History, University of California, Berkeley July 2023-Present
- Associate Professor of History, University of California, Berkeley: July 2010 – June 2023
- Assistant Professor of History, University of California, Berkeley: July 2009 – June 2010
- Assistant Professor of History, University of Colorado, Boulder: July 2004 – June 2009
- Lecturer in History, Harvard University: Spring 2004

## EDUCATION

-Ph.D., Harvard University, Cambridge, MA: March 2004
-MA, Harvard University: June 1998
-B.A., University of Colorado, Boulder, *summa cum laude:* December 1994

## WORK IN PROGRESS:

- "Aim at Empire: American Revolution through the Barrel of a Gun" – 250k-word book for W.W. Norton (expected publication 2027)
- "Means of Destruction: Guns, Freedom, and Domination in the Americas before World War II," book manuscript under contract with W.W. Norton. Research nearly complete.
- "PATH: The Project on Arms Trade History." Since 2008, I have been working with student research assistants to quantify the global arms trade, from the Napoleonic Wars to WWI. We have been extracting import and export data from manuscript sources and annual customs reports published by major arms-exporting states: The United Kingdom, the United States, Belgium, France, and Spain. Our relational database now has nearly 125,000 entries capturing the global movement of all kinds of war material, from percussion caps to artillery, from 1815-1915.

## PUBLICATIONS AND RESEARCH

### Refereed Publications

- "Portrait of Pacanne," *The American Historical Review* 131:2 (June 2026), 658–662
- "Indigenous Societies and the U.S.-Mexican War," chapter in Jennifer Keene and Andrew Huebner, eds., *The Cambridge History of War and Society in America* (Cambridge, 2026), 94-120. (Adapted from DeLay, "Independent Indians," 2007).
- *La guerra de los mil desiertos: las incursiones indias y la guerra entre Estados Unidos y México, 1820-1848*. Buenos Aires: Editorial SB, 2024 [Spanish translation of *War of a Thousand Deserts*]
- "The Arms Trade & American Revolutions," *The American Historical Review* 128:3 (Sept. 2023), 1144-1181.

**Refereed Publications, cont.**

- "Foreign Relations between Indigenous Polities, 1820-1900," in Kristin Hoganson and Jay Sexton, eds., *The Cambridge History of America and the World,* Vol 2: 1812-1900 (Cambridge University Press, 2022), 387-411.
- "Indian Polities, Empire, and Nineteenth-Century American Foreign Relations" *Diplomatic History* 39:5 (December 2015), 927-42.
- "Watson and the Shark," chapter in Brooke Blower and Mark Philip Bradley, eds., *The Familiar Made Strange: American Icons and Artifacts after the Transnational Turn* (Ithaca: Cornell University Press, 2015).
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," in Juliana Barr and Edward Countryman, eds., *Contested Spaces of Early America*, University of Pennsylvania Press, 2014, pp. 229-256.
- Editor, *North American Borderlands*. Routledge, 2012.
- *War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War*. New Haven: Yale University Press, 2008 [paperback, 2009].
- "The Wider World of the Handsome Man: Southern Plains Indians Invade Mexico, 1830-1846," *Journal of the Early Republic* 27 (March, 2007), 83-113
- "Independent Indians and the U.S.-Mexican War," *American Historical Review* 112 (Feb., 2007), 35-68.

**Other Publications:**

- "Gun Culture, Then & Now," *Vital City*, Sept. 10, 2025.
- "The Myth of Continuity in American Gun Culture," *California Law Review* 113:1, 1-79 (Feb., 2025).
- "Bruen & the Myth of Continuity in American Gun Culture," blogpost for the Duke Center for Firearms Law, September 18, 2023
- "American Guns, Mexico's Trials," *Bulletin of the American Academy of Arts and Sciences*, Spring, 2020
- "A Misfire on the Second Amendment," extended review of Roxanne Dunbar-Ortiz, *Loaded: A Disarming History of the Second Amendment*, *RAH* 47:3, Sept. 2019
- Co-author with James West Davidson, William E. Gienapp, Christine Leigh Heyrman, Mark H. Lytle, and Michael B. Stoff, *Experience History: Interpreting America's Past*, McGraw-Hill (9th ed., 2019). *Concise version: *US/A History* (9th ed., 2022).
- "How the U.S. Government Created and Coddled the Arms Industry," *The Conversation*, October 2017
- "How Not to Arm a State: American Guns and the Crisis Of Governance In Mexico, Nineteenth and Twenty-First Centuries" [24th Annual W.P. Whitsett Lecture], *Southern California Quarterly* 95:1 (Spring 2013), pp. 5-23.
- "Oportunismo, ansiedad, idealismo: los impulsos Estadunidenses durante la intervención Francesa en México," in Jean Meyer, ed., *Memorias del Simposio Internacional 5 de Mayo*, El Colegio de Puebla, 2013, pp 269-288.
- "Comanches in the Cast: Remembering Mexico's 'Eminently National War,'" in Charles Faulhaber, ed., *The Bancroft Library at 150: A Sesquicentennial Symposium*, Berkeley: University of California Press, 2011.

**Other Publications, cont.**

- "How Indians Shaped the Era of the U.S.-Mexican War," [abbreviated version of 2007 AHR article]- in Pekka Hämäläinen and Benjamin H. Johnson, eds., *Major Problems in the History of North American Borderlands*, Wadsworth, 2011.
- Response to Daniel Walker Howe, Andrés Reséndez, Ned Blackhawk, and Leonard Sadosky's essays in H-SHEAR roundtable on *War of a Thousand Deserts*, Nov. 2010.
- Top Young Historian essay, Historians News Network, October 2010.
- "Forgotten Foes," *Berkeley Review of Latin American Studies* (Fall 2010), 14-19.
- "James Madison and the Scolds," Review of J. C. A. Stagg, *Borderlines in the Borderlands: James Madison and the Spanish American Frontier, 1776-1821*, *Passport* 40:3 (January 2010).
- "Why Mexico Fought," review of Timothy J. Henderson, *A Glorious Defeat: Mexico and its War with the United States, Diplomatic History* 33:1 (January 2010).
- "19th Century Lessons for Today's Drug War Policies," *The Chronicle Review*, 7/28/2009
- "It's Time We Remembered the Role of Indians in the U.S.-Mexican War," *History News Network*, 3/9/2009
- "War of a Thousand Deserts," on *The Page 99 Test*,
- "Navajo," "Popé," and "Pueblo Indians," in Billy G. Smith, ed. *Colonization and Settlement (1585-1763*), Volume 2 in the 10-volume *Facts on File Encyclopedia of American History* (2003)
- "Narrative Style and Indian Actors in the Seven Years' War," *Common-Place: The Interactive Journal of Early American History*, 1 (1), September 2000.

**PRIZES, HONORS, & AWARDS**

- Vandervort Prize for Outstanding Article in Military History, Society for Military History, 2024
- Visiting Scholar, University of Melbourne, October 2017
- Fulbright Distinguished Lecturer, Doshisha American Studies Seminar (Kyoto), 2014
- Bryce Wood Book Award for the outstanding book on Latin America in the social sciences and humanities published in English, Latin American Studies Association, 2010
- HNN "Top Young Historian," November 2010
- W. Turrentine Jackson (biennial) Award for best first book on any aspect of the history of the American West, Western History Association, 2009
- Robert M. Utley Award for best book published on the military history of the frontier and western North America, Western History Association, 2009
- Southwest Book Award, sponsored by the Border Regional Library Association, 2009
- James Broussard Best 1st book prize, Society for Historians of the Early American Republic, 2008
- Norris and Carol Hundley Best Book Award, Pacific Coast Branch of the AHA, 2008
- The Sons of the Republic of Texas Summerfield G. Roberts Best Book Award, 2008
- Finalist, Francis Parkman Prize from the Society of American Historians, 2008
- Finalist for the Clements Prize for Nonfiction Book on Southwestern Americana, 2008
- Honorable Mention, TSHA Kate Broocks Bates Award for Historical Research, 2008

**Prizes, Honors, & Awards, cont.**

- Finalist for the PROSE Award in the U.S. History and Biography/Autobiography category, sponsored by the Association of American Publishers, 2008
- Organization of American Historians Distinguished Lecturer, 2008-2011
- Bolton-Cutter Award for best borderlands article, Western History Association, 2008
- Robert F. Heizer Prize for the best article in the field of ethnohistory, 2008
- CLAH Article Prize, Conference on Latin American History, 2008
- Stuart Bernath Article Prize, Society for Historians of American Foreign Relations, 2008
- Phi Alpha Theta/Westerners International Prize for Best Dissertation, 2005
- Harold K. Gross Prize from Harvard University for the dissertation "demonstrating the greatest promise of a distinguished career in historical research," 2004
- University of Colorado Residence Life Academic Teaching Award, 2005
- Derek Bok Center Awards for Excellence in Teaching, Spring 1999 and Fall 1999

**<u>GRANTS AND FELLOWSHIPS</u>**

- Lillian Gollay Knafel Fellow, Radcliffe Institute for Advanced Study, Harvard University, 2025-26
- Dorothy and Lewis Cullman Center for Scholars and Writers, New York Public Library Fellowship, 2025-2026 (declined)
- Rogers Distinguished Fellowship in Nineteenth Century American History, Huntington Library, Pasadena CA, 2025-26 (declined)
- Co-Principle Investigator, Arnold Ventures Award for exploration into viability of an updated, civilian-oriented lethality index of contemporary and historic small arms (2023)
- John Simon Guggenheim Foundation Fellowship, 2019-2020
- Marta Sutton Weeks Fellow, Stanford Humanities Center, 2019-2020
- Center for Advanced Studies in Behavioral Sciences Fellowship, 2019-2020 (declined)
- American Council of Learned Societies Fellowship, 2017-2018
- Harry Frank Guggenheim Foundation Fellowship, 2013-14'
- UC Humanities Research Fellowship Grant, 2013-14'
- UC Berkeley CORE Research Bridging Grant, 2012-14'
- Charles A. Ryskamp Fellowship, American Council of Learned Societies, 2010-2011
- Donald T. Harrington Fellowship, UT Austin, 2009-2010 (Declined).
- U of Colorado Graduate Committee on the Arts and Humanities Research Grant, 2008.
- American Philosophical Society / British Academy Fellowship, 2008.
- Junior Faculty Development Award, University of Colorado, 2007.
- Bill and Rita Clements Research Fellowship for the Study of Southwestern Americana, Full Year, Clements Center, Southern Methodist University, Dallas, TX, 2005-2006.
- Postdoctoral Fellowship, Full Year, Huntington Library, San Marino, CA, 2005-2006 (Declined)
- Postdoctoral Fellowship, Full Year, Newberry Library, Chicago, IL, 2005-2006 (Declined)
- Packard Foundation Dissertation Finishing Grant, 2002-2003
- American Philosophical Society, Philips Fund Grant for Native American Research, 2001

**GRANTS AND FELLOWSHIPS (cont.)**

- David Rockefeller Center for Latin American Studies Summer Grant 2001
- Department of Education Foreign Language Area Studies Grant, 2000-01
- Mellon Summer Field Research Travel Grants, 1999, 2000, 2001
- Harvard History Department Summer Travel Grant, 2000, 2001
- Graduate Society Term Time Research Fellowship, Spring 2000
- Harvard Graduate Student Council Summer Travel Grant, 1999
- The Charles Warren Center Fellowships for Summer Research, 1998, 1999
- The Graduate Society's Summer Fellowship, Harvard University, 1998
- General Artemas Ward Fellowship, Harvard University, 1996-97, 1997-98

**BOOK REVIEWS**

- Jonathan Grant, *Between Depression and Disarmament: The International Armaments Business, 1919-1939*, in the *American Historical Review* 25:3, June 2020
- David J. Silverman, *Thundersticks: Firearms and the Violent Transformation of Native America*, in the *American Historical Review*, Oct. 2017
- Rachel St. John, *Line in the Sand: A History of the Western U.S.-Mexico Border*, in the *Pacific Historical Review*, Aug. 2012.
- *Bridging National Borders in North America: Transnational and Comparative Histories*, Edited by Benjamin H. Johnson and Andrew R. Graybill, *Hispanic American Historical Review*, Feb. 2012.
- *Fiasco: George Clinton Gardner's Correspondence from the U.S.-Mexico Boundary Survey, 1849-1854*. Edited David J. Weber and Jane Lenz Elder, *New Mexico Historical Review* 86:3, Summer 2011, 526-28.
- Juliana Barr's *Peace Came in the Form of a Woman: Indians and Spaniards in the Texas Borderlands*, for the *American Historical Review* 113 (June 2008), 878-79.
- Samuel Truett's *Fugitive Landscapes: The Forgotten History of the U.S.-Mexican Borderlands*, for *Labor: Studies of Working-Class History of the Americas* 4:4 (2007), 130-32.
- Gary Clayton Anderson's *The Conquest of Texas: Ethnic Cleansing in the Promised Land, 1820-1875*, for the *Journal of American History* 93:2 (2006), 530-31.
- Samuel Truett & Elliott Young, eds., *Continental Crossroads: Remapping U.S.-Mexican Borderlands History*, for the *Hispanic American Historical Review* 86:4 (2006), 864-65.
- Rosemary King's *Border Confluences: Borderland Narratives from the Mexican War to the Present*, for *New Mexico Historical Review*, Fall 2005.
- Edward A. Goodall, *Sketches of Amerindian Tribes, 1841-1843*, for *Itinerario: The European Journal of Overseas History*, Fall 2004 (28:3).
- Alex D. Krieger's *We Came Naked and Barefoot: The Journey of Cabeza de Vaca Across North America* and Rolena Adorno's and Patrick Charles Pautz's *The Narrative of Cabeza de Vaca* for the *Southwestern Historical Quarterly*, April 2004.
- Richard Flint's *"Great Cruelties Have Been Reported:" The 1544 Investigation of the Coronado Expedition*, for the *Southwestern Historical Quarterly*, October 2003.
- Allen G. Hatley's *Indian Wars in Stephen F. Austin's Texas Colony*, *SWHQ* Oct. 2021

**PRESENTATIONS & INVITED TALKS**

- "Shoot the State: National Borders & the Arming of Indigenous Sovereignty in the Americas," Harvard Native Cultures of the Americas Seminar, April 2026
- "Shoot the State: National Borders & the Arming of Indigenous Sovereignty in the Americas," Harvard International and Global History Seminar, April 2026
- "How Guns Knit Together the American Revolution International," Organization of American Historians, April 2026
- "Ghost Guns & History," 34th Annual Ira C. Rothgerber Jr. Conference, University of Colorado Law School, April 2026
- "Dam-Breaking: The Arms Trade & American Revolutions," 2026 Bilson Lecture, University of Saskatchewan, Jan. 2026.
- "The Afterlives of Civil War Guns," roundtable presentation at the American Historical Association annual meeting, Chicago, Jan. 2026
- "Dam-Breaking: The Arms Trade & American Revolutions," 2025 Rahv, Hughes, Manuel and Marcuse Lecture, Brandeis University, Oct. 2025
- "Shoot the State: National Borders & the Arming of Indigenous Sovereignty in the Americas," at "Plains & Pampas: Comparative Indigenous Borderlands in the Americas," workshop, Columbia University, Oct. 2025
- "The Myth of Continuity in American Gun Culture," Center for the Study of Guns & Society Conference, Wesleyan University, Oct. 2025
- "Superior for What? Government & Civilian Guns in American History," Center for the Study of Guns & Society Conference, Wesleyan University, Oct. 2025
- "Dam-Breaking: The Arms Trade & American Revolution," 2025 Society of the Cincinnati Lecture, Virginia Commonwealth University, Sept. 2025
- "Explaining the Cherokee War of 1776," invited public lecture at the Hennage Auditorium, Colonial Williamsburg, May 2025
- "Gun Culture Then and Now," presentation at American Society for Eighteenth Century Studies Conference, March 2025
- "Belts & Songs: Why Cherokees Went to War with the Colonies in 1776," invited paper at the American Origins Seminar, Huntington Library, San Marino, CA, Feb. 2025.
- "Firearms & the American Revolution," Omohundro Institute Annual Conference, Université de Poitiers, France, June 2024
- "The Myth of Continuity in American Gun Culture," invited presentation at "The Future of the Second Amendment" panel at the UC Berkeley Law School, April 2024.
- "The Myth of Continuity in American Gun Culture," invited presentation at "Why History Matters" panel at UCLA, April 2024

**PRESENTATIONS & INVITED TALKS (cont.)**

- Roundtable participant in “Across the Oceans: Transnational Connections during the Long 19th Century,” American Historical Association annual conference, San Francisco, Jan. 2024
- Roundtable chair, “Beyond the Second Amendment: Rethinking U.S. Gun History,” American Historical Association Annual Conference, San Francisco, Jan. 2024
- In public conversation with Heather Cox Richardson about her book *Democracy Awakening*, Book Passage, Corte Madera, Nov. 2023
- In public conversation with Dylan Penningroth about his book *Before the Movement*, Book Passage, San Francisco, Oct. 2023.
- “How and Why to Count Winchesters in 1868,” invited presentation at the conference “Current Perspectives on the History of Guns and Society, Wesleyan University, Oct. 2023
- “What Did the Founders Think Guns Were For?” presentation to the UC Berkeley Emeriti Association, September 2023
- “What a Junk-Shop Musket has to say about the American Revolution,” presentation at Approaching American Revolutions Symposium, USC, May 2023
- “War of a Thousand Deserts,” (virtual) presentation for the Instituto de Investigaciones Históricas, Universidad Autónoma de Baja California, March 2023
- “The Myth of Continuity in American Gun Culture,” BOCA-LONGA Conference, Stanford University, March 2023.
- “Why Dragging Canoe Sold Kentucky,” paper presentation at the Western History Association Conference, San Antonio, TX Oct. 2022
- Roundtable participant for “After 1800: Rethinking Revolution and Counter-Revolution in the Atlantic World,” USC/Écoles des Hautes Études en Sciences Sociales, June 2022
- Roundtable participant for “Empire and U.S. Foreign Relations,” Society for Historians of American Foreign Relations, June 2022
- “Aim at Empire: Arms Trading & The Fates of American Revolutions,” paper presentation at Kent State University, March 2022
- “Aim at Empire: Arms Trading & The Fates of American Revolutions,” paper presentation at the Berkeley Economic History Seminar, Feb. 2022
- “Aim at Empire: Arms Trading & The Fates of American Revolutions,” (virtual) paper presentation at El Colegío de México, Nov. 2021.
- “Tribe and Nation in North America,” comment for roundtable on Sumit Guha’s *Tribe and State in Asia through Twenty-Five Centuries*, Institute for Historical Studies, UT Austin, November 2021.
- “What is History Now,” Roundtable participant at UC Berkeley History Colloquium, October 2021
- "Tsiyu Gansini’s Predicament: Guns, Ammunition, & Cherokee Choices before the Revolution," Rocky Mountain Seminar in Early American History, Oct., 2021
- “Aim at Empire,” talk at the UC Berkeley Institute for International Studies, Sept. 2021

**PRESENTATIONS & INVITED TALKS (cont.)**

- Roundtable participant in "the U.S.-Mexican Borderlands" for Janet Napolitano and Daniel Sargent's class "Intro to Security Policy," GSP, Berkeley, Sept. 2021
- "Arms Trading and American Revolutions," paper for roundtable on Transnational Revolutionary History, Society for Historians of the Early American Republic, July 2021
- Roundtable on Armed Conflict and Military History, Society for Historians of American Foreign Relations annual conference, June 2021.
- "Guns Across Borders," presentation at Revolutions Across Borders symposium, Newberry Library, June, 2021.
- "Indigenous Agency, Whiggish History, and 'the Conquest of Mexico,'" American Historical Association, Jan. 2021
- "Arms Trading and the Fates of American Revolutions," invited paper given in the Cambridge University American History Seminar, March 1, 2021
- "Indigenous Agency, Whiggish History, and 'the Conquest of Mexico,'" Conference on Latin American History, Jan. 2021
- "Aim at Empire," presentation at the Stanford Humanities Center, December 2019
- "America's Guns, Mexico's Trials," Morton Mandel Public Lecture given at the invitation of the American Academy of Arts and Sciences, Berkeley, CA, Nov. 20, 2019
- "Arms Trading & New World Decolonization," paper presented at University College, London, May 2019.
- "The Texas Gun Frontier & the Travails of Mexican History," keynote at the 1st Biennial Symposium on Borderlands & Borders, Texas A&M University, San Antonio, April 2019
- "Guns and Revolution: The Arms Trade and the First Global Wave of Decolonization," Boston College, September 2018
- "Migration and the History of Immigration Enforcement on the U.S.-Mexican Border," at conference on Borders, Borderlands, and Migration, Institute of Slavic, East European, and Eurasian Studies and the Central European University, UC Berkeley, Sept. 2018
- "Shoot the State," roundtable presentation at the Western History Association, Nov. 2017
- "The Texas Gun Frontier and the Travails of Mexican History," Gary L. Nall Lecture, West Texas A&M, October 2017
- "Guns and Revolution: The Arms Trade and the Making of American Revolutions, 1774-1825," University of Melbourne, October 2017
- "Dam-Breaking: How the Arms Trade Enabled the First Global Wave of Decolonization, 1775-1825," New York University, September 2017
- "The Most Dangerous Man You've Never Heard Of," invited presentation at symposium "Small Arms, Big Business: Trading Arms - Political, Cultural and Ethical Dimensions in Historical and Global Perspectives," Zentrum für Interdisziplinäre Forschung (ZIF), Bielefeld, Germany, June 2017.
- Organizer/chair and presenter for roundtable "Arsenal to the World: The Missing History of the American Arms Trade," OAH April 2017
- "The Ungovernable Rio Grande," Cal History Homecoming talk, February 2017
- "The Texas Gun Frontier and the Travails of Mexican History, or, No More Weapons! (Unless they're for Us)," CENFAD Colloquium, Temple University, January 2017

**PRESENTATIONS & INVITED TALKS (cont.)**

- "The Texas Gun Frontier and the Travails of Mexican History, or, No More Weapons! (Unless they're for Us)," University of Connecticut, October, 2016
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Harvard University, October 2016
- "How Transimperial Arms Bazaars Stabilized Instability in the Greater Caribbean," Rothermere Institute, Oxford University, May 2016
- "The International Arms Trade and the Brittle State in Mexico, 1810-1920," University of Chicago Latin American Seminar, December 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Northwestern University, December 2015
- "Guns and the Making of the Modern Americas," Stanford University, November 2015
- "The Texas Gun Frontier and the Travails of Mexican History," UT Austin, November 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," University of Cincinnati, September 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Society for Historians of American Foreign Relations, Conference Keynote, June 2015
- "War of a Thousand Deserts," San Jacinto Symposium, Houston, TX, April 2015
- "Dambreaking: Guns, Mercantilism, and the Demolition of Europe's America," the James P. Jones endowed lecture, Florida State University, March 2015
- "Dambreaking: Mercantilism, Armaments, and the Demolition of Europe's America," Indiana University, October 10, 2014
- "Gotham's Gun Barons: New York City Arms the Americas, 1865-1934," Doshisha University, Kyoto, Japan, July 25, 2014
- "How Borderland Indians Shaped the Era of the U.S.-Mexcan War," Keynote address for the 2014 Doshisha American Studies Seminar, Kyoto, July 26, 2014
- "War and Trade," Roundtable on new histories of trade, Society for Historians of American Foreign Relations, Lexington, June 2014
- "Gotham's Gun Barons: New York City Arms the Americas, 1865-1934," Cambridge University, November 25, 2013
- "A Protest of Arms: Guns and the Brittle State in Mexico, 1810-1920," Cambridge University Borderlands Workshop, November 11, 2013
- "Gotham's Gun Barons: New York City Arms the Americas," Oxford University, Oct 2013
- "Marcellus Hartley: The Most Dangerous Man You've Never Heard Of," OAH April 2013
- "A Good Story," invited presentation to admitted students at Cal Day, April 20, 2013
- "Beware the Metanarrative; or, How I Acquired My Resistance to Resistance," Kaplan Lecture, University of Pennsylvania, March 2013
- "Domestic Dependent Notions: American Indians and the First Few Pages of American Empire," American Studies Association meeting, San Juan, Nov. 2013
- "Indian History and the History of American Foreign Relations," Society for Historians of American Foreign Relations annual conference, June 2012
- "How Not to Arm a State: American Guns and the Mexican National Project, 1810-1920," Society for Historians of American Foreign Relations annual conference, June 2012

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Opportunism, Anxiety, and Idealism: U.S. Impulses during the French Intervention in Mexico," invited paper at el Simposio Internacional 5 de Mayo de Mexico, Biblioteca Palafoxiana, Puebla, Mexico, May 2012.
- "How Not to Arm a State: American Guns and the Mexican National Project, 1810-1920," Organization of American Historians annual conference, April 2012
- Chair, roundtable on the state of the field in U.S.-Mexico Borderlands History, Organization of American Historians annual conference, April 2012
- "So Far From God, So Close to the Gun Store: Borderlands Arms Trading and the Travails of Mexican History," 26th Annual W.P. Whitsett Lecture, CSU Northridge, March 2012
- "War of a Thousand Deserts," at the Tattered Cover Bookstore, Denver, CO, March 2012
- "Frontiers, Borderlands, and Transnational History," Huntington Library symposium on the Significance of the Frontier in an Age of Transnational History, Feb. 2012 [Audio in file#2]
- "Sailing Backwards on Mexico's 'Iron River of Guns': The Political Economy of the Arms Trade in the 19th and 21st Century's, Harvard Kennedy School, Feb. 2012
- presentation at Stanford University's Comparative Wests Seminar, April 2011
- "The Drug War and Borderlands History," Cal Alumni Day, Oct. 2011.
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," invited talk for round two of Contested Spaces in Early America symposium, Clements Center for Southwest Studies, Southern Methodist University, Dallas, TX, April, 2011
- "Blood Talk: People and Peoples in the Navajo-New Mexican Borderland," invited talk at UCLA's American Indian Studies Center, March 2011
- "Blood Talk: People and Peoples in the Navajo-New Mexican Borderland," invited talk presentation the USC-Huntington Early Modern Studies Institute and the Autry Museum of Western Heritage, March 2011
- "People and Peoples in Borderland Relations: Blood Talk in New Mexico," invited talk for Contested Spaces in Early America symposium, McNeil Center for Early American Studies, University of Pennsylvania, Philadelphia, PA October 2010
- "How Indians Shaped the U.S.-Mexican War," invited talk for the Bay Area Latin America Forum, Berkeley, CA September 2010
- "Indians and the U.S.-Mexican War," invited talk at University of North Texas, Sept. 2010
- "Patterns of Violence in Navajo-New Mexican Relations," Pacific Coast Branch of the American Historical Association annual meeting, Santa Clara CA, August 2010
- "States and Stateless Peoples in George Herring's *From Colony to Superpower*," Society for Historians of American Foreign Relations annual meeting, Madison, WI, June 2010
- "Indians, Politics, and 19th-Century American Empire," UC Berkeley-Stanford-UC Davis faculty dinner, April 2010
- "War of a Thousand Deserts," invited Keynote Address to the James Rawley Conference in the Humanities, University of Nebraska, Lincoln, April 2010
- "19th Century Lessons for Today's Drug War Policies," History as a Resource for Decision Making, UC Berkeley, March 2010
- "Comanches in the Cast: Recovering Mexico's 'Eminently National War, 1830-1846," Bancroft Sesquicentennial Symposium, Berkeley, CA, March 2010.

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Mexico, Native Polities, and the Continuous 19th Century American Empire," invited talk for the Harvard Symposium on 19th Century Empire, Cambridge, MA April 2009
- "War of a Thousand Deserts: How Indians Shaped the Era of the U.S.-Mexican War," paper presented to the El Paso History Museum, February 2009
- "War of a Thousand Deserts: How Indians Shaped the Era of the U.S.-Mexican War," paper presented at the Texas Community College Teachers Assn. Conference, Austin, Feb. 2009
- "Putting Indians into the U.S.-Mexican War," paper presented at the Organization of American Historians annual meeting, New York, March 2008.
- "Military History and Non-State Peoples," roundtable paper presented at the American Historical Association conference, Washington D.C., Jan. 2008.
- "The French and Indian War," public talk for the High Plains Chautauqua, Greeley, CO, Aug. 8, 2007
- "The Comanche Lens: Seeing Nation States through Tribes on the U.S.-Mexican Borderlands," invited talk at the University of San Diego Trans-Border Institute, April. 2007.
- "The Comanche Lens: Seeing Nation States through Tribes on the U.S.-Mexican Borderlands," invited talk at the George and Anne Richards Civil War Era Center, Penn State University, Jan. 2007.
- "Independent Indians, the U.S.-Mexican War, and the Reshaping of North America," paper presented at the American Historical Association conference, Atlanta, GA, Jan. 2007 (*Panel organizer*)
- "Opportunity Costs: Southern Comanches between Mexico and Texas, 1836-1846," paper presented at the Filson Institute's Comparative Borderlands Conf., Louisville, KT, Oct. 2006.
- "The War of a Thousand Deserts: Indians, the U.S.-Mexican War, and the Reshaping of North America," Clements Center Southern Methodist University, Feb. 2006.
- "Independent Indians and Borderlands Scholarship in the Americas" roundtable presentation at the Conference on Latin American History, Philadelphia, PN, Jan. 2006.
- "Comanches in the Cast: Remembering Mexico's 'Eminently National War,' 1830-1846," paper at the Latin American Studies Association Conference, Los Vegas, NV Oct. 2004
- Invited comment on Marie Duggan's "Franciscan Missions as Institutions of Economic Development: The Case of California, 1769-1832," at the Boston Area Latin American Seminar, Dec. 2003
- Invited comment on David J. Weber's "Spaniards and their Savages in the Age of Enlightenment," at the Boston Area Latin American Seminar, Oct. 2002.
- "Mexicans, Indians, and Anglo-Americans: Ethnic Conflict and Territorial Expansion, 1776-1854," paper presented at the Harvard Ethnic Studies Conference, Cambridge, MA, Feb. 2002.
- "Americans Watching: Savage Indians, Suffering Mexicans, and Manifest Failures, 1835-1854," paper presented at the American Historical Association conference, San Francisco, Jan. 2002.
- "The War of a Thousand Deserts: Indian Power & the Contest for Mexico, 1835-1854," paper presented at the Conference on Latin American History, San Francisco, Jan. 2002

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Indian Power and the Fragmentation of Northern Mexico, 1835-1846," paper presented at the Western History Association Conference, San Diego, CA, Oct. 2001. (*Panel organizer*).
- "Americans Watching: Savage Indians, Suffering Mexicans, and Manifest Failures, 1835-1854," paper presented at Global America: The New International History Conference, Harvard, April 2001.
- Commentator at roundtable discussion of Fred Anderson's *Crucible of War* at the Charles Warren Center for Studies in American History, Harvard University, Feb. 2000.

**CONSULTING**

- Washington D.C.
    - Submitted declaration for the Attorney General's Office of Washington D.C. in defense of district law limiting high-capacity gun magazines in Hanson et al., v. District of Columbia, Case No. 22-cv-02256 (D.D.C.), Nov. 2022.
- Oregon
    - Submitted declaration as expert witness for the Attorney General's Office of the State of Oregon in defense of state law limiting high-capacity gun magazines in Joseph Arnold et al., v. Tina Kotek, et al., No. 22-cv-41008 (Harney Cnty. Cir. Ct.), Dec. 2022. Testified remotely in preliminary injunction trial, Dec. 2022. Testified in person at the case trial, Sept. 2023.
    - Submitted declaration for Attorney General's Office of the State of Oregon in defense of state law limiting high-capacity gun magazines in *Oregon Firearms Federation et al. v. Tina Kotek et. al.*, 2:22-cv-01815-IM (D. Ore.) (lead case); Mark Fitz, et al., v. Ellen F. Rosenblum, et al., 3:22-cv-01859-IM (D. Ore.) (trailing case); Katerina B. Eyre, et al., v. Ellen F. Rosenblum et al., 3:22-cv-01862-IM (D. Ore.) (trailing case); and Daniel Azzopardi, et al., v. Ellen F. Rosenblum, et al., 3:22-cv-01869-IM (D. Ore.) (trailing case). Feb. 2023. Deposed March 14, 2023. Testified in Fed Dist. Court trial in Portland, June 2023.
- Illinois
    - Submitted declarations for Attorney General's Office of the State of Illinois and the City of Chicago in defense of its law/municipal code limiting assault weapons and high-capacity magazines in Harrel v. Raoul, Case No. 23-cv-141-SPM (S.D. Ill.); Langley v. Kelly, Case No. 23-cv-192-NJR (S.D. Ill.); Barnett v. Raoul, 23-cv-209-RJD (S.D. Ill.); Federal Firearms Licensees of Illinois v. Pritzker, 23-cv-215-NJR (S.D. Ill.); Herrera v. Raoul, 23-cv-532 (N.D. Ill.); and *Kenneally v. Raoul, et al.*, 23-cv-50039 (N.D. Ill.). March 2023.
- California
    - Submitted declaration for Attorney General's Office of the State of California in defense of its law limiting high-capacity magazines in William Wiese, et al., v. Rob Bonta, et al., 2:17-cv-00903-WBA-KJN (E.D. Cal.), May 2023

**CONSULTING (cont.)**

- Washington (state)
  - Submitted declaration for Attorney General's Office of the State of Washington in defense of its law limiting high-capacity magazines in Gabriella Sullivan, et al., v. Bob Ferguson, et al., (W.D. Wash.), 3:22-cv-05403, May 2023; and in *Brumback, et al., v. Bob Ferguson, et al.* (E.D. Wash.),1:22-cv-03093-MKD, Jan. 2024.
  - Submitted report in defense of WA assault weapons law, for Intervenor-Defendant Alliance for Gun Responsibility in *Hartford et al. v. Ferguson, et al.* (W.D. Wash.), No. 3:23-cv-05364-RJB; *Banta, et al. v. Ferguson and Batiste* (E.D. Wash.), No. 2:23-cv-00112-MKD; and *Guardian Arms, et al., v. State of Washington, et al.* (Wash., and County of Thurston), No. 23-2-01761-34, Jan. 2024.
- Colorado
  - Submitted expert report for the Town of Superior, Cities of Superior and Boulder, and Board of County Commissioners of Boulder County in defense of their laws limiting certain firearms and high-capacity magazines in Rocky Mountain Gun Owners et al., v. the Town of Superior et al., (D. Colo.), 22-cv-2680, May 2023.
  - Submitted expert declaration for Attorney General's Office of the State of Colorado in defense of its law regulating ghost guns in National Association of Gun Rights et al., v. Jared S. Polis (D. Colo), 24-cv-00001-GPG-STV. Feb. 2024; testified March 2024.
- New Jersey
  - Submitted expert report for Attorney General's office of the State of New Jersey in defense of its laws regulating assault weapons and high-capacity magazines in Association Of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin et al. (D.N.J.), 3:18-cv-10507; Cheeseman et al. v. Platkin et al. (D.N.J.), 1:22-cv-04360; Ellman et al. v. Platkin et al. (D.N.J.), 3:22-cv-04397, July 2023.
- Delaware
  - Submitted declaration for Attorney General's office of the state of Delaware in defense of its law regulating ghost guns in John Rigby et al. v. Kathy Jennings et al. (D. Del), 1:21-cv-01523-MN, Sept. 2023.
- Nevada
  - Submitted declaration for Attorney General's office of the state of Nevada in defense of its law regulating ghost guns in Roger Palmer et al., v. Stephen Sisokak et al. (D. Nev), 3:21-cv-00268, April 2024.
- New York
  - Submitted declaration for Attorney General's office of the State of New York in defense of its law regulating assault weapons in J. Mark Lane, et al., v. Steven G. James, et al. (S.D.N.Y), 22-cv-10989 (KMK), May 2024.
- Massachusetts
  - Submitted declaration for the Office of the Attorney General of Massachusetts in defense of aspects of its requirements for the commercial sale of handguns in Stefano Granata et al., v. Andrea Joy Campbell et al., (D. Mass), 1:21-cv-10960-DJC, Sept. 2024.

**CONSULTING (cont.)**

- Virginia
    - Submitted declaration for the Office of the Attorney General of Virginia in defense of aspects of its regulations of assault weapons and magazine capacity in Joseph Santolla et. al., v. Colonel Jeffrey S. Katz, et. al. (Circuit Court, County of Washington), CL26001139-00; John Crump, et. al., v. Colonel Jeffrey S. Katz, et. al. (Circuit Court, County of Lancaster), CL26001201-00; Eric Black, et. al., v. Scott C. Hook and Commonwealth of Virginia (Circuit Court, County of Fauquier), CL26000241-00, June 2026.
    - Submitted declaration for the Office of the Attorney General of Virginia in defense of aspects of its regulations of assault weapons and magazine capacity in Dustin Curtis, et. al., v. Colonel Jeffery S. Katz, et. al. (Circuit Court for the County of Spotsylvania), CL26002454-00, June 2026.
- Supreme Court
    - Contributor and signatory to Brief for Amici Curiae Professors of History and Law in Support of Petitioner, United States of America v. Zackey Rahimi, 2023.
    - Contributor and signatory to Brief for Amici Curiae History and Law Professors in Support of the Petitioner, Unites States of America v. Ali Danial Hemani, 2025

**TEACHING**

**Classes Offered at UC Berkeley**

- HIST 7a: Lower-division lecture – *North America through Reconstruction*, 2011, 2012, 2015, 2018, 2020, 2021, 2024 (always in fall)
- HIST 100: Upper-Division Lecture - *American Encounters*, Fall 2009
- HIST 101: Undergraduate Research Seminar - *Senior Thesis Seminar* Spring 2010; Spring 2012, Spring 2013, Fall 2014, Spring 2022, Spring 2023
- HIST 102: Undergraduate Research Seminar, *Senior Thesis Seminar*, Spring 2024
- HIST 103: Undergraduate Reading Seminars:
    - *Borderlands in North America*, Fall 2009
    - *The U.S. and Latin America in the 19th C.*, Spring 2012
    - *The Border* (reading seminar), Fall 2016
    - *The Radicalism of American Revolutions*, Fall 2022
- HIST 104: Undergrad lecture/seminar- *The Craft of History*, Spring 2015, Spring 2017
- HIST 135B: Upper-division lecture - *Encounter and Conquest in Indigenous America*, Spring 2019, Spring 2022, Spring 2023, Fall 2023
- HIST 280: Graduate Reading Seminars:
    - *Borderlands in World History*, Fall 2011
    - *The Making of the Modern World, through the Age of Revolutions* (Sem.), Fall 2014 (co-taught with Daniel Sargent)
    - *The Making of the Modern World, since the Age of Revolutions* (Sem.) Spring 2015 (co-taught with Daniel Sargent)
    - *Borderlands in North America* (reading seminar), Spring 2015

**Classes Offered at UC Berkeley, Cont.**

  - *Native North American History* (reading seminar), Spring 2021
- HIST 285: Graduate Research Seminars:
  - *American History before 1900*, Spring 2013, Fall 2015
  - *Topics in American History*, Fall 2018, Spring 2024
- HIST 375: Graduate Sem: *Teaching History at the University* (pedagogy), Spring 2021

**Classes Offered at the University of Colorado**

- HIST 1015*:* Lower-Division lecture - *U.S. History to 1865*, Fall 07', Fall 08'
- HIST 1035*:* Lower-Division lecture - *Honors: United States History to 1865*, Fall 04'
- HIST 2015*:* Lower-Division lecture - *Early America*, Fall 06'
- HIST 3050: Undergraduate seminar - *The Arms Trade in World History*, Spring 09'
- HIST 3317*:* UG sem. - *Interethnic Borderlands in the American West*, Fall 04', Fall 07
- HIST 4115: Upper-Div. lec – *Natives & Newcomers in the Americas*, Fall 06', Spring 08'
- HIST 4327*:* Upper-Division lecture - *Novelty, Conflict, and Adaptation in the American Southwest*, Spring 05', Spring 08'
- HIST 4617*:* Upper-Division lecture - *Native North American History: Origins to 1815*, Spring 05', Spring 07', Spring 09'
- HIST 5106: Graduate Reading seminar - *Colloquium: U.S. History to 1865*, Fall 08'
- HIST 6030: Grad. Reading sem - *Frontiers and Borderlands in the Americas*, Spring 07'

**Students Mentored through UCB's Undergraduate Research Apprentice Program (URAP)**

- *Project on Arms Trade History* (Spring 2023): Nela Taeb, Grace Qian, Michael Florip, Song Li, Ava Escobedo Avery Wheless, Etienne Comperat, Max Buchs, Yann Huguenin
- *French Diplomatic Records on the U.S. and Saint-Domingue, Early 19th C.* (Fall 2024): Nicolas Andreu, Briac Sockalingum, and Valentin Cadieux
- *Mapping Indigenous Dispossession in the Revolutionary Era* (Spring 2025): John Dong, Chloe Hansford, Spencer Owen
- *Images for Aim at Empire* (Spring 2026): Chloe Hansford, Raphael Potruch
-

**PhD Students** (1) = advisor/co-advisor; (2) 2nd reader

- **Current Students:**
  - Jayden Lim (1)
  - Zahra Hasanain (1)
  - Daimeon Shanks (Jurisprudence & Social Policy, UCB Law)
  - Alex Chaparro (History Department, University of Texas, Austin)
  - William Parish IV (History Department, Stanford University)
  - Scott Wagner (History Department, USC)
  - Carlotta Wright de la Cal (2)
    - Dissertation: "Indigenous Infrastructures: Native Workers and Railroads in the U.S.-Mexico Borderlands"
  - Julia Frankenbach (1)
    - Dissertation: "Strange Missions: Livestock Production, Gender, & Power in the Native Bay Area"

- **Former PhD Students:**
  - Ariel Ron (2), Glenn M. Linden Associate Professor of the U.S. Civil War Era, Southern Methodist University
    - o Dissertation: "Developing the Country: 'Scientific Agriculture' and the Roots of the Republican Party" (2012)
  - Mattie Harper, Grantmaking Officer, Bush Foundation
    - o Dissertation (Ethnic Studies): "French Africans in Ojibwe Country: Negotiating Marriage, Identity, and Race, 1780-1890" (2012)
  - Melisa Galván (2), Associate Professor, California State University, Northridge
    - o Dissertation: "From Contraband Capital to Border City: Matamoros, 1746-1848," (2013)
  - Allie McLafferty (2), History Instructor, St. Stephens Episcopal School, Austin, TX
    - o Dissertation: "'A Plumb Craving for the Other Color': White Men, Non-White Women, and the Sexual Crisis in Antebellum America," (2013)
  - Jennifer Carlson, Professor of Sociology, Arizona State University
    - o Dissertation (Sociology): "Clinging to their Guns?: The New Politics of Gun Carry in Everyday Life," 2013
  - Delia Hagen (1), Founding Director Hagen Historical Consulting, Missoula, Montana
    - o Diss: "Northern Plains Borders and the People In Between, 1860-1940" 2015
  - Bathsheba Demuth (2), Dean's Associate Professor of History and Environment & Society, Brown University
    - o Dissertation: "The Power of Place: Ideology and Ecology in the Bering Strait, 1848-1988" (2016)
  - Alberto Garcia (2), Assistant Professor, San José State University
    - o Dissertation: "The Politics of Bracero Migration" (2016)
  - Robert Lee (2), University Lecturer, Cambridge University
    - o Dissertation: "Louisiana Purchases: The U.S.-Indian Treaty System in the Missouri River Valley" (2017)
  - Erica Lee (1), Analyst in Emergency Management and Disaster Recovery, Congressional Research Service, Washington, D.C.
    - o Dissertation: "Sanctuaries into Fortresses: Refugees and the Limits of Obligation in Progressive-Era America" (2017)
  - Javier Cikota (2), Assistant Professor, Bowdoin College
    - o Dissertation: "Frontier Justice: State, Law, and Society in Patagonia, 1880-1940" (2017)
  - David Tamayo (2), Assistant Professor, University of Michigan
    - o Dissertation: "Serving the Nation: Rotary and Lions Clubs, the Mexican Middle Classes, and the Post-Revolutionary State, 1920s-1960s" (2018)
  - Julia Lewandowski (1), Assistant Professor, University of California, San Diego
    - o Dissertation: "Small Victories: Indigenous Proprietors Across Empires in North America" (2019)
  - Franklin Sammons (1), Assistant Professor, Washington & Lee
    - o Dissertation: "Yazoo's Settlement: Finance, Law, and Dispossession in the

Southeastern Borderlands, 1789-1820" (2021)
- Sophie FitzMaurice (1) Postdoctoral Fellow, Joint Center for History and Economics, Magdalene College and King's College, University of Cambridge
  - Dissertation: "The Material Telegraph: An Environmental History of the Technology that Wired America, c. 1848-1920." (2023)
- J.T. Jamieson (2) Presidential Management Fellow, U.S. Citizenship & Immigration Services, Washington, D.C.
  - Dissertation: "'A Mere Change of Location': Migration and Reform in America, 1787-1861." (2023)
- Russ Weber (Assistant Professor, Dept. of Social Sciences, Los Medanos College)
  - Dissertation: American Feeling: Political Passions and Affective Identity in the Revolutionary Era, 1754-1815 (2024)
- Noah Ramage (1) Assistant Professor of History, University of Colorado, Boulder
  - Dissertation: "Phoenix on Fire: The Cherokee Nation from Reconstruction to Denationalization" (2024)
- Annabel LaBrecque (1) History Teacher, The Branson School, Marin CA
  - Dissertation: Salt of the Earth: Unsettled Histories of the North American Interior (2024)
- Kyle Jackson (1) Postdoctoral Fellow, Kinder Institute on Constitutional Democracy, University of Missouri
  - Dissertation: Port of Call-to-Arms: New Orleans and the Frustrations of Empire in the Greater Caribbean, 1835-1920 (2025)

**SERVICE**

**University of California, Berkeley History Department**

- Search Committees:
  - Native North American History Search Committee, 2021-22'
  - US West Search Committee, 2018-19'
  - 20th Century Latin America Search Committee, 2014-15'
  - U.S. History Search Committee (Chair), 2012-13'
  - Latin America Search Committee, 2011-12'
- Vice-Chair for Personnel, 2024-25'
- Endowed Chairs Committee, 2021-22,' 2025
- AC-5 Grad Admissions Committee, 2020-21', 2022-23', 2023-24' (chair)
- Governance Task Force Committee, 2014-15'
- Committee on the History Undergraduate Major: 2011-12' (chair, spring 2012); 2015-16'; 2016-17' (chair)
- Honors Committee, 2009-10'
- Admissions Committee, US Field, 2009-10'
- Reentry and Disabled Student Advisor, 2009-10'
- Faculty co-sponsor, with Daniel Sargent, of the Berkeley International and Global History Conference (BIG-H), 2011-2017
- Co-founder (with Daniel Sargent) and co-organizer (since 2021 with Rebecca Herman) of the Berkeley Global History Seminar, 2010-2025

**University of California, Berkeley, Campus Service**

- On The Same Page selection committee, 2024 (for 2025)
- Senate Liaison for external review of UC Berkeley Department of Ethnic Studies, 2021
- Letters & Sciences Executive Committee, 2020-2023
  - L&S Executive Committee Liaison for the external review of UC Berkeley Department of Slavic Languages & Literatures, 2022
- Berkeley Institute for International Studies (IIS)
  - IIS Directorship Search Committee, 2021
  - IIS Faculty Board, 2020-present
  - IIS Simpson Award Committee, 2012; 2013; 2015 (chair); 2016-2019; 2023, 2025
- Bancroft Library
  - Friends of the Bancroft Library Council, 2021-2022
  - Bancroft Library Prize Committee, 2015, 2016, 2017, 2019, 2020

**University of California, Berkeley, Campus Service (cont.)**

- Academic Senate Committee on Committees, 2015 – 2017
- American Cultures Senate Subcommittee, 2011-12'

**University of Colorado History Department**

- Departmental Undergraduate Studies Committee, 2007-08'
- Departmental Executive Committee, 2006-07'
- Robert G. Athearn Lecture organizer, 2006
- Judge for Colorado History Day, Spring 2005
- History Department Graduate Studies Committee, 2004-05', 2008-09'
- Phi Alpha Theta/History Club Advisor, Fall 2004

**Professional Service, Memberships, K-12 and Public Outreach**

- Series Editor with Steven Hahn and Amy Dru Stanley for University of Pennsylvania Press book series, "America in the Nineteenth Century", 2014-
  present. Within the series, I have had served as faculty editor for the following books, working closely with their authors throughout the process:
  - William Kiser, *Borderlands of Slavery: The Struggle Over Captivity and Peonage in the American Southwest* (2017)
  - Noelani Arista, *The Kingdom and the Republic: Sovereign Hawai'i and the Early United States* (2019)
  - Katherine Bjork, *Prairie Imperialists: The Indian Country Origins of American Empire* (2019)
  - Alaina Roberts, *I've been Here All the While: Black Freedom on Native Land* (2021)
  - Paul Conrad, *The Apache Diaspora: Four Centuries of Displacement and Survival* (2021)
  - William Kiser, *Illusions of Empire: The Civil War and Reconstruction in the U.S.-Mexico Borderlands* (2021)
  - Sarah Keyes, *American Burial Ground: A New History of the Overland Trail*

(2023)

- Editorial Board Service:
  - *Reviews in American History*, 2019-2022
  - *Journal of the Early Republic*, 2020-2022
  - *Journal of the Civil War Era*, 2016-2018
  - *Pacific Historical Review*, 2012-2015
  - *Ethnohistory*, 2009-2012
- Prize Committees:
  - Robert M. Utley Award Com., Western History Association, 2022-2025
  - Ray Allen Billington Prize, Org. of American Historians, 2017-2019.
  - David J. Weber-Clements Center Prize Committee, Western History Association, 2016-2018.
  - Bernath Lecture Prize Committee, Society for Historians of American Foreign Relations, 2015-2018.
  - Louis Knott Koontz Memorial Award committee, Pacific Coast Branch of the American Historical Association, 2012-15
  - CLAH Article Prize Committee (Chair), Conference on Latin American History, 2012
  - John Ewers Book Prize Committee, Western History Association, 2012
  - Sons of the Republic of Texas, Summerfield G. Roberts Book Award Committee, 2010-2012
  - Western History Association's Huntington-WHA Ridge Prize Committee, 2009-2011.
- Conference Committees:
  - Western History Association (Chair, Local Arrangements Committee, San Francisco, 2027
  - Society for Historians of the Early American Republic, 2012, 2021, 2025
  - Society for Historians of American Foreign Relations, 2012, 2013
  - Organization of American Historians, 2012
  - Western History Association, Denver, 2009 [Local Arrangements]
  - American Society for Ethnohistory, 2005
- Manuscript Reviewer for *American Historical Review*, *Ethnohistory, Western Historical Quarterly,* the *Journal of American History, Modern American History, Law and History Review*, *Economics and Human Biology*, *History: the Journal of the Historical Association*, *Journal of the Early Republic*; *Enterprise & Society*; *William & Mary Quarterly*; *Civil War History*; *the Southwestern Historical Quarterly*; Oxford University Press, Harvard University Press, Princeton University Press, University of Pennsylvania Press, University of California Press, University of Arizona Press, Basic Books, Yale University Press, University of Colorado Press, University of Kansas Press, Cornell University Press, Palgrave & Macmillan; University of North Carolina Press, Duke University Press, University of Virginia Press, University of Tennessee Press, Texas A&M University Press; University of Nebraska Press, Blackwell Publishing, and Rourke Publishing.
- Other Professional Service:

  - Co-Chair, Taskforce on Conference Conduct and Sexual Harassment, 2019, Society for Historians of American Foreign Relations
  - Nominating Committee, Western History Association, 2019-2021
  - External Reviewer for UC Davis Undergraduate Program Review, 2017
  - Secretary and then Chair, Borderlands & Frontiers Studies Committee, Conference on Latin American History, 2011-2012
  - Grant/Fellowship reviews for: National Science Foundation; Comisión Nacional de Investigación científica y tecnológica (Chile)
  - Evaluations and nominations for the MacArthur Fellowship Program

- Memberships: American Historical Association; Org. of American Historians; Conference on Latin American History; Society for Historians of American Foreign Relations; Society for Historians of the Early Am Republic; Western History Association.
- K-12 and Public Outreach:
  - Academic Advisor, Teaching American History Grant "American Democracy in Word and Deed," Mt. Diablo School District, CA, 2009-2013.
  - Presenter at Teaching American History Grant workshops in Oakland, CA, Dec. 2009, May 2010, and Oct. 2010.
  - Lead Presenter at Teaching American History or Gilder-Lehrman workshops for primary-school teachers in:
    - Hartford, Delaware, June 2012
    - New Orleans / San Antonio, June 2012
    - Chicago, IL (June 2011)
    - Deer Valley, AZ (Feb., 2010)
    - Crescent City, CA (Jan., 2009 and April, 2010);
    - Eureka, CA (Jan., 2009);
    - Huntsville, Alabama (June 2008 and June 2009)

**Media**:

- Interviewed on the 250th Anniversary of the Declaration of Independence, CSPAN, July 4, 2026
- Interviewed about the "American Revolution International" Panel, OAH 2026, for the OAH Podcast, July 2026.
- Invited essay, "Nineteenth Century Reformers Made this Country More Equal, Inclusive, and Strong," *Los Angeles Times*, July 2, 2026. Reprinted in *The Columbian* (Clark County, Washington); *The East Bay Times*; *Chattanooga Times Free Press*; *The Mercury News*.
- Interview about *Aim at Empire* for the Harvard Griffin GSAS Colloquy Podcast, July 2026.
- Interviewed on the history of the United States between the Founding and Reconstruction for the Podcast "Audacity Conversations" for the Audacity Radio Network, June 2026.
- Interviewed for article about the western shows created by Taylor Sheridan, *Times of London*, Nov. 8, 2025

**Media, cont.**

- Interviewed for an article about the Puckle Gun and current court cases, *Wall Street Journal*, July 11, 2024
- Interviewed for an article about Bruen, Rahimi, and current Second Amendment court cases, *Washington Post*, July 7, 2024
- Interviewed for Faculti.net on "The Myth of Continuity in American Gun Culture," April 2024
- Interviewed about the film There Will Be Blood for Historians at the Movies Podcast, Feb. 2024.
- Interviewed about "The Arms Trade & American Revolutions" for the American Historical Review's podcast History in Focus, October 2023.
- Interviewed for episodes 1 & 2 of The Gun Machine podcast, by WBUR and The Trace, October 2023.
- Hour-long interview with the History of California Podcast, Oct. 2020
- On-air interview for BBC News World Service on gun law following the massacres in Gilroy, El Paso, and Dayton, August 10, 2019
- On-air interview for extended program "The American Gun Industry: A Billion Dollar Business," Australian Broadcasting Corp., March, 2018
- On-air Interview for BBC Newsday on Remington's bankruptcy, March 27, 2018
- On-air interview for "City Visions," KALW San Francisco, on youth protests against gun violence, March 26, 2018
- On-air interview, BBC Radio 5 on America's gun business, Feb. 26, 2018
- On-air interview for "The Attitude," Pacifica Network, on America's gun business, February 20, 2018
- "Gotham's Gun Baron," Spoken essay for BBC Radio Three program *The Essay*, January 2017
- On-screen consultant for German documentary on the U.S. presidency, "Die US-Präsidenten und der Krieg," produced by Westdeutscher Rundfunk and aired nationally in Germany in November 2016.
- "Guns, Capitalism, and Revolution in the Americas," 2015 SHAFR keynote address filmed and broadcast on CSPAN's American History TV, (first aired August 1, 2015).
- Interview with Deborah Lawrence and Jon Lawrence for Contesting the Borderlands: Interviews on the Early Southwest (University of Oklahoma Press, 2016), 182-200.
- Guest of NPR's Backstory, with the American History Guys, Jan 17, 2014
- Invited essay for the *New York Times*' Room for Debate feature, July 2, 2013
- Guest on NPR's "On Point with Tom Ashbrook," Nov. 7, 2012.
- Guest on PRI's "The World," April 12, 2011
- On-screen consultant for "The Mexican-American War," Oct. 29, 2006, History Channel

- KERA "Think" radio interview on *War of a Thousand Deserts*, 2008.