ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General
VIVIANA M. HANLEY
CHRISTINA MCCALL
SABRINA T. MCGRAW
EDWARD P. WOLFE
Deputy Attorneys General
State Bar No. 247835
600 W Broadway, STE 1800
San Diego, CA 92101-3375
Telephone: (619) 321-5426
Fax: (916) 731-2124
E-mail: Edward.Wolfe@doj.ca.gov
*Attorneys for Defendants, State of California and Robert Bonta, in his official capacity as head of the California Department of Justice*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** Plaintiff, **v.** **STATE OF CALIFORNIA and ROBERT BONTA, in his official capacity as the head of the California Department of Justice,** Defendants. | 8:26-cv-01697-MRA-ADSx<br>**DECLARATION OF MICHAEL VORENBERG**<br>Date: September 11, 2026<br>Time: 1:30 p.m.<br>Courtroom: 9B<br>Judge: The Honorable Monica Ramirez Almadani<br>Trial Date: None set<br>Action Filed: July 1, 2026 |

## TABLE OF CONTENTS

PROFESSIONAL QUALIFICATIONS .......... 1
OPINIONS .......... 3
I. Summary of Opinions .......... 3
II. Scope .......... 5
III. Research Materials and Methodology .......... 11
IV. Historical Background and Terminology .......... 13
A. The Henry Rifle and the Winchester Repeating Rifle .......... 15
B. The Henry Rifle and the American Civil War .......... 17
C. Militias .......... 21
D. The U.S. Army During Reconstruction .......... 24
V. Findings: High-Capacity, Rapid-Firing Firearms During Reconstruction .......... 30
A. Overview: Henry Rifles and Winchester Repeating Rifles During Reconstruction .......... 30
B. Henrys and Winchesters in the Reconstruction-Era West .......... 31
C. Henrys and Winchesters in the Reconstruction-Era North .......... 38
D. Henrys and Winchesters in the Reconstruction-Era South .......... 41
VI. Conclusion. Reconstruction and Today: Continuity and Change .......... 59

# EXPERT REPORT AND DECLARATION OF MICHAEL VORENBERG

I, Michael Vorenberg, declare under penalty of perjury that the following is true and correct:

1. I have been asked by the Office of the Attorney General of the California Department of Justice to prepare an expert report on the existence, usage, and regulation of high-capacity, rapid-firing firearms during the era surrounding the adoption of the Fourteenth Amendment to the U.S. Constitution in 1868. This declaration ("Report") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Report.

## PROFESSIONAL QUALIFICATIONS

2. I am the Royce Family Professor of History at Brown University. I received my A.B. from Harvard University in 1986, and my Ph.D. in history from Harvard in 1995. After receiving my Ph.D., I began a postdoctoral fellowship at the W.E.B. Du Bois Institute at Harvard, and then served as an assistant professor of History at the State University of New York at Buffalo. I joined the faculty at Brown University in 1999, and have taught history there ever since.

3. I have concentrated my research on the history of the U.S. Civil War and Reconstruction. I am the author of three books. My first book, *Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment*, was published by Cambridge University Press in 2001. The book was a Finalist for the Gilder Lehrman Lincoln Prize. I am also the author of *The Emancipation Proclamation: A Brief History with Documents*, published by Bedford/St. Martin's in 2010. My most recent book is *Lincoln's Peace: The Struggle to End the American Civil War*, published by Alfred A. Knopf in 2025. Like my first book, *Lincoln's Peace* was a Finalist for the Gilder Lehrman Lincoln Prize. The book was the Winner of two prizes: the John L. Nau III Prize in American Civil War

History, awarded by the University of Virginia; and the Tom Watson Brown Book Award, awarded by the Society of Civil War Historians, for the best book on the causes, conduct, and effects of the American Civil War. I also have authored a number of articles and essays, including a number on law, the Constitution, and military affairs during the Civil War and Reconstruction. These include: "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Southern Illinois University Press, 2018); Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment* (Columbia University Press, 2010); "Reconstruction as a Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions in the History of Postbellum America* (Oxford University Press, 2006); and "Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (Dec. 2005), 416-26.

4. My curriculum vitae is attached as **Exhibit A**.

5. I have been retained by the California Department of Justice to serve as an expert witness in this case. I am being compensated at a rate of $300 per hour. I have reviewed the Complaint, the *ex parte* temporary restraining order briefing, and the preliminary injunction motion in this case.

6. I have provided expert testimony in *Christopher J. Hoffman v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:24-cv-00664-CAB-MMP), and in *California Rifle & Pistol Association v. Luna*, a lawsuit in the Central District of California (Case no. 2:23-cv-10169), both challenging firearms licensing requirements; *Jane Doe v. Bonta*, a lawsuit in the Central District of California (Case No. 8:23-cv-01324), and in *Koppel v. Bonta*, a lawsuit in the Central District of California (Case No. 8:23-cv-00813), both challenging California's "good moral character" and psychological examination concealed carry

weapon licensing requirements; *Rhode v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:18-cv-00802-BEN-JLB) challenging "background checks" for ammunition; *Miller v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:19-cv-01537-BEN-JLB), and *Rupp v. Bonta*, a lawsuit in the Central District of California (Case No. 8:17-cv-00746-JLS-JDE), both challenging California's regulations of assault weapons; *Wiese v. Bonta*, a lawsuit in the Eastern District of California (Case No. 2:17-cv-00903-WBS-KJN) and *Duncan v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:17-cv-01017-BEN-JLB), both challenging California's regulations of large-capacity magazines; *Oregon Firearms Federation, Inc. v. Brown*, a lawsuit in the District of Oregon (Case No. 2:22-cv-01815-IM) challenging that state's regulation of large-capacity magazines; *National Association for Gun Rights v. City of Naperville, Ill.*, a lawsuit in the Northern District of Illinois (Case No. 1:22-cv-04775) challenging the state of Illinois' and the City of Naperville's regulation of assault weapons; and *National Association of Gun Rights v. Campbell*, a lawsuit in the District of Massachusetts (Case No. 1:22-cv-11431) challenging the state of Massachusetts' regulation of assault weapons and large-capacity magazines.

## OPINIONS

### I. Summary of Opinions

7. This Report provides results of an investigation into the existence, usage, and regulation of high-capacity, rapid-firing firearms during the Reconstruction period of U.S. History (1863-1877), with special focus on the period during Reconstruction when the Fourteenth Amendment to the U.S. Constitution was created, ratified, and enforced (1866-1876). The result of the investigation can be summarized as follows: There were high-capacity, rapid-firing firearms during Reconstruction, and all of them, including those that could easily be carried by a single individual, were regarded in all the states at the time as weapons suitable only for law enforcement officers, not for ordinary citizens. With very few

exceptions, almost all of which were in the Western Territories, high-capacity, rapid-firing firearms during the era were understood to be weapons of war or anti-insurrection, not weapons of individual self-defense.

8. Evidence for these assertions does not necessarily take the form of statutes or court decisions, and that is entirely unsurprising: explicit legal text prohibiting civilian possession of the most dangerous weapons of war was not commonly the means by which such weapons were regulated in the United States during the Civil War and Reconstruction. Instead, regulation of the most dangerous weapons, including lethal firearms, took place most commonly at the local level. Either by town ordinance or at the discretion of local officers, such as sheriffs or mayors, civilians could be restricted in the arms that they were allowed to possess.[1]

9. Looking more narrowly at the period surrounding the creation of the Fourteenth Amendment, prohibitions against the most dangerous firearms existed also in the policies and practices of the U.S. army and its auxiliary or allied units, such as the state-wide militias that operated as law enforcement bodies in a number of southern states during the period of Reconstruction.[2] Because of this regulatory norm in the U.S. military, I could not find statutes or court opinions during the period that banned civilian possession of artillery pieces, hundreds of which existed unused after the Civil War; instead civilians were prevented from possessing such pieces by the policy and practice of the U.S. army and its allied military units. High-capacity, rapid-firing firearms, which like artillery pieces were created as weapons of war, were regulated in the same way, through policy and practice limiting possession of such firearms to the U.S. army and its allied military units. Unlike artillery pieces, however, high-capacity, rapid-firing firearms during

[1] Joseph Blocher, "Firearm Localism," *Yale Law Journal*, 123 (2013), 82-146.

[2] James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967).

Reconstruction did come to be regarded by their manufacturers as having a potential market among U.S. civilians.

10. However, efforts to create a market for high-capacity, rapid-firing firearms in the United States during Reconstruction failed miserably. Americans who were not part of legal law enforcement bodies rarely bought high-capacity, rapid-firing firearms. One reason why these firearms failed to sell was the regulatory climate surrounding them. U.S. and pro-Union state authorities sometimes seized shipments of such weapons on the assumption that they were intended for use by insurrectionary groups. Because of the negligible demand for such weapons, owners of gun shops rarely stocked them. The primary, almost exclusive buyers of high-capacity, rapid-firing weapons during Reconstruction were a small number of U.S. army units and state law enforcement bodies. Manufacturers of high-capacity, rapid-firing firearms during Reconstruction thus looked outside the United States for buyers. The Winchester Repeating Rifle Company, the only company to produce such weapons during post-Civil War Reconstruction, stayed afloat during Reconstruction mainly by selling these firearms to foreign armies.

11. During Reconstruction, high-capacity, rapid-firing firearms did not circulate widely among the civilian population; thus, there was no need for legislative efforts to regulate them among civilians. Instead, during Reconstruction, high-capacity, rapid-firing firearms were possessed almost exclusively by the U.S. army and related military units, and they were regulated by the policies and practices of the army and these related military units.

## II. SCOPE

12. In preparing this declaration, I have researched legal matters from the founding era of the United States (the era surrounding the ratification of the Constitution in 1789 and the Bill of Rights in 1791) through the era of Reconstruction. Most of my attention has been to the era surrounding the creation

of the Fourteenth Amendment (adopted in 1868), as this period is my specialty and, with regard to firearms law, this era has not been scrutinized with the rigor that scholars have applied to the Founding period.

13. The era of the Fourteenth Amendment is known generally by professional historians also as the period of Reconstruction, typically defined as the period 1863-1877.[3] The starting point of 1863 correlates to the Emancipation Proclamation, the final version of which was signed by President Abraham Lincoln on January 1, 1863. The endpoint correlates to March 1877, when a new president, the Republican Rutherford B. Hayes, was inaugurated after a months-long contested election; and Hayes, once in office, oversaw the removal of all remaining U.S. troops in southern states that had been part of the Confederate States of America, the rebellious entity that had fought the United States during the Civil War of 1861-1865. Within the general period of Reconstruction, the more narrow time period examined in this Report is 1866-1876. This is the period covering events relevant to the relationship between the Fourteenth Amendment and firearms during the greater period of Reconstruction. Such events include (in chronological order): the passage by the U.S. Congress of the Civil Rights Act of 1866 and the new Freedman's Bureau Act (the initial Freedman's Bureau Act, passed in March 1865, was for one year only); the passage of the Fourteenth Amendment by Congress in 1866; the passage by Congress of the Reconstruction Act of 1867 (sometimes referred to as the "Military Reconstruction Act"); the adoption of the Fourteenth Amendment by state ratification in 1868; the enforcement of the Fourteenth Amendment by U.S. Statutes adopted in 1870-71; and the first interpretation of the Fourteenth Amendment's relation to the Second Amendment by the U.S. Supreme Court, in *U.S. v. Cruikshank*, 92 U.S. 542 (1876). This Report

---

[3] Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: Harper and Row, 1988), xxvii.

also mentions the opinion in *Presser v. Illinois* (116 U.S. 252 (1886)), even though it came after Reconstruction, because the events that led to the case occurred in early 1879, very soon after the end of Reconstruction.

14. During the Civil War and Reconstruction, as the constitutional order changed, much about firearms and firearms law changed as well. The war led to greater firearms production and distribution. Reconstruction-era imperatives of legal equality for Black people led to the elimination of race-based restrictions for arms and the imposition of restrictions on Whites deemed disloyal to the United States. Meanwhile, gun-bearing militias increased in number during the Reconstruction-era South as a means of maintaining postwar peace and preventing further insurrection. To ensure that these militias served the interests of the United States and not those of insurrectionists, former Confederates were often banned from the organizations and African Americans, who previously had been denied membership in southern state militias, were encouraged to join. As this declaration will detail, some units of these state militias were armed with high-capacity, rapid-firing firearms. These units were military in nature: they were civilian militias sworn to uphold the local, state, and U.S. governments against enemies, the most numerous of whom were insurrectionaries who sought to overthrow loyal state governments established in the South in the wake of the Civil War. Militias were under the control of state governors. During and after the Civil War, they worked in tandem with occupation U.S. military forces, which were under the authority of the U.S. President and the U.S. War Department. As part of their objective to keep the peace in communities threatened by insurrectionaries, loyal militias and U.S. occupying forces used the discretionary authority that state and federal law bestowed on them to prevent potentially insurrectionary forces from obtaining or possessing dangerous firearms, including high-capacity, rapid-firing rifles.

15. Such rifles were meant primarily as military weapons, and thus, in the postwar South, they were restricted to the possession of legitimate state militias.

This initiative was made part of U.S. law in an 1873 act authorizing the federal government to resume the pre-war practice of helping to arm state militias. Unlike the pre-war law, the post-war law prohibited restrictions in militia membership based on race or previous condition of servitude. U.S. oversight of militias, including the nature of arms possessed by militias, was one of a number of ways that federal authorities and their state-level auxiliaries regulated weapons during Reconstruction.[4]

16. In the Fourteenth Amendment era, regulation of dangerous firearms occurred rarely if ever by state and national laws concerning civilians. Rather, it took place through local legislation, local policing, military policy, and military action (with "military" meaning both U.S. military as well as local and state militias). Another reason that the lack of state laws regulating dangerous firearms should not be taken as evidence of a history of anti-regulation is that state legislatures prior to the late 1800s produced little law of *any* kind, in contrast to what state legislatures would come to do in the twentieth and twenty-first centuries. Between 1832 and 1900, almost all of the state legislatures went from meeting annually to biennially.[5] The most likely reason for the shift was that, in the words of one scholar, "it was reasoned that biennial sessions produced fewer new laws, thereby fostering economic stability while also reducing costs associated with operating the legislature."[6] State governments thus created fewer laws, and what laws that they did create concerned mostly matters of property. Not until the end of the nineteenth century did states begin to meet more regularly and to pass more laws. It is unsurprising, then, that state legislators did not begin to propose laws

---

[4] "An Act to authorize and direct the Secretary of War to distribute arms and military equipment under the act of April 23, 1808, ch. 282, 17 Stat. 608 (March 3, 1873).

[5] Peverill Squire, *The Evolution of American Legislatures: Colonies, Territories, and States, 1619-2009* (Ann Arbor: University of Michigan Press, 2012), 243-248.

[6] Peverill Squire, "American State Legislatures in Historical Perspective," *PS: Political Science and Politics*, 52 (July 2019), 418-420.

regulating Winchester rifles until the 1890s.[7] As this declaration details, Winchester rifles were the most common weapons of the Fourteenth Amendment era that held multiple rounds (typically sixteen) and could fire rapidly. It is no coincidence that the 1890s, when legislation specifying Winchesters first appeared, was also the decade when these weapons were in significant circulation in the U.S. for the first time in the United States. Up to that point, it was highly unusual for federal or state statutes dealing with firearms to specify a brand name. The fact that any laws, whether passed or merely proposed, singled out Winchesters indicates a particular intention on the part of lawmakers to regulate high-capacity, rapid firing guns.

17. Because of the limited nature of state lawmaking in the mid-nineteenth century, a search for historically analogous regulation in the Reconstruction era that is limited to formal, explicit state and federal statutes is too narrow, as firearms regulation in particular during this period occurred mainly through the day-to-day actions and policies—policies as often implicit as explicit—of legitimate armed authorities. Arms possessed by militias was one of a number of ways that federal authorities and their state-level auxiliaries regulated weapons during Reconstruction.[8]

18. For legitimate armed authorities, and for the loyal government entities that oversaw and commanded them, the regulation and oversight of weapons designed for military use was a primary function. Such weapons included those designed to maximize human casualties, including Henry and Winchester Rifles. Henry Rifles were the predecessor model to Winchesters. Like Winchesters, they

[7] *See* https://firearmslaw.duke.edu/laws/1893-fla-laws-71-72-an-act-to-regulate-the-carrying-of-firearms-chap-4147-c2a7c2a7-1-4 (an 1893 Florida law licensing the carrying or owning of "a Winchester or other repeating rifle"); *Charleston, South Carolina Tri-Weekly Courier*, Jan. 20, 1897, p. 3 (reporting a proposal for a law licensing the carrying or owning of "a Winchester or other repeating rifle").

[8] "An Act to authorize and direct the Secretary of War to distribute arms and military equipment under the act of April 23, 1808, ch. 282, 17 Stat. 608 (March 3, 1873).

held a high number of rounds (typically sixteen) and fired rapidly. However, whereas the rounds of a Henry had to be loaded all at once, using a time-consuming method of insertion through the rear stock, the rounds of a Winchester could be loaded more easily, and constantly, through a gate at the side of the carriage. Mass production of high-capacity, rapid-firing rifles began just before the outbreak of the U.S. Civil War, first with the Henry and then with the Winchester Rifle. These firearms represented new kinds of weapons. They fell into a tradition of weapons deemed especially dangerous because they were designed not for hunting or self-defense but for offensive killing and wounding. But whereas earlier dangerous weapons, like Bowie knives and "sawed-off" shotguns—regular shotguns modified by users (as opposed to mass-produced short-barreled shotguns, which did not come into use until the late 1800s)—were intended to inflict maximum injury or death on a *single* person, Henrys and Winchesters were intended to kill or wound *multiple* people quickly. The manufacturers of these weapons thus assumed that their primary use would be military. Mass production of these firearms began just before the outbreak of the U.S. Civil War, and although they were not adopted in a widespread way by the U.S. or Confederate armies, some foreign armies did adopt them. During the violence of Reconstruction that followed the Confederate Army surrenders, Winchester rifles became increasingly popular among armed bands, some of which were legitimate, loyal military units, such as state-approved militias, and some of which were illegitimate, disloyal insurrectionary groups, such as the Ku Klux Klan. An 1874 investigation by the *New York Tribune* revealed that the demand for Winchesters and other, less lethal rifles had increased in New Orleans and other parts of the South as insurrectionary groups sought weapons for "military purposes."[9] During the era of the Fourteenth Amendment, loyal law enforcement entities, including U.S. army units and state militias, sought to restrict access to Winchesters. Their initiatives indicated an understanding that high-capacity, rapid-

[9] "Few Firearms Sent South," *New York Daily Tribune*, Sept. 22, 1874, p. 5.

firing rifles could and should be regulated to secure peace and public safety, and that such regulation did not violate the Second Amendment.

19. This Report covers the geographic area of the entire United States, both its states and territories, during Reconstruction. However, its particular regional focus is on the southern states that had declared themselves seceded in 1860-1861 and had joined together into the Confederacy by April 1861. These states collectively represented the region during 1866-1876 where there was the most frequent use of firearms, mainly because of armed conflict either between contending factions within these states or between the U.S. army and insurgents in these states. Even more specifically, this was the only region outside of the Western Territories where Henry and Winchester Rifles were used. In the Western Territories during Reconstruction, these weapons were used primarily by the U.S. army against Native Americans in the so-called "Indian Wars" that extended from the 1860s to the 1890s. Some civilian U.S. citizens in the Western Territories during this period also possessed these weapons. However, as with all firearms in the region at the time, it is difficult to determine how common possession of Henry Rifles and Winchester Repeating Rifles was in the Western Territories in the Reconstruction period. Also, laws in these territories in this period were in flux, so it is difficult to know whether possession by civilian U.S. citizens there was lawful. Whatever the laws were at any given moment in this region during Reconstruction, the number of non-army U.S. citizens in the Western Territories was always negligible.

## III. Research Materials and Methodology

20. Research materials included standard scholarly works on firearms and U.S. history for the period of Reconstruction—roughly twenty scholarly books and thirty scholarly articles. Materials also included newspaper and magazine articles contemporary to the period studied. Hundreds of these are accessible and were accessed via commonly used databases by scholars, such as Chronicling America,

Pro-Quest Historical Newspapers, Newspapers.com, and the Hathi Trust. U.S. government documents and documents from U.S. states and territories were accessed via the Hein Online database or the Nexis Uni database (a version of the better-known Lexis Nexis legal database).

21. All of these documents, whether contemporary to the period studied or produced by scholars after that period, were searched for information regarding high-capacity, rapid-firing firearms, with special attention to the presence, use, and regulation of these firearms during the Reconstruction era (1863-1877).

22. In all my research, I gave more weight to evidence that attested to firearms being owned and/or used than to evidence that manufacturers of the firearms or other sellers were trying to get people to buy and use them. Advertisements for the firearms are not evidence of possession. However, if advertising material provided testimony of the firearms being owned or used, I treated that testimony as legitimate evidence, albeit evidence that might have been embellished, even invented, for the sake of sales.

23. I did much research to estimate the number of high-capacity, rapid-firing rifles—specifically Henrys and Winchesters—that were produced and in circulation in the United States during the era of the Fourteenth Amendment. The only existent original sources regarding production and distribution of these rifles are the serial number ledger books of the Winchester Repeating Arms Company, located at the Cody Firearms Museum (CFM) in Cody, Wyoming. However, this archive contains only ledger books for the post-1875 period. Records prior to 1875 seem to have been lost when the records were transferred from the company's headquarters in Connecticut to the CFM. However, I had access to a published survey of the original records, including the pre-1875 records. That survey appears in a 1955 book by John E. Parsons.[10] Parsons had access to all of the company

[10] John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 102-7.

records, including pre-1875 records, prior to their transfer to the CFM. The Parsons survey, not the CFM ledgers, was thus the obvious source for me to use in analyzing the manufacture and distribution of Henrys and Winchesters. Another crucial source regarding production and circulation of Henrys and Winchesters is research completed by Herbert G. Houze, which included a 1994 book commissioned by the Olin Corporation, which eventually came to own the Winchester Repeating Arms Company.[11] Neither Houze's research nor Parsons's, nor the archival records at the CFM, provide comprehensive details as to the recipients of gun shipments from the Winchester company.[12] Yet, other sources provide some details about owners and providers of Winchester rifles, and I present these details below.

## IV. Historical Background and Terminology

24. Weapons capable of shooting high numbers of rounds (more than 10) did exist by the time that the Second Amendment was adopted in 1791, but only in very small numbers, and almost exclusively in Europe. Those that might have existed in the U.S. at the time were made to order by individual gunsmiths for individual customers. These bespoke weapons were extraordinarily rare in the United States surrounding the period of the adoption of the Second Amendment.

25. One of these rare guns was the "Cookson" or "Hill" model, based on the "Lorenzoni system" established in Europe in the 1600s. Only one gun of this type definitively existed in early America; it was an 11-shot rifle mentioned in an account of 1722 from Boston. Even if others of this type existed in British North America, they would not have been well known. According to one expert, the slightest defect in these weapons would lead to an explosion, so they required

---

[11] Houze, *Winchester Repeating Arms Company: Its History and Development from 1865 to 1981* (Iola, Wisc.: Krause, 1994). *See also,* H. G. Houze, "A Reevaluation of the Henry and Model 1866 Serial Numbering," Man at Arms, 13 (July/August 1991), 10-17.

[12] Parsons, *The First Winchester*, 104-5.

perfect construction by "fine craftsmen." Thus, only "wealthy sportsmen" could afford them.

26. Another rare high-capacity gun of the era was the Girardoni (or Girandoni) air rifle, which could hold at least 20 rounds. The Girardoni was manufactured exclusively in Europe. Most of the guns manufactured were custom-ordered in the late 1700s by the Austrian army, which used the weapons with some success. To maintain a military advantage, the Austrians demanded that the guns be manufactured in secret.[13] No Girardoni is known to have appeared in America prior to 1800. There were about 30-40 guns on the Lewis and Clark expedition of 1804-1806, including a single Girardoni. Expedition leaders used it not for self-defense or hunting but for one purpose only: to impress Native Americans with white Americans' advanced technology.[14] Its presence on the expedition is not evidence that the gun was well-known to Americans of the period, much less to Americans at the time of the Second Amendment's adoption more than ten years earlier.

27. Some firearms experts and attorneys—but not professional historians—have asserted that high-capacity, rapid-firing guns were common enough in early America that many lawmakers would have known of their existence even as early as the time of the adoption of the U.S. Constitution (1789) and Bill of Rights (1791). In this version of history, American lawmakers, well-aware of such guns, would have regulated them if that was their inclination, and the fact that no regulation of such guns can be found prior to the Civil War indicates that lawmakers had no such inclination. This version of history has been debunked

[13] W. H. B. Smith, *Gas, Air and Spring Guns of the World* (Harrisburg, Penn.: Military Service Publishing Company, 1957), 30.

[14] Jim Garry, *Weapons of the Lewis and Clark Expedition* (Norman, Okla.: Arthur H. Clark, 2012), 94; S. K. Wier, "The Firearms of the Lewis and Clark Expedition" (2010), http://www.westernexplorers.us/Firearms_of_Lewis_and_Clark.pdf (accessed Nov. 7, 2022).

by professional historians, all of whom agree that, as one scholar puts it, high-capacity, rapid-firing firearms prior to the Civil War were "flawed, experimental curiosities," and "most of these weapons never advanced beyond proof of concept."[15]

**A. The Henry Rifle and the Winchester Repeating Rifle**

28. Only during the Civil War and Reconstruction did mass-manufactured, high-capacity, rapid-firing come into existence, and, as mentioned already, this Report focuses on Henry Rifles, Winchester Rifles, and the regulation surrounding them. It does so because these weapons were the only ones from the era of the Fourteenth Amendment that can be considered analogous to the weapons covered by AB 1127. They could be carried by a single person (as opposed to artillery), they were mass-manufactured, and they could fire roughly 16 rounds in rapid succession. They are not perfect analogs to the weapons covered by the California statute, which are those that can be modified to fire automatically with a single pull of a trigger, in the sense that the weapons under the California statute are more lethal and dangerous than Henrys and Winchesters ever were.

29. The Henry Rifle and the Winchester Repeating Rifle were nearly the same weapon. Manufacturing of the Henry began soon after the weapon was patented, in 1860. In 1866, the Winchester Repeating Rifle was established in New Haven, Connecticut. Its owner, Oliver Winchester, hired the inventor of the Henry, who designed a slightly modified version of the Henry Rifle. The new model was dubbed a Winchester Repeating Model. Because it was released in 1866, it was

---

[15] Brian DeLay, "The Myth of Continuity in American Gun Culture," *California Law Review*, 113 (Feb. 2025), 21. The attorney David B. Kopel has published the most often cited articles about high-capacity arms in early America; *see* David B. Kopel and Joseph G.S. Greenlee, "The History of Bans on Types of Arms Before 1900," *Journal of Legi*slation, 50 (2024), 223-386; and David B. Kopel, "The History of Firearms Magazines and Magazine Prohibitions," *Albany Law Review*, 88 (2015), 849-84. Kopel acknowledges that it was not until 1866 that the first "rifle with more than ten rounds of ammunition" was able to achieve "mass-market success in the United States" (this was the "Winchester 66" model); see Kopel, "The History of Firearms Magazines and Magazine Prohibitions," 849.

sometimes called the "Winchester 66." In 1873, a new model of Winchester was released, the "Winchester 73." The rifle was nearly the same as the "Winchester 66" but used a slightly different type of ammunition. All of these rifles, the Henry and the two models of the Winchester, had the following features: they held fifteen rounds in a chamber fixed within a stock just below the rifle barrel; they used a lever below the trigger to eject spent shells and load new rounds; and they were easily reloaded. The Winchester was easier to reload than the Henry—it had a "gate" on the side near the trigger that allowed the user to feed rounds into the gun during lulls in firing or after all the rounds in the chamber were spent. Advertisements for Henrys and Winchesters claimed that the weapons could fire two rounds per second (this rate might have been exaggerated—some of the same ads made the false claim that the guns held eighteen rounds, not fifteen—but all agreed that the rifle could fire at a rate at least as fast as any existing rifle).

30. There were other individual-use weapons during the Reconstruction era that could fire multiple shots in rapid sequence, but none had a capacity close to that of a Henry or Winchester. Some sidearms, most notably six-shot revolvers, could fire rounds in rapid sequence. But no common, mass-manufactured sidearm held more than ten rounds. Certain rifles beside the Henry and Winchester could fire multiple rounds rapidly, but none held more than ten rounds. The most common of the lower-capacity repeating rifle was the Spencer, which could hold seven rounds.[16] The U.S. army and the Confederate army approved the adoption of Spencers. Spencers and repeating rifles with similar capacities were known either by their company name or by the generic term "repeaters" or "repeating rifles." Henrys and Winchesters were also repeating rifles, but because they were in a class of their own, due to their much higher capacity, they were generally known only as Henrys or as Winchesters. In the language of the day, they did not fall into the

[16] Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, (9th ed., Appleton, Wisc.: Gun Digest Books, 2019), 633-34.

generic category of "repeaters" or "repeating rifles" (thus a very well-armed individual of the period might be described as having "a revolver, a repeater, and a Winchester"—three distinct categories).

31. This Report occasionally uses the term "Henry-Winchester." Although the Winchester Repeating Rifle effectively replaced the Henry Rifle, Henry Rifles continued to be used long after Winchesters began to be produced. At certain times and places during Reconstruction, both types of weapons might be found in possession of a single, armed group. For such situations, the phrase "Henry Rifles and/or Winchester Repeating Rifles" would be appropriate, but seeing how cumbersome that phrase is, it has been shortened in this Report to "Henry-Winchester" or "Henry-Winchesters."

**B. The Henry Rifle and the American Civil War**

32. Production and sales numbers reveal that Henry Rifles and their successors, Winchester Repeating Rifles, were uncommon during the Civil War and Reconstruction compared to other rifles.[17] Until 1866, manufacturers of Henrys and Winchesters concentrated their marketing efforts within the United States on trying to persuade the U.S. army and pro-Union state militias to adopt the high-capacity, rapid-firing rifles as standard weapons for soldiers.[18] The U.S. War Department never adopted Henry-Winchesters. The army's chief of ordnance, General James Ripley, reported early in the war that these rifles, along with lower-capacity rifles were "too complicated, too heavy, and too costly . . . and apt to waste

---

[17] Unless otherwise noted, this Report relies on two sources for numbers of Henry Rifles and Winchester Repeating Rifles manufactured and sold: Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); and John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955).

[18] Haag, *The Gunning of America*, 65-81. During the Civil War, the pro-Union border states of Kentucky and Missouri had state-wide militias that were authorized by state governments to fight for the Union.

ammunition."[19] The ordnance department never changed its position on Henry-Winchesters. During the Civil War, the U.S. army opted instead for single-shot rifles and, in some instances, low-capacity "repeaters" (rifles that held magazines of two to seven rounds). The U.S. army did allow individual commanders of army units or allied units to buy Henry-Winchesters for their soldiers. For example, of the 900 Henry rifles sold during 1862, 300 went to Kentucky's pro-Union state militia.[20] Although some military units that purchased Henry Rifles were able to do so using funds allotted to them by state governments, most of the soldiers and officers who purchased the weapons used their own money. By the end of the Civil War in 1865, U.S. soldiers had purchased about 8,500 Henry Rifles; most of those had been bought with the soldiers' own money. By contrast, the U.S. government had purchased nearly 107,000 Spencer single-shot rifles for use by the army.[21]

33. Meanwhile during the Civil War, the Confederate War Department also never adopted Henry Rifles. Whether that was by choice is unclear. Oliver Winchester, who had the greatest control of the company that made Henrys, declared that he did not want the weapons sold to Confederates. His policy may have been due to pure loyalty to the Union cause or to fear that he would be charged with treason by the U.S. government if he facilitated gun sales to the rebels. Some Confederate soldiers were able to acquire Henrys by theft or by using agents who purchased them in the North and smuggled them to the South.[22] Most Confederates knew about the weapon. A widely-circulated story told of a Confederate soldier who called the gun "that damned Yankee rifle that can be

---

[19] Haag, *The Gunning of America*, 70.

[20] Haag, *The Gunning of America*, 76.

[21] Haag, *The Gunning of America*, 81.

[22] *Ibid.*, 65. For evidence that U.S. authorities would have regarded the sale of Henrys to Confederates as treasonous, and thus that Winchester had good reason to avoid such sales, see Haag, *The Gunning of America*, 90.

loaded on Sunday and fired all week." One of the soldiers in Robert E. Lee's Army of Northern Virginia regretted that "we never did secure the Winchester."[23] Some Confederate soldiers did manage to obtain Henry-Winchesters, either by smuggling or, more commonly, by confiscating them from captured Union soldiers. In late 1862, for example, a number of pro-Union Kentucky soldiers who had just acquired Henry Rifles were overrun by pro-Confederate Kentuckians and Tennesseans. As many as 300 Henry rifles ended up in Confederate hands as a result.[24] These weapons probably did not stay with the southerners for very long. By June 1865, all of the major Confederate armies had surrendered. Typically, surrender required all Confederate soldiers to "stack arms." If they had sidearms, they could keep them, but any rifles had to be relinquished. Confederate veterans would thus have been prohibited from having Henry-Winchesters. If they failed to turn in their rifles, they were in violation of the "parole" agreement that protected them from imprisonment after surrender. At least some ex-Confederate soldiers ended up with Henry-Winchesters, however, though not legally. Some ex-Confederates managed to get Henry-Winchesters by stealing them from U.S. army depots. Others bought them from smugglers who had gotten the weapons in Mexico and then carried them across the border to Texas. Henry-Winchesters were easier to find in Mexico than in the U.S. in 1864-1867. They had been sold by the thousands to the Juaristas, the rebel force that would ultimately wrest Mexico from Maximilian, the self-proclaimed "Emperor" installed in Mexico City by Napoleon III of France.

34. Not only the Juaristas but other non-U.S., non-Confederate armies possessed Henry-Winchesters. Indeed, foreign armies were the main market for Henry-Winchester manufacturers during Reconstruction. Had it not been for the war in Mexico, along with the Franco-Prussian War and the various armed conflicts

---

[23] Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38.

[24] Haag, *The Gunning of America*, 76.

between the Russian and Ottoman empires—all wars involving thousands of Henry-Winchesters—the manufacturers of these weapons would likely have gone bankrupt.[25]

35. In the United States by 1866, Henry-Winchesters did exist, to be sure, but in much smaller numbers than in foreign countries. U.S. veterans of the Civil War could possess Henry rifles. Beginning in May 1865, U.S. army volunteers began mustering out in significant numbers. The non-regular U.S. army (that is, the volunteer force), nearly a million strong by April 1865, would fall well below 100,000 by the end of the year. Unlike ex-Confederate soldiers, ex-U.S. soldiers could keep their rifles upon discharge. This meant that U.S. soldiers at the time who had Henry rifles might continue to possess them once they re-entered civilian life. However, the number of such U.S. veterans who kept their Henrys was small, perhaps 7,500,[26] and those that opted to keep them paid dearly. The U.S. army did not simply give weapons away for free to discharging soldiers who had acquired them at no cost from their military units. Rather, soldiers wanting to keep their weapons had to buy them at market value. A Spencer carbine (a short-barreled, repeating rifle, and one of the most popular weapons among U.S. soldiers), would cost a discharging soldier about $10 (roughly $175 in 2022 dollars). A Henry would cost at least $30 (roughly $525 in 2022 dollars). A private in the U.S. army typically made $13 per month. If he had a Spencer that he wanted to buy, he would have to pay less than one month's wages—not a bad deal for a perfectly sound and

[25] *Ibid.*, 109-42.

[26] The figure of 7,500 Henrys kept by pro-Union soldiers after the war is reached in the following way. 8,500 had been purchased by or for U.S. soldiers. *See ibid.*, 81. Of these, roughly 2,000 were purchased for soldiers (based on a count of regiments known to have bought the rifles with public funds). Thus 6,500 Henrys were privately owned by soldiers. Of the roughly 2,000 Henrys purchased for soldiers, 808 were known to have been bought by the soldiers at the end of the war. *See* 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," *U.S. Congressional Serial Set* (1871), pp. 167-172. Thus, a generous estimate of how many U.S. veterans had Henrys after the war is 7,500.

popular rifle. If he wanted to buy a Henry, though, that would cost him more than two months' wages, and there would be little to persuade him that the difference in price corresponded to the difference in value. The result was that very few Henrys were purchased by discharged U.S. soldiers. According to a U.S. army report, 808 Henrys were purchased by discharging Civil War soldiers, compared to 8,289 Spencer Carbines.[27] Henrys that were not purchased went to the U.S. War Department's ordnance department. There are no records detailing what happened to surplus Henry Rifles. The absence of records indicating sales of Henrys to private distributers, a common practice by the U.S. army, suggests that the Henrys remained in U.S. arsenals or were destroyed. By the end of the Civil War in 1865, very few combatants had used Henry Rifles, and fewer still had kept them once they were discharged. The result was that only a small number of Henrys were in circulation in the United States immediately after the war—perhaps 10,000, and this in a country of roughly 35 million people.[28] Thus, the few people that did have Henrys were made up primarily of veterans who understood they were weapons of war–-they had used them as such–-rather than weapons of individual self-defense.

**C. Militias**

36. While Henrys were rare in the post-Civil War period, Winchesters became increasingly common, though they were not to be held in significant numbers until the 1890s. In the era of the Fourteenth Amendment, they appeared in

[27] General Orders, No. 101, May 30, 1865, *The War of the Rebellion* (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43; 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," *U.S. Congressional Serial Set* (1871), pp. 167-172.

[28] 11,000 Henry Rifles were produced between 1861 and 1865; *see* Parsons, *The First Winchester*, 48. Assuming that all were sold—a generous assumption—then 2,500 were sold to civilians and 8,500 to U.S. soldiers (the 8,500 figure comes from note 11 above). Of the 8,500 U.S. soldiers who had Henrys, 7,500 kept them after the war; *see* note 11 above. Thus 10,000 Henrys were in circulation after the war (again, a generous estimate). The U.S. census of 1860 reported just over 31 million Americans; the census of 1870 reported just over 38 million. Thus 35 million is given as an estimate of the population of the United States in 1865.

newspaper reports most commonly as the weapon of choice of two state militias, those in Louisiana and South Carolina. Because they were used by militias, it is important to understand the role of militias in the era of the Civil War and Reconstruction. These militias were fundamentally different from those of the period of Colonial America and the Early Republic. In those earlier periods, militias were seen as local forces guarding against the potential over-reaching power of a monarch or national government. In the era of the Fourteenth Amendment, militias were local forces aligned *with* the national government.

37. The power under the U.S. Constitution for a President to call up state militias is what Abraham Lincoln invoked at the start of the war when he authorized up to 75,000 men to come together to put down the insurrection in the southern states. The Confederate States of America, which adopted a constitution quite similar to the U.S. Constitution, invoked this same authority when calling up its national army.

38. Although soldiers had been called to national armies in their role as state militiamen, the armed units that formed the basis of national armies during the Civil War were not state-based militia units but rather state-formed regiments approved as national army units by the U.S. War Department (hence only in rare instances would a regiment be a replica of a local militia unit). Nonetheless, the national armies continued to be managed at times by laws designed in the pre-war era to manage state militias. In July 1862, for example, the United States passed a Militia Act that standardized the terms of membership in state-wide militias even though state-wide militias had grown defunct in the North prior to the war; only in this way—by legislating via the old state militia system—did the U.S. War Department have the authority to manage the personnel of the national army. The July 1862 Act significantly declared that Black Americans could not be denied admission to state militias. That was a pivotal development, as most state militias

prior to the war (all of them in the South, most of those in the North), had denied membership to Black Americans.

39. When the Civil War ended in mid-1865, state militias, which had been given new life by the war, thrived, but not everywhere. In the North, they fell into disuse, though they would begin to appear again with strength in the late 1870s and 1880s. In the border states of Missouri and Kentucky, which had remained loyal to the Union despite being slave states, state militias continued to be important, as guerrillas caused disturbances in the states long after the Civil War was over In the states of the former Confederacy after the war, the state militias had the most visible presence. Invoking newly passed discriminatory state laws ("Black Codes"), or simply acting on their own discretion, southern state militias in 1865 and 1866, which excluded all Black Americans, harassed, assaulted, and even killed Black Americans and pro-Union whites. These militias were composed mostly of former Confederate soldiers, many of whom wore their Confederate uniforms while in action. These militias were regarded by U.S. lawmakers as pernicious and unlawful. Leaving aside the obvious illegality of the many acts committed by these militias, they were in violation of U.S. law simply by wearing Confederate uniforms.[29]

40. As a result of the activities of southern state militias that sought to overthrow the authority of the U.S. government, the U.S. Congress in March 1867 abolished all southern state militias, with some exceptions, including Arkansas and Tennessee.[30]

---

[29] James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, *Opinions of the Attorney Genera*l, 11:208-09. For these immediate post-war southern militias, see William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67.

[30] 14 U.S. Statutes 487, Chap. 170, Sec. 6 (Approved March 2, 1867); Sefton, *The United States Army and Reconstruction*, 112; Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," *Arkansas Historical Quarterly*, 64

(continued…)

41. After Congress in 1867 abolished all but the exempted southern state militias, some of the newly created pro-Union governments in the non-exempted southern states created new state militias that were expressly tasked with subduing insurrection and anti-black activities.[31] As will be detailed later in this declaration, two such states, Louisiana and South Carolina, ended up creating militia units armed with Winchester rifles.

42. The composition of and membership requirements of the new state militias indicate much about attitudes toward firearms regulation among law makers of the time. The inclusion of Black Americans in the militias was part of a larger understanding among Republicans in the era of the Fourteenth Amendment that regulations restricting blacks from possessing firearms were no longer to be regarded as constitutional. The new militias did more than include blacks. They excluded some whites, specifically those who were regarded as still supporting the Confederate cause. Thus, the new state militias that began forming in 1868, the same year as the adoption of the Fourteenth Amendment, indicated that lawmakers understood that Black Americans' security required not simply the absence of regulations denying them arms but the presence of regulations denying arms to those who were known to support insurrection against the United States and violence against blacks.

**D. The U.S. Army During Reconstruction**

43. The U.S. army began occupying parts of the South as soon as the Civil War broke out and would not end its occupation until 1877, the end of

---

(Winter 2005), 356-58; Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119.

[31] Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33; Otis A. Singletary, "The Texas Militia During Reconstruction," *Southwestern Historical Quarterly*, 60 (July 1956), 25-28; Allan Robert Purcell, "The History of the Texas Militia, 1835-1903" (Ph.D. diss., University of Texas, Austin, 1981), 221-27.

Reconstruction, when it removed its last units from Florida, Louisiana, and South Carolina. During the Civil War, the U.S. army had exclusive police powers in the occupied South until or unless local policing institutions—courts and constabularies—were deemed loyal to the United States. At that point, the U.S. army cooperated with local police institutions to "keep the peace." Yet U.S. commanders retained the power, which they had had since the start of the war, to declare martial law in an area, thus suspending the civil institutions there. This arrangement carried over from the Civil War into the early years of post-war Reconstruction. Until April 1866, U.S. troops had unrestrained power to operate within state boundaries to keep the peace. As part of that power, they could use troops as police and hold their own courts that could try civilians.[32]

44. The army also was willing to use this power in states that had never declared themselves seceded. The army had overseen arrests and prosecutions of alleged traitors in Indiana in 1864, actions that were ultimately deemed unconstitutional in the U.S. Supreme Court's post-war *Milligan* opinion. In June 1866, the army had intervened in New York and Vermont to capture Irish nationalists known as Fenians who had fought against British troops in Canada and then crossed over to the United States. (Neither Henrys nor Winchesters were used in the conflicts between the Fenians and Canadian troops.) General-in-Chief Ulysses S. Grant ordered General George Meade to inform the New York and Vermont governors that they should call out volunteer militia units to capture the Fenians.[33]

45. The federal-state structure of armed enforcement that took place during the 1866 Fenian crisis was the model that U.S. authorities had in mind for the South once the southern states began creating pro-Union state militias. The

[32] Sefton, *The U.S. Army and Reconstruction*, 5-106.

[33] W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71.

hope was that the southern states would end up like New York and Vermont during the Fenian crisis: they would develop and sustain new, pro-Republican state militias that would be the primary armed force in the states, with the U.S. army playing only an ancillary role.

46. This plan for U.S. army-southern state militia cooperation nearly came apart beginning in April 1866. In that month, President Andrew Johnson proclaimed that a state of "cessation of hostilities" existed in all the southern states but Texas (in August 1866 he would proclaim that in Texas, too, there was a "cessation of hostilities). Johnson thus effectively removed "war powers" as a constitutional justification for the army's presence in the South. His move was part of his general turn against the Republican program of Reconstruction. Also in April 1866, he vetoed the Civil Rights Act of 1866, a veto that Congress overrode. Two months earlier, he had vetoed the act renewing the Freedman's Bureau. Eventually, Congress passed a new act for the Bureau, which Johnson again vetoed but Congress overrode. Both the Civil Rights Act and the Freedman's Bureau Act established, among other things, that the army would continue to have policing powers in the southern states. Those powers were to be used specifically to put down insurrectionaries who threatened to undermine the civil rights of Black Americans or in any way jeopardize pro-Union citizens and institutions. The Civil Rights Act contained a military provision that empowered the army to act reactively or preemptively against any actual or anticipated insurrectionary threat.[34] Even though Congress was able to sustain this military provision as well as the rest of the Civil Rights Act of 1866 against Johnson's veto, the military provision was jeopardized by Johnson's declaration of a "cessation of hostilities." The declaration signaled that Johnson might not sustain the army in its duties specified by

[34] Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88.

Congressional measures like the Civil Rights Act. Also in April 1866, the U.S. Supreme Court announced that it was ruling in favor of the plaintiff in the *Milligan* case (the actual opinion was not issued until January 1867). That case was narrowly about the power of the army to try civilians in areas where civil courts were operative; more broadly it was about the power of the army to have any authority at all to occupy an area ostensibly at peace.

47. U.S. Republican authorities moved quickly to protect their power to occupy the formerly rebel South. Secretary of War Stanton prepared an order that invoked the military provision of the Civil Rights Act of 1866 to justify continued military occupation of the South. This was a novel move, as it allowed military occupation in the absence of "war powers." The Civil Rights Act was justified not by "war powers" but by the Thirteenth Amendment abolishing slavery. A small number of Republicans, most notably Representative John Bingham, thought the Civil Rights Act needed more justification than that. For this reason, among others, Bingham pressed for a new constitutional amendment, which ultimately emerged as the Fourteenth Amendment. The resolution for the amendment was passed by Congress a few months after the Civil Rights Act and sent to the states for ratification. Congress would ultimately declare that the Civil Rights Act of 1866 was authorized by the Fourteenth as well as the Thirteenth Amendments.

48. The military provision of the Civil Rights Act of 1866 was not enough to put U.S. military occupation of the South on sure footing. The President still controlled the army in his capacity as commander-in-chief. Congress thus began to wrest control of the army from President Johnson. First, it passed the Reconstruction Act of 1867, which formalized military occupation and required southern states to ratify the Fourteenth Amendment in order to be readmitted to the Union. Then Congress passed measures (most notably the Tenure of Office Act) that shifted aspects of army control from the President to Congress. Then it impeached Johnson, though Johnson was ultimately acquitted by the Senate. In the

meantime, the army and the U.S. Attorney General opted to take the narrowest possible reading of the Milligan decision, such that the only power deemed out of the army's hands in occupied areas was the power to try civilians if civilian courts were operative. By 1868, then, the year of the Fourteenth Amendment's adoption, the U.S. army had secured for itself a place in the southern states as a legitimate occupying force in the South. It would affirm this status with the acts of 1870 and 1871 enforcing the Fourteenth Amendment as well as the Fifteenth Amendment, which had been adopted in 1870. The last of these enforcement acts, the so-called "KKK Act," was aimed directly at breaking up the Ku Klux Klan and similar insurrectionary, paramilitary organizations that terrorized Black Americans and pro-Union whites ("terror" was one of the most commonly used words of the time to describe the Klan's intent toward Black Americans).

49. The reason to understand this sequence of events is to understand the way that firearms regulation actually occurred in practice during the era of the Fourteenth Amendment. As stated earlier, regulation rarely, if ever, took the form of state laws banning specific weapons, but that does not mean that regulation did not exist. Quite to the contrary: weapons, including high-capacity, rapid-firing rifles, could be restricted or banned, but this happened through the regulatory apparatus of the era, which was the U.S. army and its ancillary military units, including militias.

50. It is also important to understand the history of the Fourteenth Amendment era so that one can see it is not so different from our own. The central role played by the military was not regarded as dangerous or evident of the existence of war in the era of the Fourteenth Amendment. This was not a regime of martial law. Like the U.S. today, it was an era technically of peace though threatened by occasional domestic disturbances. Military authorities had the power to declare martial law (Congress would limit this authority in the Posse Comitatus Act of 1878), but martial law was almost never declared. When it was declared, it

was done so almost always not by national or military authorities but by loyal state governors, much as loyal state governors are looked to today to call out the National Guard in times of emergency. During the era of the Fourteenth Amendment, then, the main role of the U.S. army was to act as an ancillary police force to the state militias or other local and state policing operations. In this capacity, the army worked with states to detect and arrest insurrectionaries and civil-rights violators. Although sometimes those arrested would stand trial in a federal court—this happened most famously in the South Carolina Ku Klux Klan trials of 1871-72—the army and agents of the Department of Justice looked to the state courts to be the primary judicial institutions of locales. As an example: President Ulysses S. Grant in 1871, in his capacity as commander-in-chief of the U.S. army, ordered all insurrectionaries in South Carolina to turn in their firearms to legitimate authorities. If insurrectionaries were found who had not turned in their weapons, they could be arrested and denied habeas corpus rights under Grant's order.[35] However, prosecutions and trials of such insurrectionaries going forward would be conducted by state authorities, if those authorities were known to be loyal to the United States. In its capacity as an ancillary police force to state militias, with both armed organizations committed to subduing insurrectionaries and civil-rights violators, the U.S. army sought to prevent weapons from reaching unlawful insurgent groups. Army officers relied on their own intelligence operators as well as private intelligence agencies like the Pinkertons to learn of arms shipments. By the terms of the Civil Rights Act of 1866 and the Enforcement Acts of 1870, the U.S. army and related military units were authorized to act preemptively to prevent

[35] Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, pp. 4086-87 (March 24, 1871), 4089-90 (Oct. 12, 1871), 4090-92 (Oct. 17, 1871), 4092-93 (Nov. 3, 1871; this proclamation revoked suspension of habeas corpus in Marion County, South Carolina), 4093-4095 (Nov. 10, 1871).

insurrectionaries from making armed assaults on loyal Unionists. The seizure of weapons intended for insurrectionaries thus represented a lawful use of military authority under the Fourteenth Amendment.[36]

51. As a result, any southern person or combination of persons considering having Henry or Winchester rifles shipped to them faced the prospect that the U.S. army or state militia might keep the shipment from reaching them and that, even if the shipment did reach them, the policing forces could arrest them and confiscate the weapons.

## V. FINDINGS: HIGH-CAPACITY, RAPID-FIRING FIREARMS DURING RECONSTRUCTION

### A. Overview: Henry Rifles and Winchester Repeating Rifles During Reconstruction

52. An oft-cited scholar in legal debates over firearms contends that "the Winchester Model 1866 . . . became a huge commercial success. So by the time the Fourteenth Amendment was ratified in 1868, rifles holding more than 10 rounds were common in America." The first part of this statement is true: the "Winchester 66" did become a commercial success. The author neglects to mention, however, that prior to the end of Reconstruction, that commercial success was due almost entirely to sales to foreign armies. Thus, it does not follow that the success of the company during Reconstruction is evidence of the presence of Winchesters in the United States. Indeed, the author's second statement, that "rifles holding more than 10 rounds were common in America" at the time of the Fourteenth Amendment, is false.[37]

---

[36] No U.S. court ever denied the constitutionality of such seizures of weapons or the legislation that authorized the seizures. *See* Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction."

[37] David Kopel, "The History of Magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post*, May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/

(continued…)

53. Rifles holding more than ten rounds made up a tiny fraction of all firearms in the United States during Reconstruction. Furthermore, as will be discussed in more detail below, possession of such rifles—legal possession, that is—was limited almost exclusively to U.S. soldiers and civilian law enforcement officers.

**B. Henrys and Winchesters in the Reconstruction-Era West**

54. One of the places that Henrys and Winchesters could be found during Reconstruction was in the West, though the weapons did not proliferate there at the time at anything like the scale invented by novelists and film-makers of the late nineteenth and twentieth centuries.

55. With the passage of the Homestead Act (1862), the end of the Civil War (1865), the completion of the first transcontinental railroad (1869), and the discovery of gold in the Black Hills of Dakota Territory, the appeal of traveling to or through the Western Territories increased. Because law enforcement was minimal in the region, and also because the U.S. army could offer travelers and settlers little protection—they were too consumed during the era with subduing

(accessed September 22, 2022). Kopel's contention also appears on page 4 of his co-authored Amicus Brief in a federal case from California, *Fyock v. City of Sunnyvale*, Case No. 14-15408 (9th Cir. 2015). *See* David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.). For the number of Henrys and Winchesters manufactured 1861-1877, as well as the number of these rifles shipped to foreign armies, see John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. To understand the scale of these numbers, one should contrast them to the production and sales of other rifles of the era. For example, according to Parsons, the total number of Henrys and Winchesters manufactured in 1861-1877 was 164,466 (this includes the 56,000 shipped to foreign armies), whereas in the same period, 845,713 Springfield "trap-door" single-shot rifles were manufactured. *See* "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3; some of the data in this report is aggregated and printed at the Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoor-production-serial-numbers.htm.

Native Americans—Americans came to regard self-defense as particularly important in the region. The Winchester company tried to capitalize on the situation by touting the benefits of its rifle. The "Winchester 73" model in particular was aimed at Westerners or potential Westerners. The company emphasized that the speed and high capacity of the rifle allowed a single person to hold off a band of outlaws or hostile Native Americans.[38] The marketing campaign was aimed especially at Americans planning to travel to the Western Territories.

56. Many travelers to the West carried firearms, to be sure, but a very small number of those arms were Henrys or Winchesters. Most of the accounts of privately held Winchesters during Reconstruction that I found in the research for this Report did come from the Western Territories, but there were fewer than fifteen such accounts that were not expressly fictional. Two such accounts became legendary, mainly because the manufacturers of the Henry-Winchesters used them to advertise their rifles. One account was of two former U.S. soldiers who were part of a mining operation in the Rocky Mountains and used their Henry Rifles to defeat some raiding Blackfoot Indians. Another was of a private guard hired by Wells Fargo to accompany a cash shipment to the West; he was attacked by robbers near Nevada City and used his Henry Rifle to kill them all. It might be noted that these stories, assuming they are true, did not involve individual self-defense by ordinary civilians. They involved defense of economic enterprises by trained gunmen.[39] Less oft-told incidents involving Henrys and Winchesters from the Western Territories involved brutal violence between thuggish combatants. There was no heroic road warrior or "Indian fighter" in these tales, and thus they were not likely to build appeal for the rifles. Particularly gruesome were the murder-by-

[38] See, for example, the ad printed over three issues in the *Wyoming Leader* (March 17, April 21, May 8, 1868, always p. 4).

[39] Williamson, *Winchester*, 42-44.

Winchester accounts stemming from the Horrell-Higgins feud in New Mexico Territory near the Texas border.[40]

57. Because some Henrys and Winchesters found their way to the Western Territories, and because some of the U.S. army operations against Native Americans took place in Western *states* as well as the Western Territories, Henrys and Winchesters may have ended up in the Western states during Reconstruction (these included California, Colorado, Nevada, and Oregon). However, I found no significant evidence of Henrys or Winchesters in the Western states.[41]

58. The Winchester company hoped that West-bound Americans' desire to hunt, and not just their wish for protection, would fuel sales of their weapon. The great bison hunts on the Plains were famous by the late 1860s, and the Winchester company tried to capitalize on the craze. Its marketing effort failed. Bison-hunters preferred other models. It did not help that the most famous Western hunter of the time, Buffalo Bill Cody, did not use a Winchester. His famous gun, which he dubbed "Lucretia Borgia," was a single-shot Springfield.

59. The Winchester company had only marginally more success trying to sell its guns elsewhere to hunters and "sportsmen," a term used to describe not only hunters but competitive target-shooters. The only place where Winchesters caught on for hunting was in Africa, where American and European "big game" hunters wanted to shoot large animals with as many rounds as possible, in as fast a time as

---

[40] C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49.

[41] Exceptions to this statement about the absence of Henry-Winchesters in western states are the state armories in these states. Reports from these armories sometimes mention the rifles. For example, the armory in the state penitentiary at Salem, Oregon in 1868 had 13 Henry rifles and zero Winchesters, compared to hundreds of other firearms. Because this was a penitentiary armory, the Henrys that were there necessarily were for use by law enforcement officers, not individuals seeking self-defense. "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95.

possible, in order to avoid being killed by the prey.[42] Target-shooters demanded accuracy of their guns, and potential buyers worried that a rifle built for capacity and speed would lose something in accuracy. To assuage such concerns, a Winchester model that began selling in early 1877 (the "Winchester 76") came with the option of a "set trigger," such that the shooter could set the trigger by moving it very slightly forward, at which point only a tiny bit of pull would set off the shot. The "set trigger" type of Winchester was more popular at shooting contests than earlier Winchesters, but it still was not as popular as other rifles, especially Remingtons and Springfields. One reason why was its price. The "set trigger" version of the Winchester was typically $10 more than the "standard trigger" models, which already were on the expensive side ("standard trigger" Winchesters were typically 20-30% more expensive than Remingtons and Springfields).

60. The mythology of the Winchester as "the gun that won the West" remains alive today,[43] but if there is truth behind the myth, the period of the "winning of the West" was not in the era of the Fourteenth Amendment but rather in the last years of the 1800s. Furthermore, the story of the of the Winchester in the West in this later era highlights the weapon's primary function as military weapon, not a weapon of self-defense. At first in the post-Civil War West, U.S. army units in the West rarely possessed Winchesters during Reconstruction. The army had continued its Civil War-era policy of non-adoption of Winchesters. Yet soldiers in the West did notice that the weapon was being used by some of their enemy soldiers among the Sioux and other Native Americans on the Great Plains. U.S.

[42] My research uncovered fewer than ten accounts of African big-game hunting that appeared in U.S. publications during Reconstruction. As an example, see "Lovejoy," "Letter from Africa," *Fayette County Herald* (Washington, Ohio), Dec. 21, 1871, p.2 (by "accounts" I mean supposedly true accounts; there were even more accounts that were expressly fictional).

[43] David E. Petzal, "The Gun that Won the West," *Field and Stream*, Jan. 23, 2026, *https://fieldandstream.com/stories/guns/rifles/winchester-model-1873-gun-that-won-the-west* (accessed Aug. 12, 2026).

soldiers at first assumed that the Natives were getting the weapons legally from traders who were operating with the approval of the U.S. Bureau of Indian Affairs. That assumption fueled long-standing hostility of the U.S. army toward the Bureau. The main newspaper of the armed services of the time, the *Army and Navy Journal*, published a satirical piece in 1867 pretending to be a Native American expressing gratitude to the Bureau for allowing tribes to acquire single-shot guns and suggesting that the Bureau might now "give us Spencer or Henry rifles."[44]

61. In fact, the Sioux and their allies did not get their Henrys (or Winchesters) from the Bureau. Many of the weapons had been seized from American emigrants and settlers whom the Natives had attacked. Many also had been robbed by shippers heading to or through the Western Territories.

62. Here it is helpful to use the history of western Native American warriors acquiring Winchesters for military purposes to make a more general observation: the shipping of Henry-Winchesters was unreliable, a fact that helps explain why the gun was unlikely to "win" the American West or any other area far from the northeastern manufacturing center of the weapons. The weapons were manufactured in New Haven, Connecticut and shipped around the country to U.S. ordnance depots, state arsenals, private gun stores, and, in rare cases, individuals (individual mail-order did not become common until the 1890s, and the first mail-order guns were shipped by Sears in the early 1900s).[45] There was no U.S. parcel post until 1913; all shipping was done by private companies like Wells Fargo. These companies divided up regions of the country, a legal monopolistic practice, in order to maximize profits. In practical terms, this meant that shipping costs were high, so buyers would be reluctant to ship goods that could be lost. Loss was a very real possibility when it came to shipping weapons to hostile areas. Shipping

[44] *Army and Navy Journal*, June 1, 1867, p. 350.

[45] Williamson, *Winchester*, 178.

companies might use armed guards—some, as we have seen, armed with Henrys or Winchesters—but the guards stood little chance against an enemy that outnumbered them and was armed with the same type of guns. The cost of the risk was passed from the manufacturers and "jobbers" who arranged for sales to the consumers. The risk-induced increase in cost was a disincentive to prospective individual or gun-store buyers in the West. This was one more factor providing a disincentive not only to potential private buyers but to the U.S. army to adopt Henry-Winchesters.

63. A side-effect of the faulty shipping operation, as already mentioned, was that in the wars between the U.S. army and the Plains Native Americans in the 1870s, Native Americans sometimes fought with Winchesters. One U.S. colonel even claimed that the Winchester had transformed "the Plains Indian from an insignificant, scarcely dangerous adversary into as magnificent a soldier as the world can show."[46]

64. The truth of that observation was borne out at the Battle of Little Big Horn in 1876. Famously, the U.S. army commanded by George Custer was wiped out by the Plains Indians. Most of Custer's troops carried single-shot Springfield rifles. The Native Americans carried a variety of weapons, many of which were Winchesters.[47] One of Custer's underlings, Marcus Reno, wrote after the battle that "the Indians had Winchester rifles and the column [of U.S. cavalry] made a large target for them and they were pumping bullets into it.[48] Weaponry was not the sole reason for Custer's defeat that day at the Little Big Horn. Still, it is worth noting

[46] Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299. In the northwest part of the Western Territories, the Nez Perce also were fond of Winchesters. Chief Joseph usually kept one close at hand. *See* Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12.

[47] Hämäläinen, *Lakota America*, 340.

[48] Haag, *The Gunning of America*, 176-77.

that "the gun that won the West" was in the hands of Native American soldiers, not U.S. soldiers, at the most famous battle in the West of all time. Also, the weapon's obviously understood purpose was as a military weapon, not a weapon of individual self-defense.

65. Humiliated by Custer's defeat, the U.S. army in the West still did not choose to adopt Winchesters after Little Big Horn. However, an increasing number of regiments in the West did act on their own to use ordnance funds to buy Winchesters. Although the army did not officially adopt the Winchester, it did all it could to keep the weapon, along with lower-capacity repeating rifles, out of the hands of the Plains Indians. Right away after Custer's defeat the army banned traders from trading any types of guns to any Natives, friendly or hostile. U.S. officers sought to arrest traders who had been selling Winchesters to Plains Indians against government policy.[49] Meanwhile, American civilians in the Western Territories demanded that Canadian authorities also intervene to keep Winchesters from Native Americans, specifically the Blackfoot.[50]

66. It is impossible to know all the reasons why the U.S. army did not adopt Henrys or Winchesters before or even soon after Little Big Horn, but one reason was the same one that had lingered on Americans' minds ever since the Henry Rifle was introduced in the early 1860s: the fear that the weapon was as dangerous to its user as it was to its intended target. The stories that manufacturers had helped circulate early on from the West about the power of the rifle to allow one person to defeat many failed to muster much enthusiasm for the weapon. It did not help that some assessments from experts were negative. At a showcase of firearms in Switzerland soon after the Civil War, a judge rendered the verdict that the rifle seemed delicate and unnecessarily lethal—"more wonderful than

[49] *Chicago Daily Tribune*, July 23, 1876, p. 4.

[50] *Chicago Daily Tribune*, April 15, 1878, p. 4.

practical."[51] Back in the U.S., skeptics worried that the rifle would fail at a crucial moment or explode. When it came to Henrys and Winchesters, argued a writer for the New York Herald, the most widely circulating newspaper in the country, the "dangers are too many."[52]

**C. Henrys and Winchesters in the Reconstruction-Era North**

67. The North was the region in the United States where Henrys and Winchesters were hardest to find, either because they were deemed too dangerous or because northerners already felt themselves well-armed. Recall that hundreds of thousands of U.S. soldiers had returned home from the Civil War with rifles in hand, almost all of the weapons either Spencer low-capacity repeaters or single-shot Enfields, Sharps, or Springfields, but rarely Henrys or Winchesters.

68. The near-absence of Henry-Winchester rifles in the North became clear during the "Great Strike" of 1877. The "Great Strike" began as a local labor action in West Virginia and turned into a massive strike stretching from Philadelphia to Chicago. Mob violence was prevalent. In this months-long episode, during which thousands of Americans were injured and hundreds were killed, there were only two incidents that I found involving Henrys or Winchesters. In Chicago during the rioting, a U.S. soldier fired a Henry rifle in response to civilians pelting his regiment with rocks. He may purposefully have avoided shooting anyone—no one was hit. But the sound of the shot went a long way toward quieting the crowd. The soldier in question was from a regiment that had been assigned to the Western Territories but transferred temporarily to Chicago to put down the unrest. That explained why he had a Henry. His regiment likely acquired Henrys to fight Plains Indians; now he used the weapon—albeit

[51] Haag, *The Gunning of America*, 70.

[52] "Breech-Loading Arms," *New York Herald*, Oct. 12, 1866, p. 4.

sparingly—to subdue strikers.[53] In Jackson County, Kansas, just north of Topeka, railroad managers armed forty employees with Winchester rifles, ordering them to scare off the local strikers. To give the gang the veneer of a legitimate posse, the managers arranged for the local sheriff to deputize the gunmen. Violence ensued when the "posse" confronted the strikers, and at least one of the strikers was killed, though not necessarily by a Winchester.[54]

69. In general, however, Henrys and Winchesters were rare to find among northerners during Reconstruction. They were sometimes mentioned in ads displayed in northern publications aimed at hunters and target-shooters. If the ads were any indication of the target audience, the hoped-for buyers of the rifles were elites—not the types who showed up during the mobbing of the Great Strike of 1877—and they were interested in peaceful shooting contests, not fending off potential violent attackers.[55] Reports from state adjutant generals in the North sometimes show Henrys and Winchesters in arsenal inventories, but these guns were always far outnumbered by the more popular rifles of the era in the region—Enfields, Sharps, Spencers and Springfields.

70. Beginning in about the mid-1870s, northerners became more interested in owning Winchesters and modern rifles in general, not for purposes of self-defense but for purposes of collective defense of their communities and states. This was the period when National Guard units came into being, beginning in the northern states. They were in effect state militias. The engine that drove their creation was not a fear of tyranny or of insurrection but a nationalistic fervor fueled

---

[53] Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52.

[54] "A Tough Customer," *St. Louis Globe-Democrat*, Oct. 1, 1877, p. 4.

[55] See, for example, an ad for many types of guns, including "Henry's Sporting Rifle," in Wilkes' *Spirit of the Times: The American Gentleman's Newspaper*, March 24, 1866, p. 59 (the ad was reprinted in the same weekly publication irregularly through June 16, 1866).

in particular by the nation's Centennial, which began to be celebrated in the early 1870s even before the major exhibitions and commemorations of 1876.[56] With the rise of this movement came a perceived business opportunity for the Winchester company, which began placing ads for their rifles in northern newspapers, magazines, and gun catalogs. The greatest number of ads appeared in western Pennsylvania.[57] The ads seem to have had some effect. A newspaper published in northwestern Pennsylvania reported in October 1877 that "Winchester rifles are becoming quite fashionable in this section, and are rapidly displacing the old double-barreled rifles. . . . The Remington rifle is highly spoken of by those who have used it, but it is not a repeater, or 'stem-winder,' and so the Winchester is ahead."[58]

71. The rise of National Guard units in northern states in the late 1870s inspired private armed companies to form, drill, and parade. One of these groups was the Lehr und Wehr Verein of Chicago, Illinois, led by the Socialist activist Henry Presser. Presser's company paraded one day in the spring of 1879. They carried rifles—not Winchesters but Springfields. Socialist sympathizers nearby joined with the group, and Presser was arrested and tried for organizing a private militia. His case ended up in the Supreme Court, which ruled in the Presser case in 1886 that the armed company's actions were indeed unlawful.

---

[56] Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. Hannah's dissertation is crucial for countering the assumption, now rejected by historians, that the rise of the National Guard movement in the northern states was a reaction to events in the South of the 1870s or to the Great Strike of 1877. *See also*, Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97.

[57] See, for example, *James Bown and Son's Illustrated Catalogue and Price List*, 29th annual ed. (Pittsburgh, Penn., 1877), 33.

[58] *The Forest Republican* (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4.

**D. Henrys and Winchesters in the Reconstruction-Era South**

72. In the South during Reconstruction, high-capacity, rapid-firing firearms proliferated far more than in any other region of the country. Yet, the number of these weapons in the region was still small relative to other types of firearms—no more than 8,000, I would estimate.[59] Furthermore, most of the Winchesters in the region were used for military purposes, either by legitimate, loyal militias, or by illegitimate, paramilitary groups. Most famously, Winchester Repeating Rifles were the preferred weapon of two large state militias, those of Louisiana and South Carolina, that were organized to put down insurrection against state and national authority as well as terrorism against Black Americans. These state militias received more guns from the U.S. Ordnance Department than militias in other states during Reconstruction; thousands of these guns were Winchester rifles.[60]

73. The story of the South Carolina state militia getting armed with Winchesters begins with the inauguration of Robert K. Scott as the state's governor in 1868. Scott, a white man, was a pro-Reconstruction Republican. He had been born in Pennsylvania, he grew up in Ohio, and he became a high-ranking officer in the U.S. army during the Civil War. After the war, he was an officer in the Freedman's Bureau. As Governor of South Carolina, he endorsed and helped arrange the creation of a pro-Republican state militia open to Black Americans and pro-Republican whites.

[59] This estimate is based on the assumption that all 6,000 Winchesters that Governor Scott ordered for the South Carolina state militia were delivered (the exact number delivered is unknown, and most likely it is lower). When this number is combined with the roughly 1,000 Winchesters used to arm the Metropolitans in Louisiana over a six-year period, along with perhaps another 1,000 stolen from U.S. army depots, the sum is 8,000.

[60] J. Jacob Calhoun, "Reconstruction through Rifles: The Role of Violence in Black Americans' Fight for Liberty in the Postemancipation Era," Ph.D. diss. (University of Virginia, 2024), 93.

74. The state act creating the state militia was adopted in 1868. The militia was always a work-in-progress, so it is impossible to know exactly how many men served in it at any given time. A reasonable estimate is that 1000 men were in the militia by 1869. Scott hoped that the force would grow eventually to 6000. Although the militia was open to pro-Republican whites, most of the members were Black Americans. The state did not have enough arms to supply the men. In the summer of 1869, the state's adjutant general traveled to Washington, D.C. to arrange with the U.S. War Department for an allotment of funds to pay for arms for the state militia. This arrangement was a restoration of a policy that had long been in place but had often fallen into disuse: the U.S. War Department would pay each state an annual allotment to sustain its state militia. With the funds that the South Carolina adjutant general received in mid-1869, he helped arrange the purchase of hundreds of guns, both Winchesters and Springfields. By August 1869, Winchesters had begun to arrive in South Carolina, earmarked for members of the state militia.[61]

75. From late 1869 to early 1871, companies of black state militiamen armed with Winchesters appeared regularly across South Carolina. At first, Governor Scott was thrilled with the organization. On March 29, 1870, he delivered a speech that extolled the Black-American dominated militia as the best way to ensure that peace would return to the state and that future elections would be fairly held. He particularly recommended that state militias be armed with Winchesters. He had seen first-hand how these weapons intimidated potentially violent protesters even without being fired. His neighboring state of Georgia should have such a militia staffed with blacks and armed with Winchesters, Scott advised. "I tell you the Winchester rifle is the best law that you can have there," he

[61] Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996), 75; Singletary, *Negro Militia and Reconstruction*, 20-21.

declared. Georgia, one of the states that had had its pro-Democrat, anti-black militia dissolved by Congress in 1867, never did create a new militia. Scott knew that it wouldn't. His speech was meant to announce not only to South Carolina but to neighboring states that the old ways of the Confederacy were gone for good. Members of the opposition to Scott and the Republicans in South Carolina became furious. Many called him "Winchester Scott" and bewailed "Scott's Winchester Rifle tactics."[62]

76. The Ku Klux Klan of South Carolina decided to meet Winchesters with Winchesters. They sent agents to the North to buy crates of Winchesters and ship them to South Carolina in crates with false labels ("Agricultural Implements" said one; "Dry Goods" said another).[63] The state militia and the U.S. army were able to intercept some of the crates, but others arrived at their destination. The Klan and auxiliary white supremacist groups distributed the weapons to Scott's opponents in towns across the state. [64] Violence broke out across the state. That was a regular occurrence during election season, but this time the lethality was more severe than usual. Both sides had Winchesters. If the Klan and other insurgents were to be put down, some state officials argued, Winchester Rifles would need to be kept out of their hands and held only by authorized peace officers.[65]

77. With the help of the intervention of the U.S. army and his own state militia, Scott was able to win re-election in 1870. Almost immediately, Scott used his role as governor—and thus head of all state militias—to draw down the

---

[62] See, for example, *Charleston News*, Oct. 17, 1870, p. 2.

[63] John Burke to John B. Hubbard, Oct. 10, 1870, in *Report of the Joint Investigating Committee on Public Frauds and Election of Hon. J. J. Patterson to the United States Senate, made to the General Assembly of South Carolina* (Columbia, S.C., Calvo and Patton, 1878), 675-76.

[64] Zuczek, *State of Rebellion*, 79-80.

[65] H.W. Purvis to Robert K. Scott, Oct. 21, 1870, and John B. Dennis to Robert K. Scott, Oct. 24, 1871, both in Governor's Papers, South Carolina Department of Archives and History, Columbia, S.C.

violence in the state by attempting to remove Winchesters from the population. Aided by U.S. army units, his administration attempted to confiscate as many Winchesters as they could from insurrectionary groups like the Klan. Then he asked those state militiamen who were holding onto their Winchesters instead of storing them in state arsenals to turn the weapons in. This regulatory action was not unusual; as discussed below, it happened in Louisiana a few years later. Some Winchesters in South Carolina under Scott did end up coming back into state arsenals, either by way of confiscation from Klansmen or voluntary submissions by militiamen. But many Winchesters stayed in circulation. To help solve the crisis, Scott suspended the state militia.

78. In early 1874, South Carolina was again the site of violent uprisings from insurrectionists, and the pro-Republican government responded by re-forming the state militia. The adjutant general of the state reported that he barely had any guns for the men. In fact, a report he had issued the year before declared that there were 627 Winchesters in state arsenals. Probably the official was worried that widespread arming of Black Americans and white Republicans with Winchesters would create a mini-civil war like the one in 1870.[66] The re-activated state militia was poorly organized and poorly armed. For armed support between 1874 and 1876, the Republican administration of the state relied mostly on the U.S. army.

79. Then, in 1876, came the final battles between pro-Republican, U.S.-authorized armed men (the U.S. army units and state militia) and the insurrectionary opposition forces, the "Red Shirts." Of the many reasons that the opposition forces could be categorized as insurrectionary, perhaps the most obvious was that they regularly stole weapons, including Winchesters, from state arsenals.[67] When the voting in 1876 was over, the two sides in the struggle each declared

---

[66] *Ibid.*, 140-41.

[67] *Ibid.*, 171.

victory. Two governors then existed, and since no one was going to accept a resolution of the crisis by law, the state was in political chaos, with armed groups on each side ready to go to battle. When companies of armed men marched for their respective candidates, plenty of them carried Winchesters. Only some of those Winchesters had been obtained legally. Those carried by the "Red Shirts" had almost certainly been stolen from state depots. The distribution of Winchester rifles in South Carolina during Reconstruction, either legally to peace officers such as militiamen or illegally to insurrectionaries, had been of such a high rate that the state government in 1878 sought to regulate these weapons. It passed a law requiring civilians to return to the state Winchester rifles that had been intended for lawful use by state authorities.[68]

80. The Louisiana state militia was created in 1870. The story of how Louisiana state militiamen ended up armed with Winchesters starts before the organization was created. In 1868, the New Orleans metropolitan police force was re-organized under Republican leadership. It now used "Metropolitans" as its nickname. Its members included Black Americans as well as whites of varying ethnicities, the city being one of the most ethnically diverse in the country. The number of Metropolitans in 1868 was small—perhaps just over 100—but by 1870 that number was close to 700. During its earliest years, from 1868 to 1870, the Metropolitans' superintendent, A. S. Badger, armed many of the men with Winchesters. In 1870, Governor Henry Warmoth engineered the creation of the state militia. Warmoth envisioned a state militia that would be composed of 2,500 Black Americans and 2,500 white former Confederates. The Confederates, in theory, would be loyal to the United States and thus supportive of Reconstruction programs created by Republicans. Anyone could see that the two sides of this force would not fit together easily. To help foster something approaching unity across

---

[68] *General Statutes of South Carolina*, chap. 524, sec. 6, March 22, 1878, pp. 596.

the state militia, Warmoth appointed James Longstreet, a former Confederate General, as head of the state militia. As part of the act creating the state militia, the New Orleans Metropolitans were incorporated into the state militia. The Metropolitans after 1870 were thus both an urban police force and a company of state militiamen. In this latter role, they were authorized to operate outside of city limits. The Metropolitans were the best-trained unit in the state militia. Because many of their numbers carried Winchesters, they were also the best armed.[69]

81. Between 1870 and 1874, politics in Louisiana was multifaceted and ever-shifting. Warmoth regularly changed his political stances, outside blocs suddenly gained inside influence, and through it all, pro-Democratic factions, supported by armed "White Leagues," tried to resurrect the Old South on the soil of Louisiana. In 1872, William Kellogg won the governorship. Kellogg was a Republican, one more radical than Warmoth and more in line with the Republicans in the U.S. Congress. Warmoth in 1872 had sided with John McEnery, a former Confederate, an anti-Reconstruction Democrat, and a leading voice for state redemption.

82. The state militia, composed of a group loyal to the Warmoth-McEnery faction and a group loyal to Kellogg, was rendered ineffective after 1872 by its lack of cohesion. Individual units within the state militia were nonetheless important, as they were the only legitimate state-level armed forces. Of these units, the Metropolitans remained the most effective and best armed, as they still carried Winchesters, whereas most of the other units did not. In politics, whoever controlled the Winchester-armed Metropolitans would always have an advantage because, as Governor Scott of South Carolina had said in 1870, "the Winchester rifle is the best law that you can have." By late April 1873, William Kellogg, the

[69] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 130-31; Singletary, *Negro Militia and Reconstruction*, 69-70.

newly elected Governor, had established control of the Metropolitans. Unfortunately, he had established that control too late to use the Metropolitans to help avert the worst racial massacre that the state had ever seen, probably the worst racial massacre of Reconstruction: the Colfax Massacre of April 13, 1873.

83. The tragedy of the Colfax Massacre has been the subject of much historical study, but never from the perspective of a Winchester Repeating Rifle. The combatants at Colfax, in Grant Parish, about 200 miles northwest of New Orleans, consisted of one legitimate armed force and one illegitimate one. The legitimate armed force was a unit of the state militia led by William Ward, a Black American who had fought for the U.S. during the Civil War. More than 100 of Ward's men, perhaps more than 150, would be murdered at Colfax. The illegitimate armed force was a "posse" deputized by two local men, one who claimed to be a judge and one who claimed to be a sheriff. In fact, as all in the "posse" knew, the so-called judge and so-called sheriff had held those positions under the former governor, not under the current governor, who had denied them commissions that would have kept them in office. The claim of the "judge" and "sheriff" was that the former governor had in fact won the 1872 election and thus that they held their positions legitimately. (Election-result denial is not a new phenomenon; it was rampant in the South during Reconstruction.) Years later, when the Colfax episode came before the U.S. Supreme Court in the form of the *Cruikshank* case, Justice Bradley, author of the controlling opinion, declared that leaders of the so-called posse were private citizens, not state officers. Bradley was technically right. But at the time of the Colfax Massacre, the lead murderers had donned masks of state-legitimated authority. Neither the legitimate nor the illegitimate side at Colfax carried Winchesters. But if William Ward had had his way, his side would have had them.

84. Two days before the massacre, Ward had left Colfax for New Orleans. He knew that violence might erupt in Colfax, and he wanted to persuade Governor

Kellogg to send military support. Almost certainly, Ward was going to ask Kellogg to send the Winchester-armed Metropolitans. Ward never made it to New Orleans. Even if he had, the Metropolitans could not have made it to Colfax in time to stop the massacre. They might not have been willing to go—it would be another ten days beyond the massacre before their loyalty to Kellogg was cemented. The important point amid all these hypotheticals is this: William Ward believed that a cadre carrying Winchesters was the best chance his men had.

85. By October 1873, the Metropolitans had pledged their loyalty to Kellogg, and Kellogg had helped secure for them and other state militia units hundreds of new Winchesters. Kellogg dispatched the Metropolitans to Grant Parish, the site of the Colfax Massacre, to reestablish control of the area for the Republicans. They and their Winchesters arrived at the end of the month—more than 25 weeks after William Ward had hoped they would come.[70]

86. The power of the Metropolitans, along with their Winchesters, would soon be stripped away. Opponents of Kellogg gained control of the Metropolitans' Board by early 1874. They reduced the numbers of the force and limited their geographical range to New Orleans and its outskirts. If violence broke out in a rural area like Grant Parish, there would be nothing that the Metropolitans could do about it. Kellogg's opponents helped funnel to White Leaguers many Winchester rifles that had been held by the Metropolitans. Hundreds of Winchesters that had been stamped "LSM" (Louisiana State Militia) found their way into the hands of insurrectionaries.[71] White Leaguers also obtained Winchesters through secret shipments from allies in the North; as part of the regulatory regime in the state, lawful authorities had been charged with intercepting such shipments.[72] On

---

[70] *New Orleans Republican*, June 13, 1873, p. 1; *Ouachita Telegraph*, October 24, 1873, p 1.

[71] "Stolen State Arms," *New Orleans Republican*, Nov. 1, 1874, p. 4.

[72] Elizabeth R. Varon, *Longstreet: The Confederate General Who Defied the South* (Simon and Schuster, 2023), 183-84.

September 14, 1874, came a lethal engagement involving Winchester rifles on both sides: the Battle of Liberty Place, fought in the heart of New Orleans. Thousands of White Leaguers, outnumbering the Metropolitans 10 to 1, launched a coordinated attack. During the fight, the White Leaguers seized firearms, including Winchesters, from defeated militiamen as well as from police stations and militia arsenals.[73] After the White Leaguers had demonstrated their superior force, Governor Kellogg knew that he might soon be removed, so he engineered a compromise that kept him in office. Part of the deal was the disbandment of the state militia. This move was also meant to stem the tide of Winchesters that were reaching civilian hands.[74]

87. The Second Amendment was directly discussed by parties on both sides of the Battle of Liberty Place. When Longstreet's militiamen had attempted to prevent shipments of arms, including Winchesters, from reaching White Leaguers, the insurrectionists claimed that their Second Amendment rights were being violated.[75] After the Battle of Liberty Place, the White Leaguers fomented support by claiming that the Second Amendment had been violated. One prominent group of White Leaguers, the Committee of Seventy, denounced the lawful authorities who had seized weapons "in our streets and in private stories," contending that they meant "to deprive the white people of the State of Louisiana of the right to bear arms."[76] Governor Kellogg pointed out that the White Leaguers' complaint purposely omitted the first clause of the Second Amendment, which prioritized arms for a "well regulated militia." Because of this misinformation campaign, Kellogg explained, Louisianans had gotten the wrong-headed idea that the "whole text" of the amendment was the non-abridgement clause, and that the

[73] Varon, *Longstreet*, 207.

[74] Rousey, *Policing the Southern City*, 155-56.

[75] Varon, *Longstreet*, 202-3.

[76] Committee of the Seventy, "To the People of the United States." *New Orleans Bulletin Supplement*, September 25, 1874, 5.

amendment said nothing about prioritizing firearms for militias. The result was that "every man, unless he had the Constitution, or was . . . pretty well acquainted with the provisions of the Constitution," mistakenly believed that "he had the constitutional privilege to go on the streets or in the cars with his arms."[77] In sum, the authorized government of Louisiana had sought to disarm civilians of high-capacity, rapid-firing arms notwithstanding the Second Amendment; in response, insurgents had promulgated a contrary interpretation of the Second Amendment to promote the illegal use of high-capacity, rapid-firing arms for dangerous and deadly purposes.

88. How did disloyal insurgents in the South obtain Winchesters? In Louisiana, as in all the states of Reconstruction, there were internal, often violent conflicts over the control of the state government. By various means, from outright theft to the legitimate winning of a state election, the opposition to a Republican government in a state like Louisiana could gain access to Winchesters. Once these weapons were in the hands of insurrectionary groups, they could end up with anyone, including an outlaw with no particular political persuasion. That is probably how a Winchester ended up among a large cache of arms held by the husband-wife team known as the Guillorys, a pair of marauding thieves who went on a rampage near Opelousas, Louisiana in the late summer of 1873. When a posse caught up with them, it easily dispatched the couple, killing the husband and seriously wounding the wife.[78]

89. By 1874, all of the state militias had been disbanded. Redeemers—those in each state wanting state redemption from Reconstruction—had been

---

[77] 43rd Cong., 2nd sess., "Testimony of William P. Kellogg," Jan. 6, 1875, *Condition of the South, Denial of Elective Franchise*, part 2, Louisiana Evidence, House Report 101, p. 198; *see* Varon, *Longstreet*, 213-14.

[78] "Another Battle," *The Opelousas Journal*, Aug. 29, 1873, p. 3. A side note to the episode: No one in the posse had a Winchester, and the Guillorys in the exchange of gunfire opted not to use their Winchester, only their low-capacity rifles and shotguns.

against the state militias from the start and were glad to see them go. By the end of Reconstruction, all of the southern states had reverted to their pre-1867 militia system, 1867 being the year that the U.S. Congress abolished all southern militias except those in Arkansas and Tennessee.[79] Under the renewed militia system, volunteer militias could form on their own with the explicit or implicit approval of state governors. Because most of the southern state governments after 1874 were ruled by pro-redemption Democrats, most of the militias that formed after 1874 were of the sort that would have been considered insurrectionary by pro-Reconstruction Republicans in the states as well as by the Congressional Republicans who had abolished such militias in 1867.

90. The three states that were not controlled by Redeemers after 1874 were Florida, Louisiana, and South Carolina. In Louisiana and South Carolina, the 1876 state elections were disputed (so, too, quite famously, was the national election of 1876). In both states, as a result, the two contending sides, pro-redemption Democrats and pro-Reconstruction Republicans, claimed victory and claimed that their gubernatorial candidate was the legitimate governor of the state. In each of these states, therefore, there were two governors. Meanwhile, in Florida, there was no dispute over the governor's office, but there was conflict nonetheless because the electoral board of the state was controlled by pro-Reconstruction Republicans while the rest of the state government was controlled by pro-redemption

---

[79] The Texas Rangers claimed to be a state militia loyal to the U.S. right up until it was disbanded in 1877, but by 1874, if not earlier, the group was clearly on the side of the Democrats in the state. A number of Democrats in 1877 pleaded with the state government not to disband the Rangers. One wealthy Democrat in 1877 even offered the state government a voluntary donation of Winchesters for the state militia (the militia had not used Winchesters prior to that point). The state government rejected the offer and disbanded the militia. *See* Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70; Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93.

Democrats.[80] As a result of the internal conflicts within Florida, Louisiana, and South Carolina, the U.S. army dispatched troops to the capitals of each state. The troops were intended to "keep the peace" in all the states, to ensure that the pro-Reconstruction Republican governors of Louisiana and South Carolina were accepted as the only legitimate governors of the states, and to protect the Florida electoral board from being disbanded by pro-redemption Democrats.

91. The circumstances described above had important consequences for those who came to possess Henrys and Winchesters by the end of Reconstruction. In Louisiana and South Carolina prior to 1874, these high-capacity, rapid-firing firearms were possessed and regulated by pro-Reconstruction Republicans, who possessed them specifically for the purpose of state defense against armed insurrectionaries allied with pro-redemption Democrats. Once pro-redemption Democrats in these states after 1874 claimed that their "governor" was the only legitimate governor of the state—a position supported by most whites in each state—the "governor" in question used his alleged authority to distribute Winchesters held in state armories to pro-redemption volunteer militia groups. In Louisiana, the pro-redemption groups known as White Leaguers in 1876-77 marched through the streets of New Orleans demanding that their "governor," Francis T. Nicholls, be recognized as the sole governor of the state. At least 500 of the White Leaguers, but probably hundreds more, carried Winchester rifles.[81] According to a Black American who later testified about events in New Orleans at the time, some of the White Leaguers not only paraded with their Winchesters but

[80] Jerrell H. Shofner, "Florida Courts and the Disputed Election of 1876," *Florida Historical Quarterly*, 48 (July 1969), 26-46.

[81] *Chicago Daily Inter Ocean*, January 12, 1877, p. 2; *New Orleans Republican*, March 13, 1877, p. 2.

also wore their old Confederate uniforms.[82] The U.S. army regarded these marchers as insurrectionaries.

92. A similar situation played out in South Carolina, though there, the pro-redemption Democrats were known as Red Shirts. Beginning in 1874 and continuing through 1876, South Carolina Red Shirts created volunteer militias that obtained Winchesters from pro-redemption authorities in the state government. There were many Winchesters to be had in that state, as the pro-Reconstruction Governor Robert "Winchester" Scott back in 1869-1870 had purportedly ordered thousands of them. The exact number that Scott had acquired remains in dispute.[83] Whatever the number was, it seems that only a few hundred ended up in the hands of Red Shirts in the 1874-76 period, though that was still a few hundred more than Republicans of the era thought was legal.[84]

93. With only a few exceptions (fewer than five), all reliable reports in which Henrys or Winchesters were mentioned in accessible records from the Reconstruction South indicate that they were regarded solely as firearms meant for legitimate law enforcement officers.[85] An example of an exception comes from Marianna, Florida in September 1869. There, a group of about twenty-five Black

---

[82] Testimony of William Murrell, *Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States* (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521.

[83] During the U.S. Congressional investigations into Klan activities, investigators tried to ascertain how many Winchesters had actually arrived in South Carolina for Scott's militia; they failed to learn what the number was, though one witness did confirm that the Winchesters that did arrive there were intended for the state militia, including the African Americans among them. *See* 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), *U.S. Congressional Serial Set* (1871), p. 467; and *ibid.*, vol. 4 (South Carolina,), p. 767.

[84] Zuczek, *State of Rebellion*, 140-41, 170-71 (some of the Winchesters were referred to as "militia guns"; *see ibid.*, 171).

[85] This Report does not accept as evidence second- or third-hand rumors of Henrys or Winchesters being present, though even such rumors prior to 1870 were infrequent.

Americans, including women and children, were having a barbecue. From the woods nearby an unseen assailant fired "thirteen or fourteen shots in rapid succession," killing and wounding many of the party. The U.S. officer who later reported on the episode assumed that the assailant had used a Henry rifle because of the speed and volume of the shots fired. He wrote to his superior asking for a "first-class detective" to be sent to the town to investigate who the perpetrator or perpetrators might be. "If detectives can't be furnished," he added, "a few Henry rifles would have an excellent moral effect here."[86]

94. At least some state-level law enforcement officials outside of Louisiana and South Carolina ended up with Henrys or Winchesters. A pro-Republican jailer in a sheriff's office in Alabama was able to use a Winchester to fend off attacking Klansmen in January 1871.[87] In 1873, a dozen men in southwestern Texas deputized to fight Native Americans near the Mexican border were successful in subduing the Natives and, in reward, were presented by the state legislature with Winchester rifles (they had not used Winchesters to fight the Natives, though the Natives that they fought might well have used Winchesters).[88] The most revealing example comes from 1875 Mississippi, in the testimony of Sheriff John Milton Brown of Coahoma. Brown was the first Black American sheriff anywhere in Mississippi. He reported that Black Americans in his region had no guns and implied that they had been ordered to turn in their arms to the white insurrectionaries who controlled most of the state. Brown, though, had not turned in any weapons because he believed that his position as sheriff allowed him

---

[86] J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), *U.S. Congressional Serial Set* (1871), pp. 289-90.

[87] 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama), *U.S. Congressional Serial Set* (1871), pp. 414-15.

[88] *Texas Session Laws*, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26.

to keep his weapons. As he told an investigator, he had "one Henry rifle" and he thought that he "was justified in having that, because I was sheriff."[89]

95. Americans have long disputed and no doubt will continue to dispute the meaning, implications, and correctness of the U.S. Supreme Court's two earliest "Second Amendment" opinions, which were offered during or soon after Reconstruction: *U.S. v. Cruikshank* and *Presser v. Illinois*.[90] But one issue regarding those cases is beyond dispute: they did not involve high-capacity, rapid-firing firearms. There were no Henrys or Winchesters at Colfax on the tragic day of the massacre there in 1873. There were none in the hands of the military companies that marched on that spring day in Chicago in 1879—the episode that would lead to the 1886 *Presser* decision (Presser's men carried single-shot Remington rifles).[91] On the question of whether the law could treat high-capacity, rapid-firing firearms differently from other types of weapons, the Reconstruction-era Justices had nothing to say. But the land they lived in, the land they ruled over, was one where high-capacity, rapid-firing firearms were held only by a select few, almost all of whom were U.S. soldiers or civilian law enforcement officers sworn to uphold the U.S. government. These gunmen held their distinctive weapons not to defend themselves as individuals from imagined foes but to defend their state and country against all-too-real criminals and insurrectionaries.

96. As the story of John Milton Brown indicates, Black American policing officials (sheriffs and militiamen), some of them armed with high-capacity, rapid-firing rifles, helped ensure that legitimate government authorities prevented or overturned white supremacist efforts to ban blacks from militias, deny them access

---

[89] 46th Cong., 2nd sess., S. Rep. 693, pt. 2 "Investigation of Causes of Migration of Negroes from Southern to Northern States," *U.S. Congressional Serial Set* (1879-88), 357.

[90] *U.S. v. Cruikshank*, 92 U.S. 542 (1875); *Presser v. Illinois*, 116 U.S. 252 (1886).

[91] "The Reds," *Chicago Daily Tribune*, March 23, 1879, p. 7.

to firearms, or seize their firearms. Such practices were in line with the spirit if not the letter of the law of the Civil Rights Act of 1866, the Second Freedman's Act of 1866, and the Fourteenth Amendment of 1868, all of which nullified the southern state Black Codes passed by disloyal white supremacists who sought to disarm loyal Black Americans. It is worth noting, though, that a Black American who carried a Winchester for a state militia was different from the much larger population of Black Americans who did not belong to state militias. The Winchester-toting black militiaman held his gun only with the authorization of and regulation by the state government. He did not own his gun. It belonged to the state. It was supposed to be in an armory, not at a private home, when not in militia-use. Hypothetically, if Black Americans wanted Henrys or Winchesters at their homes, they might lawfully have been allowed to have them there. But this hypothetical scenario is irrelevant. Southern Black Americans for the most part lacked the means to buy Winchesters. Mostly rural workers, their wages were notoriously low—sometimes only in the form of shares of crops—and they would not be inclined to spend $30 to $40 on a gun that would represent perhaps 3 to 6 months wages. There was no necessity for them to do so: perfectly adequate guns for individual self-defense, even some "repeaters," would have been in their price range.

97. The Fourteenth Amendment assured Black Americans that they could possess firearms for self-defense but did not assure them that they could possess any firearm they wanted, including a high-capacity, rapid-firing rifle. This same principle of the Amendment held equally true for whites.

98. Americans in the Reconstruction-era South understood perhaps better than anyone that Henrys and Winchesters were primarily weapons for organized military use that did not belong in the general population. Except for a small number of insurrectionary militias, like the Ku Klux Klan, the enemies of the Republican state administrations in Louisiana and South Carolina, which had armed

their state militias with high-capacity, rapid-firing firearms, did not respond by trying to obtain the same weapons for themselves. Rather, they responded by demanding the removal of the weapons and the organizations that carried them. When these opposition factions came into power in 1877, they disbanded the state militias and warehoused the Winchesters. To be sure, they maintained laws that allowed citizens to possess firearms for their individual self-defense, but they did not view high-capacity, rapid-firing firearms as appropriate for such a purpose.

99. My examination of statutes and state-level court opinions from the Reconstruction-era South revealed that firearms were sometimes mentioned as weapons of individual self-defense, but in such instances, the types of firearms mentioned were, with one exception, low-capacity firearms such as pistols, revolvers, muskets, and rifles.[92]

100. The one potential exception comes from a Tennessee state court opinion of 1871, *Andrews v. State*. The court in *Andrews* ruled that among the weapons a citizen might possess were rifles "of all descriptions," including "the shot gun, the musket, and repeater."[93] This opinion has been cited by at least one scholar as evidence that high-capacity, rapid-firing firearms were understood to be possible weapons of individual self-defense.[94] Yet, a "repeater" at the time of the *Andrews* opinion (1871), and during the whole of Reconstruction, would have been understood to be a low-capacity repeating rifle, such as a Spencer, which held far fewer rounds than a Henry or Winchester. The parlance of the day put Henrys and Winchesters in a separate category from "repeaters." Again and again during

---

[92] The survey that I conducted was of all state statutes and state-level cases in the period 1863-1877 from the South relating to regulation of weapons. A list of state-level cases from all states appears at https://guncite.com/court/state/ (accessed September 25, 2022).

[93] *Andrews v. State*, 50 Tenn. (3 Heisk.) 179 (1871).

[94] See, for example, Kopel, "The Second Amendment in the 19th Century," *Brigham Young University Law Review*, 1998 (1998), 1418-21.

Reconstruction, from the Western Territories to the northern and southern states, when a cache of firearms was described, Henrys and Winchesters, though obviously repeating rifles, were always listed separately from "repeaters." Furthermore, the firearms mentioned in Judge Thomas J. Freeman's majority opinion in *Andrews*—shotguns, muskets, repeaters—were mentioned exclusively in terms of what a person might possess in his role as a member of the militia. The chief judge of the court, Alfred O. P. Nicholson, joined in that opinion. There was one judge on the court, though, who believed that the Andrews opinion should go further—that it should allow individuals to possess any weapon, regardless of what the militias in the state did or did not possess. That judge, Thomas A. R. Nelson, expressed his view in a concurring opinion, which he alone signed. The opinion did not mention Henrys or Winchesters as weapons that he thought that any individual might possess.[95]

101. Even more revealing evidence for Reconstruction-era officials believing that high-capacity, rapid-firing firearms should be regulated comes from Louisiana. Of the states that had militias that carried Henrys or Winchesters, Louisiana was the only one that left behind a readily accessible record of how these high-capacity, rapid-firing firearms were to be managed by state authorities. All arms for the state militia were overseen by the state adjutant general, James Longstreet. A former Confederate General who joined the Louisiana Republican Party after the Civil War—a move that forever marked him as a turncoat by his former Confederate comrades—Longstreet well understood the ongoing insurrectionary intentions of former Confederates in his state and elsewhere. He thought it crucial to ensure that such men did not end up with Winchesters, and that they be incited as little as possible by the sight of Winchesters being carried in public by their organized enemies, Black-American militiamen foremost among

[95] *Andrews v. State*, 50 Tenn. (3 Heisk.) 193-200 (1871).

them. For these reasons, he took extraordinary precautions concerning the Winchesters that were held in the New Orleans armory. His orders for the armory began with typical provisions such as putting guards around the building and making sure that all guns inside were racked when not in authorized use. Then, in the last provision of his orders, he turned specifically to Winchesters. They were not to "be taken to pieces, or any part of [them] removed . . . unless authorized by the Division Commander." The Winchesters were also not to be used for "parade or drill upon the streets or public highways" without the Division Commander's authority. Such restrictions were not put on the other weapons in the arsenal; they were only for the Winchesters.[96]

## VI. Conclusion. Reconstruction and Today: Continuity and Change

102. How does the situation surrounding high-capacity, rapid-firing firearms today compare to the Reconstruction era? High-capacity, rapid-firing firearms are still being sold under the name Winchester, by companies such as Browning, but the Winchester Repeating Rifle Company ceased to exist long ago. Of course, high-capacity, rapid-firing firearms can be found under plenty of other names today. But whereas today the owners of such firearms might be civilians, in the Reconstruction era they would be almost exclusively soldiers or law enforcement officers. There were civilians during Reconstruction who owned high-capacity, rapid-firing rifles, to be sure. Yet almost all such civilians were "frontiersmen" of the Western Territories, and the population of the Western Territories was tiny compared to the population of the United States as a whole. Furthermore, Henrys and Winchesters, the only high-capacity, rapid-firing firearms of the era, were not the preferred firearms of the "frontiersmen" of the region.

---

[96] Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in *Annual Report of the Adjutant General of the State of Louisiana*, for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39.

103. By far the largest population possessing Henrys and Winchesters during Reconstruction were members of state-wide militias. These organizations no longer exist under their Reconstruction name of "state militias." They evolved into the National Guard, a term first used in place of "state militias" in the North in the 1880s but ultimately applied to all state-level forces that were auxiliary to the U.S. army, including those in the South. National Guard units today are not analogues to the Reconstruction-era state militias; they are direct descendants.[97] And they operate in exactly the same way. They are under the command of state governors but can be used as auxiliary forces of the U.S. army—that is, they can be "federalized."[98] Membership in the National Guard, like membership in the Reconstruction-era state militias, is regulated. National Guard units, like Reconstruction-era state militias, are expected to have proficiency with the weapons they use and to have unfailing allegiance to the recognized governments of their state and nation. Their access to high-capacity, rapid-firing firearms is regulated. Such weapons are typically kept under guard in a central location, such as an armory, and dispensed to their users only for purposes of drilling, training, or actual use on those occasions when National Guard units are called out. Beside today's

---

[97] Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97.

[98] The statutory language that enabled Abraham Lincoln to call up state militias in 1861, which was then invoked occasionally during Reconstruction to federalize state militias, now resides in the statute that enables the President to federalize the National Guard; *see* 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A Stat. 15; Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006, 119 Stat. 3440). One of the reasons for the rise in significance of the National Guard after Reconstruction was the federal "Posse Comitatus Act" of 1878, which prohibited the direct intervention of the U.S. army into states except in extraordinary circumstances. After that legislation, the National Guard units were needed not so much as auxiliaries to the U.S. army as substitutes for them. On the "Posse Comitatus Act" see Gautham Rao, "The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," *Law and History Review*, 26 (Spring, 2008), 1-56.

National Guard, other users of high-capacity, rapid-firing firearms at present include civilian law enforcement officers. As this Report has shown, the analogs of such officials during the Reconstruction era—urban policemen, sheriffs, or U.S. marshals—also were known on occasion to carry high-capacity, rapid-firing firearms.

104. What is distinctly different today compared to Reconstruction is the ownership of high-capacity, rapid-firing firearms by Americans who have no connection to the military or law enforcement. If such owners along with their weapons were transported by a time machine back to the Reconstruction-era South, they would find themselves suspected of being outlaws by law enforcement officers. If they then gathered together into organized companies, they would be considered insurrectionary militias, which is precisely how the Ku Klux Klan was regarded during Reconstruction by the U.S. army, the state militias, and other legitimate, pro-Union law enforcement officials. Law-making and law-enforcing authorities did not stand by as disloyal, dangerous insurgents sought to obtain and use high-capacity, rapid-firing weapons for their illegal purposes; they did not think these activities fell into legitimate activity under the Second Amendment. Instead, they used their authority to deny such weapons, and they saw no conflict between this regulation and the Second Amendment.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 21, 2026 at Providence, Rhode Island.

Michael Vorenberg

# EXHIBIT A

# CURRICULUM VITAE

## Personal Information

Michael Vorenberg, Professor of History

Education: Ph.D. in History, Harvard University, November 1995 (American History)
A.M. in History, Harvard University, March 1990 (American History)
A.B. in History, Harvard University, June 1986, *summa cum laude* (Ancient History)

## Professional Appointments

Royce Family Professor of History, Brown University, 2026-
Professor of History, Brown University, 2025-2026
Associate Professor of History (with tenure), Brown University, 2004-2025
Vartan Gregorian Assistant Professor, Brown University, 2002-2004
Assistant Professor, History Department, Brown University, 1999-
Assistant Professor, History Department, SUNY at Buffalo, 1996-99
Post-Doctoral Fellow, W.E.B. Du Bois Center, Harvard University, 1995-96
Lecturer, History and Literature Program, Harvard University, 1995-96

## Scholarship

### Books

*Lincoln's Peace: The Struggle to End the American Civil War* (New York: Alfred A. Knop, 2025)

*The Emancipation Proclamation: A Brief History with Documents* (Bedford/St. Martin's, 2010).

*Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment*. Cambridge: Cambridge University Press, 2001. (Paperback edition, 2004.)

### Chapters in Books

"20 Men, Dead in the Stono," in Brian Matthew Jordan and Jonathan White, eds., *Last Bivouacs: Reflections on the Meaning of Civil War Graves* (Athens: University of Georgia Press, 2023).

"The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88.

"The Thirteenth Amendment," in *1865: America Makes War and Peace* in *Lincoln's Final Year* (Carbondale, Ill.: Southern Illinois University Press, 2015), 7-21.

"Liberté, Égalité, and Lincoln: French Readings of an American President," in Richard Carwardine and Jay Sexton, eds., *The Global Lincoln* (New York: Oxford University Press, 2011), 95-106.

"Was Lincoln's Constitution Color-Blind?," in Thomas A. Horrocks, Harold Holzer, and Frank J. Williams, eds., *The Living Lincoln* (Carbondale, Ill.: Southern Illinois University Press, 2011), 115-27.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment* (New York: Columbia University Press, 2010).

"Did Emancipation Create American Citizens?: Abraham Lincoln's View" (in Russian), in Victoria Zhuravleva, ed., *Abraham Lincoln: Lessons of History and the Contemporary World* (Moscow: Russian State University for the Humanities Press, 2010).

"Abraham Lincoln's 'Fellow Citizens'—Before and After Emancipation," in William A. Blair and Karen Fisher Younger, eds., *Lincoln's Proclamation: Emancipation Reconsidered* (Chapel Hill: University of North Carolina Press, 2009), 151-169.

"The Thirteenth Amendment Enacted," in Harold Holzer and Sara Vaughn Gabbard, eds., *Lincoln and Freedom: Slavery, Emancipation, and The Thirteenth Amendment* (Carbondale, Ill.: Southern Illinois University Press, 2007).

"After Emancipation: Abraham Lincoln's Black Dream," in John Y. Simon, Harold Holzer, and Dawn Vogel, eds., *Lincoln Revisited* (New York: Fordham University Press, 2007)

"Slavery Reparations in Theory and Practice: Lincoln's Approach," in Brian Dirck, ed., *Lincoln Emancipated: The President and the Politics of Race* (DeKalb: Northern Illinois Univ. Press, 2007).

"Reconstruction as a Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions in the History of Postbellum America* (New York: Oxford University Press, 2006).

"The World Will Forever Applaud: Emancipation," in Aaron Sheehan-Dean, ed., *The Struggle for a Vast Future: The American Civil War* (Oxford, UK: Osprey, 2006).

"Emancipating the Constitution: Francis Lieber and the Theory of Amendment," in Charles R. Mack and Henry H. Lesesne, eds., *Francis Lieber and the Culture of the Mind* (Columbia: Univ. of South Carolina Press, 2005).

"The Chase Court (1864-1873): Cautious Reconstruction," in Christopher Tomlins, ed., *The United States Supreme Court: The Pursuit of Justice* (Boston: Houghton Mifflin, 2005).

"Bringing the Constitution Back In: Amendment, Innovation, and Popular Democracy during the Civil War Era," in Meg Jacobs, William Novak, and Julian Zelizer, eds., *The Democratic Experiment: The Promise of American Political History* (Princeton: Princeton University Press, 2003).

"The King's Cure: Abraham Lincoln and the End of Slavery," in Charles Hubbard, ed., *Lincoln Reshapes the Presidency* (Mercer, Penn.: Mercer Univ. Press, 2004).

"Rutherford B. Hayes," in Alan Brinkley and Davis Dyer, eds., *TheReader's Companion to the American Presidency*. Boston: Houghton Mifflin, 2000.

"Abraham Lincoln and the Politics of Black Colonization," in Thomas F. Schwartz, ed., *"For a Vast Future Also": Essays from the Journal of the Abraham Lincoln Association*. New York: Fordham University Press, 1999. (Reprint of article listed below.)

"James Mitchell Ashley," "Norman Buel Judd," "Edward McPherson," "Dean Richmond," and "Willard Saulsbury," in John A. Garraty and Mark C. Carnes, eds., *American National Biography*. New York: Oxford University Press, 1999.

"Lydia Maria Child," "Horace Greeley," "Samuel Finley Breese Morse," "James Gordon Bennett, Jr.," in Peter J. Parish, ed., *Reader's Guide to American History*. Cambridge: Fitzroy Dearborn, 1997.

**Refereed Journal Articles**

"Exceptional Times," *Journal of the Civil War Era*, 16 (March 2026), 172-184.

"Spielberg's *Lincoln*: The Great Emancipator Returns," *Journal of the Civil War Era*, 3 (December 2013), 549-72.

"Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (December 2005), 416-26.

"'The Deformed Child': Slavery and the Election of 1864." *Civil War History*, 47 (September 2001), 240-257.

"Abraham Lincoln and the Politics of Black Colonization." *Journal of the Abraham Lincoln Association*, 14 (Summer 1993): 23-46.

**Non-Refereed Articles**

"Abraham Lincoln's Wiliest Trick Should Be a Lesson for Biden," Guest Essay, *New York Times*, August 27, 2024, https://www.nytimes.com/2024/08/27/opinion/abraham-lincoln-lesson-biden.html

"Emancipation—Then What?," *New York Times*, Guest Essay for "Disunion" Series, January 15, 2013, http://opinionator.blogs.nytimes.com/2013/01/15/emancipation-then-what/?_php=true&_type=blogs&_r=0

"Hearts of Blackness: Reconsidering the Abolitionists—Again," *Reviews in American History*, 32 (March 2004), 33-40.

"The Battle Over Gettysburg: What Lincoln Would Have Said about September 11, 2001." *Brown Alumni Magazine*, 103 (Jan./Feb. 2003), 27.

"Recovered Memory of the Civil War," *Reviews in American History*, 29 (Dec. 2001), 550-58.

**Book Reviews**

Contributor to Review Symposium, "A Discussion of David W. Blight's *Yale and Slavery: A History*," *Perspectives on Politics* (January 2025), 7-8.

Review of Cynthia Nicoletti, *Secession on Trial: The Treason Prosecution of Jefferson Davis*, in *American Historical Review*, 124 (June 2019), 1075-76.
Review of Don H. Doyle, T*he Cause of All Nations: An International History of the American Civil War*, in *Journal of Southern History*, 82 (Jan. 2016), 440-2.
Review of Nicolas Barreyre, *L'or et la Liberté: Une Histoire Spatiale des États-Unis après la guerre de Sécession*, in the *American Historical Review*, 120 (Dec. 2015), 1895-96.
Review of Pamela Brandwein, *Rethinking the Judicial Settlement of Reconstruction*, in the *American Historical Review*, 116 (Dec. 2011), 1506-7.
Review of Phillip W. Magness and Sebastian N. Page, *Colonization After Emancipation: Lincoln and the Movement for Black Resettlement*, in the *Journal of Illinois History*, Winter 2011.
Review of Tony Horwitz, *Midnight Rising: John Brown and the Raid that Sparked the Civil War*, in the *Brown Alumni Monthly*, September/October 2011.
Review of Eric Foner, *Our Lincoln: New Perspectives on Lincoln and His World*, in *Civil War History*, 57 (June 2011), 184-86.
Review of Laura F. Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South*, in the *American Historical Review*, 114 (Dec. 2009), 1454-55.
Review of Austin Allen, *Origins of the Dred Scott Case: Jacksonian Jurisprudence and the Supreme Court, 1837-1857*, *Journal of Southern History*, 74 (Nov. 2008), 966-967.
Review of Hans L. Trefousse, *First Among Equals: Abraham Lincoln's Reputation During His Administration*, in the *American HistoricalReview*, 111 (Dec. 2006), 1516-1517.
"A Debt Unpaid," review of Mary Frances Berry, *My Face is Black is True: Callie House and the Struggle for Ex-Slave Reparations*, *Washington Post*, September 18, 2005 (Sunday Book Review), page T04.
Review of Elizabeth Leonard, *Lincoln's Avengers*, in the *Chicago Tribune*, April 11, 2004 (Sunday "Book World"), p. 2.
Review of Mark E. Neely, *Party Conflict in the Civil War North*, in the *Pennsylvania Magazine of History and Biography*, 127 (Oct. 2003), 442-44.
Review of Harry V. Jaffa, *A New Birth of Freedom: Abraham Lincoln and the Coming of the Civil War*, in the *American Historical Review*, 106 (Dec. 2001), 1805-1806.
Review of George Anastaplo, *Abraham Lincoln: A Constitutional Biography*, in the *Journal of American History*, 88 (Sept. 2001), 649-650.
Review of Christopher Waldrep, *Night Riders: Defending Community in the Black Patch, 1890-1915*, in *Labor History* 35 (Fall 1994), 582-85.

**Invited Lectures**

"Lincoln's Peace: The Struggle to End the American Civil War," J. Howard Wert Lecture, March 26, 2026, Dickinson College, Carlile, Pennsylvania.

"Are We at War? The History and Meaning of Wartime in the United States," March 23, 2026, Claremont McKenna College, Claremont, California.

"Lincoln's Peace: Searching for the End of the American Civil War," Sept. 30, 2025, Ryland Lecture, University of Richmond, Richmond, Virginia.

"What is an American?: Abraham Lincoln's Answer," Langston Lincoln Lecture, March 29, 2022, York University, York Pennsylvania.

"A Righteous Peace: Abraham Lincoln, the Civil War, and the End of Slavery," The Humanities Forum, Providence College, Oct. 18, 2019.

"How Wars End--or Don't: The Civil War as a Case Study," Henry E. Huntington Society of Fellows Lecture, May 8, 2019.

"Lincoln's Peace: The Struggle to End the American Civil War," Occidental College (Billington Lecture), Feb. 21, 2019.

"The Fate of Slavery after Emancipation," The Great Lectures Series (as OAH Distinguished Lecturer), New York City, October 14, 2017.

"Abraham Lincoln, the Thirteenth Amendment, and the Struggle for American Peace and Freedom," University of Saint Mary Annual Lincoln Lecture, Topeka, Kansas, February 20, 2017.

"The 14th Amendment as an Act of War," Boston College, Clough Center, Newton, Massachusetts, September 20, 2016.

"Born in the USA—So What?" Worcester Polytechnic Institute, Constitution Day University Speaker, Worcester, Massachusetts, September 19, 2016.

"The Slave Power on the Gallows: The Deeper Meaning of the Execution of Henry Wirz, Confederate Commandant," University of California, Berkeley, Legal History Workshop, March 29, 2016.

Salmon P. Chase Symposium on the Thirteenth Amendment (participant), Georgetown Law Center, Dec. 4-5, 2015, Washington, DC.

"Spielberg's Lincoln, the Thirteenth Amendment, and the End of Slavery: 150 Years Later," Boston University, Dec. 1, 2015

"The Last Surrender: Looking for the End of the Civil War," presented at The Lincoln Forum, Gettysburg, Pennsylvania, November 17, 2015.

"Voting Rights and the Meaning of Freedom: The View from the Civil War Era," Annual Lincoln Legacy Lecture, University of Illinois at Springfield, October 15, 2015.

"Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment," Roger Williams University, October 6, 2015.

"Lincoln and the Jews, Freedom and Discrimination," Brown Hillel Alumni Association, New York City, May 17, 2015.

"When Should History Say That Slavery Ended in the United States?," Center for Slavery and Justice, Brown University, May 8th, 2015.

"Lincoln, the Constitution, and the Civil War," Community College of Rhode Island, April 29, 2015.

"Judgment at Washington: Henry Wirz, Lew Wallace, and the End of the Civil War," Annual Symposium of Capitol Historical Society, Washington, DC, May 2, 2014.

"Emancipation, Lincoln, and the Thirteenth Amendment," Dole Forum, Dole Institute of Politics, University of Kansas, Lawrence, Kansas, November 21, 2013.

"Spielberg's Lincoln and the Relation between Film and History," Department of History, Loyola University, Chicago, Illinois, November 13, 2013.

"The Appomattox Effect: Struggling to Find the End of the American Civil War," Newberry Library Colloquium, Chicago, Illinois, November 6, 2013.

"Reconstruction and the Origins of Civil Rights," National Endowment for the Humanities Summer Institute on Civil Rights History, Harvard University, Cambridge, Massachusetts, July 1, 2013.

"The Origins and Process of Emancipation," Emancipation at 150 Symposium, Boston College Clough Center, Newton, Massachusetts, April 23, 2013.

"Emancipation—Then What? Citizenship?" Emancipation Proclamation Symposium, University of Michigan, October 26, 2012.

"Blood, Allegiance, Belief: The Meanings of Citizenship in the Civil War Era," University of Michigan Law School, January 31, 2012.

"American by War: The People and Their Nations during the Civil War," Phillips Andover Academy, Andover, MA, Nov. 17, 2011.

"Birthright and the Myth of Liberal Citizenship," JANUS Forum, Brown University, Nov. 15, 2011.

"American by War: The People and Their Nations during the Civil War," Western Kentucky University, Bowling Green, KY, Oct. 12, 2011.

"The Elections of 1860 and 2010 and the Politics of Citizenship," Colby College Symposium on the American Civil War Sesquicentennial, Waterville, Maine, November 10, 2010.

"Americans Debate Citizenship—Then and Now," Brown Club of England, October 12, 2010, London.

"War Powers, *Ex Parte Merryman*, and the Relevance of the American Civil War," American Bar Association Workshop for High School Teachers, Washington, D.C., June 19, 2010

"Originalism and the Meanings of Freedom," Georgetown Law School, Washington, D.C., March 30, 2010.

"Abraham Lincoln, Politician," Rotary Club of Rhode Island, Warwick, R.I., November 6, 2008.

"Lincoln the Citizen," Abraham Lincoln Symposium, National Archives, Washington, D.C., September 20, 2008.

"Emancipation and its Meaning in Current Scholarship," National Endowment for the Humanities Summer Institute on "Slavery and Emancipation," Philadelphia, Pennsylvania, July 28, 2008.

"Lincoln the Citizen–Or Lincoln the Anti-Citizen?," Abraham Lincoln Symposium, Springfield, Illinois, February 12, 2008.

"The Tangled History of Civil Rights and Citizenship in the Civil War Era," University of Virginia School of Law, November 2007.

"Civil Liberties and Civil Rights: The Civil War Era," American Bar Association, Chicago, May 2006.

"Race, the Supreme Court, and the Retreat from Reconstruction," Boston College School of Law, April 2007.

"Forever Free: The Meanings of Emancipation in Lincoln's Time and Ours," St. Louis University, December 7, 2006.

"Slavery Reparations in Historical Context," Connecticut College, New London, Connecticut, March 2, 2006.

"Abraham Lincoln, The Civil War and the Conflicting Legacies of Emancipation," presented as part of the "Forever Free" series, Providence Public Library, Providence, R.I., January 26, 2006.

"Abraham Lincoln, War Powers, and the Impact of the Civil War on the U.S. Constitution," presented at symposium on "War Powers and the Constitution," Dickinson College, Dickinson, Penn., October 3, 2005.

"Reconsidering Law, the Constitution, and Citizenship," presented at "New Directions in Reconstruction," Beaufort, S.C., April 15-18, 2004.

"Abraham Lincoln, Slavery, and Modern Legacies," Public History Series, University of Las Vegas, Nevada, February 12, 2004.

"Oaths, African Americans, and Citizenship," University of Nevada at Las Vegas Law School, February 12, 2004.

"Reconsidering the Era of the Oath: African Americans Before Union Military Courts during the American Civil War," presented to the Law and History symposium, Northwestern University Law School, Chicago, Ill., November 3, 2003.

"Lincoln's Constitution: Its Meaning Then and Now," presented to the Old Colony Civil War Round Table, Dedham, Mass., September 16, 2003.

"The Inevitability and Impact of the Industrial Revolution in America: Slater Mill and Rhode Island as a Case Study, presented to Brown Freshman Orientation, Slater Mill, Pawtucket, Rhode Island, September 1, 2003.

"Racial and Written Constitutions in Nineteenth-Century America," presented to the workshop of the Department of History, Boston College, Newton, Massachusetts, March 2003.

"Black Freedom and the Meanings of Reparations for Slavery for Abraham Lincoln and his Time," presented to the Lincoln Group of Boston, Massachusetts, April 2002.

"Abraham Lincoln, Abolition, and the Impact of the Civil War on the Cult of the Constitution," presented at the Social Law Library, Suffolk University, Boston, Massachusetts, February 2002.

"After Emancipation: Abraham Lincoln's Black Dream," presented at the "Lincoln Forum," Gettysburg, Penn., Nov. 2001.

"Francis Lieber, Constitutional Amendments, and the Problem of Citizenship," presented at The Francis Lieber Symposium, University of South Carolina, Columbia, S.C., November 2001.

"How Black Freedom Changed the Constitution," presented at the "Writing the Civil War" symposium, Atlanta History Center, Atlanta, Georgia, September 2001.

"From a Covenant with Death to a Covenant with Life: The Constitution's Transformation during the American Civil War," presented as the Annual Constitutional Anniversary Lecture, National Archives, Washington, D.C., September 2001.

"New Perspectives on Abraham Lincoln, Emancipation, and the Civil War," presented to the Civil War Round Table of Rhode Island, Cranston, Rhode Island, June 2001.

"Historical Roots of the Modern Civil Rights Movement: The Constitution," presented at the Civil Rights Summer Institute, Harvard University, Cambridge, Massachusetts, June 2001.

"Race, Law, and the Invention of the State Action Doctrine in the Late Nineteenth Century," presented at the Columbia University Law School, New York City, April 2001.

"A King's Cure, a King's Style: Lincoln, Leadership, and the Thirteenth Amendment," presented at the "Abraham Lincoln and the Legacy of the Presidency" conference, Lincoln Memorial U., Harrogate, Tenn., April 2001.

"The Tangled Tale of Civil War Emancipation," presented at the University of Richmond, Richmond, Virginia, March 2001.

"The King's Cure: Abraham Lincoln, the Thirteenth Amendment, and the Fate of Slavery," presented at the Abraham Lincoln Institute of the Mid-Atlantic, Washington, D.C., March 2001.

"Race, the Supreme Court, and the Retreat from Reconstruction," presented at the Boston College School of Law, Newton, Mass., April 2000.

"Beyond the 'New Birth of Freedom': Lincoln and the National Vision of the African-American Future," presented at the *Lincoln and Gettysburg Symposium*, Gettysburg, Pennsylvania, November 1993.

**Papers Read or Discussed**

"Birth, Belief, and Blood: Gaining and Losing Citizenship During the American Civil War," presented at the Annual Meeting of the American Historical Association, New York City, Jan. 6, 2025.

"Reconstruction Historians in the Courtroom: A Roundtable about History, Gun Laws, and the Constitution," roundtable organizer and participant, Biennial Meeting of the Society of Civil War Historians, Raleigh, N.C., June 21, 2024.

"Historians and Lawyers on the Second Amendment," roundtable participant, Duke University Law School Symposium on the Second Amendment, Aug. 2, 2024.

"The *Bruen* Stutter-Step: 1791, 1868, and the (Temporarily) Open Question of When a Right Comes to Mean What it Means," *Journal of American Constitutional History* conference, University of Wisconsin Law School, Sept. 30, 2023.

"Reconstruction as Risorgimento: The Creation and Limits of U.S. National Citizenship in the Long Nineteenth Century," presented at the conference "Citizenship and Identity in Italy and the United States: Contestations and Struggles," American Academy at Rome, Feb. 10, 2023.

"Prisoners of Freedom, Prisoners of War: An Untold Story of Black Incarceration--And How it Might be Told," Brown Legal History Workshop, Oct. 28, 2019.

"Bearer of a Cup of Mercy: Lew Wallace's American Empire," Henry E. Huntington Library, Research Fellows Meeting, Feb. 6, 2019.

"Anti-Imperialism and the Elusive End of the American Civil War," Conference on "Remaking North American Sovereignty," Banff, Alberta, Canada, July 31, 2015.

"The Election of 1864: Emancipation Promised, Emancipation Deferred," presented at the Annual Meeting of the Organization of American Historians, Atlanta, Georgia, April 11, 2014.

"The Appomattox Effect: Searching for the End of War in the American Civil War and Beyond," Massachusetts Historical Society, Boston, March 5, 2014.

"The Appomattox Effect: Struggling to Find the End of the American Civil War," Department of History, Northwestern University, Evanston, Ill., Nov. 15, 2013.

"The Appomattox Myth: Struggling to Find the End of the American Civil War," Newberry Library Fellows' Seminar Series, Newberry Library, Chicago, Illinois, September 23, 2013.

**"**Birth, Blood, and Belief: Allegiance and the American Civil War," presented at the Elizabeth Clark Legal History Workshop Series, Boston University School of Law, Nov. 16, 2011.

Comments and Moderator, "Finance," "Slavery's Capitalism," Brown University, April 8, 2011.

"French Readings of Lincoln's Role in the Creation of American Citizenship," presented at the conference on European Readings of Abraham Lincoln, American University of Paris, Paris, France, October 18, 2009.

"Was Lincoln's Constitution Color-Blind?," presented at the Abraham Lincoln Bicentennial Symposium, Harvard University, April 24, 2009.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," presented at "Slavery, Abolition, and Human Rights: Interdisciplinary Perspectives on the Thirteenth Amendment, University of Chicago Law School, April 17, 2009.

"Did Emancipation Create American Citizens?—Abraham Lincoln's View," presented at the conference on Abraham Lincoln: Issues of Democracy and Unity, Russian State University for the Humanities, Moscow, Russia, Feb. 8, 2009.

"The Racial and Written Constitutions of Nineteenth-Century America," Cogut Center for the Humanities, Brown University, Nov. 4, 2008.

"Civil War Era State-Building: The Human Cost," Boston University Political History Workshop, March 19, 2008.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," annual meeting of the Law and Society Association, Montreal, May 30, 2008.

Moderator and Commentator for "Citizenship in Nineteenth-Century America: A Roundtable," annual meeting of the American Society of Legal History, Baltimore, Nov. 2006.

Comments on "The Bureaucracy of Slavery and Emancipation," annual meeting of the American Society for Legal History, Cincinnati, Ohio, Nov. 2005.

"Claiming Citizenship: Black and White Southerners Make Their Cases During the Civil War," presented at the annual meeting of the Southern Historical Association, Memphis, November 2004.

"Imagining a Different Reconstruction Constitution," presented at the annual meeting of the Social Science History Association, Baltimore, November 2003.

"West of Reconstruction: Resolving Mexican-American Property and Citizenship in the Civil War Era," presented at the annual meeting of the American Historical Association, San Francisco, California, January 2002.

"The Limits of Free Soil: The Resolution of Mexican Land Claims during the American Civil War," presented at the annual meeting of the Organization of American Historians, St. Louis, Missouri, April 2000.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Nineteenth-Century America," presented at the annual meeting of the American Society for Legal History, Toronto, Ontario, October 1999.

"Law, Politics, and the Making of California Free Soil during the American Civil War," presented at the annual meeting of the Western History Association, Portland, Oregon, October 1999.

Comments on "Race and the Rethinking of the New York Constitutional Convention of 1821," presented at the annual meeting of the Society for Historians of the Early American Republic, Lexington, Kentucky, July 1999.

"Land Law in the Era of Free Soil: The Case of New Almaden," presented at the annual meeting of the American Society for Environmental History, Tucson, Arizona, April 1999.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Antebellum America," presented at the annual meeting of the Society for Historians of the Early American Republic, Harpers Ferry, W.V., July 1998.

"The Constitution in African-American Culture: Freedom Celebrations and the Thirteenth Amendment," presented to the W.E.B. Du Bois Institute, Harvard University, Cambridge, Massachusetts, April 1996.

"Civil War Emancipation and the Sources of Constitutional Freedom," presented at the annual meeting of the annual meeting of the Organization of American Historians, Washington, D.C., April 1995.

"The Origins and Original Meanings of the Thirteenth Amendment," presented at the annual meeting of the American Society for Legal History, Washington, D.C., October 1994.

"Civil War Emancipation in Theory and Practice: Debates on Slavery and Race in the Border States, 1862-1865," presented at the annual meeting of the Southern Labor Studies Conference, Birmingham, Alabama, October 1993.

**<u>Service</u>**

**Brown University**

<u>University Service</u>

Anna S. K. Brown Collection Committee of Management, member, 2016-present.

University Nominations Committee, 2015-2018. Chair of Subcommittee on Faculty Service Awards

Co-Organizer (with Profs. Ahmed, Nedostup, Owens), Brown Legal History Workshop, 2015-present.

Faculty Advisor to *Brown Undergraduate Law Review*, 2019-21.

Political Theory Project, Advisory Board, 2010-2019.

Choices Program, interviewee and consultant for programs and curricula on

U.S. Democracy; the U.S. Constitution; and the History of Slavery and the Slave Trade, 2005-2015.
Commentator for presentation of the film "Lincoln" at Brown University, sponsored by the Center for Slavery and Justice and the John Hay Library, March 1, 2013.
Organizer and Presenter, "Abraham Lincoln for the 21st Century: A Symposium Honoring the Abraham Lincoln Bicentennial," John Hay Library, Brown University, Feb. 27-28, 2009. Plenary lecture by Benjamin Jealous, president of NAACP, and six symposium participants. Funding secured from Rhode Island Foundation, Rhode Island Lincoln Bicentennial Commission, Brown Provost, Brown Dean of Faculty, History Department, Africana Studies Department.
Graduate Council, July 2004-07.
Steering Committee on Slavery and Justice, 2004-06.
Truman Scholarship Committee, 2005-06.
Marshall and Rhodes Scholarships, Interview Committee, 1999-2001, 2005-06.
Instructional Technology Advisory Group, 2002-04.
Lectureship Committee, 2001-2003.
Royce Fellowship Applications, Referee, 2000-01.
University Advising:
First-Year Advisor, 2001-03, 2005-07, 2012-13, 2014-16, 2020-21.
Sophomore Advisor, 2000-2021.
Randall Counselor, 2000-2001.
University Search Committees:
Director of the Center for the Study of Slavery and Justice, 2010-12.
Dean of the College, 2005-06.
Director of the Center for Race and Ethnicity, 2000-01.

<u>Departmental Service</u> (Department of History)
Department Graduate Advisor (DGA), Department of History, 2023-present.
Curriculum Coordinator, 2020-22.
Graduate Committee, 2007, 2014-16, 2023-present.
Planning and Priorities Committee, 2002, 2009-12 (Chair)

**Profession**

Board of Editors, *Journal of Constitutional History*, 2022-present.
Program Committee, Society of Civil War Historians, 2022 annual conference, 2020-2022.
Cromwell Fellowship Committee, American Society for Legal Historians, 2014-2017.
Board of Editors, *Law and History Review*, 2004-2013 (reappointed 2009).
Advisory Committee, United States Abraham Lincoln Bicentennial Commission, 2002-10.
Board of Advisors, Lincoln Prize, Gettysburg Institute (2000-present).
Co-Chair, Local Arrangements Committee, Annual Meeting of the Society for Historians of the Early American Republic, Providence, Rhode Island, Summer 2004.

Referee for National Endowment for the Humanities Scholarly Editions, 2002; Summer Grants, 2001-2003.
Committee Member, Local Arrangements Committee, Annual Meeting of the American Society for Environmental History, to be held in Providence, Rhode Island, Spring 2003.
Invited participant (one of four) for an electronic roundtable discussion sponsored by H-SHEAR, a division of H-NET, on teaching.

**<u>Academic Honors and Fellowships</u>**

Winner, John L. Nau III Book Prize, 2026, for *Lincoln's Peace: The Struggle to End the American Civil War*.
Finalist, Lincoln Prize, 2026, for *Lincoln's Peace: The Struggle to End the American Civil War*.
Ray Allen Billington Professor, Occidental College/Henry E. Huntington Library, 2018-19.
Pembroke Center for the Study of Women and Gender, Brown University, 2016-17.
National Endowment for the Humanities Long-Term Fellowship, Massachusetts Historical Society, Boston, Massachusetts, 2014.
National Endowment for the Humanities Long-Term Fellowship, Newberry Library, Chicago, Illinois, 2013.
Finalist, CIES Fulbright Fellowship for University of Rome III (2010-11 competition)
Cogut Center for the Humanities Fellowship, Brown University, Fall 2008.
William McLoughlin Prize for Teaching in the Social Sciences, Brown University, 2007.
Karen Romer Prize for Undergraduate Advising, Brown University, 2007.
History News Network (HNN) "Top Young Historian," 2005 (1 of 12 named in the U.S.).
Vartan Gregorian Assistant Professorship, Brown University, 2002-2004.
Finalist, Lincoln Prize, 2002 (for *Final Freedom*).
American Council of Learned Societies/Andrew W. Mellon Fellowship, 2002-03.
Kate B. and Hall J. Peterson Fellowship, American Antiquarian Society, 2002-03.
Salomon Research Award, Brown University, 2002-2003.
National Endowment for the Humanities Summer Stipend, 2001.
Julian Park Fund Fellowship, SUNY at Buffalo, 1998.
Research Development Fund Fellowship, SUNY at Buffalo, 1997.
Harold K. Gross Prize for Best Dissertation at Harvard in History, 1996.
Delancey Jay Prize for Best Dissertation at Harvard on Human Liberties, 1996.
W.E.B. Du Bois Fellowship, Harvard University, 1995.
Whiting Fellowship in the Humanities, 1994.
Bowdoin Prize for Best Essay at Harvard in the Humanities, 1993.
Indiana Historical Society Graduate Fellowship, 1993.
W. M. Keck Fellowship, Henry E. Huntington Library, 1993.
Everett M. Dirksen Congressional Research Fellowship, 1993.
Mark DeWolfe Howe Fellowship, Harvard Law School, 1993.
Charles Warren Center Research Fellowship, Harvard History Dept., 1991-2.
Derek Bok Award for Distinction in Teaching at Harvard, 1991.
Philip Washburn Prize for Best Senior Thesis at Harvard in History, 1986.

Date of c.v. preparation: July 13, 2026