ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General
EDWARD P. WOLFE
GABRIELLE D. BOUTIN
VIVIANA M. HANLEY
SABRINA T. MCGRAW
CHRISTINA MCCALL
Deputy Attorneys General
State Bar No. 234139
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-7890
Fax: (916) 324-8835
E-mail: Christina.McCall@doj.ca.gov
*Attorneys for Defendants State of California and Robert Bonta, in his official capacity as head of the California Department of Justice*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br>**v.**<br>**STATE OF CALIFORNIA and ROBERT BONTA, in his official capacity as the head of the California Department of Justice,**<br>Defendants. | 8:26-cv-01697-MRA-ADSx<br><br>**DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: September 11, 2026<br>Time: 1:30 p.m.<br>Courtroom: 9B<br>Judge: The Honorable Monica Ramirez Almadani<br>Trial Date: None set<br>Action Filed: July 1, 2026 |

## Table of Contents

REPORT AND DECLARATION OF ROBERT J. SPITZER .......... 1
BACKGROUND AND QUALIFICATIONS .......... 2
SUMMARY OF OPINIONS .......... 5
I. Introduction: Auto Sears .......... 7
II. Historical Government Regulation of Weapons Dealers and Weapons Commerce .......... 10
III. Regulatory History of Trap Guns .......... 15
IV. Historic Regulation of Gunpowder .......... 19
V. Regulatory History of Fully Automatic and Semi-Automatic Firearms .......... 29
A. State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms in the Early Twentieth Century .......... 37
B. State Regulation of Ammunition Feeding Devices. .......... 41
C. Lessons from the Regulation of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices .......... 45
D. The History of Pre-Twentieth Century Firearms Technologies .......... 47
VI. Historic Weapons Proofing .......... 62
VII. Conclusion .......... 67

**REPORT AND DECLARATION OF ROBERT J. SPITZER**

I, Robert J. Spitzer, declare under penalty of perjury that the following is true and correct:

1. I have been asked to render an opinion on the history of firearms restrictions, including historical restrictions on trap guns, gunpowder, and the advent of machine guns (fully automatic firearms), semiautomatic firearms, related ammunition feeding devices, and the process of gun "proofing," as they relate to modern restrictions on the sale of "semiautomatic pistol[s] with a cruciform trigger bar that can be readily converted by hand or with common household tools into a machinegun by the installation or attachment of a pistol converter."[1] In addition, this also pertains to the requirement under the California law that pistols include a chamber load indicator and a magazine disconnect mechanism as commercial sale requirements.

2. This declaration is based on my own personal knowledge, research, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3. I have been retained by the Office of the Attorney General of the California Department of Justice to provide expert testimony in litigation challenging restrictions on the sale of semiautomatic machine gun-convertible pistols, and on the requirement that semiautomatic pistols include chamber load indicators and magazine disconnect mechanisms as required in California's Unsafe Handgun Act.

4. I am being compensated at a rate of $500/hour for my work on this declaration, and $750/hour for any testimony or depositions in connection with this matter.

/ / /

/ / /

[1] California Penal Code § 27595(a); AB 1127 Chapter 572.

## BACKGROUND AND QUALIFICATIONS

5. I am Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an adjunct professor at the College of William & Mary School of Law. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia. A copy of my curriculum vitae is attached as Exhibit A to this Declaration.

6. I am the author of 16 books on American politics subjects, including six on gun policy. I have been studying and writing about gun policy for forty years, and I have been studying and writing about historical gun laws for over ten years. My first publication on the subject of gun policy appeared in 1985.[2] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control*, has been in print continually since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The tenth edition of the book was recently published by Routledge Publishers (2026). My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023, 2025), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in the national and international media on gun-related matters. For thirty years, I have been a member of the National Rifle Association and of Brady United Against Gun Violence.

7. I have also been retained to serve as an expert witness in the following cases: *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v.*

[2] Robert J. Spitzer, "Shooting Down Gun Myths," *America* (June 8, 1985), 468–69.

*Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No.: 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez,* No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez,* No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu* , No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951 (D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum* No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141, (S.D. Ill.); *Mitchell, et al. v. Atkins, et al*., 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et al*., 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, 22-cv-10989 (S.D.N.Y.)*; Rocky Mountain Gun Owners, et. al. v. The Town of Superior*, 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, 17-cv-00903 (E.D. Cal.); *Banta v. Ferguson*, 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, 23-cv-05364 (W.D. Wash.); *RMGO/Mosgrove v. Polis*; *Koppel v. Bonta*, 8:23-cv-00813 (C.D. Cal.); *Calce v. City of New York*, Case 1:21-cv-08208-ER; *D.B. v. Sullivan*, No. 22-CV-282 (MAD)(CFH) (N.D.N.Y.); *Richey v. Sullivan*, Case No. 1:23CV344 (AMN-DJS) (N.D.N.Y.); *Commonwealth of Pennsylvania v. Tomlinson*, CP-31-CR-217-2023; *National Association for Gun Rights et al v. Polis*

U.S.D.C. Colo. Case No. 1:2024cv00001; *O'Neil et al. v. Neronha et al*., C.A. No. 1:23-cv-00070-WES-PAS; *State of Washington v. Gator's Custom Guns* (Cowlitz County Superior Court Case No. 23-2-00897-08); *Guardian Arms, LLC, et al. v. State of WA, et al.*, No.: 23-2-01761-34; *Virginia Citizens Defense League et al. v. City of Roanoke et al*., CL-2474; *RMGO v. Polis* (U.S. District Court for the District of Colorado); *Yzaguirre v. District of Columbia*, 24-cv-01828 (D.D.C.); *Clemendor v. District of Columbia*, 24-cv-01955 (D.D.C); *State of New Jersey v. Fox*, Docket No. FO-14-123-20, FO-14-141-21; *State of New Jersey v. Ricciardi*, Docket No. FO-14-54-21, FO-14-149-22, DOL Nos. 24-01899, 24-01900; *Birney et al., v. Delaware Department of Safety and Homeland Security, et al.* (C.A. No. K23C-07-019 RLG); *Beckwith et al. v. Frey*, Dkt. No. 1:24-cv-00384-LEW (D. Me.); *Succow. v. Bondi*, Case 3:25-cv-250 (SVN).

8. I have testified under oath in the following cases: *Oregon Firearms Federation v. Kotek*, U.S. District Court for the District of Oregon, June 2023, 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM; *Commonwealth of Pennsylvania v. Tomlinson*, Huntingdon County, PA, November 2023, CP-31-CR-217-2023; *Commonwealth of Pennsylvania v. Rosa, et al.*, Monroe County, PA, May 2024, Court of Common Pleas of Monroe County, Forty-Third Judicial District, Commonwealth of Pennsylvania; *Vermont Federation of Sportsmen's Clubs v. Birmingham*, U.S. District Court for the District of Vermont, June 2024, Case No. 2:23-cv-710; *Succow v. Bondi*, U.S. District Court for the District of Connecticut, January 12, 2026, No. 3:25-cv-00250-SVN.

9. I have been deposed under oath in the following cases: *Oregon Firearms Federation, Inc., et al. v. Kotek*, et al., US District Court for Oregon, April 2023, Case No. 2:22-cv-01815-IM (lead case); *Knife Rights v. Bonta*, U.S. District Court for the Southern District of California, February 2024, 3:23-cv-00474-JES-DDL; *O'Neil v. Neronha*, U.S. District Court for the District of Rhode

Island, September 2024, C.A. 23-cv-70; *Garcia/RMGO v. Polis,* U.S. District Court for the District of Colorado, Civil Action No. 23-cv-02563-JLK, January 2025.

**SUMMARY OF OPINIONS**

10. Gun ownership is as old as America, but so are gun laws. From the 1600s through the early twentieth century, the colonies, states, territories, and localities enacted literally thousands of gun laws of every imaginable variety. In this document, I examine historical analogues relevant to the challenged California law, Assembly Bill 1127, pertaining to restrictions on the sale of "semiautomatic pistol[s] with a cruciform trigger bar that can be readily converted. . .into a machinegun by the installation or attachment of a pistol converter. . . ."[3] I also examine historical analogues relevant to the challenged provisions of the California the Unsafe Handgun Act that require new models of pistols to have a chamber load indicator and a magazine disconnect mechanism to be approved for retail sale.

11. In its Complaint in this case, the U.S. Government asserts that "There is no historical tradition analogous to a ban of a weapon in common use" and that "there is no historical tradition of banning the purchase and sale of a weapon in common use."[4] As the account to come will show, neither of these assertions is correct. These assertions fail to understand both the plethora of weapons regulations enacted throughout American history and the changing, developmental nature of the American nation-state from the colonial era to the start of the twentieth century. Early American governance generally lacked the tools, resources, or regulatory ability to simply ban weapons outright in what began as an overwhelmingly agrarian, pre-industrial, undeveloped nation-state. Yet early leaders did enact wide-ranging measures to restrict weapons considered dangerous or a threat to public safety. As this Declaration will demonstrate, there are indeed numerous historical

[3] California Penal Code § 27595(a); AB 1127 Chapter 572.

[4] Complaint, *U.S. v. California*, U.S. District Court, Central District of California, Case 8:26-cv-01697, 07/01/26, 7.

analogues of historical weapons laws that sought to thwart access to and use of "weapons in common use" and the "purchase and sale" of the same.

12. As the historical record shows, common use was no barrier to the effort to restrict weapons deemed dangerous, used for criminal activities, or that posed a threat to public order and safety. Exemplars of such laws include wide-ranging and prolific regulation of "fighting knives" (most famously the Bowie knife) and various types of clubs.[5] Both types of weapons were extremely common, relatively inexpensive, and easy to obtain. Even so, from the early 1800s to the state of the twentieth century, every state in the country enacted anti-fighting knife laws, with over 40 of the states stipulating in law restrictions on Bowie knives by name. And every state in the country also enacted laws restricting types of clubs. These laws encompassed anti-concealed carry laws, laws barring any knife and club carrying, anti-sales laws, and tax laws, among others.[6]

13. The specific focus in this Declaration, however, is historical analogues directly pertinent to California's Unsafe Handgun Act chamber load indicator and magazine disconnect mechanism requirements and Assembly Bill 1127's restriction on the commercial sale of handguns easily converted to machine guns.

14. Before getting to particulars, this analysis will also demonstrate that a specific relationship did and does exist between the development of new weapons technologies, their spread into society, and subsequent regulation by the government as part of a centuries-long effort to protect the public from harm, enhance public safety, and to dampen weapons-related criminality and violence. This pattern of concerns about criminal violence and for public safety leading to

---

[5] These and many other types of early weapons laws are described and examined in Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 55-83; Robert J. Spitzer, "Understanding Gun Law History After *Bruen*," *Fordham Urban Law Journal* 51(October 2023): 57-115.

[6] Spitzer, "Understanding Gun Law History After *Bruen*," 88-95, 110-13.

weapons restrictions is not new; in fact, it can be traced back throughout the Nation's history.

15. In this Declaration I examine specific examples of weapons or technologies that, when they were invented or developed and then made their way into civil society, were subject to governmental restriction. The historical examples include: restrictions on "trap guns"; gunpowder (including but not limited to gunpowder storage and transport laws); restrictions on fully automatic (most famously the Tommy gun) and semi-automatic firearms, along with related restrictions on detachable ammunition feeding devices and related analysis of experimental multi-shot firearms dating back several hundred years and of multi-shot firearms that proved more successful, including Colt revolvers and Winchester rifles. Finally, this Declaration turns to gun "proofing" laws, an early example of what we would now call a consumer protection measure (the term "consumer" actually appears in one of these laws—two centuries before the birth of the modern consumer movement in the 1970s).

## I. INTRODUCTION: AUTO SEARS

16. The recent California law that imposes restrictions on licensed firearms dealers' sale of certain types of specified handguns revolves around simple, inexpensive devices identified variously as auto sears, switches, or Glock switches. Such devices, considered a type of "trigger activator,"[7] when inserted or installed in a semi-automatic firearm (meaning that the weapons fires one round with each pull of the trigger) changes its functionality such that it becomes in effect a fully automatic firearm that fires rounds continuously while the trigger is depressed—as many as 20 rounds per second.[8] Stated differently, such a device

[7] Virginia State Legislative Information System, https://lis.virginia.gov/bill-details/20251/SB886. A more well-known example of a trigger activator is the bump stock.

[8] Amanda Watford, "States move to outlaw popular 'Glock switches' that make some guns fully automatic," *Stateline*, April 23, 2025, https://stateline.org/2025/04/23/states-move-to-outlaw-popular-glock-switches-that-

(continued…)

"interferes with a gun's internal trigger components so that it fires continuously when the trigger is pulled back and held."[9]

17. Auto sears-type devices have existed for decades,[10] but their widespread circulation is relatively new, as is their rise in use in crime, partly because of the rise in 3D printing that can easily manufacture them, though most are imported from China.[11] From 2012 to 2016, for example, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) reported seizing 814 such "conversion parts." During the period from 2017 to 2021, ATF seizures rose to 5,454. From the start of 2022 through October 2024, 12,360 gun conversion devices were recovered by the ATF.[12] From 2019 to 2025, auto-sears-installed guns were also used in over 20 mass shootings.[13]

18. These devices have come under scrutiny because of their spreading criminal use and because fully automatic firearms have long been regulated by federal law under the National Firearms Act of 1934 and the Firearms Owners

make-some-guns-fully-automatic/?utm_source=The+Trace+mailing+list&utm_campaign=03e468bfd6-trace_briefing_march_20_2026&utm_medium=email&utm_term=0_-0db2af62e3-69360165

[9] David A. Lieb, "At least half of US states now outlaw devices that convert pistols into machine guns," *AP*, March 30, 2025, https://apnews.com/article/glock-switch-machine-guns-pistols-9b6f83b729baa98ce98cf66917f4af92?utm_source=The+Trace+mailing+list&utm_campaign=deb5d1a766-trace_bulletin_march_20_2026&utm_medium=email&utm_term=0_-d51f5dae56-69360165

[10] Jorge Leon first invented the Glock switch in 1987 and received a patent for the device in 1998. Leon said that he invented the devices "to help the military and police in his native country of Venezuela." Bill Hutchinson, "'I feel terrified': Inventor of 'Glock switch' technology says he regrets creation," *ABC News*, June 24, 2024, https://abcnews.com/US/feel-terrified-inventor-glock-switch-technology-regrets-creation/story?id=111271476 The patent expired in 2016, which opened the gates to its proliferation. Leon said he regretted developing the device. Travis Pike, "Glock Switches: A Full Breakdown," *Pew Pew Tactical*, https://www.pewpewtactical.com/glock-switch/

[11] Alain Stephens and Keegan Hamilton, "The Return of the Machine Gun," *The Trace*, March 22, 2022, https://www.thetrace.org/2022/03/auto-sear-gun-chip-glock-switch-automatic-conversion/

[12] Lieb, "At least half of US states now outlaw devices that convert pistols into machine guns."

[13] "'Glock Switches' and Auto Sears," *The Smoking Gun*, https://smokinggun.org/glock-switches-auto-sears/

Protection Act of 1986, guided by the accepted understanding that fully automatic weapons have no place in civil society.[14] As of the start of 2026, 29 states plus the District of Columbia and the federal government restrict auto-sears-type devices.[15] Regarding gun manufacturer Glock, its handguns have come under particular scrutiny "because of the Glock's internal design, which makes its parts easy to access and modify"[16] compared with pistols manufactured by other companies. By one account, Glock handguns "are often cited as some of the easiest to modify."[17] The recent California law at issue in this case focuses specifically on weapons with a feature common to Glocks, "'cruciform trigger bars' — a reference to the construction of an internal component used in all Glocks."[18] Thus, the California law "prohibit[s] gun dealers from selling pistols that can be easily converted into fully automatic weapons through the simple installation of a 'switch.'"[19]

19. This returns us to the central question at hand: historic weapons laws that imposed restrictions on weapons, or weapons alterations, such that such weapons or devices possessed traits deemed unnecessarily or unjustifiably destructive, harmful, or dangerous, and were therefore subject to restriction. This Declaration examines several such types of historic restrictions, including trap

[14] 48 Stat. 1236 (1934); 100 Stat. 449 (1986).

[15] "Which states have laws prohibiting auto sears/Glock switches?" https://everytownresearch.org/rankings/law/auto-sears-glock-switches-prohibited/; "Auto Sears," https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/auto-sears/

[16] Stephens and Hamilton, "The Return of the Machine Gun." For more on Glock switches' functionality, see Travis Pike, "Glock Switches: A Full Breakdown," Pew Pew Tactical, December 6, 2025, https://www.pewpewtactical.com/glock-switch/

[17] Watford, "States move to outlaw popular 'Glock switches' that make some guns fully automatic."

[18] Champe Barton, "Facing Legal Pressure, Glock Revamps Pistols To Prevent Machine Gun Conversions," *The Trace*, November 24, 2025, https://www.thetrace.org/2025/11/glock-switch-ban-new-pistol-machine-gun/

[19] "Following Years of Pressure from Everytown to Modify Its Pistols to Not Accept 'Glock Switches,' Glock to Discontinue Existing Product Line," *Everytown*, October 28, 2025, https://www.everytown.org/press/following-years-of-pressure-from-everytown-to-modify-its-pistols-to-not-accept-glock-switches-glock-to-discontinue-existing-product-line/; Daniel T. McElrath, "Glock Unveils Its GEN6, V-Series Pistols," *American Rifleman*, December 6, 2025, https://www.americanrifleman.org/content/glock-unveils-its-gen6-v-series-pistols/

guns, gunpowder, fully automatic and semi-automatic weapons, and the ammunition feeding devices integral to their operation, and gun "proofing." Before turning to these examples, however, it is important to note that government regulation of weapons dealers and sellers (as noted, the California law imposes restrictions on gun dealers) has a long history, dating to the 1600s. Specific regulation of commercial weapons sellers and dealers accelerated when industrialization and mass production of firearms took off after the Civil War. Further, the Unsafe Handgun Act imposes safety requirements on handguns that prevents their sale, as discussed earlier. This concern for consumer safety emphasizing product reliability and safety pertaining specifically to firearms also has specific historical antecedents, as seen in historic gunpowder storage and transport laws, trap guns, and historic requirements for gun "proofing." These will also be examined in the course of this Declaration.

## II. HISTORICAL GOVERNMENT REGULATION OF WEAPONS DEALERS AND WEAPONS COMMERCE

20. Colonial, state, and local laws encompassing the licensing or permitting of dangerous weapons and substances, and their commercial or even private sales or transfers, date to the 1600s and 1700s,[20] but became more wide-ranging and widespread in the 1800s and early 1900s, coinciding with the two key factors: the expansion of governmental resources and capabilities, and the transition of firearms manufacturing and sales "from craft to industry."[21] These laws pertained to weapons and substances that posed a threat to public safety. This is consistent with what became the more widespread use of governmental licensing by the nineteenth century, which was employed "to regulate and control a host of economic activities, trades, callings, and professions," including gun sales, though

[20] Robert J. Spitzer, "Historical Firearm Licensing and Permitting Laws," *Dickinson Law Review* 129(Spring 2025): 1062-63, 1071-74.

[21] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 97.

"the overall justification for licensing was the same as the police power generally—the public good and the people's welfare."[22]

21. A number of licensing and recording laws demonstrate a tradition of placing requirements on weapons vendors, in addition to, or aside from, the purchasers themselves. The licensing of businesses and occupations by governments extended to a wide array of areas and products, including not only firearms but alcohol, gambling and betting, tobacco, pawnbrokers, real estate and insurance agents, physicians, dentists, theaters, and many more.

22. A total of at least 27 states enacted commercial licensing laws pertaining to weapons commerce with 25 states doing so from the 1600s to the end of the 1800s, and 9 states doing so in the early 1900s (some states enacted laws in both centuries; see Exhibits B and C).

23. A remarkably early, if limited, commercial licensing law was enacted by the Connecticut colony in 1642. The law barred the sale or barter of weapons to Indigenous people as well as "to any person inhabiting out of this Jurisdiction" but excepted people who first obtained a license to engage in such transactions from "the particular Court" or "two magistrates"[23] to do so. Strictly speaking, this statute was aimed at any individual who might contemplate such trade, but the focus was on regulating commercial activity, to the extent feasible, in the mid-seventeenth century. New Hampshire enacted a similar law in 1689 which made it a crime to "Barter give, or by any meanes Supply any indian or Indians, or the neighbouring French, w'th Armes or Am'unition of any kinde whatsoever without licence first obtained from the Govern'r & Councell. . . ."[24] Neither of these two laws specified

---

[22] William J. Novak, *The People's Welfare* (Chapel Hill, NC: University of North Carolina Press, 1996), 90.

[23] Act of Dec. 1, 1642, CONN. GEN. STAT. (Brown & Parsons 1850) (Law Passed 1642).

[24] New Hampshire Province Laws, 1689, 288-89; [CHAPTER 27.]; [NO ARMS OR AMMUNITION TO BE SUPPLIED, TO INDIANS OR FRENCH WITHOUT A LICENSE.]

the conditions or circumstances under which such a license might be granted, leaving that to the discretion of the governing authority.

24. An 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans unless they obtained a license from the governor.[25] An 1854 law for San Francisco, California licensed commercial shooting galleries.[26] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements, such as an ordinance for Martinsburg, West Virginia in 1876 that required a license issued by the mayor for the opening and maintenance of a pistol gallery.[27]

25. A common variation of these licensing laws is illustrated by an 1837 Alabama law regulating fighting knives, including Bowie knives and Arkansas toothpicks, that imposed a hefty $100 tax (equal to about $3478 in 2026[28]) on any person "selling, giving or disposing of such weapon" where failure to pay the fee would be subject to "the pains and penalties of perjury."[29] (This is also an example of a regulatory tax.)

26. Aside from direct licensing of weapons purchasers by a government official or entity, at least 17 states required those who sold or otherwise transferred guns or other weapons to others to record information about the buyer, with that information to be maintained and subject to possible later examination. This

[25] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

[26] *Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council* 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

[27] J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 76, Image 76 (1875) available at The Making of Modern Law: Primary Sources. 1876.

[28] https://www.officialdata.org/us/inflation/1837

[29] 1837 Ala. Acts 7.

regulatory mechanism put the burden of information collection and maintenance on the private seller or dealer, rather than directly on the government, though it served the same public policy purpose: to acquire and maintain information about those who obtained the weapons in question and when, for future reference or inspection by government officials or others. Instead of local governments gathering information and evaluating the legality or propriety of those wishing to acquire or use firearms, that requirement was imposed on gun sellers and dealers by the government. In the process, the merchants were generally obligated to make sure that any prospective buyer meet whatever criteria or conditions the government had set to make sure the buyer was eligible to complete the transaction. In some instances, these requirements existed along with direct governmental licensing. As historian William J. Novak notes, governments enacted “statutes that used the license as the first step in a more comprehensive regulatory strategy.”[30]

27. As gun sales, gun manufacturing and marketing transitioned in the post-Civil War period “gunmaking had completed the transition from craft to industry. . .an item of machine production carried on in large plants”[31] the ability and necessity to regulate firearms became more feasible because of the long tradition of government exercising licensing power over merchants, retailers, occupations, and businesses coupled with growing government capabilities. For example, award-winning historian William Novak noted that by 1868 Alabama had required licensing for “over thirty occupations and businesses,” including “dealers in firearms.”[32]

28. In 1885, Illinois enacted this registration requirement for weapons dealers:

> All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given

[30] Novak, *The People’s Welfare*, 91.
[31] Kennett and Anderson, *The Gun in America*, 97.
[32] Novak, *The People’s Welfare*, 91.

> away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[33]

Thus, the government's authority to regulate the commercial sale of firearms is both longstanding and extensive. With minor variations, this law was typical of such requirements. For example, a 1911 Colorado law offered this detailed set of instructions:

> Every individual, firm or corporation engaged . . . in the retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[34]

The 1911 New York pistol permit law also required every person selling any handgun to maintain a register "at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other

---

[33] Merritt Starr & Russell H. Curtis, *Annotated Statutes of the State of Illinois in Force* (1885), Criminal Code, ch. 38, ¶ 90.

[34] 1911 Colo. Sess. Laws 408, Section 3.

mark of identification on such pistol, revolver or other firearm."[35] The purchaser also had to produce a permit at the time of the transaction, with the seller to note the permit information. A 1914 Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[36]

29. As these examples make clear, governments exercised fulsome and plenary authority to enact licensing and other measures pertaining to both personal and commercial/business-related activities to regulate arms commerce and activities. Governments did so utilizing a wide array of regulatory tools to do so (see Exhibits B and C).

## III. REGULATORY HISTORY OF TRAP GUNS

30. Very much like the insertion or installation of a simple, inexpensive auto sear in a semi-automatic firearm to cause it to fire fully automatically, trap guns involved taking a legal gun and modifying it through a simple procedure to then make the firearm in question more dangerous and therefore illegal when so modified. Not to be confused with firearms used in trapshooting, trap guns were devices or contraptions rigged in such a way as to fire when the owner or other operator was not present. Typically, trap guns could be set to fire remotely by rigging the firearm with a string or wire which then discharged when tripped.[37] At least 27 colonies/states enacted anti-trap gun laws from the 1600s through the early 1900s (see Exhibit D).

31. As early as 1670, Massachusetts enacted this law penalizing the setting of trap guns:

---

[35] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

[36] Samuel A. Ettelson, *Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916* 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[37] See Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.

> Wheras severall persons have bine greatly Indangered by seting of Guns It is enacted by the Court and the authoritie therof that none shall sett any Guns except in Inclosures and that the gun be sufficiently enclosed soe as it be Cecure from hurting man or beast and that hee that seteth the gun doe give warning or notice therof to all the Naighbours on the penaltie of paying a fine of five pounds to the use of the Collonie for every default.[38]

32. In 1751, New Jersey enacted a law saying that "if any Person or Persons whatsoever, after the Publication of this Act, shall presume to set any Gun or Guns, or plant sharp stakes, in Order to kill Deer, or any other wild Beasts" that person or persons was to pay a fine, with "double Damages to any Person who shall be injured thereby."[39]

33. This 1771 New Jersey both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[40]

34. In 1826 and 1829, North Carolina enacted two trap gun laws pertaining specifically to hunting that regulated their use, confining the setting of them to certain specified locations and times, and including a notification requirement to forewarn those in the area of the trap gun—an express recognition

---

[38] Act of Jun. 8, 1670, 230, MASS. GEN. LAWS (William White 1861) (Law Passed 1670).

[39] 1751 N.J. Laws 189.

[40] 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

that such trap guns, even though set for hunting purposes, posed a threat to humans.[41]

35. Also sometimes referred to as “man traps,” “set guns,” or “infernal machines,”[42] the term trap gun came to encompass other kinds of traps designed to harm or kill those who might encounter them, including for purposes of defending property from intruders. Unlike the other weapons restrictions examined here, opinion was initially more divided on the relative merits or wisdom of setting such devices, with some arguing that thieves or criminals hurt or killed by the devices had it coming,[43] though the weight of opinion seemed mostly against such devices—a fact reflected in the existence of anti-trap gun laws—because of the likelihood that innocent persons could be injured or killed, and also because such devices represented an arbitrary and excessive meting out of vigilante-style “justice,”[44] often for petty crimes.

36. This dilemma was expressed this way in an item appearing in Scientific American in 1864, which opined:

> It used to be common in England, in former times, to warn depredators off premises by putting up signs reading “man traps and spring guns,” thereby hinting at a speedy and terrible fate to the evil-disposed. This practice was at any rate honest; but what shall be said of these persons in modern times who

---

[41] 1826-1827 Laws of North Carolina Regular Session, 83, CHAPTER CLV; 1829-1830 Laws of North Carolina – Regular Session, 83, CHAPTER CXXXI.

[42] E.g. 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1–3.

[43] For example, this small item appeared in the *Bangor (Maine) Daily Whig* on October 27, 1870: “A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window. A few such ‘accidents’ are needed to teach the thieves who have lately been operating in this city, a lesson.”

[44] This is my observation based on my reading of historic newspaper accounts from the late 1800s, and from the number of anti-trap gun laws enacted. As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.

deliberately place man traps where the innocent and unthinking walk headlong into them?[45]

37. Those who set gun traps typically did so to defend their places of business, properties, or possessions. This 1870 newspaper account from an incident in New York City provides an example where a burglar was killed by a gun-trap set by a shopkeeper, who was then prosecuted: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured Agostino." After the verdict the man continued to be held under $2,000 bail.[46]

38. Inevitably, the traps sometimes wound up hurting or killing innocents, even including the person who set the trap. For example, this 1891 newspaper account from Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[47]

39. In an 1873 case, an Iowa court considered the case of a man who was shot and wounded by a trap gun for entering the property of another in order to steal some grapes. Even though the trespasser admitted to the trespass, the court made clear that the trespass did not justify use of a trap gun: "injury to others may not be inflicted, and that some trespassers and other inconsiderable violators of the law are not to be visited by barbarous punishments or prevented by inhuman inflictions of bodily injuries."[48] As an Ohio newspaper commented about a young man who was

[45] "Man Traps and Spring Guns," *Scientific American*, November 5, 1864, 298. Trap guns were also a problem in Britain and Canada. In 1827 the British Parliament made the setting of such traps a misdemeanor. "Man Traps," St. Louis Globe-Democrat, October 14, 1883.

[46] "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF.

[47] "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk.

[48] *Hooker v. Miller*, 37 Iowa 613 (1873).

shot by a trap gun in 1881 while trying to steal some melons from a melon patch, "it is a crime to set a trap gun of much greater magnitude than to steal melons."[49]

40. As noted, at least 27 states had anti-trap gun laws at the statewide or local level (see Exhibit D). In addition to the 1670, 1751 and 1771 laws quoted above, 16 laws were enacted in the 1800s, and 16 in the early 1900s (some states enacted laws in more than one century).

41. Trap guns and auto-sears-altered firearms were both instances of weapons that could be altered through simple and inexpensive means that, when altered, were seen to pose a threat to public safety warranting the enactment of legislative restrictions. The details of the regulatory policy tools employed reflect the difference in technology—string or wire versus an auto sear—where the former was and is beyond regulation, since wire and string are abundant and ubiquitous. Auto sears, relatively inexpensive and now easier to manufacture by individuals or import, can be rendered all but useless if current semi-auto handguns can be manufactured or modified to make their installation highly difficult, the principle giving rise to the current California law. While the creation of a trap gun fell to the gun owner, not a manufacturer, the process of creating and setting a trap gun closely mirrors the modern safety concerns of handguns that do not possess basic safety features, and for which sales to consumers are restricted. This also invites a comparison to the historic regulation of gunpowder, a substance indispensable to the discharge of firearms until the latter part of the nineteenth century.

## IV. Historic Regulation of Gunpowder

41. Gunpowder has been widely and extensively regulated in the American colonies and states. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start

[49] "How a Melon Thief Came to Grief," Wellington Enterprise, Wellington, Ohio, September 21, 1881, https://www.newspapers.com/image/171228605/?terms=%22trap%20gun%22&match=1

of the twentieth century (*see* Exhibits E, F, G, and H). Gun powder regulations encompassed a variety of policy tools including licensing, storage, manufacturing, sale, ignition, and transport. When new or more devastating explosives were invented, they too were subject to similar regulation. The regulation of gunpowder is relevant to this analysis because it was a dangerous but indispensable component for the discharge of firearms (as primer and propellant) from the earliest days through the latter half of the nineteenth century, when improvements in enclosed metallic ammunition cartridges, and the firearms to accommodate them, became widely available in the civilian market.[50] As Exhibit E shows, at least seven gun powder laws were enacted in the colonies in the 1600s, thirty gunpowder laws were passed in the 1700s, 175 laws in the 1800s, and seventy-six laws in the 1900s up until 1934 (*see* Exhibits F, G, and H for full texts of the laws), yielding a grand total of over 300 laws in forty-nine states. In short, the states enacted a blizzard of these laws, demonstrating ubiquitous and plenary governmental authority to regulate gunpowder, extending to all corners of municipalities, including private homes and other buildings. One element of this regulation was gunpowder licensing; at least 22 states enacted such licensing from the 1700s through the early 1900s (see Exhibit E). This pertained directly to the operation of firearms, as gunpowder was indispensable to firearm discharge for most guns through the post-Civil War period. Indeed, gunpowder restrictions appeared in laws enacted right up to the start of the twentieth century. As was true of the licensing of concealed weapons carrying, local officials had wide-ranging discretion to grant (and often also the power to revoke) the issuance of licenses for firearms discharges and gunpowder, and to

[50] "Cartridge Cases," National Institute of Justice, https://nij.ojp.gov/nij-hosted-online-training-courses/firearms-examiner-training/module-03/cartridge-cases; "History of Ammunition from Origin to the Modern Cartridge," Ammunitionstore.com, Mar. 21, 2017, https://ammunitionstore.com/pages/news/history-of-ammunition-from-origin-to-the-modern-cartridge/; William Harris, "10 Innovations That Led to the Modern Bullet," Howstuffworks, Apr. 16, 2024, https://science.howstuffworks.com/10-bullet-innovations.htm.

attach specific conditions for the licensees to follow. In addition, gunpowder was also subject to "proofing" (like gun proofing). Those laws are discussed at the end of this Declaration.

42. These regulations served several purposes. Early in our history, a primary concern was to accumulate, preserve, and make available gunpowder for collective defense needs. Non-military public safety imperatives also motivated the enactment of gunpowder laws from the seventeenth through the twentieth century. These measures generally focused on safe storage, transport, and use, all designed to prevent the foreseeable significant public dangers associated with improper transportation, use, and storage of gunpowder. As Adam Winkler observed with respect to the Founding period, "[t]here were laws requiring gunpowder to be stored safely, even though the rules made it more difficult for people to load their guns quickly to defend themselves against attack."[51] Included among these laws were those that specified limits on how much gunpowder individuals could keep, and even what purposes were and were not allowed.

43. Fear of the devastating effects of fires and explosions was also a major (though not the only) concern at a time when most structures were made of wood or other highly flammable materials, fire retardant materials and safety standards in construction were virtually unheard of, and the state of firefighting was primitive.[52] As Mark Anthony Frassetto concluded: "[h]istorically, virtually every jurisdiction heavily regulated the possession, transportation, sale, and manufacture of gunpowder to prevent fires and explosions and regulated the shooting of guns both to protect against unintentional shootings and fires caused by gunshots."[53] Saul

[51] Adam Winkler, *Gunfight* (NY: W.W. Norton, 2011), 286. *See also* 116–17.

[52] Jill Lepore, *New York Burning: Liberty, Slavery and Conspiracy in Eighteenth-Century Manhattan* (NY: Knopf, 2005), 42.

[53] Mark Anthony Frassetto, "Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment," *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society*, Jacob Charles, Joseph Blocher and Darrell Miller, eds. (NY: Oxford University Press, (continued…)

Cornell and Nathan DeDino noted that gunpowder laws were not simply restricted to large cities like Boston, New York, and Philadelphia, but, in the case of Pennsylvania, for example, "appeared within the statutes that provided for the initial incorporation of new towns alongside the provisions that created commons and streets and regulated public nuisances."[54]

44. Early gunpowder laws were also very specific in stipulating the amount of gunpowder that could be kept, where it could be kept, the types of containers holding the powder, the specific means and circumstances by which it would be transported, and its use.[55] These laws encompassed gunpowder dealers and sellers, but also private individuals, affecting not only the location but amount of gunpowder they could keep. This was significant because, as noted, gunpowder was indispensable for the firing of guns up through the latter part of the nineteenth century.

45. An important way to gauge the impact of these laws on individuals is those that imposed very strict limits on the amount of gunpowder that could be kept in homes and other structures. Many laws imposed limits by weight of how much gunpowder could be stored or kept, and the circumstances of that storage. The pound weight limits could range from one pound up to fifty. Clearly, these larger limits pertained to commercial dealers and purposes. But far lower limits had direct bearing on individuals who wanted gunpowder for their own purposes.

46. For example, laws in Connecticut imposed a limit of no more than one pound to be kept in any building—enough for an individual, but not enough for commercial purposes. An 1827 ordinance for New Haven, Conn. said that no one

2023), 195–212; Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73 (2004): 510; Winkler, *Gunfight*, 116–17.

[54] Cornell and DeDino, "A Well-Regulated Right," 511.

[55] Cornell and DeDino, "A Well-Regulated Right," 511–12; Frassetto, "The Duty to Bear Arms," 203–08.

could "keep any quantity of gunpowder greater than one pound weight, without having obtained a license for that purpose from said Court of Common Council, in the manner herein prescribed."[56] The limitation was enforced through licensing and stipulated details. A similar ordinance was enacted for Bridgeport, Conn. in 1874.[57] An 1832 Connecticut state law gave wide discretion to local officials to confiscate gunpowder at their discretion if it was deemed unsafe.[58] Laws in other states that specified a storage limit of a one pound limit included, among others, those in Massachusetts (1833, 1870),[59] Michigan (1846),[60] Maine (1848),[61] Missouri (1850),[62] New York (1885),[63] and Vermont (1853).[64] The "one pound" of powder for use by a single individual was a standard reflected in early militia laws that required militiamen to have that amount as part of their accoutrements. The one pound standard appears specifically in militia laws for militias in Massachusetts

---

[56] Charter and By-Laws of the City of New Haven, Nov. 1848, p. 48–49, Image 48–49, *available at* The Making of Modern Law: Primary Sources (1827).

[57] Charter and Ordinances of the City of Bridgeport: as Amended and Adopted p. 194, *available at* The Making of Modern Law: Primary Sources (1874).

[58] 1832 Conn. Acts 391, An Act Regulating the Mode Of Keeping Of Gunpowder, Ch. 25, § 1–2.

[59] An Act Further Regulating the Storage, Safe Keeping, and Transportation of Gunpowder in the City of Boston, ch. 151, §§ 1–12, 1833 Mass. Acts 728, 728–35 (Dutton & Wentworth); Municipal Register of the City of Lawrence, 1870 p. 185, Image 185, *available at* The Making of Modern Law: Primary Sources (1870).

[60] Sanford Moon Green, The Revised Statutes of the State of Michigan: Passed and Approved May 18, 1846, p. 200–01, Image 216–217, *available at* The Making of Modern Law: Primary Sources (1846).

[61] The Revised Ordinances of the City of Portland, 1848, p. 22, Image 22, *available at* The Making of Modern Law: Primary Sources (1848).

[62] An Ordinance in Relation to Gunpowder and Hemp, and the Storing Thereof, no. 2382, §§ 1–13, ST. LOUIS, MISSOURI, THE REVISED ORDINANCES OF THE CITY (Chambers & Knapp 1850).

[63] Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations, p. 184, Image 185, *available at* The Making of Modern Law: Primary Sources (1885).

[64] 1853 Vt. Acts & Resolves 32. No. 35. -- AN ACT IN RELATION TO GUNPOWDER.

(1636),[65] New Hampshire (1718),[66] New Jersey (1746),[67] Virginia (1752),[68] Maryland (1756),[69] Vermont (1779),[70] and North Carolina (1787),[71] among many other states. In other words, individuals could have and store gunpowder for their own use, but not too much, and for the good of public safety.

47. Some gunpowder laws pertained directly to individual behavior. To examine the earliest of these laws, a colonial Virginia law enacted in 1623 restricted discharging firearms to save gunpowder: “That no commander of any plantation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainments, &c.”[72]

48. In 1629, Virginia directed that colonists “shall use their best endeavors to preserve and keep in dry and tight houses or casks” the constituent components to make gunpowder, including potash, “saltpeeter,” wood ash, and also that they “preserve and keep all their urine”[73] for that purpose. A 1655 Virginia colonial law aimed at wasteful and dangerous use of gunpowder by individuals in firearms discharges when those firing were intoxicated (with two amusing exceptions) punished any “persons or persons soever shall, after publication hereof, shoot any

---

[65] Laws of the Colony of New Plymouth, Act of November 15, 1636, MASS. GEN. LAWS (Dutton & Wentworth 1836) (Law Passed 1636).

[66] An Act for the Regulating of the Militia, §§ 1-11, 16, 20-21, & 26, 1718 N.H. Laws 91, 91–98 (B. Green).

[67] Act of May 8, 1746, N.J. STAT. (New Jersey State Library Bureau of Archives and History 1980).

[68] An Act for the Better Regulating and Disciplining the Militia, ch. 3, §§ 1 & 4, 1757 Va. Acts 15, 15–16 (sine nomine et sine anno).

[69] An Act for Regulating the Militia of the Province of Maryland, 1756 Md. Laws 450, 450, 452–54, 455–56, & 458–61 (Lord Baltimore Press 1935) (Law Passed 1756).

[70] An Act for Forming and Regulating the Militia and for Encouragement of Military Skill, for the Better Defence of This State, 1779 Vt. Acts & Resolves 18, 19–20 (Padlock & Spooner).

[71] An Act for Raising Troops for the Protection of the Inhabitants of Davidson County, ch. 1, §§ 5, 12, & 14, N.C. GEN. STAT. (Hodge & Wills 1791) (Law Passed 1787).

[72] The Laws of Virginia, Vol. 1, 1623, 127; https://archive.org/details/statutesatlargeb01virg/page/126/mode/2up?view=theater.

[73] 1629 Va. Acts 151, Acts of Mar. 24, 1629, Act 5, “For the better furtherance and advancement of staple commodities.”

guns at drinking (marriages and funerals only excepted). . . ."[74]

49. A 1675-76 Virginia law penalized anyone found "within any Indian towne" or more than three miles from any English plantation with arms, gunpowder, and shot "except one gunn and tenn charges of powder and shott for his necessary use" was subject to prosecution.[75]

50. A 1690 New York law united gunpowder regulation with a very specific burden on firearm discharge when it made it unlawful "to burn any powder. . .upon pain of paying for every shot or discharging of gun or pistol" unless for authorized reasons.[76]

51. Note that, even in this very early period, the colonies could restrict or even bar gunpowder use for gun firing (as opposed to storage restrictions); impose penalties that included the taking of powder from any offending individuals; and restrict gunpowder transport. Early laws called for confiscation of gunpowder in individuals' possession for safety-related reasons including to avoid unsafe storage (gunpowder was of course indispensable to the firing of guns well into the nineteenth century). A Massachusetts law from 1719 directed that any gunpowder found on board any vessel docked at the port of Boston was subject to confiscation.[77] The concern over gunpowder led Massachusetts to enact a more sweeping measure in 1801 directing that all gunpowder entering Boston that was not promptly stored in a designated Powder House would be confiscated.[78] Similar

---

[74] 1655 Va. Acts 401, Acts of Mar. 10, 1655, Act XII. Note the two amusing exceptions to drunken shooting in the law.

[75] Acts of Assembly, Mar. 1675–76, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* at 336–37 (1823) *available at* https://babel.hathitrust.org/cgi/pt?id=mdp.35112104867892&seq=340.

[76] The State of New – York Page 222–23, Image 228–229 (1849), *available at* The Making of Modern Law: Primary Sources (1650–1699: 1690).

[77] 1719 Mass. Acts 348, An Act In Further Addition To An Act For Erecting A Powder House In Boston, ch. III, § 1.

[78] 1801 Mass. Acts 507, An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and to Prevent Damage from the Same, ch. XX.

New Hampshire laws in 1786 and 1793 said that any container or building which housed ten pounds of gunpowder or more in Portsmouth would be subject to seizure.[79] A 1795 Pennsylvania law imposed a series of testing, transport, storage, and sale requirements on gunpowder that called for the confiscation of any powder over twenty-five pounds to be sold in Philadelphia if not inspected first.[80] Gunpowder laws were significant not only because it was a dangerous substance to keep, but because it was indispensable to the operation and discharge of most firearms until after the time of the Civil War.

52. Also in the 1800s those who violated gunpowder transport, storage or related laws faced seizure of the powder in various states and localities.[81]

53. These kinds of restrictions, along with many others, lace the gunpowder laws in the centuries to come. These laws sharply and specifically burdened the ability of individuals to keep and use gunpowder for personal purposes.

54. A 1783 Massachusetts law restricting firearms and gunpowder in Boston began by noting that "The depositing of loaded arms in the houses of the town of Boston is dangerous." It barred bringing gunpowder or gunpowder-loaded firearms into any house or other structure in the city. The penalty for doing so was that "such

---

[79] 1786 N.H. Laws 383-84, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town; 1793 N.H. Laws 464-65, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town.

[80] Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred, to the Twentieth Day of March, One Thousand Eight Hundred and Ten Page 240-244, Image 284-288 (1810) available at The Making of Modern Law: Primary Sources. 1795.

[81] E.g. The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to the City Page 89-96, Image 89-96 (1854) Available at The Making of Modern Law: Primary Sources, 1821; Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 72-73, Image 72-73 (1856) available at The Making of Modern Law: Primary Sources, 1847; Offenses Affecting Public Safety, Ordinances of the City Council of Memphis, ch.14, Art. 3, §1 (1867); Asa Fowler, The General Statutes of the State of New-Hampshire; to Which are Prefixed the Constitutions of the United States and of the State. With a Glossary and Digested Index Page 206, Image 227 (1867), 1854, Safe-Keeping of Gunpowder, § 1.

person shall forfeit" the firearm and pay a fine.[82] Similarly, Maine enacted two related measures in 1821. One provided that officials of towns were to be "empowered to make rules and regulations" regarding "all gun powder which is or may be within such town, shall be kept, had or possessed therein; and no person or persons shall have, keep, or possess within such town, any gun powder, in any quantity, manner, form or mode. . . ."[83] Local officials were further empowered in the second law "to enter any building, or other place, in such town, to search for gun powder. . . ."[84] to enforce these restrictions.

55. New Jersey enacted a measure in 1857 stipulating that "no person or persons residing within the aforesaid limits, shall be allowed to keep more than two pounds of gunpowder, except in a magazine at least fifty feet distant from any building. . . ."[85] In 1861, the state legislature gave the city of Paterson plenary power to "regulate the keeping and transporting of gunpowder."[86] In fact the state legislature granted similar regulatory authority to localities in at least 24 laws enacted from 1868 to 1900.[87]

56. Like the example of New Jersey, state and town jurisdictions around the country commonly and widely gave full regulatory authority to local officials, like

---

[82] 1783 Mass. Acts 218, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder Within the Town of Boston, ch.13.

[83] Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix, p. 112–13, Image 183-184 (Vol. 1, 1821), § 1.

[84] 1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5.

[85] 1857 N.J. Laws 461. This state legislature act pertained to the Township of Orange.

[86] 1861 N.J. Laws 335. *See also* 1863 N.J. Laws 317.

[87] 1868 N.J. Laws 961; 1869 N.J. Laws 719; 1870 N.J. Laws 613; 1870 N.J. Laws 1141; 1870 N.J. Laws 1190; 1871 N.J. Laws 867; 1871 N.J. Laws 1431; 1872 N.J. Laws 489; 1872 N.J. Laws 1051; 1872 N.J. Laws 1213; 1872 N.J. Laws 1320. See also similar laws (up to 1900) enacted in 1873, 1874, 1874, 1875, 1875, 1878, 1884, 1894, 1895, 1895, 1895, 1897, and 1898. https://heinonline.org/HOL/LuceneSearch?terms=gunpowder&journal=ssnj&searchtype=advanced&sections=any&submit=Search&collection=ssl.

this one for officials in Boise County, Idaho in 1863, who were given "full power and authority . . . to regulate the storage of gunpowder and other combustible materials . . . ."[88] in populated communities. Moreover, gunpowder laws "were not challenged under the Second Amendment or state Second Amendment analogues."[89]

57. As Adam Winkler concluded, "the basic idea that gun possession must be balanced with gun safety laws was one that the founders endorsed."[90] Cornell and DeDino reach a similar conclusion, saying that gunpowder laws "were clearly crafted to meet the needs of public safety, but they also provided a check on the creation of a private arsenal" by imposing, among other things, quantity limits, such that "[t]he gunpowder storage laws of the eighteenth century thus constituted a significant limit on the right to bear arms."[91] As the foregoing account demonstrates, state and local regulatory authority over every aspect of gunpowder, including its use for firearms or other purposes, was extensive, ubiquitous, and plenary, encompassing and superseding any contemplated private uses of the same. As with auto sears/switches, the goal was the same: to protect and promote public

---

[88] 1863 Id. Sess. Laws 634, To Incorporate the City of Idaho in Boise County, § 5. For example, *see also* 1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12; 1855 Ill. Laws, 25, An Act To Incorporate the Town of Daville, § 16; The Revised Statutes of the State of Indiana, Passed at the Thirty-Sixth Session of the General Assembly; Also, Sundry Acts, Ordinances, and Public Documents Directed to be Printed Along with the Said Statutes: To Which are Prefixed the Constitution of the United States and of the State of Indiana p. 485–86, Image 499-500 (Vol. 1, 1852); 1860 Kan. Sess. Laws 137, An Act to Amend and Consolidate the Several Act Relating to the City of Lawrence, § 35, pt. 7 1860; 1881 Wash. Sess. Laws 121–22, An Act to Incorporate the City of Port Townsend, ch. 2, § 21; 1901 Mich. Pub. Acts 154, Local Acts, An Act to Revise and Amend the Charter of the City of Muskegon . . . , tit.7, § 24, pt. 11; 1902 N.J. Laws 294, An Act Relating to, Regulating and Providing for the Government of Cities, ch. 107, § 14, pt. 33.

[89] Frassetto, "The Duty to Bear Arms," 204. Frassetto points out (at 204) that "the limited number of [court] challenges related to whether regulating gunpowder storage fell within the state police power or whether storing gunpowder in cities represented a per se nuisance."

[90] Winkler, *Gunfight*, 117.

[91] Cornell and DeDino, "A Well Regulated Right," 512.

safety by imposing specific limitations.

## V. REGULATORY HISTORY OF FULLY AUTOMATIC AND SEMI-AUTOMATIC FIREARMS

58. The central controversy about auto sears is that they dramatically increase the firepower of the weapons into which they are inserted, and that this can be done easily by individuals rather than at the factories that produce the guns. As the historical narrative to come demonstrates, America has long been extremely concerned about weaponry that fires numerous rounds rapidly since the time at which multi-shot firearms married to ammunition feeding devices that make such rapid fire possible began to circulate meaningfully in society. Such concerns resulted in the enactment of widespread and extensive restrictions from the time that such weapons entered the civilian market.

59. While weapons capable of firing numerous rounds in rapid succession can be traced to guns of the late nineteenth and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,[92] it and its successors were military weapons designed to be used in combat and fired from a tripod or similar supporting apparatus, owing to the Gatling gun's size and weight. These weapons did not circulate in civil society and therefore did not give rise to civilian regulation. Strictly speaking, guns like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets while depressing a gun trigger. The development of a fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull, came to fruition in the lead-up to and during World War I. These tripod-mounted military guns, like the Maxim machine gun, operated to devastating

[92] The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and in the Spanish-American War of 1898. It was not a hand-carried interpersonal weapon. Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* (Washington, D.C.: Center of Military History, 2008), 367–68; "Gatling Gun," *History.com*, September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

effect on the battlefield. They initially fired 200-400 rounds per minute, but later 400-600 rounds per minute, from a gun weighing roughly 100 pounds.[93]

60. Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon: the Thompson submachine gun, widely known as the Tommy gun. Though it was developed for use in World War I as "purely a military weapon,"[94] it came too late in the war to have much effect. Its inventor, John Thompson, patented his .45 caliber gun in 1920.[95] The Tommy gun was initially unregulated after World War I and was made available for civilian purchase by the company in order to try to boost its anemic sales, typically outfitted with either a 20–30 round stick magazine or a 100-round drum magazine. (The U.S. military showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[96]) It was only at this point—in the early 1920s—that such hand-held weapons operated reliably, were made available to civilians, and began to circulate in society,[97] though sales in the early 1920s were sluggish. By 1925, Thompson's marketing company, Auto-Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals.[98] This pattern of anemic sales typified the gun's

---

[93] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 127; "How The Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

[94] William J. Helmer, *The Gun That Made the Twenties Roar* (Highland Park, NJ: The Gun Room Press, 1969), 75.

[95] Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun," *Military History Now*, January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

[96] John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975), 149–52; Helmer, *The Gun That Made the Twenties Roar*, 161–64.

[97] Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" *The National Interest*, July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.

[98] Kennett and Anderson, *The Gun in America*, 203. Helmer confirms the number of 3000 guns sold by 1925. *The Gun That Made the Twenties Roar*, 74. Helmer says that "sales declined steadily" after 1921; see 130.

commercial trajectory: "Despite its initial publicity and later notoriety, the Thompson submachine gun was a failure from the start."[99] This was especially true for police forces, to whom Thompson and his company marketed the gun aggressively, even when criminals found the gun appealing. "As a criminal's weapon, the Tommygun was an unqualified success. As a police weapon, it was such a flop that many law-enforcement officials wished sincerely that it had never come off the drawing board."[100] For example, after the 1929 gangland St. Valentine's Day massacre, a representative of Auto-Ordnance visited Chicago police captain John Stege to offer assistance. Captain Stege "practically ran him out of the office. . . .It was Stege's opinion that not even the police should be armed with machine guns," an opinion shared "by many other lawmen in the country."[101] Another police chief explained why: "It is not possible for a police officer to open a machine gun up on a crowded street . . . because you are going to kill possibly ten innocent people to one criminal."[102] Poor military and law enforcement sales forced the company to "peddle the new gun in peacetime" by trying "to think up something else it might be good for." Their conclusion was to market the gun as "good for anything."[103]

61. After 1926, sales began to rise, primarily because of newfound interest by the American military, which started to use the weapon in foreign military operations, especially in Nicaragua, and by the Belgian military.[104] In 1930, the Auto-Ordnance company closed down its sales department because of escalating concerns about its weapons falling into criminal hands, and the attendant bad

---

[99] Helmer, *The Gun That Made the Twenties Roar*, 129.

[100] Helmer, *The Gun That Made the Twenties Roar*, 126. Helmer quotes numerous police officials denouncing the weapon as useless for the police; see 126–28.

[101] Helmer, *The Gun That Made the Twenties Roar*, 126.

[102] Helmer, *The Gun That Made the Twenties Roar*, 126. The gun's rare actual use confirmed this fear. In an attack on John Dillinger, for example, FBI agents "mistakenly shot three innocent customers." (128).

[103] Helmer, *The Gun That Made the Twenties Roar*, 75.

[104] Helmer, *The Gun That Made the Twenties Roar*, 130-45.

publicity. All commercial sales were discontinued except to the military and law enforcement.[105] The result was that by 1932, sales had fallen to fewer than ten per month. Through 1938, the company reported total sales of 10,300. The company's revival came thanks to World War II.[106]

62. Before the early 1920s, these fully automatic weapons were unregulated for the obvious reason that they did not exist or were not circulating widely in society. When they did begin to circulate, however, their uniquely destructive capabilities rapidly became apparent, especially to the emergent Prohibition-fueled gangster organizations of the 1920s.

63. Another automatic weapon developed for World War I was the Browning Automatic Rifle (BAR). It fired a .30-06 caliber round, could receive a 20-round box magazine, and could fire up to 650 rounds per minute. The BAR first appeared on the battlefield in 1918.[107] It was "a heavy machine rifle weighing nearly twenty pounds with bipod and loaded magazine[.]"[108] It, too, made its way into civilian life and found favor among criminals and gangsters in the 1920s and early 1930s.[109] Guns like the Tommy gun and the BAR were actually used relatively infrequently by criminals generally, but when they were used, they exacted a devastating toll and garnered extensive national attention, such as their use in the infamous St. Valentine's Day massacre in Chicago in 1929.[110]

---

[105] Helmer, *The Gun That Made the Twenties Roar*, 143-44.

[106] Helmer, *The Gun That Made the Twenties Roar*, 167-79.

[107] Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?" *The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle," *Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.

[108] Helmer, *The Gun That Made the Twenties Roar*, 37.

[109] Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12. The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example. Christian Oord, "The Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online*, April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.

[110] Chris McNab, *Deadly Force: Firearms and American Law Enforcement* (NY: Osprey Publishing, 2009), 97–98.

64. I conducted a search of Newspapers.com from 1920-1930 using the search terms "Tommy Gun," "Thompson submachine" and "machine gun." The search for "Tommy Gun" turned up essentially no hits until 1928, a clear indication that this particular term did not come in to wide use until fairly late in the decade. The search for "machine gun" turned up more, but many of those instances were references to the weapons owned or used by the military (including many stories about World War I). The search for "Thompson submachine," by contrast, yielded many articles from across the country. Starting in the fall of 1920, a few newspaper articles described demonstrations of the gun for police and other government officials and agencies, and local police forces sometimes purchasing a few of the guns. Reports of demonstrations of the gun to police forces and other state and local officials and also of some purchases appeared regularly starting in 1921, and continued throughout the 1920s, as did numerous articles describing the gun's development and capabilities by inventor John Thompson. These articles also reprinted standard accounts of the Tommy gun's weight, size, firing capabilities and possible uses by law enforcement.

65. To cite a few examples of early news coverage, an account in the Western Sentinel from December 3, 1920 reported on a demonstration of the Tommy gun, saying that it weighed about seven pounds, fired .45 caliber rounds, could fire up to 1500 rounds per minute, and could receive a box magazine holding 20 rounds, or a drum magazine with either 50 or 100 rounds.[111] It went on to say that the gun was "without equal for riot use and for the police chasing thieves and other lawbreakers who attempt to escape in automobiles, for with this little weapon it is a very easy thing to rip the tires off of an escaping car, and the gun is so light and simple that an inexperienced man can fire with the effect of an expert

[111] "New Type of Gun is Demonstrated Here," Winston-Salem, North Carolina; https://www.newspapers.com/image/89498556/?terms=%22Thompson%20submachine%22&match=1).

marksman and moving targets can be hit with the ease that a fireman sprays a hose or on flame." Other articles touted the gun's usefulness in controlling riots and mobs. An account from the Jamestown Weekly Alert reported that state and county officials were provided with ten of the guns for "hunting down whiskey runners in the northern part of the state."[112]

66. Starting in roughly late 1921 and early 1922, a handful of small news items reported thefts of Tommy guns from armories or police stations. The one notable crime-related case to receive enormous press attention was a major seizure of about 600 Tommy guns with ammunition and magazines, first reported about June 16, 1921, from a ship docked at the port of Hoboken, New Jersey, bound for Ireland for use by the IRA in the ongoing Irish rebellion (Ireland won its independence from Britain in 1922).

67. Newspaper reports of criminal use of Tommy guns were few, small, and spare until 1926, when a few very sensational news reports of their criminal use began receiving widespread and extensive attention in newspapers across the country. Most of these initial stories were reports of Chicago gangster use (notably one "Al Caponi" in an early account) along with stories from the New York City-New Jersey area. For example, an AP story from October 16, 1926 with the dateline Somerville, N.J. reported on "the advance of 500 city, state and volunteer police on the mountain stronghold of New Jersey's machine gun mail bandits."[113] According to the account, eight men robbed a truck of over $100,000 and were holed up at the stronghold. The authorities were also armed with weapons that included machine guns, and were contemplating the expansion of the search party with 2000 militiamen.

[112] "New Submachine Guns Received," Jamestown, North Dakota, May 12, 1921; https://www.newspapers.com/image/465633429/?terms=%22Thompson%20submachine%22&match=1).

[113] Use Expert Riflemen to Hunt Robbers," Ithaca Journal, N.Y., https://www.newspapers.com/image/254505945/?terms=%22Thompson%20submachine%22&match=1.

68. Coinciding with these extensive stories were articles, editorials, and exposés calling for changes in the law to address this growing gun crime problem. For example, an article from the Boston Herald began by quoting a magazine story from Collier's Weekly that observed: "The police authorities are powerless to interfere with the sale and distribution of the highest powered instrument of destruction that has yet been placed at the convenience of the criminal element in this country."[114] The Herald sent out a man to see if an average person could buy a machine gun "without trouble." The buyer's conclusion: "He had no trouble" purchasing the gun, which the article labeled "a diabolical engine of death." The article detailed that for the prospective gun purchaser, "Pistols would not be shown unless the customer exhibited a permit, but machine guns could be had over the counter with no such formalities." The article concluded this way: "Here is a case where it seems that 'there ought to be a law.' This weapon . . . was designed for war. . . . a machine gun is the greatest aid to crime that yet has been placed within the reach of criminals."

69. Reports and exposés, juxtaposed with lurid and sensational accounts of Tommy gun criminality, built pressure on the states to enact laws that regulated machine guns (at least 35 states plus D.C. did so between 1925 and 1935[115]; see

[114] Machine Guns for All," Kennebec Journal, Augusta, Maine, December 4, 1926, https://www.newspapers.com/image/857617757/?terms=%22Thompson%20submachine%22&match=1.

[115] 1931 Ark. Laws 704-6; 1935 Ark. Laws 171; Act effective July 29, 1927, ch. 552, 1927 Cal. Stat. 938; 1933 Cal. State. 1169; 1935 Conn. Laws 389; Act of Feb. 25, 1931, ch. 249, 37 Del. Laws 813; District of Columbia: D.C.: Act of July 8, 1932, Pub. L. No. 72-275, § 1, 8, 47 Stat. 650, 652; 1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8; 1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1; Act of Apr. 27, 1933, no. 120, 1933 Haw. Sess. Laws 117; Act of July 2, 1931, 1931 Ill. Laws 452; Act of Mar. 27, 1927, ch. 156, 1927 Ind. Acts 469; 1929 Ind. Acts 139; Act of Apr. 19, ch. 234, 1927 Iowa Acts 201; Act of Nov. 28, 1933, ch. 62, 1933 Kan. Sess. Laws 76 (Spec. Sess.); Act of July 7, 1932, no. 80, 1932 La. Acts 336; 1927 Md. Laws 156, § 388-B.; 1933 Md. Laws 1045; Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887; 1929 Mich. Pub. Acts 529; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231; Act of June 1, 1929, H.R. no. 498, 1929 Mo. Laws 170; 1935 Mont. Laws 57; Act of Apr. 29, 1929, ch.

(continued…)

Exhibit I), and also put pressure on Congress to act. A long-stalled bill in Congress to restrict the interstate shipment of guns received renewed interest and support in 1926, eventually leading to congressional enactment of the Mailing of Firearms Act of 1927, a limited measure that failed to restrict interstate handgun shipment because it did not affect non-Postal Service shipments. From 1926 on, news stories were filled with the kind of sensational gangster-related stories that led to the Tommy gun being labeled the weapon that "made the Twenties roar," and that also led to many anti-machine gun laws. For example, an article dated November 27, 1928 reported that "Chicago's war on gangsters and racketeers was reopened tonight with the drafting of a law to prohibit the sale of machine guns. 'Tommy guns,' the bullet spitting little Thompson submachine guns which are inseparable from gang fights, bank robberies, assassinations and other major crimes . . . could be purchased as easily and legally in Chicago as a pound of meat. . . . practically every sporting goods establishment in Chicago carried the firearms and sold them readily.[116] State Senator Arthur Huebsch will introduce the bill." (Illinois adopted an anti-machine gun law in 1931.[117])

190, 1929 Neb. Laws 673; 1920 N.J. Laws 67; Act of Mar. 19, 1927, ch. 95, 1927 N.J. Laws 180; 1934 N.J. Laws 394-95; Act of Apr. 15, 1931, ch. 435, 1931 N.Y. Laws 1033; 1933 N.Y. Laws 1639; 1917 N.C. Sess. Laws 309; 1933 N.C. Sess. Laws 387; Act of Mar. 9, 1931, ch. 178, 1931 N.D. Laws 305; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 488, 489; Act of Apr. 25, 1929, no. 329, 1929 Pa. Laws 777; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; Uniform Machine Gun Act, ch. 206 §§ 1–5, 1933 S.D. Sess. Laws 245; Act of Oct. 25, 1933, ch. 82, 1933 Tex. Gen. & Spec. Laws 219; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137; Act of Mar. 6, 1933, ch. 64, 1933 Wash. Sess. Laws 335; Act of June 5, 1925, 1925 W. Va. Acts 24 Extraordinary Sess.); Act of May 28, 1929, ch. 132, 1929 Wis. Sess. Laws 157; 1933 Wyo. Sess. Laws 117.

[116] Machine Gun Ban Plan of Chicago," The Salt Lake Tribune, https://www.newspapers.com/image/542285510/?terms=%22Thompson%20submachine%22&match=1.

[117] Former Ill. Rev. Stat. ch. 38, ¶¶ 414a to 414g, "An Act to regulate the sale, possession and transportation of machine guns," approved July 2, 1931.

### A. State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms in the Early Twentieth Century

70. In response to the wider availability of firearms like the Tommy gun and the BAR, between 1925 and 1935, at least 35 states (plus D.C.) enacted anti-machine gun laws (see Exhibit I). These state (and eventually federal) enactments were anticipated, justified, and promoted by the National Conference of Commissioners on Uniform State Laws, a national organization formed in 1892 to provide "non-partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical areas of state statutory law."[118] (Today, the organization is known as the Uniform Law Commission.)

71. In 1923, the Commission organized a special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms." In 1928, it issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading."[119] In 1930, it issued a model firearms act focusing on "guns of the pistol type." In 1932, it issued a model act "intended not only to curb the use of the machine gun, but to make it unwise for any civilian to possess one of the objectionable type." The Commission explained that, between 1923 and 1930, "the infant industry of racketeering grew to monstrous size, and with it the automatic pistol replaced the revolver, to be in turn displaced by a partly concealable type of machine gun—the Thompson .45 inch caliber submachine gun becoming most popular. . . ."[120]

72. The U.S. Congress enacted a machine gun ban for the District of Columbia in 1932 which defined a machine gun as "any firearm which shoots

---

[118] Uniform Law Commission, About Us, https://www.uniformlaws.org/aboutulc/overview.

[119] Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

[120] "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October 4–10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

automatically or semiautomatically more than twelve shots without reloading."[121] The National Rifle Association endorsed D.C.'s ban, stating "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."[122] In his testimony before Congress in 1934 on the bill that became the National Firearms Act, NRA vice president Milton A. Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . . the association I represent is absolutely favorable to reasonable legislation. We are responsible for the uniform firearms act . . . in the District of Columbia. It is on the books now."[123]

73. In 1934, Congress enacted the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and therefore general circulation of fully automatic weapons, like the Tommy gun. The National Firearms Act imposed a tax on the manufacture, sale, and transfer of listed weapons, including machine guns, sawed-off shotguns and rifles, silencers, and "any other weapons" with certain firing capabilities. Such weapons had to be registered with the Treasury Department, and the owners fingerprinted and subject to a background check, with the payment of a $200 tax.[124] The early models of the Tommy gun could fire "an astounding 1,500 rounds per minute. A Tommy gun could go through a 100-round drum magazine in four seconds. Later versions fired 600 to 700 rounds per minute."[125]

74. In his opening statement to the Ways and Means Committee of the U.S. House of Representatives, Attorney General Homer Cummings made clear that the bill under consideration was designed to fight the epidemic of gun crime where criminals could evade capture by crossing state lines:

[121] "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).
[122] S. Rep. No. 72-575, at 5–6 (1932).
[123] "Hearings Before the Committee on Ways and Means," 36.
[124] 48 Stat. 1236.
[125] Moss, "From Gangland to the Battlefield."

> The development of late years of the predatory criminal who passes rapidly from State to State, has created a situation which is giving concern to all who are interested in law and order. . . . there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. . . . In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.[126]

75. As one member of the committee observed, "The question in my mind and I think in the majority of the committee is what we can do to aid in suppressing violations by such men as [John] Dillinger and others."[127]

76. To address the problem, the original version of the bill proposed regulating both semi-automatic and fully automatic firearms. It defined restricted machine guns the same as the 1932 D.C. law, with its emphasis on outlawing guns that could fire rapidly and repetitively without reloading, whether semi-automatically or fully automatically: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[128] The final version of the bill limited restrictions to fully automatic firearms.

77. In addition to the National Firearms Act's restrictions on fully automatic weapons, during this same time period at least seven states plus the District of Columbia, and as many as ten states plus D.C., enacted laws restricting

---

[126] "Hearings Before the Committee on Ways and Means," 4. The version of the bill that appears on page 1 of the Hearings had this definition of machine gun: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading."

[127] "Hearings Before the Committee on Ways and Means," 42.

[128] Ibid., 52.

semi-automatic weapons.[129] The reason for restricting semi-automatic firearms is not hard to discern. These restrictions all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology: an action that automatically loads a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[130] During the time that Thompson and his company were developing and marketing the Tommy gun (which could fire in semi- or full-auto modes[131]), they were also developing the Thompson Autorifle, a "strictly semiautomatic rifle" for which the military showed greater interest than it did for the Tommy gun.[132] The Autorifle was also promoted to police and military organizations, though it was overshadowed by the Tommy gun. Ultimately, the military opted for the semiautomatic M1 Garand over the Autorifle.[133]

78. As the prior discussion reveals, the regulation of automatic and semi-automatic weapons in the 1920s and 1930s arose from the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time, and the related understanding that these weapons had no justifiable civilian use. By that time, gun technology was now available that made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices. Again, the lesson is the same: once these technologies began to spread in civil society and be used for criminal or other dangerous purposes, regulatory efforts ensued.

---

[129] See also Spitzer, "Gun Law History in the United States and Second Amendment Rights," 68–71. The language of the restrictions in Illinois, Maine, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

[130] Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 32–33. In 1913, Florida enacted this measure: "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns."

[131] Helmer, *The Gun That Made the Twenties Roar*, 48–49, 255–56.

[132] Helmer, *The Gun That Made the Twenties Roar*, 37, 50.

[133] Helmer, *The Gun That Made the Twenties Roar*, 161.

**B. State Regulation of Ammunition Feeding Devices.**

79. Restrictions on fully automatic and semi-automatic firearms were closely tied to restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic weapons are predicated on some kind of mechanical loading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired. As is the case with contemporary limitations on ammunition magazine capacity, state laws enacted early in the twentieth century imposed restrictions based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to a high of eighteen (Ohio).

80. Magazine capacity/firing limits were imposed in three categories of state laws (see Table 1 below): thirteen states plus the District of Columbia regulating semi-automatic and fully automatic weapons (Arkansas, California, Connecticut, District of Columbia, Massachusetts, Michigan, Minnesota, Montana, New Jersey, North Carolina, Ohio, Rhode Island, South Dakota, and Virginia[134]); twelve states regulated fully automatic weapons only, where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices (Illinois, Louisiana, Minnesota, New Jersey, North Carolina, North Dakota, Oregon, Pennsylvania, South Carolina, Texas, Vermont,

---

[134] 1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; 1927 Mass. Acts 413, 413–14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137. Two of these states enacted early laws focused on such weapons' use in hunting. New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading." 1920 N.J. Laws 67, ch. 31, Section 9. North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917. 1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

and Wisconsin[135]); and four states restricted all guns that could receive any type of ammo feeding mechanism or round feeding device and fire continuously in a fully automatic manner (California, Hawaii, Missouri, and Washington).[136]

[135] 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1–2; Act of July 7, 1932, no. 80, 1932 La. Acts 336; 1933 Minn. Laws 231–33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1–3; 1929 Mo. Laws 170; 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1–2; 1931 N.D. Laws 305–06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1–2; 1933 Or. Laws 488, An Act to Amend Sections 72–201, 72–202, 72–207; 1929 Pa. Laws 777, §1; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1–4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess. Laws 245, 164.01.

[136] 1927 Cal. Stat. 938; 1933 Haw. Sess. Laws 117; Wash. 1933 Sess. Laws 335.

**TABLE 1**

30 AMMUNITION MAGAZINE RESTRICTIONS IN 26 STATES, 1917-1935[137]

| Semi-automatic and Fully Automatic Firearms (restricted firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (restricted firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -Arkansas (5 rounds; 1935)<br>-California (10 rounds; 1933)<br>-Connecticut (5 rounds; 1935)<br>-District of Columbia (12 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927) | -Illinois (8 rounds; 1931)<br>-Louisiana (8 rounds; 1932)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Carolina (16 rounds; 1933)<br>-North Dakota (loadable | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington (1933) |

[137] Including the District of Columbia. Note that California, Minnesota, New Jersey, and North Carolina appear twice in this table yielding 26 states with 30 laws. The dataset from which this information is drawn ended in 1935, so it does not include any states that might have enacted similar restrictions after that. See Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/; HeinOnline.

| | | |
|---|---|---|
| -Minnesota (1 round; 1933)<br>-Montana (6 rounds); 1935)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-South Carolina (8 rounds; 1934)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | |

81. A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

> all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.[138]

The other three states in this category (Hawaii, Missouri, Washington[139]) utilized this same description. In all, at least twenty-six states enacted thirty gun

[138] 1927 Cal. Stat. 938.

[139] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (see Table 1). The original version of the legislation that became the National Firearms Act of 1934, as noted earlier, included this definition of machine gun that encompassed both semi-automatic and fully automatic firearms: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[140] (This text was derived from the law enacted by Congress for the District of Columbia in 1932, which also stipulated a 12 round limit, as noted previously.)[141] The final version of the 1934 bill was limited to fully automatic firearms only and did not include any limitation by number of rounds fired.

82. Regulations concerning removable ammunition magazines and magazine capacity were thus common as early as the 1920s—the period of time when these weapons and devices began to make their way into civilian life and also contributed to violence and criminality, as illustrated by the Tommy gun narrative and other weapons discussed here. These regulations were adopted by over half of all the states, representing approximately 58% of the American population at that time.[142]

### C. Lessons from the Regulation of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices

83. The lesson from this sequence of events early in the twentieth century demonstrates that changes in gun policy followed a series of steps that respond to developments in firearms technologies and their use in crime, each dependent on the previous step. *First*, a new gun or gun technology is invented. *Second*, it may then be patented, though the patenting of a design or idea by no means assures that it will proceed beyond this point. *Third*, it is typically developed with a focus on

[140] "National Firearms Act," Hearings Before the Committee on Ways and Means, House of Representatives, on H.R. 9066, April 16, 18, and May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 52.

[141] Ibid., 45.

[142] U.S. Census, Historical Population Change Data (1910-1920) (using 1920 census data), https://www.census.gov/data/tables/time-series/dec/popchange-data-text.html.

military applications and supplying military needs, not directly for civilian acquisition or use. *Fourth*, some military-designed weapons may then spread to, or be adapted to, civilian markets and use. *Fifth*, if such weapons then circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes.[143]

84. New gun laws are not enacted when firearm technologies are conceived, invented, or subject to experimentation. They are enacted when those technologies circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers. In addition, such government regulations are shaped by the capabilities and policy tools available to the government at the time. As American governance grew, so did its array of possible policy tools.

85. This lesson is significant because some argue that the absence of government gun regulations in history—at the time of the invention of various weapons or weapons developments—means that regulations now are unjustifiable, or have no historical basis. For example, lawyer and gun rights advocate David Kopel argues that "[m]agazines of more than ten rounds are older than the United States."[144] Drawing on examples like a firearm "created around 1580" capable of firing sixteen "'superposed' loads" (with each round stacked on top of the other); the Puckle gun said to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the Pepperbox pistol of the early 1800s,[145] Kopel suggests that "magazines of more than ten rounds are older than the Second Amendment."[146]

[143] Spitzer, "Understanding Gun Law History After *Bruen*," 60, 70-71.

[144] David Kopel, "The History of Firearm Magazines and Magazine Prohibitions," *Albany Law Review* 78 (2014-2015): 851.

[145] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 852–54.

[146] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 849.

86. Kopel's arguments fail for two sets of reasons. First, as explained in the following section, this narrative misrepresents the availability and capabilities of these early weapons. Second, the account fails to understand the relationship between firearms' technological development, their spread into civil society, and government gun policy and law. As one gun history expert noted, "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on its way."[147] The firearms and firearm feeding devices regulated in the early twentieth century in the previous account represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices. This is essential to understand in order to explain why restrictions on these types of weapons did not emerge until the early twentieth century.

## D. The History of Pre-Twentieth Century Firearms Technologies

### 1. Early Multi-Shot Weapons Did Not Achieve Any Kind of Commercial Success or Popularity

87. Single-shot, muzzle-loaded firearms were the ubiquitous guns from the time of America's initial settlement by Europeans until the latter part of the nineteenth century.[148] Yet as researchers and experts of gun history have noted, experimental multi-shot guns existed in the eighteenth century (with multi-shot experimental designs dating back as much as two centuries earlier). For example, a firearm from the late 1500s that was designed to fire up to sixteen rounds is

---

[147] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* (NY: Scribner, 2021), 3–4.

[148] "Weapons of War (1600-1800)," The Smithsonian, February 6, 2018, https://learninglab.si.edu/collections/weapons-of-war-1600-1800/HUoHq60eaAj1UKyz; "The Production of Muskets and Their Effects in the Eighteenth Century," *Forbes and Fifth*, University of Pittsburgh, https://www.forbes5.pitt.edu/article/production-muskets-and-their-effects-eighteenth-century.

described in a book titled, *Firearms Curiosa*. But this book's very title indicates why this narrative is irrelevant to the modern gun debate. The definition of "curiosa" is something that is rare or unusual. As the book's author, Lewis Winant says, his book is about "oddity guns" and "peculiar guns."[149] That is, they were anything but common, ordinary, or found in general circulation. Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[150] A "Roman candle charge" was defined by Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[151] In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited. Winant concludes: "Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[152] Several "multi-shot" guns invented prior to the perfection of the revolver and repeating rifle relied on this strategy, which had a number of defects all stemming from the difficulty of loading multiple charges in one barrel, with potentially catastrophic results should a charge go off before it was supposed to.

88. An early multi-shot gun, the "Puckle Gun," patented in 1718 in London by James Puckle, could fire nine rounds per minute (hardly comparable to the firing capabilities of semi- and fully automatic weapons of the twentieth and twenty-first centuries). The patent drawing of this weapon shows it sitting on a

---

[149] Lewis Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 8, 9.

[150] Winant, *Firearms Curiosa*, 168.

[151] Winant, *Firearms Curiosa*, 166.

[152] Winant, *Firearms Curiosa*, 166.

tripod on the ground.[153] It was not a hand-held weapon. In the patent, Puckle described it as "a portable Gun or Machine (by me lately invented) called a DEFENCE."[154] It was indeed a military weapon, as Winant says: "Of the oddities among military weapons none has received more publicity than the Puckle gun. . . . The Puckle invention was probably the first crank-operated machine gun. It embodied several elements that closely resemble construction features of Gatling, Hotchkiss and other manually-operated machine guns." Winant continued, "It is doubtful that any of the Puckle guns that may have been actually produced ever saw service."[155] A different account of this weapon says: "There is in fact no record of such a gun ever having been built,"[156] although there are claims to the contrary. A contemporaneous poet, commenting on 'Puckle's Machine Company', wrote "Fear not, my friends, this terrible machine. They're only wounded who have shares therein."[157] This weapon "never advanced beyond the prototype stage."[158] Among its problems: "the flintlock mechanism[s] that ignited the cartridges were unreliable, which is highly important when trying to fire shots in rapid succession."[159] As one analyst concluded, the gun "was absolutely rubbish and made zero sense."[160] And it certainly never made its way to American shores.

89. In short, it was an experimental weapon designed for military use, and the patent's reference to "DEFENCE" was clearly a reference to military defense, not personal defense. As this account confirms, it was likely never even

---

[153] Winant, *Firearms Curiosa*, 220.

[154] Winant, *Firearms Curiosa*, 219.

[155] Winant, *Firearms Curiosa*, 219–20.

[156] Ellis, *The Social History of the Machine Gun*, 13.

[157] Winant, *Firearms Curiosa*, 219-21. See also "The Puckle Gun: Repeating Firepower in 1718," December 25, 2016, https://www.youtube.com/watch?v=GPC7KiYDshw.

[158] Rasenberger, *Revolver*, 3.

[159] *See* Jack Dunhill, *The Puckle Gun: The First "Machine Gun" from 1718 That Fired Square Bullets*, IFLSCIENCE (Mar. 6, 2023), https://www.iflscience.com/the-puckle-gun-the-first-machine-gun-from-1718-that-fired-square-bullets-67831.

[160] Dunhill, *The Puckle Gun*.

manufactured beyond perhaps a prototype. It was a failed effort, even though later gun inventors learned from its failure.

90. The example of the Belton flintlock is sometimes cited to argue that the Second Amendment was written with firearms capable of firing multiple times in mind.[161] Joseph Belton was an inventor who corresponded with Congress in 1777, claiming that he could produce and provide a flintlock that could fire as many as sixteen to twenty consecutive rounds without reloading. After showing preliminary interest on May 3, Congress balked at Belton's proposed "extraordinary allowance" and decided on May 15 that the idea "be dismissed."[162] Belton reportedly demonstrated the rifle, which by his account fired projectiles a distance of 20 to 30 yards, to several government officials, including General Horatio Gates, Major General Benedict Arnold, and scientist David Rittenhouse. These individuals, and some others, signed a cautiously worded letter submitted by Belton to Congress on July 10 saying that "Muskets of his Construction with some small alterations, or improvements might be Rendered, of great Service, in the Defense of lives, Redoubts, Ships &c, & even in the Field. . . ."[163] That same day, however, Congress decided again that "the petition of Thomas [Joseph] Belton be dismissed."[164]

91. The problems with Belton's scheme were evident. It relied on "superposed loads" as a firing method, a "discredited" and dead-end technology (see earlier discussion). Despite Belton's offer to demonstrate the gun, not only are there "no known surviving examples of Belton's gun," but "the only evidence" of

---

[161] *See* David Kopel, "The Founders Were Well Aware of Continuing Advances in Arms Technology," Volokh Conspiracy (May 26, 2023), https://reason.com/volokh/2023/05/26/the-founders-were-well-aware-of-continuing-advances-in-arms-technology/.

[162] *Correspondence between John Belton and the Continental Congress*, WIKISOURCE, https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress (last visited October 21, 2025).

[163] *Id.*

[164] *Id.*

the gun's existence is "the correspondence between Belton and Congress."[165] From this account, there is no reason to believe that the gun "had been produced, and was possible to produce in quantity" at a reasonable price.[166] In all, Belton's claims about his experimental weapon bore no relationship to actual firearms in circulation in America — since Belton's weapon was never proven feasible, much less reproduced, much less distributed — during this time. For anyone to claim based on the Belton case that "our Founding Fathers . . . knew about repeating rifles" and therefore "the Second Amendment was. . .designed to protect the right to own a repeating rifle"[167] is not only an unsupported claim, but a preposterous claim.

92. To take a different example, an advertisement appeared in a South Carolina newspaper in 1785 placed by a gunsmith offering for sale four-shot repeating guns.[168] The ad, however, was an apparent reference to "imported Belgian

---

[165] *Belton Flintlock*, MIL. WIKI, https://military-history.fandom.com/wiki/Belton_flintlock. Harold L. Peterson similarly noted that the only evidence of the alleged existence or operation of the Belton gun was his "meager description" of it, from which "it is impossible to determine exactly how the Belton improvement operated." Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* ((Harrisburg, PA: The Stackpole Co., 1956), 218.

[166] Kopel, "The Founders Were Well Aware of Continuing Advances in Arms Technology."

[167] Logan Metesh, *As a Matter of Fact, the Founding Fathers Did Know About Repeating Rifles*, TRUTH ABOUT GUNS (Nov. 24, 2019), https://www.thetruthaboutguns.com/founding-fathers-knew-repeating-rifles-bill-rights-drafted/; *see also* Dave Duringer, *Founding Fathers Knew About Repeating Rifles Before Bill of Rights*, LAWNEWS.TV (July 17, 2016), https://lawnews.tv/founding-fathers-knew-about-repeating-rifles-before-bill-of-rights/; Eli D. Camacho, *5 Myths About the 2nd Amendment and the AR-15*, MEDIUM (Apr. 2, 2018), https://medium.com/@EliDCamacho/5-myths-about-the-2nd-amendment-and-the-ar-15-a080a94e9a2c. Kopel makes the similar, meaningless claim that the country's Founders "were well aware" of these pioneering, experimental, but unproven multishot technologies, as though this "awareness" somehow means that they would have disapproved of contemporary restrictions on multi-shot weapons. *See* Kopel, "The Founders Were Well Aware of Continuing Advances in Arms Technology." The Founders' "awareness" that such experimental weapons existed centered around their hope that the experimental, untried weapons might eventually be suitable for military use, a prospect that in any case never came to fruition. Kopel also conflates early American leaders' abiding interest in the government funding, advancing, and reproducing new weapons technologies for the country's military forces, on the one hand, with the notion that it had anything whatever to do with private citizen gun acquisition and use, on the other.

[168] The ad appeared in the *Columbian Herald* of Charleston on October 26,

(continued…)

or French-made Segales pistols which had four rifled barrels." Two of the four barrels could be discharged by pulling two triggers; the barrels could then be rotated by hand to discharge the other two. Yet this exotic weapon suffered from the same technological and safety problems as similar guns of the time, and no evidence has been offered to suggest that these European-made guns were widely replicated, much less circulated in early American society.[169]

93. The Jennings multi-shot flintlock rifle from 1821, capable of firing up to twelve "superposed" shots before reloading,[170] is also cited as an early multi-shot gun. Yet according to *Flayderman's Guide to Antique American Firearms*, its production quantity was so small as to be "unknown" and therefore is "extremely rare," unsurprising since it utilized fatally defective "superposed" firing (discussed earlier) relying on twelve individual touchholes.[171] Similar problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century. According to Carl P. Russell: "Flintlock revolving pistols had been given trials and some practical use very early in the nineteenth century, but the loose priming powder in the pan of each cylinder constituted a hazard that was never eliminated."[172]

94. Another example often cited is the Girandoni (or Girardoni) air rifle, a military weapon developed for crack shots in the Austrian army that was capable of firing up to 20 rounds. One of these was taken along on the Lewis and Clark expedition of 1804-1806.[173] But these guns were a rarity, as they were extremely

---

1785. Kopel, "The Founders Were Well Aware of Continuing Advances in Arms Technology."

[169] Declaration of Kevin M. Sweeney in Support of Defendants' Opposition To Plaintiffs' Motion For Preliminary Injunction, *Delaware State Sportsmen's Association v. Delaware Department of Safety and Homeland Security*, Case 1:22-cv-00951-RGA, Document 41, Filed 01/31/23, 23-24.

[170] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 853.

[171] Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th ed. (Iola, IA: Gun Digest Books, 2007), 683.

[172] Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of Nebraska Press, 1957), 91.

[173] David Kopel, "The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post*, May 29, 2014,

(continued…)

expensive, fragile, and complex, and few were made—no more than about 1,500.[174] In fact, the rifles never caught on as they proved to be impractical on the battlefield, and even more so for civilian use. To wit:

> Leather gaskets needed to be constantly maintained and swelled with water to sustain pressure. Once empty the reservoirs required a significant effort and 1500 strokes to restore full power. A supply wagon was subsequently outfitted with a mounted pump to readily supply soldiers but this negated one of the key features—mobility. The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon. The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort.[175]

95. First introduced to the Austrian army in the late 1700s, "[t]he guns became inoperable after a very short time" of use and were "entirely phased out" by 1810.[176] One American manufacturer, Isaiah Lukens of Pennsylvania, apparently produced perhaps four such weapons.[177] The rest were made and used in Europe. And while Lewis and Clark did bring a Girandoni with them, they never intended to

---

https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/. The Girandoni air gun taken by Lewis and Clark was never used in combat or battle, but to impress the Native Americans they encountered. Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that they were not aware of the extensive pre-fire preparations needed. See Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and passim.

[174] Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

[175] John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," *GUNS.com*, March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[176] Frederick J. Chiaventone, "The Girandoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon," *Warfare History Network*, January 2013, https://warfarehistorynetwork.com/article/lewis-and-clarks-girandoni-air-rifle/.

[177] Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CTR. OF THE WEST (Aug. 3, 2014), https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/.

use it for hunting, in combat or battle, but to impress and deter the Native Americans they encountered (which it did). Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that the Indians were not aware of the extensive pre-fire preparations needed.[178]

96. Another example sometimes cited is the Volcanic repeating pistol, patented in 1854. The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations. But the company was "short-lived" and went "defunct" in 1866, even though its partners included Horace Smith, Daniel B. Wesson, and Courtlandt Palmer.[179] Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work, but the actual weapons produced by Volcanic were few, flawed, and experimental,[180] dubbed "radical defects" by Winchester himself.[181] In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust for many decades" until the company finally sold them for fifty cents each to employees.[182]

97. Other attempts to establish early gun firing provenance sometimes reference the Mannlicher rifle. Yet this development was initially a failure: "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass production."[183] The true semi-automatic weapon did not become feasible and available until the beginning of the twentieth century, and the primary market was the military.[184]

---

[178] Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 108, 158, 160, and passim.

[179] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51–52.

[180] "Volcanic Repeating Arms," https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms*, 303–5.

[181] Quoted in Haag, *The Gunning of America*, 56.

[182] Haag, *The Gunning of America*, 60.

[183] Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

[184] Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1st Freedom*, July 2022, 32–39.

98. The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together, found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver, owing to pepperboxes' "frightening flaws."[185] The reason: pepperboxes were "heavy, lumpy, and impractical."[186] The addition of more barrels added more weight, and less practicality, to the gun, resulting in an inverse relationship between more barrels and less gun utility. By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[187] Further, "[t]hey also had a nasty habit of discharging all their barrels at once. No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[188] Indeed, the Colt revolver was "the first widely used multishot weapon,"[189] although it took decades for this and similar revolvers to catch on.

99. Colt's technological developments notwithstanding, single shot guns were the ubiquitous firearm until after the Civil War, although some long gun repeaters appeared late in the Civil War.[190] Even so, the "standard infantry weapon [in the Civil War] remained the single-shot, muzzle-loaded weapon."[191] Historian James M. McPherson concurred that, even though some repeating rifles appeared in

[185] *Pepperbox Pistols: Last Line of Defense*, RELICRECORD, https://relicrecord.com/blog/pepperbox-pistols-last-line-of-defense/ [https://perma.cc/8AJU-6XT8].

[186] Rasenberger, *Revolver*, 54.

[187] Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.

[188] Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster, 1959), 154. By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison." Winant, *Pepperbox Firearms*, 32.

[189] Rasenberger, *Revolver*, 401.

[190] Kopel, "The history of magazines holding 11 or more rounds"; Kennett and Anderson, *The Gun in America*, 112–13.

[191] Snow and Drew, *From Lexington to Desert Storm*, 90.

the Civil War as early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons throughout the war."[192]

### 2. The Colt Revolver Did Not Achieve Popularity Until Decades After its Invention

100. As noted, the idea of an available, affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s. Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was the first practical firearm that could shoot more than one bullet without reloading, and was "the first widely used multishot weapon."[193] Even then, Colt could not readily manufacture multi-shot weapons for many years because the technology was still being developed and he could find no market for them, either from the government or the public. The government, in fact, dismissed such firearms as mere "novelties."[194] After an 1837 test of Colt's gun and others the government concluded that it was "entirely unsuited to the general purposes of the service."[195] The government also rejected the weapon after tests in 1836, 1840, and 1850. Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s. The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was a sideshow through most of the war. . . ."[196] And though the Colt-type revolver "had proved itself, the official sidearm of the United States Army [in the Civil War] remained a single shot pistol."[197] It took the Colt's limited use during the Civil War to finally spur the post-Civil War proliferation of the Colt-type revolver and similar firearms into society.[198]

[192] James M. McPherson, *Battle Cry of Freedom* (NY: Oxford University Press, 1988), 475.
[193] Rasenberger, *Revolver*, 3–5, 401.
[194] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 24.
[195] Rasenberger, *Revolver*, 136.
[196] Rasenberger, *Revolver*, 390.
[197] Kennett and Anderson, *The Gun in America*, 91.
[198] Haag, *The Gunning of America*, 34–37, 46–64. As Haag said, "the Civil War saved" the gun industrialists (65).

101. Beyond that, the early Colt revolvers were "single action"—that is, the trigger had to be pulled back ("cocked") each time to then fire a round. Thus the single action revolver did not fire in a semi-automatic fashion. Colt developed a "double action" revolver in 1877 where the "trigger pull then performs two functions: it cocks the hammer and then releases the hammer to fire the gun."[199] The double action gun, however, was initially "plagued with problems."[200] The U.S. military didn't adopt the Colt double action revolver until 1892, and even then requested improvements thereafter.[201]

102. As detailed below, once revolvers began to spread from the military to the civilian market following the Civil War, and became associated with lawless violence, they were swiftly met by laws and regulations aimed at curbing their possession and use.

### 3. The Winchester Repeating Rifle Did Not "Win the West"[202]

103. Even the famous Winchester repeating rifle did not obtain popularity until the onset of the twentieth century, despite the fanciful claim that it won the American West. While inventor Benjamin Henry claims credit for developing the first practical, lever action repeating rifle (patented in 1860), his competitor Winchester "deftly gutted" the Henry Arms Company, coopting it to form the Winchester Arms Company in 1866, paving the way for Winchester's dominance.[203] But this weapon was reproduced in small numbers, and virtually all to the military, as explained below.

---

[199] McKenzie Hanson, "Single Action vs. Double Action Revolvers," Targetbarn.com, October 13, 2022, https://www.targetbarn.com/broad-side/single-action-vs-double-action-revolvers/

[200] "I Have This Old Gun: Colt 1878 Double-Action Revolver," *American Rifleman*, September 20, 2023, https://www.americanrifleman.org/content/i-have-this-old-gun-colt-1878-double-action-revolver/

[201] Will Elsbury, "Military Sidearms, from Revolvers to Semi-Automatic Pistols: A Resource Guide," Library of Congress, April 9, 2024, https://guides.loc.gov/military-sidearms-from-revolvers-to-semiautomatic-pistols

[202] This phrase became synonymous with the Winchester rifle (e.g. see Adam Winkler, *Gunfight* (NY: W.W. Norton, 2011), 248), though it is false, as discussed elsewhere in this section.

[203] Haag, *The Gunning of America*, 96.

104. The Winchester rifle could fire up to fifteen rounds without reloading. Yet the widely known Winchester 1873, "was designed for sale to the Government as a military arm."[204] A gun whose legendary status wildly outdistanced its actual production and impact, it was nevertheless an important firearm in the late nineteenth century, although this "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s. Its celebrity biography backdated its diffusion and even its popularity."[205] In fact, the slogan stating that the Winchester "won the West" was invented by Winchester executive Edwin Pugsley as a marketing ploy in 1919.[206]

105. An analysis of production runs of Henrys and Winchesters from 1861-1871 concluded that they produced a total of about 74,000 guns. Most of them—about 64,000—were sold to foreign militaries, leaving about 9000 for domestic American sales. Of those, 8500 were acquired by Union soldiers, leaving a very small supply of guns for domestic civilian acquisition.[207] By comparison, 845,713 Springfield "trap-door" single shot rifles were manufactured during this same time period.[208] Thus, the Henry and Winchester rifles certainly could not have been considered popular, nor is it true that magazines holding more than ten rounds "were very commonly possessed in the United States since 1862."[209] As historian Brian DeLay concluded, "very few [of the Henrys and Winchesters] were in the

---

[204] Koller, *The Fireside Book of Guns*, 112.

[205] Haag, *The Gunning of America*, 179.

[206] Haag, *The Gunning of America*, 353.

[207] Brian DeLay, "The Myth of Continuity in American Gun Culture," *California Law Review* 113 (February 2025): 41; Herbert G. Houze, *Winchester Repeating Arms Company: Its History & Development from 1865 to 1981* (Iola, WI: Krause Publications, 2004), 21, 36–41, 51, 59, 65–66, 71, 73, 75; Tom Hall to D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16, Winchester Repeating Arms Company, Office files (MS:20), McCracken Research Library, Cody, WY.

[208] According to an account of the Springfield, "The end of the Trapdoor series came in 1892, when the government adopted a bolt-action repeating rifle known as the Krag-Jorgensen." "The Trap Door Rifle," National Park Service, July 22, 2020, https://www.nps.gov/spar/learn/historyculture/trapdoor-rifle.htm.

[209] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 871.

hands of private persons that might have used them in ways that attracted regulatory attention."[210]

106. Additionally, the Winchester was not a semi-automatic firearm (nor was the Henry repeater); it was a lever-action rifle (the definition of "repeater") that required the shooter to manipulate a lever in a forward-and-back motion before each shot. And when the gun was emptied, it had to be manually reloaded, one round at a time.[211] The Winchester Model 1905, then called a "self-loading" rifle, was a true semi-automatic firearm. It could receive a five or ten round box magazine, although from 1905 to 1920 only about 30,000 of the guns were made. Even in World War I, soldiers primarily used bolt-action one shot rifles that could fire about twelve rounds per minute.[212]

107. With all this, the Winchester was by no means universally embraced by long gun users. Indeed, "a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader."[213] According to A.C. Gould, writing in 1892, single-shot rifles were: "less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used."[214]

---

[210] DeLay, "The Myth of Continuity in American Gun Culture," 41.

[211] Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

[212] Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns Have Advanced Since The Second Amendment," *Military & Defense*, December 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html; Phil Bourjaily, "Blast From the Past: Winchester Model 1905," *Field & Stream*, January 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

[213] Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129.

[214] Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-1894*, 131.

**4. The Rise of Post-Civil War Multi-Shot Handguns Was Accompanied by Escalating Firearm Violence and then Firearm Regulations**

108. Following the Civil War, revolvers were marketed to the civilian population in newspaper advertisements extolling their virtues. For example, when Smith & Wesson's near-monopoly over the manufacture of cartridge revolvers ended with the expiration of its Rollin White patent in 1870, "dozens of other [gun] makers"[215] entered the market. Soon these other manufacturers were producing abundant cheap revolvers at low cost to the consumer. As Kennett and Anderson noted, Colt's initial revolvers sold for $35, but by 1900 the "'two dollar pistol' was a fixture in American life."[216] Further, as the mail order business boomed from the 1870s on, companies like Montgomery Ward and Sears began selling revolvers through their catalogs—especially small, cheaper, lighter-weight models that cost less to mail. Cheap handguns were advertised not only through catalogs, but also through newspaper and magazine advertisements.[217]

109. The rise in the circulation of reliable multi-shot handguns in society was accompanied by the rapid spread of concealed carry restrictions, especially in the post-Civil War period, precisely because of their contribution to escalating interpersonal violence.[218] By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.[219] In addition, in the late 1800s and early 1900s several jurisdictions barred possession of such weapons outright, regardless of other circumstances.[220]

---

[215] Kennett and Anderson, *The Gun in America*, 98.

[216] Kennett and Anderson, *The Gun in America*, 99.

[217] Kennett and Anderson, *The Gun in America*, 99-100. See also Haag, *The Gunning of America*, 251-55.

[218] Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979); Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 218–19.

[219] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63–67; Spitzer, "Understanding Gun Law History After *Bruen*," 99-100, 105-15.

[220] Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88; Geoffrey Andrew Holmes, Compiled Ordinances of the City of

(continued…)

As discussed earlier, it was only in the post-World War I era when multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society and came to be associated with criminal use that they became a regulatory and public policy concern.

110. The problems with claims that historical multi-shot weapons were both viable and commonly possessed before the late nineteenth century are two-fold: they misrepresent the actual past of the weapons cited, and even more importantly fail to understand the connection between gun technology developments and the steps leading up to changes in gun-related public policy to regulate threats posed by those developments. As discussed previously, that process has occurred, both historically and in the modern era, through a series of sequential steps.

111. *First*, a new gun or gun technology must be invented. *Second*, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution and dissemination. As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[221] And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[222] *Third*, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications. Military weaponry is developed without consideration of potential civilian use and the

---

Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209–210 (1887) § 105; William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89–90, Image 89–90 (1900) § 209; 1911 N.Y. Laws 442–43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1; 1915 N.D. Laws 96, ch. 83, §§ 1–3, 5. Not included in this list are other state laws that barred weapons possession to specific groups (enslaved persons, minors) or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.

[221] Winant, *Firearms Curiosa*, 36.

[222] Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

consequences of dissemination in the civilian market.[223] *Fourth*, some military-designed weapons may then spill over into, or be adapted to, civilian markets and use. *Fifth*, if such weapons then circulate sufficiently to pose a public safety or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes. This pattern also fits Glock switches/auto sears precisely.

112. Again, to simply assert or assume that past firearms design/development, invention, or patenting equals commonality, viability, or a measurable presence or impact on society, is a leap in logic without historical foundation. It would be as logical to reject modern governmental regulation of electric power through such government agencies as state power commissions and the Federal Energy Regulatory Commission (founded in 1977) because no such regulation was enacted around the time of Benjamin Franklin's experiments with electricity in the mid-eighteenth century. The fact that inventors worked on new firearm designs and modifications tells us nothing about the consequences of such designs for society and public policy. And the existence of such designs does not equal technological viability or reliability, much less general availability, much less societal circulation and use of these weapons. Other weapons subject to government restriction in our history further illustrate these principles, including auto sears.

## VI. HISTORIC WEAPONS PROOFING

113. Gun "proofing" (sometimes also "proving" or "testing") refers to "a stress test on a firearm or component of a firearm by firing one or more 'proof cartridges' to ensure the structural integrity of the gun or part being tested. Once the

[223] Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed here—in particular the Bowie knife and various clubs. These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers during the Civil War. Knives and clubs are far simpler technologically compared to firearms (and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

proof cartridge or cartridges are fired, the gun is inspected to verify no damage to any of the parts of the gun has incurred."[224] This process has a long history focusing on what we would now call consumer protection. In the 1630s, England established a "broad system for quality control" to test newly manufactured guns because "gun failures were often severe," often resulting in injuries and fatalities.[225] The British Proof House, created to address this quality control problem, continues to operate up to the present.

114. Gun proofing has a similarly long history in America—bearing in mind, however, that most firearms found in America during the colonial and Federal periods were manufactured abroad and then imported. As historian Brian Delay notes, "on the eve of the Revolution there were only around 175 gunsmiths in the colonies" that had the ability to manufacture new firearms.[226] Gunsmiths in America spent most of their time and effort repairing existing firearms rather than making new ones. This continued to be true into the nineteenth century.[227]

115. Even given that relatively few firearms in America were manufactured here, gun proofing, and also gunpowder proofing, were key to the making of firearms. According to one source, the proofing of gun barrels in the 1770s occurred by loading the barrel "with four times the normal amount of powder along with a patch and ball. The barrel had yet to be mounted onto a stock as this much powder would produce enough recoil to break the stock, or perhaps even the tester's shoulder." After firing, it would then be examined for "cracks and

---

[224] George Harris, "What Does it Mean to Proof a Firearm?" *NRA Shooting Illustrated*, November 29, 2020, https://www.shootingillustrated.com/content/what-does-it-mean-to-proof-a-firearm/

[225] "History of the London Proof House," https://www.gunproof.co.uk/history-of-gun-proof See also Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (Stanford, CA: Stanford University Press, 2019), 28.

[226] Brian DeLay, "The Myth of Continuity in American Gun Culture," *California Law Review* 113 (February 2025): 68.

[227] DeLay, "The Myth of Continuity in American Gun Culture," 60-63.

swells."[228]

116. Proofing extended to gunpowder production as well. Noting that gunpowder was indispensable to firearms operation, a 1794 Pennsylvania law stipulated that gunpowder, including that imported and that produced in the state, was found to "vary much in its strength, and sometimes of inferior qualities." In order to insure that "the purchaser and ***consumer*** [be] protected against fraud and imposition [emphasis added]," it enacted a mandatory testing, proofing, and inspection regimen. This included employment of a recently developed device called a "pendulum powder proof."[229]

117. Massachusetts, a leader in early firearm production, enacted a law in 1804, the preamble of which stated: "Whereas no provision hath been made by law for the proof of Fire Arms manufactured in this Commonwealth by which it is apprehended that many may be introduced into use which are unsafe and thereby the lives of the Citizens be exposed. . . ."[230] The law charged the governor with appointing inspectors for each county "whose duty it shall be to prove all Musket Barrels and Pistol barrels which being sufficiently ground bored and breeched shall be offered to him to be proved — who shall prove the Musket barrels twice in manner following. . . ."[231] Ten years later, Massachusetts amended the law specifying in more detail how the gun proofing was to be conducted.[232] The state

---

[228] Harry Schenawolf, "How Colonial Gunsmiths Forged Musket and Rifle Gun Barrels," *Revolutionary War Journal*, May 29, 2023, https://revolutionarywarjournal.com/how-colonial-gunsmiths-forged-musket-and-rifle-gun-barrels/

[229] 1794 Pa. Laws 764, 764-69, An Act Providing for the Inspection of Gun-Powder, ch. 337.

[230] 1804 Mass. Laws 111, Ch. 81, 1804. — Chapter 81. [January Session, ch, 35.] AN ACT TO PROVIDE FOR THE PROOF OF FIRE ARMS MANUFACTURED WITHIN THIS COMMONWEALTH. https://archives.lib.state.ma.us/server/api/core/bitstreams/f844908a-8cb3-45d8-8382-5fbe24899ee5/content

[231] 1804 Mass. Laws 111.

[232] Act of Feb. 28, ch. 193, §§ 1–2, 1814 Mass. Acts 464, 464–465 (Russell, Cutler, & Co.). "CHAP: CXCII.

enacted similar, more detailed gun proving measures in 1836[233] and 1881.[234]

118. In 1820 New Hampshire enacted a gunpowder inspection law that charged the governor to appoint qualified inspectors to insure that all gunpowder be "well manufactured and composed of pure materials, and such gunpowder shall be of the proof hereinafter mentioned. . . ."[235]

119. Maine enacted a firearm proofing law in 1821. State appointed inspectors were to act as "provers of barrels of all new, or unused fire arms. . . ."[236] Such proofed barrels were then to be marked appropriately.

120. An indication of the extent to which firearms proofing was ingrained in gun work is an 1815 Philadelphia ordinance that required permission from the president of the board of commissioners for anyone seeking to "prove any pistol, gun, musket barrels, or cannon" in certain sections of Philadelphia.[237] Similarly, an 1868 ordinance from Terre Haute, Indiana that barred firearm or cannon discharge included a provision that excepted any who were firearm manufacturers who were "trying or proving articles manufactured or repaired by him."[238] An 1877 ordinance for a city in Missouri made special provision for gunsmiths in the city to be granted "the privilege to fix some suitable place within the corporate limits of the city," for "the purpose of trying or testing fire arms. . . ."[239]

---

[233] Mass. Gen. Laws ch. 28, §§ 63-68, 264-65 (1836).

[234] Charles Allen, Report of the Commissioners on the Revision of the Statutes Page 333, Image 30 (Vol. 2, 1881) available at The Making of Modern Law: Primary Sources. This law increased the maximum number of inspectors allowed per county from two to six.

[235] An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, ch. 25, §§ 1-9, 1820 N.H. Laws 274, 274-76 (Hill & Moore), CHAP. XXV.

[236] ME. STAT., ch. 162, §§ 1–4 (J. Griffin 1821). CHAPTER CLXII. An Act to provide for the proof of Fire Arms.

[237] Act of Nov. 6, 1815, § 8, An Act of Incorporation, for that Part of the Northern Liberties [Philadelphia] (S. Probasco 1824).

[238] An Ordinance Prohibiting the Building and Burning of Bonfires, the Discharge of Cannon or Other Fire-Arms, etc., ch. 18, §§ 1–7, TERRE HAUTE, INDIANA, THE CHARTER, GENERAL ORDINANCES, AND BY-LAWS OF THE CITY (Hebb & Goodwin 1882) (Law Approved August 4, 1868).

[239] Ordinances of the City of Mexico, ch. 6, §§ 1–2, MEXICO WEEKLY LEDGER, Jan. 25, 1877, at 4 (Mexico, Missouri), CHAPTER VI.

121. Benjamin L. Cavataro offered this assessment of historic gun proofing and similar laws: "early American legislators and revisors saw safety standards for firearms as analogous to protections applicable to other consumer products. In short, firearms were understood as consumer products that were properly subject to manufacturer-level safety regulation."[240] Moreover, the federal government took keen interest in firearms' quality when domestic gun production began to significantly increase in the pre-Civil War period. While most directly concerned with the reliability and safety of firearms purchased for military use, the federal government's Ordnance Board (which was responsible for the acquisition of weapons and other military needs) required that firearms be tested before government purchase. Their goal, as expressed in 1837, was to avoid "risk to the national safety by adopting new inventions without being convinced of their superiority."[241] Thus, the safety standards gun makers were obliged to meet for military acquisition would apply as well to civilian purchases of the same or similar firearms. Samuel Colt, for example, acknowledged that his early revolvers from the 1830s and 1840s—tested and rejected by the military for purchase until years later—were "liable to accident."[242] Government pressures eventually led Colt to produce a safer and more reliable product for both the military and civilian markets.

122. Historic gun proofing laws are an exemplar of an analog to the current California law (the Unsafe Handgun Act) that establishes safety requirements for semi-automatic pistols, including requiring a chamber load indicator and a magazine disconnect mechanism. In fact, the early gun and gunpowder proofing laws examined here in many ways presaged the development of broader consumer and product safety laws—notably, the landmark Pure Food and Drugs Act of 1906,

[240] Benjamin L. Cavataro, "Regulating Guns as Products," *George Washington Law Review* 92(February 2024): 160.

[241] Quoted in Lindsay Schakenbach Regele, "A Different Constitutionality for Gun Regulation," *Hastings Constitutional Law Quarterly* 46 (Spring 2019): 528.

[242] Jim Rasenberger, *Revolver* (NY: Scribner, 2020), 136.

for example. The idea that firearms should be manufactured and sold as a safe and reliable product is one that beggars contradiction.

## VII. CONCLUSION

123. As noted at the outset of this Declaration, American governance has long imposed regulations and restrictions related to commercial firearm licensing and commerce. As the manufacturing and distribution of firearms accelerated in the nineteenth century through advances in transportation and the rise of factory-produced weapons, sales-related restrictions also accelerated.

124. The historical weapons regulatory analogs to modern auto sears examined here pertain to the modern regulation of auto sears, and therefore of certain types of semi-automatic handguns (notably the Glock), in two fundamental respects. First, like the rigging of a trap gun, auto sears are simple, inexpensive devices that can be obtained and inserted into certain makes of handguns by the gun owner to create a fully automatic handgun that, by its functionality, poses a substantially greater risk to public safety and good order. A similar comparison is apt for the historic regulation of gunpowder. Second, like the extensive restrictions imposed on fully automatic and semi-automatic firearms and their accompanying ammunition feeding devices, auto sears dramatically increase the firepower of the guns into which they are inserted in a manner that unnecessarily and unacceptably endangers public safety. When semi-automatic and fully automatic firearms began to circulate meaningfully in society and became identified with criminality and the inherent dangers of excessive firepower, they were subject to wide-ranging restriction. Finally, early gun proofing exemplifies historic government concern for, and regulation of, firearms and gunpowder to insure consumer safety and reliability, making them analogs to the challenged provisions of California's Unsafe Handgun Act.125. Gun ownership is as old as the country. But so are guns and other dangerous weapons laws, which date to the Nation's earliest days. Such regulations have adapted to technological and other changes in threats to public safety from that

day to this. If the Nation's first 300 years of history demonstrate anything, it is that gun laws and gun rights were perfectly compatible.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 21 2026, at Williamsburg, Virginia

Robert J. Spitzer

Robert Spitzer

# EXHIBIT A

# EXHIBIT A

February 2026

## Curriculum Vitae


### Robert J. Spitzer

### Adjunct Professor, College of William & Mary School of Law

### Distinguished Service Professor, Emeritus
### State University New York at Cortland

Address: 5333 Center St.
Williamsburg, VA 23188
(607) 423-1781
Robert.spitzer@cortland.edu
https://sites.google.com/site/robertspitzercortland/


Education: A.B. (Political Science), summa cum laude, State University of New York at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

Positions Held:

Adjunct Professor, College of William and Mary School of Law, Spring 2023-present.
Affiliated Scholar, Research Scholar of Public Policy, College of William & Mary, 2023-present.
Affiliated Scholar, Government Department, College of William and Mary, 2023-present.
Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997-present.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985, 1986, 1988.
Copy Editor, Administrative Science Quarterly, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.

Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

**Honors**:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.
Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.
Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.
Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.
Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.
Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.
SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.
Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."
Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.
Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.
Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.
Who's Who in the World, 1996.
Dictionary of International Biography, 1995.
Who's Who in the East, 1995-96; 1997-98
Ex officio member, Cortland County Bicentennial Committee, 1987-89.
Chair, SUNY Cortland Bicentennial Committee, 1987-89.
Phi Eta Sigma, SUNY Cortland, 1994.
Phi Kappa Phi, SUNY Cortland, 1990.

Men of Achievement (1986)
Contemporary Authors, vol. 112 (1985) and subsequent updates.
International Authors and Writers Who's Who, 1985-present.
International Who's Who in Education, Winter 1985-86.
Herbert H. Lehman Graduate Fellowship, 1975-79.
Who's Who Among Students in American Universities and Colleges, 1974-75.
Phi Beta Kappa Club, SUNY College at Fredonia, 1975.
Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

**Research Fellowships and Projects**:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.

**PUBLICATIONS AND PAPERS**:

**BOOKS**:

The Presidency and Public Policy: The Four Arenas of Presidential Power (University, AL: The University of Alabama Press, 1983). A study of the President's relations with Congress in the making of domestic policy. Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987). A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto: Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents

and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution: Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial. Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert Spitzer.

President and Congress: Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021; 9th ed. 2024; 10th ed. 2026). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Theodore Lowi, Margaret Weir, Caroline Tolbert, Andrea Campbell (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021; 14th ed. 2023).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; 3rd ed. 2016; 4th ed. 2025). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (Oxford University Press, 2015; revised paperback ed. 2017); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

The Gun Dilemma: How History Is Against Expanded Gun Rights (Oxford University Press, 2023; revised paperback ed. 2025). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Gun Law History: How Three-hundred Years of Weapons Laws Built the Nation (Oxford University Press, forthcoming).

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present.

Books include:

Daniel Hoffman, Our Elusive Constitution, (1997)
Martin Sheffer, God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment, (1999)
Daniel Levin, Representing Popular Sovereignty: The Constitution in American Political Culture, (1999)
Robert Spitzer, ed., Politics and Constitutionalism, (2000)
Laura Langer, Judicial Review in State Supreme Courts (2002)
Ian Brodie, Friends of the Court (2002)
Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2002)
Artemus Ward, Deciding to Leave: The Politics of Retirement from the United States Supreme Court (2003)
James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)
Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).
Stephen Kershnar, Justice for the Past (2004).
Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).
Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)
Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).
G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).
Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).
G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform, 3 vols. (2006).
Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).
Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).
David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).
Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).
Robert Blomquist, The Quotable Judge Posner (2010).
Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).
Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).
Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law

and Policy (2nd ed. 2010).
Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).
Stephen A. Simon, Universal Rights and the Constitution (2014).
Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).
Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).
Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit of Moderation (2016).
Peter J. Galie, et al., eds., New York's Broken Constitution (2016).
Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).
Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).
Clyde H. Ray, John Marshall's Constitutionalism (2019).
Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).
Robert M. Howard, et al., Power, Constraint, and Policy Change: Courts and Education Finance Reform (2021).
Mark C. Dillon, The First Chief Justice (2022).
Richard W. Waterman, Constitutional Ambiguity and the Interpretation of Presidential Power (2025).
Eric T. Kasper and JoAnne Sweeny, eds., Free Speech and Incitement in the Twenty-First Century (2025).
Richard W. Waterman, Through the Constitution's Eyes: A Historical Analysis of the President's Article II Powers and Duties (2025).
Nina M. Moore, Toeing the Line: The U.S. Supreme Court and Affirmative Action Politics (2026).
Barbara L. Graham, Supreme Court Policymaking and Race (2026).

Book Series Editor, Presidential Briefing Books, Routledge, 2015-present.
Mary Stuckey, Political Rhetoric (2015)
Michael A. Genovese, Presidential Leadership in an Age of Change (2015)
Christopher Fettweis, Making Foreign Policy Decisions (2016)
Nancy Maveety, Picking Judges (2016)
Richard S. Conley, Presidential Relations with Congress (2017)
Andrew L. Stigler, Governing the Military (2019)
Graham G. Dodds, The Unitary Presidency (2020)

Member, Board of Editors for the Encyclopedia of Guns in American Society, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, Issues: Understanding Controversy and Society, ABC-CLIO, 2011-2016.

**BOOK CHAPTERS**:

"Third Parties in New York," in Governing New York State (formerly New York State Today), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.: SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in Social Regulatory Policy: Recent Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO: Westview Press, 1988), 111-141.

"The President's Veto Power," in Inventing the American Presidency: Early Decisions and Critical Precedents, ed. by Thomas Cronin (Lawrence, KA: University Press of Kansas, 1989), 154-179.

"President and Congress," in The CQ Guide to the Presidency, ed. by Michael Nelson (Washington, D.C.: Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in Encyclopedia of American Political Parties and Elections, ed. by L. Sandy Maisel (New York: Garland Pub., 1991): American Labor Party, Benjamin Bubar, closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, American Government: Freedom and Power (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in Encyclopedia of the American Legislative System, ed. by Joel Silbey (NY: Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in The Presidency and the Persian Gulf War, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York: Praeger, 1993).

"Is the Separation of Powers Obsolete?" in The Presidency Reconsidered, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in Understanding the Presidency, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the Encyclopedia of the American Presidency, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including “Council on Environmental Quality,” “Office of Intergovernmental Relations,” “Presentation Clause,” “Signing Statements,” “Item Veto,” “Pocket Veto,” “Regular Veto”.

Two entries in the Encyclopedia of the United States Congress, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including “Separation of Powers” and “Presidential Veto”.

"The President, Congress, and the Fulcrum of Foreign Policy," in The Constitution and the Conduct of American Foreign Policy, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in The Executive Office of the President, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the Oxford Historical Guide to American Government (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in Liberty Under Law, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

"Multi-Party Politics in New York," in Multi-Party Politics and American Democracy, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of “Cultures” and “Debates” boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, We the People (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

“Gun Control: Constitutional Mandate or Myth?” in Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

“The Right to Life Party” and related entries in The Encyclopedia of American Third Parties, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

“New York, New York: Start Spreadin’ the News,” in Prayers in the Precincts, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

“The Clinton Crisis and Its Consequences for the Presidency,” in The Clinton Scandal

and the Future of American Politics, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in Politics and Constitutionalism, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the Encyclopedia of American Political History, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in The Constitution and Its Amendments, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in The Second Amendment in Law and History, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in The Oxford Companion To United States History ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in The Presidency and the Law: The Clinton Legacy, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in Honor and Loyalty: Inside the Politics of the Bush White House, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the Encyclopedia of Guns in American Society, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; 2nd ed. 2011; 3rd ed. 2023): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the Encyclopedia of the American Presidency, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for The Encyclopedia of New York State, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

“Gun Rights for Terrorists? Gun Control and the Bush Presidency,” Transformed By Crisis: The Presidency of George W. Bush and American Politics, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

“The Presidential Veto Is An Effective Tool for Governing,” in Debating the Presidency, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

“Veto: The Power to Say ‘No,’” in Thinking About the Presidency, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

“The ‘Protective Return’ Pocket Veto: Presidential Aggrandizement of Constitutional Power,” Executing the Constitution, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

“Gun Violence and Gun Control,” in Social Issues in America: An Encyclopedia, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

“The Commander-in-Chief Power and Constitutional Invention in the Bush Administration,” The Presidency and the Challenge of Democracy, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

“Right to Bear Arms,” Encyclopedia of American Civil Liberties, 4 vols., ed. By Paul Finkelman (NY: Routledge, 2006).

“Gun Violence is a Serious Problem,” Gun Violence: Opposing Viewpoints, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

“The Commander-in-Chief Power in the George W. Bush Administration,” Presidential Power in America, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

“Presidential Veto” and “Gun Control,” Encyclopedia of American Government and Civics ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

“Gerald R. Ford,” Encyclopedia of Political Communication ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

“Leading Elite Opinion: Law Reviews and the Distortion of Scholarship,” in Leadership at the Crossroads, Vol 2, “Leadership and Politics,” ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

“Gun Control Policy,” in Encyclopedia of Issues in U.S. Public Policy, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in Winning the Presidency 2008, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in Debating Reform: Conflicting Perspectives on How to Fix the American Political System, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" You Asked: 20 Questions About America, U.S. Department of State, 2010.

"Liberals and the Presidency," Contending Approaches to the American Presidency, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" The American Presidency in the 21st Century, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in Governing America, ed. By Paul Quirk and William Cunion (New York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for Issues: Understanding Controversy and Society, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," Encyclopedia of Applied Ethics, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" Winning the Presidency 2012, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." American Government. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," American Governance, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," American Presidents and the Constitution, Ken Gormley, ed. (New York: New York University Press, 2016, 2022).

"The Unitary Executive and the Bush Presidency," The George W. Bush Presidency, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Guns Return to American Elections," US Election Analysis 2016: Media, Voters and the Campaign, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 2016.

"Stricter Gun Laws are Reasonable and Sensible," Gun Control in the United States: A Reference Handbook, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," Guns: Interdisciplinary Approaches to Politics, Policy, and Practice, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Guns and the 2020 Elections," US Election Analysis 2020, Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 2020.

"Looking Down the Barrel of the 2020 Elections," The 2020 Presidential Election: Key Issues and Regional Dynamics, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," Developments in American Politics 9, Gillian Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," The Conversation on Guns, James A. Densley, ed. (Baltimore: Johns Hopkins University Press, 2023).

"To Brandish or Not to Brandish: The Consequences of Gun Display," New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, 2023).

"Guns and the 2024 Elections," U.S. Election Analysis 2024, Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 2024.

**ARTICLES**:

"Jamestown: Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69. Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun Control, April/May, 1987; Gun Control, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and The Informed Argument, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY: Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," America, June 15, 1985.

"The Item Veto Reconsidered," Presidential Studies Quarterly 15(Summer, 1985): 611-17.

"Promoting Policy Theory: Revising the Arenas of Power," Policy Studies Journal, 15 (June 1987), 675-89. Reprinted in Daniel C. McCool, ed. Public Policy Theories, Models, and Concepts (Englewood Cliffs, NJ: Prentice-Hall, 1995); and L.F. Goodchild, et al, Public Policy and Higher Education (Needham Heights, MA: Simon & Schuster, 1997).

"A Course Module: The Politics of Abortion," NEWS for Teachers of Political Science, 53 (Spring, 1987).

"But for A Single Vote...," New York Delegate, July, 1987. Abridged version appeared on editorial page of the Rochester Times Union, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", Election Politics, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," Policy Studies Journal, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," Policy Studies Journal, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," PS: Political Science and Politics, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," PS: Political Science and Politics, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," Oklahoma City University Law Review, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," Congress and the Presidency, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," Pace Law Review, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" The Spectator, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," Political Science Quarterly, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," Presidential Studies Quarterly, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," PS: Political Science and Politics, 32 (September 1999).

"The Gun Dispute," American Educator, 23 (Summer 1999): 10-15. Reprinted in Annual Editions: Criminal Justice (Dushkin/McGraw-Hill, 2000); and in Criminology

(Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," Congress Monthly, September/October 2000.

"Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, Silveira v. Lockyer (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Presidential Studies Quarterly 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson* Case," St. John's Law Review 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," Focus on Law Studies 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," Fordham Law Review 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," PS: Political Science and Politics 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, The PRG Report 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, American Literary History 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, Injury Prevention 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," Albany Government Law Review 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," Presidential Studies Quarterly 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," Gonzaga Law Review 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," Government, Law and Policy Journal 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," Presidential Studies Quarterly 42(September 2012): 637-55.

"Gun Laws," New York State Bar Association Journal 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," Presidents and Executive Politics Report 35(Fall 2012).

"Writing the Gun Debate," Los Angeles Review of Books, February 10, 2013.

"A Historical Look at Gun Control in America," WCNY Magazine, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," PS: Political Science and Politics 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," The Islamic Monthly, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," White House Studies 12(October 2013): 125-46.

"A Look at the 2014 Elections," WNCY Magazine, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," Albany Law Review, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," Social Science Docket, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," The Critique (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" Items: Insights from the Social Sciences, Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.

“Understanding Gun Law History After *Bruen*: Moving Forward by Looking Back,” Fordham Urban Law Journal 51 (October 2023): 57-115.

“Historical Weapons Restrictions on Minors,” Rutgers University Law Review Commentaries 76(Spring 2024): 101-24.

“America’s Untold Gun Law History,” The Torch: The Magazine of the International Association of Torch Clubs (98) Fall 2024: 20-24.

“Historical Firearms Licensing and Permitting Laws,” Dickinson Law Review 129 (Spring 2025): 1041-74.

**OP-ED ARTICLES/BLOG POSTS**:

"Court Rulings on 2nd Amendment: No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," Rochester Times Union, September 14, 1987.

"The Great Gun Fallacy," Syracuse Post-Standard, March 30, 1989.

"Four Cases on Right to Bear Arms," Syracuse Post-Standard, April 22, 1989.

"Don't Start Line-Item Veto," Syracuse Post-Standard, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," Syracuse Post-Standard, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," Los Angeles Times, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" Christian Science Monitor, September 19, 1997.

“Assault Weapons Ban,” Christian Science Monitor, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," Syracuse Post-Standard, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," Syracuse Post-Standard, April 20, 1999.

"The Gun Saga in Congress," Intellectual Capital, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" Intellectual Capital, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," Intellectual Capital 5(February 10-17, 2000).

"Gun Control After Columbine," Intellectual Capital 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," The Catholic Review, March 30, 2000.

"Why Would Anyone Want the Job Now?" Chicago Tribune, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," Syracuse Post-Standard, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," Syracuse Post-Standard, June 12, 2001.

"Exposure Erodes Clout of NRA," Columbus Dispatch, April 24, 2003.

"Hazing Scandals," Syracuse Post-Standard, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, Syracuse Post-Standard, February 18, 2004.

"NRA Loses Its Political Firepower," Los Angeles Times, April 12, 2004. Also in the Deseret News.

"A 'Tortured' Interpretation of the President's Vast Powers," Syracuse Post-Standard, June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives,"

September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard*, January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post*, September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post*, January 3, 2012.

"The Disappearing Faculty," *The Huffington Post*, February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post*, June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post*, June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard*, July 4, 2012.

"Aurora Won't Change Anything," *Salon*, July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill*, January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News*, January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News*, January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard*, January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News*, April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle*, April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog,* American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine,* June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him."

*Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post,* June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post,* January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

“Americans Used to Be Good at Gun Control. What Happened?” *New York Times,* October 3, 2017.

“An American Standoff,” *New York Daily News*, October 8, 2017.

“Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting,” *Washington Post,* February 15, 2018.

“The NRA’s Journey from Marksmanship to Political Brinkmanship,” *The Conversation,* February 23, 2018.

“How to Keep the Deadliest Guns Out of Dangerous Hands,” *New York Daily News,* March 5, 2018.

“You Can Report a Bad Driver; Why Not an Angry Gun Owner?” *Syracuse Post Standard*, March 11, 2018.

“Here’s What Trump Doesn’t Know about Knives, Guns and Murder,” *Washington Post,* May 9, 2018.

“‘Stand Your Ground’ Laws Have Failed to Stem Crime or Improve Safety,” Rockefeller Institute of Government, June 4, 2018.

“What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'” *CNN.com*, September 13, 2018.

“The Gun Safety Issue is Actually Helping Democrats,” *New York Times,* November 12, 2018.

“Impeachment: Be Careful What You Ask For,” *Syracuse Post Standard,* December 30, 2018.

“Why the Supreme Court Will Almost Surely Strike Down New York City’s Gun Law,” *New York Daily News,* January 24, 2019.

“Why ‘Vice’ Deserves an Oscar,” *Los Angeles Times*, February 7, 2019.

“One Year Later: Parkland Shifted the Politics of Guns,” *Syracuse Post Standard,* February 17, 2019.

“There’s No Second Amendment Right to Large-Capacity Magazines,” *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News*, October 14, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation*, November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot*, February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK*, February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot*, May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation*, May 25, 2022.

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times*, May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network*, May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation*, June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK*, June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation*, November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-Standard*, November 4, 2022.

"What our past tells us about young people and guns," *The Hill*, March 28, 2023.

"Stand-Your-Ground, the Castle Doctrine, and Public Safety," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 3, 2023.

"For Most of U.S. History We've Had Both Gun Rights and Gun Regulations," *TIME.com,* June 6, 2023.

"Is domestic abuse really protected by the Second Amendment?" *The Hill*, July 14, 2023.

"America's Original Gun Control," *The Atlantic Monthly,* August 12, 2023.

"The Unusual Thing About Hunter Biden's Indictment," *CNN.com,* September 15, 2023.

"Minors, Guns, History, and the Second Amendment," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, April 24, 2024.

"The Supreme Court's Gun Rights Decision Deepens the Cracks in Originalism," *The Hill,* June 24, 2024.

"Court's Immunity Ruling Undermines Founders' Intent," *Virginia Daily Press/Virginian-Pilot,* July 17, 2024.

"Historical Context, Weapons Laws, and Early American Governance," *Second Thoughts Blog*, Duke Center for Firearms Law, October 18, 2024.

"The Trump Threat to America's Legal Order," *ArtsForum*, November 12, 2024.

"Newport News Council's Revised Gun Rule has Long Legal Precedent," *Virginia Daily Press/Virginian-Pilot*, December 8, 2024.

"A Court Ruling on Minors and Handguns Got the History Wrong," *The Hill*, February 7, 2025.

"Historic Weapons Licensing Laws," *Second Thoughts Blog*, Duke Center for Firearms Law at Duke University, June 4, 2025.

"What Would the Founders Have Thought About 'No Kings' Rallies?" *Virginia Daily Press/Virginian-Pilot*, June 27, 2025; *Virginia Gazette*, June 28, 2025.

"Trump is Making It Easier Than Ever for Criminals to Get Guns," *The Hill*, July 3, 2025.

"How America Became Awash in Guns," *Vital City*, September 10, 2025. 175

"Trump's idea to ban guns for trans people would backfire," *The Hill,* September 11, 2025.

"Virginia Gun Purchase Licensing Law Rooted in History," *Virginia Daily Press/Virginian-Pilot,* December 11, 2025.

"History is Clear: Gun Carry Regulation was Always the Norm," *The Hill*, January 16, 2026.

"What Happens When the Second Amendment Collides with Public Safety?" *DCReport*, February 10, 2026.

**TESTIMONY, BRIEFS, AND REPORTS**:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting: Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.*, U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Healey,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26, 2019).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education

to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta*, U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.

**PAPERS AND PRESENTATIONS** (not including those given on the Cortland campus):

"The President as Policy-Maker: The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party: The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic: Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet: Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power: Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power: The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto: Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete? An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the Washington Post, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes: The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October

14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"College and Life: Really the Same," SUNY Cortland Commencement Address, May 14, 2017.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol*

*Association v. NYC*, November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C., November 29-December 1, 2022.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., February 16, 2023.

"The Obama Presidency and Gun Policy," Paper Presented for Hofstra University's 13th Presidential Conference on The Barack Obama Presidency, Hempstead, NY, April 19-21, 2023. Archived with selected conference papers at: https://www.hofstra.edu/cultural-center/obama/; https://www.hofstra.edu/sites/default/files/2024-02/spitzer-paper.pdf

"Gun Law History and Virginia," League of Women Voters, Williamsburg, Va., June 22, 2023.

"Gun Policy in the U.S.: Past, Present, Future," College of William & Mary, Williamsburg, Va., September 21, 2023.

"Historical Gun Laws Pertaining to Minors," 2023 Cooper-Walsh Colloquium, Conference on *Public Health, History, and the Future of Gun Regulation After Bruen,* Fordham University School of Law, New York City, NY, October 12-13, 2023.

"Presidential Impeachment: What It Is, How It Works, Why It Matters," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., October 19, 2023.

"The Politics of Gun Control," TORCH Club of Williamsburg, Va., January 16, 2024.

"Gun Law History in America and Virginia," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., February 21, 2024.

"Law and History Roundtable: The *Rahimi* Supreme Court Case," Center for the Study of Guns and Society, Duke University School of Law, Durham, NC, August 2, 2024.

"The 2024 Presidential Elections," TORCH Club of Williamsburg, Va., October 15, 2024.

"The 2024 Presidential Elections," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., October 18, 2024.

"Gun Law History: Separating Fact from Fiction," SUNY Geneseo, NY, October 22, 2024.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., February 28, 2025.

"Historical Gun and Weapons Licensing and Permitting Laws," Conference on the Second Amendment After *Bruen,*" Penn State Dickinson Law School, Carlisle, PA, April 4, 2025.

Guest lecturer, PUBP 491-02: Gun Policy and the Second Amendment, College of William & Mary, Spring 2025, Fall 2025.

"The Unitary Theory of Executive Power: The Most Important Constitutional Theory No One Knows," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., October 8, 2025.

**PANEL PARTICIPATION**:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans: An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, “Executing the Constitution,” APSA, Boston, August 29 - Sept. 1, 2002.

Chair, “Marketing the President,” APSA, Philadelphia, August 28-31, 2003.

Discussant, “Media Coverage of the Presidency,” APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, “Does Presidential Leadership in Foreign Policy Matter?” APSA, Chicago, September 2-5, 2004.

Roundtable member, “The Ins and Outs of Obtaining a Book Contract,” APSA, Chicago, September 2-5, 2004.

Discussant, “Presidential Power: Lessons From the Past,” APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, “The Unitary Executive in a Separated System,” APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, “The Culpability of Congress,” Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, “Keeping the Modern Presidency in Check and Balance,” APSA, Chicago, August 30-September 2, 2007.

Discussant, “Presidential Endings: George W. Bush and the Final Two Years,” APSA, Chicago, August 30-September 2, 2007.

Discussant, “Staffing and Decisionmaking in the White House,” APSA, Boston, August 28-31, 2008.

Panel Chair, “Early Assessments of the Obama Presidency,” APSA, Washington, D.C., September 2-5, 2010.

Discussant, “Historical Perspectives on the Presidency,” APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, “Politics and Presidential Travel,” APSA, Washington, D.C., August 27-31, 2014.

Discussant, “The Obama Presidency and Constitutional Law,” APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022 (virtual).

Discussant, "Revisiting Watergate: Crisis, Renewal, and the Presidency," APSA, Philadelphia, Sept. 5-8, 2024.

**BOOK REVIEWS**:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142: An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers: Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions: Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective, Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in

Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives, Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and

Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans: The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution,

by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).

Gun Country: Gun Capitalism, Culture and Control in Cold War America by Andrew McKevitt, Perspectives on Politics 22(December 2024).

**SELECTED MEDIA APPEARANCES/QUOTATIONS**:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Full Frontal With Samantha Bee," "Ali Velshi"; FOX News, PBS's "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021), "Rifles, Rights, and Realities: The Great Gun Debate" (Famous Creations LLC). Quoted in or by the New York Times, Atlantic Monthly, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America,

Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area universities.

## **PROFESSIONAL ASSOCIATIONS**:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group), APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.

## **TEACHING AREAS**:

American Government: courses taught include Law and Politics, Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy: courses taught include Politics and Policy, Introduction to Public Policy, Gun Policy. Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

## **TEACHING-RELATED AWARDS**:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students." (The only faculty member ever to win this award more than once.)

**OTHER PROFESSIONAL ACTIVITIES:**

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.

**SELECTED COMMUNITY SERVICE**

Advisory Council, WHRO Public Media, Williamsburg, Va., 2025-present.

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).
Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's (N.Y.) Odyssey 2010 Project, 1996.

**EXHIBIT B**

## EXHIBIT B

## TABLE OF WEAPONS LICENSING LAWS*

| STATE | CARRY OR HAVE | FIRE OR DISCHARGE PERMIT | HUNT SPORT | COMMERCIAL WEAPON SALE FIRE TRANSPORT | GUNPOWDER EXPLOSIVES LICENSING | SELLER REGISTERS BUYER | NAMED GROUPS & | PRE-CIVIL WAR BLACKS ^ | REG TAX |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | | 1879 | | 1837,1874, 1875,1886, 1892,1898, 1899 | | | | 1805 | 1837 1851 1865 1867 |
| Alaska | 1903** | | | | | | | | |
| Arizona | 1880** | | | | | | | | |
| Arkansas | 1923, 1931, 1935 | 1871 | | 1882 | | | | 1838 | |
| California | 1876#, 1878#, 1880#, 1880, 1884#, 1890#, 1891, 1896#, 1917#, 1923# | 1869 | | 1854,1856, 1880,1886 | 1883,1889 | 1917,1923, 1931 | | | |
| Colorado | | 1875 | | | | 1911 | | | |
| Connecticut | 1890, 1923#, 1935 | 1835, 1845, 1869, 1877 | | 1642,1923 | 1775,1827, 1874,1901, 1909,1930 | 1918 | 1642,~ 1665~ | | |
| Delaware | | | | 1911 | 1911 | 1911 | 1909 | 1797, | 1909 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 1832,<br>1841,<br>1843 | |
| District of Columbia | 1892#,<br>1932# | | | | | | | | |
| Florida | 1893#,<br>1931 | | | 1878,1881,<br>1887,1889,<br>1895 | | | 1847~ | 1865/66 | |
| Georgia | 1910# | | | 1897,1902 | 1921 | | | 1768,<br>1784 | 1866<br>1894 |
| Hawaii | 1925,<br>1927#,<br>1933 | | 1870,<br>1933 | 1927, 1933 | | 1927,1933,<br>1933 | | | |
| Idaho | 1905,**<br>1910** | | | | | | | | |
| Illinois | 1876,<br>1882#,<br>1887#,<br>1893#,<br>1914#,<br>1917#,<br>1931# | 1841, 1869 | | 1814, 1914 | 1851,1869,<br>1881 | 1885 | | | |
| Indiana | 1925# | 1855 | | 1895, 1925 | 1847 | | 1925 | | |
| Iowa | | 1855, 1880 | | 1887 | 1873 | | | | |
| Kansas | 1879,**<br>1882,**<br>1884,**<br>1887,**<br>1888,**<br>1888,**<br>1890,**<br>1890,**<br>1893** | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Kentucky | | | | 1884 | 1864,1874 | | | | |
| Louisiana | | 1870 | | 1869,1870, 1880,1889 | | | | 1848 | 1857 1869 |
| Maine | 1909# | 1867 | | | 1848,1855, 1867,1873, 1874,1878 | | | | |
| Maryland | | | 1876, 1882 | | | | 1882 | 1806 | |
| Massachusett s | 1906#, 1927# | | | | 1651,1895, 1898 | | 1769,~ 1884, 1922 | | |
| Michigan | 1889, 1925#, 1927# | 1848, 1895 | | | | 1913,1925, 1927 | | | |
| Minnesota | 1882#, 1933 | 1858 | | | 1858,1889 | | | | |
| Mississippi | | | | 1896,1898, 1906 | | | | 1804 | 1841 , 1844 1861 1867 1874 1882 1900 |
| Missouri | 1871, 1880, 1892, 1921# | 1843, 1894 | | 1888, 1921 | 1899 | 1921 | 1844~ | 1818, 1854 | |
| Montana | 1895, 1918, 1935# | | | 1894 | | 1918 | 1913 | | |
| Nebraska | 1895# | | | | 1869 | | | | |
| Nevada | 1903,** | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1905** | | | | | | | | |
| New Hampshire | 1917#, 1923# | 1823, 1870 | | 1689 | 1820 | | 1917, 1923 | | |
| New Jersey | 1873#, 1892, 1897#, 1905, 1912, 1927#, 1934 | 1871 | 1722, 1751, 1771, 1902, 1914 | | | | 1914, 1916 | | |
| New Mexico | | | 1915 | | | | | | |
| New York | 1881#, 1885#, 1891, 1903, 1911 | 1824, 1881, 1898 | 1763, 1923 | | 1885,1890, 1903 | 1911 | 1680,~ 1884 1885, 1911, 1923 | | |
| North Carolina | 1919# | | | 1889,1919 | | 1919 | | 1840 | 1856 1858 1866 1883 1909 |
| North Dakota | 1915#, 1923#, 1925#, 1931 | | | | | 1923 | | | |
| Ohio | 1933 | 1823, 1855, 1856 | | | 1835,1878, 1884,1889, 1900,1902 | | | | |
| Oklahoma | 1902** | | | 1890 | | | | | |
| Oregon | 1887, 1898#, 1913#, | 1868, 1879 | | 1887,1889 | 1872 | 1913,1917 | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1917#, 1925 | | | | | | | | |
| Pennsylvania | 1929#, 1931# | 1713,1721, 1721,1750, 1750,1824 | | | | | 1676,~ 1763,~ 1903 | 1706 | |
| Rhode Island | 1927# | | 1907 | 1851 | 1821,1902 | | | | |
| South Carolina | 1934 | 1802 | | 1890, 1893 | | | | 1740 | 1923 |
| South Dakota | 1933# | | 1899 | | | | | | |
| Tennessee | | | | 1863, 1867, 1879 | | | | | |
| Texas | | 1898 | 1919 | 1860,1872, 1880, 1887, 1899 | | 1931 | | | 1872 |
| Utah | 1888 | | 1905 | | 1875 | | 1850,~ 1905 | | |
| Vermont | 1895 | 1890, 1895 | 1908 | | 1891,1894 | | | | |
| Virginia | 1899#, 1908#, 1926, 1934# | 1859 | | 1876 | | 1899,1926 | | 1792, 1805, 1806 | 1926 |
| Washington State | 1895# | 1890 | | 1890,1892 | 1881,1881, 1881,1883 | | 1911 | | |
| West Virginia | 1881, 1925# | 1875 | 1909 | 1856,1876 | | 1925 | | | |
| Wisconsin | 1896#, 1931-33 | 1888 | | | 1888 | | | | |
| Wyoming | 1933 | 1893 | 1899, 1913 | | | 1933 | 1915 | | |
| U.S. GOVT | | | | | | | | | 1919 1932 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL STATES | 40 | 27 | 12 | 21 | 22 | 17 | 15 | 13 | 10 |
| TOTAL LAWS | 106 | 46 | 20 | 61 | 51 | 25 | 27 | 20 | 26 |

*Sources: https://firearmslaw.duke.edu/repository/search-the-repository/; HeinOnline; Genesa C. Cefali and Jacob D. Charles, "A Brief Overview of Gun Registration in U.S. History," *New Histories of Gun Rights and Regulation*, Joseph Blocher, Jacob D. Charles and Darrell A.H. Miller, eds. (NY: Oxford University Press 2023), 167-94. Note that the unit of analysis here is the law, not the state, though the laws are organized by state for the sake of clarity. A few of the above laws appear in more than one category.
&Named groups include Native Americans, felons, non-citizens, non-state residents, and minors.
**Laws with this mark from Mark Anthony Frassetto, Kellen Heniford, and Anna Neiman-Golden, "An Interactive Database of Historical Public Carry Licensing Laws," *Second Thoughts Blog*, Duke University Center for Firearms Law, November 13, 2025, https://firearmslaw.duke.edu/2025/11/an-interactive-database-of-historical-public-carry-licensing-laws; https://airtable.com/appOTa0I7x4kaIk8o/shrU5Kz6pCYO86tpu/tblNaBhKQJvophCtK/viw3P6GCP6sZl2Len
^Laws pertaining to the enslaved or free persons of color.
# Weapons carry laws that included discretionary evaluative criteria for governmental officials to determine whether to grant the license application.
~Licensing laws pertaining to Indigenous people.

# EXHIBIT C

# EXHIBIT C

# LICENSE AND LICENSING LAWS

**ALABAMA**

Harry Toulmin, A Digest of the Laws of the State of Alabama: Containing the Statutes and Resolutions in Force at the End of the General Assembly in January, 1823. To which is Added an Appendix; Containing the Declaration of Independence; the Constitution of the United States; the Act authorizing the People of Alabama to form a Constitution and State Government; and the Constitution of the State of Alabama Page 627, Image 655 (1823) available at The Making of Modern Law: Primary Sources. 1805
Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, except the tools given him to work with, or that he is ordered by his master, mistress, or overseer, to carry the said articles from one place to another, but all and every gun , weapon, or ammunition, found in the possession or custody of any slave, may be seized by any person, and upon due proof made thereof, before any justice of the peace of the county or corporation where such seizure shall be made, shall, by his order, be forfeited to the seizer, for his own use; and moreover, every such offender shall have and receive, by order of such justice, any number of lashes, not exceeding thirty-nine, on his bare back for every such offense : Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and revocable at any time within such term, at the discretion of the said justice, and to prevent the inconveniences arising from the meeting of slaves.

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.
And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

John W.A. Sanford, The Code of the City of Montgomery [Alabama], Prepared in Pursuance of an Order of the City Council of Montgomery Page 7-9, Image 12 (1861) available at The Making of Modern Law: Primary Sources. 1856.
[An Act to Incorporate the City of Montgomery, Approved December 23d, 1837] § 6. And be it further enacted, That the said Mayor and Aldermen, shall have power and authority for the

ordinary current expenses of said city, to assess, levy and collect annually, a tax on. . . pistol galleries, fifty dollars…

An Act to Establish Revenue Laws of the State of Alabama, no. 1, § 2, pt. 11, 1865 Ala. Laws 3, 7 (Reid & Screws 1866), AN ACT To establish Revenue Laws of the State of Alabama.
11. On all pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie-knives, or knives of the like description, held by persons not regular dealers as aforesaid, a tax of three dollars each; and said taxes shall be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year; and in default of such payment when demanded by the assessor, said pistols, revolvers, bowie knives, or knives of like description, shall be seized by him, and unless redeemed by payment within ten days thereafter of such tax with an additional penalty of fifty per cent., the same shall be sold at public outcry before the court house door, after five days'
notice, and the overplus remaining, if any, after deducting the tax and penalty aforesaid, shall be paid over to the person from whom the said pistols, revolvers, bowie knives, or knives of like description, were taken.

[REGULATORY TAX] The Revised Code of Alabama, Ch. 3, Article II, Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources. 1867
Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.
https://go.gale.com/ps/retrieve.do?tabID=Monographs&resultListType=RESULT_LIST&searchResultsType=SingleTab&retrievalId=a2089b1e-e11b-4197-9fc5-674d5575b69f&hitCount=1138&searchType=BasicSearchForm&currentPosition=122&docId=GALE%7CDT0104044702&docType=Code&sort=Pub+Date+Forward+Chron&contentSegment=ZMMK&prodId=MMLP&pageNum=7&contentSet=GALE%7CDT0104044702&searchId=R1&userGroupName=cowmsl&inPS=true

1875-76 Ala. Acts Ch. 1, p. 82
15. For dealers in pistols, bowie-knives and dirk-knives, whether the principal stock in trade or not, fifty dollars. . . .
23. For each shooting gallery, twenty-five dollars.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery, with the Charter Page151, Image 151 (1879) available at The Making of Modern Law: Primary Sources. 1879 [Ordinances of the City of Montgomery,] § 449. Any person who fires or discharges, or causes to be fired or discharged, any pistol, gun, cannon, anvil, or anything of like kind or character; or who lets off or discharges any rocket, fire-crackers, squib or other fire-works, without first having obtained permission of the Mayor, who shall designate the place where such firing may be done, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources. 1892
[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

1898 Ala. Acts 190, An Act To Amend The Revenue Laws Of The State Of Alabama, pt. 66-67. 66th. For dealers in pistol, bowie or dirk knives, whether principal stock in trade or not, one hundred dollars. 67th. For wholesale dealers in pistol or rifle cartridges in towns or cities of twenty thousand or more inhabitants, ten dollars. In all other places, five dollars: Provided, That the wholesale dealers license shall entitle them to sell at retail.

**ARKANSAS**

Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A. D. 1837, in the Year of Our Independence the Sixty-second, and of the State of Second Year Page 587, Image 602 (1838) available at The Making of Modern Law: Primary Sources. 1838
Negroes and Mulattoes, § 17. No free negro shall be suffered to keep or carry any gun or rifle, or weapon of any kind, or any ammunition without a license first had and obtained, for that purpose, from some justice of the peace of the county in which such free negro or mulatto resides, and such license may be granted and revoked by any justice of the peace of the county. §18. Every gun, rifle, or weapon of any kind, or ammunition, found in the possession or custody of any free negro or mulatto, not having a license as required by the preceding section, may be seized by any person, and upon due proof thereof made before some justice of the peace of the county in which such seizure was made, shall by order of such justice be forfeited to the use of the person making the seizure, and such justice shall also impose a fine on such negro or mulatto, for the use of the county, not exceeding twenty dollars.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 231, Image 231 (1871) available at The Making of Modern Law: Primary Sources. 1871
[Offenses Affecting the Public Safety, § 288. No person shall fire or discharge any cannon, gun, fowling piece, pistol, or fire-arms, of any description, or fire, explode, or set off any squibs, cracker, or other thing containing powder or other combustible or explosive material, without permission from the may which permission shall limit the time of such firing, and shall be subject to be revoked by the mayor at any time after it has been granted. Any violation hereof shall subject the party to a fine of not less than two nor more than ten dollars.]

John H. Herry, Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of the State of Arkansas; General Incorporation Laws; and All Acts of the General Assembly Relating to the City; in Force March 10, 1882 Page 149, Image 334 (1882) available at The Making of Modern Law: Primary Sources. 1882
[Ordinances of the] City of Little Rock, [§ 344. That it shall be unlawful for any person to engage in, exercise or pursue any of the following avocations or business without first having obtained and paid for a license therefor from the proper city authorities the amount of which licenses are hereby fixed as follows, to wit: . . . ]§ 27. Shooting galleries, or pistol galleries, $25 per annum, in advance.

1923, An Act to Regulate the Ownership of Pistols and Revolvers, No. 430, 1-4, Ark. Acts 379, 379-80 (requiring persons having pistols and revolvers to present such firearms to the county clerk for registration and requiring such persons to apply for a license to possess the firearm).

1931 Ark. Laws 704, 704-6
ACT 225.
AN ACT to Prohibit the Possession, Transportation or Sale of Machine Guns, and Inflicting Penalty for Violation Thereof.
SECTION 1. It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or for any railroad company, or express company, or other common carrier, or any officer, agent; or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport from one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm of the type commonly known as a machine gun.
SECTION 2. It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store, keep, possess, or have in possession, except as hereinafter provided, any firearm of the type commonly known as a machine-gun.
SECTION 3. It shall be unlawful for any person to sell, or give away, or be interested directly or indirectly, in the sale or giving away, of any firearm of the type commonly known as a machine-gun.
SECTION 4. Provided, this Act shall not apply to the military authorities of the State or nation, and provided further, that any peace officer of the State, counties or political subdivision thereof, may possess machine-guns when required in the performance of their duties. After April 1, 1931, every person permitted by this Act to possess a machine-gun, shall file in the office of the Secretary of State, on a blank to be supplied by the Secretary of State, an application to be

properly sworn to, which shall include his name and address, and the serial number of the machine-gun which he desires to possess. Thereupon, the Secretary of State shall file such application his office, registering such officer in a book or index to be kept for that purpose, and assign to him a number, and issue to him a card, which he shall keep with him while he has such machine-gun in his possession. Such registration shall be made on the date application is received and filed with the Secretary of State, and shall expire on December 31, of the year in which said license is issued.
SECTION 5. Any person violating any part of this law shall upon conviction be fined in any sum not more than $1,000.00, and not less than $100.00, and the machine-gun or guns found in his possession shall be confiscated and-the title thereof shall pass to the political subdivision of the State making the capture.
SECTION 6. All laws and parts of laws in conflict herewith are hereby repealed, and whereas criminals are using machine-guns for illegal purposes, this Act being necessary for the immediate preservation of the public peace, health, and safety, an emergency is hereby declared, and it shall be in force and effect from and after its passage.
Approved: March 26th, 1931.

1935 Ark. Laws 171, 171-75
ACT 80.
"AN ACT Relating to Machine Guns, and to Make Uniform the Law With Reference Thereto."
Be It Enacted by the General Assembly of the State of Arkansas;
SECTION 1. "Machine Gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. . . .
SECTION 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of (not less than twenty years).
SECTION 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of (not less than ten years).
SECTION 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose;
(a) when the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or
(b) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or
(c) when the machine gun is of the kind described in Section 8 and has not been registered as in said section required; or
(d) when empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.
SECTION 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

SECTION 6. Nothing contained in this act shall prohibit or interfere with 1. the manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; 2. the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; 3. the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifestly not aggressive or offensive.
SECTION 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given, or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer shall permit any 'marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of (not less than ............ hundred dollars).
SECTION 8. Every machine gun now in this State adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the (Secretary of state), on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the (secretary of State), and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.
SECTION 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record upon application of the (district attorney), shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the State or a political subdivision thereof. . . .
SECTION 14. WHEREAS, under the present law of the state of Arkansas the officers of the state are powerless to effectively combat crime, therefore, it being necessary for the preservation of the public peace, health and safety, an emergency is hereby declared, and this act shall take effect and be in force from and after its passage and approval.
APPROVED: February 26, 1935.

**CALIFORNIA**

Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854

Ordinances of the [City of San Francisco], § 13. Every person, house, or firm engaged in keeping a pistol or rifle shooting gallery, shall pay for a license to carry on the same, the sum of ten dollars per quarter, in addition to the amount of the powder license.

General orders of the Board of Supervisors providing regulations for the government of the City and County of San Francisco. 1869
[Discharge of Cannon: Permit to be given by Mayor, and filed in office of Chief of Police. Discharge of Fire Arms prohibited within certain limits.] Sec. 22. No person shall discharge any cannon within that portion of this city and county lying between Larkin and Ninth Streets and the outer line of the streets forming the water-front, except by special permission, in writing, from the Mayor, which permit shall designate the time and particular locality of the firing, and the number of discharges which are authorized. A copy of such permit shall be filed by the person obtaining the same, in the office of the Chief of Police, at least two hours before the time of such firing; and the person or persons engaged in the discharge of such cannon, shall, on the demand of any citizen or peace officer, exhibit the permit by which such firing is authorized; and no person shall discharge any fire-arm of any other description in that portion of the city and county bounded by Devisadero, Ridley, Market, and Ninth streets, and the outer line of the streets forming the water-front, or within three hundred yards of any public highway, or upon any ground set apart as a cemetery, or public square, or park, or within three hundred yards of any dwelling-house. But this section shall not be construed so as to prohibit any person from shooting destructive animals within or upon his own inclosure. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor; and upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, or by imprisonment in the county jail out more than thirty days.

SACRAMENTO, CHARTER AND ORDINANCES OF THE CITY, no. 84, §§ 1-4 (D. Johnston & Co. 1896) (Law Passed 1876).
"ORDINANCE NO. 84.
Prohibiting the carrying of concealed deadly weapons, passed April 24, 1876.
The Board of Trustees of the City of Sacramento ordain as follows:
Section 1. It shall be unlawful for any person, not being a public officer or traveler, or not having a permit from the Police Commissioners of the City of Sacramento, to wear or carry, concealed, any pistol, dirk, or other dangerous or deadly weapon.
Sec. 2. Any person violating the provisions of this ordinance shall be punished by a fine not exceeding five hundred dollars, or by imprisonment in the city prison not exceeding ten days, or by both such fine and imprisonment. Amendment, by Ordinance 95, passed July 17, 1876.
Sec. 3. The Police Commissioners of the City of Sacramento may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his protection.
Sec. 4. This ordinance shall be in force from and after its passage."
R. M. Clarken, ed., Charter and Ordinances of the City of Sacramento Together with Such Statutes as Are Especially Important and an Appendix of City Officers from 1849 to 1897, Inclusive (Sacramento, CA: D. Johnston & Co., 1896), 173. Ordinance No. 84—Prohibiting the Carrying of Concealed Deadly Weapons, §§ 1-4. Passed April 24, 1876.

Ordinance No. 55—Prohibiting the Carrying of Concealed Weapons, §§ 1-4 in Charter and Revised Ordinances of the City of Eureka (1878).
"Ordinance No. 55. Prohibiting the Carrying of Concealed Weapons (Approved Nov. 6th, 1878.)
The Mayor and Common Council of the City of Eureka do ordain as follows:
Sec. 1. It shall be unlawful for any person not being a public officer, or traveler, or not having a permit from the Mayor of this city, to wear or carry concealed, within the corporate limits of this city, any pistol, dirk, or any other dangerous or deadly weapon.
Sec. 2. Every person violating any of the provisions of this Ordinance shall be deemed guilty of a misdemeanor, and upon due proof thereof, shall be fined in a sum not to exceed one hundred dollars, or imprisonment in the city prison not exceeding ten (10) days, or by both such fine and imprisonment. Such persons, and no others, shall be termed travelers within the meaning of this Ordinance as may be actually engaged in making a journey at the time.
Sec. 3. The Mayor of the city may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed weapons for his own protection.
Sec. 4. This Ordinance shall take effect from and after its first publication."
1878, Eureka, CA, Charter and Revised Ordinances of the City of Eureka, Ordinance No. 55, §§ 1-4
Charter and Revised Ordinances of the City of Eureka (Eureka, CA: Standard Print, 1905), 251. Penal Ordinances, Ordinance No. 55— Prohibiting the Carrying of Concealed Weapons, §§ 1-4. Approved November 6, 1878.

Prohibiting the Carrying of Concealed Deadly Weapons, § 22 of General Order no. 1,603—Relating to the Police Department, General Orders of the Board of Supervisors Providing Regulations for the Government of the City And County of San Francisco (1880).

"Sec. 22. It shall be unlawful for any person, not being a public officer or traveler, or not having a permit from the Police Commissioners of this city and county, to wear or carry concealed, in this city and county, any pistol, dirk or other dangerous or deadly weapon.

Every person violating any of the provisions of this Order shall be deemed guilty of a misdemeanor, and punished accordingly. Such persons and no others shall be termed " travelers," within the meaning of this Order, as may be actually engaged in making a journey at the time.

The Police Commissioners may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his own protection."
1880, CA, General Order no. 1,603—Relating to the Police Department, § 22—Prohibiting the Carrying of Concealed Deadly Weapons

Order no. 1589, §§ 1-2 & 10, nos. 4-6, SAN FRANCISCO, THE GENERAL ORDERS OF THE BOARD OF SUPERVISORS PROVIDING REGULATIONS FOR THE GOVERNMENT (Bunker & Hiester 1881). 1880.
"ORDER No. 1589.
IMPOSING MUNICIPAL LICENSES.
The People of the City and County of San Francisco do ordain as follows:
[Penalty.]

SECTION 1. Every person who shall violate any of the provisions of this order shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not more than one thousand dollars, or by imprisonment not more than six months, or by both.
[Municipal Licenses.]
SECTION 2. It shall he unlawful for any person to engage in or carry on any business, trade, profession or calling, for the transaction or carrying on of which a license is required, without first taking out or procuring the license, required for such business, trade, profession or calling…
…[Rates of License.]
SECTION 10. The rates of license shall be according to the following schedule:…
…[Vendors of Gunpowder.]
IV. For vendors of gunpowder two and a half dollars per quarter.
[Keepers of Gunpowder Magazines.]
V. For keepers of gunpowder magazines, thirty dollars per quarter.
[Keepers of Shooting Galleries.]
VI. For keepers of shooting galleries, seven dollars and fifty cents per quarter, exclusive of powder license."
The General Orders of the Board of Supervisors Providing Regulations for the Government of the City and County of San Francisco (San Francisco, CA: Bunker & Hiester, 1881), 95. Order Number 1589—Imposing Municipal Licenses, §§ 1-2 & 10, nos. 4-6. Approved July 28, 1880.

Concealed Weapons, THE NAPA VALLEY REGISTER, Nov. 10, 1880 at 3.
"Concealed Weapons.
The Board of Trustees of Napa, at their last meeting, passed an ordinance against carrying concealed weapons. It is as follows:
SECTION 1. Every person not being a peace officer, who shall within the corporate limits of the City of Napa, carry or wear any dirk, pistol, sword-in-cane, sling-shot, or other dangerous or deadly weapon concealed, except by special permission in writing from the President of the Board of Trustees of said city, shall upon conviction thereof before any Court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be fined in any sum not less than Ten nor more than One Hundred Dollars, and be imprisoned until such fine be paid, not exceeding one day for each dollar of such fine."
Full Text (from Newspapers.com): The Napa Valley Register, Wed., Nov. 10, 1880.
"Concealed Weapons." The Napa Valley Register, November 10, 1880, p. 3.

1883 Cal. Stat. 156, § 153.
The Municipal Council shall provide by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also all fines collected in the police court for violations of fire ordinances.

An Ordinance to Prohibit the Carrying of Concealed Deadly Weapons, ST. HELENA STAR, [Cal.] Dec. 9, 1884 at 2.
Ordinance NO. 62
An ordinance to prohibit the carrying of concealed deadly weapons.
The Board of Trustees of the Town of St. Helena do hereby ordain as follows:

Section One—Every person, not being a peace officer, who shall within the corporate limits of the town of St. Helena, carry or wear concealed any pistol, dirk, sword, slung-shot or other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor and shall be fined in any sum not less than ten nor more than fifty dollars or by imprisonment not less than one day nor more than thirty days.

Section Two—Provided the President of the Board of Trustees may grant written permission to any peaceable person whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his own protection, such permission not to extend beyond one year.

Section Third—Ordinance number fourteen is hereby repealed.

This ordinance shall take effect and be in full force ten days from the first publication.

In Board of Trustees finally passed this 9th day of December, A. D. 1884.

Full Text (From Newspapers.com): St. Helena Star, Dec. 11, 1884

"An Ordinance to Prohibit the Carrying of Concealed Deadly Weapons." St. Helena Star, December 9, 1884, p. 2. Volume 11, Number 23.

Nathan Newmark, The Political Code of the State of California. As Enacted in 1872, and Amended in 1889. With Notes and References to the Decisions of the Supreme Court Page 963 (1889) available at The Making of Modern Law: Primary Sources. 1889

[Political Code of the State of California,] Charitable Fund, §153. The Municipal Council shall provide, by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also, all fines collected in the Police Court for violations of fire ordinances. Said fund shall be under the direction and control of and subject to such regulations as may be prescribed by the Board of Fire Commissioners.

Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890

Section 1 . It shall be unlawful for any person in the City of Oakland, not being a public officer or a traveler actually engaged in making a journey, to wear or carry concealed about his person without a permit, as hereinafter provided, any pistol, slung-shot, brass or iron knuckles, sand club, dirk or bowie knife, or iron bar or other dangerous or deadly weapon, or any sling or other contrivance by which shot or other missiles are or may be hurled or projected. A written permit may be granted by the Mayor for a period of not to exceed one year to any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person.

Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891

Be it ordained by the City Council of the City of Stockton as follows:

One-Concealed Weapons, Burglars' Tools.

Section 1. It shall be unlawful and a misdemeanor: 1. For any person not being a peace officer or actually prosecuting a journey to or from the town, city or county of his residence, to wear or carry concealed about his person any pistol, dirk, bowie-knife, slungshot, sand-club, metallic

knuckles or any other deadly or dangerous weapon, except he first have a written permit to so do from the Mayor of the City of Stockton.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources. 1896
Ordinances of the City of Fresno, § 8. Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, §§ 3-4.
SEC. 3. Every person who carries in any city, city and county, town or municipal corporation of this state any pistol, revolver, or other firearm concealed upon his person, without having a license to carry such firearm as hereinafter provided in section six of this act, shall be guilty of a misdemeanor, and if he has been convicted previously of any felony, or of any crime made punishable by this act, he is guilty of a felony.
SEC 4. The unlawful possessing or carrying of any of the instruments, weapons, or firearms enumerated in section one to section three inclusive of this act, by any person other than those authorized and empowered to carry or possess the same as hereinafter provided, is a nuisance, and such instruments, weapons or firearms are hereby declared to be nuisances, and when any of said articles shall be taken from the possession of any person the same shall be surrendered to the magistrate before whom said person shall be taken, except that in any city, city and county, town or other municipal corporation the same shall be surrendered to the head of the police force, or police department thereof. The officers to whom the same may be so surrendered, except upon certificate of a judge of a court of record, or of the district attorney of any county that the preservation thereof is necessary or proper to the ends of justice, shall proceed at such time or times as he deems proper, and at least once in each year to destroy or cause to be destroyed such instruments, weapons, or other firearms in such manner and to such extent that the same shall be and become wholly and entirely ineffective and useless for the purpose for which it was manufactured.
SEC 6. It shall be lawful for the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or head, that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof, to issue to such person a license to carry concealed a pistol, revolver or other fire-arm; provided, however, that the application to carry concealed such firearm shall be filed in writing and shall state the name and residence of the applicant, the nature of applicant's occupation, the business address of applicant, the nature of the weapon sought to be carried and the reason for the filing of the application to carry the same.

1923 Cal. Stat. 696, An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Manufacture, Sale, Possession or Carrying of Certain Other Dangerous Weapons Within this State; To Provide for Registering All Sales of Pistols, Revolvers or Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Carrying of Concealed Firearms Except by Lawfully Authorized Persons; To Provide for the Confiscation and Destruction of Such Weapons in Certain Cases; To Prohibit the Ownership, Use or Possession of Any of Such Weapons by Certain Classes of Persons; To Prescribe Penalties for Violations of This Act and Increased Penalties for Repeated Violations Hereof; To Authorize, In Proper Cases, The Granting of Licenses or Permits to Carry Firearms Concealed Upon the Person; To Provide for Licensing Retail Dealers in Such Firearms and Regulating Sales Thereunder; And To Repeal Chapter One Hundred Forty-Five of California Statutes of 1917, Relating to the Same Subject, ch. 339, § 3, 8.
Sec. 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this act shall be construed to apply to and include all firearms having a barrel less than twelve inches in length. Any person who shall violate the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.
Sec. 3. If any person shall commit or attempt to commit any felony within this state while armed with any of the weapons mentioned in section one hereof or while armed with any pistol, revolver or other firearm capable of being concealed upon the person, without having a license or permit to carry such firearm as hereinafter provided, upon conviction of such felony, he shall in addition to the punishment prescribed for the crime of which he has been convicted, be punishable by imprisonment om a state prison for not less than five nor more than ten years…
Sec. 8. It shall be lawful for the sheriff of a county, and the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or other police head, <u>that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof</u>, to issue such person a license to carry concealed a pistol, revolver or other firearm for a period of one year from the date of such license…

1931 Cal. Stat. 2317, An Act to Control and Regulate the Possesion, Sale and Use of Pistols, Revolvers and Other Firearms Capable of Being Concealed Upon the Person, ch. 1098, §9.
Every person in the business of selling, leasing, or otherwise transferring a pistol, revolver or other firearm, of a size capable of being concealed upon the person, whether such seller, lessor or transferor is a retail dealer, pawnbroker, or otherwise, except as hereinafter provided, shall keep a register in which shall be entered the time of sale, the date of sale, the name of the salesman making the sale, the place where sold, the make, model, manufacturer's number, caliber, or other marks of identification on such pistol, revolver or other firearm. Such register shall be prepared by and obtained from the state printer and shall be furnished by the state printer to such dealers on application at a cost of three dollars per one hundred leaves in triplicate . . . [t]he purchaser of

any firearm capable of being concealed upon the person shall sign, and the dealer shall require him to sign his name and affix his address to said register in triplicate, and the salesman shall affix his signature in triplicate as a witness to the signature of the purchaser. . . [t]his section shall not apply to wholesale dealers in their business intercourse with retail dealers.

**COLORADO**

Thomas M. Patterson, The Charter and Ordinances of the City of Denver, as Adopted Since the Incorporation of the City and Its Organization, November, 1861, to the First Day of February, A.D., 1875, Revised and Amended, Together with an Act of the Legislature of the Territory of Colorado, in Relation to Municipal Corporations, Page 78, Image 78 (1875) available at The Making of Modern Law: Primary Sources. 1875
[City of Denver,] Charter and Ordinances: Offenses Affecting Public Safety, § 1. If any person shall, within this city, fire or discharge any cannon, gun, fowling piece, pistol or fire arms of any description, or fire, explode or set off any squib, cracker, or other thing containing powder or other combustible or explosive material, without permission from the Mayor (which permission shall limit the time of such firing, and shall be subject to be revoked by the Mayor or City Council at any time after the same has been granted), every such person shall, on conviction, be fined in a sum not less than one dollar and not exceeding one hundred dollars: Provided, that no permission shall be granted to any person or persons to hold or conduct any shooting match or competitive trial of skill with fire arms within the limits of this city.

1911 Colo. Sess. Laws 408
Section 3. Every individual, firm or corporation engaged, within this commonwealth, in the retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and., if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record- book shall be open at all times to the inspection of any duly authorized police officer.
Section 4. Every individual, firm or corporation fail- ng to keep the record provided for in the first section of this act, or who shall refuse to exhibit such record when requested by a police officer, and any purchaser, lessee or exchanger of a pistol or revolver, who shall, in connection with the making of such record, give false information, shall be guilty of a Misdemeanor, and shall, upon conviction, be punished by a fine of not less than twenty-five, nor more than one hundred dollars, or by imprisonment in the county jail for a term not exceeding one year, or by both such fine and imprisonment.

**CONNECTICUT**

Act of Dec. 1, 1642, CONN. GEN. STAT. (Brown & Parsons 1850); Public Records of the Colony of Connecticut 79 (1850) (Law Passed 1642).

"…It is Ordered, that noe man within this Jurisdiction shall directly or indirectly amend, repaire, or cause to be amended or repaired, any gun, small or great, belonging to any Indian, nor shall endeavor the same, nor shall sell or give to any Indian, directly or indirectly, any such gun or gunpowder, or shott, or lead, or mould, or military weapons, or armor, nor shall make any arrow heads, upon payne of ten pound fine for every offence at lest, nor sell nor barter any guns, powder, bullitts or lead, whereby this Order might be evaded, to any person inhabiting out of this Jurisdiction, without licence of this or the particular Court, or som two Magistrates, upon payne of ten pound for every gun, five pound for every pound of powder, 40s. for every pound of bullitts or lead, and so proportionably for any greater or lesser quantity."
J. Hammond Trumbull, ed., Public Records of the Colony of Connecticut, Prior to the Union With New Haven Colony, May, 1665; Transcribed and Published (in Accordance With a Resolution of the General Assembly) Under the Supervision of the Secretary of State, With Occasional Notes, and an Appendix (Hartford, CT: Brown & Parsons, 1850), 79. Capitall Lawes Established by the Generall Court, the First of December, 1642. Passed December 1, 1642.

The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 79, Image 91 (1850) available at The Making of Modern Law: Primary Sources. 1665
It is ordered, that no man within this Jurisdiction shall directly or indirectly amend, repair, or cause to be amended or repaired, any gun small or great belonging to any Indian, nor shall endure the same, nor shall sell or give to any Indian, directly or indirectly, any such gun or gunpowder, or shot, or lead, or mold, or military weapons, or armor, nor shall make any arrow heads, upon pain of a ten pound fine for every offense at least, nor sell nor barter any guns, powder, bullets or lead, whereby this order might be evaded, to any person inhabiting out of this Jurisdiction, without license of this or the particular court, or some two magistrates, upon pain of ten pound for every gun, five pound for every pound of powder, 40s for every pound of bullets or lead, and so proportionately for any greater or lesser quantity.

The Public Records Of The Colony Of Connecticut. Hartford, 1890 Page 190-192, Image 194-196, available at The Making of Modern Law: Primary Sources. 1775
An Act for Encouraging the Manufacture of Salt Petre and Gun Powder. . .Be it enacted, That no salt petre, nitre or gun-powder made and manufactured, or that shall be made and manufactured in this Colony, shall be exported out of the same by land or water without the license of the General Assembly or his Honor the Governor and Committee of Safety, under the penalty of twenty pounds for every hundred weight of such salt petre, ntire or gun-powder, and proportionately for a greater or lesser quantity so without license exported; to be recovered by bill, plaint, or information, in any court of record in this Colony by law proper to take cognizance thereof. . . Be it further enacted by the authority aforesaid, That no powder-mill shall be erected in this Colony for the manufacture of gun-powder without the license of the general assembly, or in their recess the Governor and Council, first had and obtained under the penalty of thirty pounds for every such offence; to be recovered as the other forgoing personalities in this act are above directed to be recovered.

Charter and By-Laws of the City of New Haven, November, 1848 Page 48-49, Image 48-49 (1848) available at The Making of Modern Law: Primary Sources. 1827

A By-Law Relative to the Storage and Sale of Gunpowder. Be it ordained by the Mayor, Aldermen, and Common Council of the city of New Haven, in Court of Common Council assembled, 1st. That hereafter no person or persons shall, within the limits hereafter described, either directly or indirectly, sell and deliver any gunpowder, or have, store, or keep any quantity of gunpowder greater than one pound weight, without having obtained a license for that purpose from said Court of Common Council, in the manner herein prescribed. Provided, that nothing in this by-law contained shall be construed to prevent any person or persons from having or keeping in his or their possession, a greater quantity of powder than one pound weight, during any military occasion or public celebration, while acting under any military commander, and in obedience to his orders, or under permission and authority therefor, first had and obtained of the Mayor or some one of the Aldermen of said city. Provided also, That any person or persons purchasing gunpowder, shall be allowed between the rising and setting of the sun, sufficient time to transport the same from any place without said limits, through said limits to any place without the same. 2d. The Court of Common Council aforesaid, shall have power, on application to them made, to grant and give any meet person or persons a license to sell gunpowder, and for that purpose to have, store, and keep gunpowder in quantity not exceeding at any one time seven pounds weight, and that well secured in a tin canister or canisters, and at such place or places within said limits and for such term of time, not exceeding one year, as said Court shall deem fit; which license shall be signed by the Clerk of said Court, and shall be in the form following, viz — Whereas the Mayor, Aldermen, and Common Council of the City of New Haven, in Court of Common Council convened, have approved of ___, as a suitable and proper person to keep, store, and sell gunpowder within the City of New Haven: We do therefore give license to said ____, to sell gunpowder at (describe the place) and for the purpose aforesaid, to have, keep, and store in said building any quantity of gunpowder not exceeding at any one time seven pounds weight, until the ___ day of ___. Dated, Signed per order, A.B., Clerk. For which license the person receiving the same shall pay the City Clerk twenty-five cents; and the same shall be by said Clerk recorded at full length. And before any license shall be given as aforesaid, the person or persons receiving the same shall pay to the Clerk aforementioned, for the use of said city, a sum after the rate of five dollars per annum. 3d. Before any shall proceed to sell or to store or keep gun-powder by virtue of any such license so given as aforesaid, such person shall put in a conspicuous place upon the front part of the building in which such powder is to be stored or sold, a sign, with the following words plainly and legibly inscribed thereon, viz., "Licensed to keep Powder," and shall continue the same during the time he shall keep, store, or sell gunpowder in said building. 4th section repealed. 5th. That no person or persons shall put or receive or have any quantity of gunpowder on board of any steamboat, for transportation therein in any of the waters within the limits of said city. 6th. If any person shall sell, keep, or store any gunpowder within the limits aforesaid, contrary to the true intent and spirit of this by-law, or without complying with all the pre-requisites enjoined thereby; or if any person or persons shall put or receive, or have on board of any steamboat for transportation on any of the waters within the limits of said city, any quantity of gunpowder, such person or persons shall forfeit and pay the sum of thirty-four dollars, one half to him who shall give information, and the other half to the use of the city.

The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835

Chapter 26. A ByLaw in relation to the Firing of Guns and Pistols, within the limits of the city of New-London, and making parents and guardians, and masters, liable for breaches of by-laws by minors and apprentices. Be it ordained by the mayor and aldermen, and common council and freemen of the city of New-London, That no gun or pistol shall be fired at any time within the limits of said city, unless on some public day of review, and then by order of the officers of the military companies of said city, or by permission of the mayor, or one of the aldermen of said city; and whosoever shall fire any gun or pistol, contrary to the form and effect of this by-law, shall for every such offence, forfeit and pay the sum of two dollars, to be recovered by due process in any court in said city, proper to try the same. § 2. And whereas the firing of guns and pistols, crackers, or other fire works is most frequently done by apprentices and minors under age, who are unable to pay the forfeiture incurred by the by-law of this city – be it also ordained that where any minor or apprentice shall be guilty of any breach of the by-laws relating to the firing of guns, pistols, crackers, or other fire-works, the parent, guardian, or master of such minor or apprentice, shall be liable to pay the forfeitures incurred by said by-law, and the same shall be recoverable of any parent, guardian or master, by action of debt brought on said by law, before any court in said city proper to try the same. And it shall be the duty of the city attorney and lawful for any other person to prosecute for said penalty; and one-half of said penalty shall go to the informer, or the person prosecuting for the same, and the other half to the use of the city.

1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.
[E]very person who shall fire any gun or other fire-arm of any kind whatever within the limits of the city of New Haven, except for military purposes, without permission first obtained from the mayor of said city, shall be punished by fine not exceeding seven dollars, or by imprisonment in the county jail not exceeding thirty days.

Charles L. Upham, The Charter and By-Laws of the City of Meriden. With Extracts from the Public and Private Acts of the State of Connecticut, Applicable to the City of Meriden; Together with Certain Votes of the Common Council; the Rules and Regulations of the Board of Water Commissioners, and of the Police Department; and the Rules of Order of the Common Council of the City of Meriden Page 135, Image 140 (1875) available at The Making of Modern Law: Primary Sources. 1869
A by-law concerning the discharge of fire-arms and fire-works [, City of Meriden, Conn.], § 1. Be it enacted by the Court of Common Council of the City of Meriden, § 1. That no person shall discharge any pistol, gun, cannon, or other fire-arm of any sort or description, within the limits of said city, unless on occasion of some public festivity, and then by permission of the mayor or one of the aldermen of said city, or unless on occasion of military exercises and parade, and then by order of some military officer; and whoever shall discharge any pistol, gun, cannon, or other fire-arm of any sort, contrary to the form and effect of this by-law, shall, for every such offense, forfeit and pay, for the use of the treasury of said city, a fine of five dollars.

Charter and Ordinances of the City of Bridgeport: as Amended and Adopted Page 194 (1874) available at The Making of Modern Law: Primary Sources. 1874
An Ordinance Relative to Gunpowder and Explosive Substances. Be it ordained by the Common Council of the City of Bridgeport, § 1. No person shall have, or keep for sale or for any other purpose, within the limits of this city, any quantity of gunpowder or gun-cotton, exceeding one

pound in weight; no person shall have, keep for sale, use, or other purpose, within the city limits, any quantity of nitro-glycerine, or other explosive substances or compounds exceeding six ounces, without special license thereof from the common council. No person shall transport any gunpowder through said city without a permit first had and obtained from the fire marshal, and in accordance with such rules and regulations as may be established by said fire marshal. No person shall, within said city, place, receive, or have any gunpowder on board of any steamboat used for the carrying of passengers, with intent to transport the same therein.

J. M. Meech, Charter and Revised Ordinances of the City of Norwich With the Amendments Thereto, and Statutes of the State Relating to Municipal Corporations, in Force January 1st, 1877 Page 178, Page 185 (1876) available at The Making of Modern Law: Primary Sources. 1877 Ordinances of Norwich. § 15. No person or persons shall fire any swivel, musket, fowling-piece, pistol, or other gun of any description within said city at a less distance than fifty rods from any dwelling house, or public highway, or street without written permission from the Mayor or one of the aldermen of said city; and every person so offending shall, for every such offence, forfeit and pay for the use of said city the sum of three dollars: Provided always, that nothing herein contained shall be construed to extend to the members of any military company when under the command of any military officer, not to prevent the firing of any gun or guns for the destruction of any noxious birds or animals by any person or persons upon his or their premises.

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources. 1890
Good Order and Decency § 192. Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

1901 Conn. Pub. Acts 602, § 20.
The warden and burgesses, when assembled according to law, shall have power to make, alter, repeal, and enforce such bylaws, orders, ordinances, and enactments as they deem suitable and proper, not inconsistent with this resolution or contrary to the laws of this state or of the United States, for the following purposes: . . . to license, regulate, or prohibit the manufacture, keeping for sale, or use of fireworks, torpedoes, firecrackers, gunpowder, petroleum, dynamite, or other explosive or inflammable substance, and the conveyance thereof through any portion of the borough . . . .
Sale of Firearms, ch. 137, Conn. Gen. Stat. 2678 (1918) (requiring any person engaged in the business of selling or exchanging firearms to keep a register).

1923 Conn. Pub. Acts 3707, An Act Concerning the Possession, Sale and Use of Pistols and Revolvers, ch. 252, § 2, 3.
No person shall advertise, sell, deliver, offer or expose for sale or delivery or have in his possession with intent to sell or deliver any pistol or revolver at retail without having a permit therefor issued as hereinafter provided.

The chief of police or, where there shall be no chief of police, the warden of the borough of the first selectman of the town, as the case may be, may, upon the application of any person, issue a permit in such form as may be prescribed by the superintendent of state police for the sale at retail of pistols and revolvers within the jurisdiction of the authority issuing such permit. Upon the application of any person having a bona fide residence or place of business within the jurisdiction of any such authority or, upon the application of any bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any state or sub-division of the United States, such chief of police, warden or selectmen may issue a permit to such person to carry a pistol or revolver within the jurisdiction of the authority issuing the same, provided such authority shall find that such applicant intends to make no use of the pistol or revolver thereunder other than a proper use and that such person is a suitable person to receive such permit. The superintendent of state police may, upon application, issue to any holder of any permit to carry any pistol or revolver hereinbefore provided for, a permit to carry a pistol or a revolver within the state . . . .

Sec. 5. No sale of any pistol or revolver shall be made except in the room, store or place described in the permit for the sale of pistols and revolvers, and such permit or a copy thereof certified by the authority issuing the same shall be exposed to view within the room, store or place where pistols or revolvers shall be sold or offered or exposed for sale, and no sale or delivery of any pistol or revolver shall be made unless the purchaser or person to whom the same is to be delivered shall be personally known to the vendor of such pistol or revolver or the person making delivery thereof or unless the person making such purchase or to whom delivery thereof is to lic made shall provide evidence of his identity. The vendor of any pistol or revolver shall keep a record of every pistol or revolver sold in a book kept for that purpose, which record shall be in such form as shall be prescribed by the superintendent, of state police and shall include the date of the sale, the caliber, make, model and manufacturer's number of such pistol or revolver and the name, address and occupation of the purchaser thereof, which record shall be signed by the purchaser and by the person making the sale, each in the presence of the other, and shall be preserved by the vendor of such pistol or revolver for a period of at least six years.

Sec. 7. No person, firm or corporation shall sell at retail, deliver or otherwise transfer any pistol or revolver to any alien, nor shall any person deliver any pistol or revolver at retail except upon written application therefor and no sale or delivery of any pistol or revolver shall be mode upon the date of the filing or receipt of any written application for the purchase thereof, and when any pistol or revolver shall b delivered in connection with the sale or purchase, such pistol or revolver shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no pistol or revolver when delivered on tiny sale or purchase shall be loaded or contain therein any gunpowder or other explosive or any bullet, ball or shell. Upon the delivery of any pistol or revolver the purchaser shall sign in triplicate a receipt for such pistol or revolver which shall contain the name, address and occupation of such purchaser, the date of sale, caliber, make, model and manufacturer's number and a general description thereof. One of such triplicate receipts shall, within twenty-four hours thereafter, be forwarded by the vendor of such pistol or revolver to the superintendent of state police and one to the authority issuing the permit for the sale of such pistol or revolver and the other shall be retained by such vendor for at least six years.

Sec. 8. No person shall make any false statement or give any false information connected with any purchase, sale or delivery of any pistol or revolver, and no person shall sell, barter, hire, lend, give or deliver to any minor under the age of eighteen years any pistol or revolver.

1930 Conn. Stat. 903, Dealing in Explosives; License., ch. 147, § 2644. 1909
No person shall manufacture, store, sell, or deal in gunpowder or any material or compound . . . unless he shall first obtain from the commissioner of state police or the fire marshal of the town where such business is conducted a written license therefor . . . which license shall specify the building where such business is to be carried on or such material deposited or used.

1935 Conn. 389, 389-94
CHAPTER 152
AN ACT CONCERNING MACHINE GUNS.
Be it enacted by the Senate and House of Representatives in General Assembly convened:
SECTION 1. The term "Machine Gun," as used in this act, shall apply to and include a weapon of any description, loaded or unloaded, from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically, discharged from a magazine, by a single function of the firing device. . . .
SEC. 2. Any person who shall possess or use a machine gun in the perpetration or attempted perpetration of a crime of violence shall be imprisoned not more than twenty years.
Sc. 3. Any person who shall possess or use a machine gun for an offensive or aggressive purpose shall be imprisoned not more than ten years.
SEC. 4. The possession or use of a machine gun shall be presumed to be for an offensive or aggressive purpose: (a) When the machine gun shall be on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun was found; or (b) when in the possession of, or use by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any state or federal court of record of the United States of America, its territories or insular possessions; or (e) when the machine gun shall be of the kind described in section seven hereof and has not been registered as in said section required; or (d) when empty or loaded pistol shells of thirty (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun shall be found in the immediate vicinity thereof.
SEc. 5. The presence of a machine gun in any room, boat or vehicle shall be presumptive evidence of the possession or use of the machine gun by each person occupying such room, boat or vehicle.
SEc. 6. Each manufacturer shall keep a register of all machine guns manufactured or handled by him. Such register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of each machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered. Upon demand, any manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, and parts and supplies therefor, and shall produce the register, herein required, for inspection. Any person who shall violate any provision of this section shall be fined not more than two thousand dollars.
SEc. 7. Each machine gun in this state on July 1, 1935, adapted to use pistol cartridges of thirty (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the commissioner of the state police on July 1, 1935, and annually thereafter on the first day of July. If acquired after July 1, 1935, it shall be registered within twenty-four hours after its acquisition and, thereafter, annually, on the first day of July. Blanks for registration shall be prepared by said commissioner

and furnished upon application. To comply with this section, the application as filed shall show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which the gun was acquired. The registration data shall not be subject to inspection by the public. Any person who shall fail to register any gun as required by this section shall be presumed to possess the same for an offensive or aggressive purpose. The provisions of this section shall not apply to any machine gun which has been registered under the provisions of section six of this act and which is still in the actual possession
of the manufacturer.
SEC. 8. A warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of thirty (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the state's attorney, shall have authority to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the state or of a political subdivision thereof.
SEC. 9. No provision of this act shall apply to the manufacture of machine guns for sale or transfer to the United States government, to any state, territory or possession of the United States or to any political subdivision thereof or to the District of Columbia.
Sec. 10. This act shall take effect from its passage.

## **<u>DELAWARE</u>**

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, §6.
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1832 Del. Laws 208, A Supplement to an Act to Prevent the Use of Firearms by Free Negroes and Free Mulattoes, and for Other Purposes, chap. 176, § 1.
. . . it shall not be lawful for free negroes and free mulattoes to have, own, keep or possess any gun, pistol, sword or any warlike instruments whatsoever: Provided however, that if upon application of any such free negro or free mulatto to one of the justices of the peace of the county in which such free negro or free mulatto resides, it shall satisfactorily appear upon the written certificate of five or more respectable and judicious citizens of the neighborhood, that such free negro or free mulatto is a person of fair character, and that the circumstances of his case justify his keep and using a gun, then and in every such case it shall and may be lawful for such justice to issue a license or permit under his hand and authorizing such free negro or free mulatto to have use and keep in his posession a gun or fowling piece.

1841 Del. Laws 430, An Act Concerning Fees, ch. 368, § 1.
Justices of the Peace shall receive . . . For licenses to negroes to keep a gun, twenty five cents.

9 Del. Laws 552 (1843), A Further Supplement To An Act Entitled "An Act To Prevent The Use Of Fire-arms By Free Negroes And Free Mulattoes And For Other Purposes, § 1. 1843

That the proviso in the first section of the act to which this is a further supplement, and all and every the provisions of the said act, or any other supplemental act thereto, which authorizes the issuing, by a justice of the peace, of a license or permit to a free negro or free mulatto to have, use and keep in his possession, a gun or fowling piece, be and the same are hereby repealed, made null and void.

1909 Del. Laws 577, House Joint Resolution Providing for Increase in Non-Resident Gunners License Fee, ch. 271.
Whereas, there are numerous gunners from other States who make it a practice to gun in this State, and under existing laws a license fee of Five Dollars is collected from them. And Whereas, our neighboring States charge non-resident gunners a license fee of more than Five Dollars. Therefore be it resolved by the Senate and House of Representatives of the State of Delaware in General Assembly met: That from and after the passage of this Resolution up to and including April 30th, 1911, all non-resident gunners shall be required to pay a license fee of Ten Dollars per annum, said license fee to be collected in the same manner and by the same agency as non-resident gunners' licenses are now collected.

Vol. 26 Del. Laws 28, 28- 29 (1911)
Section 1. That from and after the first day of June, in the year of our Lord, one thousand nine hundred and eleven, it shall be unlawful for any person or persons, firm, company or corporation, to sell, or expose to sale, any pistol or revolver, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made especially for the defense of one's person, without first having obtained a license therefor, which license shall be known as "Special License to Sell Deadly Weapons;" provided, however, that this provision shall not relate to toy pistols, pocket knives, or knives used in the domestic household, or surgical instruments or tools of any kind.
Section 2. Any person or persons, firm, company or corporation, desiring to engage in the business of selling revolvers, pistols, or revolver or pistol cartridges, stilettos, steel or brass knuckles, or other weapons made for the defense of one's person, shall, after the above mentioned date, apply to the Clerk of the Peace of the County in which it is desired to conduct such business and shall obtain a license therefor, for which he, they, or it shall pay the sum of twenty-five dollars, which said license shall entitle the holder thereof to conduct said business for the term of one year from its date.
Section 3. It shall be unlawful for any person or per- sons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.
Section 4. It shall be the duty of any person or persons, firm, company or corporation, desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times, a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business in which said book he shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser; and no sale shall be made weapon, etc. until the purchaser has been positively identified. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

**DISTRICT OF COLUMBIA**

Washington D.C. 27 Stat. 116 (1892)
CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.
SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply. to <u>any person who shall have been granted a written permit to carry such weapon or weapons by any</u> judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, <u>upon satisfactory proof to him of the necessity for the granting thereof</u>; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.
SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.
SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.
SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

Washington D.C. 47 Stat. 650, 651-652 (1932)
CARRYING CONCEALED WEAPONS
SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.
EXCEPTIONS
SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing or dealing in firearms, or the agent or

representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business-within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, <u>if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed</u>. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SELLING TO MINORS AND OTHERS

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

## **<u>FLORIDA</u>**

Leslie A. Thompson, A Manual or Digest of the Statute Law of the State of Florida, of a General and Public Character, in Force at the End of the Second Session of the General Assembly of the State, on the Sixth Day of January, 1847 Page 547, Image 582 (1847) available at The Making of Modern Law: Primary Sources. 1847

For the Prevention of Indians Roaming at Large Throughout the State, § 1. From and after the passage of this act, if any male Indian of the years of discretion, venture to roam or ramble beyond the boundary lines of the reservations, which have been assigned to the tribe or nation to which said Indian belongs, it shall and may be lawful for any person or persons to apprehend, seize, and take said Indian, and carry him before some Justice of the Peace, who is hereby authorized, empowered, and required, to direct (if said Indian have not a written permission from the agent to do some specific act) not exceeding thirty-nine stripes, at the discretion of the Justice, to be laid on the bare back of said Indian; moreover, to cause the gun of said Indian (if he has one) to be taken from him, and deposited with the colonel of the county, or captain of the district, in which said Indian may be taken, subject to the order of the superintendent of Indian Affairs.

An Act Prescribing Additional Penalties for the Commission of Offences against the State, and for Other Purposes, Ch. 1460, No. 3, §§ 12-15, 1865 Fla. Laws 23, 25-27. 1865/1866.

"Sec 12. Be it further enacted. That it shall not be lawful for any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge of Probate of the county in which he may be a resident for the time being: and the said Judge of Probate is hereby authorized to issue such license, upon the recommendation of two respectable citizens of the county, certifying to the peaceful and orderly character of the applicant; and any negro, mulatto, or other person of color, so offending, shall be deemed to be guilty of a misdemeanor, and upon conviction, shall forfeit to the use of the informer all such fire-arms and ammunition, and in addition thereto, shall be sentenced to stand in the pillory for one hour, or be whipped, not exceeding thirty-nine stripes, or both, at the discretion of the jury,

Sec. 13. Be it further enacted, That it shall be the duty of the Judge of Probate to keep an accurate register of all licenses so issued as aforesaid, and at each regular meeting of the Board of County Commissioners, to lay the same before them for their supervision, who shall have power to revoke any licenses which, in their opinion, may have been granted to improper persons.

Sec. 14. Be it further enacted, That if any negro, mulatto, or other person of color, shall intrude himself into any religious or other public assembly of white persons, or into any railroad car or other public vehicle set apart for the exclusive accommodation of white people, he shall be deemed to be guilty of a misdemeanor, and upon conviction, shall be sentenced to stand in the pillory for one hour, or be whipped, not exceeding thirty-nine stripes, or both, at the discretion of the jury; nor shall it be lawful for any white person to intrude himself into any religious or other public assembly of colored persons, or in to any railroad car or other public vehicle, set apart for the exclusive accommodation of persons of color, under the same penalties.

Sec. 15. Be it further enacted, That if any person shall form any military organization in this State, not authorized by law, or shall participate or aid or abet in the formation of such organization, he shall be deemed to be guilty of a misdemeanor, and upon conviction shall be fined in a sum not exceeding one thousand dollars, and imprisoned for a term not exceeding six months; or shall be made to stand in the pillory for one hour, and be whipped, not exceeding thirty-nine stripes, at the discretion of the jury: Provided, That if the person so convicted shall, upon the trial, be proved to have accepted an office in such organization, the penalties herein provided may be increased three-fold, at the discretion of the jury."

Acts and Resolutions Adopted by the General Assembly of Florida at Its Fourteenth Session, Begun and Held at the Capitol, in the City of Tallahassee, on Monday, December 18, 1865 (Tallahassee, FL: Dyke & Sparhawk, 1866), 25-27. Chapter 1,460 [ No. 3. ]—An Act Prescribing Additional Penalties for the Commission of Offences against the State, and for Other Purposes, §§ 12-15. Passed the House of Representatives January 4, 1866. Passed the Senate January 8, 1866. Approved by the Governor January 15, 1866.

1887 Fla. Laws 164-165, An Act to Establish the Municipality of Jacksonville Provide for its Government and Prescribe it's jurisdiction and powers, chap. 3775, § 4.

The Mayor and City Council shall within the limitations of this act have power by ordinance to . . . regulate and license the sale of firearms and suppress the carrying of concealed weapons.

1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4. 1898

§ 1. That in each and every county of this State, it shall be unlawful to carry or own a Winchester or other repeating rifle or without first taking out a license from the County Commissioner of the

respective counties, before such persons shall be at liberty to carry around with him on his person and in his manual possession such Winchester rifle or other repeating rifle. § 2. The County Commissioners of the respective counties in this State may grant such licenses at any regular or special meeting. § 3. The person taking out such license shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners, and at the same time there shall by kept by the County Commissioners granting the same a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same. § 4. All persons violating the provisions of Section 1 of this Act shall be guilty of a misdemeanor, and on conviction shall be fined not exceeding one hundred dollars or imprisonment in the county jail not exceeding sixty days.

1895 Fla. Laws 14
Fourteenth. No merchant, store-keeper or dealer shall keep for sale or sell pistols, Springfield rifles, repeating rifles, bowie knives or dirk knives, without first paying a license tax of ten dollars; Provided, Said pistols, Springfield rifles, repeating rifles, bowie knives or dirk knives, shall not be sold to minors. Every violation of this paragraph shall be punished by a fine of fifty dollars, or by imprisonment in the county jail not more than six months.

1931 Fla. Laws 2069, § 7.
The village shall have the following rights and powers . . . To license, tax, regulate, or prohibit, within the village or any part thereof . . . explosives, guns, pistols and other weapons . . . .

**GEORGIA**

A Digest of the Laws of the State of Georgia. From Its First Establishment as a British Province down to the Year 1798, Inclusive, and the Principal Acts of 1799: In Which is Comprehended the Declaration of Independence; the State Constitutions of 1777 and 1789, with the Alterations and Amendments in 1794. Also the Constitution of 1798 Page 153-154, Image 160-161 (1800) available at The Making of Modern Law: Primary Sources. 1768
Laws of Georgia, An Act to amend and Continue "An Act for the Establishing and Regulating Patrols, and for Preventing any Person from Purchasing Provisions or any Other Commodities from, or Selling Such to any Slave, Unless Such Slave Shall Produce a Ticket from His or Her Owner, Manager or Employer . . . Be it enacted, That immediately from and after passing of this act, it shall not be lawful for any slave, unless in the presence of some white person, to carry or make use of fire arms, or any offensive weapon whatsoever, unless such slave shall have a ticket or license in writing from his master, mistress, or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed every week, or unless there be some white person of the age of sixteen years or upwards in the company of such slave when he is hunting or shooting, or that such slave be actually carrying his master's arms to or from his master's plantation by a special ticket for that purpose, or unless such slave be found in the day-time, actually keeping off birds within the plantation to which such slave belongs, loading the same gun at night, within the plantation to which such slave belongs, loading the same gun at night, within the dwelling house of his master, mistress or white overseer: Provided always, That no slave shall have liberty to carry any gun, cutlass, pistol, or other offensive weapon, abroad at any time between Saturday evening after sunset and Monday morning before sun rise,

notwithstanding a license or ticket for so doing. II. And be it further enacted, That in case any or either of the patrols, established or to be established within this province, by virtues of the said act, on searching and examining any negro house for offensive weapons, fire arms and ammunition, shall find any such, or in case any person shall find any slave using or carrying fire arms or other offensive weapons, contrary to the intent and meaning of this act, such patrol, or person or persons, may lawfully seize and take away such offensive weapons, fire arms, and ammunition, but before the property thereof shall be vested in the person or persons who shall seize the same, such person or persons shall, within three days next after such seizure, go before a justice of the peace, and shall make oath of the manner of taking thereof, and if such justice of the peace, after such oath made, or upon due examination, shall be satisfied that the said fire arms, offensive weapon, or ammunition, shall have been seized according to the directions, and agreeable to the true intent and meaning of this act, the said justice shall, by certificate under his hand and seal, declare them forfeited, that the property is lawfully vested in the person or persons who seized the same.

Act of Feb. 1784, Digest of Laws of the State of Georgia 288-89 (Watkins ed. 1800).
II. And be it enacted by the authority aforesaid, for the better preventing disturbances among the Indians, by persons bartering with them in the woods, or hunting in their grounds, or in any other wise trespassing on the same, that from and after the passing of this act, it shall not be lawful for any person or persons to sell, truck, barter, or exchange with any Indian or Indians, any rum or other strong liquors, clothing, arms, ammunition, or any other thing whatsoever, privately in the woods, in their hunting grounds, or at cow-pens in the settlements, or at any other place other than at stores or houses licensed for that purpose, or shall hunt or trespass on the lands beyond the present temporary boundary line.
file:///C:/Users/Bob/Downloads/digestoflawsofst1800stat-145-289.pdf

https://scholar.google.com/scholar_case?case=6390872913740945967&hl=en&lr=lang_en&as_sdt=0&as_vis=1&oi=scholaralrt&html=&pos=1&folt=cit&fols=

1866 Ga. Laws 27-28, An Act to Authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham Counties to Levy a Special Tax for County Purposes, and to regulate the same, §§ 3-4.
§ 1. . . . collect a tax of two dollars per head on each and every dog over the number of three, and one dollar a piece on every gun or pistol, musket or rifle over the number of three kept or owned on any plantation in the counties aforesaid; the said tax to be applied to such county purposes as the said courts shall direct. § 2. That the owner of every plantation in said counties shall be required to render, upon oath, a full return of every dog, gun, pistol, musket, or rifle so held or kept as aforesaid, and shall be held responsible for the tax imposed upon them, which tax the said Inferior Courts are hereby authorized and empowered to enforce, as in other cases.

Treasurer's Report, 1894 Ga. Laws 325, 325-326.
"TREASURER'S REPORT.
EXHIBIT
R. U. Hardeman, Treasurer, in Account with State of Georgia
To Balance in Treasury September 30th, 1893, as per Report................ $1,139,837.45
From Pistol Dealers Tax for 1893 . . . $90.00

From Pistol Dealers Tax for 1894 . . . $2,522.00"
Acts and Resolutions Of the General Assembly Of the State of Georgia 1894 (Atlanta, GA: Geo. W. Harrison, State Printer, Franklin Printing and Publishing Co., 1895), 325-326. Treasurer's Report.

1902 Ga. Laws 434-35, § 16.
Be it further enacted by the authority aforesaid, That the mayor and aldermen of the said city of Forsyth shall have full power to license, regulate and control by ordinance all . . . gun shops, dealers in guns or pistols . . . .

1910 Ga. Laws 134, No. 432.
Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910
§ 348 (a). Carrying pistols without license. [It shall be unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the ordinary of the respective counties in which the party resides, before such person shall be at liberty to carry around with him on his person, or to have in his manual possession outside of his own home or place of business: Provided that nothing in this law shall be construed to alter, affect, or amend any laws now in force in this State relative to the carrying of concealed weapons on or about one's person, and provided further, that this shall not apply to sheriffs, deputy sheriffs, marshals, or other arresting officers of this State or United States, who are now allowed, by law, to carry revolvers; nor to any of the militia of said State while in service or upon duty; nor to any students of military colleges or schools when they are in the discharge of their duty at such colleges.] § 348 (b). License, how obtained. [The ordinary of the respective counties of this State in which the applicant resides may grant such license, either in term time or during vacation, upon the application of party or person desiring to apply for such license; provided applicant shall be at least eighteen years old or over, and shall give a bond payable to the Governor of the State in the sum of one hundred dollars, <u>conditioned upon the proper and legitimate use of said weapon</u> with a surety approved by the ordinary of said county, and the ordinary granting the license shall keep a record of the name of the person taking out such license, the name of the maker of the fire-arm to be carried, and the caliber and number of the same.] § 348 (c). Fee for license. [The person making such application and to whom such license is granted, shall pay to the ordinary for granting said license the sum of fifty cents, which license shall cover a period of three years from date of granting same.] § 348 (d). Punishment. [Any person violating any of the provisions of the three preceding sections shall be punished as for a misdemeanor, as prescribed in section 1065 of this Code.]

1921 Ga. Laws 248, Explosives, Use of Regulated, § 1.
That from and after the passage of this Act, It shall be unlawful for any person, association of persons, co-partnerships or corporations to have, own, possess or control within the State of Georgia, any dynamite, nitro-glycerine, gun cotton, or any other high explosive of any name whatsoever, without first having registered his, their or its name with the Ordinary of the County where such person, association or persons, co-partnership or corporation resides, or does business, in a book to be kept by said Ordinary to be known as the Explosive Register . . . .

**<u>HAWAII</u>**

1870 Haw. Sess. Laws 26, An Act to License the Carrying of Fowling Pieces and Other Firearms, chap. 20, §§ 1 to 3.
Lawrence McCully, Compiled Laws of the Hawaiian Kingdom Page 539, Image 545 (1884) available at The Making of Modern Law: Primary Sources. 1870
An Act to License the Carrying of Fowling Pieces and Other Fire-Arms. Whereas, the Act for the protection of Kolea or Plover and other useful birds, approved on the 20th day of April, A.D. 1859, has proved ineffectual for the purposes intended thereby, and Whereas, The general and indiscriminate use of fire-arms, which are frequently used for the destruction of useful, imported and migratory insectivorous birds and their progeny, is an injury to the agricultural and pastoral interests of this Kingdom, therefore, Be it Enacted by the King and Legislative Assembly of the Hawaiian Islands in the Legislature of the Kingdom assembled: § 1. That the Minister of the Interior may at any time license for a term of one year, any applicant for such license, to use and carry fire-arms for sporting purposes, in the District of Kona, Island of Oahu, on receiving for such license the sum of five dollars. § 2. Any person in said district who shall use or carry for sporting purposes, any gun, carbine, rifle, pistol, or other fire-arms, without having at first obtained a license as hereinbefore provided, shall, upon conviction therefor, before any police or district justice, be fined in a sum not to exceed fifty dollars for every such offense, and in default of payment of such sum, shall be imprisoned at hard labor, until such fine and costs are paid, according to law. § 3. All such licenses shall be signed by the Minister of the Interior, numbered according to their respective dates and impressed with the seal of his department, and no such license shall be transferable.

Revised Laws of Hawaii 1925, 791-92 (1925).
Section 2137. Form or report. It shall be the duty of the sheriff to prepare and furnish to all persons applying therefor [meaning applying under Section 18 of 1927 Haw. Sess. Laws 209-217], proper blanks upon which such information shall be furnished, in the following form: [requiring name of owner, name of possessor, number, description, makers name, factory number, and number disposed of and date].

1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17.
Section 1. Definitions. "Pistol" or "revolver" as used in this Act, means any firearm with barrel less than twelve inches in length. "Crime of Violence", as used in this Act means any of the following crimes, namely, murder, manslaughter, rape, mayhem, assault to do great bodily harm, robbery, larceny, burglary and house-breaking. Section 2. Committing crime when armed. If any person, when armed with a pistol or revolver, shall commit or attempt to commit an act constituting a crime of violence, he may in addition to the punishment otherwise provided for the crime, be punished by imprisonment for not more than one year or by a fine of not more than one thousand dollars ($1,000.00) or by both; provided, that the act aforesaid be one which is capable of being committed or facilitated by means of a pistol or revolver. Section 3. Being armed prima facie evidence of intent. In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol or revolver and had no license to carry the same, shall be prima facie evidence of his intention to commit said crime of violence; provided,

that the criminal act committed or attempted be one which is capable of being committed or facilitated by means of a pistol or revolver.

Section 5. Carrying or keeping small arms by unlicensed persons. Except as otherwise provided in Sections 7 and 11 hereof in respect of certain licensees, no person shall carry, keep, possess, or have under his control a pistol or revolver; provided, however, that any person who shall have lawfully acquired the ownership or possession of a pistol or revolver may, for purposes of protection and with or without a license, keep the same in the dwelling house or business office personally occupied by him, and, in case of an unlawful attack upon any person or property in said house or office, said pistol or revolver may be carried in any lawful, hot pursuit of the assailant.

Section 6. Exceptions. The provisions of the preceeding section shall not apply to marshals, sheriffs, prison or jail wardens or their deputies, policemen, mail carriers, or other duly appointed law enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States, or of the National Guard, when on duty, or of organizations by law authorized to purchase or receive such weapons from the United States or this territory, or to officers or employees of the United States authorized by law to carry a concealed pistol or revolver, or to duly authorized military organizations when on duty, or to the members thereof when at or going to or from their customary places of assembly, or to the regular and ordinary transportation of pistols or revolvers as merchandise, or to any person while carrying a pistol or revolver unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

Section 9. Transfers regulated. No person shall transfer by way of sale, gift, loan or otherwise, a pistol or revolver unless the prospective transferee, when he applies for the transfer, presents a permit duly granted under Section 2141 of the Revised Laws of Hawaii 1925; nor shall he make such transfer unless the transferee be a person in respect of whom there is no reasonable cause, known to the transferor, for believing that such transferee has committed or attempted, or has been convicted of committing or attempting, a crime of violence. No seller shall in any event deliver a pistol or revolver on the day when the application to purchase and the statement hereinafter mentioned shall be made. When delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, race, nationality, color and place of birth, the date of sale, the caliber, make, model, and manufacturer's number of the weapon, and stating that he has never been convicted of a crime of violence. The seller shall promptly sign and forward by registered mail one copy thereof to the treasurer of the territory, and one copy thereof to the sheriff of the county or city and county of which the seller is a resident, and shall retain the other copy for six years. A statement shall be deemed promptly forwarded if it is forwarded within seven days, unless a shorter time is provided therefor in regulations established by the Governor.

Section 10. Dealers to be licensed. No retail dealer or selling agent shall sell or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol or revolver without being licensed as hereinafter provided.

Section 11. Dealers' Licenses; by whom granted, and conditions thereof. The duly constituted licensing authorities of any political subdivision of this territory may grant licenses in form prescribed by the treasurer of the territory, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision,

pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:
1. The business shall be carried on only in the building designated in the license.
2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.
3. No pistol or revolver shall be delivered unless the purchaser either is personally known to the seller or shall present clear evidence of his identity.
4. The seller shall faithfully comply with the requirements of Section 9 hereof and with all other provisions of this Act and of Chapter 128, Revised Laws of Hawaii 1925. A copy of the statement required by Section 9 hereof shall be entered by the seller in a book of record to be kept in his place of business and to be always open to the inspection of the officers and authorized representatives of the territorial government, including the police. Said book shall be preserved for six years.
5. No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.
No license to sell at retail shall be granted to anyone except as provided in this section.
Section 12. False information forbidden. No person shall, in purchasing or otherwise securing delivery of a pistol or revolver, or in applying for a license to carry the same, give false information or offer false evidence of his identity.
Section 17. Penalties. Any violation of any provision of this Act shall constitute an offense punishable by a fine of not more than one thousand dollars ($1,000.00) or imprisonment for not more than one year, or both.
Section 25. Section 2143 of the Revised Laws of Hawaii 1925, is hereby amended by inserting, after the first sentence in said section [“The permit mentioned in section 2141 shall not be issued to any alien until the applicant has filed with the sheriff or a deputy sheriff of the county or city and county a request in writing, signed by two responsible citizens requesting that such permit be issued, and recommending and vouching for the applicant.”], the following: “The request aforesaid shall include (1) an expression of the belief of such citizens that the applicant has never committed or attempted a crime of violence, as that phrase is defined in the Small Arms Act; that he has never been convicted thereof anywhere and that he is not likely to commit or attempt any such crime and (2) a brief statement of the facts relating to the age, character, nativity and personal history of the applicant, insofar as these facts are within the personal knowledge of such responsible citizens. Such facts as are within the personal knowledge of one of them, only, shall be included in a supplemental written statement signed by the person having such knowledge.” [The rest of Section 2143 reads: “Aliens obtaining a permit as prescribed by the above section shall be required to secure an annual license from the treasurer of the county or city and county, and to pay to the treasurer an annual license tax of five dollars; provided, however, that to aliens who must necessarily use fire-arms in carrying on their business, such as rice planting, such license shall be issued free of charge upon a certificate from the sheriff of the county or city and county in which they carry on such business to the effect that the fire-arms and ammunition mentioned in their permit are necessary to the conduct of their business.”]
Section 26. Section 2146 of the Revised Laws of Hawaii 1925, is hereby amended to read as follows: “Section 2146. Penalties. Any person who shall be found in the possession of any firearm or firearms or any ammunition without having complied with the provisions of this chapter, or who shall fail to give, file or forward required information, reports or statements, or

who shall otherwise violate the provisions of this chapter in matters not covered by Section 2142 hereof, shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined by the court of appropriate jurisdiction in a sum of not more than five hundred dollars ($500.00).
Any person, firm, corporation, copartnership, failing to file any information herein required to be filed, shall be deemed guilty of a misdemeanor and upon conviction shall be fined by the court of appropriate jurisdiction not more than five hundred dollars ($500.00).
The divulging of official information recorded or on file in a public office shall be punishable in like manner; provided, however, that where the information divulged has not tended, or been designed to encourage, or to render formidable armed resistance to the law, the fine shall not exceed twenty-five dollars ($25.00)."

1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3.
Every person residing or doing business or temporarily sojourning within the Territory on the effective date of this Act who possesses a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, not already registered in the name of the present possessor, or who possesses ammunition of any kind or description, except shotgun ammunition, shall, within ten days of said effective date, register the same with the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn. Every person arriving in the Territory after the effective date of this Act, who brings with him firearms or ammunition of the type and description set out in this section, shall register the same in similar manner within forty-eight hours after arrival. The registration shall be on such forms as may be designated by the bureau of crime statistics and shall include a description of the class of firearm or firearms and ammunition owned by him, or in his possession, together with the name of the maker and the factory number, if known or ascertainable, and the source from which possession was obtained. Within sixty days after the effective date of this Act, the chief of police of the city and county of Honolulu and the sheriffs of the several counties, other than the city and county of Honolulu, shall furnish the bureau of crime statistics a record of all registrations now on file in their respective offices. Within ten days after the end of each month the chief of police of the city and county of Honolulu and the sheriffs of the several counties, other than the city and county of Honolulu, shall furnish to the bureau of crime statistics duplicate copies of all registrations made during the preceding month. No fee shall be charged for such registration. Any person who fails to comply with the provisions of this section shall he punished by a fine of not more than two hundred and fifty dollars ($250.00).

1933 Haw. Sess. Laws 37-38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 4.
§ 4. No person residing or doing business or temporarily sojourning within the Territory shall take possession of any fire arm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior Acts or unregistered, or of any ammunition of any kind or description, except shotgun ammunition, either through sale, gift, loan, bequest, or otherwise, whether procured in the Territory or imported by mail, express, freight, or otherwise, until he shall first have procured from the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu,

wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn, a permit to acquire as prescribed herein. The chief of police of the city and county of Honolulu or the sheriffs of the several counties, other than the city and county of Honolulu, are hereby authorized, within their discretion, to issue permits, within their respective jurisdictions, to acquire rifles, pistols, and revolvers to citizens of the United States, of the age of twenty years or more, and to duly accredited official representatives of foreign nations. Permits to acquire ammunition for rifles, pistols and revolvers acquired prior to the effective date of this Act and registered in accordance with the provisions hereof, may be granted persons [sic] of the age of twenty years or more irrespective of citizenship. Permits to acquire shotguns may be granted to persons of the age of sixteen years or more, irrespective of citizenship. Applications for such permits shall be signed by the applicant upon forms to be specified by the bureau of crime statistics, and shall be signed by the issuing authority. One copy of such permit shall be retained by the issuing authority, as a permanent official record. Such permit shall be void unless used within ten days after the date of issue. In all cases where possession is acquired from another person in the Territory the permit shall be signed in ink by the holder thereof and shall thereupon he delivered to and taken up by the person selling, loaning, giving or delivering the firearm or ammunition, who shall make entry thereon setting forth in the space provided therefor the name of the person to whom the firearm or ammunition was delivered, and the make, style, caliber, and number, as applicable. He shall then sign it in ink and cause it to he delivered or sent by registered mail to the issuing authority within forty-eight hours. In case receipt of such firearms or ammunition is had by mail, express, freight, or otherwise, from sources outside the Territory, the person to whom such permit has been issued, shall make the prescribed entries thereon, sign in ink, and cause it to be delivered or sent by registered mail to the issuing authority within forty-eight hours after taking possession of the firearms or ammunition. No person shall sell, give, loan, or deliver into the possession of another any firearm or ammunition except in accordance with the Provisions of this section. Any person acquiring a firearm or ammunition under the provisions of this section shall, within five days of acquisition, register same in the manner prescribed by Section 3 of this Act. No fee shall be charged for permits under this section. Any person who violates any provision of this section shall be punished by a fine of not more than five hundred dollars ($500.00) or imprisonment for not more than one year, or by both.

1933 Haw. Sess. Laws 38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 5. 1933
Any person who has procured a hunting license under the provisions of Sections 2028-2032, inclusive, of the Revised Laws of Hawaii 1925, as amended, shall, while actually engaged in hunting or while going to or from the place of hunting, be authorized to carry and use any lawfully acquired rifle or shotgun and suitable ammunition therefor.

1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.
§ 8. In an exceptional case, when the applicant shows good reason to fear injury to his person or property, the chief of police of the city and county of Honolulu or the sheriff of a county, other than the city and county of Honolulu, may grant a license to a citizen of the United States or a duly accredited official representative of a foreign nation, of the age of twenty years or more, to carry concealed on his person within the city and county or the county in which such license is

granted, a pistol or revolver and ammunition therefor. Unless renewed, such license shall automatically become void at the expiration of one year from date of issue. No such license shall issue unless it appears that the applicant is a suitable person to be so licensed, and in no event to a person who has been convicted of a felony, or adjudged insane, in the Territory or elsewhere. All licenses to carry concealed weapons heretofore issued shall expire at midnight on the effective date of this Act. No person shall carry concealed on his person a pistol or revolver or ammunition therefor without being licensed so to do under the provisions of this section. For each such license there shall he charged a fee of ten dollars ($10.00), which shall be covered into the treasury of the city and county or the county in which such license is granted. Any person violating this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.
Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

**ILLINOIS**

An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814
That it shall not be lawful for any person whatever without license from the Governor or some sub-agent appointed by him to purchase or receive by gift or other wise of any of the before mentioned Indians, any horse, mare, gun, tomohawk, knife, blanket, shrouding, calico, saddle, bridle, or any goods wares or merchandize whatever, that all such sales or gifts shall be considered as fraudulent on the part of the buyer or receiver and that any white person or free person of coulour whatever so buying or receiving any such articles of any one of those Indians shall be liable to pay a fine of twenty dollars to be recovered before a justice of the peace . . . ."

Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841
[An Ordinance Regulating the Police of the City of Quincy], § 5. Be it further ordained by the City Council of the City of Quincy, That no person shall, within the limits of said city, fire or discharge any cannon, musket, rifle, fowling piece, or other fire arms, or air-gun, except in cases of necessity, or in the performance of a public or lawful act of duty, or discharge or set of any cracker, rocket, torpedo, squib, or other fire works, within the limits of said city, without permission first obtained from the Mayor or one of the Aldermen, or Marshal of said city; and every person so offending shall forfeit and pay, for the use of said city, not less than one dollar, nor more than three dollars, for every such offense.

George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources. 1851
Ordinances of the City of Chicago: Regulating the Keeping and Conveying Gun Powder and Gun Cotton; § I. (Be it ordained by the Common Council of the city of Chicago) That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing, signed by the mayor and clerk and sealed with the corporate seal, under a penalty of twenty-five dollars for every offence. § II. All applications for permits shall be addressed to the common council or mayor in writing, signed by the applicant. Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot. When issued the clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business and date of permit. Persons to whom permits may be issued shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gun powder or gun cotton than fifty pounds at one time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business with the words “gun powder and gun cotton” painted or printed theron in large letters. A violation of any clause of this section shall subject the offender to a fine of not less than ten dollars nor exceeding one hundred dollars. § III. No person shall convey or carry any gun or carry any gun powder or gun cotton, (exceeding one pound in quantity), through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the gun powder or gun cotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a leather bag or case, sufficient to prevent such gun powder or gun cotton from being spilled or scattered under a penalty of one hundred dollars. IV. No vessel, laden in whole or in part with gun powder or gun cotton, shall land at, or make fast to any dock or wharf upon the Chicago river, or either branch thereof, between the south line of the school section and Chicago avenue, or to discharge such gun powder or gun cotton within said limits. If any master, or owner of any vessel, or other person shall violate any provision of this section, he shall be subject to a fine of not less then twenty-five dollars and not exceeding one hundred dollars. § V. The mayor shall have power to cause any vessel to be removed form the limits

mentioned in the previous section, to any place beyond the same, by a written order, which shall be executed by the marshal or some other member of the police. If any person shall neglect or refuse to obey such order, or shall resist any officer in the execution of the same, he shall be subject to a penalty of one hundred dollars. § VI. Al permissions granted under this ordinance shall expire on the tenth day of June each year. And no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit so issued. § VII. It shall be the duty of the officers of the police department, fire-wardens, and firemen, to report all violations of this ordinance which may come to the knowledge of the city attorney for prosecution.

James M. Cunningham, The City Charter and the Revised Ordinances of the City of Peoria, Illinois; Also, the Original City Charter, and the Several Amendments Thereto, and the State Laws Relating to the City or Specially Affecting Its Interests; Together with the Rules of Order and Business for the Government of the City Council. Arranged, Revised, and Published, Under the Authority of the City Council, in the Year 1869 Page 254, Image 284 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of the City of Peoria: Public Safety and Convenience], § 1. That it shall not be lawful for any person in said city, without permission from the mayor or superintendent of police, to fire or discharge any cannon, musket, rifle, fowling-piece, pistol, or other fire-arms or air guns, except it is done in cases of necessity, or in the performance of a public act of lawful duty, or by military companies when on parade or in the discharge of duty; and every person violating the provisions of this section shall, on conviction, forfeit and pay not less than one dollar nor more than one hundred dollars for every offense.

Revised Ordinances of the City of Galesburg, the Charter and Amendments, State Laws Relating to the Government of Cities and Appendix Page 122-123, Image 127-128 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of Galesburg, Ill.], Gunpowder-Fires, Fire-Arms, § 1. The keeping for sale or selling gunpowder, without a license therefor, is prohibited, and no license shall be issued allowing the keeping in store more than twenty-five pounds of gun powder at any one time, unless kept in some secure magazine or fire-proof powder house, located at least one hundred feet from any other occupied building, and when kept in a store or place for retail it shall be kept in tin or other metallic canisters or cases, and in a part of the building remote from any fire, lamp, candle or burning matter liable to produce explosion, and whoever shall violate this section, or any provision of it, shall be subject to a penalty of twenty dollars. § 2. Each person licensed to sell gunpowder shall keep a sign, with the words "Gunpowder for Sale," in plain letters, in some conspicuous place in the front of the building where such powder is kept. And no sales of gunpowder, except in unopened cans shall be sold after night, and any person convicted of violation of any of the provisions of this section shall be subject to a penalty of ten dollars. § 3. Whoever shall bring or cause to be brought into the city any gunpowder concealed in any box or other package, or in any package marked as containing other articles, in which such powder is contained, shall be subject to a penalty of twenty-five dollars. §4. The carrying gunpowder through the streets or other public places, in a careless or negligent manner, or the remaining with such powder in any place longer than necessary for the transportation of the same from one place to another, shall subject the party offending to a penalty of not less than five dollars. . .

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876 Misdemeanors, § 39. No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Egbert Jamieson, The Municipal Code of Chicago: Comprising the Laws of Illinois Relating to the City of Chicago, and the Ordinances of the City Council; Codified and Revised Page 301-304, Image 309-312 (1881) available at The Making of Modern Law: Primary Sources. Ordinances of Chicago, § 1264. No person shall keep, sell or give away any gunpowder or gun-cotton in any quantity, without permission in writing, signed by the mayor and city clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own use a quantity of gunpowder or guncotton not exceeding one pound. . . § 1271. It shall be unlawful for any person or persons to carry or convey any gunpowder or guncotton (exceeding fifty pounds in quantity) through any street, alley, highway or road in the city, or within one miles of the limits thereof, in any cart, carriage, wagon, dray or wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a good tight and substantial leather bag sufficient to prevent the same from being spilled or scattered or unless the same is put into a well covered and perfectly water tight box, the bottom and sides which shall be completely covered with zinc, or unless such gunpowder or guncotton be secured in water tight patent metallic cases or kegs. . . § 1275. Any person or persons, corporation or corporations, violating any of the provisions of sections (storage, manufacturing and sale §§) shall be subject to a fine of not less than fifty dollars, and not exceeding two hundred dollars, for each and every offense, and each and every day that gunpowder or guncotton shall be kept in any place contrary to any provision of this article shall constitute a violation thereof. § 1276. No vessel laden in whole or in part with gunpowder or guncotton shall land or make fast to any dock or wharf upon the Chicago river, or either branch thereof between the south line of the school section and Chicago avenue, or discharge such gunpowder or guncotton within said limits. If any master or owner of any vessel or other person shall violate any provision of this section he shall be subject to a fine of not less than twenty dollars, and not exceeding one hundred dollars.

LAKE, THE REVISED ORDINANCES OF THE TOWN, [Illinois] ch. 32, §§ 1-9 (Beach, Barnard & Co. 1882).
Chapter XXXII.
CONCEALED WEAPONS.
SECTION 1. It shall be unlawful for any person within the limits of the town to carry or wear under his clothes, or concealed about his person, any pistol, colt or slung shot, cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk, razor or dagger, or any other dangerous or deadly weapon.

§ 2. Any such weapon or weapons duly adjudged by the police magistrate, or any justice of the peace of said town, to have been worn or carried by any person, in violation of the first section of this chapter, shall be forfeited or confiscated to the said Town of Lake, and shall be so adjudged.

§ 3. Any policeman of The Town of Lake may within the limits of said town without a warrant arrest any person or persons whom such policeman may find in the act of carrying or wearing under their clothes or concealed about their persons, any pistol, or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk, or dagger, or razor or any other dangerous or deadly weapon, and detain him, her or them in the town jail until a summons or warrant can be procured on complaint made (under oath or affirmation) for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

§ 4. Upon complaint made, under oath or affirmation, to any magistrate or justice of the peace in said town, that any person has been guilty of violating any of the provisions of section 1 of this chapter, a summons or warrant shall issue for the summoning or arrest of the offender or offenders, returnable forthwith; upon the return of such summons or warrant, such magistrate or justice shall proceed to the hearing and determination of the matter, and if it shall be adjudged that such person or persons has or have incurred any of the penalties fixed by this chapter, such magistrate or justice of the peace shall so adjudge, and order that the weapon or weapons, concerning the carrying or wearing of which such penalty shall have been incurred, shall be confiscated to The Town of Lake.

§ 5. Any person or persons violating any of the provisions of section 1 of this chapter shall pay a fine of not less than five dollars nor more than fifty dollars, in the discretion of the magistrate or court before whom such conviction shall be had.

§ 6. The prohibitions of this chapter shall not apply to the officers or members of the police force of said town when on duty, nor to any officer of any court whose duty may be to serve warrants or to make arrests; nor to persons whose business or occupation may seem to require the carrying of weapons for their protection, and who shall have obtained from the president of the board of trustees a license so to do, as hereinafter provided.

§ 7. The president <u>may grant to so many and such persons as he may think proper licenses to carry concealed weapons, and may revoke any and all of such licenses at his pleasure</u>.

§ 8. Applications for such licenses shall be made to the clerk, and when granted, the person applying therefor shall pay to the clerk, for the use of the town, the sum of two dollars, and thereupon a license shall be issued by the town clerk, and signed by the president.

§ 9. Every such license shall state the name, age, occupation and residence of the person to whom it is granted, and shall expire on the thirtieth day of June next following.

The Revised Ordinances of the Town of Lake, Comprising the Laws of Illinois Relating to the Town of Lake, and the Ordinances of the Board of Trustees (Chicago, IL: Beach, Barnard & Co., 1882), 177-78. Chapter 32—Concealed Weapons, §§ 1-9. (Undated).

Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.

All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register

shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public, and all persons who may wish to examine the same may do so at all reasonable times during business hours. A failure to keep such register, or to allow an examination of the same, or to record therein any sale or gift of a deadly weapon, or the keeping of a false register, shall be a misdemeanor, and shall subject the offender to a fine of not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

HYDE PARK, ILLINOIS, MUNICIPAL CODE OF THE VILLAGE, ch. 12, §§ 1-9 (sine nomine 1887).
"CHAPTER XII.
CONCEALED WEAPONS…
...105. Section 1. It shall be unlawful for any person within the limits of the village to carry or wear under his clothes, or conceal about his person, any pistol, colt or slung shot, cross knuckles or knuckles of lead, brass or other metal, or bowie knife, dirk knife or dirk, razor or dagger, or any other dangerous or deadly weapon.

106. § 2. Any such weapon or weapons duly adjudged by any police magistrate or justice of the peace of said village to have been worn or carried by any person, in violation of the first section of this chapter, shall be forfeited or confiscated to the Village of Hyde Park, and shall be so adjudged.

107. § 3. Any policeman of the Village of Hyde Park may, within the limits of said village, without a warrant, arrest any person or persons whom such policeman may find in the act of carrying or wearing under his or their clothes or concealed about his or their persons, any weapon mentioned in section one of this chapter, and detain him, her or them in the village jail or armory until a summons or warrant can be procured on complaint made (under oath or affirmation) for the trial of such person or persons, and for the seizure and confiscation of such concealed weapons.

108. § 4. Upon complaint made, under oath or affirmation, to any magistrate or justice of the peace in said village, that any person has been guilty of violating any of the provisions of section one of this chapter, a summons or warrant shall issue for the summoning or arrest of the offender or offenders, returnable forthwith; upon the return of such summons or warrant, such magistrate or justice shall proceed to the hearing and determination of the matter, and if it shall be adjudged that such person or persons has or have incurred any of the penalties fixed by this chapter, such magistrate or justice of the peace shall so adjudge, and order that the weapon or weapons, concerning the carrying or wearing of which such penalty shall have been incurred, shall be confiscated to the Village of Hyde Park.

109. § 5. Any person or persons violating any of the provisions of section one of this chapter shall pay a fine of not less than five dollars nor more than two hundred dollars, or be imprisoned for a term not exceeding six months, or both, in the discretion of the magistrate or court before whom such conviction shall be had.

110. § 6. The prohibitions of this chapter shall not apply to the officers or members of the police force of said village when on duty, nor to any officer of any court whose duty may be to serve warrants or to make arrest; nor to persons whose business or occupation may seem to require the carrying of weapons for their protection, and who shall have obtained from the President of the Board of Trustees a license so to do, as hereinafter provided.

111. § 7. The President of the Board of Trustees may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all of such licenses at his pleasure.
112. § 8. Applications for such licenses shall be made to the President of the Board of Trustees, and the person applying therefor shall pay to the Village Comptroller the sum of two dollars before such license shall be issued.
113. § 9. Every such license shall state the name, age[,] occupation and residence of the person to whom it is granted, and shall expire at the end of the current fiscal year."
Henry V. Freeman, ed., Municipal Code of the Village of Hyde Park Together with General Laws Affecting Municipal Corporations; Charters and Special Ordinances Granting Certain Privileges in the Village (Hyde Park, IL: s.n., 1887), 28-29. Chapter 12—Concealed Weapons, §§ 1-9. Approved March 28, 1887.

George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources. 1893
Concealed Weapons, §531. It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot, cross knucklet, or knuckles of lead, brass or other metal, or bowie knife, dirk, dagger, or any other dangerous or deadly weapon. . . § 537. The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all such licenses at his pleasure. § 538. Applications for such licenses shall be made to the city clerk, and when granted, the applicant therefor shall pay to the said clerk, for the use of the city, the sum of two dollars. § 539. Every such license shall state the name, age and occupation and residence of the person to whom it is granted.

Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants [Chicago] from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914
Ordinance of May 25, 1914, § 4a. It shall be unlawful for any person, firm or corporation to sell, barter or give away to any person within the City of Chicago, any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character which can be concealed on the person, except to licensed dealers and to persons who have secured a permit for the purchase of such articles from the general superintendent of police as hereinafter required; provided, this section shall not apply to sales made of such articles which are delivered or furnished outside the City of Chicago. § 5. It shall be unlawful for any person to purchase any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character, which can be concealed on the person, without first securing from the General Superintendent of Police a permit so to do. Before any such permit is granted, an application in writing shall be made therefor, setting forth in such application the name, address, age, height, weight, complexion, nationality and other elements of identification, of the person desiring such permit, and the applicant shall present such evidence of good character as the General Superintendent of Police in his discretion may require. § 6. It shall be the duty of the General Superintendent of Police to refuse such permit to (a) All persons having been convicted of any crime. (b) all minors. "Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the General Superintendent of Police to grant such permit, upon the payment of a fee of one dollar. § 8. Any person, firm or

corporation violating any of the provisions of this ordinance, shall be fined not less than Fifty Dollars ($50.00) nor more than Two hundred Dollars ($200.00) for each offense, and every purchase, sale or gift of any weapon mentioned in this ordinance shall be deemed a separate offense.

Samuel Irwin, Reports of Cases At Law And In Chancery 566 (vol. #278, Chicago, Ill, 1917). 1917
It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar.

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.
Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

**INDIANA**

1847 Ind. Acts 93, An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory Thereto Into One Act, and to Amend the Same, chap 61, § 8, pt. 4.
To regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder and other explosive compounds . . . .

W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855
Ordinances [of Jeffersonville], § 3, Pt. 11. It shall also be a nuisance and unlawful . . . To discharge or cause to be discharged any fire arms, squibs, bombs or fire works of any kind without license being first obtained therefor.

Revision of 1895. The General Ordinances of the City of Indianapolis. Containing also, Acts of the Indiana General Assembly so far as they Control Said City, to which Prefixed a Chronological Roster of Officers from, 1832 to 1895 and Rules Governing the Common Council Page 290-291, Image 372-373 (1895) available at The Making of Modern Law: Primary Sources. 1895
Laws and Ordinances [of the City of Indianapolis], An Ordinance Licensing Rifle and Pistol Practice in the City of Indianapolis, § 1. Be it ordained by the Common Council and Board of Aldermen of the City of Indianapolis, That it shall hereafter be unlawful for any person to

conduct or carry on any shooting gallery or room where rifle or pistol shooting is practiced, in the City of Indianapolis, without first having procured a license so to do, as hereinafter provided. § 2. A license fee of twenty-five dollars for six months and fifty dollars for one year shall be paid by the person conducting such business. Upon the payment of twenty-five dollars to the City Treasurer by any person desiring to carry on such a gallery or room, the City Treasurer shall issue to him a receipt therefor, designating therein what said money is paid for; and upon the surrender thereof to the City Clerk [Comptroller] that officer shall issue to such person a license for the said term of six months; and likewise, upon the payment of fifty dollars, a license for one year shall issue. The Clerk [Comptroller] shall be entitled to charge one dollar for the issue of every such license. Said license shall be in the usual form. § 3. Any person opening or carrying on such a gallery or room without such license shall be fined in any sum not exceeding fifty dollars; and every day's continuance shall constitute a spate offense.

1925 Ind. Acts 495, 495-98
Pistols and Revolvers Defined.
SECTION 1. Be it enacted by the general assembly of the State of Indiana, That the term "pistol or revolver," as used in this act, shall be construed as meaning any firearm with a barrel less than twelve inches in length.
Crime-Committing When Armed With Pistol or Revolver.
SEc. 2. If any person shall, within the State of Indiana, commit or attempt to commit a crime, when armed with a pistol or revolver, and having no permit to carry the same, he shall, in addition to the punishment provided for the crime, be guilty of a felony and shall be punished by imprisonment for not less than one year and not more than five years.
Subsequent Offenses.
SEc. 3. The judge shall have the power to sentence any person who may be convicted for a second or third, or other subsequent offense under section 2 of this act, to double or triple the penalty imposed thereby.
Felony-Conviction For-Prohibited From Possessing Pistol.
SEC. 4. No person who has been convicted of a felony committed against the person or property of another shall own or have in his possession or under his control, within the State of Indiana, a pistol or revolver. A violation of this section shall constitute a felony and be punishable by imprisonment for not less than one year, and not more than five years.
Pistol or Revolver-Possession Without Permit.
SEc. 5. No person shall carry, within the State of Indiana, a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a permit therefor as hereinafter provided. Violations of this section shall constitute a misdemeanor and be punished by a line of one hundred dollars ($100.00), to which may be added imprisonment for not more than one year, and upon conviction the pistol or revolver shall be confiscated and destroyed by the sheriff on order of the court.
Persons Exempt From Act.
SEc. 6. The provisions of the preceding section shall not apply to marshals, sheriffs, deputy sheriffs, policemen or any other duly appointed peace officers, nor the pistols or revolvers of any bank, trust company, or common carriers, or to the officers or employes of any bank, trust company, or common carriers, while such officers or employes are guarding money or valuables within the line of their duties as such employes, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps or the

mail service of the United States, or the national guard, when on duty, or organizations by law authorized to purchase or receive such weapons from the United States, or the State of Indiana, nor to duly authorized military or civil organizations when parading, nor to the members thereof when at .or going to or from their customary places of assembly.

Permits-Clerk of Circuit Court-Application-Form Fee.

SEC. 7. The clerk of any circuit court of the State of Indiana, shall, upon application of any citizen having a bona fide residence or place of business within the State of Indiana, or of any person having a bona fide residence or place of business within the United States, and a permit to carry a firearm concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a permit to such citizen to carry a pistol or revolver within the State of Indiana, during the period of one year or until revoked, as herein provided. Such application for permit Shall be signed by two resident householders and freeholders of the county in which the applicant lives, and it shall appear from such application that the applicant is a suitable person to be granted a permit under the law. The permit shall be in duplicate, in form to be prescribed by the adjutant general of the State of Indiana, and shall bear the name, address, description and signature of the applicant and reason given for desiring a permit. The original thereof shall be delivered to the applicant, the duplicate shall be preserved for six years by the clerk of the circuit court issuing the same. For each permit so issued, the applicant shall pay the sum of one dollar ($1.00).

Minors-Sale of Pistols or Revolvers to Prohibited.

SEc. 8. Any person or persons who shall, within the State of Indiana, sell, barter, hire, lend, or give to any minor under the age of twenty-one years, any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars ($100.00), or be imprisoned for not more than three months, or both, except for uses as hereinbefore provided.

Sale of Pistols and Revolvers-Record-Penalty.

SEc. 9. No person shall within the State of Indiana sell, deliver or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is not a citizen or has been convicted of a felony against the person or property of another, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made, the purchaser or his duly authorized agent and the seller or his duly authorized agent shall in the presence of each other sign in duplicate a statement containing the purchaser's full name, age, dress, place of birth, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, forward by registered mail, to the clerk of the circuit court of the county in which the seller resides, one copy thereof and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall constitute a misdemeanor and shall be punished by a fine of not less than one hundred dollars ($100.00), or by imprisonment for not more than one year, or by both such fine and imprisonment.

Pistols and Revolvers-Sale Without License.

SEC. 10. Whoever, within the State of Indiana, without being licensed as hereinafter provided, sells, delivers, transfers, advertises, or exposes for sale, or has in his possession with intent to

sell, pistols or revolvers, shall be deemed guilty of a felony and upon conviction thereof shall be punished by imprisonment for not less than one year nor more than two years.

Dealers' Licenses-Conditions on Which Sold-Record Advertisement.

SEC. 11. The clerk of the circuit court of any county may grant licenses, to any reputable, established dealer, on forms to be prescribed by the adjutant general, permitting the licensee to sell at retail within the State of Indiana pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.
2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.
3. No pistol or revolver shall be delivered: (a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor, (b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor, (c) If the seller has reasonable cause to believe that the purchaser is an unnaturalized foreign-born person or has been convicted of a felony against the person or property of another.
4. A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the adjutant general and shall be signed by the purchaser and by the person effecting the sale, and in the presence of each other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, age, place of birth, nationality of the purchaser. One copy of said record shall,
within seven days, be forwarded by registered mail to the clerk of the circuit court of the county in which the seller resides, and the other copy shall be retained by the seller for six years.
5. No pistol or revolver, or placard advertising the sale thereof, or imitation thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

False Information.

SEC. 12. If any person in purchasing or otherwise securing delivery of a pistol or revolver or applying for a permit to carry same within the State of Indiana shall give false information or offer false evidence of his identity he shall be deemed guilty of a felony and upon conviction shall be punished by imprisonment for not less than one year nor more than five years.

Obliteration of Make, Model, Number-Penalty.

SEC. 13. No person shall within the State of Indiana, change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that such possessor has changed, altered, removed, or obliterated the same. Violations of this section shall be a misdemeanor and shall be punished by imprisonment for not less than six months nor more than one year.

Felony-Possession of Revolver Prima Facie Evidence.

SEC. 14. In the trial of a person charged with committing or attempting to commit a felony against the person or property of another while armed with a pistol or revolver, without having a permit to carry such firearm as hereinbefore provided, the fact that such person was so armed shall be prima facie evidence of his intent to commit such felony.

Weapons Exempt.

SEC. 15. This act shall not apply to antique pistols or revolvers incapable of use as a deadly weapon.

Prior Licenses.

SEC. 16. Any or all licenses heretofore issued to carry or possess revolver or pistol shall be revoked and rendered null and void on and after thirty days from the taking effect of this act.
Revocation of License.
SEC. 17. Hereafter in any court of record upon trial of any person for a penal offense, and upon a showing that such person is not a fit person to carry concealed weapons, the court may enter an order revoking such person's license to carry concealed weapons and such fact shall be communicated to the public officer issuing the same.
Licensed Dealers-Statement–Penalty.
SEC. 17 1/2. It shall be unlawful from and after the taking effect of this act, for any person, firm or corporation to receive or have in his or its possession within the State of Indiana any pistol or revolver purchased or acquired after the taking effect of this act, except a licensed dealer, who shall not have signed and forwarded to the clerk of the county in which he resides the statements provided for in section 9 of this act, before or at the time of taking possession of such pistol or revolver. Whoever shall violate the provisions of this section of this act shall be deemed guilty of a misdemeanor and shall upon conviction thereof be- fined not more than $100, to which may be added imprisonment for not more than sixty days.
Repeal.
SEC. 18. All laws and parts of laws in conflict herewith are hereby repealed.
Unconstitutional Provisions.
SEC. 19. If any provision or section of this act shall be held void or unconstitutional, all other provisions and all other sections of this act, which are not expressly held to be void or unconstitutional, shall remain in full force and effect.

**IOWA**

John F. Dillon, The Revised Ordinances of the City of Davenport, Revised and Digested by Order of the City Council, Containing the Original and Amended City Charters, with Notes and References to Judicial Decisions Page 145, Image 145 (1866) available at The Making of Modern Law: Primary. 1855
[Ordinances of Davenport Iowa,] Chapter 19, An Ordinance to Prohibit the Discharge of fire-arms, fire-crackers, and rockets within the city, § 1. No person shall discharge any gun, pistol or other fire-arms, or use or discharge any fire-crackers, rockets, or any other description of fire-works, within the limits of said city, without permission in writing from the Mayor. § 2. Any person violating any provision of this ordinance, shall pay a fine of not less than two dollars nor more than ten dollars for each offense.

The Code: Containing All the Statutes of the State of Iowa, of a General Nature, Passed at the Adjourned Session of the Fourteenth General Assembly Page 76-77, Image 88-89 (1873) available at The Making of Modern Law: Primary Sources. 1873
Cities and Incorporated Towns, Powers, § 456. They shall have power to prevent injury or annoyance from anything dangerous offensive or unhealthy, and to cause any nuisance to be abated; to regulate the transportation and keeping of gunpowder or other combustible, and to provide or license magazines for the same; to prevent and punish fast or immoderate riding through the streets; to regulated the speed of trains and locomotives on railways running over the streets or through the limits of the city or incorporated town by ordinance, and enforce the same by a fine not exceeding one hundred dollars: to establish and regulate markets; to provide for the

measuring or weighing of hay, coal, or any other article of sale; to prevent any riots, noise, disturbance, or disorderly assemblages; to suppress and restrain disorderly houses, houses of ill fame, billiard tables, nine or ten pin alleys, or tables and ball alleys, and to authorize the destruction of all instruments or devices used for purposes of gaming, and to protect the property of the corporation and its inhabitants and to preserve peace and order therein.

E. E. Aylesworth, Compiled Ordinances of the City of Council Bluffs; Containing the Original and Amended City Charter, with Statutes, Notes and References to Judicial Decisions Page 175, Image 175 (1880) available at The Making of Modern Law: Primary Sources. 1880 [Ordinances of the] City of Council Bluffs, [Misdemeanors,] § 16. Whoever shall discharge any cannon, gun, pistol or other fire-arms in or across any street or other public place, or in or across any private lot, tract of land or other place not of his own property, without first obtaining a permit to do so from the Mayor of the city, if in a public place, or from the owner of the lot or land if in a private place, shall be deemed guilty of misdemeanor, and on conviction thereof shall be punished by a fine of not less than three nor more than thirty dollars.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 168-169, Image 171-172 (1887) available at The Making of Modern Law: Primary Sources. 1887 Ordinances, City of Council Bluffs, Shooting Gallery, § 5. No person shall carry on or take part in carrying on any pistol gallery or shooting gallery without license therefor from said city, and the charge for such license shall be ten dollars per month, or fifty dollars per annum. §6. No licensee or his employee, or any person in charge of any pin alley, ball alley, pistol gallery or shooting gallery, shall at any time, without gain or profit, permit or allow any minor to be or remain in or about the same to play thereat, under penalty of the same fine and forfeiture as set forth in section 2 of this chapter.

**KENTUCKY**

Charter of the City of Covington, and Amendments Thereto up to the Year 1864, and Ordinances of Said City, and Amendments Thereto, up to the Same Date Page 148-149, Image 148-149 (1864) available at The Making of Modern Law: Primary Sources. 1864
Ordinances of the City of Covington, An Ordinance Regulating the Sale of Powder in the City of Covington, § 1. Be it ordained by the City Council of Covington, That it shall not be lawful for any person or persons to erect, within the limits of the corporation, any powder magazine, or any other building for the purpose of storing gun powder in greater quantities than is hereinafter specified; and any person violating the provision of this section, shall, on conviction before the Mayor, forfeit and pay a fine of one hundred dollars, and ten dollars for every twenty-four hours said building shall be used or occupied for the storage of more than twenty-five pounds of powder. § 2. Be it further ordained, That it shall not be lawful for any person to keep, in storage or for sale, more than one hundred pounds of powder in any one house in said city, at any one time: and that amount, or any part thereof, shall be securely and carefully kept, and closed up in a good and sufficient safe, so that it can not by any means be exposed. A violation of this section shall subject the person to a fine, on conviction, of five dollars for every offense. § 3. Be it further ordained, That no person or persons shall sell, or keep for sale, in said city, any gun powder without having first obtained a permission so to do from the Mayor of said city, who

shall, before said license is granted, be fully assured and satisfied that the applicant has good and sufficient safes to keep powder in, in conformity with the second section of this ordinance; and when the Mayor is satisfied that the license may be granted, without too much risk to the community at large, he shall issue said license to the applicant, upon his paying into the City Treasury the sum of twenty dollars for one year's license, and to the Mayor fifty cents, and to the City Clerk twenty-five cents, for their certificates. Any person who shall sell any gun powder in said city from and after the passage of this ordinance, without having first obtained a license therefor, shall, for each and every offense, forfeit, pay, on conviction, the sum of five dollars and costs.

1874 Ky. Acts 327, An Act to Revise and Amend the Charter of the City of Newport, § 6.
To prohibit the manufacture of gunpowder or other explosive, dangerous, or noxious compounds or substances in said city, and to regulate their sale and storage by license.

**LOUISIANA**

John C. White, Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish Page 68, Image 70 (1848) available at The Making of Modern Law: Primary Sources. 1848
[Ordinances of the Parish of East Feliciana,] Of Slaves, § 5. No slave shall carry a gun to hunt, except on the plantation of his master or mistress; nor then unless accompanied by the overseer or some other free white member of the family, or has a written permit from his owner or overseer, which permit shall state for what said slave is hunting: Any person having the charge of slaves, who shall permit this section to be violated, shall pay a fine of twenty dollars, for the use of the parish, upon information to any Justice, whose duty it is to take cognizance of the case.

Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court, and Constitutional Provisions, Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council Page 242, Image 268 (1857) available at The Making of Modern Law: Primary Sources. 1857
[Ordinances of the City of New Orleans,] Revenue – Taxes and Licenses, § No. 680. Every keeper of a pistol gallery, the whole tax being levied on each and every gallery, sixty dollars.

Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court. And Constitutional Provisions Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council Page 257, Image 257 (1870) available at The Making of Modern Law: Primary Sources. 1870
[Ordinances of the City of New Orleans,] Offences and Nuisances, § 635. No person shall fire or discharge any gun, pistol, fowling piece or fire-arms, within the limits of the city, or set fire to, or discharge any rocket, cracker, squib or serpent, or shall throw any lighted rocket, cracker, squib or serpent, within the limits of the city, without the license of the common council; Provided, that nothing herein contained shall apply to military reviews or to the lawful use of weapons in self defense.

**MAINE**

The Revised Ordinances of the City of Portland, 1848 Page 22, Image 22 (1848) available at The Making of Modern Law: Primary Sources.
[Ordinances of the City of Portland,] Of Gunpowder, § 1. No person not licensed to keep and sell gunpowder shall keep or have in his shop, store, dwelling house or other tenement, at any one time, a larger quantity of gunpowder than one pound. § 2. No person licensed to keep and sell gunpowder shall have or keep in his store, shop, dwelling house or in any other tenement or place whatever at any one time, a larger quantity of gunpowder then twenty-five pounds. § 3. Every person licensed to keep and sell gunpowder shall provide himself with a strongly made copper chest or box with a copper cover well secured, with hinges and a lock of the same material, and the keg or canister in which said powder may be, shall be kept in said copper chest or box, which shall at all times be placed near the outer door of the building in which it is kept, in convenient place to remove in case of fire. § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board a quantity of gunpowder exceeding twenty-five pounds, or receive gunpowder on board exceeding twenty-five pounds, without first having obtained a permit from the mayor and aldermen, and said permit shall designate the wharf at which said powder may be landed, or received on board.

Act of Dec. 31, 1855, nos. 1-12, PORTLAND, MAINE, CHARTER & ORDINANCES OF THE CITY (Dresser, McLellan & Co. 1881). 1855.
"Rules and Regulations
ESTABLISHED BY MAYOR AND ALDERMEN.

1. The mayor and aldermen shall annually, in the month of April, appoint a keeper of the city powder magazine, who shall be sworn to the faithful discharge of the duties of the office, and give bond with sureties to be approved by the mayor and aldermen in the sum of two hundred dollars for the faithful performance of his duties.

2. It shall be the duty of the keeper of the city powder magazine to receive and safely keep in the city powder magazine, all powder brought thereto for deposit, and deliver the same to the owner thereof, or his order, when thereto requested, for such fees, to be paid to him by such owner, as may be established therefor, and shall only deliver powder in the manner prescribed in these rules and regulations.

3. No person shall keep or have in his shop, store, dwelling-house or other tenement, at any one time, a larger quantity of gunpowder than one pound unless he is licensed by the mayor and aldermen to keep and sell gunpowder, which license shall expire in one year from its date.

4. No person licensed as aforesaid, shall have or keep in his store, shop, dwelling-house or any other tenement, or place whatever, at any one time, a larger quantity of gunpowder than seventy-five pounds.

5. Every person licensed as aforesaid, shall provide himself with a strongly made copper chest or box, with a copper cover well secured with hinges and lock of the same material; and the kegs or canisters in which said powder may be, shall be kept in said copper chests or box, which shall, at all times, be placed near the outer door of the building in which it is kept, in a convenient place for removal in case of fire.

6. No person shall haul unto or lay at any wharf bridge or other landing place in this city, or bring within two hundred yards thereof any boat or vessel having on board any quantity of gunpowder exceeding twenty-five pounds, or land from or receive on board any boat or vessel, at any such wharf, bridge or landing place, any gunpowder exceeding the amount aforesaid without obtaining a permit from the mayor; and no boat or vessel with gunpowder on board in quantity[1] exceeding twenty-five pounds, shall remain at any wharf, bridge or other landing place in the city more than six hours; nor shall any such boat or vessel be allowed to ground at any such place, or remain there after sunset.

7. The mayor, or in his absence, the chairman of the committee on fire department, may grant permits to land gunpowder for immediate shipment or transportation, on either of the abutments near the draw of Tukey's bridge; they may also grant permits to land or ship gunpowder from canal boats or other boats on board vessels lying at or near the end of Smith's wharf or either of the wharves between said Smith's wharf and Portland bridge, provided that the consent in writing of the owner or agent or wharfinger of such wharf shall first be delivered to the mayor.

8. The mayor, or in his absence, the chairman of committee on fire department, may grant permits for landing upon or shipment from any wharf in the city, of gunpowder in quantity not exceeding six kegs of twenty-five pounds each.

9. No gunpowder shall be conveyed from the magazine[2] through any street in the city in any carriage other than the one provided for such purposes by the city, excepting however, that a quantity not exceeding six kegs of twenty-five pounds each may be conveyed through any street if the same be in tight casks and each of said casks put into a strong bag and remain in such bag while in any street. Provided, that the owners of powder mills may transport powder to the city powder magazine, or when the Cumberland and Oxford canal is closed, to the bridge or the wharves named in section seven, entering the city by Congress or Portland streets, along Vaughan, Brackett and Arsenal streets, to the city powder magazine, in their own carriages safely covered. And the owners of powder mills may convey powder intended for shipment as in section seven, in their own carriages safely covered, through Vaughan, Danforth and Canal streets, to the wharves named in section seven, and in no case shall any vehicle in which powder is so conveyed, be allowed to stop in any street. Provided, however, that on and after the completion of Waldo street, said carriages, when transporting powder for shipment as aforesaid, shall pass through said Waldo, Canal and Commercial streets to the wharves aforesaid.

10. Every person licensed to sell gunpowder shall have and keep a sign board over the outside of the door or principal entrance to the building in which such powder is kept, on which shall be distinctly painted the words, "Licensed to keep and sell gunpowder."

11. Every person violating any of these rules and regulations will be liable to a fine of not less than twenty nor more than one hundred dollars, as provided in revised statutes, chapter twenty-six.

12. The mayor and aldermen shall annually appoint one or more persons whose duty it shall be to transport all gunpowder in the city that may be required, and who shall have the custody of the vehicle provided for that purpose, whose compensation shall be such as the mayor and aldermen may determine."

Clarence Hale, ed., The Charter and Ordinances of the City of Portland, Together with Acts of the Legislature, Relating to the City, and to Municipal Matters (Portland, ME: Dresser, McLellan & Co., 1881), 225-28. Gunpowder and Explosive Substances; Rules and Regulations Established by Mayor and Aldermen, nos. 1-12. Adopted Dec. 31, 1855.

Ordinance no. 16, §§ 10 & 14, SACO [Maine], THE CHARTER AND ORDINANCES OF THE CITY (Butler & Place 1867).

"…Sect. 10. No person shall fire any rocket, squib or cracker, or other thing formed of gun powder, or other explosive substance, in whole or in part, nor make any bonfire of tar barrels, or any other substances, nor, except in the performance of some duty authorized by law, discharge any field piece, gun, or other fire-arm, in or upon any street or way of the city, without permission of the mayor and aldermen…

…Sect. 14. Any person offending against any of the provisions of this ordinance, shall forfeit and pay for each offence a fine of not more than twenty dollars, provided, however, that the complaint for such offence be instituted within three months from the time of its commission…" The Charter and Ordinances of the City of Saco Together with the Act Establishing the Municipal Court: Also the Rules and Orders of the City Council, with a List of Officers for 1867, and the Address of the Mayor at the Organization of the City Government (Biddeford, ME: Butler & Place, 1867), 39-40. Ordinance Number 16—An Ordinance for the Prevention of Certain Acts in the Streets of the City of Saco, §§ 10 & 14. Passed July 3, 1867; Approved July 5, 1867.

The Charter, Amendments, and Acts of the Legislature Relating to the Municipal Court, and the Ordinances of the City of Lewiston, Together with the Boundaries of the Several Wards, Regulations Respecting Gunpowder, and an Abstract of the Laws Relating to the Powers and Duties of Cities and Towns Page 43, Image 43 (1873) available at The Making of Modern Law: Primary Sources. 1873

Regulations Relating to Gunpowder, § 1. No person shall keep or have in any shop, store, dwelling house or tenement, in the city of Lewiston, at any one time a larger quantity of gun-powder than one pound, unless he is licensed by the mayor and aldermen to keep and sell gunpowder, or except as hereinafter provided. § 2. It shall not be lawful for any person or persons to sell any gunpowder which may at the time be within said city, in any quantity, by wholesale or retail, without having first obtained from the mayor and aldermen a license to sell gunpowder, and every license shall be written or printed, and duly signed by the mayor, on a paper upon which shall be written or printed a copy of the rules and regulations established by the city relative to keeping, selling and transporting gunpowder within said city; and every such license shall be in force one year from the date thereof, unless revoked by the mayor and aldermen; but such license may, prior to its expiration, be renewed by an endorsement thereon by the mayor, for the further term of one year, and so from year to year, provided, always, that it may at any time be rescinded or revoked by the mayor and aldermen, for good and sufficient reasons. § 3. Every person who shall receive a license to sell gunpowder, as aforesaid, shall pay for the same to the treasurer of the city the sum of three dollars, and for each renewal of the same, the sum of one dollar.

A.G. Davis, City Clerk, Charter and Ordinances, and Rules and Orders of the City Council. Revised February 1874 Page 52, Image 53 (1874) available at The Making of Modern Law: Primary Sources. 1874

City Ordinances, § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board more than twenty-five pounds of gun-powder, nor discharge or receive on board exceeding that quantity, without having first obtained from the Mayor a permit therefor, designating the wharf at which said powder may be landed or received on board.

Gunpowder, §§ 1-14, BANGOR, CHARTER AND ORDINANCES OF THE CITY (Burr & Robinson 1878).

"GUNPOWDER. . . .

The following are and shall be the rules and regulations for the keeping of gunpowder in this city, made according to the laws of this state:

Section 1. No person, except on military duty in the public service of the United States, or this state, shall keep, have, or possess in any building, or in any place, or in any carriage, or on any wharf, or on board of any ship, or other vessel, within two hundred yards of any wharf, in the city of Bangor, or in the city, any gunpowder in any quantity exceeding one pound, in any way or manner, other than by the rules and regulations hereinafter mentioned, may be permitted and allowed.

Sec. 2. No person shall sell, or keep for sale, any gunpowder within the city of Bangor, in any quantity without having first obtained from the chief engineer of said city a license signed by him, on which shall be written or printed a copy of the rules and regulations established relative to the keeping, selling, and transporting gunpowder within said city, and every license shall be in force for one year from the date thereof, unless annulled by said engineer, and no longer; but such license may, prior to the expiration of that term, be renewed by the chief engineer, from year to year, by endorsement thereon; provided, always, that the chief engineer may rescind any such license, if in his opinion, the person or persons have disobeyed the law, or infringed these rules and regulations. And every person who shall receive a license to sell gunpowder as aforesaid, shall pay for the same the sum of five dollars, and for the renewal thereof one dollar, which sum shall be paid to the chief engineer, and by him paid into the city treasury.

Sec. 3. All gunpowder which shall be kept, had, or possessed within the city of Bangor, or brought into, or transported through the same, contrary to these rules and regulations, or to such as may from time to time be made by the city council, shall be forfeited, and may be seized and taken into custody by any one or more of the municipal officers of the city, and the same shall be libelled according to the laws of the state.

Sec. 4. No vessel, on board of which gunpowder shall be laden, shall lie at any wharf in the city of Bangor, or within two hundred yards of any wharf or landing place, except[1] as hereinafter provided.

Sec. 5. Gunpowder may be landed from boats at any point south of Water street, on the west side of Kenduskeag stream, and between the foot of said Water street and Hampden line; and at a point south of Washington street, on the east side of Kenduskeag stream, and between the foot of said Washington street, and Orono line; and no gunpowder shall be landed at any other place in said city, without a written permit from one or more of the engineers; and in no case shall powder remain at the place where landed for a longer time than is necessary for its removal.

Sec. 6. All boats employed in the conveyance of gunpowder shall have displayed at the stern or bow, a red flag, so long as there is any gunpowder on board; and all powder so conveyed shall be covered over with canvas or other suitable covering.

Sec. 7. Gunpowder in any quantity not exceeding six quarter casks, may be put on board of any vessel or boat lying at any wharf in the city: Provided, that no vessel or boat, with powder on board, shall remain at the wharf more than three hours, or be allowed to ground, or remain after sunset; and it shall be the duty of all dealers to deliver to the captain a copy of this section, at their own expense, at the time the powder is shipped.

Sec. 8. No gunpowder shall be conveyed through the city, within a quarter of a mile of Kenduskeag stream, in any other than a carriage closely covered with leather or canvas, and without any iron or steel on any part thereof; which carriage shall have first been approved by the chief engineer, and marked on each side in capitals with the words 'Approved Powder Carriage;' except however, that a quantity not exceeding four casks of twenty-five pounds each, may be transported through or removed in the city in tight casks enclosed in a strong leather bag or bags, on which shall be legibly marked the word 'Gunpowder.' And in no case shall powder remain on board any vehicle for a longer time than is necessary for its removal.

Sec. 9. No gunpowder shall be kept otherwise than as hereinafter provided for licensed dealers, at any place in the city, except the city powder house, and any other place or places that may be hereafter designated by the chief engineer of the fire department.

Sec. 10. Licenses to keep and sell gunpowder shall be granted on application to the chief engineer.

Sec. 11. Every person or firm who shall obtain a license as aforesaid, shall place and keep over the outside of the principal door or entrance from the street, of the building in which such powder is kept, a sign-board with the words ‘licensed to keep and sell gunpowder,’ painted in capitals thereon.

Sec. 12. No person, or firm, licensed to sell gunpowder at wholesale or retail, or both, shall have on hand at any one time, more than four quarter casks of twenty-five pounds each, or in lieu thereof, three quarter casks of twenty-five pounds each, and a tin or cupper canister containing twenty-five pounds. The casks and canister kept on hand shall always be deposited in a copper chest, with two handles, a tight cover, with hinges, and a padlock, all of copper. The chest shall always be locked except for the time necessary to put in or take out powder, and shall be placed on the lower floor of the store, and within six feet of the principal entrance thereto. Each cask shall be kept in a leather bag, closely tied, and shall not be opened for any purpose whatever.

Sec. 13. The chief engineer shall have the superintendence[2] of the powder houses, and shall annually appoint a suitable person to receive the powder that may from time to time be deposited therein, and deliver the same to the order of the owners thereof, who shall pay such fees for receiving, storing, and delivering the same, as the chief engineer shall direct. The keeper thus appointed shall receive said fees as a compensation for his services, and shall hold his office during the pleasure of the chief engineer.

Sec. 14. The chief engineer shall keep a record of all licenses granted and renewals thereof, and of the places designated for keeping and selling gunpowder, which places shall not be changed except by consent of the chief engineer, expressed in said licenses. All persons, on receiving a license, shall sign their names to these rules and regulations in a book kept by the chief engineer for that purpose, as evidence of their assent to, and obligation to comply with, said order and regulations.”

Charter and Ordinances of the City of Bangor, together with the Acts of the Legislature Relating to the City (Bangor, ME: Burr & Robinson, 1878), 87-90. Gunpowder, §§ 1-14. Undated.

An Ordinance Relating to Concealed Weapons, §§ 1-5, in City of Portland Auditor's Fifty-First Annual Report of the Receipts and Expenditures of the City of Portland [Maine] for the Financial Year of 1909 152-53 (1910). 1909.

"ORDINANCE RELATING TO CONCEALED WEAPONS.

Be it ordained by the Mayor, Aldermen and Common Council of the City of Portland, in City Council assembled, as follows:

SECTION 1. No person shall, within the corporate limits of the City of Portland, in a threatening manner display any firearm, slung shot, knuckles, bowie knife, dirk, stiletto, or other dangerous or deadly weapon. And no person shall, within the corporate limits of the City of Portland, wear under his clothes or concealed about his person any such fire arm, slung shot, knuckles, bowie knife, dirk, stiletto, or other dangerous or deadly weapon, unless first licensed so to do in the manner following:

SECTION 2. The Chief of Police, or, in his absence, either of the captains of police, may, upon written application, issue to any person of good moral character, whose business or occupation requires the carrying of such weapons for protection, a certificate setting forth that such person has complied with the requirements of this ordinance, and that he has been duly licensed to carry such weapon or weapons for protection. Such license shall continue in effect until revoked by the Chief of Police.

SECTION 3. Nothing in the foregoing sections shall be construed as forbidding the carrying or wearing of such weapons by United States marshals, sheriffs and their deputies, and constables and police officers of the City of Portland.

SECTION 4 Whoever violates this ordinance shall be fined not less than five nor more than twenty dollars for each offence.

SECTION 5. This ordinance shall take effect when approved.

Approved by the Mayor, October 9, 1909."

Full Text: 1909, Portland, ME, Ordinance Relating to Concealed Weapons
City of Portland Auditor's Fifty-First Annual Report of the Receipts and Expenditures of the City of Portland for the Financial Year of 1909: Jan. 1, 1909 (Both Inclusive) Dec. 31, 1909, With the Mayor's Address and Annual Reports of the Several Departments Made to the City Council, December, 1909, Also Catalogue of the City Councils Since Adoption of City Charter, 1832–1910 (Portland, ME: Mark’s Printing House, 1910), 152-153. Approved October 9, 1909.

**MARYLAND**

1806 Md. Laws 44, An Act To Restrain The Evil Practices Arising From Negroes Keeping Dogs, And To Prohibit Them From Carrying Guns Or Offensive Weapons, ch. 81
…it shall not be lawful for any negro or mulatto within this state to keep any dog, bitch or gun , except he be a free negro or mulatto, and in that case he may be permitted to keep one dog, provided such free negro or mulatto shall obtain a license from a justice of the peace for that purpose, and that the said license shall be in force for one year, and no longer, and if any dog or bitch owned by any negro, not possessed of such license, shall be seen going at large, it shall be lawful for any person to kill the same, and in case of any suit instituted therefor, the person or persons killing the said dog or bitch may plead the general issue, and give this act in evidence. II. …it shall not be lawful for any free negro or mulatto to go at large with any gun, or other offensive weapon; and in case any free negro or mulatto shall be seen going at large carrying a gun, or other offensive weapon, he shall be liable to be carried before any magistrate, in virtue of a warrant to be issued by any justice of the peace, directed to a constable of the county, and on conviction of having violated the provisions of this section of the act, such offender shall thereupon forfeit, to the use of the informant, such gun, or other offensive weapon, which shall thus have been found in his or her possession, and be subject to the payment of the costs which shall have accrued in such prosecution; provided, that nothing in this act shall extend to prevent any free negro or mulatto from carrying a gun, or other offensive weapon, who shall, at the time

of his carrying the same, have a certificate from a justice of the peace, that he is an orderly and peacable person, which certificate shall be in force for one year from the date thereof and no longer.

Lewis Mayer, Revised Code of the Public General Laws of the State of Maryland, with the Constitution of the State Page 173, Image 202 (1879) available at The Making of Modern Law: Primary Sources. 1876
Wild Fowl and Game, § 23. The clerk of the Circuit Court for Harford county, and the clerk of the Circuit Court for Cecil county, shall upon the application of any resident of the State of Maryland, being the owner of any sink-box, craft or sneak-boat, such as is allowed by this act to be used and employed in shooting at wild water fowl therefrom; and giving satisfactory evidence to said clerk that the said applicant is a resident of the State of Maryland, and is the bona fide owner of the sink-box, craft, or sneak-boat, grant a license under the seal of his court, to such applicant to gun after and shoot at wild water-fowl from such sink-box or sneak-boat northward of the line named and described in first section of this act from the first day of November in each and every year to the thirty-first day of March next succeeding thereafter in each and every year; provided that such license shall not authorize any person using such sink-box or sneak-boat to gun after or shoot at wild water-fowl therefrom within a less distance than half a mile from any shore in Harford or Cecil County, or southward of the line particularly described in the first section of this act.

1882 Md. Laws 257, An Act to . . . Exempt All That Portion of the Waters of the Chesapeake Bay Lying Northward of a Certain Line Therein Described from the Operation and Effect of Sections One and Three . . ., ch. 180, § 8
. . . the special police appointed by this act are authorized to arrest any person or persons who may be discovered in the act of hunting or shooting crippled ducks, or in purloining ducks that have been killed by other persons having a proper license to shoot, as well as other persons violating the provisions of this section, and upon conviction thereof before any justice of the peace of Cecil or Harford Counties, the license of such persons or persons shall be revoked, and such persons or persons, whether licensed or not, shall be fined not less than twenty dollars for each offense, and shall forfeit the boat and gun or guns, and material so employed in violation of the provisions of this section, which boat and gun or guns, and material shall be sold, and the proceeds of such fine and sale, after the costs of prosecution have been paid, shall go to the officer or officers making the arrest. . .

1882 Md. Laws 656
Section 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for any person or persons within the State of Maryland to manufacture or sell, barter or give away the cartridge toy pistol to any one whomsoever Sec. 2. Be it enacted, That it shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years. Any person or persons violating any of the provisions of this act shall, on conviction thereof, pay a fine of not less than fifty nor more than two hundred dollars, together with the cost of prosecution, and upon failure to pay said fine and cost, be committed to jail and confined therein until such fine and costs are paid, or for the period of sixty days, whichever shall first occur.

**MASSACHUSETTS**

William Henry Whitmore, The Colonial Laws of Massachusetts: Reprinted From the Edition of 1672, with the Supplements Through 1686: Containing Also, a Bibliographical Preface and Introduction, Treating of All the Printed Laws From 1649 to 1686: Together with the Body of Liberties of 1641, and the Records of the Court of Assistants, 1641-1644 Page 126, Image 330 (1890) available at The Making of Modern Law: Primary Sources. 1651
Prescriptions, (1651) § 2. And it is further ordered; that no person (except for the defence of themselves and their vessels at Sea) shall transport any gunpowder out of this jurisdiction, without license first obtained from some two of the Magistrates, upon penalty of forfeiting all such powder as shall be transporting or transported, or the value thereof.

A Collection Of Original Papers Relative To The History Of The Colony Of Massachusetts-Bay Page 492, Image 497 (1769) available at The Making of Modern Law: Primary Sources. 1769
Laws of the Colony of Massachusetts, That notwithstanding the ancient law of the country, made in the year 1633, that no person should sell any arms or ammunition to any Indian upon penalty of 10l. for every gun, 5l. for a pound of powder, and 40s. for a pound of shot, yet the government of the Massachusetts in the year 1657, upon the design to monopolize the whole Indian trade did publish and declare that the trade of furs and peltry with the Indians in their jurisdiction did solely and properly belong to their commonwealth and not to every indifferent person, and did enact that no person should trade with the Indians for any fort or peltry, except such as were authorized by the court, under the penalty of 100l. for every offence, giving liberty to all such as should have license from them to sell, unto any Indian, guns, swords, powder and shot, paying to the treasurer 3d. for each gun and for each dozen of swords; 6d. for a pound of powder and for every ten pound of shot, by which means the Indians have been abundantly furnished with great store of arms and ammunition to the utter ruin and undoing of many families in the neighboring colonies to enrich some few of their relations and church members.

The Revised Ordinances of 1885, of the City of Boston, as Passed and Approved December 14, 1885. (With Amendments Thereto, Passed and Approved, to May 1, 1886): Being the Ninth Revision. To Which are Added the Revised Standing Regulations of the Board of Aldermen. 9th Rev. Page 172, Image 182 (1886) available at The Making of Modern Law: Primary Sources. 1884
Ordinances of the City of Boston. Of Fire-Arms, Bonfires, and Brick-Kilns. § 4. No person shall sell to any child under the age of sixteen years without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate. But the provisions of this section shall not apply to paper caps of which the only component parts are chlorate of potash and sulphide of antimony, nor to any appliance for exploding the same. The provisions of this section shall be inserted in every license granted for the sale of gunpowder.

Revised Ordinances of 1892, of the City of Boston, and the Revised Regulations of 1892, of the Board of Aldermen of the City of Boston, Being the Eleventh Revision, Third Edition, Containing All Ordinances Passed Between March 3, 1892, and February 1, 1895, and All

Regulations of the Board of Aldermen Passed Between July 22, 1892, and February 1, 1895 Page 115, Image 129 (1895) available at The Making of Modern Law: Primary Sources. 1895 Ordinances of Boston, Prohibitions and Penalties, § 91. No person shall manufacture or sell, or expose for sale, any guncotton, nitro-glycerine, or any compounds of the same, nor any fulminate or substance, except gunpowder, intended to be used by exploding or igniting it, in order to produce a force to propel missiles, or to rend substances apart, except in accordance with a permit from the board of fire commissioners; nor shall any person send or carry through the public streets any such substance, except in the manner and in the quantities allowed by statute or ordinance.

Revised Ordinances of the City of Woburn. Revised Woburn, Massachusetts Page 91 Image 91 (1898) available at The Making of Modern Law: Primary Sources. 1898
License to Sell Gunpowder in the City of Woburn. No person shall sell any gunpowder within the city, without such license. Every license shall be in force one year from the date thereof; provided, that any license may be rescinded by the City Council, at their discretion. § 3. Every person so licensed shall keep a sign over and outside of the principal entrance from the street of the building in which the powder is kept, in which shall be printed in capitals the words: "License to keep and sell gunpowder" § 4. The city clerk shall keep a record of all licenses, and of the places designated therein, which places shall not be changed, unless by consent of the City Council, in writing. Every person who receives a license shall sign his name to a copy of the rules prescribed in this chapter, as evidence of his assent thereto. §5. The provisions of the foregoing four sections shall not apply or extend to the keeping or storing of metallic cartridges in fire proof magazines, nor to cartridge manufacturers, so long as they shall keep their powder in canisters, as prescribed in section one, and in fire proof magazines, located and built to the satisfaction of the City Council so long as such manufacturers allow no more than one hundred pounds of gunpowder in any magazine, or five pounds of gunpowder not made into cartrdiges, in any workshop at any one time.

1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons
SECTION 1. The justice of a court, or trial justices, the board of police or mayor of a city, or the selectmen of a town, or persons authorized by them, respectively, may, upon the application of any person, issue a license to such person to carry a loaded pistol or revolver in this Commonwealth, if it appears that the applicant has good reason to fear an injury to his person or property, and that he is a suitable person to be so licensed.
SECTION 2. Whoever, except as provided by the laws of this Commonwealth, carries on his person a loaded pistol or revolver, without authority or permission as provided in section one of this act, or whoever carries any stiletto, dagger, dirk-knife, slung-shot or metallic knuckles, shall upon conviction be punished by a fine of not less than ten nor more than one hundred dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment.

1922 Mass. Acts 563, ch. 485, An Act Relative to the Sale and Carrying of Firearms, ch. 485, § 8 (amending § 130)
§ 8 (amending § 130). Whoever sells or furnishes to a minor under the age of fifteen, or to an unnaturalized foreign born person who has who has not a permit to carry firearms under section one hundred and thirty-one, any firearm, air gun or other dangerous weapon or ammunition

therefor shall be punished by a fine of not less than ten nor more than fifty dollars, but instructors and teachers may furnish military weapons to pupils for instruction and drill.

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
Section 3. . . The justice of a court or a trial justice, the board of police or mayor of a city, the selectmen of a town, or the commissioner of public safety, or persons authorized by them, may, upon the application of any person residing or having a place of business within the jurisdiction of the person or body issuing the license, except an unnaturalized person, a person who has been convicted of a felony or of the unlawful use or sale of drugs or a minor other than one fifteen years of age or over in the employ of a bank, public utility corporation or business of a similar nature whose application is endorsed by his employer, issue a license to such applicant to carry a pistol or revolver in the commonwealth or to possess therein a machine gun, <u>if it appears that he has good reason to fear an injury to his person or property or for any other proper purpose, and that he is a suitable person to be so licensed.</u> Such license shall be issued for a term not to exceed one year, but may be for a less period, and all such licenses shall be revocable at the will of the person or body issuing the same, who shall forthwith send written notice of such revocation to the commissioner of public safety. Said licenses shall be issued on forms furnished by said commissioner and a copy of every license so issued shall within one week after the granting thereof be sent to the said commissioner. . . .
In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty–one and one hundred and thirty one B. . . § 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

## <u>**MICHIGAN**</u>

The Revised Charter and Ordinances of the City of Detroit Page 150, Image 151 (1848) available at The Making of Modern Law: Primary Sources. 1848
[Ordinances of Detroit,] Prevention of Fires, § 9. No person shall fire or set off any squib, cracker, gunpowder or fire works, or fire any gun or pistol in any part of this city, unless by written permission of the Mayor or two Aldermen, which permission shall limit the time of such firing, and shall be subject to be revoked at any time by the Common Council; and any person or persons violating any of the provisions of this section, shall forfeit the penalty of five dollars for each and every offence. § 10. Every person firing a cannon within this city, unless by permission of the Mayor or two Aldermen, shall forfeit the penalty of twenty-five dollars: Provided, that nothing in this or the preceding section shall be construed to prohibit any military company from firing any gun or cannon when authorized by their commanding officer or officers.

General Ordinances of the Village of St. Joseph, ST. JOSEPH SATURDAY HERALD, Oct. 5, 1889, at 7. (St. Joseph, MI).

"SEC. 8. No person shall shoot any bird or animal, or hunt with gun or dog in any street, alley, park or public ground.

SEC. 9. No person, except peace officers, shall carry or wear under their clothes, or concealed about their person any pistol, revolver or slung-shot, knuckles, bowie-knife, dirk, dagger or any other dangerous or deadly weapon, except by written permission of the President.

SEC. 10. Any such weapon duly adjudged by a competent Court to have been worn, carried, drawn or flourished by any person in violation of either of the last two sections shall be forfeited and confiscated to the village of St. Joseph in addition to other penalties provided.

...

SEC. 16. No person except peace officers in the discharge of their duty, or a citizen in self-defense, shall draw, handle or flourish a revolver, pistol or gun in any street, alley, park or other public place."

Full Text (From Newspapers.com): 1889, MI, St. Joseph Saturday Herald, Oct. 5, 1889
"General Ordinances of the Village of St. Joseph." St. Joseph Saturday Herald, Oct. 5, 1889, p. 7. Ordinance 1—Relative to the Appointment and Duties of Certain Officers, §§ 8, 9, 10, & 16. In effect October 15, 1889. Volume 30, Number 24. (St. Joseph, MI).

1895 Mich. Local Acts 596, § 44
SEC. 44. No person shall fire or discharge any gun or pistol firearms or fireworks. or carry firearms, or throw stones or other missiles within said park or boulevard, nor shall any person fire, discharge or set off any rocket, cracker, torpedo, squib or other fireworks or things containing any substance of any explosive character on said park or boulevard, without the permission of said commissioners, and then only under such regulations as they shall prescribe.

1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, § 1-2. Every person, firm or corporation engaged in any way or to any extent in the business of selling at retail guns, pistols, other fire-arms and silencers for fire-arms shall keep a register in which shall be entered the name, age, occupation and residence (if residing in the city with the street number of such residence) of each and every purchaser of such guns, pistols, other fire-arms or silencers for fire-arms together with the number or other mark of identification, if any, on such gun, pistol, other fire-arms or silencer for firearms which said register shall be open to the inspection of all peace officers at all times. § 2. Every person violating any of the provisions of this act shall be deemed guilty of a misdemeanor and shall upon conviction be subject to a fine of not more than fifty dollars or to imprisonment in the county jail for not more than ten days or to both such fine and imprisonment in the discretion of the court.

1925 Mich. Pub. Acts 473, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 2-4.
§ 2. Any person who shall commit or attempt to commit a felony when armed with a pistol, revolver or gun, as defined in section one, shall, in addition to the punishment provided for committing the crime, be punished by imprisonment for not less than two nor more than five

years within the discretion of the court. § 3. The court shall have power to sentence any person who may be convicted of a second offense to double the addition penalty imposed under section two thereof for carrying such concealed weapon without a license. § 4. In the trial of a person for the commission of murder, assault with intent to do great bodily harm, robbery, larceny, or any attempt to commit any of such offenses, the fact that he was armed with a pistol, revolver or gun as herein defined and had no permit to carry the same, shall be prima facie evidence of his intention to commit the crime with which he is charged[.]
No person shall carry a pistol, revolver or gun concealed on or about his person or in any vehicle owned or operated by him, except in his dwelling house, place of business or on his premises, without a license therefor, as hereinafter provided. The provisions of this section, however, shall not apply to the regular and ordinary transportation of pistols, revolvers or guns as merchandise, or to any member of the army, navy or marine corps of the United States, or to the national guard when on duty, or organizations by law authorized to purchase or receive such weapons from the United States or from this state, nor to duly authorized military organizations when on duty, nor to the members thereof when going to or returning from their customary places of assembly, nor to wholesale or retail dealers therein, nor to peace officers of the state.
The license herein mentioned shall be in a form prescribed by the secretary of state and shall be in triplicate. It shall give the name, address and description of the licensee and the reason for granting a license. Each of said copies shall be signed by the licensee. The original shall be delivered to such licensee; one copy shall be mailed by registered letter within thirty days to the secretary of state and the other copy shall be preserved by the person issuing the license.

1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7.
No person shall deliver or otherwise transfer a pistol, revolver or gun as defined in this act, to a person unless it be securely wrapped and unloaded. Before the same is delivered to the purchaser, he shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, nationality, the date of sale, the caliber, make, model and manufacturer's number of the weapon. The seller shall, within thirty days thereafter, sign and mail by registered letter one copy thereof to the secretary of state, one copy to the chief of police of the city or village in which the same was sold or to the sheriff of the county of which the seller is a resident and shall retain the other copy. This section shall not apply to sales at wholesale. Any person convicted of wilfully violating the provisions of this section shall be punished by a fine of not less than one hundred dollars or by imprisonment of not more than one year or by both such fine and imprisonment in the discretion of the magistrate.

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1927 Mich. Pub. Acts 891, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 9.
SEC. 9. On or before the first day of November, nineteen hundred twenty-seven, any person within this state who owns or has in his possession a pistol as defined in this act, shall, if he reside in an incorporated city or an incorporated village having an organized police department, present such weapon for safety inspection to the commissioner or chief of police of such city or village; if such person reside in a part of the county not included within the corporate limits of such city or village he shall so present such pistol for safety inspection to the sheriff of such county. Any person owning or coming into possession of a pistol after the first day of November, nineteen hundred twenty-seven, shall forthwith present such pistol for safety inspection in the manner provided in this section. A certificate of inspection shall thereupon be issued in triplicate on a form provided by the commissioner of public safety, containing the name, age, address, description and signature of the person presenting such pistol for inspection, together with a full description thereof; the original of such certificate shall be delivered to the registrant; the duplicate thereof shall be mailed to the commissioner of public safety and field and indexed by him and kept as a permanent official record for a period of six years, and the triplicate of such certificate shall be retained and filed in the office of said sheriff, or commissioner or chief of police, as the case may be. The provisions of this section shall not apply to wholesale or retail dealers in firearms or to collections of pistols kept solely for the purpose of display, as relics, souvenirs, curios or antiques, nor to weapons heretofore registered under the provisions of section eleven of act number three hundred thirteen of the public acts of nineteen hundred twenty-five. Any person who fails to comply with the provision of this section shall be guilty of a misdemeanor and shall be punished by a fine not exceeding one hundred dollars or imprisonment in the county jail not exceeding ninety days, or by both such fine and imprisonment in the discretion of the court.

## MINNESOTA

Henry John Horn, The Charter and Ordinances of the City of St. Paul, Together with Legislative Acts Relating to the City, and the State Constitution, in an Appendix Page 113, Image 114 (1858) available at The Making of Modern Law: Primary Sources. 1858
Revised Ordinances [of the City of St. Paul], An Ordinance to Restrain the Use of Fire Arms and the Exhibition of Fire Works. The Common Council of the City of Saint Paul do ordain as follows: § 1. It shall not be lawful for any person to fire or discharge any cannon, gun, fowling piece, pistol or fire arms of any description, or fire, explode or set off any squib, cracker or other thing containing powder or other combustible or explosive material, or to exhibit any fire works or make or exhibit any bonfire, within the limits of said city, without permission from the Common Council or written permission from the Mayor, which permission shall limit the time of such firing, and shall be subject to be revoked by the Common Council at any time after it has been granted. §2. Any person violating any provision of this ordinance, shall on conviction thereof, be punished by a fine not exceeding one hundred dollars.

The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858

Ordinances of the City of St. Paul, An Ordinance to Regulate the Sale of Gunpowder, § 1. No person shall keep, sell or give away gunpowder or guncotton in any quantity without first having paid into the City Treasurer the sum of five dollars, and obtain from the Common Council a permission in writing, signed by the Mayor and Clerk, and sealed with the corporate seal, under a penalty not exceeding fifty dollars, for every offence, provided any person may keep for his own use not exceeding one pound of powder or one pound of gun cotton, at one and the same time. § 2. All applications for permits shall be addressed to the Common Council, in writing, signed by the applicant. Not exceeding four permits shall be granted in any one block; when the number of applications in any block shall at any time exceed the numbers to be granted, the requisite number shall by chosen by ballot. When issued, the Clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business, and date of permits. Persons to whom permits may be issued, shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gunpowder or guncotton than fifty pounds at one time, and the same shall be kept in tin canisters or cans, or kegs securely looped and headed, containing not to exceed twenty-five pounds each and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor Nor shall any person sell or weigh any gunpowder or guncotton, after the lighting of lamps in the evening, unless in sealed canisters or cans. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word "gunpowder" painted or printed thereon in large letters. Any person violating any clause of this section, shall, upon conviction therof be punished by a fine of not less than ten, nor more than one hundred dollars. § 3. No person shall convey or carry any gunpowder or guncotton, exceeding (one pound in quantity) through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cans or kegs well headed and hooped, sufficient to prevent such gunpowder or guncotton from being spilled or scattered, under a penalty of fifty dollars. § 4. All permissions granted under this ordinance shall expire on the second Tuesday of May in each year; and no permit shall be granted to any retailer of intoxicating liquors, or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit which may be issued.

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882
Concealed Weapons – License, § 1. It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be

procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.
Sec. 7. The Mayor of the city of St. Paul may grant to so many, and to such persons as he may think proper, licenses to carry concealed weapons; and may revoke any and all of such licenses at his pleasure.
Sec. 8. Application for such licenses shall be made to the mayor of said city, in writing, and when granted, the person applying therefor, shall pay into the city treasury the sum of two dollars, and thereupon a license shall be issued by the city clerk, and signed by the mayor.
Sec. 9: Every such license shall state the name, age, occupation and residence of the person to whom it is granted, and shall expire on the thirty-first day of December of each and every year."

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources. 1888.
Making, Selling, etc., Dangerous Weapons, § 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons, § 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

Harry Toulmin, Ordinances of the City of Saint Paul, from May, 1887, to July, 1889 Page 90, Image 90 (1889) available at The Making of Modern Law: Primary Sources. 1889
Ordinances of the City of St. Paul, [Establishing and Fixing the License to be Paid to the City of St. Paul for Conducting, Managing or Carrying on Either or any of the Different Branches of Business Hereinafter Mentioned and Limiting the Duration Thereof, and Also Repealing Certain Ordinances Herein Named,] § 2. The different and various kinds of business, employments and avocations for which licenses are hereby fixed and established, and the sum and amount of the license for each separate one are as follows, to wit: Gun powder ……………..$15.00.

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a “Machine Gun”, as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.
§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the

addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.
§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers and showing a particular description of such machine gun now owned or possessed by them or shall make such report as to hereinafter acquired machine guns within 10 days of the acquisition thereof; nor to any person legally summoned to assist in making arrests or Preserving peace, while said person so summoned is engaged in assisting such officer; nor shall this Act apply to the armed forces of the United States or of the State of Minnesota.
§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

**MISSISSIPPI**

1804 Miss. Laws 90-91, An Act Respecting Slaves, § 4.
[Slaves not to carry offensive or defensive weapons]. [N]o Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with, or that he is ordered by his master, mistress or overseer to carry the said articles from one place to another, but all, and every gun, weapon or ammunition found in the possession or custody of any slave, may be seized by any person, and upon due proof thereof made before any justice of the peace of the county or corporation, where such seizure shall be made, by his order, be forfeited to the seizer for his own use; and moreover, every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty nine, on his bare back for every such offence: Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing, to any slave, on application of his master, or overseer to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and recoverable, at any time within such term, at the discretion of said justice.

1861-62 Miss. Laws 134
CHAPTER CXXV.

SECTION 1. Be it enacted by the Legislature of the State of Mississippi, That it shall not he lawful for any Sheriff or Tax-Collector to collect from any tax payer the tax heretofore or hereafter assessed upon any bowie-knife, sword cane, or dirk-knife, and that hereafter the owner of any bowie-knife, sword-cane or dirk-knife. shall not be required to give in to the tax assessor either of the aforesaid articles as taxable property any law to the contrary notwithstanding. . . . Approved, December 19, 1861.

[REGULATORY TAX] 1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1.
[A] tax of not less than five dollars or more than fifteen dollars shall be levied and assessed annually by the board of Police of Washington county upon every gun and pistol which may be in the possession of any person in said county, which tax shall be payable at any time on demand, by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to forthwith distrain and seize such gun or pistol, and sell the same for cash at the door of the Court House, after giving ten days notice by advertisement, posted in front of said Court House, and out of the proceeds of such sale, there shall be paid the amount of such tax and the cost of sale, and if any surplus remains, it shall be paid to the owner of such gun or pistol. The amount of the tax so assessed and collected, shall be paid to the county Treasurer, and shall constitute a part of the bridge fund of said county.

Revised Ordinances, ch. 5, art. 1, § 57, no. 7, JACKSON, MISSISSIPPI, CHARTER AND REVISED ORDINANCES OF THE CITY (Pilot Publishing 1874).
“CHAPTER 5.
IN RELATION TO TAXES AND PRIVILEGES.
ARTICLE 1. TAXES.
Sec. 57. There shall be levied and collected, in each and every year, the following taxes…
…6. On all saddle or race horses, the sum of five dollars.
7. On Bowie knives, dirk knives, sword canes, dueling or other pistols, five dollars each.
8. On each piano, five dollars.
9. On each gold watch, one dollar.
10. On each silver watch, fifty cents.
Adopted September 10, 1874.”
Oliver Clifton, ed., Charter and Revised Ordinances of the City of Jackson, to Which Is Added an Appendix (Jackson, MS: Pilot Publishing Company, 1874), 45–46. Chapter 5—In Relation to Taxes and Privileges, Article 1—Taxes, § 57, no. 7. Adopted September 10, 1874.

1876 Miss. Laws 134
Property taxable: pistols, bowie knives, dirks and sword canes, value of same. . . .

Revised Ordinances, ch. 1, art. 1, §§ 3–5, JACKSON, MISSISSIPPI, AMENDMENTS TO THE CHARTER AND REVISED ORDINANCES OF THE CITY (Clarion Steam Publishing 1882).
“CHAPTER 1.
IN RELATION TO THE LEVY AND COLLECTION OF TAXES.
ARTICLE 1.
ASSESSMENT.

Section 1. Be it ordained by the Board of Mayor and Aldermen of the city of Jackson…
…Sec. 3. That under section four of said act, it shall be the duty of the City Assessor as soon after the commencement of the fiscal year as practicable, to have made assessment rolls for the assessment of real and personal property in said city, the land roll to be separate from the personal roll, two of each to be made; the same to be properly ruled and headed for the entry of the following items: The roll for the assessment of personal property; the name to whom any property shall be taxable; number of cattle, number of horses, number of mules, number of sheep, number of goats, number of swine, number of carriages or other wheeled vehicles, pianos, organs, melodeons, pistols, dirks, bowie-knives, sword-canes, guns, over one, watches, jewelry, gold and silver plate, with a separate column for the value of each…
…Sec. 4. Between the said 1st day of February and the 1st Monday in June in each year, said Assessor shall assess all the property, real and personal, subject to taxation in said city, and he shall set down on said assessment rolls in the appropriate columns, the names, in alphabetical order, of the taxable inhabitants of the city, each item of taxable property, value of same and amount of tax.
Sec. 5. Said Assessor shall also cause to be printed lists as follows:
List of taxable property in the city of Jackson, of ______ on the 1st day of February, 188__
Number of cattle (over two cows and calves), valued at $_______
Number of horses valued at $_______
Number of mules valued at $_______
Number of sheep or goats (over ten head) valued at $_______
Number of hogs (over ten head) valued at $_______
Number of carriages and other wheeled vehicles valued at $_______
Number of pianos, organs and melodeons valued at $_______
Number of watches valued at $_______
Jewelry valued at $_______
Gold and silver plate valued at $_______
Number of guns (more than one) valued at $_______
Number of pistols, bowie-knives and sword canes valued at $_______
…"
Amendments to the Charter and Revised Ordinances of the City of Jackson (Jackson, MS: Clarion Steam Publishing House, 1882), 16–17. Revised Ordinances, Chapter 1—In Relation to the Levy and Collection of Taxes, Article 1—Assessment, §§ 3–5. Adopted April 27, 1882.

An Act To Amend § 557 and 585, Code of 1880, so as to Increase the Public Revenue, and Provide for the Faithful Collection of the Same, ch. 2, § 1, 1886 Miss. Laws 12, 19. 1886.
"CHAPTER II.
AN ACT to amend Section 557 and 585, Code of 1880, so as to increase the public revenue, and provide for the faithful collection of the same:
SECTION 1. Be it enacted by the Legislature of the State of Mississippi, That Section 585 of the Code, 1880, be and is hereby amended as follows: Strike out all after the first line, and insert in lieu thereof the following: . . .
On each shooting gallery or target, gun, or similar contrivance,
by whatsoever name called - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - 25.00
On each cane-rack, knife-rack, or any similar contrivance, by
whatsover name called, kept and operated for public use - - - - - - - - - - - - -25.00

Law of the State of Mississippi, Passed at a Regular Session of the Mississippi Legislature, Held in the City of Jackson, Commencing January 5, 1886, and Ending March 18, 1886 (Jackson, MS: R. H. Henry, State Printer, 1886), 19. Chapter 2—An Act To Amend § 557 and 585, Code of 1880, so as to Increase the Public Revenue, and Provide for the Faithful Collection of the Same, § 1. Approved, March 18th, 1886.

1900 Miss. Laws 51-52, An Act to Amend Chapter 32 of the Acts of 1894 Relating to Personal Assessment Rolls, ch. 49, § 1.
The auditor of the public accounts shall, by the first day of February in each year, furnish the clerk of the board of supervisors of each county with three copies of blank assessment rolls, and counties having two judicial districts shall be furnished with four copies; said roll shall be made of good paper, neatly and substantially bound and properly ruled and headed for the assessment of personal property and polls, in which to enter the following items: . . . sixteenth column, number of guns over one; seventeenth column, number of pistols, bowie knives, dirks or sword canes[.]

1906 Miss. Laws 367, Privilege Taxes, ch. 114, § 3887.
Dealers in Deadly Weapons: On each person or firm dealing in pistols, dirk knives, sword canes, brass or metallic knuckles, or other deadly weapons (shotguns and rifles excepted) – 100.00. And which shall be in addition to all and any other taxes or privileges paid. On each firm or dealer selling air guns, target or flobert rifles (and this shall apply even if the same has a license to sell merchandise, pistols or cartridges) – $25.00.

**MISSOURI**

Henry S. Geyer, A Digest of the Laws of Missouri Territory. Comprising: An Elucidation of the Title of the United States to Louisiana:-Constitution of the United States:-Treaty of Session:-Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818
Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Adam B. Chambers, The Revised Ordinances of the City of Saint Louis, Revised and Digested by the Fifth City Council during the First Session, Begun and Held in the City of St. Louis, on

the Second Monday of May, A. D. 1843. with the Constitutions of the United States and the State of Missouri, and the City Charter Page 304, Image 305 (1843) available at The Making of Modern Law: Primary Sources. 1843
[Ordinances of Kansas City,] Misdemeanors, § 10. Every person who shall discharge any cannon or other ordinance, or fire off any carbine, fusil, rifle, musket, gun, pistol, or other arms, or set off any squib or cracker, or fly any kite in the air, within the city, shall be deemed guilty of a misdemeanor. This section shall not apply to the firing of salutes by any military corps, or to the firing of salutes upon any occasion of general public interest. Provided, such firing be caused by persons, associations or companies, volunteers or otherwise, who may be engaged in lawful celebrations of public rejoicings, or in the lawful military exercises of said companies or volunteers; nor to prevent any manufacturer from trying or proving the articles manufactured by him within the limits of the city, provided the same be done without danger or injury to the neighborhood. § 11. Every person who shall fire any heavy cannon, or set off any rockets or fire works, or illuminate in any unusual manner any house or building, without first having obtained written permission from the Mayor, specifying the time and place, when and where the same shall be allowed, shall be deemed guilty of a misdemeanor.

1844 Mo. Laws 577, An Act To Restrain Intercourse With Indians, ch. 80, § 4.
No person shall sell, exchange or give, to any Indian, any horse, mule, gun, blanket, or any other article or commodity whatever, unless such Indian shall be traveling through the state, and leave a written permit from the proper agent, or under the direction of such agent in proper person.

1854 Mo. Laws 1094, An Act Concerning Free Negros and Mulattoes, ch. 114, §§ 2-3.
§ 2. No free negro or mulatto shall be suffered to keep or carry any firelock, or weapon of any kind, or any ammunition, without license first had and obtained for the purpose, from a justice of the peace of the county in which such free negro or mulatto resides, and such license may be revoked at any time by the justice granting the same or by any justice of the county. § 3. Any gun, firelock, or weapon of any kind, or any ammunition, found in the possession of any free negro or mulatto not having a license, as required by the last preceding section, may be seized by any person, and upon due proof thereof, before any justice of the peace of the county in which such seizure shall have been made, shall be forfeited by order of such justice, to the person making the seizure, for his own use.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources. 1871
Ordinances of the City of St. Louis, Misdemeanors, § 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence. § 10. Nothing in the preceding section shall be so construed as to prevent any United States,

State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880
Chapter XXXIV. Public Safety. . . .
Sec. 3. No person shall, in this city, wear under his clothes or concealed about his person, any pistol or revolver, except by special permission from the Mayor; nor shall any person wear under his clothes, or concealed about his person, any slung-shot, cross knuckles, knuckles of lead, brass or other metal, or any bowie knife, razor, billy, dirk, dirk-knife or dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon. Any person, violating any provision or requirement of this section, shall be deemed guilty of a misdemeanor, and, upon conviction thereof before the City Recorder, shall be fined not less than fifty dollars nor more than five hundred dollars : Provided, however, That this section shall not be so construed as to prevent any United States, State, County or City officer, or any member of the City government, from carrying such weapons as may be necessary in the proper discharge of his duties.

Henry Smith Kelley, Laws Applicable to and Governing the City of Saint Joseph, Mo., As a City of the Second Class, Contained in the Revised Statutes of 1879, and Subsequent Legislative Enactments; Also the General Ordinances Now in Force, Revised and Made to Conform to the Laws Governing Such Cities Page 192, Image 222 (1888) available at The Making of Modern Law: Primary Sources. 1888
General Ordinances [of the City of St. Joseph], [Amusement-Shows,] Shooting Gallery; license for. — § 3. No person shall carry on or take part in carrying on, any pistol gallery or shooting gallery, without a license therefor from said city; and the charge for such license shall be five dollars per month.

The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892
Chapter 18. Of Misdemeanors.
Sec. 1471. Concealed weapons – carrying of, prohibited.
Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offense.

The Revised Ordinances of the City of Huntsville, Missouri, of 1894. Collated, Revised, Printed and Published by Authority of the Mayor and Board of Aldermen of the City of Huntsville, Missouri, Under an Ordinance of the Said City, Entitled: "An Ordinance in Relation to Ordinances, and the Publication Thereof." Approved on the 11th Day of June, 189 Page 58-59, Image 58-59 (1894) available at The Making of Modern Law: Primary Sources. 1894
Ordinances of the City of Huntsville, An Ordinance in Relation to Carrying Deadly Weapons, § 1. If within the city any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for

religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under militia law of the state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weapon or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the city prison not exceeding thirty days nor less than five days or by both such fine and imprisonment; provided, the Mayor may grant permission to any person to discharge gun, pistol or other firearms under the proper circumstances shown to him. § 2. The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to exercise process or warrants, or to suppress breaches of the peace or to make arrests, nor to persons moving or travelling peaceably through this state; and it shall be good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his home, person or property.

Francis M. Wilson, The Revised Statutes of the State of Missouri, 1899. To This Volume are Annexed the Acts of Congress in Relation to the Election of United States Senators, in Relation to Fugitives from Justice, Concerning Naturalization and the Authentication of Public Records; an Appendix Containing the Scheme and Charter of and Laws Specially Applicable to the City of St. Louis and the Acts Establishing the Criminal Court of the Fifteenth Circuit, the Criminal Court of Jackson County, the Criminal Court of Buchana County, the Criminal Court of Greene County, the Louisiana Court of Common Pleas, the Hannibal Court of Common Pleas, the Cape Girardeau Court of Common Pleas and the Sturgeon Court of Common Pleas. Revised and Promulgated by the Fortieth General Assembly Page 1752, Image 645 (Vol. 2, 1899) available at The Making of Modern Law: Primary Sources. 1899
[Permit to Keep Explosives, § 7457. No person, corporation or joint-stock company shall, on and after ten days after this article shall take effect, have retain or keep in his possession or under his or her control, nor sell, give away or in any manner or way dispose of dynamite, giant powder, nitro-glycerine or any explosive substance, except gunpowder and blasting powder for ordinary purposes, without first obtaining a permit authorizing the same from the clerk of the county court, or mayor of the city of St. Louis, in whichever county or city such applicant may desire to do such business, nor without first making and delivering the affidavit required by the next succeeding section of this article.]

1921 Mo. Laws 691, 692
Section 1. Pistol, revolver or firearms to be plainly marked. No wholesaler or dealer therein shall have in his possession for the purpose of sale, or shall sell, any pistol, revolver, or other firearm of a size which may be concealed upon the person, which does not have plainly and permanently stamped ,upon the metallic portion thereof, the trademark or name of the maker, the model and the serial factory number thereof, which number shall not be the same as that of any other such weapon of the same model made by the same maker, and the maker, and no wholesale or retail dealer therein shall have in his possession for the purpose of sale, or shall sell, any such weapon

unless he keep a full and complete record of such description of such weapon, the name and address of the person from whom purchased and to whom sold, the date of such purchase or sale, and in the' case of retailers the date of the permit and the name of the circuit clerk granting the same, which record shall be open to inspection at all times by any police officer or other peace officer of this state.

Sec. 2. Shall secure permit to acquire weapon.-No person, other than a manufacturer or wholesaler thereof to or from a wholesale or retail dealer therein, for the purposes of commerce, shall directly or indirectly buy, sell, borrow, loan, give away, trade, barter; deliver or receive, in this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, unless the buyer, borrower or person receiving such weapon shall first obtain and deliver to, and the same be demanded and received by, the seller, loaner, or person delivering such weapon, within thirty days after the issuance thereof, a permit authorizing such person to acquire such weapon. Such permit shall be issued by the circuit clerk of the county in which the applicant for a permit resides in this state, <u>if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age, and that the granting of the same will not endanger the public safety.</u> The permit shall recite the date of the issuance thereof and that the same is invalid after thirty days after the said date, the -name and address of the person to whom granted and of the person from whom such weapon is to be acquired, the nature of the transaction, and a full description of such weapon, and shall be countersigned by the person to whom granted in the presence of the circuit clerk. The circuit clerk shall receive therefor a fee of $0.50. If the permit be used, the person receiving the same shall return it to the circuit clerk within thirty days after its expiration, with a notation thereon showing the date and manner of the disposition of such weapon. The circuit clerk shall keep a record of all applications for such permits and his action thereon, and shall preserve all returned permits. No person shall in any manner transfer, alter or change any such permit or make a false notation thereon or obtain the same upon any false representation to the circuit clerk granting the same, or use or attempt to use a permit granted to another.

Sec. 3. Weapons must be stamped.-No person within this state shall lease, buy or in anywise procure the possession from any person, firm or corporation within or without the state, of any pistol, revolver or other firearm of a size which may be concealed upon the person, that is not stamped as required by section 1 of this act; and no person shall buy or otherwise acquire the possession of any such article unless he shall have first procured a written permit so to do from the circuit clerk of the county in which such person resides, in the manner as provided in section 2 of this act.

Sec. 4. Manufacture not prohibited.-Nothing herein contained shall be considered or construed as forbidding or making it unlawful for a dealer in or manufacturer of pistols, revolvers or other firearms of a size which may be concealed upon the person, located in this state, to ship into other states or foreign countries, any such articles whether stamped as required by this act or not so stamped.

**<u>MONTANA</u>**

Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895

Crimes Against the Public Peace, § 759: Every person who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor, is punishable by imprisonment in the state prison not exceeding ten years and by a fine not exceeding ten thousand dollars.

1913 Mont. Laws 53, An Act to Provide that Aliens Shall Pay a Gun License, and Providing a Penalty for Failure to Obtain License; to Provide for and Regulate the Duties of the Game and Fish Warden and His Deputies, and to Provide for the Disposition of the Fines so Collected, ch. 38, § 1.
There is hereby created a gun license for aliens. No person not a bona fide citizen of the United States shall own or have in his possession, in the State of Montana, any gun, pistol or other firearm without first having obtained from the Game and Fish Warden a license therefor, which said license shall cost the owner of said firearm the sum of Twenty-five ($25) Dollars, and shall expire one year from date of issuance thereof; provided, however, that this section shall not apply to one who has obtained the Twenty-five ($25) Dollar hunting license required by the laws of Montana; provided, further, that the provisions of this section shall not apply to any alien who is a bona fide resident of the State of Montana and the owner of not less than one hundred and sixty acres of land therein, nor shall it apply to any settler on the public lands of the State of Montana who shall have begun to acquire land under the laws of the United States by filing thereon, nor shall it apply to persons engaged in tending or herding sheep or other animals, held in herd.

1918 Mont. Laws 6-7,9, An Act Entitled "An Act Providing for the Registration of All Fire Arms and Weapons and Regulating the Sale Thereof and Defining the Duties of Certain County Officers and Providing Penalties for a Violation of the Provisions of This Act," ch. 2, §§ 1, 3, 8.
§ 1. Within thirty days from the passage and approval of this Act, every person within the State of Montana, who owns or has in his possession any fire arms or weapons shall make a full, true, and complete verified report upon the form hereinafter provided to the sheriff of the County in which such person lives, of all fire arms and weapons which are owned or possessed by him or her or are in his or her control, and on sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered. § 3. Any person signing a fictitious name or address or giving any false information in such report shall be guilty of misdemeanor, and any person failing to file such report as in this Act provided, shall be guilty of a misdemeanor. § 8. For the purpose of this Act a fire arm or weapon shall be deemed to be any revolver, pistol, shot gun, rifle, dirk, dagger, or sword.

1935 Mont. Laws 57, 57-60
CHAPTER 43
An Act Relating to Machine Guns, and Their Association with Crimes of Violence as Herein Defined, Providing Presumptions Respecting the Use or Possession Thereof, Search Warrants for Machine Guns, Registration of the Same, and to Make Uniform the Law with Reference Thereto.
Be it enacted by the Legislative Assembly of the State of Montana:

Section 1. Definitions. "Machine Gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than six shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. . . .
Section 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the State Penitentiary for a term of not less than twenty years.
Section 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State Penitentiary for a term of not less than ten years.
Section 4. Possession or use of a machine gun shall be used for presumed to be for offensive or aggressive purpose: offensive or aggressive purpose:
(a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or
(b) When in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or
(c) When the machine gun is of the kind described in Section 8 and has not been registered as in said section required; or
(d) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.
Section 5. The presence evidence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
Section 6. Exceptions. Nothing contained in this Act shall prohibit or interfere with:
1. The manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose;
2. The possession of a machine gun for scientific purpose, or the possession of a machine gun not useable as a weapon and possessed as a curiosity, ornament, or keepsake;
3. The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifestly not aggressive or offensive.
Section 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not less than One Hundred Dollars ($100.00).
Section 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this Act, and annually thereafter. If acquired hereafter it shall be registered

within twenty-four hours after its acquisition. Blanks for registration shall be prepared by the Secretary of State, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The registration date shall not be subject to inspection by the public. Any person failing to register any gun as required by this Section, shall be presumed to possess the same for offensive or aggressive purpose.
Section 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this Act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the County Attorney, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the state or a political subdivision thereof.
Section 10. If any provision of this Act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable. . . .
Approved February 20, 1935.

## NEBRASKA

1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.
The City Council shall have power to license all . . . vendors of gunpowder[.]

1895 Neb. Laws 210, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XVI, § 6.
The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all of such licenses at his pleasure. Every such license shall state the name, age, occupation, and residence, of the person to whom granted, and shall be good for one year. A fee of fifty cents shall be paid therefor to the City Treasurer, and by him placed in the police fund.

## NEW HAMPSHIRE

New Hampshire Province Laws, 1689, 288-89
[CHAPTER 27.]
[NO ARMS OR AMMUNITION TO BE SUPPLIED, TO INDIANS OR FRENCH WITHOUT A LICENSE.]
[Mass. Archives, vol. 107, p. 113. Court Records, June 14, 1689.]
It is ordered by the Govern'r & Councel & Repr'sentatives of this Colony, that no Person whatsoever, during the time of hostility w'th the Indeans pr'sume directly or Indirectly to sell Barter give, or by any meanes Supply any indian or Indians, or the neighbouring French, w'th Armes or Am'unition of any kinde whatsoever without licence first obtained from the Govern'r &

Councell, on paine of being reputed Enemyes to the Crowne & English Nation, & to be proceeded ag't as Such w'th utmost Severity of Law.
June 14: 1689: Voted In the affirmative
As attests Ebenezer Prout Clerk
Consent'd to by the Govern'r and Councill June 14'o June 1689.

1820 N.H. Laws 274-76, An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, ch. 25, §§ 1-9.
§ 1. [T]he Governor . . . is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state, and such other places as may by him thought to be necessary[.] § 2. [F]rom and after the first day of July next, all gunpowder which shall be manufactured within this state shall be composed of the following proportions and quality of materials . . . § 3. It shall be the duty of each of said inspectors to inspect, examine and prove all gunpowder which after the first day of July shall not be deposited at any publick [sic] powder magazine, or manufactory of this state . . . § 4. [N]o gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy-five yards at the least. § 5. [W]henever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials . . . the inspector in such case, shall mark each cask containing such impure, ill manufactured, or deficient gunpowder, with the word "Condemned" on both heads of the cask . . . § 6. [I]f any person shall knowingly sell any condemned gunpowder . . . every such person, so offending, shall forfeit and pay not less than two hundred nor more than five hundred dollars . . . § 7. [E]ach inspector . . . be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gunpowder, by him examined, inspected and proved . . . to be paid by the owner or owners of the gunpowder. § 8. [I]f any manufacturer of gunpowder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export or cause to be exported withou the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act. § 9. [I]f any person with within this state . . shall knowingly sell, expose, or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be composed of the proof herein before required, shall forfeit and pay not less than five dollars nor more than fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act.

1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.
That if any person or persons shall within the compact part of the town of Portsmouth, that is to say, within one mile of the courthouse, fire or discharge any cannon, gun, pistol or other fire arms, or beat any drum, (except by command of a military officer, having authority therefor) or fire or discharge any rockets, squibs, crackers, or any preparation of gunpowder, (except by the permission of the police officers, or of a major part of them first had in writing) . . . every such

person, for every such act shall be taken and deemed to be an offender against the police of Portsmouth, and shall be liable to the penalties hereinafter expressed.

The Charter, with Its Amendments and the General Ordinances of the City of Dover Page 32, Image 32 (1870) available at The Making of Modern Law: Primary Sources. 1870
General Statutes [Ordinances of the City of Dover, [New Hampshire] Offences Against the Police of Towns,] § 5. No person shall, within the compact part of any town, fire or discharge any cannon, gun, pistol, or other fire-arms, or beat any drum, except by command of a military officer having authority therefor, or fire or discharge any rockets, squibs, crackers, or any preparation of gunpowder, except by permission of a majority of the police officers or selectmen in writing, or make any bonfire, or improperly use or expose any friction matches, or knowingly raise or repeat any false cry of fire.

1917 N.H. Laws 727-28, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, §§ 1-3, 6.
§ 1. No person shall manufacture, sell, or deal in firearms or in gunpowder, dynamite, nitro-glycerine, or other form of high explosive, unless he shall first obtain, from the selectmen of the town or the chief of police of the city where such business is to be conducted, a written license therefor, and no person shall conduct such business within the state but outside the limits of any organized town or city, unless he shall first obtain such license from the county commissioners of the county in which such business is to be conducted; which license shall specify the building where such business is to be carried on or material deposited or used. § 2. No such licensed person shall sell or deliver firearms to any person not a citizen of the United States, unless he shall have legally declared his intention of becoming a citizen, or any such explosive material or compound to any person, except upon presentation of a permit such as is hereinafter provided for, nor unless satisfied that the same is to be used for a lawful purpose. § 3. Every person so licensed shall keep, on blanks to be furnished by the secretary of state, a record of the names and residences of all persons to whom he shall sell or deliver firearms or any such explosive material or compound, the purpose of which the same is to be used¸ the date of sale, the amount paid, the date of the purchaser's permit, the name and title of the person by whom the permit was issued, and, within five days after such sale or delivery, shall file such record thereof with the clerk of the city or town wherein he sale or delivery was made, or with the county commissioners in case of sales or deliveries within the state, but outside the limits of any organized city or town. The records thus filed shall at all times be open to the inspection of the police departments, or other public authorities. He shall also affix to the receptacle containing such explosive material or compound a label with the name of the compound, his own name, and the date of sale.
§ 6. No person not a citizen of the United States or one who has legally declared his intention of becoming such a citizen shall have in his possession any firearm or firearms of whatsoever kind or description unless he has a written permit to have such possession issued and signed as hereinafter provided. Any such person desiring to possess a firearm or firearms for any lawful purpose shall first make written application to the chief of police or selectmen of the town wherein he resides . . . stating the purposes for which the possession of the firearm or firearms is desired and a description of the firearm or firearms. The applicant shall also state his full name, occupation, place of residence and if in a city the street and number. If such chief of police or selectmen or county commissioners are satisfied that the applicant intends to use the firearm or firearms in a lawful manner and as set forth in his application, a permit shall be issued, signed by

the chief of police of the city, a selectmen of the town, or county commissioners, as the case may be, giving to the applicant the right to have in his possession such firearm or firearms. The holder of any such permit shall keep the permit on his person at all times when he is in possession of the firearm or firearms as authority for such possession and shall exhibit the same when so requested by any person.

1917 N.H. Laws 728-29, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, § 6.
No person not a citizen of the United States or one who has legally declared his intention of becoming such a citizen shall have in his possession any firearm or firearms of whatsoever kind or description unless he has a written permit to have such possession issued and signed as hereinafter provided. Any such person desiring to possess a firearm or firearms for any lawful purpose shall first make written application to the chief of police or selectmen of the town wherein he resides . . . stating the purposes for which the possession of the firearm or firearms is desired and a description of the firearm or firearms. The applicant shall also state his full name, occupation, place of residence and if in a city the street and number. If such chief of police or selectmen or county commissioners are satisfied that the applicant intends to use the firearm or firearms in a lawful manner and as set forth in his application, a permit shall be issued, signed by the chief of police of the city, a selectmen of the town, or county commissioners, as the case may be, giving to the applicant the right to have in his possession such firearm or firearms. The holder of any such permit shall keep the permit on his person at all times when he is in possession of the firearm or firearms as authority for such possession and shall exhibit the same when so requested by any person.

1923 N.H. Laws 138
SECTION 1. Pistol or revolver, as used in this act shall be construed as meaning any firearm with a barrel less than twelve inches in length.
SECT. 2. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall in addition to the punishment provided for the crime, be punished by imprisonment for not more than five years.
SECT. 3. No unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another shall own or have in his possession or under his control a pistol or revolver, except as hereinafter provided. Violations of this section shall be punished by imprisonment for not more than two years and upon conviction the pistol or revolver shall be confiscated and destroyed.
SECT. 4. No person shall carry a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment not exceeding one year or by both fine and imprisonment.
SECT. 5. The provisions of the preceding sections shall not apply to marshals, sheriffs, policemen, or other duly appointed peace and other law enforcement officers, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps of the United States, nor to the national guard when on duty, nor to organizations by law authorized to purchase or receive such weapons, nor to duly authorized military or civil organizations when parading, or the members thereof when at or going to or from their customary places of assembly.

SECT. 6. The selectmen of towns or the mayor or chief of police of cities may, upon application of any person issue a license to such person to carry a loaded pistol or revolver in this state, for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury' to his person or property or for any other proper purpose, and that he is a suitable person to be licensed. The license shall be in duplicate and shall bear the name, address, description, and signature of the licensee. The original thereof shall be delivered to the licensee, the duplicate shall be preserved by the selectmen of towns and the chief of police of the cities wherein issued for a period of one year.

SECT. 7. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of twenty-one years any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars or be imprisoned not more than three months, or both. This section shall not apply to fathers, mothers, guardians, administrators, or executors who give to their children, wards, or heirs to an estate, a revolver.

SECT. 8. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who is an unnaturalized foreign-born person or has been convicted of a felony against the person property of another, except upon delivery of a written permit to purchase, signed by the selectmen of the town or the mayor or chief of police of the city. Before a delivery be made the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward to the chief of police of the city or selectmen of the town one copy thereof and shall retain the other copy for one year. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than one year, or by both such fine and imprisonment.

SECT. 9. Whoever, without being licensed as hereinafter provided, sells, advertises, or exposes for sale, or has in his possession with intent to sell, pistols or revolvers, shall be punished by imprisonment for not more than two years.

SECT. 10. The selectmen of towns and the chief of police of cities may grant licenses, the form of which shall be prescribed by the secretary of state, effective for not more than one year from date of issue, permitting the licensee to sell at retail pistols and revolvers subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.
2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.
3. No pistol or revolver shall be delivered (a) to a purchaser not personally known to the seller or who does not present clear evidence of his identity; nor (b) to an unnaturalized foreign-born person or a person who has been convicted of a felony and has no permit as required by section 8 of this act.

A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the secretary of state and shall be signed by the purchaser and by the person effecting the sale, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded to

the selectmen of the town or the chief of police of the city and the other copy retained for one year.
SECT. 11. If any person in purchasing or. otherwise securing delivery of a pistol or revolver shall give false information or offer false evidence of his identity he shall be punished by imprisonment punished, for not more than two years.
SECT. 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed, altered, removed, or obliterated, shall be presumptive evidence that such possessor has changed, altered, removed or obliterated the same. Violations of this section shall be punished by a fine of not more than two hundred dollars or by imprisonment for not more
than one year, or both.
SECT. 13. All licenses heretofore issued within the state permitting the carrying of pistols or revolvers upon the person shall expire at midnight of July 31, 1923.
SECT. 14. This act shall not apply to antique pistols or revolvers incapable of use as such.
SECT. 15. All acts and parts of acts inconsistent herewith are hereby repealed, and this act shall take effect upon its passage.

**NEW JERSEY**

An Act to Prevent the Killing of Deer out of Season, and Against Carrying of Guns and Hunting by Persons not Qualified (1722)
"Provided always, That nothing contained in this Act shall be deemed or construed to hinder any Person from killing any Kind of Deer, within his Feild where Corn is Growing, at any Time in the Month of January, nor to extend to any Free Native Indians Carrying Guns, Hunting, Killing or having in their Custody any Skins or Deers Flesh for their own Use, any Thing in this Act to the contrary notwithstanding.
And whereas divers Abuses have been committed, and great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to Hunt on other People[']s Land; for Remedy whereof for the Future, Be it Enacted by the Authority aforesaid, That if any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun, or Hunt on the Improved or Inclosed Lands in any Plantation, and on other than his own, unless he have Lisence or Permission from the owner of such Lands or Plantation, and shall be thereof Convicted, either upon the View of any Justice of the Peace within this Province, or by the Oath or Affirmation of any one or more Witnesses, before any Justice of the Peace, he shall, for every such Offence, forfeit the Sum of Fifteen Shillings, with Costs attending such Conviction. And if any Person whatsoever, who is not Owner of one Hundred Acres of Land, or otherwise Qualified, in the same Manner as Persons are or ought to be, for Electing of Representatives to serve in General Assembly, shall at any Time, after the Publication hereof, carry any Gun, or Hunt in the Woods or Uninclosed Lands, without Lisence or Permission obtained from the Owner or Owners of such Lands, and shall be thereof Convicted, in manner aforesaid, such Offender shall forfeit and pay the Sum of Ten Shillings, with Costs as aforesaid, for every such Offence."
1722, NJ, An Act to prevent the Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not qualified.
Bernard Bush, Laws of the Royal Colony of New Jersey, vol. 1 (Trenton N.J: New Jersey State Library Archives and History Bureau, 1977), 293-295.

1751 N.J. Laws 188-89
A Supplementary Act to the Act entitled, An Act to prevent the killing of Deer out of Season and against carrying of Guns, and hunting by Persons not qualifyed. . . .
AND BE IT FURTHER ENACTED by the Authority aforesaid, That if any Person or Persons, shall presume to carry a Gun or Guns, or hunt or watch for Deer, or any other Game, or set in any Dog or Dogs to drive Deer, or any other Game in any Person or Persons Land, without leave first had and obtained (if not of his own Family) in writing under the hand of the Owner or Owners thereof, or such Person or Persons who hath the Possession or Care of such Land, not exceeding one Day, before such Person or Persons so offending shall upon complaint made thereof by any Person or Persons whatsoever, to any Justice of the Peace of the County where such Offence is committed; the said Justice is hereby required to Issue out his Warrant against such Offender or Offenders, to bring him or them before him; and if he or they are convicted of such Offence or Offences before the said Justice, by the Oath or Affirmation of one or more Witnesses, then he is hereby required and commanded, to bind such Offender or Offenders, in their own Recognizance, in the Sum of Ten Pounds, to his or their good Behaviour for three Months; and also give Judgment, that he or they shall pay the Sum of Five Pounds, and the Costs of such Conviction, and binding him or them, to his or their good Behaviour: And if the said person or Persons so convicted, shall delay or refuse to enter into the said Recognizance, and pay the Sum and Costs aforesaid, then the said Justice is hereby required and commanded to commit the said Offender or Offenders to the Gaol of said County, until he or they shall comply to enter into said Recognizance, and pay the Sum and Costs aforesaid, and also the Gaolers Fees; and the Sheriff of the said County, or his Gaoler, is hereby required and commanded to take such Offender or Offenders into his Custody, and him or them safely keep in close Gaol until such Offender or Offenders shall comply as aforesaid. . . .
Bradford (1751) 18:1:2, pp. 15-20.

Charles Nettleton, Laws of the State of New-Jersey Page 26, Image 53 (1821) available at The Making of Modern Law: Primary Sources. 1771.
"An Act for the Preservation of Deer, and other game, and to prevent trespassing with guns (1771), § 1. Be it Enacted by the Governor, Council and General Assembly of this colony of New Jersey, and it is hereby enacted by the authority of the same, That if any person or persons shall presume, at any time after the publication hereof, to carry any gun on any lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he hath license or permission in writing from the owner or owners, or legal possessor, every such person so offending, and convicted thereof, either upon the view of any justice of the peace within this colony, or by the oath or affirmation of one or more witnesses, before any justice of the peace of either of the counties, cities, or towns corporate of this colony, in which the offender or offenders may be taken or reside, he or she, or they, shall for every offence, forfeit and pay to the owner of the soil, or his tenant in possession, the sum of forty shillings, with costs of sit; which forfeiture shall and may be sued for and recovered by the owner of the soil, or tenant in possession before any justice of the peace in this colony, for the use of such owner or tenant in possession...
...§ 3. And be it further enacted by the authority aforesaid, That if the person or persons offending against this act be non-residents of this colony, he or they shall forfeit and pay for every such offence, five pounds, and shall forfeit his or their gun or guns to any person or

persons, who shall inform and prosecute the same to effect, before any justice of the peace in any county of this colony, wherein the offender or offenders may be taken or apprehended."

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871
[Ordinances of Jersey City, NJ, In Relation to the Sidewalks, Public Grounds and Streets in Jersey City,] § 26. No person shall, within this city, fire or discharge any gun, pistol, cannon, or fowling piece or other fire-arms, unless in defense of his property or person; nor let off any squibs, crackers or other fireworks, unless by permission of the city authorities, under the penalty of ten dollars for each and every offense; provided, however, that this section of the ordinance shall not apply to the Fourth of July.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873
An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control. Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

Concealed Weapons Prohibited, Acts of the 116th Legislature of the State of New Jersey Chapter 217, §§ 1-2 (1892).

"Supplement to an act entitled 'An act concerning disorderly persons,' approved April ninth, one thousand eight hundred and seventy-five.

Sec. 1. Be it enacted by the Senate and General Assembly of the State of New Jersey, That if any person shall be apprehended in any city of this state, having concealed upon his or her person any offensive weapon, then he or she shall be deemed and adjudged to be a disorderly person; provided, that this act shall not apply to sheriffs, under sheriffs, deputy sheriffs, constables, policemen or other peace officers, nor to any person having a written permit from the police authorities of such city to carry such weapon.

Sec. 2. And be it enacted. That this act shall take effect immediately.

Approved March 29, 1892."

1892, NJ, Concerning Disorderly Persons, Chapter 217, §§ 1-2

Acts of the One Hundred and Sixteenth Legislature of the State of New Jersey, and Forty-Eighth Under the New Constitution (Trenton, NJ: MacCrellish & Quigley, 1892), 353. Chapter 217—Supplement to an Act Entitled "An Act Concerning Disorderly Persons," Approved April Ninth, One Thousand Eight Hundred and Seventy-Five, §§ 1-2. Approved March 29, 1892.

Town of Montclair: An Ordinance to Regulate the Carrying of Concealed Weapons and to Prohibit the Carrying of the Same Except as Herein Provided, MONTCLAIR TIMES, May 15, 1897, at 8 (Montclair, New Jersey).

"TOWN OF MONTCLAIR.

An Ordinance to Regulate the Carrying of Concealed Weapons and to Prohibit the Carrying of the Same Except as Herein Provided.

The Council of the Town of Montclair in the County of Essex do ordain as follows:

SECTION 1. No person shall carry any deadly weapon concealed on his person within the Town of Montclair except members of the police force of the Town of Montclair, public officers either of the United States or of this State or any sub-division thereof who are duly authorized by law to carry such weapons and persons to whom permits shall have been issued as hereinafter provided.

SEC. 2. Any person who has occasion to carry a deadly weapon for his protection may apply to the Superintendent of Police and if he is satisfied <u>that the applicant is a proper and law-abiding person and that there is good reason why such applicant should be allowed to carry such weapon</u> he may issue a permit to said person allowing him to carry such weapon, but before delivering such permit he shall procure the same to be countersigned by the Chairman of the Police Committee of the Council. Such applicant shall at the time of issuing of the permit file with the Chief of Police his name and address. A permanent record of such permits shall be kept at police headquarters, showing the date of each permit, the name and address of the person to whom it has been issued and the date of revocation thereof.

SEC. 3. Any person violating the terms of this ordinance shall be subject to a fine of twenty dollars and in case of non-payment thereof to imprisonment in the county jail for a period of thirty days.

SEC. 4. The Chairman of the Police Committee of the Council or the Superintendent of Police shall have the power to annul or revoke any permission given under this ordinance and a written notice of such revocation or annulment served personally or mailed to the person to whom the permit has been issued at the address given by him at the time of obtaining his permit, shall be deemed sufficient notice of such revocation or annulment, and such revocation or annulment shall take effect immediately if served personally, and if served by mail, twenty-four hours after

it shall have been mailed . It shall be the duty of such chairman after serving such notice forthwith to file with the Superintendent of Police a written notice of such revocation, with the day and hour of serving the same and the manner of service, and the Chief of Police shall enter such revocation on the aforesaid record as soon as it shall have gone into effect.

SEC. 5. All persons to whom such permission shall be given are hereby declared to be individually responsible for their own acts and for the consequences which may arise from the use of any weapon or weapons to be carried under the permission to be obtained as provided in this ordinance.

Adopted May 3d, 1897.

Full Text: 1897, NJ, Montclair Times, May 15, p. 8

"Town of Montclair: An Ordinance to Regulate the Carrying of Concealed Weapons and to Prohibit the Carrying of the Same Except as Herein Provided." Montclair Times, May 15, 1897, p. 8. Volume 21, Number 1058. An Ordinance to Regulate the Carrying of Concealed Weapons and to Prohibit the Carrying of the Same Except as Herein Provided, §§ 1-8. Adopted May 3, 1897. (Montclair, NJ).

1902 N.J. Laws 780, An Act to Require Non-residents to Secure Licenses before Hunting or Gunning within the State of New Jersey and Providing Penalties for Violation of Its Provisions, ch. 263, § 1.

Every non-resident of this state shall be required to take out a license before he shall begin hunting or gunning in this state, which license the several county clerks of this state, and each of them, are hereby authorized and required to issue upon the payment by the applicant of a license fee of ten dollars, and an issuance fee of fifty cents to the county clerk issuing the same; such license shall be a certificate of permission to hunt and gun within the state of New Jersey and shall include the name, age and place of residence and business of the applicant with his description as nearly as may be[.]

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both; provided, however, that nothing in this act shall be construed to prevent any sheriff, deputy sheriff, police officer, constable, state detective, member of a legally organized detective agency or any other peace officer from carrying weapons in the discharge of his duty; nor shall this act apply to any person having a written permit to carry such weapon, firearm, stiletto, razor, dagger or knife, from the mayor of any city, borough or other municipality, having a mayor, or from the township committee or other governing body of any township or other municipality not having a mayor, which permits such officers and governing bodies are hereby authorized to grant; said permits shall be issued at the place of residence of the person obtaining the same and when issued shall be in force in all parts of the state for a period of one year from date of issue unless sooner revoked by the officer or body granting the same; and provided further, that nothing contained herein shall prevent any person from keeping or carrying about his or her place of business, dwelling house or premises any such weapon, firearm, stiletto, dagger, razor or knife, or from carrying the same from any

place of purchase to his or her dwelling house, or place of business, or from his or her dwelling house or place of business to any place where repairing is done to have the same repaired and returned; and provided further, that nothing in this act shall be construed to make it unlawful for any person to carry a gun, pistol, rifle or other firearm or knife in the woods or fields or upon the waters of this state for the purpose of hunting; a fee of twenty-five cents may be lawfully charged by such officer or body granting such permit.

Act of Mar. 28, 1912, ch. 225, §§ 1-5, N.J. Laws 364, 364-66.
"BE IT ENACTED by the Senate and General Assembly of the State of New Jersey:

'1. Any person who shall carry any revolver, pistol, firearm, bludgeon, blackjack, knuckles, sand-bag, slung-shot or other deadly, offensive or dangerous weapon, or any stiletto, dagger or razor or any knife with a blade five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor; provided, however, that nothing in this act shall be construed to prevent any sheriff, prosecutor, deputy sheriff, jailer, police officer, constable, State detective, member of a legally organized detective agency, or any other peace officer from carrying weapons when engaged in the discharge of his duty; nor to duly authorized military or civil organizations, when parading nor to members thereof when going to and from the places of meeting of their respective organizations; nor shall this act apply to any <u>person having a written permit</u> to carry such weapon, firearm, stiletto, razor, dagger or knife, or slung-shot, obtained from and signed by the mayor of any city, borough or other municipality, or from any judge of the Court of Common Pleas, which permits such officers are hereby authorized to grant. Such permits shall be issued at the place of residence of the person obtaining the same, and, when issued shall be in force in all parts of the State for a period of one year from date of issue, unless sooner revoked by the officer granting the same, and said permit shall be dated and shall be recorded in the office of the clerk of the county where granted within ten days after the granting of same, and in the event of the recipient failing to record the same as herein provided said permit shall be deemed and taken to be revoked and cancelled. It is further provided, that nothing contained herein shall prevent any person from keeping or carrying about his or her place of business, dwelling house or premises any of such weapons, firearms, stilettos, daggers, razors, knives or slung-shots, or from carrying the same from any place of purchase to his or her dwelling house or place of business, or from his or her dwelling house or place of business to any place where repairing is done, to have the same repaired and returned; and it is provided further, that nothing in this act shall be construed to make it unlawful for any person to carry a gun, rifle or knife in the woods or fields, or upon the waters of this State, for the purpose of hunting or target practice.

2. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slung-shot, billy, sandclub, sand-bag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases, or gives any gun, revolver, pistol or other firearm, or any air-gun, spring-gun or other instrument or weapon in which the propelling force is spring or air, or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of twenty-one years, is guilty of a misdemeanor; provided, however, that nothing in this section shall prevent any person between the ages of sixteen and twenty-one from obtaining any gun, revolver, pistol or other firearm, air or spring-gun, if the

consent in writing of the parent or guardian of said minor so to do be presented to the person from whom such weapon be obtained agreeable to the provisions of this act.

3. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sand-club, sand-bag, metal knuckles, bludgeon, dagger, dirk, dangerous knife, razor, stiletto, revolver, bomb or other high explosive, or any other dangerous or deadly instrument or weapon, with the intent to use the same unlawfully against another is guilty of a high misdemeanor; the possession by any person other than a public officer or one having a permit for the same as herein provided, of any weapons specified in the foregoing section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of this section.

4. Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered at the time of sale the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm. Every person who shall fail to keep a register and to enter therein the facts required by this section, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for the inspection of any peace officer. Every person becoming the lawful possessor of such a pistol, revolver or other firearm, who shall sell, give or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply to wholesale dealers.

5. All acts and parts of acts inconsistent with the provisions of this act shall be and the same hereby are repealed, and this act shall take effect immediately.
Approved March 28, 1912."
Acts of the One Hundred and Thirty-Sixth Legislature of the State of New Jersey, and Sixty-Eighth under the New Constitution (Trenton, NJ: MacCrellish & Quigley, 1912), 364-366. Chapter 225—A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes (Revision of 1908)," Approved June Fourteenth, One Thousand Eight Hundred and Ninety-Eight, §§ 1-5. Approved March 28, 1912.

1914 N.J. Laws 65, Supplement to an Act Entitled "An Act to License Citizens of this State to Hunt and Pursue Wild Animals and Fowl," ch. 43, § 1.
No license to hunt, pursue or kill with a gun or any fire-arm any of the game birds¸ wild animals or fowl of this State, shall be issued to any person under the age of fourteen years, and if any applicant for license shall misrepresent his age he shall be liable to a penalty of twenty dollars, to be sued for and recovered as other penalties under the fish and game laws.

1916 N.J. Laws 275-76, An Act to Prohibit Any Person from Going into the Woods or Fields with a Gun or Other Firearm when Intoxicated, or under the Influence of any Drug or Intoxicating Liquor, ch. 130, §§ 1-2.
1. It shall be unlawful for any person to go into the woods or fields at any time with a gun or firearm when intoxicated or under the influence of any drug or drugs or of intoxicating liquor. 2. Any person violating any of the provisions of this act shall be liable to a penalty of fifty dollars for each offense, to be sued for and recovered in the manner provided and by the persons authorized to sued for and recover penalties. . . . Upon the conviction of any person for violating

the provisions of this act, the license to hunt and fish of such person issued to him . . . shall become void, and the justice of the peace, District Court judge, or police magistrate before whom such conviction is had, shall take from the person so convicted the license, mark the same "revoked" and send it to the Board of Fish and Game Commissioners. If such conviction is reversed on appeal the license shall be restored to the defendant. Any license to hunt or fish issued to any person convicted of a violation of this act during the calendar year in which such offense occurred shall be null and void.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.
1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second. 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1927 N.J. Laws 742
No retail dealer shall sell or expose for sale, or have in his possession with intent to use, any of the firearms or instruments enumerated in section one hereof without being licensed as hereafter provided. The Common Pleas judge of any court of this State, by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political-division, pistols or revolvers, subject to the follow-ing conditions, for breach of any of which the license shall be subject to forfeiture:
1. The business shall be carried on only in the building or buildings designated in the license.
2. The license or a copy thereof certified by the issuing authority shall be displayed in a conspicuous place on the premises where it can be easily read.
3. No pistol or revolver, or imitation thereof, or placard advertising the sale thereof, shall be placed in any window or in any part of said premises where it can be readily seen from the outside.
4. No pistol or revolver shall be delivered (a) unless the purchaser shall have obtained a permit to purchase days shall have elapsed after the application for the permit; (c) unless the purchaser either is personally known to the seller or shall present evidence of his identity; (d) unless the pistol or revolver shall be unloaded and securely wrapped; provided, however, a permit to cover a pistol or revolver shall, for the purposes of this section and of section nine of this act, be equivalent to a permit to purchase a pistol or revolver. 5. A true record of every pistol shall be made in a book kept for the purpose, the form of which shall be prescribed by the Secretary of State and shall be personally signed by the person effecting the sale, and shall contain the date of

the sale, the calibre, make, model, and manufacturer's number of the weapon, and the name, address and permit number of the purchaser.

Any person who shall knowingly sell any of the firearms or instruments enumerated in section one hereof to a minor under the age of eighteen years, or to a person not of sound mind, or to a drug addict, or to a person who has been convicted of committing or attempting to commit any of the crimes enumerated in section two hereof when armed with any of the firearms or instruments enumerated in section one hereof, shall he guilty of misdemeanor.

No person shall sell a pistol or revolver to another person unless the purchaser has first secured a permit to purchase or carry a pistol or revolver. No person of good character and who is of good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in other sections of this act, shall be denied a permit to purchase a pistol or revolver. The judge of any court within this State (except, however, justices of the peace), the sheriff of a county or the chief of police of a city, town or municipality shall upon application issue-to any person qualified under the provisions of this section a permit to purchase a pistol or revolver, and the Secretary of State shall have concurrent jurisdiction to issue such permit in any case, notwithstanding it has been refused by any other licensing official, if in his opinion the applicant is qualified.

Applications for such permits shall be in form as prescribed by the Secretary of State and shall set forth the name, residence, place of business, age, occupation, sex, color, and physical description of the applicant, and shall state whether the applicant is a citizen, and whether he has ever been convicted of any of the crimes enumerated in section two hereof as defined in this act. Such application shall he signed by the applicant and shall contain as reference the names and addresses of two reputable citizens personally acquainted with him. Application blanks shall be obtainable from the Secretary of State and from any other officers authorized to grant such permit.. and may be obtained from licensed retail dealers. The application, together with a fee of fifty cents. shall be delivered or forwarded to the licensing authority who shall investigate the same, and unless food cause for the denial thereof shall appear, shall rant said permit within seven days from the date of the receipt of the application. The permit shall be in form prescribed by the Secretary of State and shall be issued to the applicant in triplicate. The applicant shall deliver to the seller the permit in triplicate and the seller shall indorse on the back of each copy the make, model, calibre and serial number of the pistol or revolver, sold tinder the permit. One copy shall then be returned to the purchaser with the pistol or revolver, one copy shall be kept by the seller as a permanent record, and the third copy shall be forwarded by the seller within three days to the Secretary of State. If the permit is not granted, the fee shall be returned to the applicant.

All fees for permits shall be paid into the general fund of the State if the permit be issued by the Secretary of State; to the municipality if the permit be issued by a municipal officer; in all other instances to the general fund of the county wherein the officer acts or the licensee resides or does business.

A person shall not be restricted as to the number of pistols or revolvers he may purchase, if he applies for and obtains permits to purchase the same, but only one pistol or revolver shall be purchased or delivered on each permit.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

1. A gangster is hereby declared to be an enemy of the state. 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties. 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster. 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute. 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

**NEW MEXICO**

1915 N.M. Law 153, An Act to Amend Sections . . . of Chapter 85 of the Laws of 1912 Relative to the Protection of Game and Fish, ch. 101, §7.
. . . No person shall at any time shoot, hunt or take in any manner any wild animals or birds or game fish as herein defined in this state without first having in his or her possession a hunting license as hereinafter provided for the year in which such shooting, fishing or hunting is done. The presence of any person in any open field, prairie or forest, whether enclosed or not with traps, gun or other weapon for hunting, without having in possession a proper hunting license as herein provided, shall be prima facie evidence of the violation of this section.

**NEW YORK**

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 40-41, Image 62-63 (1896) available at The Making of Modern Law: Primary Sources. 1680.
Laws of the Colony of New York, Indians. No person shall sell, give or barter directly or indirectly any gun or guns, powder, bullet, shot, lead nor any vessel or burthen, or row boat, canoes only excepted without license first had and obtained under the governors hand and seal to any Indian whatsoever, nor to any person inhabiting out of this Government, nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapon, vessel, or boat so sold given or bartered, five pounds for every for every pound of powder, and forty shillings for every pound of shot or lead and proportionately for any greater or lesser quantity.

1763 N.Y. Laws 442
LAWS OF NEW-YORK

1. In order therefore the more effectually to punish and prevent such Abuses as foresaid, . . .That if any Person or Persons whatsoever, other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants, do and shall, at any Time or Times from and after the Publication of this Act, carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, CornField, or other inclosed Land whatsoever, within the City of New-York, or the Liberties thereof, without Licence in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor of such Orchard, Garden, Corn-Field, or other inclosed Land; or shall enter into, or pass through any Orchard, Garden, Corn-Field or Moving-Ground, in any of the aforesaid Places without Fire-Arms, and thereof shall be convicted before any Member of his Majesty's Council, either of the Justices of the Supreme Court, or the Mayor, Recorder, or any one of the Aldermen of the City of New-York, for the Time being, by the Oath of one credible Witness, or by Confession of the Party offending, he, she, or they so offending, shall severally forfeit and pay for every such Offence, the Sum of twenty Shillings; to be recovered and applied in the Manner herein after directed.

Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources. 1824
[Ordinances of the City of Schenectady,] XI. And be it further ordained, That if any person shall fire or discharge any gun, pistol, rocket, cracker, squib or other fire works, in any street, lane or alley, or in any yard, garden or other enclosure, or in any place which persons frequent to walk within the limits aforesaid, without permission of the mayor or one of the aldermen or assistants of this city, such person shall forfeit for every such offence the sum of one dollar…

Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources. 1881
Carrying of Pistols, § 264. Every person except judges of the federal, state and city courts, and officers of the general, state and municipal governments authorized by law to make arrests, and persons to whom permits shall have been issued, as hereinafter provided, who shall have in his possession within the city of New York a pistol of any description concealed on his person, or not carried openly, shall be deemed guilty of a misdemeanor, and shall be punished, on conviction by a fine not exceeding ten dollars, or, in default of payment of such fine by imprisonment not exceeding ten days. § 265. Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description. Any non-resident who does business in the city of New York, and has occasion to carry a pistol while in said city, must make application for permission to do so to the officer in command of the station-house of the police precinct in which his so does business, in the same manner as is required by residents of said city, and shall be subject to the same conditions and restrictions.

Charles Wheeler, By-Laws of the Village of Mechanicville. Adopted by the Trustees October 18, 1881 Page 7, Image 8 (1881) available at The Making of Modern Law: Primary Sources. 1881
[Ordinances of the Village of Mechanicville, NY,] Fires and Their Prevention, Fire Arms and Fire Works, § 20. No person, except on the anniversary of our national independence, and on that day only, at such place or places as the President or Trustees shall permit, shall fire, discharge or set off, in the village, any gun, cannon, pistol, rocket, squib, cracker or fire ball, under the penalty of five dollars for each offense.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884
Carrying, Using, Etc., Certain Weapons, § 410. A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources. 1885
An Act to Limit the Carrying and Sale of Pistols and other fire arms in the cities of this state. Chap. 375, § 1. No person under the age of eighteen years shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other firearms of any kind, and no person shall in such cities sell or give any pistol or other fire-arms to any person under such age. § 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and in all trials or examinations for said offense the appearance of the person so alleged or claimed to be under the age of eighteen years shall be evidence to the magistrate or jury as to the age of such person. § 3. Nothing herein contained shall apply to the regular and ordinary transportation of pistols or fire-arms as articles of merchandise in said cities, or to the carrying of a gun or rifle through a street or highway of any city, with the intent to use the same outside the said city; nor to any person under such age carrying an pistol or firearms under license given by the mayor of said cities; but no license so given shall be in force more than one year from its date; and all such <u>licenses may be revoked at the pleasure of the mayor</u>, and a full complete and public record shall be kept by the mayor of said cities of all such licenses and the terms and date thereof.
https://babel.hathitrust.org/cgi/pt?id=umn.31951d02427774f&seq=848&q1=carrying+and+sale+of+pistols

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 184, Image 185 (1885) available at The Making of Modern Law: Primary Sources. 1885
Ordinances of [the City of Syracuse,] Gunpowder, Etc. § 1. No person except when on military duty in the public service of the United States, or of this State, or in case of public celebration with permission of the mayor or common council, shall have, keep or possess in any building, or carriage, or on any dock, or in any boat or other vessel, or in any other place within the city limits, gun-powder, giant- powder, nitro-glycerine, dynamite or other explosive material, in quantity exceeding one pound, without written permission from the chief engineer of the fire department. Any person violating any of the provisions of this section shall be liable to a fine of not less than ten nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor more than three months, for each offense.

Mark Ash, The New York City Consolidation Act, as in Force in 1891: With Notes Indicating the Statutory Sources, References to Judicial Decisions, and All Laws Relating to New York City, Passed Since January 1, 1882, Together with an Appendix of the Royal English Colonial Charters of New York City Page 209, Image 233 (Vol. 1, 1891) available at The Making of Modern Law: Primary Sources. 1890
Ordinances of the City of New York, § 455. No person shall manufacture, have, keep, sell, or give away any gunpowder, blasting powder, gun-cotton, niro-glycerine, dualin, or any explosive oils or compounds, within the corporate limits of the city of New York, except in the quantities limited, in the manner, and upon the conditions herein provided, and under such regulations as the board of fire commissioners shall prescribe : and said board shall make suitable provision for the storage and safe keeping of gunpowder and other dangerous and explosive compounds or articles enumerated under this title, beyond the interior line of low water-mark in the city and county of New York. The said board may issue licenses to persons desiring to sell gunpowder or any of the articles mentioned under this section at retail, at a particular place in said city to be named in said license (provided that the same shall not be in a building used in any part thereof as a dwelling unless specially authorized by said license), and persons so licensed may on their premises, if actually kept for sale, persons so licensed may have on their premises, if actually kept for sale, a quantity not exceeding at any one time, of nitro-glycerine, five pounds; of gun-cotton, five pounds of gunpowder, fourteen pounds; blasting powder, twenty-five pounds. . .

1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.
No person other than members of the police force, regularly elected constables, the sheriff of Erie county, and his duly appointed deputies, shall, in the city, carry concealed upon or about his person, any pistol or revolver, or other dangerous weapon or weapons, without first obtaining a permit, as hereinbefore provided; and such permit shall be produced and exhibited by any person holding the same, upon the request of a member of the police force. A violation of any of the provisions of this section shall be a misdemeanor and punishable as such; and all fines imposed and collected for such violations shall be deposited to the credit of said pension fund by the clerk of the court imposing the same.

Rules, By-Laws and Ordinances of the Village of Wappingers Falls. Adopted September 13, 1898 Page 34, Image 32.(Wappingers Falls, 1898) available at The Making of Modern Law: Primary Sources. 1898
Ordinances of Wappinger Falls. Park Ordinances. § 1. No person or persons shall fire or discharge any gun or pistol or other firearm, or any rocket torpedo, or other fireworks of any description, nor send up any balloon, nor throw stones or missiles, nor play ball within the limits of Mesier Park, without the permission obtained of the Park Commissioners at a meeting of the Board.

An Ordinance to regulate the government of parks and other public pleasure grounds of The City of New York, at 600 (1903). 1903
Be it Ordained by the Board of Aldermen of The City of New York, as follows: All persons are forbidden . . .
XXIV. No one shall fire or carry any firearm, fire cracker, torpedo or fire-works, nor make a fire, nor make any oration, nor conduct any religious or other meeting or ceremony within any of the parks, parkways, squares or places in The City of New York under the jurisdiction of the Department of Parks without special permission from the Commissioner having jurisdiction.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §1.
Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1911 N.Y. Laws 443, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §1.
Any person over the age of sixteen years, who shall have in his possession in any city, village or town of this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, without a written license therefor, issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance in such city, village or town, shall be guilty of a misdemeanor.

1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

Such chapter is hereby amended . . . § 1914. Sale of pistols, revolvers and other firearms. Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre [sic], make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm. Such person shall also, before delivering the same to the purchaser, require such purchaser to produce a permit for possessing or carrying the same as required by law, and shall also enter in such register the date of such permit, the number thereon, if any, and the name of the magistrate or other officer by whom the same was issued. Every person who shall fail to keep a register and enter therein the facts required by this section, or who shall fail to exact the production of a permit to possess or carry such pistol, revolver or other firearm, if such permit is required by law, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for the inspection of any peace officer. Every person becoming the lawful possessor of such pistol, revolver or other firearm, who shall sell, give or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply to wholesale dealers.

1923 N.Y. Laws 140–141, An Act to Amend the Conservation Law in Relation to Aliens, ch. 110, § 2.
2. It shall be unlawful for any unnaturalized foreign born person to hunt for, or capture or kill, in this state any wild bird or animal, either game or otherwise, of any description except in defense of person or property or except under a special license issued directly by the conservation commission; and to that end it shall be unlawful for any unnaturalized foreign born person within this state, to own or be possessed of a shotgun or rifle of any make, unless he possess such special license.

## NORTH CAROLINA

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources. 1840
Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

1856 N.C. Sess. Laws 34, chap. 34, §2, pt. 4.
Revenue:
(4) On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty-five cents; on dirks and sword canes, sixty-five cents: Provided, however,

That of said arms, only such shall be taxable, as at sone time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.

An Act to Amend the Charter of the Town of Asheville, § 36, nos. 2 & 9, 1883 N.C. Priv. Sess. Laws 853, 870–872 (Ashe & Gatling).
“CHAPTER 111.
An act to amend the charter of the town of Asheville.
The General Assembly of North Carolina do enact…
…Sec. 36. In addition to the subjects listed for taxation, the aldermen may levy and collect a tax on the following subjects, the amount of which tax, when paid, shall be collected by the city tax collector instantly; and if the same be not paid on demand, the same may be recovered by suit or by distress and sale of the articles on which tax is imposed, or of any other property of the owner which may be forthwith distrained and sold to satisfy said taxes…
…2nd. Upon every shooting gallery, billiard table, bowling alley or alley of like kind, bowling saloon, bagatelle table, pool table or place of any other game or play, with or without a name, kept for hire, or kept in a house where liquor is sold, or a house used or connected with such a house, or used or connected with a hotel or restaurant, a license tax not exceeding fifty dollars…
…9th. Upon each and every of the following objects and occupations the aldermen, may at discretion impose the following taxes, to wit…
…upon every person or firm or company selling pistols, bowie knives, dirks, slung shot, brass knuckles or other like deadly weapons, in addition[1] to all other taxes, a license tax not exceeding fifty dollars.”
Laws and Resolutions of the State of North Carolina Passed by the General Assembly at Its Session of 1883, Begun and Held in the City of Raleigh on Wednesday, the Third Day of January, A. D. 1883: To Which Are Prefixed a Register of State Officers, Members of the General Assembly, Judiciary, a List of Commissioners of Affidavits, and State Constitution (Raleigh, NC: Ashe & Gatling, 1883), 870–72. Private Acts, Chapter 111—An Act to Amend the Charter of the Town of Asheville, § 36, Numbers 2 & 9. Ratified March 8, 1883.

1909 N.C. Sess. Laws 777, Priv. Laws, An Act for a New Charter for the City of Southport, North Carolina, ch. 345, § 23, pt. 14.
[O]n dealers in pistols, guns, dirks, bowie knives, sling shots, brass or metal knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars; on dealers in firecrackers, Roman candles, skyrockets, toy pistols or fireworks of any kind, a tax not exceeding fifty dollars.

1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.
§ 1. That it shall be unlawful for any person, firm, or corporation in this State to sell, give away or dispose of, or to purchase or receive, at any place within the State from any other place within or without the State, without a license or permit therefor shall have first been obtained by such purchaser or receiver from the clerk of the Superior Court of the county in which such purchase, sale, or transfer is intended to be made, any pistol, so-called pump-gun, bowie knife, dirk, dagger or metallic knucks. § 2. That the clerks of the Superior Courts of any and all counties of this State are hereby authorized and directed to issue to any person, firm, or corporation in any such county a license or permit to purchase or receive any weapon mentioned in section one of this act

from any person, firm, or corporation offering to sell or dispose of the same, which said license or permit shall be in the following form, to wit:
NORTH CAROLINA,
-- County.
I __ _ - -- clerk of the Superior Court of said county, do hereby certify that ------------------------ whose place of residence is----- ------------------------- Street, in -------- - -- (or) in---------------- Township -- County, North Carolina, having this day satisfied me as to his, her (or) <u>their good moral character</u>, and that the possession of one of the weapons described in section one of this act <u>is necessary for self-defense or the protection of the home</u>, a license or permit is therefore hereby given said ----------------- to purchase one pistol, (or) ---------------------------------------- from any person, firm, or corporation authorized to dispose of the same.
(If any other weapon is named, strike out word pistol.)
This -------- day of ------------------- , 19.--
Clerk Superior Court
§ 3. . . Provided, that if said clerk shall not be so fully satisfied, he shall refuse to issue said license or permit. . . . § 5. That each and every dealer in pistols, pistol cartridges and other weapons mentioned in section one of this act shall keep and accurate record of all sales thereof, including the name, place of residence, date of sale, etc., of each person, firm, or corporation, to whom or which any and all such sales are made, which said record shall be open to the inspection of any duly constituted State, county or police officer, within this State. . . .

**<u>NORTH DAKOTA</u>**

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.
§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony, unless such instrument weapon or explosive is carried in the prosecution of or to effect a lawful and legitimate purpose. § 2. The possession, in the manner set forth in the preceeding Section, of any of the weapons or explosives mentioned therein, shall be presumptive evidence of intent to use the same in violation of this act. § 3. Penalty – Any person upon conviction of violating the provisions of this Act, shall, in the discretion of the court, be imprisoned in the State Penitentiary nor more than two years, or in the county jail not more than one year, or by a fine of not more than one hundred dollars, or by both such fine and imprisonment. Provided, however, that any citizen of good moral character may, upon application to any district court, municipal, or justice of the court, be granted the permission to carry a concealed weapon <u>upon the showing of reasonable cause</u>. . . . § 5. Emergency. An emergency is hereby declared to exist in that professional criminals are frequently found to carry concealed about their persons, the dangerous weapons or explosives mentioned in Section 1 of this Act. And, whereas, the present

law is inadequate to prevent such criminals from carrying concealed weapons or explosives; therefore, this Act shall take effect and be in force from and after its passage and approval.

1923 N.D. Laws 379, 380-82 ch. 266
Sec. 2. Commiting Crime When Armed. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall be in addition to the punishment provided for the crime, be punished by imprisonment for not less than ten years.
Sec. 6. Carrying Pistol Concealed. No person shall carry a pistol or revolver concealed in any vehicle or in any package, satchel, grip, suit case or carry in any way or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided. Violations of this section shall be punished by imprisonment for not less than one year, and upon conviction the pistol or revolver shall be confiscated or destroyed.
Sec. 8. Issue of Licenses to Carry. The justice of a court of record, the chief of police of a city or town and the sheriff of a county, or persons authorized by any of them shall upon the application of any person having a bonafide residence or place of business within the jurisdiction of said licensing authority, or of any person having a bona fide residence or place of business within the United States and license to carry a fire arm concealed upon his person issued by the authorities of any State or sub-division of the United States, issue a license to such person to carry a pistol or revolver within this State for not more than one year from date of issue, <u>if it appears that the applicant has good reason to fear an injury to his person or property or for any other proper purpose, and that he is a suitable person to be so licensed</u> . . .
Sec. 10. SALES REGULATED. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward by registered mail one copy thereof to the Secretary of State, and one copy thereof to the chief of police of the city or town, or the sheriff of the county of which the seller is a resident, and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not less than $100 or imprisonment for not less than one year, or by both such fine and imprisonment.
Sec. 11. DEALERS TO BE LICENSED. Whoever, without being licensed as hereinafter provided, sells, or otherwise transfers, advertises, or exposes for sale, or transfers or has in his possession with intent to sell, or otherwise transfer, pistols or revolvers, shall be punished by imprisonment for not less than two years.
Sec. 12. DEALERS' LICENSES: By WHOM GRANTED, AND CONDmoNs THEREOF.) The duly constituted licensing authorities of any city, town or subdivision of this state, may grant licenses in form prescribed by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political

subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

The business shall be carried on only in the building designated in the license.

The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

No pistol or revolver shall be delivered-

(a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor

(c) If the seller has reasonable cause to believe that the purchaser either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof.

A true record, in triplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Secretary of State, and shall be personally signed by the purchaser and by the person affecting the sale, each in the presence of the other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, occupation, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded by registered mail to the Secretary of State and one copy thereof to the chief of police of the city or town or the sheriff of the county of which the seller is a resident, and the other copy retained for six years.

No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2.
§ 2 Committing Crime When Armed. If any person shall commit, or attempt to commit, a crime when armed with a pistol or revolver, and has no permit to carry the same, he may be punished by imprisonment for not more than ten years, in addition to the punishment provided for the crime. Such imprisonment, if not exceeding one year, to be in the County jail, and if exceeding one year to be in the State Penitentiary.

1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second. § 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun¸ automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to

purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

**OHIO**

The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823
[Ordinances of Marietta, Ohio; An Ordinance For Preventing the Wanton Use of Fire Arms, Etc., § 1. Be it ordained by the Town of Marietta, in Town meeting legally assembled, and by the authority thereof it is ordained and enacted , That if any person, after this ordinance takes effect, shall discharge or explode, or aid or assist in discharging or exploding any gun powder, from guns, fire arms, or by any other means, within the limits of the town plot of Marietta, where by the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered (unless such firing shall by authorized by permission in writing from the town council then in office, or by the command of some military officer in discharge of his duty as such,) the person so offending may be complained of before any justice of the peace for the town and upon conviction, shall be fined by such justice not than less one dollar (sic), nor more than five dollars for the first offence, and for the second and all subsequent offences against this ordinance, such person shall be fined not less than five, nor more than ten dollars, and pay all costs, to be collected as other penalties by law are. . .

An Act Incorporating the City of Cincinnati: And a Digest of the Ordinances of Said City, of a General Nature, Now in Force, with an Appendix Page 57-58, Image 58-59 (1835) available at The Making of Modern Law: Primary Sources. 1835
Ordinances of the City of Cincinnati, An Ordinance to Regulate the Keeping of Gunpowder, § 1. Be it ordained by the City Council of the City of Cincinnati, That no person or persons in the city of Cincinnati, shall keep, have, or possess, in any house, warehouse, shop, shed, or other building, nor in any street, side walk, lane, alley, passage, way, or yard, nor in any cellar, wagon, cary, or carriage, of any kind whatever; nor in any other place, within said city, Gun Powder, in any way or manner, other than as provided for by this ordinance; nor in any quantity exceeding twenty-five pounds, to be divided into six equal parts. § 2. Be it further ordained, That it shall not be lawful for any person or persons to sell gun powder by retail within said city, without having first obtained a license from the city council for that purpose; and every person obtaining a grant for a license to sell gun powder, shall receive a certificate of such grant from the city clerk, and pay into the city treasury, a sum not exceeding one hundred dollars, nor less than ten dollars; besides fifty cents to the Mayor for issuing the same; Provided that license be granted to not more than four persons in any one ward, and so that they be separated from each other, by at least two entire blocks or squares; and all applications for such license, shall be in writing, stating the situation where such gunpowder is to be kept. § 3. Be it further ordained, That every person who obtains a license as aforesaid to retail gun powder, shall keep the same in tin canisters, well secured with good and sufficient covers; and shall place on the store or building

containing the same, a sign with the words, LICENSED TO SELL GUN POWDER, Provided that nothing in this ordinance shall be so construed to prevent any person from carrying gun powder through the streets in its exportation, or to some place of deposit, without the limits of the corporation, if the same be put up in tight and well secured kegs or vessels. § 4. Be it further ordained, That it shall be the duty of the city marshal and his deputies, and any of the fire wardens, on any day, (Sundays excepted) between sun rising and setting, to enter into any house or building, or any other place within said city, where gun powder is kept or suspected to be kept, and examine the premises, and if they or either of them shall find any gun powder, contrary to the provisions of this ordinance, they or either of them shall seize such powder, together with the vessel containing the same, in the name of the city of Cincinnati; and the officer making such seizure, if he be other than the marshal, shall forthwith report such seizure to the marshal, who shall immediately take charge of the gun powder so seized, as if in case of seizure by himself; and in either case he shall immediately take charge of the gun powder so seized; to be conveyed to some safe place of deposit without the limits of the city. And the marshal shall, moreover, forthwith report such seizure to the mayor, with the name of the person in whose possession such gun powder was seized, or with the name of the owner, if his name be known, whereupon the mayor shall issue a citation against the owner, if known and within his jurisdiction, and if not, then against the person whose possession such gunpowder was seized, citing the defendant to appear on a day to be named in such citation, and show cause, if any he have, why the gun powder so seized should not be forfeited to the city, and a fine imposed agreeably to the provisions of this ordinance; upon which citation proceedings shall be had as in other cases upon the city ordinances, and if a final judgment of forfeiture be pronounced against the gun powder so seized, the marshal shall proceed to sell and dispose of the same for the benefit of said city, after having given three days notice of such sale, by advertisement in at least three public places in the city, and at one of the market houses on market day, to the highest bidder; and the net proceeds thereof shall be credited on the execution against the person fined for keeping the same contrary to the provisions of this ordinance: Provided, that, of any lot of powder seized according to the provisions of this ordinance, not more shall be sold by the marshal than will pay the fine and costs of suit and expense attending the seizure.

George W. Malambre, Laws and General Ordinances of the City of Dayton, Containing the Laws of the State upon Municipal Government; All the General Ordinances in Force August 30th, 1855; a List of the Officers of the City under the New Act of Incorporation, Together with the Amount of Taxes Levied in Each Year for General and Special Purposes, since 1851, and the Total Amount in Each Year, of Property Subject to Taxation Page 214, Image 219 (1855) available at The Making of Modern Law: Primary Sources. 1855
Ordinances of the City of Dayton. Offenses. § 38. Sec. XXXIX. If any person, or persons, shall fire any cannon, gun, or other firearms, within the bounds of the building lots, or cemetery ground in this city, or within one hundred yards of any public road, within this corporation, except by permission of council, and except in proper situations for firing salutes, or by command of a military officer in performance of military duty, every person, so offending, on conviction thereof, shall pay a fine not exceeding ten dollars, and costs.

W. H. Gaylord, Standing Rules of Order of the Cleveland City Council: With a Catalogue of the Mayors and Councils of the City of Cleveland, from Its Organization, April, 1836, to April,

1871, and Officers of the City Government for 1872 Page 101, Image 124 (1872) available at The Making of Modern Law: Primary Sources. 1856
[Ordinances of the City of Cleveland,] An Ordinance to Prevent the Firing of Guns and Fire-works, § 1. Be it ordained by the City Council of the City of Cleveland, That no person shall fire any cannon, gun, rifle, pistol, or fire-arms of any kind, or fire or explode any squib, rocket, cracker, Roman candle, or other combustible fire-works within the city. § 2. This ordinance shall not apply to any military company, when drilling under command of any officer thereof, or to the use of fire-arms in the lawful defense of the person, family or property of any person, or to the killing of any dog whose owner or possessor has not complied with the provisions of the ordinance relating to dogs. § 3. The board of city improvements may, at its discretion, give permission to any person or persons to discharge fire-arms or fire-works on the fourth day of July; such permission may be given through any public paper of the city, or otherwise. § 4. That any person violating any provision of this ordinance shall, on conviction thereof, be fined in any sum not exceeding twenty dollars.

1878 Ohio Laws 199, An Act to Amend, Revise, and Consolidate the Statutes Relating to Municipal Corporations, to Be Known as Title Twelve, Part One, of the Act to Revise and Consolidate the General Statutes of Ohio, div. 3, ch. 3, § 1, pt. 14.
To regulate the transportation and keeping of gunpowder, and other explosive and dangerous combustibles, and to provide or license magazines for the same.

M. Augustus Daugherty, Supplement to the Revised Statutes of the State of Ohio Containing All the Statutes Amendatory of or Supplementary to the Revised Statutes, Together with the Miscellaneous Acts, General or Permanent in Their Nature, In Force January 1, 1884. 3d ed. Edited by James M. Williams Page 633, Image 641 (1884) available at The Making of Modern Law: Primary Sources. 1884
Licenses, § 24. All vendors of gunpowder shall pay a license fee of fifteen (15) dollars per annum. All keepers or owners of gunpowder magazines shall pay a license fee of one hundred (100) dollars per annum.

1889 Ohio Laws 164, An Act to Amend Section 2669 of the Revised Statutes, as Amended April 22, 1885, § 1.
The council of the city or village may provide by ordinance for licensing all exhibiters of shows or performances of any kind, not prohibited by law, hawkers, peddlers, auctioneers of horses and other animals on the highways or public grounds of the corporation, venders [sic] of gun powder and other explosives, taverns and houses of public entertainment, and hucksters in the public streets or markets, and in granting such license, may extract and receive such sum of money as it may think reasonable[.]

1900 Ohio Laws 730, An Act to Provide a License on Trades, Business and Professions Carried on . . . , §§24-25.
§ 24. All keepers or owners of gun powder magazines shall pay a license fee of one hundred dollars ($100) per annum, and shall notify the chief of the fire department, in writing, of the place where the same is kept or stored; but no license shall be issued under this section without the consent of the mayor. § 25. All keepers of shooting galleries shall pay a license fee of fifty

dollars ($50) per annum, or for a less period of one year at a rate of ten dollars ($10) per month, no license to be issued for a less period than one month.

1902 Ohio Laws 23, Extraordinary Sess., An Act to Provide for the Organization of Cities and Incorporated Villages . . . and to Repeal All Sections of the Revised Statutes Inconsistent Herewith, § 7, pt. 11.
To regulate the transportation, keeping and sale of gunpowder and other explosives or dangerous combustibles and materials and to provide or license magazines for the same.

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.
That § 12819 of the General Code be supplemented . . . to read as follows: Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty. Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

**OKLAHOMA**

General Laws Relating to Incorporated Towns of Indian Territory Page 43, Image 39 (1890) available at The Making of Modern Law: Primary Sources. 1890
Revised Ordinances of the Town of Checotah, [An Ordinance Requiring Persons Engaged in Certain Businesses or Avocations to Procure a License for so Doing and Providing of Penalty for Failure so to do, § 1. That the licenses hereinafter named shall be fixed, imposed and collected at the following rates and sums, and it shall be unlawful for any person or persons to exercise or pursue any of the following avocations or businesses within the corporate limits of Checotah without having first obtained a license therefor from the proper authority, having paid for the same in lawful money of the united States as hereinafter provided,] 29th. Pistol or shooting Gallery – For each and every pistol and shooting gallery, per month, five dollars.

**OREGON**

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 205-206, Image 206-207 (1872) available at The Making of Modern Law: Primary Sources. 1868
[Concerning Offences and Disorderly Conduct, § 2. That any person or persons who shall fire any pistol, gun or rifle, or any other species of fire-arms within the following limits: the Willamette river on the east and (10) Tenth Street on the west, Caruther's Addition on the south and F Street on Couch's Addition on the north, shall on conviction thereof before the Recorder, be subject to a penalty of not less than five nor more than fifty dollars, or imprisonment, at the discretion of the Recorder, not exceeding twenty days. Provided that the Marshal shall permit upon the national holidays and other days of public celebration, any appropriate display of fire-arms and other instruments named in this section.]

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 225-227, Image 226-228 (1872) available at The Making of Modern Law: Primary Sources. 1872
Ordinances of the City of Portland, To Regulate the Storage and Sale of Gunpowder, and Other Explosive Materials, § 1. No person shall keep for sale any gunpowder in any building, store or place in the City of Portland, without having first obtained a license therefor. § 2. The license for selling gunpowder shall be five dollars per quarter, to be issued as other licenses are issued under the provisions of Ordinance 984, entitled "An Ordinance to impose and regulate licenses in the City of Portland." § 3. No person shall receive, keep or store, or aid or assist any person in receiving, keeping or storing gunpowder in a larger quantity than five pounds, in or into any building, or upon any premises, unless the person receiving, keeping or storing the same is duly licensed to sell gunpowder. § 4. No person or persons duly authorized to sell gunpowder, as hereinbefore provided, shall keep, store, or have in any one place more than twenty five pounds of powder, which shall be kept in any air-tight metallic vessel marked with the word "Gunpowder," in plain Roman letters, not less than three inches in height, and of proportionate width, which vessel shall be placed or kept at all times, conspicuously in view near the entrance of the premises where kept, and convenient for removal therefrom. § 5. Upon the front of every building or premises where powder is kept in a conspicuous place a sign with the word "gunpowder" painted thereon in Roman letters, not less than three inches in height. § 6. No person shall convey, cause to be conveyed, or assist in conveying in any vehicle and gunpowder,

unless the same shall be securely packed in close packages, nor unless such packages shall be securely covered while on the vehicle. § 7. No vessel shall be allowed to remain at any wharf more than twenty-four hours with gunpowder on board, except such as may be kept for ship's use, and if such vessel shall be at the wharf overnight, a watchman shall be kept on duty on board all night. All gunpowder landed or placed on a wharf, sidewalk, street or public way for forwarding or shipment shall be forwarded or shipped immediately after it shall be so landed or placed. § 8. The provisions of this Ordinance shall be deemed to apply to "giant powder" "gun cotton" or any other explosive substance having an explosive power equal to that of ordinary gunpowder. § 9. Any person or persons violating any of the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and on conviction before the Police Judge, shall be fined not less than ten nor more than one hundred dollars, or by imprisonment in the city jail not less than two nor more than twenty days, or both, at the discretion of the Police Judge. § 10. The officers of the Fire Department and Police are directed to see that the provisions of this Ordinance are enforced, and to make complaint before the Police Judge for the violation of its provisions.

J.C. Moreland, Charter and Ordinances of the City of Portland and Table of Grades: Together with the Rules of Order, Reports of officers, etc. Page 207, Image 212 (1879) available at The Making of Modern Law: Primary Sources. 1879
Ordinances [of the City of Portland], Concerning Offenses and Disorderly Conduct, § 2. The City of Portland does ordain as follows… That any person or persons who shall fire any pistol, gun or rifle, or any other species of fire-arms, within the corporate limits of the city, shall, on conviction thereof before the Police Court, be fined not less than five dollars nor more than fifty dollars: Provided, That all circumstances of necessity may be plead as a defense to the offense described in this section; and, provided further, that the Chief of Police may permit upon the national holidays and other days of public celebration any appropriate display of firearms named in this section.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oregon | 1898
An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.
It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1913 Or. Laws 497
Section 1. It shall be unlawful for any person, firm or corporation to display for sale at retail any pocket pistol or revolver or to sell at retail, barter, give away or dispose of the same to any person whomsoever, excepting a policeman, member of the militia or peace officer of the State of Oregon, unless the purchaser or person attempting to procure the same shall have a permit for the purpose of procuring such pocket pistol or revolver signed by the municipal judge or city

recorder of the city or county judge or a justice of the peace of the county wherein such person resides.
Section 2. Provided, that no judge, city recorder or justice of the peace shall issue such permit until said applicant has furnished him with an affidavit from at least two reputable freeholders as to the applicant's good moral character.
Section 3. All persons, firms or corporations engaged in the retail sale of pocket pistols or revolvers shall keep a record of the sale of such pocket pistols or revolvers by registering the name of the person or persons and the number of the pocket pistol or revolver and shall transmit same to the sheriff of the county in which purchase is made on the 1st and 15th day of each calendar month.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 9.
Section 1. No person shall carry in any city, town, or municipal corporation of this State any pistol, revolver or other firearm concealed upon his or her person, or of a size which may be concealed upon his or her person, without a license or permit therefor, issued to him or her by a chief of police or sheriff of such city, town or municipal corporation, or in such manner as may be prescribed by ordinance of such city, town or municipal corporation. This section, however, shall not apply to sheriffs and their deputies, constables, marshals, police officers or any other duly appointed peace officers, nor to any person or persons summoned by such officers to assist in making arrest or preserving the peace while said person or persons are engaged in assisting such officers; nor to duly authorized military organizations when parading, nor to members thereof when going to and from places of meeting of their respective organizations.
Section 3-A. Any person who violates the provisions of Section 1, Section 2, or Section 3 of this Act, shall be fined in a sum no greater than $100.00, or be imprisoned in the county jail for a term no longer than three months, or by both such fine and imprisonment.
Section 4. Any person who violates the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has once been convicted of a violation of any of said sections, is guilty of a misdemeanor, and upon conviction thereof shall be imprisoned in a county jail or reformatory for not less than thirty days nor for more than one year.
Section 4-A. Any person who violates the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has more than once been convicted of a violation of any of said sections, is guilty of a felony, and shall be punished by imprisonment in the State prison for a term not exceeding three years.
Section 4-B. Any person who violates any of the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has been convicted of a felony, upon conviction thereof shall be imprisoned in the penitentiary of this State for a period not exceeding five years.
Section 4-C. For the purposes of this Act any pistol, revolver, or other firearm of a size which may be concealed upon his or her person shall be deemed a dangerous weapon.
Section 9. It shall be lawful for the sheriff of any county, chief of police, city or town marshal, or other head of the police department of any city, town or other municipal corporation of this State, upon proof before him that the person applying therefor is of good moral character, and that proper cause exists for the issuance thereof, to issue to such person a license for one year, to have

and carry concealed a pistol, revolver or other firearm; provided, however, that no such license shall be issued to any person under the age of twenty-one years.
The person obtaining a permit to carry a concealed pistol or revolver shall pay to the officer issuing such permit the sum of One Dollar. Said license for carrying a concealed pistol or revolver is revocable at any time and must be immediately surrendered on demand. The license while in force entitles the holder to carry the said arm in any county in the State of Oregon.

1925 Or. Laws 468, 469-471
Section 5. Except as otherwise provided in this act, it shall be unlawful for any person within this state to carry concealed upon his person or within any vehicle which is under his control or direction any pistol, revolver or other firearm capable of being concealed upon the person without having a license to carry such firearm, as hereinafter provided in section 8 hereof. Any person who violates the provisions of this section shall be guilty of a misdemeanor, and if he has been convicted previously of any felony, or of any crime made punishable by this act, he is guilty of a felony. This section shall not be construed to prohibit any citizen of the United States, over the age of eighteen years, who resides or is temporarily sojourning within this state, and who is not within the excepted classes prescribed by section 2 hereof, from owning, possessing or keeping within his place of residence or place of business any pistol, revolver or other firearm capable of being concealed upon the person, and no permit or license to purchase, own, possess or keep any such firearm at his place of residence or place of business shall be required of any such citizen. Firearms carried openly in belt holsters shall not be deemed to be concealed within the meaning of this section.

**PENNSYLVANIA**

Charter To William Penn, And Laws Of The Province Of Pennsylvania, Passed Between The Years 1682 And 1700 Page 32, Image 37 (1879) available at The Making of Modern Law: Primary Sources. 1676
Laws of the Duke of York, Indians (1676). No person shall sell give or barter directly or indirectly any gun or guns powder, bullet, shot, lead nor any vessel of burthen, or row boat canoes only excepted without license first had and obtained under the Governor's hand and Seal, to any Indian whatsoever, nor to any person inhabiting out of this government nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapons, vessel or boat, so sold given or bartered, five pounds for every pound of shot or lead and proportionally for any greater or lesser quantity.

2 The Statutes at Large of Pennsylvania, 1682-1801 (1706) @233-36.
CHAPTER CXLIII AN ACT FOR THE TRIAL OF NEGROES Whereas some difficulties have arisen within this province about the manner of trial and punishment of negroes committing murder manslaughter buggery burglary rapes attempts of rapes and other high and heinous enormities and capital offenses for remedy thereof and for the speedy trial and punishment of such negro or negroes offending as afore said. . . .
Section V And be it further enacted by the authority afore said That if any negro shall presume to carry any guns sword pistol fowling piece clubs or other arms or weapons whatsoever without his master's special license for the same and be convicted thereof before a magistrate he shall be whipped with twenty one lashes on his bare back. . . .

Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713
Pennsylvania Archives 1713, The Act for the Better Government of the City of Philadelphia (1713), This Act inflicts 5s penalty on persons riding a gallop and 10s for persons trotting, with Drays or their Teams in the streets, and 5th for suffering a Dog or a Bitch going at large; or firing a Gun without license, or if a Negro be found in any disorderly practices or other Misbehaviors may be whipped 21 lashes for any one offence or committed to prison, which words “other misbehaviors,” are very uncertain and give very arbitrary power where the punishment is great. [(Summary of Statute from Archive compilation)].
https://go.gale.com/ps/retrieve.do?tabID=Monographs&resultListType=RESULT_LIST&searchResultsType=SingleTab&retrievalId=33bf6464-d643-4c0d-9094-96bbcc5e544a&hitCount=12&searchType=BasicSearchForm&currentPosition=9&docId=GALE%7CDT0103988129&docType=American+colonial+record&sort=Relevance&contentSegment=ZMMK&prodId=MMLP&pageNum=1&contentSet=GALE%7CDT0103988129&searchId=R1&userGroupName=cowmsl&inPS=true
link.gale.com/apps/doc/DT0103988129/MMLP?u=cowmsl&sid=bookmark-MMLP&pg=162.

Act of 26th August 1721.
[An Act of 9th of February, 1750-51, § 1. If any person or persons whatsoever, within any county, town or within any other town or borough in this province, already built and settled, or hereafter to be built and settled , not hitherto restricted nor provided for by our laws, shall set on fire their chimneys to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, or shall fire any gun or other fire arm, or shall make or cause to be made, or sell or utter, or offer to expose to sale, and squibs, rockets, or other fire works, or shall cast, throw or fire any squibs, rockets, or other fire works within any of the said towns or boroughs without the governor’s special license for the same, every such person or persons so offending shall be subject to the like penalties and forfeitures, and be recovered in like manner, as in and by an act, passed in the eighth year of the reign of king George the first, entitled ‘An act for preventing accidents that may happen by fire are directed to be levied and recovered.]

John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721
[An Act for Preventing Accidents that may Happen by Fire, § IV. And whereas much mischief may happen by shooting of guns, throwing casting and firing of squibs, serpents, rockets, and other fire-works, within the city of Philadelphia, if not speedily prevented: Be it therefore enacted, That if any person or persons, of what sex, age, degree or quality soever, from and after publication hereof, shall fire any gun or other fire-arms, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire works, or shall cast, throw or or fire, any squibs, rockets, or other fire works, within the city of Philadelphia, without the governor’s special license for the same, of which license due notice shall first be given to the

mayor of the said city, such person or persons so offending, and being thereof convicted before any one justice of the peace of the said city, either by confession of the party so offending, or by the view of any of the said justices, or by the oath or affirmation of one or more witnesses, shall for every such offence forfeit and pay the sum of five shillings; one half to the use of the poor of the said city, and the other half to the use of him or them who shall prosecute, and cause such offender to be as aforesaid convicted; which forfeitures shall be levied by distress and sale of the offenders goods as aforesaid; and for want of such distress, if the offender refuse to pay the said forfeiture, he shall be committed to prison, for every such offence the space of two days without bail or main-prize; Provided, that such conviction be made within ten days after such offence committed [ and if such offender be a negro or Indian slave, he shall instead of imprisonment be publically whipped, at the discretion of the magistrate.]

1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries
That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, … within any of the said towns or boroughs without the Governor’s special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources.
1750
[Ordinances of the District of Southwark,] An Act for the More Effectual Preventing [of] Accidents, etc. § 1. Be it enacted, That if any person shall fire any gun or other fire-arm, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire-works, or shall cast, throw or fire any squibs, rockets or other fire-works, within any of the said towns or boroughs, without the Governor’s special license for the same, every such person or persons, so offending, shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, “ An Act for Preventing Accidents, Etc

1763 Pa. Laws 319, An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians, § 1.
If any person or persons whatsoever shall directly or indirectly give to, sell barter or exchange with any Indian or Indians whatsoever any guns, gunpowder, shot, bullets, lead or other warlike stores without license . . . every such person or persons so offending, being thereof legally convicted . . . shall forfeit and pay the sum of five hundred pounds . . . and shall be whipped with thirty-nine lashes on his bare back, well laid on, and be committed to the common gaol(jail) of the county, there to remain twelve months without bail or mainprise.

An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824
[An Ordinance for the Suppression of Nuisance, and for the regulation of drivers of carriages and horses, in and through the streets, lanes and alleys, within the incorporated part of the township of the Northern Liberties, and for enforcing useful regulations therein.] § 8. And be it further ordained and enacted by the authority aforesaid, That no person or persons shall fire, or discharge any cannon, or piece of artillery, or small arms, or prove any pistol, gun, musket barrels, or cannon, or illuminate, or cause to be illuminated, any house within the regulated parts, incorporated as aforesaid, in said township, without permission from the president of the board of commissioners, under the penalty of forfeiting and paying for every piece of cannon or other artillery, or small arms, or pistol, gun, or musket barrel so fired, or house so illuminated, the sum of two dollars.

1903 Pa. Laws 178, An Act Requiring non-resident hunters, and unnaturalized, foreign born, resident-hunters, to procure a license before hunting in the Commonwealth … §§1 and 2
§ 1. . . . every non-resident and every unnaturalized foreign-born resident of this Commonwealth shall be required to take out a license from the treasurer of the county in which he proposes to hunt. . . § 2. Possession of a gun, in the fields or in the forests or on the waters of this Commonwealth, by an unnaturalized, foreign-born resident or a non-resident of this Commonwealth, without having first secured the license required by this act, shall be prima facie evidence of a violation of its provisions; and any person so offending shall be liable to a penalty of twenty-five dollars for each offense. . .

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1 and 2
§ 1. Be it enacted, etc., That the term “machine gun” as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device. § 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years. § 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence. § 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this

act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1931 PA. Laws 498, No. 158
Sec. 4. No person who has been convicted in this Commonwealth or elsewhere of a crime of violence shall own a firearm, or have one in his possession or under his control.
Sec. 5. No person shall carry a firearm in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided. . . .
Section 7. The chief or head of any police force or police department of a city, and, elsewhere in this Commonwealth, the sheriff of a county, may, upon the application of any person, issue a license to such person to carry a firearm in a vehicle or concealed on or about his person within this Commonwealth for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper reason for carrying a firearm, and that he is a suitable person to be so licensed. . .[and] the reason given for desiring a license.

**RHODE ISLAND**

The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to the City Page 89-96, Image 89-96 (1854) Available at The Making of Modern Law: Primary Sources. 1821
An Act Regulating the Storage, Safe Keeping and Transportation of Gunpowder in the Town of Providence, (1821) § 2. And be it further enacted, That is shall not be lawful for any person or persons to sell any gunpowder which may at the time be within the town of Providence in any quantity, by wholesale or retail, without first having obtained from the town council of said town a license to sell gunpowder; and every such license shall be written or printed, and signed by the president of said council or their clerk, on a paper upon which shall be written or printed a copy of this act; and every such license shall be in force for one year from the date thereof, unless annulled by said council, and no longer; but such license may, prior to the expiration of that time, be renewed, by endorsement thereon, for a further term of one year, and so from year to year: provided, always, that the said town council may annul any such license, if in their opinion the person or persons licensed have forfeited the right of using the same by any violation of the law relative thereto; and every person who shall receive a license as aforesaid shall pay therefor the sum of five dollars, and on having the same renewed shall pay therefor the sum of one dollar, which shall be paid to the clerk of said council, for their use, for the purpose of defraying the expense of carrying this act into execution. § 3. And be it further enacted, That any person or

persons who shall keep, have, possess or transport any gunpowder within the town of Providence, contrary to the provisions of this act, or who shall sell any gunpowder therein, without having a license therefor, then in force, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding five hundred dollars, for each and every offence; and if any gunpowder kept contrary to the provisions of this act shall explode in any shop, store, dwelling-house, ware-house or other building, or in any place in said town, the occupant, tenant or owner of which has not a license in force to keep and sell gunpowder therein, or which gunpowder shall have been kept in a manner contrary to the terms and conditions of such license, such occupant tenant or owner shall forfeit and pay a fine of not less than twenty dollars nor more than five hundred dollars. . . § 6. And be it further enacted, That the said firewards, or any of them, may enter the store or place of any person or persons licensed to sell gunpowder, to examine and ascertain whether the laws relating thereto are strictly observed; and also whenever there may be an alarm or fire; and in such last case may cause the powder there deposited to be removed to a place of safety, or to be destroyed by wetting or otherwise, as the exigency of the case may require; and it shall be lawful for any one or more of the firewards aforesaid to enter any dwelling house, store, building or other place in said town to search for gunpowder which they may have reason to suspect to be concealed or unlawfully kept therein; first having obtained from some justice of the peace of said town a search warrant therefor; which warrant any one of the justices of said town is hereby respectively authorized to issue, upon the complaint of such fireward or firewards, supported by his or their oath or affirmation. . . And be it further enacted, That all persons who wish have a license to keep and sell gunpowder within the town shall make application to the town council in writing, stating the place of business and whether they wish to sell by wholesale or retail, or both; and to each person or firm who may be approbated, a certificate of license shall be granted, on payment of the fee established by law. § 14. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by retail, shall be allowed to keep in the place or building designated in the license, twenty-five pounds of gunpowder, and no more, at one time, which shall always be kept in tin or copper canisters, capable of containing no more than twelve and a half pounds each with a small aperture at the top, and a tin or copper cover thereto. § 15. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by wholesale, shall provide and keep a tine or copper chest, with two handles and a tight cover, furnished with a hinge, and secured with a padlock, all of tin or copper chest, with two handles and a tight cover furnished with a hinge and secured padlock, all of tin or copper; such chest shall always be kept on the lower floor, on the right side of and close to the principal door or entrance from the street into the building so licensed, except when otherwise designated by the council and shall always be kept locked, except when powder is put in or taken out; and such person or firm, so licensed shall be allowed to deposit and keep, in such tin or copper chest, a quantity of gunpowder not exceeding four casks of twenty-five pounds each; the heads of each cask not to be opened, and each cask to be kept in a strong leather bag, closely tied and marked as aforesaid. § 16. And be it further enacted, that every person or firm licensed to keep and sell gunpowder as aforesaid, by wholesale or retail, shall have and keep a signboard placed over the door or building in which such powder is kept, on which shall be painted in Roman capitals the words "Licensed to sell Gunpowder"

1902 R.I. Pub. Laws 67, An Act in addition to chapter 40 of the General Laws, Entitled "Of the Town Council": § 1.

Town councils and city councils may from time to time make and ordain all ordinances and regulations for their respective towns, not repugnant to law, which they may deem necessary for the safety of their inhabitants from the manufacture, storage, keeping, having in possession, transportation, sale, or use of gunpowder, gun-cotton, dynamite, nitro-glycerine, nitro-gelatine, lyddite, chlorate of potash, picric acid, sodium calcium carbide, acetylene gas, gasoline gas, and any and all other explosives and explosive chemicals; and may prohibit the manufacture, storage, keeping having in possession, transportation , sale , or use by any and all persons or persons of any or all said substances and gases in their respective towns, unless a license for the same shall be first obtained from the town council or board of aldermen, which license shall be for the term of one years from the date thereof unless sooner revoked by order of said town council or board of aldermen. Any person violating any provision of any such ordinance or regulation, or any such prohibition, shall be fined not less than twenty dollars nor more than one hundred dollars for each such offense.

1907 R.I. Pub. Laws 66, An Act for the Protection of Deer
§ 1. It shall be unlawful to pursue or shoot deer in this state except in accordance with the provisions of this act. § 2. Any person owning or occupying any farm or orchard and any person in his employ may, while on his own premises or the premises of his employer, kill any deer which shall be found destroying any crops, vegatables, or fruit trees belonging to such person or his employer: Provided, however, that no such person shall shoot any deer unless he has obtained from the secretary of state a permit so to do; and the secretary of state shall, upon application, issue to any responsible land owner, or his employees, a permit authorizing such person to shoot deer in accordance with the provisions of this section. No person shall pursue or shoot any deer except with a shot gun, or employ any missile larger than buck shot. § 3. Any person violating the provisions of this act shall be fined not less than one hundred dollars nor more than five hundred dollars for each offence.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: § § 1, 4, 5 and 6
§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly.
§ 2. If any person shall commit or attempt to commit a crime of violence when armed with or having available any firearm, he may in addition to the punishment provided for such crime of violence be punished as provided in this act. In the trial of a person for committing or attempting to commit a crime of violence the fact that he was armed with or had available a pistol without license to carry the same, or was armed with or had available a machine gun, shall be prima facie evidence of his intention to commit said crime of violence.

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act. § 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another. § 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, <u>if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed</u>. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the fingerprint, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.
§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.
§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

## <u>SOUTH CAROLINA</u>

1731-43 S.C. Acts 168, § 23. 1740

It shall not be lawful for any slave, unless in the presence of some white person, to carry or make use of firearms or any offensive weapon whatsoever, unless such negro or slave shall have a ticket or license in writing from his master, mistress or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed once every month, or unless there be some white person of the age of 16 or upwards, in the company of such slave when he is hunting or shooting; or that such slave be actually carrying his masters arms to or from his masters plantation, by a special ticket, for that purpose, or unless such slave be found in the day time actually keeping off rice birds, or other birds within the plantation to which such slave belongs, lodging the same gun at night within the dwelling house of his master, mistress or white overseer. And provided also that no negro or other slave shall have liberty to carry any guns, cutlass, pistol or other weapon abroad form at any time between Saturday evening after sunset and Monday morning before sunrise notwithstanding a license or ticket for so doing. And in case any person shall find any slave using or carrying fire-arms, or other offensive weapons, contrary to the true intention of this act; every such person may lawfully seize and take away such fire-arms or offensive weapons; but before the property of such goods shall be vested in the person who shall seize the same, such person shall, within 48 hours next after such seizure, go before the next justice of the peace, and shall make oath of the manner of the taking; and if such justice of the peace after such oath shall be made, or upon any other examination, he shall be satisfied, that the said fire-arms or other offensive weapons, shall have been seized according to the directions and agreeable to the true intent and meaning of this act, the said justice shall, by certificate under his hand and seal, declare them forfeited, and that the property is lawfully vested in the person who seized the same. Provided that no such certificate shall be granted by any justice of the peace until the owner or owners of such fire-arms or other offensive weapons so to be seized as aforesaid, or the overseer or overseers who shall or may have the charge of such slave or slaves from, whom such fire-arms or other offensive weapons shall be taken or seized shall be duly summoned, to show cause (if any such they have) why the same should not be condemned as forfeited; or until 48 hours after the service of such summons and oath made of the service thereof before the said justice.

Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802
[Ordinances of the City of Charleston, An Ordinance for Appointing Commissioners of the Streets, Defining their Powers, and for other Purposes therein Mentioned, § 8. And be it further ordained by the authority aforesaid, That no person or persons, shall fire any squibs, crackers, or other fireworks, except at times of public rejoicing, and at such places as the intendant for the time being may permit, by license under his hand; nor burn any chips, shavings, or other combustible matters, in any of the streets, lanes, wharves, alleys, or open or enclosed lots of the city, nor fire any gun, pistol, or fire arms, within the limits of the city, except on occasion of some military parade, and then by the order of some officer having the command, under the penalty of ten dollars, for every such offense; nor shall any person or persons, raise or fly any paper or other kite, within the said city, under the said penalty of ten dollars.]

John E. Breazeale, The Revised Statutes of South Carolina, Containing the Code of Civil Procedure, and the Criminal Statutes. Also The Constitutions of the United States and of the

State, and the Rules of the Supreme and of the Circuit Courts of the State Page 431, Image 529 (Vol. 2, 1894) available at The Making of Modern Law: Primary Sources. 1890
Chapter XXVIII Violations of the License Laws by Insurance and Other Companies, Emigrant Agents, owners or shows, etc., Persons Selling Pistols, etc. §490. No person or corporation within the limits of this State shall sell or offer for sale any pistol, rifle, cartridge or pistol cartridge less than .45 caliber, or metal knuckles, without first obtaining a license from the county in which such person or corporation is doing business so to do. The County Board of Commissioners of the several Counties of this State are authorized to issue licenses in their respective Counties for the sale of pistols and pistol and rifle cartridges of less than .45 caliber, and metal knuckles, upon the payment to the County Treasurer by the person or corporation so applying for said license of the sum of twenty-five dollars annually; and any person who shall sell or offer for sale any pistol, or pistol or rifle cartridge of less than .45 caliber, or metal knuckles, without having obtained the license provided in this Section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding one year, or both, at the discretion of the court.

1893 S.C. Acts 426, An Act To Amend An Act Entitled “An Act To Provide For A License For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State”, § 2
. . . That the County Commissioners of the Several Counties of the State be, and they are herby, authorized to issue licenses in their respective Counties for the sale of pistols and pistol cartridges upon the payment to County Treasurer by the person or corporation so applying for said licenses of the sum of twenty-five dollars annually.

1923 S.C. Acts 19-20, License Tax on Ammunition — Candy — Admissions — Regulations to have force of law.
That every person, firm or corporation doing business within the State of South Carolina and engaging in the business of selling at retail or in any individual instance selling to the final consumer, such articles as are named in this section, for the privilege of carrying on such business, shall be subject to the payment of a license tax which shall be measured by and graduated in accordance with the volume of sales of such person, firm or corporation as follows: (a) There shall be levied, assessed, collected and paid upon all ammunition, including shells for shotguns and cartridges for rifles, pistols, revolvers, automatic pistols, rifles and machine guns, and upon such shells and cartridges partially prepared for use but lacking powder or shot or other necessary constituent, and upon blank shells and cartridges (but not upon powder or shot or caps not prepared and not in form to use in modern firearms), when sold at retail or to the ultimate consumer, the following: Upon all shotgun or other shells, two ($2.00) dollars per thousand rounds; Upon all cartridges, twenty-five (25) caliber or greater, two ($2.00) dollars per thousand rounds. (b) The license taxes imposed upon ammunition shall be paid by stamps to be affixed and cancelled by the retailer or other final seller, and said stamps shall be affixed to the smallest container in which or from which articles are sold, as soon as the original packages are opened or broken, or if received in no other form than that in which sold, as soon as the containers are placed in the place of business of the retailer; in the case of articles inteneded for sale in the packages in which received from outside the State of South Carolina without opening or alteration of any sort, each package must be immediately marked with the date of receipt and the place from which received and no stamps need be affixed so long as such package remains unopened and unaltered.

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6. § 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device. § 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun. § 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store, keep, possess, or have in possession, except as hereinafter provided, any firearm of the type defined above or commonly known as a machine gun. § 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun. § 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permiteed by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign

to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued. § 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

**SOUTH DAKOTA**

1899 S.D. Sess. Laws 112, An Act For The Protection Of Game And The Appointment Of Wardens, And The Licensing Of Hunters And Prescribing Penalties For The Violation Of Its Provisions, pt. 3
At any time kills or shoots any wild duck, goose or brant with any swivel gun or other gun, except as is commonly shot from the shoulder, or in hunting such birds makes us of any artificial light or battery. . .

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.
§ 1. “machine gun” applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. “Crime of Violence” apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation. § 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years. § 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years. § 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof. § 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found. § 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific

purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive. § 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment. § 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of State, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and <u>the purpose for which, the gun was acquired</u>. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

**<u>TENNESSEE</u>**

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 148-149, Image 149-150 (1863) available at The Making of Modern Law: Primary Sources. 1863 [Ordinances of the City of Memphis, Shooting Galleries, § 1. That no person or persons shall set up or use any pistol gallery, or place for the discharging of pistols, guns or other firearms in the first story of any building in the city; nor shall any gallery be used in any manner involving risk or danger to any person in the city; nor shall any person setting up or using such pistol gallery be exempt from the ordinance and penalties now in force, for discharging or shooting any pistol, gun or firearms within the city limits, until such person or persons have applied and paid for license to set up and use such pistol gallery, according to the provisions of this ordinance. § 2. That the person or persons applying for license to keep such pistol gallery, shall, at the time of obtaining such license, enter into bond with good security, to be approved by the City Register, in the sum of three thousand dollars, payable as other city bonds, conditioned that no gambling of any kind be permitted in such pistol gallery, or in the room used for such pistol gallery, or any room adjacent thereto, under the control and connected with said pistol gallery, or its proprietors or keepers; and that all shooting or discharging of firearms shall be done only with the perfect security against any harm to persons or property in the vicinity of such pistol gallery; such penalty to be recoverable for every violation of this section of this ordinance, and of the conditions of said bond. § 3. That the proprietors or persons keeping such pistol gallery shall not permit any minors to shoot in such gallery without the written consent of the lawful guardian of

such minor, unless such guardian be personally present, and consenting to such shooting; nor shall the proprietors or keepers of such gallery permit any shooting in the same after eleven o'clock at night, or on Sunday, nor shall such shooting gallery be allowed to be kept open for shooting after eleven o'clock at night or on Sunday. Any violation of this ordinance is hereby declared a misdemeanor, and each offender, on conviction shall be fined in any sum not less than five nor more than fifty dollars for any violation of this ordinance, recoverable as other fines. § 4. Any person or persons shall before putting up or using such pistol or shooting gallery, first apply for, and obtain license, as other licenses are obtained, and shall pay for such license the sum of one hundred dollars per annum for each and every pistol or shooting gallery establishment under the provision of this ordinance. § 5. That the board of Mayor and Aldermen retain the power and right to, at any time, repeal this ordinance and revoke and recall any license to keep a pistol gallery, by refunding a pro rata part of the amount paid for any license then outstanding.]

1879 Tenn. Pub. Acts 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1.
It shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol; Provided that this act shall not be enforced against any persons now having license to sell such articles until the expiration of such present license.

**TEXAS**

Charter and Revised Ordinances of the City of Galveston, and All Ordinances in Force to April 2d, 1872 Page 94, Image 107 (1873) available at The Making of Modern Law: Primary Sources. 1872
[Ordinances of the City of Galveston, Taxes – License Tax and Ad-Valorem Tax,] Art. 418, § 26. Every keeper of a billiard or other like table, for public use, a tax of twenty dollars for each and every table so kept; and every keeper of a tenpin alley, a tax of thirty dollars for each and every alley so kept for public use. Every keeper of a pistol or rifle gallery, a tax of twenty-five dollars.

Revised Ordinances of the City of Fort Worth, Texas, 1873-1884 Page 64-65, Image 62-63 (1885) available at The Making of Modern Law: Primary Sources. 1880
Ordinances of the City of Fort Worth, An Ordinance prohibiting the shooting off, firing or discharging of Fire-arms; the firing, exploding or setting off of Squibs, Firecrackers, Torpedoes, Roman Candles, Sky-rockets or other things containing powder or other explosive matter, or the throwing of any fire balls, or making of any bon-fires in the corporate limits of the City of Fort Worth. Be it ordained by the City Council of the City of Fort Worth: § 1. It shall be unlawful for any person or persons to shoot off, fire, or discharge any gun, pistol, revolver or any firearm of any description, or to fire, explode or set off any squib, firecracker, torpedo, roman candle, sky-rocket, or other thing containing powder or other explosive matter, or to throw any fire-ball or make any bon-fire in the corporate limits of this city, and that any person or persons violating the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be fined in any sum not less than one dollar nor more than one hundred dollars. Provided that this shall not apply to any licensed shooting gallery nor to the shooting of dogs running at large in violation of the city ordinances

The Laws of Texas 1822-1897. Austin's Colonization Law and Contract; Mexican Constitution of 1824; Federal Colonization Law; Colonization Laws of Coahuila and Texas; Colonization Law of State of Tamaulipas; Fredonian Declaration of Indpendence; Laws and Decrees, with Constitution of Coahuila and Texas; San Felipe Convention; Journals of the Consultation; Proceedings of the General Council; Goliad Declaration of Independence; Journals of the Convention at Washington; Ordinances and Decrees of the Consultation; Declaration of Independence; Constitution of the Republic; Laws, General and Special, of the Republic; Annexation Resolution of the United States; Ratification of the Same by Texas; Constitution of the United States; Constitutions of the State of Texas, with All the Laws, General and Special, Passed Thereunder, Including Ordinances, Decrees, and Resolutions, with the Constitution of the Confederate States and the Reconstruction Acts of Congress Page 234-235, Image 734-735 (Vol. 6, 1898) available at The Making of Modern Law: Primary Sources. 1898
[An Act to Incorporate the Town of Round Top, County of Fayette, . . . Article Tenth. That from and after the passage of this act it shall be unlawful to fire any pistol, rifle, shot gun, or other kind of fire-arms, within the limits of the town of Round Top, and any person violating this act shall be guilty of a misdemeanor, and on conviction thereof shall be fined not less than five nor more than twenty-five dollars, to be collected by the mayor of the town; but this act shall not prevent any gunsmith, within the limits of the town, from discharging on the premises thereof, fire-arms made or repaired in his shop, for the purpose of training such fire-arms; provided, that none but gunsmiths shall have the privilege of being authorized to discharge fire-arms; and for that purpose each gunsmith shall build a rock wall, in front of which he shall cause a target to be placed, The mayor shall issue a permit to any gunsmith applying for the same, for the period of one year, which permit may be renewed after its expiration.]

Revised Ordinances of the City of Victoria Texas Page 75, Image 77 (1899) available at The Making of Modern Law: Primary Sources. 1899
[Ordinances of the City of Victoria,] Revised Penal Ordinances: Discharging Firearms, § 1. If any person shall discharge any gun, pistol or firearm of any description on or across any public square, street or alley, or elsewhere within the corporate limits of the City of Victoria, whether the premises on or across which such fire arm is discharged be public or private he shall be fined in any sum not to exceed ten dollars. § 2. Exceptions. The provisions of the foregoing section shall not be construed to apply to gunsmiths discharging fire arms brought to them for repairs, or to training guns or pistols of their own make, when done with the permission and at a place approved by the City Marshal; nor shall parties shooting in galleries licensed by the city come within the meaning of the preceding article. § 3. If any person shall discharge any gun, pistol or fire arm of any description as alarm for fire, or upon the discovery of any fire, or during the progress of any fire, he shall be fined in any sum not to exceed twenty-five dollars.

1919 Tex. Gen. Laws 297-98, An Act to Preserve, Propagate, Distribute, and Protect the Wild Game, Wild Birds, Wild Fowl of the State . . . , ch. 157, § 42.
It shall be unlawful for any citizen of this State to hunt outside of the county of his residence with a gun without first having procured from the Game, Fish and Oyster Commissioner or one of his deputies or from the County Clerk of the County in which he resides a license to hunt, and for which he shall pay to the officer from whom he secures such license the sum of two ($2.00) dollars. . . Any person hunting any game or birds protected by the laws of the State, and who

shall refuse to show his license herein provided for to any sheriff . . . on demand shall be deemed guilty of a violation of the provisions of this law, and any person violating any of the provisions of this Section shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum of not less than ten (10.00) dollars nor more than one hundred (100.00) dollars.

1931 Tex. Gen. Laws 447, Occupation Tax on Sale of Pistols, ch. 267, 3, 447 (requiring retail dealers to keep registries of sales of firearms).

**UTAH**

An Ordinance Prohibiting the Sale of Arms, Ammunition, or Spiritous Liquors to the Indians, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 63 (Henry McEwan 1866). 1850
"Sec. 1. Be it ordained by the General Assembly of the State of Deseret: That if any person shall hereafter trade or give any guns, rifles, pistols or any other deadly weapons, ammunition or spirituous liquors to any Indian, without having a license, he shall, on conviction thereof before any Justice of the Peace, he fined in a sum not exceeding one hundred dollars for each offense, and also forfeit all the property received from the Indian, which shall be sold and the proceeds thereof paid into the public treasury."

Revised Ordinances and Resolutions of the City Council of Salt Lake City, in the Territory of Utah, with Congressional and Territorial Laws on Townsites and Great Salt Lake City Charter, and Amendments Page 161-162, Image 196-197 (1875) available at The Making of Modern Law: Primary Sources. 1875
Ordinances of Salt Lake City, Relating to Gunpowder, Gun Cotton and Nitro-Glycerine, § 1. Be it ordained, by the City Council of Salt Lake City, that it shall not be lawful for any person or persons to keep, sell or give away, gunpowder, gun-cotton, or nitro-glycerine, in any quantity without permission of the City Council; Provided, any person may keep, for his own use, not exceeding five pounds of gun powder, one pound of gun cotton, or one ounce of nitro-glycerine. § 2. All permits , when issued , shall be registered by the Recorder, and shall state the name and place of business, and date of permit, and the same shall not be granted for a longer time than one year; and no person to whom any permits may be issued, shall have or keep, at his place of business or elsewhere, within the city, (except in such places as may be approved by the City Council), a greater quantity of gunpowder or guncotton than twenty-five pounds, and the same shall be kept in tin canisters or cases, and nitro-glycerine not to exceed five ounces, and in a situation remote from fires lighted lamps or candles. Nor shall any person sell or weigh gunpowder, gun cotton, or nitro-glycerine, after the lighting of lamps or gas in the evening , unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word gunpowder painted or printed thereon in large letters. § 3. No person shall convey or carry any gunpowder exceeding one pound in quantity through any street or alley in the city, unless the said gunpowder is secured in tight cans, kegs or cases, sufficient to prevent the same from being spilled or scattered , and in no quantity exceeding one hundred pounds, except under the direction of a police officer. § 4. A violation of any clause of this ordinance shall subject the offender to a fine, for each offence, in any sum not exceeding one hundred dollars.

The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888)
Dangerous and Concealed Weapons.
SEC. 14. Any person who shall carry any slingshot, or any concealed deadly weapon , without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

1905 Utah Laws 197, An Act for the Protection of Fish, Game, and Birds . . . , ch. 118, § 30.
It shall be unlawful for any non-resident person or for resident who is not a citizen of the United States to kill any game, animals, birds or fish in this State, without first having procured the license to do so hereinafter provided for. Any non-resident person or any resident who is not a citizen of the United States, upon the payment to the State Commissioner, of the sum of twenty-five dollars, shall be entitled to receive a license, from said commissioner, which will entitle him to hunt and kill game, animals, birds and fish, for the period of one year subject to all the laws of this State for the protection of fish and game.

## **<u>VERMONT</u>**

Act of Incorporation and By-Laws of the Village of Bradford Page 14, Image 15 (1890 ) available at The Making of Modern Law: Primary Sources. 1890
[Ordinances of the Village of Bradford] By-laws, Miscellaneous, § 6. Any person who shall fire any cannon, swivel gun, pistol, torpedo, squib, cracker, or throw any fire ball, in any street, alley or lane, except by permission of the trustees, shall be fined five dollars.

Act of Incorporation and By-Laws of the Village of Bradford. 1890 Page 12-13, Image 13-14 (1891) available at The Making of Modern Law: Primary Sources.
Ordinances of the Village of Bradford, § 11. The Trustees may grant licenses, for one year or less, to keep gun powder or gun cotton or other explosives for sale, if in their opinion the public safety is not endangered thereby. Said gun powder or gun cotton or other explosive shall be kept in close tin canisters which shall only be opened in the day time. § 12. The license shall specify the quantity allowed and the place where such gun powder or gun cotton and other explosives shall be kept, and on every building in which such gunpowder or gun cotton or other explosives is kept for sale shall be placed in a conspicuous position a sign with the words, “Licensed to sell Powder,” printed or painted thereon. § 13. The Trustees may also grant licenses to store gun powder and other explosives in larger quantities in places used for no other purpose which they consider at a safe distance from other buildings. § 14. The Trustees may at any time inspect the premises where gun powder, gun cotton and other explosives are kept, in order to satisfy themselves that the regulations are complied with. § 15. Any person who shall without license keep in any building in the Village any nitro-glycerine, or more than half a pound of gun powder or two ounces of gun cotton, which shall be only for his own use, shall be fined five dollars for every day so offending. § 16. All licenses granted by the Trustees by virtue of these by-laws shall be signed by a majority of the Trustees and recorded in the office of the Clerk of the Corporation at the expense of the person licensed and shall not become valid until so recorded. § 17. The Trustees are authorized to revoke any license mentioned in these by-laws, whether granted by themselves or their predecessors in office, whenever in their opinion the public good requires it. Such revocation shall be recorded in the Clerk’s office, and shall become operative

whenever the Trustees shall deliver a written notice thereof to the person whose license is revoked.

Act of Incorporation and By-Laws of the Village of Northfield Page 19-20, Image 19-20 (1894) available at The Making of Modern Law: Primary Sources. 1894
Regulations for Handling Explosives, Artcle XV., § 1. No person shall at any time keep within the limits of said Village, any powder, or guncotton, without a written license, signed by a majority of the trustees, who shall have discretionary power to grant the same for retailing purposes ; not, however, exceeding twenty pounds shall be kept in any one building at a time, and that to be kept in close metal cans, or flasks, which are not to be opened except in the day time, Said license specify the building, or place where said powder or guncotton shall or may be kept, the quantity such person may keep, and shall be conditional that any Trustee may at any time make inspection of the quantity of powder or gun-cotton kept, and the manner of keeping the same; said license to be in force until revoked by a majority of the Trustees. And it shall be the duty of the person or persons so licensed to procure said license to be recorded in the records of said Village, and to put up, in some conspicuous place on every building within the limits of the Village in which he has powder or guncotton stored, a sign with the words “LICENSED TO SELL GUNPOWDER.” Provided, that a majority of the Trustees may grant license for storing or keeping larger quantities, and that any person may keep not over two pounds which shall be kept in a metallic flask or a powder horn. Article XVI. PENALTY FOR VIOLATION OF ABOVE ARTICLE. § 1. If any person shall keep, without a license therefore, or as provided in the XVth article, any powder, or gun cotton, or either of said articles, or shall keep either of said articles in any buildings or places except those mentioned in his license, he shall forfeit and pay to the treasurer of said Village Five dollars for each day said powder or guncotton shall be suffered to remain within the limits of said village.

Quoted in Brief of Amicus Curiae Patrick J. Charles at App. 13, N.Y. State Rifle & Pistol Ass’n, v. City of New York (Ordinances of the City of Barre, Vermont). 1895
CHAPTER 16, SEC. 18. No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.

1908 Vermont Session Laws 132, § 1.
No person shall at any time hunt, shoot, pursue, take or kill any of the wild animals, wild fowl or birds of this state, nor use a gun for hunting the same, without having first procured a license therefor as hereinafter provided, and then only during the respective periods of the year when it shall be lawful, and subject to all the provisions of chapter 220 of the Public Statutes. . .

**<u>VIRGINIA</u>**

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources. 1792
[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] § 8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense. § 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

1805 Va. Acts 51, An Act Concerning Free Negroes and Mulatoes
That no free negro or mulato shall be suffered to keep or carry any firelock of any kind… without first obtaining a license from the court…

1806 Va. Acts 51, ch. 94
Required every "free negro or mulatto" to first obtain a license before carrying or keeping "any fire-lock of any kind, any military weapon, or any powder or lead."

The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859
[Ordinances of Richmond,] Nuisances Not in Streets, § 11. If any person shall sell, or expose for sale in this city, any torpedos, popcrackers, squibs, or other fire-works, of any kind whatever, except in packages containing each at least one hundred, or shall without permission in writing from the mayor, discharge, or set off, in any street or alley of the city, any balloon, rocket, torpedo, popcracker, fireworks or any combination of gunpowder, or any other combustible or dangerous material; or if any person shall, except under the fortieth section of the ordinance concerning streets, without necessity fire or discharge in this city any cannon, gun, pistol, or other fire-arms of any kind, or shall make therein any unusual noise, whereby the inhabitants thereof may be alarmed, or raise or fly a kite in this city, or if any auctioneer shall use any bell or herald to notify the public of any sale, except of real property, every such person herein offending, shall pay a fine of not less than one nor more than twenty dollars.

RICHMOND, THE CHARTER OF THE CITY, ch. 48, §§ 16-18 & 46-47 (sine nomine 1938) (Laws Passed From 1899 to 1934). 1899.

"CHAPTER 48
CONCERNING VARIOUS NUISANCES…

…15. No minor shall have, keep or carry in the streets, alleys, lanes or parks of the city any toy pistol or toy rifle adapted to the use of explosive caps, cartridges or pellets, or which, by means of explosives, pneumatic pressure or mechanical contrivance, expels or discharges any ball, missile or projectile; nor shall any minor have, keep or carry upon the streets, alleys, lanes or parks of the city any firearms of any kind or description whatever. Any violation of any of the provisions of this section shall subject the offender to a fine of not less than five nor more than ten dollars, to be imposed, upon conviction, by the police justices, as the case may be. (April 10, 1903.)

16. No person shall sell, give, present or lend to any minor in the city, any toy pistol or toy rifle adapted to the use of explosive caps, cartridges or pellets, or which by means of explosives, pneumatic pressure or mechanical contrivance expels or discharges any ball, missile or projectile, nor any firearms of any description whatever; nor shall any person sell or give to any minor loaded cartridges, blanks or explosive caps of any character whatever. Any person violating the provisions of this section shall, upon conviction in either of the police courts, be fined not less than ten nor more than twenty dollars. (March 11, 1920.)

17. That all dealers in firearms and other deadly weapons shall keep an accurate register of the number and character of the weapons purchased, name of person from whom purchased and date of purchase, and likewise keep an accurate record of each sale of such deadly weapons, which shall show the date of sale, the name of the purchaser and the number and character of the weapon, which records shall be open to the inspection of any police officer of the city of Richmond, and a copy of which shall be made and certified by such dealer monthly to the chief of police of the city of Richmond. Any person violating the provisions of this section shall be liable to a fine of not less than five dollars nor more than twenty-five dollars for each offense, recoverable before the police justices of the city of Richmond, as the case may be. (May 11, 1916.)

18. No person, firm or incorporated company shall keep in any house in the city any loaded shell or shot or any explosive material of any sort not authorized by ordinance. And any person, firm or incorporated company violating the provisions of this section shall be fined not less than twenty dollars nor more than one hundred dollars, and each day on which the same is kept in the city shall be a distinct offense, and punishable as such. (Code 1899.)…

…46. No person shall sell or exchange within the city limits of Richmond, any pistol, dirk, bowie knife, sling shot or any weapon of a like kind, or pistol or rifle ammunition, unless and until he shall first have obtained a permit to be granted by the chief of police, to sell or exchange such weapon and such permit shall be exhibited to the person to whom such weapon is sold or exchanged, and on request shall be exhibited for inspection by any police officer of the city of Richmond.

(a) No person shall purchase, or otherwise procure as his own property or for temporary use any pistol, dirk, bowie knife, sling shot or any weapon of a like kind, or pistol or rifle ammunition, unless and until he shall procure a permit from the chief of police granting permission to make such purchase or to procure the same for use as aforesaid, which permit shall be filed with the person from whom such purchase or exchange is made; provided, that nothing in this section shall apply to the sale or exchange of low power rifles or rifle ammunition known or designated as 22-calibre, commonly used for target practice purposes.

(b) Any person violating the provisions of this section shall be liable to a fine of not less than twenty-five nor more than one hundred dollars for each offense, recoverable before one of the police justices of the city of Richmond. (August 16, 1924.)

47. If any person carry about his person hid from common observation, any pistol, dirk, bowie knife, razor, sling shot, metal knucks or any weapon of like kind, he shall upon conviction thereof, be fined not less than one hundred dollars nor more than five hundred dollars or by imprisonment in jail for not less than six months, or by both such fine and imprisonment, such penalties to be imposed by the police justices of the city of Richmond as the case may be, but this ordinance shall not apply to any police officer, town or city sergeant, constable, sheriff, notary public, conservator of the peace, or to carriers of the United States mail in rural districts, or collecting officer while in the discharge of his official duty, provided, the circuit court of any county in term time, and any corporation court in term time, upon written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapons, may grant such permission for one year. The order making same shall be entered in the law order book of such court. (August 15, 1934.)"

The Charter of the City of Richmond as Amended to July 1, 1938 (Richmond, VA: s.n., 1939), 815-16 & 828-29. Chapter 48—Concerning Various Nuisances, §§ 16-18 & 46-47. Laws passed from 1899 to August 15, 1934.

1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780

If any person carry about his person, hid from common observation, any pistol, dirk, bowie knife, razor, slungshot, or any weapon of like kind he shall be fined not less than twenty dollars nor more than one hundred dollars, or be committed to jail not more than thirty days, or both, in the discretion of the court, or jury, trying the case: and such pistol, dirk, bowie knife, razor, slungshot, or any weapon of like kind, shall be forfeited to the Commonwealth and may be seized by an officer as forfeited. Upon conviction of the offender the said weapon shall be sold by the officer and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety; provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, collecting officer while in the discharge of his official duty: provided the judge of any circuit or hustings court in term time, upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon may grant such permission for one year; the order making same shall be entered in the order book of such court.

1926 Va. Acts. 285-87, CHAP. 158-An ACT to improve a license tax on pistols and revolvers; to regulate the sale thereof and of ammunition therefor; and to provide that the proceeds of such tax shall be used for the establishment of a diseased and crippled children's hospital, §§ 1-9.

1. Be it enacted by the general assembly of Virginia, That it shall be the duty of every person residing in this State and owning a pistol or revolver therein, to pay on or before the first day of January of each year a license tax of one dollar on each pistol or revolver so owned, or in the event that such pistol or revolver shall be acquired by any such person on or after the first day of February, such license tax shall be forthwith paid thereon. The application for the license shall give the name of the owner, and the number, make and calibre [sic] of such pistol or revolver, which shall be set forth in the license. All pistol or revolver licenses shall run from the first day of January to the first day of the following January. Such license taxes shall be paid to the

treasurer of the city or county whrein the said owner resides, and the said treasurer shall not receive more for handling the funds arising from the tax imposed by this act than he receives for handling other State funds. The treasurers shall not receive compensation for their services in issuing the license cards herein provided for. Upon payment of the tax provided for in this section the person paying the same shall be entitled to a license card therefor, showing the year for which the license is paid, the county or city issuing the card, the serial number of the license, and the number, calibre [sic], make and owner of the pistol or revolver. When the license card is issued the treasurer shall record the name of the owner of the pistol or revolver, and the number, calibre [sic] and make thereof with the number of the license, in a book prepared for the purpose. The license cards and book shall be furnished by the boards herein provided and shall be paid out of the funds derived from the pistol and revolver licenses. If any such card should be lost the owner of the card shall pay to the treasurer twenty-five cents for a duplicate card.
2. It shall be the duty of every retailer selling a pistol or revolver in this State, at the time of such sale, to keep a record of the name and address of the purchaser and the number, make and calibre [sic] of the pistol or revolver, and to report once a month to the treasurer of his county or city the names of such purchasers, if any, together with the number, make and calibre [sic] of each pistol or revolver purchased; and all persons receiving or having in their possession a pistol or revolver for the purpose of repairing the same shall report to the treasurer of his county or city once a month giving the name and address of the owner and the calibre [sic], make and serial number of such pistol or revolver.
3. It shall be unlawful for any retailer in this State to sell ammunition for any pistol or revolver to any person unless the person desiring to make such purchase displays the license card for the current year provided for in this act.
4. Any person violating any provision of this act or using a license card not issued to him, for the purpose of purchasing ammunition, or using a license card for the purchase of pistol or revolver ammunition unless the ammunition is intended to be used for the weapon mentioned in the license card shall be guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than fifty dollars, or sentenced to the State convict road force for not less than thirty or not more than sixty days, or both, in the discretion of the tribunal trying the case.
5. The provisions of this act shall not apply to any officer authorized by law to carry a pistol or revolver nor to the pistol or revolver of such officer when such pistol or revolver is carried in discharge of his official duty, except that every officer shall list his pistol or revolver with the treasurer of his county or city annually by January first; nor to a pistol of an obsolete type kept as a souvenir, memento or relic, such as cap and ball type, etcetera, or souvenir used or captured by any person or relative in any war. But such pistol shall be registered as herein provided, upon satisfactory proof to the officer issuing such license that the pistol in question comes properly within this exception, in which case, no license tax shall be charged.
6. The tax hereby imposed shall be in lieu of all other taxes on such pistols and revolvers; but nothing in this act shall be construed to apply to such weapons in the stocks of licensed wholesaler or retailers.
7. All funds arising from pistol and revolver licenses, except as hereinbefore provided, shall be kept separate from other funds and shall be paid into the State treasury to establish a fund known as the diseased and crippled children's hospital fund, which shall be used for the purpose of establishing and maintaining within the State at such place or places as may be selected by the board hereinafter provided for, a hospital or hospitals for the care, treatment and vocational

training of diseased and crippled children resident in Virginia, or for any such rehabilitation work that the board may deem wise.

Each treasurer shall between the first and fifteenth of July and between the first and fifteenth of January report to the auditor of public accounts collections, which he is required to make by this act, and shall at the same time pay into the State treasury the amount collected less the commissions which he is authorized to retain for collecting same as provided for in this act, and the auditor of public accounts shall keep said funds separate from other funds to be designated and known as "the diseased and cripple children's hospital fund."

8. The administration of the aid fund shall be under the direction of a board of seven physicians to be appointed by the governor. . . . [Description of board and its functions].

9. The State treasurer shall make payments from the fund hereinabove created on warrants from the auditor of public accounts, issued on vouchers certified by the chairman of the board hereinabove created on authority of the board.

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, . . .

§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.

§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and <u>the purpose for which it was acquired by the person to whom the machine gun was sold</u>. . .

**<u>WASHINGTON STATE</u>**

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

1881 Wash. Sess. Laws 93, An Act to Incorporate the City of Dayton, chap. 2, § 20.
The city of Dayton shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation, storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

1881 Wash. Sess. Laws 121-22, An Act to Incorporate the City of Port Townsend, ch. 2, § 21.
The City of Port Townsend has power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation and keeping of gunpowder, or other combustibles, and to provide or license magazines for the same[.]

1883 Wash. Sess. Laws 161, An Act to Incorporate the City of Ellensburgh, ch. 2, § 20.
The city of Ellensburg shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy . . . to regulate the transportation storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

Del Cary Smith, Ordinances of the City of Port Townsend, Washington, Comprising the General Ordinances of the City, Together with the Private Ordinances Now in Force Page 27, Image 28 (1890) available at The Making of Modern Law: Primary Sources. 1890
[Ordinances of Port Townsend, WA,] Division III, Offenses Against Public Safety, Convenience and Health, § 15. Whoever shall fire or discharge any cannon, gun, pistol revolver or any firearm of any description, or shall fire, or explode or set off any squib, firecracker, torpedo or other thing containing powder or other explosive material, without permission from the Mayor or common council so to do, within the city limits, shall, on conviction, be punished by a fine of not less than five nor more than twenty dollars; provided that such permission, when given, shall definitely limit the time of such firing, and may at any time be revoked. But nothing in this section shall prevent the ordinary and usual fireworks demonstration on National holidays; subject, however, to such regulation, control and orders as the City Marshal may deem proper to make for the protection of property from fire.

Albert R Heilig, Ordinances of the City of Tacoma, Washington Page 334, Image 335 (1892) available at The Making of Modern Law: Primary Sources. 1892
Ordinances of Tacoma, Defining Disorderly persons and Prescribing the Punishment for disorderly conduct within the city of Tacoma, § 1. . . . All persons (except police officers as aforesaid) who shall draw, exhibit or attempt to use any deadly weapon upon, to or against another person, in said city with intent to do bodily injury to such person; and All persons (except peace officers as aforesaid and persons practicing at target shooting in a shooting gallery duly licensed) who shall, within the city limits, fire off or discharge any gun, pistol or fire arm of any kind, or bomb, shall be deemed and are disorderly persons, and guilty of a misdemeanor.

Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895
ORDINANCE No. A544. AN ORDINANCE TO PUNISH THE CARRYING OF CONCEALED WEAPONS WITHIN THE CITY OF SPOKANE.
The City of Spokane does ordain as follows:
SECTION I. If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife ), or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons.
SECTION 2. This ordinance shall take effect and be in force ten days after its passage.
Passed the City Council January 2, 1895.

1911 Wash. Sess. Laws 303, An Act Relating to the Carrying of Firearms, Requiring Licenses of Certain Persons, and Fixing a Penalty for the Violation Thereof, ch. 52, § 1.
It shall be unlawful for any person who is not a citizen of the United States, or who has not declared his intention to become a citizen of the United States, to carry or have in his possession at any time any shot gun, rifle or other firearm, without first having obtained a license from the state auditor, and said license is not to be issued by said state auditor except upon the certificate of the consul domiciled in the State of Washington and representing the country of such alien, that he is a responsible person and upon the payment for said license of the sum of fifteen dollars ($15.00)[.]

**WEST VIRGINIA**

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 25, Image 25 (1875) available at The Making of Modern Law: Primary Sources. 1875
[Ordinances of Martinsburg, An Ordinance to Prevent Certain Improper Practices Therein Specified,] § 3. If any person shall fire or discharge within such parts of the town which are or shall be laid out into lots, or within two hundred yards of said limits, any cannon, gun, pistol or

fire-arms, or any cracker, squib, rocket or fire-works, except it be in case of necessity, or in the discharge of some public duty, or at a military parade by order of the officer in command, or with the permission of the Mayor or Council of the town, such person for every such offence shall forfeit any pay to the town not less than one nor more than five dollars.

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 76, Image 76 (1875) available at The Making of Modern Law: Primary Sources.
1876
[Ordinances of Martinsburg,] An Ordinance in Relation to Pistol Galleries, § 1. Be it ordained by the Council of the Corporation of Martinsburg, That no pistol gallery, in which air guns or pistols, or guns or pistols in which are fired powder, is used, shall be established or carried on within the limits of the Corporation of Martinsburg by any person or persons, until the person or persons desiring to establish or carry on the same shall first obtain from the Mayor, attested by the Clerk of the Corporation, a permit authorizing the person or persons therein named to prosecute said business, and designating the place at which the same is to be carried on. § 2. That the Mayor shall not issue the permit authorized by the first section of this ordinance, unless the building to be used for said pistol gallery, is so detached from adjacent or surrounding private dwellings, that the noise incident to the carrying on of said business, shall not render the said gallery a nuisance to the surrounding or adjacent dwellings. § 3. Any person or persons violating the provisions of this ordinance, shall be fined for the first offense, not less than two nor more than ten dollars, at the discretion of the Mayor, and for any subsequent offence, not less than two or more than thirty dollars, and commitment in the county jail not exceeding thirty days, either or both of said punishment, at the discretion of the Mayor.

Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206. 1881
An Ordinance in relation to offenses . . .
SEC. 14. It shall be unlawful for any person to carry any slung shot, colt, or knucklers of lead, brass or other metal or material, or to carry about his person, hid from common observation, any pistol, dirk , bowie knife, or weapon of the like kind, without a permit in writing from the mayor so to do. It shall also be unlawful for any person or persons to sell or give away to a person not of age, any slung shot, colt, or knuckler or knucklers of lead, brass or other metal or material, or any pistol, dirk, bowie knife or weapon of the like kind.

1909 W.Va. Acts 479-80, An Act to Amend and Re-Enact Sections . . . Relating to the Protection and Preservation of Certain Animals, Birds, and Fishes and of Forests and Streams, ch. 60, § 19. The carrying of any uncased gun in any of the fields or woods of this state, by any person not having the lawful right to hunt, pursue or kill game, birds or animals in such fields or woods shall, as to such person, other than the bona fide owner, or owners of such fields or woods, his or their child or children, tenant or tenants, lessee or lessees, be deemed prima facie evidence of a violation of this section; and any person claiming to hold a license to hunt in this state, having in his possession any gun or other hunting paraphernalia in such woods, or fields, shall, on failure to produce such license for inspection to any warden of this state or owner or agent of the owner of such woods and fields on demand, be deemed guilty of a misdemeanor and shall be punished on conviction, as provided later in this section. Provided, however, that any resident owner, or

owners, of farm lands, their resident child or children, or bona fide tenants, shall have the right to hunt, kill and pursue birds or game on such farm lands of which he, or they, are the bona fide owners or tenants, during the season when it is lawful to kill, catch or pursue birds or game, without securing such resident license; and provided, further, that the owners of adjoining lands may each have the privilege of reciprocating the non-licensed privilege, by giving each other written privilege to exchange hunting rights only, on land immediately joining each other, and upon which each party resides.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a.
Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That such applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is <u>a person of good moral character, of temperate habits, not addicted to intoxication</u>, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner. Fourth: <u>The purpose or purposes for which the applicant desires to carry such weapon and the necessity therefor</u> and the county or counties in which said license is desired to be effective. Upon the hearing of such application the court shall hear evidence upon all matters stated in such application and upon any other matter deemed pertinent by the court, and if such court be satisfied from the proof that there is good reason and cause for such person to carry such weapon, and all of the other conditions of this act be complied with, said circuit court or the judge thereof in vacation, may grant said license for

such purposes, and no other, as said a circuit court may set out in the said license (and the word "court" as used in this act shall include the circuit judge thereof, acting in vacation); but before the said license shall be effective such person shall pay to the sheriff, and the court shall so certify in its order granting the license, the sum of twenty dollars, and shall also file a bond with the clerk of said court, in the penalty of three thousand five hundred dollars, with good security, signed by a responsible person or persons, or by some surety company, authorized to do business in this state, conditioned that such applicant will not carry such weapon except in accordance with his said application and as authorized by the court, and that he will pay all costs and damages accruing to any person by the accidental discharge or improper, negligent or illegal use of said weapon or weapons. Any such license granted after this act becomes effective shall be good for one year, unless sooner revoked, as hereinafter provided, and be co-extensive with the county in which granted, and such other county or counties as the court shall designate in the order granting such license; except that regularly appointed deputy sheriffs having license shall be permitted to carry such revolver or other weapons at any place, within the state, while in the performance of their duties as such deputy sheriffs and except that any such license granted to regularly appointed railway police shall be co-extensive with the state, and all license fees collected hereunder shall be paid by the sheriff and accounted for to the auditor as other license taxes are collected and paid, and the state tax commissioner shall prepare all suitable forms for licenses and bonds and certificates showing that such license has been granted and to do anything else in the premises to protect the state and see to the enforcement of this act. The clerk of the court shall immediately after license is granted as aforesaid, furnish the superintendent of the department of public safety a certified copy of the order of the court granting such license, for which service the clerk shall be paid a fee of two dollars which shall be taxed as cost in the proceeding; within thirty days after this act becomes effective it shall be the duty of the clerks of each court in this state having jurisdiction to issue pistol licenses to certify to the superintendent of the department of public safety a list of all such licenses issued in his county. Provided, that nothing herein shall prevent any person from carrying any such weapon, in good faith and not for a felonious purpose, upon his own premises, nor shall anything herein prevent a person from carrying any such weapon (unloaded) from the place of purchase to his home or place of residence, or to a place of repair and back to his home or residence; but nothing herein shall be construed to authorize any employee of any person, firm or corporation doing business in this state to carry on or about the premises of such employer any such pistol, or other weapon mentioned in this act for which a license is herein required, without having first obtained the license and given the bond as herein provided; and, provided, further, that nothing herein shall prevent agents, messengers and other employees of express companies doing business as common carriers, whose duties require such agents, messengers and other employees to have the care, custody or protection of money, valuables and other property for such express companies, from carrying any such weapon while actually engaged in such duties, or in doing anything reasonably incident to such duties; provided, such express company shall execute a continuing bond in the penalty of thirty thousand dollars, payable unto the state of West Virginia, and with security to be approved by the secretary of state of the state of West Virginia, conditioned that said express company will pay all damages, accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such agent, messenger or other employee while actually engaged in such duties for such express company, in doing anything that is reasonably incident to such duties; but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred

dollars in any one case, and such bond shall be filed with and held by the said secretary of state, for the purpose aforesaid, but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such express company to establish that such agent, messenger or other employee was not actually employed in such duties for such express company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and, provided further, that nothing herein shall prevent railroad police officers duly appointed and qualified under authority of section thirty-one of chapter one hundred forty-five of Barnes' code or duly qualified under the laws of any other state, from carrying any such weapon while actually engaged in their duties or in doing anything reasonably incident to such duties; provided, such railroad company shall execute a continuing bond in the penalty of ten thousand dollars payable unto the state of West Virginia and with security to be approved by the secretary of state of the state of West Virginia conditioned that said railroad company will pay all damages accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such railroad special police officer whether appointed in this or some other state while actually engaged in such duties for such railroad company, in doing anything that is reasonably incident to such duties, but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state for the purpose aforesaid but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such railroad company to establish that such railroad police officer was not actually employed in such duties for such railroad company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and provided, further, that in case of riot, public danger and emergency, a justice of the peace, or other person issuing a warrant, may authorize a special constable and his posse whose names shall be set forth in said warrant, to carry weapons for the purpose of executing a process, and a sheriff in such cases may authorize a deputy or posse to carry weapons, but the justice shall write in his docket the cause and reasons for such authority and the name of the person, or persons, so authorized, and index the same, and the sheriff or other officer shall write out and file with the clerk of the county court the reasons and causes for such authority and the name, or names of the persons so authorized, and the same shall always be open to public inspection, and such authority shall authorize such special constable, deputies and posses to carry weapons in good faith only for the specific purposes and times named in such authority, and upon the trial of every indictment the jury shall inquire into the good faith of the person attempting to defend such indictment under the authority granted by any such justice, sheriff or other officer, and any such person or persons so authorized shall be personally liable for the injury caused to any person by the negligent or unlawful use of any such weapon or weapons. It shall be the duty of all ministerial officers, consisting of the justices of the peace, notaries public and other conservators of the peace of this state, to report to the prosecuting attorney of the county the names of all persons guilty of violating this section, and any person willfully failing so to do, shall be guilty of a misdemeanor and shall be fined not exceeding two hundred dollars, and shall, moreover, be liable to removal from office for such willful failure; and it shall likewise be the duty of every person having knowledge of the violation of this act, to report the same to the prosecuting attorney, and to freely and fully give evidence concerning the same, and any one failing so to do, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not exceeding one hundred dollars; provided, further, that nothing herein contained shall be so construed as to prohibit sheriffs, their regularly appointed deputies, who actually

collect taxes in each county, and all constables in their respective counties and districts, and all regularly appointed police officers of their respective cities, towns or villages, all jailors and game protectors who have been duly appointed as such, and members of the department of public safety of this state, from carrying such weapons as they are now authorized by law to carry, who shall have given bond in the penalty of not less than three thousand five hundred dollars, conditioned for the faithful performance of their respective duties, which said officers shall be liable upon their said official bond, for the damages done by the unlawful or careless use of any such weapon or weapons, whether such bond is so conditioned or not. It shall be unlawful for any person armed with a pistol, gun, or other dangerous or deadly weapon, whether licensed to carry same or not, to carry, expose, brandish, or use, such weapon in a way or manner to cause, or threaten, a breach of the peace. Any person violating this provision of this act shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than fifty nor more than three hundred dollars or imprisoned in the county jail not less than thirty nor more than ninety days, or be punished by both fine and imprisonment in the discretion of the court. Any circuit court granting any such license to carry any of the weapons mentioned in this act, the governor, or the superintendent of the department of public safety, with the consent of the governor, may, for any cause deemed sufficient by said court, or by the governor or by the superintendent of the department of public safety with the approval of the governor aforesaid, as the case may be, revoke any such license to carry a pistol or other weapon mentioned in this act for which a license is required, and immediate notice of such revocation shall be given such licensee in person, by registered mail or in the same manner as provided by law for the service of other notices, and no person whose license has been so revoked shall be re-licensed within one year thereafter; provided, that the authority so revoking such license may, after a hearing, sooner reinstate such licensee.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b.
(b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol

licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.
It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

**WISCONSIN**

Charter and Ordinances of the City of La Crosse [WI], with the Rules of the Common Council Page 202, Image 205 (1888) available at The Making of Modern Law: Primary Sources. 1888
An Ordinance in Relation to the Discharge of Firearms and firecrackers and to the use and exhibition of fireworks, § 1. No person shall fire or discharge any cannon, gun, fowling piece, pistol or firearms of any description, or fire, explode or set off any squib, cracker or other thing containing powder or other combustible or explosive material, or set off or exhibit any fireworks within the limits of the city of La Crosse, without having first obtained written permission from the mayor, which permission shall limit the time and fix the place of such firing, and shall be subject to be revoked at any time after the same may have been granted. Any violation of this ordinance shall subject the person or persons so violating the same to a fine of not less than one dollar nor exceeding twenty-five dollars; but this ordinance shall not be construed to prohibit the discharge of firearms by the chief of police or any of his subordinates or any peace officer when required or made necessary in the performance of any duty imposed by law.

Charter and Ordinances of the City of La Crosse, with the Rules of the Common Council Page 239-242, Image 242-245 (1888) available at The Making of Modern Law: Primary Sources. 1888
Ordinances of La Crosse, An Ordinance to Provide for Licensing Vendors of Gunpowder and Other Explosive Substances and to Regulate the Storing, Keeping and Conveying of all Dangerous and Explosive Materials and Substances within the City of La Crosse, and in relation to the Storage and Sale of Lime Therein, § 1. It shall be unlawful for any person to keep for sale,

sell or give away any gunpowder, giant powder, nitro-glycerine, gun-cotton, dynamite or any other explosive substance of like nature or use without having first obtained a license therefor from the city of La Crosse in the manner hereinafter provided. Any person convicted of a violation of this section shall be punished by a fine of twenty-five dollars for each offense. . . § 3. It shall be unlawful for any person licensed pursuant to the foregoing sections of this ordinance to have or keep at his or her place of business an amount of gunpowder or other explosive material greater in the aggregate than fifty pounds at any one time, or to keep the same in any other than cases or canisters made of tin, or other metal holding not to exceed ten pounds each. Such gunpowder or other explosive materials shall be kept in places remote from fires and lighted lamps or candles, and where the same may be easily accessible so as to be removed in case of fire. No person shall sell any gunpowder or other explosive material after the lighting of lamps in the evening unless in sealed canisters or cases; and all places where business is carried on under any such license shall have a sign put up in a conspicuous place at or near the front door thereof with the word "gunpowder" painted thereon in large letters. Any person violating any provision of this section shall, upon conviction, be punished by a fine of not less than five dollars nor more than fifty dollars for each offense; and upon any such conviction the common council may at its discretion by resolution duly passed revoke the license of the person so convicted. This ordinance shall not be construed as to prevent persons who are not vendors of the articles mentioned in the title thereof from keeping gunpowder in quantities not exceeding one pound for their own use.

Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. 1896
Chapter XX. Misdemeanors.
Section 25. It shall be unlawful for any person except policemen, regular or special, or any officer authorized to serve process, to carry or wear concealed about his person, any pistol or colt, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or bowie -knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon, within the limits of the city of Milwaukee; provided, however, that the chief of police of said city may upon any written application to him made, issue and give a written permit to any person residing within the city of Milwaukee, to carry within the said city a pistol or revolver when it is made to appear to said chief of police <u>that it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted</u>, to carry such weapon; and the holding of such permit by such person shall be a bar to prosecution under this ordinance. Said chief of police shall keep the names and residences of all persons to whom he may grant such permits, in a book to be kept for that purpose, and he shall have power to revoke such permit at any time.
Said chief of police shall, upon granting each and every such permit, collect from the person to whom the same is granted, the sum of three ( 3 ) dollars, and he shall pay all moneys so collected by him upon granting such permits, into the city treasury.
Any person who shall wear or carry any such pistol , slung-shot, cross-knuckles, knuckles of brass, lead or other metal, knife, dirk or dagger, or any other dangerous or deadly weapon, within the limits of the city of Milwaukee, contrary to the provisions of this chapter, shall be liable to a penalty of not less than ten nor more than one hundred dollars for each and every offense.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06.
164.01 Definitions (a) “Machine gun” applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .
164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.
164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.
164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.
164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

**WYOMING**

A. McMicken, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 115-116, Image 116-117 (1893) available at The Making of Modern Law: Primary Sources.
1893
[Ordinances of the] City of Rawlins, Article II, Protection of Persons and Property, § 1. If any person shall within this city fire or discharge any cannon, gun, fowling piece, pistol or firearms of any description, or fire, explode, or set off any squib, cracker, or anything containing powder or other combustible or explosive material, without permission of the Board of Trustees, or the written permission of the mayor (which permission shall limit the time of the firing and shall be subject to be revoked by the mayor or Board of Trustees at any time after the same has been

granted) every such person shall, on conviction, be fined in a sum of not less than five dollars and not exceeding one hundred dollars.

1899 Wyo. Sess. Laws 32-33, An Act for the Better Protection of the Game and Fish of this State . . . , ch. 19, § 14.
Any person who is a bona fide citizen of the State of Wyoming shall, upon payment of one dollar to any Justice of the Peace of the county in which he resides, be entitled to receive from said Justice of the Peace, a gun license, which license shall permit such person to pursue, hunt and kill any of the animals mentioned in this Section, during the time allowed therefor. . . . Any person who is not a resident of the State of Wyoming, shall upon payment to any Justice of the Peace of this State of the sum of forty dollars to be entitled to receive from such Justice of the Peace a license, which license shall permit such person to pursue, hunt and kill any of the animals mentioned in this Section, during the time allowed therefor of the current year.

1913 Wyo. Sess. Laws 165, An Act . . . Relating to the Duties of the State Game Warden, Assistant and Deputy Game Wardens, and the Preservation of the Game Animals and Game Birds and Fish of the State of Wyoming . . . , ch. 121, § 38.
That Section 20 . . . be . . . amended . . . § 20. Any person who is not a bona fide elector of this state, or the child or legal ward of a bona fide elector of this state, or a soldier or sailor who is a bona fide elector of the United States, and has been stationed at a government post within this state for one year past, or non-residents having property in this state on which they pay taxes to the amount of $100.00 or over annually, but who shall be a citizen of the United States or a free-holder in this state, shall upon payment of five dollars to any Justice of the Peace . . . be entitled to receive from such officer a gunner’s license, which license shall permit such person to kill any of the game birds of this state during the current season under the restrictions heretofore and hereinafter imposed.

1915 Wyo. Sess. Laws 91, An Act Relating to the Preservation of the Game Animals, Game Birds, and Fish of the State of Wyoming . . . , ch. 91, § 13.
There is hereby created a special gun and fish license for aliens. No person, not a bona fide citizen of the United States, shall own or have in his possession, in the State of Wyoming, any gun, pistol or other firearm, or any fishing tackle, without first having obtained the specified license therefor, which such special gun and fish license shall cost the owner the sum of Twenty-five Dollars[.]

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.
§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer’s number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers

handwriting and the date of such sale. § 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased. § 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times. § 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

**U.S. GOVERNMENT**

Statutes at Large of the United States of America, vol. 40, pt. 1, ch. 18, tit. 19, § 900, nos. 10–12 (Government Printing Office 1919).
"CHAP. 18.—An Act To[1] provide revenue, and for other purposes.[2]
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled…
…TITLE IX.—EXCISE TAXES.
Sec. 900. That there shall be levied, assessed, collected, and paid upon the following articles sold or leased by the manufacturer, producer, or importer, a tax equivalent to the following percentages of the price for which so sold or leased…
…(10) Firearms, shells, and cartridges, except those sold for the use of the United States, any State, Territory, or possession of the United States, any political subdivision thereof, the District of Columbia, or any foreign country while engaged against the German Government in the present war, 10 per centum;
(11) Hunting and bowie knives, 10 per centum;
(12) Dirk knives, daggers, sword canes, stilettos,[3] and brass or metallic knuckles, 100 per centum…"
Statutes at Large of the United States of America from April, 1917, to March, 1919: Concurrent Resolutions of the Two Houses of Congress and Recent Treaties, Conventions, and Executive Proclamations; Amendment to the Constitution, vol. 40, pt. 1 (Public Acts & Resolutions) (Washington, DC: Government Printing Office, 1919), 1122. Chapter 18—An Act to Provide Revenue, and for Other Purposes, Title 9—Excise Taxes, § 900, nos. 10-12. Approved February 24, 1919.

Statutes at Large of the United States of America, vol. 47, pt. 1, ch. 209, tit. 4, § 610 (Government Printing Office 1933) (Law Passed 1932).
"[CHAPTER 209.]
AN ACT
To provide revenue, equalize taxation, and for other purposes:[1]
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled…
…SEC. 610. TAX ON FIREARMS, SHELLS, AND CARTRIDGES.

There is hereby imposed upon firearms, shells, and cartridges, sold by the manufacturer, producer, or importer, a tax equivalent to 10 per centum of the price for which so sold. The tax imposed by this section shall not apply (1) to articles sold for the use of the United States, any State, Territory, or possession of the United States, any political subdivision thereof, or the District of Columbia, or (2) to pistols and revolvers."
The Statutes at Large of the United States of America from December 1931 to March 1933: Concurrent Resolutions[,] Recent Treaties, Executive Proclamations and Agreements[,] Proposed Amendments to the Constitution and Twentieth Amendment to the Constitution, vol. 47, pt. 1 (Washington, DC: Government Printing Office, 1933), 264. Chapter 209—An Act to Provide Revenue, Equalize Taxation, and for Other Purposes, Title 4—Manufacturers' Excise Taxes, § 610. Approved June 6, 1932.

Sources: https://firearmslaw.duke.edu/repository/search-the-repository/; Genesa C. Cefali and Jacob D. Charles, "A Brief Overview of Gun Registration in U.S. History," *New Histories of Gun Rights and Regulation*, Joseph Blocher, Jacob D. Charles and Darrell A.H. Miller, eds. (NY: Oxford University Press 2023), 167-94; HeinOnline.

# EXHIBIT D

# EXHIBIT D

# TRAP GUN RESTRICTIONS

## CALIFORNIA:

1937 Cal. Stat. 1395, Chap. 449
SECTION 1. Section 1154.5 is hereby added to the Fish and Game Code to read as follows:
1154.5. It is unlawful to set, cause to be set, or placed any trap gun. A "Trap gun" is a firearm loaded with other than blank cartridges and connected with a string or other contrivance contact with which will cause the firearm to be discharged.

## IOWA:

McClain, Emlin. McClain's Annotated Code and Statutes of the State of Iowa, Showing the General Statutes in Force July 4, 1888. Chicago, Callaghan.
Annotated Code of the State of Iowa: Containing All the Laws of a General Nature Enacted by the Twenty-Sixth General Assembly, at the Extra Session, Which Adjourned July 2, 1897. Des Moines, F.R. Conaway.
A party has no right to prevent a trespass of life, or by inflicting great bodily injury, as by this kind by the use of means dangerous to [life, as by a] a spring-gun: *Hooker v. Miller*, 37-613.

## MAINE:

1919 Maine - 79th Legislature, Public & Private, Special Acts and Resolves, Regular Session: 3, 242.
Sec. 51. Swivel, pivot and set gun added to prohibited devices in trapping or hunting for fur-bearing animals; trapping of foxes in Lincoln county prohibited; provision requiring notice posted over bear trap repealed. No person shall at any time set a snare or a swivel, pivot or set gun for any fur-bearing animal, under a penalty of one hundred dollars and costs for each offense and by imprisonment for sixty days, and shall forfeit any such snare, swivel, pivot or set gun, and any fur-bearing animal found in such snare, or killed by such swivel, pivot or set gun, to any person finding the same. . . .

1920-1921 Maine 821, Appendix, Chapter 218.

Fish and Game. Authority of wardens increased. Certain implements and devices prohibited. Cusk fishing regulated. Permits to take alewives. Closed time on fur bearing animals. Traps to be labeled, and snares, set guns, etc. prohibited. Permits to import game. Penalty for violations. Wardens may sell game seized. P. L. **1917,** Chap. 219, .and P. L. 1919, Chap. 196, amended.

## MARYLAND:

1910 Md. Laws 521, § 16c.
Sensitive Places and Times | Maryland | 1910
§ 16c. That it shall be unlawful for any person to hunt, pursue or kill any of the birds or animals named in Section 12, 13, 14 and 14A of this Act, or any insectivorous birds (excepting English sparrows), in Allegany County on Sunday, or on election days, and it shall be prima facie evidence of a violation of this Act if any person is found in the fields or woods with on a gun on Sunday or on election days, or to hunt or kill in any trap or destroy any of the birds . . .

## MASSACHUSETTS:

Act of Jun. 8, 1670, 230, MASS. GEN. LAWS (William White 1861) (Law Passed 1670).
"Wheras severall persons have bine greatly Indangered by seting of Guns It is enacted by the Court and the authoritie therof that none shall sett any Guns except in Inclosures and that the gun be sufficiently enclosed soe as it be Cecure from hurting man or beast and that hee that seteth the gun doe give warning or notice therof to all the Naighbours on the penaltie of paying a fine of five pounds to the use of the Collonie for every default."

## MICHIGAN:

1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1.
Dangerous or Unusual Weapons | Michigan | 1875
[I]f any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236.
Dangerous or Unusual Weapons | Michigan | 1931
Setting spring guns, etc.–Any person who shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than one year, or by a fine of not more than five hundred dollars, and the killing of any person by the firing of a gun or device so set shall be manslaughter.

**MINNESOTA:**

1869 General Laws of Minnesota 11th Session: 50-51.
CHAPTER XXXIX
An Act to prohibit the setting of traps or spring guns, rifles, or other deadly weapons.
SECTION 1. The setting of a so-called trap or spring gun, pistol, rifle or other deadly weapon in this state, is hereby prohibited and declared to be unlawful.
SEC. 2. Any person offending against the foregoing section shall be punished as follows : If no injury results therefrom to any person, the person so offending shall punished by imprisonment in the county jail of the proper county, for a period not less than six (6) months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment at the discretion of the court. If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the state prison for a term not exceeding fifteen, nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.
SEC. 3. This act shall take effect and be in force from and after its passage.
Approved Feb. 27, 1869.

The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | Minnesota | 1873
Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65.
§ 64. The setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state is hereby prohibited and declared to be unlawful.
§ 65. Any person offending against the foregoing section shall be punished as follows: If no injury results therefrom to any person, the person so offending shall be punished by imprisonment in the county jail of the proper county for a period not less than six months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment, at the discretion of the court. If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the state prison for a term not exceeding fifteen nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.

1903 Minn. Laws 588-89, An Act for the Preservation, Propogation, Protection, Taking, Use and Transportation of Fish and Game, ch. 336, § 12.
No person shall at any time set, lay, prepare or have in possession any trap, snare, artificial light, net, bird lime, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the birds in this act mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. Whoever shall offend against any of the provisions of this section shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not less than ten (10) dollars nor more than one hundred (100) dollars, and costs of prosecution, or by imprisonment in the county jail for not less than ten (10) days nor more than ninety (90) days, for each and every offense.

**MISSOURI:**

"Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891: "Chillicothe, Mo., Feb. 11 – In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[1]

**MONTANA:**

[1] See https://bit.ly/3CtZsfk.

1921 Montana - 17th Legislative Assembly, Regular and Extraordinary Sessions: Chapter 238, 521-533, 527.
Section 14. Manner of Taking Fish and Game. No person shall take, capture, shoot, kill, or attempt to take, capture, shoot or kill any game animals or game birds from any automobile, or within the bounds of any public highway, or by the aid or with the use of any set-gun, jack-light or other artificial light, trap, snare, or saltlick, nor shall any such set-gun, jack-light or other artificial light, trap, snare, salt-lick or other device to entrap or entice game animals or game birds, be used, made or set. . . .

1923 Montana - 18th Legislative Assembly, Regular Session: Chapter 77, 203-225, 210
3694. MANNER OF TAKING FISH AND GAME. No person shall take, capture, shoot, kill or attempt to take, capture, shoot, or kill any game animals or game birds from any automobile, or within the bounds of any public highway, or by the aid or with the use of any set-gun, jack-light, or other artificial light, trap, snare, or salt-lick, nor shall any such set-gun, jack-light, or other artificial light, trap, snare, salt-lick, or other device to entrap or entice game animals or game birds, to be used, made, or set; provided, however, this does not prohibit the shooting of wild waterfowl from blinds or over decoys with a gun only, not larger than a number 10 guage fired from the shoulder; nor shall game birds be killed or hunted from aeroplane, power-boat, sail-boat, any boat under sail, or any floating device towed by powerboat or sailboat. No person shall take into a field or forest, or have in his possession, while out hunting, any device or mechanism, designated to silence or muffle or minimize the report of any firearm, whether such device or mechanism be separated from or attached to any firearm.

**NEVADA:**

1912 James G.; et al. Sweeney. Revised Laws of Nevada, 1872.
6567. Setting spring gun.
SEC. 302. Every person who shall set a so-called trap, spring pistol, rifle, or other deadly weapon, shall be punished as follows:
1. If no injury result therefrom to any human being, by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both.
2. If injuries not fatal result therefrom to any human being, by imprisonment in the state prison for not more than twenty years.

3. If the death of a human being results therefrom, under circumstances not rendering the act murder, by imprisonment in the state prison for not more than twenty years, otherwise the punishment shall be as for murder.

**NEW HAMPSHIRE:**

1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18.
Dangerous or Unusual Weapons | New Hampshire | 1915
A person who violates a provision of this part is guilty of a misdemeanor and shall be fined as follows . . . [p]rovided, however, that a person violating the prohibition against setting a spring gun the object of which is to discharge a firearm, shall be fined not more than five hundred dollars nor less than fifty dollars, and shall be liable for twice the amount of the damage caused by his act, to be recovered by the person sustaining the injury or loss.

**NEW JERSEY:**

1751 N.J. Laws 189
AND BE IT ENACTED by the Authority aforesaid, That if any Person or Persons whatsoever, after the Publication of this Act, shall presume to set any Gun or Guns, or plant sharp stakes, in Order to kill Deer, or any other wild Beasts, on his own, or the Lands of any other Person whatsoever, he or she so offending, shall forfeit for every such Offence, the Sum of Five Pounds, to be recovered by any Person or Persons whatsoever, who shall sue for the same, and applied in Manner aforesaid, besides double Damages to any Person who shall be injured thereby.

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.
Dangerous or Unusual Weapons | New Jersey | 1771
And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.

**NEW MEXICO:**

1855 N.M. 406
No. 4228. AN ACT TO PROHIBIT NON-RESIDENTS FROM HUNTING, DUCKING, AND FISHING, WITHIN THE LIMITS OF THIS STATE.
I. Be it enacted by the Senate and House of Representatives, now met and sitting in General Assembly, and by the authority of the same, That from and after the passing of this Act, it shall not be lawful for any non-resident of this State to use a gun, set a trap, or decoy, or to employ any other device for killing or taking deer, turkeys, ducks, or any other game, nor to set a trap, or seine, or net, or draw or use the same, or any other contrivance for taking or killing fish within the territorial limits of this State.
II. That every person who shall offend against the provisions of this Act shall be deemed guilty of a misdemeanor, and on conviction thereof shall be liable to a penalty not exceeding two hundred dollars, nor less than one hundred dollars, and imprisonment not exceeding three months, nor less than one month for each and every violation of any of the provisions of this Act.
III. That all persons shall be deemed and taken as non-residents within the meaning of this Act, who shall not have had their actual domicil in this State for two years next preceding their use of any of the implements of the chase or fishery forbidden by this Act. But nothing herein contained shall be construed as prohibiting any landholder from authorizing any person to hunt or shoot ducks or other game, or to fish within the boundaries of his own land.
December 19, 1855.

**NEW YORK:**

"The Man Trap," The Buffalo Commercial, Nov. 1, 1870: "Coroner Flynn and the jury previously impaneled yesterday morning concluded the inquest on the body of George Tweedle, the burglar, who was shot by the trap-gun in the shop of Joseph J. Agostino . . . . A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow. . . . The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by Joseph D. Agostino. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured Agostino. He will not be released, however, but will be held under $2,000 bail."[2]

[2] See https://bit.ly/3yUSGNF.

1877 N.Y. Laws 434, Chap. 411, 434-39.
CHAP. 411.
AN ACT to further amend chapter seven hundred and twenty-one of the laws of eighteen hundred and seventy.one, entitled "An act to amend and consolidate the several acts relating to the preservation of moose, wild deer, birds and fish." Passed June 5,1877.
§ 1. . . . No person shall, in any part of this state, set any trap, spring-gun, or other device at any artificial salt-lick, or other place, for the purpose of trapping and killing any moose or deer.

1886 N.Y. Laws 361, Chap. 194, 361-62.
Chap. 194.
AN ACT to amend chapter five hundred and thirty-four of' the laws of eighteen hundred and seventy-nine, entitled "An act for the preservation of' moose, wild deer, birds, fish and other game," and to repeal chapter five hundred and fifty-seven of the laws of eighteen hundred and eighty-five, entitled "An act for the better preservation of wild deer." Passed April 24, 1886.
SECTION 1. Section one of chapter five hundred and thirty-four of the laws of eighteen hundred and seventy-nine, entitled "An act for the preservation of moose, wild deer, birds, fish and other game," is hereby amended so as to read as follows:
§ 1. . . .No person shall, in any part of this State, set any trap, spring-gun or other device at any artificial salt lick or other place for the purpose of trapping or killing wild deer.
https://heinonline-org.proxy.wm.edu/HOL/Page?collection=ssl&handle=hein.ssl/ssny0340&id=369&men_tab=srchresults

**NORTH CAROLINA:**

1826-1827 Laws of North Carolina Regular Session, 83.
CHAPTER CLV.
An act to authorise the setting of guns in the nighttime, in the Great Dismal Swamp, in the county of Pasquotank.
Be it enacted by the General Assembly of the State of North-Carolina, and it is hereby enacted by the authority of the same, That from and after the passing of this act, it shall and may be lawful for the citizens of Pasquotank county to set guns in the Great Dismal Swamp of said county, in the night time, viz. between sunset and sunrise, for the purpose of destroying bears and beasts of prey.

II. And be it further enacted, That every person desirous of setting guns in the said swamp, shall, before doing the same, give at least ten days notice thereof, by advertising the same in the neighbourhood, under penalty of fifty dollars for each neglect, to be recovered before any justice of the peace, by any person suing for the same; any law to the contrary notwithstanding.
Ratified in General Assembly, this 12th day of February, A.D. 1827.

1829-1830 Laws of North Carolina – Regular Session, 83
CHAPTER CXXXI
Beit enacted by the General Assembly of the State of North Carolina, and it is hereby enacted by the authority of the same. That from and after the ratification of this act, it shall be lawful for the citizens of Pasquotank and Perquimans counties to set guns in the desert in said counties, between sunset and sun-rise, for the purpose of destroying beasts of prey.
II. Be it further enacted. That all laws and clauses of laws heretofore passed in relation to this subject, be and the same are hereby repealed.
III, Be it further enacted. That any person violating the provisions of this act, by setting guns in said desert at any other time than specified in this act, shall forfeit and pay the penalty of one hundred dollars, to be recovered before any justice of the peace, by any informer, one half to his use, and the other half to the use of the poor of the county in which such suit may have been instituted.

**NORTH DAKOTA:**

1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1.
Dangerous or Unusual Weapons | North Dakota | 1891
That it shall be unlawful for any person or persons to kill, ensnare or trap in any form or manner, or by any device whatever, or for any purpose, any buffalo, elk, deer, antelope or mountain sheep between the 1st day of January and the 1st day of September of each and every year. And it shall be unlawful for any person or persons, at any time, to use or employ any hound or dogs of any kind in running or driving any buffalo, elk, deer, antelope or mountain sheep, or to set any gun or guns or gun trap to be discharged upon or by, any buffalo, elk, deer, antelope or mountain sheep as driven or pursued in any manner whatever.

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | North Dakota | 1895
Setting Spring Gun, Trap or Device. Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or other device so set shall be deemed to be manslaughter in the first degree.

**OHIO:**

"How a Melon Thief Came to Grief," Wellington Enterprise, Wellington, Ohio, September 21, 1881,
https://www.newspapers.com/image/171228605/?terms=%22trap%20gun%22&match=1
"But whatever the intention, it is a crime to set a trap gun of much greater magnitude than to steal melons, and one that he will not be likely to repeat. We hear that the affair has been settled between the parties and there will be no prosecution." [Huntington, Ohio]

**OKLAHOMA:**

Samuel H.; Day Harris, Jean P., et al. Revised Laws of Oklahoma 1910: Being a Compilation, Classification and Revision of All General Laws of the State of Oklahoma in Force and Effect on the 25th Day of February, 1911 (1912).
2317. Act imminently dangerous. Homicide perpetrated by an act imminently dangerous to others and evincing a depraved mind regardless of human life, is not the less murder because there was no actual intent to injure others. . . .
Criminal responsibility for death caused by spring gun or other dangerous mantrap upon one's own property. 14 L. R. A. (ns) 346-n.

**OREGON:**

1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2.
Dangerous or Unusual Weapons | Oregon | 1925
§ 1. It shall be unlawful for any person to place or set any loaded spring-gun or set-gun, or any gun or firearm or other device of any kind designed for containing or firing explosives in any place whatsoever where the same may be fired, exploded or discharged by the contract of any person or animal with any string, wire, rod,

stick, spring or other contrivance affixed thereto or connected therewith or with the trigger thereof.
§ 2. Any person who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than $100 nor more than $500, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment; provided, however, that this act shall not apply to any loaded spring-gun or set-gun or firearm or any device placed for the purpose of destroying gophers, moles or other burrowing rodents.

**PENNSYLVANIA:**

The Wrightsville Star, Wrightsville, Pa., March 7, 1873, 3, https://www.newspapers.com/image/774191522/?terms=%22trap%20gun%22&match=1
"Jesse R. Pennepacker, who shot the colored man Burrell, on Thursday morning last in Columbia [Pa.], by means of a trap gun set for the purpose of preventing his chicken coop from the depredation of thieves, was arrested and taken before Judge Livingston, who released him on bail in the sum of $8,000 for his appearance at court."

**RHODE ISLAND:**

1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6;
1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6.
Hunting | Rhode Island | 1890, 1892
§ 6. Every person who shall at any time of year, take, kill or destroy any quail or partridge, by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net, or spring for the purpose of taking, killing or destroying any quail or partridge, or who shall shoot any water fowl by means or by the use of any battery, swivel, punt or pivot gun, shall be fined for each offence, twenty dollars. Provided, however, that at such seasons as the taking, killing or destroying of such birds is prohibited by this chapter, any person may snare on his own land.

**SOUTH CAROLINA:**

1855 S.C. 406.

Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved December 19, 1855,
Hunting | South Carolina | 1855
Hunting, General Provisions, § 21.
That it shall not be lawful for any non-resident of this State to use a gun, set a trap or decoy, or to employ any other device for killing or taking deer, turkeys, ducks or other game, not to set a trap, seine, or net, or draw or use the same, or any other contrivance for taking or killing fish, within the territorial limits of this State.

1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1.
Dangerous or Unusual Weapons | South Carolina | 1931
Be it enacted by the General Assembly of the State of South Carolina: That it shall be unlawful for any person, firm, or corporation to construct, set, or place a loaded trap gun, spring gun, or any like device in any manner in any building, or in any place within this State, and any violation to the provisions of this Act shall be deemed a misdemeanor and punished by fine of not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars, or by imprisonment of not less than thirty (30) days nor more than one (1) year, or by both fine and imprisonment, in the discretion of the Court.

**SOUTH DAKOTA:**

1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22.
Hunting | South Dakota | 1909
§ 21. No person shall at any time catch, take or kill any of the birds or animals mentioned in this chapter in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same.
§ 22. No person shall at any time set, lay or prepare or have in possession, any trap, snare, artificial light, net, bird line, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the same animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. The use of rifles in the hunting of said birds is prohibited.

**UTAH:**

An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866).
Sentence Enhancement for Use of Weapon | Utah | 1865
§ 102. If any person maliciously injure, deface or destroy any building or fixture attached thereto, or wilfully and maliciously injure, destroy or secrete any goods, chattels or valuable paper of another, or maliciously, prepare any dead fall, or dig any pit, or set any gun, or arrange any other trap to injure another's person or property, he shall be imprisoned not more than one year, or fined not exceeding five hundred dollars, or both fined and imprisoned at the discretion of the court; and is liable to the party injured in a sum equal to three times the value of the property so destroyed or injured or damage sustained, in a civil action.

1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3. Dangerous or Unusual Weapons | Utah | 1901
§ 1. Infernal machine defined. That an infernal machine is any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or to strike with any of its parts, unexpectedly when moved, handled or open, or after the lapse of time, or under conditions, or in a manner calculated to endanger health, life, limb or property.
§ 2. That every person who delivers or causes to be delivered, to any express or railway company or other common carrier to any person any infernal machine, knowing it to be such, without informing such common carrier or person of the nature therof, or sends the same through mail, or throws or places the same on or about the premises or property of another, or in any place where another may be injured thereby, in his person or property, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding twenty-five years.
§ 3. Penalty for constructing or having in possession – That every person who knowingly constructs or contrives any infernal machine, or with intent to injure another in his person or property, has any infernal machine in his possession, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years.

**VERMONT:**

1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1
Dangerous or Unusual Weapons | Vermont | 1884
A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his personal representative may have the action, as provided in sections two thousand one hundred and thirty-eight and two thousand one hundred and thirty-nine of the Revised Laws.

Vermont Public Acts, No. 80—An Act Revising, in Amendment of and in Addition to the Fish and Game Laws. pp. 89-90, 1892
Sec. 58. A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such trap, in the civil action, for twice the amount of such damage. If the person injured dies, his personal representative may have the action, as provided in sections 2138 and 2139 of the Revised Laws.
Approved November 22, 1892

1912 Vt. Acts and Resolves 261
Dangerous or Unusual Weapons | Vermont | 1912
. . . and provided further that a person violating the prohibition against setting a spring gun or other device the object of which is to discharge a firearm shall be fined not more than five hundred dollars nor less than fifty dollars, and shall also be liable for twice the amount of the damage caused by his act to be recovered by the person sustaining the injury or loss, in an action on this section.

**WASHINGTON:**

1897 Wash. Sess. Laws 83 Chap. LII
SEC. 5. Every person who shall, within the State of Washington, fire-hunt for deer, moose, elk, antelope, caribou, mountain sheep or goat, or trap, ensnare or set up any traps, swivel, pivot or spring guns, pitfalls, or other devices for the purpose of trapping, ensnaring or killing deer, elk, moose, caribou, antelope, mountain sheep

or goat, shill be guilty of a misdemeanor, and upon conviction thereof shall be punished as hereinafter provided.

1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3.
Dangerous or Unusual Weapons | Washington | 1909
§ 266. Setting Spring Guns. Every person who shall set a so-called trap, spring pistol, rifle, or other deadly weapon, shall be punished as follows: 1. If no injury result therefrom to any human being, by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both. 2. If injuries not fatal result therefrom to any human being, by imprisonment in the state penitentiary for not more than twenty years. 3. If the death of a human being results therefrom, by imprisonment in the state penitentiary for not more than twenty years.

**WISCONSIN:**

David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2, 1872) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Wisconsin | 1872
Offenses Cognizable Before Justices, Miscellaneous. § 53. Any person or persons in this State who shall hereafter set any gun, pistol or revolver, or any other firearms, for the purpose of killing deer or any other game, or for any other purpose, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, and shall be imprisoned in the county jail of the proper county for a term of not less than twenty days.

1883 Laws of Wisconsin - CHAPTER 20, 13.
AN ACT to amend section 4394 of chapter 181 of the revised statutes, relating to setting spring guns.
The people of the state of Wisconsin, represented in senate and assembly, do enact as follows:

SECTION 1. Section 4394 of chapter 181 of the revised statutes of Wisconsin, is hereby amended to read as follows: Any person who shall set or fix in any manner whatever any gun, pistol or other fire-arm, or any spring-gun for the purpose of killing game of any kind by coming in contact therewith, or with any string, wire or other contrivance attached thereto, by which the same may be discharged, or for any other purpose, shall be punished by imprisonment in the state prison not less than six months nor more than three years; and if the death of any person is caused thereby he shall be deemed guilty of manslaughter in the second degree.
SECTION 2. This act shall take effect and be in force from and after its passage and publication.
Approved March 1, 1883

1897 Wis. Sess. Laws 344, Ch. 188
5. Any trap, snares, spring gun, set guns or other device or contrivance which might entrap, ensnare or kill any animals, birds or waterfowl protected by law.

1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1.
Hunting | Wisconsin | 1921
(29.22)(1) No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game . . . and no person shall carry with him in any automobile any gun or rifle unless the same is unloaded, and knocked down or unloaded and inclosed within a carrying case[.]

Sources: https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search; HeinOnline

# EXHIBIT E

**EXHIBIT E**

**TABLE OF GUNPOWDER LAWS**

| STATE | STORAGE LAWS | MANUFACTURING INSPECTION SALE IGNITE | TRANSPORT LAWS |
|---|---|---|---|
| Alabama | 1848, 1887 | | |
| Alaska | | | 1913 |
| Arizona | 1867,1877 | | 1889 |
| Arkansas | 1887 | 1884 | 1875 |
| California | 1851,1855, 1875 | 1883,1923 | |
| Colorado | 1868,1875, 1886, 1913 | 1911 | |
| Connecticut | 1827,1832, 1832,1859, 1862,1864, 1874, 1901 | 1665,1775, 1836,1923, 1930 | |
| Delaware | 1841,1852, 1865,1885, 1901 | 1845,1911, 1913,1919 | |
| District of Columbia | | | |
| Florida | 1838,1887, 1901 | 1923,1927 | |
| Georgia | 1900 | 1831,1858, 1902 | 1837 |
| Hawaii | 1884,1903, 1933 | | 1933 |
| Idaho | 1863,1897, 1901 | | |
| Illinois | 1855,1869, 1869,1908 | 1851 | |
| Indiana | 1836,1852, 1855,1871, 1879,1895, 1901 | 1847 | |
| Iowa | 1838,1847, 1856,1873, 1907 | 1845 | 1843 |
| Kansas | 1860,1915 | | |
| Kentucky | 1806,1864, 1869,1912 | 1874 | 1898 |
| Louisiana | 1808,1816, 1852,1884, | 1817 | |

| | | | |
|---|---|---|---|
| | 1904 | | |
| Maine | 1821,1821, 1848,1873, 1874 | 1821,1840 | |
| Maryland | 1794,1879, 1900 | 1757 | 1776 |
| Massachusetts | 1715,1719, 1783,1783, 1783,1801, 1847,1870, 1882,1904, 1919 | 1651,1814, 1881,1895, 1898 | |
| Michigan | 1841,1846, 1867,1869, 1879,1901 | 1901 | |
| Minnesota | 1884,1921 | 1858 | |
| Mississippi | 1818,1824 | | |
| Missouri | 1822,1823, 1873,1881, 1887,1909, 1913 | 1921 | |
| Montana | 1887,1903 | | |
| Nebraska | 1867,1897, 1901 | 1869,1895 | |
| Nevada | 1877,1901 | | |
| New Hampshire | 1786,1793, 1854 | 1820,1825, 1891,1913, 1917 | |
| New Jersey | 1811,1837, 1857,1863, 1866,1886, 1902 | 1639,1776, 1811,1886, 1903,1927, 1927 | 1874 |
| New Mexico | 1851,1909 | 1923 | 1887 |
| New York | 1763,1784, 1799,1877, 1885,1900 | 1652,1664, 1690,1744, 1788,1890, 1911 | 1645, 1763, 1877 |
| North Carolina | 1901 | 1905,1909 | |
| North Dakota | 1895,1905 | 1923 | |
| Ohio | 1832,1833, 1835,1856, 1878,1902 | 1849,1889 | |
| Oklahoma | 1903 | 1890,1890, 1899 | |
| Oregon | 1862,1872, | 1903,1913 | |

| | | | |
|---|---|---|---|
| | 1878,1903 | | |
| Pennsylvania | 1725,1783, 1787,1791, 1816,1847, 1868,1887, 1896,1919 | 1682,1721, 1750,1794, 1795 | 1874 |
| Rhode Island | 1762,1798, 1902 | 1762,1776, 1821,1858, 1885 | |
| South Carolina | 1802,1823 | 1802,1890, 1903 | 1901 |
| South Dakota | 1890,1907 | 1913 | |
| Tennessee | 1850,1855, 1895,1901 | 1867,1899 | 1899 |
| Texas | 1839,1899, 1876,1901 | | |
| Utah | 1864,1875, 1888,1901 | 1901 | |
| Vermont | 1876,1882, 1891,1894, 1895,1900 | 1865,1882, 1919 | |
| Virginia | 1629,1879, 1901 | 1623 | 1887 |
| Washington | 1861,1862, 1867,1881, 1881,1883, 1886,1907 | 1896 | |
| West Virginia | 1875,1899, 1901,1909 | 1925 | |
| Wisconsin | 1883,1883, 1919 | 1888,1911, 1911 | |
| Wyoming | 1884,1893, 1900,1907, 1919 | | |
| TOTAL STATES | 49 | 39 | 15 |
| TOTAL LAWS | 195 | 92 | 17 |

SOURCE: Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/; HeinOnline. Note that the unit of analysis here is the law, not the state, though they are arrayed by state for the sake of clarity.

# EXHIBIT F

# EXHIBIT F

# GUNPOWDER STORAGE/USE LAWS

## ALABAMA

1848 Ala. Acts 121–22, An Act To Prevent the Storage of Gun-powder in Larger Quantities Than One Hundred Pounds Within the City of Mobile, § 1.
It shall not be lawful for the Corporation of the City of Mobile, or any person or persons, to receive or keep, or have on storage in any building of any kind within three miles of the Mobile River, or Bay, gun-powder or gun-cotton or any explosive material, in larger quantities than one hundred pounds, unless the same be kept on one of the islands in the Mobile river or bay, in the neighborhood of the city of Mobile, but then the same shall not be kept at any point within the distance of one mile of the eastern bank of said river.

Robert C. Brickell, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887; with Such Statutes Passed at the Session of 1886-87, as are Required to Be Incorporated Therein by Act Approved February 21, 1887; and with Citations of the Decisions of the Supreme Court of the State Construing the Statutes Page 93, Image 103 (Vol. 2, 1887) available at The Making of Modern Law: Primary Sources. 1887
Storing Gunpowder in Town Limits, § 4093. Storing Gunpowder in city or town. – Any person who keeps on hand, at any one time, within the limits of any incorporated city or town, for sale or for use, more than fifty pounds of gunpowder, must, on conviction, be fined not less than one hundred dollars.

## ALASKA

Alaska - Territorial Legislature, First Regular Session 1, 1913, 157-59
CHAPTER 63.
(S. B. No. 41.)
AN ACT to prohibit the transportation of explosives and other dangerous articles on vessels or vehicles carrying passengers for hire.
Be it enacted by the Legislature of the Territory of Alaska:
Section 1. That on and after the passage of this act it shall be unlawful to transport, carry or convey any dynamite, gunpowder, nitro-glycerine, naptha, benzine, gasoline, crude or refined petroleum, or other like explosive burning fluids, or like dangerous articles on any vessel or vehicle of any description operating in the Territory of Alaska, or on the rivers or other waters thereof, when such vessel or vehicle is carrying passengers for hire: Provided, that refined petroleum may be carried on said vessels or vehicles when the same is put in good iron-bound casks, barrels, or boxes, in metallic cans, or vessels carefully packed in boxes, the said casks, barrels, or boxes being plainly marked upon the heads thereof with the name of the manufacturer, the name of the article, and the temperature at which the same will ignite, which must not be less than one hundred and ten (110) degrees Fahrenheit, and the empty barrels, casks, boxes in which said refined oil was carried may be returned to place of shipment by the vessels or vehicles upon which it was originally transported.

Sec. 2. Every package containing explosives or other marked dangerous articles when presented to the master, conductor, or proprietor of any vessel or vehicle for shipment shall have plainly marked on the outside thereof the contents thereof, and it shall be unlawful for any person to deliver, or cause to be delivered, to any vessel or vehicle engaged in commerce by land or water in the Territory of Alaska, or to carry upon any such vessel or vehicle any explosives or other dangerous articles under any false or deceptive marking, description, invoice, shipping order, or other declaration, or' without informing the agent of such carrier of the true character thereof at or before the time such delivery or carriage is made. Whoever shall knowingly violate, or cause to be violated, any provision of this section, or the preceding section, shall be deemed guilty of a misdemeanor and punished by a fine not exceeding two thousand ($2,000) dollars or imprisonment not exceeding eighteen (18) months or both.
Sec. 3. When the death or bodily injury of any perjury son is caused by the explosion of any article named in this act while the same is being placed on any vessel or vehicle to be transported in violation thereof, or while the same is being transported, or while the same is being removed from such vessel or vehicle, the person knowingly placing, or aiding, or permitting the placing of such articles upon any such vessel or vehicle to be transported, shall be imprisoned not more than ten (10) years.
Sec. 4. That nothing in the provisions of this act shall prohibit the transportation of gasoline or any of motive power the products of petroleum on any motor-boat or vessel for use as a source of motive power on such motor-boat or vessel.
Approved, April 29, 1913.

## ARKANSAS

E.W. Rector, Digester, Digest of the Laws and Ordinances of the City of Hot Springs, with the Constitution of the State of Arkansas, General Incorporation Laws of the State and Amendments Thereto, Applicable to the Cities of the First-Class, and in Force on the 1st of January, 1887 Page 61, Image 258 (1887) available at The Making of Modern Law: Primary Sources. 1886 [Ordinances of the] City of Hot Springs, §131. That no person shall carry gun powder, giant powder, dynamite, nitro-glycerine or blasting powder on any vehicle in any part of the city, unless the same shall be secured in kegs, boxes or canisters, sufficiently close to prevent the grains thereof from falling out, and be laid upon or covered over with sheets of canvas or other cloth, and such vehicles shall not be allowed to remain on the streets or sidewalks for more than one hour while containing such gun powder or explosives above mentioned. § 132. That it shall be unlawful to erect or build a powder magazine, or a magazine for any of the explosives mentioned in this ordinance, in the city, within three hundred yards of any other building; and, Provided, That in no case shall it be lawful to build or erect any such magazine in the city unless the same be erected in a safe and secure way, and under permission of the council of the city.

## CALIFORNIA

1851 Cal. Stat. 360–61, An Act to Reincorporate the City of San Francisco, § 13.
To regulate the location of slaughter-houses, markets, stables, and houses for the storage of gun-powder and other combustibles.

1855 Cal. Stat. 27, Laws of the State of California, pt. 10.
To provide for the prevention and extinguishment of fires and to organize and establish fire companies.

1875 Cal. Stat. 628, Statutes of California.
[T]o prohibit the establishment and maintenance of such slaughter-houses, or the storage of gunpowder and other combustibles and explosive substances within the incorporated limits of the city.

**COLORADO**

The Revised Statutes of Colorado: as Passed at the Seventh Session of the Legislative Assembly, Convened on the Second Day of December, A.D. 1867. Also, the Acts of a Public Nature Passed at the Same Session, and the Prior Laws Still in: Together with the Declaration of Independence, the Constitution of the United States, the Organic Act, and the Amendments Thereto Page 606, Image 606 (1868) available at The Making of Modern Law: Primary Sources. 1868
Towns and Cities: Article III. General Powers of Trustees, §1. The board of trustees of every such town shall have control of the finances, and all the property, real and personal, belonging to the corporation; and shall likewise have power within the limits of the town: . . . Seventh, To provide regulations for the prevention and extinguishment of fires; to prevent the erection of wooden buildings within prescribed limits; to regulate the construction of chimneys, furnaces and fire-places; to regulate the storage of gunpowder, gun-cotton, nitro-glycerine, tar, pitch, resin, and other combustible or inflammable materials, and to prescribe the places the places and manner of storing the same.

Thomas M. Patterson, The Charter and Ordinances of the City of Denver, as Adopted Since the Incorporation of the City and Its Organization, November, 1861, to the First Day of February, A.D., 1875, Revised and Amended, Together with an Act of the Legislature of the Territory of Colorado, in Relation to Municipal Corporations Page 135, Image 135 (1875) available at The Making of Modern Law: Primary Sources. 1875
[Ordinances] of the City of Denver, § 12. No person shall keep at his place of business or elsewhere within this city a greater quantity of gunpowder or gun-cotton than twenty-five pounds at one time, and the same shall be kept in tin or copper canisters or cases containing not to exceed five pounds in each and in a situation remote from fires, lighted lamps and candles, and from which they may easily be removed in case of fire; and no person or persons shall sell or weigh any gunpowder or guncotton after the lighting of lamps in the evening unless in sealed canisters or cases; and no person shall be allowed to keep nitro-glycerine in any part of said city. A violation of any of the provisions of this section shall subject the offender to a fine not less than ten dollars nor exceeding one hundred dollars. § 13. It shall be lawful for the Mayor or any member of the City Council, the Chief of Police or police officers or Chief or Assistant Chief Engineer, when any of them shall have cause to suspect that any gunpowder, gun-cotton or nitro glycerine is concealed or kept within the city, in violation of the provisions of this ordinance, to search any place in said city for the purpose of determining whether any gunpowder, gun-cotton or nitro-glycerine is concealed or kept as aforesaid. Any person who shall obstruct or hinder any such officer, making search in the execution of his duties under this section, shall forfeit and pay to said city for each offense a sum not less than ten dollars nor more than one hundred dollars.

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 355, Image 355 (1886) available at The Making of Modern Law: Primary Sources. 1886
Vehicles for Transporting Powder, Sec. 14. No wagon, dray, cart or other vehicle loaded, in whole or in part, with gunpowder or gun-cotton, shall be permitted to stand or remain on any street, alley, highway or place in said city, except when unavoidably detained, and every magazine, safe, box or keg used for storing or transporting, and all vehicles employed in hauling gunpowder or gun-cotton within the city, shall have the word "Powder" painted upon both sides of the same in large letters.

1913 Colo. Sess. Laws 156, To Amend . . . the Revised Statutes of Colorado for 1908, Concerning Powers of Incorporated Towns and Cities, ch. 53, §1.
The city council, or board of trustees in towns, shall have power to regulate or prevent the storage and transportation of gunpowder, tar, pitch . . . or any of the products thereof, and other combustible or explosive material, within the corporate limits, and prescribe the limits within which any such regulations shall apply. Also to regulate the use of lights in stables, shops and other places, and to prevent the building of bonfires; and also to regulate or prevent the storage of gunpowder and other high explosives within the corporate limits and other high explosives within the corporate limits, or within one mile of the outer boundaries thereof. Also, to regulate and restrain the use of fireworks, fire crackers, torpedos, Roman candles, sky-rockets and other pyrotechnic displays.

## CONNECTICUT

Charter and By-Laws of the City of New Haven, November, 1848 Page 48-49, Image 48-49 (1848) available at The Making of Modern Law: Primary Sources. 1827
A By-Law Relative to the Storage and Sale of Gunpowder. Be it ordained by the Mayor, Aldermen, and Common Council of the city of New Haven, in Court of Common Council assembled, 1st. That hereafter no person or persons shall, within the limits hereafter described, either directly or indirectly, sell and deliver any gunpowder, or have, store, or keep any quantity of gunpowder greater than one pound weight, without having obtained a license for that purpose from said Court of Common Council, in the manner herein prescribed. Provided, that nothing in this by-law contained shall be construed to prevent any person or persons from having or keeping in his or their possession, a greater quantity of powder than one pound weight, during any military occasion or public celebration, while acting under any military commander, and in obedience to his orders, or under permission and authority therefor, first had and obtained of the Mayor or some one of the Aldermen of said city. Provided also, That any person or persons purchasing gunpowder, shall be allowed between the rising and setting of the sun, sufficient time to transport the same from any place without said limits, through said limits to any place without the same. 2d. The Court of Common Council aforesaid, shall have power, on application to them made, to grant and give any meet person or persons a license to sell gunpowder, and for that purpose to have, store, and keep gunpowder in quantity not exceeding at any one time seven pounds weight, and that well secured in a tin canister or canisters, and at such place or places within said limits and for such term of time, not exceeding one year, as said Court shall deem fit; which license shall be signed by the Clerk of said Court, and shall be in the form following, viz — Whereas the Mayor, Aldermen, and Common Council of the City of New Haven, in Court of

Common Council convened, have approved of ___, as a suitable and proper person to keep, store, and sell gunpowder within the City of New Haven: We do therefore give license to said ____, to sell gunpowder at (describe the place) and for the purpose aforesaid, to have, keep, and store in said building any quantity of gunpowder not exceeding at any one time seven pounds weight, until the ___ day of ___. Dated, Signed per order, A.B., Clerk. For which license the person receiving the same shall pay the City Clerk twenty-five cents; and the same shall be by said Clerk recorded at full length. And before any license shall be given as aforesaid, the person or persons receiving the same shall pay to the Clerk aforementioned, for the use of said city, a sum after the rate of five dollars per annum. 3d. Before any shall proceed to sell or to store or keep gun-powder by virtue of any such license so given as aforesaid, such person shall put in a conspicuous place upon the front part of the building in which such powder is to be stored or sold, a sign, with the following words plainly and legibly inscribed thereon, viz., “Licensed to keep Powder,” and shall continue the same during the time he shall keep, store, or sell gunpowder in said building. 4th section repealed. 5th. That no person or persons shall put or receive or have any quantity of gunpowder on board of any steamboat, for transportation therein in any of the waters within the limits of said city. 6th. If any person shall sell, keep, or store any gunpowder within the limits aforesaid, contrary to the true intent and spirit of this by-law, or without complying with all the pre-requisites enjoined thereby; or if any person or persons shall put or receive, or have on board of any steamboat for transportation on any of the waters within the limits of said city, any quantity of gunpowder, such person or persons shall forfeit and pay the sum of thirty-four dollars, one half to him who shall give information, and the other half to the use of the city.

Simeon Eben Baldwin, Revision of 1875. The General Statutes of the State of Connecticut, with the Declaration of Independence, the Constitution of the United States, and the Constitution of Connecticut Page 539, Image 590 (1874) available at The Making of Modern Law: Primary Sources. 1832
Qui-Tam Suits and Forfeitures, § 27. Every person, who shall refuse to remove any gun-powder in his charge, when legally requested by the selectmen of the town in which the same is deposited or kept, or who shall not deposit and keep it at the place legally designated by them, shall forfeit fifty dollars.

1832 Conn. Acts 391, An Act Regulating the Mode Of Keeping Of Gunpowder, Chap. 25, § 1-2.
§ 1 . . . [I]t shall be lawful for the select-men of each and every town within this State, or a majority of them, by their order, in writing, directed to the owners or persons having charge of the same, to cause to be removed to some safe and convenient place within said town, and within such time, as in said order may be prescribed, and quantity of gunpowder so deposited or kept, within the limits of said town, as in the opinion of said select-men, or a majority of them, may endanger the persons or dwellings of any individuals whatsoever. Whereupon it shall become the duty of the persons thus notified, to remove the said gunpowder within the time, and to the place specified in said order. § 2. That in case the said gun powder shall not be removed pursuant to said order, as is hereinbefore prescribed the said select-men, or a majority of them, may remove or cause the same to be removed to such place within said town, as in their opinion shall be deemed safe and convenient. And they shall have and retain a lien upon the said powder for all necessary expenses in removing and keeping the same.

1859 Conn. Acts 62, An Act In Addition To And In Alteration Of "An Act For Forming And Conducting The Military Force," chap. 82, § 7.
It shall be the duty of the quarter-master general, annually, to inspect the armories and gun houses of the several companies, and also the rooms occupied by the regimental bands; and, on or before the first day of November, to make to the adjutant-general a full report of the condition of the same, and what companies are entitled to the allowance for armory rent; for which services he shall be allowed the sum of nine cents for every mile of necessary travel.

1862 Conn. Acts 76, An Act In Addition To "An Act to Provide For the Organization And Equipment Of A Volunteer Militia, And To Provide For the Public Defense," chap. 68, § 34.
It shall be the duty of the brigade inspectors of the respective brigades, annually, in the month of October or November, to carefully inspect the armories and gun houses of the companies belonging to their brigades, and also the rooms occupied by regimental bands; and, on or before the first day of December, to make a full report to the quartermaster general of the condition of the same, and of the number of arms and equipments of the state, deposited in such armories and gun-houses . . . .

1864 Conn. Acts 95, An Act In Addition To And In Alteration Of "An Act Relating To The Militia," chap. 73, § 8.
It shall be the duty of the quartermaster general to provide a suitable armory for each company of active militia, upon a certificate from the adjutant general, that such company has organized according to law, and has made requisition for an armory, through the commanding officer of said company, as a drill room and place to preserve its arms and equipments; and also to provide for the expenses of cleaning and keeping in good repair the said arms and equipments, in such manner as he may prescribe.

Charter and Ordinances of the City of Bridgeport: as Amended and Adopted Page 194 (1874) available at The Making of Modern Law: Primary Sources. 1874
An Ordinance Relative to Gunpowder and Explosive Substances. Be it ordained by the Common Council of the City of Bridgeport, § 1. No person shall have, or keep for sale or for any other purpose, within the limits of this city, any quantity of gunpowder or gun-cotton, exceeding one pound in weight; no person shall have, keep for sale, use, or other purpose, within the city limits, any quantity of nitro-glycerine, or other explosive substances or compounds exceeding six ounces, without special license thereof from the common council. No person shall transport any gunpowder through said city without a permit first had and obtained from the fire marshal, and in accordance with such rules and regulations as may be established by said fire marshal. No person shall, within said city, place, receive, or have any gunpowder on board of any steamboat used for the carrying of passengers, with intent to transport the same therein.

1901 Conn. Pub. Acts 602, § 20.
The warden and burgesses, when assembled according to law, shall have power to make, alter, repeal, and enforce such bylaws, orders, ordinances, and enactments as they deem suitable and proper, not inconsistent with this resolution or contrary to the laws of this state or of the United States, for the following purposes: . . . to license, regulate, or prohibit the manufacture, keeping for sale, or use of fireworks, torpedoes, firecrackers, gunpowder, petrolemn, dynamite, or other

explosive or inflammable substance, and the conveyance thereof through any portion of the borough . . . .

**DELAWARE**

1841 Del. Laws 198, A Supplement to the Act Entitled "An Act for Establishing the Boundaries of the Town of Dover, and for Other Purposes Therein Mentioned, § 2.
And be it enacted, That it shall be the duty of the said commissioners, justices and constable to suppress, extinguish and prevent all bonfires from being lighted or kept up on the public square of the said town: and to suppress and prevent the firing of guns, crackers or squibs, by boys or others, within the limits of the said town.

1852 Del. Laws 216, § 27.
to regulate the storage of gunpowder, or any other dangerously combustible matter.

1865 Del. Laws 930, An Act to Prevent the Loading of Gunpowder Within Certain Distances of Railroads, chap. 554, § 1.
That it shall be unlawful for any person or persons to load gunpowder of any kind into cars on any railroad in this State, within one hundred yards of the bed of the regular track used in carrying passengers, and upon conviction of any person engaged in participating in any way in loading or putting gunpowder of any kind into cars standing within one hundred standing within one hundred yards of the regular bed of the railroad engaged in carrying passengers in this State, he shall forfeit and pay to the State a fine of one thousand dollars and be imprisoned for the term of six months, at the discretion of the Court.

W.B. Hvland, Wilmington City Code. The Ordinances of the City of Wilmington, Delaware. Also, the Original Borough Charter, the Charter of the City of Wilmington, and the Acts of the Legislature, Now in Force Relating to the City Page 689, Image 689 (1885) available at The Making of Modern Law: Primary Sources. 1885
[Wilmington] City Ordinances, § 2. For the purpose of supplying retailers of gunpowder within the City of Wilmington, it shall and may be lawful to introduce the same in kegs, containing not more than twenty-five pounds each, carefully enclosed in good bags, or by putting a sheet of canvas under and around the said kegs, sufficient to prevent the gunpowder from scattering from the said carriage, wagon or other vehicle in which it is conveyed, and no one carriage or other vehicle shall contain, at any one time, more than ten of the above described kegs of gunpowder, and if any gunpowder shall be brought into this city, except in the manner and in the quantity herein set forth, and contrary to the provisions of this ordinance, the person or persons owing the said gunpowder, and the person or persons, so conveying the same shall, for each and every such offense, forfeit and pay the sum of five hundred dollars, one moiety to be paid into the city treasury and the other moiety to the person informing and prosecuting the offender to conviction. Provided, That this section shall not extend to that part of the Christiana river included within the city limits; vessels loaded with powder being free to pass in said river along the city front.

1901 Del. Laws 399, Of Ciries and Towns, § 8.

. . . The council may also pass ordinances to . . . regulate the storage of gunpowder or any other dangerous or combustible materials . . . .

**FLORIDA**

1838 Fla. Laws 70, An Act To Incorporate the City of Key West, § 8.
Be it further enacted, That the common council of said city shall have power and authority to prevent and remove nuisances . . . to provide safe storage of gunpowder . . . .

1887 Fla. Laws 164-165, An Act to Establish the Municipality of Jacksonville Provide for its Government and Prescribe its Jurisdiction and Powers, chap. 3775, § 4.
The Mayor and City Council shall within the limitations of this act have power by ordinance to . . . regulate the storage of gun-powder, tar, pitch, resin, saltpetre, gun cotton, coat oil, and other combustible, explosive and inflammable material . . . .

1901 Fla. Laws 262, § 33.
That the Council shall have power to prohibit and suppress all gambling houses, bawdy houses and disorderly houses; any exhibition, show, circus, parade or amusement contrary to good morals, and all obscene pictures and literature; to regulate, restrain or prevent the carrying on of manufactories dangerous in increasing or producing fires; to regulate the storage of gunpowder, tar, pitch, rosin, saltpetre, gun-cotton, coal-oil and all other combustibles, explosives and inflammable material . . . .

**GEORGIA**

1900 Ga. Laws 201, § 15.
Be it further enacted, That the town council of said town shall have power and authority . . . to regulate the keeping and selling of dynamite, gunpowder, kerosene and all other hazardous articles of merchandise.

**HAWAII**

Lawrence McCully, Compiled Laws of the Hawaiian Kingdom Page 86-87, Image 93 (1884) available at The Making of Modern Law: Primary Sources. 1884
Of the Safe Keeping of Gunpowder, § 354. The Minister of the Interior may make such regulations for the storing, keeping and transportation of gunpowder, in any town of the kingdom, as he may think the public safety requires; and no person shall store, keep, or transport any gunpowder, in any other quantity or manner than is prescribed in such regulations. § 355. Whoever shall violate any such regulations, shall be fined for each offense, not less than twenty, nor more than one hundred dollars. § 356. All gunpowder introduced into, or kept in any town contrary to said regulations, may be seized by any sheriff, or any other officer of police, and the same shall be forfeited for the benefit of the public treasury. § 357. Any person injured by the explosion of any gunpowder, in the possession of any person contrary to the regulations prescribed by the Minister of the Interior, may have an action for damages against the person having custody or possession of the same, at the time of the explosion, or against the owner of the same, if cognizant of such neglect. § 358. All sheriffs, and other officers of police, shall have

authority to enter any building, or place, to search for gunpowder supposed to be concealed there contrary to law; and any Police or District Justice, may grant a search warrant for that purpose. § 359. No regulations for the safe keeping of gunpowder shall take effect until they have been published three weeks successively in some newspaper in the town, or by posting up attested copies of them in three conspicuous places in such town.

1903 Haw. Sess. Laws 55, ch. 8, § 25.
To adopt such rules and regulations within the County with regard to the keeping and storing of gun powder, Hercules powder, giant powder, kerosene or coal oil, benzoin, naptha or other explosive or combustible material, as the safety and protection of the lives and property of individuals may require.

1933 Haw. Sess. Laws 38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 6.
The possession of all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn, or to carriage as merchandise in a wrapper from the place of purchase to the purchaser's home, place of business or place of sojourn, or between these places and a place of repair, or upon change of place of business, abode, or sojourn, except as provided in Sections 5 and 8; provided, however, that no person who has been convicted in this Territory or elsewhere, of having committed or attempted a crime of violence, shall own or have in his possession or under his control a pistol or revolver or ammunition therefor. Any person violating any provision of this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

## IDAHO

1863 Id. Sess. Laws 634, To Incorporate the City of Idaho in Boise County, § 5.
Said mayor and common council shall have full power and authority . . . to regulate the storage of gunpowder and other combustible materials . . . .

1897 Id. Sess. Laws 89, § 2, pt. 18.
To regulate the storage and sale of gun powder, or other combustible material, and to prevent by all possible and proper means, danger or risk of injury or damage by fire arising from carelessness, negligence or otherwise.

1901 Id. Sess. Laws 117, 120, § 37.
The Council of Boise City has full power and authority within Boise City . . . To regulate the storage and sale of gunpowder, dynamite, giant powder, nitro-glycerine, oil and other combustible material, and prevent their manufacture in the city, and to prevent by all possible and proper means, danger or risks of injury or damage by fire arising from carelessness, negligence or otherwise.

## ILLINOIS

1855 Ill. Laws, 25, An Act To Incorporate the Town of Daville, § 16.

[The town council shall have the power] To regulate the storage of tar, pitch, rosin, gun-powder and other combustible materials.

1869 Ill. Laws 17, § 10.
[The Town council shall have power and authority] to regulate the storage of gunpowder and other combustible materials.

Revised Ordinances of the City of Galesburg, the Charter and Amendments, State Laws Relating to the Government of Cities and Appendix Page 122-123, Image 127-128 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of Galesburg, Ill.], Gunpowder-Fires, Fire-Arms, § 1. The keeping for sale or selling gunpowder, without a license therefor, is prohibited, and no license shall be issued allowing the keeping in store more than twenty-five pounds of gun powder at any one time, unless kept in some secure magazine or fire-proof powder house, located at least one hundred feet from any other occupied building, and when kept in a store or place for retail it shall be kept in tin or other metallic canisters or cases, and in a part of the building remote from any fire, lamp, candle or burning matter liable to produce explosion, and whoever shall violate this section, or any provision of it, shall be subject to a penalty of twenty dollars. § 2. Each person licensed to sell gunpowder shall keep a sign, with the words "Gunpowder for Sale," in plain letters, in some conspicuous place in the front of the building where such powder is kept. And no sales of gunpowder, except in unopened cans shall be sold after night, and any person convicted of violation of any of the provisions of this section shall be subject to a penalty of ten dollars. § 3. Whoever shall bring or cause to be brought into the city any gunpowder concealed in any box or other package, or in any package marked as containing other articles, in which such powder is contained, shall be subject to a penalty of twenty-five dollars. §4. The carrying gunpowder through the streets or other public places, in a careless or negligent manner, or the remaining with such powder in any place longer than necessary for the transportation of the same from one place to another, shall subject the party offending to a penalty of not less than five dollars. . .

1908 Ill. Laws 40-41, Regulate Storage of Combustibles–Fireworks, ¶1334, pt. 65.
To regulate and prevent storage of gunpowder, tar, pitch, resin, coal oil, benzine, turpentine, hemp, cotton, nitro-glycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bon-fires; also to regulate and restrain the use of fireworks, fire crackers, torpedoes, Roman Candles, sky rockets and other pyrotechnic displays.

## INDIANA

1836 Ind. Acts 77, An Act to Prevent Disasters on Steam Boats, § 7. 1836
That when gunpowder is shipped on board a steam boat, which shall at all times by stowed away at as great a distance as possible from the furnace, and written notification thereof shall be placed in three conspicuous parts of the boat; and in the event of such notification not being so exhibited, then for any loss of property or life for which the powder may be deemed the cause, the owner shall be liable . . . .

The Revised Statutes of the State of Indiana, Passed at the Thirty-Sixth Session of the General Assembly; Also, Sundry Acts, Ordinances, and Public Documents Directed to be Printed Along with the Said Statutes: To Which are Prefixed the Constitution of the United States and of the State of Indiana Page 485-486, Image 499-500 (Vol. 1, 1852) available at The Making of Modern Law: Primary Sources. 1852
Towns, § 22. The board of trustees shall have the following powers, viz: . . .Third. . . to regulate the storage of gun-powder, and other dangerous materials;

W.G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855
Ordinances [of Jeffersonville], § 3, pt. 10. It shall also be a nuisance and unlawful: . . . To keep in any one building more than twenty five pounds of gun powder, except in a powder house or Magazine, or to keep any quantity of gun powder for sale except in some metallic vessel and having the words “gun powder” in letters at least three inches long always affixed in some conspicuous place on the house in which it is kept.

The Charter, General Ordinances, &c., of the City of Evansville Page 230, Image 230 (1871) available at The Making of Modern Law: Primary Sources. 1871
General Ordinances [of the City of Evansville], § 23. It shall not be lawful for any person to keep within the limits of the city any gun or blasting powder, in any quantity greater than twenty-five pounds at one time; and it shall not be lawful to keep twenty-five pounds of such powder, or any less quantity, in any other vessel than a tin canister, with a proper cover or stopper, and labelled with the words “gunpowder;” nor shall it be lawful for any person to sell any such powder after twilight, or by candle or gas light.

1879 Ind. Acts 210, An Act To Amend the Thirtieth Section of an Act Entitled “An Act Granting The Citizens Of The Town Of Evansville, In The County Of Vanderburgh,” pt. 9.
To regulate the keeping and conveying of gunpowder, and all other combustible and dangerous materials, and the use of candles and lights in barns and stables.

The General Ordinances of the City of Indianapolis. Containing also, Acts of the Indiana General Assembly so far as they Control Said City, to which Prefixed a Chronological Roster of Officers fro, 1832 to 1895 and Rules Governing the Common Council. Revision of 1895 Page 230, Image 312 (1895) available at The Making of Modern Law: Primary Sources. 1895
Laws and Ordinances [of the City of Indianapolis], § 12. The Chief Fire Engineer is hereby required to search any building standing in a compact portion of the city, and in which there shall be cause to suspect the keeping of gun-powder in a quantity greater than twenty-five pounds; and in case of discovery of the same, in such quantity, it shall be seized by such Engineer and removed to some safe place; and it shall be his duty to prosecute the owner or occupant of the building before the Mayor [Police Judge]; and the defendant, upon being convicted of having committed the offense, shall be fined in any sum not exceeding fifty dollars nor less than five dollars, and he shall also be adjudged to pay the costs of the removal of the powder. § 13. Any person who shall keep, or knowingly suffer to be kept, in any building, any quantity of gun-powder greater than twenty-five pounds, or shall aid in or have knowledge of, such keeping, without giving immediate notice thereof to said Engineer or Marshal [Superintendent of Police], or to some member of said Council on conviction of such offense before the Mayor [Police

Judge], shall be fined in any sum not less than one dollar nor more than ten dollars, for every day during which gunpowder shall be stored or kept. § 14. All gunpowder, kept for retail, in quantities less than twenty-five pounds, shall, at all times, be kept in a canister of tin or other metal, securely covered from danger of fire; or, if the same be kept in a cask or other combustible vessel, such cask or vessel shall be enveloped in a close leather bag. Whoever shall keep any gunpowder for retail in said city in any other manner than as prescribed in this section, on conviction of such offense before said Mayor [Police Judge], shall be fined in any sum not less than one dollar nor more than ten dollars, for every day during which the same shall have been so kept. § 15. If any person shall transport gunpowder through the compact portion of said city in a greater quantity than one hundred pounds, or without having the casks containing the same either enveloped in close leather bags or conveyed in a close-covered carriage, on conviction of such offense before the Mayor [Police Judge], he shall be fined in any sum not less than twenty dollars nor more than fifty dollars.

1901 Ind. Acts 206, Public Comfort and Health, § 4077.
For the purpose of this paragraph jurisdiction is given such city four miles form the corporate limits . . . To regulate or prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzene, turpentine, hemp, cotton, nitroglycerine, dynamite, giant powder, petroleum, gasoline or gas, or any product thereof or any other explosive or combustible material or any material which may seem dangerous.

**IOWA**

1838 Iowa Acts 449, An Act to Prevent Disasters on Steam Boats, Navigating the Waters Within the Jurisdiction of the Territory of Iowa, §§ 11-12.
§ 11. It shall be the duty of the master, and officers, of any steam boat carrying gunpowder, as freight, to store the same in the safest part of the vessel, and separate and apart from articles liable to spontaneous combustion, and where, in discharging the cargo, it will not be necessary to carry any lighted lamp, torch, or candle, and the master and officers failing to comply with the provisions of this section, shall forfeit one hundred dollars each . . . . § 12. It shall not be lawful for any person, or persons, to put, or keep any gun powder on any steam boat, without first giving the master, or officers, notice thereof, and any person, or persons, so offending, shall be liable to pay the sum of one hundred dollars . . . .

Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 72-73, Image 72-73 (1856) available at The Making of Modern Law: Primary Sources. 1847
Burlington City Ordinances, An Ordinance to Regulate the Storage and Sale of Gunpowder in the City of Burlington, § 1. Be it ordained by the city Council of the city of Burlington, That it shall not be lawful for any merchant, trader, or other person, to retail or deliver gun-powder in said city in the night time, under a fine of five dollars. §2. It shall not be lawful for any such person to keep for sale or other purposes in said city, in his place of business, more than twenty-five pounds of gun-powder at any one time, and then only in a safe canister. § 3. It shall not be lawful for any person whatsoever to store away gun-powder for safe keeping, in any quantity whatever, in any ware-house, dwelling house, cellar, or other building or place, within the limits of said city, unless such house or place shall have first been designated by the city Council of

said city and by them approbated as a suitable place for that purpose, and then only so long as the same shall from time to time be deemed suitable by the said city Council. § 4. If any person shall violate any of the provisions of the third section of this ordinance he shall forfeit for the use of the corporation all the gun-powder which the person so violating the same may have on hand, and on conviction thereof, shall also pay a fine of one hundred dollars, and the city Marshal shall seize and remove such powder to a secure place and dispose of it by sale, and pay the proceeds, reserving costs and charges, into the city treasury.

Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 159, Image 159 (1856) available at The Making of Modern Law: Primary Sources. 1856
Burlington City Ordinances, [To Prevent Fires,] § 9. The Mayor, wharf master, or either fire warden may give such directions as either of them may think proper, relative to the location of any boat having on board gunpowder, gun cotton, hay or other combustible materials; each of said officers are hereby respectively empowered to put in force any order or direction given under this section. Any person refusing or neglecting to obey such orders or directions shall be liable to the penalty provided in the last section of this Ordinance.

The Code: Containing All the Statutes of the State of Iowa, of a General Nature, Passed at the Adjourned Session of the Fourteenth General Assembly Page 76-77, Image 88-89 (1873) available at The Making of Modern Law: Primary Sources. 1873
Cities and Incorporated Towns, Powers, § 456. They shall have power to prevent injury or annoyance from anything dangerous offensive or unhealthy, and to cause any nuisance to be abated; to regulate the transportation and keeping of gunpowder or other combustible, and to provide or license magazines for the same; to prevent and punish fast or immoderate riding through the streets; to regulated the speed of trains and locomotives on railways running over the streets or through the limits of the city or incorporated town by ordinance, and enforce the same by a fine not exceeding one hundred dollars: to establish and regulate markets; to provide for the measuring or weighing of hay, coal, or any other article of sale; to prevent any riots, noise, disturbance, or disorderly assemblages; to suppress and restrain disorderly houses, houses of ill fame, billiard tables, nine or ten pin alleys, or tables and ball alleys, and to authorize the destruction of all instruments or devices used for purposes of gaming, and to protect the property of the corporation and its inhabitants and to preserve peace and order therein.

1907 Iowa Acts 81, ch. 76, § V(e).
If there be kept, used or allowed on the within described premises benzine, benzole, dynamite, ether, fireworks, gasoline, Greek fire, gunpowder, exceeding twenty-five pounds in quantity, naptha, nitroglycerine, or other explosives, phosphorous, calcium carbide, petroleum or any of its products of greater inflammability than kerosene of lawful standard, which last named article may be used for lights and kept for sale according to law, in quantities not exceeding five barrels.

## **KANSAS**

1860 Kan. Sess. Laws 137, An Act to Amend and Consolidate the Several Act Relating to the City of Lawrence, § 35, pt. 7 1860

To regulate the keeping and conveying of gun powder and other combustible and dangerous materials, and the use of candles and lights in barns and stables.

1915 Kan. Sess. Laws 347, An Act providing for Public Safety by Regulating the Storage Handling and Disposition of Dynamite, Giant Powder, Nitro-glycerine, Gun Cotton and Other Detonating Explosives, Providing Penalties for Violation of this Act and Repealing all Acts in Conflict Herewith, § 1.
Any person, firm or corporation, in this state, who shall sell, give away or otherwise dispose of, any dynamite, giant powder, nitro-glycerine, gun cotton or other detonating explosive, shall keep a record, in a substantially bound book, which record shall set forth the kind and amount of explosives delivered, the time of delivery, the uses and purposes for which same are delivered and the place at which it is to be used . . . .

**KENTUCKY**

1806 Ky. Acts 122, An Act to Amend the Several Acts for the Better Regulation of the Town of Lexington, § 3.
Be it further enacted, That said trustees are herby authorised [sic] to make such regulations as they may deem necessary and proper, relative to the keeping of gun-powder in the said town of Lexington, and if necessary may prohibit any inhabitants of said town, from keeping in the settled parts thereof, any quantity of gun powder which might in case of fire be dangerous . . . .

Charter of the City of Covington, and Amendments Thereto up to the Year 1864, and Ordinances of Said City, and Amendments Thereto, up to the Same Date Page 148-149, Image 148-149 (1864) available at The Making of Modern Law: Primary Sources. 1864
Ordinances of the City of Covington, An Ordinance Regulating the Sale of Powder in the City of Covington, § 1. Be it ordained by the City Council of Covington, That it shall not be lawful for any person or persons to erect, within the limits of the corporation, any powder magazine, or any other building for the purpose of storing gun powder in greater quantities than is hereinafter specified; and any person violating the provision of this section, shall, on conviction before the Mayor, forfeit and pay a fine of one hundred dollars, and ten dollars for every twenty-four hours said building shall be used or occupied for the storage of more than twenty-five pounds of powder. § 2. Be it further ordained, That it shall not be lawful for any person to keep, in storage or for sale, more than one hundred pounds of powder in any one house in said city, at any one time: and that amount, or any part thereof, shall be securely and carefully kept, and closed up in a good and sufficient safe, so that it can not by any means be exposed. A violation of this section shall subject the person to a fine, on conviction, of five dollars for every offense. § 3. Be it further ordained, That no person or persons shall sell, or keep for sale, in said city, any gun powder without having first obtained a permission so to do from the Mayor of said city, who shall, before said license is granted, be fully assured and satisfied that the applicant has good and sufficient safes to keep powder in, in conformity with the second section of this ordinance; and when the Mayor is satisfied that the license may be granted, without too much risk to the community at large, he shall issue said license to the applicant, upon his paying into the City Treasury the sum of twenty dollars for one year's license, and to the Mayor fifty cents, and to the City Clerk twenty-five cents, for their certificates. Any person who shall sell any gun powder in said city from and after the passage of this ordinance, without having first obtained a license

therefor, shall, for each and every offense, forfeit, pay, on conviction, the sum of five dollars and costs.

1869 Ky. Acts 481, An Act to Amend and Reduce into One the Several Acts in Reference to the Town of Princeton, art. V, pt. 14.
To regulate the keeping and conveying of gun-powder and other combustible and dangerous materials.

1912 Ky. Acts 593, Regulate Storage of Explosives and Provide Against Fires, § 17.
To regulate the storage of gunpowder, rosin, tar, pitch, cotton, oil and all other explosives and combustible material, and to appoint some suitable person or persons, at seasonable times, to enter and examine such houses as they may designate, in order to ascertain whether any of such houses are in a dangerous condition with reference to fires, and to cause such as are in a dangerous condition to be immediately put in safe order and condition.

**<u>LOUISIANA</u>**

Police Code, or Collection of the Ordinances of Police Made by the City Council of New-Orleans. To Which is Prefixed the Act for Incorporating Said City with the Acts Supplementary Thereto Page 114-116, Image 112-114 (1808) available at The Making of Modern Law: Primary Sources. 1808
[Ordinances of the City of New Orleans, An Ordinance for Preventing Fires,] Art. 15. Captains of vessels are obliged, within twenty four hours from their arrival in this port, to deposit the gun-powder they may have on board, in the powder-magazine situate on the right bank of the river, the owner paying to the keeper of the magazine a suitable compensation. All citizens are strictly forbidden to keep in their houses, or elsewhere within the city or suburbs, more than one hundred pounds of gun-powder at a time, and in case of fire, such as live near the place where it is, if they have powder in their houses, shall be obliged to throw into their wells the barrels containing the same. These dispositions must be complied with, under the penalty of a fine, not exceeding fifty dollars, to be levied on every delinquent, who shall moreover be liable to the damage that may result.

1816 La. Acts 92, An Act to Amend the Act Entitled "An Act to Incorporate the city of New Orleans" and the Act Entitled "An act to determine the mode of election of the mayor, recorder and other public officers necessary for the administartion and police of the city of New Orleans and for Other Purposes [sic], § 1.
. . . [T]he mayor and city council of the city of New Orleans shall have full power and authority . . . [T]o prevent gun powder being stowed within the walls and suburbs in such quantity as to endanger the public safety . . . .

Levi Peirce, Commissioner, The Consolidation and Revision of the Statutes of the State, of a General Nature Page 185, Image 193 (1852) available at The Making of Modern Law: Primary Sources. 1852
Crimes and Offences, Manslaughter. § 5. When gunpowder is shipped on board of a steamboat, which shall at all times be stowed away at as great a distance as possible from the furnace, a written notification of the fact shall be placed in three conspicuous parts of the boat; and in the

event of such notification not being so exhibited , then for any loss of property, or life, for which the powder shall be deemed the cause, the owner shall be liable to the shipper for the full amount of said loss or damage; and the captain, in the event of loss of life being the result of such accident, shall be adjudged guilty of manslaughter. § 6. Any person or persons who shall ship or put on board, or cause to be shipped or put on board of any steamboat, within this State, any gunpowder, without giving notice thereof a the time of making the shipment to the master clerk of said boat, shall be liable to a penalty of two hundred dollars, which may be sued for and recovered before any court of competent jurisdiction by the owner, captain or clerk of said boat, for his or her own use and benefit; and in case of any loss of property in consequence of gunpowder being on board of said boat, the shipper that shall have failed to give due notice, as herein required, shall be liable for all losses of property or damage done thereto, or for any injury done to any person or to their family; and in case of the loss of the life of an individual on board, in consequence of gunpowder being on board, the person of persons who shall have shipped the same, without giving due notice thereof, shall, on conviction thereof, be adjudged guilty of manslaughter, and punished accordingly.

Albert Voorhies, Ex-Justice, Revised Laws of Louisiana, Approved March 14th, 1870, with Copious References to the Acts of the Legislature from and Including the Sessions of 1870, up to and Including the Session of 1882. Second Edition Page 161, Image 171 (1884) available at The Making of Modern Law: Primary Sources. 1884
Crimes and Offences, § 949. When gunpowder is shipped on board of a steamboat it shall be stored away at as great a distance as possible from the furnace, and a written notification of the fact shall be placed in three conspicuous parts of the boat; and in the event of such notification not being so exhibited, then for any loss of property or life for which the powder may be deemed the cause, the owner and captain shall be liable to the penalty provided in the proceeding section. § 950. Any person who shall ship or put on board, or cause to be shipped or put on board of any steamboat within this State, any gunpowder, without giving notice thereof, at the time of making the shipment, to the master or clerk of said boat, shall be liable to a penalty of two hundred dollars , which may be sued for and recovered by the owner, captain or clerk of said boat, for his own use and benefit; and in case of any loss of property in consequence of gunpowder being on board of said boat, the shipper that shall have failed to give due notice as herein required, shall be liable therefor, or for any injury done to any person or to his family; and in the case of loss of life the person who shall have shipped the same without giving due notice thereof, shall, on conviction be adjudged guilty of manslaughter.

1904 La. Acts 20, § 5.
That all forfeitures and fines be imposed by the Board of Fire Commissioners, from time to time, upon any member or members of the fire department force by way of discipline, shall be paid into said pension and relief fund. That all fines imposed by the courts for infractions of City ordinances relative to fire escape, fire wells and hydrants, open hatches, oils, gunpowder, right of way of the fire apparatus through the streets, and all other laws relative to the fire department, be paid over by the City Treasurer to said pension and relief fund.

**MAINE**

Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix Page 112-113, Image 183-184 (Vol. 1, 1821) available at The Making of Modern Law: Primary Sources. 1821
An Act for the prevention of damage by Fire, and the safe keeping of Gun Powder. § 1. Be it enacted by the Senate and House of Representatives, in Legislature assembled, That the Selectmen of each town within this State, containing not less than fifteen hundred inhabitants, be, and they hereby, are authorized and empowered to make rules and regulations, from time to time, in conformity with which, all gun powder which is or may be within such town, shall be kept, had or possessed therein; and no person or persons shall have, keep, or possess within such town, any gun powder, in any quantity, manner, form or mode, other than may be prescribed by the rules and regulations aforesaid. § 2. Be it further enacted, That any person or persons who shall keep, have or possess any gun powder, within any town, contrary to the rules and regulations which shall be established by the Selectmen of such town, according to the provisions of this Act, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding one hundred dollars, for each and every offence, to be recovered by action of debt in any Court proper to try the same. § 3. Be it further enacted, That all gun powder which shall be had, kept or possessed, within any town, contrary to the rules and regulations which shall be established by the Selectmen of such town, according to the provisions of this Act, may be seized by any one or more of the Selectmen of such town, and shall within twenty days next after the seizure thereof, be libelled, by filing with any Justice of the Peace in such town, a libel, stating the time, place and cause of seizure, and the time and place when and where trial shall be had before said Justice, and a copy of said libel shall be served by the Sheriff, or his deputy, on the person or persons, in whose possession the said gun powder shall have been seized. . .

1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5. 1821
Be it further enacted, That it shall, and may be lawful for any one or more of the Selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefor according to law.

The Revised Ordinances of the City of Portland, 1848 Page 22, Image 22 (1848) available at The Making of Modern Law: Primary Sources. 1848
[Ordinances of the City of Portland,] Of Gunpowder, § 1. No person not licensed to keep and sell gunpowder shall keep or have in his shop, store, dwelling house or other tenement, at any one time, a larger quantity of gunpowder than one pound. § 2. No person licensed to keep and sell gunpowder shall have or keep in his store, shop, dwelling house or in any other tenement or place whatever at any one time, a larger quantity of gunpowder then twenty-five pounds. § 3. Every person licensed to keep and sell gunpowder shall provide himself with a strongly made copper chest or box with a copper cover well secured, with hinges and a lock of the same material, and the keg or canister in which said powder may be, shall be kept in said copper chest or box, which shall at all times be placed near the outer door of the building in which it is kept, in convenient place to remove in case of fire. § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board a quantity of gunpowder exceeding twenty-five pounds, or receive gunpowder on board exceeding twenty-five pounds, without first having obtained a

permit from the mayor and aldermen, and said permit shall designate the wharf at which said powder may be landed, or received on board.

The Charter, Amendments, and Acts of the Legislature Relating to the Municipal Court, and the Ordinances of the City of Lewiston, Together with the Boundaries of the Several Wards, Regulations Respecting Gunpowder, and an Abstract of the Laws Relating to the Powers and Duties of Cities and Towns Page 43, Image 43 (1873) available at The Making of Modern Law: Primary Sources. 1873
Regulations Relating to Gunpowder, § 1. No person shall keep or have in any shop, store, dwelling house or tenement, in the city of Lewiston, at any one time a larger quantity of gun-powder than one pound, unless he is licensed by the mayor and aldermen to keep and sell gunpowder, or except as hereinafter provided. § 2. It shall not be lawful for any person or persons to sell any gunpowder which may at the time be within said city, in any quantity, by wholesale or retail, without having first obtained from the mayor and aldermen a license to sell gunpowder, and every license shall be written or printed, and duly signed by the mayor, on a paper upon which shall be written or printed a copy of the rules and regulations established by the city relative to keeping, selling and transporting gunpowder within said city; and every such license shall be in force one year from the date thereof, unless revoked by the mayor and aldermen; but such license may, prior to its expiration, be renewed by an endorsement thereon by the mayor, for the further term of one year, and so from year to year, provided, always, that it may at any time be rescinded or revoked by the mayor and aldermen, for good and sufficient reasons. § 3. Every person who shall receive a license to sell gunpowder, as aforesaid, shall pay for the same to the treasurer of the city the sum of three dollars, and for each renewal of the same, the sum of one dollar.

A.G. Davis, City Clerk, Charter and Ordinances, and Rules and Orders of the City Council. Revised February 1874 Page 52, Image 53 (1874) available at The Making of Modern Law: Primary Sources. 1874
City Ordinances, § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board more than twenty-five pounds of gun-powder, nor discharge or receive on board exceeding that quantity, without having first obtained from the Mayor a permit therefor, designating the wharf at which said powder may be landed or received on board.

**MARYLAND**

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 246, Image 239 (1811) available at The Making of Modern Law: Primary Sources. 1794
1794 Md. Laws 246, Art. 32. That if any member of society shall suffer any damage by storing gunpowder in town, or breaming ships or other vessels at the wharfs, occasioned by the act, assent or direction, of such member, the insurance of such member so suffering damage, shall thereupon become void.

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force

on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 589, Image 598 (1893) available at The Making of Modern Law: Primary Sources. 1879
Fire – Ordinances [of Baltimore], (City Code, (1879,) Art. 20, sec. 53) § 63. All gunpowder brought within the limits of the city by land, or into the port or harbor, in any ship or vessel, other than a ship or vessel of war, shall be stored in the said magazine as aforesaid; if brought by land as aforesaid, within seventeen hours thereafter; if brought into the port or harbor as aforesaid, within forty-eight hours after the ship or other vessel thus bringing it shall have broken bulk; proved the quantity thus brought in shall exceed the weight of one quarter barrel as above defined; or being of such weight and no more, shall be well secured in tin canisters; nor shall it be lawful for any ship or vessel, other than a ship or vessel of war, bringing gunpowder into the port or harbor of Baltimore, or having gunpowder on board, in a greater quantity than the weight of the quarter barrel as aforesaid; or being of such weight and no more, not secured as above provided, to approach, lie at anchor, or moor nearer than two hundred yards to any wharf, or land within the limits of said city, or discharge, land or deliver gunpowder in a greater quantity or otherwise secured than aforesaid, at any place within the said city, than at the wharf of the magazine aforesaid. . .

1900 Md. Laws 287-88, General Powers, § 181.
The Common Council shall have power to pass all such ordinances, not contrary to the Constitution and laws of this State, as it may deem necessary to the good government of the town . . . to regulate or prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzene, turpentine, hemp, cotton, nitro-glycerine, dynamite, giant powder, petroleum, gasoline or gas, or any product thereof, or any other explosive or combustible material or any material which may seem to be dangerous.

## **MASSACHUSETTS**

1715 Mass. Acts 311, An Act in Addition to an Act for Erecting of a Powder-house In Boston.
…That, from and after the publication hereof, any person within the town of Boston, that shall presume to keep, in his house or Warehouse, any powder, above what is by law allowed, shall forfeit and pay, for every half-barrel, the sum of five pounds . . . That any person or persons whosoever, that shall throw any squibs, serpents, or rockets, or perform any other fireworks within the streets, . . (shall be fined).

1719 Mass. Acts 348, An Act In Further Addition To An Act For Erecting A Powder House In Boston, ch. III, § 1
… That, from and after the publication of this Act, no gunpowder shall be kept on board any ship, or other vessel, lying to or grounded at any wharf within the port of Boston. And if any gunpowder shall be found on board such ship or vessel lying aground, as aforesaid, such powder shall be liable to confiscation, and under the same penalty, as if it were found lying in any house or warehouse. And be it further enacted by the authority aforesaid, that no powder be carried through any town upon trucks, under the penalty of ten shillings per barrel for every barrel of powder so conveyed, and so proportionally for smaller cask.

1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2
"That all cannon, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having in them any gun-powder, shall be liable to be seized by either of the Firewards of the said Town: And upon complaint made by the said Firewards to the Court of Common Pleas, of such cannon, swivels, mortar, or howitzers, being so found, the Court shall proceed to try the merits of such complaint by a jury; and if the jury shall find such complaint supported, such cannon, swivel, mortar, or howitzer, shall be adjudged forfeit, and be sold at public auction.

1783 Mass. Acts 218, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder Within the Town of Boston, ch.13
The depositing of loaded arms in the houses of the town of Boston is dangerous…That if any person shall take into any dwelling-house, stable, barn, out-house, ware-house, store, shop or other building, within the Town of Boston, any cannon, swivel, mortar, howitzer, or cohorn, or fire-arm, loaded with, or having gun powder in the same, or shall receive into any dwelling-house, stable, barn, outhouse, store, warehouse, shop, or other building, within the said town, any bomb, grenade, or other iron shell, charged with, or having gun-powder in the same, such person shall forfeit and pay the sum of ten pounds…

Act of March 1, 1783, ch. 13, 1783 Mass. Acts, p. 218; Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating to the City Page 142-143, Image 142 (1834) available at The Making of Modern Law: Primary Sources. 1783
An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston. Whereas the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in said town. § 1. Be it enacted by the Senate and House of Representatives in General Court assembled and by the authority of the same, That if any person shall take into any dwelling house, stable, barn, out house, ware house, store, shop or other building within the town of Boston, any cannon, swivel, mortar, howitzer, cohorn, or fire arm, loaded with or having gunpowder in the same, or shall receive into any dwelling house, stable, barn, out house, store, ware house, shop, or other building within said town, any bomb, grenade, or other iron shell, charged with, or having gun powder in the same, such person shall forfeit and pay the sum of ten pounds, to be recovered at the suit of the firewards [duties of Firewards transferred to Engineers,] of the said towns, in an action of debt before any court proper to try the same; one moiety thereof, to the use of said Firewards, and the other moiety to the support of the poor of said town of Boston. § 2. Be it further enacted, That all cannons, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron shells of any kind, that shall be found in any dwelling house, out house, stable, barn, store, warehouse, shop or other building, charged with or having in them any gunpowder, shall be liable to be seized by either of the Firewards of said town; and upon complaint made by the said Firewards to the Court of Common Pleas, of such cannon, swivels, mortars, or howitzers, being so found, the Court shall proceed to try the merits of such complaint by a jury; and if the jury shall find such complaint supported, such cannon,

swivel, mortar or howitzer, shall be adjudged forfeit, and sold at public auction; one half of the proceeds thereof shall be disposed of to the Firewards, and the other half to the use of the poor of the town of Boston. And when any fire arms, or any bomb, grenade, or other shell, shall be found in any house, out house, barn, stable, store, ware house, shop or other building, so charged, or having gun powder in the same, the same shall be liable to be seized in manner aforesaid; and on complaint thereof, made and supported before a Justice of the Peace, shall be sold and disposed of, as is above provided for cannon.

1801 Mass. Acts 507, An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and to Prevent Damage from the Same, ch. XX
§1… That all Gun Powder imported and landed at the port of Boston, shall be brought to and lodged in the Powder House or Magazine in said town, and not elsewhere, on pain of confiscation of all Powder put or kept in any other house or place…

Joseph Barlow Felt Osgood, The Charter and Ordinances of the City of Salem, Together with the Acts of the Legislature Relating to the City: Collated and Revised Pursuant to an Order of the City Council Page 67-68, Image 77-78 (1853) available at The Making of Modern Law: Primary 1847
[Ordinances of Salem,] Fire, § 18. By an act passed March, 6 1847, the inhabitants of any town, and the government of any city in this Commonwealth, may order than no gun-cotton, or other substance prepared, like it, for explosion, shall be kept within the limits of such town or city, excepting under the regulations and penalties that were then applicable by law to gunpowder; and if it shall be considered necessary for public safety, they may restrict the quantity to be so kept to one-fifth of the weight of gunpowder allowed by law in each case provided for. . . § 22. The inhabitants of every town may order, that no gunpowder shall be kept in any place, within the limits of such town, unless the same shall be well secured in tight casks or canisters; and that no gunpowder above the quantity of fifty pounds, shall be kept or deposited in any shop, store, or other building, or in any ship or vessel which shall be within the distance of twenty-five rods from any other building or wharf; that no gunpowder, above the quantity of twenty-five pounds, shall be kept or deposited in any shop, store, or other building, within ten rods of any other building; and that no gunpowder, above the quantity of one pound, shall be kept or deposited in any shop, store, or other building, within ten rods of any other building in such town, unless the same be well secured in copper, tin, or brass canisters, holding not exceeding five pounds each, and closely covered with copper, brass or tin covers.

Municipal Register of the City of Lawrence. 1870 Page 185, Image 185 (1870) available at The Making of Modern Law: Primary Sources. 1870
[Ordinances of Lawrence,] Concerning Fires, § 4. The city council may order that no gunpowder shall be kept within the city, except in tight casks or canisters; that not more than fifty pounds thereof shall be kept in any building within twenty-five rods of any other building, or if within ten rods, then not more than twenty-five pounds; nor more than one pound in any place, unless in copper, tin or brass canisters holding not more than five pounds each, and closely covered.

Simeon Eben Baldwin, The Public Statutes of the Commonwealth of Massachusetts, Enacted November 19, 1881; to take effect February 1, 1882. with the Constitutions of the United States and the Commonwealth, A Schedule of Acts and Resolves and Parts of Acts and Resolves

Expressly Repealed, Tables Showing the Disposition of the General Statutes and of Statutes Passed since the General Statutes, Glossary, and Index Page 381, Image 425 (1882) available at The Making of Modern Law: Primary Sources. 1882
Gunpowder, § 29. Gunpowder manufactured in this commonwealth shall be put into strong and tight casks containing twenty-five pounds, fifty pounds, or one hundred pounds each, or well secured in copper, tin, or brass canisters holding not more than five pounds each, and closely covered with copper, brass, or tin covers. § 30. Each cask containing gunpowder manufactured within this commonwealth, or brought into the same by land or by water and landed, shall be marked on the head with black paint in legible characters with the word gunpowder, the name of the manufacturer, the weight of the cask, and the year in which the powder was manufactured; and each canister of gunpowder shall be marked with the word gunpowder. § 31. Whoever knowingly marks a cask of gunpowder with the name of any person other than the manufacturer of the same, or changes gunpowder from a cask marked with the name of one manufacturer into a cask marked with the name of another manufacturer, shall for each offence forfeit a sum not exceeding twenty dollars.

1904 Mass. Acts 310-11, An Act to Authorize the Fire Marshal's Department of the District Police to Make Regulations Relative to Explosives and Inflammable Fluids, ch. 370, §§ 1-2
§ 1. The powers conferred on city councils of cities and selectmen of towns by chapter one hundred and two of the Revised Laws, to regulate the keeping, storage, use, manufacture or sale of gunpowder, dynamite or other explosives and inflammable fluids, shall hereafter be exercised by the fire marshal's department of the district police. § 2. The fire marshal's department of the district police may make regulations for the keeping, storage, use, manufacture or sale of gunpowder, dynamite or other explosives, crude petroleum or any of its products, or other inflammable fluids; and may prescribe the materials and construction of buildings to be used for any of the said purposes.

1919 Mass. Acts 139, An Act Relative to the Issuance of Search Warrants for the Seizure of Firearms, Weapons and Ammunition Kept for Unlawful Purposes, ch. 179, §§ 1-2
§ 1. A court or justice authorized to issue warrants in criminal cases may, upon complaint under oath that the complainant believes that an unreasonable number of rifles, shot guns, pistols, revolvers or other dangerous weapons, or that an unnecessary quantity of ammunition, is kept or concealed for any unlawful purpose in a particular house or place, if satisfied that there is a reasonable cause for such belief, issue a warrant to search such property. § 2. If the court or justice finds that such property is kept for an unlawful purpose, it shall be forfeited and disposed of as the court or justice may by order direct.

**MICHIGAN**

1841 Mich. Pub. Acts 30, An Act To Amend An Act Entitled "An Act To Incorporate The Village of Ypsilanti, And The Acts Or Acts Amendatory Thereof," §14.
And the said common council shall have power . . . relative to the keeping and sale of gunpowder in said village[.]

Sanford Moon Green, The Revised Statutes of the State of Michigan: Passed and Approved May 18, 1846 Page 200-201, Image 216-217 (1846) available at The Making of Modern Law: Primary Sources.
Municipal Regulations of Police, Gunpowder, § 3. The inhabitants of every township or incorporated village may, at any regular meeting, order that no gunpowder shall be kept in any place within the limits of such township or village, unless the same shall be kept in tight casks or canisters; and that no gunpowder above the quantity of fifty pounds, shall be kept or deposited in any shop, store or other building, or in any ship or vessel, which shall be within the distance of twenty-five rods from any other building, or from any wharf; that no gunpowder above the quantity of twenty-five pounds, shall be kept or deposited in any shop, store or other building, within ten rods of any other building; and that no gunpowder above the quantity of one pound, shall be kept or deposited in any shop, store or other building, within ten rods of any other building, unless the same shall be well secured in copper, tin or brass canisters, holding not exceeding five pounds each, and closely covered with copper, brass or tin covers. § 4. Upon complaint being made on oath to any justice of the peace, by any township or village officer, that he has probable cause to suspect that gunpowder is deposited or kept within the limits of the township or village, contrary to any such order, such justice may issue his warrant, directed to any constable of such township, or the marshal of such village, ordering him to enter any shop, store or other building, or vessel specified in said warrant, and there to make diligent search for the gunpowder suspected to have been deposited or kept as aforesaid, and to make return of his doings to such justice forthwith. § 5. If any person shall commit either of the offences mentioned in the two preceding sections, he shall forfeit a sum not exceeding twenty dollars; but the two preceding sections shall not extend to any manufactory of gunpowder, nor in any case prevent the transportation thereof through any township, or from one part of any township to another part thereof.

1867 Mich. Pub. Acts 2d Reg. Sess. 68, An Act To Revise The Charter Of The Village Of Hudson, § 31, pt. 12.
To regulate the buying, selling, and using of gunpowder, fire-crackers and fire-works, and other combustible materials, to regulate and prohibit the exhibition of fire-works, and the discharge of fire-crackers and fire-arms, and to restrain the making or lighting of fires in the streets and other open spaces in said village.

1869 Mich. Pub. Acts 2d Reg. Sess. 158, A Act to Amend An Act Entitled “An Act To Incorporate The Village Of Howell,” § 15.
[T]he common council shall have full power and authority to make by laws and ordinances . . . relative to keeping and sale of gunpowder, nitroglycerine, and all other dangerous and explosive articles, or burning fluids.

1879 Mich. Pub. Acts 43-44, Local Acts, An Act To Amend . . . An Act To Incorporate The Village Of Constantine, § 12
The common council shall have full power and authority to . . . regulate the keeping and sale of gunpowder in said village[.]

1901 Mich. Pub. Acts Session Laws 154, Local Acts, An Act to Revise and Amend the Charter of the City of Muskegon . . . , tit. 7, § 24, pt. 10.
[T]o direct the location of slaughter houses, markets and buildings for the storing of gunpowder and other combustible and explosive substances[.]

**MINNESOTA**

W.P. Murray, City Attorney, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 40, Image 46 (1884) available at The Making of Modern Law: Primary Sources. 1884
[Ordinances of the City of Saint Paul, The Common Council – Its General Powers and Duties § 19. To provide for the receipt, storage, transportation, safe keeping and dealing and traffic in gun powder, gun cotton, petroleum, kerosene or other dangerous, explosive or inflammable oils or substances within said city, or within one mile of the corporate limits thereof, and to provide for the summary condemnation or destruction of any of said articles as may be kept, stored, dealt in, transported through or received in said city, contrary to such ordinance s said city may enact for the safety of life and property therein.]

1921 Minn. Laws 742, An Act to Provide for the Incorporation, Organization and Government of Cities of Ten Thousand (10,000) Inhabitants or Less, (Cities of the Fourth Class), ch. 462, § 41, pt. 37.
To regulate and prevent the storage of gunpowder, dry pitch, resin, coal oil, benzene, naptha, gasoline, turpentine, hemp, cotton, nitroglycerine or any products thereof, and other combustible or explosive materials within the city, and the use thereof[.]

**MISSISSIPPI**

1817-18 Miss. Laws 220, Supplemental To An Act To Erect The Town Of Netchez Into A City To Incorporate The Same, § 2. 1818
That said president and select men, shall and may, from time to time, pass ordinances to regulate the keeping, carting and transporting gun powder or other combustible or dangerous materials[.]

George Poindexter, The Revised Code of the Laws of Mississippi: In Which are Comprised All Such Acts of the General Assembly, of a Public Nature, as were in Force at the End of the Year 1823: with a General Index Page 608, Image 612 (1824) available at The Making of Modern Law: Primary Sources. 1824
Summary of Private and Local Acts[, Port Gibson] . . . . Said president and selectmen may pass ordinances to regulate the keeping, carting and transporting gunpowder, or other combustible or dangerous materials, and, the use of lights in stables, to remove or prevent the construction of any fireplace, hearth or chimney, stoves, ovens, boilers, kettles or apparatus used in any house, building, manufactory or business which may be dangerous in causing or promoting fires; to appoint one or more officers, at reasonable times, to enter into and examine all dwelling houses, lots, yards and buildings, in order to discover whether any of them are in a dangerous state. . .

1884 Miss. Laws 412, An Act To Amend And Reduce One Act The Act Incorporating The City Of Columbus And The Several Acts Amendatory Thereto, ch. 390, § 24, pt. 16.
To regulate and prevent the storage of cotton, hay, gun powder, oil or any other combustible, explosive or inflammable [sic] material or substance; or of any material or substance offensive to public comfort or injurious to health.

**MISSOURI**

1822 Mo. Laws 41-42, An Act To Incorporate Inhabitants Of The Town Of St. Louis, § 12.
The Mayor and Board of Aldermen, shall have power by ordinance, to . . . regulate . . . the storage of gun powder, tar, pitch, rosin, hemp, cotton and other combustible materials[.]

The Acts of Assembly Incorporating the City of St. Louis, and the Ordinances of the City, Which are Now in Force Page 35, Image 35 (1828) available at The Making of Modern Law: Primary Sources. 1823
[Ordinances of the City of St. Louis,] An Ordinance Containing Regulations as to Gun Powder, § 1. Be it ordained by the Mayor and board of Aldermen of the city of St. Louis, That no store or shopkeeper, or other person or persons, shall keep, at the same time, in any house, shop, store, cellar or warehouse, or in any boat, more than thirty pounds of gunpowder, within the limits of the City. § 2. And be it further ordained, That the aforesaid quantity of powder allowed to be kept within the limits of the city, shall be kept in close kegs or canisters, and be kept in a good and safe place. § 3. And be it further ordained, That if any person or persons shall offend against, or violate this ordinance, he, she, or they, so offending, shall, upon conviction thereof, pay a fine of twenty dollars. § 4. And be it further ordained, That no boat owner, shall be allowed to keep more than one keg of powder on board his boat, within three days of his arrival, and shall be liable to the same fine as if the powder had been kept in any store or ware-house. § 5. And be it further ordained, That the Mayor or any Alderman, is hereby authorized, as often as he shall be informed, upon oath, of probable cause to suspect any person or persons whomsoever, of concealing or keeping within the said city, any quantity of gunpowder over and above thirty pounds, as aforesaid, to issue a search warrant to examine into the truth of such allegation or suspicion, and search any place whatever therein.

1873 Mo. Laws 215, An Act To Amend The Charter Of The Town Of Canton . . . , § 10.
The Board of Trustees shall have power and authority to . . . regulate the storage of gunpowder, tar pitch, rosin and other combustible materials[.]

J.H. Johnston, The Revised Charter and Ordinances of the City of Boonville, Mo. Revised and Collated, A.D. 1881 Page 44, Image 44 (1881) available at The Making of Modern Law: Primary Sources. 1881
Ordinances of the City of Boonville, General Powers of the Mayor and Board of Councilmen, § 13. To regulate the storage of gun powder and other combustible materials; and generally provide for the prevention of fires within the city.

M.J. Sullivan, The Revised Ordinance of the City of St. Louis, 1887. To Which are Prefixed the Constitution of the United States, Constitution of the State of Missouri, a Digest of Acts of the General Assembly Relating to the City, the Scheme for the Separation of the Governments of the

City and County of St. Louis and the Charter of the City Page 689-690, Image 698-699 (1887) available at The Making of Modern Law: Primary Sources. 1887
Revised Ordinances [of the City of St. Louis], Gunpowder, § 688. Not exceeding five pounds of gunpowder shall be allowed to be kept by any person or persons in any store, dwelling, building, or other place within the city, except that retailers or venders of gunpowder in small quantities may for that purpose keep any quantity not exceeding thirty pounds; provided, that the same shall also be kept in tin or metal canisters or stone jars, with good and closely fitted and well secured covers thereon; provided, also, that those parties now having magazines within the limits of the city are hereby allowed to store in such magazines such quantities of gunpowder as may be necessary for their business; provided, further, that giant powder, dynamite and nitro-glycerine shall not be stored in any place within the limits of the city, except in magazines as now located. § 689. Every retailer of gunpowder, giant powder, dynamite, nitro-glycerine or blasting powder, shall place on the building containing the same, over, or at the side of the front door thereof, a sign with the words “Powder for sale,” printed thereon, in letters at least three inches in height, and shall notify the commissioner of public buildings in which portion of said store the said powder or powders are placed, which notice shall be kept of record in the said commissioner’s office.

1909 Mo. Laws 165, Cities, Towns and Villages: Cities of the First Class, § 55, pt. 50 (L).
To direct and prohibit the management of houses for the storing of gunpowder and other combustibles and dangerous materials within the city; to regulate the keeping and conveying the same; and the use of candles and other lights in stables and other like houses.

1913 Mo. Laws 437, Municipal Corporations: Cities of the Second Class, § 8, pt. 61.
To regulate the use and storage of explosives – To regulate, restrain and prevent the discharge of firearms, fireworks, rockets or other explosive materials and substances in the city and to regulate the keeping, storage and use of powder, dynamite, guns, guncotton, nitroglycerine, fireworks and other explosive materials and substances in the city, or within two miles of the limits thereof.

**<u>MONTANA</u>**

1887 Mont. Laws 68, Extraordinary Session, An Act to Amend an Act Entitled An Act Concerning the Storage of Gunpowder, § 2.
No person, company, or corporation shall store, deposit or keep within the limits of any city, town or village, gunpowder, nitroglycerine, guncotton, dynamite, and other dangerous or powerful explosives exceeding fifty pounds, and no magazine or storehouse where such explosives are stored or kept, shall hereafter be located nearer than one-half mile from such city, town or village; Provided, That this act shall not be construed to prevent the keeping of a reasonable supply of powder in any safe place at a mine.

1903 Mont. Laws 135-36, An Act to Amend Section 908 of Chapter I Title VIII Part IV Division I of the Civil Code of Montana, and to Repeal Section 689 of the Penal Code, ch. 66, § 1.
If any railroad corporation within this State shall . . . transport within this State on any of its passenger cars, any oil of vitrol, gun powder, Lucifer matches, nitro glycerine, glynon oil, nytroleum or blasting oil, or nitrates oil, or powder mixed with any such oil, or fiber saturated

therewith, or duolin or giant powder, or blasting powder, or any other goods in a dangerous nature . . . shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined for the first offense in the sum of one thousand dollars, and for the second violation of the same provision, two thousand dollars, and for every other and further violation of any provision of which it has been twice before found guilty, a sum not less than five nor more than ten thousand dollars.

**NEBRASKA**

1867 Neb. Laws 68, An Act to Incorporate Nebraska City, § 25.
The city council shall regulate the keeping and sale of gun-powder within the city[.]

1897 Neb. Laws 162, An Act To Amend . . . Compiled Statutes of 1895 for the Government of Cities, ch. 14, § 24, pt. 38.
To . . . regulate and prevent the transportation of gun powder or other explosives or combustible articles, tar, pitch, rosin, coal, oil, benzine [sic], turpentine, hemp, cotton, nitroglycerine, dynamite, petroleum, or any other productions thereof and other materials of like nature[.]

1901 Neb.Laws 154, An Act, to Incorporate Cities of the First Class, Having Less Than Forty Thousand and More Than Twenty-Five Thousand Inhabitants and Regulating Their Duties, Powers and Governments, ch. 17, § 33.
To regulate or prohibit the transportation and keeping of gun powder, oils or other combustible and explosive articles.

**NEVADA**

1877 Nev. Stat. 87-88, An Act to Amend an Act Entitled "An Act Entitled An Act To Incorporate The Town Of Gold Hill," Approved February Twenty-one, Eighteen Hundred and Seventy Three, ch 48, § 1, pt. 5.
The Board of Trustees shall have power . . . [t]o regulate the storage of gunpowder and other explosive or other combustible material.

1901 Nev. Stat. 102-03, An Act to Incorporate the Town of Reno, ch. 97, § 17, pt. 6.
The City Council Shall have power . . . [t]o regulate or prohibit the storage of gunpowder and other explosives or combustible materials within the city.

**NEW HAMPSHIRE**

1786 N.H. Laws 383-84, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town.
That if any person or persons, shall keep in any dwelling-house, store or other buildings, on land, within the limits of said Portsmouth, except the magazine aforesaid, more than ten pounds of gun-powder at any one time, which ten pounds shall be kept in a tin canister properly secured for that purpose, such person or persons shall forfeit the powder so kept, to the firewards of said Portsmouth to be laid out by them in purchasing such utensils as they may judge proper for the

extinguishing of the fire; and the said firewards are hereby directed and empowered to seize, and cause the same to be condemned in any Court of Law or Record proper to hear and try the same, to be disposed of for the purchase aforesaid. And the offender shall also forfeit and pay a fine for the use of the poor of said Portsmouth, equal to the value of the powder so kept in any store, dwelling-house, or building; which fine, shall be sued for and recovered by the overseers of the poor of said Portsmouth, for the use of said poor, in any Court of Law proper to try the same.

1793 N.H. Laws 464-65, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town.
That if any person or persons, shall keep in any dwelling-house, store or other building on land, within the limits of said Portsmouth, except the magazine aforesaid, more than ten pounds of gun-powder at any one time, which ten pounds shall be kept in a tin canister, properly secured for the purpose, such person or persons shall forfeit the powder so kept to the firewards of said Portsmouth to be laid out by them in purchasing such utensils as they may judge proper for the extinguishing of the fire; and the said firewards are hereby directed and empowered to seize, and cause the same to be condemned in any court of record proper to hear and try the same, to be disposed of for the purchase aforesaid. And the offender shall also forfeit and pay a fine for the use of the poor of said Portsmouth, equal to the value of the powder so kept in any store, dwelling-house, or building; which fine, shall be sued for and recovered by the overseers of the poor of said Portsmouth, for the use of said poor, in any ourt of law proper to try the same.

Asa Fowler, The General Statutes of the State of New-Hampshire; to Which are Prefixed the Constitutions of the United States and of the State. With a Glossary and Digested Index Page 206, Image 227 (1867) available at The Making of Modern Law: Primary Sources. 1854
Safe-Keeping of Gunpowder, § 1. The board of firewards, if any, or the selectmen of any town, may establish rules and regulations from time to time relative to the times and places at which gunpowder may be brought to or carried from such town, by land or water, and the time when and the manner in which the same may be transported through the same. § 2. Any two firewards, police officers, or selectmen may search any building in the compact part of any town, and any vessel lying in any port, in which they have cause to suspect that gunpowder in a greater quantity than twenty-five pounds is kept or stored; and in case a greater quantity shall be found, shall seize the same as forfeited. § 3. Any person who shall keep or knowingly suffer any quantity of gunpowder greater than twenty-five pounds to be kept or stored in any such building or vessel, or aid or assist in keeping or storing the same, or shall know that the same is so stored or kept, and shall not forthwith inform one of the firewards, police officers, or selectmen thereof, shall forfeit a sum not more than five dollars nor less than one dollar, for every day the same shall be so stored or kept.

**NEW JERSEY**

Charles Nettleton, Laws of the State of New-Jersey Page 549, Image 576 (1821) available at The Making of Modern Law: Primary Sources. 1811
An Act to Regulate Gun-Powder Manufactories and Magazines within this State. §1. Be it enacted by the Council and General Assembly of this state, and it is hereby enacted by the authority of the same, That from and after the first day of May next, no person or persons

whatsoever, shall be permitted within this state to erect or establish, or cause to be erected or established, any manufactory which shall be actually employed in manufacturing gun-powder, either by himself or any other person, either on his own land or the land of another, within the distance of a quarter of a mile from any town or village, or house of public worship; or within the distance of a quarter of a mile from any dwelling-house, barn or out-house, without the consent, under hand and seal, of all and every the owner or owners of such dwelling-house, barn or outhouse, as aforesaid; and any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined any sum not exceeding two thousand dollars: Provided, That nothing in this section shall be so construed as to prevent the completing, rebuilding or repairing any powder-mill now erected or erecting in this state on the site on which the same shall be now erected or erecting. § 2. And be it enacted, That no person or persons hereafter shall be permitted to erect or cause to be erected any powder magazine within this state, either upon his own land or the land of any other person, and actually deposit gun-powder therein, within the distance of half a mile from any town or village, house of public worship, dwelling-house or out-house. And any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined not exceeding the sum of two thousand dollars.

1837 N.J. Laws 373, An Act to Incorporate the City of Trenton, § 24. 1837
That it shall and may be lawful for the common council of the said city, in common council convened, to pass such ordinances as to them shall seem meet . . . for regulating the keeping and transporting of gunpowder or other combustible or dangerous materials.

1857 N.J. Laws 461, Incorporate the Township of Orange
18. And be it enacted, That no person or persons residing within the aforesaid limits, shall be allowed to keep more than two pounds of gunpowder, except in a magazine at least fifty feet distant from any building, under a penalty of five dollars for every violation of this section, collectable with costs before any justice of the peace of the county; and all fines arising under this, and the preceding section, shall go one-half to the informant and one-half to the treasurer of the corporation.
Approved March 20, 1857.

1886 N.J. Laws 358, An Act to Regulate the Manufacture and Storage of Gun Powder, Dynamite and Other Explosives, § 1. 1886
. . . nothing in this act shall be so construed as to prevent any person or persons from storing in any fire-proof magazines any quantity of gun powder or blasting powder not exceeding in quantity two thousand pounds, within the said distance of one thousand feet of a public road; and provided, further, that the prohibition in this act contained shall not apply to any establishment, storehouse or building heretofore erected and used for the manufacturing, storing or keeping of any of said explosives.

1902 N.J. Laws 294, An Act Relating to, Regulating and Providing for the Government of Cities, ch. 107, § 14, pt. 33.
. . . [T]o regulate or prohibit the manufacture, sale, storage or use of fireworks and the use of firearms in such city; to regulate or prohibit the manufacture, sale, storage, keeping, or conveying of gunpowder, kerosene, benzine [sic], gasoline, burning fluid, nitro-glycerine,

dynamite, camphene, coal oil, spirit gas, petroleum and other dangerous or explosive materials, and the use of candles and lights in barns, stables and other buildings[.]

**NEW MEXICO**

1851 N.M. Laws 114, An Act Incorporating the City of Santa Fe, § 7.
The board of common councilors shall have power to pass By-Laws and Ordinances . . . to prohibit the firing of fire-arms . . . to regulate and prescribe the quantities and places in which gun-powder or other dangerous combustible[s] may be kept[.]

1909 N.M. Laws 333-34, An Act Providing for the Incorporation of Villages in the Territory of New Mexico, ch. 117, § 8.
That villages incorporated under this act shall have the power by ordinance, to prevent the presence within their limits of anything dangerous, offensive, unhealthy or indecent and to cause any nuisance to be abated; to regulate the transportation, storage and keeping of gun-powder and other combustibles and explosives, oils, gasoline and other articles which may endanger the property of such village[.]

**NEW YORK**

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City Page 39, Image 40 (1763) available at The Making of Modern Law: Primary Sources. 1763
A Law for the Better Securing of the City of New York from the Danger of Gun Powder. Be it therefore ordained by the Mayor, Aldermen and Commonality of the City of New York, convened in Common Council, and it is hereby ordained by the authority of the same, the from and after the publication hereof, no person or persons whatsoever inhabiting within the said city, within two miles of the city-hall of the said city, shall presume to keep in any house, shop, cellar, store-house, or other place within the said city (his majesty's garrison and magazine only excepted) any more or greater quantity of gunpowder at one time, than twenty-eight pounds weight (except in the magazines or powder house aforesaid) under the penalty of ten pounds current money of New York, for every offense.

1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof, ch. 28.
. . . [F]rom and after the passing of this act, it shall not be lawfull [sic] for any merchant, shopkeeper, or retailer, or any other person, or persons whatsoever, to have or keep any quantity of gun powder exceeding twenty-eight pounds weight, in any one place, less than one mile to the northward of the city hall of the said city, except in the public magazine at the Fresh-water, and the said quantity of twenty-eight pounds weight, which shall be lawfull [sic] for any person to have and keep at any place within this city, shall be seperated [sic] into four stone jugs or tine canisters, which shall not contain more than seven pounds each, on pain of forfeiting all such gunpowder, and the sum of fifty pounds for every hundred weight, and in that proportion for a greater or lesser quantity, and upon pain of forfeiting such quantity which any person may

lawfully keep as aforesaid, and which shall not be seperated [sic] as above directed, with full costs of suit to any person or persons, who will inform and sue for the same . . . as well for the recovery of the value of such gun powder in specie, as for the penalty aforesaid, besides costs, and to award, effectual execution thereon . . .

Meinrad Greiner, Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonalty, of the City of New-York, in Common Council Convened for the Good Rule and Government of the Inhabitants and Residents of the Said City Second Edition Page 25-26, Image 25-26 (1799) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of New York, To Regulate the Keeping of Gun-powder in the City of New York: Whereas the better to secure the inhabitants of the city of New York from the dangers they have been exposed to by large quantities of gun powder being kept in houses, shops and stores within the said city, a suitable and convenient magazine or powder house is erected and built at Inclemberg in the seventh ward for the reception of all the gunpowder which is or shall be imported into the said city: Therefore, Be it ordained by the Mayor, Aldermen and Commonality of the City of New York in Common council convened, That no person or persons shall keep in any house, shop store house or other place within two miles of the city hall of the said city (Magazines of powder of the United States or of this state only excepted) any more or greater quantity of gun powder at one time than twenty-eight pounds, and that in four separate stone jugs or in tin canisters, each of which shall not contain more than seven pounds weight of gun-powder, under the penalty of twelve dollars and fifty cents for every offense.

William G. Bishop, Charter of the City of Brooklyn, Passed June 28, 1873. As Subsequently Amended. With the Charter of April 17, 1854, and the Amendments Thereto, and Other Laws Relating to Said City. Also, the Ordinances of the Common Council of the City of Brooklyn, as Codified and Revised and Adopted Dec.10, 1877 Page 192, Image 196 (1877) available at The Making of Modern Law: Primary Sources. 1877
[Ordinances of the City of Brooklyn, Miscellaneous Provisions,] § 15. It shall not be lawful for any person to have kegs of gunpowder, or cause to be kept in any store, storehouse, manufactory or other building within the city of Brooklyn, any quantity of gunpowder exceeding twenty-five pounds in weight, under the penalty of the forfeiture of the gun-powder and an additional penalty of fifty dollars; and all gunpowder which may be kept in any building within said city shall be kept in tin canisters, and said canisters shall, at all times, be kept securely closed, except when necessary for its delivery on sale.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 184, Image 185 (1885) available at The Making of Modern Law: Primary Sources. 1885
Ordinances of [the City of Syracuse,] Gunpowder, Etc. § 1. No person except when on military duty in the public service of the United States, or of this State, or in case of public celebration with permission of the mayor or common council, shall have, keep or possess in any building, or carriage, or on any dock, or in any boat or other vessel, or in any other place within the city limits, gun-powder, giant- powder, nitro-glycerine, dynamite or other explosive material, in quantity exceeding one pound, without written permission from the chief engineer of the fire department. Any person violating any of the provisions of this section shall be liable to a fine of

not less than ten nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor more than three months, for each offense.

1900 N.Y. Laws 1174, An Act to Amend the Penal Code, Relative to the Manufacture of Gunpowder and Other Explosives, ch. 494, § 1. 1900
Keeping gunpowder unlawfully. – A person who makes or keeps gunpowder, nitro-glycerine, or any other explosive or combustible material, within a city or village, or carries such materials through the streets thereof, in a quantity or manner prohibited by law or by ordinance of the city or village, is guilty of a misdemeanor. A person who manufactures gunpowder, dynamite, nitro-glycerine, liquid or compressed air or gases, except acetylene gas and other gases used for illuminating purposes, naptha, gasoline, benzine [sic] or any explosive articles or compounds or manufactures ammunition, fireworks or other articles of which such substance are component parts in a cellar, room or apartment of a tenement or dwelling house or any building occupied in whole or in party by persons or families for living purposes, is guilty of a misdemeanor. And a person who, by the careless, negligent, or unauthorized use or management of gunpowder or other explosive substance, injures or occasions the injury of the person or property of another, is punishable by imprisonment for not more than two years. Any person or persons who shall knowingly present, attempt to present, or cause to be presented or offered for shipment to any railroad, steamboat, steamship, express or other company engaged as common carrier of passengers or freight, dynamite, nitro-glycerine, powder or other explosives dangerous to life or limb, without revealing the true nature of said explosives or substance so offered or attempted to be offered to the company or carrier to which it shall be presented, shall be guilty of a felony, and upon conviction, shall be fined in any sum not exceeding one thousand dollars and not less than three hundred dollars, or imprisonment in a state prison for not less than one nor more than five years, or be subject to both such fine and imprisonment.

## NORTH CAROLINA

1901 N.C. Sess. Laws 338-39, Priv. Laws, An Act to Amend the Charter of the Town of Laurinburg, ch. 124, § 14.
That among the powers conferred upon the Commissioners are the following: . . . to control the manner in which dynamite, blasting powder, gunpowder and other explosives and highly inflammable and dangerous substances may be stored and sold[.]

## NORTH DAKOTA

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1289, Image 1323 (1895) available at The Making of Modern Law: Primary Sources. 1895
Keeping Explosives, § 7290. Every person who makes or keeps gunpowder, saltpeter, gun-cotton, nitroglycerine or dynamite or any compound of the same, or any fulminate or substance which is intended to be used by exploding or igniting the same, in order to produce a force to propel missiles or to rend apart substances, within any city, town or village, and any person who carries any of such explosives through the streets thereof, in any quantity or manner prohibited

by law or by any ordinance, by law or regulation of said city, town or village, is guilty of a misdemeanor.

1905 N.D. Laws 103, An Act for the Organization and Government of Cities, and to Provide for the Limitation of Actions to Vacate Special Assessments Heretofore Made, ch. 62, art. 4, § 47, pt. 50.
To regulate and prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzine [sic], turpentine, hemp, cotton, nitroglycerine, petroleum or any of the products thereof, and other combustible or explosive material[.]

**OHIO**

1832 Ohio Laws 194-95, Local Acts vol. 31, An Act to Regulate the Keeping of Gunpowder in the City of Cincinnati, § 1.
It shall not be lawful for any person or persons to deposit or keep in any store, ware house [sic] or other building in the city of Cincinnati any greater quantity than twenty eight pounds of gunpowder at any one time, and all gunpowder which shall be deposited or kept in said city contrary to the provisions of this act or contrary to the provisions of any of the ordinances of said city shall be forfeited to the said city of Cincinnati, and may be seized and disposed of in such a manner as the city council of said city shall by ordinance prescribe.

1833 Ohio Laws 118, Local Acts vol. 32, An Act to Regulate the Keeping of Gunpowder in the County of Hamilton, § 1.
That it shall be the duty of the commissioners of the county of Hamilton, to examine on or before the first day of May next, all buildings wherein any gunpowder may be kept or stored by a greater quantity than one keg within said county and without the corporate limits of the city of Cincinnati[.]

An Act Incorporating the City of Cincinnati: And a Digest of the Ordinances of Said City, of a General Nature, Now in Force, with an Appendix Page 57-58, Image 58-59 (1835) available at The Making of Modern Law: Primary Sources. 1835
Ordinances of the City of Cincinnati, An Ordinance to Regulate the Keeping of Gunpowder, § 1. Be it ordained by the City Council of the City of Cincinnati, That no person or persons in the city of Cincinnati, shall keep, have, or possess, in any house, warehouse, shop, shed, or other building, nor in any street, side walk, lane, alley, passage, way, or yard, nor in any cellar, wagon, cary, or carriage, of any kind whatever; nor in any other place, within said city, Gun Powder, in any way or manner, other than as provided for by this ordinance; nor in any quantity exceeding twenty-five pounds, to be divided into six equal parts. § 2. Be it further ordained, That it shall not be lawful for any person or persons to sell gun powder by retail within said city, without having first obtained a license from the city council for that purpose; and every person obtaining a grant for a license to sell gun powder, shall receive a certificate of such grant from the city clerk, and pay into the city treasury, a sum not exceeding one hundred dollars, nor less than ten dollars; besides fifty cents to the Mayor for issuing the same; Provided that license be granted to not more than four persons in any one ward, and so that they be separated from each other, by at least two entire blocks or squares; and all applications for such license, shall be in writing, stating the situation where such gunpowder is to be kept. § 3. Be it further ordained, That every

person who obtains a license as aforesaid to retail gun powder, shall keep the same in tin canisters, well secured with good and sufficient covers; and shall place on the store or building containing the same, a sign with the words, LICENSED TO SELL GUN POWDER, Provided that nothing in this ordinance shall be so construed to prevent any person from carrying gun powder through the streets in its exportation, or to some place of deposit, without the limits of the corporation, if the same be put up in tight and well secured kegs or vessels. § 4. Be it further ordained, That it shall be the duty of the city marshal and his deputies, and any of the fire wardens, on any day, (Sundays excepted) between sun rising and setting, to enter into any house or building, or any other place within said city, where gun powder is kept or suspected to be kept, and examine the premises, and if they or either of them shall find any gun powder, contrary to the provisions of this ordinance, they or either of them shall seize such powder, together with the vessel containing the same, in the name of the city of Cincinnati; and the officer making such seizure, if he be other than the marshal, shall forthwith report such seizure to the marshal, who shall immediately take charge of the gun powder so seized, as if in case of seizure by himself; and in either case he shall immediately take charge of the gun powder so seized; to be conveyed to some safe place of deposit without the limits of the city. And the marshal shall, moreover, forthwith report such seizure to the mayor, with the name of the person in whose possession such gun powder was seized, or with the name of the owner, if his name be known, whereupon the mayor shall issue a citation against the owner, if known and within his jurisdiction, and if not, then against the person whose possession such gunpowder was seized, citing the defendant to appear on a day to be named in such citation, and show cause, if any he have, why the gun powder so seized should not be forfeited to the city, and a fine imposed agreeably to the provisions of this ordinance; upon which citation proceedings shall be had as in other cases upon the city ordinances, and if a final judgment of forfeiture be pronounced against the gun powder so seized, the marshal shall proceed to sell and dispose of the same for the benefit of said city, after having given three days notice of such sale, by advertisement in at least three public places in the city, and at one of the market houses on market day, to the highest bidder; and the net proceeds thereof shall be credited on the execution against the person fined for keeping the same contrary to the provisions of this ordinance: Provided, that, of any lot of powder seized according to the provisions of this ordinance, not more shall be sold by the marshal than will pay the fine and costs of suit and expense attending the seizure.

W.H. Gaylord, Standing Rules of Order of the Cleveland City Council: With a Catalogue of the Mayors and Councils of the City of Cleveland, from Its Organization, April, 1836, to April, 1871, and Officers of the City Government for 1872 Page 128, Image 152 (1872) available at The Making of Modern Law: Primary Sources. 1856
[Ordinances of the City of Cleveland,] Gunpowder, An Ordinance to Establish a Magazine, and Regulate the Sale of Powder. Be it ordained by the City Council of the city of Cleveland… § 3. No person shall keep within the city, any quantity of gunpowder exceeding twenty-five pounds, or of gun cotton exceeding five pounds, for a longer period than twenty-four hours, except in the powder magazine; and said twenty-five pounds shall be kept in tin or copper canisters, neither of which shall contain over seven pounds and shall be labelled "gunpowder," and be kept near the front or rear entrance of every building in which it is contained. § 4. Any person violating the provisions of this ordinance shall, on conviction thereof, be fined in any sum not exceeding twenty dollars.

1878 Ohio Laws 199, An Act to Amend, Revise, and Consolidate the Statutes Relating to Municipal Corporations, to Be Known as Title Twelve, Part One, of the Act to Revise and Consolidate the General Statutes of Ohio, div. 3, ch. 3, § 1, pt. 14.
To regulate the transportation and keeping of gunpowder, and other explosive and dangerous combustibles, and to provide or license magazines for the same.

1902 Ohio Laws 23, Extraordinary Sess., An Act to Provide for the Organization of Cities and Incorporated Villages . . . and to Repeal All Sections of the Revised Statutes Inconsistent Herewith, § 7, pt. 11.
To regulate the transportation, keeping and sale of gunpowder and other explosives or dangerous combustibles and materials and to provide or license magazines for the same.

**OKLAHOMA**

1903 Okla. Sess. Laws 107, An Act to Amend Sections . . . of the Statutes of Oklahoma, 1893, Relating to Cities[,] Towns and Villages, and for Other Purposes, ch. 7, art. 1, § 4.
The board of trustees shall have the following powers. . . to regulate the storage of gunpowder and other materials[.]

**OREGON**

1862 Or. Laws 9, An Act to Incorporate the City of Albany, § 6.
[To] regulate the storage of gun powder and other combustible materials, and the use of candles, lamps and other lights in shops, stables and other places[.]

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 225-227, Image 226-228 (1872) available at The Making of Modern Law: Primary Sources.
1872
Ordinances of the City of Portland, To Regulate the Storage and Sale of Gunpowder, and Other Explosive Materials, § 1. No person shall keep for sale any gunpowder in any building, store or place in the City of Portland, without having first obtained a license therefor. § 2. The license for selling gunpowder shall be five dollars per quarter, to be issued as other licenses are issued under the provisions of Ordinance 984, entitled "An Ordinance to impose and regulate licenses in the City of Portland." § 3. No person shall receive, keep or store, or aid or assist any person in receiving, keeping or storing gunpowder in a larger quantity than five pounds, in or into any building, or upon any premises, unless the person receiving, keeping or storing the same is duly licensed to sell gunpowder. § 4. No person or persons duly authorized to sell gunpowder, as hereinbefore provided, shall keep, store, or have in any one place more than twenty five pounds of powder, which shall be kept in any air-tight metallic vessel marked with the word "Gunpowder," in plain Roman letters, not less than three inches in height, and of proportionate width, which vessel shall be placed or kept at all times, conspicuously in view near the entrance of the premises where kept, and convenient for removal therefrom. § 5. Upon the front of every building or premises where powder is kept in a conspicuous place a sign with the word "gunpowder" painted thereon in Roman letters, not less than three inches in height. § 6. No person shall convey, cause to be conveyed, or assist in conveying in any vehicle and gunpowder, unless the same shall be securely packed in close packages, nor unless such packages shall be

securely covered while on the vehicle. § 7. No vessel shall be allowed to remain at any wharf more than twenty-four hours with gunpowder on board, except such as may be kept for ship's use, and if such vessel shall be at the wharf overnight, a watchman shall be kept on duty on board all night. All gunpowder landed or placed on a wharf, sidewalk, street or public way for forwarding or shipment shall be forwarded or shipped immediately after it shall be so landed or placed. § 8. The provisions of this Ordinance shall be deemed to apply to "giant powder" "gun cotton" or any other explosive substance having an explosive power equal to that of ordinary gunpowder. § 9. Any person or persons violating any of the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and on conviction before the Police Judge, shall be fined not less than ten nor more than one hundred dollars, or by imprisonment in the city jail not less than two nor more than twenty days, or both, at the discretion of the Police Judge. § 10. The officers of the Fire Department and Police are directed to see that the provisions of this Ordinance are enforced, and to make complaint before the Police Judge for the violation of its provisions.

1878 Or. Laws 136, An Act to Incorporate the Town of Independence, in the County of Polk, and State of Oregon, § 4.
[T]o regulate the storage of gunpowder and other combustible material, and the use of candles, lamps and other lights in shops, halls and other places[.]

1903 Or. Laws 31, Reg. Sess., Spec. Laws, An Act to Incorporate the City of Portland . . . , art. 4, § 73, pt. 36.
To regulate or prevent the storage, manufacture, and sale of dangerous, explosive, or combustible materials, including gunpowder, dynamite, giant powder, calcium carbide, nitro-glycerine, oil, and gas, and to provide for the inspection of the same; to prevent, by all proper means, all risks of injury or damage by fire arising from negligence, or otherwise[.]

**PENNSYLVANIA**

1725 Pa. Laws 31, An Act For The Better Securing Of The City Of Philadelphia From The Danger Of Gunpowder, § 2.
No person whatever within the precincts of the city of Philadelphia aforesaid, nor within Two Miles thereof, shall, from and after the Time the Powder Store aforesaid is so erected and finished presume to keep in any House, Shop, Cellar, Store, or Place of the said City, nor within Two Miles thereof, other than the Powder Store aforesaid, any more or greater Quantity, at any one Time, than Twelve Pounds of Gun-powder, under the Penalty of Ten Pounds for every such Offence.

"An Act for the better securing the city of Philadelphia and its liberties from danger of gunpowder" Act of Dec. 6, 1783, chap. 1059, 11 Pa. Stat. 209 (Sections I and II, P.L.) 1783 (Section I, P.L.) Whereas by an act, entitled "An act for the better securing the city of Philadelphia from danger of gunpowder," passed in the year one thousand seven hundred and twenty-four, and a supplement thereto, passed in the year one thousand seven hundred and forty-seven, continuing the said act in force until altered by a future assembly, it was directed that all gun-powder brought into the port of Philadelphia should be deposited in a certain powder house therein described, under the penalty of ten pounds for every offense: And Whereas another powder house or magazine hath been erected in the said city in the public square on the south

side of Vine street, between the Sixth and Seventh streets from Delaware at the public expense: And whereas the said penalty of ten pounds is not deemed sufficient to deter persons from storing large quantities of gunpowder in private houses and stores, to the great danger of the inhabitants: [Section I.] (Section II, P.L) Be it therefore enacted and it is hereby enacted by the Representatives of the Freemen of the Commonwealth of Pennsylvania in General Assembly met, and by the authority of the same, That no person whatsoever, within the precincts of Philadelphia, nor within two miles thereof, shall, from and after the passing of this act, presume to keep in any house, shop or cellar, store or place whatsoever, in the said city, nor within two miles thereof, other than in the said public magazine, any more or greater quantity at any one time than thirty pounds weight of gun-powder, under the penalty of forfeiture of the whole quantity so over and above stored, together with a fine of twenty pounds for every such offense.

A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District Page 45-47, Image 48-50 (1832) available at The Making of Modern Law: Primary Sources. 1787 [Ordinances of Kensington, Northern Liberties, An Act for Securing the City of Philadelphia and the Neighborhood Thereof from Damage by Gunpowder (1774), § 2. No person shall keep in any house, store, shop, cellar or other place within the city of Philadelphia, nor the country adjacent, within two miles of the said city, any greater quantity of gunpowder, at one time, than thirty pounds weight thereof, under the penalty of forfeiture of the whole quantity so over and above stored or kept, together with the sum of twenty pounds for every such offense. . . § 5. All gunpowder brought by land into the said city, or the adjacent country, within two miles of the said city, if above thirty pounds weight at one time, shall be immediately carried to the said magazine, and delivered to the superintendent thereof, or his deputy, within the hours hereinafter prescribed for his attendance at the said magazine, under the same penalties as if brought by water, and not delivered, as in such case is herein directed, at the said magazines. . . § 12. Any justice of the peace within the limits of the said city, and the adjacent country within two miles of the said city, on demand made by such superintendent or keeps of the said magazine, showing a reasonable cause, on oath or affirmation, may issue his warrant under his hand and seal empowering such superintendent or keeper of the said magazine to search, in the day time, any house, store, shop, cellar or other place, or any boat, ship or other vessels, for any quantity of gunpowder forbidden by this act to be kept in any place or places, and for that purpose to break open, in the day time, and such house, store, shop, cellar or other places aforesaid, or any boat, ship or other vessel, if there be occasion; and the said superintendent or keeper of the said magazine, on finding such gunpowder, may seize and remove the same, in twelve hours, from any such place or places, boats, ships or vessels, to the said magazine, and therein detain the same, until it be determined in the proper court, whether it be forfeited or not by virtue of this act; and the said superintendent or keeper of the said magazine shall not in the mean time be sued for seizing, keeping and detaining the same, nor shall any writ of replevin issue therefor, until such determination as aforesaid be made, but all such suits are hereby declared to be illegal, erroneous and abated.]

1791 Pa. Laws 105, A Supplement to the Act, Entitled “An Act for Securing the City of Philadelphia and the Neighborhood Thereof from Damage by Gun-powder, § 1.
That it shall and may be lawful for the owners of gun-powder not deposited , or to be deposited, in the said magazine, the square to the south of Vine street, to remove and deposit the same in

the said new magazine; and all gun-powder brought into the city of Philadelphia, from and after the first day of July next, shall be deposited and kept in the said new magazine subject to the regulation contained in the said first recited act.

By-Laws and Ordinances of the City of Pittsburgh, and the Acts of Assembly Relating Thereto; with Notes and References to Judicial Decisions Thereon, and an Appendix, Relating to Several Subjects Connected with the Laws and Police of the City Corporation Page 73, Image 75 (1828) available at The Making of Modern Law: Primary Sources. 1816
[Ordinances of the City of Pittsburgh,] An Ordinance Containing Regulations as to Gun-Powder, § 1. That no shop-keeper or other person or persons, shall keep, at the same time, in any house, shop, cellar or warehouse, or other apartment, or in any boat within the said city, more than thirty pounds weight of gun-powder. § 2. That the aforesaid quantity of gun-powder allowed to be kept within the city, shall be deposited in a place by itself, separate from other goods and commodities, and shall be secured by lock and key, or in some other safe manner. § 3. That no person shall carry or convey in any dray, cart, wagon or other carriage, any greater quantity of gun-powder than thirty pounds weight, at any one time, in or through the city, without securing the same in a good bag or bags, or within a canvas or other safe covering completely around the said powder, sufficient to prevent the same from scattering from the said carriage. §4. That if any person or persons shall offend against or violate any of the sections contained in this ordinance, he, she or they, so offending, shall, upon conviction thereof, pay a fine of fifty dollars.

A Digest of Acts of Assembly, Relating to the Incorporated District of the Northern Liberties; and of the Ordinances for the Government of the District Page 101-102, Image 101-102 (1847) available at The Making of Modern Law: Primary Sources. 1847
Ordinances of the Northern Liberties, Act of March 16, 1847. Whereas an article called gun cotton, with properties of ignition and explosion similar to those of gunpowder, and equally if not more dangerous in towns and cities, has been introduced. Therefore, § 1. That no gun-cotton shall be introduced in Philadelphia, nor placed in storage therein, in greater bulk or quantity in any one place, than is permitted by existing laws, with regard to gunpowder; and that all the fines, penalties and forfeitures imposed by an act entitled "An act for securing the city of Philadelphia, and the neighborhood thereof, from damage by gunpowder," passed on the twenty-eighth day of March, seventeen hundred and eighty seven, and a supplement thereto, passed on the fourteenth day of March, eighteeen hundred and eighteen, shall apply and be extended to gun-cotton in the same manner, and with the same effect, as if the word gun-cotton were inserted in the said act.

1868 Pa. Laws 321, An Act Supplementary to an Act to Incorporate the City of Corry . . . , § 2, pt. 6.
To regulate, by ordinances . . . the storage, sale of gun powder, fire works and other inflammable or dangerous articles, and the location of refineries.

A Revised Edition of Acts of Assembly and Ordinances Relating to the Borough of Gettysburg, Together with a Brief History of the Town from Its Foundation to the Present Time, 1887. Revised Edition Page 62-63, Image 63-64 (1887) available at The Making of Modern Law: Primary Sources. 1887

Ordinances of the City of Gettysburg, Keeping Powder or Gun Cotton for Sale, § 9. That no person shall keep or have in their possession or cause to be kept within said borough, rock or gun powder, gun or explosive cotton, or other combustible matter likely to prove dangerous, unless the same is preserved carefully and without danger to the citizens in a safe magazine constructed and used solely for that purpose and at a distance of at least 500 feet from any dwelling, and the person offending against this section shall, upon conviction before the burgess or any Justice of the Peace, pay a fine and penalty of twenty dollars. To be collected as all such fines are now by law collectible.

Ordinances of the Borough of Shamokin, Pa. Page 71-72, Image 78-79 (1896) available at The Making of Modern Law: Primary Sources. 1896
Ordinances of the Borough of Shamokin, PA, An Ordinance Regulating the Storage of Coal, Oil, Benzene and Other Inflammable Oils and Regulating the Hauling and Storage of Gun Powder and other Explosives in the Borough of Shamokin, § 3. That no person shall convey or cause to be conveyed through any of the streets, lanes or alleys of the Borough in any cart, wagon or other vehicle, at any one time, any greater quantity of gun powder, blasting powder, or other explosives than twenty five pounds without a sheet of canvass under, around and over the same sufficient to prevent it from being scattered from the said cart, wagon or vehicle, or being ignited by sparks or otherwise under the penalty of forfeiture of the said gun powder, blasting powder or other explosive, and for every such offense the person so offending upon conviction thereof before the Chief Burgess or any Justice of the Peace within the Borough shall pay a fine of not less than One Dollar nor more than Ten Dollars to be collected as penalties of like amount are not by law collectible. § 4. No person or persons, firm or corporation, shall keep, in any house, store, cellar, shop, shed, yard or other place within the borough a greater quantity of gun powder, blasting powder or other explosive at any one time than two kegs thereof under a penalty of not less than One Dollar nor more than Ten Dollars for every keg of powder or other explosive so kept over and above two kegs as above mentioned except in stone buildings erected for that purpose not less than two hundred yards from any other building or public road.

1919 Pa. Laws 710, An Act relating to fires and fire prevention. . .
The department may adopt and enforce rules and regulations governing the having, using, storage, sale and keeping of gasoline, naptha, kerosene, or other substance of like character, blasting powder, gun powder, dynamite, or any other inflammable or combustible chemical products or substances or materials. The department may also adopt and enforce rules and regulations requiring the placing of fire extinguishers in buildings.

**RHODE ISLAND**

1762 R.I. Pub. Laws 132, An Act of June 1762.
And be it further Enacted by the Authority Aforesaid, That every person who shall import gunpowder into the town of Newport aforesaid shall cause the same to be conveyed immediately to the powder house at the North Easterly part of town, before the vessel in which the said Powder shall be imported, be brought to any Wharf; upon the penalty of paying into the Town-Treasury of the said Town of Newport, a Fine of Ten Shillings Lawful Money, for every cask which shall not be conveyed to the Powder House as aforesaid. That every other person who shall have Gun-powder in his or her Possession and shall neglect or refuse to cause the whole of

the same to be conveyed to the said Powder-House immediately excepting 25lb. which shall be kept in a Tin Powder-Flask, shall pay as a fine into the Town Treasury aforesaid, the Sum of Ten Shillings Lawful Money, for every Cask he or she shall neglect or refuse to cause to be conveyed to the Powder-House as aforesaid, and in Proportion for any less Quantity. That no Vessel of War or other Vessel shall take on board any Powder before they go from the Wharf, upon the Penalty of paying a Fine of Ten Shillings Lawful Money, for every Cask so taken on board. And that the Keeper of the Powder-House be allowed the same Fees as heretofore hath been allowed by Law, for delivering out every Hundred Weight of Powder, and in Proportion for a greater of less quantity.

1798-1813 R.I. Pub. Laws 85, An Act Relative To The Keeping Gun-Powder In The Town Of Providence, §2. 1798
§ 1. Be it therefore enacted by the General Assembly, and by the authority thereof it is hereby enacted, That no person or persons shall hereafter keep or deposit gunpowder, in a greater quantity than twenty-eight pounds, in any shop, building or other place, in the town of Providence, except such place or places as the Town Council of said town shall allow and designate for that purpose. § 2. And be it further enacted, That all and every person and persons whomsoever, who shall hereafter keep or depsoit gunpowder, in a greater quantity than twenty eight pounds, in any shop or shops, building or buildings, or in any other place or places in said town, except only such place or places as the Town-Council of said town shall allow and designate for that purpose, shall forfeit and pay the sume of twenty dollars, for each and every such offence, to be recovered by bill, plaint or information, before one or more of the Justices of the Peace for said town, and for the use of the poor of said town. 3. And be it further enacted, That the said quantity of twenty-eight pounds of gun-powder, shall be kept in tin canisters, and in no other vessels; and if any person or persons, whomsoever, shall keep the same in any vessl or thing, except said tin canisters, the person or persons guilty thereof, shall, for each and every such offence, forfeit and pay the sum of twenty dollars, to be recovered and appropriated as aforesaid.

1902 R.I. Pub. Laws 67, An Act in addition to chapter 40 of the General Laws, Entitled "Of the Town Council": § 1.
Town councils and city councils may from time to time make and ordain all ordinances and regulations for their respective towns, not repugnant to law, which they may deem necessary for the safety of their inhabitants from the manufacture, storage, keeping, having in possession, transportation, sale, or use of gunpowder, gun-cotton, dynamite, nitro-glycerine, nitro-gelatine, lyddite, chlorate of potash, picric acid, sodium calcium carbide, acetylene gas, gasoline gas, and any and all other explosives and explosive chemicals; and may prohibit the manufacture, storage, keeping having in possession, transportation , sale , or use by any and all persons or persons of any or all said substances and gases in their respective towns, unless a license for the same shall be first obtained from the town council or board of aldermen, which license shall be for the term of one years from the date thereof unless sooner revoked by order of said town council or board of aldermen. Any person violating any provision of any such ordinance or regulation, or any such prohibition, shall be fined not less than twenty dollars nor more than one hundred dollars for each such offense.

**SOUTH CAROLINA**

Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 153, Image 156 (1802) available at The Making of Modern Law: Primary Sources. 1802
Ordinances of Charleston, An Ordinance to Revise and Amend an Ordinance Respecting Fires in the City of Charleston, and for other Purposes Therein Mentioned, § 5. And be it further Ordained by the Authority Aforesaid, That it shall and may be lawful for the fire-masters to enter into the houses, out-houses, stables and yards of every owner or tenant of the same in Charleston, wherever they shall see occasion and enquire, search, and examine if any quantities of gun-powder ,hay, straw, fodder, pitch, tar, rosin, turpentine, hemp, oil, tallow, or other combustible matter, are lodged in any such place within the said city, which may be in danger of taking fire; and if the said fire-masters shall find there is apparent danger that fire may be communicated by such combustibles, they shall admonish the owner or the tenant of such house or houses, to remove the same, and in case such person or persons shall refuse or neglect to remove the same, within twelve hours from such notice being given, the said fire masters are hereby empowered, and directed, to cause the same to be removed and lodged in some more secure place, at the charge of such owner or tenant, and shall issue a warrant, under the hands and seals of any three, or more of them, and levy the expenses of the same and fine of thirty dollars for every such offense.

Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto Page 75-76, Image 75-76 (1823) available at The Making of Modern Law: Primary Sources. 1823
Ordinances of the Town of Columbia, An Ordinance to Prohibit the Keeping of more gun powder in the town of Columbia than a certain quantity, and for other purposes therein mentioned (1820). Be it ordained by the Intendant and Wardens of the town of Columbia, and it is hereby ordained by the authority of the same, That from and after the first day of July next, no merchant, retailer, dealer in powder, or any person or persons whatever, within the said town, shall retain, keep or have in his, her or their possession, at any time, a greater quantity of gunpowder than fifty pounds weight. And be it further ordained by the authority aforesaid, That it shall be the duty , and lawful for the fire-masters, or any two of them, as also for the town marshal, on information given to them, or the same coming to their knowledge, by any means whatever, of a greater quantity of gunpowder than fifty pounds weight, being in the possession of, or within the enclosure of any person or persons whatsoever, to enter into the enclosures of any person or persons whatsoever, to enter into the enclosures house or houses, out-houses, stables, and yards f every owner or tenant of the same within the town of Columbia, and enquire, search and examine if any greater quantity than fifty pounds weight are lodged or contained in any such place within the said town; and, if upon such information, examination or search, the said fire-masters or town marshal shall have just grounds to suspect, or be satisfied that a greater quantity of gunpowder than is allowed by this ordinance, is lodged or contained in any such place or places aforesaid, they are hereby required, immediately thereupon, to give information thereof to the intendant and wardens of the said town. And be it further ordained by the authority aforesaid, That all and every owner or tenant of such house or houses, places or enclosures, after being duly summoned to appear before the intendant and wardens, and upon a conviction of each

and every such offence, as is prohibited by this ordinance, shall be subject to a fine not exceeding twenty dollars. Provided nevertheless, That if any person or persons shall erect or build such a building or buildings within the limits of the said town, in which gunpowder may be lodged or deposited, without endangering the said town, or the property of any of the citizens thereof, and to be approved by the said fire-masters and the intendant and wardens, that then such building or buildings shall exempt the proprietors or owners who have gun-powder deposited therein, form the fines by this ordinance imposed, except as before excepted.

**SOUTH DAKOTA**

1890 S.D. Sess. Laws 72, An Act to Provide for the Incorporation of Cities and Their Classification According to Population, art. 5, § 1, pt. 53.
To regulate and prevent the storage of gun powder, tar, pitch, resin, coal, oil, benzine [sic], turpentine, hemp, cotton, nitro-glycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bonfires; also to regulate and restrain the use of fire works, fire crackers, torpedoes, roman candles, sky rockets, and other pyrotechnic displays.

1907 S.D. Sess. Laws 113-14, An Act Entitled an Act to Provide for the Incorporation of Cities under Commission, ch. 86, § 54, pt. 53.
To regulate and prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzine [sic], turpentine, hemp, cotton, nitro-glycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bonfires, also to regulate and restrain the use of fireworks, fire crackers, torpedoes, roman candles, skyrockets, and other pyrotechnic displays.

**TENNESSEE**

John M. Lea, The Revised Laws of the City of Nashville, with the Various Acts of Incorporation and Laws Applicable to the Town and City of Nashville, and a List of the Different Boards of Mayor and Aldermen, and Other Officers of Said City from the Year 1806 to 1850, Inclusive Page 49, Image 50 (1850) available at The Making of Modern Law: Primary Sources. 1850
[An Act to Reduce the Several Acts Incorporating the Town of Nashville in one act, and to Amend the Same, § 6. The Mayor and Aldermen shall have power, by ordinance within the city – ]25th. To regulate the storage of gun-powder, tar, pitch, rosin, salt-petre, gun-cotton, and all other combustible material, and the use of lights, candles and stove-pipes in all stables, shops, and other places.

1855-1856 Tenn. Pub. Acts 34, An Act to Amend and Reduce into One, the Acts Relating to the Charter of the Town of Clarkeville, ch. 32, § 2, pt. 20. 1855
To provide for the prevention and extinguishment of fires; to organize, establish and equip fire companies, hose companies, and hook and ladder companies; to regulate, restrain or prohibit the erection of wooden or combustible buildings in any part of the city; to regulate and to prevent the carrying on of manufactories dangerous in causing or producing fires; to regulate the storage of gun powder, tar, pitch, rosin, saltpetre [sic], gun cotton and all other combustible or explosive material[.]

1895 Tenn. Pub. Acts 129-30, An Act to Incorporate the City of South Fulton, in Obion County Tennessee . . . , ch. 85, § 3, pt. 14.
To regulate the storage of gunpowder, tar, pitch, resin, saltpeter, gun cotton, coal oil, and all other combustibles, explosive or inflammable material, and the use of lights, candles, lamps, stove pipes, steam pipes, and chimneys in all storehouses, dwellings, outhouses, shops, stables, and other places, and to regulate and suppress the use and sale of fire crackers or fireworks of all kinds, toy pistols, air guns, or target guns.

1901 Tenn. Pub. Acts. 406, An Act to Incorporate the Town of Carthage, in Smith County, Tennessee, and Conferring and Defining the Corporate Powers Thereof, ch. 186, § 10.
Be it further enacted, That the Council shall have power by ordinance to . . . regulate the storage of gunpowder and other explosives, and noisome or offensive substances. . .

**TEXAS**

1839 Tex. Gen. Laws 214, An Act To Incorporate The City Of Austin, § 7
That the Mayor and Counsel shall have full power and authority … to prevent gunpowder being stored within the city and suburbs in such quantities as to endanger the public safety. . .

Revised Code of Ordinances of the City of Mckinney. Revised Page 40, Image 41 (1899) available at The Making of Modern Law: Primary Sources. 1899
[Ordinances of the City of McKinney,] Storing of Gun Powder and Other Explosives. Be it ordained by the city council of the city of McKinney: That it shall be unlawful for any person, firm or corporation to have or keep stored within the limits of the city of McKinney, at any one time, more than four kegs either of blasting powder or gun powder nor a greater amount of any other high explosive than is reasonably necessary for one day's business and none of the same shall be kept within the corporate limits of the city of McKinney for wholesale purposes at all. § 2. That any person guilty of a violation of this ordinance shall on conviction be fined in any sum not less than ten dollars nor more than twenty-five dollars for each offense. And further, That each day any person, firm or corporation shall have or keep any amount of such material as is mentioned in section No. 1 stored within the city limits of the city of McKinney in excess of the amounts designated in this ordinance shall constitute a separate offense.

1876 Tex. Gen. Laws 29, An Act To Incorporate The City Of Galveston And to Grant A New Charter, Tit. 7, Art. II, § 108
To direct, control and prohibit the keeping and management of houses, or any building for the storing of gun-powder and other combustible, explosive or dangerous materials, within the city; to regulate the keeping and conveying of the same, and the use of candles and other lights in stables and other like houses.

1901 Texas Gen. Laws 41: §98.
The city council may also regulate or prohibit and prevent the carrying on of work and manufactures that are dangerous in promoting or causing fires, and may prohibit the building or erection of cotton presses and sheds, or may restrict the same to such limits as are prescribed by

ordinance; and may regulate or prohibit and prevent the use of fireworks and firearms, or the keeping and management of houses or other structures or places for storing gunpowder, dynamite, or other combustible, explosive, or dangerous material or substances within the city, and may regulate the keeping and conveying of the same.

**UTAH**

1864-65 Utah Laws 47, To Incorporate The City Of Payson, § 27 1864
To direct or prohibit the location and management of houses for the storing of gunpowder, tar, pitch, resin or other combustible and dangerous materials within the city, and to regulate the conveying of gunpowder.

Revised Ordinances and Resolutions of the City Council of Salt Lake City, in the Territory of Utah, with Congressional and Territorial Laws on Townsites and Great Salt Lake City Charter, and Amendments Page 161-162, Image 196-197 (1875) available at The Making of Modern Law: Primary Sources. 1875
Ordinances of Salt Lake City, Relating to Gunpowder, Gun Cotton and Nitro-Glycerine, § 1. Be it ordained, by the City Council of Salt Lake City, that it shall not be lawful for any person or persons to keep, sell or give away, gunpowder, gun-cotton, or nitro-glycerine, in any quantity without permission of the City Council; Provided, any person may keep, for his own use, not exceeding five pounds of gun powder, one pound of gun cotton, or one ounce of nitro-glycerine. § 2. All permits , when issued , shall be registered by the Recorder, and shall state the name and place of business, and date of permit, and the same shall not be granted for a longer time than one year; and no person to whom any permits may be issued, shall have or keep, at his place of business or elsewhere, within the city, (except in such places as may be approved by the City Council), a greater quantity of gunpowder or guncotton than twenty-five pounds, and the same shall be kept in tin canisters or cases, and nitro-glycerine not to exceed five ounces, and in a situation remote from fires lighted lamps or candles. Nor shall any person sell or weigh gunpowder, gun cotton, or nitro-glycerine, after the lighting of lamps or gas in the evening , unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word gunpowder painted or printed thereon in large letters. § 3. No person shall convey or carry any gunpowder exceeding one pound in quantity through any street or alley in the city, unless the said gunpowder is secured in tight cans, kegs or cases, sufficient to prevent the same from being spilled or scattered , and in no quantity exceeding one hundred pounds, except under the direction of a police officer. § 4. A violation of any clause of this ordinance shall subject the offender to a fine, for each offence, in any sum not exceeding one hundred dollars.

1888 Utah Laws 166, An Act to Establish a Uniform System of County Governments, ch. 50, § 19, pt. 31.
To adopt such rules and regulations within their respective counties, except within municipal corporations, with regard to the keeping and storing of every kind of gun powder, [H]ercules powder, giant powder, or other combustible material, as the safety and protection of the lives and property of individuals may require.

1901 Utah Laws 139: 60.

To regulate or prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzene, turpentine, nitroglycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bonfires.

**VERMONT**

1876 Vt. Acts & Resolves 357, An Act in Amendment of An Act to Incorporate the Village of St. Albans, Approved November 18, 1859, and of the Several Amendments Thereof Heretofore Enacted, § 10, pt. 8.
To regulate the manufacture and keeping of gunpowder, ashes and all other dangerous and combustible material.

Barber, Orion M. The Vermont Statutes, 1894: Including the Public Acts of 1894, with the Declaration of Independence, the Articles of Confederation, and the Constitutions of the United States, and the State of Vermont Page 918, Image 935 (1895) available at The Making of Modern Law: Primary Sources. 1882
A person who has in his possession a toy pistol for the explosion of percussion caps or blank cartridges, with intent to sell or give away the same, or sells or gives away, or offers to sell or give away the same, shall be fined not more than ten nor less than five dollars; and shall be liable for all damages resulting from such selling or giving away, to be recovered in an action on the case.

Act of Incorporation and By-Laws of the Village of Bradford. 1890 Page 12-13, Image 13-14 (1891) available at The Making of Modern Law: Primary Sources. 1891
Ordinances of the Village of Bradford, § 11. The Trustees may grant licenses, for one year or less, to keep gun powder or gun cotton or other explosives for sale, if in their opinion the public safety is not endangered thereby. Said gun powder or gun cotton or other explosive shall be kept in close tin canisters which shall only be opened in the day time. § 12. The license shall specify the quantity allowed and the place where such gun powder or gun cotton and other explosives shall be kept, and on every building in which such gunpowder or gun cotton or other explosives is kept for sale shall be placed in a conspicuous position a sign with the words, "Licensed to sell Powder," printed or painted thereon. § 13. The Trustees may also grant licenses to store gun powder and other explosives in larger quantities in places used for no other purpose which they consider at a safe distance from other buildings. § 14. The Trustees may at any time inspect the premises where gun powder, gun cotton and other explosives are kept, in order to satisfy themselves that the regulations are complied with. § 15. Any person who shall without license keep in any building in the Village any nitro-glycerine, or more than half a pound of gun powder or two ounces of gun cotton, which shall be only for his own use, shall be fined five dollars for every day so offending. § 16. All licenses granted by the Trustees by virtue of these by-laws shall be signed by a majority of the Trustees and recorded in the office of the Clerk of the Corporation at the expense of the person licensed and shall not become valid until so recorded. § 17. The Trustees are authorized to revoke any license mentioned in these by-laws, whether granted by themselves or their predecessors in office, whenever in their opinion the public good requires it. Such revocation shall be recorded in the Clerk's office, and shall become operative whenever the Trustees shall deliver a written notice thereof to the person whose license is revoked.

Act of Incorporation and By-Laws of the Village of Northfield Page 19-20, Image 19-20 (1894) available at The Making of Modern Law: Primary Sources. 1894
Regulations for Handling Explosives, Artcle XV., § 1. No person shall at any time keep within the limits of said Village, any powder, or guncotton, without a written license, signed by a majority of the trustees, who shall have discretionary power to grant the same for retailing purposes ; not, however, exceeding twenty pounds shall be kept in any one building at a time, and that to be kept in close metal cans, or flasks, which are not to be opened except in the day time, Said license specify the building, or place where said powder or guncotton shall or may be kept, the quantity such person may keep, and shall be conditional that any Trustee may at any time make inspection of the quantity of powder or gun-cotton kept, and the manner of keeping the same; said license to be in force until revoked by a majority of the Trustees. And it shall be the duty of the person or persons so licensed to procure said license to be recorded in the records of said Village, and to put up, in some conspicuous place on every building within the limits of the Village in which he has powder or guncotton stored, a sign with the words "LICENSED TO SELL GUNPOWDER." Provided, that a majority of the Trustees may grant license for storing or keeping larger quantities, and that any person may keep not over two pounds which shall be kept in a metallic flask or a powder horn. Article XVI. PENALTY FOR VIOLATION OF ABOVE ARTICLE. § 1. If any person shall keep, without a license therefore, or as provided in the XVth article, any powder, or gun cotton, or either of said articles, or shall keep either of said articles in any buildings or places except those mentioned in his license, he shall forfeit and pay to the treasurer of said Village Five dollars for each day said powder or guncotton shall be suffered to remain within the limits of said village.

Quoted in Brief of Amicus Curiae Patrick J. Charles at App. 13, N.Y. State Rifle & Pistol Ass'n, v. City of New York (Ordinances of the City of Barre, Vermont) 1895
CHAPTER 16, SEC. 18. No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.

1900 Vt. Acts and Resolves 145, An Act to Amend the Charter of the City of Montpelier, § 42. Said board of fire wardens may inspect the manner of manufacturing and keeping gun powder, lime, ashes, matches, lights, fireworks or combustibles[.]

## VIRGINIA

1629 Va. Acts 151, Acts of March 24th, 1629, Act 5,
For the better furtherance and advancement of staple commodities, and more especially that of potashes and saltpeeter, it is thought fit that every master of a family within the several

plantations of this colony shall use their best endeavors to preserve and keep in dry and tight houses or casks all those ashes that shall proceed and be made by the woo[d] that is burned in clearing their grounds . . . And that every master of a family shall have a special care, after a notice thereof given, to preserve and keep all their urine which shall be made in their several plantations. . .
Available at https://archive.org/details/statutesatlargeb01virg

1879 Va. Acts 104, City Council – Powers, Duties, etc., ch. V, § 19
To direct the location of all buildings for storing gun-powder or other combustible substances; to regulate the sale and use of gunpowder, fire-crackers, fire-works, kerosene oil, nitroglycerine . . . the discharge of firearms . . .

1901 Va. Acts 203, An Act to Incorporate the Town of La Crosse, Mecklenburg County, Virginia, ch. 189, § 13.
The council shall have, subject to the provisions of this act, the control and management of the fiscal and municipal affairs of the town; of all property, real and personal, belonging to said town; and may make such ordinances, orders, and by-laws and regulations as it may deem necessary to carry out the following powers, which are hereby conferred on it . . . to regulate or prevent the storing of gunpowder . . .

## WASHINGTON STATE

1861-1862 Wash. Sess. Laws 22, An Act to Incorporate the City of Walla Walla, art. 5, § 3, pt. 22. 1861
To regulate the storage of gunpowder, pitch, tar, rosin and all other combustible materials, . . . in shops, stables and other places. To prevent, remove or secure any fire-place, stove, chimney, oven, boiler, or other apparatus which may be dangerous in causing fire.

1862 Wash. Sess. Laws 48, Local and Priv. Laws, An Act to Incorporate the City of Lewiston, art. 5, § 3, pt. 22.
To regulate the storage of gunpowder, pitch, tar, rosin, and all other combustible materials, and the use of candles, lamps, or other lights in shops, stables and other places. To prevent, remove or secure any fire-place, stove, chimney, oven, boiler, or other apparatus which may be dangerous in causing fire.

1867 Wash. Sess. Laws 116, An Act to Incorporate the City of Vancouver, ch. 1, § 32, pt. 16.
To regulate the storage and sale of gunpowder, or other combustible material, and to provide, by all possible and proper means, against danger or risk of damage by fire arising from carelessness, negligence or otherwise.

1881 Wash. Sess. Laws 121-22, An Act to Incorporate the City of Port Townsend, ch. 2, § 21.
The City of Port Townsend has power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation and keeping of gunpowder, or other combustibles, and to provide or license magazines for the same[.]

1881 Wash. Sess. Laws 93, An Act to Incorporate the City of Dayton, chap. 2, § 20.

The city of Dayton shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation, storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

1883 Wash. Sess. Laws 161, An Act to Incorporate the City of Ellensburgh, ch. 2, § 20.
The city of Ellensburg shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy . . . to regulate the transportation storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

E.W. Rector, Digester, Digest of the Laws and Ordinances of the City of Hot Springs, with the Constitution of the State of Arkansas, General Incorporation Laws of the State and Amendments Thereto, Applicable to the Cities of the First-Class, and in Force on the 1st of January, 1887 Page 61, Image 258 (1887) available at The Making of Modern Law: Primary Sources. 1886 [Ordinances of the] City of Hot Springs, §131. That no person shall carry gun powder, giant powder, dynamite, nitro-glycerine or blasting powder on any vehicle in any part of the city, unless the same shall be secured in kegs, boxes or canisters, sufficiently close to prevent the grains thereof from falling out, and be laid upon or covered over with sheets of canvas or other cloth, and such vehicles shall not be allowed to remain on the streets or sidewalks for more than one hour while containing such gun powder or explosives above mentioned. § 132. That it shall be unlawful to erect or build a powder magazine, or a magazine for any of the explosives mentioned in this ordinance, in the city, within three hundred yards of any other building; and, Provided, That in no case shall it be lawful to build or erect any such magazine in the city unless the same be erected in a safe and secure way, and under permission of the council of the city.

1907 Wash. Sess. Laws 634-636, An Act Relating to Cities of the Second Class and Providing for the Government of Such Cities . . . , ch. 241, § 29, pt. 21.
Powers of Council Enumerated. The city council of such city shall have power and authority: . . . 21. Combustibles; To regulate or prohibit the loading or storage of gunpowder and combustible or explosive materials in the city, or transporting the same through its streets or over its waters.

**WEST VIRGINIA**

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 26, Image 26 (1875) available at The Making of Modern Law: Primary Sources. 1875
[Ordinances of Martinsburg, An Ordinance to Prevent Certain Improper Practices Therein Specified,] § 12. It shall not be lawful for any person to keep in any shop, store, warehouse or other house or building within this town, without the special permission or authority from the Council, a greater quantity of gun or rock powder at any one time than twenty-five pounds; and every person offending against the provision of this section shall forfeit and pay to the town a fine of not less than five nor more than ten dollars.

1899 W.Va. Acts 24, An Act to Amend and Re-Enact and to Reduce into One Act, the Several Acts Incorporating the Town of Sisterville, in the County of Tyler; Defining the Powers Thereof,

and Describing the Limits of Said Town; and Incorporating the City of Sisterville, in Said Tyler County, ch. 4, § 28.
[T]o regulate the keeping of gunpowder and other inflammable or dangerous substances[.]

1901 W.Va. Acts 321, An Act to Create the Municipal Corporation of "The City of Morgantown" . . . , ch. 144, § 18.
[T]o regulate the keeping of gun powder and other inflammable or dangerous substances[.]

1909 W.Va. Acts 59, An Act . . . Granting a Charter to the City of Charleston, ch. 2, art. 4, § 7.
[T]o regulate or prohibit the keeping of gun powder and other combustible or dangerous articles[.]

**WISCONSIN**

1883 Wis. Sess. Laws 315, vol. 2, An Act to Revise, Consolidate and Amend the Charter of the City Of Wausau, ch. 151, tit. 5, § 38.
The powers conferred upon the said council to provide for the abatement or removal of nuisances, shall not bar or hinder suits, prosecutions or proceedings in the courts according of law. Depots, houses or buildings of any kind, wherein more than twenty-five pounds of gun powder are deposited, stored or kept at any one time . . . within the limits of said city are hereby declared and shall be deemed public or common nuisances.

1883 Wis. Sess. Laws 369-70, vol. 2, An Act to Revise, Consolidate and Amend the City Charter of the City of Fond du Lac, ch. 152, ch. [sic] 6, § 8, pt. 16.
To prevent and prohibit the manufacture, keeping or storing of nitro-glycerine, and to regulate the keeping and storing of gunpowder, gun cotton, burning fluids, coal oils and other dangerous explosive materials, in said city, and to provide for the inspection of illuminating oils and fluids.

1919 Wis. Sess. Laws 282, An Act . . . Relating to Powers of Town Meetings, ch. 261, § 1.
To regulate the storage of gunpowder and other dangerous materials[.]

**WYOMING**

1884 Wyo. Sess. Laws 134, An Act Entitled an Act to Incorporate the Town of Sheridan, ch. 85, § 28, pt. 1.
[T]o regulate the storage of gun-powder, kerosene and other dangerous material[.]

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 96-97, Image 97-98 (1893) available at The Making of Modern Law: Primary Sources. 1893
Revised Ordinances of the City of Rawlins, [Precautionary Regulations,] § 13. That no person shall keep at his place of business or elsewhere within the city a greater quantity of gun powder or gun cotton than fifty pounds at one time, and the same shall be kept in tin or copper canisters or cases, containing not to exceed five pounds each, and in a situation remote from fires, lighted lamps and candles; and no person shall sell or weigh any gun powder or gun cotton after the

lighting of lamps in the evening, unless in sealed canisters or cases. Any violation of the provisions of this section shall be subject to a fine of not less than ten dollars nor more than one hundred dollars. § 14. It shall be lawful for the mayor, City Trustee, city marshal, police officers or fire-wardens, when any of them shall suspect that any gun powder or gun cotton is concealed or kept within the city in violation of the provisions of this Ordinance, to search any place in said city for the purpose of determining whether any gun powder or gun cotton is kept as aforesaid. Any person who shall obstruct or hinder any such officer making search in the execution of his duties under this section, shall forfeit and pay to said city for each offense a sum not less than ten dollars nor more than one hundred dollars.

Revised Ordinances and Charter of the City of Laramie, Wyo., with Constitutional Provisions and Legislative Enactments Governing the Same Page 200-201, Image 206-207 (1900) available at The Making of Modern Law: Primary Sources. 1900
[Ordinances of Laramie, Gunpowder and Explosives, § 12. No person shall keep at his place of business or elsewhere within this city, a greater quantity of gunpowder, gun-cotton, nitro-glycerine, dynamite, giant powder or other explosives than twenty-five pounds at one time; and the same shall be kept in tin or copper canisters or cases not exceeding five pounds in each, and in a position remote from fires, lighted lamps and candles, and from which they may be easily removed in case of fire; and no person or persons shall weigh or sell any gunpowder or gun cotton on after the lighting of lamps in the evening, unless in sealed canisters or cases; and no person shall be allowed to keep nitro-glycerine in any part of said city. A violation of any of the provisions of this section shall subject the offended to a fine of not less than ten nor exceeding fifty dollars. § 13. It shall be lawful for the chief of the fire department, when he shall have cause to suspect that any gunpowder, gun cotton, nitro-glycerine, dynamite, giant powder or other explosives is concealed or kept within the city, in violation of the provisions of this ordinance, to search any place in said city for the purpose of determining whether any gunpowder, gun-cotton, nitro-glycerine, dynamite, giant powder or other explosives are concealed or kept as aforesaid. Any person who shall obstruct or hinder such officer making search in the execution of his duties under this section, shall forfeit and pay to said city for each offense a sum no tless than ten dollars, nor more than fifty dollars.]

1907 Wyo. Sess. Laws 96, An Act Prescribing Additional Duties and Powers for the Regulation and Government of Cities of the First Class . . . , ch. 71, § 14, pt. 41.
To regulate and prevent the transportation and storage of gunpowder or other explosive or combustible articles. . .

1919 Wyo. Sess. Laws 17, An Act . . . Relating to the Storage of Explosives, ch. 17, § 1.
. . . It shall be unlawful for any person or company to store any gunpowder or any other explosive material at a less distance than one thousand feet from any house or habitation, when more than fifty pounds are at the same place; but it shall be unlawful to place or to keep any powder or other explosive material, in any house or building occupied as a residence, or in any outbuilding pertaining thereto.

SOURCE: https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT G

# EXHIBIT G

# GUNPOWDER/GUN MANUFACTURING/INSPECTION/SALE/IGNITE

## ARKANSAS

William W. Mansfield, A Digest of the Statutes of Arkansas: Embracing All Laws of a General and Permanent Character in Force at the Close of the Session of the General Assembly of One Thousand Eight Hundred and Eighty-three Page 490, Image 506 (Vol. 1, 1884) available at The Making of Modern Law: Primary Sources. 1884
Carrying Weapons, § 1909. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person, any dirk or bowie knife, or a sword or spear in a cane, brass or metal knucks, or any pistol of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol or any kind of cartridges for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

## CALIFORNIA

1883 Cal. Stat. 156, § 153.
The Municipal Council shall provide by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also all fines collected in the police court for violations of fire ordinances.

1923 Cal. Stat. 695, 696-97, 701
Sec. 9. Every person in the business of selling, leasing or otherwise transferring a pistol, revolver or other firearm, of a size capable of being concealed upon the person, whether such seller, lessor or transferrer is a retail dealer, pawnbroker or otherwise, except as hereinafter provided, shall keep a register in which shall be entered the time of sale, the date of sale, the name of the salesman making the sale, the place where sold, the make, model, manufacturer's number, caliber or other marks of identification on such pistol, revolver or other firearm. Such register shall be prepared by and obtained from the state printer and shall be furnished by the state printer to said dealers on application tit a cost of three dollars per one hundred leaves in duplicate and shall be in the form hereinafter provided. The purchaser of any firearm, capable of being concealed upon the person shall sign, and the dealer shall require him to sign his name and affix his address to said register in duplicate and the salesman shall affix his signature in duplicate as a witness to the signatures of the purchaser. Any person signing a fictitious name or address is guilty of a misdemeanor. The duplicate sheet of such register shall on the evening of the day of sale, be placed in he mail. postage prepaid and properly addressed to the board of police commissioners, chief of police, city marshal, town marshal or other head of the police department of the city, city and county, town or other municipal corporation wherein the sale was made: provided, that where the sale is made in a district where there is no municipal police

department, said duplicate sheet shall be mailed to the county clerk of the county wherein the sale is made. A violation of any of the provisions or this section by any person engaged in the business of selling, leasing or otherwise transferring such firearm is a misdemeanor. This section shall not apply to wholesale dealers in their business intercourse with retail dealers, nor to wholesale or retail dealers in the regular or ordinary transportation of unloaded firearms as merchandise by mail, expres4 or other mode of shipment, to points outside of the city, city and county, town or municipal corporation wherein they are situated. The register provided for in this act shall be substantially in the following form: [Form of Register included]

**COLORADO**

1911 Colo. Sess. Laws 408
Section 3. Every individual, firm or corporation engaged, within this commonwealth, in the-retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and., if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record- book shall be open at all times to the inspection of any duly authorized police officer.
Section 4. Every individual, firm or corporation failing to keep the record provided for in the first section of this act, or who shall refuse to exhibit such record when requested by a police officer, and any purchaser, lessee or exchanger of a pistol or revolver, who shall, in connection with the making of such record, give false information, shall be guilty of a Misdemeanor, and shall, upon conviction, be punished by a fine of not less than twenty-five, nor more than one hundred dollars, or by imprisonment in the county jail for a term not exceeding one year, or by both such fine and imprisonment.

**CONNECTICUT**

The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 79, Image 91 (1850) available at The Making of Modern Law: Primary Sources.
It is ordered, that no man within this Jurisdiction shall directly or indirectly amend, repair, or cause to be amended or repaired, any gun small or great belonging to any Indian, nor shall endure the same, nor shall sell or give to any Indian, directly or indirectly, any such gun or gunpowder, or shot, or lead, or mold, or military weapons, or armor, nor shall make any arrow heads, upon pain of a ten pound fine for every offense at least, nor sell nor barter any guns, powder, bullets or lead, whereby this order might be evaded, to any person inhabiting out of this Jurisdiction, without license of this or the particular court, or some two magistrates, upon pain of ten pound for every gun, five pound for every pound of powder, 40s for every pound of bullets or lead, and so proportionately for any greater or lesser quantity.

The Public Records Of The Colony Of Connecticut. Hartford, 1890 Page 190-192, Image 194-196, available at The Making of Modern Law: Primary Sources. 1775
An Act for Encouraging the Manufacture of Salt Petre and Gun Powder. . .Be it enacted, That no salt petre, nitre or gun-powder made and manufactured, or that shall be made and manufactured in this Colony, shall be exported out of the same by land or water without the license of the General Assembly or his Honor the Governor and Committee of Safety, under the penalty of twenty pounds for every hundred weight of such salt petre, ntire or gun-powder, and proportionately for a greater or lesser quantity so without license exported; to be recovered by bill, plaint, or information, in any court of record in this Colony by law proper to take cognizance thereof. . . Be it further enacted by the authority aforesaid, That no powder-mill shall be erected in this Colony for the manufacture of gun-powder without the license of the general assembly, or in their recess the Governor and Council, first had and obtained under the penalty of thirty pounds for every such offence; to be recovered as the other forgoing personalities in this act are above directed to be recovered.

1836 Conn. Acts 105, An Act Incorporating The Cities of Hartford, New Haven, New London, Norwich and Middletown, chap. 1, § 20.
. . . relative to prohibiting and regulating the bringing in, and conveying out, or storing of gunpowder in said cities . . . .

1923 Conn. Pub. Acts 3707, 3707-10
Sec. 5. No sale of any pistol or revolver shall be made except in the room, store or place described in the permit for the sale of pistols and revolvers, and such permit or a copy thereof certified by the authority issuing the same shall be exposed to view within the room, store or place where pistols or revolvers shall be sold or offered or exposed for sale, and no sale or delivery of any pistol or revolver shall be made unless the purchaser or person to whom the same is to be delivered shall be personally known to the vendor of such pistol or revolver or the person making delivery thereof or unless the person making such purchase or to whom delivery thereof is to lic made shall provide evidence of his identity. The vendor of any pistol or revolver shall keep a record of every pistol or revolver sold in a book kept for that purpose, which record shall be in such form as shall be prescribed by the superintendent, of state police and shall include the date of the sale, the caliber, make, model and manufacturer's number of such pistol or revolver and the name, address and occupation of the purchaser thereof, which record shall be signed by the purchaser and by the person making the sale, each in the presence of the other, and shall be preserved by the vendor of such pistol or revolver for a period of at least six years.
Sec. 7. No person, firm or corporation shall sell at retail, deliver or otherwise transfer any pistol or revolver to any alien, nor shall any person deliver any pistol or revolver at retail except upon written application therefor and no sale or delivery of any pistol or revolver shall be mode upon the date of the filing or receipt of any written application for the purchase thereof, and when any pistol or revolver shall b delivered in connection with the sale or purchase, such pistol or revolver shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no pistol or revolver when delivered on tiny sale or purchase shall be loaded or contain therein any gunpowder or other explosive or any bullet, ball or shell. Upon the delivery of any pistol or revolver the purchaser shall sign in triplicate a receipt for such pistol or revolver which shall contain the name, address and occupation of such purchaser, the date of sale, caliber, make, model and manufacturer's number and a general description thereof. One of such triplicate

receipts shall, within twenty-four hours thereafter, be forwarded by the vendor of such pistol or revolver to the superintendent of state police and one to the authority issuing the permit for the sale of such pistol or revolver and the other shall be retained by such vendor for at least six years. Sec. 8. No person shall make any false statement or give any false information connected with any purchase, sale or delivery of any pistol or revolver, and no person shall sell, barter, hire, lend, give or deliver to any minor under the age of eighteen years any pistol or revolver.

1930 Conn. Stat. 903, Dealing in Explosives; License., ch. 147, § 2644. 1909
No person shall manufacture, store, sell, or deal in gunpowder or any material or compound . . . unless he shall first obtain from the commissioner of state police or the fire marshal of the town where such business is conducted a written license therefor . . . which license shall specify the building where such business is to be carried on or such material deposited or used.

## DELAWARE

1845 Del. Laws 10, A Supplement To The Act Entitled "An Act To Survey, Lay Out And Regulate the Streets Of Smyrna and for Other Purposes," ch. 12, § 2.
That it shall be the duty of the said commissioners, justice of the peace and constable to suppress, extinguish and prevent all bonfires from being lighted or kept up in any of the streets, lanes or alleys of the said town, and to suppress and prevent the firing of guns, pistols crackers or squibs, or the making or throwing of fire-balls by boys or others within the limits of said town.

Vol. 26 Del. Laws 28, 28- 29 (1911)
Section 1. That from and after the first day of June, in the year of our Lord, one thousand nine hundred and eleven, it shall be unlawful for any person or persons, firm, company or corporation, to sell, or expose to sale, any pistol or revolver, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made especially for the defense of one's person, without first having obtained a license therefor, which license shall be known as "Special License to Sell Deadly Weapons;" provided, however, that this provision shall not relate to toy pistols, pocket knives, or knives used in the domestic household, or surgical instruments or tools of any kind.
Section 2. Any person or persons, firm, company or corporation, desiring to engage in the business of selling revolvers, pistols, or revolver or pistol cartridges, stilettos, steel or brass knuckles, or other weapons made for the defense of one's person, shall, after the above mentioned date, apply to the Clerk of the Peace of the County in which it is desired to conduct such business and shall obtain a license therefor, for which he, they, or it shall pay the sum of twenty-five dollars, which said license shall entitle the holder thereof to conduct said business for the term of one year from its date.
Section 3. It shall be unlawful for any person or per- sons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.
section 4. It shall be the duty of any person or persons, firm, company or corporation, desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times, a book which shall be furnished him by the Clerk of the Peace of the County wherein he does

business in which said book he shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser; and no sale shall be made weapon, etc. until the purchaser has been positively identified. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

1913 Del. Laws 439, § 18.
No child under the age of fifteen years shall be employed, permitted or suffered to work . . . in or about establishments wherein nitroglycerine, dynamite, dualin, guncotton, gunpowder or other high or dangerous explosives are manufactured, compounded or stored; unless said establishment are insured under the approval of the board of insurance underwriters of the district where said establishment is situated.

Vol. 30 Del. Laws 55, 55-56 (1919)
Section 222. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for the defense of one's person.
It shall be the duty of any person or persons, firm, company or corporation desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business, in which said book lie shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser, and the names and addresses of at least two freeholders resident in the County wherein the sale is made, who shall positively identify the purchaser before the sale can be made; Provided, that no clerk, employee or other person associated with the seller shall act as one of the identifying freeholders. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

## FLORIDA

1923 Fla. Laws 431-32, An Act for the Protection of Person Who Use Shot-guns in the Pursuit of Game and for Sport . . ., ch. 9340, § 1.
That from and after the passage of this Act it shall be unlawful for any person, firm or corporation to offer for sale or sell in the state of Florida any loaded shot-gun shells which have been divested of their interstate character unless such loaded shot-gun shell shall be plainly printed on the box or carton in which they are sold, and also printed plainly, or stamped, on the top and outside with words and figures plainly indicating the character, quality and quantity of powder contained in such shell.

1927 (vol II) Fla. Laws 212, pt. 15.

The City Council shall have the power to pass ordinances on the following subjects as it deems necessary . . to prohibit or regulate the sale of firearms, cartridges, gun shells or other ammunition for firearms.

**GEORGIA**

Oliver H. Prince, A Digest of the Laws of the State of Georgia: Containing all Statutes and the Substance of all Resolutions of a General and Public Nature, and now in Force, which have been Passed in this State, Previous to the Session of the General Assembly of Dec. 1837 Page 619, Image 619 (1837) available at The Making of Modern Law: Primary Sources. 1831
An Act to Regulate the transportation of gunpowder and to authorize the forfeiture of such as shall be transported in violation of the provisions of this act (1831) #20, § 1. From and after the passage of this act, it shall be the duty of all owners, agents and others, who may or shall have any gunpowder, exceeding in quantity five pounds, transported upon the waters or within the limits of this State, to have the word gunpowder marked in large letters upon each and every package which may or shall be transported. § 2. All gunpowder exceeding five pounds in quantity which shall hereafter be transported or engaged for transportation upon any of the waters or within the limits of this State, without being marked as directed in the first section of this act, shall be liable to seizure and forfeiture – one half to the informer, the other for the use of the volunteer companies most convenient or contiguous to the place of seizure or forfeiture.

A Compilation of the Acts of the Legislature Incorporating the City of Macon, Georgia, and of the Ordinances, Passed by the City Council of Macon, to the 14th February, 1858, Now of Force Page 48, Image 48 (1858) available at The Making of Modern Law: Primary Sources. 1858
Ordinances. § 5. It shall not be lawful for any person to fire a gun, pistol, or any other fire arms, within three hundred yards of any house, except in cases of military parade; nor shall any person burn rockets, crackers, or any kind of fireworks within the limits of the city. Any person so offending shall be fined in a sum not exceeding twenty dollars.

1902 Ga. Laws 434-35, § 16.
Be it further enacted by the authority aforesaid, That the mayor and aldermen of the said city of Forsyth shall have full power to license, regulate and control by ordinance all . . . gun shops, dealers in guns or pistols . . . .

**ILLINOIS**

George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources. 1851
Ordinances of the City of Chicago: Regulating the Keeping and Conveying Gun Powder and Gun Cotton; § I. (Be it ordained by the Common Council of the city of Chicago) That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing, signed by the mayor and clerk and sealed with the corporate seal, under a penalty of twenty-five dollars for every offence. § II. All applications for permits shall be addressed to the common council or mayor in writing, signed by the applicant. Not exceeding four permits shall be granted in any block. When the number of applications in

any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot. When issued the clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business and date of permit. Persons to whom permits may be issued shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gun powder or gun cotton than fifty pounds at one time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business with the words "gun powder and gun cotton" painted or printed theron in large letters. A violation of any clause of this section shall subject the offender to a fine of not less than ten dollars nor exceeding one hundred dollars. § III. No person shall convey or carry any gun or carry any gun powder or gun cotton, (exceeding one pound in quantity), through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the gun powder or gun cotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a leather bag or case, sufficient to prevent such gun powder or gun cotton from being spilled or scattered under a penalty of one hundred dollars. IV. No vessel, laden in whole or in part with gun powder or gun cotton, shall land at, or make fast to any dock or wharf upon the Chicago river, or either branch thereof, between the south line of the school section and Chicago avenue, or to discharge such gun powder or gun cotton within said limits. If any master, or owner of any vessel, or other person shall violate any provision of this section, he shall be subject to a fine of not less then twenty-five dollars and not exceeding one hundred dollars. § V. The mayor shall have power to cause any vessel to be removed form the limits mentioned in the previous section, to any place beyond the same, by a written order, which shall be executed by the marshal or some other member of the police. If any person shall neglect or refuse to obey such order, or shall resist any officer in the execution of the same, he shall be subject to a penalty of one hundred dollars. § VI. Al permissions granted under this ordinance shall expire on the tenth day of June each year. And no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit so issued. § VII. It shall be the duty of the officers of the police department, fire-wardens, and firemen, to report all violations of this ordinance which may come to the knowledge of the city attorney for prosecution.

Egbert Jamieson, The Municipal Code of Chicago: Comprising the Laws of Illinois Relating to the City of Chicago, and the Ordinances of the City Council; Codified and Revised Page 301-304, Image 309-312 (1881) available at The Making of Modern Law: Primary Sources. 1881 Ordinances of Chicago, § 1264. No person shall keep, sell or give away any gunpowder or gun-cotton in any quantity, without permission in writing, signed by the mayor and city clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own use a quantity of gunpowder or guncotton not exceeding one pound. . . § 1271. It shall be unlawful for any person or persons to carry or convey any gunpowder or guncotton (exceeding fifty pounds in quantity) through any street, alley, highway or road in the city, or within one miles of the limits thereof, in any cart, carriage, wagon, dray or wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a good tight and substantial

leather bag sufficient to prevent the same from being spilled or scattered or unless the same is put into a well covered and perfectly water tight box, the bottom and sides which shall be completely covered with zinc, or unless such gunpowder or guncotton be secured in water tight patent metallic cases or kegs. . . § 1275. Any person or persons, corporation or corporations, violating any of the provisions of sections (storage, manufacturing and sale §§) shall be subject to a fine of not less than fifty dollars, and not exceeding two hundred dollars, for each and every offense, and each and every day that gunpowder or guncotton shall be kept in any place contrary to any provision of this article shall constitute a violation thereof. § 1276. No vessel laden in whole or in part with gunpowder or guncotton shall land or make fast to any dock or wharf upon the Chicago river, or either branch thereof between the south line of the school section and Chicago avenue, or discharge such gunpowder or guncotton within said limits. If any master or owner of any vessel or other person shall violate any provision of this section he shall be subject to a fine of not less than twenty dollars, and not exceeding one hundred dollars.

**INDIANA**

1847 Ind. Acts 93, An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory Thereto Into One Act, and to Amend the Same, chap 61, § 8, pt. 4.
To regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder and other explosive compounds . . . .

**IOWA**

1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12
That the said city council shall have power, and it is hereby made their duty to make and publish from time to time, all such ordinances as shall be necessary to secure said city and the inhabitants thereof . . . to impose fines, forfeitures and penalties on all persons offending against the laws and ordinances of said city, and provide for the prosecution, recovery and collection thereof, and shall have power to regulate by ordinance the keeping and sale of gun-powder within the city.

**KENTUCKY**

1874 Ky. Acts 327, An Act to Revise and Amend the Charter of the City of Newport, § 6.
To prohibit the manufacture of gunpowder or other explosive, dangerous, or noxious compounds or substances in said city, and to regulate their sale and storage by license.

**LOUISIANA**

Ordinances Ordained and Established by the Mayor & City Council of the City of New Orleans. New Orleans, 1817.The Making of Modern Law: Primary Sources. Web. 24 October 2019. 1817 Art. 10. It shall not be lawful for any person to have or keep within the city and suburbs, or within two miles of the same (except the public magazine, or place of depot appointed for that purpose) any quantity of gunpowder, at any one time, exceeding one hundred pounds weight, in any one place, house, store or out-house, which said quantity of one hundred pounds shall be separated in several stone jugs or tin canisters, each of which shall not contain more than ten pounds of powder, and shall be provided with a safe and sufficient stopple; and if any person or

person shall keep any greater quantity of gunpowder at any one time than one hundred pounds, in any one place, house, store or out-house, or if the same gunpowder, so kept as aforesaid, shall not be separated in the manner herein above directed, he, she, or they shall forfeit all such gunpowder so kept contrary to the true intent and meaning of this ordinance, or so permitted to be kept, and which shall not be separated as aforesaid, and shall also forfeit and pay a fine not less than twenty-five, nor more than one hundred dollars, to be recovered with costs of suit, by the Mayor or any other competent magistrate; one half to the informer, and the other half for the use of the city

**MAINE**

Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix Page 685-686; Image 272-273 (Vol. 2, 1821) available at The Making of Modern Law: Primary Sources. 1821
An Act to Provide for the Proof of Firearms, § 1. Be it enacted by the Senate and House of Representatives, in Legislature assembled, That the Governor, by and with the consent of the Council, be, and he hereby is empowered to appoint suitable persons, to be provers of barrels of all new, or unused fire arms; and it shall be the duty of each person so appointed, to prove and try the strength of the barrels of all fire arms which shall be offered him for that purpose, and in such manner as to satisfy himself of the strength of the same; and shall in a permanent manner, mark and number every barrel by him so proved, and make and deliver to the person applying to have the same proved, a certificate for each barrel proved and found good in the form following: I certify that on this ___ day f ___ A.D. 18___ I proved for ____, a musket, pistol, or rifle barrel, (as the case may be) and which is numbered and marked as in the margin, and that the same is good and strong. A.B. Prover of fire arms. § 2. Be it further enacted, That each prover shall be entitled to receive from the person applying to have such barrel proved, twenty five cents, in addition to the expense of the powder necessary for that purpose for each barrel so proved; whether the same shall stand the proof and be marked or not. § 3. Be it further enacted, That if any person shall sell or offer for sale within this State, any new, or unused musket, rifle, or pistol barrel, without having the same first proved, marked, and certified according to the provisions of this Act, he shall forfeit for each barrel so sold the sum of ten dollars, to be recovered by an action of debt before any Court proper to try the same; to the use of any person who shall sue for and recover the same, or by indictment to the use of the state. § 4. Be it further enacted, That if any person shall falsely alter the stamp or mark on the certificate of any prover of fire arms, appointed as aforesaid, and be convicted thereof before any Court proper to try the same, he shall forfeit and pay a fine of not more than one hundred dollars, nor less than twenty dollars according to the nature and aggravation of the offence, for the use of the State.

The Revised Statutes of the State of Maine Passed October 22, 1840 to Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 697, Image 713 (1841) available at The Making of Modern Law: Primary Sources. 1834
Section 4. If any person shall carry on the business of manufacturing gun powder, or of mixing or grinding the composition therefor, in any building within eighty rods from any valuable building, erected at the time when such business may be commenced the building, in which such

business may be carried on as aforesaid, shall be deemed a public nuisance; and such person shall be liable to be prosecuted and indicted accordingly.

**MARYLAND**

1757-68 Md. Acts 53, An Act for Prohibiting all Trade with the Indians, for the Time Therein Mentioned, ch. 4, § 3. 1760-1769
That it shall not be lawful for any Person or Persons within this Province, to sell or give to any Indian Woman or Child, any Gun-powder, Shot, or Lead, whatsoever, nor to any Indian Man within this Province, more than the Quantity of one Pound of Gun-powder, and Six Pounds of Shot or Lead, at any one Time, and not those, or lesser Quantities of Powder or Lead oftener than once in Six Months, under the Penalty of Five Pounds Current Money, for every pound of gunpowder. . .

**MASSACHUSETTS**

William Henry Whitmore, The Colonial Laws of Massachusetts: Reprinted From the Edition of 1672, with the Supplements Through 1686: Containing Also, a Bibliographical Preface and Introduction, Treating of All the Printed Laws From 1649 to 1686: Together with the Body of Liberties of 1641, and the Records of the Court of Assistants, 1641-1644 Page 126, Image 330 (1890) available at The Making of Modern Law: Primary Sources. 1651
Prescriptions, (1651) § 2. And it is further ordered; that no person (except for the defence of themselves and their vessels at Sea) shall transport any gunpowder out of this jurisdiction, without license first obtained from some two of the Magistrates, upon penalty of forfeiting all such powder as shall be transporting or transported, or the value thereof.

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1.
…from and after the passing of this act, all musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . with a charge of powder equal in weight to the ball which fits the bore of the barrel to be proved . . . § 2. That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act to which this is an addition . . .

Charles Allen, Report of the Commissioners on the Revision of the Statutes Page 333, Image 30 (Vol. 2, 1881) available at The Making of Modern Law: Primary Sources. 1881
Fire Arms, § 18. There shall be in each county, where the manufacture of fire-arms is carried on, provers of fire-arms, not more than six in number, appointed by the governor with the advice and consent of the council, who shall prove all musket barrels and pistol barrels which, being sufficiently ground, bored and breeched, are offered to them to be proved. § 19. All musket barrels and pistol barrels manufactured in this commonwealth shall, before they are sold or stocked, be proved by one of the provers with a ball suited to the bore of the barrel and with a

charge of powder equal in weight to the ball. The powder used in such proof shall be such that one ounce thereof in a howitzer of four and a half inch caliber at elevation of forty-five degrees shall be of sufficient power to carry a twelve-pound shot one hundred and thirty yards; or that one ounce therof in a howitzer of five and a half inch caliber at an elevation of forty-five degrees shall be sufficient to carry a twenty-four pound shot eighty yards.

Revised Ordinances of 1892, of the City of Boston, and the Revised Regulations of 1892, of the Board of Aldermen of the City of Boston, Being the Eleventh Revision, Third Edition, Containing All Ordinances Passed Between March 3, 1892, and February 1, 1895, and All Regulations of the Board of Aldermen Passed Between July 22, 1892, and February 1, 1895 Page 115, Image 129 (1895) available at The Making of Modern Law: Primary Sources. 1895 Ordinances of Boston, Prohibitions and Penalties, § 91. No person shall manufacture or sell, or expose for sale, any guncotton, nitro-glycerine, or any compounds of the same, nor any fulminate or substance, except gunpowder, intended to be used by exploding or igniting it, in order to produce a force to propel missiles, or to rend substances apart, except in accordance with a permit from the board of fire commissioners; nor shall any person send or carry through the public streets any such substance, except in the manner and in the quantities allowed by statute or ordinance.

Revised Ordinances of the City of Woburn. Revised Woburn, Massachusetts Page 91 Image 91 (1898) available at The Making of Modern Law: Primary Sources. 1898
License to Sell Gunpowder in the City of Woburn. No person shall sell any gunpowder within the city, without such license. Every license shall be in force one year from the date thereof; provided, that any license may be rescinded by the City Council, at their discretion. § 3. Every person so licensed shall keep a sign over and outside of the principal entrance from the street of the building in which the powder is kept, in which shall be printed in capitals the words: "License to keep and sell gunpowder" § 4. The city clerk shall keep a record of all licenses, and of the places designated therein, which places shall not be changed, unless by consent of the City Council, in writing. Every person who receives a license shall sign his name to a copy of the rules prescribed in this chapter, as evidence of his assent thereto. §5. The provisions of the foregoing four sections shall not apply or extend to the keeping or storing of metallic cartridges in fire proof magazines, nor to cartridge manufacturers, so long as they shall keep their powder in canisters, as prescribed in section one, and in fire proof magazines, located and built to the satisfaction of the City Council so long as such manufacturers allow no more than one hundred pounds of gunpowder in any magazine, or five pounds of gunpowder not made into cartrdiges, in any workshop at any one time.

**MICHIGAN**

1901 Mich. Pub. Acts 154, Local Acts, An Act to Revise and Amend the Charter of the City of Muskegon . . . , tit.7, § 24, pt. 11.
To regulate, restrain and prohibit the buying, carrying and selling gunpowder, fire crackers [sic] or fireworks manufactured and prepared therefrom, or other combustible materials, the exhibition of fireworks and the discharge of firearms, and lights in barns, stables and other buildings, and to restrain the making of bonfires in streets, yards and public grounds[.]

**MINNESOTA**

The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858
Ordinances of the City of St. Paul, An Ordinance to Regulate the Sale of Gunpowder, § 1. No person shall keep, sell or give away gunpowder or guncotton in any quantity without first having paid into the City Treasurer the sum of five dollars, and obtain from the Common Council a permission in writing, signed by the Mayor and Clerk, and sealed with the corporate seal, under a penalty not exceeding fifty dollars, for every offence, provided any person may keep for his own use not exceeding one pound of powder or one pound of gun cotton, at one and the same time. § 2. All applications for permits shall be addressed to the Common Council, in writing, signed by the applicant. Not exceeding four permits shall be granted in any one block; when the number of applications in any block shall at any time exceed the numbers to be granted, the requisite number shall by chosen by ballot. When issued, the Clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business, and date of permits. Persons to whom permits may be issued, shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gunpowder or guncotton than fifty pounds at one time, and the same shall be kept in tin canisters or cans, or kegs securely looped and headed, containing not to exceed twenty-five pounds each and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor Nor shall any person sell or weigh any gunpowder or guncotton, after the lighting of lamps in the evening, unless in sealed canisters or cans. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word “gunpowder” painted or printed thereon in large letters. Any person violating any clause of this section, shall, upon conviction therof be punished by a fine of not less than ten, nor more than one hundred dollars. § 3. No person shall convey or carry any gunpowder or guncotton, exceeding (one pound in quantity) through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cans or kegs well headed and hooped, sufficient to prevent such gunpowder or guncotton from being spilled or scattered, under a penalty of fifty dollars. § 4. All permissions granted under this ordinance shall expire on the second Tuesday of May in each year; and no permit shall be granted to any retailer of intoxicating liquors, or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit which may be issued.

**MISSOURI**

1921 Mo. Laws 691, 692
Section 1. Pistol, revolver or firearms to be plainly marked. No wholesaler or dealer therein shall have in his possession for the purpose of sale, or shall sell, any pistol, revolver, or other firearm of a size which may be concealed upon the person, which does not have plainly and permanently stamped ,upon the metallic portion thereof, the trademark or name of the maker, the model and the serial factory number thereof, which number shall not be the same as that of any other such weapon of the same model made by the same maker, and the maker, and no wholesale or retail dealer therein shall have in his possession for the purpose of sale, or shall sell, any such weapon unless he keep a full and complete record of such description of such weapon, the name and

address of the person from whom purchased and to whom sold, the date of such purchase or sale, and in the' case of retailers the date of the permit and the name of the circuit clerk granting the same, which record shall be open to inspection at all times by any police officer or other peace officer of this state.

Sec. 2. Shall secure permit to acquire weapon.-No person, other than a manufacturer or wholesaler thereof to or from a wholesale or retail dealer therein, for the purposes of commerce, shall directly or indirectly buy, sell, borrow, loan, give away, trade, barter; deliver or receive, in this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, unless the buyer, borrower or person receiving such weapon shall first obtain and deliver to, and the same be demanded and received by, the seller, loaner, or person delivering such weapon, within thirty days after the issuance thereof, a permit authorizing such person to acquire such weapon. Such permit shall be issued by the circuit clerk of the county in which the applicant for a permit resides in this state, if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age, and that the granting of the same will not endanger the public safety. The permit shall recite the date of the issuance thereof and that the same is invalid after thirty days after the said date, the -name and address of the person to whom granted and of the person from whom such weapon is to be acquired, the nature of the transaction, and a full description of such weapon, and shall be countersigned by the person to whom granted in the presence of the circuit clerk. The circuit clerk shall receive therefor a fee of $0.50. If the permit be used, the person receiving the same shall return it to the circuit clerk within thirty days after its expiration, with a notation thereon showing the date and manner of the disposition of such weapon. The circuit clerk shall keep a record of all applications for such permits and his action thereon, and shall preserve all returned permits. No person shall in any manner transfer, alter or change any such permit or make a false notation thereon or obtain the same upon any false representation to the circuit clerk granting the same, or use or attempt to use a permit granted to another.

Sec. 3. Weapons must be stamped.-No person within this state shall lease, buy or in anywise procure the possession from any person, firm or corporation within or without the state, of any pistol, revolver or other firearm of a size which may be concealed upon the person, that is not stamped as required by section 1 of this act; and no person shall buy or otherwise acquire the possession of any such article unless he shall have first procured a written permit so to do from the circuit clerk of the county in which such person resides, in the manner as provided in section 2 of this act.

Sec. 4. Manufacture not prohibited.-Nothing herein contained shall be considered or construed as forbidding or making it unlawful for a dealer in or manufacturer of pistols, revolvers or other firearms of a size which may be concealed upon the person, located in this state, to ship into other states or foreign countries, any such articles whether stamped as required by this act or not so stamped.

**NEBRASKA**

1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

The City Council shall have power to license all . . . vendors of gunpowder[.]

1895 Neb. Laws 233, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XXV, § 17.
No person shall keep, sell, or give away any gunpowder or guncotton in any quantity without permission in writing signed by the Chief of Fire Department and City Clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own defense a quantity of gunpowder or guncotton not exceeding one pound.

**NEW HAMPSHIRE**

1820 N.H. Laws 274-76, An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, ch. 25, §§ 1-9.
§ 1. [T]he Governor . . . is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state, and such other places as may by him thought to be necessary[.] § 2. [F]rom and after the first day of July next, all gunpowder which shall be manufactured within this state shall be composed of the following proportions and quality of materials . . . § 3. It shall be the duty of each of said inspectors to inspect, examine and prove all gunpowder which after the first day of July shall not be deposited at any publick [sic] powder magazine, or manufactory of this state . . . § 4. [N]o gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy-five yards at the least. § 5. [W]henever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials . . . the inspector in such case, shall mark each cask containing such impure, ill manufactured, or deficient gunpowder, with the word "Condemned" on both heads of the cask . . . § 6. [I]f any person shall knowingly sell any condemned gunpowder . . . every such person, so offending, shall forfeit and pay not less than two hundred nor more than five hundred dollars . . . § 7. [E]ach inspector . . . be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gunpowder, by him examined, inspected and proved . . . to be paid by the owner or owners of the gunpowder. § 8. [I]f any manufacturer of gunpowder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export or cause to be exported withou the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act. § 9. [I]f any person with within this state . . shall knowingly sell, expose, or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be composed of the proof herein before required, shall forfeit and pay not less than five dollars nor more than fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act.

1825 N.H. Laws 74, An Act to Regulate the Keeping and Selling and Transporting of Gunpowder, ch. 61, § 5.

[I]f any person or persons shall sell or offer for sale by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common, such person so offending shall forfeit and pay for each and every offence a sum not more than five dollars nor less than one dollar, to be recovered and applied as aforesaid.

1891 N.H. Laws 332, Safe-keeping of Gunpowder and Other Explosives, ch. 117, § 7.
If any person shall carry from town to town, or from place to place, any gunpowder for the purpose of peddling or selling it by retail in quantities less than twenty-five pounds, or shall sell, or offer to sell, by retail, any gunpowder in any highway or street, or on any wharf, parade, or common, or if any person shall sell or deal out any gunpowder in the night time, between sunset and sunrise, he shall forfeit for each offense a sum not more than five dollars.

1913 N.H. Laws 639, An Act to Regulate the Transportation of Dynamite, Gunpowder and Explosives, ch. 128, § 1.
It shall be unlawful to transport, carry, or convey from one place in this state to another place in this state, any dynamite, gunpowder, or other explosive on any vessel or vehicle of any description operated by a common carrier, which vessel or vehicle is carrying passengers for hire: Provided, that it shall be lawful to transport on any such vessel or vehicle small arms ammunition in any quantity, and such fuses, torpedoes, rockets, or other signal devices, as may be essential to promote safety in operation; and properly packed and marked samples of explosives for laboratory examination, not exceeding a net weight of one-half pound each, and not exceeding twenty samples at one time in a single vessel or vehicle; but such samples shall not be carried in that part of a vessel or vehicle which is intended for transportation of passengers for hire: Provided further, that nothing in this section shall be construed to prevent the transportation of military or naval forces with their accompanying munitions of war on passenger equipment vessels or vehicles.

1917 N.H. Laws 727-28, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, §§ 1-3.
§ 1. No person shall manufacture, sell, or deal in firearms or in gunpowder, dynamite, nitro-glycerine, or other form of high explosive, unless he shall first obtain, from the selectmen of the town or the chief of police of the city where such business is to be conducted, a written license therefor, and no person shall conduct such business within the state but outside the limits of any organized town or city, unless he shall first obtain such license from the county commissioners of the county in which such business is to be conducted; which license shall specify the building where such business is to be carried on or material deposited or used. § 2. No such licensed person shall sell or deliver firearms to any person not a citizen of the United States, unless he shall have legally declared his intention of becoming a citizen, or any such explosive material or compound to any person, except upon presentation of a permit such as is hereinafter provided for, nor unless satisfied that the same is to be used for a lawful purpose. § 3. Every person so licensed shall keep, on blanks to be furnished by the secretary of state, a record of the names and residences of all persons to whom he shall sell or deliver firearms or any such explosive material or compound, the purpose of which the same is to be used¸ the date of sale, the amount paid, the date of the purchaser's permit, the name and title of the person by whom the permit was issued, and, within five days after such sale or delivery, shall file such record thereof with the clerk of the city or town wherein he sale or delivery was made, or with the county commissioners in case

of sales or deliveries within the state, but outside the limits of any organized city or town. The records thus filed shall at all times be open to the inspection of the police departments, or other public authorities. He shall also affix to the receptacle containing such explosive material or compound a label with the name of the compound, his own name, and the date of sale.

**NEW JERSEY**

1639 N.J. Laws 18, Ordinance of the Director and Council of New Netherland, Prohibiting the Sale of Firearms, etc. to Indians . . .
Whereas the Director General and Council of New Netherland have observed that many persons, both Servants of the Company and Inhabitants, have contrary to the orders and commands of their High Mightiness the Lords States General and the Incorporated West India Company, presumed to sell to the Indians in these parts, Guns, Powder and Lead, which hath already caused much mischief, and if no means be adopted by Us here to prevent the same would hereafter entail nothing else than greater evil; Therefore every inhabitant of New Netherland, be his state, quality or condition what it may, is most expressely forbidden to sell any Guns, Powder or Lead to the Indians on pain of being punished by Death, and if any one shall inform against any person who shall violate this law, he shall receive a reward of Fifty guilders. . .

1776-1777 N.J. Laws 6, An Act for the Inspection of Gunpowder, ch. 6, § 1. 1776
That any Person who, from and after the Publication of this Act, shall offer any Gun-Powder for Sale, without being previously inspected and marked as is herein after directed, shall forfeit, for every such Offence, the Sum of Five Shillings a Pound for every Pound weight so offered for Sale, and so in Proportion for greater or lesser quantity[.]

1811 N.J. Laws 300, An Act to Regulate Gun Powder Manufactories and Magazines within this State, § 1.
. . . [N]o person or persons whatsoever, shall be permitted within this state to erect or establish, or cause to be erected or established, any manufactory which shall be actually employed in manufacturing gun-powder, either by himself or any other person, either on his own land or another, within the distance of a quarter of a mile from any town or village or house of public worship; or within the distance of a quarter of a mile from any dwelling house, barn or out house, without the consent under hand and seal of all and every the owner or owners of such dwelling house, barn, or out house as aforesaid; and any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined any sum not exceeding two thousand dollars: Provided, that nothing in this section shall be so construed as to prevent the completing, rebuilding or repairing any powder mill now erected or erecting in this state on the site on which the same shall be now erected or erecting.

1886 N.J. Laws 358, An Act to Regulate the Manufacture and Storage of Gun Powder, Dynamite and Other Explosive, ch. 250, § 1.
That no person or persons or corporations shall after the passage of this act, be permitted within this state to erect, have or maintain, or cause to be erected, had or maintained any establishment, storehouse or building in which in which shall be manufactured, stored or kept any gun powder, blasting powder, dualin, dynamite, forcite, giant powder, nitro-glycerine, or any powder or materials of which nitro-glycerine is an essential ingredient or forms a component part, or any

other explosive within the distance of one thousand feet from any public road; and every person or corporation offending against the provisions of this act shall be guilty of a misdemeanor, and, on conviction thereof, shall be liable to a fine not exceeding two thousand dollars[.]

1903 N.J. Laws 671, An Act Concerning Railroads, ch. 257, § 49.
No person shall be entitled to carry or require any company to carry on any railroad any aqua fortis, oil or vitriol, gunpowder, nitro-glycerine, matches, or other goods of a dangerous nature¸ and if any person sends by the railway any such goods without distinctly marking their nature on the outside of the package containing the same, or otherwise giving notice in writing to the agent of the company with whom the same are left at the time of so sending, he shall forfeit to the company twenty dollars for every such offense, and be besides liable to all damage that may occur therefrom, and the company may refuse to take any parcel that they may suspect to contain goods of a dangerous nature or may require the same to be opened to ascertain the fact.

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.
1. No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 742
No retail dealer shall sell or expose for sale, or have in his possession with intent to use, any of the firearms or instruments enumerated in section one hereof without being licensed as hereafter provided. The Common Pleas judge of any court of this State, by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political-division, pistols or revolvers, subject to the follow-ing conditions, for breach of any of which the license shall be subject to forfeiture:
1. The business shall be carried on only in the building or buildings designated in the license.
2. The license or a copy thereof certified by the issuing authority shall be displayed in a conspicuous place on the premises where it can be easily read.
3. No pistol or revolver, or imitation thereof, or placard advertising the sale thereof, shall be placed in any window or in any part of said premises where it can be readily seen from the outside.
4. No pistol or revolver shall be delivered (a) unless the purchaser shall hve obtained a permit to purchase days shall have elapsed after the application for the permit; (c) unless the purchaser either is personally known to the seller or shall present evidence of his identity; (d) unless the pistol or revolver shall be unloaded and securely wrapped; provided, however, a permit to cover a pistol or revolver shall, for the purposes of this section and of section nine of this act, be equivalent to a permit to purchase a pistol or revolver. 5. A true record of every pistol shall be made in a book kept for the purpose, the form of which shall be prescribed by the Secretary of State and shall be personally signed by the person effecting the sale, and shall contain the date of the sale, the calibre, make, model, and manufacturer's number of the weapon, and the name, address and permit number of the purchaser.

Any person who shall knowingly sell any of the firearms or instruments enumerated in section one here- of to a minor under the age of eighteen years, or to a person not of sound mind, or to a drug addict, or to a person who has been convicted of committing or attempting to commit any of the crimes enumerated in section two hereof when armed with any of the firearms or instruments enumerated in section one hereof, shall he guilty of misdemeanor.

No person shall sell a pistol or revolver to another person unless the purchaser has first secured a permit to purchase or carry a pistol or revolver. No person of good character and who is of good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in other sections of this act, shall be denied a permit to purchase a pistol or revolver. The judge of any court within this State (except, however, justices of the peace), the sheriff of a county or the chief of police of a city, town or municipality shall upon application issue-to any person qualified under the provisions of this section a permit to purchase a pistol or revolver, and the Secretary of State shall have concurrent jurisdiction to issue such permit in any case, notwithstanding it has been refused by any other licensing official, if in his opinion the applicant is qualified.

Applications for such permits shall be in form as prescribed by the Secretary of State and shall set forth the name, residence, place of business, age, occupation, sex, color, and physical description of the applicant, and shall state whether the applicant is a citizen, and whether he has ever been convicted of any of the crimes enumerated in section two hereof as defined in this act. Such application shall he signed by the applicant and shall contain as reference the names and addresses of two reputable citizens personally acquainted with him. Application blanks shall be obtainable from the Secretary of State and from any other officers authorized to grant such permit.. and may be obtained from licensed retail dealers. The application, together with a fee of fifty cents. shall be delivered or forwarded to the licensing authority who shall investigate the same, and unless food cause for the denial thereof shall appear, shall rant said permit within seven days from the date of the receipt of the application. The permit shall be in form prescribed by the Secretary of State and shall be issued to the applicant in triplicate. The applicant shall deliver to the seller the permit in triplicate and the seller shall indorse on the back of each copy the make, model, calibre and serial number of the pistol or revolver, sold tinder the permit. One copy shall then be returned to the purchaser with the pistol or revolver, one copy shall be kept by the seller as a permanent record, and the third copy shall be forwarded by the seller within three days to the Secretary of State. If the permit is not granted, the fee shall be returned to the applicant.

All fees for permits shall be paid into the general fund of the State if the permit be issued by the Secretary of State; to the municipality if the permit be issued by a municipal officer; in all other instances to the general fund of the county wherein the officer acts or the licensee resides or does business.

A person shall not be restricted as to the number of pistols or revolvers he may purchase, if he applies for and obtains permits to purchase the same, but only one pistol or revolver shall be purchased or delivered on each permit.

**NEW MEXICO**

1923 N.M. Laws 179, An Act Making It a Felony to Transport or Place a Bomb, Dynamite or Other High Explosive in or upon Any Public Service Passenger Coach or Passenger Train, or to Maliciously Use or Handle Dynamite or Other Explosive, ch. 115, § 1.

Any person who knowingly transports or takes into or upon any public service passenger car or passenger coach in the State of New Mexico, any bomb, dynamite, nitro-glycerine, vigorite, Giant or Hercules powder, gunpowder or other chemical compound or explosive shall be guilty of a felony and upon conviction thereof shall be punished by imprisonment for a term of not less than three years nor more than five years.

**NEW YORK**

1652 N.Y. Laws 128 Ordinance of the Director and Council of New Netherland Against Illegal Trade In Powder, Lead And Guns In New Netherland By Private Persons
An act prohibited the Illegal Trade in Powder, Lead and Guns, however the exact text has been lost to history.

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 40-41, Image 62-63 (1896) available at The Making of Modern Law: Primary Sources. 1650-1699 Laws of the Colony of New York, Indians. No person shall sell, give or barter directly or indirectly any gun or guns, powder, bullet, shot, lead nor any vessel or burthen, or row boat, canoes only excepted without license first had and obtained under the governors hand and seal to any Indian whatsoever, nor to any person inhabiting out of this Government, nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapon, vessel, or boat so sold given or bartered, five pounds for every for every pound of powder, and forty shillings for every pound of shot or lead and proportionately for any greater or lesser quantity.

The Documentary History Of The State Of New – York Page 222-223, Image 228-229 (1849) available at The Making of Modern Law: Primary Sources. 1650-1699: 1690
[By the Court of Albany, etc. (1690) Whereas diverse persons daily waste powder which is of such necessary use for defense of this City and County of Albany, and although many have been advertised thereof yet persist in the same: These are in his majesty's name to prohibit all persons whatsoever within the same city and county to burn any powder unless to kill provision, or for his majesty's service and benefit of the place aforesaid, upon pain of paying for every shot or discharging of gun or pistol (contrary to the intent of this order) six shillings current money of this province of New York, or corporal punishment at discretion.]

Documents Relative To The Colonial History Of The State Of New-York Page 254-255, Image 274-275 (1855) available at The Making of Modern Law: Primary Sources. 1744
A letter from Governor Clinton to the Lords of Trade. . . . I have taken every other precaution in my power to guard against my surprise by sending circular orders to the respective Colonels of Militia and to the Captains of his Majesty's Companies posted in this province to inspect the Arms and Accoutrements of their men, and see that they are in good order and fit for immediate service, and that as often as conveniently may be they do exercise the men in arms keeping strict discipline, whereby they may be able not only to repel the French Forces , if this Province should be attacked by them, but to be also in condition if necessary, to attack them, pursuant to Mr.

Stones letter to me of 3rd September last by order of their Excellency's the Lords Justices, for which end I have issued the enclosed proclamation to forbid the exportation of gun powder, or the applying the French with any kind of provisions warlike stores, or merchandise.

N.Y., N.Y. Ordinance Ordained and Established by the Mayor, Aldermen and Commonality of the City of New-York, image 118-119 (1793). 1788
(IV) And be it further enacted by the authority aforesaid, that it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever, within the limits aforesaid, or in any ship or other vessel, within forty-eight hours after her arrival in the harbor, or at any time after such ship or other vessal shall and may have hauled along side any wharf, pier or key, within the limits aforesaid: And that upon any such search it shall be lawful for the persons finding any such gun powder, immediately to sieze, and at any time within twelve hours after such seizure, to convey the same to one of the magazines aforesaid; and the same gun powder so removed, to detain and keep, until it shall be determined by the Mayor or Recorder and any two Aldermen of the said city, whether the same is forfeited by virtue of this Act: And the person or persons so detaining the same, shall not be subject or liable to any action or suit for the detention thereof. Provided always, that nothing in this clause of this Act contained, shall be construed to authorize any person having such warrant to take advantage of the same for serving any civil process of any kind whatsoever. Provided also, that nothing in this Act contained shall extend to ships of war, or packets in the service of the United States or any of them, or of any foreign Prince or State; nor to authorise the searching for gun powder on board of any such ship or vessel while laying in the stream, and upwards of one hundred yards from the wharf or shore.

Mark Ash, The New York City Consolidation Act, as in Force in 1891: With Notes Indicating the Statutory Sources, References to Judicial Decisions, and All Laws Relating to New York City, Passed Since January 1, 1882, Together with an Appendix of the Royal English Colonial Charters of New York City Page 209, Image 233 (Vol. 1, 1891) available at The Making of Modern Law: Primary Sources. 1890
Ordinances of the City of New York, § 455. No person shall manufacture, have, keep, sell, or give away any gunpowder, blasting powder, gun-cotton, niro-glycerine, dualin, or any explosive oils or compounds, within the corporate limits of the city of New York, except in the quantities limited, in the manner, and upon the conditions herein provided, and under such regulations as the board of fire commissioners shall prescribe : and said board shall make suitable provision for the storage and safe keeping of gunpowder and other dangerous and explosive compounds or articles enumerated under this title, beyond the interior line of low water-mark in the city and county of New York. The said board may issue licenses to persons desiring to sell gunpowder or any of the articles mentioned under this section at retail, at a particular place in said city to be named in said license (provided that the same shall not be in a building used in any part thereof as a dwelling unless specially authorized by said license), and persons so licensed may on their premises, if actually kept for sale, persons so licensed may have on their premises, if actually

kept for sale, a quantity not exceeding at any one time, of nitro-glycerine, five pounds; of gun-cotton, five pounds of gunpowder, fourteen pounds; blasting powder, twenty-five pounds. . .

1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.
Such chapter is hereby amended . . . § 1914. Sale of pistols, revolvers and other firearms. Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre [sic], make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm. Such person shall also, before delivering the same to the purchaser, require such purchaser to produce a permit for possessing or carrying the same as required by law, and shall also enter in such register the date of such permit, the number thereon, if any, and the name of the magistrate or other officer by whom the same was issued. Every person who shall fail to kep a register and enter therein the facts required by this section, or who shall fail to exact the production of a permit to possess or carry such pistol, revolver or other firearm, if such permit is required by law, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for the inspection of any peace officer. Every person becoming the lawful possessor of such pistol, revolver or other firearm, who shall sell, give or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply to wholesale dealers.

## NORTH CAROLINA

1905 N.C. Sess. Laws 547, Priv. Laws, An Act to Amend the Charter of the Town of Pine Bluff, in Moore County, ch. 188, § 6.
That the commissioners of said town shall have authority to pass all necessary by-laws and ordinances for the proper government of the town, and to enforce the same by means of suitable fines and penalties. Among the powers specifically conferred upon the commissioners are the following: . . . to prescribe conditions under which may be sold and used fire-arms of all kinds including toy guns and pistols and air-guns, brass knuckles, loaded canes, dirks, bowie and other knives used as weapons, ammunition and fire-works, not inconsistent with the general laws of the State[.]

1909 N.C. Sess. Laws 777, Priv. Laws, An Act for a New Charter for the City of Southport, North Carolina, ch. 345, § 23, pt. 14.
[O]n dealers in pistols, guns, dirks, bowie knives, sling shots, brass or metal knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars; on dealers in firecrackers, Roman candles, skyrockets, toy pistols or fireworks of any kind, a tax not exceeding fifty dollars.

## NORTH DAKOTA

1923 N.D. Laws 379, 380-82

Sec. 10. SALES REGULATED. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward by registered mail one copy thereof to the Secretary of State, and one copy thereof to the chief of police of the city or town, or the sheriff of the county of which the seller is a resident, and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not less than $100 or imprisonment for not less than one year, or by both such fine and imprisonment.

Sec. 11. DEALERS TO BE LICENSED. Whoever, without being licensed as hereinafter provided, sells, or otherwise transfers, advertises, or exposes for sale, or transfers or has in his possession with intent to sell, or otherwise transfer, pistols or revolvers, shall be punished by imprisonment for not less than two years.

Sec. 12. DEALERS' LICENSES: By WHOM GRANTED, AND CONDmoNs THEREOF.) The duly constituted licensing authorities of any city, town or subdivision of this state, may grant licenses in form prescribed by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

The business shall be carried on only in the building designated in the license.

The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

No pistol or revolver shall be delivered-

(a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor

(c) If the seller has reasonable cause to believe that the purchaser either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof.

A true record, in triplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Secretary of State, and shall be personally signed by the purchaser and by the person affecting the sale, each in the presence of the other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, occupation, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded by registered mail to the Secretary of State and one copy thereof to the chief of police of the city or town or the sheriff of the county of which the seller is a resident, and the other copy retained for six years.

No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

**OHIO**

1849 Ohio Laws 407-08, Local Acts vol. 48, An Act to Incorporate the Town of Ripley in the County of Brown, § 4.
That the said town council of Ripley shall have power to ordain and establish laws and ordinances . . . to regulate the sale of gunpowder therein[.]

1889 Ohio Laws 164, An Act to Amend Section 2669 of the Revised Statutes, as Amended April 22, 1885, § 1.
The council of the city or village may provide by ordinance for licensing all exhibiters of shows or performances of any kind, not prohibited by law, hawkers, peddlers, auctioneers of horses and other animals on the highways or public grounds of the corporation, venders [sic] of gun powder and other explosives, taverns and houses of public entertainment, and hucksters in the public streets or markets, and in granting such license, may extract and receive such sum of money as it may think reasonable[.]

**OKLAHOMA**

1890 Okla. Sess. Laws 447-48, Crime and Punishment: Homicide, ch. 25, art. 17, § 24.
Every person guilty of making or keeping gunpowder or saltpeter within any city or village, in any quantity of manner such as is prohibited by law or by any ordinance of said city or village, in consequence whereof any explosion occurs whereby any human being is killed, is guilty of manslaughter in the second degree.

1890 Okla. Sess. Laws 474, Crime and Punishment: Of Crimes against the Public Health and Safety, ch. 25, art. 38, § 4.
Every person who makes or keeps gunpowder or saltpeter within any city or village, and every person who carries gunpowder through the streets thereof, in any quantity or manner such as is prohibited by law, or by any ordinance of such city or village, is guilty of a misdemeanor.

Dorset Carter, Annotated Statutes of the Indian Territory: Embracing All Laws of a General and Permanent Character in Force at the Close of the Second Session of the Fifty-fifth Congress Page 757, Image 841 (1899) available at The Making of Modern Law: Primary Sources. 1899
Indian Territory, § 4345 Every person other than an Indian, who within the Indian country, purchases or receives of any Indian in the way of barter, trade or pledge, a gun, trap or other article commonly used in hunting, any instrument of husbandry, or cooking utensils of the kind commonly obtained by the Indians in the intercourse with the white people, or any article of clothing except skins or furs, shall be liable to penalty of fifty dollars.

**OREGON**

1903 Or. Laws 106, Spec. Sess., An Act to Incorporate the City of North Bend, and to Provide a Charter Therefor . . . , § 27, pt. 23.
To regulate the transfer of gunpowder, dynamite, nitro-glycerine, and other combustibles and explosives through the streets or alleys of the city[.]

1913 Or. Laws 497
Section 1. It shall be unlawful for any person, firm or corporation to display for sale at retail any pocket pistol or revolver or to sell at retail, barter, give away or dispose of the same to any person whomsoever, excepting a policeman, member of the militia or peace officer of the State of Oregon, unless the purchaser or person attempting to procure the same shall have a permit for the purpose of procuring such pocket pistol or revolver signed by the municipal judge or city recorder of the city or county judge or a justice of the peace of the county wherein such person resides.
Section 2. Provided, that no judge, city recorder or justice of the peace shall issue such permit until said applicant has furnished him with an affidavit from at least two reputable freeholders as to the applicant's good moral character.
Section 3. All persons, firms or corporations engaged in the retail sale of pocket pistols or revolvers shall keep a record of the sale of such pocket pistols or revolvers by registering the name of the person or persons and the number of the pocket pistol or revolver and shall transmit same to the sheriff of the county in which purchase is made on the 1st and 15th day of each calendar month.

**<u>PENNSYLVANIA</u>**

Charter To William Penn, And Laws Of The Province Of Pennsylvania, Passed Between The Years 1682 And 1700 Page 32, Image 37 (1879) available at The Making of Modern Law: Primary Sources. 1650-1699
Laws of the Duke of York, Indians (1676). No person shall sell give or barter directly or indirectly any gun or guns powder, bullet, shot, lead nor any vessel of burthen, or row boat canoes only excepted without license first had and obtained under the Governor's hand and Seal, to any Indian whatsoever, nor to any person inhabiting out of this government nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapons, vessel or boat, so sold given or bartered, five pounds for every pound of shot or lead and proportionally for any greater or lesser quantity.

Act of 26th August 1721
1700-1729
[An Act of 9th of February, 1750-51, § 1. If any person or persons whatsoever, within any county, town or within any other town or borough in this province, already built and settled, or hereafter to be built and settled , not hitherto restricted nor provided for by our laws, shall set on fire their chimneys to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, or shall fire any gun or other fire arm, or shall make or cause to be made, or sell or utter, or offer to expose to sale, and squibs, rockets, or other fire works, or shall cast, throw or fire any squibs, rockets, or other fire works within any of the said towns or boroughs without the governor's special license for the same, every such person or persons so offending shall be subject to the like penalties and forfeitures, and be recovered in like manner, as in and by an act,

passed in the eighth year of the reign of king George the first, entitled 'An act for preventing accidents that may happen by fire are directed to be levied and recovered.]

John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1700-1729
[An Act for Preventing Accidents that may Happen by Fire, § IV. And whereas much mischief may happen by shooting of guns, throwing casting and firing of squibs, serpents, rockets, and other fire-works, within the city of Philadelphia, if not speedily prevented: Be it therefore enacted, That if any person or persons, of what sex, age, degree or quality soever, from and after publication hereof, shall fire any gun or other fire-arms, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire works, or shall cast, throw or or fire, any squibs, rockets, or other fire works, within the city of Philadelphia, without the governor's special license for the same, of which license due notice shall first be given to the mayor of the said city, such person or persons so offending, and being thereof convicted before any one justice of the peace of the said city, either by confession of the party so offending, or by the view of any of the said justices, or by the oath or affirmation of one or more witnesses, shall for every such offence forfeit and pay the sum of five shillings; one half to the use of the poor of the said city, and the other half to the use of him or them who shall prosecute, and cause such offender to be as aforesaid convicted; which forfeitures shall be levied by distress and sale of the offenders goods as aforesaid; and for want of such distress, if the offender refuse to pay the said forfeiture, he shall be committed to prison, for every such offence the space of two days without bail or main-prize; Provided, that such conviction be made within ten days after such offence committed [ and if such offender be a negro or Indian slave, he shall instead of imprisonment be publically whipped, at the discretion of the magistrate.]

1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries
That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, … within any of the said towns or boroughs without the Governor's special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

1794 Pa. Laws 764, An Act Providing For The Inspection Of Gunpowder chap. 337
Whereas gun-powder imported from abroad, and manufactured within this state, have frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use: And whereas the modes heretofore used to prove the force thereof have been found uncertain and variable; and whereas Joseph Leacock, of the city of

Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch-pall, by which it is conceived that the force of gunpowder may be proved by experiment, and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection, and the purchaser and consumer protected against fraud and imposition. § 1. . . That from and after the first day of October next, all gun-powder manufactured within this state, with intent to sell the same within the city or county of Philadelphia, shall be put in good and tight kegs or casks of twenty-five, fifty, or one hundred pounds neat weight, each made of well seasoned timber, bound together with at least twelve hoops, and having a hole bored in each head, of the diameter of one fourth part of an inch, well stopped with corks, and having the tare weight to each cask marked thereon, and that all such gun powder, and all other gun-powder, wheresoever manufactured, imorted into the port of Philadelphia, or brought into the city or county of Philadelphia for sale, shall be deposited forthwith on such importation or bringing by land or by water, in the public magazine in the said city, and delivered to the care of the keeper of the same, who shall give his receipt for the same, deliverable to the order of him or them who shall so deposit the same. § 2. And be it further enacted by the authority aforesaid, That David Rittenhouse, Francis Gurney and Thomas Procter be, and they are hereby, appointed Commissioners, to procure at least two pendulum powder proofs, upon the construction invented by the said Joseph Leacock, as nearly uniform in the length of the radius and weight of the pendulum, and in length of caliber and weight of the pistol, as they can procure the same, and therewith make experiments of the respective strenght or force of of the several species of gun-power imported from abroad, and manufactured within this state, sufficient in number to assertain the quality and force of three different degrees of strength in explosion, and marking the number of degrees on the graduated arch of the said engine, to which equal quantities be weight of the said three species of gun-powder, rammed with equal force into the pistol, shall elevate the said pendulum; and the powder which shall be barely capable of raising the said pendulum to the lowest rate of elevation, shall be standard for the state of Pennsylvania for gun powder of the first or lowest proof; and the powder which shall be capable of raising the said pendulum to the highest rate of elevation, shall be the standard of gun-powder for the State of Pennsylvania for the third or highest proof; and the middle or second proof standard of gun-powder shall be ascertained by the number of degrees of the said graduated arch, to which the same quantity of weight in equal moieties of the first and third proof powder shall be capable of raising the said pendulum; and the said standard being fixed and ascertained, the said Commissioners shall make report thereof in writing, by indentures under their hands and seals, on part thereof, together with one of the said pendulum powder proofs, and as accurate a draft and description thereof as can be made shall be returned to the Governor, to be filed and remain in the office of the Secretary of the Commonwealth, on other part shall be returned to the master of the Rolls, to be recorded in his office, and filied among the laws of the state and the otehr part together with the other pendulum powder proofs, shall be delivered to the first inspector of gun powder to be appointed in pursuance of this act, and by him, and his successors in office, to his and their succesors, as often as another officer shall be appointed.

Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred, to the Twentieth Day of March, One Thousand Eight Hundred and Ten Page 240-244, Image 284-288 (1810) available at The Making of Modern Law: Primary Sources. 1795

An Act providing for the inspection of Gun-powder. Whereas gun-powder imported from abroad and manufactured within this state, hath frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use: and whereas the modes heretofore used to prove the force thereof have been found uncertain and variable: and whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch-pall, by which it is conceived that the force of gun-powder may be proved by experiment and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection , and the purchaser and consumer protected against fraud and imposition: § 1. Be it enacted by the Senate and House of Representatives of the commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same, That from and after the first day of October next, all gun-powder manufactured within this state, with intent to sell the same within the city or county of Philadelphia, shall be put in good and tight kegs or casks of twenty-five, fifty, or one hundred pounds neat weight , each made of well seasoned timber, bound together with at least twelve loops, and having a hole bored in each head with the diameter of one fourth part of an inch, well stopped with corks and having the tare weight (weight of the actual keg or cask) of each cask marked thereon, and that all such gun-powder, and all other gun-powder, wheresoever manufactured imported into the port of Philadelphia, or brought into the city or county of Philadelphia for sale, shall be deposited, forthwith on such importation or bringing by land or by water, in the public magazine in in the said city, and delivered to the care of the keeper the same, who shall give his receipt for the same, deliverable to the order of him or them who shall deposit the same. § 2. And be it further enacted by the authority aforesaid, That David Rittenhouse, Francis Gurney, and Thomas Procter be, and they are hereby, appointed commissioners, to procure at least two pendulum powder proofs, upon the construction invented by the said Joseph Leacock, as nearly uniform in length and radius and weight of pendulum, and in length of caliber and weight of the pistol, as they can procure the same, and therewith make experiments of the respective strength or force of the several species of gun-powder imported from abroad and manufactured within this state, sufficient in number to ascertain the quality and force of three different degrees of strength in explosion, and marking the number of degrees on the graduated arch of the said engine, to which equal quantities of weight of the said three species of gunpowder, rammed with equal force into the pistol, shall elevate the said pendulum; and the power which shall be barely capable of raising the said pendulum to the lowest rate of elevation, shall be the standard for the state of Pennsylvania for gun-powder of the first or lowest proof; and the powder which shall be capable of raising the said pendulum to the highest rate of elevation, shall be the standard of gunpowder for the state of Pennsylvania of the third or highest proof; and the middle or second proof standard of gun-powder shall be ascertained by the number of degrees on the said graduated arch, to which the same quantity by weight in equal moieties of the first and third proof powder shall be capable of raising the said pendulum; and ht said standard being so fixed and ascertained, the said commissioners shall make report thereof in writing, by indentures under their hands and seals, one part thereof, together with one of the said two pendulum powder proofs, as accurate a draft and description thereof as can be made shall be returned to the Governor, to be file and remain the office of the Secretary of the commonwealth; and one other part shall be returned to the Master of Rolls, to be recorded in his office, and filed among the laws of the state; and the other part, together with the other pendulum powder proofs, shall be delivered to the first Inspector of gun-powder to be appointed in pursuance of this act, and by him, and his successors in office, to

his and their successors, as often as another officer shall be appointed. . . § 6. And by it further enacted by the authority aforesaid, That it shall be the duty of the inspector of gunpowder so to be appointed, for the time being, to attend at the aid public magazine, and his office so to be built, as often as shall be necessary, to inspect and examine all gunpowder there to be deposited, to draw samples form each cask of powder which shall be so as aforesaid bored, and to open or otherwise get samples of casks of powder not bored as aforesaid, and removing such samples to his office, there to prove the same b the pendulum proof aforesaid, and note the standard quality of each cask, to provide himself with cedar plugs stamped on the outer end with the letters S.P. and the figures number one, number two, and number three, so designate the first, second and third proofs of standard gunpowder of the state of Pennsylvania, and another stamped with letters S.P. to designate condemned gun-powder, and therewith carefully to plug up the holes opened or made for the purpose with such marked plugs, as the proof quality of the powder in each cask respectively contained, and occasionally to weight the said casks; and if upon weighing the same suspicion shall arise that he casks are false tared, or do not contain the quantity herein above mentioned for each cask, to empty the same, and weigh the cask and powder separately, to ascertain the deficiency, if any, in the neath weight, and to fill the same to its due weight out of the other cask belonging to the same person, marking the weight taken on the ullage casks , and keeping an exact account in the books thereof, and of the names of the owners and persons bringing and depositing the same. . . §10. And be it further enacted by the authority aforesaid That if any person, from and after the first day of October next, importing or bringing into the port or city, or county of Philadelphia, any quantity of gun-powder exceeding twenty-five pounds, with intent to sell the same, shall neglect to deposit the same for inspection in the magazine aforesaid, or shall sell the same before it be inspected and marked as aforesaid, or shall sell any gun-powder that shall be condemned as aforesaid as and for merchantable gun-powder every person so offending shall forfeit all such gunpowder as aforesaid. § 11. And be it further enacted by the authority aforesaid, That the inspector shall be entitled to demand and receive of and from the owner and possessor of all gun-powder deposited in the said magazine, and by him or his Deputy examine, proved and plugged, as aforesaid, the following sums or rates, whether the same be approved or condemned, paid or secured before the same shall be removed from the magazine; if the Inspector shall so require; for every cask of powder, manufactured in this state, or any of the United States, bored, and stopped with corks by the manufacturer, containing twenty-five pounds neat weight, seven cents; for every like cask containing fifty pounds, eight cents; for every like cask containing one hundred pounds, nine cents; and fore very cask of foreign powder, or powder manufactured in the United States, not bored and stopped with corks as aforesaid, double the said price or rates; and for every cask which shall find deficient one per cent. In weight and shall fill up, fifty cents. § 12. And be it further enacted by the authority aforesaid, that if any dispute should arise between the owner, possessor or consignee of any such powder and the Inspector, touching the proof or condemnation thereof, or the goodness of the materials and manner in which the casks are made, upon application by the owner, possessor or consignee of such powder to one of the Magistrates of the city or county of Philadelphia, where the dispute shall arise, the said Magistrate shall issue this warrant to three indifferent judicious persons to be triers thereof, one of them to be named by the said owner, possessor or consignee, of by the said Inspector, and the third of the said Magistrate shall thereupon give his judgment agreeably to the report of the said triers, or any two of them; ad in case the said Magistrate shall on such reports adjudge the powder not to be merchantable, he shall award the owner, possessor or consignee thereof, to pay all costs; but in the case the said powder shall be found

merchantable, the Inspector shall be adjudged to pay all costs, which may have accrued, and shall thereupon cause the powder to be marked as the standard to eb directed by the said triers.

**RHODE ISLAND**

1762 R.I. Pub. Laws 132
And be it further Enacted by the Authority aforesaid, That no person whatsoever shall fire a gun or other fireworks within one hundred yards of the said powder house, upon the penalty of paying a fine of ten shillings lawful money, for every such offence, to be recovered by the Town Treasurer, for the use of the said Town.

Records Of The State Of Rhode Island And Providence Plantations In New England.Providence Page 18-19, Image 20-21 (1863) available at The Making of Modern Law: Primary Sources. 1776
An Act for the Inspection of Gunpowder, Manufactured within this State (1776). Be it enacted by this General Assembly, and by the authority thereof, it is enacted, that if any person or persons, within this state, shall vend or expose to sale any gunpowder, manufactured within the same, unless said gunpowder be packed in a good dry cask, marked with the two first letters of the manufacturer's name, and hath been examined and approved by the inspector of gunpowder, for said state, and by him marked with the letters U.S.A., and such other marks as are necessary to distinguish the several sorts of gunpowder: the person or persons so offending shall forfeit and pay £6 lawful money, for every cask so exposed to sale; to be recovered by bill, plaint or information, upon conviction before any court of record within this state; which forfeiture shall one moiety thereof be given to the informer, and the other be paid in to the general treasury of the state. And be it further enacted by the authority, aforesaid, that the said inspector be paid out of the general treasury nine-pence, lawful money, for every cask so marked and inspected by him.

The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to the City Page 89-96, Image 89-96 (1854) Available at The Making of Modern Law: Primary Sources. 1821
An Act Regulating the Storage, Safe Keeping and Transportation of Gunpowder in the Town of Providence, (1821) § 2. And be it further enacted, That is shall not be lawful for any person or persons to sell any gunpowder which may at the time be within the town of Providence in any quantity, by wholesale or retail, without first having obtained from the town council of said town a license to sell gunpowder; and every such license shall be written or printed, and signed by the president of said council or their clerk, on a paper upon which shall be written or printed a copy of this act; and every such license shall be in force for one year from the date thereof, unless annulled by said council, and no longer; but such license may, prior to the expiration of that time, be renewed, by endorsement thereon, for a further term of one year, and so from year to year: provided, always, that the said town council may annul any such license, if in their opinion the person or persons licensed have forfeited the right of using the same by any violation of the law relative thereto; and every person who shall receive a license as aforesaid shall pay therefor the sum of five dollars, and on having the same renewed shall pay therefor the sum of one dollar, which shall be paid to the clerk of said council, for their use, for the purpose of defraying the

expense of carrying this act into execution. § 3. And be it further enacted, That any person or persons who shall keep, have, possess or transport any gunpowder within the town of Providence, contrary to the provisions of this act, or who shall sell any gunpowder therein, without having a license therefor, then in force, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding five hundred dollars, for each and every offence; and if any gunpowder kept contrary to the provisions of this act shall explode in any shop, store, dwelling-house, ware-house or other building, or in any place in said town, the occupant, tenant or owner of which has not a license in force to keep and sell gunpowder therein, or which gunpowder shall have been kept in a manner contrary to the terms and conditions of such license, such occupant tenant or owner shall forfeit and pay a fine of not less than twenty dollars nor more than five hundred dollars. . . § 6. And be it further enacted, That the said firewards, or any of them, may enter the store or place of any person or persons licensed to sell gunpowder, to examine and ascertain whether the laws relating thereto are strictly observed; and also whenever there may be an alarm or fire; and in such last case may cause the powder there deposited to be removed to a place of safety, or to be destroyed by wetting or otherwise, as the exigency of the case may require; and it shall be lawful for any one or more of the firewards aforesaid to enter any dwelling house, store, building or other place in said town to search for gunpowder which they may have reason to suspect to be concealed or unlawfully kept therein; first having obtained from some justice of the peace of said town a search warrant therefor; which warrant any one of the justices of said town is hereby respectively authorized to issue, upon the complaint of such fireward or firewards, supported by his or their oath or affirmation. . . And be it further enacted, That all persons who wish have a license to keep and sell gunpowder within the town shall make application to the town council in writing, stating the place of business and whether they wish to sell by wholesale or retail, or both; and to each person or firm who may be approbated, a certificate of license shall be granted, on payment of the fee established by law. § 14. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by retail, shall be allowed to keep in the place or building designated in the license, twenty-five pounds of gunpowder, and no more, at one time, which shall always be kept in tin or copper canisters, capable of containing no more than twelve and a half pounds each with a small aperture at the top, and a tin or copper cover thereto. § 15. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by wholesale, shall provide and keep a tine or copper chest, with two handles and a tight cover, furnished with a hinge, and secured with a padlock, all of tin or copper chest, with two handles and a tight cover furnished with a hinge and secured padlock, all of tin or copper; such chest shall always be kept on the lower floor, on the right side of and close to the principal door or entrance from the street into the building so licensed, except when otherwise designated by the council and shall always be kept locked, except when powder is put in or taken out; and such person or firm, so licensed shall be allowed to deposit and keep, in such tin or copper chest, a quantity of gunpowder not exceeding four casks of twenty-five pounds each; the heads of each cask not to be opened, and each cask to be kept in a strong leather bag, closely tied and marked as aforesaid. § 16. And be it further enacted, that every person or firm licensed to keep and sell gunpowder as aforesaid, by wholesale or retail, shall have and keep a signboard placed over the door or building in which such powder is kept, on which shall be painted in Roman capitals the words “Licensed to sell Gunpowder”

Newport (R.I.). Charter of the City of Newport, R.I., And the Special State Laws Relating Thereto, Together With the Ordinances for the Government of the City. Newport, 1858.

Newport RI 1858 Sec. 11. And be it further enacted, That no person whosoever shall fire a gun or other fire-works within one hundred yards of the said powder-house, upon the penalty of two dollars for every such offense, to be recovered by the town treasurer for the use of said town. Sec. 12. And be it further enacted, That no ship or vessel having more than five barrels of gunpowder on board, shall come to anchor in the harbor of Newport, anywhere to the eastward of Goat Island, and lie there more than twenty-four hours, after notice and warning shall be given by the president of the town council . . .

1885 R.I. Pub. Laws 6, An Act In Amendment Of And in Addition To Chapter 242 Of The Public Statutes, Entitles "Of Offenses Against Private Property." § 1
§ 1. Every person who shall knowingly deliver or cause to be delivered to any person or carrier any box, can or other package of nitro-glycerine, gunpowder, naptha or other equally explosive material, not marked with a plain and legible label describing its contents, or who shall remove or cause to be removed any such label or mark shall be fined not more than ten thousand dollars or imprisoned not more than five years.

**SOUTH CAROLINA**

Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802
[Ordinances of the City of Charleston, An Ordinance for Appointing Commissioners of the Streets, Defining their Powers, and for other Purposes therein Mentioned, § 8. And be it further ordained by the authority aforesaid, That no person or persons, shall fire any squibs, crackers, or other fireworks, except at times of public rejoicing, and at such places as the intendant for the time being may permit, by license under his hand; nor burn any chips, shavings, or other combustible matters, in any of the streets, lanes, wharves, alleys, or open or enclosed lots of the city, nor fire any gun, pistol, or fire arms, within the limits of the city, except on occasion of some military parade, and then by the order of some officer having the command, under the penalty of ten dollars, for every such offense; nor shall any person or persons, raise or fly any paper or other kite, within the said city, under the said penalty of ten dollars.]

John E. Breazeale, The Revised Statutes of South Carolina, Containing the Code of Civil Procedure, and the Criminal Statutes. Also The Constitutions of the United States and of the State, and the Rules of the Supreme and of the Circuit Courts of the State Page 431, Image 529 (Vol. 2, 1894) available at The Making of Modern Law: Primary Sources. 1890
Chapter XXVIII Violations of the License Laws by Insurance and Other Companies, Emigrant Agents, owners or shows, etc., Persons Selling Pistols, etc. §490. No person or corporation within the limits of this State shall sell or offer for sale any pistol, rifle, cartridge or pistol cartridge less than .45 caliber, or metal knuckles, without first obtaining a license from the county in which such person or corporation is doing business so to do. The County Board of Commissioners of the several Counties of this State are authorized to issue licenses in their respective Counties for the sale of pistols and pistol and rifle cartridges of less than .45 caliber, and metal knuckles, upon the payment to the County Treasurer by the person or corporation so applying for said license of the sum of twenty-five dollars annually; and any person who shall

sell or offer for sale any pistol, or pistol or rifle cartridge of less than .45 caliber, or metal knuckles, without having obtained the license provided in this Section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding one year, or both, at the discretion of the court.

1903 S.C. Acts 124, An Act to Protect Fish by the Regulation of the Sale of Dynamite and Other Similar Explosives: § 1.
§ 1. Be it enacted by the General Assembly of the State of South Carolina, That no person shall sell, deliver or dispose of dynamite or similar powerful explosives, except ordinary gunpowder, unless such person knows the purchaser or the party to receive the same and is satisfied that the explosive is not to be used for killing fish, and then only upon a written application from party desiring to purchase, stating the purpose for which he desires to use the said explosives; and a person selling, delivering or disposing of such explosives, shall keep a book in which shall be recorded the name of the purchaser or party to whom the explosive is delivered, the quantity so sold or delivered, and the date of such sale or delivery.

**SOUTH DAKOTA**

1913 S.D. Sess. Laws 292, An Act to Regulate the Sale of Dynamite or Other High Explosives, and to Provide a Penalty for the Violation Thereof, § 1.
No person, firm, or corporation shall sell any dynamite or other high explosive, except ordinary gun powder in the state of South Dakota, to any person unknown to the seller, unless introduced by some person known to the seller, and on every sale the seller shall before delivery, make entry on a book kept for that purpose stating the date of sale, the name and address of the purchaser, the name and quantity of the article sold, the purpose for which it is required and the name of the person, if any, who introduced them. Any person failing to comply with the requirements of this section shall be deemed guilty of a misdemeanor.

**TENNESSEE**

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 52, Image 52 (1867) available at The Making of Modern Law: Primary Sources. 1867
Ordinances of the City of Memphis, Nuisance and Abatement Thereof, It is a public nuisance. — § 5 To carry on the business of manufacturing gun-powder or of mixing or grinding the materials therefor, in any building within eighty rods of any valuable building erected at the time such business may be commenced.

1899 Tenn. Pub. Acts 327, An Act to Repeal the Charter of the Town of Waverly, in Humphreys County, and to Incorporate Said Town and Define Its Rights, Powers, etc., ch. 174, § 11, pt. 10.
[The Town has power] To regulate, restrain, or prevent the carrying on of manufactories dangerous in causing or producing fires, and to prevent and suppress the sale of firearms, fireworks, Roman candles, crackers, sky rockets, etc., and toy pistols.

**UTAH**

1901 Utah Laws 76, An Act Relating to the Marketing of Explosives, Inflammable Substances or Dangerous Acids, Chemicals and Compounds for Storage or Transportation, and Providing Penalties for the Violation of This Act, ch. 77, § 1.
Penalty for delivering dangerous explosive for storage or transportation. That every person who knowingly leave with or delivers to another, or to any express or railway company or other common carrier, or to any warehouse or storehouse any package containing nitro-glycerine, dynamite, guncotton, gunpowder, or other highly explosive compound, or any benzine [sic], gasoline, phosphorus, or other highly inflammable substance or any vitriol, . . . or other dangerous acid . . . to be handled, stored, shipped or transported, without plainly marking and indicating on such package the name and nature of the contents thereof, is guilty of a misdemeanor, and punishable by a fine not exceeding three hundred dollars, or by imprisonment in the county jail not exceeding six months.

**VERMONT**

1865 Vt. Acts & Resolves 213, An Act to Amend an Act Entitled "An Act to Incorporate the Village of Rutland," Approved November 15, 1847, § 10.
. . . and said fire wardens may inspect the manner of manufacturing and keeping gun-powder, lime, ashes, matches, lights, fire-works of all kinds, and other combustibles, . . . and a majority of said fire-wardens may, if they deem the same to be dangerous, order the persons manufacturing and keeping such gun powder . . . in what manner to manufacture and keep the same[.]

Barber, Orion M. The Vermont Statutes, 1894: Including the Public Acts of 1894, with the Declaration of Independence, the Articles of Confederation, and the Constitutions of the United States, and the State of Vermont Page 918, Image 935 (1895) available at The Making of Modern Law: Primary Sources. 1882
A person who has in his possession a toy pistol for the explosion of percussion caps or blank cartridges, with intent to sell or give away the same, or sells or gives away, or offers to sell or give away the same, shall be fined not more than ten nor less than five dollars; and shall be liable for all damages resulting from such selling or giving away, to be recovered in an action on the case.

1919 Vt. Acts and Resolves 136, An Act to Regulate the Transportation of Dynamite, Gunpowder and Other Explosives by Common Carriers, § 1.
It shall be unlawful to transport, carry or convey from one place in this state to another place in this state, any dynamite, gunpowder, or other explosive on any vessel or vehicle of any description operated by a common carrier, which vessel or vehicle is carrying passengers for hire[.]

**VIRGINIA**

That no commander of any plantation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainments, &c.
The Laws of Virginia, Vol. 1, 1623, 127.
https://archive.org/details/statutesatlargeb01virg/page/126/mode/2up?view=theater

**WASHINGTON STATE**

Edward D. McLaughlin, The Revised Statutes and Codes of the State of Washington Page 686, Image 738 (1896) available at the Making of Modern Law: Primary Sources. 1896
Public Nuisance, § 3910 – Certain Defined. It is a public nuisance—5. To carry on the business of manufacturing gun powder, nitroglycerine or other highly explosive substance, or mixing or grinding the materials therefor, in any building within fifty rods of any valuable building, erected at the time such business may be commenced.

**WEST VIRGINIA**

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.
It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

**WISCONSIN**

Charter and Ordinances of the City of La Crosse, with the Rules of the Common Council Page 239-242, Image 242-245 (1888) available at The Making of Modern Law: Primary Sources.
Ordinances of La Crosse, An Ordinance to Provide for Licensing Vendors of Gunpowder and Other Explosive Substances and to Regulate the Storing, Keeping and Conveying of all Dangerous and Explosive Materials and Substances within the City of La Crosse, and in relation to the Storage and Sale of Lime Therein, § 1. It shall be unlawful for any person to keep for sale, sell or give away any gunpowder, giant powder, nitro-glycerine, gun-cotton, dynamite or any other explosive substance of like nature or use without having first obtained a license therefor from the city of La Crosse in the manner hereinafter provided. Any person convicted of a violation of this section shall be punished by a fine of twenty-five dollars for each offense. . . § 3. It shall be unlawful for any person licensed pursuant to the foregoing sections of this ordinance to have or keep at his or her place of business an amount of gunpowder or other explosive material greater in the aggregate than fifty pounds at any one time, or to keep the same in any other than cases or canisters made of tin, or other metal holding not to exceed ten pounds each. Such gunpowder or other explosive materials shall be kept in places remote from fires and lighted lamps or candles, and where the same may be easily accessible so as to be removed in case of fire. No person shall sell any gunpowder or other explosive material after the lighting of lamps in the evening unless in sealed canisters or cases; and all places where business is carried on under any such license shall have a sign put up in a conspicuous place at or near the front door thereof with the word "gunpowder" painted thereon in large letters. Any person violating

any provision of this section shall, upon conviction, be punished by a fine of not less than five dollars nor more than fifty dollars for each offense; and upon any such conviction the common council may at its discretion by resolution duly passed revoke the license of the person so convicted. This ordinance shall not be construed as to prevent persons who are not vendors of the articles mentioned in the title thereof from keeping gunpowder in quantities not exceeding one pound for their own use.

1911 Wis. Sess. Laws 227-28, An Act . . . Relating to the Regulation of the Manufacture and Storage of Gunpowder and Black Blasting Powder, and Providing a Penalty, ch. 223, § 1.
§ 1. . . § 4393a-1. It shall be unlawful for any person, firm, or corporation to manufacture gunpowder or black blasting powder in any quantity whatsoever within the corporate limits of any city or village or within one hundred rods of any occupied dwelling house or any church, schoolhouse, town hall, depot or other place in which people are accustomed to assemble. § 4393a-2. It shall be unlawful for any person, firm or corporation engaged in the manufacture of gunpowder or black blasting powder to store, or permit to be stored on the land or premises where gunpowder or black blasting powder is manufactured, any dynamite or explosive other than that manufactured at such gunpowder or black blasting powder manufacturing plant or within one mile of any plant where gunpowder of black blasting powder is manufactured. § 4393a-3. It shall be unlawful for any person, firm, or corporation engaged in the manufacture of gunpowder or black blasting powder, to store or to keep in storage or permit to be stored or kept in storage, at any plant where gunpowder or black blasting powder is manufactured, more than one hundred twenty-five thousand pounds of gunpowder or black blasting powder in any building or storage magazine at such plant[.]

1911 Wis. Sess. Laws 572, An Act . . . Relating to Child Labor, ch 479, §4.
§ 1728f. 1. No child under the age of eighteen years shall be employed . . . in or about establishments where nitroglycerine, dynamite, dualin, guncotton, gunpowder or other high or dangerous explosive is manufactured, compounded or stored[.]

SOURCE: Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT H

# EXHIBIT H

# GUNPOWDER/GUN TRANSPORTATION LAWS

## ARIZONA

Act of Mar. 18, 1889, 1889 Ariz. Sess. Laws 16–17. 1889
Sec. 1. If any person within any settlement, town, village or city within the Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which he is convicted, the weapon or weapons so carried.
Sec. 2. The preceding article shall not apply to a person in actual service as a militiaman, nor as a peace officer or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.
Sec. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sol for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.
Sec. 4. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.. . .
Sec. 6. Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.

## ARKANSAS

Act of Feb. 16, 1875,1874-75 Ark. Acts 156. 1875
Sec. 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-

give nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

**GEORGIA**

Oliver H. Prince, A Digest of the Laws of the State of Georgia: Containing all Statutes and the Substance of all Resolutions of a General and Public Nature, and now in Force, which have been Passed in this State, Previous to the Session of the General Assembly of Dec. 1837 Page 619, Image 619 (1837) available at The Making of Modern Law: Primary Sources. 1837
An Act to Regulate the transportation of gunpowder and to authorize the forfeiture of such as shall be transported in violation of the provisions of this act (1831) #20, § 1. From and after the passage of this act, it shall be the duty of all owners, agents and others, who may or shall have any gunpowder, exceeding in quantity five pounds, transported upon the waters or within the limits of this State, to have the word gunpowder marked in large letters upon each and every package which may or shall be transported. § 2. All gunpowder exceeding five pounds in quantity which shall hereafter be transported or engaged for transportation upon any of the waters or within the limits of this State, without being marked as directed in the first section of this act, shall be liable to seizure and forfeiture – one half to the informer, the other for the use of the volunteer companies most convenient or contiguous to the place of seizure or forfeiture.

**HAWAII**

1933 Haw. Sess. Laws 38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 6.
The possession of all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn, or to carriage as merchandise in a wrapper from the place of purchase to the purchaser's home, place of business or place of sojourn, or between these places and a place of repair, or upon change of place of business, abode, or sojourn, except as provided in Sections 5 and 8; provided, however, that no person who has been convicted in this Territory or elsewhere, of having committed or attempted a crime of violence, shall own or have in his possession or under his control a pistol or revolver or ammunition therefor. Any person violating any provision of this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

**IOWA**

An Act Defining Crime and Punishments, Ch. 49, Sec. 72, in Revised Statutes of the Territory of Iowa (Reprint 1911) 1843
SEC. 72. If any person shall aid or assist a prisoner, lawfully committed or detained in any jail, for any offense against this territory, or who shall be lawfully confined by virue of any civil process, to make his or her escape from jail, though no escape be actually made, or if an), person shall convey or cause to be delivered to such prisoner any disguise, instrument or arms, proper to facilitate the escape of such prisoner, any person so offending, although no escape or attempt to escape be actually made, shall, on conviction, be punished by fine not exceeding five hundred dollars nor les than one hundred dollars, and imprisonment in the penitentiary, at hard labor, for a term not exceeding two years.

## KENTUCKY

Kentucky Statutes Containing All General Laws including Those Passed at Session of 1898, p. 547 Sec. 1259. 1898
Hunting or fishing on another's land. Any person who shall enter upon the inclosed lands of another for the purpose of shooting, hunting, or fishing, without the consent of the owner or occupant of said lands, shall be fined not less than five nor more than twenty-five dollars. (See further, sec. 1252.)

## MARYLAND

Proceedings of the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776 Page 147, Image 147 (1836) available at The Making of Modern Law: Primary Sources. 1776
[1776 Md. Laws 146.Resolved, that no muskets or rifles, except by the owner thereof on his removal to reside out of this province, or any gun barrels, gun locks, or bayonets, be carried out of his province, without the leave of the council of safety for the time being.]

## NEW JERSEY

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 263, Image 309 (1877) available at The Making of Modern Law: Primary Sources. 1874
Crimes, An Act Relating to the Transportation of Explosive and Dangerous Material, § 1. That if any person shall deliver, or cause to be delivered, to any canal, railroad, steamboat, or other transportation company, or to any persons, firm, or corporation engaged in the business of transportation, any nitroglycerine, dualin, dynamite, gunpowder, mining or blasting powder, gun-cotton, phosphorous, friction matches, or other explosive or dangerous material of any nature whatsoever, under any false or deceptive invoice or description, or without previously informing such person, firm or corporation, in writing, of the true nature of such article, and without having the box, keg, barrel, can or package containing the same plainly marked with the name of the explosive or dangerous material therein contained, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to imprisonment for thirty days, and to pay a fine

of one hundred dollars, and shall be responsible for all damages to persons or property directly or indirectly resulting from the explosion of any such article. § 2. That it shall and may be lawful for any officer or agent of any person, firm, or corporation, engaged in the business of transportation to require any package tendered for transportation, believed to contain explosive material, to be opened by the person delivering the same, and to refuse to receive any such package unless such requirements be complied with; and if such package be opened and found to contain such explosive or dangerous material, the said package and its contents shall be forthwith removed to any lawful place for the storing of gun-powder, and after conviction of the offender, or after three months from such removal, the said package, with its contents, shall be sold at public sale, after the expiration of ten days from notice of the time and place of such sale, published in one newspaper in the county where such seizure shall have been made; and the proceeds of such sale, after deducting therefrom the expenses of removal, storage, advertisement, and sale, shall be paid into the treasury of the said county; provided, however, that nothing in this act contained shall be construed to require common carriers to transport any such explosive or dangerous articles against their consent, nor to transport them otherwise than at such times, and under such regulations for safety to persons and property, as they may from time to time prescribe in relation thereto

**NEW MEXICO**

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887). 1887
Sec. 1. That any person who shall hereafter carry a deadly weapon, either concealed or otherwise, on or about the settlements of this territory, except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family or property, the same being then and there threatened with danger, or except such carrying be done by legal authority, upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than three hundred, or by imprisonment not less than sixty days, nor more than six months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.
Sec. 2. Any person who shall draw a deadly weapon or another, or who shall handle a deadly weapon in a threatening manner, at or towards another, in any part of this territory, except it be in the lawful defense of himself, his family or his property, or under legal authority, upon conviction thereof, shall be fined in any sum not less than one hundred dollars, nor more than five hundred dollars, or by imprisonment at hard labor in the county fail or territorial penitentiary not less than three months nor more than eighteen months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.
Sec. 3. Any person who shall unlawfully assault or strike at another with a deadly weapon, upon conviction thereof shall be punished by a fine not exceeding one thousand dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary, not exceeding three years, in the discretion of the court or jury trying the same.
Sec. 4. Any person who shall unlawfully draw, flourish or discharge a rifle, gun or pistol within the limits of any settlement in this territory, or within any saloon, store, public hall, dance hall or hotel, in this territory, except the same be done by lawful authority, or in the lawful defense of himself, his family or his property, upon conviction thereof shall be punished by a fine of not

more than one thousand dollars, or by imprisonment for a term of not more than three years, or by both such fine and imprisonment, in the discretion of the court or jury trying the same. The word "settlement," as used in this act, shall be construed to mean any point within three hundred yards of any inhabited house, in the territory of New Mexico.
Sec. 5. Any person being armed with a deadly weapon, who shall, by words, or in any other manner, insult or assault another, upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, not more than three hundred dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary for not less than three months, nor more than one year, or by both such fine and imprisonment, in the discretion of the court or jury trying the same. . . .
Sec. 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted.
Sec. 9. Persons traveling may carry arms for their own protection while actually prosecuting their journey and may pass through settlements on their road without disarming; but if such travelers shall stop at any settlement for a longer time than fifteen minutes they shall remove all arms from their person or persons, and not resume the same until upon eve of departure.
Sec. 10. Sheriffs and constables of the various counties, and marshals and police of cities and towns, in this territory, and their lawfully appointed deputies, may carry weapons, in the legal discharge of the duties of their respective offices, when the same may be necessary, but it shall be for the court or the jury to decide from the evidence whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons as punished, for the violation of the preceding sections of this act.

**NEW YORK**

1645 N.Y. Laws 47, By The Director And council Of New Netherland Further Prohibiting The Sale Of Firearms, etc., To Indians
Whereas the Director General and Council of New Netherland having long ere this noticed the dangerous practice of selling Guns, Powder and Lead to the Indians, and moreover published at the time an Ordinance prohibiting the same on pain of Death, notwithstanding which some persons have yet undertaken to barter all sorts of ammunition among the Heathen, purchasing the same secretly here and then transporting it up the River and elsewhere, to the serious injury of this Country, the strengthening of the Indians and the destruction of the Christians, as We are now, also, informed with certainty, that our enemies are better provided with Powder than we, which they contrive to obtain through other Barbarians, our friends. . .There, we must expressely forbid, as we hereby do, all persons from this time forth from daring to trade any munitions of War with the Indians, or under any pretense whatsoever, to transport them from here without express permission, on pain of being punished by Death, and having the vessel confiscated in which the same shall be found laden or to have been put on board. Let everyone be warned hereby and save himself from difficulty.

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City Page 20, Image 21 (1763) available at The Making of Modern Law: Primary Sources. 1763
§ XVI. And whereas the present store-keeper of the magazine with the consent of the corporation, for the more safe conveying of gun-powder to and from the said magazine, hath provided leather bags, or covers, in order to cover all casks of gun powder to and form the said magazine, be it ordained by the authority aforesaid that from and after the publication hereof, no cart-man, or other person whatsoever, do presume to carry any gun powder to or from the said Magazine, or through any part of this city, but what shall be covered with leather bags as aforesaid, under the penalty of forty shillings, for every offense; the one half thereof to the informer, and the other half to the church wardens of this city for the time being, for the use of the poor thereof.

William G. Bishop, Charter of the City of Brooklyn, Passed June 28, 1873. As Subsequently Amended. With the Charter of April 17, 1854, and the Amendments Thereto, and Other Laws Relating to Said City. Also, the Ordinances of the Common Council of the City of Brooklyn, as Codified and Revised and Adopted Dec.10, 1877 Page 192, Image 196 (1877) available at The Making of Modern Law: Primary Sources. 1877
Ordinances of the [City of Brooklyn, Miscellaneous Provisions,] § 16. No person shall carry, or cause to be carried, any gunpowder through any street, lane or alley in the city, unless the same be secured in tight casks, kegs or cases, well headed and hooped; and said casks, kegs or cases shall be put into and entirely covered with a bag or case sufficiently to prevent any said gunpowder from being spilled or scattered, under the penalty of forfeiture of the gunpowder and a fine of fifty dollars for every violation of the provisions of this act.

**PENNSYLVANIA**

Frederick Charles Brightly, Brightly's Annual Digest for 1873 to 1878. Annual Digest of the Laws of Pennsylvania for the Years 1873 to 1878 Together with Some laws of Older Date Inadvertently Omitted in Purdon's Digest Completing Brightly Purdon's Digest to the Present Date Page 1835, Image 65 (1878) available at The Making of Modern Law: Primary Sources. 1874
[Digested Laws 1873-78,] Common Carriers, 1. Carriers of explosive materials regulated. Penalties. 2. Power to open packages. Removal and sale. § 1. If any person shall knowingly deliver, or cause to be delivered to any canal, railroad, steamboat or other transportation company, or to any person, firm or corporation engaged in the business of transportation, any nitro-glycerine, dualin, dynamite, gunpowder, mining or blasting powder, gun-cotton, phosphorus, or other explosive material adapted for blasting, or for any other purpose for which the articles before mentioned, or any of them, may be used, under any false or deceptive invoice or description, or without informing such person, firm or corporation, in writing, at or before the time when such delivery is made, of the true nature of such, and without having the keg, barrel, can or package containing the same plainly marked with the name of the explosive material therein contained, together with the word "dangerous" article, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to imprisonment for thirty days, and to pay a fine of one hundred dollars; and shall be responsible for all damages to persons or

property, directly or indirectly resulting from the explosion or combustion of any such article. § 2. It shall and may be lawful for any officer or agent of any person, firm or corporation engaged in the business of transportation, upon affidavit made of the fact that any package tendered for transportation, not in compliance with the provisions of the first section hereof, is believed to contain explosive material such as aforesaid, to require such package to be opened, and to refuse to receive any such package unless such requirement be complied with; and if such package be opened, and found to contain any explosive material, the said package and its contents shall be forthwith removed to any lawful place for the storing of gunpowder; and after conviction of the offender, or after three months from such removal, the said package, with its contents, shall be sold at public sale, after the expiration of ten days from notice of the time and place of such sale, published in one newspaper in the county where such seizure shall have been made; and the proceeds of such sale, after deducting therefrom the expenses of removal, storage, advertisement and sale, shall be paid into the treasury of the said county.

## SOUTH CAROLINA

Act of Feb. 20, 1901, ch. 435, §1, 1901 S.C. Acts 748. 1901
Sec. 1. Be it enacted by the General Assembly of the State of South Carolina: That from and after the first day of July 1902 it shall be unlawful for any one to carry about the person whether concealed or not any pistol less than 20 inches long and 3 pounds in weight. And it shall be unlawful for any person, firm or corporation to manufacture, sell or offer for sale, or transport for sale or use into this State, any pistol of less length and weight. Any violation of this Section shall be punished by a fine of not more than one hundred dollars, or imprisonment for not more than thirty days and in case of a violation by a firm or corporation it shall forfeit the sum of one hundred dollars to and for the use of the school fund of the County wherein the violation takes place to be recovered as other fines and forfeitures: Provided, this Act shall not apply to peace officers in the actual discharge of their duties, or to persons while on their own premises. . . .
Sec. 3. In case it shall appear to the satisfaction of the presiding Judge or Magistrate before whom such offender is tried that the defendant had good reason to fear injury to the person or property and carried said weapon to protect himself or property he may in his discretion suspend sentence.

## TENNESSEE

1899 Tenn. Session Laws 780
Provided however, That it shall be lawful for any person to hunt quail or partridges in said counties with a gun, between the first day of November and the first day of January of each year. But it is further provided, that it shall not be lawful to hunt upon the inclosed lands of another with a gun, as above mentioned, until written permission is first obtained from the owner or owners of such inclosed lands.

## VIRGINIA

Thomas D. Davis, The Code of the City of Lynchburg, Va., Containing the Charter of 1880, with the Amendments of 1884, 1886 and 1887, and the General Ordinances in Force July 1st, 1887,

Also a Digest of Acts of Assembly and of Ordinances Affecting the Rights and Interests of the City of Lynchburg and its Citizens, Together with a Brief Sketch, Historical and Statistical Page 117, Image 128 (1887) available at The Making of Modern Law: Primary Sources. 1887 [Ordinances of Lynchburg,] Public Safety, § 19. No person shall carry gunpowder, blasting powder, dynamite or other explosives on a vehicle in any part of the city unless the same shall be secured in kegs, boxes, or canisters, so that no part thereof can fall out or escape.

SOURCE: Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT I

# EXHIBIT I

# MACHINE GUN AND SEMI-AUTOMATIC FIREARMS LAWS

## ARKANSAS

1931 Ark. Laws 704, 704-6
ACT 225.
AN ACT to Prohibit the Possession, Transportation or Sale of Machine Guns, and Inflicting Penalty for Violation Thereof.
SECTION 1. It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or for any railroad company, or express company, or other common carrier, or any officer, agent; or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport from one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm of the type commonly known as a machine gun.
SECTION 2. It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store, keep, possess, or have in possession, except as hereinafter provided, any firearm of the type commonly known as a machine-gun.
SECTION 3. It shall be unlawful for any person to sell, or give away, or be interested directly or indirectly, in the sale or giving away, of any firearm of the type commonly known as a machine-gun.
SECTION 4. Provided, this Act shall not apply to the military authorities of the State or nation, and provided further, that any peace officer of the State, counties or political subdivision thereof, may possess machine-guns when required in the performance of their duties. After April 1, 1931, every person permitted by this Act to possess a machine-gun, shall file in the office of the Secretary of State, on a blank to be supplied by the Secretary of State, an application to be properly sworn to, which shall include his name and address, and the serial number of the machine-gun which he desires to possess. Thereupon, the Secretary of State shall file such application his office, registering such officer in a book or index to be kept for that purpose, and assign to him a number, and issue to him a card, which he shall keep with him while he has such machine-gun in his possession. Such registration shall be made on the date application is received and filed with the Secretary of State, and shall expire on December 31, of the year in which said license is issued.
SECTION 5. Any person violating any part of this law shall upon conviction be fined in any sum not more than $1,000.00, and not less than $100.00, and the

machine-gun or guns found in his possession shall be confiscated and-the title thereof shall pass to the political subdivision of the State making the capture.
SECTION 6. All laws and parts of laws in conflict herewith are hereby repealed, and whereas criminals are using machine-guns for illegal purposes, this Act being necessary for the immediate preservation of the public peace, health, and safety, an emergency is hereby declared, and it shall be in force and effect from and after its passage.
Approved: March 26th, 1931.

1935 Ark. Laws 171, 171-75
ACT 80.
"AN ACT Relating to Machine Guns, and to Make Uniform the Law With Reference Thereto."
Be It Enacted by the General Assembly of the State of Arkansas;
SECTION 1. "Machine Gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. . . .
SECTION 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of (not less than twenty years).
SECTION 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of (not less than ten years).
SECTION 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose;
(a) when the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or
(b) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or
(c) when the machine gun is of the kind described in Section 8 and has not been registered as in said section required; or
(d) when empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

SECTION 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
SECTION 6. Nothing contained in this act shall prohibit or interfere with 1. the manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; 2. the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; 3. the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifestly not aggressive or offensive.
SECTION 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given, or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer shall permit any 'marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of (not less than ............ hundred dollars).
SECTION 8. Every machine gun now in this State adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the (Secretary of state), on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the (secretary of State), and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.
SECTION 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record upon application of the (district attorney), shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and

either destroyed or delivered to a peace officer of the State or a political subdivision thereof. . . .
SECTION 14. WHEREAS, under the present law of the state of Arkansas the officers of the state are powerless to effectively combat crime, therefore, it being necessary for the preservation of the public peace, health and safety, an emergency is hereby declared, and this act shall take effect and be in force from and after its passage and approval.
APPROVED: February 26, 1935.

**CALIFORNIA:**

1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1-2.
§ 1. . . . [E]very person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment. Provided, however that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties.
§ 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

1933 Cal. Stat. 1169
§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…
§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips,

discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

1933 Cal. Stat. 1169
§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…
§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

## CONNECTICUT

1935 Conn. Laws 389, 389-94
CHAPTER 152
AN ACT CONCERNING MACHINE GUNS.
Be it enacted by the Senate and House of Representatives in General Assembly convened:
SECTION 1. The term "Machine Gun," as used in this act, shall apply to and include a weapon of any description, loaded or unloaded, from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically, discharged from a magazine, by a single function of the firing device. . . .
SEC. 2. Any person who shall possess or use a machine gun in the perpetration or attempted perpetration of a crime of violence shall be imprisoned not more than twenty years.
Sc. 3. Any person who shall possess or use a machine gun for an offensive or aggressive purpose shall be imprisoned not more than ten years.
SEC. 4. The possession or use of a machine gun shall be presumed to be for an offensive or aggressive purpose: (a) When the machine gm shall be on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun was found; or (b) when in the possession of, or use by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any state or federal court of record of the

United States of America, its territories or insular possessions; or (e) when the machine gun shall be of the kind described in section seven hereof and has not been registered as in said section required; or (d) when empty or loaded pistol shells of thirty (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun shall be found in the immediate vicinity thereof.

SEc. 5. The presence of a machine gun in any room, boat or vehicle shall be presumptive evidence of the possession or use of the machine gun by each person occupying such room, boat or vehicle.

SEc. 6. Each manufacturer shall keep a register of all machine guns manufactured or handled by him. Such register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of each machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered. Upon demand, any manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, and parts and supplies therefor, and shall produce the register, herein required, for inspection. Any person who shall violate any provision of this section shall be fined not more than two thousand dollars.

SEc. 7. Each machine gun in this state on July 1, 1935, adapted to use pistol cartridges of thirty (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the commissioner of the state police on July 1, 1935, and annually thereafter on the first day of July. If acquired after July 1, 1935, it shall be registered within twenty-four hours after its acquisition and, thereafter, annually, on the first day of July. Blanks for registration shall be prepared by said commissioner and furnished upon application. To comply with this section, the application as filed shall show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which the gun was acquired. The registration data shall not be subject to inspection by the public. Any person who shall fail to register any gun as required by this section shall be presumed to possess the same for an offensive or aggressive purpose. The provisions of this section shall not apply to any machine gun which has been registered under the provisions of section six of this act and which is still in the actual possession of the manufacturer.

SEC. 8. A warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of thirty (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of

the state's attorney, shall have authority to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the state or of a political subdivision thereof.
SEC. 9. No provision of this act shall apply to the manufacture of machine guns for sale or transfer to the United States government, to any state, territory or possession of the United States or to any political subdivision thereof or to the District of Columbia.
Sec. 10. This act shall take effect from its passage.

**DELAWARE:**

1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1.
On and after the passage and approval of this Act it is and shall be unlawful for any person or persons other than the State Military Forces or duly authorized Police Departments to have a machine gun in his or their possession, within the State of Delaware. Any person or persons convicted under the provisions of this Act shall be deemed guilty of a felony and shall be punished by either fine or imprisonment, or both, in the discretion of the Court . . . .

**DISTRICT OF COLUMBIA:**

District of Columbia 1932:
1932, Public-No. 275-72D Congress
CHAPTER 465
H.R. 8754
AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.
DEFINITIONS
SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .
SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment

for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law -enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United

States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or
blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed - oft shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his

possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,
or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained
from the superintendent of police of the District of Columbia. 4. A true record shall be made in a book kept for the purpose the form of which may be prescribed by the Commissioners, of pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. 5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years. 6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily

be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol,
machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: Provided, however, That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen,
or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers
and retail dealers licensed under section 10 of this Act.

PENALTIES

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

CONSTITUTIONALITY

SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.
Approved, July 8, 1932.
https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0

**FLORIDA:**

1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8.
It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns.

1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1.
That it shall be unlawful for any person to throw any bomb or to shoot off or discharge any machine guns upon, across or along any road, street or highway in the State of Florida, or upon or across any public park in the State of Florida, or in, upon or across any public place where people are accustomed to assemble in the State of Florida, and the casting of such bomb or the discharge of such machine gun in, upon or across such public street, or in, upon or across such public park, or in, upon or across such public place, whether indoors or outdoors, including all theatres and athletic stadiums, with intent to do bodily harm to any person or with intent to do damage to the property of any person, shall be a felony and shall be punishable by death.

**HAWAII:**

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.
Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the

United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

1933 Haw. Sess. Laws 36, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 2.
Definitions. "Firearm" as used in this Act means any weapon, the operating force of which is an explosive. This definition includes pistols, revolvers, rifles, shotguns, machine guns, automatic rifles, noxious gas projectors, mortars, bombs, cannon and sub-machine guns. The specific mention herein of certain weapons does not exclude from the definition other weapons operated by explosives. "Crime of violence" as used in this Act means any of the following crimes, namely: murder, manslaughter, rape, kidnapping, robbery, burglary, and those certain crimes set forth in Sections 4130 and 4131 of said Revised Laws. "Pistol" or "revolver" as used in this Act, means and includes any firearm of any shape whatsoever with barrel less than twelve inches in length and capable of discharging loaded ammunition or any noxious gas. "'Person" as used in this Act includes individuals, firms, corporations and copartnerships, and includes wholesale and retail dealers.

**ILLINOIS:**

1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2.
§ 1. For purposes of this Act the term "machine gun" apples to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

The term "manufacturer" shall apply to and include all persons dealing with machine guns as merchandise.
§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that 1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns. 2. The provisions of this Act shall not apply to the Army, Navy or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns. 3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics. 4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers 5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.
Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7.
Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

**INDIANA:**

1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1.
. . . [W]hoever shall be the owner of, or have in his possession, or under his control, in an automobile, or in any other way, a machine gun or bomb loaded with explosives, poisonous or dangerous gases, shall be deemed guilty of a felony, and upon conviction thereof, shall be imprisoned for a term of not less than one year nor more than five years.

1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2.
Whoever shall discharge, fire off, or operate any loaded machine gun, or whoever shall drop form an airplane, automobile, or from any building or structure, or who shall throw, hurl, or drop from ground or street, or keep in his possession and under his control any bomb filled with deadly or dangerous explosives, or dangerous or poisonous gases, shall be deemed guilty of a felony and upon conviction shall be imprisoned for a term of not less than two nor more than ten years.

1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1.
Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting to commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not less than ten years nor more than twenty years . . . .

**IOWA:**

1927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1-2.
§ 1. No person, firm, partnership, or corporation shall knowingly have in his or its possession or under his or its control any machine gun which is capable of being fired from the shoulder or hip of a person, and by the recoil of such gun.
§ 2. No person, firm, partnership, or corporation shall do any act with the intent to enable any other person, firm, partnership, or corporation to obtain possession of such gun.

**KANSAS:**

1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Ulawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1-3.
§ 1. That is shall be unlawful for any person, firm, or corporation other than a sheriff or other peace officer or any military unit of the state or of the United States or any common carrier for hire, to transport or have in his possession or under his control a firearm known as a machine rifle, machine gun, or submachine gun: Provided, That banks, trust companies or other institutions or corporations subject to unusual hazard from robbery or holdup, may secure permits form the sheriff of the county in which they are located for one or more of their employees to have such firearms: Provided further, That museums, American Legions posts, and other similar patriotic organizations may possess such firearms, when no usable as a weapon and when possessed as a curiosity, ornament or keepsake.
§ 2. That any person violating the provisions of the preceding section shall be guilty of a felony, and upon conviction shall be subject to imprisonment in the state penitentiary for not less than one year nor more than five years.
§ 3. Upon complaint being made on oath to any officer authorized to issue process for the apprehension of offenders that a firearm or firearms known as a machine rifles, machine guns or sub-machine guns as described in this act, are concealed in any particular house or place, and if such magistrate shall be satisfied that there are reasonable grounds for believing same to be true, he shall issue a warrant to search the house or place for such firearms . . . .

**LOUISIANA:**

1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a Penalty for a Violation Hereof . . . , §§ 1-2.
§ 1. . . . for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.
§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that (exceptions for law enforcement, military, war relics, museums, guards, messengers) . . . .

**MARYLAND:**

1927 Md. Laws 156, § 388-B.
That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

1933 Md. Laws 1045
CHAPTER 550.
AN ACT to add thirteen new sections to Article 27 of the Code of Public General Laws of Maryland, title "Crimes and Punishments," to follow immediately after Section 350 of said Article, to be sub-titled "Uniform Machine Gun Act" and to be known as Sections 350A, 350B, 350C, 350D, 350E, 350F, 350G, 350H, 3501, 350J, 350K, 350L, 350M, respectively relating, to the manufacture, sale and possession of machine guns and imposing imprisonment or fines for violations of the provisions thereof.
SECTION 1. Be it enacted by the General Assembly of Maryland, That thirteen new sections be added to Article 27 of the Code of Public General Laws of Maryland, title "Crimes and Punishment" to follow immediately after Section 350

of said Article and to be designated as Sections 350A, 350B, 350C, 350D, 350E, 350F, 350G, 350H, 3501, 350J, 350K, 350L, 350M, and to read as follows:

Section 350A. Definitions. "Machine Gun" as used in this Act, means a weapon, of any description, by whatever name known, loaded or unloaded, from which more than one shot or bullet may be automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder of any degree, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applies to and includes firm, partnership, association or corporation.

Section 350B. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

Section 350C. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for term of not more than ten years.

Section 350D. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose:

(a) when the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or

(b) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or

(c) when the machine gun is of the kind described in Section 350H and has not been registered as in said section required; or

(d) when empty or loaded shells which have been used or are susceptible of being used in the machine gun are found in the immediate vicinity thereof.

Section 350E. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

Section 350F. Exceptions. Nothing contained in this Act shall prohibit or interfere with

1. the manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States, the several States or of any political sub-division thereof, or the transportation required for that purpose;

2. the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake;

3. the possession of a machine gun for a purpose manifestly not aggressive or offensive.

Section 350G. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not more than one hundred dollars.

Section 350H. Every machine gun now in this state shall be registered in the office of the Secretary of State, on the effective date of this Act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of State, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

Section 3501. Warrant to search any house or place and seize any machine gun possessed in violation of this Act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the State's Attorney, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the state or a political sub-division thereof.

Section 350J. If any provision of this Act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the
provisions of this Act are declared to be severable.

Section 850K. Uniformity of interpretation. This Act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

Section 350L. Short title. This Act including Sections 350A to 350M may be cited as the Uniform Machine Gun Act.

Section 350M. Repeal. All Acts or parts of Acts which are inconsistent with the provisions of this Act are hereby repealed to the extent of such inconsistency. Approved April 21, 1933.

**MASSACHUSETTS:**

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
. . . Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . .

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
§ 1. In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty one B. . .
§ 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

**MICHIGAN:**

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

**MINNESOTA:**

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.
§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun

within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.
§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers . . .
§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

**MISSOURI:**

1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2.
§ 1. Unlawful to sell, deliver, transport or have in possession any machine gun. – It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

§ 2. The term "machine-gun" defined – The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

**MONTANA**

1935 Mont. Laws 57, 57-60
CHAPTER 43
An Act Relating to Machine Guns, and Their Association with Crimes of Violence as Herein Defined, Providing Presumptions Respecting the Use or Possession Thereof, Search Warrants for Machine Guns, Registration of the Same, and to Make Uniform the Law with Reference Thereto.
Be it enacted by the Legislative Assembly of the State of Montana:
Section 1. Definitions. "Machine Gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than six shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. . . .
Section 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the State Penitentiary for a term of not less than twenty years.
Section 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State Penitentiary for a term of not less than ten years.
Section 4. Possession or use of a machine gun shall be used for presumed to be for offensive or aggressive purpose: offensive or aggressive purpose:
(a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or
(b) When in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or
(c) When the machine gun is of the kind described in Section 8 and has not been registered as in said section required; or
(d) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

Section 5. The presence evidence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
Section 6. Exceptions. Nothing contained in this Act shall prohibit or interfere with:
1. The manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose;
2. The possession of a machine gun for scientific purpose, or the possession of a machine gun not useable as a weapon and possessed as a curiosity, ornament, or keepsake;
3. The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifestly not aggressive or offensive.
Section 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts,
and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not less than One Hundred Dollars ($100.00).
Section 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this Act, and annually thereafter. If acquired hereafter it shall be registered
within twenty-four hours after its acquisition. Blanks for registration shall be prepared by the Secretary of State, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The registration date shall not be subject to inspection by the public. Any person failing to register any gun as required by this Section, shall be presumed to possess the same for offensive or aggressive purpose.
Section 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber

possessed in violation of this Act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the County Attorney, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the state or a political subdivision thereof. . . .
Approved February 20, 1935.

**NEBRASKA:**

1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2.
§ 1. Machine Guns – Sale Unlawful – Penalty – It shall be unlawful for any person, firm or corporation, its or their agents or servants, to sell or cause to be sold or otherwise to dispose of any machine gun to any person in the State of Nebraska, except officers of the law, agents of the United States government, or agents of the law enforcement department of the State of Nebraska. If any person, firm or corporation, or its or their agents or servants violate any of the provisions of this section, they shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in a sum not less than one thousand dollars nor more than ten thousand dollars.
§ 2. U.S. Army and National Guard Exempt – It shall be unlawful for any person or persons, except officers of the law, soldiers of the United States Army, or officers and enlisted men of the National Guard of this state, to transport any machine gun on any highway within this state, or to have in possession for any unlawful purpose any machine gun. Any person violating any of the provisions of this section shall be deemed guilty of a felony and upon conviction thereof, shall be imprisoned in the state penitentiary for not less than one year nor more than ten years.

**NEW JERSEY:**

1920 N.J. Laws 67, An Act to Amend an Act Entitled, "An Act for the Protection of Certain Kinds of Birds, Game and Fish, to Regulate Their Method of Capture, and Provide Open and Close Seasons for Such Capture and Possession," ch. 31, § 9.
It shall be unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than

twice without reloading, or to use any silencer on any gun rifle or firearm when hunting for game or fowl under a penalty of twenty dollars for each offense.

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.
No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.
§ 1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.
§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.
§ 1. A gangster is hereby declared to be an enemy of the state.
§ 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties.

§ 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster.
§ 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute.
§ 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

**NEW YORK:**

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.
A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3.
§ 1. . . A person who sells or keeps for sale, or offers or gives, disposes of or transports any instrument or weapon of the kind usually known as a machine-gun or a sub-machine gun to any person is guilty of a felony, except that the manufacture of machine-guns and sub-machine guns as merchandise and the sale and shipment thereof direct to regularly constituted or appointed state or municipal police departments, sheriffs, policemen, and other peace officers, and to state prisons, penitentiaries and county jails, and to military and naval organizations shall be lawful.
§ 3. . . . A machine gun is a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or

bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun. A person who possesses or uses such machine-gun is guilty of a felony. The presence of such machine-gun in any room, dwelling, structure, or vehicle shall be presumptive evidence of its illegal possession by all the persons occupying the place where such machine gun is found.

**NORTH CAROLINA:**

1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.
That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

1933 N.C. Sess. Laws 387
CHAPTER 261
AN ACT TO MAKE THE POSSESSION OF MACHINE GUNS AND OTHER LIKE WEAPONS UNLAWFUL.
The General Assembly of North Carolina do enact:
SECTION 1. It shall be unlawful for any person, firm or corporation to manufacture, sell, give away, dispose of, use or possess machine guns, sub-machine guns, or other like weapons: Provided, however, that this section shall not apply to the following:
Banks, merchants, and recognized business establishments for use in their respective places of business, who shall first apply to and receive from the Clerk of the Superior Court of the county in which said business is located, a permit to possess the said weapons for the purpose of defending the said business; officers and soldiers of the United States army, when in discharge of their official duties, officers and soldiers of the militia and the State guard when called into actual service, officers of the State, or of any county, city or town, charged with the execution of the laws of the State, when acting in the discharge of their official duties: Provided, further, that automatic shotguns and pistols or other automatic weapons that shoot less than sixteen shots shall not be construed to be or mean a machine gun or sub-machine gun under this act; and that any bona fide resident of this State who now owns a machine gun used in former wars, as a relic or souvenir, may retain and keep same as his or her property without violating the provisions of

this act upon his reporting said ownership to the Clerk of the Superior Court of the county in which said person lives.
SEC. 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor and shall be fined not less than five hundred ($500.00) dollars, or imprisoned for not less than six months, or both, in the discretion of the court.
SEC. 3. That all laws and clauses of laws in conflict with the provisions of this act are hereby repealed.
SEC. 4. That this act shall be in full force and effect from and after its ratification.
Ratified this the 11th day of April, A. D. 1933.

**NORTH DAKOTA:**

1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.
§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun¸ automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

**OHIO:**

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.
That § 12819 of the General Code be supplemented . . . to read as follows: Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty. Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

**OREGON:**

1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4.
§ 3. Except as otherwise provided in this act, it shall be unlawful for any person within this state to possess or have in his possession any machine gun . . .
§ 4. The unlawful concealed carrying upon the person or within the vehicle of the carrier of any machine gun, pistol, revolver or other firearm capable of being concealed upon the person is a nuisance. Any such weapons taken from the person or vehicle of any person unlawfully carrying the same are herby declared to be nuisances, and shall be surrendered to the magistrate before whom said person shall be taken . . .

1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2.
On and after the date upon which this act takes effect no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or the state of Oregon or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver, or other firearms capable of being concealed upon the person, or machine gun. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this acts shall be construed to apply to and include all firearms having a barrel less than 12 inches in length. The word "machine gun" shall be construed to be a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device. Any person who shall violate the provisions of this section shall be guilty of a felony and, upon conviction thereof, be punishable by imprisonment in the state penitentiary for not less than one nor more than five years.

**PENNSYLVANIA:**

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1-4
§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.
§ 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association

or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years.
§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.
§ 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: § 3.
§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence

imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

**RHODE ISLAND:**

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 12.
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "crime of violence" shall mean and include nay of the following crimes or any attempt to commit any of the same, viz.murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any firearm. Possession of any firearm upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6
§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.
§ 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.
§ 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for

the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8.
§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.
§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.
§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any Pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any

attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 3. No person who has been convicted in this state or elsewhere of a crime of violence shall purchase own, carry or have in his possession or under his control any firearm.

**SOUTH CAROLINA:**

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6.
§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device.
§ 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun.
§ 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store, keep, possess, or have in possession, except as hereinafter provided, any firearem of the type defined above or commonly known as a machine gun.
§ 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun.
§ 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport

machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permiteed by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued.
§ 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

**SOUTH DAKOTA:**

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

§ 1. “machine gun” applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. “Crime of Violence” apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. “Person” applied to and includes firm, partnership, association or corporation.
§ 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.
§ 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.
§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof.
§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive.
§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was

acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.
§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

**TEXAS:**

1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining “Machine Gun” and “Person”; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6
§ 1. Definition. “Machine gun” applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device. “Person” applies to and includes firm, partnership, association or corporation.
§ 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two nor more than ten (10) years.
§ 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than (10) years.
§ 4. [Excludes military, police, unusable keepsakes, prison officers.]
§ 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative

public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

**VERMONT:**

1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1.
A person engaged in hunting for game who uses, carries, or has in his possession a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges, shall be fined not more than five hundred dollars nor less than fifty dollars. The presence of such a firearm in a hunting camp shall be presumptive evidence that the possessor of such a firearm has violated the provisions of this section.

**VIRGINIA:**

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.
§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, . . .
§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.
§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.
§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted

of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold. . .

**WASHINGTON:**

1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5.

§ 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: provided, however, that such limitation shall not apply to any peace officer in the discharge of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

§ 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

§ 3. Any person violating any of the provisions of this act shall be guilty of a felony.

§ 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Washington to seize said machine gun, or parts thereof, wherever and whenever found.
§ 5. This act is necessary for the immediate preservation of public health and safety, and shall take effect immediately.

**WEST VIRGINIA:**

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.
It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b.
(b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of

riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

**WISCONSIN:**

1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1.
Any person who shall own, use or have in his possession a machine gun shall be punished by imprisonment in the state prison for a term the minimum of which shall be one year and the maximum fifteen years. Nothing in this section shall be construed as prohibiting police officers, national guardsmen, sheriffs and their deputies from owning, using or having in their possession a machine gun while actually engaged in the performance of their lawful duties; nor shall any person or organization be prohibited form possessing any machine gun received from the government as a war trophy.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06.
164.01 Definitions (a) "Machine gun" applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .
164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby

declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.
164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.
164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.
164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1.
No person shall sell, possess, use or transport any machine gun or other full automatic firearm, nor shall any person sell, possess, use or transport any bomb, hand grenade, projectile, shell or other container of any kind or character into which tear gas or any similar substance is used or placed for use to cause bodily discomfort, panic, or damage to property. (2) Any person violating any of the

provisions of this section shall be punished by imprisonment in the state prison for a term of not less than one year nor more than three years. (3) [doesn't apply to police, military etc.].

**WYOMING:**

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.
§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.
§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.
§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.
§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE: https://firearmslaw.duke.edu/repository/search-the-repository/; HeinOnline

# EXHIBIT J

# EXHIBIT J

# WEAPONS PROOFING LAWS

## INDIANA

An Ordinance Prohibiting the Building and Burning of Bonfires, the Discharge of Cannon or Other Fire-Arms, etc., ch. 18, §§ 1–7, TERRE HAUTE, INDIANA, THE CHARTER, GENERAL ORDINANCES, AND BY-LAWS OF THE CITY (Hebb & Goodwin 1882) (Law Approved August 4, 1868).
AN ORDINANCE prohibiting the building and burning of Bonfires, the discharge of Cannon or other fire-arms, the setting off or discharging of Rockets, Roman-Candles, Fire-Crackers, Squibs, or other Fire-Works, within the city limits.

Section 1. Be it ordained by the Common Council of the City of Terre Haute, That it shall be unlawful to construct or set fire to any collection of combustible materials, for the purpose of making a bonfire, upon any of the streets, alleys, squares, or lots within the limits of said city.

Sec. 2. No person shall discharge any cannon, swivel, anvil, gun or other fire-arm, within the limits of said city, except he be a manufacturer of fire-arms, trying or proving articles manufactured or repaired by him, in such a manner as not to endanger or injure persons or property in the neighborhood.

Sec. 3. No person shall set off or discharge any rocket, Roman-candle, fire-cracker, squib, or other fire-works within the limits of said city.

Sec. 4. No person shall throw any fire-ball, fire-brand, or other ignited substance or substances upon, through, along or across any street, alley, sidewalk, lot or ground within said city: Provided, That nothing in this Ordinance shall be construed to prohibit the use and exhibition of any fire-works on the fourth of July, Christmas day, the eighth [first][2] day of January, or the twenty-second day of February. And provided further, That the Mayor and any two Councilmen may authorize the discharge of cannon or fire-arms in commemoration of any important event.

Sec. 5. Every person who shall be aiding or abetting in the commission of any offense specified in this Ordinance, or who shall counsel, encourage, hire, command, or otherwise procure such offense to be committed, shall suffer the same punishment and penalties which are herein prescribed for the punishment of the principals.

Sec. 6. Every person who shall violate any of the provisions of this Ordinance shall, for each violation of the same, be fined not less than five nor more than twenty-five dollars.

Sec. 7. Whereas an emergency exists for the immediate taking effect of this Ordinance, the same shall be in full force from and after its publication."

Thos. C. Anderson, ed., The Charter, General Ordinances, and By-Laws of the City of Terre Haute (Terre Haute, IN: Hebb & Goodwin, 1882), 392–93. Ordinances, Chapter 18, An Ordinance Prohibiting the Building and Burning of Bonfires, the Discharge of Cannon or Other Fire-Arms, the Setting off or Discharging of Rockets, Roman-Candles, Fire-Crackers, Squibs, or Other Fire-Works, Within the City Limits, §§ 1–7. Approved August 4, 1868.

## MAINE

ME. STAT., ch. 162, §§ 1–4 (J. Griffin 1821).
"CHAPTER CLXII.
An Act to provide for the proof of Fire Arms

Sec. 1. Be it enacted by the Senate and House of Representatives, in Legislature assembled, That the Governor, by and with the consent of the Council, be, and he hereby is empowered to appoint suitable persons, to be provers of barrels of all new, or unused fire arms; and it shall be the duty of each person so appointed, to prove and try the strength of the barrels of all fire arms which shall be offered him for that purpose, and in such manner as to satisfy himself of the strength of the same; and shall in a permanent manner, mark and number every barrel by him so proved, and make and deliver to the person applying to have the same proved, a certificate for each barrel proved and found good in the form following: I certify that on this— day of— A.D. 18— I proved for—, a musket, pistol, or rifle barrel, (as the case may be) and which is numbered and marked as in the margin, and that the same is good and strong. A.B. Prover of fire arms.

Sec. 2. Be it further enacted, That each prover shall be entitled to receive from the person applying to have such barrel proved, twenty five cents, in addition to the expense of the powder necessary for that purpose for each barrel so proved; whether the same shall stand the proof and be marked or not.

Sec. 3. Be it further enacted, That if any person shall sell or offer for sale within this State, any new, or unused musket, rifle, or pistol barrel, without having the same first proved, marked, and certified according to the provisions of this Act, he shall forfeit for each barrel so sold the sum of ten dollars, to be recovered by an action of debt before any Court proper to try the same; to the use of any person who shall sue for and recover the same, or by indictment to the use of the state.

Sec. 4. Be it further enacted, That if any person shall falsely alter the stamp or mark on the certificate of any prover of fire arms, appointed as aforesaid, and be convicted thereof before any Court proper to try the same, he shall forfeit and pay a fine of not more than one hundred dollars, nor less than twenty dollars according to the nature and aggravation of the offence, for the use of the State."

Laws of the State of Maine; to Which Are Prefixed the Constitution of the U. States and of Said State, in Two Volumes with an Appendix, vol. 2 (Brunswick, ME: J. Griffin, 1821), 685–86. Chapter 162—An Act to Provide for the Proof of Fire Arms, §§ 1–4. Approved March 10, 1821.

## **MASSACHUSETTS**

1804 Mass. Laws 111, Ch. 81
1804. — Chapter 81.
[January Session, ch, 35.]
AN ACT TO PROVIDE FOR THE PROOF OF FIRE ARMS MANU-
FACTURED WITHIN THIS COMMONWEALTH.

Whereas no provision hath been made by law for the proof of Fire Arms manufactured in this Commonwealth by which it is apprehended that many may be introduced into use which are unsafe and thereby the lives of the Citizens be exposed, to prevent which

Sect. 1st. Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same That the Governor by and with the advice and consent of the Council be and he hereby is empowered to appoint in any part of this Commonwealth where the Manufacture of fire Arms is carried on, suitable persons to be provers of fire arms not exceeding

two in any County who shall be sworn to the faithful discharge of their trust, whose duty it shall be to prove all Musket Barrels and Pistol barrels which being sufficiently ground bored and breeched shall be offered to him to be proved — who shall prove the Musket barrels twice in manner following vizt.
SEE REST OF LAW
https://archives.lib.state.ma.us/server/api/core/bitstreams/f844908a-8cb3-45d8-8382-5fbe24899ee5/content

Act of Feb. 28, ch. 193, §§ 1–2, 1814 Mass. Acts 464, 464–465 (Russell, Cutler, & Co.).
"CHAP: CXCII.
An Act in addition to an act, entitled "An act to provide for the proof of Fire Arms, manufactured within this Commonwealth."
Sec. 1. BE it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same, That from and after the passing of this act, all musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act, entitled 'An act to provide for the proof of Fire Arms, manufactured within this Commonwealth,' to which this is an addition, in manner following, viz: with a charge of powder equal in weight to the ball which fits the bore of the barrel to be proved; and the powder used in such proof one ounce thereof in a howitzer of four and a half inch caliber, at an elevation of forty-five degrees, shall be of sufficient power to carry a twelve pound shot one hundred and thirty yards; or one ounce thereof in a howitzer of five and a half inch caliber, at an elevation of forty-five degrees, shall be sufficeient to carry a twenty-four pound shot eighty yards, and the ball used in such proof shall be suited to the bore of the barrel to be proved as aforesaid.
Sec. 2. Be it further enacted, That if any person or persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act to which this is an addition; or if any person or persons shall sell, stock or finish, or shall knowingly purchase any musket barrel or pistol barrel manufactured within this Commonwealth, which shall not have been first proved, marked and stamped according to the provisions aforesaid, the person or persons who shall so manufacture, sell and deliver, or knowingly purchase any musket or pistol without causing the same to be first proved, marked and stamped as aforesaid, and the person or persons who shall sell, stock or finish, or shall knowingly purchase any musket barrel or pistol barrel, which shall not have been proved, marked and stamped as aforesaid, shall severally forfeit the sum of ten dollars, to be recovered by an action of debt before any court proper to try the same, by any person who shall sue for and recover the same, to his own use: Provided however, That the foregoing provisions and penalties shall not extend to any muskets or pistols, or musket or pistol barrels, manufactured in any armoury of the United States, for their use, or in execution of any contract made or to be made with the United States, for the manufacture of fire arms."
https://firearmslaw.duke.edu/assets/act-of-feb.-28,-1814-mass.-acts.pdf
Laws of the Commonwealth of Massachusetts, Passed by the General Court, at Their Session, Which Commenced on Wednesday the 12th Day of January, and Which Ended on Monday the 28th Day of February, 1814 (Boston, MA: Russell, Cutler, & Co., 1814), 464–65. Chapter 193—

An Act in Addition to an Act, Entitled "An Act to Provide for the Proof of Fire Arms, Manufactured Within This Commonwealth," §§ 1–2. Approved February 28, 1814.

Mass. Gen. Laws ch. 28, §§ 63-68, 264-65 (1836).
Sect. 63. The governor, with the advice and consent of the council, shall appoint suitable persons, not exceeding two in any county, where the manufacture of fire arms is carried on, to be provers of fire arms, who shall be sworn to the faithful discharge of their trust, and who shall prove all musket barrels and pistol barrels, which being sufficiently ground, bored and breeched, shall be offered to them to be proved.
Sect. 64. All musket barrels and pistol barrels, manufactured in this state, shall, before the same shall be sold, and before the same shall be stocked, be proved by one of the provers aforesaid, in manner following, namely; with a charge of powder equal in weight to the ball which fits the bore of the barrel to be proved ; and the powder used in such proof shall be such, that one ounce thereof in a howitzer of four and a half inch calibre, at an elevation of forty five degrees, shall be of sufficient power to carry a twelve pound shot one hundred and thirty yards ; or one ounce thereof in a howitzer of five and a half inch calibre, at an elevation of forty five degrees, shall be sufficient to carry a twenty four pound shot eighty yards ; and the ball used in such proof shall be suited to the bore of the barrel to be proved as aforesaid.
Sect. 65. If the said musket and pistol barrels shall stand the proof aforesaid, and shall in no respect fail, then the said prover shall stamp the same on the upper side, and within one and an half inches of the breech of said barrels, with a stamp consisting of the initial letters of the prover's name, and over those letters the letter P., and, in the line with the said initial letters, and further up said barrel, the figures designating the year in which the proof is made, and over the said figures the letter M. ; which said letters and figures shall be so deeply impressed on said barrel, that the same cannot be erased or disfigured, and shall be in the form following . . . and when any barrels shall burst, or shall in any manner fail in the proving, as aforesaid, so that in the opinion of the prover they are unfit for use, they shall not be stamped.
Sect. 66. Any prover, so proving musket or pistol barrels, shall be entitled to receive from the owner, for each musket barrel thirty three cents, and for each pistol barrel twenty five cents, whether the same stand proof and are stamped or not.
Sect. 67. If any person shall manufacture, within this state, any Penalty for musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol so manufactured, without having the barrels first proved, marked and stamped as aforesaid, or shall sell, stock, or finish, or shall knowingly purchase, any musket barrel or pistol barrel, manufactured within this state, which shall not have been first proved, marked and stamped, he shall forfeit for each offence the sum of ten dollars ; provided, however, that the penalties and provisions mentioned in this section shall not extend to any muskets or pistols, or musket or pistol barrels, manufactured in any armory of the United States, for the use of, or in execution of any contract made or to be made with, the United States, for the manufacture of fire arms.
Sect. 68. If any person shall forge or alter the stamp of any such prover of fire arms, impressed on any musket or pistol barrel pursuant to law, he shall pay a fine not exceeding fifty dollars.
https://archive.org/details/revisedstatuteso00mass/page/264/mode/2up?q=252

Charles Allen, Report of the Commissioners on the Revision of the Statutes Page 333, Image 30 (Vol. 2, 1881) available at The Making of Modern Law: Primary Sources.

Fire Arms, § 18. There shall be in each county, where the manufacture of fire-arms is carried on, provers of fire-arms, not more than six in number, appointed by the governor with the advice and consent of the council, who shall prove all musket barrels and pistol barrels which, being sufficiently ground, bored and breeched, are offered to them to be proved. § 19. All musket barrels and pistol barrels manufactured in this commonwealth shall, before they are sold or stocked, be proved by one of the provers with a ball suited to the bore of the barrel and with a charge of powder equal in weight to the ball. The powder used in such proof shall be such that one ounce thereof in a howitzer of four and a half inch caliber at elevation of forty-five degrees shall be of sufficient power to carry a twelve-pound shot one hundred and thirty yards; or that one ounce therof in a howitzer of five and a half inch caliber at an elevation of forty-five degrees shall be sufficient to carry a twenty-four pound shot eighty yards.

**MISSOURI**

Ordinances of the City of Mexico, ch. 6, §§ 1–2, MEXICO WEEKLY LEDGER, Jan. 25, 1877, at 4 (Mexico, Missouri).
CHAPTER VI.
Be it enacted by the City Council of the City of Mexico.

Sec . 1. That every gunsmith within the city of Mexico, for the purpose of trying or testing fire arms, may have the privilege to fix some suitable place within the corporate limits of the city of Mexico for that purpose, provided the place so selected will not endanger the lives of any one passing by, or annoy those living nearest to the ground selected.

Sec. 2. Upon the complaint of any one to the city Marshal that the trying or testing of fire arms endangers the lives or annoys families living nearest the place, the Marshal shall give said person two days'[1] notice to abate the same and if not abated then the person so testing shall be deemed guilty of a misdemeanor and upon conviction fined not less than five dollars for each and every such offence. Passed January 3d, 1877

"Ordinances of the City of Mexico." Mexico Weekly Ledger, January 25, 1877, p. 4. Volume 14; Number 40. Ordinances of the City of Mexico, Chapter 6—Gunsmiths, §§ 1–2. Passed January 3, 1877.

**NEW HAMPSHIRE**

An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, ch. 25, §§ 1-9, 1820 N.H. Laws 274, 274-76 (Hill & Moore*).
"CHAP. XXV.
AN ACT to Provide for the appointment of Inspectors and regulating the manufacture of Gunpowder.

Sec. 1. Be it enacted by the senate and house of representatives in general court convened, That his excellency the governor by and with the advice of council, be, and he is hereby authorized to <u>appoint an inspector of gunpowder</u> for every public powder magazine, and at every manufactory of gunpowder in this state, and at such other places as may by him be thought necessary; and his excellency the governor by and with the advice of council is hereby further

authorized and empowered to remove said inspectors or any of them at pleasure, and may by new appointments from time to time fill any vacancy or vacancies which may happen.

Sec. 2. And be it further enacted, That from and after the first day of July next, all gunpowder which shall be manufactured within this state, shall be composed of the following proportions and quality of materials, that is, every one hundred parts of gunpowder shall be composed of fourteen parts of fresh burnt coal, made from wood which forms the least ashes, and which has been carefully and well prepared and made into coal, after being stripped of its bark; ten parts of pure sulphur, and seventy-six parts of purified nitre.

Sec. 3. And be it further enacted, That it shall be the duty of each of said inspectors to inspect, examine and prove all gunpowder which after the first day of July shall not be deposited at any public powder magazine, or manufactory of this state, before the same shall be removed from the manufactory or received into such public powder magazine, and if upon inspection and examination it shall appear to the inspector that such gunpowder is well manufactured and composed of pure materials, and such gunpowder shall be of the proof hereinafter mentioned, the inspector shall mark each cask containing gunpowder by him inspected, examined, and proved as aforesaid, with the words "New Hampshire inspected proof," and with his christian and surname, and shall also in figures mark upon each cask the quantity of powder contained therein, and the year in which the inspection is made.

Sec. 4. And be it further enacted, That no gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy-five yards at the least.

Sec. 5. And be it further enacted, That whenever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials, or of any improper proportion of materials, and which shall not be of the proof herein before mentioned, the inspector in such case, shall mark each cask containing such impure, ill manufactured, or deficient gunpowder, with the word "Condemned" on both heads of the cask, and with the same words on the side thereof, with the christian and surname of the inspector on one head of the cask.

Sec. 6. And be it further enacted, That if any person shall knowingly sell any condemned gunpowder, or shall fraudulently alter or deface any mark or marks, placed by an inspector upon any cask or casks containing gunpowder, or shall fraudulently put any gunpowder, which shall not have been inspected, or which has been condemned, into any cask or casks, which shall have been marked by any inspector agreeably to the provisions contained in the third section of this act, every such person, so offending, shall forfeit and pay not less than two hundred nor more than five hundred dollars, for each and every offence, to be recovered in an action of debt, in any court of competent jurisdiction, one half thereof to the use of the state, the other to the use of him or them who shall sue and prosecute for the same.

Sec. 7. And be it further enacted, That each inspector who may be appointed by virtue of this act, shall, before he acts as inspector, be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gunpowder, by him examined, inspected and proved, whether the same be by him approved or condemned, to be paid by the owner or owners of the gunpowder.

Sec 8. And be it further enacted, That if any manufacturer of gunpowder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export or cause to be exported

without the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act.

Sec 9. And be it further enacted, That if any person within this state, after the first day of January next, shall knowingly sell, expose, or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be composed of the proof herein before required, shall forfeit and pay not less than five dollars nor more than fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act."

Laws of the State of New Hampshire: June Session, 1820 (Concord, NH: Hill & Moore, 1820)*, 274-76. Chapter 25—An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, §§ 1-9. Approved June 21, 1820.

**PENNSYLVANIA**

1794 Pa. Laws 764, An Act Providing for the Inspection of Gun-Powder, ch. 337.

C H A P T E R CCCXXXVII.

An A C T providing for the Inspection of Gun-powder.

W H E R EA S gun-powder imported from abroad, and manufactured within this state, hath frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use: And whereas the modes heretofore used to prove the force thereof have been found uncertain and variable: And whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch-pall, by which it is conceived that the force of gunpowder may be proved by experiment, and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection, and the purchaser and consumer protected against fraud and imposition:

SECTION I. Be it therefore enacted . . . That, from and after the first day of October next, all gun-powder manufactured within this state, with intent to sell the same within the city or county of Philadelphia., shall be put in good and tight kegs or calks of twenty-five, fifty, or one hundred pounds neat weight, each made of well seasoned timber, bound together with at least twelve hoops, and having a hole bored in each head, of the diameter of one fourth part of an inch, well stopped with corks, and having the tare weight of each calk marked thereon, and that all such gun-powder, and all other gun-powder, wherever manufactured, imported into the port of Philadelphia, or brought into the city or county of Philadelphia for sale, shall be deposited, forthwith on such importation or bringing in by land or by water, in the public magazine in the said city, and delivered to the care of the keeper of the same, who shall give his receipt for the same, deliverable to the order of him or them who shall so deposit the same.

Sect. II. And be it further enacted by the authority aforesaid, That David Rittenhouse, Francis Gurney and Thomas Proctor be, and they are hereby, appointed Commissioners, to procure at least two pendulum powder proofs, upon the construction invented by the said Joseph Leacock, as nearly uniform in the length of the radius and weight of pendulum, and in length of caliber and weight of the pistol, as they can procure the same, and therewith make experiments of the respective strength or force of the several species of gun-powder imported from abroad, and

manufactured within this state, sufficient in number to ascertain the quality and force of three different degrees of strength in explosion, and marking the number of degrees on the graduated arch of the said engine, to which equal quantities by weight of the said three species of gun-powder, rammed with equal force into the pistol, shall elevate the said pendulum; and the powder, which shall be barely capable of raising the said pendulum to the lowest rate of elevation, shall be the standard for the state of Pennsylvania for gun-powder of the first or lowest proof; and the powder, which shall be capable of raising the said pendulum to the highest rate of elevation, shall be the standard of gun-powder for the state of Pennsylvania of the third or highest proof; and the middle or second proof standard on the said graduated arch, to which the same quantity by weight in equal moieties of the first and third proof powder shall be capable of raising the said pendulum; and the said standard being so fixed and ascertained, the said Commissioners shall make report thereof in writing, by indentures under their hands and seals, one part thereof, together with one of the said two pendulum powder proofs, and as accurate a draft and description thereof as can be made shall be returned to the Governor, to be filed and remain in the office of the Secretary of the commonwealth; one other part shall be returned to the Master of the Rolls, to be recorded in his office, and filed among the laws of the state; and the other part, together with the other pendulum powder proofs, shall be delivered to the first Inspector of gun-powder to be appointed in pursuance of this act, and by him, and his successors in office, to his and their successors, as often as another officer shall be appointed."

Act of Nov. 6, 1815, § 8, An Act of Incorporation, for that Part of the Northern Liberties [Philadelphia] (S. Probasco 1824).
"AN ORDINANCE,
For the suppression of Nuisances, and for the regulation of drivers of carriages and horses, in and through the streets, lanes and alleys, within the incorporated part of the township of the Northern Liberties, and for enforcing useful regulations therein...
...Sect. 8. And be it further ordained and enacted by the authority aforesaid, That no person or persons shall fire, or discharge any cannon, or piece of artillery, or small arms, or prove any pistol, gun, musket barrels, or cannon, or illuminate, or cause to be illuminated, any house within the regulated parts, incorporated as aforesaid, in said township, without permission from the president of the board of commissioners, under the penalty of forfeiting and paying for every piece of cannon or other artillery, or small arms, or pistol, gun, or musket barrel so fired, or house so illuminated, the sum of two dollars."
An Act of Incorporation, for that Part of the Northern Liberties, Lying Between the Middle of Sixth Street and the River Delaware, and Between Vine Street and Cohocksink Creek with ordinances for the Improvement of the Same (Philadelphia, PA: S. Probasco, 1824), 51. An Ordinance for the Suppression of Nuisances, and for the Regulation of Drivers of Carriages and Horses, in and Through the Streets, Lanes, and Alleys, Within the Incorporated Part of the Township of the Northern Liberties, and for Enforcing Useful Regulations Therein, § 8. Passed November 6, 1815.
*An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same* 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

Sources: HeinOnline; https://firearmslaw.duke.edu/repository-of-historical-gun-laws