ROB BONTA
Attorney General of California
CHARLES J. SAROSY
Supervising Deputy Attorney General
VIVIANA M. HANLEY
CHRISTINA MCCALL
SABRINA T. MCGRAW
EDWARD P. WOLFE
Deputy Attorneys General
State Bar No. 247835
600 W Broadway, STE 1800
San Diego, CA 92101-3375
Telephone: (619) 321-5426
Fax: (916) 731-2124
E-mail: Edward.Wolfe@doj.ca.gov
*Attorneys for State of California and Robert Bonta, in his official capacity as head of the California Department of Justice*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br>**v.**<br>**STATE OF CALIFORNIA and ROBERT BONTA, in his official capacity as the head of the California Department of Justice,**<br>Defendants. | Case No. 8:26-cv-01697-MRA-ADSx<br>**DECLARATION OF SALVADOR GONZALEZ IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br>Date: September 11, 2026<br>Time: 1:30 PM<br>Courtroom: 9B<br>Judge: Hon. Mónica Ramírez Almadani<br>Trial Date: None set<br>Action Filed: July 1, 2026 |

I, Salvador Gonzalez, declare under penalty of perjury that:

1. I am over the age of 18 years and competent to make this declaration, which is based on my personal knowledge, training, and experience.

2. I am a Special Agent Supervisor for the California Department of Justice ("CA DOJ"), Bureau of Firearms ("BOF").

**A. Background and Qualifications**

3. My curriculum vitae is attached hereto as **Exhibit A.** It contains a description of my educational background, professional achievements, and qualifications.

4. I have worked as a Special Agent Supervisor with CA DOJ for approximately seven years. I started working at CA DOJ approximately twelve years ago and approximately eleven of my twelve years have been at BOF. BOF serves the people of California through education, regulation, and enforcement actions regarding the manufacture, sale, ownership, safety training, and transfer of firearms.

5. My current job responsibilities at CA DOJ BOF involve the recovery, investigation, and identification of firearms. In addition, over the past eleven years, I have handled semiautomatic pistols that are compliant with California law, including, specifically, pistols that contain a chamber load indicator and a magazine disconnect mechanism. I have also handled semiautomatic pistols that can be readily converted into automatic machineguns with the addition of a device called a pistol converter (also called an auto sear or machinegun conversion device), as well as pistol converters themselves. Over the course of my career, I have become proficient in the use and disassembly of various firearms, including the various structural components of firearms, and how they work together.

6. For approximately the past seven years, I have overseen CA DOJ's Roster of Handguns Certified for Sale (the "Handgun Roster") which lists handguns approved for manufacture and sale in California. My oversight involves confirming

whether handguns submitted by manufacturers that have passed independent laboratory testing contain certain safety features required under California statutes and regulations, including a chamber load indicator and a magazine disconnect mechanism. I am familiar with the components of numerous handguns currently and previously on the Roster.

7. During the course of my employment with CA DOJ, I have participated in excess of 50 search warrants that involved the illegal possession of firearms. I have also made or assisted in the arrest of at least 100 people for violations involving illegal weapons possession.

8. In May 2005, I received a Bachelor of Science degree in Criminal Justice, and a Bachelor of Arts degree in Ethnic Studies, from the California State University, Sacramento.

9. In addition, I have taken and completed multiple, formal courses on weapons use, maintenance, repair, and identification. This includes completing: (a) a twenty-four hour “Law Enforcement & Military Colt M16/AR-15 Rifle Armorer’s Course” to safely use and maintain weapons and a twenty-four hour re-certification course; (b) an eight hour “Alcohol, Tobacco and Firearms Privately Made Firearms Training” on the identification of privately manufactured firearms; (c) a forty hour “California Peace Officer Standards and Training (POST)-approved Firearms Instructor/Range Master School” course; (d) an eight hour “Glock Armorer’s Course” on safe use and maintenance of weapons and an eight hour re-certification course; (e) a ten hour firearms-investigation-and-identification training for law enforcement, including formal training on assault weapons; (f) a four hour assault-weapons-familiarization course for law enforcement; and (g) an eight hour course on relevant gun issues in northern California, including trends, laws, and features and characteristics of firearms.

10. Based on my experience with firearms, education, formal trainings, and work at CA DOJ, I am knowledgeable about handguns (including semiautomatic

pistols), machineguns, pistol converters (whether made from metal or 3-D printed plastic), and privately manufactured and 3-D printed firearms and firearms accessories. I am also knowledgeable about the requirements of California's Unsafe Handgun Act (Cal. Penal Code §§ 31900–32110) and California's Assembly Bill 1127 (Cal. Penal Code §§ 16880, 16885, 17015, 27595, 27595.1, 32103). I am also able to inspect and determine whether a handgun complies with the relevant statutory and regulatory requirements of the Unsafe Handgun Act and Assembly Bill 1127.

**B. Unsafe Handgun Act**

11. The Unsafe Handgun Act (UHA) generally prohibits the manufacture or retail sale of any handgun that is not listed on the Handgun Roster, which is maintained by the CA DOJ. Cal. Penal Code § 32000, 32015.

12. For any new handgun model to be added to the Handgun Roster, the handgun—whether a revolver or a pistol—must pass "firing" and "drop safety" tests performed by an independent laboratory that is approved by the CA DOJ. Cal. Penal Code §§ 31900, 31905, 31910. The firing test ensures that handguns do not malfunction upon firing. The drop safety test ensures that safety features prevent the handgun from discharging when dropped. Any handgun must also have a "safety device," which functions to prevent the accidental discharge of a firearm. Cal. Penal Code § 31910.

13. A revolver holds a cartridge of ammunition in a revolving cylinder with a separate chamber for each cartridge, so the cylinder rotates and reloads a new cartridge with each pull of the trigger. A semiautomatic pistol holds a cartridge of ammunition in a magazine rather than a cylinder, and it reloads by firing the round, ejecting the empty casing, and reloading the firing chamber with a new cartridge each time the trigger is pulled and released.

14. For any new semiautomatic pistol model to be added to the Handgun Roster, in addition the requirements described in paragraph 12, the pistol model

must also have a magazine disconnect mechanism. If the semiautomatic pistol model is a centerfire pistol—meaning that it fires cartridges with a primer located in the center of the cartridge's base, as opposed to the rim of the cartridge—then the pistol model must additionally have a chamber load indicator. Cal. Penal Code §§ 31910, 32010.

15. A magazine disconnect mechanism prevents a semiautomatic pistol that has a detachable magazine from discharging when the detachable magazine is not inserted in the pistol. A mechanism qualifies as a magazine disconnect under the UHA if it prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted. Cal. Penal Code § 16900; Cal. Code Regs. tit. 11, § 4060(d)(2). Generally, a magazine disconnect mechanism is a component of the frame that looks like a small lever, which functions to impede the operation of the firearm.

16. The purpose of a magazine disconnect mechanism is to prevent accidental discharges, and the resulting risk of serious injury and death, that can occur when a handgun is still loaded despite the magazine having been removed by the user, as users often mistakenly equate the magazine having been removed with the handgun being unloaded.

17. A chamber load indicator is a small device that is on the slide or another part of the pistol, and is intended to alert the pistol user as to whether the pistol is loaded with a cartridge in the firing chamber. California Penal Code section 16380 and the California Code of Regulations, title 11, section 4060(d)(1) set forth the specific requirements for a chamber load indicator.

18. Chamber load indicators are an important firearm feature that increases safety. By quickly and clearly informing a firearm user whether a handgun is loaded, chamber load indicators help prevent accidental discharges that can result in serious injury and death.

19. Even a person trained to use and handle firearms can accidentally fire a semiautomatic pistol because they think the pistol is not loaded even when there is still a cartridge in the firing chamber. Such accidental discharges can happen in a variety of contexts, such as when a firearm owner is cleaning their pistol, or when a child or untrained person who resides with a firearm owner, accesses and handles the pistol. In executing search warrants and arrests, I have often seen firearms that were not safely stored or secured in residences where children also lived. Magazine disconnect mechanisms and chamber load indicators are designed to increase the safety of both the firearm user and people in the user's vicinity, even if the firearm owner is trained to use and handle firearms. To give an example from my professional experience, in late 2015 or early 2016, while seizing a firearm and disarming a prohibited individual, a seasoned Special Agent prepared to clear a handgun, a standard safety procedure during any firearm seizure. He removed the magazine, but as soon as he racked the slide back, the firearm discharged. While the basic mechanics of most handguns are similar, key design differences exist. In this specific instance, the cartridge failed to eject and instead detonated. If the unfamiliar handgun had featured a chamber load indicator, the Special Agent would have had the option to safely package and transport the handgun to a secure location for unloading. Furthermore, had the handgun been equipped with a magazine disconnect mechanism, it would not have discharged even if the Agent had accidentally pulled the trigger.

20. The absence of a chamber load indicator or a magazine disconnect mechanism in a semiautomatic pistol increases the risk of accidental discharge and injury to Californians from the use of these handguns. In 1991, the United States General Accounting Office ("GAO") produced a report to Congress concluding: "About 1 of every 3 deaths from accidental firearm discharges could be prevented by a firearms safety device." The report also found that 23% of deaths could have been prevented by a chamber load indicator. There were some examples of

accidental fatal shootings described in the report, which include: (1) a 15-year-old boy who took a handgun from his dad's nightstand and playfully pointed the handgun at his 11-year-old sister before shooting his sister in the head not knowing the handgun was loaded; (2) a 17-year-old boy who put a handgun in his mouth, believing it was unloaded, and then pulling the trigger twice, with the handgun firing on the second pull; and (3) a man who typically kept his handgun unloaded accidentally shot his wife in the chest while cleaning the handgun because he forgot that he had put a cartridge in the firing chamber two weeks earlier. This report is attached hereto as **Exhibit B**, and is entitled GAO Report to the Chairman, *Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented* (March 1991).

21. Another study, published in 2003 in a journal called *Annals of Emergency Medicine*, concluded that chamber load indicators, magazine disconnect mechanisms, and firing pin blocks could have prevented as many as one-third of the accidental shootings reviewed in the study. This study is attached hereto as **Exhibit C**, and is entitled *Unintended Shootings in a Large Metropolitan Area: An Incident-Based Analysis*.

22. Another study, published in 2003 in a journal called *Injury Prevention*, concluded that of the accidental shooting deaths reviewed in the study, 20% could have been prevented by a chamber load indicator and 4% could have been prevented by a magazine disconnect mechanism. This study is attached hereto as **Exhibit D**, and is entitled *Unintended and undetermined firearm related deaths: a preventable death analysis for three safety devices*.

23. The Handgun Roster is publicly available at https://oag.ca.gov/firearms/certified-handguns/search, and is searchable by manufacturer, model, and firearm type, and barrel length.

24. As of the date of this declaration, there are 961 handgun models listed on the Handgun Roster. Of those 961 handgun models, 570 are semiautomatic pistol models.

25. The first semiautomatic pistol model with a chamber load indicator and a magazine disconnect mechanism was added to the Handgun Roster in September, 2008. As of February 2023, there were 32 semiautomatic pistol models listed on the Handgun Roster that have a chamber load indicator and a magazine disconnect mechanism. These pistol models are manufactured by four different companies. Since March 2023, when the former UHA microstamping requirement was preliminarily enjoined, 140 semiautomatic pistol models with a chamber load indicator and/or a magazine disconnect mechanism have been listed on the Handgun Roster, including two biometric smart gun models. These pistol models are manufactured by 21 different companies.

26. The handguns listed on the Handgun Roster are suitable and sufficient for the purpose of self-defense. They do not lack any features that render them materially less effective for self-defense than other handguns.

**C. Assembly Bill 1127**

27. Assembly Bill (AB) 1127 added new definitions to the California Penal Code for “machinegun-convertible pistol” and “pistol converter.” Cal. Penal Code §§ 16885, 17015. A “machinegun-convertible pistol” is defined as “any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with common household tools . . . into a machinegun by the installation or attachment of a pistol converter as a replacement for the slide’s backplate without any additional engineering, machining, or modification of the pistol’s trigger mechanism.” *Id.* §§ 27595(a), 16885(a). A “pistol converter” is defined as “any device or instrument that when installed in or attached to the rear of the slide of a semiautomatic pistol, replaces the backplate, and interferes with the trigger mechanism and thereby enables the pistol to shoot automatically more than one

shot by a single function of the trigger." *Id.* § 17015. Images of examples of a cruciform trigger bar and pistol converter, along with some brief descriptions to describe the images, are available at **Exhibit E**.

28. A pistol converter—also called an auto sear, machinegun conversion device, or Glock switch—is typically a small device that can be inserted into the back of a semiautomatic pistol, enabling it to fire like a machinegun. A pistol converter can be made from metal, or 3-D printed from plastic.

29. A semiautomatic pistol with a cruciform trigger bar typically fires through the following steps: (1) pulling the trigger pushes the firing pin back; (2) the cruciform trigger bar is moved downward until the spring-loaded firing pin is released; (3) the bullet in the cartridge is fired; (4) after the recoil, the cruciform trigger bar moves back up and the trigger bar's sear blocks the firing pin until the trigger is pulled again. The pistol fires one bullet each time the trigger is pulled and released.

30. While pistol converters come in various designs and configurations, they typically disrupt this normal firing process by doing the following: (1) the pistol converter replaces the back plate of the pistol's slide; (2) the disconnector (leg) on the pistol converter is wedged between the end of the cruciform trigger bar, the slide  and near the foot of the firing pin; (3) the pistol converter's disconnector holds down the cruciform trigger bar from setting back into place so that the trigger bar cannot prevent the firing pin from continuously firing any cartridge in the chamber, thereby allowing the pistol user to pull and hold the trigger for the pistol to keep firing (as opposed to pulling and releasing the trigger each time to fire). Attached as **Exhibit F** are images with brief descriptions to help provide a visual of the processes described in paragraphs 29 and 30.

31. A semiautomatic pistol that is equipped with a pistol converter can fire like a machinegun at about 20 rounds per second.

32. Not every semiautomatic pistol can be converted into a machinegun using a pistol converter in the manner described in paragraph 30. Nor is every semiautomatic pistol with a cruciform trigger bar readily convertible into a machinegun. For this specific platform, it is the combination of an easy-to-remove slide backplate, the space within the slide that is available for the pistol converter to fit in, and the cruciform trigger bar that permit the semiautomatic pistol to be converted into a machinegun in this manner. Generally, a pistol converter can be installed on a semiautomatic pistol with this design in less than 15 minutes, either with or without using common household tools. The modification process may range from a simple five-minute procedure to replace the slide's back plate to a more comprehensive procedure of milling the slide in order for the pistol converter to fit properly.

33. Of the semiautomatic pistol models that were listed on the Handgun Roster on December 26, 2025, models made by three firearms manufacturers—Derya, Glock, and Shadow Systems were listed as falling within the definition of a machinegun-convertible pistol at California Penal Code section 16885. The CA DOJ BOF provided a list of these models to all California licensed firearms dealers in the advisory that is attached as **Exhibit G.** As mentioned in the advisory, the list included several models that Glock had previously announced would be discontinued. The current number of semiautomatic pistol models that are on the Handgun Roster that are listed as falling within the definition of a machinegun-convertible pistol is 25 and are made by the same three manufacturers.

34. I am aware of publicly announced plans by Derya and Glock to make design modifications to their semiautomatic pistol models so that they no longer fall within the definition of a machinegun-convertible pistol at California Penal Code section 16885.

35. If the impacted manufacturers make design modifications to their semiautomatic pistol models so that they no longer fall within the definition of a

machinegun-convertible pistol, and submit that model through the UHA process to get the model listed on the Handgun Roster, then that model can be sold at retail in California assuming that it meets all other relevant UHA and AB 1127 requirements.

36. Although pistol converters are independently illegal to possess, manufacture, or sell in California and under federal law, they can be illegally obtained via online sellers or manufactured in minutes using a 3-D printer. For example, foreign companies use various websites to sell pistol converters and illegally import them into the United States, typically from the People's Republic of China. Additionally, the software files to 3-D print a pistol converter can be quickly downloaded from the Internet at minimal or no cost, and then can be used on an average 3-D printer to print a pistol converter that is nearly as reliable as one made from metal. 3-D printers have shifted from intricate technical interest, into mainstream consumer and household items. You can buy reliable, fast machines for no more than $300, and standard printing filaments are even stocked in major retail stores like Walmart and online stores like Amazon.

37. According to the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives (U.S. ATF), the number of pistol converters recovered in crimes skyrocketed 784% between 2019 (658) and 2023 (5,816), and California was in the top ten states where these devices were recovered. ATF, *National Firearms Commerce and Trafficking Assessment: NFCTA Updates, New Analysis, and Policy Recommendations*, Vol. IV, Part V, Privately Made Firearms Updates and New Analysis at 7–8, https://www.atf.gov/sites/default/files2/nfcta_volume_iv_-_part_v_0.pdf. The U.S. ATF has estimated that from 2019 to 2024, it has recovered more than 31,000 pistol converters. United States Attorney's Office for Central District of California, *U.S. Attorney and ATF Release New Public Service Announcement Warning Against Possession of Machine Gun Conversion Devices*,

https://www.justice.gov/usao-cdca/pr/us-attorney-and-atf-release-new-public-service-announcement-warning-against-possession (Jan. 11, 2024).

38. The U.S. ATF publishes state-level data about firearms that have been submitted to the U.S. ATF by local law enforcement agencies for tracing purposes. As the disclaimer for these data states, "Not all firearms used in crime are traced and not all firearms traced are used in crime." In reviewing the state-level data for California, it appears that the U.S. ATF began in 2022 separately reporting trace data for pistol converters—what the U.S. ATF calls machinegun conversion devices or MCDs. In 2022, there were zero pistol converters submitted to ATF for tracing. That number increased to 67 in 2023, and increased further to 269 in 2024. These numbers are likely underreporting the number of pistol converters recovered in California because not every law enforcement agency that recovers a pistol converter submits it to the U.S. ATF for a trace.

39. One example in California of how a pistol converter was involved in a mass shooting was during the spring of April 2022, in downtown Sacramento, where a stolen semiautomatic pistol, illegally fitted with a pistol converter, was used in a violent clash that left six people dead and twelve wounded, highlighting the extreme lethality of converted weapons.

40. While the criminal prohibition on pistol converters is one available tool to prevent the ready conversion of semiautomatic pistols into fully automatic weapons, the data on the increasing prevalence of pistol converters, notwithstanding their illegality, demonstrates that more could be done to prevent such conversion. AB 1127 responds to this concern, technologically precluding such conversion by requiring manufacturers to fix the design flaw that enables it before a new handgun model may be added to the Handgun Roster.

41. As of the date of this declaration, there are approximately 183 semiautomatic pistol models listed on the Handgun Roster and available for retail sale in California that do not fall within section 16885's definition of a

machinegun-convertible pistol, and have a chamber load indicator and/or magazine disconnect mechanism. This total is less than the number in paragraph 24—the total number of semiautomatic pistol models listed on the Handgun Roster—because there are models listed on the Handgun Roster that do not have a chamber load indicator and/or magazine disconnect mechanism because the UHA permitted them to remain on the Roster after these feature requirements took effect. Cal. Penal Code § 32010(d).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on August 24, 2026, in Sacramento County, California.

SALVADOR GONZALEZ

# EXHIBIT A

# Curriculum Vitae

Special Agent Supervisor Salvador Gonzalez
California Department of Justice
Bureau of Firearms

## EDUCATION:

05/2005, Bachelor of Science Degree, Criminal Justice, California State University Sacramento.
05/2005, Bachelor of Arts Degree, Ethnic Studies, California State University Sacramento.

## EMPLOYMENT:

08/2006 to 09/2014, Investigator, California (CA) Department of Motor Vehicles (DMV). I conducted criminal and administrative investigations including consumer, & licensee fraud. I provided expertise in auto theft, counterfeit documents, identity theft & performed undercover investigations. I provided technical expertise to allied agencies.

09/2014 to 07/2018, Special Agent, California Department of Justice (DOJ), Bureau of Firearms (BOF). I conducted investigations on Armed & Prohibited Persons that resulted in the seizure of weapons & the prevention of illegal firearms trafficking. I conducted firearms dealer investigations in regards to firearm law compliance or illegal firearm transactions. I provided firearm training & expertise to allied agencies. I enforced regulations regarding the manufacture, sale, ownership & transfer of firearms and various violations occurring at California gun shows.

07/2018 to 8/2019, Special Agent, California Department of Justice (DOJ), Bureau of Gambling Control (BGC). I conducted investigations regarding gambling crimes in the state of California. I conducted investigations in California cardrooms and casinos involving money laundering, drugs, illegal bookmaking, and other illegal gambling activities.

8/2019 to present, Special Agent Supervisor, California Department of Justice (DOJ), Bureau of Firearms (BOF). In my career I have attended at least 15 gun shows and have become familiar with current laws pertaining to the sales of firearms in the State of California. The California Department of Justice, Bureau of Firearms, maintains the State Assault Weapon Registry. If a person with registered assault weapons or other firearms becomes prohibited from possessing firearms I have been assigned to recover the firearms. Special Agents within the CA DOJ BOF are frequently assigned to give assault weapons training to other law enforcement agencies and to help assist in identifying such firearms.

## TRAINING:

On 08/7/2006, I completed an excess of 640 hours of Peace Officer Standards and Training (POST) at a recognized Basic Specialized Investigator Academy at the Golden West College in Huntington Beach, CA.

On 09/25/2014, I attended an assault weapons familiarization training class for law enforcement and I received four (4) hours of formal training on firearms / assault weapons. I have also received formal and informal training from other experienced BOF agents regarding firearms violations.

On 02/25/2016, I attended a firearms investigation and identification training class for law enforcement and I received ten (10) hours of formal training on firearms / assault weapons.

On 08/31/2016, I attended the California Department of Justice Advanced Training Center Submachine Gun Operator Course and I received twenty-four (24) hours of formal training on the proper use and deployment of a submachine gun.

On 11/29/2018, I attended the Glock Armorer's Course and I received eight (8) hours of formal training on how to safely use and maintain your weapon.

On 09/20/2019, I completed a 40 hour California Peace Officer Standards and Training (POST) approved Firearms Instructor/Range Master School. This class was offered by the American River College/Los Rios Community College District.

On 10/22/2019, I attended the Alcohol Tobacco and Firearms Crime Gun Seminar and I received four (4) hours of training on the successful use of the National Integrated Ballistic Information Network (NIBN).

On 12/18/2019, I attended the National Center for Biomedical Research and Training Academy of Counter-terrorist Education Course for Law Enforcement Active Shooter Emergency Response Performance Level and I received twenty-four (24) hours of training on the successful use of active shooter emergency response.

On 12/19/2019, I attended the National Center for Biomedical Research and Training Academy of Counter-terrorist Education Course for Law Enforcement Active Shooter Emergency Response Performance Level Train–the-Trainer and I received eight (8) hours of training in order to train officers on active shooter emergency response.

On 08/19/2020, I attended the California Department of Justice Advanced Training Center Less Lethal Munitions User's Course and I received four (4) hours of formal training on the proper use and deployment of a less lethal munition.

On 08/19/2020, I attended the California Department of Justice Advanced Training Center Distraction Device User's Course and I received four (4) hours of formal training on the proper use and deployment of a distraction device.

On 09/30/2020, I received Special Deputation as a Task Force Officer for the Bureau of Alcohol Tobacco Firearms and Explosives.

On 6/16/2021, I attended the Alcohol Tobacco and Firearms Privately Made Firearms Training and I received eight (8) hours of training on the identification of a privately made firearm (PMF).

On 11/2/2021, I attended the Law Enforcement & Military Colt M4 / M16 / AR-15 Rifle Armorer's Course and I received twenty-four (24) hours of formal training on how to safely use and maintain your weapon. This class was offered by Colt.

On 7/13/2022, I attended the Benelli M1, 2 & 4 Series Armorer's Course and I received eight (8) hours of formal training on how to safely use and maintain your weapon. This class was offered by the Team One Network.

On 10/19/2023, I attended the Glock Armorer's Re-Certification Course and I received an additional eight additional (8) hours of formal training on how to safely use and maintain your weapon. This class was offered by Glock Professional, Inc.

On 01/16/2024, I attended the Pistol Red Dot Certification Class and I received sixteen (16) hours of formal training on how to train officers on the fundamentals of pistol shooting with the use of the Red Dot Sights. This class was offered by the San Mateo County Sheriff's Office.

On 02/22/2024, I attended the National Center for Biomedical Research and Training Academy of Counter-terrorist Education Course for Law Enforcement Active Shooter Emergency Response Performance Level and I received an additional eight (8) hours of training on the successful use of active shooter emergency response.

On 11/06/2024, I attended the Northern California High Intensity Drug Trafficking Area's training on Relevant Firearm Issues for California and Federal Law Enforcement and I received eight (8) hours of training on relevant gun issues, which included trends, laws, features and characteristics of firearms, investigative tools, expert testimony, and charging and sentencing considerations.

On 11/24/2024, I attended the Law Enforcement & Military Colt M4 / M16 / AR-15 Rifle Armorer's Re-Certification Course and I received twenty-four (24) hours of formal training on how to safely use and maintain your Colt M4/ M16 / AR-15 Rifle. This class was offered by Colt.

During the course of my career I have become semi-proficient in the use and disassembly of various revolvers, semi-automatic pistols, submachine guns, shotguns, and various rifles. I have made or assisted in the arrest of at least 100 persons for violations involving illegal weapons possession. In the course of my employment I have participated in an excess of 50 search warrants which involved the illegal possession of firearms. I have conducted over 30 presentations and training courses based on privately made firearms, silencers, assault weapons and firearm familiarization, which help grasp the California Penal Code as it pertains to firearms. These presentations and trainings have been presented to several California Department of Justice Special Agents, Federal and State Allied Agencies, District Attorneys, Property Technicians and California Department of Justice Deputy Attorney Generals.

# EXHIBIT B

United States General Accounting Office

# GAO

Report to the Chairman, Subcommittee on Antitrust, Monopolies, and Business Rights, Committee on the Judiciary, U.S. Senate

March 1991

# ACCIDENTAL SHOOTINGS

## Many Deaths and Injuries Caused by Firearms Could Be Prevented

143619

RELEASED

RESTRICTED—Not to be released outside the General Accounting Office unless specifically approved by the Office of Congressional Relations.

GAO

**United States**
**General Accounting Office**
**Washington, D.C. 20548**

**Program Evaluation and**
**Methodology Division**

B-240648.2

March 19, 1991

The Honorable Howard Metzenbaum
Chairman, Subcommittee on Antitrust, Monopolies,
and Business Rights
Committee on the Judiciary
United States Senate

Dear Mr. Chairman:

At your request, we examined the extent to which certain safety devices could prevent firearms-related deaths. Specifically, we examined the proportion of accidental deaths that might have been averted by two technological modifications to firearms: a child-proof safety device that automatically engages and a device that indicates whether a gun is loaded. We also looked at injuries caused by accidental firearm discharges, for which we developed new information.

This report presents the findings of our research, which shows that the two safety devices could potentially save many lives and would undoubtedly also prevent many injuries. We also present information on the likely number of individuals injured in accidental shootings and discuss a range of alternatives for dealing with this public health problem.

As we arranged with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from its date. At that time, copies of the report will be sent to the Chairman of the Consumer Product Safety Commission, and we will make copies available to others upon request.

If you have any questions or would like additional information, please call me at (202) 275-1854 or Robert York, Acting Director of Program Evaluation in Human Services Areas, at (202) 275-5885. Other major contributors to this report are listed in appendix IV.

Sincerely yours,

Eleanor Chelimsky
Assistant Comptroller General

# Executive Summary

## Purpose

In 1988, some 1,501 people were killed in the United States by accidental discharges of firearms, and many more were injured. Among those killed were 277 children under age 15.

Concerned about these accidental shootings, the Chairman of the Subcommittee on Antitrust, Monopolies, and Business Rights of the Senate Committee on the Judiciary asked GAO to examine the extent to which certain safety devices could prevent such deaths or injuries. Specifically, GAO was asked to examine the proportion of accidental firearms fatalities that might have been prevented by two types of technological modifications to firearms: a child-proof safety device that automatically engages and a device that indicates whether a gun is loaded. GAO also examined nonfatal injuries, in an effort to establish the totality and costs of deaths and injuries from accidental firearm discharges as well as the relative size of fatal accidents vis-a-vis that totality.

## Background

The debate over firearms policy receives nationwide attention on a continuing basis, but only rarely has that debate focused on firearms as consumer products. Nonetheless, one recommendation that has been made is that guns be treated like other consumer products. Some have proposed making guns safer so as to reduce the number of accidental firearm discharges resulting in injuries and deaths. This proposal is in line with efforts aimed at improving the safety of a variety of consumer products implicated in accidental injuries and deaths. However, the Consumer Product Safety Commission, the primary federal agency with responsibility for product safety, is not allowed to take action that will restrict the manufacture or sale of firearms. No other agency is explicitly charged with monitoring firearms safety.

Firearms are the fourth leading cause of accidental deaths among children 5 to 14 years old and the third leading cause of accidental deaths among 15- to 24-year-olds. Across all age groups, accidental shootings are the sixth leading cause of potential years of life lost because of accidents.

## Results in Brief

From a nationally projectable sample, GAO estimates that 31 percent of accidental deaths caused by firearms might be prevented by the addition of two safety devices. Of the 107 accidental firearms-related fatalities GAO examined for calendar years 1988 and 1989, 8 percent could have been prevented had the firearms been equipped with a child-proof safety device. (This 8 percent represents instances in which children

under the age of 6 accidentally shot and killed themselves or other persons.) In an additional 23 percent of the cases, people accidentally shot and killed themselves or others with firearms they thought were unloaded. These deaths could have been prevented by a loading indicator.

Although it has long been assumed that far more injuries than deaths occur from accidental discharges of firearms, no information has been available on the actual number of injuries. GAO examined data on accidental shootings in 10 cities and found that in 1988 and 1989, these areas had a ratio of 105 injuries for each death (that is, more than 100 to 1). Although this estimate, based on a judgmental sample, cannot be generalized to the country as a whole, it is nevertheless reasonable to infer from it that the number of accidental injuries from firearms nationwide is substantial and far exceeds the number of fatalities.

## GAO's Analysis

### Prevention of Accidental Deaths and Injuries

About 1 of every 3 deaths from accidental firearm discharges could be prevented by a firearms safety device. From data in autopsy and police reports, GAO determined the numbers of accidental firearm deaths in 1988 and 1989 that (1) could have been prevented and (2) could not have been prevented by either of the two safety devices studied. GAO examined 107 total deaths from accidental firearm discharges. In that sample of fatalities, 34 could have been prevented by safety devices; 52 could not have been. Not enough data were available to determine whether the other 21 were preventable.

A child-proof safety device (that is, one that prevents the trigger from accidentally being engaged) could have prevented all the accidents in which children under the age of 6 killed themselves or others (8 percent of the total). However, according to experts in pediatric injuries, including experts with research experience in firearms, a child-proof safety device on a firearm (whether based on the child's strength, cognitive skills, or both) could reliably be expected to deter only children under the age of 6.

A safety device that indicates whether a firearm is loaded could have prevented another 23 percent of the deaths. Many accidental deaths

caused by firearms, other than those affecting children, involve uncertainty about whether the weapon is loaded. For example, one might empty a firearm but not notice that a round remains in the chamber, one might typically leave a weapon unloaded and so assume that it is always unloaded, or one might pull the trigger several times without discharge (dry-firing) and so assume the chamber to be empty even though it is not.

Other accidental deaths GAO examined were not considered preventable by these devices. For example, death can be caused by a gun that discharges when it is accidentally dropped or falls from its storage location or by a hunter mistakenly believing he or she is shooting at game.

From our sample, we can project that about 458 (plus or minus 89) of the 1,501 deaths in 1988 could have been prevented by either a childproof device or a loading indicator device. In addition to the lives that could be saved, there are medical expenses and other economic costs to society that would not occur were these deaths to be prevented. Averting 458 deaths would avoid costs estimated to exceed $170 million.

## Deaths and Injuries

According to statistics maintained by the National Center for Health Statistics, the number of deaths annually caused by accidental firearm discharges has generally been decreasing, ranging from 1,955 deaths in 1980 to 1,501 deaths in 1988. This is a decline of 23 percent over 8 years. However, no national data have been maintained on the number of injuries caused by accidental firearm discharges. In fact, few police departments maintain records on injuries caused by firearms. GAO identified 10 cities whose police departments maintain such data. These cities had populations ranging from about 93,000 to over 1 million.

The police data GAO examined showed that there were 527 injuries and 5 deaths from accidental shootings in 1988 and 1989. Thus, across these 10 cities, the ratio of nonfatalities to fatalities was about 105 to 1.

An estimate of the overall costs associated with unintentional firearm injuries and deaths can be derived by combining the incidence data with information on the cost of injuries. If there were 1,500 deaths and some 12,000 hospitalizations (less than one tenth the number of injuries estimated from our sample) from accidental shootings every year, that would translate into an estimated lifetime cost, each year, of close to $1 billion.

## Recommendation

The number of individuals being injured and killed each year in accidental shootings is substantial. GAO has determined that two technologies—child-proof safeties and loading indicators—show promise for reducing the number of deaths and injuries. However, obstacles remain to realizing this promise and, in addition, other approaches (for example, training gun owners or limiting access to firearms) may be equally or more effective.

The human, economic, and public health costs of these shootings to the victims, their families, and society are considerable. The magnitude of the problem requires that all possible efforts be made to reduce the number of accidental shootings.

The Consumer Product Safety Commission, the primary federal agency with responsibility for product safety, is currently not allowed to take any action that might restrict the availability of firearms to the consumer. GAO recommends that the Consumer Product Safety Act be amended to clearly establish that the Consumer Product Safety Commission can regulate the risk of injury associated with firearms.

## Agency Comments

GAO did not request comments on a draft of this report.

# Contents


| | | |
|---|---|---|
| **Executive Summary** | | 2 |
| **Chapter 1 Introduction** | | 8 |
| | Background | 8 |
| | Objectives, Scope, and Methodology | 10 |
| | Study Strengths and Limitations | 12 |
| | Organization of the Report | 14 |
| **Chapter 2 The Preventability of Accidental Deaths From Firearms** | | 15 |
| | Methodology | 15 |
| | Findings | 17 |
| | Characteristics of Accidental Deaths From Firearms | 19 |
| | Estimates of Preventable Deaths | 24 |
| **Chapter 3 Accidental Injuries and Deaths From Firearms** | | 26 |
| | Methodology | 26 |
| | Findings | 27 |
| | Implications | 30 |
| **Chapter 4 Implications** | | 32 |
| | The Size of the Problem | 32 |
| | Approaches to Reducing Accidental Shootings | 33 |
| | Conclusion and Recommendation | 36 |
| **Appendixes** | Appendix I: Sampling and Estimation Methodology | 38 |
| | Appendix II: Costs of Firearm Injuries | 40 |
| | Appendix III: Suggested Legislative Language | 42 |
| | Appendix IV: Major Contributors to This Report | 43 |
| **Bibliography** | | 44 |
| **Tables** | Table 1.1: Unintentional Firearm Deaths and Injuries 1980-88 | 10 |
| | Table 3.1: Deaths and Injuries From Accidental Firearm Discharges, 1988 and 1989 | 28 |
| | Table I.1: Estimates and Sampling Errors for Findings on Preventability | 39 |

# Figures

Figure 2.1: Proportion of Preventable to Other Deaths Caused by Accidental Firearm Discharges 19
Figure 2.2: Sex and Age Group of Shooters 20
Figure 2.3: Percent of Accidental Deaths That Were Self-Inflicted 21
Figure 2.4: Location of Firearm Accidents Resulting in Death 22
Figure 2.5: Type of Weapon Involved in Accidents 23
Figure 2.6: Ownership of Weapons Involved in Accidents 24
Figure 3.1: Proportion of Injuries and Deaths Caused by Accidental Firearm Discharges 29

## Abbreviation

GAO General Accounting Office

Case 8:26-cv-01697-MRA-ADS Document 43-7 Filed 08/25/26 Page 28 of 100 Page ID #:1463

# Introduction

A 4-year-old boy shoots his 2-year-old brother with the .22-caliber pistol he finds under the seat of his father's pickup truck. A 10-year-old finds a .38-caliber revolver in a dresser drawer. He does not think it is loaded and accidentally kills his 8-year-old sister while playing with the gun.

These and similar incidents highlight an issue of concern: accidental injuries and deaths from firearms. Currently in the United States, about 1,500 people die each year from accidental shootings, and an unknown number of people are injured. Firearms are the fourth leading cause of accidental deaths among children 5 to 14 years old and the third leading cause of accidental deaths among 15- to 24-year-olds. Across all age groups, accidental shootings are the sixth leading cause of potential years of life lost from accidents.[1] Some 277 children under age 15 were killed in accidental shootings in 1988.

The Chairman of the Subcommittee on Antitrust, Monopolies, and Business Rights of the Senate Committee on the Judiciary requested that we undertake a study to try to estimate the number of deaths and injuries that might be prevented by two possible technological modifications to firearms: child-proof safeties that would automatically engage and loading indicators that would show when a live round was in the chamber, ready to be fired.

In response to this request, we conducted a study to examine the magnitude of the problem of unintentional firearms injuries and to estimate the effect of the two proposed technological modifications in preventing such accidents.

## Background

The debate over firearms policy receives nationwide attention on a continuing basis. Most of this debate has focused on issues of gun ownership, such as waiting periods for purchase, background checks, gun licensing, and banning certain types of weapons. These issues generally focus on problems with the illegal use of firearms versus rights of gun ownership for protection and recreation.

Absent from most of the gun control debate is a discussion of firearms as consumer products. One recommendation that some researchers in public health have made is that guns be treated like other consumer products. That is, they propose that steps be taken to make guns safer

[1]The standard method of calculating potential years of life lost is to subtract the age at death of the accident victim from age 65.

to at least reduce the number of injuries and deaths resulting from the accidental discharge of firearms. This proposal is in line with efforts aimed at improving the safety of a variety of consumer products implicated in accidental injuries and deaths, including automobiles, toys, and poisonous substances. The federal government has increasingly played a role in mandating changes to products to improve their safety. However, the Consumer Product Safety Commission, the primary federal agency with responsibility for product safety, is not allowed to take action that will restrict the availability of firearms to the consumer. No other agency has been charged with monitoring the public health risks firearms may entail.

This report looks at the probable effects of two specific suggestions from the public health literature for improving the safety of firearms: child-proof safeties and loading indicators.

## Accidental Shootings

As mentioned above, shootings are among the leading causes of accidental deaths, particularly among young people. It should be noted that accidental shooting deaths represent only a small proportion of the total number of people injured and killed by firearms each year. The majority of deaths from firearms (56 percent) are suicides, with homicides accounting for most of the remainder (39 percent). Only 5 percent of firearms-related deaths each year are caused by accidental shootings.

Nonetheless, the number accidentally injured or killed by firearms may represent a substantial number of cases. While data on the number of fatalities are available, there is little information on the number of injuries caused by accidental shootings. And, despite attention to the issue of firearm accidents by public health researchers, there is little in the way of empirical evidence on the circumstances of accidents involving firearms, so not much is known about the details of those shootings.

National data are available on the number of deaths caused by unintentional shootings. The National Center for Health Statistics annually collects national data for all causes of death. Numbers for the years 1980-88 are shown in table 1.1. No comparable information is available for nonfatal injuries.

Table 1.1: Unintentional Firearm Deaths and Injuries 1980-88

| | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|---|---|---|---|
| Deaths | 1,955 | 1,871 | 1,756 | 1,695 | 1,668 | 1,649 | 1,452 | 1,440 | 1,501 |
| Nonfatal injuries | NA | NA | NA | NA | NA | NA | NA | NA | NA |

As can be seen, there was a generally downward trend in the number of deaths each year until 1987, with an increase in 1988, the most recent year for which information is available. We do not know why the number of deaths has declined, but there are several possible explanations. Education in gun safety and public awareness campaigns may be having some effect. There may be fewer deaths because gun owners are taking more precautions in storing and handling their weapons. There may also be a greater general awareness of the dangers associated with firearms, so individuals refrain from handling unfamiliar weapons. The many products entering the market for securing firearms may also be having an effect. Many devices are available for storing guns or protecting them from unauthorized users. Another possible explanation is that more shooting victims may be surviving their injuries because of better trauma care and better access to care. Any or all of these influences may be working to bring down the number of fatalities.

## Objectives, Scope, and Methodology

The central objective of this project was to provide an estimate of the proportion of firearms accidents that might be prevented by the addition of a child-proof safety or a loading indicator. This issue divides into two questions:

- What proportion of firearm accidents might have been prevented with a child-proof safety?
- What proportion of accidents might have been prevented with a loading indicator?

A second objective of our research was to add to the base of knowledge on firearm accidents, particularly by contributing information on the number of injuries. No national estimates are available on accidental injuries from firearms. As a result, there is no clear understanding of (1) the universe of accidents, both fatal and nonfatal, annually caused by firearms; (2) the relative importance of fatal accidents in terms of that universe (that is, it is not known if the deaths in any given year represent 5 percent of the accidental shootings or 50 percent); and (3) the costs represented by this unknown universe of deaths and injuries.

The scope of our work was limited to unintentional injuries and deaths from firearms. This eliminates the vast majority of gunshot injuries, specifically those related to any types of criminal activity or suicide attempt. Similarly, we limited the scope of "preventable" shootings to those that could have been averted by means of a child-proof safety or a loading indicator. We collected data for 1988 and 1989, the most recent years for which complete data were available at the time of our research.

For our examination of preventability, we looked at cases in which there had been a death as a result of an accidental firearm discharge. We collected data from a nationally representative sample of jurisdictions. This allowed us to develop a statistically valid estimate of the proportion of deaths preventable with a child-proof safety or loading indicator.

We determined if there were any deaths from accidental shootings in 1988 or 1989 by contacting state vital records offices and the coroners or medical examiners in the selected jurisdictions. The determination of whether a particular shooting might have been prevented by a child-proof safety or a loading indicator required detailed information about the particular incident. Generally, this meant that we needed information on the shooter, the weapon, and the circumstances of the accident.

By limiting the cases to fatalities, we could contact coroners or medical examiners in the selected jurisdictions to obtain the needed information. Information from these files for deaths was sufficiently detailed in about 80 percent of the cases to allow a determination of preventability.

We limited this examination of preventability to fatal shootings primarily because less information is maintained on accidental injuries than on deaths. In our preliminary investigation, we learned that the information we needed to make a determination of preventability was very often not available in cases in which there was only an injury and no death. In fact, in many instances, it might not be possible to locate any information about a nonfatal accident.

We learned that many police departments do not maintain retrievable records on accidental shootings (since these are not crimes), and even when they do, they document more completely the incidents in which a shooting victim died. Even in deaths believed from the outset to be accidental, the homicide unit is often involved in the investigation. Additionally, details of the circumstances surrounding accidental deaths are

usually available from coroners' and medical examiners' reports. In contrast, information from the case records of injuries we examined was rarely sufficient to allow us to determine preventability. Consequently, we restricted our preventability determinations to cases involving accidental deaths.

We did examine accidents involving nonfatal injuries in order to develop some information about the frequency of such accidents and to explore the relative proportion of injuries to deaths. Our examination of these accidents is based on data drawn from 10 cities. The lack of data in many police departments for such accidental shootings limited our study. We identified 10 urban police departments that maintained accessible records on accidental firearm injuries and were willing to provide the case file information. Police departments that were included in our study were for the following cities: Tucson, Arizona; San Jose, California; Denver, Colorado; Atlanta, Georgia; Louisville, Kentucky; St. Paul, Minnesota; Albuquerque, New Mexico; Columbia, South Carolina; Dallas, Texas; and Salt Lake City, Utah. Because this was a convenience sample of departments, the results from these 10 cities cannot be generalized to the country as a whole.

A more detailed discussion of the scope and methodology we used is provided in the chapters covering each part of the work. The sampling plan is discussed in detail in appendix I.

It should be noted that we did not investigate the specifics of design modifications to firearms to make them child-proof or to indicate whether they were loaded. We learned that various devices exist and are available on some firearms, but we did not examine the difficulty or cost associated with providing such devices on all firearms. We have examined the potential effectiveness of such devices in preventing accidental shooting deaths on the assumption that all firearms would be equipped with them. We comment further on this in chapter 4.

As requested by the subcommittee, we did not request comments on our report from any federal agency. Our work was performed in accordance with generally accepted government auditing standards.

## Study Strengths and Limitations

There is very little specific information currently available about the details and circumstances surrounding accidental shootings. In particular, there is little known about nonfatal shootings. One strength of this study is that it adds to the knowledge on this topic.

A second strength is the method we used for our examination of preventability. Because we collected data from a nationally representative sample of jurisdictions, we have developed a valid estimate of the proportion of deaths preventable nationwide by means of a child-proof safety or a loading indicator. In carrying out this study, we went to great lengths to obtain information on the accidental shootings in our sample, contacting coroners and medical examiners and, when necessary, seeking additional information from police records.

We have attempted to make the most conservative choices in our assumptions. For example, in considering at what age a child-proof safety might be effective in consistently preventing a child from firing a weapon, we chose the youngest age proposed by any expert in the area. Undoubtedly, some older children would also be prevented from firing weapons equipped with such devices, but we have only counted children under 6 in our calculations of preventability.

The limitations to our investigation relate primarily to our examination of the proportion of firearm accidents resulting in injuries. Because we had to rely solely upon police department records for this information, there are potential gaps in the data. As is usual in the United States, each police department has its own recordkeeping system, with accidental shootings filed under different categories in different departments. In some instances, the department retrieved the records for us from computerized files, while in other instances we had to conduct a hand search of all records filed under some broader heading. These different recordkeeping systems may account for some variability in the number of cases identified in the different cities. But any bias must necessarily be in the conservative direction (that is, the numbers can only underreport the actual totals), because all the cases we report were of identifiable accidental shootings.

An additional limitation is that we could not evaluate all possible alternatives for reducing firearm accidents; we could evaluate only the potential effectiveness of child-proof safeties and loading indicators. We discuss other possible approaches in chapter 4.

It should be noted that most of these limitations are merely reflections of immaturity in this area of research. This is also true of other areas in which police data and uncounted or hidden populations are involved and for which no national monitoring agency responsibility exists.

## Organization of the Report

In chapter 2, we address the question of firearm accidents that could be prevented by child-proof safeties and loading indicators. Our research on nonfatal injuries from firearm accidents is discussed in chapter 3, and we discuss the implications of our findings in chapter 4. The sampling plan and estimation methodology are provided in appendix I. Appendix II contains a discussion of the costs of firearm injuries. Suggested legislative language for implementing our recommendation is provided in appendix III. Major contributors to the report are listed in appendix IV.

# The Preventability of Accidental Deaths From Firearms

In this chapter, we report on our estimate of the proportion of all accidental firearm deaths that could be prevented by either a child-proof safety device or a device that indicates whether a gun is loaded. We first describe the methodology we used to determine which deaths could have been prevented. Next, we provide our findings on the numbers of accident cases in our sample that were preventable by a child-proof safety or loading indicator and the accidents that were not thereby preventable. We include a description of some of the characteristics of the accidents in our sample and conclude with estimates of preventable deaths nationwide.

## Methodology

To determine the percentage of accidental deaths from firearms that could have been prevented by either of the two types of devices, we examined data from medical examiners and coroners in a sample of jurisdictions from across the United States. We randomly selected 110 urban and rural jurisdictions (counties and independent cities) and determined if there had been any deaths in the jurisdictions from accidental shootings in 1988 or 1989, the most recent years for which data were available. To determine if there were any such deaths, we contacted state vital records offices and the coroners or medical examiners in the selected jurisdictions.

We requested complete case file information (investigation reports, autopsy results, and so on) from the medical examiner or coroner for every accidental death from firearms that we identified. In some cases, when medical examiners' or coroners' data were insufficient to allow a preventability determination, we sought supplemental information from police department records. In total, we reviewed 107 case files.

After our review of case files, we divided the accidental firearm deaths into four categories: (1) those that could have been prevented by a child-proof safety device, (2) those that could have been prevented by a loading indicator device, (3) those that could not have been prevented, and (4) those for which a preventability determination could not be made.

We constructed criteria for determining which cases fell into each category. For deciding which accidents could have been prevented by a child-proof safety device, we sought the advice of experts. Several types of child-proof devices are on the market. Through various means, such devices lock the trigger to prevent it from being pulled. According to pediatrics experts and experts on deaths and injuries from firearms, a

child-proof device can be reasonably expected to prevent only children up to about age 6 from discharging a firearm. Children under that age are not considered strong enough physically or developed enough cognitively to be able to disengage a safety mechanism designed to be child-proof. Therefore, our criterion for determining the number of deaths that could have been prevented by a child-proof device was the age of the child firing the weapon.

Loading indicators allow one to determine at a glance whether a firearm is unloaded and whether a round remains in the chamber. Our criterion for determining the number of deaths that could have been prevented by a loading indicator was that there was evidence that the shooter believed the weapon was unloaded. We required that there be evidence of one of three situations in the case file. First, the shooter believed the firearm to be unloaded because either the shooter had emptied the firearm but failed to note that a round remained in the chamber or the shooter's common practice was to leave the weapon unloaded and so assumed it to be. Second, the shooter pulled the trigger several times without the firearm discharging (dry-firing) and so assumed it to be unloaded. Or third, the firearm had been stored for over a month, so the shooter did not remember whether it was loaded but assumed it was not.

We judged an accidental firearm death to be nonpreventable in cases in which there was specific evidence that the conditions above for child-proof safeties and loading indicators were not met (that is, shooter over age 6, shooter knew weapon was loaded). Examples of nonpreventable accidents (that is, not preventable by either of these two devices) included cases in which a weapon fell or was knocked to the ground and consequently discharged. Hunting accidents in which victims were mistakenly shot (for example, the 18-year-old man who was shot by a friend who mistook him for a deer) were also considered nonpreventable.

We classified as "undeterminable" any death for which the case file lacked sufficient detail to enable a determination of preventability. These included self-inflicted shootings in which there was no way of determining whether the victim had checked the gun before firing it.

For addressing the question of how many accidental shootings might have been prevented by the two safety devices, we examined accidental deaths from firearms, rather than injuries, primarily because more information is maintained on accidental deaths than on injuries. For example, police departments document more completely incidents in

which a shooting victim died. Even in deaths believed from the outset to be accidental, the homicide unit is often involved in the investigation. Additionally, details of the circumstances surrounding accidental deaths are usually available from coroners' and medical examiners' reports. Information from such sources was often sufficiently detailed to allow a determination of preventability. In contrast, information from the case records of injuries we examined was rarely sufficient to allow us to determine preventability. Consequently, we restricted our preventability determinations to cases involving accidental deaths.

## Findings

### Child-Proof Safety Devices

Of the 107 deaths we reviewed, 9 (8 percent) resulted from shots fired by children under age 6. These deaths could have been prevented by a child-proof safety device. Although children under the age of 6 generally cannot disengage a child-proof device, they are quite capable of firing a handgun, as demonstrated by medical examiners' and coroners' reports. In one case, for example, a 1-1/2-year-old boy and his 3-1/2-year-old brother were playing with a .38 caliber handgun that they found under their father's pillow. The weapon discharged, striking the younger child and killing him.

### Loading Indicator Devices

Of the 107 deaths, 25 (23 percent) could have been prevented had the firearm had a loading indicator. These deaths occurred when the shooter, typically a male between 13 and 24 years old, believed for one reason or another that the firearm was unloaded. In one case, a 15-year-old boy removed a .22 caliber handgun from his father's nightstand and pointed it playfully at his 11-year-old sister. He had already removed the clip, for he was familiar with the gun (having fired it at the range once before), and thus believed the gun was unloaded. However, he did not realize that a round remained in the firing chamber; upon discharge, it struck his sister in the head.

Other deaths occurred when the shooter dry-fired a weapon one or more times and so believed it to be unloaded. In one case, a 17-year-old boy took a large-caliber handgun he believed to be unloaded and, in the presence of two friends, put it in his mouth. He pulled the trigger and, when the weapon failed to discharge, he placed it to his head and again pulled the trigger. The weapon then discharged.

In still other cases, the shooter habitually unloaded a firearm before storing it and so assumed it to be unloaded. For example, one man was cleaning his .44 caliber handgun that he always kept unloaded, but he had forgotten that he had placed a loose round in the chamber 2 weeks earlier. When he cocked the hammer to clean it, he inadvertently touched the trigger. The bullet struck his wife in the chest.

## Other Accidents

In 52 (49 percent) of the 107 cases we examined, the accident involved neither a child under the age of 6 nor a firearm believed to be empty. These deaths largely include those that occurred because a weapon discharged when it fell or was knocked to the ground. For example, in one case, a hunter was jumping into the back of a pickup truck when his rifle knocked against the truck bed and discharged. The bullet entered the cab of the truck, killing a passenger.

Although we classified such cases as "nonpreventable" by a loading indicator, we believe that some clearly would have been prevented had the shooter (1) been more careful in handling the weapon, (2) not been intoxicated, or (3) received training in firearm handling. We used gun safety materials published by the National Rifle Association to develop statements of basic safety practices. Among the 107 cases we examined, 90 involved clear violations of good gun-handling practices. For example, 7 cases involved intoxication or some use of alcohol and 10 cases involved Russian roulette.

In 21 (20 percent) of the 107 cases we examined, the case file information was insufficient to enable us to determine preventability. In one case, a 42-year-old male was admitted to a hospital with a gunshot wound in the abdomen. The case file indicated only that the wound was self-inflicted and occurred as the victim was reportedly putting the gun in a holster. It did not contain information on whether the victim thought the firearm was unloaded. Undoubtedly, some unknown proportion of these cases also could have been prevented by the presence of a loading indicator.

Figure 2.1 shows, for the 107 accidental deaths we reviewed, those that could have been prevented, those that could not have been prevented by either a child safety or loading indicator device, and those for which a preventability determination could not be made.

**Figure 2.1: Proportion of Preventable to Other Deaths Caused by Accidental Firearm Discharges[a]**




[a]From our sample of 107 cases, calendar years 1988 and 1989.

## Characteristics of Accidental Deaths From Firearms

In the course of our review, we observed several interesting characteristics about accidental deaths from firearms. (Figures 2.2 through 2.6 show selected characteristics of the case files we reviewed.) As shown in figure 2.2, many more shooters were male than were female, and more shooters were between the ages of 13 and 24 than in other age groups.

Figure 2.2: Sex and Age Group of Shooters[a]




[a]Based on 86 case files that included both sex and age.

Slightly more than half the deaths were from self-inflicted wounds, as shown in figure 2.3.

**Figure 2.3: Percent of Accidental Deaths That Were Self-Inflicted**




More deaths occurred in or near a private residence than in vehicles, parks, or streets, as shown in figure 2.4.

**Figure 2.4: Location of Firearm Accidents Resulting in Death[a]**




[a]"Other" includes public streets, sidewalks, alleys, public parks, workplaces, and firing ranges.

A handgun was the weapon involved in the majority of deaths, as shown in figure 2.5.

Figure 2.5: Type of Weapon Involved in Accidents




And over 4 out of 10 victims died by their own (or their family's) firearm, as shown in figure 2.6.

Figure 2.6: Ownership of Weapons Involved in Accidents




## Estimates of Preventable Deaths

Nationwide, in 1988, according to the National Center for Health Statistics, 1,501 deaths resulted from accidental firearm discharges. From our sample, we can project that about 458 (plus or minus 89) of these deaths could have been prevented by either a child-proof device or a loading indicator device.[1] Specifically, 113 (plus or minus 64) could have been prevented with a child-proof device, and 345 (plus or minus 99) with a loading indicator device. Of the remaining deaths, 767 (plus or minus 125) could not have been prevented with these devices. Although we can project that over 400 deaths could have been prevented with these devices, it is likely that many additional deaths could have been prevented had good gun-handling practices been exercised, such as locking up and storing firearms unloaded and refraining from horseplay and the use of alcohol when handling firearms.

In addition to the lives that could be saved, there are medical expenses and other economic costs to society that could be avoided were these deaths to be prevented. The costs associated with shootings are quite

[1] Because our sample was randomly selected, our results are projectable to the country as a whole. All samples, however, are subject to sampling errors, which define the upper and lower bounds of the estimate calculated. All sampling errors for the estimates in this chapter were calculated at the 95-percent confidence level. (See appendix I for the sampling plan and the error for each estimate.)

high. If 458 deaths were averted, this would avoid costs estimated to exceed $170 million. (See appendix II for further discussion of the costs of firearm injuries and deaths.)

# Accidental Injuries and Deaths From Firearms

As we stated in chapter 1, data on the number of fatalities are available, but there is little information on the number of injuries caused by accidental shootings. This chapter reports on our examination of the universe of injuries and deaths caused by accidental firearm discharges. We first describe the methodology we used to determine the ratio of injuries to deaths. Next, we provide our findings on the accidental shooting cases in our sample. We conclude with a discussion of the estimates of injuries from accidental firearm discharges nationwide.

## Methodology

We examined firearm accidents involving injuries, but no deaths, in order to develop some information about the frequency of such accidents and the relative proportion of injuries to deaths. As we noted in chapter 1, our examination of these accidents is based on a sample of 10 urban police departments. The lack of data on accidental shootings in many police departments limited our study.

As we sought data on firearm accidents from city police departments, we found that the sophistication of police department recordkeeping systems varied widely, as did the extent of data maintained on cases involving accidental firearms discharges. Because police department record systems are essentially designed to track crimes and not accidents, many police departments do not maintain records on accidental shootings unless they result in death. And those that do maintain records on accidental shootings often include these records in a large "miscellaneous" category that makes their retrieval and review very labor intensive and time consuming. In contrast, some police departments maintain records by code, with a different code for each type of event they investigate, including firearm accidents. Other departments group their reports into sufficiently narrow categories (for example, "accidents" and "assaults") that the manual retrieval and review of the reports is feasible.

We identified 10 urban area police departments that maintained accessible records on accidental shootings and were willing to provide the case file information. To identify these police departments, we began with a list of jurisdictions suggested as having good data bases by several national law enforcement organizations. We contacted every police department suggested as well as others to which those departments referred us. The 10 cities included in our study were Tucson, Arizona; San Jose, California; Denver, Colorado; Atlanta, Georgia; Louisville, Kentucky; St. Paul, Minnesota; Albuquerque, New Mexico; Columbia,

South Carolina; Dallas, Texas; and Salt Lake City, Utah. The 1986 area populations ranged from 93,000 to over 1 million.

We obtained information from the 10 police departments on all the reported accidental shootings in their jurisdictions in 1988 and 1989. In most states (including 8 of the 10 states where cities in our study are located), hospitals and physicians are required by law to report gunshot injuries to the police. Two of the states where our cities are located, New Mexico and Kentucky, have no such statewide legal requirement. However, according to police officials in the 2 cities studied in those two states, Albuquerque and Louisville, medical professionals report cases involving gunshot injuries as a common practice. As a result, we are confident that the majority of accidental injuries from firearms in our 10 sampled cities are captured in our study.

Such reporting requirements were not the sole reason we sought data from police departments rather than from hospitals, the most common source of injury information. We learned that hospital records typically do not include information about whether a firearm injury was accidentally or intentionally inflicted, and thus we could not separate accidents from suicide or homicide attempts.

At the 10 police departments, we examined a total of 532 cases of accidental firearms discharges that resulted in either injury or death in 1988 and 1989.[1] Whereas we could project from our sample of medical examiners and coroners the nationwide number of accidental deaths from firearms that could have been prevented, we cannot do so for injuries. Because our sample of the 10 urban police departments is not representative, we cannot generalize our results either regionwide or nationwide. Nevertheless, as there has been a dearth of data on accidental injuries from firearms, we believe that our data will contribute to the national base of knowledge on accidental injuries from firearms. Knowledge about the number of injuries that occur each year is important for understanding the size of the public health problem, a key element in any consideration of the need to find solutions to the problem.

## Findings

Of the 532 accidental firearm discharge cases we examined, 527 resulted in injuries, and 5 resulted in deaths. This is a ratio of 105 to 1 of injuries

[1] Not included in the 532 cases were shootings involving BB pistols or pellet guns and three cases with injuries where handguns loaded with blanks were intentionally fired. We also excluded cases of accidental firearms discharges where no one was injured and cases where the victim refused to cooperate with the police in providing any information about how the shooting occurred or who was involved.

to deaths. Table 3.1 shows the numbers of injuries and deaths from accidental firearm discharges in the 10 cities.

**Table 3.1: Deaths and Injuries From Accidental Firearm Discharges, 1988 and 1989**

| City and state | Population[a] | Death | Injury | Total |
|---|---|---|---|---|
| Albuquerque, N. Mex. | 366,750 | 1 | 48 | 49 |
| Atlanta, Ga. | 421,910 | 1 | 80 | 81 |
| Columbia, S.C. | 93,020 | 0 | 12 | 12 |
| Dallas, Tex. | 1,003,520 | 1 | 248 | 249 |
| Denver, Colo. | 505,000 | 2 | 15 | 17 |
| Louisville, Ky. | 286,470 | 0 | 34 | 34 |
| St. Paul, Minn. | 263,680 | 0 | 2 | 2 |
| Salt Lake City, Utah | 158,440 | 0 | 12 | 12[b] |
| San Jose, Calif. | 712,080 | 0 | 19 | 19 |
| Tucson, Ariz. | 358,850 | 0 | 57 | 57 |
| **Total** | **4,169,720** | **5** | **527** | **532** |

[a]1986 population.

[b]Does not include first three quarters of 1988.

The reasons for the wide variation in the cities' numbers of deaths and injuries, inconsistent with their population sizes, are unknown. To some extent, the variation may stem from differences in the police departments' recordkeeping systems. As we stated above, some departments had very sophisticated computerized systems that allowed for easier (and presumably more accurate) retrieval of cases. For example, Dallas, the city in our sample with the highest number of accidental shootings, had one of the most sophisticated recordkeeping systems.

Another reason for the wide variation may be differences in patterns of gun ownership. There are higher rates of gun ownership in the South and some parts of the West than in the North, for example. This may, in part, account for the low number of accidents in St. Paul and the higher numbers in Dallas, Atlanta, and Tucson. We have no ready explanation for why San Jose, the second largest city in our sample, had many fewer instances of accidental shootings than did Dallas, the largest city we studied.

At the least, however, the numbers of injuries are conservative. According to several police officials, some cases undoubtedly are not reported, although it is impossible to know how many. If some accidental shootings go unreported and uninvestigated, this is far more likely to happen in cases involving only injuries and no deaths. This

means that the reported numbers of deaths should be very accurate while the numbers of injuries may be underreported.

The characteristics of the accidental injury cases we reviewed were similar to those of the preventable and other death cases discussed in chapter 2. That is, the vast majority (90 percent) of the shooters were male, and almost half of all shooters were between the ages of 13 and 24. Most of the injuries were self-inflicted; most were caused by a handgun. In about two thirds of the cases, the accident occurred in or near a private residence.

The following case typifies the circumstances surrounding many of the accidental shootings in our sample. A 14-year-old youth was handling a .38 caliber handgun in his front yard. He assumed it to be unloaded and pulled the trigger, shooting himself in the foot.

Figure 3.1 shows, for the 532 cases we reviewed, that 99 percent of the accidental firearms discharges resulted in injuries rather than deaths. As already noted, we estimate that the ratio of injuries to fatalities is 105 to 1, based on the cases we reviewed in 10 cities.

**Figure 3.1: Proportion of Injuries and Deaths Caused by Accidental Firearm Discharges**



## Implications

As we stated in chapter 1, we know that the number of deaths nationwide resulting from accidental firearm discharges was 1,501 in 1988, the most recent year for which totals are available. Given the cases we reviewed in 10 cities, we derived an estimate of the ratio of injuries to deaths of 105 to 1. Were we to apply this estimate to the nation, using the known number of deaths, we would estimate that there were approximately 157,600 injuries from accidental firearm discharges each year. However, because the sample of cities on which the ratio is based was not randomly selected, we cannot generalize to the nation as a whole.

There are a number of potential sources of bias in the data. First, the data most likely underestimate the actual number of injuries because of the general lack of reporting of accidental shootings. This source of bias would mean that the true ratio of injuries to deaths would be even higher than what we found.

There are also potential biases that would indicate the true ratio nationwide could be lower than that in our sample (that is, nationwide there could be fewer than 105 injuries for every death). Our sample of jurisdictions, driven by data availability, was entirely urban, and this could bias an estimate of the proportion of accidents that were survivable. There are at least three factors directly related to the survivability of a shooting that could vary between urban and rural settings: the caliber of the firearm (.22, .45, and so on), the type of firearm (handgun, long gun, or shotgun), and the quality of medical treatment received. The caliber of the firearm could bias the estimate, since caliber is positively associated with lethality. If lower-caliber firearms are more common in urban shootings (which we do not know), then urban victims could have a greater likelihood of surviving, thus inflating the ratio of injuries to deaths. The type of firearm could bias the estimate, since rifles, more common in rural hunting situations, are more lethal, even when caliber is held constant, because the bullet is fired with greater velocity. Thus, if rural victims are more likely to be shot with rifles, a higher proportion of rural shootings would likely result in death. Finally, the quality of medical treatment could bias the estimate, since urban dwellers are generally closer to emergency care, resulting in urban gunshot victims being more likely to survive potentially fatal injuries.

One frequent source of bias from nonrandom samples, that the locations selected were somehow "unique" or different from average, we do not believe to be a problem for this study. There is no reason to expect that the most important factor in whether an accidental shooting proves

fatal or not—where the bullet strikes the victim—should differ in any way from one locale to the next. Since these are accidental shootings, and not intentional, having a bullet strike a vital organ should largely be a random occurrence, regardless of whether the shooting is in an urban area or a rural one, a large city or a small one.

Even though we cannot validly project the proportion of injuries to deaths resulting nationally from accidental firearm discharges, there are some indications that the data from our sample are reasonable. As mentioned above, the characteristics of the cases in this sample are very similar to those from the representative sample of deaths we described in chapter 2. In addition, the figures seem in line with the injury-to-death ratios for other types of accidents. When the 105 to 1 ratio of injuries to deaths caused by accidental firearms discharges is compared with similar data for other types of accidents, our data appear consistent. For example, according to the National Safety Council, similar proportions of injuries to deaths exist nationwide for all accidents (94 to 1), accidents occurring in the workplace (162 to 1), and accidents occurring in the home (151 to 1).[2]

[2]These numbers are for "disabling injuries." A disabling injury is defined as an injury causing death, permanent disability, or any degree of temporary total disability beyond the day of the accident.

Case 8:26-cv-01697-MRA-ADS Document 43-7 Filed 08/25/26 Page 52 of 100 Page ID #:1487

# Implications

## The Size of the Problem

As we stated in chapter 1, the number of deaths from accidental shootings has been generally declining over the last several years. This would seem to indicate that the problem is not large and has leveled off. However, what is missing from this picture is any sense of the number of injuries resulting from accidental shootings. Without this information, we cannot judge how big a public health problem firearm accidents really are.

From the declining number of deaths, we cannot determine if the total number of accidental shootings is declining (and declining at the same rate) or if the same number of people are accidentally shot each year but better trauma care is saving the lives of an increasing proportion of the victims.

Our report presents data on the number of injuries associated with every death. Although we cannot project to the country as a whole, were there actually to be the same ratio nationwide as in the 10 cities we studied, that would mean there are approximately 157,600 such injuries each year.

That number, because of methodological limitations discussed in chapter 3, must be viewed as a gross estimate. However, the number does give some sense of the size of the problem. It seems obvious that the total number of accidental shootings is many times the number of fatalities. This is in line with other causes of accidental death and injury. For example, as mentioned in chapter 3, the ratio of workplace injuries to deaths is 162 to 1, while accidents in the home have an injury to death ratio of 151 to 1. Thus, a ratio of tens of injuries for each death seems reasonable for accidental shootings.

Even if one excluded Dallas, the city in our sample with the largest number of injuries, there would remain 279 injuries and 4 deaths (that is, a ratio of 70 to 1), still a large relative proportion of injuries to deaths. If one were to reduce by half the ratio of injuries to deaths that we found, that would still result in a projection of approximately 78,800 injuries annually from accidental shootings in the United States. If one were to reduce it even further, to account for any possible bias, it seems likely, and reasonable, that the resulting projection would still be tens of thousands of such injuries each year. If the true ratio of injuries to deaths nationwide were only one tenth of the ratio in the cities we studied, it would mean there are over 15,000 injuries from accidental shootings each year.

In addition to the tragedy of these shootings, occurring as they primarily do among young people, there is the issue of costs. As mentioned in chapter 2, the costs associated with gunshot wounds are quite high. Thus, the economic effect of thousands of accidental shootings could be significant. Even if the true number of accidental shootings is smaller than the ratio from the 10 cities studied would indicate, the costs would still be substantial. If there were 1,500 deaths and some 12,000 hospitalizations (less than one tenth the number of injuries estimated from our sample of cities) every year, that would translate into an estimated lifetime cost, each year, of close to $1 billion.[1] (See appendix II for further discussion of the costs of firearms injuries and deaths.)

It seems clear that thousands of individuals and families are affected by these accidents each year. We turn now to a discussion of approaches that are available for reducing the number of such shootings.

## Approaches to Reducing Accidental Shootings

Many of the accidental shootings each year are preventable. Of the fatal shootings we examined, we estimate that 31 percent could have been prevented by two technological modifications to firearms. Undoubtedly, additional fatalities were preventable among cases in which there was insufficient information for us to make a determination. Many nonfatal shootings are obviously also preventable.

Different approaches could be taken to try to reduce the number of accidental shootings. These include mandating modifications to firearms, requiring training in gun safety, and enacting statutes to penalize gun owners who are negligent in their handling or storage of weapons.

### Mandated Modifications to Firearms

Our research has demonstrated that lives could be saved and injuries prevented if all guns were equipped with either a child-proof safety or a loading indicator or both. There are clearly instances in which such devices would prevent tragedy. Our projections are that, at current accident rates, some 458 lives could be saved each year if all firearms had both these safety devices.

[1]The lifetime cost of an accident is defined as the present discounted value of costs occurring in all future years. Costs include actual dollar expenditures related to illness or injury, including amounts spent for hospital and nursing home care, physician and other medical professional services, drugs and appliances, and rehabilitation. Estimates also include life years lost and the indirect cost associated with loss of earnings because of short- and long-term disability and premature death from injury. The estimated costs are derived from data for all shootings, not just unintentional shootings.

Gun manufacturers could choose to modify their firearms to include child-proof safeties or loading indicators, motivated by a desire to promote greater welfare or to avoid potential litigation or by pressure from consumers demanding firearms with such features. However, if a guarantee were needed that all firearms have these safety devices, this would have to be mandated by legislative action of the Congress. Current statutes place firearms outside the jurisdiction of the Consumer Product Safety Commission, and the Bureau of Alcohol, Tobacco, and Firearms is not empowered to control these design aspects of guns. Thus, regulatory action to require modifications could not be taken without specific new legislation.

A child-proof safety that automatically engaged and that came as a built-in part of the firearm could protect young children from adults' carelessness in storing loaded weapons where children can have access to them. Just as passive seat belts that automatically engage have been required in automobiles to protect the occupants without requiring that specific actions be taken each time the vehicle is used, child-proof safety devices on firearms could provide protection in the absence of specific behavior to secure the firearms. Child-proof safeties on firearms could prevent over 100 instances annually in which children fatally shoot someone, often themselves or another child.

Likewise, loading indicators could potentially prevent over 300 deaths resulting from accidental shootings each year among adolescents and adults. Our research demonstrates that, even more than child-proof safeties, this modification could potentially prevent many injuries and deaths. Such a device might also take the "fun" out of such games as Russian roulette.

Our projections of the number of lives saved that could be attributable to these safety devices require that two conditions be met. First, all firearms would have to be equipped with these devices. And second, all other relevant conditions would remain unchanged. That is, there would be no increase in gun safety awareness or education in safe gun-handling practices, because such changes could also save lives.

There are potential problems in implementing any requirement for firearms to be equipped with these safety devices. First, there may be technological difficulties to overcome in designing child-proof safeties and loading indicators for the myriad firearms on the market. In addition, there are possible logistical difficulties:

- loading indicator devices would require that users (including unintended users, such as adolescents) be educated to understand their use and to recognize the indication that the firearms were loaded;
- there are possible objections to the desirability of having onlookers be able to readily judge if a firearm is loaded (for example, if a weapon is being used for protection); and
- this type of child-proof safety would only prevent very young children from firing the gun and would likely not be effective against use by older children or adolescents.

Beyond the logistics of implementing the modifications, there is the question of effectiveness. Our projections for the number of lives that could be saved each year assumes that all firearms are equipped with these safety devices. But any changes of this type would presumably be mandated only for new firearms entering the market.

While over 4 million firearms are manufactured in the United States each year, there are an estimated 200 million firearms already in the market. Approximately 50 percent of U.S. households report owning one or more firearms. This represents an enormous pool of weapons that would not be affected by design modifications. Furthermore, firearms, unlike many consumer products, have a long period of use. It is not uncommon for firearms to be passed from one generation to the next, so it cannot be expected that within a decade, for example, the majority of old-style firearms would be out of use. To affect this pool of weapons, owners would have to be required to modify all their firearms, to equip them with the two safety devices.

## Other Approaches

Other options are available, including many devices currently on the market, designed to prevent a firearm from being used by any unauthorized person. These include locking storage cases, trigger guards, combination locks that can be built into the weapon, and a variety of other mechanisms for securing firearms of different types. In addition, there is the simple expedient of keeping firearms unloaded, with ammunition stored separately.

However, all these approaches require some positive action on the part of the user to ensure that the firearms are not accessible to children or other unauthorized users. Passive restraints in automobiles were required when data showed that many passengers were not using seat belts that required buckling. The current number of accidents with firearms is testament to the fact that gun users frequently do not take the

available safety steps. It is not known if education in proper safety procedures would be sufficient to ensure that appropriate precautions would be taken. And requiring that all purchasers of firearms take gun safety training would necessitate some form of registration and monitoring of gun owners.

We know of no ready replacements on the market for a loading indicator. The necessary alternative is proper education in the use and handling of firearms. All users need to be trained to immediately inspect a weapon to determine if it is loaded before handling it further. As we stated in chapter 2, a majority of the accidents we examined involved some violation of safe gun-handling standards. Unfortunately, as our research has shown, many fatal accidents involve users who are not the owners of the firearms. Thus, firearm training aimed at owners will not prevent many of these accidents if others are allowed access to a loaded weapon.

Some states have adopted an approach aimed at encouraging owners to take proper precautions in storing their firearms. Both Florida and Connecticut have recently enacted statutes to hold adults guilty of criminal negligence if they allow minors to gain access to loaded firearms that are subsequently involved in accidental shootings. Penalties include fines and possible imprisonment. Other states (including Wisconsin and Virginia) have considered, but not passed, similar statutes.

## Conclusion and Recommendation

The number of individuals being injured and killed each year in accidental shootings is substantial. Whereas the problem may have been viewed as small when only the number of deaths was known, we now know that the overall problem is likely to be very large, with many thousands of individuals being injured each year.

We have demonstrated the potential effectiveness of two technologies—child-proof safeties and loading indicators—for preventing some of these accidents, thereby reducing the number of deaths and injuries. However, there remain obstacles to realizing this promise. How these mechanisms might be implemented is not immediately clear.

These mechanisms are not the only approaches available, however. There are other approaches (for example, training gun owners or limiting access to firearms) that may be equally or more effective.

The human, economic, and public health costs of these shootings to the victims, their families, and society are considerable. The magnitude of the problem requires that all possible efforts be made to reduce the number of accidental shootings.

The Consumer Product Safety Commission, the primary federal agency with responsibility for product safety, is currently not allowed to take any action that might restrict the availability of firearms to the consumer. We recommend that the Consumer Product Safety Act be amended to clearly establish that the Consumer Product Safety Commission can regulate the risk of injury associated with firearms. Suggested legislative language for implementing our recommendation is provided in appendix III.

# Sampling and Estimation Methodology

The study design involved collecting data from two separate samples. One sample was used to examine the preventability of accidental shootings by child-proof safeties and loading indicator mechanisms. A second sample was used to examine the prevalence of nonfatal injuries from accidental shootings. We discuss each sample in turn.

## Sample for Examining Preventability

To determine the percentage of accidental deaths from firearms that could have been prevented by either of the two types of devices, we examined data from medical examiners and coroners in a random sample of jurisdictions from across the United States. In each jurisdiction, we contacted state vital records offices and the coroners or medical examiners and asked if there had been any deaths from accidental shootings in 1988 or 1989, the most recent years for which data were available at the time of our study.

We collected information only for shooting deaths classified as accidental. For jurisdictions using the ICD-9 coding system, we limited the data collection to fatalities coded under the E922 category ("accident caused by firearm missile").[1] Thus, we excluded deaths involving firearms that were classified as suicides or homicides or could not be classified.

The sampling frame was the 3,139 counties and independent cities listed by the Bureau of the Census.[2] We divided these jurisdictions into two strata on the basis of population: an urban stratum (population greater than or equal to 50,000) and a rural stratum (fewer than 50,000 residents). We then selected a random sample of jurisdictions within each stratum. We selected 60 urban jurisdictions and 50 rural jurisdictions, for a total of 110 counties and independent cities. Data were not obtained for either year in 3 jurisdictions. One year's data were unavailable in an additional 4 jurisdictions.

From the data we collected, we computed sampling errors for the major findings on preventability presented in chapter 2. We present our estimates in table I.1, along with the sampling error for each estimate. When added to and subtracted from the estimates, the sampling errors provide the 95-percent confidence interval for each finding.

[1] U.S. Department of Health and Human Services, The International Classifications of Diseases, 9th Revision, Clinical Modification, 2nd ed. (Washington, D.C.: 1980).

[2] U.S. Department of Commerce, County and City Data Book (Washington, D.C.: 1988).

**Table I.1: Estimates and Sampling Errors for Findings on Preventability[a]**

| Variable | Estimate | Sampling error |
|---|---|---|
| Preventable by a child-proof device | 7.5% | 4.2% |
| Preventable by a loading indicator device | 23.0 | 6.6 |
| Total preventable by either device | 30.5 | 5.9 |
| Nonpreventable by either device | 51.1 | 8.3 |
| Preventability could not be determined | 16.7 | 7.3 |

[a]Figures represent percent of accidental deaths.

For a check on the accuracy of our sample, we used our data to generate an estimate of the expected number of accidental deaths in a year. Using these data, we estimate that 1,581 deaths from accidental shootings (plus or minus 696) would be expected in a year. This estimate compares favorably with the known number of 1,501 deaths in 1988.

We also computed estimates and sampling errors for the other variables presented in chapter 2 (sex and age of shooters, percentage of self-inflicted shootings, location of accident, type of weapon, and ownership of weapon). These estimates are available upon request.

## Sample for Examining Injuries

We employed a snowball sampling technique to identify police jurisdictions where the needed information was retrievable. We began by asking experts on police departments (from the National Institute of Justice, the National Criminal Justice Reference Service, the Police Executive Research Forum, and the Police Management Association) to list any departments with records systems that might contain information on accidental shootings in an accessible form. We contacted every police department suggested in order to determine the feasibility of obtaining the needed case records. In addition, at each department, we asked for referrals to other departments where the needed information might be obtained. This process of contacting departments and asking for referrals was continued until the list of new department names was exhausted.

We identified 10 urban area police departments that maintained accessible records on accidental shootings and that were willing to provide the case file information. The 10 cities included in our study were Tucson, Arizona; San Jose, California; Denver, Colorado; Atlanta, Georgia; Louisville, Kentucky; St. Paul, Minnesota; Albuquerque, New Mexico; Columbia, South Carolina; Dallas, Texas; and Salt Lake City, Utah. Because this was a convenience sample of departments, the results from these 10 cities cannot be generalized to the country as a whole.

# Costs of Firearm Injuries

The specific information needed to develop a precise estimate of the costs of unintentional firearm injuries and deaths is not available. However, the information that is available shows that the total costs associated with gunshot wounds are likely to be quite high.

One recent study estimates the average lifetime cost of different types of injuries, defined as the present discounted value of costs occurring in all future years.[1] Costs are enumerated as actual dollar expenditures related to illness or injury, including amounts spent for hospital and nursing home care, physician and other medical professional services, drugs and appliances, and rehabilitation. The cost estimates also include life years lost and the indirect cost associated with loss of earnings from short- and long-term disability and premature death from injury.

Using this approach, the average lifetime cost of a firearm injury (including both fatal and nonfatal injuries) is estimated to be $53,831.[2] This can be broken down into estimated costs for firearm injuries of different levels of severity. For those that do not require hospitalization, the estimated per person cost is $458, while injuries requiring hospitalization are estimated to cost $33,159 per person. And the average lifetime cost of a firearm fatality is $373,520, the highest of any cause of injury.

We know from national mortality data that about 1,500 people die each year in the United States from accidental shootings. Based on data from the National Hospital Discharge Survey, it is estimated that in excess of 65,000 persons are hospitalized every year with injuries resulting from firearms. However, it is not known how many of these firearm injuries are unintentional. One study of hospitalizations over the course of a year at one regional trauma center found that 18.8 percent of the firearm-related injuries were unintentional.[3] Applying this 18.8-percent figure to the 65,129 firearm-related hospitalizations nationwide yields an estimate of 12,244 annual hospitalizations from unintentional

[1]Dorothy P. Rice et al., Cost of Injury in the United States: A Report to Congress (San Francisco, Calif.: Institute for Health and Aging, University of California, and Injury Prevention Center, The Johns Hopkins University, 1989).

[2]Rice's cost estimates are in 1985 dollars.

[3]Michael J. Martin et al., "The Cost of Hospitalization for Firearm Injuries," Journal of the American Medical Association, 260:20 (November 25, 1988), 3048-50. The 18.8-percent figure was computed omitting cases that could not be categorized as either intentional or unintentional.

firearm injuries. There are no reliable estimates of the number of persons each year who suffer firearm-related injuries that do not require hospitalization.

The estimates from the study on costs can be combined with the incidence data to derive a rough estimate of the overall costs associated with the unintentional firearm injuries and deaths occurring in a single year. The average lifetime costs associated with 1,500 deaths would be over $500 million (that is, 1,500 times $373,520 equals $560,280,000). For 12,244 hospitalizations, the average lifetime cost would be over $400 million (that is, 12,244 times $33,159 equals $405,998,796). So, omitting any costs associated with injuries not requiring hospitalization, the estimated lifetime costs for accidental shootings is close to $1 billion ($966,278,796) every year.

The estimated costs associated with shootings can also be used to value the savings that would be associated with specific types of prevention. In chapter 2, we estimated that some 458 deaths might be prevented each year if all firearms were equipped with child-proof safeties and loading indicators. If 458 deaths were averted, this would avoid lifetime costs estimated to exceed $170 million.

The estimates above are based on one approach to estimating the costs of firearm injuries and deaths. Different federal agencies have used different dollar amounts for the value of life, ranging from several hundred thousand dollars to several million dollars. If higher figures are considered in the calculations, the estimated costs of accidental shootings can increase dramatically. For example, one frequently used value is $2 million.[4] Applying the $2 million figure to the 1,500 deaths that occur each year yields an estimated annual value of life lost through accidental shootings of $3 billion. Applying this value to our projection of 458 deaths that might be averted would yield estimated annual savings of over $900 million. Higher assigned values for each life would result in higher estimated savings.

[4]Clayton P. Gillette and Thomas D. Hopkins, Federal Agency Valuations of Human Life (Washington, D.C.: Administrative Conference of the United States, 1988).

# Suggested Legislative Language

This appendix suggests legislative language that would implement the revisions we recommend to clearly establish that the Consumer Product Safety Commission can regulate the risk of injury associated with firearms. The legislative language should read as follows:

Section 3(a) of the Consumer Product Safety Act (15 USC 2052) is amended by striking out subparagraph (a)(1)(E) and redesignating subparagraphs (F) through (I) as subparagraphs (E) through (H), respectively.

Section 8 of the Consumer Product Safety Act (15 USC 2057) is amended by adding at the end thereof the following sentence:

> This section shall not apply in the Commission's regulation of the risk of injury associated with firearms.

Section 3 of the Consumer Product Safety Commission Improvements Act of 1976 (15 USC 2080 note) is amended by striking out subparagraph (d)(2) and subparagraph (e) and inserting in lieu thereof:

> (e) the Consumer Product Safety Commission has authority to regulate the risk of injury associated with firearms.

Section 3 of the Consumer Product Safety Commission Improvements Act of 1976 (15 USC 2080) is further amended by striking out "(1)" in subparagraph (d).

# Major Contributors to This Report

## Program Evaluation and Methodology Division

George Silberman, Assistant Director
Marcia Crosse, Senior Evaluator

## Denver Regional Office

Arlene Alleman, Regional Management Representative
James Espinoza, Evaluator

# Bibliography


Alexander, G. R., et al. "Firearm-Related Fatalities: An Epidemiologic Assessment of Violent Death." American Journal of Public Health, 75 (February 1985), 165-68.

Baker, S. P., et al. "Firearms and the Public Health." Journal of Public Health Policy, 1 (September 1980), 224-29.

Baker, S. P., et al. The Injury Fact Book. Lexington, Mass.: Lexington Books, 1984.

Baker, S. P., and A. E. Waller. Childhood Injury State-by-State Mortality Facts. Baltimore, Md.: The Johns Hopkins Injury Prevention Center, January 1989.

Barlow, B., et al. "Ten Years' Experience with Pediatric Gunshot Wounds." Journal of Pediatric Surgery, 17 (December 1982), 927-32.

Christoffel, K. K. "American as Apple Pie: Guns in the Lives of US Children and Youth." Pediatrician, 12 (1985), 46-51.

Christoffel, K. K., and T. Christoffel. "Handguns: Risks versus Benefits." Pediatrics, 77 (May 1986), 781-82.

Christoffel, K. K., and T. Christoffel. "Handguns as a Pediatric Problem." Pediatric Emergency Care, 2 (June 1986), 75-81.

Christoffel, K. K., et al. "Biopsychosocial Development: Critical to Injury Analysis and Prevention." Paper presented at the Annual Meeting of the American Public Health Association, November 1988.

Cole, T. B., and M. J. Patetta. "Hunting Firearm Injuries, North Carolina." American Journal of Public Health, 78 (December 1988), 1585-86.

Copeland, A. R. "Accidental Death by Gunshot Wound—Fact or Fiction." Forensic Science International, 26 (1984), 25-32.

Etter, I. B. "The National Safety Council's Estimates of Injury Costs." Public Health Reports, 102 (November-December, 1987), 634-36.

Fiedler, M., et al. "Review of Gunshot Wounds in Dayton, Ohio: Demographics, Anatomic Areas, Results, and Costs." Archives of Surgery, 120 (July 1985), 837-39.

Fischer, R. P., et al. "The Economics of Fatal Injury: Dollars and Sense." Journal of Trauma, 25 (August 1985), 746-50.

Heins, M., et al. "Gunshot Wounds in Children." American Journal of Public Health, 64 (April 1974), 326-30.

Jagger, J., and P. E. Dietz. "Deaths and Injury by Firearms: Who Cares?" Journal of the American Medical Association, 255 (June 13, 1986), 3143-44.

Keck, N. J., et al. "Characteristics of Fatal Gunshot Wounds in the Home in Oklahoma: 1982-1983." American Journal of Diseases of Children, 142 (June 1988), 623-26.

Kellerman, A. L., and D. T. Reay. "Protection or Peril? An Analysis of Firearm-Related Deaths in the Home." New England Journal of Medicine, 314 (June 12, 1986), 1557-60.

MacLennan, C. "The Unmeasured Costs of Injury." Public Health Reports, 102 (November-December 1987), 636-37.

MacKenzie, E. J., et al. "The Economic Impact of Traumatic Injuries: One-year Treatment-Related Expenditures." Journal of the American Medical Association, 260 (December 9, 1988), 3290-96.

Martin, M. J., et al. "The Cost of Hospitalization for Firearm Injuries." Journal of the American Medical Association, 260 (November 25, 1988), 3048-50.

Morrow, P. L., and P. Hudson. "Accidental Firearm Fatalities in North Carolina, 1976-80." American Journal of Public Health, 76 (September 1986), 1120-23.

Munoz, E. "Economic Costs of Trauma, United States, 1982." Journal of Trauma, 24 (March 1984), 237-44.

National Rifle Association. Safety with Firearms. Washington, D.C.: 1965.

National Rifle Association. Home Firearm Safety: Guidelines for Handling and Storing Guns in the Home. Washington, D.C.: 1990.

National Safety Council. Accident Facts. Chicago: 1988.

Nelson, C. L., et al. "Gunshot Wounds: Incidence, Cost, and Concepts of Prevention." Clinical Orthopedics and Related Research, 222 (September 1987), 114-21.

Ordog, G. J., et al. "Pediatric Gunshot Wounds." Journal of Trauma, 27 (November 1987), 1272-78.

Ordog, G. J., et al. "Gunshot Wounds in Children Under 10 Years of Age: A New Epidemic." American Journal of Diseases of Children, 142 (June 1988), 618-22.

Ornehult, L., and A. Eriksson. "Accidental Firearm Fatalities During Hunting." American Journal of Forensic Medicine and Pathology, 8:2 (1987), 112-19.

Patterson, P. J., and L. R. Smith. "Firearms in the Home and Child Safety." American Journal of Diseases of Children, 141 (February 1987), 221-23.

Rice, D. P., et al. "The Economic Costs of Illness: A Replication and Update." Health Care Financing Review, 7 (Fall 1985), 61-80.

Rice, D. P., et al. Cost of Injury in the United States: A Report to Congress. San Francisco, Calif.: Institute for Health and Aging, University of California and Injury Prevention Center, The Johns Hopkins University, 1989.

Rivara, F. P., and F. B. Stapleton. "Handguns and Children: A Dangerous Mix." Developmental and Behavioral Pediatrics, 3 (March 1982), 35-38.

Schetky, D. H. "Children and Handguns: A Public Health Concern." American Journal of Diseases of Children, 139 (March 1985), 229-31.

Valentine, J., et al. "Gunshot Injuries in Children." Journal of Trauma, 24 (November 1984), 952-56.

Waller, A. E., et al. "Childhood Injury Deaths: National Analysis and Geographic Variations." American Journal of Public Health, 79 (March 1989), 310-15.

Wintemute, G. J. "Firearms as a Cause of Death in the United States, 1920-1982." Journal of Trauma, 27 (May 1987), 532-36.

Wintemute, G. J., et al. "The Epidemiology of Firearm Deaths Among Residents of California." Western Journal of Medicine, 146 (March 1987), 374-77.

Wintemute, G. J., et al. "When Children Shoot Children: 88 Unintended Deaths in California." Journal of the American Medical Association, 257 (June 12, 1987), 3107-9.

Requests for copies of GAO reports should be sent to:

U.S. General Accounting Office
Post Office Box 6015
Gaithersburg, Maryland 20877

Telephone 202-275-6241

The first five copies of each report are free. Additional copies are $2.00 each.

There is a 25% discount on orders for 100 or more copies mailed to a single address.

Orders must be prepaid by cash or by check or money order made out to the Superintendent of Documents.

United States
General Accounting Office
Washington, D.C. 20548

First-Class Mail
Postage & Fees Paid
GAO
Permit No. G100

Official Business
Penalty for Private Use $300

# EXHIBIT C

Case 8:26-cv-01697-MRA-ADS Document 43-7 Filed 08/25/26 Page 72 of 100 Page ID #:1507



# Unintended Shootings in a Large Metropolitan Area: An Incident-Based Analysis

**Richard B. Ismach, MD, MPH**
**Avid Reza, MD, MPH**
**Roy Ary, MD**
**Tomoko Rie Sampson, MPH**
**Kidist Bartolomeos, MPH**
**Arthur L. Kellermann, MD, MPH**

*From the Center for Injury Control, Rollins School of Public Health of Emory University, Atlanta, GA (Ismach, Sampson, Bartolomeos, Kellermann), and the Department of Emergency Medicine, School of Medicine, Emory University, Atlanta, GA (Ismach, Reza, Ary, Kellermann).*

**See related article, p. 1, and editorial, p. 32.**

**Study objective:** We determine the proportion of unintended shootings that might be prevented by promoting safe storage, safe handling, and/or safer firearm designs.

**Methods:** A regional firearm injury surveillance system was used to identify fatal and nonfatal unintentional shootings in a 5-county metropolitan area. Case reports were reviewed, and the causes of each shooting were independently classified by 4 members of the research team. A consensus conference was held to resolve disagreements.

**Results:** Between May 1, 1996, and June 30, 2000, 216 cases of unintentional firearm injury were identified, 3.8% of the shootings documented during the study period. Six (2.8%) were fatal. The majority of victims were between 15 and 34 years of age. One fourth (54) of the shootings involved victims younger than 18 years. Handguns were involved in 87% of the incidents. Enough information was available to characterize the incident in 122 (57%) cases. All but 6 fell into 1 or more of 3 broad categories of causation: child access (14%), mishandling (74%), and/or deficiencies in firearm design (32%).

**Conclusion:** Many unintentional shootings could be prevented by promoting safe storage of guns in the home, promoting safe handling of firearms, and requiring that all new handguns incorporate basic safety features.

[*Ann Emerg Med.* 2003;41:10-17.]

*Copyright © 2003 by the American College of Emergency Physicians.*

*0196-0644/2003/$30.00 + 0*
*doi:10.1067/mem.2003.7*

## INTRODUCTION

In 1999, firearms were implicated in 28,874 fatalities in the United States.[1] Although the vast majority of these deaths were suicides (16,599) or homicides (10,828), approximately 3% were unintentional (824), comprising 30,467 potential years of life lost. One hundred fifty-eight of these unintended deaths were pediatric (<18 years old).[1] A disproportionate number of unintentional firearm injuries involve children.[2-4]

The case/fatality ratio for unintentional shootings is estimated to be between 13:1 and 100:1.[2,3,5] Although some of these injuries are relatively minor, others are severe.[3-5] The costs of acute care, rehabilitation, and long-term disability caused by firearm injury are substantial, as much as $2.3 billion in 1994.[5,6] Total costs, including lost productivity resulting from injury-related death and disability, might be 15-fold greater.[7]

Despite the magnitude of the problem, little is known about the factors that contribute to unintentional shootings.[5,8,9] To determine the proportion that might be prevented by various strategies, we identified unintentional shootings in a major metropolitan area and classified them by causation.

## METHODS

An electronic firearm injury surveillance system was used to identify fatal and nonfatal shootings in a 5-county area of metropolitan Atlanta, GA. The strengths and limitations of this system have been described in detail in an earlier report.[10] Five medical examiner's offices, 22 area emergency departments, and 33 law enforcement agencies submitted case reports to the system. Records were linked to generate as complete a picture as possible of each event. This study was exempted by our institutional review board.

A case was defined as an injury caused by the unintentional discharge of a projectile from a powder firearm. Powder firearms included all kinds of pistols, rifles, and shotguns but excluded air rifles and BB guns. Incidents of unintended discharge that did not result in injury and incidents of injury resulting from blunt trauma (eg, gun dropped on a victim's foot) were excluded. Bystanders inadvertently shot during an attempted assault or drive-by shooting were considered victims of intentional injury and were excluded as well. The initial classification was made by the reporting agency. Our study interval was limited to shootings that occurred between May 1, 1996, and June 30, 2000.

Four members of our team (RBI, AR, RA, and ALK) independently studied each report to determine the circumstances of the shooting. Both the ED data collection form and, if available, the written law enforcement narrative were reviewed. In most instances, the police report was the only source that contained information about the circumstances of the shooting. In no case did the ED report or medical examiner's report conflict with a police report regarding injury circumstances. Cases were classified into 1 or more of 3 predefined categories: preventable by safe storage, preventable by safer handling, and preventable by safer design. When the shooter was a minor who gained access to an adult's gun without the adult's permission, we considered the incident preventable by safer storage. Preventable by safer handling was selected when the narrative indicated that the firearm discharged (1) during cleaning, (2) while clearing a jammed round or attempting to unload, (3) while playing with or showing off the firearm, or (4) while moving, handling, or catching the firearm. Preventable by safer design was selected when the narrative specifically noted any of the following: (1) the shooter did not realize the firearm was loaded; (2) the magazine was out of the firearm or removed by the shooter before the trigger was pulled; or (3) the firearm discharged when dropped or placed on a hard surface. Some cases fell into more than one of these categories and were coded as such. After initial coding, our team met to review cases that were coded differently and to seek a consensus.

Confidence intervals (CIs) were estimated by using a $z$ statistic for 1-sample proportions. Interrater reliability was measured by using the proportion of cases in which investigators agreed, with cases weighted by the percentage of investigators who agreed. For example, if 3 of the 4 raters judged a case to be preventable by safer

design, that case would receive a weight of 0.75. A sensitivity analysis was performed by assuming that all cases with missing information would not have been preventable by any of the methods described. Statistical analyses were done with SAS for Windows statistical software package (version 8.02, SAS Institute, Inc., Chicago, IL).

## RESULTS

During the 49-month study period, 5,735 cases of firearm injury were reported in our 5-county metropolitan area. A total of 247 (4.3%) of these were initially classified as unintentional. After a review of these case reports, 31 of these shootings were reclassified as either intentional or of uncertain intent, leaving 216 cases (3.8% of all shootings during the study period) in our analysis. Six (2.8%) of these unintentional shootings resulted in a fatality.

A matching police offense report was linked to the ED report for 145 (67%) cases. For most of the remaining cases, the only documentation available was the 1-page reporting form that lists victim age, sex, and race, as well as the manner and severity of injury. The form does not provide enough information to classify the specific circumstances of the event.[10]

Eighty-seven percent (187) of the 216 victims were male, 65% (141) were black, 24% (51) were white/non-Hispanic, and 8% (18) were members of other racial or ethnic groups. The age distribution of victims is similar to the national mortality profile for unintentional firearm-related deaths; one fourth involved victims younger than 18 years (Table 1).

Nearly 40% (85) of the victims shot themselves. Sixteen percent (34) were shot by a friend or acquaintance and 5% (10) by a family member. One percent (3) were unintentionally shot by their spouse or intimate partner. Thirty-eight percent of unintended shootings (n=81; nearly two thirds of those in which the incident location was specified) occurred in a home. Seven percent (16) occurred in an automobile. Only 3 cases involved hunting. The vast majority of unintentional shootings (188 [87%]) involved a handgun (Table 2).

**Table 1.**
*Unintentional firearm injuries in metropolitan Atlanta, GA, May 1996 through June 2000 (N=247).*

| Variable | Included in Analysis, No. (%) | Insufficient Information, No. (%) | Excluded (Not Unintentional), No. (%) |
|---|---|---|---|
| **Age distribution, y** | | | |
| 0–4 | 1 (1) | 2 (2) | 0 (0) |
| 5–14 | 17 (14) | 6 (6) | 2 (6) |
| 15–24 | 51 (42) | 41 (44) | 13 (42) |
| 25–34 | 19 (16) | 23 (24) | 7 (23) |
| 35–44 | 18 (15) | 9 (10) | 5 (16) |
| 45–54 | 7 (6) | 4 (4) | 2 (6) |
| 55–64 | 5 (4) | 2 (2) | 1 (3) |
| ≥65 | 0 (0) | 1 (1) | 0 (0) |
| Not specified | 4 (3) | 6 (6) | 1 (3) |
| **Race distribution** | | | |
| Black | 79 (65) | 62 (66) | 17 (55) |
| White | 33 (27) | 18 (19) | 12 (39) |
| Other | 9 (7) | 9 (10) | 1 (3) |
| Not specified | 1 (1) | 5 (5) | 1 (3) |
| **Sex distribution** | | | |
| Female | 14 (11) | 14 (15) | 9 (29) |
| Male | 107 (88) | 80 (85) | 21 (68) |
| Not specified | 1 (1) | 0 (0) | 1 (3) |

**Table 2.**
*Unintentional firearm injuries in metropolitan Atlanta, GA: Incident details.*

| Variable | No. | % |
|---|---|---|
| **Type of firearm** | | |
| Handgun | 188 | 87 |
| Shotgun | 6 | 3 |
| Rifle | 11 | 5 |
| Unknown | 11 | 5 |
| **Victim-shooter relationship** | | |
| Self | 85 | 39 |
| Family | 10 | 5 |
| Friend | 34 | 16 |
| Spouse/intimate partner | 3 | 1 |
| Stranger | 7 | 3 |
| Not specified | 77 | 36 |
| **Incident location** | | |
| Residence | 81 | 38 |
| Street or sidewalk | 20 | 9 |
| Woods or field | 4 | 2 |
| Bar or tavern | 3 | 1 |
| Retail establishment | 3 | 1 |
| Automobile | 16 | 7 |
| Parking lot | 9 | 4 |
| Other | 3 | 1 |
| Not specified | 77 | 36 |

Case 8:26-cv-01697-MRA-ADS Document 43-7 Filed 08/25/26 Page 75 of 100 Page ID #:1510


Among the 204 shootings in which information about the nature of the wounds was available, 17 were to the head or face, 21 to the chest or abdomen, 5 to the back, 53 to an arm, and 104 to a leg. Most victims had only a single wound. Of those for whom the ED disposition was recorded, 48 were admitted, 1 was transferred to another hospital, and 52 were discharged home. Three were pronounced dead in the ED.

Enough information was available to characterize incident circumstances in 122 cases (57% of the total). All but 6 of these fell into 1 or more of 3 broad categories of causation: preventable by safe storage, preventable by safer handling, or preventable by safer design (Table 3). Seventeen shootings (14% of those analyzed) occurred when one or more children younger than 18 years of age gained unsupervised access to a gun. Almost all of the firearms involved in these incidents were stored unlocked and loaded. The parents of one victim kept their gun in a combination safe, but the child discovered the combination on a slip of paper.

Ninety shootings (74% of those analyzed) were attributed to mishandling of the firearm. Eighteen occurred while the owner was cleaning the gun or clearing a jammed round, 42 occurred while the user was playing with or showing off the gun, and 30 occurred when the user moved, fumbled, or dropped (but then caught) the gun.

Thirty-nine shootings (32% of those analyzed) were attributed to potential deficiencies in the firearm's design. In 17 cases, the investigating officer specifically noted that the shooter was unaware that the weapon was loaded. A loaded chamber indicator is designed to alert the user that a round is in the chamber.[4] Six shootings occurred while the pistol's magazine was removed, possibly giving the handler the mistaken impression that the weapon was unloaded. A magazine safety is designed to block the trigger when the magazine is removed to prevent discharge of a round retained in the chamber.[4] Nineteen shootings occurred when the gun was dropped or struck a hard surface. A firing pin block, also known as a "drop safety device," is designed to prevent a gun's firing pin from contacting the cartridge if the weapon is dropped or struck against a hard surface.[4]

Reviewers independently agreed on 98.2% of cases regarding exclusion because of lack of sufficient information. Complete agreement was reached on 94% of cases that were judged to be potentially preventable by safer storage, 78% of cases that were judged potentially preventable by safer handling, and 85% of cases that were judged to be potentially preventable by basic mechanical safety features. When disagreement occurred, there was a clear majority view in all but a handful of cases (2%, 6%, and 2%, respectively). Almost all of these initial disagreements were the result of a reviewer inadvertently overlooking a relevant fact or term in the police narrative. Once these were identified, complete agreement was reached on better than 99% of cases in each category.

**Table 3.**
*Unintentional firearm injuries in metropolitan Atlanta, GA: Analysis of incidents and their causes.**

| Category | No. | % | 95% CI, % | Lower Limit (Sensitivity Analysis),† % |
|---|---|---|---|---|
| Preventable by safer storage | 17 | 14 | 8–20 | 4 |
| Preventable by safer handling | 90 | 74 | 66–82 | 35 |
| Preventable by safer design | 39 | 32 | 24–40 | 13 |

*The total number of cases is 122. Categories are not mutually exclusive, and therefore, the total exceeds 100%.
†The sensitivity analysis assumed that the lower CI was correct and that none of the cases for which there was insufficient information were preventable in any way.

## DISCUSSION

Unintentional firearm injuries accounted for a small fraction of firearm-related fatalities in our community during the study interval but caused a somewhat larger percentage of nonfatal injuries (0.2% and 3.9%, respectively). Most of the victims were male patients between 15 and 34 years of age. An incident-based analysis revealed several options for prevention, including promoting safer storage of guns in the home, teaching safe handling of firearms, and incorporating basic safety features into new gun designs.[4,5,11-13]

Approximately 40% of US households contain 1 or more firearms.[14] The average gun-owning household contains 4.[15] Between one fourth and one third of gun-owning households contain at least 1 handgun.[14-16] Rates of firearm ownership are greater in rural areas and small towns, but households in urban areas are more likely to contain handguns.[16] The rate of gun ownership in metropolitan Atlanta is similar to that noted in other metropolitan areas of the south and west.[17]

Persons who keep a firearm for protection are much more likely to store the weapon loaded and readily available than people who own firearms for other reasons.[8,14,16,18,19] However, keeping an unlocked and loaded gun in the home violates a central tenet of firearm safety. The National Rifle Association's "A Parent's Guide to Gun Safety" advises owners to "always keep the gun unloaded until ready to use" and to "store guns so that they are inaccessible to children and other unauthorized users."[11] The *Clinician's Handbook of Preventive Services* echoes this admonition.[12] There is evidence that few gun dealers share this advice with customers, even those with young children.[20] In any case, many gun-owning parents store their firearms in an unsafe manner.[19,21-24]

When children find a gun, they often play with it. Jackman et al[25] placed pairs and trios of 8- to 12-year-old boys in a room with a 1-way mirror and observed them for 15 minutes. An actual .38 caliber pistol, altered so it could not be fired, was concealed in a drawer. Instead of a magazine of bullets, the pistol contained a radio transmitter that activated a light whenever the trigger was pressed with enough force to discharge the weapon. Of the 29 groups tested, 21 discovered the gun within 15 minutes of being placed in the room. Members of 16 (76%) groups handled the gun, and 1 or more members of 10 (48%) groups pulled the trigger. During subsequent questioning, nearly half of the boys said that they were unsure whether the gun was real or a toy. More than 90% reported having prior gun safety instruction. Hardy et al[26] observed a group of young children and noted that when they were left unsupervised around guns, they touched and played with them, despite clear instructions not to do so.

When children gain unsupervised access to a gun, the consequences can be tragic. Wintemute et al[27] studied fatal shootings of children by children in California and noted that more than half occurred when children played with a loaded gun they found in the home. Grossman et al[28] studied unintentional and self-inflicted firearm injuries of children in Seattle and noted that many involved a gun found in the victim's home or the home of a relative or friend.

In hopes of teaching young children to avoid touching a gun if they find one, the National Rifle Association developed the Eddie Eagle program.[29] Although the curriculum has reportedly been taught to more than 12 million children in 10,000 schools, it has not been objectively evaluated to confirm that it is effective.[30]

Adult training programs are not very effective at encouraging safe storage of guns in the home. Weil and Hemenway[16] surveyed 605 adult gun owners and found that those who had received firearms training were no more likely to store their guns safely than those who did not. Cook and Ludwig[14] analyzed responses to an independent survey of more than 1,600 gun owners and obtained similar findings. They did note, however, that gun owners trained by the National Safety Council were somewhat more likely to report storing their gun safely than those trained by other organizations.

Several states enacted laws that hold the owner responsible if a child gains access to the gun and is injured to promote safe storage of guns. An evaluation of these child access prevention laws concluded that enactment was associated with a 23% decrease in the rate of unintentional firearm-related deaths of children younger than 15 years of age.[31] However, another group studied the effect of child access prevention laws in the 15 states in which they were in effect and found evidence of effect in only one, Florida.[32]

Safe handling might have prevented 66% to 82% of the unintentional shootings in our study. Firearm safety training programs emphasize several worthwhile concepts, including "always keep the gun pointed in a safe direction" and "always keep your finger off the trigger until ready to shoot."[33] Trainees are taught to assume

that every firearm is loaded unless they can personally verify that it is unloaded by inspecting the chamber.

Despite the intuitive appeal of firearm safety training, researchers have found that education alone is often ineffective at promoting safe behavior, particularly when it involves a complex series of actions.[34,35] Not surprisingly, the demographic group at greatest risk of unintentional injury (ie, young men) is also the group that is least receptive to safety training.[35] First-time applicants for a driver's license are required to demonstrate their ability to safely operate a motor vehicle, but first-time purchasers of a firearm are not required to learn or demonstrate safe handling skills.[36]

Little thought has been given to the idea of making safer guns.[37] In 1988, the US General Accounting Office studied the extent to which child-proof safety devices or a loaded chamber indicator could prevent firearm-related deaths.[5] Researchers randomly selected 107 fatal unintentional shootings from urban and rural jurisdictions across the United States and reviewed the case files to characterize each event. On the basis of the incident narratives, they concluded that a loaded chamber indicator might have prevented 23% of the deaths and that a child-proof safety device might have prevented another 8%. The remaining deaths were either judged to be nonpreventable by these 2 strategies, or the data were insufficient to make a determination. Other safety devices were not considered.

We found evidence that loaded chamber indicators, magazine safeties, and firing pin blocks might have prevented as many as one third of the unintended shootings in our series. Widespread adoption of these safety features, plus routine use of devices that prevent unauthorized child access, might have prevented as many as 46% of the unintended shootings in our series.

It is possible that other safety devices might have prevented additional shootings. For example, a grip safety device automatically locks the pistol's trigger mechanism unless the weapon's grip is properly grasped. A positive safety device is designed to prevent the firearm from being discharged unless it is purposefully disengaged.[4] These devices might have prevented some of the shootings attributed to mishandling.

Emerging technologies could produce even safer guns.[37] It should be possible, for example, to design a firearm that can be easily fired by adults but not by young children. Widespread adoption of child-resistant aspirin bottles prevented many unintentional poisonings; widespread adoption of child-resistant firearms might prevent many unintentional shootings.[37,38]

The technology exists to manufacture personalized handguns that can only be fired by their owners.[37-39] Personalized guns would be particularly useful for law enforcement because a surprising number of officers are shot and killed each year by an offender who grabs their service weapons.[40]

Despite the potential benefits of safer gun designs, there is no impetus for the gun industry to adopt them. Federal law specifically exempts domestic handgun manufacturers from consumer product safety regulations. The public is largely unaware of this fact. Half of the respondents in 2 recent polls by the National Opinion Research Center expressed the belief that all or some guns are regulated for safety.[18] Sixty-eight percent of respondents, including 64% of gun-owning respondents, supported the idea of "government safety regulations for the design of guns." Remarkably, 94% of respondents (including fully 93% of those who own guns) agreed that "handguns made in the United States should be required to meet the same federal safety and quality standards as imported handguns." Eighty-eight percent of respondents to the National Opinion Research Center surveys, including 80% of gun-owning respondents, endorsed the idea that new handguns should be legally required to be child-resistant. Seventy-one percent of respondents (including 59% of gun owners) agreed with the statement, "All new handguns should be personalized."[18]

There are several limitations in our study. First, the system we used to identify cases relied on voluntary reporting. Three sources of data were used to maximize rates of detection: a 1-page incident report faxed from area hospital EDs, county medical examiner's case files, and police offense reports from local law enforcement agencies.[10] Between May 1996 and December 1998, an audit revealed that 13% of ED reports submitted to our

Case 8:26-cv-01697-MRA-ADS Document 43-7 Filed 08/25/26 Page 78 of 100 Page ID #:1513


system could not be matched with a corresponding police report.[10] This strategy minimized the potential for missed cases, but it could not eliminate it entirely.[41] Individuals who did not disclose their injury to the police or seek care in an ED, as well as those who were treated in an ED but not reported, would not be detected by using our system.

Misclassification can occur in any retrospective study. Our data on causation are only as good as the police reports on which they are based.[3,41] To minimize misclassification, we manually reviewed each case before including it in our series. Twenty-one shootings initially classified as unintentional were subsequently reclassified as intentional or indeterminate and excluded from our analysis.

Missing data complicated our efforts to categorize the circumstances involved in these shootings. No police report was available for 95 of the cases reported by ED personnel. Even when a police report was secured, the documentation was sometimes too sketchy to accurately characterize the event. At the outset of the study, we had hoped to identify the specific make and model of firearm involved in these shootings to confirm whether it lacked specific safety features. Unfortunately, investigating officers rarely documented the specific make and model in their offense reports.

Finally, our findings are limited to a single 5-county metropolitan area of a major southern city and might not be applicable to major cities in other parts of the country, much less to smaller communities or rural areas. For example, only 3 of our incidents were linked to hunting. Nationwide, as many of one fifth of all unintentional shootings are related to hunting.

Nonetheless, our results support 2 important conclusions. First, almost all of the unintended shootings we studied could be attributed to 1 or more of 3 factors: child access, mishandling of the firearm, and deficiencies in design. All 3 causes might be amenable to intervention. Nearly half the shootings might have been prevented if the gun involved had incorporated 3 simple mechanical safety features—a loaded chamber indicator, a grip safety, and a firing pin block—and had been kept inaccessible to children. Most of the remaining incidents might have been prevented if the handler had followed the most basic safety rules. Identifying which strategy or which combination of strategies is most effective will require further research.

This study would not have been possible without access to data from a regional firearm injury reporting system. A nationwide system of this sort, with attention paid to prospective collection of high-quality data, could generate invaluable information about the circumstances, location, and contributing factors involved in thousands of shootings each year.[42] The reports produced would not only be useful to local and state law enforcement, they would also be useful to firearm safety instructors, gun enthusiasts, gun industry executives, and others interested in preventing deaths and injuries caused by firearms.

Author contributions: The study was initially conceived, designed, and piloted by ALK, TRS, and KB. Revision of the study design was made by RBI, AR, and ALK. Final data collection and abstraction was performed by RBI and AR. Analysis and coding of each case was performed by RBI, AR, RA, and ALK. Data entry and verification was carried out by RBI and AR. Statistical analysis was carried out by RBI, with assistance from AR. All of the authors had input into the final manuscript, which was largely written by RBI, AR, RA, and ALK. RBI and ALK take responsibility for the paper as a whole.

Received for publication March 28, 2002. Revision received August 28, 2002. Accepted for publication September 3, 2002.

The views expressed are those of the authors and do not necessarily reflect those of the funding organizations or Emory University.

Supported by grants from the National Institute of Justice (#95-IJ-CX-0025), the John D. and Catherine T. MacArthur Foundation, and the Funder's Cooperative.

**Address for reprints:** Arthur L. Kellermann, MD, MPH, Center for Injury Control, Rollins School of Public Health, Emory University, 1518 Clifton Road, NE, Atlanta, GA 30322; E-mail akell01@emory.edu.

## REFERENCES

1. National Center for Injury Prevention and Control. 1999, United States: firearm deaths and rates per 100,000. Available at: http://webapp.cdc.gov/sasweb/ncipc/mortrate10.html. Accessed August 4, 2002.

2. Sinauer N, Annest JL, Mercy JA. Unintentional, nonfatal firearm-related injuries. A preventable public health burden. *JAMA.* 1996;275:1740-1743.

3. Kellermann AL, Rivara FP, Lee RK, et al. Injuries due to firearms in three cities. *N Engl J Med.* 1996;335:1438-1444.

4. Karlson T, Hargarten S. *Reducing Firearm Injury and Death: A Public Health Sourcebook.* New Brunswick, NJ: Rutgers; 1997.

5. US General Accounting Office. *Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented.* Washington, DC: US General Accounting Office; 1991.

6. Cook PJ, Lawrence BA, Ludwig J, et al. The medical costs of gunshot injuries in the United States. *JAMA.* 1999;282:447-454.

7. Max W, Rice DP. Shooting in the dark: estimating the cost of firearm injuries. *Health Aff (Millwood).* 1993;12:171-185.

8. Sadowski LS, Munoz SR. Nonfatal and fatal firearm injuries in a rural county. *JAMA.* 1996;275:1762-1764.

9. Cole TB, Patetta MJ. Hunting firearm injuries, North Carolina. *Am J Public Health.* 1988;78:1585-1586.

10. Kellermann A, Bartolomeos K, Fuqua-Whitley D, et al. Community-level firearm injury surveillance: local data for local action. *Ann Emerg Med.* 2001;38:423-429.

11. National Rifle Association. A parent's guide to gun safety. Available at: http://www.nra.org. Accessed November 10, 1998.

12. Office of Disease Prevention and Health Promotion, Public Health Service, United States Department of Health and Human Services. *Clinician's Handbook of Preventive Services: Putting Prevention into Practice.* Washington, DC: US Government Printing Office; 1994.

13. Robinson KD, Teret SP, Vernick JS, et al. *Personalized Guns: Reducing Gun Deaths Through Design Changes.* 2nd ed. Baltimore, MD: The Johns Hopkins Center for Gun Policy and Research; 1998.

14. Cook P, Ludwig J. *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use.* Washington, DC: Police Foundation; 1996.

15. Wright J. Ten essential observations on guns in America. *Society.* 1995;32:63-68.

16. Weil DS, Hemenway D. Loaded guns in the home. Analysis of a national random survey of gun owners. *JAMA.* 1992;267:3033-3037.

17. Kellermann AL, Fuqua-Whitley DS, Sampson TR, et al. Public opinion about guns in the home. *Inj Prev.* 2000;6:189-194.

18. Teret SP, Webster DW, Vernick JS, et al. Support for new policies to regulate firearms. Results of two national surveys. *N Engl J Med.* 1998;339:813-818.

19. Stennies G, Ikeda R, Leadbetter S, et al. Firearm storage practices and children in the home, United States, 1994. *Arch Pediatr Adolesc Med.* 1999;153:586-590.

20. Sanguino SM, Dowd MD, McEnaney SA, et al. Handgun safety: what do consumers learn from gun dealers? *Arch Pediatr Adolesc Med.* 2002;156:777-780.

21. Senturia YD, Christoffel KK, Donovan M. Gun storage patterns in US homes with children. A pediatric practice-based survey. *Arch Pediatr Adolesc Med.* 1996;150:265-269.

22. Webster DW, Wilson MEH, Duggan AK, et al. Parents' beliefs about preventing gun injuries to children. *Pediatrics.* 1992;89:908-914.

23. Becher EC, Christakis NA. Firearm injury counseling: are we missing the mark? *Pediatrics.* 1999;104:530-534.

24. Farah MM, Simon HK, Kellermann AL. Firearms in the home: parental perceptions. *Pediatrics.* 1999;104:1059-1063.

25. Jackman GA, Farah MM, Kellermann AL, et al. Seeing is believing: what do boys do when they find a real gun? *Pediatrics.* 2001;107:1247-1250.

26. Hardy MS, Armstrong FD, Martin BL, et al. A firearm safety program for children: they just can't say no. *J Dev Behav Pediatr.* 1996;17:216-221.

27. Wintemute GJ, Teret SP, Kraus JF, et al. When children shoot children: 88 unintended deaths in California. *JAMA.* 1987;257:3107-3109.

28. Grossman DC, Reay DT, Baker SA. Self-inflicted and unintentional firearm injuries among children and adolescents: the source of the firearm. *Arch Pediatr Adolesc Med.* 1999;153:875-878.

29. National Rifle Association. NRA's Eddie Eagle program. Available at: http://www.nra.org/eddie/eddiemain.html. Accessed November 2, 2001.

30. Fairfax V. Eddie Eagle elementary gun safety education program. In: Bilchik S, ed. *Promising Strategies to Reduce Gun Violence.* Washington, DC: Office of Juvenile Justice and Delinquency Prevention, US Department of Justice; 1999. Available at: http://ojjdp.ncjrs.org/pubs/gun_violence/profile49.html. Accessed December 10, 2002.

31. Cummings P, Grossman DC, Rivara FP, et al. State gun safe storage laws and child mortality due to firearms. *JAMA.* 1997;278:1084-1086.

32. Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional firearm deaths among children. *Pediatrics.* 2000;106:1466-1469.

33. Brown R, Goldman L. *Physician Firearm Safety Guide.* Chicago, IL: American Medical Association; 1998.

34. Haddon W. The changing approach to the epidemiology, prevention and amelioration of trauma: the transition to approaches etiologically rather than descriptively based. *Am J Public Health.* 1968;58:1431-1438.

35. Kellermann A, Todd K. Injury control. In: Tintinalli JE, Kelen GD, Stapczynski JS, eds. *Emergency Medicine: A Comprehensive Study Guide.* 5th ed. New York, NY: McGraw-Hill; 1999:1735-1738.

36. Koop CE, Lundberg GB. Violence in America: a public health emergency. Time to bite the bullet back [editorial] [published errata appear in *JAMA.* 1992;268:3074 and 1994;271:1404]. *JAMA.* 1992;267:3075-3076.

37. Association of Trial Lawyers of America, Johns Hopkins Center for Gun Policy and Research. *Guns: A Public Health Approach; Making Changes in Making Guns.* Washington, DC: Johns Hopkins Center for Gun Policy and Research; 1995.

38. Kellermann AL, Holliger E. Firearm-related injuries. In: Bernstein E, Bernstein J, eds. *Case Studies in Emergency Medicine and Health of the Public.* Boston, MA: Jones and Bartlett; 1996:247-257.

39. Weiss D. *Smart Gun Technology Project Final Report.* Washington, DC: US Department of Justice; 1996.

40. Wintemute GJ. Homicide, handguns, and the crime gun hypothesis: firearms used in fatal shootings of law enforcement officers, 1980 to 1989. *Am J Public Health.* 1994;84:561-564.

41. Kellermann AL, Bartolomeos KK. Firearm injury surveillance at the local level: from data to action. *Am J Prev Med.* 1998;15:109-112.

42. Barber C, Hemenway D, Hargarten S, et al. A "call to arms" for a national reporting system on firearm injuries. *Am J Public Health.* 2000;90:1191-1193.

**EXHIBIT D**

ORIGINAL ARTICLE

# Unintentional and undetermined firearm related deaths: a preventable death analysis for three safety devices

**J S Vernick, M O'Brien, L M Hepburn, S B Johnson, D W Webster, S W Hargarten**

*Injury Prevention* 2003;**9**:307–311

**Objective:** To determine the proportion of unintentional and undetermined firearm related deaths preventable by three safety devices: personalization devices, loaded chamber indicators (LCIs), and magazine safeties. A personalized gun will operate only for an authorized user, a LCI indicates when the gun contains ammunition, and a magazine safety prevents the gun from firing when the ammunition magazine is removed.
**Design:** Information about all unintentional and undetermined firearm deaths from 1991–98 was obtained from the Office of the Chief Medical Examiner for Maryland, and from the Wisconsin Firearm Injury Reporting System for Milwaukee. Data regarding the victim, shooter, weapon, and circumstances were abstracted. Coding rules to classify each death as preventable, possibly preventable, or not preventable by each of the three safety devices were also applied.
**Results:** There were a total of 117 firearm related deaths in our sample, 95 (81%) involving handguns. Forty three deaths (37%) were classified as preventable by a personalized gun, 23 (20%) by a LCI, and five (4%) by a magazine safety. Overall, 52 deaths (44%) were preventable by at least one safety device. Deaths involving children 0–17 (relative risk (RR) 3.3, 95% confidence interval (CI) 2.1 to 5.1) and handguns (RR 8.1, 95% CI 1.2 to 53.5) were more likely to be preventable. Projecting the findings to the entire United States, an estimated 442 deaths might have been prevented in 2000 had all guns been equipped with these safety devices.
**Conclusion:** Incorporating safety devices into firearms is an important injury intervention, with the potential to save hundreds of lives each year.

See end of article for authors' affiliations

Correspondence to: Jon S Vernick, Johns Hopkins Bloomberg School of Public Health, Center for Gun Policy and Research, 624 N Broadway, Baltimore, MD 21205, USA; JVernick@jhsph.edu

Rather than relying exclusively on changing the behavior of the users of dangerous products, injury prevention efforts have also focused on changing the design of the product itself to make it safer.[1] Of consumer products in the United States, firearms are among the most deadly. From 1990 to 1999, there were more than 12 000 unintentional firearm related deaths in the United States, with an additional 4000 deaths in the "undetermined" category.[2] Yet firearms can be designed with built-in safety features that may prevent at least some of these deaths.[3]

Injury prevention efforts to improve the safe design and manufacture of guns have concentrated primarily on three safety technologies: (1) personalization devices, (2) loaded chamber indicators (LCIs), and (3) magazine safeties. A personalized gun is a firearm that will fire only for an authorized user. This can be accomplished through a variety of user-recognition technologies—for example, fingerprint readers—that can be built into the design of the gun. Unless the firearm recognizes its authorized user, it is unable to fire.[4 5]

A LCI is a device designed to indicate that the gun's firing chamber contains ammunition.[6] LCIs are intended to prevent firearm related deaths where the gun's operator did not know the gun was loaded. At present, loaded chamber indicators are included on about 10%–20% of new pistol models.[6 7] However, existing loaded chamber indicators generally consist of a small raised lever or button on the gun, with no additional markings to convey its meaning. Patents exist, however, for LCIs that would be far easier for operators to understand.[6] A magazine safety (sometimes also called a magazine disconnect safety) blocks a semiautomatic pistol from firing when its ammunition magazine is removed, even if there is still a round in the chamber.[8]

Although all three of these safety devices have been widely discussed and promoted in both the public health and popular literature, there have been few attempts to quantify their potential benefits. The United States General Accounting Office estimated that 23% of a sample of unintentional deaths were preventable by a loaded chamber indicator and 8% by a childproofing device.[9] The childproofing device considered in the General Accounting Office study was intended to prevent discharge by young children only (age <6), and therefore was not a personalized gun. Similarly, Ismach and colleagues concluded that in 14% of the incidents in their sample of mostly non-fatal firearm injuries the shooter was unaware that the gun was loaded; in 5% the handgun's ammunition magazine had been removed just before the shooting.[10] From a North Carolina sample, Cherry and colleagues determined that the shooter believed the gun was unloaded in 39 of 187 (21%) unintentional firearm related deaths.[11]

Using data from Maryland and Milwaukee, Wisconsin, this study examines the proportion of certain firearm related deaths that might be preventable by each of the three major safety devices. By including personalization technology, our analysis allows for a comparison of the relative benefits of the different devices.

## METHODS

### Data sources

Information about firearm related deaths was obtained from two primary sources: the Maryland Office of the Chief Medical Examiner, and the Wisconsin Firearm Injury Reporting System (FIRS). We reviewed the case files for all

**Abbreviations:** CI, confidence interval; FIRS, Firearm Injury Reporting System; LCI, loaded chamber indicator; RR, relative risk

Inj Prev: first published as 10.1136/ip.9.4.307 on 23 December 2003. Downloaded from http://injuryprevention.bmj.com/ on January 5, 2023 by guest. Protected by copyright.

Case 8:26-cv-01697-MRA-ADS Document 43-7 Filed 08/25/26 Page 82 of 100 Page ID #:1517


unintentional and undetermined firearm related deaths in Maryland and Milwaukee County for 1991–98. These files include information obtained from medical examiner investigations, police files, and crime laboratory reports. For each firearm related death, we abstracted a variety of information about the victim, shooter, weapon, and circumstances of the death. Deaths associated with non-powder firearms (for example, airguns and bb guns) were excluded. The combined dataset represents a convenience sample based on the ease of obtaining the data, their relative quality and completeness, and the value of increasing the overall sample size.

Medical examiners sometimes code certain, seemingly unintentional, deaths as homicides (rather than ''accidents'') where the gun's trigger is intentionally pulled, even if the shooter did not intend to cause the death of the victim.[12 13] This may be based on a technical, rather than intent based, definition of a homicide as one where the actions of one person result in the death of another. Therefore, using the Wisconsin surveillance system (FIRS), we separately identified those ''homicides'' in Milwaukee County where (1) the circumstances of the death indicated an accidental firing—such as playing with or cleaning a firearm and (2) the Federal Bureau of Investigation's Supplemental Homicide Reports data similarly coded the death as a ''negligent manslaughter''.[14] In the absence of a comparable surveillance system, it would have been much more difficult to conduct a similar analysis of Maryland homicides.

Preliminary analyses of these negligent homicides in Milwaukee indicated that, as expected, their circumstances were very similar to both the accidental and undetermined deaths in Milwaukee County. Similarly, unintentional and undetermined deaths, as well as the combined data for Maryland and Milwaukee shared comparable age, sex, and type of gun characteristics. Our assessment of the circumstances of these deaths also suggested that the events surrounding unintentional and undetermined deaths were very similar. For these reasons, and to increase the precision of our point estimates, subsequent analyses combine the data from Maryland and Milwaukee.

Suicides and non-negligent homicides are not included in this analysis. Medical examiner and police records rarely contained detailed information about the circumstances of the death (for the suicides), or whether the shooter was the owner or an authorized user of the gun (for homicides). In addition, the factors associated with preventability may have been different for these intentional deaths.

### Definition of a ''preventable'' death

Our primary goal was to estimate the proportion of the firearm related deaths in our sample that might have been prevented by one or more of the three safety devices. For each case, two reviewers (JV, MO) applied a set of rules to code the death as (1) ''preventable'', (2) ''possibly preventable'', or (3) ''not preventable''. The very small number of cases where reviewers disagreed were resolved by a third reviewer (SJ) or by consensus.

For LCIs, a death was coded as preventable only if the case file indicated *clear* evidence that the shooter did not realize the gun was loaded at the time of the shooting. Usually this was based on unambiguous statements of witnesses interviewed by the police. In addition, the shooter must be old enough to understand the message to be conveyed by a LCI; to be conservative in this regard, we established a minimum age of 10. We coded the death as possibly preventable if there was only *some* evidence that the shooter thought the gun was unloaded. We assume (based on patent information) that such devices could be applied to any firearm, and can be designed so that even an untrained user would understand that the gun was loaded.

For personalized guns, a death was considered preventable if there was clear evidence in the case file that the shooter was not the owner or authorized user of the gun. For example, personalized guns can prevent deaths where the shooter is below the legal age for gun ownership—by definition an unauthorized user. We recognize that this assumes that adult owners of personalized handguns will not provide them to children, an assumption that might not always be correct. We coded deaths as ''possibly'' preventable by personalized guns when the case file indicated some evidence that the shooter was not an authorized user.

For magazine safeties, our preventability criteria required clear evidence that the shooter removed the ammunition magazine from a semiautomatic pistol immediately before the shooting. Where there was less clear evidence, the deaths were coded as possibly preventable.

For all of the devices, we conservatively coded the death as ''not preventable by safety devices'' if it did not meet any of the above criteria. It is important to recognize that characterizing a death as ''preventable'' does *not* mean that it would certainly have been prevented by the relevant safety device—only that, applying our rules, we determine that the death *could* have been prevented.

### Analyses

Applying our criteria, for each of the safety devices we calculate the proportion of the deaths in our sample that fit the three categories of preventability. We also conducted bivariate analyses of deaths coded as preventable, compared with those coded as not preventable, to examine factors associated with differences between these two groups. To test the statistical significance of these bivariate analyses, $\chi^2$ tests of independence, calculation of relative risks, and confidence intervals were used. Finally, extrapolating from our data, we calculate the number of lives that might be saved in the United States by these devices.

## RESULTS

There were a total of 117 unintentional, undetermined, and negligent homicide deaths in our data set for 1991 to 1998, 66 in Maryland and 51 in Milwaukee (see table 1). Males (91%) and persons aged 0–20 (53%) represent the majority of the decedents. Handguns were involved in 81% of the deaths, with roughly equal proportions of pistols and revolvers. Among the circumstances of the incident, ''playing with or showing the gun to others'' (51%), and ''handling or transporting the gun'' (21%) represented nearly three quarters of all deaths.

Among all deaths, 43 (37%) met our criteria for being ''preventable'' by a personalized gun, 23 (20%) by a loaded chamber indicator, and five (4%) by a magazine safety. A smaller proportion of deaths for each device were classified as ''possibly preventable'' (see table 2).

Overall, 52 of the deaths (44%, 95% confidence interval (CI) 35% to 53%) fit our criteria as preventable by at least one of the devices. Some were preventable by more than one device. Importantly, there was no statistically significant difference in overall preventability by site ($\chi^2 = 0.74$, $p = 0.39$), reinforcing our decision to combine the Maryland and Milwaukee data for analysis. Also, no type of death was significantly more likely to be preventable than any other, whether unintentional, undetermined, or negligent homicide ($\chi^2 = 0.14$, $p = 0.93$). Again, this suggests that the relevant characteristics of these deaths are similar enough to justify combining the data for our purposes.

In the bivariate analyses, we compared preventable with non-preventable deaths, excluding those that were only ''possibly'' preventable. In these analyses, several characteristics of the deaths were associated with higher proportions

Inj Prev: first published as 10.1136/ip.9.4.307 on 23 December 2003. Downloaded from http://injuryprevention.bmj.com/ on January 5, 2023 by guest. Protected by copyright.

Case 8:26-cv-01697-MRA-ADS Document 43-7 Filed 08/25/26 Page 83 of 100 Page ID #:1518


**Table 1** Selected characteristics of unintentional, undetermined, and negligent homicide firearm related deaths in Maryland and Milwaukee, 1991–98

| Variable* | No (%) |
|---|---|
| Age (years) | |
| 0–17 | 46 (39) |
| 18–20 | 16 (14) |
| 21–40 | 37 (32) |
| 41+ | 18 (15) |
| Sex | |
| Male | 107 (91) |
| Female | 10 (9) |
| Race | |
| White | 60 (51) |
| Black | 54 (46) |
| Other | 3 (3) |
| Site/type of death | |
| *Maryland (n = 66)* | |
| Unintentional | 20 (30) |
| Undetermined | 46 (70) |
| *Milwaukee (n = 51)* | |
| Unintentional | 13 (25) |
| Undetermined | 12 (24) |
| Negligent homicide | 26 (51) |
| Circumstance | |
| Cleaning | 3 (3) |
| Handling/transporting/loading/unloading | 25 (21) |
| Hunting | 6 (5) |
| Miscellaneous/other | 5 (4) |
| Playing with/showing gun to others | 60 (51) |
| Thought safety was on/problem with safety | 4 (3) |
| Unknown | 14 (12) |
| Type of gun | |
| *Handgun (n = 95)* | |
| Pistol | 42 (36) |
| Revolver | 45 (38) |
| Unknown/other | 8 (7) |
| *Long gun (n = 19)* | |
| Rifle | 9 (8) |
| Shotgun | 10 (9) |
| *Missing (n = 3)* | |

*Age, sex, and race data refer to the decedent, whether or not the decedent is also the shooter. Circumstance and type of gun refer to characteristics of the event.

**Table 2** Number (%) of preventable firearm deaths by various safety devices in Maryland and Milwaukee, 1991–98

| | Personalized gun | LCI | Magazine safety | Any of three safety devices* |
|---|---|---|---|---|
| Preventable | 43 (37) | 23 (20) | 5 (4) | 52 (44) |
| Possibly preventable† | 13 (11) | 15 (13) | 3 (3) | 19 (16) |
| Not preventable by safety devices | 61 (52) | 79 (68) | 109 (93) | 46 (39) |
| Total | 117 (100) | 117 (100) | 117 (100) | 117 (100) |

*Because the same death may be preventable by more than one device, figures in this column are *not* the sum of the other three columns.
†For personalized guns, this category includes deaths where the shooter was not in immediate control of the firearm when it discharged (for example, a firearm that discharged when dropped from a tree stand while hunting). For loaded chamber indicators (LCIs), this category includes so-called Russian roulette shootings (a LCI might eliminate the element of chance from this activity).

**Table 3** Proportion of deaths preventable by at least one safety device, by selected variable categories, and results of $\chi^2$ tests of independence for each category

| Variable | Percent preventable | p Value for $\chi^{2}$* |
|---|---|---|
| Age (years) | | <0.001 |
| 0–17 | 88 | |
| 18–20 | 62 | |
| 21–40 | 19 | |
| 41+ | 13 | |
| Type of gun | | <0.001 |
| Handgun | 62 | |
| Long gun | 8 | |
| Circumstance | | <0.001 |
| Hunting | 33 | |
| Handling/transporting/loading | 27 | |
| Playing with/showing gun to others | 80 | |
| Thought safety was on/problem with safety | 50 | |
| Unknown | 23 | |

*For each of the variables (age, type of gun, circumstance), the $\chi^2$ tests the null hypothesis that the proportion of preventable firearm related deaths across the appropriate subcategories (that is, the different age, type of gun, and circumstance groupings) is the same.

of preventability (see table 3). Incidents where the decedent was aged 0–17 were three times as likely to be preventable (relative risk (RR) 3.3, 95% CI 2.1 to 5.1) as those involving all older persons. Deaths involving handguns were eight times as likely to be preventable (RR 8.1, 95% CI 1.2 to 53.5) as those involving long guns. Among the circumstances of the incident, deaths that involved "playing with or showing the gun to others" were most likely to be preventable (RR 3.2, 95% CI 1.9 to 65.3).

Based on our estimates of the proportion of deaths preventable by any safety device (44%, 95% CI 35% to 53%), we can calculate the number of lives that might be saved if all firearms had all three devices. In 2000, there were 776 unintentional firearm deaths in the United States. Applying our results yields an estimate of 341 unintentional deaths (95% CI 272 to 411) that might have been prevented. There were also 230 firearm deaths of undetermined intent in 2000, producing an estimate of 101 preventable deaths (95% CI 81 to 122) in this category. Combining these data, 442 lives might have been saved in 2000 if all firearms had all three safety devices (95% CI 353 to 533).

## DISCUSSION

Overall, more than 40% of the firearm related deaths in our sample were preventable by at least one of the three safety devices. Providing all three of these devices in all firearms could save more than 400 lives each year. Other research suggests that there would also be significant cost savings associated with preventing firearm related deaths, both for the victims' families and for the community as a whole.[15 16] Of course, any assessment of the desirability of the devices should weigh the benefits in lives saved (and injuries averted) against the costs to consumers of providing or requiring the devices.

Our conclusion that 20% of the deaths were preventable by a LCI is convincingly close to prior research, falling between the General Accounting Office's 23% figure, and Ismach *et al*'s 14%. No prior research has examined the proportion of deaths preventable by a personalized gun. Yet our results suggest that personalized guns may be among the most beneficial firearm safety design changes for the future.

However, personalized guns are not uniformly supported by gun control advocates. In fact, some have argued that increased availability of these guns may even be counterproductive.[17] Our research can help clarify the risk-benefit

Inj Prev: first published as 10.1136/ip.9.4.307 on 23 December 2003. Downloaded from http://injuryprevention.bmj.com/ on January 5, 2023 by guest. Protected by copyright.

Case 8:26-cv-01697-MRA-ADS Document 43-7 Filed 08/25/26 Page 84 of 100 Page ID #:1519


equation for these guns by providing better information about how many lives might be directly saved by personalized guns. For loaded chamber indicators and magazine safeties, these concerns are minimized because potential gun buyers already have the option to purchase guns with these features.

Just 4% of the deaths in our sample were preventable by a magazine safety. The action of removing the ammunition magazine from a pistol prior to the shooting is apparently less common than other circumstances surrounding firearm related deaths, or at least is less frequently noted in medical examiner and police reports. However, the passive or automatic nature of magazine safeties, coupled with their relatively low price and mechanical simplicity, suggests that these devices remain a useful injury intervention.

Although safer handling or storage of firearms might also have prevented some of the deaths in our sample, this was not the focus of our research. In addition, there is some evidence that it may be quite difficult to alter the firearm handling, ownership, or storage practices of children[18 19] and adults.[20–23]

For the present study we did not examine the safety devices' effects on suicides and non-negligent homicides. Personalized guns, in particular, might prevent youth suicides, and even some homicides where the gun was recently stolen from its owner. Future research, based on newly developed surveillance systems, might therefore yield greater estimates of the number of lives saved by these devices when all deaths are included.

### Limitations

Our study has several limitations. There is inherent uncertainty in any determination of whether some safety device might have prevented any given death. We have tried to minimize some of this uncertainty by establishing reasonably specific rules and by using multiple coders. With data from Maryland and Milwaukee, the generalizability of our findings to other areas or to the United States as a whole is uncertain. However, the comparability of our findings regarding preventability among the two regions, and with other research, suggests that regional variation in preventability within the United States may not be especially great. The age distribution of our sample is somewhat younger than the nation as a whole, though the gender distribution is similar to national data.

As described, we did not include negligent homicides in Maryland. However, the purpose of our analysis was not to determine the raw number of preventable deaths, but the proportion of deaths that might be prevented by the various safety devices. Only if the proportion of negligent homicides in Maryland that were preventable was very different from the rest of the deaths in our sample would their absence affect our results. The similarity in preventability of Milwaukee's negligent homicides with the rest of the deaths suggests that this is probably not the case.

For several reasons, our estimate of the number of lives that might be saved by the three safety devices may be conservative. First, the reported number of unintentional deaths in the United States is likely to be an underestimate since many of these deaths, as in our Milwaukee data, are coded as negligent homicides. Inclusion of these negligent homicides substantially increased the number of Milwaukee cases in our sample. Also, in our calculations of lives potentially saved, we use only those deaths we classified as preventable, not those classified as possibly preventable.

On the other hand, we understand the uncertainties inherent in this or any calculation of possible lives saved under various assumptions. For example, this calculation assumes that the proportion of deaths preventable in our sample would be the same for the United States as a whole. In addition, our lives saved calculations assume that all firearms would have the safety devices. Of course, even if *new* firearms were required to contain the devices, many older guns without the devices would remain in circulation. Therefore, it might be some years before the maximum benefit of the technologies would be felt. We also assume that LCIs can be designed, as a new California law requires, to be understood even by untrained users.[24]

Some might even argue that the inclusion of new safety devices into firearms could result in the loss of lives, for example if the firearm did not function as intended during a defensive gun use, or if the increased cost forced some to forgo the purchase of a gun. Designers of personalized guns attempt to minimize or eliminate any interference with the normal operation of the firearm. LCIs and magazine safeties should result in little change to the operation or cost of a gun. The increased cost of personalized guns, and the impact this might have on purchasing decisions, is not known. In addition, despite the arguments of some researchers,[25] the best available evidence suggests that there are relatively few defensive uses of guns compared with gun related deaths and crimes.[26 27]

## CONCLUSION

Despite the potentially lifesaving benefits of firearm safety technologies, most firearm manufacturers have not provided these devices voluntarily.[6 7] In the United States, the public would support legislation requiring these devices. In one national poll, legislation requiring all new handguns to contain a LCI (73% in favor) or personalization technology (71% in favor) were each supported by a large majority of the respondents.[28]

Certainly, incorporating safety devices into firearms is not the only appropriate strategy for responding to the many different causes of firearm violence. However, examples of successful design changes for other products (such as motor vehicles and prescription drug containers),[29 30] coupled with the results of our study, suggest that product modification should remain an important intervention for firearms as well.

## ACKNOWLEDGEMENTS

The authors gratefully acknowledge funding for this research from the Funders' Collaborative for Gun Violence Prevention. We also thank Allegra Kim for her assistance, and the Offices of the Medical Examiners for Milwaukee and Maryland for collecting and making available the data for this study.

### Key points

- Changing the design of products to make them safer is a proven injury prevention strategy, but for firearms this strategy has not yet been widely adopted.
- For firearms, loaded chamber indicators and magazine safeties are designed to prevent some deaths where the shooter did not know the gun was loaded; personalization devices prevent the gun from being fired by an unauthorized user.
- In this study of the lifesaving potential of these three firearm safety devices, 44% of the deaths in the sample were preventable by at least one of the devices.
- Design changes to firearms have the potential to save hundreds of lives each year in the United States.



Inj Prev: first published as 10.1136/ip.9.4.307 on 23 December 2003. Downloaded from http://injuryprevention.bmj.com/ on January 5, 2023 by guest. Protected by copyright.

**Authors' affiliations**

**J S Vernick, S B Johnson, D W Webster,** Johns Hopkins School of Public Health, Center for Gun Policy and Research, Baltimore, Maryland
**M O'Brien, L M Hepburn,** Harvard School of Public Health, Injury Control Research Center, Cambridge, Massachusetts
**S W Hargarten,** Medical College of Wisconsin, Firearm Injury Center, Milwaukee, Wisconsin

## REFERENCES

1 **National Committee for Injury Prevention and Control**. *Injury prevention: meeting the challenge.* New York, NY: Oxford University Press, 1989:7–8.
2 **Centers for Disease Control and Prevention**. *Web-based Injury Statistics Query and Reporting System (WISQARS).* Available at http://www.cdc.gov/ncipc/osp/data.htm (accessed on 10 April 2003).
3 **Freed LH**, Vernick JS, Hargarten SW. Prevention of firearm-related injuries among youth: a product oriented approach. *Pediatr Clin North Am* 1998;**45**:427–38.
4 **Teret SP**, Culross PL. Product-oriented approaches to reducing youth gun violence. *Future Child* 2002;**12**:119–31.
5 **Teret SP**, Lewin NL. Policy and technology for safer guns: an update. *Ann Emerg Med* 2003;**41**:32–4.
6 **Vernick JS**, Meisel ZF, Teret SP, *et al.* ''I didn't know the gun was loaded'': an examination of two safety devices that can reduce the risk of unintentional firearm injuries. *J Public Health Policy* 1999;**20**:427–40.
7 **Milne JS**, Hargarten SW, Kellermann AL, *et al.* Effect of current federal regulations on handgun safety features. *Ann Emerg Med* 2003;**41**:1–9.
8 **Karlson TA**, Hargarten SA. *Reducing firearm injury and death: a public health sourcebook on guns.* New Brunswick, NJ: Rutgers University Press, 1997:71–2.
9 **United States General Accounting Office**. *Accidental shootings: many deaths and injuries caused by firearms could be prevented.* Washington, DC: United States General Accounting Office, 1991:1–47.
10 **Ismach RB**, Reza A, Ary R, *et al.* Unintended shootings in a large metropolitan area: an incident based analysis. *Ann Emerg Med* 2003;**41**:10–17.
11 **Cherry D**, Runyan C, Butts J. A population based study of unintentional firearm fatalities. *Inj Prev* 2001;**7**:62–5.
12 **Barber CW**, Ozonoff VV, Schuster M, *et al.* Massachusetts weapon-related injury surveillance system. *Am J Prev Med* 1998;**15**(suppl 3):57–66.
13 **Frattaroli S**, Webster DW, Teret SP. Unintentional gun injuries, firearm design, and prevention: what we know, what we need to know, and what can be done. *J Urban Health* 2002;**79**:49–59.
14 **Barber C**, Hemenway D, Hochstadt J, *et al.* Underestimates of unintentional firearm fatalities: comparing Supplementary Homicide Report data with the National Vital Statistics System. *Inj Prev* 2002;**8**:252–6.
15 **Cook PJ**, Ludwig J. *Gun violence: the real costs.* New York, NY: Oxford University Press, 2000:97–115.
16 **Cook PJ**, Lawrence BA, Ludwig J, *et al.* The medical costs of gunshot injuries in the United States. *JAMA* 1999;**282**:447–54.
17 **Sugarmann J**. Loaded logic: making guns smart won't stop killings like the one in Michigan. *Washington Post* 2002, March 5: B2.
18 **Hardy MS**, Armstrong FD, Martin BL, *et al.* A firearm safety program for children: they just can't say no. *J Dev Behav Pediatr* 1996;**17**:216–21.
19 **Jackman GA**, Farah MM, Kellermann AL, *et al.* Seeing is believing: what do boys do when they find a real gun? *Pediatrics* 2001;**107**:1247–50.
20 **Brent DA**, Baugher M, Birmaher B, *et al.* Compliance with recommendations to remove firearms in families participating in a clinical trial for adolescent depression. *J Am Acad Child Adolesc Psychiatry* 2000;**39**:1220–6.
21 **Hemenway D**, Skolnick SJ, Azrael DR. Firearm training and storage. *JAMA* 1995;**273**:46–50.
22 **Connor SM**, Wesolowski KL. ''They're too smart for that'': predicting what children would do in the presence of guns. *Pediatrics* 2003;**111**:e109–14.
23 **Grossman DC**, Cummings P, Koepsell TD, *et al.* Firearm safety counseling in primary care pediatrics: a randomized, controlled trial. *Pediatrics* 2001;**106**:22–6.
24 **California Senate**. Bill No 489, September 2003.
25 **Kleck G**, Gertz M. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *Journal of Criminal Law and Criminology* 1995;**86**:150–87.
26 **McDowall D**, Wiersema B. The incidence of defensive firearm use by US crime victims, 1987–1990. *Am J Public Health* 1994;**84**:1982–4.
27 **Hemenway D**. Survey research and self-defense gun use: an explanation of extreme overestimates. *Journal of Criminal Law and Criminology* 1997;**87**:1430–45.
28 **Teret SP**, Webster DW, Vernick JS, *et al.* Public support for innovative gun policies: the results of two national surveys. *N Engl J Med* 1998;**339**:813–8.
29 **Rogers GB**. The safety effects of child-resistant packaging for oral prescription drugs: two decades of experience. *JAMA* 1996;**275**:1661–5.
30 **National Highway Traffic Safety Administration**. *Effectiveness of occupant protection systems and their use, fourth report to Congress.* Washington, DC: US Department of Transportation, 1999:i.

# ECHO

### Lighter balls for younger children



Please visit the *Injury Prevention* website [www.injuryprevention.com] for a link to the full text of this article.

The incidence of hand and wrist injuries from balls used by children in sporting activities may be reduced by increasing awareness of parents and coaches, using lighter balls, and introducing weight categories for players.

The case notes of all children aged 6–13 years attending the accident and emergency department of the Royal Aberdeen Children's Hospital from January to December 2001 as a result of a wrist, hand, or finger injury sustained from a blow by a ball were reviewed and the cause, type, and severity of the injury noted.

Altogether 187 children (125 boys, 69%) were seen over the study period. Football (soccer) resulted in 120 (64%) of the injuries, with 93 (78%) sustained by boys. Serious injuries were noted in 69 cases—67 fractures and two dislocations (37% of the total presentations). The fracture rate was higher in the injuries sustained outside school.

All injuries in this study were caused by a blow from a ball. Most football injuries in youngsters are mild, but their severity increases with age as children become heavier and achieve higher skill levels. The study concluded with the following recommendations. Firstly, using lighter balls for younger children would reduce the force of a blow. Secondly, weight categories would ensure that heavier players were not kicking or throwing balls at lighter players. Thirdly, awareness of the risk of hand and wrist injuries among parents and coaches should be increased.

Wider implementation of these modifications should be considered, and a register of injuries kept by sporting bodies would be of benefit in monitoring such injuries.

▲ *British Journal of Sports Medicine* 2003;**37**:351–353.

Inj Prev: first published as 10.1136/ip.9.4.307 on 23 December 2003. Downloaded from http://injuryprevention.bmj.com/ on January 5, 2023 by guest. Protected by copyright.

# EXHIBIT E

## Cruciform Trigger Bar







Cruciform Trigger Bar - A cruciform trigger bar is a component in a semiautomatic pistol that serves as a linkage between the trigger and firing pin and has its sear incorporated in a cross-shaped surface (circled).

## Pistol Converter










The Pistol Converter's back plate's inner measurement is approximately .67 in x .52 in with a .10 in wide tab.




The Glock 17/19/20/21/22/23/26/27/34/35 Gen 3 Slide Cover plate's inner measurement is also approximately .67 in x .52 in with a .10 in wide tab.

# EXHIBIT F




How A Glock Works
④ After the recoil, the connector allows the trigger bar to move back up and the trigger bar's sear is able to retain the firing pin until the trigger is pulled again.
③ ...allowing it to strike the primer and firing the round.
① As the trigger is pulled, the trigger bar pulls the firing pin back...
② ...the connector guides the trigger bar downward, until the spring-loaded firing pin is released


How A "Pistol Converter" Works
3 After the recoil, the "Pistol Converter" prevents the trigger bar from moving back up into place allowing the firing pin to strike the primer and fire a round repeatedly until the trigger is released.
1 As the trigger is pulled, the trigger bar pulls the firing pin back...
2 ...the connector guides the trigger bar downward, until the spring-loaded firing pin is released

# EXHIBIT G

**California Department of Justice**
**Bureau of Firearms**
**Firearms Dealer/Ammunition Vendor Information**
**Advisory Number: 173**
**Issue Date: December 26, 2025**

**SUBJECT: Assembly Bill (AB) 1127 – Semiautomatic Pistols Currently on the Roster of Handguns Certified for Sale that Would Qualify as a "Machinegun-Convertible Pistol"**

The purpose of this notice is to inform all California Firearm Dealers which semiautomatic pistols that are currently on the Roster of Handguns Certified for Sale (Handgun Roster) would qualify as a "machinegun-convertible pistol" under the new Penal Code section 27595 added by Assembly Bill (AB) 1127 (stats. 2025, ch. 572).

**Brief Overview of the Statutory Requirements Under AB 1127:**

Commencing July 1, 2026, AB 1127 prohibits a California firearms dealer from selling, offering for sale, exchanging, giving, transferring, or delivering a "machinegun-convertible pistol," except as specified under the new Penal Code section 27595. The penalties for violating this prohibition are outlined in the new Penal Code section 27595, subdivision (b).

AB 1127 defines a "machinegun-convertible pistol" under the new Penal Code section 16885, subdivisions (a) and (b) as:

*[A]ny semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with common household tools, as defined in Section 4082 of Title 11 of the California Code of Regulations, into a machinegun by the installation or attachment of a pistol converter as a replacement for the slide's backplate without any additional engineering, machining, or modification of the pistol's trigger mechanism.*

*A machinegun-convertible pistol does not include a hammer-fired semiautomatic pistol or striker-fired semiautomatic pistol lacking a cruciform trigger bar, which instead has a trigger bar that is shielded from interference by a pistol converter.*

AB 1127 additionally adds to the definition of a "machinegun" at Penal Code section 16880 "any machinegun-convertible pistol equipped with a pistol converter, as defined in [Penal Code] Section 17015."

The full text of AB 1127 is attached to this advisory and is available at this hyperlink: https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202520260AB1127.

**List of Semiautomatic Pistols Currently on the Roster of Handguns Certified for Sale that Would Qualify as a "Machinegun-Convertible Pistol"**

Under Penal Code section 32015, the California Department of Justice (Department) maintains the Handgun Roster, which is available at this hyperlink: https://oag.ca.gov/firearms/certified-handguns/search. Commencing July 1, 2026, AB 1127 will prohibit a firearms dealer from selling a semiautomatic pistol that falls within the definition of a "machinegun-convertible pistol," unless an exception at the new Penal Code section 27595 applies, even if that semiautomatic pistol is listed on the Handgun Roster.

To assist dealers in identifying such semiautomatic pistols, below is a list of semiautomatic pistols that are currently (as of the date of this advisory) on the Handgun Roster that qualify as a "machinegun-convertible pistol" under AB 1127. Please note that the models below have not necessarily been renewed for listing on the Handgun Roster in 2026 pursuant to Penal Code section 32015, subdivision (b) and California Code of Regulations, title 11, section 4072. The list also includes models that a manufacturer has stated will be discontinued (for more information, see this hyperlink: https://us.glock.com/en/discontinued-models).

**California Department of Justice**
**Bureau of Firearms**
**Firearms Dealer/Ammunition Vendor Information**
**Advisory Number: 173**
**Issue Date: December 26, 2025**

| Manufacturer | Model/Materials | Barrel Length | Caliber |
|---|---|---|---|
| Derya | DY9*/Steel Alloy: Polymer | 3.86" | 9mm |
| Glock | 17 (Black) / Steel, Polymer | 4.49" | 9mm |
| Glock | 17 OD / Steel, Polymer | 4.49" | 9mm |
| Glock | 17C / Steel, Polymer | 4.49" | 9mm |
| Glock | 17RTF2 (Black) / Steel, Polymer | 4.49" | 9mm |
| Glock | 19 / Steel, Polymer | 4.02" | 9mm |
| Glock | 19 OD / Steel, Polymer | 4.02" | 9mm |
| Glock | 19C / Steel, Polymer | 4.02" | 9mm |
| Glock | 20 / Steel, Polymer | 4.60" | 10mm |
| Glock | 20 OD / Steel, Polymer | 4.60" | 10mm |
| Glock | 20C / Steel, Polymer | 4.60" | 10mm |
| Glock | 20SF (Black) / Steel, Polymer | 4.60" | 10mm |
| Glock | 21 / Steel, Polymer | 4.60" | .45 ACP |
| Glock | 21 OD / Steel, Polymer | 4.60" | .45 ACP |
| Glock | 21C / Steel, Polymer | 4.60" | .45 ACP |
| Glock | 21SF-STD / Steel, Polymer | 4.61" | .45 ACP |
| Glock | 22 / Steel, Polymer | 4.49" | .40 S&W |
| Glock | 22 - California Department of Corrections / Steel; Polymer | 4.49" | .40 S&W |
| Glock | 22 - FBI 100 Yr. Commemorative (Blk) / Steel, Polymer | 4.49" | .40 S&W |
| Glock | 22 C / Steel, Polymer | 4.49" | .40 S&W |
| Glock | 22 OD / Steel, Polymer | 4.49" | .40 S&W |
| Glock | 22RTF2 (Black) / Steel, Polymer | 4.49" | .40 S&W |
| Glock | 23 / Steel, Polymer | 4.02" | .40 S&W |
| Glock | 23 OD / Steel, Polymer | 4.02" | .40 S&W |
| Glock | 23C / Steel, Polymer | 4.02" | .40 S&W |
| Glock | 26 / Steel, Polymer | 3.46" | 9mm |
| Glock | 26 OD / Steel, Polymer | 3.46" | 9mm |
| Glock | 27 / Steel, Polymer | 3.46" | .40 S&W |
| Glock | 27 OD / Steel, Polymer | 3.46" | .40 S&W |
| Glock | 29 / Steel, Polymer | 3.78" | 10mm |
| Glock | 29 OD / Steel, Polymer | 3.78" | 10mm |
| Glock | 29SF (Black) / Steel, Polymer | 3.78" | 10mm |
| Glock | 30 / Steel, Polymer | 3.78" | .45 ACP |
| Glock | 30 OD / Steel, Polymer | 3.78" | .45 ACP |
| Glock | 30SF / Steel, Polymer | 3.78" | .45 ACP |
| Glock | 31 / Steel, Polymer | 4.49" | .357 SIG |
| Glock | 31 OD / Steel, Polymer | 4.49" | .357 SIG |
| Glock | 31C / Steel, Polymer | 4.49" | .357 SIG |
| Glock | 32 / Steel, Polymer | 4.02" | .357 SIG |
| Glock | 32 OD / Steel, Polymer | 4.02" | .357 SIG |
| Glock | 32C / Steel, Polymer | 4.02" | .357 SIG |
| Glock | 33 / Steel, Polymer | 3.46" | .357 SIG |
| Glock | 33 OD / Steel, Polymer | 3.46" | .357 SIG |

**California Department of Justice**
**Bureau of Firearms**
**Firearms Dealer/Ammunition Vendor Information**
**Advisory Number: 173**
**Issue Date: December 26, 2025**

| Manufacturer | Model/Materials | Barrel Length | Caliber |
|---|---|---|---|
| Glock | 34 / Steel, Polymer | 5.32" | 9mm |
| Glock | 34 OD / Steel, Polymer | 5.32" | 9mm |
| Glock | 35 / Steel, Polymer | 5.32" | .40 S&W |
| Glock | 35 OD / Steel, Polymer | 5.32" | .40 S&W |
| Glock | 36 / Steel, Polymer | 3.78" | .45 ACP |
| Glock | 36 OD / Steel, Polymer | 3.78" | .45 ACP |
| Glock | 38 / Steel, Polymer | 4.02" | .45 GAP |
| Glock | 38 OD / Steel, Polymer | 4.02" | .45 GAP |
| Glock | 39 / Steel, Polymer | 3.46" | .45 GAP |
| Glock | 39 OD / Steel, Polymer | 3.46" | .45 GAP |
| Glock | G-37 / Steel, Polymer | 4.49" | .45 GAP |
| Glock | G-37 OD / Steel, Polymer | 4.49" | .45 GAP |
| Shadow Systems | DR920P SS-2239-CA* / Stainless Steel; Polymer; Aluminum | 4.5" | 9mm |
| Shadow Systems | DR920P SS-2240-CA* / Stainless Steel; Polymer; Aluminum | 4.5" | 9mm |
| Shadow Systems | MR920 SS-1039-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |
| Shadow Systems | MR920 SS-1040-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |
| Shadow Systems | MR920 SS-1052-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |
| Shadow Systems | XR920 SS-3039-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |
| Shadow Systems | XR920 SS-3040-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |
| Shadow Systems | XR920 SS-3052-CA* / Stainless Steel; Polymer; Aluminum | 4" | 9mm |

**Support and Contact Information:**

Should you have any questions, please contact the Bureau of Firearms, Customer Support Center:

- Phone: 855-365-3767
- Email: bofdes@doj.ca.gov

Thank you for your attention to this important matter.

**Attachment(s):**

- Assembly Bill No. 1127

LEGISLATIVE COUNSEL BUREAU
STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**Assembly Bill No. 1127**

CHAPTER 572

An act to amend Section 3273.50 of the Civil Code, and to amend Section 16880 of, and to add Sections 16885, 17015, 27595, 27595.1, and 32103 to, the Penal Code, relating to firearms.

[Approved by Governor October 10, 2025. Filed with Secretary of State October 10, 2025.]

LEGISLATIVE COUNSEL'S DIGEST

AB 1127, Gabriel. Firearms: converter pistols.

Existing law prohibits any person from selling, leasing, or transferring any firearm unless the person is licensed as a firearms dealer, as specified. Existing law prescribes certain requirements and prohibitions for licensed firearms dealers. A violation of any of these requirements or prohibitions is grounds for forfeiture of a firearms dealer's license. For purposes of these provisions, existing law defines "machinegun" to mean, among other definitions, any weapon that shoots or is designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

This bill would, on and after July 1, 2026, prohibit a licensed firearms dealer to sell, offer for sale, exchange, give, transfer, or deliver any semiautomatic machinegun-convertible pistol, except as specified. For these purposes, the bill would define "machinegun-convertible pistol" as any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with common household tools into a machinegun by the installation or attachment of a pistol converter, as specified, and "pistol converter" as any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, replaces the backplate and interferes with the trigger mechanism and thereby enables the pistol to shoot automatically more than one shot by a single function of the trigger. The bill would make a violation of these provisions punishable by a fine, a 2nd violation punishable by a fine that may result in a suspension or revocation of the dealer's license and removal from certain centralized lists maintained by the Department of Justice, and a 3rd violation punishable as a misdemeanor that shall result in the revocation of the dealer's license and removal from certain centralized lists.

Existing law prohibits the manufacture, sale, possession, or transportation of a machinegun, except as authorized. A violation of these prohibitions is punishable as a felony.

This bill would expand the above definition of "machinegun" to include any machinegun-convertible pistol equipped with a pistol converter and,

thus, prohibit the manufacture, sale, possession, or transportation of a machinegun-convertible pistol equipped with a pistol converter.

Existing law, subject to certain exceptions, generally makes it an offense to manufacture or sell an unsafe handgun, as defined, and requires the Department of Justice to compile a roster listing all of the handguns that have been tested and determined not to be unsafe handguns. Existing law establishes criteria for determining if a handgun is an unsafe handgun, including, for firearms manufactured after a certain date and not already listed on the roster, the lack of a chamber load indicator and a magazine disconnect mechanism.

For any pistol listed on the roster on January 1, 2026, that was not subject to the above-described requirements to be on the list because it was submitted for testing before specified dates, that is thereafter only modified to change the design features that brought the pistol within the definition of a machinegun-convertible pistol, and that is submitted to an independent certified laboratory for testing pursuant to the above-described testing provisions before January 1, 2027, this bill would authorize that pistol to be submitted for testing and added to the roster without meeting those requirements.

This bill would make these provisions severable.

This bill would incorporate additional changes to Section 3273.50 of the Civil Code proposed by AB 1263 to be operative only if this bill and AB 1263 are enacted and this bill is enacted last.

By creating a new crime and expanding the application of an existing crime, this bill would create a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1. Section 3273.50 of the Civil Code is amended to read:

3273.50. As used in this title, the following definitions apply:

(a) "Ammunition" has the same meaning as provided in subdivision (b) of Section 16150 of the Penal Code.

(b) "Firearm" has the same meaning as provided in subdivisions (a) and (b) of Section 16520 of the Penal Code.

(c) "Firearm accessory" means an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with a firearm that is designed, intended, or functions to alter or enhance the firing capabilities of a firearm, the lethality of the firearm, or a shooter's ability to hold and use a firearm.

(d) "Firearm-related product" means a firearm, ammunition, a firearm precursor part, a firearm component, firearm manufacturing machine, and a firearm accessory that meets any of the following conditions:

(1) The item is sold, made, or distributed in California.

(2) The item is intended to be sold or distributed in California.

(3) The item is or was possessed in California and it was reasonably foreseeable that the item would be possessed in California.

(e) "Firearm precursor part" has the same meaning as provided in Section 16531 of the Penal Code.

(f) "Firearm industry member" shall mean a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale sale, or retail sale of firearm-related products.

(g) "Firearm manufacturing machine" means a three-dimensional printer, as defined in Section 29185 of the Penal Code, or CNC milling machine that, as described in that section, is marketed or sold as, or reasonably designed or intended to be used to manufacture or produce a firearm.

(h) "Reasonable controls" means reasonable procedures, acts, or practices that are designed, implemented, and enforced to do the following:

(1) Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully.

(2) Prevent the loss or theft of a firearm-related product from the firearm industry member.

(3) Ensure that the firearm industry member complies with all provisions of California and federal law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product.

(4) Prevent the installation and use of a pistol converter, as defined in Section 17015 of the Penal Code, with a firearm.

SEC. 1.5. Section 3273.50 of the Civil Code is amended to read:

3273.50. As used in this title, the following definitions apply:

(a) "Ammunition" has the same meaning as provided in subdivision (b) of Section 16150 of the Penal Code.

(b) "Firearm" has the same meaning as provided in subdivisions (a) and (b) of Section 16520 of the Penal Code.

(c) "Firearm accessory" means an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with a firearm that is designed, intended, or functions to increase a firearm's rate of fire or to increase the speed at which a person may reload a firearm or replace the magazine, or any other attachment or device described in subdivision (a) of Section 30515 of the Penal Code that may render a firearm an assault weapon when inserted into, affixed onto, or used in conjunction with a firearm. The term firearm accessory also includes any other device,

tool, kit, part, or parts set that is clearly designed and intended for use in manufacturing firearms.

(d) "Firearm-related product" means a firearm, ammunition, a firearm precursor part, a firearm component, firearm manufacturing machine, and a firearm accessory that meets any of the following conditions:

(1) The item is sold, made, or distributed in California.

(2) The item is intended to be sold or distributed in California.

(3) The item is or was possessed in California and it was reasonably foreseeable that the item would be possessed in California.

(e) "Firearm precursor part" has the same meaning as provided in Section 16531 of the Penal Code.

(f) "Firearm industry member" shall mean a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale sale, or retail sale of firearm-related products.

(g) "Firearm manufacturing machine" means a three-dimensional printer, as defined in Section 29185 of the Penal Code, a computer numerical control (CNC) milling machine, or a similar machine, that is marketed or sold as or is reasonably designed or intended to be used to manufacture or produce firearms, firearm components, or firearm accessories.

(h) "Reasonable controls" means reasonable procedures, acts, or practices that are designed, implemented, and enforced to do the following:

(1) Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully.

(2) Prevent the loss or theft of a firearm-related product from the firearm industry member.

(3) Ensure that the firearm industry member complies with all provisions of California and federal law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product.

(4) Prevent the installation and use of a pistol converter, as defined in Section 17015 of the Penal Code, with a firearm.

SEC. 2. Section 16880 of the Penal Code is amended to read:

16880. (a) As used in this part, "machinegun" means any weapon that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

(b) The term "machinegun" also includes the frame or receiver of any weapon described in subdivision (a), any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if those parts are in the possession or under the control of a person.

(c) The term "machinegun" also includes any weapon deemed by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives as readily convertible to a machinegun under Chapter 53 (commencing with Section 5801) of Title 26 of the United States Code.

(d) The term "machinegun" also includes any machinegun-convertible pistol equipped with a pistol converter, as defined in Section 17015.

SEC. 3. Section 16885 is added to the Penal Code, to read:

16885. (a) As used in this part, "machinegun-convertible pistol" means any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with common household tools, as defined in Section 4082 of Title 11 of the California Code of Regulations, into a machinegun by the installation or attachment of a pistol converter as a replacement for the slide's backplate without any additional engineering, machining, or modification of the pistol's trigger mechanism.

(b) A machinegun-convertible pistol does not include a hammer-fired semiautomatic pistol or striker-fired semiautomatic pistol lacking a cruciform trigger bar, which instead has a trigger bar that is shielded from interference by a pistol converter.

(c) A polymer notch or other piece of polymer molded into the rear of the pistol frame does not prevent ready conversion into a machinegun and will not prevent a pistol from qualifying under this definition.

SEC. 4. Section 17015 is added to the Penal Code, to read:

17015. "Pistol converter" means any device or instrument that when installed in or attached to the rear of the slide of a semiautomatic pistol, replaces the backplate, and interferes with the trigger mechanism and thereby enables the pistol to shoot automatically more than one shot by a single function of the trigger. A pistol converter includes, but is not limited to, a pistol converter manufactured using a three-dimensional printer, as defined in Section 29185.

SEC. 5. Section 27595 is added to the Penal Code, to read:

27595. (a) Except as provided in subdivision (c), commencing on July 1, 2026, a firearms dealer licensed pursuant to Sections 26700 to 26920, shall not sell, offer for sale, exchange, give, transfer, or deliver any semiautomatic machinegun-convertible pistol, as defined in Section 16885.

(b) (1) A violation of subdivision (a) shall be punishable by a fine of not more than one thousand dollars ($1,000).

(2) A second violation of subdivision (a) shall be punishable by a fine of not more than five thousand dollars ($5,000) and may result in the suspension or revocation of the dealer's license issued under Sections 26700 to 26920, inclusive, and removal of the firearms dealer from any centralized list maintained by the Department of Justice pursuant to Sections 26715, 28450, and 29060.

(3) A third violation of subdivision (a) is a misdemeanor and shall result in the revocation of the dealer's license issued under Sections 26700 to 26920, inclusive, and removal of the firearms dealer from any centralized list maintained by the Department pursuant to Sections 26715, 28450, and 29060.

(c) This section shall not apply to any of the following:

(1) A machinegun-convertible pistol delivered to a firearms dealer prior to January 1, 2026.

(2) The sale of a machinegun-convertible pistol to any of the following entities for lawful use in the discharge of their official duties:

(A) A police department, sheriff's office, probation department, marshal's office, district attorney's office, the California Highway Patrol, the Department of Justice, the Department of Corrections and Rehabilitation.

(B) Any state agency listed in paragraph (6) or paragraph (7) of subdivision (b) of Section 32000.

(C) The military or naval forces of this state or of the United States.

(3) A private party to private party transaction conducted through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).

(4) A transfer of a machinegun-convertible pistol to a gunsmith or other qualified entity for service or repair.

(5) The sale or transfer of a machinegun-convertible pistol to a firearms dealer licensed pursuant to Sections 26700 to 26920, inclusive, or to federally licensed firearms manufacturers or dealers outside California.

(6) A transfer of a machinegun-convertible pistol back to a private party after temporary safekeeping storage pursuant to Section 26892.

(7) A transfer of a machinegun-convertible pistol back to a private party after a period of temporary prohibition pursuant to Section 29830.

(8) A transfer of a machinegun-convertible pistol to any forensic laboratory or forensic laboratory employee, while on duty and acting within the scope and course of employment.

(9) The sale of a machinegun-convertible pistol to an individual who is an active peace officer described in Section 830.1 or a reserve peace officer described in Section 830.6 who is employed or appointed by a law enforcement agency described in Section 830.1 and is authorized to carry a firearm on duty.

SEC. 6. Section 27595.1 is added to the Penal Code, to read:

27595.1. The Department of Justice is authorized to adopt regulations to implement Section 27595.

SEC. 7. Section 32103 is added to the Penal Code, to read:

32103. (a) A pistol may be submitted for testing described in Section 32010 and added to the roster described in subdivision (a) of Section 32015 without being subject to the requirements of subparagraph (D) or (E) of paragraph (2) of subdivision (a) of Section 31910, or the requirements of subdivision (d) of Section 32010, if all of the following conditions are met:

(1) The pistol was listed on the roster, described in subdivision (a) of Section 32015, on January 1, 2026.

(2) The pistol was not subject to the requirements of subparagraph (D) or (E) of paragraph (2) of subdivision (a) of Section 31910 because it was submitted for testing before the dates identified in subdivision (d) of Section 32010.

(3) The pistol was thereafter only modified to change design features which brought the pistol within the definition of machinegun-convertible pistol in Section 16885.

(4) The modified pistol is submitted to an independent certified laboratory for testing pursuant to Article 5 (commencing with Section 32000) of Chapter 4 before January 1, 2027.

(b) Any firearm meeting the requirements of this section shall be removed from the roster according to subdivision (b) of Section 31910 on the same timeline as the pistol that appeared on the roster prior to being modified pursuant to this section.

SEC. 8. If any section, subsection, sentence, or clause of this act is for any reason declared unconstitutional, invalid, or unenforceable by any court of competent jurisdiction, such decision shall not affect the constitutionality, validity, or enforceability of the remaining portions of this act or any part thereof. The Legislature hereby declares that it would have adopted this act notwithstanding the unconstitutionality, invalidity, or unenforceability of any one or more of its sections, subsections, sentences, or clauses.

SEC. 9. Section 1.5 of this bill incorporates amendments to Section 3273.50 of the Civil Code proposed by both this bill and Assembly Bill 1263. That section of this bill shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2026, (2) each bill amends Section 3273.50 of the Civil Code, and (3) this bill is enacted after Assembly Bill 1263, in which case Section 1 of this bill shall not become operative.

SEC. 10. No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O