HARMEET K. DHILLON
Assistant Attorney General

Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone: (202) 304-8447
barry.arrington@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA
*Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA and ROBERT BONTA, in his official capacity as head of the California Department of Justice,<br><br>Defendants. | Case No. 8:2026-cv-1697-MRA-ADS<br><br>**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing: September 11, 2026<br>Hearing Time: 10:00 a.m.<br>Courtroom: 9B<br><br>Hon. Mónica Ramírez Almadani<br>United States District Judge |

R. JONAS GEISSLER
Deputy Assistant Attorney General

BARRY K. ARRINGTON (TX No. 24129555)
Acting Chief, Second Amendment Section

PATRICK TODD (TX No. 24106513)
TRISTAN SILVA II (DC No. 90037513)
Trial Attorneys
Second Amendment Section
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone: (202) 304-8447

TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (Cal. Bar No. 272742)
Assistant United States Attorney
United States Attorney's Office
300 North Los Angeles Street, Suite 7516
Los Angeles, California 90012
Telephone: (213) 894-2464
Julie.hamill@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## TABLE OF CONTENTS

I. Section 12601 Authorizes Equitable Relief. .......... 1

II. Plaintiff Has Not Brought a Facial Challenge. .......... 1

III. Defendants Give up on Their Claims about Section 1983. .......... 2

IV. Defendants Concede That Enforcement of Statutes Is Actionable Under Section 12601. .......... 2

V. The Statutes Are Presumptively Unconstitutional. .......... 3

VI. Defendants Invite This Court to Ignore *Wolford*. .......... 5

VII. The Availability of Non-Banned Arms Does Not Save the Statutes. .......... 7

VIII. The Statutes Are Not Presumptively Valid Commercial Regulations. .......... 8

IX. California Does Not Meet Its Step-Two Burden. .......... 9

- A. Quantity Is No Substitute for Quality. .......... 9
- B. Gunpowder Storage Laws Are Not Analogous to Arms Bans. .......... 9
- C. Accidental Discharges Are as Old as Firearms. .......... 10
- D. “Proving” Laws are Not Analogous to Firearms Bans. .......... 10
- E. Statutes Regulating Novelty Toy Pistols Were Directed at Children. .......... 11
- F. The Most Popular Handgun in America Is Not “Dangerous and Unusual.” .......... 12
- G. Machinegun Conversion Devices Are Illegal. .......... 13

XI. Conclusion. .......... 14

# TABLE OF AUTHORITIES

## CASES

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 183 F.4th 211 (3d Cir. 2026) .......... 10, 12, 13

*Boland v. Bonta*, 662 F. Supp. 3d 1077 (C.D. Cal. 2023) .......... 6, 7, 11, 14

*Cal. Chamber of Commerce v. Council for Education and Research on Toxics*, 29 F.4th 468 (9th Cir. 2022) .......... 14

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......... 5, 7, 9, 12

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .......... 5

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .......... 3

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009) .......... 14

*McDonald v. City of Chi., Ill.*, 561 U.S. 742 (2010) .......... 8

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .......... 3, 12

*Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025) .......... 5

*Ortega v. Grisham*, 148 F.4th 1134 (10th Cir. 2025) .......... 5

*Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005) .......... 14

*Renna v. Bonta*, 667 F. Supp. 3d 1048 (S.D. Cal. 2023) .......... 6, 7, 8

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) .......... 14

*Snope v. Brown*, 145 S. Ct. 1534 (2025) .......... 6

*Staples v. United States*, 511 U.S. 600 (1994) .......... 12

*United States v. Board of Education for School District of Philadelphia*, 911 F.2d 882 (3d Cir. 1990) .......... 3

*United States v. City of Ferguson*, No. 4:16-cv-00180 (E.D. Mo. Feb. 10, 2016) .......... 3

*United States v. Cty. of Maricopa,* 889 F.3d 648 (9th Cir. 2018) .......... 2

*United States v. Rahimi*, 602 U.S. 680 (2024) .................... 6

*United States v. Town of Colorado City*, 935 F.3d 804 (9th Cir. 2019) .................... 1, 3

*Wolford v. Lopez*, 146 S.Ct. 2032 (2026) .................... 4, 5, 6

## STATUTES

34 U.S.C. § 12601 .................... 1

42 U.S.C. § 1983 .................... 2

## STATE CASES

*Andrews v. State*, 50 Tenn. 165 (1871) .................... 5

## STATE STATUTES

1881 Penn. Ch. 124 .................... 12

1882 N.J. Ch. 4 .................... 12

1883 Kans. Ch. 105 .................... 12

1883 Ohio ch. 336, 222 .................... 12

1883 Wash. Terr. 67 .................... 12

1884 Iowa Ch. 78 .................... 12

1884 Michigan, Ch. 138, 144 .................... 12

Cal. Penal Code § 27595(a) .................... 1

Cal. Penal Code § 32015 .................... 1

Cal. Penal Code § 32625(a) .................... 13

Plaintiff filed its Motion for Preliminary Injunction (Pl. Mot.) [ECF 28] on July 28, 2026. Plaintiff submits the following Reply in support of that motion.

**I. Section 12601 Authorizes Equitable Relief.**

Consider law enforcement officer violations of the Fourth Amendment through abusive police practices such as those displayed in the Rodney King incident. Now consider law enforcement officer violations of the Establishment Clause of the First Amendment such as those at issue in *United States v. Town of Colorado City*, 935 F.3d 804 (9th Cir. 2019). What do the two kinds of law enforcement misconduct have to do with each other? The answer, of course, is nothing, except that both kinds of misconduct violate people's constitutional rights. *Colorado City* holds that Establishment Clause violations are just as actionable under 34 U.S.C. § 12601 (Section 12601) as Fourth Amendment violations.

Throughout this case, Defendants have been frenetically attempting to build a false narrative—that Section 12601 claims are limited to Rodney King-type violations. *Colorado City* destroys that narrative. That is why Defendants studiously avoided mentioning that case even though it is one of the two controlling Ninth Circuit cases analyzing the scope of Section 12601. Defendants' omission speaks volumes.

**II. Plaintiff Has Not Brought a Facial Challenge.**

Defendants seem to think they can transform the Complaint into a facial challenge to the Glock Ban[1] and the Roster[2] through the verbal alchemy of incessant repetition. Between their motion to dismiss and their response, they use derivatives of the term "facial" thirty–four times, as if by repeating the term often enough it will become true. It is not true. Plaintiff will not rehash the arguments in its response to the motion to dismiss (*see* Response in Opposition to Defendants'

---

[1] Cal. Penal Code § 27595(a).

[2] The CLI and MDM requirements of Cal. Penal Code § 32015.

Motion to Dismiss Complaint (Pl. Resp.) [ECF 42], 1-2) other than to point out once again that the word "facial" does not appear in the Complaint. The Complaint sets forth a claim to enjoin law enforcement *conduct* that violates the Second Amendment. Compl. ¶ 64.

Defendants' "facial challenge" mania led them to a bizarre assertion. They write: "Congress would not have drafted a statute authorizing suits over rights-depriving 'pattern[s] or practice[s] of conduct by law enforcement officers' to authorize suits in which law enforcement practices are irrelevant." Defendants' Opposition to Motion for Preliminary Injunction (Def. Opp.) [ECF 43], 6. That tautology has no bearing on Plaintiff's claim, which only seeks to enjoin law enforcement conduct. *See* Pl. Resp. 1-2.

**III. Defendants Give up on Their Claims about Section 1983.**

In their motion to dismiss (Def. Mot.) [ECF 29], Defendants originally asserted that 42 U.S.C. § 1983 has nothing to do with Section 12601. *See* Def. Mot. 3. That assertion was never tenable under *United States v. Cty. of Maricopa,* 889 F.3d 648 (9th Cir. 2018), and *Colorado City*. Now, Defendants concede that point as evidenced by the fact that they spend two pages comparing and contrasting the two statutes. Def. Opp. 6-7. Plaintiff consistently argued that the statutes must be interpreted pursuant to the *in pari materia* doctrine. Pl. Resp. 12-13. Defendants have tacitly conceded the point.

**IV. Defendants Concede That Enforcement of Statutes Is Actionable Under Section 12601.**

The Court must decide whether Defendants' enforcement of a statute is "conduct" as that term is used in Section 12601. *See* Pl. Resp. 1. It is. And Section 12601 makes it unlawful for law enforcement officers to engage in a pattern or practice of enforcement of a statute that deprives persons of their constitutional

rights.[3] *See* Pl. Resp. 8-11. Defendants now concede that enforcement of a statute can be the basis of Section 12601 liability.

The enforcement of a statute was part of the basis of the United States' Section 12601 claim against the Fergeson Police Department. *See* Pl. Mot. 14. Specifically, the police department's enforcement of the city's "Failure to Comply" ordinance was law enforcement conduct that deprived the citizens of Ferguson of their constitutional rights. *See* Compl., *United States v. City of Ferguson*, No. 4:16-cv-00180 (E.D. Mo. Feb. 10, 2016) [ECF 1] ¶¶ 45-46, 51, 62, 74, 88, 186.

Defendants now concede this point. *See* Def. Opp. 7. Defendants attempt to deflect by asserting that Ferguson was different because the enforcement of the statute there resulted in Fourth Amendment violations. This is a distinction that makes no difference. As we have seen, Section 12601 is not limited to remedying Fourth Amendment violations. *See Colorado City*, *supra; see also* Pl. Mot. 14, n.5.

**V. The Statutes Are Presumptively Unconstitutional.**

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court set forth the following test for evaluating Second Amendment claims:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that

[3] The mere existence of the California Department of Justice website advisory about its enforcement of the Glock Ban established its pattern or practice on July 1. A sign reading "whites only" establishes a pattern or practice, even if no black person ever subjects themselves to the humiliation of applying for the job and being rejected. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977). Similarly, law enforcement officers' posting of a virtual "we will enforce the Glock ban against you" advisory has the same impact even if no one got themselves arrested by defying it. Where a governmental defendant announces a discriminatory policy, the policy itself constitutes a "pattern or practice." *United States v. Board of Education for School District of Philadelphia*, 911 F.2d 882, 892 (3d Cir. 1990).

> conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

597 U.S. at 24.

In *Wolford v. Lopez*, 146 S.Ct. 2032, 2044 (2026), the Court clarified step one of the *Bruen* test:

> [The analysis required in a Second Amendment case] involves two steps. First, a court must determine whether the law before it clashes with the plain text of the Amendment's language. This inquiry entails three subsidiary questions. **First**, does the law apply to the people—which is to say, to all members of the political community? **Second**, does it concern any form of Arms, i.e., any weapon customarily used for offensive or defensive purposes? **Third**, does the law place any restrictions on either the keeping (i.e., possession) or the bearing (i.e., carrying) of arms?
>
> If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional—which means that it may violate the preexisting right that the Amendment codified. But because that right was not in every way coterminous with the Amendment's literal language, further analysis may be needed. Specifically, the relevant government—federal, state, or local may be able to show that its challenged law did not infringe the historical understanding of the codified right.

146 S. Ct. at 2043-44 (cleaned up; citations and quotation marks omitted; emphasis added).

Thus, step one of the *Bruen* test requires a court to ask three questions:

A. First, does the law apply to the people?

B. Second, does it concern any form of arms?

C. Third, does the law place any restrictions on either the possession or carrying of arms?

Here, step one of the *Bruen* test is easily met. No one can reasonably dispute that: (1) the individuals who are subject to the burdens of the Glock Ban and the

Roster are among the "people;" (2) the Glock Ban and the Roster obviously apply to arms;[4] and (3) the statutes restrict the possession of arms.

This matter concerns the keeping of arms. The natural definition of keeping arms means to have those arms in an individual's possession. *Heller*, 554 U.S. at 582. The right to keep arms naturally includes the right to acquire firearms in the first place. *Nguyen v. Bonta*, 140 F.4th 1237, 1243 (9th Cir. 2025) (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, . . . and to purchase and provide ammunition suitable for such arms . . ..."). *See also Ortega v. Grisham*, 148 F.4th 1134, 1143 (10th Cir. 2025); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). One must obviously be able to acquire and possess firearms to do what the Second Amendment protects, i.e., the right to keep and bear arms for self-defense. *See Wolford*, 146 S. Ct. at 2041.

In summary, the answer to all three of *Wolford's* questions in the instant case is "yes." Therefore, the Glock Ban and the Roster clash with the plain text of the Second Amendment and are presumptively unconstitutional.

## VI. Defendants Invite This Court to Ignore *Wolford*.

Defendants acknowledge *Wolford's* clarification of the *Bruen* test, (Def. Opp. 8), but then invite the Court to ignore it. *Id*. Defendants would add a fourth question at step one: Is the restraint on the right to keep arms "meaningful,"

---

[4] "The phrase 'to keep and bear Arms,' . . . signifies what its terms mean in ordinary usage—that is, to 'have' and 'carry Arms.' [citing *District of Columbia v. Heller*, 554 U.S. 570, 583-585 (2008)]. And 'Arms,' . . . refers to implements used for offense or defense. *Id*., at 581. . . . *[H]andguns, which are 'overwhelmingly chosen by American society' for self-defense, fall squarely into this category*. *Id*., at 628." *Wolford* at 2041 (emphasis added).

whatever that means? Def. Opp. 9.[5] Defendants basically assert the Court can ignore *Wolford* and just add this fourth question, because they contend *Wolford* was merely summarizing its existing decisions. Def. Opp. 9 n.6. Defendants' added undefined "meaningful" test would materially change and undermine the Supreme Courts' holding.

Yes, in *Wolford* the Supreme Court summarized and clarified its existing decisions. But the Court was not inviting the lower courts to carry on with business as usual and issue decisions conflicting with the *clarified Bruen test*. The whole point of the exercise was to act as a corrective for lower courts that would otherwise be tempted to "smuggle additional limits . . . into the plain-text stage of the inquiry." *Wolford*, at 2054, n.1 (Barrett, J., concurring). That includes the Ninth Circuit cases on which Defendants rely. *See United States v. Rahimi*, 602 U.S. 680, 712–13 (2024) (Gorsuch, J., concurring) (criticizing the Ninth Circuit's "government always wins" approach to Second Amendment cases).

In summary, contrary to Defendants' specious assertion, existing decisions from lower courts "bent on distorting th[e] Court's Second Amendment precedents"[6] did not survive contact with *Wolford*. The Supreme Court made clear: there are <u>only</u> three inquiries at *Bruen's* step one.

Furthermore, Defendants' assertion that Plaintiff does not meet its step-one burden is especially egregious with respect to the Roster provisions. This Court and its sister court have already held that those provisions are presumptively unconstitutional at step one. *Boland v. Bonta*, 662 F. Supp. 3d 1077, 1085 (C.D. Cal. 2023); *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1061 (S.D. Cal. 2023).

---

[5] Whether Defendants' "proposed fourth question" might have purchase in pre-*Wolford* Ninth Circuit case law is irrelevant. *Wolford's* holding, directly applicable here, clarified that there are three inquiries at step one, not four.

[6] *See Snope v. Brown*, 145 S. Ct. 1534, 1538 (2025) (Thomas, J., dissenting from denial of certiorari).

## VII. The Availability of Non-Banned Arms Does Not Save the Statutes.

Defendants try to excuse their unconstitutional restrictions by pointing to their "but we have not banned all arms" canard. Def. Opp. 11. Allowance of some constitutional rights while illegally restricting others does not inoculate Defendants from liability for their pattern or practice of law enforcement misconduct.

Let's go back to basics. In *Heller*, the District of Columbia argued that its ban on handguns was constitutional because its citizens still had access to long guns. *See D.C. v. Heller*, 554 U.S. 570, 629 (2008). The Supreme Court rejected that argument out of hand. It wrote: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." Our system would never tolerate an argument in any other context that a law is constitutional because it does not infringe on the protected right as much as it could have. Justice Kavanaugh once noted that the argument Defendants make is "a bit like saying books can be banned because people can always read newspapers." *Heller v. D.C.*, 670 F.3d 1244, 1289 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

This very Court has dispatched the Defendant's attempted false dichotomy in *Boland v. Bonta*. 662 F. Supp. 3d at 1085–86. And, a sister court likewise dispatched the false dichotomy in *Renna v. Bonta*, in a passage that bears specific quotation:

> But the *availability* of handguns on the roster for retail purchase does not address in any way whether Plaintiffs' desire to purchase off-roster semiautomatic handguns is *covered* by the Second Amendment. Instead, the argument focuses on the *burden* imposed on Plaintiffs' rights, which assumes Plaintiffs' conduct is protected (covered) by the Amendment. Defendants' argument is therefore rejected as it fails to address the plain text of the Amendment.

667 F. Supp. 3d at 1062.

> […] Defendants' argument that it is constitutionally permissible to prohibit commercial sales of state-of-the-art semiautomatic pistols, so

> long as Plaintiffs can purchase single shot handguns, revolvers and older grandfathered models of semiautomatic pistols that are shrinking in number and less desirable runs headlong into *Heller's* admonition [quoted above]. As *Bruen* reiterates, the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" 142 S.Ct. at 2156 (quoting *McDonald v. City of Chi., Ill.*, 561 U.S. 742, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)).

*Id.*, at n.8 (cleaned up).

Here, Defendants similarly argue that their enforcement of the Glock Ban does not implicate the Second Amendment's plain text because they have not banned the commercial sale of all semiautomatic pistols (just the most popular ones).[7] Def. Opp. 9-10. This is a repetition of the same sort of false dichotomy, presenting enforcement of an unconstitutional limitation on some firearms as excusable because the limitation does not yet reach the right to keep and bear other constitutionally permissible firearms.

**VIII. The Statutes Are Not Presumptively Valid Commercial Regulations.**

The statutes are not, as Defendants argue, presumptively valid commercial regulations. Def. Opp. 10. The statutes do not regulate the sale of handguns. They ban the sale of handguns in common use. "Regulate" and "ban" are not synonyms. Defendants' argument runs counter to issues a sister court already has decided. In *Renna v. Bonta*, the Court rejected the State's argument that banning the sale of firearms falls under *Heller's* "commercial regulation" carveout. *Id.*, 667 F. Supp. 3d at 1064. Thus, there is no commercial exception to the unconstitutional enforcement of a ban on constitutionally protected firearms.

[7] Glock handguns are the most popular handguns in America. Declaration of Earl Griffith ¶ 11.

## IX. California Does Not Meet Its Step-Two Burden.

### A. Quantity Is No Substitute for Quality.

California's misplaced reliance on proffered, unreliable expert opinion is unavailing. Defendants ask this Court to ignore the Supreme Court's clear admonition regarding American history in *Heller*.[8] Instead, Defendants urge the Court to place their proffered expert above the Supreme Court's binding precedent.

Robert Spitzer is representative of this effort. He has provided testimony in 51 post-*Bruen* Second Amendment cases. *See* Spitzer Dec. [ECF 43-6], ¶ 7. And he has never testified that a challenged regulation has no analogue. In the instant case, as he has done in those other cases, he gives the misimpression that there are literally dozens if not hundreds of historical analogues to the California statutes. Spitzer Dec. 1-444. Wrong.

If there really were relevantly similar analogues to California's laws (there are not), a brief and specific report identifying those historical laws and explaining why their "how" and "why" are similar to the Glock Ban and the Roster would be sufficient. California has submitted a total of 892 pages of expert reports. The quantity of pages does not equate to quality of conclusions, nor does it overcome established precedent.

### B. Gunpowder Storage Laws Are Not Analogous to Arms Bans.

Like other advocates, Defendants attempt to conflate gunpowder-storage laws with firearm bans. *Heller* itself spiked gunpowder storage laws as relevant analogues. *Id.*, 554 U.S. at 632 (gunpowder storage laws were fire safety regulations; they are not analogous to handgun ban). Eighteen years later, we are still arguing about them. "[T]he Founding-era gunpowder aggregation laws that

---

[8] "[H]andguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629.

[the State] points to are not apt comparators because the 'why' is not analogous." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 183 F.4th 211, 243 (3d Cir. 2026) (en banc) (*Cheesman*). "The gunpowder laws were enacted as fire-safety measures, not to address firearm violence." *Id*. The Court must not rely on these non-analogous laws and should not credit Defendants' experts who wrongfully assert that those laws are analogous when the Supreme Court already made clear they are not.

**C. Accidental Discharges Are as Old as Firearms.**

Defendants would have the Court believe that firearms features "obscuring whether the firearm is loaded" are a "dramatic technological change" from the muskets of the Founding Era. Def. Opp. 12. Nonsense. Accidental discharges from supposedly unloaded firearms are as old as firearms themselves.

Indeed, the historical ubiquity of this problem even led Mark Twain to once quip:

> A youth who can't hit a cathedral at thirty yards with a Gatling gun in three quarters of an hour, can take up an old empty musket and bag his grandmother every time, at a hundred. Think what Waterloo would have been if one of the armies had been boys armed with old muskets supposed not to be loaded . . ..

Mark Twain, "Advise to Youth" (1882), available at https://library.cscc.edu/twain.

**D. "Proving" Laws are Not Analogous to Firearms Bans.**

Next, Defendants suggest that the Founding-Era "proving" laws are analogous. This argument need not detain this Court long because it has already rejected an identical argument:

> The first type of law the government cites as analogous to the CLI and MDM requirements are proving laws. . . . Proving involved testing the firearm to ensure it would not fail and that it could carry a shot over a certain distance. Inspectors stamped passing firearms with the inspector's initials and the year onto the barrel so that the stamp could not be erased or disfigured. Only firearms that passed inspection and were stamped could be sold . . .. The modern-day regulation of CLI

> and MDM requirements are not analogous enough to historical precursors of proving laws to pass constitutional muster. CLIs and MDMs are safety features designed to limit accidental discharges that occur when someone mistakenly believes no round is in the chamber. . . . The goal behind proving laws, on the other hand, was to ensure that a firearm was adequately manufactured. The differences between how and why these laws burden a law-abiding citizen's right to armed self-defense is evident. Whereas CLI and MDM requirements add additional required features to and alter the operation of an otherwise well-manufactured handgun, proving laws focused only on confirming the basic operating features of a firearm. Whereas CLI and MDM requirements aim to prevent harm to others resulting from the user not knowing the firearm is loaded, proving laws targeted the firearm itself and aimed to protect the safety of the person using the firearm. Whereas CLI and MDM requirements are effectuated by checking only a few examples of a particular handgun model, proving laws were effectuated by examining each firearm manufactured. Whereas proving laws supported the use of firearms for self-defense by ensuring the weapon worked properly and safely, the MDM requirement can actually work against the use of a handgun for self-defense because it will not fire without the magazine. Put simply, requiring each model of handgun to contain additional features to potentially help a user safely operate the handgun is completely different from ensuring that each firearm's basic features were adequately manufactured for safe operation. Moreover, the CLI and MDM requirements do not impose a comparable burden as proving laws on the right of armed self-defense. Whereas proving laws kept out of the hands of law-abiding citizens only firearms with manufacturing defects, CLI and MDM requirements keep out of their hands virtually all new, state-of-the-art handguns.

*Boland*, 662 F. Supp. 3d at 1086–87 (cleaned up, citations and quotation marks omitted).

**E. Statutes Regulating Novelty Toy Pistols Were Directed at Children.**

Defendants argue that certain late nineteenth century "toy pistol" statutes are analogous to the CLI and MDM requirements. Def. Opp. 15. These statutes come too late in time to shed any light on the original public meaning of the Second and

Fourteenth Amendments. Moreover, they were not directed at arms in common use by law-abiding adults. The statutes were child safety measures directed at novelty "toy pistols." *See, e.g.*, 1881 Penn. Ch. 124 (prohibiting sales to minors); 1882 N.J. Ch. 4 (prohibiting sales to minors); 1883 Ohio ch. 336, 222 (prohibiting sales to minors); 1883 Kans. Ch. 105 (prohibiting sales to minors); 1883 Wash. Terr. 67 (prohibiting sales to minors); 1884 Iowa Ch. 78 (prohibiting sales to minors); 1884 Michigan, Ch. 138, 144 (prohibiting sales to minors). Even those statutes that did not explicitly state they were directed at children were child-safety regulations. Defendants' own expert attests that these statutes were enacted to prevent injuries to children, not to ban the sale of typical pistols. [ECF. 43-1] Rivas Dec. ¶ 29 n.57. None of the toy pistol statutes are analogous to a ban on the sale of "typical" handguns in common use by law-abiding adults. Otherwise, they would have been used as analogues to support the District of Columbia's ban in *Heller*.

### F. The Most Popular Handgun in America Is Not "Dangerous and Unusual."

*Heller* held that handguns are the most popular weapon chosen by Americans for self-defense and therefore they cannot be banned. *Id*., 554 U.S. at 629. The Second Amendment "protects the possession and use of weapons that are in common use . . .." *Bruen*, 597 U.S. at 21. Conversely, it does not protect "dangerous and unusual" weapons. *Id*. Dangerous and unusual weapons cannot simultaneously be in common use. "[T]he two descriptors are mutually exclusive." *Cheeseman*, 183 F.4th at 234.

To this, Defendants respond that if only the Supreme Court had known that semiautomatic firearms could be converted to automatic firearms; then it would have understood that semiautomatic firearms are "especially dangerous" and allowed states to ban them. Def. Opp. 15-19. But when it decided *Heller*, the Supreme Court knew that semiautomatic firearms can be converted into machineguns. *See Staples v. United States*, 511 U.S. 600 (1994). And it made no

exception to the common-use test for semiautomatic firearms because such firearms are "widely accepted as lawful possessions." *Id*. at 612.

Defendants advance several nineteenth century laws dealing with things like trap guns, slungshots and Bowie knives in support of their argument. But if those laws were analogous to a ban on handguns in common use, again, *Heller* would have been decided differently.

New Jersey advanced essentially the same set of laws in *Cheeseman*. The court rejected the proposed analogues. It stated that the regulations are inapt analogues because they do not target a class of weapons in common use for lawful purposes (like the handguns banned here). *Id*., 183 F.4th at 245. The only evidence is that such weapons were widely used in criminal activities. *Id*. That is not the case, here.

Analysts estimate that, as of 2020, Glock held nearly 65% of the U.S. market for handguns. *Gaston Glock & family*, Forbes (Apr. 5, 2021). Defendants do not dispute this. Thus, Defendant's argument leaves this Court with the exact mutually exclusive problem against which the *Cheesman* Court warned: the *Heller* Court made clear that states cannot ban handguns, but California enforces a ban of 65% of handgun sales. Those two positions cannot be reconciled and the unconstitutional enforcement of the ban must be enjoined.

**G. Machinegun Conversion Devices Are Illegal.**

Defendants argue that it is necessary to ban Glocks to prevent them from being converted into machineguns. Def. Opp. 19. That is not true. Using a conversion device to convert a semiautomatic firearm into a machinegun was illegal long before the Glock Ban was enacted. *See* Cal. Penal Code § 32625(a). Defendants' argument makes no sense. Defendants' position is like saying that they have the power to ban shotguns because shotguns could possibly be converted into illegal, sawed-off shotguns.

## X. California's Policy Arguments Fail.

Finally, California advances policy arguments (which it calls the "equities") in favor of the Glock Ban and the Roster. Again, this Court has previously rejected an identical argument in *Boland*:

> The balance of the equities and the public interest weigh in favor of granting an injunction. Without a preliminary injunction enjoining enforcement of the [likely unconstitutional statutes], Plaintiffs will continue to suffer harm because the government will continue infringing their Second Amendment rights. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Cal. Chamber of Commerce v. Council for Education and Research on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (cleaned up). Indeed, "public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005); *see Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (explaining that it is in the public interest to halt the "ongoing enforcement of the potentially unconstitutional regulations" because those regulations would infringe not only on the constitutional rights of the plaintiffs but also of the rest of the public subject to the same regulation). Moreover, the government "cannot suffer harm from an injunction that merely ends an unlawful practice" such as denying Californians' Second Amendment rights. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). The balance of the equities therefore tips in Plaintiffs' favor.

662 F. Supp. 3d at 1090.

This remains as true today as when the Court ruled in *Boland*.

## XI. Conclusion.

The Court already has enjoined enforcement of the CLI and MDM features of the Roster. The United States merely is requesting the Court to enter a similar injunction for the same reasons.

The Glock Ban bans the sale of the most popular handgun in America in flagrant disregard of *Heller*. Its continued enforcement is an affront to the Constitution, and should also be enjoined at the earlier possible time. Accordingly,

Plaintiff respectfully requests the Court to grant its motion for preliminary injunction.

Respectfully submitted this 1st day of September 2026.

*/s/ Barry K. Arrington*
Barry Arrington
Acting Chief
Second Amendment Section

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the United States, certifies that this brief contains 4,513 words, which complies with the word limit of L.R. 11-6.1.

Dated: September 1, 2026

Respectfully submitted,

*/s/ Barry K. Arrington*
Barry Arrington
Acting Chief
Second Amendment Section