**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| DAVID J. BATHRAS, *et al.*,<br>*Plaintiffs*, | * | |
| | * | |
| v. | * | Civil Action Nos. RDB-26-2074;<br>RDB-26-2647 |
| WESTLEY MOORE, *in his official capacity as Governor of Maryland*, *et al.*,<br>*Defendants.* | * | |
| | * | |

* * * * * * * * * * * * *

## MEMORANDUM OPINION

During the 2026 Legislative Session of the Maryland General Assembly Senate Bill 334, 2026 Maryland Session Laws, Ch. 771 ("SB 334"), was passed and ultimately signed by the Governor of Maryland. It bans the manufacture, sale, purchase or transfer of "machine gun convertible pistols" which can be converted with the insertion of a device that can be 3D printed or purchased easily online. This conversion transforms pistols from semiautomatic firearms, firing one bullet each time a trigger is pressed, to machineguns which fire continuously if the trigger is held down. During lengthy legislative hearings, evidence was presented by law enforcement representatives that such converted firearms can fire up to 1,200 rounds per minute. The law was codified on October 1, 2026, and the substantive provisions become effective on January 1, 2027. The Plaintiffs in this case challenge the constitutionality of this law and petition this Court to immediately issue an injunction barring its implementation. As this Court ruled at an expedited hearing, on September 25, 2026, injunctive relief would be an extraordinary exercise of this Court's power in blocking a democratically enacted state law. The petition is therefore DENIED.

Plaintiffs David J. Bathras, Sr., Roslyn Mickens, Atlantic Guns, Inc., National Rifle Association of America, Firearms Policy Coalition, Inc., Second Amendment Foundation, Francis M. Duffy, Stanley Peter, Jr., The Machine Gun Nest, Engage Armament LLC, and Maryland Shall Issue, Inc. (collectively, "Plaintiffs"), bring this action for declaratory and equitable relief against Defendants Westley Moore, in his official capacity as Governor of Maryland, Anthony G. Brown, in his official capacity as Attorney General of the State of Maryland, and Michael A. Jackson in his official capacity as Secretary of the Maryland State Police (collectively, "Defendants"). Plaintiffs seek a declaration that Senate Bill 334, which was codified on October 1, 2026 in Sections 4-301, 4-302, 4 305.2, 4-306 of the Criminal Article of the Maryland Code, violates the Second and Fourteenth Amendments of the U.S. Constitution.

This now-consolidated action began as two separately filed actions by two distinct sets of Plaintiffs. The two actions, *Duffy v. Moore*, 26-2647 (D. Md.), and *Bathras v. Moore*, No. 26-2074 (D. Md.), filed on July 2, 2026, and May 26, 2026, respectively, each allege a single count under the Second and Fourteenth Amendments. *See Duffy v. Moore*, 26-2647 (D. Md.), (ECF No. 1); *Bathras v. Moore*, 26-2074 (D. Md.), (ECF No. 1). The *Duffy* and *Bathras* Plaintiffs each filed a motion for preliminary injunction on July 13, 2026, and July 20, 2026, respectively (the "Motions"), which are currently pending before this Court. *See Bathras*, (ECF Nos. 21, 29). On July 23, 2026, this Court granted the Parties' Motion to Consolidate Cases *Duffy v. Moore*, RDB-26-2647 and *Bathras v. Moore*, RDB-26-2074, so that all subsequent filings are to be made only in the lead case, *Bathras v. Moore*, RDB-26-2074. *Bathras*, (ECF No. 25). Following the consolidation, the Court ordered consolidated briefing in response to the Plaintiffs' pending

motions for preliminary injunction. (ECF No. 32). On August 21, 2026, Defendants filed a Consolidated Opposition to Plaintiffs' Motions for Preliminary Injunction. (ECF No. 35). On September 22, 2026, Plaintiffs filed a Consolidated Reply In Support of Their Motions for a Preliminary Injunction. (ECF No. 39). The Court held an in-person hearing on Plaintiffs' Motions (ECF Nos. 21, 29) on September 25, 2026 (ECF No. 41). At the conclusion of oral argument, the Court ruled from the bench and DENIED the Motions (ECF Nos. 21, 29), promising an opinion to follow. (ECF No. 41.) This Memorandum Opinion expounds upon the Court's reasoning.

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal quotations omitted). The Court is also cognizant that facial challenges,[1] such as the one presented here, are "'disfavored' because they 'often rest on speculation,' 'short circuit the democratic process,' and 'run contrary to the fundamental principle of judicial restraint.'" *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024) (en banc) (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008)), *cert. denied sub nom.*, *Snope v. Brown*, 145 S. Ct. 1534 (2025). Reconciling competing claims of harm is particularly fraught here where the Court is asked to enjoin democratically elected representatives from enforcing duly enacted laws.

[1] A facial attack challenges the legislative act in its entirety such that "no application of the statute could be constitutional." *Sabri v. United States*, 541 U.S. 600, 609 (2004). By contrast, an as-applied challenge "claim[s] that the [statute] is unconstitutional because of the way it was applied to the particular facts of [the challenger's] case." *United States v. Salerno*, 481 U.S. 739, 745 n.3 (1987).

This Court's analysis is guided principally by the Supreme Court's decision in *New York State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022), as reaffirmed by *Wolford v. Lopez*, 609 U.S. 185 (2026),[2] as well as the U.S. Court of Appeals for the Fourth Circuit's decision in *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc), *cert. denied sub nom.*, *Snope v. Brown*, 145 S. Ct. 1534 (2025), which upheld Maryland's assault weapons ban under the Second Amendment. *Id.* at 441-42. The machinegun convertible pistols here likely fall within the plain text of the Second Amendment under *Wolford* and *Bianchi* given their popularity among civilians and law enforcement. However, Plaintiffs cannot show a likelihood of success on the merits because Defendants have shown that SB 334 falls within the historic tradition of firearm regulation. SB 334 is consistent with restrictions on excessively dangerous weapons which have been regulated in response to their criminal misuse and lethality. Machinegun convertible pistols, which can be modified into combat weapons with the insertion of a 3D printed device, implicate technological advances our founders could not have foreseen. The State has submitted historic evidence supporting that SB 334 is a commensurate response to the advances and to today's unrelenting tide of mass shootings and gun violence.[3] Plaintiffs' request to enjoin SB 334 is DENIED.

---

[2] In *Bruen*, the Court struck down a New York law requiring applicants interested in carrying a handgun for the use of self-defense in public to obtain a special license demonstrating "proper cause." *Bruen*, 597 U.S. at 11-12. The Court held that the Second and Fourteenth Amendments protect the right of an individual to carry a handgun outside the home for self-defense. *Bruen*, 597 U.S. at 10. In doing so, the Court established a two-step framework for Second Amendment claims. *Bruen*, 597 U.S. at 17. In *Wolford*, the Court applied Bruen's framework in striking down a Hawaii law prohibiting licensed concealed-carry permit holders from carrying handguns on private property open to the public unless the property owner gave express permission. *Wolford*, 609 U.S.at 190-91.

[3] Since 2020, firearm-related injuries are the leading cause of death for children in the United States. *See* Bailey K. Roberts, et al., Trends and Disparities in Firearm Deaths Among Children, National Library of Medicine, at 2 (Sep. 2023), https://perma.cc/8RUZ-7G6H; Carolyn Raymond-King, M.D.,

## BACKGROUND

### A. Relevant Provisions of SB 334

On May 26, 2026, Governor Moore signed SB 334. *See* 2026 Md. Laws Ch. 771 (codified at Md. Code Ann., Crim. Law §§ 4-301, 4-302, 4-305.2, 4-306). The law went into effect on October 1, 2026, though its substantive provisions only become effective on January 1, 2027. *Id.* § 4-305.2(a). The provision most relevant to this action provides that "on or after January 1, 2027, a person may not manufacture, sell, offer for sale, purchase, receive, or transfer a machine gun convertible pistol," subject to narrow exceptions. *Id.* § 4-305.2(a).

The full text of Section 4-305.2 provides:

> (a) Except as otherwise provided in this section, on or after January 1, 2027, a person may not manufacture, sell, offer for sale, purchase, receive, or transfer a machine gun convertible pistol.
>
> (b) The Department of State Police shall adopt regulations to implement this section, including publishing a list of prohibited machine gun convertible pistols.
>
> (c)(1) In this subsection, "immediate family member" means a spouse, child, stepchild, parent, stepparent, sibling, or stepsibling.
>
> (2)(i) A person who lawfully obtained and possesses a machine gun convertible pistol may sell or otherwise transfer a machine gun convertible pistol to an immediate family member who is not prohibited under federal or State law from possessing a firearm.
>
> (ii) A person who is not otherwise prohibited under federal or State law from possessing a firearm may purchase or otherwise receive a machine gun convertible pistol from an immediate family member who lawfully obtained the pistol.

---

Ph.D., et al., Current Causes of Death Among Children and Adolescents in the United States, Correspondence, N. Engl. J. Med. 2026; 394:1958-1959 (May 13, 2026), https://perma.cc/TV5U-QFAC.

*Id.* § 4-305.2. In turn, SB 334 defines a "machine gun convertible pistol" as "any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or by using common household tools into a machine gun by the installation or attachment of a pistol converter as a replacement for the slide's backplate." *Id.* § 4-301(o)(1). SB 334 directs the Maryland State Police to adopt regulations to implement this provision, "including publishing a list of prohibited machine gun convertible pistols." *Id.* § 4-305.2(b).

Violations are subject to the existing penalty structure under Criminal Law Article Section 4-306, a misdemeanor with up to three years imprisonment and/or up to a $5,000 fine.

### B. Conversion of Pistols to Machineguns

In general, firearms may be categorized as either semiautomatic, where one bullet is fired each time the trigger is pressed, or automatic (i.e., machineguns), where bullets are fired continuously if the trigger is held down. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994); 26 U.S.C. § 5845(b). Machineguns are regulated at both the federal level and under Maryland state law, so that possession is generally banned except under narrow circumstances. *See* 18 U.S.C. § 922(o); Md. Code Ann., Crim. Law §§ 4-404, 4-405.

In semiautomatic firearms, a component called the "sear" functions to permit only one bullet to be fired when the trigger is pressed. *See* David B. Kopel, *Machine Gun History and Bibliography*, 25 Wyo. L. Rev. 45, 51-52 (2025); 18 U.S.C. § 921(a)(29) (defining "semiautomatic rifle" as rifle that fires one round while containing the next round "and which requires a separate pull of the trigger to fire each cartridge"). A semiautomatic firearm may be converted into an automatic firearm through the incorporation of a small device, such as a "switch" or

"auto sear," which overrides the sear to allow for continuous bullets when the trigger is pressed. *See* Md. Code Ann., Crim. Law §§ 4-301(p), 4-301(r). Federal and Maryland law prohibit possession of machinegun conversion devices like switches. *See* 26 U.S.C. § 5845(b) (defining "machinegun" to include "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun"); 18 U.S.C. § 922(o) (making it "unlawful for any person to transfer or possess a machinegun," subject to narrow exceptions); Md. Code Ann. Crim. Law §§ 4-301(p)(2), (r), 4 305.1.

**C. The General Assembly's Response to the Spread of Machine Gun Conversion Devices**

Senate 334 was introduced during the 2026 Legislative Session to address what the bill's sponsor, Senator Sara Love, termed as "DIY, do-it-yourself machineguns": easily converted handguns which can "fir[e] up to 1,200 rounds per minute with a single pull of the trigger." Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026), testimony of Senator Sara Love, [hereinafter, "SB 334 Introduction"] at 57:50-58:51;[4] Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) (written testimony of Tara H. Jackson, State's Attorney for Prince George's County), https://perma.cc/7QEC-MZW5 (similar). Introducing SB 334, Senator Love described mass shootings in recent years that were

[4] The recording of the Judicial Proceedings Committee bill hearing for SB 334 is available at https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jpr&ys=2026RS&clip=JPR_2_5_2026_meeting_2&billNumber=sb0334 (last accessed Oct. 5, 2026).

committed with converted pistols, including a 2023 shooting at Morgan State University that left five wounded. *Id.* at 58:58-1:00:00.

Senator Love explained that SB 334 targets particularly convertible models, since mass shootings have persisted despite existing federal and state laws making machineguns and machinegun conversion devices illegal. S.B. 334 Introduction, at 59:50-1:00:11; *see also* Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026), (written testimony of Senator Love), https://perma.cc/LK8E-L8HL .

Following the introduction of SB 334, legislators considered testimony in support of the bill from multiple witnesses, including law enforcement agencies,[5] such as the Baltimore Police Department, Annapolis Police Department, Montgomery County Police Department, and Prince George's County State's Attorney's Office. *See* Committee Testimony and Witness Sign-Up: SB0334 Criminal Law - Firearm Crimes - Machine Gun Convertible Pistols, https://perma.cc/9QQG-M5QY; Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) (written testimony of Erin Murphy, Esq., Chief of Staff & Government Affairs, Baltimore Police Department), https://perma.cc/3NPU-6HH7; Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) (written testimony of Tara H. Jackson, State's Attorney for Prince George's County), https://perma.cc/7QEC-MZW5 .

---

[5] No law enforcement agency testified against SB 334. *See* Committee Testimony and Witness Sign-Up: SB0334 Criminal Law - Firearm Crimes - Machine Gun Convertible Pistols, https://perma.cc/9QQG-M5QY.

The Baltimore Police Department's testimony described the "heightened lethality and indiscriminate danger posed" by the "rate of fire" from the "firearms modified with Glock switches." Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) (written testimony of Erin Murphy, Esq., Chief of Staff & Government Affairs, Baltimore Police Department), https://perma.cc/3NPU-6HH7 . Likewise, testimony from a representative of Giffords Law Center, the gun violence prevention organization led by former Congresswoman, gun owner, and gun violence survivor Gabby Giffords, described the particular public safety threat posed by converted pistols:

> Pistols converted into DIY machine guns are extremely dangerous because they can fire up to 1,200 rounds per minute. Their recoil also makes them hard to control and shoot accurately. Shootings committed with these modified pistols can be deadlier because they allow shooters to spray bullets with a single pull of the trigger, endangering bystanders.

Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) (written testimony of Erin Earp, Esq., Senior Policy Attorney, Giffords Law Center, https://perma.cc/P6KX-MM8C); Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) (written testimony of Kendall Jackson, Everytown for Gun Safety), https://perma.cc/L2YS-9GL8 ("Their recoil also makes them hard to control and shoot accurately, endangering bystanders. Modified pistols equipped with switches have become a weapon of choice for criminals and have been recovered or used in crimes across Maryland . . . ."); *see also* Decl. of Lt. Colonel M. Correll, (ECF No. 35-1 ¶¶ 7-10) (explaining the public safety risks from "continuous recoil caused by

automatic fire in these modified pistols [which] makes it extremely difficult to fire them with accuracy" and "small and concealable" nature of pistols makes their conversion more difficult to detect). In sum, lawmakers considered testimony from law enforcement and gun violence prevention organizations highlighting that the convertible guns can be easily converted within minutes into a concealable and difficult to control "weapon of mass violence." Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026), at 1:30:09-1:30:30 (oral testimony of John O'Brien, Director of the Montgomery County Police Department Special Investigations Division).

Compounding the problem, Senator Love and others explained that "3D printing"[6] has made it "cheap and easy" to obtain conversion devices:

> [D]ue to the growth of 3-D printing and traffickers who smuggle and sell them, these small devices are cheap and easy to get. ATF data shows that recoveries of machine gun conversion devices increased by 784% from 2019 to 2023 alone. Maryland data shows us that these DIY machine guns have been recovered or used in crimes across Maryland at an increasing rate.

Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026), (written testimony of Senator Love), https://perma.cc/LK8E-L8HL. The President of the Baltimore City Council wrote that "Baltimore City has seen an influx of these illegally converted machine guns in recent years; the Baltimore Police Department (BPD) reported that recoveries nearly doubled between 2024 and 2025." S. Jud. Proceedings Comm. Hearing

[6] 3D printing, which is also known as additive manufacturing, allows for the creation of physical objects from 3D computer models by adding material one layer at a time. *See* NIST, Additive Manufacturing, https://perma.cc/9ZJY-A72Q. 3D printers are available for personal use, and object designs are widely available online for free, making it "easy, fast, and cheap" to locate designs and "print" corresponding objects at home. *See* Tabrez Y. Ebrahim, 3D Printing: Digital Infringement & Digital Regulation, 14 Nw. J. Tech. & Intell. Prop. 37, 41 (2016).

on S.B. 334 (written statement of Zeke Cohen, Baltimore City Council President's Office), https://perma.cc/FLW4-R7VZ. A representative from the Montgomery County Police Department similarly testified that, in the past year, the department recovered 70% more machinegun convertible pistols than the year prior. *Id.* at 1:30:44-1:31:07 (oral testimony of John O'Brien, Director of the Montgomery County Police Department Special Investigations Division).

Declarations submitted by the State attest to the increased machinegun-related crime. In Maryland, firearm recoveries by state and local law enforcement involving at least one machinegun have increased, from a total of 30 in the four years between 2019 and 2022, to 292 between 2023 and 2026, an increase of 873%. *See* (ECF 35-2, Decl. of Rosemary Chappell ¶ 7). The majority of machineguns in these recoveries "are pistols that feature cruciform trigger bars." *Id.* Machine-gun related criminal charges in Maryland have also increased: from 2019 through 2022, Maryland brought, on average, approximately 14 charges per year for all state crimes most tied to machineguns.[7] *See* (ECF No. 35-3, Decl. of Kathleen Maher, at pp. 4-5). This number has increased by more than 1,300%, reaching 202 charges in 2024, 278 in 2025, and 231 so far in 2026. *Id.*

Legislators designed SB 334 to "protect its citizens and its law enforcement from these DIY machine guns" by targeting the easily convertible designs. Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026), (written testimony of Senator

---

[7] This data combines Maryland District Court and Circuit Court charges each year for the following crimes: Crim. Law § 4-405(a) (use of a machinegun for an offensive purpose), § 4-305.1 (possession of rapid fire trigger activator), § 4-404 (use of machinegun in crime of violence). *See* (ECF No. 35-3, Decl. of Kathleen Maher ¶ 4).

Love), https://perma.cc/LK8E-L8HL; SB 334 Introduction at 1:00:14-1:01:52. Senator Love explained:

> The majority of gun manufacturers use designs that are not easily convertible to machine guns. But several do. And while those manufacturers should be taking steps to make sure their guns can't be easily converted into DIY machine guns, they have not. That is why we need SB 334 to strengthen product safety standards for all handguns sold in Maryland, ensuring that no handgun sold to civilians can be easily converted into a DIY machine gun.

*Id.*; SB 334 Introduction, at 1:00:14-1:01:05.

More specifically, designs sold by the Austrian manufacturer Glock, and those with similar designs, "are uniquely easy to convert with switches . . . because they use cross-shaped (or 'cruciform') trigger bars that provide surface area for a switch to contact." Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) (written testimony of Greg Lickenbrock, Senior Firearms Analyst for Everytown for Gun Safety), https://perma.cc/ZCH9-C3RJ. Machine gun conversion devices can be installed in "less than a minute." *Id.* Other pistols made by manufacturers like Smith & Wesson, Sig Sauer, and Springfield, feature "trigger bars [that] are broken into smaller, disparate components that are shielded from interference." *Id.*

Plaintiffs allege that the cruciform trigger bar has been a feature of Glock pistols since the models were first sold in the U.S. in 1986, and all factory stock models of Glock pistols have a cruciform trigger bar. (Am. Compl., ECF No. 17 ¶¶ 30-33). When Glock's patent expired in 2020, companies began producing similar "Glock-style pistols" based on the design. (*Id.* ¶ 32). Plaintiffs assert, "[t]o the best of [their] knowledge," that Glock and Glock-style pistols "are the only handguns that meet SB 334's definition of a 'machine-gun convertible pistol.'" (*Id.* ¶ 34). Analysts estimate that, as of 2020, Glock held nearly 65% of the U.S. market

share for handguns. *Gaston Glock & Family*, Forbes (Apr. 5, 2021), https://perma.cc/6HWX-6FFP. Glock pistols rank among the top-selling firearms in the U.S. civilian market. *See, e.g.*, *Best-Selling Guns*, Guns.com (May 5, 2026), https://perma.cc/9JGJ-ZXXN (listing two Glock models in the top-five-selling handguns). Glock pistols have also been used by law enforcement. *Glock History*, GLOCK, https://perma.cc/CLZ5-9ATE ("Over 65% of federal, state and local agencies in the United States have been issued GLOCK pistols."); *New Technology Initiatives*, Balt. Police Dep't, https://perma.cc/38AU-6V8V (noting that Baltimore Police Department issued Glock pistols to its officers).

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). In determining whether to issue a preliminary injunction, this Court must follow the test set forth by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which requires a showing that:

(1) the movant is likely to succeed on the merits;

(2) the movant is likely to suffer irreparable harm absent preliminary relief;

(3) the balance of equities favors the movant; and

(4) an injunction is in the public interest.

555 U.S. at 20; *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

A court cannot issue a preliminary injunction absent a "clear showing" that all four requirements are satisfied. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 979 F.3d 219, 226 (4th Cir. 2020), *rev'd on other grounds*, 2 F.4th 330 (4th Cir. 2021); *accord Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). The plaintiff "bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). Thus, a court need not address all four *Winter* factors if one or more factors is not satisfied. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

A court should exercise "greater caution, deliberation, and sound discretion" in determining whether to issue an injunction, "the strong arm of equity," because injunctions themselves can inflict harm. *See Truly v. Wanzer*, 46 U.S. 141, 142 (1847). The practical limitations at this preliminary stage also counsel caution: such motions are often decided hurriedly on the basis of a limited evidentiary record. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004) (en banc) (McConnell, J., concurring). A motion for a preliminary injunction, therefore, requires the Court to make "a prediction about the merits of the case" on thin evidence, primarily affidavits drafted by attorneys, without the benefits of discovery and testimony vetted by the adversarial process. *Americans for Prosperity Found. v. Albence*, -- F.4th --, 2026 WL 2563151, at *2 (3d Cir. Aug. 31, 2026).

## ANALYSIS

### I. Defendants' Standing Challenge

As an ancillary matter, within Defendants' irreparable harm arguments, Defendants also challenge the standing of two individual Plaintiffs and as to association Plaintiffs National

Rifle Association, Firearms Policy Coalition, Second Amendment Foundation, and Maryland Shall Issue. (ECF No. 35 at 31, 36-37). To establish Article III standing a plaintiff must satisfy three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, [ ] and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" [ ]. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." [ ] Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified) (citations omitted); *see also Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 283-84 (4th Cir. 2018). However, as Plaintiffs correctly observe, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (internal quotation marks omitted). "[O]nce it is established that at least one party has standing to bring the claim, no further inquiry is required as to another party's standing to bring that claim." *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209 (4th Cir. 2020), *as amended* (Aug. 31, 2020) (citing *Horne v. Flores*, 557 U.S. 433, 446-47 (2009)). Here, Defendants have only challenged standing as to six of the eleven Plaintiffs, so Defendants cannot establish that *no* Plaintiff has standing to bring the claim. *Id.*

Notwithstanding this, the Court briefly addresses Defendants' standing arguments. The two individual Plaintiffs have demonstrated an injury in fact. Mr. Bathras currently owns a Glock pistol, and SB 334 targets Glocks by prohibiting models with a cruciform trigger from being transferred and sold after January 1, 2027. (ECF No. 21-3, Decl. Bathras, ¶ 4 ("I

currently own a Glock semiautomatic pistol that I lawfully acquired and possess for lawful purposes, including self-defense, training, recreational shooting, and collection."). Ms. Mickens is a "registered gun collector," "instructor," and "member of each of the organization" co-plaintiffs, who, but for SB 334, "would acquire Glock and Glock style semiautomatic pistols after January 1, 2027." (ECF No. 21-4, Decl. Mickens ¶¶ 3-5). Their "course of conduct is 'arguably affected with a constitutional interest'" sufficient to demonstrate injury in fact. *See Kipke v. Moore*, 165 F.4th 194, 213 (4th Cir. 2026) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) and *Bruen*, 597 U.S. at 8).

As for the association Plaintiffs, Defendants contend that they lack standing because "any injury to their membership 'will turn on the kind of individualized proof that requires the participation of its members in this suit.'" (ECF No. 35 at 36-37 (quoting *Association of Am. Railroads v. Hudson*, 144 F.4th 582, 593-94 (4th Cir. 2025)). However, the equitable relief sought in this action does not require individualized proof of their members' injuries or "property-specific" information; the relief sought seeks to enjoin the enforcement of an allegedly unconstitutional statute under the Second and Fourteenth Amendments. *See Association of Am. Railroads v. Hudson*, 144 F.4th 582, 589-90, 594 (4th Cir. 2025) ("[A]n action seeking prospective declaratory and injunctive relief . . . is less likely to call for such particularized proofs, and is indeed the very 'type of relief for which associational standing was originally recognized.'" (quoting *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007)); *National Federation of the Blind, Inc. v. Wal-Mart Associates, Inc.*, 566 F.Supp.3d 383, 395-96 (D. Md. 2021). At this stage, it is sufficient for standing that the individual plaintiffs and dealers in this action who have attested to an inability to sell Glock pistols, also have attested that they are members

of the organizations. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342-44 (1977); *National Federation of the Blind, Inc*, 566 F.Supp.3d at 395-96; (ECF No. 21-3, Decl. Bathras, ¶ 7 (attesting to membership in National Rifle Association, Firearms Policy Coalition, and Second Amendment Foundation); (ECF No. 21-5, Decl. Schneider at ¶ 7(attesting Atlantic Guns Inc.'s membership in the same)); (ECF No. 29-3, Decl. Duffy, ¶ 3 attesting to membership in Maryland Shall Issue); (ECF No. 17, Am. Compl. ¶¶ 7-12).

## II. Preliminary Injunctive Relief

Plaintiffs have not carried their burden as to the four *Winter* factors to warrant injunctive relief by this Court.

### A. Likelihood of Success

Plaintiffs facially challenge SB 334 "in its entirety as to *all* handguns with a cruciform trigger bar." *See, e.g.*, (ECF No. 21-1, at 4) (emphasis in original). Under Supreme Court and Fourth Circuit precedent, "facial challenges are 'disfavored' because they 'often rest on speculation,' 'short circuit the democratic process,' and 'run contrary to the fundamental principle of judicial restraint.'" *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024) (en banc) (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008)), *cert. denied sub nom.*, *Snope v. Brown*, 145 S. Ct. 1534 (2025). Such challenges are "the 'most difficult . . . to mount successfully" since Plaintiffs must "establish 'that no set of circumstances exists under which the statute at issue would be valid,' or that the statute lacks any 'plainly legitimate sweep.'" *Id.* at 452 (alteration in original) (first quoting *United States v. Rahimi*, 602 U.S. 680, 693 (2024), then quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

Plaintiffs contend that SB 334 cannot pass constitutional muster under the framework for Second Amendment claims established in *New York State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022). (ECF No. 21-1 at 8-9; ECF No. 29-1 at 14). *Bruen* established a two-step analysis, which (1) considers first whether a challenged law falls within the plain text of the Second Amendment, and (2) if so, whether the State can rebut the presumption of unconstitutionality by showing that the law fits within "this Nation's historical tradition of firearm regulation":

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.

*Bruen*, 597 U.S. at 17. Plaintiffs have not carried their burden to show a likelihood of success under this framework. Although machinegun convertible pistols likely fall within the plain text of the Amendment, the State has shown that SB 334 fits within the historic tradition restricting "excessively dangerous weapons" which are prone to criminal misuse.

**1. Machinegun convertible pistols likely qualify as "Arms" within the plain text of the Second Amendment.**

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.[8] If the individual's regulated conduct does not fall within the plain text

[8] "[T]he Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*" against the states. *McDonald v. Chicago*, 561 U.S. 742, 791 (2010). In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court determined that the Second Amendment protects the right to keep a handgun in the home for self-defense. *Heller*, 554 U.S. at 595, 628-29; *see infra* Section II.A.1(i.).

then "the Second Amendment does not apply." *United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024) (en banc) (citation omitted). However, if the individual's regulated conduct does fall within the plain text, then the State must rebut the presumption of unconstitutionality. *Bruen*, 597 U.S. at 17.

Here, the Parties dispute whether machinegun convertible pistols qualify as "Arms" under Supreme Court jurisprudence and the Fourth Circuit Court of Appeals' decision in *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc), *cert. denied sub nom.*, *Snope v. Brown*, 145 S. Ct. 1534 (2025). Plaintiffs claim that machine convertible pistols are handguns which "fall squarely into this category." (ECF No. 21-1 at 9 (quoting *Wolford v. Lopez*, 609 U.S. 185, 192 (2026)). Meanwhile, the State contends that machinegun convertible pistols are "excessively dangerous arms" which are not reasonably related to the right of self-defense protected by the Second Amendment. (ECF No. 35 at 15-16 (quoting *Bianchi*, 111 F.4th at 450).

The Court finds that Plaintiffs have shown, under *Bianchi*, *Heller*, and *Wolford*, that machinegun convertible pistols likely fall within the Amendment's purview because they have been in "common use for lawful purposes." *Bruen*, 597 U.S. at 32.

### *i.* *Bruen* Step 1 Adopts *Heller's* Plain Text Analysis

*Bruen* Step 1 adopts the approach to the plain text inquiry as set forth in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Bruen*, 597 U.S. at 17, 26; *see also Wolford v. Lopez*, 609 U.S. 185, 195 (2026); *Bianchi*, 111 F.4th at 444-46. In *Bruen*, the parties did not dispute that "handguns are weapons 'in common use today' for self defense," and that "carrying handguns publicly for self-defense" fell within the plain text of the Second Amendment. *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 580, 627). In *Heller*, the Supreme Court held that the Second

Amendment safeguards the right to possess a handgun in the home. *Id.* at 635. Taking the textual and historical analysis into account, the *Heller* Court found that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

Regarding the term "Arms," the Court found that it referred "to weapons that were not specifically designed for military use and were not employed in a military capacity." *Id.* at 581. However, the term is not confined to "Arms" in existence at the time of the founding, but extends to "all instruments that constitute bearable arms." *Id.* at 581. The Court clarified, however, that this "right was not unlimited," as the Court "d[id] not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation." *Id.* at 595 (emphasis in original); *id.* at 626 ("[T]he Second Amendment is not unlimited."). "Self defense" "was the *central component* of the right itself." *Id.* at 599 (emphasis in original). The *Heller* Court explained that Americans in the founding era "understood the 'right of self-preservation' as permitting a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Id.* at 594-95 (quoting 1 Blackstone's Commentaries 145-146, n. 42 (1803)).

The Court announced additional limitations on the right. First, the Court found it would be "startling" to read the Second Amendment such that "the National Firearms Act's restrictions on machineguns . . . might be unconstitutional." *Id.* at 624. Indeed, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Therefore, the Court reasoned that "weapons that are most useful in military service—M–16 rifles and the like—may be banned" under the Second

Amendment. *Id.* at 624. In addition, the Court reasoned that the Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625. These "dangerous and unusual weapons" are not "in common use," and can be prohibited. *Id.* at 627. Unlike those weapons, the Court recognized that "the American people have considered the handgun to be the quintessential self-defense weapon." *Id.* at 629.

### ***ii.*** **The Fourth Circuit Applies *Heller's* Plain Text Analysis to Assault Weapons**

In *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024), the Fourth Circuit Court of Appeals considered whether assault weapons were "Arms" within the Second Amendment. The Fourth Circuit instructed, based on *Heller* and *Bruen*, that the text must be read against "its historical and legal backdrop." *Id.* at 448 (citing *Bruen*, 597 U.S. at 25). The Court, therefore, reaffirmed part of its pre-*Bruen* holding that the assault weapons, such as AR-15s, were outside of the Second Amendment because they are "ill-suited and disproportionate to self-defense"—assault weapons were more similar to "'weapons that are most useful in military service." *Id.* at 448, 461 (first citing, *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), *abrogated by New York State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1, 28 (2022)); *see also id.* at 448 ("*Bruen* did not disturb the analysis Courts of Appeals conducted under the first step of their framework." (quoting *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 8 (D.D.C. 2023)).

This conclusion was strengthened by the *Heller* Court's finding that "the *central component*" of the right was "self-defense." *Id.* at 448. The Court explained that the weapons fell outside of the Amendment's text because they were disproportionate to the goal of self-defense and were, instead, more suited to criminal and military use:

> What brings all the weapons beyond the scope of the Second Amendment together, and what separates them from the handgun, is their ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection. As such, they are weapons most suitable for criminal or military use.

*Id.* at 451. The Fourth Circuit issued its decision, recognizing that the Supreme Court has not yet had the opportunity to decide the "full array of weaponry that falls outside the ambit of the Second Amendment." *Id.* at 451.

Given these principles, AR-15s fell outside of the Amendment' scope: "Between its firepower, accuracy, and modifiability, the 'net effect' of the AR-15's 'military combat features is a capability for lethality,'" not self defense. *Id.* at 456 (quoting *Kolbe v. Hogan*, 849 F.3d 114, 144 (4th Cir. 2017), *abrogated in part by Bruen*, 597 U.S. 1). It was also noteworthy that the "AR-15 and other assault rifles" were "preferred weapons" for criminals intending to harm to "innocent civilians," and that AR-15s pose a unique risk to law enforcement. *Id.* at 456-57. The Fourth Circuit rejected appellant's contention that the popularity or common use of a weapon could render it within the Second Amendment. *Id.* at 460. Instead, under *Bruen*, a "weapon must be 'in common use today for self-defense' to be within the ambit of the Second Amendment." *Id.* (quoting *Bruen*, 597 U.S. at 32). The Court acknowledged the possibility that weapons may "proliferate before lawmakers comprehend that they are ill-suited or disproportionate to self-defense," as "dangerousness and unusualness need not be static concepts." *Id.* at 460-61.

The Supreme Court denied appellants' petition for certiorari to review the Fourth Circuit's decision. When it did so, Justices Thomas, Alito, and Gorsuch noted that they would grant the petition for certiorari, and Justice Kavanaugh issued a statement reiterating that the Second Amendment protects those weapons in "'in common use' by law-abiding citizens."

*Snope v. Brown*, 145 S.Ct. 1534 (2025). In light of its precedents, Justice Kavanaugh questioned the decision in *Bianchi v. Brown* "[g]iven that millions of Americans own AR-15s" and a "significant majority of the States allow possession" of these firearms. *Id.* at 1534.

Since *Bianchi*, the Supreme Court has issued further guidance on the *Bruen* framework. In *Wolford v. Lopez*, 609 U.S. 185 (2026), the Court struck down Hawaii's regulation that prohibited licensed concealed-carry permit holders from carrying handguns on private property open to the public unless the property owner gave express permission. *Wolford*, 609 U.S. at 190-91. Citing *Heller* with approval, the Court found that "handguns, which are 'overwhelmingly chosen by American society' for self-defense, fall squarely into" the category of "Arms." *Wolford*, 609 U.S. at 192. Regarding *Bruen* Step 1, the Court recognized that the Parties did not dispute that the parties were "people" and that they seek to "bear," i.e. "carry, 'arms,'" so that "the plain text of the Second Amendment protects what petitioners want to do: carry handguns for self-defense." *Wolford*, 609 U.S. at 202. The Supreme Court rejected the State's attempt to argue that the Second Amendment did not historically encompass armed entry on private property without the owner's consent, instructing that the historical authorities were "out of place at *Bruen's* first step." *Id.* at 205.[9]

[9] Plaintiffs urge this Court to find that *Wolford* abrogated the *Bianchi* Court's *Bruen* Step 1 analysis. (ECF No. 39 at 5). Plaintiffs contend that *Bruen* Step 1 should be confined to the three subsidiary questions of whether the regulated conduct implicates people, keeping or carrying, and arms, without consideration of the historical context. As explained during the hearing, the Court declines to adopt Plaintiff's reading of *Wolford* and this narrow interpretation for several reasons. First, *Wolford's* discussion of *Bruen* Step 1 was abbreviated, possibly because the parties did not dispute that the Hawaii public carry rule at issue fell within the plain text. *Wolford*, 609 U.S. at 202. Second, in *United States v. Price*, 111 F.4th 392 (4th Cir. 2024) when a similarly narrow interpretation was urged, the Fourth Circuit squarely rejected it as contrary to "the analysis put forth in [Supreme Court precedents] *Heller*, *Bruen*, and *Rahimi*." *United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024). Third, the Court finds that *Wolford* can be read harmoniously with the binding precedents from the Fourth Circuit. *Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019) ("We do not lightly presume that the law of the circuit has been

The Supreme Court has granted petitions for writ of certiorari in consolidated cases challenging Illinois' assault weapons ban and Connecticut's assault weapons ban, which was passed in 2013 following the Sandy Hook Elementary School shooting. *Grant v. Higgins*, 146 S.Ct. 2811 (2026); *Viramontes v. Cook Cnty., Illinois*, 146 S.Ct. 2813 (2026).[10]

### ***iii.*** **Application To Machinegun Convertible Pistols**

These precedents instruct that a machinegun is a weapon of crime and war, while a handgun is not, which leaves machinegun convertible pistols in a liminal space between the categories. *Bianchi*, 111 U.S. at 451-52. SB 334 targets common handguns which are equipped with a design that makes them uniquely easy to convert into illegal weapons of mass violence. Since the ban applies to common handguns, regardless of their later criminal conversion, the Court finds that machinegun convertible pistols fall within the plain text of the Second Amendment.

Defendants argue, under *Bianchi*'s reasoning, machinegun convertible pistols are similar to "dangerous and unusual weapons" which are "ill-suited" and "disproportionate" to the goal of self-defense. *Bianchi*, 111 U.S. at 451-59; (ECF No. 35 at 15-16).. As emphasized in *Bianchi*, because machinegun convertible pistols are easily modified to "mimic military-grade machine guns," their lethality is disproportionate to self-defense, and instead are more suited to criminal use. *Id.* at 456 (quoting *Bevis v. City of Naperville*, 657 F.Supp.3d 1052, 1074 (N.D. Ill. 2023)).

---

overturned."). Moreover, Plaintiff's reading of *Wolford* as abrogating the *Bianchi* Court's *Bruen* Step 1 analysis would not change the outcome of this Court's *Bruen* analysis.

[10] Oral argument is currently scheduled for December 2, 2026. *See Grant v. Higgins*, No. 25-566 (Sep. 4, 2026).

Indeed, Defendants have identified certain facts in support of their position. Once converted, machinegun convertible pistols can shoot 1,200 rounds with a single pull of the trigger. SB 334 Introduction, at 57:50-58:51. The recoil makes continuous fire in the converted pistol difficult to control, endangering law enforcement and innocent bystanders. *See* Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) (written testimony of Erin Earp, Esq., Senior Policy Attorney, Giffords Law Center, https://perma.cc/P6KX-MM8C). Additionally, the small size of machinegun convertible pistols makes their conversion particularly difficult to detect. Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) at 1:30:09-1:1:30:30 (oral testimony of John O'Brien, Director of the Montgomery County Police Department Special Investigations Division).

Their lethality and concealability make these models more suited for criminal enterprises than self defense. For example, in Maryland, law enforcement agencies are recovering converted models at increased rates at crime scenes, and have reported their use in mass shootings and in organized crime in recent years. *See* S. Jud. Proceedings Comm. Hearing on S.B. 334 (written statement of Zeke Cohen, Baltimore City Council President's Office), https://perma.cc/FLW4-R7VZ.; (ECF 35-2), Decl. of Rosemary Chappell ¶ 7 (reporting firearm recoveries involving at least one machinegun have exponentially increased, from a total of 30 in the four years between 2019 and 2022, to 292 between 2023 and 2026, an increase of 873%--the majority of which are "pistols that feature cruciform trigger bars").

However, as Plaintiffs correctly observe, the guidance from the Supreme Court and Fourth Circuit precedents above more clearly counsel treating machinegun convertible pistols as handguns that fall within the plain text of the Amendment. Machinegun convertible pistols include "Glock" and "Glock-style" handguns,[11] which are popular handguns in the United States.[12] *See, e.g.*, *Bianchi*, 111 F.4th 455 (referring to the "Glock 19" as "commonly used handgun"). The Supreme Court explained in *Heller* that "handguns" are the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629, and reiterated in *Wolford* that "handguns . . . fall squarely into" the definition of "Arms." *Wolford*, 609 U.S. at 192 (citing *Heller*, 554 U.S. at 628); *see also Snope v. Brown*, 145 S.Ct. 1534 (June 2, 2025) (Kavanaugh, J.). The Fourth Circuit recognized that "The *Heller* Court placed such weapons of crime and war in explicit contradistinction to the handgun," which falls within the Amendment. *Bianchi*, 111 U.S. at 451. Given the Supreme Court's commands regarding handguns and the fact that SB 334 prohibits transfers of machinegun convertible pistols pre-conversion, the Court finds that Plaintiffs have demonstrated that SB 334's prohibition on the manufacture, sale, and transfer of machinegun convertible pistols falls within the ambit of the Second Amendment.

---

[11] Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) (written testimony of Greg Lickenbrock, Senior Firearms Analyst for Everytown for Gun Safety, https://perma.cc/ZCH9-C3RJ (emphasis added)).

[12] *See, e.g.*, *Gaston Glock & Family*, Forbes (Apr. 5, 2021), https://perma.cc/6HWX-6FFP (noting, as of 2020, Glock held nearly 65% of the U.S. market share for handguns)*; Best-Selling Guns*, Guns.com (May 5, 2026), https://perma.cc/9JGJ-ZXXN (listing two Glock models in the top-five-selling handguns).

**2. SB 334 fits within the historic tradition of regulating "excessively dangerous" weapons with potential "for criminal abuse or unreasonable capacity to inflict casualties."**

However, even if the machinegun convertible pistols fall within the Second Amendment, Plaintiffs have not demonstrated a likelihood of success with respect to *Bruen's* Step 2. As a preliminary matter, Plaintiffs argue that machinegun convertible pistols cannot fall within the historic tradition of firearm regulation because Glocks and Glock-style handguns are "arms in common use for lawful purposes," and therefore neither "dangerous" nor "unusual." (ECF No. 29-1 at 18-20; ECF No. 21-1 at 10-14 (similar); ECF No. 39 at 8-11).

However, whether a weapon is in "common use for lawful purposes" versus "dangerous and unusual" is considered under *Bruen's* Step 1, not the historical analysis under *Bruen* Step 2. *See, e.g.*, *Bianchi*, 111 U.S. at 460 (rejecting notion that "a weapon's common use is conclusive evidence that it cannot be banned"); *Kipke v. Moore*, 165 F.4th 194, 206 (4th Cir. 2026) (recognizing the *Bruen* Step 1 considers "whether the weapons at issue are "in common use for a lawful purpose" (quoting *United States v. Price*, 111 F.4th 392, 400 (4th Cir. 2024))); *Del. State Sportmen's Assn. v. Del. Dep't Safety and Homeland Secy*, 664 F.Supp.3d 584, 591-97 (D. Del. 2023) (similar), *aff'd*, 108 F.4th 194 (3d Cir. 2024), *cert. denied sub nom.*, *Gray v. Jennings*, 145 S.Ct. 1049 (2025); (ECF No. 29-1 at 18-20; ECF No. 21-1 at 10). Plaintiffs' contention, therefore, that the State cannot regulate firearms in common use is misplaced. (ECF No. 29-1 at 18); (ECF No. 21-10 at 10); *Del. State Sportmen's Assn. v. Del. Dep't Safety and Homeland Secy*, 664 F.Supp.3d 584, 597 (D. Del. Mar. 27, 2023). These assertions would end the analysis at *Bruen* Step 1 and find any firearm that falls within the plain text cannot be regulated. However,

that is not the framework. As the *Bruen* Court explained, "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *The government must then justify its regulation* by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24 (emphasis added).

Having found that machinegun convertible pistols likely fall within the plain text, the Court next considers whether the State has shown that the regulation falls within the "Nation's historical tradition of firearm regulation." *Id.* Under *Bruen* Step 2, courts may consider a "variety of sources, including scholarship," "but the best evidence" are what *Bruen* referred to as "historic analogues"—"old legal rules from which a court may draw a strong inference that the modern law at issue is consistent with the codified right." *Wolford*, 609 U.S. at 196 (citing *Bruen*, 597 U.S. at 24, 28, 34-60). To assess their consistency, the Supreme Court has instructed courts to consider the (1) "number of jurisdictions in which they were adopted" since an interpretation should not be based upon a law in effect in a single jurisdiction; (2) "the extent to which they were well-accepted," such as by courts or through open or tacit acceptance; and (3) whether the analogue is "relevantly similar" in terms of the "how" and "why" it burdened the right. *Wolford*, 609 U.S. at 196-97 (citing *Bruen*, 597 U.S. at 29, 36, 67).

The analogue need not be "a historical twin" or "dead ringer for historical precursors" but must be "a well-established and representative historical analogue." *Bruen*, 597 U.S. at 28-30. The government must demonstrate that the regulation "is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

*Bruen* additionally instructs that a court's approach to the historical analysis may vary depending on whether the regulation addresses modern concerns not present at the founding.

*See Bruen*, 597 U.S. at 27-29. When the analysis concerns a societal concern that has existed "since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bianchi*, 111 U.S. at 462-63 (quoting *Bruen*, 597 U.S. at 27). Conversely, a "more nuanced approach" may be required when the regulation "implicate[s] unprecedented societal concerns or dramatic technological changes." *Bruen*, 597 U.S. at 26-27.

As Plaintiffs conceded during the hearing of September 25, 2026, SB 334 calls for such a nuanced approach. In *Bianchi*,[13] the Fourth Circuit applied a "nuanced approach" for the historical analysis of Maryland's assault weapons ban because it addressed an unprecedented societal concern—"horrific mass shootings"—and technological changes—"[r]apid advancements in gun technology" for weapons "to kill as many people in as little time as possible." *Bianchi*, 111 U.S. at 463; *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 44-46, 52 (1st Cir. 2024) (similar). Here, SB 334 addresses mass shootings by targeting specific models which, as aided by the proliferation of 3D printed conversion devices, can be quickly converted into firearms with machinegun capabilities. Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026), testimony of Senator Sara Love, at 57:50-1:00:00; *see also Bondi v. VanDerStok*, 604 U.S. 458, 463 (2025) (recognizing "profound changes in how guns are made and sold" "[w]ith the introduction of new technologies like 3D printing

[13] *Bianchi* was decided on remand from the Supreme Court following its decision in *Bruen*. The Fourth Circuit found that Maryland's assault weapons ban fell outside of the ambit of the Second Amendment under *Bruen* Step 1. However, the Fourth Circuit further analyzed the ban under *Bruen* Step 2 "[o]ut of respect for the Supreme Court's order remanding this case after *Bruen*." *Bianchi*, 111 U.S. at 461.

and reinforced polymers"). It is evident that a nuanced approach is required. *Bianchi*, 111 U.S. at 464 ("These are not our forebears' arms, and these are not our forebears' calamities.").

Under the nuanced approach, this Court finds that SB 334's prohibition is consistent with the principles that underpin our regulatory tradition. In *Bianchi*, "[u]pon canvassing the historical record of arms regulations" the Fourth Circuit found that Maryland's assault weapons ban was "readily 'consistent with this Nation's historical tradition of firearm regulation.'" *Bianchi*, 111 U.S. at 462-64. Distilling its analysis, the Fourth Circuit explained:

> When a weapon's potential for widespread criminal abuse or unreasonable capacity to inflict casualties became apparent to lawmakers, they did not hesitate to regulate in response. We hold that the Maryland statute fits comfortably within this venerable tradition.

*Bianchi*, 111 U.S. at 464; *see also Hanson v. District of Columbia*, 120 F.4th 223, 240 (D.C. Cir. 2024) (finding, similarly, that, historically, legislatures have regulated "unprecedentedly lethal criminal activity by restricting or banning weapons that are particularly susceptible to, and [are] widely used for, multiple homicides and mass injuries"), *cert. denied*, 145 S.Ct. 2778 (2025); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46, 49-50 (1st Cir. 2024) (finding ban of large capacity magazines aligns with "historical tradition of regulating arms used for self-defense" when "arms [are] found to pose growing threats to public safety"). The Court likewise finds that SB 334's prohibition on the manufacture and sale of machinegun convertible pistols fits within this historical tradition of regulating weapons prone to criminal abuse or unreasonable capacity to inflict casualties.

As a general matter, Plaintiffs take issue with the time period of the regulations cited by Defendants, which span from the 1700s through the 20th century to modern regulations of machineguns, claiming that nineteenth century restrictions "come too late" and that

"[t]wentieth [c]entury [and later] evidence is irrelevant." (ECF No. 39 at 16-17). Regarding time periods for the historical analysis, in *Bruen*, the Supreme Court provided the following guidance:

> [W]hen it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634-35, 128 S.Ct. 2783. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.

*Bruen*, 597 U.S. at 34 (citation modified); *Wolford*, 609 U.S. at 207 (similar) (citing *Bruen*, 597 U.S. at 39). However, the Supreme Court also indicated in *Bruen* and *Wolford* that later historical regulations which bear on the endurance of underlying principles are relevant to the inquiry. *Wolford*, 609 U.S. at 207 (explaining that "overwhelming evidence" shows an "enduring American tradition permitting public carry" (citation omitted)). In *Bruen*, the Court recognized that while Courts should "guard against giving postenactment history more weight than it can rightly bear," courts may look to later history since a "regular course of practice can 'liquidate & settle the meaning of ' disputed or indeterminate 'terms & phrases.'" *Bruen*, 597 U.S. at 35-36 (citations omitted). To the extent that the later history contradicts the text, however, the text controls. *Id.* at 36. Therefore, this Court must accord regulations from later time periods less weight if they contradict earlier understandings of the right, and the Court must accord the later regulation no weight if it contradicts the text.

With these principles in mind, the Court finds that SB 334 comports with the evidence of historic regulations submitted by Defendants. (ECF No. 35 at 20-30).

In the founding era, "firearms were a common fixture in the American home, but they were not used often in homicides" because these weapons were "prone to misfiring and needed to be reloaded after each shot, a time-consuming process." *Bianchi*, 111 U.S. at 464 (citations omitted); *Barnett v. Raoul*, 180 F.4th 1035, 1056-57 (7th Cir. 2026) (similar). Instead, early Americans engaged in physical fighting or used melee weapons. *Bianchi*, 111 U.S. at 464-65 (citation omitted). Defendants identify two exceptions to the paucity of early regulation: restrictions on armed groups and gunpowder restrictions. (ECF No. 35 at 20-22). Both regulations were designed to prevent mass casualties at a time when the only way to obtain the firepower necessary to commit a mass killing was through the aggregation of people and gunpowder. *Barnett v. Raoul*, 180 F.4th 1035, 1057 (7th Cir. 2026); *Bianchi*, 111 F.4th at 464-65.

Responding to the risk of violence caused by large groups, "[t]he American Colonies and United States followed English common law by treating armed groups as riots or unlawful assemblies." Mark Anthony Frassetto, *Mass Violence and the Second Amendment: Analogizing Historical Prohibitions on Armed Groups to Modern Prohibitions on Assault Weapons and Large Capacity Magazines*, 76 Ala. L. Rev. 43, 54-55 (2024). Multiple colonies and early states, including Massachusetts, New Hampshire, New Jersey, Maine, Rhode Island, Michigan and Wisconsin, codified these provisions, beginning as early as the 1750s.[14]

In response, Plaintiffs contend that these laws "target only people who carried weapons in groups bent on lawlessness" and are therefore unlike SB 334. (ECF No. 39 at 13-14).

[14] An Act for Further Preventing All Riotous, Tumultuous, and Disorderly Assemblies, Mass. Acts, 380 (Law Passed 1752); Act of Feb. 16, 1791, ch. 87, 1791 N.H. Laws 718; Act of Feb. 24, 1797, ch. 637, 1797 N.J. Laws 179; 1838-39 Wis. Sess. Laws 368; Me. Stat. tit. 12, ch. 159, § 5 (1840); 1846 Mich. Pub. Acts. ch. 157, 679; 1857 R.I. Acts & Resolves ch. 213 532, 533.

However, according to early American treatises, the assembly of an armed group constituted riotous or unlawful behavior without the need for any further unlawful action. A contemporary law dictionary explained, "'If a number of men assemble with arms, in terrorem populi, though *no act is done*, it is a riot.'" Mark Anthony Frassetto, *Mass Violence and the Second Amendment: Analogizing Historical Prohibitions on Armed Groups to Modern Prohibitions on Assault Weapons and Large Capacity Magazines*, 76 Ala. L. Rev. 43, 54-55 (2024) (emphasis added) (quoting 1 William Russell & Daniel Davis, A Treatise on Crimes and Misdemeanors 351 (Boston, Wells and Lily 1824)). A criminal law treatise published in 1838 similarly emphasized that the definition of a riot was satisfied by the presence of an armed group: "'in every riot there must be some such circumstances . . . as are naturally apt to strike a terror into the people,' i.e. by a 'show of arms.'" *Id.* at 55 (quoting John A.G. Davis, A Treatise on Criminal Law, with an Exposition of the Office and Authority of Justices of the Peace in Virginia 252 (Philadelphia, C. Sherman & Co. 1838)). Plaintiffs also argue that the regulations made it unlawful if the individuals did not disband at the direction of the sheriff. (ECF No. 39 at 14). This argument lacks nuance: it scrutinizes the exact mechanism of the restriction while ignoring the underlying principle at the core of it. As Defendants note, "'[w]hereas the firepower needed to carry out a mass killing used to come from an aggregation of people,' that same violence is now threatened by a single individual" with a machinegun convertible pistol. (ECF No. 35 at 21-22 (quoting *Barnett v. Raoul*, 180 F.4th 1035, 1057 (7th Cir. 2026)).

Likewise, the "[a]ggregation of gunpowder concerned colonists as large amounts of the substance 'could kill many people at once if ignited.'" *Bianchi*, 111 U.S. at 464-65 (quoting *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 49 (1st Cir. 2024)). In response to this

threat, American cities and states[15] restricted gunpowder quantities. *Id.* at 465. For example, a 1784 New York law limited individuals from possessing more than twenty-eight pounds of gunpowder in any one place and it required that the twenty-eight pounds of gunpowder be separated into four canisters. 1784 N.Y. Laws 627 (preventing "Danger Arising from the Pernicious Practice of Lodging Gun Powder"). Plaintiffs contend that the suggestion that gunpowder storage restrictions limited "the right to keep and bear arms is silly," (ECF No. 39 at 14 (quoting *Hanson v. District of Columbia*, 120 F.4th 223, 235 (D.C. Cir. 2024)), but that is precisely what the Fourth Circuit has determined. *Bianchi*, 111 U.S. at 464-65 (finding gunpowder laws evince willingness to restrict "accumulation of firepower [which is] disproportionate to the lawful purpose of individual self-defense."). Far from "silly," it requires no strain of the imagination to find that the same founding-era lawmakers may well have responded to today's concern about machinegun convertible pistols just as the Maryland General Assembly did: by limiting the sale of these models that can be easily converted into firing "1,200 rounds per minute." *See Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 47, 49 (1st Cir. 2024) (finding ban on large capacity magazines consistent with historic gunpowder regulations).

[15] 1784 N.Y. Laws 627; Act of Dec. 6, 1783, chap. 1059, 11 Pa. Stat. 209; 1786 N.H. Laws 383-84; An Act Relative to the Keeping Gun-Powder in the Town of Providence, 1798-1813 R.I. Pub. Laws 85, § 2; 1801 Mass. Acts 507; 1806 Ky. Acts 122 § 3; 1811 N.J. Laws 300, § 1.

In the nineteenth century, Defendants identify restrictions that responded to advancements in weapons technology, including bowie knives,[16] slungshots[17] and blackjacks.[18] (ECF No. 35 at 23-26). Bowie knives were widely carried, though feared as an "instrument of almost certain death." *Cockrum v. State*, 24 Tex. 394, 402 (1859). Bowie knives and other similarly "concealable weapons liable to criminal misuse" were used in "an alarming proportion of the era's murders and serious assaults." *National Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 243 (2d Cir. 2025) (citation omitted), *cert. granted sub. nom.*, *Grant .v Higgins*, 146 S. Ct. 2811 (2026). Blunt force weapons like slungshots and blackjacks, although popular and favored by police, were also concealable, dangerous, and popular among criminals. *People v. Brown*, 253 Mich. 537, 541-42 (1931) (blackjacks); David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 345 (2024) (slungshots).

In response to bowie knives, multiple states banned their sale or imposed burdensome taxes on their sale;[19] others banned carrying the weapon entirely or subject to narrow exceptions;[20] and most states restricted their concealed carry. *Lamont*, 153 F.4th at 243; Robert

[16] A bowie knife "w[as] designed 'expressly for fighting,' with longer blades, crossguards to protect fighters' hands, and clip points to facilitate cutting or stabbing adversaries." *National Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 243 (2d Cir. 2025), *cert. granted sub. nom.*, *Grant .v Higgins*, 146 S.Ct. 2811 (2026).

[17] A slungshot is a handheld weapon created in the mid-nineteenth century "with a weighted object at the end of a flexible strap." *Duncan v. Bonta*, 133 F.4th 852, 876 (9th Cir. 2025).

[18] A blackjack is a weapon with a "coil spring body with cylindrical shaped head." *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 357 (2024).

[19] *See* 1838 Tenn. Pub. Acts 200 (banning sale); 1881 Ark. Acts 192 (same); 1837 Ala. Laws 7 ($100 tax per sale, amounting to several thousand dollars today); 1838 Fla. Terr. Laws 36 ($200 per year tax on Bowie-knife sellers and $10 per year on Bowie-knife carriers).

[20] 1871 Tex. Laws 1st Sess. 25 (ban on all carry absent "reasonable grounds" to fear an attack); 1881 Ark. Acts 191 (ban on all carry); 1889 Ariz. Sess. Laws 30 (ban on all carry with narrow exceptions).

J. Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 90-94 (2023). Several state court decisions enforced and upheld the restrictions on bowie knives or similar weapons. *Cockrum v. State*, 24 Tex. 394, 402 (1859); *Haynes v. Tennessee*, 24 Tenn. 120, 122 (1844); *Aymette v. State*, 21 Tenn. 154, 158-59 (1840). In response to blackjacks and slungshots, multiple state legislatures banned their sale, manufacture, and carrying of such weapons; and several jurisdictions prohibited their concealed carry.[21] The varied legislative responses targeted "excessively dangerous weapons" which were particularly "popular[] with street criminals," once it became apparent that the weapons were being criminally abused and increasing violent deaths. *Bianchi*, 111 U.S. at 464-68. SB 334 likewise responds to the use of machinegun convertible pistols by criminal enterprises and in mass violence[22] by banning the sale and manufacture of models particularly susceptible to misuse.

---

[21] Act of Apr. 7, 1849, ch. 278, § 1, 1849 N.Y. Laws 403, 403 (banning manufacture and sale of slungshots); Act of Nov. 12, 1849, No. 36, 1849 Vt. Acts & Resolves 26, 26 (same); Act of Apr. 15, 1850, ch. 194, § 2, 1850 Mass. Acts 401, 401 (same); Act of Mar. 10, 1856, ch. 636, 1855-1856 Ky. Acts 96, 96-97 (1856) (ban on sale); Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 71, 71 (same); Act of June 2, 1893, ch. 4125, § 3, 1893 Fla. Laws 51, 52 (ban on manufacture and sale of slungshots); Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442, 442 (banning manufacture and sale of blackjacks); Act of Mar. 28, 1912, ch. 225, §§ 1-1, 1912 N.J. Laws 364, 364-65 (same); Act of May 4, 1917, ch. 145 §§ 1-2, 1917 Cal. Stat. 221, 221 (same); Act of Feb. 21, 1917, ch. 377 §§ 2-3, 1917 Or. Laws 804, 804 (same and banning concealed carry); *see also* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 358 (2024) (collecting laws).

[22] *See, e.g.*, Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026) (written testimony of Erin Murphy, Esq., Chief of Staff & Government Affairs, Baltimore Police Department), https://perma.cc/3NPU-6HH7 (referencing use of machinegun convertible pistol by drug trafficking criminal organization and in mass shooting).

In the twentieth century, Defendants submit that restrictions on short-barreled shotguns and machineguns responded to the disproportionate risks to public safety posed by technologically advanced weapons. (ECF No. 35 at 26-30). As early as the founding era, legislatures enacted requirements on barrel length to ensure that the weapons would be appropriate for "the common defense." *United States v. Miller*, 307 U.S. 174, 177-78 (1939) (upholding constitutionality of barrel length restriction). As shortened barrels became popular with Prohibition-era gangsters, the "'mass shooters of their day,'" Congress regulated sawed-off shotguns and short-barreled rifles. *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 47 (1st Cir. 2024). Barrel length was regulated under the National Firearms Act of 1934, 26 U.S.C. §§ 5801-5872, ("NFA") to address this emerging public safety threat: "because a short-barreled rifle's concealability coupled with its 'heightened capability to cause damage' make the weapon more appealing to those who intend to wield the firearm for unlawful use." *United States v. Rush*, 130 F.4th 633, 643 (7th Cir. 2025) (citation omitted).

To address this issue, the NFA imposed a "then-prohibitive $200 tax on the transfer or manufacture of machine guns, [and] short-barreled shotguns and rifles[.]" Catherine Camp, *Gun Regulation Exceptionalism and Adolescent Violence: A Comparison to Tobacco*, 48 J.L. Med. & Ethics 25, 28 (2020); *see also Heller*, 554 U.S. at 621-22 (describing indictment for "transporting an unregistered short-barreled shotgun in interstate commerce" (citing *United States v. Miller*, 307 U.S. 174 (1939)). SB 334 aligns with the how and why of these regulations: through SB

334, Maryland regulates specifications for firearms manufactured and sold in the State because of their concealability and propensity for criminal misuse.[23]

Lastly, Defendants submit that machineguns, which introduced "weapons with firepower not seen before in civilian life," were adopted by criminals in the 1920s and 1930s and regulated accordingly over the following decades. (ECF No. 35 at 37 (quoting *Bianchi*, 111 U.S. at 469)). These machineguns could also be modified to increase their capacity for mass casualties: "these firearms' detachable magazines 'empowered individual shooters to inflict far more damage on more people than had been possible with earlier technologies.'" *Bianchi*, 111 U.S. at 469. Unsurprisingly, machineguns became associated with "notorious crimes" and mass shootings, such as the "St. Valentine's Day Massacre (seven gang members and associates killed) and the Kansas City Massacre (four law enforcement officers and one prisoner killed)." *Bianchi*, 111 U.S. at 469-70 (citation omitted). In response, "[a]t least 29 states enacted anti-machine-gun laws between 1925 and 1934." *Id.* at 470 n.14 (collecting laws). At the federal level, Congress banned possession in the District of Columbia of 'any firearm which shoots automatically or semiautomatically more than twelve shots without reloading,'" and passed the National Firearms Act of 1934, which imposed burdens on their manufacture and sale and required registration, described above. *Id.* at 470 (quoting Pub. L. No. 72-275, 47 Stat. 650 (1932)).

---

[23] *See, e.g.*, Decl. of Lt. Colonel M. Correll, (ECF No. 35-1 ¶¶ 7-10) (explaining "small and concealable" nature of pistols makes their conversion more difficult to detect); Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm., 449th Sess. (Md. 2026), at 1:30:09-1:1:30:30 (oral testimony of John O'Brien, Director of the Montgomery County Police Department Special Investigations Division).

Ultimately, in 1986, Congress effectively banned the transfer and possession of machineguns. Pub. L. No. 99-308, § 102, 100 Stat. 449 (1986) (making it "unlawful for any person to transfer or possess a machinegun" subject to narrow exceptions authorized by the Government). The legislative history indicates that it was proposed to address the use of machineguns by criminal enterprises, which was self-evident to its sponsor. *United States v. Wilks*, 58 F.3d 1518, 1519 (10th Cir. 1995) (citations omitted). Representative Hughes remarked, "I do not know why anyone would object to the banning of machine guns." *Id.* In the decades since, the Supreme Court and lower courts have upheld these restrictions as consistent with the Second Amendment. *Heller*, 554 U.S. at 624 (explaining that it would be "startling" to suggest that the Second Amendment protects use of machineguns).[24] Again, SB 334 comports with this tradition of restricting excessively dangerous weapons, which are known for criminal misuse and their capacity to inflict mass casualties.

In response to these later regulations, Plaintiffs contend that *Bianchi's* analysis emphasizing "excessively dangerous weapons" at *Bruen* Step 2 has been abrogated by the Supreme Court's decision in *Wolford* which considered "common use" as the "critical feature" of historical regulations. (ECF No. 39 at 15). Whether the weapon is in "common use" and "excessively dangerous" were separate, though related, inquiries under *Bianchi* and *Wolford* did

[24] As Judge Boardman of this Court explained, "The Second Amendment does not guarantee a right to possess machineguns, including a switch-equipped Glock pistol." *United States v. Oxley*, DLB-23-213, 2025 WL 2306238, at *12 (D. Md. Aug. 8, 2025); *see also United States v. Fisher*, No. 1:23-CR 00045-MR-WCM, 2024 WL 589115, at *3 (W.D.N.C. Feb. 13, 2024) ("[M]achineguns, and therefore machinegun conversion kits, are 'dangerous and unusual weapons' that fall outside the protection of the Second Amendment.") (citation omitted); *United States v. Mitchell*, 734 F. Supp. 3d 702, 709-10 (N.D. Ohio 2024) (noting that "post-*Bruen*, district courts have uniformly rejected constitutional challenges . . . in cases involving possession of glock switches or similar conversion devices" and collecting cases).

not change this. The Fourth Circuit rejected Plaintiff's proposition that a weapon "in common use" cannot be regulated in keeping with historic principles. *Bianchi*, 111 U.S. at 459-60 ("[W]eapons that are *not* in common use can safely be said to be *outside* the ambit of the Second Amendment. But the logic does not work in reverse. Just because a weapon happens to be in common use does not guarantee that it falls within the scope of the right . . . ."). *Wolford* did not change this: at Step 1, *Wolford* considered whether the regulation pertains to "any form of 'Arms,' *i.e.*, *any weapon customarily used* for offensive or defensive purposes,'" i.e. common usage. *Wolford*, 609 U.S. at 195 (emphasis added). At Step 2, *Wolford* does not reference common usage or weapons "customarily" used. *Wolford*, 609 U.S. at 205-12. The "excessive[] danger[]" posed by weapons and the proportionality of the State's responses are appropriately considered under *Bruen* Step 2. *Bianchi*, 111 U.S. at 462. This makes practical sense: valid weapons regulations are designed to address an excessive danger, perhaps not only in spite of, but because of its commonality.

Plaintiffs also argue that even if *Bianchi*'s historical analysis has not been abrogated, the machinegun convertible pistols at issue are distinguishable from the AR-15s that were at issue because the Maryland Handgun Roster Board has designated machinegun convertible pistols "useful for legitimate sporting, self-protection, or law enforcement purposes." (ECF No. 39 at 15) (quoting Md. Code Ann., Pub. Safety § 5-405(a)(1)). The law evolves with emerging threats, it is not confined by prior firearms laws that did not appreciate the models' capacity for conversion or anticipate the rise of 3D printing. *C.f. United States v. Rahimi*, 602 U.S. 680, 691 (2024) ("[Recent Supreme Court] precedents were not meant to suggest a law trapped in amber.").

Plaintiffs also contend that the historic tradition would not endorse SB 334 because it regulates a machinegun convertible pistol before it is modified or converted to an excessively dangerous weapon. (ECF No. 39 at 15-16). There is no dispute, however, that existing regulations of machineguns are strict and well-established. *Compare* (ECF No. 35 at 2, 26-27) (explaining that machineguns are "strictly" regulated and analyzing as part of historic regulation), *with* (ECF No. 39 at 16-17). At the September 25, 2026 hearing, Plaintiffs also admitted that once a switch or conversion device is installed in an MCP, it becomes a machinegun.[25] Therefore, regulation of machinegun convertible pistols, which are particularly susceptible to conversion, comports with judicial and administrative decisions that have upheld regulations on conversion devices and machinegun kits prior to their assembly into a machinegun. *United States v. Fisher*, No. 1:23-CR 00045-MR-WCM, 2024 WL 589115, at *3 (W.D.N.C. Feb. 13, 2024) ("[M]achineguns, and therefore machinegun conversion kits, are 'dangerous and unusual weapons' that fall outside the protection of the Second Amendment.") (citation omitted); *United States v. Mitchell*, 734 F. Supp. 3d 702, 709-10 (N.D. Ohio 2024) (noting that "post-*Bruen*, district courts have uniformly rejected constitutional challenges . . . in cases involving possession of glock switches or similar conversion devices" and collecting cases). To the extent that Plaintiffs contend that machinegun convertible pistols are not so simply converted to justify their regulation, the Court finds that Plaintiffs have not sustained

[25] The National Firearms Act defines machineguns as, in part, "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," and "any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).

their burden on those facts, which may be developed at a later stage on the merits. (ECF No. 39 at 29 (citing ECF No. 35-5 (ATF Rulings 82-2 and 82-8[26]))

Courts have also recognized that a weapon's modifiability into a disproportionately lethal weapon supports its regulation under *Bruen* Step 2. *Bianchi*, 111 U.S. at 456 ("Between its firepower, accuracy, and *modifiability*, the 'net effect' of the AR-15's 'military combat features is a *capability for lethality*.'" (emphases added) (citation omitted)); *Del. State Sportmen's Assn. v. Del. Dep't Safety and Homeland Secy*, 664 F.Supp.3d 584, 589 (D. Del. Mar. 27, 2023) (denying request to enjoin law banning manufacture, sale, or transfer of "Large-capacity magazine[s]" defined as "capable of accepting, or *that can readily be converted* to hold, more than 17 rounds of ammunition." (emphasis added)), *aff'd*, 108 F.4th 194 (3d Cir. 2024), *cert. denied sub nom.*, *Gray v. Jennings*, 145 S.Ct. 1049 (2025). These decisions recognize the technological evolution of firearms and their capacity for mass violence justify proportionate regulation.

In sum, the Court finds that Plaintiffs have failed to demonstrate a clear likelihood of success on the merits. Plaintiffs have demonstrated that SB 334 covers conduct within the Second Amendment's plain text. However, Plaintiffs have failed to demonstrate a likelihood of success at *Bruen's* Step 2. Defendants have introduced well-documented evidence that SB 334 fits within the country's historic tradition of regulating technologically advanced weapons which have the "potential for widespread criminal abuse or [an] unreasonable capacity to inflict casualties." *Bianchi*, 111 U.S. at 464.

---

[26] Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Justice, National Firearms Act Handbook app. B at 142–44 (April 2009) (attached as Exhibit 5 to Defendants' Opposition, ECF No. 35-5).

**B. Irreparable Harm**

As Chief Judge Russell of this Court has noted, "the deprivation of a constitutional right 'unquestionably constitutes irreparable injury.'" *Kipke v. Moore*, 695 F. Supp. 3d 638, 662 (D. Md. 2023) (quoting *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022)). Accordingly, without Plaintiffs' alleged constitutional injury, Plaintiffs have failed to show that they will be irreparably harmed. *Miranda*, 34 F.4th at 365.

In addition, Plaintiffs' claimed economic harms from the cost of compliance with SB 334 and associated losses are too vague and speculative to demonstrate irreparable harm. (ECF No. 21-1 at 17; ECF No. 29-1 at 28-29); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (recognizing that plaintiffs must make a "clear showing of irreparable harm," which "must be neither remote nor speculative, but actual and imminent" (citation omitted)). The statute does not go into effect until January 1, 2027, and Plaintiffs have not demonstrated the extent of these future losses, that they will be unable to sell their existing inventories before then, or that they will be unable to continue to hold classes using machinegun convertible pistols. *Cf.* (ECF No. 29-6, Raymond Decl. ¶¶ 4,5); (ECF No. 29-5, Krop Decl., ¶¶ 4-6); (ECF No. 29-3, Duffy Decl., ¶¶ 5,6); (ECF No. 29-4, Peter Decl. ¶ 5 ("From time to time I sell factory stock Glock pistols, as permitted by Maryland law, but will refrain from doing so . . . ."); (ECF No. 39 at 19 (disputing Defendants' contention that the transfers of machinegun convertible pistols could fall within SB 334's exception for gratuitous transfers); *Firehouse v. United States Dep't Defense*, 2:25-CV-00041, 2025 WL 2496205, at *1 (E.D.N.C. Aug. 29, 2025) (recognizing that unrecoverable economic harm has "typically been reserved for circumstances where the economic loss was severe or threatened an entities' solvency"); *cf. Ass'n of Cmty.*

*Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (finding irreparable harm where plaintiff showed rule would reduce Medicare drug expenditures by nearly $5 billion and be unrecoverable economic harm). Plaintiffs have not demonstrated that they will suffer irreparable harm absent an injunction.

**C. Balance of the Equities and Public Interest**

The Parties do not dispute that these factors merge when the government opposes a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); (ECF Nos. 21-1 at 17, 29-1 at 29; ECF No. 35 at 37). These factors "call for caution because this injunction threatens federalism and the separation of powers—"[t]wo clear restraints on the use of the equity power."" *Del. State Sportmen's Assn., Inc. v. Del. Dep't Safety & Homeland Scy*, 108 F.4th 194, 205 (3d Cir. 2024) (quoting *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring)), *cert. denied*, *cert. denied sub nom.*, *Gray v. Jennings*, 145 S.Ct. 1049 (2025).

Plaintiffs' public interest arguments are premised on finding SB 334 unconstitutional. (ECF Nos. 21-1 at 17, 29-1 at 29). As stated above, because Plaintiffs have failed to show a likelihood of success on their claim that SB 334, it follows that they cannot demonstrate that the equities and public interest favor an injunction.

Meanwhile, as this Court has noted, Marylanders have an "interest in preventing gun violence." *Kipke v. Moore*, 695 F.Supp.3d 638, 663 (D.Md. 2023) (finding injunction would "undermine the public's interest in preventing gun violence").

Moreover, Plaintiffs ask this Court to block a democratically enacted state law. (ECF No. 35 at 37-38). Yet, the public interest is served by "giving effect to the will of the people by enforcing the laws they and their representatives enact." *Thompson v. Dewine*, 959 F.3d 804,

812 (6th Cir. 2020). "There is always a public interest in prompt execution" of the laws. *Nken*, 556 U.S. at 436. On this motion for preliminary injunction, without the full benefits of discovery and a trial on the merits, the Court must "err on the side of respecting state sovereignty." *Del. State Sportmen's Assn., Inc. v. Del. Dep't Safety & Homeland Scy*, 108 F.4th 194, 206 (3d Cir. 2024), *cert. denied sub nom.*, *Gray v. Jennings*, 145 S.Ct. 1049 (2025).

## CONCLUSION

For the reasons stated above, Plaintiffs' Motions for a Preliminary Injunction in this consolidated case (ECF Nos. 21, 29) are DENIED.

A separate Order follows.

Date: October 5, 2026

/s/

Richard D. Bennett
United States Senior District Judge