# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA,

Plaintiff,

v.

MONTGOMERY COUNTY, MARYLAND, MONTGOMERY COUNTY, MARYLAND POLICE DEPARTMENT, and MAXWELL C. UY, *in his official capacity as Sheriff of Montgomery County, Maryland,*

Defendants.

Civil Action No. 26-3025-TDC

**MEMORANDUM OPINION**

Plaintiff the United States of America ("the Government") has filed this civil enforcement action pursuant to 34 U.S.C. § 12601 against Defendants Montgomery County, Maryland ("the County"), the Montgomery County Police Department ("MCPD"), and the Sheriff of Montgomery County. In the Complaint, the Government seeks an injunction, as well as declaratory relief, barring the "pattern or practice of conduct by law enforcement officers" consisting of the expected enforcement of Montgomery County Expedited Bill 23-26 ("Bill 23-26E"), a county law that restricts the possession and transportation of firearms at or near certain sensitive locations, on the grounds that Bill 23-26E violates the rights of County citizens and visitors under the Second Amendment to the United States Constitution. Compl. ¶ 52, ECF No. 1. The Government has also filed a Motion for a Preliminary Injunction, and Defendants have filed a Motion to Dismiss the Complaint. After briefing, the Court held a hearing on the Motions on October 1, 2026. For

the reasons set forth below, the Motion to Dismiss will be GRANTED, and the Motion for a Preliminary Injunction will be DENIED.

## BACKGROUND

On July 27, 2026, the County enacted Bill 23-26E to amend Chapter 57 of the Montgomery County Code ("the Code"), which regulates the possession and use of weapons within the County. Section 57-11 of the Code, as amended by Bill 23-26E, reads in relevant part:

**57-11. Firearms in or near places of public assembly.**

(a) In or within 100 yards of a place of public assembly, a person must not:

(1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, shotgun, or ammunition or major component for these firearms; or

(2) sell, transfer, possess, or transport a firearm created through a 3D printing process.

(b) This section does not:

(1) prohibit the teaching of firearms safety or other educational or sporting use in the areas described in subsection (a);

(2) apply to a law enforcement officer, or a security guard licensed to carry the firearm;

(3) apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;

(4) apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm;

(5) apply to separate ammunition or an unloaded firearm:

(A) transported in an enclosed case or in a locked firearms rack on a motor vehicle, unless the firearm is a ghost gun or an undetectable gun; or

(B) being surrendered in connection with a gun turn-in or similar program approved by a law enforcement agency; or

(6) apply to a firearm that is carried or transported in a motor vehicle if the firearm is:

(A) locked in a container; or

(B) a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

Montgomery Cnty. Code § 57-11; Bill No. 23-26E at 5–6, Mot. Dismiss Ex. 9, ECF No. 24-10.

Chapter 57 defines "place of public assembly" as:

(1) a publicly or privately owned: (A) park; (B) place of worship; (C) school; (D) library; (E) recreational facility; or (F) multipurpose exhibition facility, such as a fairgrounds or conference center;

(2) government building open to the public for the business of government or community use;

(3) polling place;

(4) courthouse; or

(5) legislative assembly.

A "place of public assembly" includes "all property associated with the place, such as a parking lot or grounds of a building."

Montgomery Cnty. Code § 57-1; Bill No. 23-26E at 2–3.

County restrictions on the possession or transportation of firearms in or near places of public assembly have been in place since approximately 1997 and were modified several times since then, including in 2022 when the County enacted Expedited Bill 21-22 ("Bill 21-22E"), which narrowed the definition of "place of public assembly" to a specifically enumerated list of sensitive locations in an effort to comply with the United States Supreme Court's guidance on Second Amendment analysis, including in relation to "sensitive places," in *New York State Rifle &*

*Pistol Association v. Bruen*, 142 S. Ct. 2111, 2129–30, 2133–34 (2022). *See* Bill No. 21-22E, Mot. Dismiss Ex. 5, ECF No. 24-6; Montgomery Cnty. Code § 57-1.

Bill 23-26E was enacted following *Engage Armament LLC v. Montgomery County*, 356 A.3d 79 (Md. 2026), in which the Supreme Court of Maryland held, in relevant part, that certain provisions in the version of Chapter 57 then in effect, including the definition of "place of public assembly," exceeded the County's authority under state law. *Id.* at 122. Bill 23-26E therefore narrowed, rather than expanded, the restrictions on firearm possession or transportation in or near places of public assembly. For example, in complying with *Engage Armament LLC*, Bill 23-26E removed approximately five locations from the definition of a place of public assembly, including hospitals, community health centers, long-term care facilities, childcare facilities, and "gathering[s] of individuals to collectively express their constitutional right to protest or assemble." Bill 23-26E at 3. Bill 23-26E also added the exclusion from the restrictions in Chapter 57-11 for the possession of a handgun by a person with a permit to carry it under State law while traveling on public highways within 100 yards of a place of public assembly, if the firearm is located in a container or carried in compliance with state law limitations applicable to a person with a permit. *See id.* at 6; Montgomery Cnty. Code § 57-11(b)(6).

On August 3, 2026, within a week of the enactment of Bill 23-26E, the Government filed the present civil action in this Court. In the Complaint, the Government alleges that: (1) Bill 23-26E is "presumptively unconstitutional" in that it violates the Second Amendment as interpreted by *Bruen* and *Wolford v. Lopez,* 146 S. Ct. 2032, 2040 (2026); (2) Montgomery County's law enforcement officers "have an affirmative duty to use their best efforts to enforce" Bill 23-26E; and (3) such enforcement would therefore constitute "a pattern or practice of conduct by law enforcement officers" that "deprives persons of rights, privileges, or immunities secured or

protected by the Constitution or laws of the United States." Compl. ¶¶ 21, 48–50 (quoting 34 U.S.C. § 12601(a)). The Government therefore asserts a violation of 34 U.S.C. § 12601 ("§ 12601"), which provides that it is unlawful for "any governmental authority, or any agent thereof . . . to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 34 U.S.C. § 12601(a). This action is asserted under the civil enforcement authority of the United States Department of Justice ("DOJ") set forth in 34 U.S.C. § 12601(b), which provides in part that "the Attorney General . . . may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice." 34 U.S.C. § 12601(b).

## DISCUSSION

In its Motion for a Preliminary Injunction, the Government seeks an order barring enforcement of Bill 23-26E during the pendency of this case. In their Motion to Dismiss, Defendants seek dismissal of the Complaint on the grounds that (1) the Government lacks standing to assert this challenge to Bill 23-26E, and also has failed to state a plausible claim for relief, because the cited basis of authority for this civil enforcement action, 34 U.S.C. § 12601, does not apply to the asserted claim; and (2) the claim against the MCPD should be dismissed because the MCPD is not a legal entity subject to suit. In the alternative, Defendants argue that the Motion for a Preliminary Injunction should be denied because (1) the Government cannot demonstrate a likelihood of success on the merits, both because § 12601 does not authorize the Government to advance its claim, which is effectively a facial challenge to the constitutionality of Bill 23-26E, and because Bill 23-26E does not violate the Second Amendment; and (2) the Government has failed to establish the remaining requirements for a preliminary injunction.

Because the Motion to Dismiss could be determinative of this case, the Court will address that Motion first.

## I. Defendants' Motion to Dismiss

In broad terms, Defendants' Motion to Dismiss is based on the argument that the Government's claim, which effectively amounts to a challenge to the constitutionality of Bill 23-26E, cannot properly be advanced through a civil enforcement action under 34 U.S.C. § 12601. Defendants assert that this deficiency demonstrates both that the Government lacks standing under Article III of the United States Constitution, and that the Government has failed to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. Legal Standard

At the outset, the Government contests the assertion that this argument implicates standing based on the contention that a claim that a statute does not authorize the civil action in question is "unrelated to the Article III standing inquiry." Pl.'s Opp'n Mot. Dismiss & Reply Mot. Prelim. Inj. ("Pl.'s Opp'n") at 3, ECF No. 28. There is some basis to consider the potential lack of statutory authority to advance a claim under § 12601 to be a standing issue. *See, e.g., United States v. City of Philadelphia*, 644 F.2d 187, 189 (3d Cir. 1980) (affirming the dismissal of a complaint for which the district court found that the United States "had no standing to advance the civil rights of third parties absent an express statutory grant of the necessary authority"); *United States v. Elrod*, 627 F.2d 813, 815, 819 (7th Cir. 1980) (concluding that the "standing question" of whether the United States could bring a claim to vindicate the constitutional rights of inmates was resolved by the recently enacted Civil Rights of Institutionalized Persons Act, Pub. L. No. 96-247 (1980), which provided "explicit statutory authority for the Attorney General to bring actions such as the one brought here").

At the same time, where DOJ undisputedly has the statutory authority to assert a civil enforcement action under 34 U.S.C. § 12601, and the issue is whether the Government's cause of action meets the requirements of that statutory provision, it may be more proper to construe Defendants' argument as one that the Complaint fails to state a valid claim for relief pursuant to Rule 12(b)(6). *See DiCocco v. Garland*, 52 F.4th 588, 591 (4th Cir. 2022) (noting that "a valid claim for relief is not a prerequisite for standing"). Because the parties have not identified any material basis upon which the Court's analysis would change if the argument were viewed as one relating to standing as opposed to a failure to state a claim, the Court need not resolve this preliminary dispute. The Court will therefore assume without deciding that standing exists and will, pursuant to Rule 12(b)(6), consider whether the Government has alleged a claim that may properly be advanced pursuant to 34 U.S.C. § 12601. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 n.2 (2004) ("We assume, without deciding, that [the] allegations are sufficient" to satisfy Article III standing).

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions, conclusory statements, or "formulaic recitation[s] of the elements of a cause of action" are not enough. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

### B. "Pattern or Practice of Conduct by Law Enforcement Officers"

In seeking dismissal, Defendants argue that where the Government's claim is asserted pursuant to DOJ's civil enforcement authority set forth in 34 U.S.C. § 12601, it fails because that statute requires a "pattern or practice of conduct by law enforcement officers" that deprives persons of constitutional rights, *id.* § 12601(a), and the Complaint does not allege facts demonstrating any such pattern or practice, whether through the text of Bill 23-26E or otherwise. The Government argues that this requirement is satisfied by the text of Bill 23-26E, which it claims to be facially unconstitutional, and by the expectation that Montgomery County law enforcement officers will enforce this law.

In assessing the arguments, the Court first turns to the text of the statute. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) ("It is well settled that 'the starting point for interpreting a statute is the language of the statute itself.'" (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980))). Section 12601(a) defines "Unlawful conduct" as follows:

> It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

34 U.S.C. § 12601(a). In § 12601(b), the statute provides civil enforcement authority to DOJ as follows:

> Whenever the Attorney General has reasonable cause to believe that a violation of [subsection (a)] has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain equitable and declaratory relief to eliminate the pattern or practice.

*Id.* § 12601(b).

As the text makes clear, and the Government does not dispute, to assert a viable claim under this statute, the Government must allege facts demonstrating a "pattern or practice of conduct by law enforcement officers." *Id.* § 12601(a).

The Government contends that "pattern or practice" is a "term of art," with a "consistent judicial interpretation" in federal civil rights law. Pl.'s Opp'n at 7. The term "pattern or practice" is most commonly associated with the authority granted to DOJ, as set forth in multiple federal anti-discrimination laws, to bring a civil enforcement action to enforce the rights protected by those laws when there has been a "pattern or practice" of discrimination. However, the Supreme Court has stated that in relation to one such statute, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-6(a), "the pattern or practice language . . . was not intended as a term of art, and the words reflect only their usual meaning." *Int'l Bhd. of Teamsters v. United States* ("*Teamsters*"), 431 U.S. 324, 337 n.16 (1977).

Generally, a "pattern or practice" requires "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," or a "standard operating procedure" that was "the regular rather than the unusual practice." *Id.* at 336. Thus, "[a] pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature," such as when an entity "repeatedly and regularly engaged in acts prohibited by the statute." *Id.* at 336–37 n.16 (quoting the statement of Senator Hubert H. Humphrey relating to Title VII, 110 Cong. Rec. 14270 (1964)) (noting that this "interpretation of 'pattern or practice'. . . is consistent with the understanding of the identical words as used in similar federal legislation"). Other courts considering the same "pattern or practice" language contained in similar federal anti-discrimination statutes have emphasized the need for multiple instances of the deprivation of rights at issue. *See United States v. W. Peachtree*

*Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) (interpreting the term "pattern or practice" within the Fair Housing Act as encompassing "more than an 'isolated or accidental or peculiar event'" (citation omitted)); *see also Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 278 (4th Cir. 1980) (in relation to Title VII, stating that a "pattern or practice" of employment discrimination can be shown through a "sufficient number of instances of similar discriminatory treatment experienced by individuals" across an enterprise).

The same principles apply to § 12601. In *United States v. Johnson*, 122 F. Supp. 3d 272 (M.D.N.C. 2015), in considering the authority provided in § 12601 at a time when it was codified at 42 U.S.C. § 14141, the court analyzed the meaning of "pattern or practice of conduct by law enforcement officers" in assessing whether the federal government had adequately alleged a violation of rights under that provision based on claims that a county sheriff's office had engaged in discriminatory law enforcement activities against Hispanic individuals. *Id.* at 281–82, 347. The court applied *Teamsters*, including its references to the need for "more than the mere occurrence of isolated . . . or sporadic discriminatory acts," and dismissed the case because the Government's citation of "two or three alleged instances" of discriminatory conduct, "with no individual being shown to . . . have been subjected to" an alleged oral instruction from the sheriff to arrest Hispanics, was "insufficient to establish a pattern or practice under prevailing case law." *Id.* at 348, 353 (quoting *Teamsters* 431 U.S. at 348).

Here, although the Complaint makes the broad allegation that "Defendants have engaged in, and, on information and belief, will continue to engage in, a pattern or practice of conduct by law enforcement officers that deprives persons" of constitutional rights, Compl. ¶ 56, it provides no facts in support of this claim and instead provides only the general statements that "law enforcement officers have an affirmative duty to use their best efforts to enforce" Bill 23-26E, and

that it would be "unreasonable to assume" that the law was enacted without an intent to enforce it. *Id.* ¶ 48. Notably, the Complaint is devoid of any allegations of any actual conduct by law enforcement officers relating in any way to Bill 23-26E. Indeed, there is no claim or record of actual enforcement actions taken by Montgomery County law enforcement officers not only in relation to Bill 23-26E since its enactment in July 2026, but also in relation to Bill 21-22E, the prior amendment to Chapter 57 enacted in 2022, or earlier Montgomery County laws relating to possession or transportation of firearms in or near places of public assembly. Where there is no history of any such enforcement of the prior versions of the County's prohibitions on firearms in or near places of public assembly, and Bill 23-26E did not expand, but in fact narrowed, the scope of such prohibitions, there is no basis to infer that enforcement actions are now occurring. Thus, regardless of the specific contours of the term "pattern or practice," where the Complaint has provided no facts showing any conduct by law enforcement officers, there has been no plausible allegation of a "pattern or practice of conduct by law enforcement officers" as required for the Government to advance a civil enforcement action pursuant to 34 U.S.C. § 12601.

**C. Bill 23-26E as a "Pattern or Practice"**

In the absence of any facts showing any instance, let alone a pattern or practice, of enforcement of Bill 23-26E by Montgomery County law enforcement officers, the Government argues that the requirement of a "pattern or practice of conduct by law enforcement officers" can be satisfied by the mere existence of an unconstitutional policy that could potentially be enforced by law enforcement officers, and that Bill 23-26E itself constitutes such a policy because it violates the Second Amendment.

In support of this argument, the Government relies on case law arising under the federal anti-discrimination statutes providing DOJ with the authority to bring a civil enforcement action to remedy a "pattern or practice" of discrimination and argues that it demonstrates that an openly

declared policy of discrimination may be sufficient to establish a pattern or practice violation. *See, e.g.*, *United States v. Bd. of Educ. for Sch. Dist. of Philadelphia*, 911 F.2d 882, 892 (3d Cir. 1990) (in a pattern-or-practice case under Title VII, stating that "[w]here the allegedly discriminatory policy is openly declared—in this case it was, among other things, published in the Pennsylvania Code—then proof that the policy was actually being followed consistently is not necessary in order to obtain an injunction against subsequent implementation"). However, in *Board of Education for the School District of Philadelphia*, cited by the Government, the court noted that where the statute in question, which generally barred schoolteachers from wearing religious clothing at school in order to preserve an atmosphere of religious neutrality, had some constitutional applications, there would still need to be "evidence showing prosecution in situations" in which enforcement would be unconstitutional in order to demonstrate the required "pattern or practice." *See id.* at 893. Here, Bill 23-26E almost certainly has some constitutional applications, such as the prohibitions on firearms at certain recognized sensitive places, such as schools, government buildings, courthouses, and legislative assemblies, *see District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and there has been no showing of any enforcement of the bill in relation to any of the allegedly unconstitutional applications.

More importantly, any examples in which such civil rights statutes allow a discriminatory policy to satisfy the pattern-or-practice requirement, without any evidence of an actual pattern or practice of discriminatory conduct, would not advance the Government's argument because the pattern-or-practice authority in such statutes is textually distinct from the language in § 12601.

For example, the pattern-or-practice provision in Title VII states that:

> Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a *pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter*, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights

> herein described, the Attorney General may bring a civil action in the appropriate district court.

42 U.S.C. § 2000e-6(a) (emphasis added). Other federal anti-discrimination statutes providing the DOJ with similar civil enforcement authority use this same language of "pattern or practice of resistance to the full enjoyment of any of the rights secured," including Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-5, barring discrimination in public accommodations; and the Fair Housing Act, 42 U.S.C. § 3614(a), barring discrimination in housing. Another similar statute, the Equal Credit Opportunity Act, 15 U.S.C. § 1619e(h), authorizes an agency to refer a matter to the Attorney General when there is reason to believe that "[one] or more creditors has engaged in a pattern or practice of discouraging or denying applications for credit," and authorizes the Attorney General to bring a civil enforcement action when there is reason to believe that "one or more creditors is engaged in a pattern or practice in violation of this subchapter." *Id.* § 1619e(g), (h).

Such text, including the use of the qualifier "resistance to the full enjoyment" of rights, materially differs from that of § 12601, which authorizes DOJ to bring a civil enforcement action only when there is a "pattern or practice of conduct by law enforcement officers" that deprives persons of constitutional rights. 34 U.S.C. § 12601(a), (b). The distinction is notable because § 12601 was enacted in 1994, after the enactment of all of the above-referenced federal anti-discrimination laws. In fact, Congress recognized this history of providing pattern-or-practice authority under such statutes as it was considering the predecessor bill to § 12601, the Police Accountability Act of 1991 ("PAA"), H.R. 2972, 102nd Cong. (1991), which used the same text in relation to this issue. *Id.* § 2; *see also* Omnibus Crime Control Act of 1991, H.R. 3371, 102nd Cong. § 1201–1203 (1991) (incorporating the PAA); H.R. Rep. No. 102-1085, at 65 (1992) (discussing the incorporation). Specifically, the House Judiciary Committee Report on the Omnibus Crime Control Act of 1991, in discussing the PAA, described DOJ's "pattern or practice

authority under eight civil rights statutes." H.R. Rep. No. 102-242, pt. 1, at 24, 137 (1991) ("the House Report"). Under these circumstances, Congress's use of different language in § 12601, specifically, its unique use of the qualifier "conduct by law enforcement officers," necessarily reflects that the relevant text is not to be interpreted in the same manner, based on the principle that "where words differ . . . 'Congress acts intentionally and purposely in the disparate inclusion or exclusion,'" and "[t]here is strong reason to believe that Congress intended the differences that its language suggests." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Thus, even if the term "pattern or practice" could be construed as including a legislative act that is allegedly unconstitutional, which arguably might demonstrate "resistance" to the full enjoyment of rights, the plain language of § 12601 requires something more specific, that any such policy must be one that addresses "conduct by law enforcement officers" that deprives persons of constitutional rights. 34 U.S.C. § 12601(a). Bill 23-26E, however, does not in any way direct or even refer to conduct by law enforcement officers that could violate the law.

The Government also invokes 42 U.S.C. § 1983 ("§ 1983"), in support of its claim that the text of § 12601 authorizes a civil enforcement action to challenge any unconstitutional policy potentially enforceable by law enforcement officers, based on the contention that a § 1983 claim can be asserted when a law enforcement officer threatens to take an unconstitutional action, and that § 1983 and § 12601 should be read *in pari materia*. Section 1983, which provides individuals with a private right of action to sue state or local government officials for a violation of a federal constitutional or statutory right, provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

> Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Although the Government has cited § 1983 cases in which there was an alleged threat that a law enforcement officer would take an unconstitutional action, those cases did not involve a threat to enforce an allegedly unconstitutional law or policy. *See, e.g.*, *Sterling v. Borough of Minersville*, 232 F.3d 190, 192–93, 196 (3d Cir. 2000) (finding a cognizable § 1983 claim asserted against a law enforcement officer for threatening to disclose a teenager's sexual orientation to family members, which led the teenager to commit suicide); *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978) (finding cognizable a § 1983 claim where a correctional officer allegedly threatened physical harm to an inmate if he persisted in pursuing judicial remedies).

The Government's reliance on § 1983 is unpersuasive for several reasons. First, the Government has cited no authority, and the Court has not identified any, for the sweeping proposition that § 1983 and § 12601 must be read *in pari materia*, defined as pertaining to the same subject such that they "should therefore be construed 'as if they were one law.'" *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (quoting *United States v. Freeman*, 44 U.S. 556, 564 (1845)). Neither *United States v. County of Maricopa,* 889 F.3d 648 (9th Cir. 2018), nor *United States v. City of Columbus*, No. 99-CV-1097, 2000 WL 1133166 (S.D. Ohio Aug. 3, 2000), both cited by the Government, stand for this proposition, as they focus on the narrower issue of the required proof to hold a local government liable under § 12601 and in fact both note material distinctions between the two statutes. *See Cnty. of Maricopa*, 889 F.3d at 652–53 (finding that the § 1983 standard for holding a local government liable based on the actions of a policymaker also applies to a claim under § 12601, but noting that § 12601 specifically applies to constitutional violations "that are systematically perpetrated by local police departments" and declining to decide whether § 12601, unlike § 1983, imposes liability "on the basis of general agency principles" in

light of its different text); *City of Columbus*, 2000 WL 1133166, at *7 (finding that § 12601, like § 1983, does not provide for vicarious liability but noting that § 12601 differs from § 1983 in that it provides for "broad injunctive relief where appropriate"). Significantly, the Supreme Court has declined to find two statutes to be *in pari materia* even when they are part of the same "comprehensive federal legislative effort" to achieve "broad, common goals" if they "play different roles in achieving" those goals. *Erlenbaugh*, 409 U.S. at 245; *see also United States v. Broncheau*, 645 F.3d 676, 685 (4th Cir. 2011) (stating that "the principle of *in pari materia* has "no force" where two statutes relate to similar subjects but "the purposes underlying the laws var[y]" (citation omitted)). Although both statutes generally provide means by which to vindicate constitutional rights, it is indisputable that they play different roles and serve different purposes, in that § 1983 primarily provides a private cause of action for damages for violations of constitutional rights, while § 12601 provides for a civil enforcement action by the federal government for injunctive relief and is limited to violations arising from a pattern or practice of conduct of law enforcement officers.

Second and relatedly, as stated above in relation to the civil rights statutes enacted prior to § 12601, § 1983 is textually distinct from § 12601 in ways material to the parties' dispute. Section 1983 allows a private cause of action when a person acting "under color of any statute, ordinance, regulation, custom, or usage" of a State "subjects, or causes to be subjected" an individual "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Notably, § 1983 specifically allows a challenge to an action by a government official based on a "statute, ordinance, [or] regulation," while § 12601 contains no such language. *Id.*; 34 U.S.C. § 12601. Further, § 12601 authorizes a civil enforcement action by the Attorney General only when there is a "pattern or practice of conduct by law enforcement

officers," while § 1983 includes no such language. *Id.* § 12601. Had Congress intended for a civil enforcement action under § 12601 to be available under the exact same circumstances under which a private right of action under § 1983 could be advanced, it would not have used such differing language. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 63; *see also Erlenbaugh*, 409 U.S. at 244 (stating that "whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject"). As a result, § 1983 not only cannot be construed as requiring a "pattern or practice of conduct by law enforcement officers," but the lack of these words in its text demonstrates that it does not require a "pattern or practice" of any kind, or "conduct by law enforcement officers" of any kind. Because of the significant textual differences between the two statutes, § 1983 is an ineffective analogue for interpreting the boundaries of § 12601 as it relates to the required showing of conduct under the statute.

Indeed, the textual distinctions between § 12601 and both the federal anti-discrimination laws and § 1983, considered together, firmly illustrate the limitations of § 12601. First, they demonstrate that § 12601 generally does not authorize a civil enforcement action based only on an allegedly unconstitutional statute or ordinance. Had Congress intended to provide such authority, it likely would have used language similar to that in § 1983, which allows a private civil action to be initiated in response to action taken "under color of any statute, ordinance, regulation, custom, or usage." 42 U.S.C. § 1983. Similarly, to the extent that the language "pattern or practice of resistance to the full enjoyment of . . . rights," as used in the federal anti-discrimination laws, could be construed as permitting a civil enforcement action based on an unconstitutional policy that illustrates such resistance, Congress's use of different language in § 12601, in which it required a "pattern or practice of conduct by law enforcement officers" signals that the kind of practice that

is actionable must be one that includes more than an abstract policy expressed in a statute and instead consists of actual conduct by law enforcement officers.

Second, even to the extent that this term can be construed as permitting a civil enforcement action based on an allegedly unconstitutional policy, it must be one that specifically addresses "conduct by law enforcement officers." 34 U.S.C. § 12601. While the plain language of § 1983 places no limits on the range of violations of federal rights that may underlie a § 1983 claim, § 12601's inclusion of the unique requirement of a "pattern or practice of conduct by law enforcement officers" must be construed as requiring that the allegedly unconstitutional policy be one that actually directs conduct by law enforcement officers. Similarly, while the federal anti-discrimination laws, by their plain language, require that the pattern or practice providing authority for a civil enforcement action be one that demonstrates resistance to rights protected by the particular civil rights statute in question, rather than other rights, *see, e.g.*, 42 U.S.C. § 2000e-6(a), the qualifier in § 12601 of a pattern or practice "of conduct by law enforcement officers . . . that deprives persons of rights," 34 U.S.C. § 12601(a), necessarily limits a civil enforcement action to one in which any allegedly unconstitutional policy is one that actually directs certain conduct by law enforcement officers.

Here, the allegedly unconstitutional policy at issue is Bill 23-26E, which places restrictions on the possession or transportation of firearms in or near places of public assembly by private individuals, identified as "person[s]." *E.g.*, Bill 23-26E at 5 ("In or within 100 yards of a place of public assembly, a person must not . . . sell, transfer, possess, or transport a [firearm]."). Bill 23-26E contains no language directing Defendants or any law enforcement officers to engage in or refrain from any general or specific conduct, whether related to the enforcement of these prohibitions on private conduct or otherwise. Indeed, as the Government acknowledged at the

hearing, the claim in the Complaint is essentially a facial challenge to the constitutionality of Bill 23-26E's restrictions on the conduct of private individuals as violative of the Second Amendment, and its analysis in both the Complaint and its briefs on the Motions focuses almost exclusively on whether that statutory restriction on private conduct is "presumptively unconstitutional," Compl. ¶ 21; Pl.'s Mot. Prelim. Inj. at 3, ECF No. 3-1, and not on any statutory direction within Bill 23-26E to law enforcement officers to engage in any particular conduct.

Where, as discussed above, § 12601 is limited by its text to civil enforcement actions directed at a pattern or practice of conduct of law enforcement officers, or potentially a policy directing law enforcement officers to engage in certain conduct, Bill 23-26E cannot be construed as itself demonstrating a "pattern or practice of conduct by law enforcement officers" that deprives individuals of constitutional rights. 34 U.S.C. § 12601. Had Congress intended for a facial challenge to the constitutionality of a state or local law restricting private conduct to be cognizable under § 12601, it would not have included the requirement that the pattern or practice at issue be one of "conduct by law enforcement officers." *See id.*

This reading is further bolstered by consideration of the statute as a whole. *See King v. Burwell*, 576 U.S. 473, 586 (2015) (stating that "oftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context," so courts "must read the words "with a view to their place in the overall statutory scheme" (internal citation omitted)). Section 12601 falls within Part B, Subchapter VIII of Chapter 121 of Title 34 of the United States Code. Title 34 is entitled, "Crime Control and Law Enforcement," Chapter 121 is entitled "Violent Crime Control and Law Enforcement," Subchapter VIII is entitled "State and Local Law Enforcement," and Part B is entitled "Police Pattern or Practice." Part B contains only two sections within it, the first of which is § 12601, and the second of which is entitled, "Data on Use of

Excessive Force," which provides the Attorney General with the authority to acquire data about the use of excessive force by law enforcement officers. 34 U.S.C. § 12602. All of these headings convey that the statutes contained within, including § 12601, are focused on addressing potentially problematic police and law enforcement conduct in the enforcement of criminal laws, such as the excessive force discussed in § 12602, as opposed to the incidental act by law enforcement officers of enforcing laws limiting conduct by private individuals, which is at issue in the Government's claim. *See Dubin v. United States*, 143 S. Ct. 1557, 1567 (2023) (stating that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute" and that a title is "especially valuable [where] it reinforces what the text's nouns and verbs independently suggest" (citations omitted)); *Erlenbaugh*, 409 U.S. at 244 (noting the principle that "individual sections of a single statute should be construed together").

Further, the additional text stating that a civil enforcement action is available not only based on a "pattern or practice of conduct by law enforcement officers," but also based on such conduct by "officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles," demonstrates the narrow scope of the statute and helps to explain the purpose of the cause of action. 34 U.S.C. § 12601(a). The inclusion within § 12601 of a civil enforcement action based on a pattern or practice of conduct by governmental officials involved in juvenile justice illustrates the intent to limit § 12601 to civil enforcement actions relating to practices that direct the conduct of law enforcement personnel in carrying out their duties. If § 12601 were intended to authorize a civil enforcement action to contest the constitutionality of a law barring private conduct, based on a theory that law enforcement officers' general enforcement of such a law would implicate the statute, the statute likely would not have included the reference to conduct by government employees with

responsibility for the administration of juvenile justice, who would typically have no role in such activities. Rather, the inclusion of that provision further signals that, based on the text of § 12601, the civil enforcement authority does not extend beyond challenges to policies or practices that specifically direct the conduct of government personnel carrying out law enforcement duties, and that the conduct of law enforcement officers or juvenile justice officials, not the legislative enactment of prohibitions on private conduct, must be the source of the deprivation of rights.

**D. Legislative History**

The Court's reading of § 12601 is also consistent with, and thus bolstered by, the relevant legislative history. Although there is limited legislative history on § 12601 itself, as discussed above, the PAA contained identical text to that of § 12601 and is thus instructive. *See Johnson* 122 F. Supp. 3d at 347. This provision stated:

> It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

PAA, H.R. 2972, 102nd Cong. § 2 (1991); *see* House Report at 24. Though the PAA did not become law in 1991, three years later, in 1994, the above provision was enacted as 42 U.S.C. § 14141 and then re-codified in 2017 as 34 U.S.C. § 12601. *Compare* H.R. 2972, 102nd Cong. § 2 (1991), *with* 42 U.S.C. § 14141 (1994) *and* 34 U.S.C. § 12601 (2018). Because the text in the PAA is identical in relevant part to 34 U.S.C. § 12601, courts recognize the legislative history of the PAA as an effective proxy for the legislative history of § 12601. *See, e.g.*, *Johnson* 122 F. Supp. 3d at 347; *City of Columbus*, 2000 WL 1133166, at *3. The Court likewise will treat the legislative history of the PAA as illuminating of the purpose and meaning of § 12601.

The House Report addressing the PAA stated that the provision would "grant[] standing to the United States Attorney General . . . to obtain injunctive relief against government authorities that engage in patterns or practices of unconstitutional or unlawful conduct by law enforcement officers" and required the Attorney General "to collect data about the incidence of police of excessive force." House Report at 135. As background on the provision, the report detailed the brutal beating of Rodney King in 1991 by the Los Angeles Police Department, which was captured on video by a bystander and called "sickening" by President George H.W. Bush. *Id.* Following that incident, the House Judiciary Committee, Subcommittee on Civil and Constitutional Rights held a two-day hearing on police brutality and misconduct, which led to reports by citizens to the Subcommittee of other instances of police brutality and misconduct, including incidents of harassment, race discrimination, and the use of illegal weapons by police officers. *Id.* at 136. The House Report acknowledged that "the majority of police officers in America are dedicated men and women who strive to uphold the ideals of the Constitution" but stated that when faced "with evidence that the problem of excessive force is a serious one, police departments, local authorities, and the Federal Government have a responsibility to strengthen their responses." *Id.*

In explaining the response represented by the PAA, the House Report stated that "[t]he Justice Department currently lacks the authority to address systemic patterns or practices of police misconduct," as found in *United States v. City of Philadelphia*, 644 F.2d 187, 189 (3d Cir. 1980), which held that the federal government did not have the authority, absent a specific statutory authorization, "to sue a local government or its officials to enjoin violations of citizens' constitutional rights by police officers." House Report at 137. It further stated that the DOJ could not "sue to change the policy of a police department that tolerates officers beating citizens on the street. *Id.* The PAA was intended to "close this gap in the law" and authorize both DOJ and

private parties "to sue for injunctive relief against abusive police practices" and thus to provide an "enforceable right to be free from patterns of police brutality." *Id.* at 138.

Thus, the Court's reading of the text of § 12601, which limits DOJ's civil enforcement authority to instances in which there is either a pattern of police conduct that directly violates the Constitution, or a specific policy that directs law enforcement officers to act in an unconstitutional manner, aligns with the underlying purpose of § 12601 to allow DOJ to bring civil enforcement actions to address systemic police misconduct, such as the use of excessive force. In contrast, the Government's expansive reading of § 12601, under which DOJ may bring a civil enforcement action based on a statute or policy that restricts private conduct without directing law enforcement to engage in any particular conduct, extends § 12601 well beyond its intended purpose.

The Government argues that the legislative history provides some support for its position based on the statement in the House Report that "[t]he standards of conduct under the Act are the same as those under the Constitution, presently enforced in the damages actions under section 1983." House Report at 138. However, where the preceding sentence references the imposition of "standards of conduct on police officers," and the cited statement falls within a discussion of a right to be free from "patterns of police brutality," it is most fairly read in context as referencing the standards of conduct then enforced in § 1983 actions relating to alleged police misconduct, which would primarily consist of established standards under the Fourth, Fifth, and Sixth Amendments to the Constitution. There is nothing in the House Report to suggest that the PAA was aimed at authorizing a civil enforcement action to enforce constitutional rights outside the context of police misconduct. Significantly, at the time of the enactment in 1994 of § 14141, now § 12601, there was no established standard for asserting a violation of the Second Amendment in a § 1983 case because the Supreme Court did not recognize an individual right to keep and bear

arms under the Second Amendment until 2008, when it issued *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Accordingly, the assertion that in 1994, Congress intended to create through § 12601 a cause of action for the federal government to challenge laws restricting firearm possession as arguably violating an individual's Second Amendment right to keep and bear arms is untenable. *Cf. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020) (stating that a court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment" and thus "orient[ing] ourselves to the time of the statute's adoption" in 1964 in order to interpret Title VII).

Indeed, where the House Report recognized that most law enforcement officers act in a professional and constitutional manner but concluded that § 12601 was necessary to address the misconduct of the limited number who engaged in excessive force or other misconduct, the Government's reading would treat law enforcement officers who may eventually in the course of their work enforce a statute or policy that directed no law enforcement conduct, but instead imposed allegedly unconstitutional restrictions on citizens, as directly responsible for violations of the constitutional rights of their fellow citizens. Where such a reading is both incompatible with the text of the statute and at odds with the underlying purpose of the law, the Court will not adopt it.

**E. Application of § 12601**

The case law applying § 12601 supports the Court's reading of the statute. The Government has not identified, and the Court has not found, any case law under § 12601 in which the claim was not based on actual conduct by law enforcement officers depriving individuals of constitutional rights. In the three cases primarily relied upon by the Government, even when there was a specific policy in place that allegedly violated the constitutional rights of individuals, those

policies specifically directly the conduct of law enforcement officers, and there were also allegations and evidence of an extensive pattern or practice of actual conduct by law enforcement officers depriving persons of constitutional rights. In *United States v. County of Maricopa*, 889 F.3d 648 (9th Cir. 2018), in which the court found that § 12601 "imposes liability on a governmental authority whose official policy causes it to engage in 'a pattern or practice of conduct by law enforcement officers' that deprives persons of federally protected rights," the § 12601 claim at issue was based on the allegations that a sheriff's office had "adopted racially discriminatory traffic-stop policies" and that law enforcement officers from that office had "routinely targeted Latino drivers and passengers for pretextual traffic stops" and "other unlawful conduct." *Id.* at 649, 653.

Likewise, in *United States v. Town of Colorado City*, 935 F.3d 804, 810 (9th Cir. 2019), the § 12601 claim was based on the allegation that a town and members of a local law enforcement agency, the Colorado City Marshal's Office, engaged in a pattern or practice of discriminating against residents who were not members of the local majority religion, including based on conduct such as "ignor[ing] violations of the law" by members of the majority religion, assisting members of that religion, including a fugitive, in evading law enforcement activity by federal agents, "fail[ing] to provide effective police protection" for residents who were not members of that faith, and seizing such a resident and charging him with trespass on property he was legally authorized to occupy. *Id.* at 806–07. The court held that no official policy or practice was required, and that a claim based on the pattern or practice of conduct by law enforcement officers described above was sufficient state a claim. *Id.* at 810–11.

Finally, in *United States v. City of Ferguson*, No. 16-cv-0180 (E.D. Mo. 2016), based on an investigation documented in a 102-page report, DOJ asserted a § 12601 claim against the police

department in Ferguson, Missouri based on an alleged "pattern or practice of conduct" by law enforcement officers violating constitutional rights, including by conducting stops, searches, and arrests without legal justification, using excessive force, interfering with the rights to record police encounters and to protest police activities, prosecuting and resolving municipal charges in a manner that violates the rights to due process and equal protection of the law, and engaging in racially discriminatory law enforcement conduct, in violation of the First, Fourth, and Fourteenth Amendments to the Constitution. *City of Ferguson*, No. 16-cv-0180, Compl. at 1–3, 22 (ECF No. 1). To the extent that any policies or practices were referenced in the complaint, they related directly to these unconstitutional means by which police officers enforced the laws against individuals. *See id.* While the consent decree resolving the case included provisions requiring the City to take actions to reform its municipal code, those provisions are properly construed as part of the remedies to eliminate the pattern or practice of misconduct by police officers in enforcing laws in a discriminatory or otherwise unconstitutional manner and do not demonstrate that the case properly alleged a § 12601 claim in order to contest the constitutionality of any particular city ordinance. *City of Ferguson*, No. 16-cv-00180, Consent Decree ¶¶ 36–40 (ECF No. 41).

When asked at the hearing on the Motions to provide any legal authority in which § 12601 was used to bring a challenge against an unconstitutional policy absent conduct by law enforcement officers, the Government's counsel acknowledged that "they don't have anything." Consistent with that admission, this Court's review of the relevant case law provides no basis to conclude that § 12601 may support a civil enforcement action in the absence of a specific pattern or practice of conduct by law enforcement officers, an allegedly unconstitutional policy that specifically directs or restricts the conduct of law enforcement officers, or both. *See, e.g.*, *United States v. City of Los Angeles*, 288 F.3d 391, 396 (9th Cir. 2002) (considering a claim that the Los

Angeles Police Department "engaged in a pattern or practice of depriving individuals of constitutional rights through the use of excessive force, false arrests and improper searches and seizures in violation of 42 U.S.C. § 14141," later codified as § 12601); *Johnson*, 122 F. Supp. 3d at 380 (dismissing a § 12601 claim based on an alleged "pattern or practice of discriminatory law enforcement against Hispanics," where the claim was based on "vague, isolated statements" by the sheriff and statistical analysis, and there was "no evidence that any individual was unconstitutionally deprived" of constitutional rights); *United States v. City of Meridian*, No. 13-CV-978, HTW-LGI, 2022 WL 551261, at *1 (S.D. Miss. Feb. 23, 2022) (finding that there had been substantial compliance with a settlement agreement resolving a civil enforcement action based on the claim that "the City of Meridian, Mississippi, Police Department had a pattern or practice of arresting public school students without probable cause to believe that an illegal offense had been committed, thereby engaging in unconstitutional conduct"). *Cf. United States v. Lauderdale Cnty.*, 914 F.3d 960, 963 (5th Cir. 2019) (dismissing a § 12601 claim alleging that the judges of the Lauderdale County Youth Court engaged in a pattern or practice of conduct depriving juveniles of constitutional rights, which included "delay[ing] detention hearings for longer than 48 hours," "not bas[ing] their detention determinations on whether probable cause exists," and "not consistently provid[ing] defense counsel," based on the conclusion that the judges were "not officials or employees of a governmental agency with responsibility for the administration of juvenile justice" as required by the statute).

Consistent with this review, Defendants assert, and the Government does not dispute, that DOJ has "consistently used Section 12601 only to challenge patterns of misconduct by law enforcement" and have provided a DOJ report, the accuracy of which is not contested, that includes summaries of the past pattern-or-practice cases from 1994 to 2017 to confirm that DOJ had never

brought a § 12601 challenge solely to invalidate a state or local law absent any police misconduct. Mot. Dismiss at 12, ECF No. 24-1 (citing Civ. Rts. Div., U.S. Dep't of Justice, The Civil Rights Division's Pattern and Practice Police Reform Work: 1994–Present, 41–48 (2017), Mot. Dismiss Ex. 12, ECF No. 24-13); *see* Fed. R. Evid. 201(b)(2); *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (taking judicial notice of facts contained on state and federal government websites). This Court therefore agrees with the only other federal court to address this issue that there is no precedent for the type of use of § 12601 proposed by the Government. *See United States v. California,* No. 26-cv-01697, 2026 WL 2004372, at *4 (C.D. Cal. July 9, 2026) (noting that there is no "historical precedent for utilizing Section 12601 to argue that law enforcement officers engaged in a pattern or practice of unlawful conduct by enforcing a state firearms law").

The Government argues that the fact that § 12601 has never been used in the manner proposed here does not mean that that it may not do so. However, as discussed below, the Government's authority to bring a civil enforcement action to protect federal rights, which has been the subject of disputes over whether Congress explicitly authorized such an action by statute, is an issue implicating the separation of powers. *See infra* part I.F; *City of Philadelphia*, 644 F.2d at 203. In relation to issues of separation of powers, the Supreme Court has noted that the fact that one branch has never sought to exercise an authority in a certain way provides evidence that such an authority does not exist. *See, e.g., Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 142 S. Ct. 661, 666 (2022) (stating that the "lack of historical precedent" for the adoption of a vaccine mandate pursuant to the Occupational Safety and Health Act of 1970 was a "telling indication" that such a broad public health regulation "extends beyond the agency's legitimate reach" (citation omitted)); *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 640–41 (2026) (plurality opinion) (stating that the "lack of historical precedent" for the Executive Branch's use

of a particular statute to impose tariffs was a "telling indication" that the exercise of authority "extend[ed] beyond the [Executive's] legitimate reach" (quoting *Nat'l Fed'n of Indep. Bus.*, 142 S. Ct. at 666)). Thus, although not dispositive, the fact that neither the Government nor the Court has identified any example of § 12601 properly used in the manner proposed by the Government to advance a challenge to the constitutionality of a law prohibiting conduct by private individuals based only on the potential for law enforcement officers to enforce that law, provides further support for the Court's conclusion that § 12601 does not authorize such an action.

**F. Separation of Powers and Federalism**

Finally, the Court declines to adopt the Government's interpretation of § 12601 because it would effect a breathtakingly broad expansion of federal power in advancing civil enforcement actions by the federal government against state and local governments. Under the Government's view of § 12601, the federal government may file suit against a state or local law enforcement agency any time it believes that a state or local government has enacted a law that could violate an individual's constitutional rights, so long as there is some potential for that agency to be called upon to enforce the law. For instance, under the Government's reading, if a state or local government enacted a law placing restrictions on the location and manner of protest activities by citizens, the federal government could bring a § 12601 action to challenge that law as violative of the First Amendment right to freedom of speech. It could do so, for example, in the event that the federal government deemed the law to be unduly restrictive of the right to protest in support of transgender rights, or in the event that the federal government deemed the law to be unduly restrictive of the right to protest outside an abortion clinic. The federal government could also invoke § 12601 to bring a civil enforcement action to challenge a state or local law that either requires or prohibits certain religious displays in public areas as violative of the First Amendment's

religion clauses, where law enforcement could be called upon to ensure compliance, whether in a case in which the law required the display, such as that of the Ten Commandments or symbols related to religious holidays, or in a case in which the law barred such a display.

An interpretation of § 12601 as providing such expansive authority is inconsistent with the generally accepted principles that necessitated its enactment in the first place. In *City of Philadelphia*, to which § 12601 was a legislative response, the court held that the federal government lacked the authority to bring a civil enforcement action to enjoin a pattern or practice of police misconduct that allegedly violated the constitutional rights of individuals because Congress had not provided specific statutory authority to do so. *See City of Philadelphia*, 644 F.2d at 190, 201. As noted in that case, this general principle that explicit statutory authority is required for a federal civil enforcement action to uphold constitutional rights had been adopted by multiple other circuits. *See id.* at 201; *United States v. Solomon*, 563 F.2d 1121, 1123, 1128–29 (4th Cir. 1977) (holding that DOJ could not bring a civil enforcement action against state officials for alleged violations of the constitutional rights of involuntarily confined individuals with intellectual disabilities because there was no statutory authority to do so); *United States v. Mattson*, 600 F.2d 1295, 1297 (9th Cir. 1979) (same); *see also Elrod*, 627 F.2d at 819 (noting that the district court dismissed a civil enforcement action brought without explicit statutory authorization but finding that a newly enacted statute provided such statutory authorization).

As *City of Philadelphia* recognized, overly broad authority to bring federal civil enforcement actions in the absence of explicit statutory authority "does violence to the delicate balance of power among the legislative, executive, and judicial branches of government" and "strikes at the heart of fundamental comity between federal and state governments." *City of Philadelphia*, 644 F.2d at 203. *Cf. Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("Just as the

separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government. . . reduce[s] the risk of tyranny and abuse from either front"). Notably, in *Solomon*, the United States Court of Appeals for the Fourth Circuit applied similar reasoning by noting that a federal civil enforcement action to enforce constitutional rights implicates "an area where considerations of federalism and comity are also present," and that in light of congressional concerns about "federal-state relations in the area of civil rights," "we are reluctant to sustain nonstatutory executive acts in all but the clearest case." *Id.* at 1129.

Where Congress enacted § 12601 against this backdrop, it stands to reason that if it had intended to authorize such a broad-ranging array of challenges to state and local laws through § 12601, it would have done so through more explicit language authorizing civil actions against a state or local government to enjoin particular statutes or policies that violate the Second Amendment, or other specific constitutional rights, rather than, as argued by the Government, through the oblique means of permitting civil actions against a "pattern or practice of conduct by law enforcement officers," counting on some law enforcement agency to take action to enforce the law, and then allowing the federal government to file suit against the law enforcement agency. As the Supreme Court has stated in relation to a different federal statute, "[i]t would be peculiar to conclude that in closing the . . . gap" in the law, "Congress actually hid away . . . a catchall provision that reaches far beyond the . . . scenarios that prompted the legislation in the first place." *Fischer v. United States*, 144 S. Ct. 2176, 2186 (2024); *see also Sackett v. Env't Prot. Agency*, 143 S. Ct. 1322, 1340 (2023) (stating that "it would be odd indeed if Congress had tucked an important expansion" to the reach of a statute "into convoluted language" in part because "Congress does not 'hide elephants in mouseholes' by 'alter[ing] the fundamental details of a regulatory scheme

in vague terms or ancillary provisions'") (quoting *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001)).

Thus, in light of the broad recognition at the time of the statute's enactment that under our system of government, the federal government should not have unfettered authority to intrude on the actions of state and local governments, and Congress, not the Executive Branch, must decide on when such intrusions are warranted by the need to protect individual rights, § 12601 cannot properly be construed in a manner that provides the sweeping authority contemplated by the Government and instead should be limited to that authority that is explicitly provided for in the statute.

For all of these reasons, the Court finds that the Complaint fails to allege a "pattern or practice of conduct by law enforcement officers" that deprived persons of constitutional rights within the meaning of 34 U.S.C. § 12601, as necessary for a civil enforcement action under that provision to proceed. The Motion to Dismiss will therefore be granted. The Court thus need not address Defendants' other arguments relating to dismissal.

**II. The Government's Motion for a Preliminary Injunction**

In its Motion, the Government seeks a preliminary injunction to bar enforcement of Bill 23-26E during the pendency of this case. To obtain a preliminary injunction, a party must establish that: (1) there is a likelihood of success on the merits; (2) there is a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the moving party's favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of the four factors must be satisfied for the moving party to obtain a preliminary injunction. *See Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013).

Where the Court has found, based on its interpretation of 34 U.S.C. § 12601, that the Complaint is subject to dismissal because the Government has failed to allege a "pattern or practice of conduct by law enforcement officers" that deprives individuals of constitutional rights within the meaning of that statutory provision, the same analysis necessarily demonstrates that the Government has failed to establish a likelihood of success on the merits. *See supra* part I; *California,* 2026 WL 2004372, at *4 (denying a Motion for a Temporary Restraining Order in a case in which the Government similarly filed a civil enforcement action under § 12601 to assert a Second Amendment challenge to a state firearms law in part because "the use of Section 12601 to facially challenge a state criminal law is, at the very least, a novel approach that deviates from the way the statute has historically been enforced"). Where the Government has not satisfied one of the requirements for a preliminary injunction, and where the Motion to Dismiss will be granted, the Motion for a Preliminary Injunction will necessarily be denied. The Court therefore need not and will not address the remaining *Winter* factors or the arguments relating to the constitutionality of Bill 23-26E.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 24, will be GRANTED, and the Government's Motion for a Preliminary Injunction, ECF No. 3, will be DENIED. A separate Order shall be issued.

Date: November 9, 2026

THEODORE D. CHUANG
United States District Judge